# ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5313

In the United States Court of Appeals
for the District of Columbia Circuit

**LAS AMERICAS IMMIGRANT
ADVOCACY CENTER** et al.,

*Plaintiffs–Appellees,*

v.

**UNITED STATES DEPARTMENT
OF HOMELAND SECURITY** et al.,

*Defendants–Appellants.*

On Appeal from a Judgment
of the United States District Court
for the District of Columbia

## PUBLIC APPENDIX—SEALED MATERIAL
## IN SEPARATE SUPPLEMENT

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Ernesto H. Molina**
Deputy Director
Office of Immigration Litigation

**Christopher Ian Pryby**
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 598-5526
christopher.i.pryby@usdoj.gov

*Counsel for Defendants–Appellants*

# Table of Contents

District Court's Docket.................................................................. JA1

Complaint (ECF 1) ................................................................... JA15

First Amended Complaint (ECF 14)............................................ JA23

Hidalgo Declaration (ECF 23-1)................................................ JA42

Babaie Declaration (ECF 23-2) ................................................. JA58

Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Their Motion for Summary Judgment (ECF 48) ................................................................ JA76

Excerpts of Joint Appendix (ECF 53) ......................................... JA80

Second Amended Complaint (ECF 56) ....................................... JA329

Supplemental Babaie Declaration (ECF 59-1) .............................. JA374

Supplemental Hidalgo Declaration (ECF 59-2)............................. JA393

Excerpts of Supplemental Joint Appendix (ECF 69)...................... JA409

Order (Civil Rule 58 Judgment) (ECF 91).................................. JA695

Memorandum Opinion (ECF 92)............................................... JA697

Plaintiffs' Motion to Alter or Amend the Judgment (ECF 93)........ JA750

Order Denying Plaintiffs' Motion to Alter or Amend the Judgment (ECF 98)............................................................................... JA754

Defendants' Notice of Appeal (ECF 102) .................................... JA755

## U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:24−cv−01702−RC

LAS AMERICAS IMMIGRANT ADVOCACY CENTER et al
v. U.S. DEPARTMENT OF HOMELAND SECURITY et al
Assigned to: Judge Rudolph Contreras
Case in other court:  USCA, 25−05313
Cause: 05:0706 Judicial Review of Agency Actions

Date Filed: 06/12/2024
Date Terminated: 07/28/2025
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

| Date Filed | # | Docket Text |
|---|---|---|
| 06/12/2024 | 1 | COMPLAINT against EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK GARLAND, UR JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT ( Filing fee $ 405 receipt number ADCDC−10959367) filed by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Summons, # 12 Summons, # 13 Summons, # 14 Summons, # 15 Summons, # 16 Summons)(Harrison, Lindsay) (Entered: 06/12/2024) |
| 06/12/2024 | 2 | NOTICE of Appearance by Arthur B. Spitzer on behalf of All Plaintiffs (Spitzer, Arthur) (Entered: 06/12/2024) |
| 06/13/2024 | | Case Assigned to Judge Rudolph Contreras. (zcb) (Entered: 06/13/2024) |
| 06/13/2024 | 3 | SUMMONS (12) Issued Electronically as to EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK GARLAND, UR JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zcb) (Entered: 06/13/2024) |
| 06/14/2024 | 4 | NOTICE of Appearance− Pro Bono by Mary Georgevich on behalf of LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (Georgevich, Mary) (Entered: 06/14/2024) |
| 06/18/2024 | 5 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Melissa M. Root, Filing fee $ 100, receipt number ADCDC−10970486. Fee Status: Fee Paid. by LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Attachments: # 1 Declaration of Melissa M. Root, # 2 Certificate of Good Standing – Illinois, # 3 Certificate of Good Standing – Indiana, # 4 Proposed Order)(Harrison, Lindsay) (Entered: 06/18/2024) |
| 06/20/2024 | | MINUTE ORDER granting 5 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Melissa M. Root is admitted to represent Plaintiffs Las Americas Immigrant Advocacy Center and the Refugee and Immigrant Center for Education and Legal Services, *pro hac vice* in this case. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 6/20/2024. (lcrc1) (Entered: 06/20/2024) |
| 06/21/2024 | 6 | NOTICE of Appearance by Matthew E. Price on behalf of LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (Price, Matthew) (Entered: 06/21/2024) |

## JA1

| | | |
|---|---|---|
| 06/21/2024 | 7 | NOTICE of Appearance by Melissa M. Root on behalf of LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (Root, Melissa) (Entered: 06/21/2024) |
| 06/24/2024 | 8 | NOTICE of Appearance by Keren Hart Zwick on behalf of All Plaintiffs (Zwick, Keren) (Entered: 06/24/2024) |
| 06/28/2024 | 9 | NOTICE of Appearance by Christina Greer on behalf of All Defendants (Greer, Christina) (Entered: 06/28/2024) |
| 06/28/2024 | 10 | STIPULATION *AND PROPOSED ORDER REGARDING CASE SCHEDULING* by EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Greer, Christina) (Entered: 06/28/2024) |
| 07/01/2024 | | MINUTE ORDER: Upon consideration of 10 the Parties' Stipulation Regarding Case Scheduling, it is hereby ORDERED that the following schedule shall govern further proceedings: Plaintiffs' amended complaint shall be filed on or before July 12, 2024; Defendants shall produce the Administrative Record on or before July 12, 2024; if any objections to the Administrative Record exist and remain unresolved, the parties shall file a joint status report on or before July 19, 2024; Plaintiffs' motion for summary judgment shall be filed on or before July 26, 2024; Defendants' cross−motion for summary judgment and opposition shall be filed on or before August 16, 2024; Plaintiffs' opposition shall be filed on or before August 26, 2024; and Defendants' reply shall be filed on or before September 10, 2024. It is FURTHER ORDERED that any amicus briefs in support of Plaintiffs shall be filed on or before July 28, 2024; and any amicus briefs in support of Defendants shall be filed on or before August 18, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 7/1/2024. (lcrc1) (Entered: 07/01/2024) |
| 07/01/2024 | 11 | NOTICE of Appearance by Erez Reuveni on behalf of All Defendants (Reuveni, Erez) (Main Document 11 replaced on 7/2/2024) (znmw). (Entered: 07/01/2024) |
| 07/02/2024 | 12 | NOTICE of Appearance by Brian Christopher Ward on behalf of All Defendants (Ward, Brian) (Entered: 07/02/2024) |
| 07/03/2024 | 13 | NOTICE of Appearance by Lee Gelernt on behalf of All Plaintiffs (Gelernt, Lee) (Entered: 07/03/2024) |
| 07/12/2024 | 14 | AMENDED COMPLAINT against EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, MARY CHENG filed by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, LAS AMERICAS IMMIGRANT ADVOCACY CENTER, D.C., J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G..(Price, Matthew) (Entered: 07/12/2024) |
| 07/12/2024 | 15 | SEALED MOTION to Proceed Under Pseudonym filed by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R. (Attachments: # 1 Declaration of D.G., # 2 Declaration of E.R., # 3 Declaration of P.S., # 4 Declaration of D.C., # 5 Declaration of A.E., # 6 Declaration of E.D., # 7 Declaration of T.R., # 8 Declaration of S.G., # 9 Declaration of J.C., # 10 Declaration of J.R., # 11 Proposed Order)(Price, Matthew) (Entered: 07/12/2024) |
| 07/16/2024 | 16 | NOTICE of Appearance by Melissa E. Crow on behalf of All Plaintiffs (Crow, Melissa) (Main Document 16 replaced on 7/17/2024) (znmw). (Entered: 07/16/2024) |
| 07/17/2024 | 17 | NOTICE of Appearance− Pro Bono by Morgan Russell on behalf of All Plaintiffs (Russell, Morgan) (Entered: 07/17/2024) |

**JA2**

| 07/18/2024 | 18 | NOTICE of Appearance– Pro Bono by Richard P. Caldarone on behalf of All Plaintiffs (Caldarone, Richard) (Entered: 07/18/2024) |
|---|---|---|
| 07/19/2024 | 19 | MOTION to Intervene *as Defendant* by STATE OF TEXAS. (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Text of Proposed Order)(Hunker, Kathleen) (Entered: 07/19/2024) |
| 07/24/2024 | 20 | NOTICE of Appearance by Amy Mason Saharia on behalf of The Office of the United Nations High Commissioner for Refugees (Saharia, Amy) (Main Document 20 replaced on 7/25/2024) (znmw). (Entered: 07/24/2024) |
| 07/24/2024 | 21 | NOTICE of Appearance– Pro Bono by Edith Sangueza on behalf of All Plaintiffs (Sangueza, Edith) (Entered: 07/24/2024) |
| 07/26/2024 | 22 | STIPULATION */ Amended Scheduling Stipulation and Proposed Order* by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Harrison, Lindsay) (Entered: 07/26/2024) |
| 07/26/2024 | | MINUTE ORDER: Upon consideration of 22 the Parties' Amended Scheduling Stipulation, it is hereby ORDERED that the following schedule shall govern further proceedings: Plaintiffs' motion for summary judgment shall be filed on or before July 26, 2024; Defendants' cross–motion for summary judgment and opposition shall be filed on or before August 16, 2024; Plaintiffs' opposition shall be filed on or before August 26, 2024; and Defendants' reply shall be filed on or before September 10, 2024. It is FURTHER ORDERED that any amicus briefs in support of Plaintiffs shall be filed on or before July 29, 2024; and any amicus briefs in support of Defendants shall be filed on or before August 19, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 7/26/2024. (lcrc1) (Entered: 07/26/2024) |
| 07/26/2024 | 23 | MOTION for Summary Judgment *and Memorandum of Law in Support* by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Attachments: # 1 Declaration of Javier Hidalgo, The Refugee and Immigrant Center for Education and Legal Services (RAICES), # 2 Declaration of Jennifer Babaie Las Americas Immigrant Advocacy Center, # 3 Text of Proposed Order)(Harrison, Lindsay) (Entered: 07/26/2024) |
| 07/29/2024 | 24 | ENTERED IN ERROR.....Unopposed MOTION for Leave to File *A BRIEF AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS MOTION FOR SUMMARY JUDGMENT* by The Office of the United Nations High Commissioner for Refugees. (Saharia, Amy) Modified on 7/30/2024; refiled as docket entry 25 (znmw). (Entered: 07/29/2024) |
| 07/29/2024 | 25 | Unopposed MOTION for Leave to File *A BRIEF AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS MOTION FOR SUMMARY JUDGMENT* by The Office of the United Nations High Commissioner for Refugees. (Attachments: # 1 Exhibit Amicus Brief)(Saharia, Amy) (Entered: 07/29/2024) |
| 07/29/2024 | 26 | Unopposed MOTION for Leave to File *a Brief as Amicus Curiae in Support of Plaintiffs* by PUBLIC COUNSEL. (Attachments: # 1 Exhibit A – Amicus Brief)(Jacobs, Michael) (Entered: 07/29/2024) |
| 07/29/2024 | 27 | Unopposed MOTION for Leave to File *AMICUS BRIEF IN SUPPORT OF PLAINTIFFS* by HUMAN RIGHTS FIRST, HOPE BORDER INITIATIVE, IMMIGRANT DEFENDERS LAW CENTER, KINO BORDER INITIATIVE, REFUGEES INTERNATIONAL. (Attachments: # 1 Exhibit BRIEF AMICUS CURIAE)(Ragland, Thomas) Modified filers on 7/30/2024 (znmw). (Entered: 07/29/2024) |
| 07/29/2024 | 28 | MOTION for Leave to File *Brief of Amicus Curiae National Citizenship and Immigration Services Council 119 in Support of Plaintiffs Motion For Summary Judgment* by The National Citizenship and Immigration Services Council 119. (Attachments: # 1 Brief of Amicus Curiae National Citizenship and Immigration Services Council 119 In Support Of Plaintiffs Motion For Summary Judgment, # 2 Text of Proposed Order)(Hartnett, Kathleen) (Entered: 07/29/2024) |

| 07/29/2024 | 79 | AMICUS BRIEF by NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119. (mg) (Entered: 02/06/2025) |
|---|---|---|
| 07/30/2024 | 29 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Ashley A. Harris, Filing fee $ 100, receipt number BDCDC–11059713. Fee Status: Fee Paid. by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Attachments: # 1 Declaration of Ashley A. Harris, # 2 Certificate of Good Standing – Texas, # 3 Order)(Harrison, Lindsay) (Entered: 07/30/2024) |
| 07/30/2024 | 30 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– David A. Donatti, Filing fee $ 100, receipt number ADCDC–11059806. Fee Status: Fee Paid. by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Attachments: # 1 Declaration of David A. Donatti, # 2 Certificate of Good Standing – Texas, # 3 Order)(Harrison, Lindsay) (Entered: 07/30/2024) |
| 07/31/2024 | 31 | NOTICE of Appearance by Erin Ryan on behalf of All Defendants (Ryan, Erin) (Entered: 07/31/2024) |
| 08/01/2024 | 32 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Andrew L. Osborne, Filing fee $ 100, receipt number ADCDC–11063351. Fee Status: Fee Paid. by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Attachments: # 1 Declaration of Andrew L. Osborne, # 2 Certificate of Good Standing – Illinois, # 3 Proposed Order)(Harrison, Lindsay) (Entered: 08/01/2024) |
| 08/01/2024 | | MINUTE ORDER granting 29 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Ashley A. Harris is admitted to represent Plaintiffs Las Americas Advocacy Center, et al., *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 8/1/2024. (lcrc1) (Entered: 08/01/2024) |
| 08/01/2024 | | MINUTE ORDER granting 30 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that David A. Donatti is admitted to represent Plaintiffs Las Americas Advocacy Center, et al., *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 8/1/2024. (lcrc1) (Entered: 08/01/2024) |
| 08/01/2024 | | MINUTE ORDER granting 32 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Andrew L. Osborne is admitted to represent Plaintiffs Las Americas Immigrant Advocacy Center, et al., *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 8/1/2024. (lcrc1) (Entered: 08/01/2024) |
| 08/01/2024 | 33 | NOTICE of Appearance by Andrew L. Osborne on behalf of LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (Osborne, Andrew) (Entered: 08/01/2024) |
| 08/02/2024 | 34 | Memorandum in opposition to re 19 Motion to Intervene filed by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Ryan, Erin) (Entered: 08/02/2024) |
| 08/02/2024 | 35 | Memorandum in opposition to re 19 Motion to Intervene filed by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL |

| | | |
|---|---|---|
| | | SERVICES, S.G., T.R.. (Harrison, Lindsay) (Entered: 08/02/2024) |
| 08/02/2024 | 36 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Elizabeth M. Wright, Filing fee $ 100, receipt number ADCDC–11068346. Fee Status: Fee Paid. by NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119. (Attachments: # 1 Declaration of Elizabeth M. Wright in Support of Motion for Admission of Attorney Pro Hac Vice, # 2 Certificate of Good Standing)(Hartnett, Kathleen) (Entered: 08/02/2024) |
| 08/02/2024 | 37 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Celene Chen, Filing fee $ 100, receipt number ADCDC–11068383. Fee Status: Fee Paid. by NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119. (Attachments: # 1 Declaration of Celene Chen in Support of Motion for Admission of Attorney Pro Hac Vice, # 2 Certificate of Good Standing)(Hartnett, Kathleen) (Entered: 08/02/2024) |
| 08/02/2024 | 38 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Allison W. O'Neill, Filing fee $ 100, receipt number ADCDC–11068393. Fee Status: Fee Paid. by NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119. (Attachments: # 1 Declaration of Allison W. O'Neill in Support of Motion for Admission of Attorney Pro Hac Vice, # 2 Certificate of Good Standing)(Hartnett, Kathleen) (Entered: 08/02/2024) |
| 08/05/2024 | | MINUTE ORDER granting 36 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Elizabeth M. Wright is admitted to represent National Citizenship and Immigration Services Council 119, *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 8/5/2024. (lcrc1) (Entered: 08/05/2024) |
| 08/05/2024 | | MINUTE ORDER granting 37 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Celene Chen is admitted to represent National Citizenship and Immigration Services Council 119, *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 8/5/2024. (lcrc1) (Entered: 08/05/2024) |
| 08/05/2024 | | MINUTE ORDER granting 38 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Allison W. O'Neill is admitted to represent National Citizenship and Immigration Services Council 119, *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 8/5/2024. (lcrc1) (Entered: 08/05/2024) |
| 08/06/2024 | 39 | NOTICE of Appearance by Mary E. Marshall on behalf of LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (Marshall, Mary) (Entered: 08/06/2024) |
| 08/09/2024 | 40 | REPLY to opposition to motion re 19 MOTION to Intervene *as Defendant* filed by STATE OF TEXAS. (Hunker, Kathleen) (Entered: 08/09/2024) |
| 08/13/2024 | 41 | Joint MOTION for Leave to File Excess Pages by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order)(Ward, Brian) (Entered: 08/13/2024) |
| 08/14/2024 | | MINUTE ORDER granting 41 the parties' Joint Motion to Enlarge Page Limits: It is hereby ORDERED that Defendants' cross–motion for summary judgment and opposition shall not exceed 65 pages; and that Plaintiffs' opposition and reply shall not exceed 45 pages. SO ORDERED. Signed by Judge Rudolph Contreras on 8/14/2024. (lcrc1) (Entered: 08/14/2024) |

**JA5**

| | | |
|---|---|---|
| 08/14/2024 | 42 | ENTERED IN ERROR.....MOTION for Leave to File *to Appear Pro Hac Vice* by STATE OF TEXAS. (Attachments: # 1 Declaration, # 2 Exhibit)(Pettit, Lanora) Modified on 8/14/2024 (znmw). (Entered: 08/14/2024) |
| 08/14/2024 | | NOTICE OF ERROR regarding 42 MOTION for Leave to File *to Appear Pro Hac Vice*. The following error(s) need correction: Incorrect event. Other–Pro Hac Vice motion not required for government attorneys. Please refer to the court's website for information on Government Certification: https://www.dcd.uscourts.gov/attorney–renewal (znmw) (Entered: 08/14/2024) |
| 08/15/2024 | 43 | NOTICE OF SUPPLEMENTAL AUTHORITY by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (Ryan, Erin) (Entered: 08/15/2024) |
| 08/15/2024 | 44 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Nachi Baru, Filing fee $ 100, receipt number ADCDC–11095667. Fee Status: Fee Paid. by NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119. (Attachments: # 1 Declaration of Nachi Baru in Support of Motion for Admission of Attorney Pro Hac Vice, # 2 Certificate of Standing)(Hartnett, Kathleen) (Entered: 08/15/2024) |
| 08/16/2024 | 45 | Cross MOTION for Summary Judgment by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Memorandum in Support, # 2 Murray Declaration, # 3 Certified Indices of the Administrative Records, # 4 Text of Proposed Order)(Ward, Brian) (Entered: 08/16/2024) |
| 08/16/2024 | 46 | Memorandum in opposition to re 23 Motion for Summary Judgment, filed by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Memorandum in Support, # 2 Murray Declaration, # 3 Certified Indices of the Administrative Records, # 4 Text of Proposed Order)(Ward, Brian) (Entered: 08/16/2024) |
| 08/16/2024 | 47 | MOTION for Summary Judgment *Or In the Alternative, Amicus Brief in Support of Defendants* by STATE OF TEXAS. (Attachments: # 1 Text of Proposed Order)(Greene, Garrett). Added MOTION for Leave to File Amicus Brief on 8/19/2024 (znmw). (Entered: 08/16/2024) |
| 08/20/2024 | | MINUTE ORDER granting 44 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Nachi Baru is admitted to represent National Citizenship and Immigration Services Council 119, *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 8/20/2024. (lcrc1) (Entered: 08/20/2024) |
| 08/26/2024 | 48 | Memorandum in opposition to re 45 Motion for Summary Judgment,, *PLAINTIFFS OPPOSITION TO DEFENDANTS CROSS–MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT* filed by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Price, Matthew) (Entered: 08/26/2024) |

**JA6**

| | | |
|---|---|---|
| 08/26/2024 | 49 | REPLY to opposition to motion re 23 MOTION for Summary Judgment *and Memorandum of Law in Support* filed by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (See Docket Entry 48 to view document). (znmw) (Entered: 08/27/2024) |
| 09/10/2024 | 50 | Unopposed MOTION for Extension of Time to File Response/Reply as to 45 Cross MOTION for Summary Judgment by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Attachments: # 1 Text of Proposed Order)(Ward, Brian) (Entered: 09/10/2024) |
| 09/10/2024 | | MINUTE ORDER granting 50 Defendants' Unopposed Motion for Extension of Time to File Reply to 45 Cross Motion for Summary Judgment: It is hereby ORDERED that 50 Defendants' Motion for Extension of Time to File Reply is GRANTED. It is FURTHER ORDERED that Defendants' Reply is due September 13, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 09/10/2024. (lcrc1) (Entered: 09/10/2024) |
| 09/10/2024 | 51 | REPLY to opposition to motion re 45 Cross MOTION for Summary Judgment filed by STATE OF TEXAS. (Hunker, Kathleen) (Entered: 09/10/2024) |
| 09/13/2024 | 52 | REPLY to opposition to motion re 45 Cross MOTION for Summary Judgment filed by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Ward, Brian) (Entered: 09/13/2024) |
| 09/27/2024 | 53 | JOINT APPENDIX by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Attachments: # 1 Joint Appendix Part 2, # 2 Joint Appendix Part 3, # 3 Joint Appendix Part 4)(Price, Matthew) (Entered: 09/27/2024) |
| 09/30/2024 | 54 | NOTICE by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (Attachments: # 1 Exhibit – Final Rule)(Greer, Christina) (Entered: 09/30/2024) |
| 10/16/2024 | 55 | STIPULATION re 54 Notice (Other), */Second Stipulation and [Proposed] Order Regarding Case Scheduling* by A.E., D.C., D.G., E.R., J.C., J.R., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, P.S., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., T.R.. (Harrison, Lindsay) (Entered: 10/16/2024) |
| 10/16/2024 | | MINUTE ORDER: Upon consideration of 55 the Parties' Second Stipulation Regarding Case Scheduling, it is hereby ORDERED that the following schedule shall govern further proceedings: Plaintiffs shall file a second amended complaint challenging the final rule on or before November 1, 2024; Defendants shall produce the administrative record for the final rule on or before November 1, 2024; if any objections to the administrative record exist and remain unresolved, the parties shall file a joint status report concerning how to proceed on or before November 8, 2024; Plaintiffs shall file a supplemental brief in support of their motion for summary judgment and in opposition to Defendants' cross−motion, up to 25 pages, on or before November 15, 2024; Defendants shall file a supplemental brief in support of their cross−motion for summary judgment and in opposition to Plaintiffs' motion, up to 25 |

| | | |
|---|---|---|
| | | pages, on or before December 4, 2024; Plaintiffs shall file their supplemental reply, up to 15 pages, on or before December 11, 2024; Defendants shall file their supplemental reply, up to 15 pages, on or before December 18, 2024; any amicus brief filed in support of Plaintiffs, up to 15 pages, shall be filed on or before November 19, 2024; and any amicus brief filed in support of Defendants, up to 15 pages, shall be filed on or before December 6, 2024. It is FURTHER ORDERED that the parties' supplemental briefing shall be limited to addressing the impact of the issuance of the final rule, if any, on the parties' summary judgment motions, and that the parties shall not re–brief issues unaffected by the final rule. It is FURTHER ORDERED that the Court will consider previously filed amicus briefs. SO ORDERED. Signed by Judge Rudolph Contreras on 10/16/2024. (lcrc1) (Entered: 10/16/2024) |
| 11/01/2024 | 56 | AMENDED COMPLAINT *Second Amended Complaint* against All Defendants filed by REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, D.C., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, S.G., D.G., A.E., E.R., T.R., P.S., J.C., J.R., K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E..(Price, Matthew) (Entered: 11/01/2024) |
| 11/01/2024 | 57 | SEALED MOTION to Proceed Under Pseudonym filed by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C. (Attachments: # 1 Declaration of L.B., # 2 Declaration of J.G., # 3 Declaration of E.M., # 4 Declaration of R.R., # 5 Declaration of L.Q., # 6 Declaration of S.O., # 7 Declaration of J.N., # 8 Declaration of E.C., # 9 Declaration of J.E., # 10 Declaration of R.C., # 11 Declaration of M.F., # 12 Text of Proposed Order)(Price, Matthew) (Entered: 11/01/2024) |
| 11/15/2024 | 58 | NOTICE of Appearance– Pro Bono by Maura E. Smyles on behalf of LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES (Smyles, Maura) (Entered: 11/15/2024) |
| 11/15/2024 | 59 | SUPPLEMENTAL MEMORANDUM to re 23 MOTION for Summary Judgment *and Memorandum of Law in Support* filed by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Attachments: # 1 Declaration (Supplemental) of Jennifer Babaie, # 2 Declaration (Supplemental) of Javier Hidalgo)(Price, Matthew) (Entered: 11/15/2024) |
| 11/18/2024 | 60 | MEMORANDUM AND OPINION granting 15 57 Plaintiffs Unopposed Motions to Proceed Under Pseudonyms and to File Supporting Exhibits Under Seal are GRANTED. (Signed by Judge Rudolph Contreras on 11/18/24). (tj) (Entered: 11/18/2024) |
| 11/18/2024 | 61 | ORDER GRANTING PLAINTIFFS UNOPPOSED MOTIONS FOR LEAVE TO PROCEED UNDER PSEUDONYMS AND TO FILE SUPPORTING EXHIBITS UNDER SEAL. (Signed by Judge Rudolph Contreras on 11/18/24). (tj) (Entered: 11/18/2024) |
| 11/22/2024 | | MINUTE ORDER: Plaintiffs are HEREBY ORDERED to propose redactions, if necessary, to 60 the Court's Memorandum Opinion no later than December 24, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 11/22/2024. (lcrc1) (Entered: 11/22/2024) |
| 12/04/2024 | 62 | SUPPLEMENTAL MEMORANDUM to re 45 Cross MOTION for Summary Judgment filed by UR MENDOZA JADDOU, MARY CHENG, TROY A. MILLER, PATRICK J. LECHLEITNER, MERRICK B. GARLAND, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, ALEJANDRO N. MAYORKAS. (Ward, Brian) (Entered: 12/04/2024) |

| | | |
|---|---|---|
| 12/10/2024 | 63 | NOTICE of Appearance by Keren Hart Zwick on behalf of K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E. (Zwick, Keren) (Entered: 12/10/2024) |
| 12/10/2024 | 64 | NOTICE OF WITHDRAWAL OF APPEARANCE as to LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. Attorney Matthew E. Price terminated. (Price, Matthew) (Entered: 12/10/2024) |
| 12/11/2024 | 65 | SUPPLEMENTAL MEMORANDUM to re 23 MOTION for Summary Judgment *and Memorandum of Law in Support*, 45 Cross MOTION for Summary Judgment *in Opposition to Defendants' Cross Motion for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment* filed by LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. (Harrison, Lindsay) (Entered: 12/11/2024) |
| 12/17/2024 | 66 | RESPONSE TO ORDER OF THE COURT re Order *dated November 22, 2024* filed by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Harrison, Lindsay) (Entered: 12/17/2024) |
| 12/18/2024 | 67 | SUPPLEMENTAL MEMORANDUM to re 45 Cross MOTION for Summary Judgment filed by UR MENDOZA JADDOU, MARY CHENG, TROY A. MILLER, PATRICK J. LECHLEITNER, MERRICK B. GARLAND, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, ALEJANDRO N. MAYORKAS. (Ward, Brian) (Entered: 12/18/2024) |
| 01/02/2025 | 68 | Consent MOTION for Extension of Time to File *Supplemental Joint Appendix* by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Attachments: # 1 Text of Proposed Order)(Harrison, Lindsay) (Entered: 01/02/2025) |
| 01/02/2025 | | MINUTE ORDER granting 68 Consent Motion for Extension of Time: It is HEREBY ORDERED that Plaintiffs shall file the joint supplemental appendix containing the portions of the administrative record relied upon in the supplemental summary judgment briefing on or before January 10, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 1/2/2025. (lcrc1) (Entered: 01/02/2025) |
| 01/10/2025 | 69 | JOINT APPENDIX *(Supplemental)* by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Harrison, Lindsay) (Entered: 01/10/2025) |
| 01/20/2025 | 70 | MOTION FOR EMERGENCY STATUS CONFERENCE AND FOR LEAVE TO FILE SUPPLEMENTAL BRIEFING by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Attachments: # 1 Text of Proposed Order)(Harrison, Lindsay) Modified event on 1/21/2025 (znmw). Added MOTION for Leave to File on 1/21/2025 (znmw). (Entered: 01/20/2025) |
| 01/21/2025 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 70 MOTION FOR EMERGENCY STATUS CONFERENCE AND FOR LEAVE TO FILE SUPPLEMENTAL BRIEFING by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Attachments: # 1 Text of Proposed Order)(Harrison, Lindsay). |

**JA9**

| | | |
|---|---|---|
| | | Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney–renewal.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 1/28/2025. (zapb) Modified on 1/21/2025 (zapb). (Entered: 01/21/2025) |
| 01/21/2025 | | MINUTE ORDER: The parties are directed to appear for a telephonic Status Conference re Plaintiffs' Motion 70 for Emergency Status Conference and Leave to File Supplement Briefing. Status Conference set for 1/21/2025 at 3:00 PM before Judge Rudolph Contreras. Telephonic connection information will be emailed to the parties separately. Signed by Judge Rudolph Contreras on 1/21/2025. (lsj) (Entered: 01/21/2025) |
| 01/21/2025 | | NOTICE: The Court will provide access for the public to participate in the telephonic Status Conference set for 1/21/2025 at 3:00 PM before Judge Rudolph Contreras. Participants using the public access telephone line shall adhere to the rules set forth on the Court's website. Toll Free Number: 833–990–9400; Meeting ID: 698780857. (lsj) (Entered: 01/21/2025) |
| 01/21/2025 | | Minute Entry for proceedings held before Judge Rudolph Contreras: Status Conference held on 1/21/2025. Court granted the Plaintiff's 70 Motion for Emergency Status Conference and for Leave to File Supplemental Briefing. Briefing schedule set as follows: Plaintiffs' supplemental brief due by 1/24/2024; Defendants' response due by 1/30/2025; and Plaintiff's reply due by 2/3/2025. Briefing schedule as to Plaintiffs' Motion for Temporary Restraining Order set as follows: Plaintiffs Motion due by noon on 1/23/2025; Defendants' response to motion due by close of business on 1/27/2025; and Plaintiff's reply due by 1/29/2025. (Court Reporter Timothy Miller.) (zakb) Modified on 1/21/2025 to include additional deadlines (zakb). (Entered: 01/21/2025) |
| 01/23/2025 | 71 | MOTION for Temporary Restraining Order by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Attachments: # 1 Certificate of Counsel Pursuant to Local Rule 65.1(a), # 2 Proposed Order)(Harrison, Lindsay) (Entered: 01/23/2025) |
| 01/23/2025 | 72 | NOTICE of Appearance by Garrett Mitchell Greene on behalf of STATE OF TEXAS (Greene, Garrett) (Entered: 01/23/2025) |
| 01/23/2025 | 73 | NOTICE of Appearance by Kathleen T. Hunker on behalf of STATE OF TEXAS (Hunker, Kathleen) (Entered: 01/23/2025) |
| 01/24/2025 | 74 | SUPPLEMENTAL MEMORANDUM to */ on the Impact of the Termination of the CBP One Appointment System* filed by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Harrison, Lindsay) (Entered: 01/24/2025) |
| 01/27/2025 | 75 | RESPONSE re 71 MOTION for Temporary Restraining Order filed by UR MENDOZA JADDOU, MARY CHENG, TROY A. MILLER, PATRICK J. LECHLEITNER, MERRICK B. GARLAND, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, ALEJANDRO N. MAYORKAS. (Greer, Christina) (Entered: 01/27/2025) |
| 01/29/2025 | 76 | REPLY to opposition to motion re 71 Motion for TRO, filed by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., |

**JA10**

| | | |
|---|---|---|
| | | J.G., J.L., G.F., R.R., J.E., D.C.. (Harrison, Lindsay) (Entered: 01/29/2025) |
| 01/30/2025 | 77 | SUPPLEMENTAL MEMORANDUM to re 45 Cross MOTION for Summary Judgment filed by UR MENDOZA JADDOU, MARY CHENG, TROY A. MILLER, PATRICK J. LECHLEITNER, MERRICK B. GARLAND, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, ALEJANDRO N. MAYORKAS. (Greer, Christina) (Entered: 01/30/2025) |
| 02/03/2025 | 78 | REPLY re 74 Supplemental Memorandum, */Plaintiffs' Reply Brief on the Impact of the Termination of the CBP One Appointment System* filed by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Harrison, Lindsay) (Entered: 02/03/2025) |
| 02/04/2025 | | MINUTE ORDER granting 25 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that The Office of the United Nations High Commissioner for Refugee's (OUNHCR) motion for leave to file a brief as *amicus curiae* in support of Plaintiffs' Motion for Summary Judgment is GRANTED because the OUNHCR has unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of July 29, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 2/4/2025. (lcrc1) (Entered: 02/04/2025) |
| 02/04/2025 | | MINUTE ORDER granting 26 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that Public Counsel's motion for leave to file a brief as *amicus curiae* in support of Plaintiffs is GRANTED because Public Counsel has unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of July 29, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 2/4/2025. (lcrc1) (Entered: 02/04/2025) |
| 02/04/2025 | | MINUTE ORDER granting 27 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that Human Rights First, Hope Border Initiative, Immigrant Defenders Law Center, Kino Border Initiative, and Refugees International's motion for leave to file a brief as *amicus curiae* in support of Plaintiffs is GRANTED because these organizations have unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of July 29, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 2/4/2025. (lcrc1) (Entered: 02/04/2025) |
| 02/04/2025 | | MINUTE ORDER granting 28 Unopposed Motion for Leave to File Amicus Brief: It is HEREBY ORDERED that The National Citizenship and Immigration Services Council 119's (Council 119) motion for leave to file a brief as *amicus curiae* in support of Plaintiffs is GRANTED because Council 119 has unique information or perspective that can help the Court beyond the help that the lawyers for the parties are able to provide. It is FURTHER ORDERED that the amicus brief be docketed as filed as of July 29, 2024. SO ORDERED. Signed by Judge Rudolph Contreras on 2/4/2025. (lcrc1) (Entered: 02/04/2025) |
| 02/06/2025 | 80 | ORDER denying 71 Motion for TRO. See document for details. Signed by Judge Rudolph Contreras on 2/6/2025. (lcrc1) (Entered: 02/06/2025) |
| 02/06/2025 | 81 | MEMORANDUM OPINION denying 71 Motion for TRO. See document for details. Signed by Judge Rudolph Contreras on 2/6/2025. (lcrc1) (Entered: 02/06/2025) |
| 02/12/2025 | 82 | NOTICE OF WITHDRAWAL OF APPEARANCE as to STATE OF TEXAS. Attorney Lanora C. Pettit terminated. (Hunker, Kathleen) (Entered: 02/12/2025) |
| 02/18/2025 | | MINUTE ORDER: Pursuant to Federal Rule of Civil Procedure 25(d), the parties are hereby ORDERED to meet, confer, and substitute the appropriate successors for any Defendants, sued in their official capacities, who no longer hold office. It is FURTHER ORDERED that the parties shall effect such substitution on or before |

**JA11**

| | | |
|---|---|---|
| | | February 25, 2025. SO ORDERED. Signed by Judge Rudolph Contreras on 2/18/2025. (lcrc1) (Entered: 02/18/2025) |
| 02/19/2025 | | Set/Reset Deadlines: substitution of parties by 2/25/2025. (tj) (Entered: 02/19/2025) |
| 02/25/2025 | 83 | NOTICE *of Substitution of Parties* by UR MENDOZA JADDOU, MARY CHENG, TROY A. MILLER, PATRICK J. LECHLEITNER, MERRICK B. GARLAND, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF JUSTICE, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, ALEJANDRO N. MAYORKAS re Order, (Ward, Brian) (Entered: 02/25/2025) |
| 02/26/2025 | 84 | ORDER denying 19 Motion to Intervene; denying 47 Motion for Summary Judgment; granting 47 Motion for Leave to File. See document for details. Signed by Judge Rudolph Contreras on 2/26/2025. (lcrc1) (Entered: 02/26/2025) |
| 02/26/2025 | 85 | MEMORANDUM OPINION. Signed by Judge Rudolph Contreras on 2/26/2025. (lcrc1) (Entered: 02/26/2025) |
| 02/26/2025 | 86 | AMICUS BRIEF by STATE OF TEXAS. (mg) (Entered: 03/03/2025) |
| 03/10/2025 | 87 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Daniel Hatoum, Filing fee $ 100, receipt number ADCDC–11530341. Fee Status: Fee Paid. by J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Attachments: # 1 Declaration, # 2 Exhibit A – Certificate of Good Standing, # 3 Text of Proposed Order)(Harrison, Lindsay) (Entered: 03/10/2025) |
| 03/10/2025 | | MINUTE ORDER granting 87 Motion for Leave to Appear *Pro Hac Vice*: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Daniel A. Hatoum is admitted to represent Plaintiffs *pro hac vice* in this case. **Counsel should register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 3/10/2025. (lcrc1) (Entered: 03/10/2025) |
| 03/12/2025 | 88 | NOTICE of Appearance by Daniel Hatoum on behalf of All Plaintiffs (Hatoum, Daniel) (Main Document 88 replaced on 3/13/2025) (znmw). (Entered: 03/12/2025) |
| 03/13/2025 | 89 | ENTERED IN ERROR.....NOTICE OF WITHDRAWAL OF APPEARANCE as to J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Hatoum, Daniel) Modified on 3/14/2025 (znmw). (Entered: 03/13/2025) |
| 03/14/2025 | | NOTICE OF ERROR regarding 89 Notice of Withdrawal of Appearance,. The following error(s) need correction: Invalid attorney signature– signature on document must match PACER login; or filing attorney must also sign the document. Please refile. (znmw) (Entered: 03/14/2025) |
| 03/14/2025 | 90 | NOTICE OF WITHDRAWAL OF APPEARANCE as to J.R., A.E., P.S., T.R., D.G., J.C., E.R., S.G., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, K.C., J.N., J.S., L.B., R.C., M.F., W.O., E.M., E.C., A.L., S.O., L.Q., J.G., J.L., G.F., R.R., J.E., D.C.. (Hatoum, Daniel) (Entered: 03/14/2025) |
| 05/09/2025 | 91 | ORDER granting in part and denying in part 23 Plaintiffs' Motion for Summary Judgment; granting in part and denying in part 45 Defendants' Cross–Motion for Summary Judgment. See document for details. Signed by Judge Rudolph Contreras on 5/9/2025. (lcrc1) (Entered: 05/09/2025) |
| 05/09/2025 | 92 | MEMORANDUM OPINION granting in part and denying in part 23 Plaintiffs' Motion for Summary Judgment; granting in part and denying in part 45 Defendants' Cross–Motion for Summary Judgment. See document for details. Signed by Judge Rudolph Contreras on 5/9/2025. (lcrc1) (Entered: 05/09/2025) |

# JA12

| | | |
|---|---|---|
| 06/03/2025 | 93 | MOTION to Alter Judgment by A.E., A.L., D.C., D.G., E.C., E.M., E.R., G.F., J.C., J.E., J.G., J.L., J.N., J.R., J.S., K.C., L.B., L.Q., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.F., P.S., R.C., R.R., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., S.O., T.R., W.O.. (Gelernt, Lee) (Entered: 06/03/2025) |
| 06/04/2025 | 94 | NOTICE OF WITHDRAWAL OF APPEARANCE as to MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. Attorney Christina Greer terminated. (Greer, Christina) (Entered: 06/04/2025) |
| 06/13/2025 | 95 | RESPONSE re 93 MOTION to Alter Judgment filed by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, DAVID NEAL, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (Ward, Brian) (Entered: 06/13/2025) |
| 06/18/2025 | 96 | REPLY to opposition to motion re 93 Motion to Alter Judgment, filed by A.E., A.L., D.C., D.G., E.C., E.M., E.R., G.F., J.C., J.E., J.G., J.L., J.N., J.R., J.S., K.C., L.B., L.Q., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.F., P.S., R.C., R.R., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, S.G., S.O., T.R., W.O.. (Gelernt, Lee) (Entered: 06/18/2025) |
| 07/10/2025 | 97 | NOTICE OF WITHDRAWAL OF APPEARANCE as to MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. Attorney Erez Reuveni and Erin Ryan terminated. (Ward, Brian) (Entered: 07/10/2025) |
| 07/28/2025 | 98 | ORDER denying 93 Motion to Alter Judgment. See document for details. Signed by Judge Rudolph Contreras on 7/28/2025. (lcrc1) (Entered: 07/28/2025) |
| 07/28/2025 | 99 | MEMORANDUM OPINION denying 93 Motion to Alter Judgment. See document for details. Signed by Judge Rudolph Contreras on 7/28/2025. (lcrc1) (Entered: 07/28/2025) |
| 08/27/2025 | 100 | NOTICE of Appearance by Christopher Ian Pryby on behalf of All Defendants (Pryby, Christopher) (Entered: 08/27/2025) |
| 08/27/2025 | 101 | NOTICE *of Automatic Substitutions of Official−Capacity Parties* by MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (Pryby, Christopher) (Entered: 08/27/2025) |
| 08/27/2025 | 102 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 91 Order on Motion for Summary Judgment,,, by U.S. DEPARTMENT OF JUSTICE, UR MENDOZA JADDOU, TROY A. MILLER, MERRICK B. GARLAND, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. DEPARTMENT OF HOMELAND SECURITY, ALEJANDRO N. MAYORKAS, PATRICK J. LECHLEITNER, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, MARY CHENG, U.S. CUSTOMS AND BORDER PROTECTION. Fee Status: No Fee Paid. Parties have been notified. (Pryby, Christopher) (Entered: 08/27/2025) |

| | | |
|---|---|---|
| 08/28/2025 | 103 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 102 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 08/28/2025) |
| 09/02/2025 | | USCA Case Number 25–5313 for 102 Notice of Appeal to DC Circuit Court,, filed by MARY CHENG, TROY A. MILLER, UR MENDOZA JADDOU, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CUSTOMS AND BORDER PROTECTION, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF HOMELAND SECURITY, MERRICK B. GARLAND, ALEJANDRO N. MAYORKAS, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, PATRICK J. LECHLEITNER. (znmw) (Entered: 09/03/2025) |
| 10/17/2025 | 104 | NOTICE OF WITHDRAWAL OF APPEARANCE as to MARY CHENG, EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, MERRICK B. GARLAND, UR MENDOZA JADDOU, PATRICK J. LECHLEITNER, ALEJANDRO N. MAYORKAS, TROY A. MILLER, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. CUSTOMS AND BORDER PROTECTION, U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. DEPARTMENT OF JUSTICE, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. Attorney Brian Christopher Ward terminated. (Ward, Brian) (Entered: 10/17/2025) |
| 12/31/2025 | 105 | NOTICE OF WITHDRAWAL OF APPEARANCE as to A.E., A.L., D.C., D.G., E.C., E.M., E.R., G.F., HOPE BORDER INITIATIVE, HUMAN RIGHTS FIRST, IMMIGRANT DEFENDERS LAW CENTER, J.C., J.E., J.G., J.L., J.N., J.R., J.S., K.C., KINO BORDER INITIATIVE, L.B., L.Q., LAS AMERICAS IMMIGRANT ADVOCACY CENTER, M.F., NATIONAL CITIZENSHIP AND IMMIGRATION SERVICES COUNCIL 119, OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES, P.S., PUBLIC COUNSEL, R.C., R.R., REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES, REFUGEES INTERNATIONAL, S.G., S.O., STATE OF TEXAS, T.R., W.O.. Attorney Andrew L. Osborne terminated. (Harrison, Lindsay) (Entered: 12/31/2025) |
| 02/10/2026 | 106 | NOTICE of Change of Address by Melissa E. Crow (Crow, Melissa) (Entered: 02/10/2026) |
| 04/14/2026 | 107 | NOTICE OF WITHDRAWAL OF APPEARANCE as to LAS AMERICAS IMMIGRANT ADVOCACY CENTER, REFUGEE AND IMMIGRANT CENTER FOR EDUCATION AND LEGAL SERVICES. Attorney Mary E. Marshall terminated. (Harrison, Lindsay) (Entered: 04/14/2026) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAS AMERICAS IMMIGRANT ADVOCACY )
CENTER )
1500 East Yandell Drive )
El Paso, TX 79902; )
 )
REFUGEE AND IMMIGRANT CENTER FOR )
EDUCATION AND LEGAL SERVICES )
5121 Crestway Drive, Suite 105 )
San Antonio, TX 78239; )
 )
  *Plaintiffs*, )
 )
  v. )
 )
U.S. DEPARTMENT OF HOMELAND )
SECURITY, )
245 Murray Lane, SW )
Washington, DC 20528; )
 )
U.S. CITIZENSHIP AND IMMIGRATION )  Case No.
SERVICES, )
5900 Capital Gateway Drive )
Camp Springs, MD 20746; )
 )
U.S. CUSTOMS AND BORDER )
PROTECTION, )
1300 Pennsylvania Ave, NW )
Washington, DC 20229; )
 )
U.S. IMMIGRATION AND CUSTOMS )
ENFORCEMENT, )
500 12th Street, SW )
Washington, DC 20536; )
 )
U.S. DEPARTMENT OF JUSTICE, )
950 Pennsylvania Avenue, NW )
Washington, DC 20530; )
 )
EXECUTIVE OFFICE FOR IMMIGRATION )
REVIEW, )
5107 Leesburg Pike )
Falls Church, VA 22041; )
 )
ALEJANDRO MAYORKAS, Secretary of the )
Department of Homeland Security, in his )
official capacity )
245 Murray Lane, SW )
Washington, DC 20528; )
 )

1

**JA15**

UR JADDOU, Director of U.S. Citizenship and
Immigration Services, in her official
capacity,5900 Capital Gateway Drive Camp
Springs, MD 20746;

TROY A. MILLER, Senior Official Performing
the Duties of Commissioner for U.S. Customs
and Border Protection, in his official capacity,
1300 Pennsylvania Ave, NW
Washington, DC 20229;

PATRICK J. LECHLEITNER, Acting Director
of Immigration and Customs Enforcement, in
his official capacity,
500 12th Street, SW
Washington, DC 20536;

MERRICK GARLAND, Attorney General of
the United States, in his official capacity,
950 Pennsylvania Avenue, NW
Washington, DC 20530;

DAVID NEAL, Director of the Executive Office
for Immigration Review, in his official capacity,
5107 Leesburg Pike
Falls Church, VA 22041;

        *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## COMPLAINT

1.      The United States has long sheltered refugees seeking a haven from persecution. The 1980 Refugee Act enshrined that national commitment in law. While Congress has placed some limitations on the right to seek asylum over the years, it has never permitted the Executive Branch to categorically ban asylum based on where a noncitizen enters the country. To the contrary, Congress has expressly provided that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival …*), irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). That plain statutory text precludes the President and the Executive Branch from

2

**JA16**

barring noncitizens from asylum based on their manner of entry into the United States.

2.    This case challenges a June 4, 2024, Interim Final Rule ("Rule")[1] (attached hereto as Exhibit A) and accompanying Implementation Guidance ("Guidance") (attached hereto as Exhibit B) that categorically exclude an entire group of asylum seekers from access to that protection because of where they entered the country, directly contrary to the statute's mandate. Under the Rule, which incorporates a June 3, 2024, Presidential Proclamation (attached hereto as Exhibit C) noncitizens arriving between ports of entry at the southern border are, with extremely limited exceptions, categorically ineligible for asylum whenever a rolling seven-day average of the number of daily "encounters" of inadmissible noncitizens exceeds a certain numerical threshold.  That threshold has been exceeded continuously since July 2020.[2]  This policy blatantly violates the plain language of Section 1158(a)(1).

3.    The Rule also imposes new, unlawful regulations governing how arriving noncitizens are screened to determine whether they are eligible for two other more limited forms of protection against removal to persecution or torture (or "*refoulement*"): (1) protection under the Convention Against Torture, and (2) withholding of removal under 8 U.S.C. § 1231(b)(3).  Prior to the Rule, an immigration officer interviewed each noncitizen encountered to ascertain whether the noncitizen had an intention to apply for asylum or a fear of persecution.  If the person was ineligible for asylum, an asylum officer then determined whether the noncitizen had a credible fear, defined as a "significant possibility," of persecution or torture.  8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. §§ 208.30 (e)(2)-(3).  That screening threshold helped to mitigate the risk that noncitizens

---

[1] The Interim Final Rule was issued on June 4, 2024, and designated for publication on June 7, 2024.  It took effect on June 5, 2024.

[2] *See* "The Futility of 'Shutting Down Asylum' by Executive Action at the U.S.-Mexico Border," WOLA (Jun. 4, 2024), https://www.wola.org/analysis/futility-of-shutting-down-asylum-by-executive-action-us-mexico-border/.

would be erroneously returned to persecution or torture in their home countries.

4.      The Rule, however, adopts a screening policy that will systematically lead to the *refoulement* of people seeking protection from persecution, torture, and death.  First, under the Rule, a noncitizen can be quickly removed from the United States without any process whatsoever unless an immigration officer—usually a Border Patrol agent—determines that the person has "manifested" a fear of return.  Under this requirement, individuals must "manifest" a fear of persecution or torture, without being asked if they have a fear.  In practice, noncitizens who have just crossed the border, and may be hungry, exhausted, ill, or traumatized after fleeing persecution in their home countries and danger in Mexico, are likely to be intimidated by armed, uniformed Border Patrol officers, and are thus unlikely to "manifest" their fear of return.  Experience shows that, when in the past a "manifestation of fear" standard or similar directives not to ask about fear of removal were imposed, asylum seekers' fear of return has gone unrecognized.

5.      Second, even if a Border Patrol agent finds that a noncitizen adequately "manifests" a fear, the noncitizen still will not avoid removal unless an asylum officer determines that the noncitizen meets a new, more stringent screening standard: instead of satisfying the "significant possibility" standard, the noncitizen will need to show a "reasonable *probability*" of torture or persecution.  The practical impact will be the return of many victims of torture and persecution to dangerous conditions.

6.      What is more, even if a noncitizen "manifests" a fear and gets screened for some form of protection, the corresponding Guidance drastically reduces the minimum time noncitizens have to find and consult with a lawyer before a credible fear interview.  Previously, they had at least 24 hours, reduced from 48 hours just one year ago.  Now, noncitizens may have as few as four hours, which will be spent in a border facility without meaningful access to family or counsel.

3
**JA18**

In practice, this removes any chance of receiving a legal consultation, much less representation, for the overwhelming majority of noncitizens in Defendants' custody, greatly increasing the risk of *refoulement*. A copy of the Guidance issued by Immigration and Customs Enforcement has been posted online by the press. On information and belief, Customs and Border Protection has issued similar guidance, also imposing a 4-hour consultation period for asylum seekers detained in its custody. References in this Complaint to the "Implementation Guidance" and "Guidance" refer to the versions issued by both agencies.

7.     The Rule and Guidance violate the Immigration and Nationality Act ("INA") and are contrary to law under the Administrative Procedure Act ("APA"). In addition, they are arbitrary and capricious in violation of the APA, and the Rule was promulgated in violation of the APA's procedural notice-and-comment requirements.

## JURISDICTION AND VENUE

8.     This case arises under the APA, 5 U.S.C. § 701 *et seq.*; the INA, 8 U.S.C. § 1101 *et seq.*; and its implementing regulations. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 8 U.S.C. § 1252(e)(3).

9.     Venue is proper under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, many Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also appropriate under 8 U.S.C. § 1252(e)(3)(A).

## PARTIES

### I.     Plaintiffs

10.     Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs

of low-income immigrants, including asylum seekers.   An essential part of Las Americas' mission is to provide immigration counseling and legal services to asylum seekers subjected to expedited removal.   This work includes assisting asylum seekers in preparing for credible fear interviews, representing them during those interviews, and representing them throughout the process of obtaining immigration judge review of negative credible fear determinations.   Las Americas also counsels people in Mexico who are trying to seek asylum the United States so that they are aware of the CBP One know what to expect in a credible fear interview.

11.    Las Americas' mission is significantly frustrated by the Rule and Guidance. Because the Rule and Guidance reduce the number of people eligible for asylum, and significantly shorten the time that noncitizens referred for credible fear interviews have to find counsel, Las Americas is impeded in its ability to provide counseling and legal services to those seeking protection and subject to expedited removal.  Las Americas is likewise harmed by Defendants' decision to issue the Interim Final Rule without first providing notice and an opportunity to comment.  In addition to providing legal services to noncitizens on both sides of the U.S.-Mexico border, Las Americas strives to advocate and educate the public about changes to immigration law, but that work was rendered impossible by Defendants' failure to provide advance notice regarding these illegal changes.

12.    Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas. RAICES' mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals, and is the largest immigration legal services provider in Texas.

RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from DHS custody.   A central piece of RAICES' work with detained people involves helping them prepare for the credible fear process.

13.      RAICES' mission is also frustrated by the Rule and Guidance.  The significant reduction in the number of people eligible for asylum, and of the time that noncitizens will have to find legal counsel prior to a credible fear interview, will reduce its ability to provide free and low-cost legal services to underserved immigrant communities.  And the decision by Defendants to issue the rule without first giving notice and an opportunity to comment prevented RAICES from engaging in advocacy regarding these changes and likewise prevented RAICES from raising important factors that Defendants should have considered before moving forward with these illegal changes.

## II.      Defendants

14.      Defendant Department of Homeland Security ("DHS") is a cabinet-level department of the U.S. federal government.   Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

15.      Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals seeking asylum or other protection and adjudicates affirmative applications for asylum.

16.      Defendant CBP is the sub-agency of DHS that is responsible for the apprehension, processing, and detention of individuals seeking asylum or other relief at or near the U.S. border.

17.      Defendant ICE is the sub-agency of DHS that is responsible for executing removal orders and overseeing immigration detention.



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| D.G.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| E.R.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| P.S.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| D.C.* and her minor daughter, L.R.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | Case No. 24-cv-1702 |
| | ) | |
| A.E.* and her minor son, E.D.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| T.R.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| S.G.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| J.C.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |
| Chicago, IL 60604 | ) | |
| | ) | |
| J.R.* | ) | |
| c/o National Immigrant Justice Center | ) | |
| 111 W. Jackson Blvd., Suite 800 | ) | |

1

**JA23**

Chicago, IL 60604            )
            )

LAS AMERICAS IMMIGRANT ADVOCACY  )
CENTER           )
1500 East Yandell Drive       )
El Paso, TX 79902;         )
            )

REFUGEE AND IMMIGRANT CENTER FOR  )
EDUCATION AND LEGAL SERVICES   )
P.O. Box 786100         )
San Antonio, TX 78278       )
            )

     *Plaintiffs*,        )
            )

     v.            )
            )

U.S. DEPARTMENT OF HOMELAND   )
SECURITY,         )
245 Murray Lane, SW       )
Washington, DC 20528;       )
            )

U.S. CITIZENSHIP AND IMMIGRATION  )
SERVICES,         )
5900 Capital Gateway Drive    )
Camp Springs, MD 20746;      )
            )

U.S. CUSTOMS AND BORDER    )
PROTECTION,        )
1300 Pennsylvania Ave, NW    )
Washington, DC 20229;       )
            )

U.S. IMMIGRATION AND CUSTOMS   )
ENFORCEMENT,       )
500 12th Street, SW        )
Washington, DC 20536;       )
            )

U.S. DEPARTMENT OF JUSTICE,    )
950 Pennsylvania Avenue, NW    )
Washington, DC 20530;       )
            )

EXECUTIVE OFFICE FOR IMMIGRATION  )
REVIEW,         )
5107 Leesburg Pike        )
Falls Church, VA 22041;      )
            )

ALEJANDRO MAYORKAS, Secretary of the  )
Department of Homeland Security, in his  )
official capacity

2

**JA24**

245 Murray Lane, SW
Washington, DC 20528;                                      )
                                                           )
                                                           )
UR JADDOU, Director of U.S. Citizenship and                )
Immigration Services, in her official                      )
capacity,5900 Capital Gateway Drive Camp                   )
Springs, MD 20746;                                         )
                                                           )
TROY A. MILLER, Senior Official Performing                 )
the Duties of Commissioner for U.S. Customs                )
and Border Protection, in his official capacity,           )
1300 Pennsylvania Ave, NW                                  )
Washington, DC 20229;                                      )
                                                           )
PATRICK J. LECHLEITNER, Acting Director                    )
of Immigration and Customs Enforcement, in                 )
his official capacity,                                     )
500 12th Street, SW                                        )
Washington, DC 20536;                                      )
                                                           )
MERRICK GARLAND, Attorney General of                       )
the United States, in his official capacity,               )
950 Pennsylvania Avenue, NW                                )
Washington, DC 20530;                                      )
                                                           )
MARY CHENG, Acting Director of the                         )
Executive Office for Immigration Review, in her            )
official capacity,                                          )
5107 Leesburg Pike                                         )
Falls Church, VA 22041;                                    )
                                                           )
        *Defendants*.                                      )
                                                           )
_____                    )

## COMPLAINT

1.      The United States has long sheltered refugees seeking a haven from persecution. The 1980 Refugee Act enshrined that national commitment in law.  While Congress has placed some limitations on the right to seek asylum over the years, it has never permitted the Executive Branch to categorically ban asylum based on where a noncitizen enters the country.  To the contrary, Congress has expressly provided that "[a]ny [noncitizen] who is physically present in the

3

**JA25**



was ineligible for asylum, an asylum officer then determined whether the noncitizen had a credible fear, defined as a "significant possibility," of persecution or torture.  8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. §§ 208.30 (e)(2)-(3).  That screening threshold helped to mitigate the risk that noncitizens would be erroneously returned to persecution or torture in their home countries.

4.      The Rule, however, adopts a screening policy that will systematically lead to the *refoulement* of people seeking protection from persecution, torture, and death.  First, under the Rule, a noncitizen can be quickly removed from the United States without any process whatsoever unless an immigration officer—usually a Border Patrol agent—determines that the person has "manifested" a fear of return.  Under this requirement, individuals must "manifest" a fear of persecution or torture, without being asked if they have a fear.  In practice, noncitizens who have just crossed the border, and may be hungry, exhausted, ill, or traumatized after fleeing persecution in their home countries and danger in Mexico, are likely to be intimidated by armed, uniformed Border Patrol officers, and are thus unlikely to "manifest" their fear of return.  Experience shows that, when in the past a "manifestation of fear" standard or similar directives not to ask about fear of removal were imposed, asylum seekers' fear of return has gone unrecognized.

5.      Second, even if a Border Patrol agent finds that a noncitizen adequately "manifests" a fear, the noncitizen still will not avoid removal unless an asylum officer determines that the noncitizen meets a new, more stringent screening standard: instead of satisfying the "significant possibility" standard, the noncitizen will need to show a "reasonable *probability*" of torture or persecution.  The practical impact will be the return of many victims of torture and persecution to dangerous conditions.

6.      What is more, even if a noncitizen "manifests" a fear and gets screened for some form of protection, the corresponding Guidance drastically reduces the minimum time noncitizens

have to find and consult with a lawyer before a credible fear interview.  Previously, they had at least 24 hours, reduced from 48 hours just one year ago.  Now, noncitizens may have as few as four hours, which will be spent in a border facility without meaningful access to family or counsel.  In practice, this removes any chance of receiving a legal consultation, much less representation, for the overwhelming majority of noncitizens in Defendants' custody, greatly increasing the risk of *refoulement*.  A copy of the Guidance issued by Immigration and Customs Enforcement has been posted online by the press.  On information and belief, Customs and Border Protection has issued similar guidance, also imposing a 4-hour consultation period for asylum seekers detained in its custody.  References in this Complaint to the "Implementation Guidance" and "Guidance" refer to the versions issued by both agencies.

7.    The Rule and Guidance violate the Immigration and Nationality Act ("INA") and are contrary to law under the Administrative Procedure Act ("APA").  In addition, they are arbitrary and capricious in violation of the APA, and the Rule was promulgated in violation of the APA's procedural notice-and-comment requirements.

**JURISDICTION AND VENUE**

8.    This case arises under the APA, 5 U.S.C. § 701 *et seq.*; the INA, 8 U.S.C. § 1101 *et seq.*; and regulations implementing the INA.  This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 8 U.S.C. § 1252(e)(3).

9.    Venue is proper under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, many Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.  Venue is also appropriate under 8 U.S.C. § 1252(e)(3)(A).

4
**JA28**

**PARTIES**

10.     The Individual Plaintiffs are noncitizens who came to the United States to seek asylum, withholding of removal, and protection under the Convention Against Torture.[3] They were unlawfully issued expedited removal orders because of the Rule.  The Organizational Plaintiffs are organizations that serve asylum seekers.

## I.     Individual Plaintiffs

11.     Plaintiff D.G. is an asylum seeker from Colombia who fears persecution in that country by a criminal organization.  Members of this criminal organization tried to stop D.G. from selling property and instead tried to claim it for themselves.  When D.G. refused, the organization attempted to kill D.G. and her husband and held her son at gunpoint.   The family fled Colombia.  While in Mexico, D.G.'s son evaded an attempted kidnapping.  Fearing for their safety, the family fled to the United States.  D.G. did not attempt to secure a CBP One appointment because she did not know about that option.   After D.G. entered the United States and turned herself in to immigration officers on or about June 6, 2024, she was separated from her family.  Unlike her husband, who was given a credible fear interview and released into the United States, and unlike her son, who was placed directly into full removal proceedings, D.G. was denied a credible fear interview based on the Rule.  Despite her statements to immigration officers that she feared for her safety, they concluded that she did not affirmatively manifest a fear of harm.  D.G. was deported to Colombia without her family.

12.     Plaintiff E.R. is an asylum seeker from Mexico who fears persecution in that country because of domestic violence and her sexual orientation.  She had a relationship with a

---

[3] The Individual Plaintiffs are seeking leave to proceed under their initials in this case in a motion contemporaneously filed as to that issue, with declarations, filed under seal, setting forth the details provided here.  They are referred to in this complaint using their initials.

woman whose brother is a member of a criminal organization. The brother surveilled her and threatened to kill her. E.R. also fears her former partner, who cut her with a knife and beat her when she tried to leave the relationship. She fled to northern Mexico, where she was threatened with rape because of her sexual orientation. E.R. spent three months unsuccessfully attempting to obtain a CBP One appointment. E.R. then entered the United States at a port of entry without a CBP One appointment and turned herself in to immigration officers on or about June 8, 2024. E.R. attempted to tell immigration officers about her fear of returning to Mexico, but they disregarded her. E.R. was deemed ineligible for asylum based on the Rule. Even though she feared for her safety, she was denied a credible fear interview after an officer concluded that she did not affirmatively manifest a fear of harm. E.R. was deported to Mexico.

13.    Plaintiff P.S. is an asylum seeker from Nicaragua who experienced frequent harassment and violence by the Sandinista regime. When P.S. denied the Sandinistas' request to join their movement, they called him a traitor and threatened to kill him. One day, when P.S. had the Nicaraguan flag hanging outside his home instead of the Sandinista flag, those threats evolved into physical violence. P.S. tried unsuccessfully to relocate to different parts of Nicaragua. When Nicaraguan officers aligned with the Sandinistas tried to recruit him yet again, P.S. fled to Mexico with his wife. He attempted for two weeks to get a CBP One appointment, but without success. P.S. and his wife entered the United States without a CBP One appointment and turned themselves into immigration officers on or about June 11, 2024. He was then separated from his wife. P.S. tried multiple times to manifest his fear of harm by explaining to CBP officers that his life was in danger, including by presenting a letter expressing his fear of harm. Yet every attempt was either ignored or dismissed. P.S. was deemed ineligible for asylum based on the Rule. He was denied a credible fear interview after a CBP officer concluded that he did not affirmatively manifest a fear

6

**JA30**

of harm.  P.S. was deported to Mexico.  By contrast, P.S.'s wife, who fled Nicaragua for the same reasons, is now in full removal proceedings where she will have an opportunity to seek protection.

14.     Plaintiff D.C. is an asylum seeker from Mexico who fears persecution in that country, and Plaintiff L.R. is D.C.'s minor daughter.  D.C. fled her hometown due to her former partner's involvement with a criminal organization.  D.C.'s partner was incarcerated after their relationship began, but even from custody, he was violent.  On one of her visits to see him in prison, D.C.'s partner raped her, leading her to become pregnant with L.R.  When D.C. refused to smuggle contraband into the prison, her partner threatened her life and enlisted people not in custody to do the same.  D.C. fled to the United States with L.R., but she did not use the CBP One app because she did not know about it.  She and her daughter entered the United States without authorization and turned themselves in to immigration officers on or about June 8, 2024.  They were detained for about eight days.  At one point, a CBP officer told D.C. to sign a form so she could be released, without explaining or reading it to her.  When the officer later stated that she and her daughter would be "released" back to Mexico on the basis of her signature, she frantically told him that she feared for her life.  The officer responded that asylum was "over" because of the number of people arriving at the border.  D.C. was deemed ineligible for asylum based on the Rule. She was denied a credible fear interview after the officer concluded that she did not affirmatively manifest a fear of harm.  D.C. and her daughter were deported to Mexico.

15.     Plaintiff L.R. is the minor daughter of Plaintiff D.C.  As a derivative on her mother's case, L.R. was subjected to the Rule. She has been removed to Mexico.

16.     Plaintiff A.E. is an indigenous woman from Mexico who fears persecution by a criminal organization, and Plaintiff E.D. is her minor son.  This organization twice demanded that A.E. pay a substantial amount of money to them from the proceeds of a business that she ran.

When A.E. first refused payment, members of the organization struck her in the face and mouth, requiring a hospital visit.  When A.E. refused a second time, they threatened to burn down her house and business.  The next morning, A.E. learned this same organization had killed her relatives.  She therefore fled immediately to the border with her son.  She did not attempt to relocate in Mexico because the criminal organization's widespread influence made doing so unsafe.  A.E. did not apply for a CBP One appointment because she did not know she could.  A.E. and her son entered the United States without authorization and turned themselves in to immigration officers on or about June 12, 2024.  A.E. had a credible fear interview, but she did not have an opportunity to speak to an attorney beforehand, and she could not provide full answers during the interview because the officer asked primarily yes or no questions.  She was deemed ineligible for asylum under the Rule.  She was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture.  An immigration judge upheld that decision in a hearing that lasted just a few minutes.  A.E. and her son were deported to Mexico.

17.     Plaintiff E.D. is the son of A.E. and a minor.  In addition to the persecution experienced by his mother, a criminal organization attempted to recruit him.  In the credible fear interview, he did not mention this fact to the asylum officer and was not given the opportunity to speak to the immigration judge.

18.     Plaintiff T.R. is a Cuban of African descent who fears persecution due to her political opinion and because she was involved in a same-sex relationship.  T.R. worked in a government-run facility, but she was fired and subjected to surveillance after she complained about issues arising at work.  When she later raised similar concerns at another job in the same field, she was pressured into resigning.  In addition, T.R. was kidnapped and raped twice because of her

8

**JA32**

romantic relationship with a female. When she reported these rapes to the police, they did nothing. She fled to Mexico where she was robbed, including by people she believed were police officers, and witnessed the rape of a teenage girl who was traveling with her. When T.R. screamed for help, the men beat her. As a result, T.R. feared for her safety in Mexico. For several months, T.R. tried to make a CBP One appointment without success. T.R. entered the United States without authorization on or about June 16, 2024. At her credible fear interview, T.R. was deemed ineligible for asylum based on the Rule. She wanted to explain that she had been raped, but the officer seemed to be laughing at her, so she felt too uncomfortable and embarrassed. She was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld that decision. T.R. was deported to Mexico.

19. Plaintiff S.G. is an asylum seeker from Colombia who fears persecution in that country by a criminal organization that murdered his father. After his father's killer was released from prison, the rest of S.G.'s immediate family fled to the United States. The criminal organization then began to target S.G. Members of the criminal organization murdered another of S.G.'s family members, thinking it was him, and later shot at S.G. himself. S.G. fled to Mexico but feared staying there because of the criminal organization's connections in Mexico. S.G. entered the United States without authorization. He did not know about the option to make a CBP One appointment. He turned himself in to immigration officials on or about June 6, 2024. He was unable to speak to a lawyer before his credible fear interview. At his credible fear interview, S.G. was deemed ineligible for asylum based on the Rule. He had trouble explaining his story because he was told to answer yes or no questions. He was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable

probability of persecution or torture. An immigration judge upheld that decision. S.G. was deported to Colombia.

20.     Plaintiff J.C. is an asylum seeker from Mexico where he fears persecution and torture. J.C. was shot twice while playing soccer with his friends. Consequently, J.C. spent about two weeks in a coma and lost one of his eyes. J.C. does not know who attacked him and his friends but believes they were associated with organized crime. After he was released from the hospital, J.C. was subject to harassment, bullying, and targeting because of his visible impairment from the loss of his eye. One day, he was stopped by police, who accused him of selling drugs and beat him when he denied it. J.C. believes the police thought he was affiliated with organized crime because of his eye injury. Afraid for his life, J.C. entered the United States without authorization and without a CBP One appointment on or about June 25, 2024. J.C. did not have the opportunity to consult with an attorney before his credible fear interview, which occurred less than 24 hours after he expressed his fear of being deported. At his credible fear interview, J.C. was deemed ineligible for asylum based on the Rule. He was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld the decision. J.C. was deported to Mexico.

21.     Plaintiff J.R. is an asylum seeker from Colombia. J.R. and her partner co-own a business. A criminal organization demanded that J.R.'s partner pay ten percent of the business's overall revenue to them as a fee for staying in business. After J.R.'s partner refused their demands, the group gave them one month to pay or be killed. J.R.'s partner kept certain details about the group from J.R. to protect her. J.R. did not contact the police because the group is well known, and the police are unable to provide protection. Before the one-month payment deadline was up,



85.     Even for the clients who manage to both manifest a fear and also overcome the higher reasonable probability standard, the Proclamation, Rule, and Guidance will harm Las Americas' ability to engage in full representation of these individuals in removal proceedings. First, because people who were previously eligible for asylum are now limited to withholding of removal and CAT protection, which require a more stringent burden of proof than asylum, Las Americas will have to spend more time developing evidentiary records in those cases. Second, because withholding of removal and CAT protection do not allow family members to receive derivative benefits, Las Americas will have to engage in full representation for each member of a family, which will substantially increase the number of overall applications it has to complete.

86.     The new policy also jeopardizes some of Las Americas' most critical funding streams.  Many of Las Americas' existing grants require it to serve a certain number of clients each year.  The need to spend additional resources on each client, reducing the number of clients served, risks placing Las Americas below the threshold required for these grants.  A loss of funding will further hamper Las Americas' ability to fulfill its mission.

87.     The Proclamation, Rule, and Guidance similarly harm RAICES' work.  These changes will require RAICES to revamp its representation strategy and to spend more time with each individual client.  The heightened standard will also increase the number of clients for whom RAICES will need to challenge an asylum officer's negative credible fear finding before an immigration judge.  This additional time spent will limit its client population and its ability to fulfill its mission.

88.     RAICES is also one of the very few organizations that provides counsel to individuals facing the credible fear process while detained in CBP custody.  The changes in

the Rule will make it harder for RAICES to provide those services, and the four-hour consultation window will make doing so all-but-impossible—rendering obsolete the system for that work that RAICES has spent the last year developing.

89.     In addition, RAICES will be harmed by the expedited timeline for removal. Less time to reach and prepare clients will result in less effective representation.  As with Las Americas, this strain on effective representation is made worse by the Rule's heightened standard for establishing credible fear, which requires more time with clients to prepare them for interviews with asylum officers.  The increased need and decreased time frame hampers RAICES' ability to effectively serve its clients.

90.     The new policy also jeopardizes some of RAICES' critical funding streams. Much of the funding in certain RAICES' programs is tied to the number of clients it is able to serve.  If RAICES must divert its resources to spend more time assisting fewer clients, that funding may be put in jeopardy.  A loss of funding will further reduce RAICES' ability to fulfill its mission.

91.     For both organizations, the issuance of these changes via an Interim Final Rule deprived them of an opportunity to comment on the changes before they took effect.  As a result, neither organization had an opportunity to put relevant information in front of Defendants that might have informed their choices or prompted them to abandon these changes completely.

92.     For both organizations, these changes are likely to cause additional harm as staff become frustrated with their inability to provide meaningful assistance to impacted noncitizens because of the Rule's new limits and the Guidelines' imposition of an impossible timeline.  This frustration is likely to lead to vicarious trauma, burnout, and an inability to

sustain staffing to fulfill the organizations' respective missions.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of Immigration and Nationality Act and Administrative Procedure Act –
Rule Eliminating Asylum Between Ports is Contrary to Law, 8 U.S.C. § 1158)**

93. All of the foregoing allegations are repeated and realleged as if fully set forth herein.

94. The INA provides, with certain exceptions not relevant here, that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including [a noncitizen] who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).

95. The Administrative Procedure Act, 5 U.S.C. § 706, provides that courts "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

96. The Rule is contrary to law, including 8 U.S.C. § 1158(a)(1). With limited exceptions, the Rule categorically bars noncitizens from asylum merely because they enter without inspection between ports or at ports but without a CBP One appointment.

## SECOND CLAIM FOR RELIEF

**(Violation of Immigration and Nationality Act and Administrative Procedure Act –
Rule is Contrary to Law, 8 U.S.C. § 1225(b))**

97. The INA requires that any noncitizen subjected to expedited removal procedures who "indicates either an intention to apply for asylum . . . or a fear of persecution" must be referred

for a credible fear screening interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii).

98. In that screening interview, the asylum officer is to determine whether the noncitizen has a "credible fear of persecution." *Id.* § 1225(b)(1)(B)(ii), (iii). A credible fear of persecution is defined by statute as "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under [8 U.S.C.] section 1158." *Id*. § 1225(b)(1)(B)(v).

99. The Rule improperly requires asylum officers conducting credible fear interviews and immigration judges reviewing negative credible fear determinations to apply standards other than the "significant possibility" standard, including when applying the Rule's exceptions at the credible fear stage. For example, the Rule requires asylum officers conducting credible fear interviews and immigration judges reviewing negative credible fear determinations to determine whether a noncitizen has established an "exceptionally compelling circumstance" by preponderance of the evidence rather than under a "significant possibility" standard.

100. The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" [or] "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A)-(C).

101. The Rule is contrary to law, including 8 U.S.C. §§ 1225(b)(1)(A)(ii), (B)(ii), (B)(iii), and (B)(v).

## THIRD CLAIM FOR RELIEF

### (Violation of INA and Administrative Procedure Act –
### Rule is Arbitrary and Capricious)

102. All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

103.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

104.    All key aspects of the Rule—including the asylum bar, the manifestation of fear test, and the reasonable probability screening standard—are arbitrary and capricious. Defendants failed to consider critical factors, including the harm the Rule would cause asylum seekers in need of protection and the interaction of the Rule with other policies.  They likewise ignored or contradicted significant evidence undermining the reasons for the Rule including, for example, evidence that the Rule will breach the government's *non-refoulement* obligations.  Defendants departed from prior practice, including by raising the fear screening standard to an unprecedented level, without adequate explanation. And they repeatedly relied on impermissible considerations contrary to Congress's policy choices. Defendants made these same errors in adopting the Guidance and unreasonably reducing the credible fear consultation period to just four hours.

105.    Accordingly, the Rule is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act – Failure to Observe Required Procedures)

106.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

107.    The APA requires notice and opportunity for comment prior to the promulgation of regulations.  5 U.S.C. §§ 553(b), (c).  The Attorney General and Secretary of Homeland Security failed to provide notice and an opportunity to comment on the Interim Final Rule and Guidance in a timely manner.

**JA40**



**DECLARATION OF JAVIER HIDALGO,**
**THE REFUGEE AND IMMIGRANT CENTER FOR**
**EDUCATION AND LEGAL SERVICES (RAICES)**

I, Javier Hidalgo, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am a Legal Director at the Refugee and Immigrant Center for Education and Legal Services (RAICES).  I joined RAICES in 2018 and have served in my current role since 2023.  Before I assumed my current position, I worked as a unit director, before that as a supervisor and previously, as a staff attorney.  In my role as Legal Director, I work closely with and oversee the work of our Asylum Access Services program, which (among other things) serves people facing expedited removal from the United States.

3.      RAICES is a 50l(c)(3) nonprofit, non-partisan organization headquartered in San Antonio, Texas.  RAICES' mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice.  This mission encompasses striving to ensure access to asylum and protection for noncitizens, including those arriving at the border and subject to expedited removal.  RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals.  RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from the custody of the Department of Homeland Security (DHS).  To execute our mission, we strive to serve as many noncitizens as possible through our various avenues of work.

4.      As discussed in detail below, RAICES has and will continue to experience substantive harm under the Interim Final Rule issued by U.S. Citizenship and Immigration

1

**JA42**

Services ("USCIS"), Department of Homeland Security ("DHS") and the Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ"), entitled "Securing the Border" ("Rule"); and contemporaneous memoranda issued by DHS (collectively, "Guidance"). Many aspects of the Rule and Guidance directly impact and interfere with RAICES' core work. These aspects include (a) the suspension of asylum eligibility for virtually all noncitizens who present at ports of entry without a prescheduled appointment, or who enter the United States between ports of entry; (b) the requirement that all noncitizens seeking asylum use the CBP One application; (c) the requirement that noncitizens manifest fear in order to even qualify for a credible fear interview (CFI); (d) the new, heightened "reasonable probability" CFI screening standard for withholding and CAT protection; and (e) the reduction of the consultation time before a CFI from at least 24 hours to as little as 4 hours.

### RAICES' MISSION & SCOPE

5.      Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to be the largest immigration legal services provider in Texas. With offices in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and San Antonio, RAICES is a frontline organization that combines expertise developed from the daily practice of immigration law with a deep commitment to advocacy. Its staff includes nearly 300 people, including attorneys, legal assistants, social workers, advocates, and support staff.

6.      Since RAICES' founding, its staff, volunteers, and pro bono attorneys have counseled and represented thousands of noncitizens throughout Texas. RAICES offers a wide array of legal services. The scope of RAICES' services includes filing "affirmative" asylum applications, which can be submitted to U.S. Citizenship and Immigration Services ("USCIS") by noncitizens who are not in removal proceedings. It also includes representing noncitizens— including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a

**JA43**

and in bond proceedings before the EOIR and before the Board of Immigration Appeals ("BIA"). In regular proceedings, also known as defensive proceedings, we represent people seeking asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), among other forms of relief from removal.  RAICES' defensive legal representation also continues into the federal courts, where we represent clients before the United States Court of Appeals for the Fifth Circuit and the Supreme Court, where appropriate.

7.      RAICES also provides services to hundreds of people in expedited removal proceedings, including those assessed for protection through the CFI screening process.  Our Asylum Access Services team is most involved in our work serving individuals facing expedited removal.  The team represents detained individuals in the expedited removal process.  That team currently consists of a managing attorney, one senior attorney, one staff attorney, a DOJ accredited representative, four legal assistants, and two data entry clerks.[1]  We currently operate hotlines specifically for individuals detained at the South Texas Detention Center, in Pearsall, Texas; Laredo Detention Center in Laredo, Texas; and the Karnes County Immigration Processing Center in Karnes, Texas, as well as individuals detained in CBP facilities who are subject to enhanced expedited removal.

8.      Last year, we added our hotline number to a list distributed by EOIR to asylum seekers who are required to undergo their CFI while in CBP custody.  We also post signup sheets in ICE detention centers and receive referrals from both the family members of detained people and other nongovernmental organizations (NGOs).

9.      From January 1, 2024, through June 30, 2024, the Asylum Access Services team provided legal consultation or representation to 1,042 individuals in expedited removal

---

[1] Current as of the date this declaration was executed.

3

**JA44**

proceedings.  Since the Rule took effect on June 4, 2024, the Asylum Access Services team has seen 74 individuals adversely affected by the Proclamation, Rule, and Guidance.

**The Rule Harms RAICES and Our Clients**

10.     The Proclamation, Rule, and Guidance challenged in this suit have directly impacted and interfered with RAICES' ability to provide its core services: serving noncitizens clients subjected to expedited removal, and will continue to have these effects.  Thus far, these changes have forced us to divert our limited resources to preparing the relevant teams to properly and ethically represent clients impacted by the Rule.  We have devoted internal resources to training staff on the Rule and related policies, as well as on how to advocate for clients impacted by these changes.  We have also had to redirect staff resources. For example, we trained and relocated employees previously working on non-expedited-removal representation to provide consultations to callers in CBP custody.  This shift in resources significantly hampered our ability to faithfully serve clients in non-expedited removal proceedings.  Even with these reallocations of staff, we are not able to fully support people impacted by the Rule.

**The Rule's Changes to the Fear Interview Process**

11.     The Rule has caused and will continue to cause significant disruption to our work on behalf of individuals facing expedited removal, making it nearly impossible for us to serve our client population.

12.     As mentioned above, before individuals even receive a CFI, they must affirmatively manifest a fear of harm. RAICES has observed asylum seekers who were largely ignored by immigration officers, even if they were ultimately approved to proceed to a CFI.  For example, in one case, a noncitizen was only determined to have manifested fear of harm after begging an asylum officer to allow her to pursue asylum.  The officer initially told her that she did not manifest because she "did not use the word asylum," that the government is not interested in helping people

4

**JA45**

"coming here to take US jobs" who are sick or injured, and that she should "stop crying and speak like normal, decent people." This was despite her stating that she was "afraid," "wanted refuge," and "feared death." It was not until the officer observed her nearly begging on her knees that he allowed her to proceed to a CFI.

13.     Historically, CFIs were conducted while people were in ICE custody. When CFIs were done exclusively in ICE custody, we were consistently able to schedule consultations—either in person or remotely—with noncitizens identified through our hotline or referral systems *before* their CFIs (which must be conducted by Asylum Officers from USCIS). We were also able to consistently consult with individuals in ICE custody who receive a negative CFI and prepare them for an immigration judge review of that determination. We were even sometimes able to attend these interviews and review hearings with clients. In addition, we were able, on a limited basis, to enter appearances to file requests for reconsideration with USCIS for individuals who have received negative credible fear determinations.

14.     In our experience, RAICES' work providing consultations (and in some cases representation) is critically important at each step of the expedited removal process. In particular, our consultations advance our mission by helping people understand and prepare for the CFI process. People fleeing persecution have little knowledge of the U.S. immigration system and often find it difficult to speak of past traumatic experiences with agents of a foreign government, particularly when they are detained, when the interview takes place shortly after the frequently horrendous journey to this country, and when noncitizens have had minimal time to rest, recover, and prepare. Noncitizens are also unaware of what specific information is most relevant to the CFI process and are at risk of omitting critical details because they do not know where to focus their answers in the limited time allotted to them during a CFI. We know of other instances in

5

**JA46**

which people's clear verbal statements of fear have been ignored entirely and they have been removed without ever getting a CFI.

15.     The Rule makes this already difficult process much more challenging.  It significantly changes the content of a CFI, as well as the immigration judge's review.  To receive protection in the United States, noncitizens must now establish that they fit within one of the narrow exceptions for asylum applications, and, if they do not, that they qualify for withholding or CAT protection.  Whereas asylum can be obtained based on a well-founded fear of persecution, the withholding-of-removal statute requires the applicant to show that persecution is more likely than not—a higher standard.  *INS v. Stevic*, 467 U.S. 407, 429-30 (1984).  Because of this heightened standard, we have had to spend additional time explaining the changes and preparing them to answer questions about their fear of persecution or torture in their home countries.  Because many of the asylum seekers we advise have experienced violence and exploitation, these inquiries take a good deal of time, analysis, and trauma-informed services.  As a result, RAICES' staff must now engage in much more complex and cumbersome consultations and screening interviews.

16.     For example, in one case, a consultation with an asylum seeker detained in CBP custody lasted nearly three hours—far longer than normal.  The caller had received an initial negative credible fear determination, and RAICES was attempting to prepare her for a hearing challenging that determination. She had been unable to consult with an attorney prior to the CFI because she was given access to a phone for only seven minutes prior to the interview.  We were only able to speak with her after a negative CFI determination in order to prepare her to challenge that finding prior to appeal.  That preparation call was extended largely because of the detailed conversation needed to prepare the noncitizen to explain how she fit within the narrow exceptions

6

**JA47**

to the Rule.  What is more, the hearing was scheduled to take place the very next morning, on a Saturday.  This required RAICES staff to work outside of traditional business hours to prepare for the hearing after hours and offer representation over the weekend.  This is just one of many examples of how the impossibly fast pace of proceedings, combined with the practical roadblocks created by the Rule and Guidance, force RAICES staff to drop everything to provide emergency representation all in one meeting.  Attorneys must continuously check the EOIR webpage at all hours to receive notice of an upcoming hearing that is often not posted until a few hours before the hearing.  This creates incredible strain on the Asylum Access Services team, and limits the number of clients to whom they are able to provide ethical representation.

17.     In addition to these new substantive complexities, as explained below, the timeline for us to do our much more complicated work is now very condensed.  RAICES staff typically only have one phone call with an asylum seeker to cover this more complex set of information.  This leads to not being able to prepare asylum seekers as thoroughly for their CFIs and immigration judge reviews and can also lead to having to spend additional time on the phone with each asylum seeker.

18.     Finally, it is important to note just how broadly this Rule is impacting RAICES and our clients.  In our experience, the Rule leads to people receiving negative credible fear findings.  In turn, that means that RAICES must prepare many more individuals for immigration judge review.  These changes have significantly impeded our efforts to serve recently arrived noncitizens as explained more fully below.

**Impact of Guidance on RAICES' Work**

19.     In addition to the Rule itself, the Guidance has altered the expedited removal process in ways that have significantly impaired our ability to access noncitizens and have frustrated our efforts to assist these people in the process.

**JA48**

20.     Under the Guidance, DHS has shifted to giving individuals in CBP custody as little as 4 hours for consultation, instead of at least 24 hours, itself a reduction from the minimum of 48 hours required until a year ago.  As described in more detail below, that has significantly impaired our ability to connect with clients before their CFIs.

21.     The pre-CFI consultation is vitally important for all the reasons explained above. Under this new policy, people are guaranteed only 4 hours to consult after they are given the initial information about the CFI process (including a list of legal service providers, which lists RAICES as one of just a few options).  There are numerous reasons why holding CFIs in CBP custody after a reduced 4-hour consultation period disrupts our critical work.

22.     First, the limitations on communication with the outside world are much more severe in ICE facilities—where most of our client population is now detained during the CFI process—as compared to CBP facilities.  This makes 4 hours a virtually impossible time frame for consultations, particularly because it includes weekends.  Unlike in ICE facilities, NGOs cannot enter CBP facilities, which means we cannot post signup sheets there or receive referrals from other legal service providers.

23.     Second, unlike in ICE facilities, we are unable to schedule specific times for calls with people who are in CBP custody; instead, noncitizens must call us on our hotline.  Moreover, noncitizens are not permitted free access to a phone; instead, they are provided limited windows in which they may contact us, often outside of normal business hours, meaning that unfortunately people often cannot reach us or other providers.  In fact, since the Rule and Guidance have come into effect, the vast majority of the calls we have received from people in CBP custody have come in before 8 AM or after 5:30 PM.  We have been able to schedule follow-up calls with only a

8

**JA49**

limited number of individuals in CBP custody before they receive their CFIs, and even when we can it is a time-intensive, cumbersome, and impractical process.

24.     Third, CBP facilities are not set up to hold people who have counsel or may be trying to access attorneys.  We can email requests for signatures on forms like the DHS form for entering an appearance as counsel (form G-28) and make email requests for follow-up calls to the CBP office for the relevant sector of the border.  However, we cannot call directly to a CBP facility and ask to speak to someone detained there, even if we have already entered an appearance on their behalf.  We must instead request that CBP arrange for the noncitizen to call us back.  Often, however, CBP does not respond quickly enough to these email requests for RAICES attorneys to be able to properly represent an individual.  RAICES staff often must send many follow-up emails to eventually get a response.  When our lawyers attempt to ensure access to follow-up calls by entering a notice of appearance, this often does not work.  There do not seem to be protocols in place to allow or facilitate noncitizens' ability to return phone calls or send us signed forms in a timely manner.  In addition, in our experience some people in CBP custody have not even been given access to a pen and paper, which means that even if they do reach us, they cannot take notes about their interview or how to arrange to call us back for follow up.

25.     Fourth, referrals from family members also are of little help for those in CBP custody because it is functionally impossible to track a person's whereabouts when in CBP custody, so we do not know where a referred person is located.  Unlike with ICE custody, there is no universal "online detainee locator" for people in CBP custody.  While the online detainee locator will now indicate if someone is in CBP custody, it does not specify which CBP facility the person is detained in, and thus does not help to locate and contact someone who is in CBP custody in the way it does with noncitizens in ICE facilities.  Moreover, the transfers and CFI process in

9

**JA50**

CBP custody happen so quickly that people do not have time to even learn whether DHS has assigned them a critically important "Alien Registration Number," memorize it, and communicate it to us or their families in the highly limited opportunities they have to make phone calls. Notably, some are not even provided with their Alien Registration Number before calling and are instead given IDs that cannot be used to trace their cases. The result is that we often have nothing to work with when attempting to locate clients, other than their names. The best we can do is ask families to try to pass our hotline number on to their family member seeking legal help from CBP custody and hope they are able to access a legal visitation call prior to their CFI or removal. This presents an enormous obstacle because we have learned that individuals are often only given one call for the entirety of their time with CBP.

26. The reduction of the pre-CFI consultation time to as little as 4 hours significantly exacerbates these problems. These restrictions mean that people simply do not have enough time to reach us before their CFI. In particular, including weekends in the consultation period ensures that many asylum seekers will have no real opportunity to reach an attorney before interview and possibly consequently, before their removal.

27. Because we are seeing many people only after they have already received a negative CFI, we are limited to helping the individual prepare for immigration judge review.

28. Our routine inability to provide CFI consultations is a significant problem. RAICES is one of just a few organizations that offers CFI consultations to people in CBP custody, and yet the timeline makes that extremely difficult and impracticable. And without access to our services, the right to a consultation prior to the CFI is illusory at best for many asylum seekers.

29. We have also had to overhaul our processes to handle an increased number of calls coming into our hotline from CBP because of the shortened time frame for CFI consultations and

10

**JA51**

the general expedited removal process in CBP custody.  These calls are our only means of communicating with this group of asylum seekers preparing for a CFI interview.  Previously, we would accept hotline calls from individuals in ICE custody based on our capacity and then schedule follow-up calls or visits.  This system worked because we knew people could try reaching us several times over the course of a few days, and that if we were unable to answer those calls immediately, people could leave a message that we could return by setting up a call with them in ICE detention.  Now, however, we have had to shift our hotline staffing and operations to handle a significant number of calls coming from individuals in CBP custody.  The super-expedited nature of CFIs in CBP custody under the Guidance has required us to make this shift: because noncitizens will have as little as 4 hours to attempt to contact and consult with us before their CFI (and a similarly short window for immigration judge review), if we do not focus our resources in this way to catch as many calls as possible, we will never be able to communicate with people in this posture at all.

30.     Even with these changes to our procedures, the Rule and Guidance are greatly impeding our ability to serve noncitizens in expedited removal.  If we do not answer a call on the spot, at times the CBP agents decline to leave voicemails and do not provide any information about the people trying to reach us.  Without any information about the client, we cannot email the relevant CBP sector office to try to set up a consultation call, and because of the shortened 4-hour time frame, we cannot track people down before their interviews happen.  Even when we do receive a voicemail with client information, it is extremely difficult with the current constraints on our capacity to get a scheduled follow-up call with individuals for whom we do not have a signed G-28.  Indeed, CBP often will not allow us to speak with anyone for whom we do not have a G-28—and they have largely stopped coordinating the pre-representational counseling required to

11

**JA52**

get the form signed.  As noted above, we often receive voicemails with timestamps well before and after normal business hours, meaning individuals given access to phone calls at these times have no real chance of securing legal consultation or representation prior to their CFI.

31.     Essentially, our staff must strive to immediately answer every call to our hotline because that is our sole means of advising asylum seekers in CBP custody both before and after CFIs.  This has required us to devote a dramatically increased amount of staff time—including the time of staff from RAICES programs who do not generally conduct in-depth orientations and instead focus on longer-term representation in immigration court—to ensure that we can answer and respond to hotline calls.  We have increased the number of hours our staff work in a day, and have asked people to come in on weekends.  Staff who are trained to take these CBP calls take, on an ad hoc basis, as many calls as possible between scheduled meetings with clients in ICE custody, court dates, and other work duties.  But we are still unable to answer each call and provide support.

32.     Responding to this stream of calls, each of which is incredibly urgent because of the 4-hour consultation window, prevents us from supporting potential clients in ICE custody that RAICES staff would have otherwise had time and capacity to assist.  That frustrates our ability to advance our mission in providing services to other noncitizens facing removal, such as those in regular removal proceedings in immigration court and those held in ICE custody.

33.     Despite the expenditure of significant extra resources diverted from our work with clients in ICE custody, we still lack capacity to answer many calls, and many people are unable to call us before their CFIs in any event.  Thus, we are frequently unable to assist clients before their CFIs, which is a critical part of our service mission for individuals subject to expedited removal.  The reduced, 4-hour consultation period means that we will miss many potential clients entirely and will never know that they were in CBP custody or that they had a CFI.

12

**JA53**

34.     Further, although we try (in addition to providing consultations) to represent as many people as we can at their CFIs, we have been able to do so for only one or two individuals in CBP custody out of hundreds who have contacted us.  That is both because our resources are stretched so thin by the need to answer hotline calls, and also because the extremely short notice with which CFIs are scheduled makes it practically impossible to arrange to appear at a CFI.  Prior to the policies at issue in this case, RAICES staff had more time to meet with and prepare clients. Because the Rule significantly limits our ability to meet with individuals in CBP custody, more noncitizens are going to their CFIs both unprepared and unrepresented.  The lack of access to legal support, particularly when coupled with the new hurdles imposed by the Rule, make it much harder for individuals to receive a positive credible fear determination and/or vacate a negative credible fear determination.

35.     Because of the challenged policy changes, our work has heavily shifted to helping people prepare for immigration court review *after* they have a CFI denial from an asylum officer. But that impedes our work by depriving noncitizens of a fair chance to prepare for *both* stages, if necessary.  And many of the same barriers that exist in pre-CFI representation exist for clients at this stage, and in our experience our ability to intervene and achieve a positive outcome is limited once an asylum officer has already found no credible fear. Simply put, the compression at the front end of the expedited removal process to as little as 4 hours for the pre-CFI consultation period forces us to engage in much more work at the end of that process where our ability to provide meaningful assistance and consultation to noncitizens is diminished.

**JA54**

36. In addition, significant procedural hurdles make limiting our assistance to immigration judge review less effective than it would be if we could prepare our clients before the CFI. It is difficult for RAICES attorneys to submit an appearance for the immigration judge review because hearing dates are scheduled and completed in an extremely tight timeline. Typically, immigration judge review hearings are scheduled and completed within 24 to 48 hours of the time an individual receives notice of a negative CFI determination. The timing of this hearing is posted in an online portal, but often only 4 hours before the hearing. This makes it difficult to plan, within our limited capacity, for attorney representation with such little notice. It therefore significantly limits the number of people we are able to represent because we cannot know if an attorney will be available at an unknown date and time.

**Additional Harms Flowing from Expedited Removal Changes**

37. The Rule and Guidance have impacted RAICES' work in the expedited removal process and have impacted our ability to fulfill our mission, while impacting our resources and other aspects of our work.

38. First, the additional complexities mentioned above mean that our hotline calls now take much longer than they did before, reducing the number of hotline callers we can serve and increasing the number of potential clients with whom we can never speak at all. That is true even though we have scaled up the staff resources we commit, including some of our removal defense attorneys' time, to the hotline.

39. Second, because the impact of the reduced consultation period is felt nearly exclusively by people undergoing CFIs in CBP custody with their CFIs, we have had to focus heavily on helping with CFIs to people in CBP custody. This means we can serve significantly fewer individuals facing expedited removal in ICE custody.

14

**JA55**

40.     Both the Rule and the Guidance have required staff to spend less time on other aspects of their work.

41.     In addition to the substantive additional time that doing this extra work entails, we have also been forced to divert resources in order to reshape our training materials, both for our own staff and for *pro bono* attorneys and other volunteers.

42.     Everything described above is taking a serious toll on RAICES' staff.  The new credible fear procedures mean that our staff are in a constant fire drill.  Legal assistants anxiously monitor the hotline to make sure we never miss a call, as it could be our only chance to speak with someone before they are rushed through a CFI and deported, potentially to a place where they face persecution or torture.  Our hotline is also where the Asylum Office can reach us to participate in CFIs.  Should we miss an unexpected call, that noncitizen may have to go forward with an interview without preparation or the opportunity to seek representation.  The unpredictability of the calls has placed intense stress on our processes and infrastructure.

43.     When we do receive calls—and they often come in bursts—our attorneys must immediately drop all their other work and do their best to talk a client through all of the Rule's convoluted exceptions, as well as withholding and CAT claims on the spot.  Staff must also spend a great deal of time trying to track down clients who previously called and determine if, and when, those clients have further hearings scheduled.  It is difficult to plan for capacity under these constraints and unknowns.  Our staff are suffering from burnout due to the chaotic, frenetic pace of work that the Rule and Guidance necessitate.

### Conclusion

44.     Overall, RAICES has been harmed by the Rule and Guidance because, together and independently, they severely restrict our ability to effectively serve people who are facing expedited removal and denial of protection.  These policies are unrealistic and dangerous and send

15

**JA56**

the message that the United States is not welcoming of asylum seekers.  All of these changes are fundamentally contrary to our organization's mission and vision, and they are devastating RAICES' ability to serve asylum seekers, particularly those facing expedited removal.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_____

Javier Hidalgo
Executed on the 26th day of July, 2024, in San Antonio, TX

16

**JA57**

**DECLARATION OF JENNIFER BABAIE**
**LAS AMERICAS IMMIGRANT ADVOCACY CENTER**

I, Jennifer Babaie, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully.

2.      I am an attorney licensed to practice law in California and focused on immigration practice.  Since January 2023, I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas).  Prior to joining Las Americas, I worked in various related positions.  Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3.      Las Americas is a nonprofit legal services organization based in El Paso, Texas. Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights.  We provide immigration counseling and representation to immigrants seeking asylum and those detained by the U.S. government in and around West Texas, New Mexico, and Ciudad Juarez, Mexico, including by representing individuals facing expedited removal who are undergoing Credible Fear Interviews ("CFIs").  We also assist individuals who are awaiting a CBP One appointment in Mexico with preparing for CFIs.  Our goal is to ensure that individuals have a fair opportunity to establish their eligibility for protection and are not wrongfully removed to persecution or torture.

4.      Las Americas has and will continue to experience substantive harm because of a rule issued by U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland

1
**JA58**

Security ("DHS") and Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ") entitled "Securing the Border" (the "Rule"); and contemporaneous memoranda issued by DHS (collectively, the "Guidance").   The Rule and Guidance collectively impose new bars to asylum eligibility that threaten Las Americas' ability to carry our central work and mission.  Under the Rule, noncitizens arriving between ports of entry at the southwest border are categorically ineligible for asylum whenever a rolling seven-day average of the number of daily "encounters" of inadmissible noncitizens who entered between ports of entry exceeds a certain numerical threshold.  That threshold has been exceeded continuously since July 2020.  Moreover, the Rule does nothing to institute or pave the way for increasing CBP One appointments, which is the sole means of accessing asylum in the United States during suspension periods.

5.      Even individuals who meet one of the narrow exceptions to this categorical ban may only apply for asylum if they present at a port of entry and obtain an appointment with CBP to present at a border port of entry through a smartphone app called "CBP One."  As discussed below, CBP One is a complex, error-prone, smartphone application, and it is difficult for noncitizens to use CBP One and to obtain an appointment.  The app has numerous accessibility issues already known to the government thanks to feedback from advocates, including our organization.  As a result, the suspension leaves no pathway for asylum seekers who cannot obtain an appointment through no fault of their own.

6.      The Rule also imposes new burdens on noncitizens who are eligible for withholding of removal or protection against removal under the Convention Against Torture ("CAT").  Prior to the Rule, an immigration officer was required to inform any individual encountered of their rights to seek protection in the United States and ask required question to determine whether the noncitizen had a fear of persecution before initiating their removal. Although this did not always

2

**JA59**

happen in practice, those requirements were an essential protection that at least afforded individuals a means of accessing the asylum system and a chance at speaking with a licensed legal advocate who could help explain to them the complex intricacies of asylum law in the United States. Now, a noncitizen can be quickly removed from the United States unless an immigration officer determines that the person affirmatively "manifested" a fear of return without being asked. Not only does this prevent an individual from receiving any information about their rights once they are on United States soil, but it keeps these individuals in the shadows and more vulnerable to victimization at the border by criminal groups and smugglers. Simply because the United States refuses to recognize a person's protection concerns doesn't dissipate the reality that they are in danger of being harmed, and advocates such as myself must now find new ways to communicate with these people so that we can study their situations and make meaningful attempts at advocating on their behalf and on behalf of others like them.

7.      For the few people that are recorded spontaneously "manifesting" such fear, the Guidance permits them as little as little as 4 hours to consult an attorney before an immigration officer conducts a CFI—down from at least 24 hours before the Guidance, and a minimum of 48 hours just a year ago. Then, at the CFI, a noncitizen must now establish that there is a "reasonable probability" they will be tortured or persecuted if they are removed from the United States. This is a significantly more stringent standard than the "significant possibility" and "reasonable possibility" standards previously applied in these interviews.

8.      All of these aspects of the Rule and Guidance are significantly interfering with Las Americas' work, and are requiring us to spend significant amounts of time and resources in the attempt to counteract that harm.

**Las Americas' Mission & Programs**

9.      Las Americas has served people in our community from over 80 countries since 1987.  We are dedicated to serving the legal needs of low-income noncitizens and asylum seekers in West Texas, New Mexico, and Ciudad Juarez, Mexico.  We assist asylum seekers pursuing entry to the United States by providing targeted legal information, advice, and translation and referral support, to help these individuals preserve eligibility for asylum.  We also provide legal information presentations centered on clarifying the purpose and consequences of documents received upon crossing the border.

10.     Our goal is to ensure that all asylum seekers have a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture. It is essential to our mission and work that all asylum seekers have a meaningful chance to fully develop and present their claims.  To advance this mission, our goal is to serve asylum seekers with our limited resources.

11.     We are one of the only organizations providing *pro bono* representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area.  We receive a significant number of referrals and play a critical role in the community.  Whenever we are suddenly forced to significantly limit or change our services, which has been necessary because of the Rule and Guidance, it has a palpable and adverse impact on our ability to serve these migrant communities.

12.     Las Americas' total budget in the fiscal year ending 2024 was about $1,799,000.[1] The grants we receive make up approximately 85% of our revenues, and some of them have requirements regarding the number of people we serve as well as restrictions on the geography and

---

[1] As of the time of filing this declaration, this number had not been finalized, and is therefore approximate.

types of services provided.  For example, one grant requires us to serve 650 persons per year while another requires us to provide direct representation to 60 persons and pro se support to an additional 120 persons in Immigration and Customs Enforcement ("ICE") custody in New Mexico. Low bono client fees and other individual contributions make up the remainder of our income sources, but all of our detention related services, including CFI-related services, and our services in Mexico are provided at no cost to the individual.

13.     Las Americas' United States staff consists of 18 people, including attorneys, accredited representatives,[2] and paralegals.  Two additional staff members work in Mexico.  We have several program areas; those most relevant to the Rule and Guidance are detailed here.

14.     Las Americas' asylum work straddles the U.S.-Mexico border.   We assist individuals and families who have entered the United States, as well as people stranded in Mexico due to U.S. policies, including the Rule and Guidance.

15.     Our Detained Program serves migrants in the El Paso Processing Center, Otero Service Center, and the Torrance and Cibola detention facilities, in New Mexico.  The heart of our Detained Program is helping individuals in expedited removal proceedings through the credible fear process and then seeking their release from detention.  Due to the overwhelming need for our CFI-related services, in April 2023 we added a legal fellow focused entirely on CFI services. Those services have been able to continue only as a result of daily collaboration between Las Americas staff and students, and they must overcome constant logistical hurdles to remain a meaningful form of legal assistance.  We have partnered with the CUNY School of Law to pilot a remote CFI preparation model in 2023-2024 that includes resources to support representation during CFIs and immigration judge ("IJ") review hearings.  Although we hope to continue this

---

[2] *See* 8 C.F.R. § 1292.1(a)(4).

partnership, the challenges of finding students available to remain on call for major swaths of time throughout the week just in case we learn of a CFI being scheduled has proven difficult and requires flexibility and support on the part of CUNY's school administrators and professors. Moreover, the changes to the CFI process imposed by the Rule and Guidance make it so complex that students will not be able to provide meaningful assistance without a lawyer present, which makes the program virtually impossible to implement.

16.     We have also attempted to initiate a pilot remote CFI preparation model with a private law firm with the assistance of the International Refugee Assistance Project, however we have had to pause that project for multiple reasons.  First, the detention centers often take 24-48 hours to schedule client calls, and many times our clients are either moved to another detention center or have received their CFI interview before the calls can be scheduled.  Certain detention centers place even further restrictions on scheduling calls, with only certain days when women can be interviewed, for example.  Second, even when we can speak to the client, there is not enough time to prepare with them—we need a minimum of two hours, but that is just the bare minimum. Truly adequate preparation would require more than one interview over multiple days.  Finally, some detention centers allow only one-on-one calls, which prevents an interpreter from joining the call.

17.     For individuals who can clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings, competency evaluations, and more.  Where resources allow, we provide these services as part of full representation in immigration court and before the Board of Immigration Appeals.  In other

**JA63**

cases, we offer these services as *pro se* assistance.  For *pro se* individuals, we also provide assistance with document preparation and translation.

18.     In early 2019, Las Americas created the Las Americas Mexico Program ("LAMX"). LAMX was created as a temporary measure to assist noncitizens who were subject to the MPP or "Remain in Mexico" Program and thus required to wait in Mexico for their asylum cases to be heard in immigration court.  As U.S. immigration policy has changed, we have adapted LAMX's services and formalized LAMX as an incorporated entity in Mexico.  While Title 42 was in place and prevented asylum seekers from presenting at the ports to request asylum, we helped people seeking exemptions to that policy as well as those seeking parole.  Now, LAMX provides *pro se* asylum support and Know Your Rights presentations in shelters and other community spaces.  In these presentations, we teach people about the CFI process, advise them about what to expect in the expedited removal process, and field questions from people who are trying to understand how to navigate this process.

19.     In 2023, Las Americas served over 5,000 people.  We helped 3,381 people navigate the CBP One application in order to make an appointment to request asylum at a port of entry.  We also served nearly 303 individuals in ICE custody.  This work occurred alongside our casework on behalf of people seeking immigration benefits from USCIS or the immigration courts.  Across programs, we opened over 688 new cases last year.  More than half of the clients that Las Americas serves are asylum seekers, and at present, we have about 171 open cases in our Detained Program.[3]

---

[3] We collected information for 2023 and 2024 calendar year data on July 1, 2024.  Please note that due to the tight capacity of the organization and the general difficulty of allocating sufficient resources to administrative and technological support, all data reported should be taken as estimates reflecting current case data to the best of my knowledge.

Additionally, we serve hundreds of people each month with Know Your Rights presentations in shelters, both in El Paso and in Mexico.

20.     In addition to this work helping people prepare for the expedited removal process on the front end, we have also worked with many people who were deported or "voluntarily" returned to Mexico even though they are not Mexican nationals.  We are continuously working to develop systems to serve these individuals, as discussed in greater detail below.

21.     For several years now, Las Americas has been focused on helping people prepare for CFIs on both sides of the U.S.-Mexico border.  From May 12, 2023, to September 20, 2023, our cross-border program assisted more than 2,500 people in this manner and over 400 in the first half of 2024.

22.     As set forth in more detail below, however, because of the Rule and Guidance, that work is now immensely more complex and time consuming.  For example, our team in Mexico must now educate people on ways in which the Rule impedes access to asylum, explain the significance of the manifestation requirement to even receive a CFI, and prepare them to manifest their fear when they encounter a Border Patrol officer.   If a noncitizen obtains a CFI, the reduced pre-CFI consultation period (down from a minimum of two days in early 2023 to as little as four hours under the Guidance) strains our ability to provide meaningful CFI-related services in a manner that will actually reach the individual prior to the scheduling of their appointment.  This significantly limits the number of individuals we are able to prepare for a CFI, and, in turn, jeopardizes our ability to receive funding.

**The Rule Harms Las Americas' General Operations**

23.     The Rule and Guidance challenged in this suit have caused and will continue to cause harm to Las Americas' work and mission.  In particular, the Rule has forced us to divert limited resources away from individual representation to continue to meet the most urgent needs

of the community, which currently means aiding people attempting to navigate the manifestation of fear requirement and heightened "reasonable probability" standard in the CFI process.

24.     In addition, because our mission is premised on ensuring access to asylum for people who are coming to the United States, the Rule fundamentally frustrates our organization's purpose by cutting off the right to seek asylum in the United States for huge numbers of people based on factors unrelated to a person's need for protection.

***The Rule's Reliance on CBP One***

25.     As noted above, the Rule requires everyone—including people from Mexico—to make an appointment using CBP One to preserve the right to seek asylum at the border.  The harms imposed by this requirement impair the operations of Las Americas before an asylum seeker ever reaches the United States.

26.     First, the CBP One requirement has caused a dramatic diversion of resources in our Mexico office.  While we have consistently provided Know Your Rights assistance in Mexico, that work has existed alongside direct legal representation.  Now, many of those resources must be diverted to explaining the Rule, addressing the CBP One requirement—never before imposed on Mexican nationals—and helping people to understand the new procedural hurdles that they face, whether that be in managing to find a way to utilize the app successfully, or by explaining in detail the negative consequences of seeking asylum outside of a formal port of entry.  In my experience, asylum seekers prefer to come to the United States in a lawful manner, however hard realities such as lack of timely access to an appointment, violence, kidnapping, lack of safe housing or potable water, threats of deportation by Mexican officials, refusals by Border Patrol to speak to anyone who appears at a port of entry without an appointment, and misinformation lead to individuals and families being forced to seek asylum between ports of entry.

27.     Since the introduction of CBP One, moreover, we have received hundreds of requests for assistance with the app.  Non-Mexican asylum seekers were required to use the CBP One app under the Circumvention of Lawful Pathways regulation beginning in May 2023, and the new Rule now requires all asylum seekers to use the app.  Because of the Rule's CBP One requirement, our staff in Mexico primarily provide assistance with using the app, education as to the purpose of scheduling an appointment with the app, warnings on *notario* fraud and other bad actors charging money to register appointments on the app, and guidance as to consequences for entering without an appointment.  While we have continued to flag highly vulnerable cases directly with Customs and Border Protection ("CBP") in an attempt to seek humanitarian protection for them, our capacity to do so is limited by the amount of time we must spend helping those trying to understand the Rule's CBP One requirement.

28.     We have also had to divert resources to overhaul the content of the legal presentations we provide to people preparing to enter the United States.  Historically, we have focused our presentations on clarifying the purpose and consequences of documents received upon crossing the border, educating people about what to expect from expedited removal, and preparing for the credible fear process.  We have also historically acted as a referral partner whenever clients indicate a need for housing or other psycho-social support in Ciudad Juarez.

29.     With the advent of the Rule, this work has become immensely more complex.  On top of having to change our work to educate people about the substantive changes to asylum imposed by the Rule (discussed below), we now spend a great deal of time providing direct assistance to people unable to navigate CBP One on their own.

30.     Because the app is riddled with technical issues and difficult to use in general, our work in this arena is in incredibly high demand.  Since the Rule was issued in early June, we have

assisted hundreds of individuals in Mexico with the process of understanding the Rule and the CBP One requirement.

31.     Simply put, the Rule's requirement that people use the app to preserve asylum eligibility has forced Las Americas to spend resources helping people use the app rather than putting those resources toward its mission of assisting asylum seekers with CFIs, reviews of negative determinations, and representation in immigration court

***The Rule's Changes to the Credible Fear System***

32.     The changes brought by the Rule and Guidance have impaired and will continue to impair our work helping individuals who are seeking asylum and subject to the credible fear process.

33.     To begin, noncitizens will not even be interviewed for credible fear unless they affirmatively manifest a fear of persecution—and even then, their explicit statements of fear are often ignored.  As a result, we will need to educate individuals in Mexico who intend to seek asylum in the United States about the manifestation standard.  Based on our experience working with noncitizens seeking asylum, we know firsthand that manifesting a fear can be an extremely difficult task.  Noncitizens normally travel thousands of miles to reach the border, are tired and often starved, and have experienced significant trauma in their home country and on their journey north.  In addition, they are often afraid when encountering U.S. Border Guards or other officials.  By the time many actually reach a U.S. Guard to express fear, most have already had negative experiences with Mexican officials operating on the Mexico side of the border who turn back most asylum seekers and prevent them from ever reaching U.S. soil, further prohibiting lawful access to asylum.  Helping these individuals to prepare to manifest a fear immediately upon encountering a border guard often requires helping them to process that fear and trauma, which is an extremely time consuming process.  Additionally, we have heard many accounts of asylum seekers who have

expressly told U.S. immigration officers that they feared removal but were nonetheless removed without receiving credible fear interviews.

34.     Moreover, even if Border Patrol registers that a noncitizen manifests a fear, noncitizens are now required to reach an even higher threshold to establish a credible fear during the CFI.  Prior to the implementation of a 2023 rule, which raised the standard for most applicants to a "reasonable possibility," applicants for withholding or CAT protection needed only to establish a "significant possibility" that they would be persecuted or tortured if removed from the United States. Under the new Rule, they must now establish a "reasonable probability" of torture or persecution.

35.     These changes make many fewer applicants eligible for asylum or other protection and in turn make our consultations more emotionally and substantively complex.  Now, Las Americas must prepare people for a realistic chance that they will not be permitted to seek asylum, and that they face removal if they cannot overcome the higher standard.

36.     These changes have injured our operations because our procedures for educating people on how to proceed through this system are more complicated and time-consuming.  We must prepare people for multiple potential scenarios and outcomes.  Since the Rule and Guidance took effect, the duration of our CFI screening consultations has significantly increased, and it has become difficult for us to conduct such screening conversations in fewer than two hours.

37.     Moreover, the fact that noncitizens are only guaranteed 4 hours to obtain and consult with a lawyer before a CFI means we need to have two workflows.  For people in ICE custody, we have to increase the number of individuals on intake to attempt to provide them with services before their CFI interview.  At the same time, to effectively serve clients knowing we will

12
**JA69**

only have a short window to prep noncitizens for their CFI, we must try to assist them in Mexico, *before* they even enter the United States.  This issue is discussed in detail below.

38.     Because of these complexities, it is harder for us to serve as many people, which undermines our mission and complicates our ability to run a sustainable legal department. Additionally, without any knowledge of how DHS is implementing the Rule, we are left with no means of adequately clarifying for asylum seekers what to expect when reaching the border and claiming fear of return.

39.     In addition to making CFI preparation harder and more time-consuming, the Rule and Guidance have increased demand for Las Americas' representation for people who have failed their CFIs and need IJ review and requests for review by USCIS.  But our capacity to provide this representation is diminished because we must spend so much of our time and resources providing pre-CFI support.  Previously, the need to provide this post CFI-work was more modest because many clients received a positive result from the CFI.

### The Rule's Cascading Impact Beyond the Credible Fear Interview

40.     In response to the Rule's heightened burdens and convoluted processes that impede access to asylum at our southern border, it is fair to say that *all* of Las Americas' work has been forced to change.

41.     Las Americas has already diverted, and will continue to be forced to divert, significant resources to understanding the new Rule and Guidance, and their impact on the communities we serve, training staff and volunteers, and advising our clients, prospective clients, and immigration communities—all of which is necessary to carry out our work.  In addition, we will need to continue to spend resources developing educational materials, including internal training materials, external training, and *pro se* materials designed to help the impacted communities.  We also need to reroute resources towards helping our non-legal partners on both

sides of the border have a better understanding of access to asylum in the United States, so that they are able to appropriately direct individuals for referrals.  Already, I have spoken with several civil society partners on both sides of the border, and they have expressed frustration and confusion over how the U.S. is managing the ports of entries and sections of the wall in our sector.

42.     For example, we have had to devote considerable resources to create a system to educate individuals on the manifestation standard. We further have to create a system to contact individuals who are still waiting for a CFI to be scheduled.  As part of that, we have had to divert staff from other programs to be available for CFI preparation because of the four-hour timeframe before an individual is subject to a CFI interview.

43.     Even with that increase in staff, we are unable to assist as many individuals as we had previously because CFI prep sessions take considerably more time.  In these sessions, we have to help individuals understand whether they fall into one of the few narrow exceptions to the Rule's asylum bar for people who entered without CBP One appointments.  And if they do not, we need to prepare them to reach the significantly higher "reasonable probability" screening standard for withholding and CAT.  This is dramatically more than we needed to provide counsel on previously, which means we can serve fewer clients.

44.     As a result of these changes, we have also been forced to significantly reduce the number of individuals we can assist in their efforts to obtain lasting protection or relief.  For example, we now have fewer resources to represent people who have received negative credible fear determination and appeal those findings.  Previously we also provided our clients assistance applying for work authorization, but we are now forced to choose between trying to help some people navigate the Rule over helping other people secure this more lasting benefit.  We have also had to reduce the number of individuals the number of individuals in immigration custody and

14

**JA71**

who we can provide full representation before the immigration court.  While resource limitations have always existed for Las Americas, the Rule has brought that strain to a new breaking point.

**Guidance Impact on the CFI Process**

45.     The Guidance also impacts the implementation of the Rule have also made it significantly more difficult to further our mission and assist our clients.

46.     As mentioned above, CFI consultations and representation are central to Las Americas' detained legal services.  While we continue to provide this service, there is an entire population of people undergoing the CFI process in CBP custody who can no longer feasibly help.  That is because communicating with people in CBP custody is virtually impossible, particularly on the extremely expedited CFI-scheduling timeline imposed by the Guidance.  We are not allowed to enter CBP facilities nor do we have direct access to people detained there via telephone.  Even if a family member contacts us about a loved one in CBP custody, we are unable to make arrangements to communicate with them.

47.     The less than 24-hour timeline for trying to communicate with people in CBP custody exacerbates the communication problem.  Because people detained in those facilities will have their CFIs so quickly, it is not possible for us to provide a CFI consultation before the interview actually occurs, forcing us to make the difficult decision to move forward with CFI legal services exclusively for individuals in ICE custody.

48.     While people in CBP custody may be able to make a limited number of outbound calls, the only numbers that they see are for organizations who have been able to set up special hotlines with phone numbers designated solely for CBP custody.  Because we do not have the staff capacity or resources to hire support to operate such a hotline, asylum seekers in CBP custody most likely do not have any way to contact us before their CFIs or even after the interview if the result was negative and they wish to challenge it.

49.     As mentioned above, the government-created impediments to helping people in CBP custody before they have a CFI has forced us to move some of our CFI consultation work to Mexico.  Even when we try to help people prepare for CFIs while in Mexico and even when we agree to represent them in their CFIs, we are often unable to do so because of the speed with which CFIs occur in CBP custody.  Several Las Americas clients have been forced to forego having their attorney present during their CFI because the asylum office scheduled it without providing any advance notice, even in cases where an attorney has made an appearance.

50.     In these circumstances, where there is a negative CFI determination because we were denied notice and thus precluded from representing the individuals during their fear interview, we are limited to assisting clients with the immigration judge ("IJ") review of a negative CFI determination.  This assistance is also hindered by lack of information and notice.  Staff who plan to attend IJ reviews must spend time and resources keeping track of whether a hearing has been scheduled, as well as preparing substantively for arguing exceptions and eligibility for asylum, withholding of removal, and protection under CAT.

**Overarching Harms from the Rule & Guidance**

51.     The combined impact of the Rule and Guidance changes have fundamentally altered access to asylum at the U.S-Mexico border.  As policy has shifted and immigration legal services work has become more difficult, Las Americas needs to hire more staff to try to meet the demands of our community.  While we strive to increase *pro bono* representation and provide high quality legal representation, we are not government-funded and none of our grants are guaranteed beyond two to three years.  Moreover, it is difficult to secure funding for legal services, even in areas such as El Paso with clear needs and broad gaps in *pro bono* providers.

52.     Additionally, many funders are interested in funding work that reaches the greatest number of people possible.  Because the Rule will increase the workload for each case and prohibit

16
**JA73**

us from taking as many cases, we risk losing out on grants that expect the reach of our work to maintain a growth trajectory in terms of the number of different people served. For example, we have one funding source that has a stated goal of decreasing the amount of time staff take to provide services. This Rule has the opposite effect on our work.

53.     Additionally, our programs rely on volunteers. We already spend significant resources to coordinate, manage, and train volunteers. These changes injure our ability to rely on volunteers because the pace and complexity of the issues presented at the border continues to grow. The result is that many people on staff, myself included, have to devote resources to volunteer training and management, to the detriment of other work.

54.     Further, as mentioned above, the need for Las Americas to focus on the front end of the expedited removal process detracts from our ability to provide ongoing legal representation in full removal proceedings in immigration court, appeals before the Board of Immigration Appeals, and on related benefits applications with USCIS. This change will result in more denied asylum applications without fully developed records, more appeals, and less capacity to do that work both for Las Americas and similar organizations.

55.     In essence, the Rule and related border policies force Las Americas into full-time triage mode. We are now in a position of having to choose between preparing a larger number of noncitizens for the new screening processes, and providing full representation to people who are actually proceeding with their substantive claims.

56.     Last, Las Americas' staff has experienced a mental and physical toll as a result of the Rule and Guidance, and the harm Las Americas' mission. Living and working on the border, our staff are closely connected to the communities they serve. We witness firsthand the harmful effects of asylum bans and related enforcement-minded policies. Attempting to lead a team that is

already inundated with work through more tumult is having a serious, detrimental impact.  Since the Rule and Guidance went into effect, I have observed many staff members foregoing their paid leave because of the volume of work.  And because so much of our time is spent on the front end of the expedited removal process, staff are feeling less satisfied by the work because we do not have resources to provide longer-term services with the same frequency.  The sense that people cannot put their energy to the work that meaningfully advances Las Americas' mission is already leading to a sense of frustration and burnout.  These harms will only persist as time goes on.

**Conclusion**

57.     It is difficult for me to overstate the detrimental impact that this Rule and the Guidance have had, and will continue to have, on Las Americas' clients, staff, operations, and mission.  These changes will do nothing to improve the functioning of our immigration courts and will instead infringe on our clients' rights to seek asylum, strain our resources thus forcing us to cut back on our services, and impose insurmountable bureaucratic obstacles on people with legitimate asylum claims seeking refuge from persecution and torture.

Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center

Executed this 26th day of July 2024 in El Paso, Texas

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | No. 1:24-cv-01702-RC |
| v. | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) ) ) | |
| *Defendants*. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**JA76**



their manner of entry. Then, D.G., E.R., P.S., and D.C. and her child were subjected to expedited removal because they were deemed not to "manifest" a fear, even though several expressed their fear or attempted to do so. *See* D.G. Decl. ¶¶ 9-11; E.R. Decl. ¶¶ 12-15; P.S. Decl. ¶¶ 13-15; D.C. Decl. ¶ 13.[3] And though A.E., E.D., T.R., S.G., J.C., and J.R. did receive credible fear interviews, they failed because of the heightened standards and the lack of opportunity to consult given the compressed consultation period. A.E. Decl. ¶¶ 9-12; E.D. Decl. ¶¶ 10-11; T.R. Decl. ¶¶ 10-12; S.G. Decl. ¶¶ 10-12; J.C. Decl. ¶¶ 13-15; J.R. Decl. ¶¶ 9-12. Accordingly, there is the necessary one Plaintiff for each claim, which is all that is required.[4]

### B.     The Organizational Plaintiffs Have Standing.

Contrary to Defendants' arguments, Opp. 13-18, Organizational Plaintiffs have established injury-in-fact because the Rule and Guidance "directly affect[] and interfere[] with [their] core business activities" by "'perceptibly impair[ing] [their] ability to provide counseling'" and other services to asylum seekers. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395 (2024) ("*Alliance*") (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

The Rule and Guidance make it much more difficult for both Las Americas and RAICES to contact and serve their asylum seeker clients and client populations. As the largest immigration legal services provider in Texas, RAICES's core work is to represent and counsel noncitizens—including detained asylum seekers in expedited removal proceedings. ECF No. 23-1 ("Hidalgo Decl.") ¶¶ 3-7. Las Americas similarly provides pro bono representation and other assistance to asylum seekers in West Texas, New Mexico, and Ciudad Juarez, Mexico. ECF No. 23-2 ("Babaie

---

[3] Plaintiffs' declarations are located on the docket at ECF No. 15-1 through ECF No. 15-10.

[4] Defendants argue that "only J.R. has alleged injury from the four-hour consultation period." Opp. 23. But J.C. also alleges such a violation. J.C. states that he learned of his potential deportation at around 12 p.m. on June 26, had his interview the following morning, fewer than 24 hours later, and that he did not speak to an attorney during that time. J.C. Dec. ¶¶ 13-14.

2

**JA78**



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRATION ADVOCACY CENTER, et al., | ) ) ) |
| *Plaintiffs*, | )    No. 1:24-cv-01702 |
| v. | ) ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) |
| *Defendants.* | ) ) |

**JOINT APPENDIX FILED PURSUANT TO LOCAL RULE 7(N)**

**JA80**

**INDEX**

| **Proclamation** | |
| --- | --- |
| Presidential Proclamation, *Securing the Border* (June 3, 2024) | IFR_Proc_000001-14 |
| **Interim Final Rule** | |
| *Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024), https://www.federalregister.gov/documents/2024/06/07/2024-12435/securing-the-border. | IFR_Rule_000001-63 |
| *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018), https://www.federalregister.gov/documents/2018/11/09/2018-24594/alienssubject-to-a-bar-on-entry-under-certain-presidential-proclamations-procedures-for-protection | IFR_AR_000228-231 |
| *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67,202 (Oct. 21, 2020), https://www.federalregister.gov/documents/2020/10/21/2020-23159/procedures-for-asylum-and-bars-to-asylum-eligibility. | IFR_AR_000333-391 |
| *Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers,* 87 Fed. Reg. 18,078 (Mar. 29, 2022), https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-andconsideration-of-asylum-withholding-of-removal-and-cat | IFR_AR_000391-832 |
| *Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists*, 87 Fed. Reg. 19,941 (Apr. 6, 2022), https://www.federalregister.gov/documents/2022/04/06/2022-07306/public-health-determination-and-order-regarding-suspending-the-right-to-introduce-certain-persons. | IFR_AR_000833-898 |
| *Circumvention of Lawful Pathways,* 88 Fed. Reg. 31,314 (May 16, 2023), https://www.federalregister.gov/documents/2023/05/16/2023-10146/circumvention-of-lawful-pathways | IFR_AR_001141-1155 |
| *Application of Certain Mandatory Bars in Fear Screenings*, 89 Fed. Reg. 41,347 (May 13, 2024), https://www.federalregister.gov/documents/2024/05/13/2024-10390/application-of-certain-mandatory-bars-in-fear-screenings. | IFR_AR_001173-1311 |
| Border Act of 2024, S. 4361, 118th Cong. (2023–2024), https://www.congress.gov/bill/118th-congress/senate-bill/4361/text?amp%3Bq=%7B%22search%22%3A%22%5C%22immig | IFR_AR_001715-2006 |

| | |
|---|---|
| ation%5C%22%22%7D&amp%3Br=9&s=5 | |
| CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day | IFR_AR_002089-90 |
| CBP, Large group of migrants encountered were misinformed (Mar. 31, 2023), https://www.cbp.gov/newsroom/local-media-release/large-group-migrants-encountered-were-misinformed | IFR_AR_002135-40 |
| CBP, *Southwest Land Border Encounters*, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified May 15, 2024) | IFR_AR_002156-61 |
| Cong. Res. Serv., *Mexico: Organized Crime and Drug Trafficking Organizations* (July 28, 2020), https://crsreports.congress.gov/product/pdf/R/R41576/45 | IFR_AR_002330-66 |
| Decl. of Blas Nuñez-Neto, *E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) | IFR_AR_002455-80 |
| Declaration of Robert E. Perez, Dkt. 95-2, Innovation Law Lab, No. 19-15716 (Mar. 3, 2020). | IFR_AR_002554-61 |
| DHS, Form I-867A (08/01/07) | IFR_AR_002596 |
| DHS, Form I-867B (08/01/07) | IFR_AR_002597 |
| DHS, USCIS, *RAIO Combined Training Program: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024) | IFR_AR_002943-79 |
| Letter from Cory Booker, Member of Cong., inquiry to Alejandro Mayorkas, Sec'y to U.S. Dep't of Homeland Sec. (Mar. 27, 2023). | IFR_AR_006935-37 |
| Letter from Edward Markey, Member of Cong., inquiry to Alejandro Mayorkas, Sec'y to U.S. Dep't of Homeland Sec. (Feb. 21, 2023). | IFR_AR_006938-41 |
| Memorandum from Alejandro N. Mayorkas, Sec'y of Homeland Sec., *Termination of Migrant Protection Protocols* (Oct. 29, 2021), https://www.dhs.gov/sites/default/files/2022-01/21_1029_mpp-termination-memo.pdf. | IFR_AR_007309-12 |
| Memorandum from Diane Sabatino, Deputy Exec. Assistant Comm'r, Off. of Field Operations, U.S. Customs & Border Prot., *CBP One Scheduling Functionality Changes* (May 8, 2023). | IFR_AR_007341-44 |
| Memorandum from Tricia Kennedy, Program Manager, Off. of Field Operations, U.S. Customs & Border Prot., *CBP OneTM Application* (May 8, 2023). | IFR_AR_007414-24 |
| OHSS, *Data for Securing the Border IFR* (June 2024) | IFR_AR_007434-585 |
| Ribando Seelke, Clare & Karla Rios, *Haiti: Recent Developments and U.S. Policy*, Cong. Research Serv. R47394 (Jan. 23, 2023), https://crsreports.congress.gov/product/pdf/R/R47394. | IFR_AR_007927-48 |
| U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal, Volume II: Expert Reports* (Feb. 8, 2005), | IFR_AR_008170-619 |

| | |
|---|---|
| https://www.uscirf.gov/publications/report-asylum-seekers-expedited-removal | |
| U.S. Dep't of Homeland Sec., *Department of Homeland Security Border Security Metrics Report: 2021* (Apr. 27, 2022), https://www.dhs.gov/sites/default/files/2022-06/2022_0427_plcy_border_security_metrics_report_FY2021_%282020_data%29.pdf. | IFR_AR_008622-713 |
| U.S. Dep't of Homeland Sec., Off. of Immigration Statistics, *Data for the February 2023 NPRM*. | IFR_AR_009000-144 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Cross-Cultural Communication & Other Factors that May Impede Communication at an Interview* (Dec. 20, 2019). | IFR_AR_009803-28 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Gender-Related Claims* (Dec. 20, 2019). | IFR_AR_009969-10020 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Dec. 20, 2019). | IFR_AR_010021-88 |
| U.S. Dep't of Homeland Sec., U.S. Citizenship & Immigration Serv., *RAIO Combined Training Program: Interviewing – Introduction to the Non-Adversarial Interview* (Dec. 20, 2019). | IFR_AR_010147-194 |
| U.S. Dep't of State, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm | IFR_AR_011161-71 |
| USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022) | IFR_AR_011518-19 |
| Acevedo, Nicole & Albinson Linares, *Misinformation Fuels False Hope Among Migrants After Deadly Fire in Mexico*, NBC NEWS (Mar. 30, 2023), https://www.nbcnews.com/news/latino/misinformation-fuels-false-hopes-migrants-mexico-fire-rcna77398. | IFR_AR_011638-48 |
| Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends*, Washington Office of Latin America (Dec. 15, 2023), https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/ | IFR_AR_011649-60 |
| Am. Immigration Council, *Your Rights Under Al Otro Lado v. Mayorkas*, https://www.americanimmigrationcouncil.org/al-otro-lado-mayorkas (last visited May 4, 2023). | IFR_AR_011707-14 |
| Anker, Deborah & Michael H. Posner, *The Forty Year Crisis: A Legislative History of the Refugee Act of 1980*, 19 SAN DIEGO L. R. 9 | IFR_AR_011719-800 |

| | |
|---|---|
| (1981). | |
| Augustin, Ed, *Stars Align for Cuban Migrants as Record Numbers Seek Better Life in U.S.*, GUARDIAN (June 12, 2022), https://www.theguardian.com/world/2022/jun/12/cuban-migrants-us-record-numbers-migration. | IFR_AR_011891-96 |
| Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, *Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences*, 107 Personality & Individual Differences 190 (2017), https://www.sciencedirect.com/science/article/pii/S0191886916311382?via%3Dihub | IFR_AR_011905-09 |
| Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border*, BBC (July 8, 2023), https://www.bbc.com/news/world-us-canada-65848683 | IFR_AR_011910-15 |
| *Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way*, TAHIRIH (Feb. 21, 2023), https://www.tahirih.org/news/bidens-asylum-ban-will-continue-to-place-survivors-in-harms-way/. | IFR_AR_011937-41 |
| Castillo, Andrea, *Asylum Seekers Face Decision to Split Up Families or Wait Indefinitely Under New Border Policy*, L.A. TIMES (Feb. 24, 2023), https://www.latimes.com/politics/story/2023-02-24/asylum-seeking-families-consider-separation-shortage-mobile-app-appointments. | IFR_AR_012388-402 |
| Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call it dead in the House*, NPR (Feb. 4, 2024), https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached | IFR_AR_012582-99 |
| Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.*, Council on Foreign Rels. (Feb. 1, 2024), https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us | IFR_AR_012610-27 |
| Dickerson, Caitlin, *Confusion on the Border as Appeals Court Rules Against Trump's Remain in Mexico Policy*, N.Y. TIMES (Feb. 28, 2020, updated Oct. 29, 2021), https://www.nytimes.com/2020/02/28/us/migrants-court-remain-in-mexico-mpp-injunction.html. | IFR_AR_012647-50 |
| Hum. Rts. First, *New Report Documents Devastating Toll of Court-Ordered Reimplementation of Remain in Mexico* (Sept. 15, 2022), https://humanrightsfirst.org/library/new-report-documents-devastating-toll-of-court-ordered-reimplementation-of-remain-in-mexico/. | IFR_AR_013607-10 |
| Joanna Walters, *Migrant surges hint at chaos at US-Mexico border once Title 42 expires*, The Guardian (Dec. 16, 2022), https://www.theguardian.com/us-news/2022/dec/16/title-42-expires-us- | IFR_AR_014183-91 |

| | |
|---|---|
| mexico-border-migrants | |
| Jordan, Miriam & Michael Shear, *An End to Pandemic Restrictions Could Bring Thousands to the Border*, N.Y. TIMES (May 7, 2023), https://www.nytimes.com/2023/05/07/us/title-42-border-migrants.html. | IFR_AR_014192-201 |
| Jordan, Miriam, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. TIMES (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html. | IFR_AR_014202-208 |
| José Ignacio Castañeda Perez, *How social media misleads migrants about the border*, The Arizona Republic (Oct. 12, 2023), *available at* https://www.azcentral.com/story/news/politics/border-issues/2023/10/11/social-media-misinforms-migrants-about-arizona-mexico-border/70846824007/ | IFR_AR_014209-12 |
| Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down*, NBC News (May 15, 2024), https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821 | IFR_AR_014219-24 |
| Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023*, Time (Dec. 22, 2023), https://time.com/6547992/migrants-crossing-darien-gap-2023 | IFR_AR_014434-42 |
| Maria Abi-Habib & Eileen Sullivan, *Cuban Migrants Arrive to U.S. in Record Numbers, on Foot, Not by Boat*, N.Y. Times (May 3, 2022), https://www.nytimes.com/2022/05/03/world/americas/cuban-migration-united-states.html | IFR_AR_014443-50 |
| Mata, Reyes & Nick Miroff, *New Surge of Migrants Strains U.S. Capacity Ahead of May 11 Deadline*, WASH. POST (Apr. 28, 2023), https://www.washingtonpost.com/nation/2023/04/28/border-migrants-biden-title-42/. | IFR_AR_014480-84 |
| Michele R. Pistone & John J. Hoeffner, *Rules Are Made to Be Broken: How the Process of Expedited Removal Fails Asylum Seekers*, 20 Geo. Immigr. L.J. 167 (2006) | IFR_AR_014506-40 |
| Miller, Leila, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This is Why*, L.A. TIMES (Dec. 27, 2022), https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion. | IFR_AR_014543-58 |
| Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay*, N.Y. Times (Jan. 31, 2024), https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html | IFR_AR_014559-68 |
| Miroff, Nick & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America*, WASH. POST (Oct. 24, 2018), https://www.washingtonpost.com/world/national- | IFR_AR_014569-77 |

| | |
|---|---|
| security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html. | |
| Musalo, Karen & Marcelle Rice, *The Implementation of the One-year Bar to Asylum*, 31 HASTINGS INT'L & COMP. L. REV. 693 (2008), https://repository.uchastings.edu/cgi/viewcontent.cgi?article=1567&context=faculty_scholarship. | IFR_AR_014606-39 |
| Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says*, CNN (July 27, 2022), https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html | IFR_AR_014951-61 |
| Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.*, NPR, (Apr. 22, 2024), https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration | IFR_AR_015093-108 |
| Seth J. Hill & Margaret E. Roberts, *Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions*, 31 Pol. Analysis 575 (2023) | IFR_AR_015111-26 |
| Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration*, AP News (Apr. 30, 2024), https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b | IFR_AR_015127-31 |
| Shane Costello & John Roodenburg, *Acquiescence Response Bias – Yeasaying and Higher Education*, 32 Australian Ed. & Dev. Pysch. 105, 105 (2015) | IFR_AR_015163-77 |
| *Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents*, NPR (Dec. 10, 2023), https://www.npr.org/2023/12/10/1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents | IFR_AR_015213-230 |
| Steven Dudley, Parker Asmann & Victoria Dittmar, *Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border*, InSight Crime (June 2023), https://insightcrime.org/wp-content/uploads/2023/06/HGBF-US-Policy-OC-and-Migration-Policy-Brief-InSight-Crime-June-2023-FINAL-ENG.pdf | IFR_AR_015332-53 |
| Tech Transparency Project, *Inside the World of Misinformation Targeting Migrants on Social Media* (July 26, 2022), https://www.techtransparencyproject.org/articles/inside-world-misinformation-targeting-migrants-social-media. | IFR_AR_015362-76 |
| *Tell President Biden: End the Transit Ban, Start a Fair Path to Citizenship*, UNITARIAN UNIVERSALIST SERV. COMMITTEE, https://www.uusc.org/initiatives/transitban/ (last visited Apr. 13, 2023). | IFR_AR_015380-84 |
| United Nations High Comm'n for Refugees, *Ecuador: Monthly Update* | IFR_AR_015632-37 |

| | |
|---|---|
| *Oct. 2022* (Nov. 23, 2022), https://data.unhcr.org/en/documents/details/97082. | |
| UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* (Jan. 1992 ed., reissued Feb. 2019), https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967 | IFR_AR_015808-16085 |
| UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring – April 2024,* https://data.unhcr.org/en/documents/details/108399 (last visited May 31, 2024) | IFR_AR_016108-11 |
| UNHCR, *Operational Update: Mexico* (Dec. 2023), https://reporting.unhcr.org/mexico-operational-update-6421 | IFR_AR_016116-23 |
| Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires*, AP News (May 11, 2023), https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9 | IFR_AR_016775-81 |
| Whelan, Robbie, *Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program: Migrants Seeking Shelter in the U.S. Under Trump Administration Policy Report Rising Numbers of Kidnappings by Criminal Groups*, WALL STREET J. (Dec. 28, 2019), https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000. | IFR_AR_016862-68 |
| **Guidance** | |
| Memorandum from Ted H. Kim, Associate Dir., Refugee, Asylum and Int'l Operations Directorate, U.S. Citizenship and Immigration Servs., to Jennifer Higgins, Deputy Dir., U.S. Citizenship and Immigration Servs., *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border IFR Apply*, (Jun. 4, 2024) (on file with agency). | USCIS_4-Hour_AR 001-5 |
| *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) | USCIS_4-Hour_AR 041-64 |
| *U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). | USCIS_4-Hour_AR 065-70 |
| *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959 (2020) | USCIS_4-Hour_AR 071-112 |
| *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020) | USCIS_4-Hour_AR 167-190 |
| Excerpts from U.S. Citizenship and Immigration Servs., *Credible Fear Procedures Manual*, § III.D, 7-8 (last updated Apr. 6, 2023) (on file with agency) | USCIS_4-Hour_AR 293-94 |

SECURING THE BORDER

- - - - - - -

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

There are more people around the world who are displaced from their homes today than at any point in time since World War II. Many factors have contributed to this problem. Failing regimes and dire economic conditions afflict many countries, including several in the Western Hemisphere. Violence linked to transnational criminal organizations has displaced substantial numbers of people in Latin America. The global COVID-19 pandemic upended societies around the globe. Natural disasters have forced people from their homes.

As a result of these global conditions, we have been experiencing substantial levels of migration throughout the Western Hemisphere, including at our southwest land border. In 2019, encounters nearly doubled from their 2018 level to almost 1 million. In 2020, the global COVID-19 pandemic led countries throughout the world to shut their borders and suspend international travel; however, once the pandemic began to recede, international travel resumed, and we again experienced elevated levels of migration throughout the Western Hemisphere, including at our southwest land border.

On May 11, 2023, as part of my Administration's work to prepare for the end of the Centers for Disease Control and Prevention's public health order under title 42, United States Code, and to return to processing all noncitizens under immigration authorities under title 8, United States Code (title 8), the Department of Homeland Security (DHS) and the Department of Justice (DOJ) issued a final rule, entitled Circumvention of Lawful Pathways (Lawful Pathways rule), encouraging the use of lawful pathways and imposing a rebuttable presumption of asylum ineligibility on those who do not use them.

**JA88**

2

The Lawful Pathways rule was designed to address the high levels of migration throughout the Western Hemisphere and further discourage irregular migration by encouraging migrants to use lawful, safe, and orderly processes for entering the United States or to seek protection in other partner nations; imposing a presumptive condition on asylum eligibility for those who fail to do so; and supporting the swift return of those who do not have valid protection claims.

As a complement to the Lawful Pathways rule and associated enforcement efforts, the Department of State and DHS have taken significant steps to expand safe and orderly pathways for migrants to enter the United States lawfully. Those steps include establishing Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala to facilitate access to lawful pathways; expanding country-specific and other available processes to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; expanding access to visa programs for seasonal employment; establishing a mechanism for noncitizens to schedule a time and place to present at ports of entry in a safe, orderly, and lawful manner through the CBP One mobile application; and expanding refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year 2021 to up to 50,000 in Fiscal Year 2024.

The Lawful Pathways rule and these complementary measures have made a substantial impact. On May 12, 2023, DHS returned to processing all noncitizens under title 8 immigration authorities and is processing noncitizens at record scale and efficiency. Since then, my Administration has maximized the use of expedited removal to the greatest extent possible given limited resources, placing more than 970 individuals encountered at and between ports of entry at the southwest land border into the process each day on average and conducting more than 152,000

**JA89**

IFR_Proc_000002

3

credible fear interviews, both of which are record highs.  As a result, from May 12, 2023, to May 1, 2024, my Administration removed or returned more than 720,000 noncitizens who did not have a lawful basis to remain in the United States, the vast majority of whom crossed the southwest land border.  Total removals and returns in the 12 months following May 12, 2023, exceeded removals and returns in every full Fiscal Year since 2010.  The majority of all individuals encountered at the southwest land border from Fiscal Year 2021 to Fiscal Year 2023 were removed, returned, or expelled.

Despite these efforts, and after months of reduced encounter levels following the changes put in place after May 12, 2023, encounter levels increased toward the end of 2023, and December 2023 saw the highest level of encounters between ports of entry in history, as increasing numbers of people migrated through the Western Hemisphere.  The challenges presented by this surge in migration, which would have been even worse had the Lawful Pathways rule and other measures not been in place, were compounded by the fact that the surge was focused increasingly on western areas of the border in California and Arizona that are geographically remote, challenging to address, and without sufficient pre-existing infrastructure or resources to respond to the surge.  From January to March 2024, encounters decreased from and have remained below levels experienced in November and December 2023, including as a result of increased enforcement by the United States and partner countries.  However, the factors that are driving the unprecedented movement of people in our hemisphere remain, and there is still a substantial and elevated level of migration that continues to pose significant operational challenges.

The current situation is also the direct result of the Congress's failure to update an immigration and asylum system

**JA90**                                    IFR_Proc_000003

4

that is simply broken -- and not equipped to meet current needs. While my Administration has vigorously enforced the law within the constraints imposed by the existing system, the statutory framework put in place by the Congress is outdated. For the vast majority of people in immigration proceedings, the current laws make it impossible to quickly grant protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. This reality is compounded by the fact that the Congress has chronically underfunded our border security and immigration system and has failed to provide the resources or reforms it needs to be able to deliver timely consequences to most individuals who cross unlawfully and cannot establish a legal basis to remain in the United States.

Despite the strengthened consequences in place at our border through the Lawful Pathways rule and the related measures that have led to record returns and removals, encounter levels are exceeding our capacity to deliver those consequences in a timely manner due to the outdated laws and limited resources we have available.

My Administration has repeatedly asked the Congress to update the outdated and inadequate immigration statutes, to create a legal framework that is functional and addresses current realities, and to provide additional resources so that we can more effectively deliver consequences at the border. In August 2023, I requested more than $4 billion in additional funding for border security and related migration issues, including more than $2 billion for urgent DHS border management requirements. The Congress failed to act. In October 2023, I requested $13.6 billion for border enforcement and migration management. This request included more than $5 billion for DHS to manage conditions on the southern border, as well as funding

**JA91**

5

for critical capacity enhancements to keep the southern border secure. The Congress once again failed to provide our border and immigration system with the resources it needs to deliver timely consequences to those who cross unlawfully.

In early February 2024, a bipartisan group of Senators introduced legislation (bipartisan legislative proposal) containing the toughest and fairest reforms of our asylum laws in decades that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings for individuals encountered at the border, including those who are seeking protection. Critically, the bipartisan legislative proposal included nearly $20 billion in additional resources for DHS and other departments to implement those new authorities, such as:

    (a)  over 1,500 new U.S. Customs and Border Protection (CBP) personnel, including Border Patrol agents and CBP officers;

    (b)  over 4,300 new asylum officers and additional U.S. Citizenship and Immigration Services staff to facilitate timely and fair decisions;

    (c)  100 new immigration judge teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;

    (d)  shelter and critical services for newcomers in our cities and States; and

    (e)  1,200 new U.S. Immigration and Customs Enforcement personnel for functions including enforcement and deportations. While the bipartisan legislative proposal did not include everything we wanted, senior officials from my Administration worked closely with the bipartisan group of Senators to ensure that the reforms would adequately address the challenges that we have been facing at our southern border for more than a decade.

**JA92**

6

However, the Congress failed to move forward with this bipartisan legislative proposal.

The Further Consolidated Appropriations Act, 2024 (Public Law 118-47) increased funding for DHS over Fiscal Year 2023, but it did not address the needs identified in various related supplemental requests, nor did it equip the Federal Government with the new authorities from the bipartisan legislative proposal. In May 2024, when the Senate again considered the bipartisan legislative proposal, the Senate failed to advance the measure.

Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.

The Congress's failure to deliver meaningful policy reforms and adequate funding, despite repeated requests that they do so, is a core cause of this problem. Under current law, whenever a noncitizen in expedited removal indicates an intention to apply for asylum or a fear of persecution, they are referred for an interview with an asylum officer and cannot be removed through expedited removal if there is a significant possibility that they could establish eligibility for asylum. This screening standard is a requirement imposed by the Congress, but it has not functioned well in predicting ultimate success in asylum proceedings. From 2014 to 2019, 83 percent of individuals

**JA93**                                    IFR_Proc_000006

7

referred for an interview with an asylum officer passed the screening stage, meaning that they were not removed pursuant to expedited removal, but less than 25 percent of cases ultimately resulted in a grant of asylum or other protection, often after waiting years to reach a final decision.  By imposing a rebuttable presumption of asylum ineligibility on those who cross the border unlawfully, the Lawful Pathways rule has made a meaningful impact in reducing this disparity.  The screen-in rate from May 12, 2023, to March 31, 2024, dropped to 52 percent for individuals who are subject to the rebuttable presumption of asylum ineligibility.  However, the Lawful Pathways rule alone is inadequate during times of record encounter levels and cannot change the underlying statutory limitations.

Data confirm that the system has been badly strained for many years and is not functioning to provide timely relief for those who warrant it or timely consequences for those without viable protection claims.  Due to an outdated and inefficient system and insufficient resources that do not allow for prompt adjudication of claims, too many people have had to be processed by the Border Patrol and released with a notice to appear in removal proceedings before an immigration judge since May 2023. The U.S. Citizenship and Immigration Service affirmative asylum backlog is now over 1 million cases and growing, with over 300,000 applications filed prior to 2021 still pending.  At the end of Fiscal Year 2023, there were over 2.4 million cases pending in the immigration courts.  Pending cases more than doubled from the end of Fiscal Year 2016 to the end of Fiscal Year 2020 and doubled again between that time and the end of Fiscal Year 2023.  Between Fiscal Year 2006 and the end of Fiscal Year 2023, in tandem with historic increases in filings to initiate immigration court proceedings, the immigration courts' pending caseload increased from approximately 170,000 to

**JA94**

IFR_Proc_000007

8

approximately 2.46 million.  During Fiscal Year 2023, immigration judges completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts than were completed.

The status quo system -- the result of outdated laws and inadequate resources -- has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations and other criminal smuggling organizations that, without countermeasures, will continue to grow in strength and pose significant threats to the safety and security of United States communities and migrants, as well as countries throughout the region.

Considering these trends and the decades-long failure of the Congress to address the problem through systemic reform and adequate funding, and following the Congress's failure to pass the bipartisan legislative proposal, I must exercise my executive authorities to meet the moment.  This proclamation answers the call by suspending entry of noncitizens across the southern border during this time of high border crossings. Appropriate exceptions are provided, such as for those who are particularly vulnerable or present pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for safe and orderly processing into the United States. That process will continue to allow for individuals to seek entry to this country each day in a safe and orderly manner, and following their arrival, to seek protection through the appropriate process.  This proclamation, in conjunction with steps to be taken by DOJ and DHS, is needed to enhance our ability to address the historic levels of migration and more efficiently process migrants arriving at the southern border given current resource levels.

**JA95**

9

These actions do not change or fully compensate for the fact that our immigration system is under-resourced and broken, nor do they change the fact that there are significant limits to what can be achieved without the Congress fulfilling its responsibility to help solve the unprecedented challenge that we are facing. No executive action can deliver the significant policy reforms and additional resources that were in the bipartisan legislative proposal. But I will continue to take actions, within these constraints, to address the situation at our southern border.

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation under circumstances described in section 2 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

Section 1. Suspension and Limitation on Entry. The entry of any noncitizen into the United States across the southern border is hereby suspended and limited, subject to section 3 of this proclamation. This suspension and limitation on entry shall be effective at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation directed in this proclamation shall be discontinued pursuant to subsection 2(a) of this proclamation, subject to subsection 2(b) of this proclamation.

**JA96**

IFR_Proc_000009

10

Sec. 2.  Applicability of Suspension and Limitation on

Entry.  (a)  The Secretary of Homeland Security shall monitor

the number of daily encounters and, subject to subsection (b) of

this section, the suspension and limitation on entry pursuant to

section 1 of this proclamation shall be discontinued at 12:01

a.m. eastern time on the date that is 14 calendar days after the

Secretary makes a factual determination that there has been a 7-

consecutive-calendar-day average of less than 1,500 encounters,

not including encounters described in subsection 4(a)(iii) of

this proclamation.

(b)  Notwithstanding a factual determination made under

subsection (a) of this section, the suspension and limitation on

entry pursuant to section 1 of this proclamation shall apply at

12:01 a.m. eastern time on the calendar day immediately after

the Secretary has made a factual determination that there has

been a 7-consecutive-calendar-day average of 2,500 encounters or

more, not including encounters described in subsection 4(a)(iii)

of this proclamation, until such suspension and limitation on

entry is discontinued pursuant to subsection (a) of this

section.

(c)  For purposes of subsection (a) and subsection (b) of

this section, unaccompanied children (as defined in section

279(g)(2) of title 6, United States Code) from non-contiguous

countries shall not be included in calculating the number of

encounters.

Sec. 3.  Scope and Implementation of Suspension and

Limitation on Entry.  (a)  The suspension and limitation on

entry pursuant to section 1 of this proclamation shall apply

across the southern border to noncitizens, other than those

described in subsection (b) of this section, during such times

that the suspension and limitation on entry is in effect.

**JA97**

IFR_Proc_000010

11

(b)  The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to:

(i)    any noncitizen national of the United States;

(ii)   any lawful permanent resident of the United States;

(iii)  any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv)   any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v)    any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A)  members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B)  noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C)  noncitizens traveling pursuant to the visa waiver program as described in section 1187 of title 8, United States Code; and

(D)  noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe

**JA98**

12

and orderly entry of noncitizens into the United States;

(vi)   any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii)   any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

(c)   An exception under subsection (b) of this section from the suspension and limitation on entry pursuant to section 1 of this proclamation does not affect a noncitizen's inadmissibility under the Immigration and Nationality Act for a reason other than the applicability of this proclamation.

(d)   The Secretary of Homeland Security and the Attorney General are authorized to issue any instructions, orders, or regulations as may be necessary to implement this proclamation, including the determination of the exceptions in subsection (b) of this section, and shall promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

(e)   Nothing in this proclamation shall limit the statutory processes afforded to unaccompanied children upon entering the

**JA99**                                              IFR_Proc_000012

13

United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

Sec. 4. Definitions. (a) The term "encounter" refers to a noncitizen who:

> (i) is physically apprehended by CBP immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;

> (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between ports of entry; or

> (iii) is determined to be inadmissible at a southwest land border port of entry.

(b) The term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.

(c) The term "southwest land border" means the entirety of the United States land border with Mexico.

(d) The term "southern border" means the southwest land border and the southern coastal borders.

Sec. 5. Severability. It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

IFR_Proc_000013

14

Sec. 6. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i)    the authority granted by law to an executive department or agency, or the head thereof; or

(ii)   the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this third day of June, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-eighth.

**JA101**

**48710**    **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 208 and 235**

[USCIS Docket No. USCIS–2024–0006]

RIN 1615–AC92

## DEPARTMENT OF JUSTICE

### Executive Office for Immigration Review

**8 CFR Part 1208**

[A.G. Order No. 5943–2024]

RIN 1125–AB32

### Securing the Border

**AGENCY:** U.S. Citizenship and Immigration Services (''USCIS''), Department of Homeland Security (''DHS''); Executive Office for Immigration Review (''EOIR''), Department of Justice (''DOJ'').

**ACTION:** Interim final rule (''IFR'') with request for comments.

---

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act (''INA''), finding that the entry into the United States of certain noncitizens during emergency border circumstances would be detrimental to the interests of the United States, and suspending and limiting the entry of those noncitizens. The Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border, including any warranted limitations and conditions on asylum eligibility. The Departments are now issuing this IFR.

**DATES:**

*Effective date:* This IFR is effective at 12:01 a.m. eastern daylight time on June 5, 2024.

*Submission of public comments:* Comments must be submitted on or before July 8, 2024.

The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:** You may submit comments on this IFR, identified by USCIS Docket No. USCIS–2024–0006, through the Federal eRulemaking Portal: *https://www.regulations.gov.* Follow the website instructions for submitting comments.

Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage devices, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, U.S. Citizenship and Immigration Services, Department of Homeland Security, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, U.S. Department of Homeland Security; telephone (202) 447–3459 (not a toll-free call).

*For the Executive Office for Immigration Review:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, Department of Justice, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
  A. Background and Purpose
  B. Legal Authority
  C. Summary of Provisions of the IFR
III. Discussion of the IFR
  A. Current Framework
  1. Asylum, Statutory Withholding of Removal, and CAT Protection
  2. Expedited Removal and Screenings in the Credible Fear Process
  3. Lawful Pathways Condition on Asylum Eligibility
  B. Justification
  1. Global Migration at Record Levels
  2. Need for These Measures
  3. Description of the Rule and Explanation of Regulatory Changes
  C. Section-by-Section Description of Amendments
  1. 8 CFR 208.13 and 1208.13
  2. 8 CFR 208.35
  3. 8 CFR 1208.35
  4. 8 CFR 235.15
IV. Statutory and Regulatory Requirements
  A. Administrative Procedure Act
  1. Foreign Affairs
  2. Good Cause
  B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
  C. Regulatory Flexibility Act
  D. Unfunded Mandates Reform Act of 1995
  E. Congressional Review Act
  F. Executive Order 13132 (Federalism)
  G. Executive Order 12988 (Civil Justice Reform)
  H. Family Assessment
  I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
  J. National Environmental Policy Act
  K. Paperwork Reduction Act

## List of Abbreviations

AO   Asylum Officer
APA   Administrative Procedure Act
BIA   Board of Immigration Appeals (DOJ, EOIR)
CAT   Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP   U.S. Customs and Border Protection
CBP   One app CBP One mobile application
CDC   Centers for Disease Control and Prevention
CHNV   Cuba, Haiti, Nicaragua, and Venezuela
DHS   Department of Homeland Security
DOD   Department of Defense
DOJ   Department of Justice
EOIR   Executive Office for Immigration Review
FARRA   Foreign Affairs Reform and Restructuring Act of 1998
FRP   Family Reunification Parole
FY   Fiscal Year
HSA   Homeland Security Act of 2002
ICE   U.S. Immigration and Customs Enforcement
IFR   Interim Final Rule
IIRIRA   Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ   Immigration Judge
INA   or the Act Immigration and Nationality Act
INS   Immigration and Naturalization Service
MPP   Migrant Protection Protocols
NGO   Non-Governmental Organization
NEPA   National Environmental Policy Act
NTA   Notice to Appear
OHSS   Office of Homeland Security Statistics
OIS   Office of Immigration Statistics
OMB   Office of Management and Budget
POE   Port of Entry
RFA   Regulatory Flexibility Act
SWB   Southwest Land Border
TCO   Transnational Criminal Organization
UC   Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UIP   U.S. Customs and Border Protection Unified Immigration Portal
UMRA   Unfunded Mandates Reform Act of 1995
UNHCR   United Nations High Commissioner for Refugees
USBP   U.S. Border Patrol
USCIS   U.S. Citizenship and Immigration Services

## I. Public Participation

The Departments invite all interested parties to participate in this rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by the deadline stated above. The Departments also invite comments

IFR_Rule_000001

**JA102**

that relate to the economic, environmental, or federalism effects that might result from this IFR. Comments that will provide the most assistance to the Departments in implementing these changes will reference a specific portion of the IFR, explain the reason for any recommended change, and include data, information, or authority that supports such recommended change. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the IFR and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https:// www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https:// www.regulations.gov*.

*Docket:* For access to the docket and to read background documents or comments received, go to *https:// www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

## II. Executive Summary

### A. Background and Purpose

On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States are unduly strained at this time, the entry into the United States of certain categories of noncitizens [1] is detrimental to the interests of the United States, and

suspending and limiting the entry of such noncitizens. The Proclamation explicitly excepts from its terms certain persons who are not subject to the suspension and limitation. This rule is necessary to respond to the emergency border circumstances discussed in the Proclamation.

The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. As the preamble elsewhere explains, the periods during which the Proclamation is intended to be in effect, when encounters exceed certain thresholds, identify such situations. Hence, the Departments in this preamble use the term "emergency border circumstances" to refer more specifically to the period of time after the date that the Proclamation's suspension and limitation on entry would commence (as described in section 1 of the Proclamation) until the discontinuation date referenced in section 2(a) of the Proclamation or the date the President revokes the Proclamation (whichever comes first), as well as any subsequent period during which the Proclamation's suspension and limitation on entry would apply as described in section 2(b) of the Proclamation.[2] As the Proclamation and this preamble explain, these circumstances exist despite the Departments' efforts to address substantial levels of migration, and such circumstances are a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems.

The Proclamation explains that since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere,[3] including record levels at

the southwest land border ("SWB").[4] In

---

250,000 Colombians, 210,000 Haitians, and 210,000 Salvadorans, among others. By comparison, prior to 2018 there were never more than 1 million displaced persons in the hemisphere, and prior to 2007 there were never more than 300,000. Nearly 1 in every 100 people in the Western Hemisphere was displaced in 2022, compared to less than 1 in 1,000 displaced in the region each year prior to 2018. *See* UNHCR, *Refugee Data Finder, unhcr.org/ refugee-statistics/download/?url=PhV1Xc* (last visited May 27, 2024); *see also* UNHCR, *Global Trends: Forced Displacement in 2022,* at 2, 8, 9, 12 (June 14, 2023), *https://www.unhcr.org/global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases); UNHCR, *Venezuela Situation, https:// www.unhcr.org/emergencies/venezuela-situation* (last updated Aug. 2023).

[4] United States Government sources refer to the U.S. border with Mexico by various terms, including "SWB" and "the southern border." In some instances, these differences can be substantive, referring only to portions of the border, while in others they simply reflect different word choices. As defined in section 4(d) of the Proclamation, the term "southern border" includes both the southwest land border ("SWB") and the southern coastal borders. As defined in section 4(c) of the Proclamation, the term "southwest land border" means the entirety of the United States land border with Mexico. And as defined in section 4(b) of the Proclamation, the term "southern coastal borders" means all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the SWB, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico. The Departments believe that the factual circumstances described herein support applying this IFR to both the SWB and the southern coastal borders, although they recognize that occasionally different variations of this terminology may be used. The Departments further note there are sound reasons for the Proclamation and rule to include maritime borders of the United States Virgin Islands and Puerto Rico; this aspect of the Proclamation and rule help avoid any incentive for maritime migration to such locations. The dangers of such migration, and the operational challenges associated with responding to such maritime migration, are well documented. *See Securing America's Maritime Border: Challenges and Solutions for U.S. National Security: Hearing Before the Subcomm. on Transp. & Mar. Sec. of the H. Comm. on Homeland Sec.,* 108th Cong. 10–11 (prepared statement of Rear Admiral Jo-Ann F. Burdian, Assistant Commandant for Response Policy, U.S. Coast Guard) (describing an increasingly challenging operational environment and noting that most "Cuban and Haitian migrants use transit routes into Florida, either directly or via the Bahamas. Alternatively, Dominican and some Haitian migrants use shorter transit routes across the Mona Passage to Puerto Rico and the U.S. Virgin Islands. Common conveyances used in this region range from fishing vessels, coastal freighters, sail freighters, go-fast type vessels, and 'rusticas.' "); PBS, *More Than 100 Migrants Stranded Near Puerto Rico Await Help During Human Smuggling Operation* (Oct. 18, 2022), *https://www.pbs.org/newshour/world/more-than-100-migrants-stranded-near-puerto-rico-await-help-during-human-smuggling-operation* ("Mona Island is located in the treacherous waters between Dominican Republic and Puerto Rico and has long been a dropping off point for human smugglers promising to ferry Haitian and Dominican migrants to the U.S. territory aboard rickety boats. Dozens of them have died in recent months in an attempt to flee their countries amid a spike in poverty and

*Continued*

---

[1] For purposes of this preamble, the Departments use the term "noncitizen" to be synonymous with the term "alien" as it is used in the INA. *See* INA 101(a)(3), 8 U.S.C. 1101(a)(3); *Barton* v. *Barr,* 590 U.S. 222, 226 n.2 (2020).

[2] The Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility.

[3] According to OHSS analysis of the United Nations High Commissioner for Refugees ("UNHCR") data from 1969 to 2022, there were more than 8.5 million displaced persons in the Western Hemisphere in 2022, including approximately 6.6 million Venezuelans, 300,000 Nicaraguans, 260,000 Hondurans, 250,000 Cubans,

IFR_Rule_000002

response to record levels of encounters at the SWB,[5] the United States

Government has taken a series of significant steps to strengthen consequences for unlawful or unauthorized entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States for protection in decades.[6] These steps include:

• Promulgating and implementing the rule titled Circumvention of Lawful Pathways, 88 FR 31314 (May 16, 2023) (''Circumvention of Lawful Pathways rule'');

• Deploying more than 500 additional DHS personnel at a time to the SWB to support U.S. Customs and Border Protection (''CBP'') operations and refocusing a significant portion of DHS's SWB workforce to prioritize migration management above other border security missions;[7]

• Deploying over 1,000 additional Department of Defense (''DOD'') personnel on top of the 2,500 steady state presence to the SWB in May 2023 to further enhance border security;[8]

• Processing record numbers of individuals through expedited removal;[9]

• Implementing a historic expansion of lawful pathways and processes to come to the United States, including: the Cuba, Haiti, Nicaragua, and Venezuela (''CHNV'') parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide access to expedited refugee processing for eligible individuals; and the expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;[10]

• Expanding opportunities to enter the United States for seasonal employment;[11]

• Establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive in a safe, orderly, and lawful manner at ports of entry (''POEs'') through the CBP One mobile application (''CBP One app'');[12]

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in Fiscal Year (''FY'') 2021 to up to 50,000 in FY 2024;[13]

---

violence.''); United States Coast Guard, *Coast Guard Repatriates 38 Migrants to Dominican Republic Following 2 Interdictions Near Puerto Rico* (Apr. 25, 2024), https://www.news.uscg.mil/Press-Releases/Article/3755880/coast-guard-repatriates-38-migrants-to-dominican-republic-following-2-interdict/; United States Coast Guard, *Coast Guard Repatriates 101 Migrants to Dominican Republic Following 3 Interdictions Near Puerto Rico* (Apr. 9, 2024), https://www.news.uscg.mil/Press-Releases/Article/3734747/coast-guard-repatriates-101-migrants-to-dominican-republic-following-3-interdic/; United States Coast Guard, *Coast Guard, Federal, Local Interagency Responders Search for Possible Survivors of Capsized Migrant Vessel in Camuy, Puerto Rico* (Feb. 1, 2024), https://www.news.uscg.mil/Press-Releases/Article/3663106/coast-guard-federal-local-interagency-responders-search-for-possible-survivors/; United States Coast Guard, *Coast Guard Repatriates 28 Migrants to Dominican Republic, Following Interdiction of Unlawful Migration Voyage in the Mona Passage* (Jan. 31, 2024), https://www.news.uscg.mil/Press-Releases/Article/3661517/coast-guard-repatriates-28-migrants-to-dominican-republic-following-interdictio/. There were 35,100 encounters of Dominicans between POEs at the SWB in Fiscal Year (''FY'') 2023 and 14,100 in the first six months of FY 2024 (on pace for 28,200), up from an average of 400 such encounters per year in FY 2014 through FY 2019—roughly a 9-fold increase. Office of Homeland Security Statistics (''OHSS'') analysis of March 2024 OHSS Persist Dataset.

[5] At the SWB, U.S. Customs and Border Protection (''CBP'') completed approximately 1.7 million encounters at and between POEs in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.68 million in FY 2000. *Compare* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf (total apprehensions and Title 42 expulsions from 1925 to 2022), *and id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022), *with* OHSS, *2012 Yearbook of Immigration Statistics* 96 tbl. 35 (July 2013), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2012.pdf (apprehensions from FY 2003 to FY 2012), *and* OHSS, *2002 Yearbook of Immigration Statistics* 184 tbl. 40 (Oct. 2003), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2002.pdf (apprehensions from FY 1996 to FY 2002). In December 2023, CBP also completed a single-month record of approximately 302,000 encounters at and between POEs, almost one and a half times as many as the highest monthly number recorded prior to 2021 (approximately 209,000 in March 2000) based on records available in the OHSS Persist Dataset from FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individuals during the period in which noncitizens were expelled pursuant to the Centers for Disease Control and Prevention's (''CDC's'') Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See* OHSS analysis of March 2024 OHSS Persist Dataset.

DHS data in this IFR are current through March 31, 2024, the most recent month for which DHS has data that have gone through its full validation process. DHS primarily relies on two separate datasets for most of the data in this IFR. Most DHS data are pulled from OHSS's official statistical system of record data, known as the OHSS Persist Dataset, which is typically released by OHSS on a 90-day delay. Other data in this IFR are pulled from OHSS's Enforcement Lifecycle dataset, which

combines 23 separate DHS and DOJ datasets to report on the end-to-end immigration enforcement process. Due to this greater complexity, Lifecycle data generally become available for reporting 90 to 120 days after the end of each quarter.

CBP also publishes preliminary data pulled from its operational systems more quickly as part of its regular Monthly Operational Updates. The data in these updates reflect operational realities but change over time as transactional records in the systems of record are cleaned and validated; they are best viewed as initial estimates rather than as final historical records. CBP released an operational update on May 15, 2024, that includes the Component's official reporting for encounters through the end of April. Based on these data, SWB encounters between POEs fell slightly by six percent between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters,* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this IFR. Excluding March through April 2020, which was an unusual case because of the onset of the COVID–19 pandemic, the average month-over-month change between March and April for 2013 through 2024 is a 2.3 percent increase, with 4 out of those 11 years experiencing decreases in April and 7 years experiencing increases.

[6] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.

[7] DHS, *Fact Sheet: The Biden-Harris Administration Takes New Actions to Increase Border Enforcement and Accelerate Processing for Work Authorizations, While Continuing to Call on Congress to Act* (Sept. 20, 2023), https://www.dhs.gov/news/2023/09/20/fact-sheet-biden-harris-administration-takes-new-actions-increase-border.

[8] *Id.; see also* DOD, *Austin Approves Homeland Security Request for Troops at Border* (May 2,

2023), https://www.defense.gov/News/News-Stories/Article/Article/3382272/austin-approves-homeland-security-request-for-troops-at-border/.

[9] In the months between May 12, 2023, and March 31, 2024, CBP processed roughly 316,000 noncitizens encountered at and between SWB POEs for expedited removal, more than in any prior full fiscal year. OHSS analysis of data pulled from CBP Unified Immigration Portal (''UIP'') on April 2, 2024.

[10] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration.

[11] DHS, *DHS to Supplement H–2B Cap with Nearly 65,000 Additional Visas for FY 2024, Department of Homeland Security* (Nov. 3, 2023), https://www.dhs.gov/news/2023/11/03/dhs-supplement-h-2b-cap-nearly-65000-additional-visas-fiscal-year-2024.

[12] DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023), https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration; CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.

[13] U.S. State Dep't, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024* (Nov. 3, 2023) https://www.state.gov/report-to-congress-on-proposed-refugee-admissions-for-fiscal-year-2024/.

IFR_Rule_000003

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations **48713**

• Completing approximately 89 percent more immigration court cases in FY 2023 as compared to FY 2019;[14] and

• Increasing the immigration judge ("IJ") corps by 66 percent from FY 2019 to FY 2023, including maximizing the congressionally authorized number in FY 2023 for a total corps of 734.[15]

The Proclamation further states that although these efforts and other complementary measures are having their intended effect—DHS is processing noncitizens for removal in record numbers and with record efficiency[16]—the border security and immigration systems have not been able to keep pace with the number of individuals arriving at the southern border.[17] Simply put, the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection when individuals are arriving at such elevated, historic volumes.[18]

This became even more clear in the months following the lifting of the Title 42 public health Order.[19] As the Departments resumed widespread processing under title 8 authorities, the insufficiency of both the available statutorily authorized tools and the resources provided to implement them came into stark focus. Despite the expanded ability to impose consequences at the SWB through the Circumvention of Lawful Pathways rule and complementary measures, which led to the highest numbers of returns and removals in more than a decade,[20] encounter levels have remained elevated well above historical levels, with December 2023 logging the highest monthly total on record.[21] While encounter levels in calendar year 2024 have decreased from these record numbers, there is still a substantial and elevated level of migration, and historically high percentages of migrants are claiming fear and are challenging to remove, as discussed in more detail in Section III.B.1 of this preamble.[22] This

[14] See EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1–2 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf.*

[15] See EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* 1 (Jan. 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline* (showing 734 total IJs on board in FY 2023); Executive Office for Immigration Review ("EOIR") Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 27, 2024) ("The agency's streamlining efforts also enabled EOIR, by the close of FY 2023, to fill all 734 appropriated IJ positions, thus creating the largest judge corps in the agency's history.").

[16] See supra note 9. Since May 12, 2023, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative credible fear determinations, the median time from encounter to removal, over the same time frames, decreased 85 percent from 73 days to 11 days. Pre-May 12, 2023, data from OHSS Lifecycle Dataset as of December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

DHS removed or returned over 662,000 noncitizens between May 12, 2023, and March 31, 2024, or an average of over 61,300 per month (excluding crew members detained on board their vessels and other administrative returns); this represents the highest average monthly count of removals and returns since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[17] See Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office of Management and Budget ("OMB") (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[18] *Id.; see also* Ariel G. Ruiz-Soto et al., Migration Pol'y Inst., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape* 20 (Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* ("Across the border, interviewed agents expressed frustration with low staffing levels and resource allocations compared to the challenge of managing the border."). DHS acknowledges that the enacted FY 2024 DHS budget does appropriate funding sufficient to pay for approximately 2,000 additional Border Patrol agents, bringing the total level indicated by Congress up to 22,000 agents, compared with 19,855 agents for FY 2023. 170 Cong Rec. H1809–10 (daily ed. Mar. 22, 2024) (Explanatory Statement Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024) ("The agreement includes . . . [funding] to hire 22,000 Border Patrol Agents."); 168 Cong Rec. S8557 (daily ed. Dec. 20, 2022) (Explanatory Statement Regarding H.R. 2617, Consolidated Appropriations Act, 2023) ("The agreement provides funding for 19,855 Border Patrol agents."). However, the FY 2024 appropriations do not fully fund CBP's existing operational and staffing requirements. Additionally, CBP estimates that it will likely be unable to implement a hiring surge to meaningfully grow its overall staffing levels towards the staffing levels funded by the FY 2024 budget before the end of the current fiscal year. The hiring process requires time and resources to bring additional agents on board. For example, it generally takes more than six months for an applicant to complete the hiring process and report to the U.S. Border Patrol ("USBP") Academy to receive necessary training. *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("However, DHS's border security and immigration enforcement efforts along the Southwest border desperately require the additional funds requested by the Administration and included in the Senate's bipartisan border security legislation, which would provide DHS with approximately $19 billion to fund additional personnel, facilities, repatriation capabilities, and other enforcement resources.").

[19] *See* Public Health Determination and Order Regarding Suspending the Right To Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19"). Although the CDC indicated its intention to lift the order on May 23, 2022, ongoing litigation prevented the order from being lifted until it ultimately expired on May 11, 2023. *See* 88 FR at 31319.

[20] In the ten and a half months between May 12, 2023, and March 31, 2024, DHS completed over 662,000 removals and enforcement returns, more than in any full fiscal year since FY 2011, and the highest monthly average of enforcement repatriations since FY 2010. Post-May 12, 2023, repatriations from OHSS analysis of data downloaded from UIP on April 2, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on repatriations); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[21] There were nearly 302,000 CBP encounters at and between POEs along the SWB in December 2023, higher than any previous month on record. OHSS analysis of March 2024 OHSS Persist Dataset and historic CBP data for encounters prior to FY 2000; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023) (total apprehensions and Title 42 expulsions from 1925 to 2022), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf; id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[22] After peaking at nearly 302,000 in December 2023, encounters at and between POEs along the SWB fell to approximately 176,000 in January 2024, 190,000 in February 2024, and 189,000 in March 2024. At an average of 185,000 for the first three months of 2024, monthly encounters levels were almost 4 times higher than the pre-pandemic (FY 2014 through 2019) average of 48,000 encounters at and between POEs per month and—with the exceptions of FY 2022 and FY 2023—represented the highest second quarter count of encounters in any year since FY 2001. March 2024 OHSS Persist Dataset; *see also* OHSS, *2022 Yearbook of Immigration Statistics* 89 tbl. 33 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (total apprehensions and title 42 expulsions from 1925 to 2022); *id.* at 94–96 tbl. 35 (apprehensions from FY 2013 to FY 2022); OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-*

Continued

IFR_Rule_000004

**JA105**

substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limits DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities.

The sustained, high encounter rates the Departments have experienced over the past year have outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers. Due to its funding shortfall, DHS simply lacks sufficient resources, such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides," which limits DHS's ability to conduct credible fear interviews for individuals in CBP custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process.[23] This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting the Departments' ability to deliver timely consequences to individuals who do not have a legal basis to remain in the United States.[24] Individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead released pending removal proceedings under section 240 of the

INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an IJ, a process that can take several years to conclude.[25] These immigration court proceedings can be less resource intensive for processing upon initial encounter, because individuals can be released from custody fairly quickly, but are also far less likely to result in swift decisions and swift consequences, and generally require more IJ and ICE attorney time to resolve. *Compare* INA 235(b)(1), 8 U.S.C. 1225(b)(1), *with* INA 240, 8 U.S.C. 1229a. Notably, in FY 2023, when the immigration courts had a historic high number of case completions, the number of new cases far outnumbered those completions and led to a larger backlog—likely extending the length of time it will take individuals encountered and referred into section 240 removal proceedings to finish their immigration court process.[26]

Said another way, at the current levels of encounters and with current resources, the Departments cannot predictably and swiftly deliver consequences to most noncitizens who cross the border without a lawful basis to remain. This inability to predictably deliver timely decisions and consequences further compounds incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application.[27] Smugglers and transnational criminal organizations ("TCOs") have exploited this mismatch, further fueling migration by actively advertising to migrants that they are likely to be able to remain in the United States.[28]

The Departments' ability to refer and process noncitizens through expedited removal thus continues to be overwhelmed, creating a vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States. This, in turn, forces DHS to release individuals into the backlogged immigration court system; for the many cases in that system initiated just prior to or during the COVID–19 pandemic, the process can take several years to result in a final decision or consequence,[29] which then incentivizes more people to make the dangerous journey north to take their chances at the SWB.[30] The status quo of the broken immigration and asylum system has become a driver for unlawful migration throughout the region and an increasingly lucrative source of income for dangerous TCOs.[31] Without countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate.[32] All of these factors, taken together, pose significant threats to the

---

*monthly-tables* (last updated May 10, 2024) (SWB encounters from FY 2014 through December 2023).

[23] "Because ICE has very limited detention capacity and appropriated bedspace has remained relatively static, the agency must carefully prioritize whom it detains. Similar to FY 2022, during FY 2023, Enforcement and Removal Operations limited detention capacity was primarily used to house two populations: noncitizens CBP arrested at the Southwest Border and noncitizens with criminal histories [Enforcement and Removal Operations] arrested in the interior." Fiscal Year 2023 ICE Annual Report 18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf*. In FY 2024, ICE was appropriated $5,082,218,000.00 "for enforcement, detention and removal operations." Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides "$5,082,218,000 for Enforcement and Removal Operations (ERO)" and "$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations." 170 Cong. Rec. H1807, 1812 (daily ed. Mar. 22, 2024).

[24] *See* CBP, *Custody and Transfer Statistics, https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (last updated Apr. 12, 2024) (table showing that, under current constraints, the number of individuals processed for expedited removal makes up only a fraction of total processing dispositions, including section 240 proceedings).

[25] EOIR decisions completed in December 2023 were, on average, initiated in December 2020, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 50 percent of EOIR cases initiated during that time were still pending as of December 2023, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of February 12, 2024; EOIR Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited May 26, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,346 days); EOIR, *Median Completion Times for Detained Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 47 days in the first quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[26] EOIR completed more than 520,000 cases in FY 2023 (a record number), but also had almost 1.2 million case receipts, resulting in a net increase of nearly 700,000 cases in its backlog. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2020/01/31/1_pending_new_receipts_and_total_completions.pdf*; EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf*. OHSS estimates that

1.1 million of the nearly 1.2 million case receipts (95 percent) resulted from SWB encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[27] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html*.

[28] *See* Parker Asmann & Steven Dudley, *How US Policy Foments Organized Crime on US-Mexico Border,* Insight Crime (June 28, 2023), *https://insightcrime.org/investigations/how-us-policy-foments-organized-crime-us-mexico-border/*.

[29] *See supra* note 25.

[30] *See, e.g.,* Jordan, *supra* note 27.

[31] *See* Asmann & Dudley, *supra* note 28.

[32] *See* Jordan, *supra* note 27.

IFR_Rule_000005

safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit.

In the absence of congressional action to appropriately resource DHS and EOIR and to reform the outdated statutory framework, the Proclamation and the changes made by this rule are intended to substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. By suspending and limiting entries until 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE, and by imposing a limitation on asylum eligibility and making other policy changes, the Proclamation and IFR will realign incentives at the southern border.[33] The Proclamation and IFR will do this by improving DHS's ability to place into expedited removal the majority of noncitizens who are amenable to such processing; to avoid large-scale releases of such individuals pending section 240 removal proceedings; and to allow for swift resolution of their cases and, where appropriate, removal.

The Proclamation imposes a suspension and limitation on entry upon certain classes of noncitizens who are encountered while the suspension and limitation is in effect. The Proclamation provides that the suspension and limitation on entry applies beginning at 12:01 a.m. eastern daylight time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the

Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. Unaccompanied children ("UCs")[34] from non-contiguous countries are not included in calculating the number of encounters. If at any time after such a factual determination the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more, the suspension and limitation on entry will apply at 12:01 a.m. eastern time on the next calendar day (or will continue to apply, if the 14-calendar-day period has yet to elapse) until 14 days after the Secretary makes another factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters or the President revokes the Proclamation, at which time its application will be discontinued once again.

The Proclamation does not apply to the following persons:

(i) any noncitizen national of the United States;

(ii) any lawful permanent resident of the United States;

(iii) any unaccompanied child as defined in section 279(g)(2) of title 6, United States Code;

(iv) any noncitizen who is determined to be a victim of a severe form of trafficking in persons, as defined in section 7102(16) of title 22, United States Code;

(v) any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States, or presents at a port of entry pursuant to a pre-scheduled time and place, including:

(A) members of the United States Armed Forces and associated personnel, United States Government employees or contractors on orders abroad, or their accompanying family members who are on their orders or are members of their household;

(B) noncitizens who hold a valid visa or who have all necessary documents required for admission consistent with the requirements of section 1182(a)(7) of title 8, United States Code, upon arrival at a port of entry;

(C) noncitizens traveling pursuant to the visa waiver program as described in section 217 of the INA, 8 U.S.C. 1187; and

(D) noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for

the safe and orderly entry of noncitizens into the United States;

(vi) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter; and

(vii) any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a U.S. Customs and Border Protection immigration officer, due to operational considerations at the time of the entry or encounter that warranted permitting the noncitizen to enter.

The President authorized the Secretary of Homeland Security and the Attorney General to issue any instructions, orders, or regulations as may be necessary to implement the Proclamation, including the determination of the exceptions in section 3(b), and directed them to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted.

Consistent with the President's direction, the Departments have determined that this IFR is necessary to address the situation at the southern border. This IFR aligns the Departments' border operations and applicable authorities with the Proclamation's policy and objectives. Specifically, this IFR establishes a limitation on asylum eligibility that applies to certain individuals who enter during emergency border circumstances and revises certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration[35] and remove noncitizens who do not have a legal basis to remain in the United States. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.

---

[33] Under the Proclamation, the term "encounter" refers to a noncitizen who (i) is physically apprehended by CBP immigration officers within 100 miles of the United States SWB during the 14-day period immediately after entry between POEs; (ii) is physically apprehended by DHS personnel at the southern coastal borders during the 14-day period immediately after entry between POEs; or (iii) is determined to be inadmissible at a SWB POE. But the 1,500 and 2,500 encounter thresholds in the Proclamation and this rule exclude the third category of encounters—individuals determined to be inadmissible at a SWB POE. When describing historical data in this preamble, the Departments have generally sought to distinguish between encounters between POEs (also referred to as "USBP encounters") and encounters at and between the POEs (also referred to as "total CBP encounters" or "encounters," depending on the context).

[34] In this rulemaking, as in the Proclamation, the term "unaccompanied children" or "UCs" has the same meaning as the term "unaccompanied alien child[ren]" under 6 U.S.C. 279(g)(2).

[35] In this preamble, "irregular migration" refers to the movement of people into another country without authorization.

IFR_Rule_000006

*B. Legal Authority*

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[36] The Homeland Security Act of 2002 ("HSA"), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.

The INA, as amended by the HSA, charges the Secretary "with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens," except insofar as those laws assign functions to other agencies. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA also grants the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws, INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR]." INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521. In addition, under the HSA, the Attorney General retains authority to "establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out" the Attorney General's authorities under the INA. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"). These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521; INA 103(g)(1), 8 U.S.C. 1103(g)(1). With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA"), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai,* 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities.[37] Section 208 of the INA, 8 U.S.C. 1158, authorizes the "Secretary of Homeland Security or the Attorney General" to "grant asylum" to a noncitizen "who has applied for asylum in accordance with the requirements and procedures established by" the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a "refugee" within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to "establish[ ]" "requirements and procedures" to govern asylum applications. *Id.* The statute further authorizes them to "establish," "by regulation," "additional limitations and conditions, consistent with" section 208, under which a noncitizen "shall be ineligible for asylum." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]").[38] The INA also provides the Secretary and Attorney General authority to publish regulatory amendments governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 235, 236, 241, 8 U.S.C. 1225, 1226, 1231.

The HSA granted DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in the context of expedited removal, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(3), 8 U.S.C. 1103(a)(3); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b) (providing for the transfer of adjudication of asylum and refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS). Within DHS, the Secretary has delegated some of those authorities to the Director of USCIS, and AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted. *See* DHS, No. 0150.1, Delegation to the Bureau of Citizenship and Immigration Services (June 5, 2003); 8 CFR 208.2(a), 208.9, 208.30.

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 ("Refugee Protocol"), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 ("Refugee Convention"). Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning ("refouler") "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra,* 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

---

[36] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, 114; *see also* 8 U.S.C. 1231 note (United States Policy With Respect to Involuntary Return of Persons in Danger of Subjection to Torture); 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18.

[37] The HSA further provides, "Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General." Public Law 107–296, 116 Stat. 2135, 2274 (codified at 6 U.S.C. 522).

[38] Under the HSA, the references to the "Attorney General" in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

**JA108**

IFR_Rule_000007

Congress implemented these obligations through the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 ("Refugee Act"), creating the precursor to what is now known as statutory withholding of removal. The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) ("statutory withholding of removal"), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one of the protected grounds listed in Article 33 of the Refugee Convention.[39] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT. The Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") provides the Departments with the authority to "prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681–822 (codified at 8 U.S.C. 1231 note). DHS and DOJ have implemented the obligations of the United States under Article 3 of the CAT in the Code of Federal Regulations, consistent with FARRA. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), *amended by* 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, while the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, eligibility for asylum, or asylum procedures. That has been the Executive Branch's consistent position for four decades.[40] That longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may "suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—"grants the President broad discretion," it "operate[s]" only in its "sphere[ ]." *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled "Inadmissible aliens"), generally "defines the universe of aliens who are admissible" and "sets the boundaries of admissibility into the United States." *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend "entry," it "enabl[es] the President to supplement the other grounds of inadmissibility in the INA," *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[41] The asylum statute, first enacted in the Refugee Act of 1980, today provides that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is "physically present" or has "arrive[d] in the United States," *id.,* as those terms are properly understood, and exists regardless of whether a noncitizen is inadmissible.[42] As a result, the power under section 212(f) to suspend "entry" does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[43]

---

[39] *See* INS v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also* INS v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to "facilitate the assimilation and naturalization of refugees," which the Court found aligned with the discretionary provisions in section 208 of the INA, 8 U.S.C. 1158). The Refugee Convention and Protocol are not self-executing. *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[40] In 1984, then-Assistant Attorney General of the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that "[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)] proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws," including "expedited-removal proceedings" where they could "raise any claims for protection." *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations was understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. *See* Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (Feb. 21, 2024). At the same time, nothing in the proclamations or the INA have precluded the Departments from considering as an adverse *discretionary* criterion that a noncitizen is described in a section 212(f) proclamation.

[41] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States.

[42] Section 212(f) contrasts with 42 U.S.C. 265, which authorizes the CDC to temporarily suspend "the right to introduce . . . persons and property" into the United States if such suspension "is required in the interest of the public health." During the COVID–19 pandemic and to prevent the "serious danger of the introduction of [the] disease into the United States," 42 U.S.C. 265, the CDC issued an order invoking section 265 to expel certain noncitizens without allowing asylum applications. As the final rule implementing section 265 explained, the provision is part of a "broad public health statute" that "operates separately and independently of the immigration power" and authorizes the CDC "to temporarily suspend the effect of any law . . . by which a person would otherwise have the right to be introduced . . . into the U.S.," *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265 was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit "the introduction of persons" in order to broaden this provision and that this provision subsumed but was not limited to the authority to "suspend immigration." Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public-health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[43] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also

*Cf., e.g., Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have "extraterritorial application" to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) "does not allow the President to expressly override particular provisions of the INA," while emphasizing the particular "sphere[ ]" in which it operates).

Continued

IFR_Rule_000008

This rule, as discussed elsewhere, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1103(a)(1), (a)(3), (g), 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

*C. Summary of Provisions of the IFR*

This IFR adds provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuate three key changes to the process for those seeking asylum, statutory withholding of removal, or protection under the CAT during emergency border circumstances giving rise to the suspension and limitation on entry under the Presidential Proclamation of June 3, 2024, Securing the Border ("Presidential Proclamation of June 3"):

• During emergency border circumstances, persons who enter across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.11.

• During emergency border circumstances, rather than asking

specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, or protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility the noncitizen could demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The "reasonable probability" standard is defined to mean substantially more than a "reasonable possibility" but somewhat less than more likely than not.

As discussed throughout this IFR, these changes are designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances.

### III. Discussion of the IFR

*A. Current Framework*

1. Asylum, Statutory Withholding of Removal, and CAT Protection

Asylum is a discretionary benefit that can be granted by the Secretary or the Attorney General if a noncitizen establishes, among other things, that they have experienced past persecution or have a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. INA 208(b)(1)–(2), 8 U.S.C. 1158(b)(1)–(2)

(providing that, unless subject to a mandatory bar, the Secretary or Attorney General "may" grant asylum to refugees); INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A) (defining "refugee"). As long as they retain their asylee status, noncitizens who are granted asylum (1) cannot be removed or returned to their country of nationality or, if they have no nationality, their last habitual residence, (2) receive employment authorization incident to their status, (3) may be permitted to travel outside of the United States and return with prior consent, and (4) may seek derivative benefits for their spouses or children. INA 208(c)(1), 8 U.S.C. 1158(c)(1); *see Johnson* v. *Guzman Chavez,* 594 U.S. 523, 536 (2021) ("[A] grant of asylum permits an alien to remain in the United States and to apply for permanent residency after one year[.]" (emphasis omitted) (internal quotation marks and citation omitted)); 8 CFR 274a.12(a)(5) (employment authorization incident to asylum status); 8 CFR 223.1(b) (allowing for return to the United States after travel with a requisite travel document for a "person who holds . . . asylum status pursuant to section 208 of the Act"); *see also* 6 U.S.C. 271(b)(3) (transferring asylum functions to DHS); 6 U.S.C. 557 (providing that references to any other officer shall be deemed to refer to the "Secretary" with respect to any transferred function); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Asylum applications are generally classified as "affirmative" or "defensive" applications, depending on the agency with which they are filed. If a noncitizen is physically present in the United States, not detained, and not in section 240 removal proceedings, the noncitizen may file an asylum application with USCIS. These applications are "affirmative" filings. Generally, if the noncitizen is in section 240 removal proceedings before an IJ, the noncitizen may apply for asylum before the IJ as a defense to removal.[44] These applications are "defensive" filings.

Noncitizens are eligible for asylum if they have been persecuted or have a well-founded fear of future persecution in their country of nationality or, if they have no nationality, their last habitual residence, on account of one of five protected grounds and are not subject to a bar to eligibility. *See generally* INA 208, 8 U.S.C. 1158; INA 101(a)(42), 8 U.S.C. 1101(a)(42). To be granted

---

invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for "any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe," the Attorney General could issue regulations governing entry during such an emergency to "deny [certain noncitizens] a hearing . . . in special cases" notwithstanding the ordinary exclusion hearing provisions governing entry). This does not mean, however, that the President could not invoke section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

[44] The only exception is that USCIS has initial jurisdiction over asylum applications filed by a UC even where the applicant is in section 240 removal proceedings. INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C).

IFR_Rule_000009

asylum, eligible noncitizens must also establish that they merit asylum in the exercise of discretion. *Id.* Noncitizens who are ineligible for a grant of asylum, or who are denied asylum based on the Attorney General's or the Secretary's discretion, may qualify for other forms of protection. An application for asylum submitted by a noncitizen in section 240 removal proceedings is also considered an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 1208.3(b), 1208.13(c)(1). An IJ also may consider a noncitizen's eligibility for statutory withholding of removal and CAT protection under regulations issued pursuant to the implementing legislation regarding the obligations of the United States under Article 3 of the CAT. FARRA sec. 2242(b) (codified at 8 U.S.C. 1231 note); 8 CFR 1208.3(b), 1208.13(c)(1); *see also* 8 CFR 1208.16(c), 1208.17.

Statutory withholding of removal and CAT protection preclude removing a noncitizen to any country where the noncitizen would "more likely than not" face persecution or torture, meaning that the noncitizen's life or freedom would be threatened because of a protected ground or that the noncitizen would be tortured. 8 CFR 1208.16(b)(2), (c)(2). Thus, if a noncitizen establishes that it is more likely than not that their life or freedom would be threatened because of a protected ground, but is denied asylum for some other reason, the noncitizen nonetheless may be entitled to statutory withholding of removal if not otherwise barred from that form of protection. INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); 8 CFR 208.16, 1208.16. Likewise, a noncitizen who establishes that they more likely than not will face torture in their country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 208.17(a), 1208.16(c), 1208.17(a).

In contrast to the more generous benefits available by attaining asylum, statutory withholding of removal and CAT protection do not: (1) prohibit the Government from removing the noncitizen to a third country where the noncitizen would not face the requisite likelihood of persecution or torture (even in the absence of an agreement with that third country); (2) create a path to lawful permanent resident status; or (3) afford the same ancillary benefits, such as derivative protection for family members. *See, e.g., Guzman Chavez,* 594 U.S. at 536 ("distinguish[ing] withholding-only relief from asylum" on the ground that withholding does not preclude the Government from removing the noncitizen to a third country and does

not provide the noncitizen any permanent right to remain in the United States); *Matter of A–K–,* 24 I&N Dec. 275, 279 (BIA 2007) (stating that "the Act does not permit derivative withholding of removal under any circumstances"); INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (statutory provision allowing asylum status to be granted to accompanying or following-to-join spouse or children of a noncitizen granted asylum; no equivalent statutory or regulatory provision for individuals granted withholding or deferral of removal).

2. Expedited Removal and Screenings in the Credible Fear Process

In the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104–208, div. C, 110 Stat. 3009, 3009–546, Congress established the expedited removal process. The process is applicable to certain noncitizens present or arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation requirements for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be "removed from the United States without further hearing or review unless the [noncitizen] indicates either an intention to apply for asylum . . . or a fear of persecution." *Id.*

Congress created a screening process, known as "credible fear" screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. The Departments have used the same screening process to identify potentially valid claims for statutory withholding of removal and CAT protection. If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to a USCIS AO to determine whether the noncitizen has a credible fear of persecution or torture in the country of citizenship or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 235.3(b)(4). A noncitizen has a "credible fear of persecution" if "there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the

alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). If the AO determines that the noncitizen does not have a credible fear of persecution or torture, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 208.33(b)(2)(v), 1208.30(g).

If the AO (or an IJ reviewing the AO's decision) determines that a noncitizen has a credible fear of persecution or torture, USCIS can refer the noncitizen to an immigration court for adjudication of the noncitizen's claims in section 240 removal proceedings, 8 CFR 208.30(f), 8 CFR 1208.30(g)(2)(iv)(B), and the noncitizen may subsequently file a defensive asylum application with the court during those proceedings, *see* 8 CFR 1240.1(a)(1)(ii). Alternatively, USCIS can retain jurisdiction over the application for asylum for further consideration in an asylum merits interview. *See* 8 CFR 208.30(f). During an asylum merits interview, a positive credible fear determination is treated as the asylum application, and strict timelines thereafter govern the applicant's case before both USCIS and EOIR. *See* 8 CFR 208.2(a)(1)(ii), 208.3(a)(2), 208.4(b)(2), 208.9(a)(1), (e)(1)–(2), (g)(2), (i), 1240.17. The AO may grant asylum, subject to review within USCIS, where the noncitizen is eligible and warrants a grant as a matter of discretion. 8 CFR 208.14(b). If the noncitizen is not eligible or does not warrant a grant of asylum as a matter of discretion, the AO refers the application to EOIR. 8 CFR 208.14(c)(1). Where USCIS does not grant asylum, the AO's decision will also include a determination on eligibility for statutory withholding of removal and CAT protection based on the record before USCIS. 8 CFR 208.16(a), (c)(4).

For cases referred to EOIR following an asylum merits interview, the written record of the positive credible fear determination serves as the asylum application, 8 CFR 1240.17(e), and the record the AO developed during the asylum merits interview, as supplemented by the parties, serves as the record before the IJ, 8 CFR 1240.17(c), (f)(2)(i)(A)(*1*), (f)(2)(ii)(B). The IJ reviews applications for asylum de novo and also reviews applications for statutory withholding of removal and CAT protection de novo where USCIS found the noncitizen ineligible for such protection. 8 CFR 1240.17(i)(1). However, where USCIS found the noncitizen eligible for statutory withholding of removal or CAT

IFR_Rule_000010

protection, IJs must give effect to USCIS's eligibility determination unless DHS demonstrates, through evidence or other testimony that specifically pertains to the noncitizen and was not in the record of proceedings for the asylum merits interview, that the noncitizen is not eligible for such protection. 8 CFR 1240.17(i)(2). With a limited exception, DHS may not appeal the grant of any protection for which the AO determined the noncitizen eligible. *Id.*

3. Lawful Pathways Condition on Asylum Eligibility

On March 20, 2020, the Director of the Centers for Disease Control and Prevention ("CDC") issued an order under 42 U.S.C. 265 and 268 suspending the introduction of certain noncitizens from foreign countries or places where the existence of a communicable disease creates a serious danger of the introduction of such disease into the United States and the danger is so increased by the introduction of persons from the foreign country or place that a temporary suspension of such introduction is necessary to protect the public health.[45] The CDC's Title 42 public health Order was extended multiple times.[46] While the Title 42 public health Order was in effect, noncitizens who did not have proper travel documents were generally not processed into the United States; they were instead expelled to Mexico or to their home countries under the Order's authority without being processed under the authorities set forth in title 8 of the United States Code, which includes the INA. Circumvention of Lawful Pathways, 88 FR 11704, 11705 (Feb. 23, 2023) ("Circumvention of Lawful Pathways NPRM"). In early 2023, the President announced that the Administration expected to end the public health emergency on May 11, 2023, which would cause the then-operative Title 42 public health Order to end. *See id.* at 11708.

As the Departments stated in the Circumvention of Lawful Pathways rule, absent further action, the end of the Title 42 public health Order was expected to cause encounters with noncitizens seeking to enter the United States at the SWB to rise to or remain at all-time highs—as high as 11,000 migrants daily. 88 FR at 31331, 31315. And many of these individuals would be entitled to remain in the United States pending resolution of their asylum and protection claims. *See* INA 235(b)(1)(B)(ii), 8 U.S.C. 1225(b)(1)(B)(ii) (not allowing for removal of those found to have a credible fear pending further consideration of the asylum claim); *see also* 88 FR at 31363 (noting that "most non-Mexicans processed for expedited removal under Title 8 would likely establish credible fear and remain in the United States for the foreseeable future"). The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 public health Order was expected to result in many more migrants crossing the border and asserting claims of fear or seeking protection, which would in turn exceed the border security and immigration systems' capacity to process migrants in a safe, expeditious, and orderly way. *See* 88 FR at 31363. To address this expected increase in the number of migrants at the SWB and adjacent coastal borders seeking to enter the United States without authorization, the Departments promulgated the Circumvention of Lawful Pathways rule. *See* 88 FR 31314.

The Circumvention of Lawful Pathways rule, which became effective on its public inspection date, May 11, 2023, *id.,* and applies to those who enter during a two-year period, imposes a rebuttable presumption of asylum ineligibility on certain noncitizens who fail to pursue safe, orderly, and lawful processes for entry into the United States or seek protection in another qualifying country through which they traveled. 8 CFR 208.33(a), 1208.33(a). The rebuttable presumption applies to noncitizens who enter the United States from Mexico at the SWB or adjacent coastal borders without documents sufficient for lawful admission where the entry is: (1) between May 11, 2023, and May 11, 2025; (2) subsequent to the end of implementation of the Title 42 public health Order issued on August 2, 2021, and related prior orders issued pursuant to the authorities in 42 U.S.C. 265 and 268 and the implementing regulation at 42 CFR 71.40; and (3) after the noncitizen traveled through a country other than their country of citizenship, nationality, or, if stateless,

last habitual residence, that is a party to the Refugee Convention or Refugee Protocol. 8 CFR 208.33(a)(1), 1208.33(a)(1).

The presumption does not apply to UCs or to noncitizens who availed themselves of or were traveling with a family member who availed themselves of certain safe, orderly, and lawful pathways—specifically those who (1) received appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) presented at a POE pursuant to a pre-scheduled time and place or presented at a POE without a pre-scheduled time and place but who can demonstrate by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; or (3) sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. 8 CFR 208.33(a)(2), 1208.33(a)(2). Noncitizens may also overcome the presumption by demonstrating by a preponderance of the evidence that "exceptionally compelling circumstances exist." 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). Such circumstances necessarily exist where, at the time of entry, the noncitizen or a family member with whom the noncitizen is traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) was a victim of a severe form of trafficking in persons under 8 CFR 214.11(a). 8 CFR 208.33(a)(3)(i)(A)–(C), (ii), 1208.33(a)(3)(i)(A)–(C), (ii). A noncitizen presumed ineligible for asylum under the rule may still apply for statutory withholding of removal or CAT protection and thus may not be removed to a country where it is more likely than not that they will be persecuted because of a protected ground or tortured.

The condition on asylum eligibility in the Circumvention of Lawful Pathways rule ("Lawful Pathways condition") applies to asylum applications before USCIS and EOIR. 8 CFR 208.13(f), 1208.13(f). It also applies during credible fear screenings. 8 CFR 208.33(b), 1208.33(b). Noncitizens subject to expedited removal who indicate a fear of persecution or an intention to apply for asylum are currently first screened to assess whether the rebuttable presumption applies and, if so, whether the noncitizen is able to rebut the presumption. 8 CFR 208.33(b). If the AO

---

[45] CDC, Order Under Sections 362 & 365 of the Public Health Services Act (42 U.S.C. 265, 268): Order Suspending Introduction of Certain Persons from Countries Where a Communicable Disease Exists (Mar. 20, 2020), *https://www.cdc.gov/ quarantine/pdf/CDC-Order-Prohibiting-Introduction-of-Persons_Final_3-20-20_3-p.pdf.*

[46] *See* Public Health Determination and Order Regarding Suspending the Right to Introduce Certain Persons From Countries Where a Quarantinable Communicable Disease Exists, 87 FR 19941, 19941–42 (Apr. 6, 2022) (describing the CDC's recent Title 42 public health Orders, which "suspend[ed] the right to introduce certain persons into the United States from countries or places where the quarantinable communicable disease exists in order to protect the public health from an increased risk of the introduction of COVID–19").

IFR_Rule_000011

determines that the rebuttable presumption does not apply or the noncitizen has rebutted the presumption, the general procedures governing the credible fear process then apply. *See* 8 CFR 208.33(b)(1)(ii). On the other hand, if the AO determines that the noncitizen is covered by the rebuttable presumption and no rebuttal ground applies, the AO will consider whether the noncitizen has established a reasonable possibility of persecution or torture with respect to the identified country or countries of removal. *See* 8 CFR 208.33(b)(1)(i), (b)(2). The Circumvention of Lawful Pathways rule currently provides that, if a noncitizen has established a reasonable possibility of persecution or torture, then DHS will issue a notice to appear (''NTA'') to commence section 240 removal proceedings and may not refer the case to the asylum merits interview process. 8 CFR 208.33(b)(2)(ii).

Where a noncitizen requests review by an IJ, the IJ reviews the negative credible fear finding de novo. *See* 8 CFR 1208.33(b). If the IJ determines that the noncitizen has made a sufficient showing that the rebuttable presumption does not apply to them or that they can rebut the presumption, and that the noncitizen has established a significant possibility of eligibility for asylum, statutory withholding of removal, or CAT protection, the IJ issues a positive credible fear finding and the case proceeds under existing procedures. *See* 8 CFR 208.33(b)(2)(v)(A), 1208.33(b)(2)(i). If the IJ determines that the noncitizen is covered by the rebuttable presumption and it has not been rebutted, but the noncitizen has established a reasonable possibility of persecution or torture, the IJ issues a positive credible fear finding and DHS will issue an NTA to commence section 240 removal proceedings. 8 CFR 208.33(b)(2)(v)(B), 1208.33(b)(2)(ii). And finally, if the IJ issues a negative credible fear determination, the case is returned to DHS for removal of the noncitizen. *See* 8 CFR 208.33(b)(2)(v)(C), 1208.33(b)(2)(ii). In such a circumstance, the noncitizen may not appeal the IJ's decision or request that USCIS reconsider the AO's negative determination, although USCIS may, in its sole discretion, reconsider a negative determination. *See* 8 CFR 208.33(b)(2)(v)(C).

A noncitizen who has not established during expedited removal proceedings a significant possibility of eligibility for asylum because of the Lawful Pathways condition may, if placed in section 240 removal proceedings, apply for asylum, statutory withholding of removal, or

CAT protection, or any other form of relief or protection for which the noncitizen is eligible. *See* 8 CFR 1208.33(b)(4). Where a principal asylum applicant in section 240 removal proceedings is eligible for statutory withholding of removal or withholding of removal under the CAT and would be granted asylum but for the rebuttable presumption, and where either an accompanying spouse or child does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant, the presumption shall be deemed rebutted as an exceptionally compelling circumstance. 8 CFR 1208.33(c).

*B. Justification*

1. Global Migration at Record Levels

Border encounters in the 1980s, 1990s, and 2000s consisted overwhelmingly of single adults from Mexico, most of whom were migrating for economic reasons.[47] Beginning in the 2010s, a growing share of migrants were from northern Central America [48] and, since the late 2010s, from countries throughout the Americas.[49] Since 2010,

the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from the northern Central American countries, and now to single adults and families from throughout the hemisphere (and beyond). Those encountered also have been more likely to seek asylum and other forms of relief or protection, straining the Departments' capacity to process individuals through expedited removal.[50]

In the early 2010s, U.S. Border Patrol (''USBP'') encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2018. *See* 88 FR at 11708. This followed decades during which annual USBP encounters routinely numbered in the millions; however, the overall share of those who were processed for expedited removal and claimed a fear never exceeded 2 percent until 2011. *Id.* at 11708, 11716. Despite these historically low encounter numbers, the Departments faced significant challenges in 2014 due to an unprecedented surge in migration by UCs and in 2016 due to a surge in family units at the border—demographics that present unique challenges due to their vulnerability.[51]

From FY 2017 to FY 2019, however, encounters between the POEs along the SWB more than doubled, to more than 850,000, and—following a significant drop during the beginning of the COVID–19 pandemic—continued to increase in FY 2021 and FY 2022.[52] In FY 2021, USBP encounters between POEs along the SWB reached a level not seen since the early 2000s—over 1.6 million.[53] In FY 2022, encounters at the

---

[47] *See* 88 FR at 11708. According to OHSS Persist data and historic Office of Immigration Statistics (''OIS'') Yearbooks of Immigration Statistics, Mexican nationals accounted for 87 to over 99 percent of apprehensions between POEs of persons entering without inspection between 1981 and 2010. *See* March 2024 OHSS Persist Dataset; *see, e.g.,* INS, *1981 Statistical Yearbook of the Immigration and Naturalization Service* 119 tbl. 53 (1981); INS, *1999 Statistical Yearbook of the Immigration and Naturalization Service* 208–11 tbl. 56 (Mar. 2002), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1999.pdf.* For more information about Mexican migrants' demographics and economic motivations during some of that time period, see Jorge Durand et al., *The New Era of Mexican Migration to the United States,* 86 J. Am. Hist. 518, 525–27, 530–31, 535–36 (1999).

[48] Northern Central America refers to El Salvador, Guatemala, and Honduras. 88 FR at 11708 n.35.

[49] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries

accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

[50] For noncitizens encountered at the SWB from FY 2014 to FY 2019 who were placed in expedited removal proceedings, roughly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination compared to roughly 57 percent of people from northern Central America and 90 percent of all other nationalities. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023; *see also* 88 FR at 11709 n.37.

[51] Decl. of Blas Nuñez-Neto ¶ 6, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[52] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[53] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

IFR_Rule_000012

SWB reached a new high-water mark, with total USBP encounters exceeding 2.2 million.[54] FY 2023 saw a slight drop, but USBP encounters remained high—over 2.0 million.[55] By early 2023, while the Title 42 public health Order was in place, total encounters at the SWB—referring to the number of times U.S. officials encountered noncitizens attempting to cross the SWB without authorization to do so either between or at POEs—had reached all-time highs.[56] This dramatic increase in encounters has coincided with a substantial and—setting aside the period of time when the Title 42 public health Order was in effect—persistent increase in the number of noncitizens making fear claims in recent years. *See* 88 FR at 11716.[57] In 2019—prior to the implementation of the Title 42 public health Order—44 percent of noncitizens encountered at the SWB placed in expedited removal proceedings claimed fear, resulting in 98,000 credible fear screenings. *Id.* The number of fear

claims returned to these historically high levels after the Title 42 public health Order ended. From May 2023 through March 2024, approximately 54 percent of noncitizens encountered at and between SWB POEs who were subject to expedited removal claimed fear (approximately 169,000 fear claims out of 315,000 noncitizens processed for expedited removal, excluding cases processed for expedited removal but reprocessed into other dispositions by ICE).[58] These high numbers of both encounters and fear claims combine to further compound the significant stress on the immigration system.

Much of this growth in encounters was driven by nationalities that DHS had never before encountered in large numbers at the border—including nationals of countries such as Brazil, Colombia, Cuba, Ecuador, Haiti, Nicaragua, Peru, and Venezuela, as well as migrants from Eastern Hemisphere countries.[59] Because of this, DHS has had to undertake a focused diplomatic effort, working closely with the Department of State, to enter into commitments with countries to facilitate the return of their nationals. However, despite this concerted effort, it remains difficult for DHS to repatriate nationals of some of these countries who do not establish a legal basis to remain in the United States, including those from the Eastern Hemisphere—substantially limiting DHS's ability to impose consequences on those nationals.[60]

Overall, countries other than Mexico and the northern Central American countries of El Salvador, Guatemala, and Honduras accounted for 43 percent of total SWB encounters from January 2021 to March 2024—including 51 percent of total SWB encounters in FY 2023 and in the first two quarters of FY 2024—up from 10 percent from FY 2014

to December 2020.[61] Encounters of Mexican nationals have fallen to 29 percent of total SWB encounters during this time frame—an enormous change from historical trends that has sweeping ramifications for the border and immigration system, which are detailed below.[62]

The increase in migration at the SWB is consistent with global and regional trends. Over the past three years, migration around the world has reached levels not seen since World War II.[63] The Western Hemisphere is no exception and has been facing historic levels of migration that have severely strained the immigration systems of countries throughout the region.[64] There is a growing consensus within the region that this shared challenge cannot be solved without collective action—a consensus reflected by the 22 countries that have supported the Los Angeles Declaration on Migration and Protection, which proposes a comprehensive approach to managing migration throughout the region.[65]

---

[54] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[55] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters).

[56] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (providing historic data on SWB encounters). During the initial seven months of FY 2023, while the Title 42 public health Order was still in effect, total CBP encounters surged to an all-time high of 1.4 million—an 11 percent increase over the same period in FY 2022 and nearly double the encounters recorded in FY 2021 for the same time period.

[57] The percentage of noncitizens encountered at and between SWB POEs processed for expedited removal who made fear claims steadily rose from 16 percent in FY 2013 to 44 percent in FY 2019, experienced a temporary dip in FY 2020 at the start of the Title 42 public health Order, and then resumed an upward trajectory, reaching a peak of 59 percent in FY 2023, marking the highest level of fear claims as a share of the SWB expedited removal population ever recorded. *See* OHSS Enforcement Lifecycle as of December 31, 2023; March 2024 OHSS Persist Dataset. Data on the exact number of noncitizens encountered at the SWB processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that about 84 percent of all fear claims made in prior years were made by noncitizens encountered at and between SWB POEs. Even if 100 percent of fear claims made before FY 2013 were made by noncitizens encountered at the SWB, the level of fear claims as a share of SWB encounters at and between POEs processed for expedited removal in 2023 would be the highest ever.

[58] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[59] Nationals from all countries other than Mexico and the northern Central American countries accounted for less than 5 percent of total CBP SWB encounters each year between FY 1981 and FY 2010, an average of 5 percent of SWB encounters from FY 2010 to FY 2013, and 10 percent of total SWB encounters from FY 2014 to FY 2019. The increase in encounters from these new countries of origin has accelerated since the start of FY 2021, as non-Mexican, non-northern Central American countries accounted for 42 percent of encounters from the start of FY 2021 through the second quarter of FY 2024, including 51 percent of FY 2024 encounters through March 2024. OHSS analysis of historic OIS *Yearbooks of Immigration Statistics* and March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Citizenship").

[60] *See* 88 FR at 11708–11.

[61] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

The application of title 42 authorities at the SWB also altered migratory patterns, in part by incentivizing individuals who were expelled—without being issued a removal order, which, unlike a title 42 expulsion, carries immigration consequences—to try to re-enter, often multiple times. *See* 88 FR at 11709. The majority of repeat encounters were of Mexican and northern Central American nationals, who were much more likely than others to be expelled to the Mexican side of the border—between FY 2020 and FY 2023, 72 percent of Mexican and 50 percent of northern Central American encounters at and between SWB POEs resulted in title 42 expulsion, contrasting sharply with 8 percent of non-Mexican and non-northern Central American encounters experiencing similar outcomes. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Selected Citizenship").

Even accounting for increased repeat encounters, unique encounters at and between SWB POEs also hit all-time highs in each year from FY 2021 to FY 2023. Nationals of countries other than Mexico and the northern Central America countries account for an even larger share of the growth in unique encounters, comprising 51 percent of unique encounters from January 2021 to March 2024, up from 9 percent in FY 2014 to December 2020. March 2024 OHSS Persist Dataset.

[62] March 2024 OHSS Persist Dataset.

[63] Decl. of Blas Nuñez-Neto ¶ 2, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[64] *See* 88 FR at 11710–11.

[65] *See* The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

**JA114**

IFR_Rule_000013

As it prepared for the return to title 8 processing of all noncitizens, DHS led a comprehensive, all-of-government planning and preparation effort that lasted more than 18 months.[66] This included record deployments of personnel, infrastructure, and resources to support DHS's frontline personnel at a substantial cost to other DHS operations.[67] This effort also included the development and implementation of policy measures, including the joint DHS and DOJ Circumvention of Lawful Pathways rule and complementary measures, which were critically important components of DHS preparations to manage the anticipated significant influx of migrants associated with the end of the Title 42 public health Order's application at the border.[68] And the United States Government's efforts were complemented by a range of measures taken by foreign partners in the region, such as Mexico's independent decision to continue to accept the return of certain non-Mexican migrants after May 11, 2023,[69] and campaigns by Colombia and Panama to attack smuggling networks operating in the Darién Gap.[70]

The Circumvention of Lawful Pathways rule has strengthened the consequences in place for those who cross the border irregularly and is a critical component of the Government's regional strategy. DHS has also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal and limit noncitizens absconding;[71] changing the consultation period such that credible fear interviews take place no earlier than 24 hours after the noncitizen's acknowledgement of receipt of information explaining the credible fear process;[72] returning certain third-country nationals to Mexico, consistent

with established processes under the INA;[73] permitting certain non-Mexican citizens to withdraw their application for admission and voluntarily return to Mexico;[74] and increasing USCIS's capacity to train and prepare additional staff temporarily detailed as AOs to conduct credible fear interviews.[75] These measures, combined with existing processes and resources and work with regional and international partners to disrupt irregular migration and smuggling networks, seek to form a comprehensive framework for managing migratory flows to the border—one that seeks to disincentivize noncitizens from putting their lives in the hands of callous smugglers by crossing the SWB between POEs and to incentivize noncitizens to use lawful, safe, and orderly pathways and processes instead.

Without the Circumvention of Lawful Pathways rule and complementary measures, DHS assesses that irregular migration at the border would be substantially higher today. DHS saw evidence of very high levels of irregular migration in the days leading up to the end of the Title 42 public health Order on May 11, 2023.[76] A historic surge in migration culminated with what were then the highest recorded encounter levels in U.S. history over the days immediately preceding May 11, which placed a significant strain on DHS's operational capacity at the border.[77] Encounters between POEs almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 encounters immediately preceding the termination of the Title 42 public health Order (from May 8 to May 11).[78] The

sharp increase in encounters between POEs during the 30 days preceding May 11 represented the largest month-over-month increase in almost two decades—since January 2004.[79]

As a consequence of the elevated flows USBP experienced in the days leading up to the end of the Title 42 public health Order, USBP saw a steady increase in the numbers of noncitizens in custody, leading to significant operational challenges.[80] From May 8 to 11, 2023, USBP's daily in-custody average was approximately 27,000 noncitizens, with a single-day peak of approximately 28,500 on May 10—well above its holding capacity at that time of approximately 18,500.[81] During this same time frame, eight out of nine SWB sectors were over their holding capacity—with four sectors (El Centro, El Paso, Rio Grande Valley, and Yuma) at more than 50 percent over their holding capacity and one sector (Tucson) at more than two-and-a-half times over its holding capacity.[82]

This record number of encounters between POEs severely strained DHS operations and resources, as well as the resources of other Federal Government agencies, local communities, and non-governmental organizations ("NGOs").[83] CBP redirected limited resources from other mission needs—in particular, legitimate travel and trade operations, the volume of which by that time had surpassed pre-pandemic levels—to focus on processing apprehended noncitizens.[84] Overcrowding in CBP facilities increased the potential for health and safety risks to noncitizens, Government personnel, and contract support staff. Such risks were exacerbated by an increase in the average time in custody, which generally occurs when there are large numbers of noncitizens in custody who must be processed.[85] To manage these conditions, USBP sectors redirected personnel from the field to perform tasks for noncitizens in custody, including processing, transporting, and escorting noncitizens.[86] This, in turn, decreased USBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.[87]

The surge in encounters between POEs immediately preceding the end of the Title 42 public health Order also led

---

[66] Decl. of Blas Nuñez-Neto ¶ 8, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[67] *Id.*

[68] *Id.*

[69] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/ briefing-room/statements-releases/2023/05/02/ mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[70] Decl. of Blas Nuñez-Neto ¶ 40, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[71] *Id.* ¶ 5.

[72] *Id.*

[73] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (noting the United States and Mexico's commitment to increase joint actions to counter human smugglers and traffickers, address root causes of migration, and continue to combine expanded lawful pathways with consequences for irregular migration, and noting that Mexico will continue to accept back migrants on humanitarian grounds).

[74] Decl. of Blas Nuñez-Neto ¶ 5, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[75] *Id.*

[76] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[77] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[78] *Id.*

[79] *Id.*

[80] *Id.* ¶ 10.

[81] *Id.*

[82] *Id.*

[83] *Id.* ¶ 11.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] *Id.*

IFR_Rule_000014

to significant challenges for local border communities.[88] For example, in the days leading up to May 11, 2023, local community resources in El Paso, Texas, were quickly overwhelmed as the number of noncitizens arriving in the United States surpassed the city's capacity.[89] In anticipation of an influx of noncitizens arriving to the city—an influx that ultimately materialized—the city declared a state of emergency, as more than 1,000 noncitizens were sleeping on the sidewalks and left without shelter.[90] Similarly, the cities of Brownsville and Laredo, Texas, declared states of emergency to allow them to seek additional resources to bolster their capacities.[91] The surge in encounters also placed strain on interior cities. In May 2023, for instance, New York's Governor declared a State Disaster Emergency.[92]

Since their implementation in May 2023, the Circumvention of Lawful Pathways rule and complementary measures have helped DHS to better manage migratory flows. Between May 12, 2023, and March 31, 2024, CBP placed into expedited removal more than 970 individuals encountered at and between POEs each day on average, and USCIS conducted a record number of credible fear interviews (more than 152,000) resulting from such cases. This is more interviews from SWB encounters at and between POEs during the span of ten and a half months than in any full fiscal year prior to 2023, and more than twice as many as the annual average from FY 2010 to FY 2019.[93] On average, since May 12, 2023, USCIS has completed approximately 3,300 cases each week, more than double its average weekly completed cases from FY 2014 to FY 2019.[94] In addition, in FY 2023, IJs conducted over 38,000 credible fear and reasonable fear reviews, the highest figure on record since at least 2000.[95]

These efforts have significantly reduced the median time to process credible fear cases. Since May 12, 2023, the median time to refer noncitizens claiming a fear for credible fear interviews decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations, the median time from encounter to removal, in the same time frames, decreased by 85 percent from 73 days to 11 days.[96]

The increase in referrals into expedited removal proceedings, combined with the streamlining of the process, has had tangible results. From May 12, 2023, to March 31, 2024, DHS removed more than 662,000 individuals—more removals than in any full fiscal year since 2013 and an indication that the increased efficiencies gained through these measures have enabled DHS to swiftly impose immigration consequences when individuals do not establish a legal basis to remain in the United States.[97] Over the first six months immediately following May 12, 2023, DHS saw a significant decrease in border encounters between POEs. After peaking at 9,700 per day in the seven days just before the end of the Title 42 public health Order, daily SWB encounters between POEs decreased by 45 percent to an average of 5,200 per day for the period from May 12, 2023, to November 30, 2023.[98] While this months-long trend included variability over shorter periods, border encounters between POEs remained below the levels projected to occur in the absence of the

Circumvention of Lawful Pathways rule and complementary measures.[99]

While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration.

After months of relatively lower encounter levels between POEs following the changes put in place after May 11, 2023, encounter levels increased through the fall of 2023,[100] and December 2023 saw the highest levels of encounters between POEs in history, including a surge in which border encounters between POEs exceeded 10,000 for three consecutive days and averaged more than 8,000 a day for the month.[101] That surge in migration was focused increasingly on western areas of the border—California and Arizona—that had not been the focal point of migration over the prior two years, and in areas that are geographically remote and challenging to respond to. For instance, the Tucson sector's average full-year encounter total for the pre-pandemic period (FY 2014 to FY 2019) was approximately 62,000; by contrast, in November and December of 2023, the sector recorded approximately 64,000 and 80,000 encounters, respectively.[102] And while the number of encounters between POEs since December 2023 has decreased, consistent with seasonal migration flows and as a result of increased enforcement, they still remain at historically high levels—USBP encounters from January 2024 to March 2024 are just 5 percent below the levels

---

[88] *Id.* ¶ 12.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *See* N.Y. Exec. Order No. 28, Declaring a Disaster Emergency in the State of New York (May 9, 2023), *https://www.governor.ny.gov/executive-order/no-28-declaring-disaster-emergency-state-new-york; see also* Mayor of Chicago Emergency Exec. Order No. 2023–2 (May 9, 2023).

[93] Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[94] Completed cases are those with credible fear interviews that have been adjudicated or that have been closed. Pre-May 12, 2023, data from OHSS Lifecycle Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[95] EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Apr. 27, 2023), *https://www.justice.gov/eoir/media/1344816/dl?inline.*

[96] Historic processing times are based on OHSS Enforcement Lifecycle data as of December 31, 2023; post-May 12 estimates are based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. Encounter-to-removal cases include noncitizens removed after being placed in expedited removal proceedings, claiming fear, and receiving a negative fear determination or an administrative closure that is not referred to EOIR. Comparisons to the pandemic period are not relevant because many noncitizens who normally would have been referred for expedited removal processing were instead expelled under title 42 authority.

[97] OHSS analysis of data downloaded from UIP on April 2, 2024; *see* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2023-11/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf* (noncitizen removals, returns, and expulsions for FY 1892 to FY 2022).

[98] Pre-May 12, 2023, data from March 2024 OHSS Persist Dataset; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on December 12, 2023.

[99] Decl. of Blas Nuñez-Neto ¶ 4, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2) (noting that in the absence of the rule, DHS planning models suggest that irregular migration could meet or exceed the levels that DHS recently experienced in the days leading up to the end of the Title 42 public health Order).

[100] *See* CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last visited May 27, 2024) (providing monthly figures for 2021 to 2024).

[101] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024); OHSS, *2022 Yearbook of Immigration Statistics* 103–04 tbl. 39 (Nov. 2023), *https://www.dhs.gov/sites/default/files/2024-02/2023_0818_plcy_yearbook_immigration_statistics_fy2022.pdf;* -Priscilla Alvarez, *Authorities Encountering Record Number of Migrants at the Border Each Day Amid Unprecedented Surge,* CNN (Dec. 22, 2023), *https://www.cnn.com/2023/12/22/politics/border-surge-record-amounts/index.html.*

[102] *See* March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (''SW Border Encounters by Sector'').

IFR_Rule_000015

reached during the same months in 2023,[103] while some USBP sectors, such as Tucson and San Diego, have seen increases of 83 percent and 62 percent, respectively, from the second quarter of FY 2023, and Tucson is on pace for an all-time high number of annual encounters.[104]

Since the lifting of the Title 42 public health Order, then, it has become increasingly clear that DHS's ability to process individuals encountered at the SWB under applicable title 8 authorities—including, critically, to deliver timely consequences of those who do not establish a legal basis to remain in the United States—is significantly limited by the lack of resources and tools available to the Departments. In response to the record high levels of encounters between POEs in December 2023, DHS had to take extraordinary steps to shift personnel and resources to the affected sectors: CBP curtailed or suspended operations at a number of POEs, and, just before December 25, 2023, CBP reassigned 246 officers to support USBP operations. As part of these extraordinary measures: vehicular traffic through the Eagle Pass, Texas, POE was suspended on November 27, 2023; the POE in Lukeville, Arizona, was closed on December 4, 2023; rail operations at POEs in El Paso and Eagle Pass, Texas, were suspended on December 18, 2023; [105] the Morley Gate POE in Nogales, Arizona, which was closed due to construction and slated to be reopened in November 2023, delayed its reopening; [106] and operations at Pedestrian West, part of the San Ysidro POE in San Diego, California, were suspended on December 9, 2023.[107] On January 4, 2024, once the volume of migrants had diminished and CBP officers were able to return to normal duties, port operations in these locations resumed.[108]

The decision to close POEs was not one taken lightly. The United States Government fully understands the impacts of such closures on local communities on both sides of the border, both socially and economically.[109] Closing international POEs is a measure of last resort, and one that DHS was compelled to take in order to reassign its resources to support frontline agents in a challenging moment.

In addition to concerted efforts to strengthen and maximize consequences, including through new regulations, the United States Government has engaged intensively with the Government of Mexico to identify coordinated measures both countries could take, as partners, to address irregular migration. During the period before and after the December surge, the United States Government and the Government of Mexico held numerous talks at the highest levels of government to address migration. For example, President Biden and President of Mexico Andrés Manuel López Obrador spoke on December 21, 2023, and February 3, 2024.[110] During their conversation on December 21, the presidents agreed that additional enforcement actions were urgently needed so that the POEs that were temporarily closed could reopen.[111] In subsequent high-level meetings, both countries committed to expanding efforts to increase enforcement measures to deter irregular migration, expanding safe and lawful pathways, and strengthening cooperation.[112] The Government of Mexico expressed its concern about the economic impact of the POE closures and committed to increasing enforcement on key transit routes north.[113] On January 22, 2024, after a series of follow-on meetings between United States and Mexican Cabinet members in Washington, DC, Mexico's Foreign Secretary enumerated a series of steps that the United States and Mexico committed to taking to continue to address migration, including combating human smuggling and trafficking organizations.[114]

DHS assesses that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available and the Government of Mexico's operational constraints at the end of its fiscal year, which limited its ability to enforce its own immigration laws.[115] The

---

[103] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

[104] OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SW Border Encounters by Sector").

[105] *See* CBP, *Statement from CBP on Operations in Eagle Pass, Texas and Lukeville, Arizona* (Nov. 27, 2023), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-eagle-pass-texas-and-lukeville-arizona.

[106] *See* CBP, *Statement on Operational Changes and Resumption of Rail Operations in Eagle Pass and El Paso* (Dec. 22, 2023), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operational-changes-and-resumption-rail-operations.

[107] *See* CBP, *Statement from CBP on Operations in San Diego, California* (Dec. 7, 2023), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-operations-san-diego-california.

[108] *See* CBP, *Statement from CBP on Resumption of Operations in Arizona, California, and Texas* (Jan. 2, 2024), https://www.cbp.gov/newsroom/national-media-release/statement-cbp-resumption-field-operations-arizona-california-and/.

[109] *See, e.g.,* Russel Contreras, *U.S.-Mexico Border Closures Could Cost Billions,* Axios (Dec. 22, 2023), https://www.axios.com/2023/12/22/us-mexico-border-closures-could-cost-billions (discussing evidence of the "devastating consequences" that follow from partial border closings); *cf.* Bryan Roberts et al., *The Impact on the U.S. Economy of Changes in Wait Times at Ports of Entry: Report to U.S. Customs and Border Protection* 5 (Apr. 2013), https://ebtc.info/wp-content/uploads/2014/07/U.S.C.-Create-CBP-Final-Report.pdf (discussing the benefits of adding staffing to land border POEs).

[110] *See* The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/; The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Feb. 3, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/03/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-3/.

[111] The White House, *Readout of President Joe Biden's Call with President Andrés Manuel López Obrador of Mexico* (Dec. 21, 2023), https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/21/readout-of-president-joe-bidens-call-with-president-andres-manuel-lopez-obrador-of-mexico-2/.

[112] The White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/.

[113] *Id.; see also, e.g.,* Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis; US, Mexico Agree to Strengthen Efforts to Curb Record Migration, Reuters (Dec. 28, 2023), https://www.reuters.com/world/us-mexico-keep-border-crossings-open-lopez-obrador-says-2023-12-28/.

[114] *See, e.g.,* Valentine Hilaire & Cassandra Garrison, *Mexico, US Pitch Measures to Ease Pressure on Border, Plan Guatemala Talks,* Reuters (Jan. 22, 2024), https://www.reuters.com/world/americas/mexico-us-guatemala-officials-meet-migration-talks-2024-01-22/; Amna Nawaz, *Mexico's Foreign Secretary Discusses What Her Country Is Doing to Ease Border Crisis,* PBS News Hour (Jan. 25, 2024), https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis (quoting Mexico's Foreign Affairs Secretary as saying that "we have done much more law enforcement to bring down the pressure in the border in the north").

[115] *See* María Verza, *Mexico Halts Deportations and Migrant Transfers Citing Lack of Funds,* AP News (Dec. 4, 2023), https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc; *Smugglers Are Bringing Migrants To a Remote Arizona Crossing, Overwhelming Agents,* NPR (Dec. 10, 2023), https://www.npr.org/2023/12/10/1218428530/smugglers-are-bringing-migrants-to-a-remote-arizona-crossing-overwhelming-agents;

Continued

IFR_Rule_000016

**48726** **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

Departments cannot address all of these factors in one rule, but assess that this rule will significantly increase the ability to deliver timely decisions and timely consequences at the border within current resources, combating perceptions and messaging to the contrary.

Encounters between POEs in January 2024 were substantially lower than December 2023 encounters, consistent with historic seasonal trends, and encounters in January 2022 and January 2023.[116] In February and March 2024, encounter levels increased from the levels in January but remained significantly lower than in December 2023.[117] Overall, from January 1 to March 31, 2024, encounters between POEs were 5 percent lower than during the same months in 2023 and 22 percent lower than those in 2022.[118] However, despite the overall decrease in encounters since December 2023, specific areas of the border—in particular USBP's San Diego and Tucson Sectors—have experienced localized increases in encounters that have, at times, strained DHS's holding capacity, adversely impacted local operations, and limited DHS's ability to swiftly impose consequences on individuals who do not establish a legal basis to remain in the United States. During the last week of April 2024, USBP's San Diego Sector encountered an average of more than 1,400 migrants each day, including many migrants from countries outside the Western Hemisphere who are more difficult to process.[119] The USBP Tucson Sector is experiencing similar, unprecedented migratory flows and consequent challenges. This high concentration of encounters, including comparatively large numbers of migrants who are hard to remove, in a focused geographic area places particular strain on the immigration enforcement system. This is particularly true in areas of the border—such as San Diego—where infrastructure-related capacity constraints limit DHS's ability to swiftly

impose consequences at the border. These factors resulted in USBP's main processing facility in San Diego reaching over 200 percent capacity in April 2024, despite a recent expansion of this facility.

Since January 2024, the United States and Mexico have continued to hold regular, high-level conversations, as partners, to continue to deepen their collaboration, identify emerging trends, and coordinate additional steps by both countries to address changing flows. These meetings have informed operational deployments by both governments, including the coordinated response to the shift in migratory flows to the San Diego and Tucson sectors. This extensive ongoing collaboration was reflected by another bilateral engagement between President Biden and President López-Obrador on April 28, 2024, after which the presidents released a joint statement in which they ''ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights.''[120] Since then, the United States and the Government of Mexico have worked together, cooperatively, to increase enforcement.[121] But these efforts—while significant—are likely to be less effective over time. Smuggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the

funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs.

### 2. Need for These Measures

DHS projects that, absent the policy changes being promulgated here, irregular migration will once again increase, and that any disruption in Mexican enforcement will only exacerbate that trend. Without the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States.

Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution, poverty, human rights abuses, the impacts of climate change, and other factors. The case of migration through the Darién jungle between Colombia and Panama is illustrative. For example, between January and April, 2024, the United Nations High Commissioner for Refugees (''UNHCR'') tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022.[122] The number of migrants crossing the Darién will only further increase the pressure on Mexico at its southern border and on the United States at the SWB.

Past unprecedented migration surges bolster the Departments' views and the need for this rulemaking. As described in detail in Section III.B.1 of this preamble, migration trends have been steadily increasing in scope and complexity, featuring increasingly varied nationalities and demographic groups. This has been true even as DHS has experienced sustained levels of historically high encounter levels. Over the past two years, an increasing proportion of total CBP encounters at the SWB has been composed of families and UCs, and DHS has seen record flows of migrants from countries outside of northern Central America.[123] These

Adam Isaacson, *Weekly U.S.-Mexico Border Update: Senate Negotiations, Migration Trends,* Washington Office of Latin America (Dec. 15, 2023), *https://www.wola.org/2023/12/weekly-u-s-mexico-border-update-senate-negotiations-migration-trends/;* Jordan, *supra* note 27.

[116] OHSS analysis of March 2024 OHSS Persist Dataset.

[117] OHSS analysis of March 2024 OHSS Persist Dataset.

[118] OHSS analysis of March 2024 OHSS Persist Dataset.

[119] *See* Elliot Spagat, *The Latest Hot Spot for Illegal Border Crossings is San Diego. But Routes Change Quickly,* AP News (May 17, 2024), *https://apnews.com/article/san-diego-border-asylum-biden-mexico-da1e7b7c81e4e58912deff6d36dbdb9e.*

[120] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador.*

[121] *See* Valerie Gonzalez & Elliot Spagat, *The US Sees a Drop in Illegal Border Crossings After Mexico Increases Enforcement,* AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a;* Luke Barr, *US Customs And Border Protection Reopening 4 Ports of Entry After Migrant Surge Subsides,* ABC News (Jan. 2, 2024), *https://abcnews.go.com/US/us-customs-border-protection-reopening-4-ports-entry/story?id=106062555;* Seung Min Kim, *US and Mexico Will Boost Deportation Flights and Enforcement to Crack Down on Illegal Immigration,* AP News (Apr. 30, 2024), *https://apnews.com/article/joe-biden-andres-manuel-lopez-obrador-mexico-immigration-border-c7e694f7f104ee0b87b80ee859fa2b9b;* Julia Ainsley & Chloe Atkins, *Mexico Is Stopping Nearly Three Times as Many Migrants Now, Helping Keep U.S. Border Crossings Down,* NBC News (May 15, 2024), *https://www.nbcnews.com/politics/immigration/mexico-stopping-three-times-as-many-migrants-as-last-year-rcna146821.*

[122] The UNHCR tracked 20,000 irregular entries in the Darién gap in 2022. OHSS analysis of downloaded from UNHCR Operational Data Portal, *Darien Panama: Mixed Movements Protection Monitoring—January–December 2023, https://data.unhcr.org/en/documents/details/105569* (last visited May 31, 2024); *Darien Panama: Mixed Movements Protection Monitoring—April 2024, https://data.unhcr.org/en/documents/details/108399* (last visited May 31, 2024).

[123] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/*

IFR_Rule_000017

international migration trends are the result of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks.[124] The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[125] including through working closely with partner countries across the Western Hemisphere.[126] But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation.

The Departments' views and the need for this rulemaking are further supported by projections developed from ongoing work by DHS's Office of Homeland Security Statistics ("OHSS"), which leads an interagency working group that produces encounter projections used for operational planning, policy development, and short-term budget planning. OHSS uses a mixed-method approach that combines a statistical predictive model with subject matter expertise intended to provide informed estimates of future migration flow and trends. The mixed-methods approach blends multiple types of models through an ensemble approach of model averaging.[127] The

model includes encounter data disaggregated by country and demographic characteristics, data on apprehensions of third-country nationals by Mexican enforcement agencies, and economic data. DHS uses the encounter projection to generate a range of planning models, which can include "low" planning models that are based on the lower bound of the 95 percent forecast interval, "moderate" planning models that are based on the upper bound of the 68 percent forecast interval, and "high" planning models based on the upper bound of the 95 percent forecast interval. These planning models account for changes in effectiveness of current enforcement and lawful migration processes.[128]

Because of the significant time and operational cost it takes to redeploy resources, DHS is generally conservative in its enforcement planning. 88 FR at 31328. As a result, it focuses on its higher planning models as it projects future resource deployments to avoid using more optimistic scenarios that could leave enforcement efforts badly under-resourced. *Id.* The current internal projections, based on this robust modeling methodology, suggest that encounters may once again reach extremely elevated levels in the weeks to come, averaging in the three months from July to September, 2024, in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[129] The Departments believe the policies in this rule are

justified in light of high levels of migration that have ultimately proved persistent even in the face of new policies that have resulted in processing migrants with record efficiency, as evidenced by the migration patterns witnessed in December 2023. Current sustained, high encounter rates exceed the border security and immigration systems' capacity to effectively and safely process, detain, and remove, as appropriate, all migrants who are encountered.[130] This is generally true when considering total encounters across the entire SWB, and even more the case when specific sectors along the border are targeted by smuggling organizations with focused localized surges in encounters—as has been happening since the late fall in Tucson, Arizona, which accounted for 35 percent of SWB encounters between POEs in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022.[131]

Despite the fact that the average of 4,400 daily encounters between POEs in the second quarter of FY 2024 is below the highs experienced in the days immediately preceding the end of the Title 42 public health Order and in December 2023,[132] daily encounter numbers remain sufficiently high—especially in the locations where encounters have been extremely elevated, such as California and Arizona—that the numbers significantly impact the operational flexibility required to process individuals in a timely and consequential manner.[133]

---

ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated May 10, 2024) ("SWB Encounters by Agency and Family Status" and "SWB Encounters by Citizenship and Family Status").

[124] *See* 88 FR at 31327–28 & n.59.

[125] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[126] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[127] Blending multiple models and basing predictions on prior data has been understood to improve modeling accuracy. *See, e.g.,* Spyros Makridakis et al., *Forecasting in Social Settings: The State of the Art,* 36 Int'l J. Forecasting 15, 16 (2020) (noting that it has "stood the test of time . . . that combining forecasts improves the [forecast] accuracy"); The Forecasting Collaborative, *Insights into the Accuracy of Social Scientists' Forecasts of Societal Change,* 7 Nat. Hum. Behaviour 484 (2023), *https://doi.org/10.1038/s41562-022-01517-1* (comparing forecasting methods and suggesting that forecasting teams may materially improve accuracy by, for instance, basing predictions on prior data and including scientific experts and

multidisciplinary team members). DHS notes that the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. The current period is characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *See* 88 FR at 31316 n.14.

[128] OHSS Southwest Border Encounter Projection, April 2024.

[129] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

---

[130] *See, e.g.,* Decl. of Blas Nuñez-Neto ¶ 8, *M.A.* v. *Mayorkas,* No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[131] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables—October 2023, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("SW Border Encounters by Sector").

[132] March 2024 OHSS Persist Dataset. As noted *supra* note 5, preliminary April data show SWB encounters between POEs fell slightly, by 6 percent, between March and April. OHSS analysis of data obtained from CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last accessed May 24, 2024). The preliminary April data are best understood to reflect a continuation of the general pattern described elsewhere in this rule.

[133] The Tucson Sector accounted for 35 percent of USBP encounters in the second quarter of FY 2024, up from 18 percent in FY 2023 and 13 percent in FY 2022. OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *Southwest Land Border Encounters (By Component), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component* (last modified May 15, 2024). Border encounters typically fall around the New Year and often remain lower than other months in January. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/*

Continued

IFR_Rule_000018

When capacity is strained like this in specific locations along the border, it becomes even more difficult for the Departments to deliver timely decisions and timely consequences. At increased levels of encounters and without a change in policy, most non-Mexicans processed for expedited removal under title 8 would likely establish a credible fear and remain in the United States for the foreseeable future despite the fact that most of them will not ultimately be granted asylum, assuming results are similar to historic rates,[134] a scenario that would likely continue to incentivize an increasing number of migrants to journey to the United States and further increase the likelihood of sustained high encounter rates.

Even in times with sustained lower encounter volumes, such as between 2011 and 2017, the Departments experienced challenging situations, including the first surge in UCs in 2014, that severely strained the United States Government's capacity.[135] Surges in encounters at the southern border—both at and between POEs—are now occurring more frequently and at higher magnitudes, and featuring more diverse demographics and nationalities than ever before.[136] These surges affect more

CBP sectors along the border, disrupt operations more quickly, and affect readiness in other critical areas as DHS diverts resources, including front-line agents, from other urgent tasks and geographic areas.[137] These actions, in turn, impact other critical mission sets, including processing lawful trade and travel at POEs.[138]

DHS continues to lack the necessary funding and resources to deliver timely consequences to the majority of noncitizens encountered given the increased level of encounters it is experiencing at the SWB.[139] On August 10, 2023, the Administration submitted to Congress a request for $2.2 billion in supplemental funding for border operations, including $1.4 billion for CBP and $714 million for ICE for border management and enforcement and an additional $416 million for counter-fentanyl efforts.[140]

On October 20, 2023, the Administration submitted to Congress a second request for supplemental funding for DHS, which would provide funding to enhance enforcement and processing, procure and operationalize needed technologies, and hire additional personnel.[141] This funding

would further support critical border enforcement efforts, including:

• An additional 1,300 Border Patrol Agents to work alongside the 20,200 agents proposed in the President's FY 2024 budget request, as well as 300 Border Patrol Processing Coordinators and support staff;[142]

• An additional 1,600 AOs and associated support staff to process migrant claims, which would provide USCIS with the critical resources needed to expand its current credible fear interview capacity to support timely processing of those placed in expedited removal;[143] and

• An expansion of detention beds and ICE removal flight funding to sustain the current significantly increased use of expedited removal, provide necessary surge capacity, and allow DHS to process more expeditiously noncitizens who cross the SWB unlawfully and swiftly remove those without a legal basis to remain in the United States.[144]

On January 31, 2024, DHS published a new USCIS fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 FR 6194, 6194 (Jan. 31, 2024); U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction, 89 FR 20101 (Mar. 21, 2024) (making corrections). Because there is

---

*enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("Nationwide CBP Encounters by Encounter Type and Region"). Thus, while CBP's apprehension of 402,000 noncitizens between POEs in the second quarter of FY 2024 is slightly lower than the 424,000 observed in FY 2023 and 518,000 in FY 2022, it is almost four times as high as the pre-pandemic second-quarter average for FY 2014 through FY 2019, and with the exceptions of FY 2022 and FY 2023 the highest second-quarter count recorded since FY 2001. Even with the downturn between January and March, 2024, the high volume of encounters and challenging demographic mix still meant that most noncitizens processed by USBP were released from custody into the United States (including noncitizens enrolled in an ICE Alternatives to Detention program and those paroled by the Office of Field Operations). OHSS analysis of March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Outs by Agency").

[134] Since May 12, 2023, 60 percent of non-Mexican noncitizen SWB encounters (at and between POEs) processed for expedited removal who have made fear claims have been referred to EOIR for immigration proceedings. OHSS analysis of data downloaded from UIP on April 2, 2024. But based on historic (pre-pandemic) data, only 18 percent of non-Mexican noncitizens processed for expedited removal that are referred to EOIR result in an individual being granted relief or protection from removal once the case is completed. OHSS Enforcement Lifecycle December 31, 2023.

[135] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status").

[136] OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/*

*ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Family Status" and "CBP SW Border Encounters by Agency and Selected Citizenship"); *The Unaccompanied Children Crisis: Does the Administration Have a Plan to Stop the Border Surge and Adequately Monitor the Children?: Hearing Before the S. Comm. On the Judiciary,* 114th Cong. (2016) (statement of Ronald Vitiello, Acting Chief of USBP), *https://www.judiciary.senate.gov/imo/media/doc/02-23-16%20Vitiello%20Testimony.pdf;* Memorandum on the Response to the Influx of Unaccompanied Alien Children Across the Southwest Border, 1 Pub. Papers of Pres. Barack Obama 635, 635 (June 2, 2014).

[137] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2).

[138] *See, e.g.,* Decl. of Raul L. Ortiz ¶¶ 11–12, *Florida* v. *Mayorkas,* No. 23–11644 (11th Cir. May 19, 2023) (Dkt. 3–2); Decl. of Blas Nuñez-Neto ¶ 32, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[139] Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[140] *See* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3, attach. at 45–50 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[141] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical*

*National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[142] *See* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[143] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[144] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.*

IFR_Rule_000019

no fee required to file an asylum application or for protection screenings, 8 CFR 106.2(a)(28), and because Congress has not provided other funds to pay for the operating expenses of the Asylum Division,[145] fees generated from other immigration applications and petitions must be used to pay for these expenses. *See* INA 286(m), 8 U.S.C. 1356(m). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[146] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[147] Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget [148] would impose a burden on other filers.

In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[149] Critically, the proposal included nearly $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities,[150] including resources for:

- Over 1,500 new CBP personnel, including Border Patrol Agents and CBP Officers;
- Over 4,300 new AOs, as well as USCIS staff to facilitate timely and fair decisions;
- 100 additional IJ teams to help reduce the asylum caseload backlog and adjudicate cases more quickly;
- Shelter and critical services for newcomers in U.S. cities and States; and
- 1,200 new ICE personnel for functions including enforcement and removals.[151]

However, Congress failed to move forward with this bipartisan legislative proposal.[152] It also failed to pass the emergency supplemental funding requests that the Administration submitted. Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. For example, the bill does not provide the resources necessary for DHS to refer the majority of noncitizens encountered by USBP who are amenable to expedited removal into such processing, resulting in large-scale releases pending section 240 removal proceedings based on current encounter numbers. Such releases, in turn, have significant impacts on communities and contribute to further migration by incentivizing potential migrants to travel to the United States with the belief that, even if initially detained, they will ultimately be released to live and work in the United States for long periods of time. Absent the Proclamation and this rule, these harmful results are especially likely given the circumstances described in the Proclamation.

The FY 2024 appropriations provided some additional funding for DHS above its request, including for additional Border Patrol Agents and a higher level of ICE detention beds than was previously appropriated.[153] Although

this increase is helpful, there are a number of ways in which the FY 2024 budget falls well short of what DHS needs to respond to the current elevated levels of migration. For example, the FY 2024 appropriations failed to fund the salary increase set across the Federal Government by the Office of Management and Budget (''OMB''), effectively reducing salary funding for the entirety of the appropriations-funded DHS workforce.[154] This reduction will limit the availability of overtime to respond to surges in irregular migration and may require difficult operational decisions during the closing months of the fiscal year, which is historically a busier period for such migration. The appropriations also did not provide sufficient funding to maintain the temporary processing facilities needed to hold migrants in custody. Further, the funds for hiring additional personnel were restricted to the current fiscal year rather than being provided as multi-year funds as requested; given the length of the hiring process, DHS will not be able to realize the increases in personnel envisioned by the legislation before the funding expires.

All of these factors, taken together, mean that under the current appropriations law, DHS will, at best, be able only to sustain most of its current operations, resulting in an operating capacity that already experiences strain during times of high migration levels; this will, in turn, reduce DHS's ability to maximize the delivery of timely consequences for those without a lawful basis to remain. Additionally, DHS will not be able to expand capacity along the border or increase its ability to deliver consequences through referrals into expedited removal. Instead, DHS may actually need to reduce capacity in some key areas, including by closing critical temporary processing facilities and pulling USBP agents away from the frontline to undertake processing and tasks related to custody. Thus, while DHS has made significant progress toward a migration strategy focused on enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy, a lack of needed resources and tools hampers DHS's current ability to manage the unprecedented flow of hemispheric migration, and the

[145] *See* DHS, *U.S. Citizenship and Immigration Services, Budget Overview, Fiscal Year 2025 Congressional Justification* CIS—IEFA—22 (Mar. 8, 2024), *https://www.dhs.gov/sites/default/files/2024-03/2024_0308_us_citizenship_and_immigration_services.pdf* (showing AOs are funded by Immigration Examinations Fee Account); *id.* at CIS—O&S—30 (showing that appropriated funds from the Refugee, Asylum, and International Operations Directorate of USCIS support Refugee Officers).

[146] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[147] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

[148] *Id.*

[149] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[150] Deirdre Walsh & Claudia Grisales, *Negotiators release $118 billion border bill as GOP leaders call*

*it dead in the House,* NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[151] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

[152] Associated Press, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance* (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

[153] *See* House of Representatives, *Explanatory Statement: Division C, Department of Homeland Security Appropriations Act, 2024,* at 14, 25 (Mar.

18, 2024), *https://docs.house.gov/billsthisweek/20240318/Division%20C%20Homeland.pdf.*

[154] *See id.* at 14, 22 (explaining that for CBP, ''[t]he agreement includes $346,498,000 below the request, including the following: $182,772,000 for the 2024 pay raise,'' and for ICE, ''[t]he agreement provides $9,501,542,000 for Operations and Support, including a decrease below the request of $74,153,000 for the 2024 pay raise'').

IFR_Rule_000020

situation will only worsen with expected seasonal and other increases.

Immigration-related resource challenges are not unique to front-line border officials. The immigration removal continuum—from apprehension, processing, and inspection to protection interviews and removal—is hampered by a lack of sufficient funding, resources, and tools at every stage.[155] EOIR is underfunded, without sufficient resources to address the backlog of over 2.78 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024.[156] This under-resourcing has contributed to the growth of this backlog; in FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[157] The FY 2024 budget

creates even greater strains on EOIR. EOIR received $844 million this fiscal year,[158] a cut of $16 million from FY 2023.[159] EOIR's budget was also cut $94.3 million from its inflation-adjusted funding requirements (referred to as "Current Services").[160] As a result of the significant budgetary gap, EOIR will necessarily be required to reduce the Federal and contract labor force that has been supporting its immigration courts nationwide and cut spending to technological initiatives. Specifically, EOIR has identified a need to cut 200 of its authorized Federal positions and is identifying areas in which it can make cuts to contracts, including those supporting the Office of Information Technology, with the least amount of impact on operations.

Similarly, the USCIS backlog of affirmative asylum cases stands at over 1.16 million and is growing.[161] USCIS does not have enough AOs to keep pace with the number of individuals who could be referred for credible fear interviews at the border, much less keep pace with new affirmative asylum receipts or even marginally reduce the affirmative asylum backlog. In sum, the border security and immigration systems are badly strained and not functioning to provide timely relief or protection for those who warrant it or timely consequences for those without a legal basis to remain, including those without viable asylum or protection claims.

The TCOs operating in the region, and the migrants they prey upon who intend to make the dangerous journey north, have taken notice of this situation. They understand that when the capacity of DHS to quickly process individuals at the border is strained, DHS is limited in its ability to deliver timely consequences. Because of these resource limitations, individuals are more likely

than not to be released to pursue a years-long immigration court process during which, beginning 180 days after applying for asylum, they may be authorized to work.[162] These smuggling organizations have built a multi-billion-dollar industry, featuring online marketing campaigns to spread misinformation and sophisticated logistics networks designed to quickly funnel migrants to the parts of the border where DHS capacity is lower.[163]

While the emergency measures instituted by the Proclamation are in effect, the Departments will put in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time noncitizens spend in DHS facilities. The specific measures introduced by this rule are designed to further streamline DHS processes at the border so that DHS can more quickly deliver meaningful consequences to more individuals who cross unlawfully or without authorization within the resource and operational constraints that have limited DHS capacity to date.

Under this rule, while emergency border circumstances persist, the way noncitizens are processed, their eligibility for asylum, and the way in which their eligibility for protection is assessed, will change in three ways. First, during emergency border circumstances, those who enter the United States across the southern border and who are not described in section 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist. As discussed in Section III.B.3.a of this preamble, the Departments expect that applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration

[155] *See* DHS, *Statement from Secretary Mayorkas on the President's Fiscal Year 2025 Budget for the U.S. Department of Homeland Security* (Mar. 11, 2024), *https://www.dhs.gov/news/2024/03/11/statement-secretary-mayorkas-presidents-fiscal-year-2025-budget-us-department* ("DHS reiterates previously submitted funding requests that are critical to secure the border, build immigration enforcement capacity, combat fentanyl and address domestic needs like natural disaster response, which Congress has failed to act on. Among them, the October funding request, which includes $8.7 billion for border, immigration, and counter fentanyl requirements and $9.2 billion for FEMA's Disaster Relief Fund and Nonprofit Security Grant Program. Notably, the Administration's border supplemental request includes funding to build capacity in the areas of border security, immigration enforcement, and countering fentanyl. DHS strongly supports the additional $19 billion in funding proposals included in the Senate's bipartisan border legislation that would, among other things, enable DHS to hire more CBP agents and officers, ICE enforcement and investigative personnel, and USCIS asylum officers and provide new tools to bolster the Department's efforts to secure and manage the border."); *see also* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, OMB, at 2–3 (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf;* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* DHS, *Fact Sheet: Biden-Harris Administration Supplemental Funding Request* (Oct. 20, 2023), *https://www.dhs.gov/news/2023/10/20/fact-sheet-biden-harris-administration-supplemental-funding-request.*

[156] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/workload-and-adjudication-statistics.*

[157] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/05/08/2_new_cases_and_total_completions.pdf;* EOIR, *Adjudication Statistics: New Cases and Total Completions—Historical* 1 (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2022/09/01/3_new_cases_and_total_completions_-_historical.pdf.*

[158] Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133 ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $844,000,000").

[159] Consolidated Appropriations Act, 2023, Public Law 117–328, 136 Stat. 4459, 4522 (2022) ("[f]or expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, $860,000,000"); EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (showing FY 2023 enacted budget providing EOIR $860 million).

[160] EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf* (providing the Current Services Adjustment as an increase of $78.3 million, bringing the inflation-adjusted amount to $938.3 million).

[161] OHSS analysis of USCIS Global Affirmative Data as of April 25, 2024 (noting that "[d]ata is limited to filings between FY2000 and March 31, 2024").

[162] *See* 8 CFR 208.7, 274a.12(c)(8). Sixty-seven percent of individuals encountered by CBP at and between POEs at the SWB between May 2023 and March 2024 were released, including 66 percent of such individuals in the second quarter of FY 2024. These individuals include noncitizens enrolled in an ICE Alternatives to Detention program. March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters Book-Out Outcomes by Agency").

[163] *See, e.g.,* Priscilla Alvarez, *Human smugglers peddle misinformation to US-bound migrants on Facebook, watchdog says,* CNN (July 27, 2022), *https://www.cnn.com/2022/07/27/politics/human-smuggling-misinformation/index.html;* Bernd Debusmann Jr, *TikTok and Title 42 rumours fuel human smuggling at the US border,* BBC (July 8, 2023), *https://www.bbc.com/news/world-us-canada-65848683.*

**JA122**

IFR_Rule_000021

pathways, or not undertake the dangerous journey north to begin with.

Second, this rule will reduce the time it takes to process individuals placed in expedited removal at the border by changing the way CBP immigration officers identify and refer noncitizens for credible fear interviews. Under current title 8 procedures, noncitizens encountered at the border and processed for expedited removal are provided lengthy advisals regarding the credible fear and asylum process and are asked questions to ascertain whether they may potentially have a fear of persecution or torture.[164] During emergency border circumstances, DHS will move to a ''manifestation of fear'' process at the border, detailed below in Section III.B.3.b of this preamble, that will involve general (rather than individual) advisals and require individuals who have a fear of persecution or torture to manifest that fear, verbally, non-verbally, or physically, in order for DHS personnel to refer them for a credible fear interview.

Third, the limitation on asylum eligibility will be considered during credible fear interviews and reviews, and those who are subject to the limitation and are unable to establish a significant possibility of showing exceptionally compelling circumstances will be screened for eligibility for statutory withholding of removal and CAT protection under a heightened ''reasonable probability of persecution or torture'' standard—a higher standard than the ''reasonable possibility'' standard under the Circumvention of Lawful Pathways rule.

As the Departments described more fully in the Circumvention of Lawful Pathways rule, the current asylum system—in which a high number of migrants are initially determined to be eligible to pursue their claims, even though most ultimately are not granted asylum or protection at the merits stage—has contributed to the growing backlog of cases awaiting review by IJs.[165] The practical result is that those with meritorious claims may have to wait years for their claims to be granted, while individuals who are ultimately denied protection may spend years in the United States before being issued a final order of removal.[166] As the demographics of border encounters have shifted in recent years to include Mexicans claiming fear at a higher rate, and large numbers of non-Mexicans—who have historically been far more likely to assert fear claims—and as the

time required to process and remove noncitizens ineligible for protection has grown (during which individuals may become eligible to apply for employment authorization), the deterrent effect of apprehending noncitizens at the SWB has become more limited.[167]

The provisions in this rule are intended to be emergency measures that impact the expedited removal process and eligibility for relief or protection only for those who enter the United States across the southern border during emergency border circumstances. Unfortunately, the significant efforts the Departments have made to address such circumstances to date have not been as effective as they could have been had

Congress provided the personnel, infrastructure, technology, and broader reforms that the Departments have requested. Communities all over the United States are being adversely impacted as a result. The goal of these measures is to quickly reduce unlawful and unauthorized entries at the border and to quickly impose decisions and consequences on those who cross our border unlawfully and lack a legal basis to remain.

3. Description of the Rule and Explanation of Regulatory Changes

This rule amends the Departments' regulations to further the purpose of the Presidential Proclamation of June 3, 2024, which suspends and limits entry along the southern border to address the emergency border circumstances outlined in that Proclamation. The rule does so by amending 8 CFR 208.13 and 1208.13 and adding regulatory provisions at 8 CFR 208.35, 235.15, and 1208.35 that (1) limit asylum eligibility for those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances; (2) alter the process for advising noncitizens of their rights to seek asylum and for identifying which noncitizens to refer to an AO for credible fear screening during emergency border circumstances; and (3) alter the standard for screening for statutory withholding of removal and CAT protection while such circumstances exist.[168] Below is an explanation of the limitation and each change to the expedited removal and fear screening process. The specific content of each provision and amendment is set forth in detail in Section III.C of this preamble.

a. Limitation on Asylum Eligibility

As discussed above in Sections III.B.1 and 2 of this preamble, irregular migration is continuing to strain the Departments' ability to timely process, detain, and remove, as appropriate, and

---

[164] 8 CFR 235.3(b)(2).

[165] 88 FR at 31315.

[166] *See supra* note 25.

[167] According to OHSS Persist data, Mexican nationals continued to account for 89 percent of total CBP SWB encounters in FY 2010, with northern Central Americans accounting for 8 percent and all other nationalities accounting for 3 percent. March 2024 OHSS Persist Dataset. Northern Central Americans' share of total CBP SWB encounters increased to 21 percent by FY 2012 and averaged 48 percent from FY 2014 to FY 2019, the last full year before the start of the COVID–19 pandemic. *Id.* Nationals from all other countries except Mexico and the northern Central American countries accounted for an average of 5 percent of total CBP SWB encounters from FY 2010 to FY 2013, and for 10 percent of total encounters from FY 2014 to FY 2019. *Id.* This transition has accelerated since the start of FY 2021, as Mexican nationals accounted for approximately 32 percent of total CBP SWB encounters in FY 2021 through March 2024, including roughly 29 percent in the first six months of FY 2024; northern Central Americans accounted for roughly 25 percent from FY 2021 through March 2024 (20 percent in FY 2024 through March 2024); and all other countries accounted for roughly 42 percent from FY 2021 through March 2024, including roughly 51 percent of FY 2024 encounters through March 2024. *Id.*

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. In contrast, as discussed in Section III.B.3.a.iv of this preamble, from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024. OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

For noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019, nearly 57 percent of people from northern Central America (*i.e.,* El Salvador, Guatemala, and Honduras), and close to 90 percent of all other nationalities made fear claims that were referred to USCIS for determination. OHSS analysis of Enforcement Lifecycle data as of December 31, 2023. Of note, according to OHSS analysis of historic EOIR and CBP data, there is a clear correlation since FY 2000 between the increasing time it takes to complete immigration proceedings, which results in a lower share of noncitizens being removed, and the growth in non-Mexican encounters at and between SWB POEs. Both trends accelerated in the 2010s, as non-Mexicans became the majority of such encounters, and they have accelerated further since FY 2020, as people from countries other than Mexico and northern Central America now account for the largest numbers of such encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

[168] The Departments understand that the President has directed the agencies to promptly consider issuing ''any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border.'' Such actions may include other measures that are not addressed in this rule, and the Departments have considered and are continuing to consider such other actions. The Departments believe that the changes made in this rule are the most appropriate means to begin addressing the concerns identified in the Proclamation, and the Departments will assess the effectiveness of this rule as they continue to consider other actions to respond to the President's direction.

IFR_Rule_000022

thus to swiftly deliver timely decisions and timely consequences to noncitizens at the southern border. This challenge is exacerbated by the sheer number of migrants who invoke credible fear procedures at a POE or when they are encountered between POEs without following the lawful, safe, and orderly processes that DHS has made available. The Departments have implemented the Circumvention of Lawful Pathways rule and complementary measures, but Congress has not provided the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during times in which the country's border faces an emergency of the magnitude described in the Proclamation. The record numbers of migrants invoking the credible fear procedures at the southern border exacerbate the risk of severe overcrowding in USBP facilities and POEs, and it creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants without potentially meritorious claims for asylum to make the dangerous journey to the southern border to invoke credible fear procedures at the southern border and take their chances on being allowed to remain in the country for a lengthy period.

For these reasons, pursuant to section 208(b)(1)(A), (b)(2)(C), (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B), the Departments are adopting a limitation on asylum eligibility for noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Section 3(b) of the Proclamation lists classes of individuals to whom the Proclamation's suspension and limitation on entry and this limitation on asylum eligibility does not apply; those classes are discussed in Section II.A of this preamble. The exceptionally compelling circumstances exception to this rule's limitation on asylum eligibility is discussed below in Sections III.B.3.a and III.C.2 of this preamble.

The limitation on asylum eligibility is needed to address the emergency border circumstances outlined in the Proclamation and this rule and responds to the President's direction to the Secretary of Homeland Security and the Attorney General to promptly consider issuing such instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions that they determine are warranted. Under the circumstances described in the Proclamation, the Departments assess that the limitation on asylum is necessary to help streamline the Departments' processing of noncitizens, thereby conserving limited resources during the emergency border circumstances described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE.[169]

The Departments have further made the determination to apply the limitation on asylum eligibility to those who enter the United States across the southern border during emergency border circumstances irrespective of whether the noncitizen is encountered during such emergency border circumstances. This will permit a consistent application of the rule to all those who enter across the southern border during such circumstances and

[169] When it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b). *See* 8 CFR 208.35(a), 1208.35(a). The Departments anticipate that, when determining whether the limitation on asylum eligibility applies, AOs and IJs will rarely have grounds to reach a different result from the CBP immigration officers. *See* 8 CFR 208.35(b), 1208.35(b). In part, the Proclamation's application turns on straightforward questions of status—*e.g.,* whether someone was a noncitizen, Proclamation sec. 3(a)(i); was a noncitizen national, *id.* sec. 3(b)(i); was a lawful permanent resident, *id.* sec. 3(b)(ii); was a UC, *id.* sec. 3(b)(iii); or had a valid visa or other lawful permission to seek entry or admission into the United States or presented at a POE pursuant to a pre-scheduled time and place, *id.* sec. 3(b)(v). The Proclamation's application also turns on questions of historical fact, including whether the suspension and limitation on entry was in place at the relevant time, *id.* sec. 3(a), and whether someone was "permitted to enter by . . . a CBP immigration officer" based on two sets of specified considerations "at the time of the entry or encounter that warranted permitting the noncitizen to enter," *id.* Sec. 3(b)(vi)–(vii). These two exceptions allow CBP immigration officers to permit the entry of noncitizens who present at the encounter with—for example—medical issues requiring immediate attention. *See id.* sec. 3(b)(vi).

are subject to this limitation on asylum eligibility, including those who evade detection at the southern border and are later placed in section 240 removal proceedings, as well as those who affirmatively apply for asylum. The Departments have considered applying the rule's asylum limitation only to those who enter and are encountered at the southern border during emergency border circumstances. The Departments believe, however, that the rule's asylum limitation should avoid creating an incentive for noncitizens to take risky measures to evade detection, which would further strain resources dedicated to apprehension at the border.[170]

Additionally, the approach adopted in this rule is consistent with the Circumvention of Lawful Pathways rule, which, with narrow exceptions, applies to all those who enter during the two-year period currently specified in that rule, regardless of whether they are apprehended at or near the border during the 14-day period immediately after entry or within 100 miles of the border. *See* 8 CFR 208.33(c), 1208.33(d). Moreover, the Departments note that the provisions of §§ 208.35(b) and 235.15 would be applicable only to those who have entered the United States during the emergency border circumstances described in the Proclamation and this rule and are processed for expedited removal. Thus, those provisions would not apply to those who have long since entered the United States. Accordingly, the Departments have determined that it is reasonable to apply this rule's limitation on asylum eligibility consistent with the Circumvention of Lawful Pathways rule, without regard to the date of encounter or commencement of proceedings.

Even if a noncitizen entered the United States across the southern border during emergency border circumstances and is not described in section 3(b) of the Proclamation, they may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist.[171] Such circumstances necessarily

[170] The Departments note that adjudicators already make determinations regarding the noncitizen's date of arrival when determining whether the noncitizen is barred from filing an asylum application (unless meeting an exception) within one year of arrival. *See* INA 208(a)(2)(B) and (D), 8 U.S.C. 1158(a)(2)(B) and (D).

[171] The Departments decline to adopt an exception mirroring the exception from the Circumvention of Lawful Pathways rule for those who present at a POE without a pre-scheduled time and place but show that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. *See*

IFR_Rule_000023

exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety; or was a ''victim of a severe form of trafficking in persons'' as defined in 8 CFR 214.11.[172] 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Acute medical emergencies would include, but would not be limited to, situations in which someone faces a life-threatening medical emergency or faces acute and grave medical needs that cannot be

_____

8 CFR 208.33(a)(2)(ii)(B), 1208.33(a)(2)(ii)(B). This rule, unlike the Circumvention of Lawful Pathways rule, applies only in the emergency circumstances described in the Proclamation and the rule, where encounters strain the border security and immigration systems' capacity. And although the Circumvention of Lawful Pathways rule was also aimed at reducing irregular migration, it was focused on encouraging the use of lawful pathways, rather than the number of daily entrants. In these emergency border circumstances, this rule's exception for ''exceptionally compelling circumstances'' captures individuals with a time-sensitive imperative; such individuals may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. And in these emergency border circumstances, the Departments have determined that individuals who do not qualify for this exception should wait for a CBP One appointment. Moreover, under the Circumvention of Lawful Pathways rule, this exception requires additional questioning of any noncitizen who entered at a POE and is subject to the rule—time that, in the aggregate, could diminish the Departments' ability to deploy resources to address the emergency circumstances that support application of this rule.

In addition, the Departments did not include an exception for a noncitizen who sought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). This rule serves a different purpose than 8 CFR 208.33(a)(2)(ii)(C) and 1208.33(a)(2)(ii)(C); specifically, this rule is aimed at deterring irregular migration and speeding up the border process during a period of high encounters, rather than encouraging noncitizens to seek protection in other countries. During the emergency border circumstances described in the Proclamation and this rule, narrowing the exceptions to those who are unable to wait for an appointment is key. Those who sought and were denied protection in another country will still be eligible for asylum if they enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances, such as that at the time of entry they faced an acute medical emergency or an imminent and extreme threat to life or safety.

[172] The Departments note that noncitizens who are a ''victim of a severe form of trafficking in persons'' are already excepted from the Proclamation's suspension and limitation on entry as provided in section 3(b) of the Proclamation and are therefore also not subject to the rule's limitation on asylum eligibility. Nonetheless, the Departments have opted to retain ''victims of severe form of trafficking in persons'' as an exceptional circumstance to avoid any confusion and to ensure that the exceptions in this rule mirror the rebuttal circumstances the Departments adopted in the Circumvention of Lawful Pathways rule.

adequately addressed outside of the United States. Examples of imminent and extreme threats would include imminent threats of rape, kidnapping, torture, or murder that the noncitizen faced at the time the noncitizen crossed the southern border, such that they cannot wait for an appointment at a pre-scheduled time and place or until this IFR's limitation on asylum eligibility is not in effect for an opportunity to present at a POE without putting their life or well-being at extreme risk; it would not include generalized threats of violence.

The ''exceptionally compelling circumstances'' exception mirrors the rebuttal circumstance the Departments adopted in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). That exception is adopted here for the reasons articulated for adopting it in the Circumvention of Lawful Pathways NPRM and rule and the exception is intended to apply to the same circumstances identified in that NPRM and rule. *See, e.g.,* 88 FR at 11723; 88 FR at 31318, 31338, 31348, 31351, 31380, 31390, 31391–93.

Like the Circumvention of Lawful Pathways rule, this rule recognizes an additional exception that avoids the separation of families. *See* 8 CFR 208.35(c), 1208.35(c). Those noncitizens who are subject to the limitation on asylum eligibility and who do not establish exceptionally compelling circumstances under 8 CFR 208.35(a)(2)(i) or 1208.35(a)(2)(i) would be able to continue to apply for statutory withholding of removal and protection under the CAT, forms of protection to which the limitation does not apply if placed in section 240 removal proceedings. Unlike asylum, spouses and minor children are not eligible for derivative grants of statutory withholding of removal or CAT protection. *Compare* INA 208(b)(3)(A), 8 U.S.C. 1158(b)(3)(A) (''[a] spouse or child . . . of an alien who is granted asylum under this subsection may, if not otherwise eligible for asylum under this section, be granted the same status as the alien if accompanying, or following to join, such alien''), *with* INA 241(b)(3), 8 U.S.C. 1231(b)(3) (not providing for derivative statutory withholding of removal), *and* 8 CFR 1208.16(c) (not providing for derivative CAT protection); *see also Sumolang* v. *Holder,* 723 F.3d 1080, 1083 (9th Cir. 2013) (recognizing that the asylum statute allows for derivative beneficiaries of the principal applicant for asylum, but that the withholding of removal statute makes no such allowance). Again, mirroring EOIR's

family unity provision in the Circumvention of Lawful Pathways rule, *see* 8 CFR 1208.33(c), where a principal asylum applicant is eligible for statutory withholding of removal or CAT protection and would be granted asylum but for the limitation on eligibility established in this rule, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the INA, 8 U.S.C. 1158(b)(3)(A), the noncitizen shall be excepted from the limitation on eligibility by the IJ if placed in section 240 removal proceedings. 8 CFR 1208.35(c). The Departments have determined that the possibility of separating the family should be avoided. *See* E.O. 14011, Establishment of Interagency Task Force on the Reunification of Families, 86 FR 8273, 8273 (Feb. 2, 2021) (''It is the policy of my Administration to respect and value the integrity of families seeking to enter the United States.'').

In the Circumvention of Lawful Pathways rule, the Departments included a family unity provision in EOIR's regulations but not DHS's. The Departments did so because they decided at that time that those who an AO concludes are subject to the Lawful Pathways presumption and who are not able to establish an exception or rebut the presumption during a credible fear screening may not be placed into the asylum merits interview process and may instead only be issued an NTA and placed into section 240 removal proceedings. *See* 88 FR at 11725–26; 88 FR at 31336–37. For purposes of this rule, the Departments have allowed for an asylum merits interview process at the discretion of USCIS that includes USCIS discretion to apply a parallel family unity provision. *See* 8 CFR 208.35(c). This provision is discretionary to allow USCIS flexibility as it implements the new process. The Departments request comment on whether to adopt a non-discretionary family unity provision for the asylum merits interview process in a final rule.

i. Authority To Impose Additional Limitations on Asylum Eligibility

The Secretary and the Attorney General have authority to adopt this additional limitation on asylum eligibility. Both have long exercised discretion, now expressly authorized by Congress, to create new rules governing the granting of asylum. When section

IFR_Rule_000024

208 of the INA was first enacted as part of the Refugee Act of 1980, it simply provided that the Attorney General ''shall establish a procedure'' for a noncitizen ''to apply for asylum,'' and that the noncitizen ''may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such [noncitizen] is a refugee within the meaning of section 1101(a)(42)(A).'' 8 U.S.C. 1158(a) (1982). In 1980, the Attorney General, in the exercise of that broad statutory discretion, established several mandatory bars to the granting of asylum. *See* 8 CFR 208.8(f)(1) (1980); Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980). In 1990, the Attorney General substantially amended the asylum regulations, but exercised his discretion to retain the mandatory bars to asylum eligibility related to persecution of others on account of a protected ground, conviction of a particularly serious crime in the United States, firm resettlement in another country, and the existence of reasonable grounds to regard the noncitizen as a danger to the security of the United States. *See* Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30678, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly-serious-crime bar), *abrogated on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc).

In that 1990 rule, the Attorney General also codified another limitation that was first discussed in *Matter of Chen,* 20 I&N Dec. 16 (BIA 1989). 55 FR at 30678. Specifically, although the statute defines a ''refugee'' and thus allows asylum for a noncitizen based on a showing of past ''persecution or a well-founded fear of persecution,'' INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A), by regulation, a showing of past persecution only gives rise to a presumption of a well-founded fear of future persecution, which can be rebutted by showing that circumstances have changed such that the noncitizen no longer has a well-founded fear of future persecution or that the noncitizen can relocate to avoid persecution and under all the circumstances it is reasonable to expect the noncitizen to do so.[173] 8 CFR 208.13(b)(1), 1208.13(b)(1). Where the presumption is rebutted, the adjudicator, ''in the

exercise of his or her discretion, shall deny the asylum application.'' [174] 8 CFR 208.13(b)(1)(i), 1208.13(b)(1)(i). In 1990, Congress added a mandatory statutory bar for those with aggravated felony convictions. Immigration Act of 1990, Public Law 101–649, sec. 515, 104 Stat. 4978, 5053.

With the passage of IIRIRA, Congress added three categorical statutory bars to the ability to apply for asylum for (1) noncitizens who can be removed, pursuant to a bilateral or multilateral agreement, to a third country where they would not be persecuted on account of a specified ground; (2) noncitizens who failed to apply for asylum within one year of arriving in the United States; and (3) noncitizens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604, 110 Stat. 3009, 3009–690 to –691. Congress also adopted six mandatory bars to asylum eligibility that largely reflected the pre-existing, discretionary bars that had been set forth in the Attorney General's asylum regulations. These bars cover (1) noncitizens who ''ordered, incited, assisted, or otherwise participated'' in the persecution of others; (2) noncitizens who, having been convicted of a ''particularly serious crime,'' constitute a danger to the United States; (3) noncitizens for whom there are serious reasons to believe committed a ''serious nonpolitical crime outside the United States'' before arriving in the United States; (4) noncitizens for whom there are reasonable grounds to regard as a ''danger to the security of the United States''; (5) noncitizens who are removable under a set of specified grounds relating to terrorist activity; and (6) noncitizens who were ''firmly resettled'' in another country prior to arriving in the United States. *Id.* at 3009–691 (codified at INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A)). Congress further added that aggravated felonies, defined in section 101(a)(43) of the INA, 8 U.S.C. 1101(a)(43), would be considered ''particularly serious crime[s].'' *Id.* at 3009–692 (codified at INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i)).

In IIRIRA, Congress also made clear that the Executive Branch may continue to exercise its broad discretion in determining whether to grant asylum by creating additional limitations and

conditions on the granting of asylum. The INA provides that the Attorney General and Secretary ''may by regulation establish additional limitations and conditions, consistent with [section 208], under which an alien shall be ineligible for asylum.'' INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 6 U.S.C. 552(d); INA 103(a)(1), 8 U.S.C. 1103(a)(1). In addition, while section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), establishes certain procedures for consideration of asylum applications, Congress specified that the Attorney General and Secretary ''may provide by regulation for any other conditions or limitations on the consideration of an application for asylum'' so long as those conditions or limitations are ''not inconsistent with this chapter,'' INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). In sum, the current statutory framework retains the broad discretion of the Attorney General (and, after the HSA, also the Secretary) to adopt additional limitations on the granting of asylum and procedures for implementing those limitations.

Previous Attorneys General and Secretaries have since invoked their authorities under section 208 of the INA, 8 U.S.C. 1158, to establish eligibility bars beyond those required by the statute itself. *See, e.g.,* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000) (requiring consideration of the applicant's ability to relocate safely in his or her home country in assessing asylum eligibility); Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) (''Proclamation Bar IFR'') (limit on eligibility for applicants subject to certain presidential proclamations); [175] Asylum Eligibility and Procedural Modifications, 85 FR 82260 (Dec. 17, 2020) (''TCT Bar final rule'') (limit on eligibility for certain noncitizens who failed to apply for protection while in a third country through which they transited en route to the United States); [176] Procedures for Asylum and Bars to Asylum Eligibility, 85 FR 67202 (Oct. 21, 2020) (limits on eligibility for noncitizens convicted of certain criminal offenses); [177] Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of

---

[173] As noted below, the internal relocation provision was added in 2000 by Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000).

[174] There is a narrow exception to this mandatory discretionary ground for denial, called ''humanitarian asylum,'' where the noncitizen establishes ''compelling reasons for being unwilling or unable to return to the [noncitizen's] country arising out of the severity of . . . past persecution'' or ''that there is a reasonable possibility that [the non-citizen] may suffer other serious harm upon removal to [the noncitizen's] country.'' 8 CFR 208.13(b)(1)(iii), 1208.13(b)(1)(iii).

[175] *See O.A.* v. *Trump,* 404 F. Supp. 3d 109 (D.D.C. 2019) (vacating Proclamation Bar IFR).

[176] *See E. Bay Sanctuary Covenant* v. *Barr,* 519 F. Supp. 3d 663 (N.D. Cal. 2021) (preliminarily enjoining the TCT Bar final rule).

[177] *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792, 827 (N.D. Cal. 2020) (granting temporary restraining order against operation of the rule and ordering defendants to show cause why the rule should not be preliminarily enjoined).

IFR_Rule_000025

**JA126**

Removal Proceedings; Asylum Procedures, 62 FR 10312, 10342 (Mar. 6, 1997) (IFR codifying mandatory bars and adding provision allowing for discretionary denials of asylum where "the alien can be removed to a third country which has offered resettlement and in which the alien would not face harm or persecution"); *see also Yang,* 79 F.3d at 936–39 (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). Consistent with this historical practice, the Secretary and Attorney General exercised this authority when adopting the Lawful Pathways presumption of asylum ineligibility. *See* Circumvention of Lawful Pathways rule, 88 FR 31314.[178]

ii. Litigation Over the Proclamation Bar IFR

This rule places a limitation on asylum eligibility for those noncitizens who are described in the Proclamation subject to certain exceptions. The Departments acknowledge prior judicial decisions addressing a different limit on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), relating to suspensions and limitations on entry by presidential proclamation under section 212(f) of the INA, 8 U.S.C. 1182(f). In *East Bay Sanctuary Covenant* v. *Biden,* 993 F.3d 640 (9th Cir. 2021) ("*East Bay III*"), the Ninth Circuit affirmed a preliminary injunction against the Proclamation Bar IFR, which categorically rendered certain noncitizens ineligible for asylum if they entered the United States in violation of a presidential proclamation or other presidential order suspending or limiting the entry of noncitizens along the southern border. The relevant presidential proclamation in that case suspended entry of all migrants along the southern border except those who entered at a POE. *See id.* at 659. The court held that the Proclamation Bar IFR was inconsistent with section 208(a) of the INA, 8 U.S.C. 1158(a), which provides that any migrant "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or

United States waters), irrespective of such alien's status, may apply for asylum." *Id.* at 670.[179]

The Departments regard this rule as substantially different than the rule the Ninth Circuit deemed invalid in *East Bay III.* The Proclamation and limitation on asylum eligibility at issue here differ significantly from the prior categorical bar on "manner of entry" because they do not treat the manner of entry as dispositive in determining eligibility. Rather, the limitation at issue here turns on whether—during emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established during these emergency situations when it is essential that noncitizens use such pathways to ensure the United States Government's ability to manage the border. And even during these situations, AOs and IJs have the ability to except noncitizens from the rule's asylum limitation where the noncitizens establish that an exceptionally compelling circumstance exists. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may be excepted from the limitation on asylum eligibility if they experienced an acute medical emergency at the time of entry regardless of where that entry occurred. Other exceptionally compelling circumstances include, but are not limited to, if the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of their family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an imminent and extreme threat to their life or safety or was a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.11. 8 CFR 208.35(a)(2)(i)(B)–(C), 1208.33(a)(2)(i)(B)–(C). Indeed, the rule's exceptionally compelling circumstances exception is identical to the grounds that would rebut the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule, which has been allowed to continue in effect despite litigation challenging its validity. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023) (staying order vacating Circumvention of Lawful Pathways rule pending appeal). Furthermore, this rule does not implicate the same concerns as the prior

categorical bar based on "manner of entry" because it applies only to individuals who enter during emergency border circumstances and would not treat solely the manner of entry as dispositive in determining eligibility even during such circumstances, given that the rule applies both at and between POEs and in light of the exceptions available under section 3(b) of the Proclamation and for exceptionally compelling circumstances under 8 CFR 208.35(a)(2) and 1208.35(a)(2).

Moreover, the Departments disagree with important aspects of the reasoning that the district court and Ninth Circuit relied upon in *East Bay III.* The Departments argued in *East Bay III* that section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), by its plain terms requires only that a noncitizen be permitted to "apply" for asylum, regardless of their manner of entry. It does not require that a noncitizen be eligible to be granted asylum, regardless of their manner of entry. Indeed, the BIA has long taken account of a noncitizen's manner of entry in determining whether to grant asylum. *See Matter of Pula,* 19 I&N Dec. 467, 473 (BIA 1987) (holding that "manner of entry . . . is a proper and relevant discretionary factor to consider in adjudicating asylum applications"). The court in *East Bay III* rejected this argument, stating that "[e]xplicitly authorizing a refugee to file an asylum application because he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity," 993 F.3d at 670 (emphasis omitted), but the statute draws a clear distinction between the two. Section 208(a) of the INA, 8 U.S.C. 1158(a), governs who may "apply for asylum" and includes several categorical bars, such as the bar for applications for noncitizens present in the country for more than one year. INA 208(a)(1), (2)(B), 8 U.S.C. 1158(a)(1), (2)(B); *see* INA 241(a)(5), 8 U.S.C. 1231(a)(5). Section 208(b) of the INA, 8 U.S.C. 1158(b), in turn, governs who is eligible to be granted asylum. Specifically, section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), provides that the Attorney General or the Secretary "may grant asylum to an alien who has applied," INA 208(b)(2), 8 U.S.C. 1158(b)(2), then specifies six categories of noncitizens to whom "[p]aragraph (1)" (*i.e.,* the discretionary authority to grant asylum to an applicant) "shall not apply." Any noncitizen falling within one of those categories may apply for asylum under section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), but is categorically ineligible

---

[178] The Circumvention of Lawful Pathways rule was vacated by *East Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). But the Ninth Circuit has stayed that vacatur pending appeal, *see E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023), and thus the rule and its presumption remain in effect. On February 21, 2024, the Ninth Circuit placed the case in abeyance pending settlement discussions. *E. Bay Sanctuary Covenant* v. *Biden,* 93 F.4th 1130 (9th Cir. 2024).

[179] The court also held that the Proclamation Bar IFR likely did not properly fall under the good cause or foreign affairs exceptions to notice-and-comment rulemaking under 5 U.S.C. 553(a)(1) and (b)(B). *See East Bay III,* 993 F.3d at 676–77.

IFR_Rule_000026

**48736**    **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

to receive it under section 208(b) of the INA, 8 U.S.C. 1158(b).

The broad preemptive sweep that the Ninth Circuit attributed to section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), also fails to account for the discretionary nature of asylum. No noncitizen ever has a right to be granted asylum. The ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [and the Secretary's] discretion." *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 420 (1999). The *East Bay III* court did not dispute that manner of entry is a permissible consideration in determining whether to exercise that discretion to grant asylum in individual cases. 99 F.3d at 671; *see also Matter of Pula,* 19 I&N Dec. at 473; *Fook Hong Mak* v. *INS,* 435 F.2d 728, 730 (2d Cir. 1970) (Friendly, J.) (upholding the INS's authority to "determine[] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration").

The *East Bay III* court also suggested that a regulation categorically barring asylum based on manner of entry is inconsistent with the United States' commitments under the Refugee Protocol, in which the United States adhered to specified provisions of the Refugee Convention. *See* 993 F.3d at 972–75. Even accepting *East Bay III*'s reasoning on this point, that reasoning is limited to a categorical eligibility bar premised on manner of entry; this IFR does not implicate the same concerns as the prior categorical bar on "manner of entry" for the reasons identified above. In any event, the *East Bay III* court's conclusion was incorrect. The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through the provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3)(A), for mandatory withholding of removal. This rule specifically preserves the availability of that protection from removal. The INA's provision in section 208 of the INA, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987). The *East Bay III* court also misread Article 31(1) of the Refugee Convention, which pertains only to "penalties" imposed "on account of . . . illegal entry or presence" on refugees who, among other criteria, are "coming directly from a territory where" they face persecution. *See, e.g.,*

*Singh* v. *Nelson,* 623 F. Supp. 545, 560–61 & n.14 (S.D.N.Y. 1985) (quoting the Refugee Convention). And a bar to the granting of the discretionary relief of asylum is not a penalty under Article 31(1), especially given that the noncitizen remains eligible to apply for statutory withholding of removal, which implements U.S. non-refoulement obligations under the Refugee Protocol. *See Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *Cazun* v. *U.S. Att'y Gen.,* 856 F.3d 249, 257 n.16 (3d Cir. 2017).

### iii. Litigation Over Other Limitations

The Departments also acknowledge other prior precedent concerning the scope of the Departments' statutory rulemaking authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Specifically, when reviewing the TCT Bar final rule, the Ninth Circuit in *East Bay Sanctuary Covenant* v. *Garland,* 994 F.3d 962 (9th Cir. 2020) ("*East Bay I*"), held that a new condition on asylum eligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), must "further[] the purpose" of another provision in section 208 to be "consistent with" it. 994 F.3d at 977, 977–80. The Departments disagree. A requirement that additional asylum limitations can only "further[] the purpose" of the existing exceptions by either targeting threats to the nation or promoting the purposes the Ninth Circuit identified in the safe-third-country or firm-resettlement bars, *id.* at 977, is irreconcilable with the statute's meaning and conflicts with its history. Not only has Congress adopted asylum bars that do not further the purpose the Ninth Circuit identified—*e.g.,* the one-year filing deadline and the bar on successive applications—it has granted to the Departments the broad discretion to add more such bars. The Ninth Circuit's approach is also inconsistent with *Trump* v. *Hawaii,* 585 U.S. 667, 690–91 (2018) (INA's express provisions governing entry "did not implicitly foreclose the Executive from imposing tighter restrictions," even if restrictions addressed a subject that is "similar" to one that Congress "already touch[ed] on"). The statutory asylum bars likewise do not foreclose imposing further conditions, even if those conditions address subjects similar to those already in the asylum statute. *See, e.g.,* INA 241(a)(5), 8 U.S.C. 1231(a)(5) (barring from asylum those whose orders of removal have been reinstated regardless whether they have asylum claims stemming from events that occurred after the original order of removal); *see R–S–C* v. *Sessions,* 869 F.3d 1176, 1184 (10th Cir. 2017) (reconciling the reinstatement provision's bar on asylum

with section 208's allowing noncitizens to apply for asylum regardless of manner of entry).

Regardless, this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a limitation on asylum eligibility.[180] The President has determined that, under certain emergency border circumstances, entries must be suspended and limited because in such circumstances the border security and immigration systems lack capacity to deliver timely decisions and timely consequences, which threatens to incentivize further migration. And in light of such circumstances and their pernicious effects, the Departments have determined that special procedures must be used to quickly process the influx of noncitizens, including those seeking asylum. Those determinations do not conflict with the text or structure of section 208 of the INA, 8 U.S.C. 1158, and are consistent with (and an appropriate exercise of the Departments' authority under) that provision. Nothing more is required for the rule to constitute a valid exercise of authority under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C).

Moreover, this rule's propriety is reinforced by the statutory bars on asylum Congress has enacted. Just as Congress has chosen to promote systemic efficiency by prohibiting asylum applications filed more than one year after entry and by generally prohibiting noncitizens from pursuing successive asylum applications, INA 208(a)(2)(B)–(C), 8 U.S.C. 1158(a)(2)(B)–(C), this rule furthers systemic efficiency by limiting asylum in certain situations where the strains on the immigration system are at their peak. Congress did

---

[180] The Departments' interpretation of the phrase "consistent with" is supported by judicial interpretation of the term in other contexts. The D.C. Circuit, for example, has cautioned against construing "consistent with" too narrowly in a Clean Air Act case. *Envtl. Def. Fund, Inc.* v. *EPA,* 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam), *amended by* 92 F.3d 1209 (D.C. Cir. 1996). The court emphasized that this "flexible statutory language" does not require "exact correspondence . . . but only congruity or compatibility" and underscored that the phrase's ambiguity warranted deference to the agency's policy. *Id.* Other courts have adopted the same understanding of "consistent with." *See, e.g., Jimenez-Rodriguez* v. *Garland,* 996 F.3d 190, 198 (4th Cir. 2021) ("The phrase 'consistent with' does not require 'exact correspondence . . . but only congruity or compatibility.'" (quoting *Nuclear Energy Inst., Inc.* v. *EPA,* 373 F.3d 1251, 1269 (D.C. Cir. 2004))); *Nat'l Wildlife Fed'n* v. *Sec'y of U.S. Dep't of Transp.,* 960 F.3d 872, 878 (6th Cir. 2020) ("[T]he phrase 'consistent with' cannot bear the weight that the Federation places on it. Response plans are 'consistent' with the contingency plans if they 'show no noteworthy opposing, conflicting, inharmonious, or contradictory qualities'—in other words, if the documents put together are 'not self-contradictory. Consistency does *not* mean exact, point-by-point correspondence." (cleaned up)).

IFR_Rule_000027

not foreclose the Departments from likewise taking systemic considerations into account when exercising their discretion to add conditions or limitations on eligibility. Indeed, the ultimate consideration when determining whether someone warrants a grant of relief as a matter of discretion is whether granting relief "appears in the best interests of th[e] country," *Matter of Marin,* 16 I&N Dec. 581, 584 (BIA 1978), a point Congress was aware of when it amended the INA in 1996, *see id.* (best interests standard preceded 1996 amendments by nearly two decades). The Departments find that the rule's limitation on asylum eligibility furthers the efficiency aims of the asylum statute and is in the best interests of the United States because it allows the Departments to deliver timely decisions and timely consequences in order to address the emergency border circumstances discussed in the Proclamation and this rule.

Consistent with the best-interest standard, the BIA has long held a noncitizen's "circumvention of orderly refugee procedures" to be relevant to whether a favorable exercise of discretion is warranted. *Matter of Pula,* 19 I&N Dec. at 473. And the BIA has specifically considered as relevant factors the noncitizen's "manner of entry or attempted entry." *Id.* Although the rule places greater weight on these factors under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. And exactly how much weight to place on those factors, and whether to do so in weighing asylum eligibility, falls well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 244 (2001); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993); *Yang,* 79 F.3d at 936–37.

The Departments acknowledge that *Matter of Pula* did not consider a noncitizen's arrival at a POE to weigh against a discretionary grant of asylum. *See* 19 I&N Dec. at 473. But *Matter of Pula* also did not involve circumstances in which the country's border faced an emergency of a magnitude comparable to the emergency border circumstances described by the Proclamation and this rule, where even arrivals at POEs significantly contribute to the Departments' inability to process migrants and deliver timely decisions and timely consequences to those without a lawful basis to remain. Given the emergency border circumstances described by the Proclamation and the

President's direction in section 3(d) of the Proclamation to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the situation at the southern border; and given the strain on operations and resources that high volumes of new arrivals create, such that consequences cannot be appropriately delivered; the Departments believe that the rule's limitation on asylum eligibility should apply to noncitizens who enter the United States across the southern border, including at a POE during the emergency border circumstances described in the Proclamation and this rule, unless an exception applies.

In *Matter of Pula,* the BIA explained that a noncitizen's "circumvention of orderly refugee procedures," including their "manner of entry or attempted entry," is a relevant factor for asylum, 19 I&N Dec. at 473–74, and this rule merely takes such circumvention into account. Because the Proclamation contains an exception for arrivals at a pre-scheduled time and place under a process approved by the Secretary, this rule's limitation on asylum will also not apply to such arrivals. One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum. *See* 88 FR at 11719. Indeed, without CBP One, noncitizens could have longer wait times for processing at the POE depending on daily operational constraints and circumstances. *See* 88 FR at 31342. During emergency border circumstances, use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources. *See, e.g., id.* at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). The CBP One app and other lawful pathways that the United States Government has made available to those seeking to enter the United States, including to seek asylum or protection, are intended to allow for orderly processing. Therefore, those who "circumvent orderly refugee procedures," consistent with *Matter of Pula,* 19 I&N Dec. at 474, during emergency border circumstances without meeting one of the recognized exceptions will be ineligible for asylum.[181]

iv. This Limitation on Asylum Eligibility

For the reasons discussed above, the *East Bay* cases dealt with different limitations on asylum and involved different factual circumstances, and hence are distinguishable from this rule.[182] Moreover, the Departments respectfully disagree with some of the substantive holdings of the Ninth Circuit and the district court as described above. The Secretary and the Attorney General permissibly may determine that, during emergency border circumstances, it is in the "best interests of th[e] country," *Matter of Marin,* 16 I&N Dec. at 584, to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing noncitizens who do not enter in violation of it. Nothing in section 208 of the INA, 8 U.S.C. 1158, forecloses that view, and securing the best interests of the country is a reasonable policy goal under section 208 and thus "consistent with" it. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see Yang,* 79 F.3d at 939 (observing that "it is precisely to cope with the unexpected that Congress deferred to the experience and expertise of the Attorney General in fashioning section 208"); *see also id.* at 935 ("We must reject the argument that [the] regulation [establishing a categorical discretionary bar to asylum eligibility] exceeds the authority of the Attorney General if we find that the regulation has a 'reasonable foundation . . . that is, if it rationally pursues a purpose that it is lawful for the

reveals that the phrase 'irrespective of such alien's status' modifies only the word 'alien.'" *Matter of Pula,* 19 I&N Dec. at 473. "The function of that phrase is to ensure that the procedure established by the Attorney General for asylum applications includes provisions for adjudicating applications from *any* alien present in the United States or at a land or port of entry, 'irrespective of such alien's status.'" *Id.* (collecting cases). Congress accordingly made clear that noncitizens like stowaways, who, at the time the Refugee Act was passed, could not avail themselves of our immigration laws, would be eligible at least to apply for asylum "irrespective of [their] status." *Id.* "Thus, while section 208(a) provides that an asylum application be accepted from an alien 'irrespective of such alien's status,' no language in that section precludes the consideration of the alien's status in granting or denying the application in the exercise of discretion." *Id.*

[182] The Departments have considered the July 25, 2023 district court decision vacating the Circumvention of Lawful Pathways rule. *See E. Bay Sanctuary Covenant* v. *Biden,* 683 F. Supp. 3d 1025 (N.D. Cal. 2023). That decision applied the holdings of the other *East Bay* decisions generally, and the Departments do not see a need to address it separately except to note that as of publication the court's vacatur remains stayed pending appeal in the Ninth Circuit, and thus the rule is in effect. *See E. Bay Sanctuary Covenant* v. *Biden,* No. 23–16032, 2023 WL 11662094, at *1 (9th Cir. Aug. 3, 2023).

[181] As the BIA further explained with respect to the asylum statute as it existed at the time, "[a] careful reading of the language of [section 208(a)(1)]

[immigration agencies] to seek.'" (quoting *Reno,* 507 U.S. at 309)).

Beyond the clear statutory text, settled principles of administrative law dictate that the Departments may adopt generally applicable eligibility requirements. Those principles establish that it is permissible for agencies to establish general rules or guidelines in lieu of case-by-case assessments, so long as those rules or guidelines are not inconsistent with the statute, and that principle is especially salient here as asylum is inherently discretionary in nature. *See Lopez,* 531 U.S. at 243–44 (rejecting the argument that the Bureau of Prisons was required to make "case-by-case assessments" of eligibility for sentence reductions and explaining that an agency "is not required continually to revisit 'issues that may be established fairly and efficiently in a single rulemaking'" (quoting *Heckler* v. *Campbell,* 461 U.S.458, 467 (1983))); *Reno,* 507 U.S. at 313–14 (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules" (quotation marks omitted)); *Fook Hong Mak,* 435 F.2d at 730 (upholding INS's authority to "determine[ ] certain conduct to be so inimical to the statutory scheme that all persons who have engaged in it shall be ineligible for favorable consideration" and observing that there is no legal principle forbidding an agency that is "vested with discretionary power" from determining that it will not use that power "in favor of a particular class on a case-by-case basis"); *see also Singh,* 623 F. Supp. at 556 ("attempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories of illegal aliens"); *Matter of Salim,* 18 I&N Dec. 311, 315–16 (BIA 1982) (before *Pula,* explaining that a certain form of entry can be considered an "extremely adverse factor which can only be overcome with the most unusual showing of countervailing equities"); *cf. Peulic* v. *Garland,* 22 F.4th 340, 346–48 (1st Cir. 2022) (rejecting challenge to *Matter of Jean,* 23 I&N Dec. 373 (A.G. 2002), which established strong presumption against a favorable exercise of discretion for certain categories of applicants for asylee and refugee adjustment of status under section 209(c) of the INA, 8 U.S.C. 1159(c) (citing cases)); *Cisneros* v. *Lynch,* 834 F.3d 857, 863–64 (7th Cir. 2016) (rejecting challenge to 8 CFR 1212.7(d), which established strong presumption against a favorable exercise of discretion

for waivers under section 212(h) of the INA, 8 U.S.C. 1182(h), for certain classes of noncitizens, even if a few could meet the heightened discretionary standard (citing cases)).

The Departments recognize that in the Circumvention of Lawful Pathways rule they declined to adopt on a permanent basis the Proclamation Bar IFR because it conflicted with the tailored approach in that rule and because barring all noncitizens who enter between POEs along the SWB was not the proper approach under the circumstances the Departments then faced. *See* 88 FR at 31432. The Departments continue to believe that the approach taken in the Proclamation Bar IFR conflicts with the tailored approach of the Circumvention of Lawful Pathways rule as well as the tailored approach in this rule, which borrows heavily from the Circumvention of Lawful Pathways rule. The Proclamation Bar IFR contained no exceptions and was open-ended, allowing for implementation of any future proclamations or orders regardless of their terms. *See* 83 FR at 55952. In contrast, like the Circumvention of Lawful Pathways rule, this rule is narrowly tailored to address the emergency border circumstances described in the Proclamation and the rule and includes exceptions to account for circumstances in which waiting for an end to the suspension and limitation on entry and the limitation on asylum eligibility is not possible. And by relating the rule to a specific proclamation and the circumstances described therein, the Departments have been able to tailor its provisions to the terms of the Proclamation and the circumstances under which it is applied.

Finally, the Departments acknowledge that, unlike the Circumvention of Lawful Pathways rule, neither the Proclamation nor this rule excepts Mexican nationals. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii) (providing that the Lawful Pathways rebuttable presumption of asylum ineligibility applies only to those who enter the United States along the SWB after transiting through a third country). Traveling through a third country is a key part of the Circumvention of Lawful Pathways rule because one lawful pathway for obtaining protection is applying for protection in a third country. *See* 8 CFR 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The Departments recognize that some Mexican nationals seek asylum and protection in the United States. Indeed, since 2021, DHS has seen a sharp increase in total SWB encounters of Mexican nationals, from a pre-pandemic (FY 2014 through FY

2019) average of approximately 239,000 to more than 717,000 in FY 2023.[183] Of note, this increase in encounters has been accompanied by a sharp increase in referrals for credible fear interviews of Mexican nationals in expedited removal. The percentage of Mexican nationals processed for expedited removal who claimed a fear of return averaged 6 percent in the pre-pandemic period (FY 2014 through FY 2019), and never exceeded 7 percent for any fiscal year.[184] But 29 percent of all Mexican nationals processed for expedited removal at the SWB from May 12, 2023, to March 31, 2024, made fear claims, including 39 percent in February 2024.[185] Because of this sharp increase from the historical average, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems while entry is suspended and limited under the Proclamation. At the same time, the Departments continue to believe that, if encounters decrease to levels under which the systems do not experience the substantial strains they currently experience while the Circumvention of Lawful Pathways rule remains in effect, the application of that rule only to those noncitizens who travel through a third country en route to the United States appropriately accounts for the goals of encouraging migrants to seek protection in other countries or to use safe, orderly, and lawful pathways to enter the United States, ensuring the border security and immigration systems can efficiently process noncitizens, and affording asylum and other protection to those seeking it who establish their eligibility.

Under this rule, Mexican nationals will still be eligible for asylum in some circumstances—they may present at a POE pursuant to a pre-scheduled appointment, or, if they are unable to wait in Mexico while scheduling an appointment, they may be able to establish an exception to the Proclamation or exceptionally compelling circumstances under the rule. Even if they are not able to do so, the rule does not preclude eligibility for

---

[183] March 2024 OHSS Persist Dataset; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Agency and Selected Citizenship").

[184] OHSS Enforcement Lifecycle December 31, 2023.

[185] OHSS analysis of UIP ER Daily Report Data Dashboard as of April 2, 2024.

IFR_Rule_000029

statutory withholding of removal and CAT protection, and they will be able to seek such protection. In the absence of an exception, however, Mexican nationals should be ineligible for asylum under the rule because, during the emergency border circumstances described in the Proclamation and this rule, it is important to deter irregular entry by all noncitizens regardless of country of origin. And the above data make clear that additional incentives are necessary to encourage Mexican nationals to pursue the available lawful, safe, and orderly pathways, rather than entering the country unlawfully.

v. Application During Credible Fear Screenings and Reviews

The limitation on asylum eligibility adopted here applies during merits adjudications, *see* 8 CFR 208.13(g), 1208.13(g), but will most frequently be relevant for noncitizens who are subject to expedited removal under section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1). Noncitizens in expedited removal are subject to removal ''without further hearing or review'' unless they indicate an intention to apply for asylum or fear of persecution. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Noncitizens in expedited removal who indicate an intention to apply for asylum or fear of persecution are referred to an AO for an interview to determine if they have a credible fear of persecution and should accordingly remain in proceedings for further consideration of the application. INA 235(b)(1)(A)(ii), (b)(1)(B)(i), (ii), 8 U.S.C. 1225(b)(1)(A)(ii), (b)(1)(B)(i), (ii). In addition, AOs consider whether a noncitizen in expedited removal may be eligible for statutory withholding of removal or for CAT protection. *See* 8 CFR 208.30(e)(2), (3).

This rule instructs AOs and IJs to apply the limitation it adopts during credible fear screenings and reviews. 8 CFR 208.35(b), 1208.35(b). Under the rule, when screening for asylum eligibility, the AO and IJ must determine whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances. For the reasons noted in the Circumvention of Lawful Pathways rule, the Departments expect that noncitizens rarely would be found excepted from the limitation on asylum for credible fear purposes and subsequently be found not to be excepted at the merits stage. *See* 88 FR at 31380–81.

The Departments recognize that in the recent past they changed course regarding whether to apply bars and conditions and limitations on asylum eligibility during credible fear screenings by rescinding provisions that would have applied the mandatory asylum bars during credible fear screenings. *See* 87 FR at 18135. In the Circumvention of Lawful Pathways NPRM, the Departments explained their reasoning for nevertheless applying that condition on asylum eligibility during credible fear screenings, stating that the rebuttable presumption would be less difficult to apply than other bars, limitations, or conditions because the facts regarding the presumption's applicability, exceptions, and rebuttal circumstances would generally be straightforward to apply. 88 FR at 11744–45. Indeed, the Departments have applied the presumption effectively in credible fear screenings for the time in which the Circumvention of Lawful Pathways rule has been in effect.[186]

The limitation adopted here is in many ways parallel to the Lawful Pathways rebuttable presumption— specifically, it borrows from the Circumvention of Lawful Pathways rule's rebuttal circumstances—although it is more straightforward because it does not include the Lawful Pathways rebuttable presumption's exceptions for those who applied and were denied asylum or other protection in a third country and those who were unable to schedule an appointment through the CBP One app for certain reasons. *See* 8 CFR 208.33(a)(2)(ii)(B)–(C), 1208.33(a)(2)(ii)(B)–(C). Given the Departments' experience with implementing the Circumvention of Lawful Pathways rule, the Departments are confident that the limitation and

[186] In the post-May 12, 2023, period, the median time to refer noncitizens encountered by CBP at the SWB who claim a fear for credible fear interviews has decreased by 77 percent from its historical average, from 13 days in the FY 2014 to FY 2019 pre-pandemic period to 3 days in the four weeks ending March 31, 2024; for those who receive negative fear determinations or administrative closures that are not referred to EOIR, the median time from encounter to removal, in the same time frames, decreased 85 percent from 73 days to 11 days. Pre-pandemic medians based on OHSS analysis of OHSS Enforcement Lifecycle December 31, 2023; post-May 12 estimates based on OHSS analysis of operational CBP, ICE, USCIS, and DOJ/EOIR data downloaded from UIP on April 2, 2024. The Departments note that DHS recently published a notice of proposed rulemaking proposing that certain mandatory bars be considered at the screening stage under a reasonable possibility standard. Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024). If DHS were to finalize that rule as drafted, this rule's ''reasonable probability'' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility.

exceptions established here will be just as straightforward to apply as the similar provisions are for the Circumvention of Lawful Pathways rule.

b. Manifestation of Fear

This rule also alters certain aspects of the expedited removal process for individuals who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. When an immigration officer inspects a noncitizen at a POE or between POEs and determines that the noncitizen is inadmissible and will be subject to expedited removal, current regulations require the immigration officer to take certain steps before ordering the noncitizen removed from the United States. *See* 8 CFR 235.3(b). This process takes approximately two hours per individual in USBP custody. In particular, the immigration officer conducts an inspection, including taking biometrics; running background checks; collecting biographic information, citizenship, and place and manner of entry; and advising the noncitizen of the charges against them. 8 CFR 235.3(b)(2)(i). The noncitizen has an opportunity to provide a response. *Id.* The officer must also read (or have read through an interpreter, if appropriate) the information contained in the Form I–867A, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which advises the noncitizen of their ability to seek protection in the United States. *Id.* The examining immigration officer must also read the noncitizen the questions on the Form I–867B, Jurat for Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, which asks, among other things, whether the noncitizen has any fear of return or would be harmed if returned. *Id.* After the noncitizen has provided answers to the questions on Form I–867B, the immigration officer records the answers, and the noncitizen then reads the statement (or has the statement read to them) and signs the statement. *Id.* On average, USBP agents spend about 20 to 30 minutes of the inspection period completing both the Form I–867A and the Form I–867B. Finally, a noncitizen who indicates a fear of return or an intention to seek asylum is served with and acknowledges receipt of a Form M–444, which includes more detailed information about the credible fear process. 8 CFR 235.3(b)(4)(i).

Instead of this current process, DHS is adding a new provision at 8 CFR 235.15(b)(4) to modify the process for determining whether a noncitizen who enters across the southern border and is

IFR_Rule_000030

not described in section 3(b) of the Proclamation during the emergency circumstances giving rise to the Proclamation's suspension and limitation on entry should be referred to an AO for a credible fear interview. These procedures apply during emergency border circumstances. *See* 8 CFR 235.15(a). Under the new rule, immigration officers will conduct an immigration inspection and, where the noncitizen will be subject to expedited removal, will advise the noncitizen of the removal charges against them and provide an opportunity to respond, consistent with existing practice and regulations outlined above. 8 CFR 235.3(b)(2)(i). However, the immigration officer will not complete either the Form I–867A or Form I–867B or a sworn statement. Moreover, the officer will not be required to provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear. *See* 8 CFR 235.15(b)(4). Under the rule, the immigration officer will instead refer the noncitizen to an AO for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. *See id.* This manifestation can occur at any time in the process and can be expressed verbally, non-verbally, or physically.[187] In such situations, the immigration officer will not proceed further with the removal and will comply with the existing regulations, policies, and procedures, including as outlined in 8 CFR 235.3(b)(4), regarding processing and referring noncitizens for credible fear interviews. At the time that a noncitizen is referred for a credible fear interview, they will receive additional information about the credible fear process that has the same substantive information as in the current process, but without the requirement that such information be provided on a particular form.

DHS is making these changes to address the emergency circumstances at the southern border discussed in the

Proclamation and the rule in a manner consistent with its legal obligations. DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO so long as those procedures are consistent with the INA. *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

DHS believes that the above-described changes are fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). Section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A), does not specify the relevant aspects of the procedures that immigration officers must follow to determine whether a noncitizen who is subject to expedited removal can be ordered removed or whether the noncitizen must be referred to an AO for a credible fear interview. Instead, the statute provides that the immigration officer may order removed any noncitizen who, subject to certain exceptions, is arriving in the United States, or who is within a class of noncitizens subject to expedited removal as designated by the Secretary, and who is inadmissible under sections 212(a)(6)(C) or 212(a)(7) of the INA, 8 U.S.C. 1182(a)(6)(C) or 1182(a)(7). The statute further provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). But the statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture. Moreover, Congress has not provided a particular definition of the phrase "indicates . . . an intention." The statute's text thus gives DHS discretion to employ the procedures it reasonably concludes are appropriate to implement

section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[188]

Interpreting the statute in this manner is also consistent with the United States' international law obligations. As described in Section II.B of this preamble, the United States is a party to the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention. Article 33 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning "a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Refugee Convention, *supra,* 19 U.S.T. at 6276, 189 U.N.T.S. at 176.[189] Neither the Refugee Convention nor the Protocol prescribes minimum screening procedures that must be implemented.[190] Rather, each state party has the authority "to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure," as long as such procedures are consistent with the purposes of the Convention.[191] The United States has also ratified the CAT, which includes a non-refoulement provision at Article 3 that prohibits the return of a person from the United States to a country where there are "substantial grounds for believing" the person would be tortured. *See Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007); *see id.* at 115 (" '[T]he United States understands the phrase, 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' as used in

---

[187] By these terms, DHS intends to include a wide range of human communication and behavior, such that "non-verbally" could include things like noises or sounds without any words, while physical manifestations could include behaviors, with or without sound, such as shaking, crying, or signs of abuse. *See* U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges, Fact Sheet, Bureau of Population, Refugees, and Migration* (June 24, 2013), *https://2009-2017.state.gov/j/prm/releases/factsheets/2013/211074.htm.* A noncitizen could thus manifest a fear of returning to a previous location without using actual words to state that they are specifically afraid of return to their home country or country of removal.

[188] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 543 (1950) ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigrant Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 18 (D.D.C. 2020).

[189] *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.").

[190] UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967.*

[191] *Id.*

IFR_Rule_000031

**JA132**

Article 3 of the Convention, to mean 'if it is more likely than not that he would be tortured.'' '' (quoting the Senate resolution of ratification)). The CAT similarly does not prescribe screening requirements. As such, the United States has broad discretion in what procedures are appropriate to implement, through domestic law, to satisfy its non-refoulement obligations.[192]

The United States implements its obligations under the Refugee Protocol and the CAT through the INA and related rulemaking, and it provides specified procedures—including in the expedited removal process, as described above—for seeking asylum or other protection in the United States. The process outlined in this rule temporarily affords immigration officers the ability to refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. The Departments have concluded that the manifestation standard is consistent with their obligations (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured.[193]

In addition to changing to a "manifestation" standard, CBP is implementing operational changes to generally inform noncitizens subject to expedited removal that, if they have a fear of return, they should inform an immigration officer, and they will be referred to an AO for consideration of their fear claim. DHS believes that these operational changes and notice provisions, as implemented, are consistent with the notice provision in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).[194] Moreover, CBP will provide immigration officers with information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically.

Upon implementation of this rule, signs will be posted in areas of CBP facilities where individuals are most likely to see those signs. The signs will provide clear direction to individuals that, in addition to being able to inform the inspecting immigration officers of urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. These signs will be in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by those described in the Proclamation and likely subject to the provisions of this rule.[195]

Moreover, in CBP's large capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return will be shown on a loop in the processing areas and will also be available in those languages most commonly spoken by those noncitizens encountered by CBP who may be described in the Proclamation and likely subject to the provisions of this rule.[196]

The video will also explain to noncitizens that, if they inform an immigration officer that they have a fear, an AO will conduct an interview to ask questions about their fear. Consistent with CBP's Language Access Plan, CBP provides language assistance services for those who may not speak one of those languages.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have ''I Speak'' signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[198] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the sign and video will be presented will be read the contents of the sign and video in a language they understand.[199]

---

[192] Although neither the Refugee Convention nor the Refugee Protocol nor the CAT includes specific screening requirements, the United States is bound not to return noncitizens from the United States to countries where they would be tortured, or, with limited exceptions, to countries where they would be persecuted on account of a protected ground. As discussed in detail above in Section III.A.1 of this preamble, the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), not through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. And the United States implements its obligations under the CAT through regulations. *See* FARRA, Pub. L. 105–277, sec. 2242(b), 112 Stat. 2681, 2631–822 (8 U.S.C. 1231 note); 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

[193] 136 Cong. Rec. 36198 (1990) (recording the Senate's advice and consent to the ratification of the CAT, subject to certain reservations, understandings, and declarations, including that the phrase in Article 3 of the CAT, '' 'where there are substantial grounds for believing that he would be in danger of being subjected to torture,' '' is understood to mean '' 'if it is more likely than not that he would be tortured' ''); *see also Pierre,* 502 F.3d at 115.

[194] DHS acknowledges that an argument could be made that the requirement in section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS ''shall provide information concerning the asylum interview . . . to aliens who may be eligible,'' is not limited only to noncitizens who are eligible for a credible fear interview, but instead applies to noncitizens who are suspected of qualifying for expedited removal and ''may'' be eligible for an interview. In all events, DHS is providing information to noncitizens who are being processed for expedited removal about their right to seek asylum and protection in the United States. As explained below, DHS is posting signs on display for all noncitizens in CBP custody and including information in a video that will be on display for the vast majority of noncitizens in CBP custody, informing them that if they have a fear of return, they should inform an immigration officer and, if they do, an AO will conduct an interview and ask the noncitizens questions about any fear they may have. Noncitizens who indicate a fear of return will be given a more detailed written explanation of the credible fear interview process prior to being referred for the interview. That explanation will be translated into certain common languages or will be read to the noncitizen if required.

[195] Currently, these languages are English, Spanish, Mandarin, and Hindi.

[196] These large capacity facilities currently hold the vast majority of individuals in CBP custody. Although the videos will not be shown at smaller facilities, including small POEs and Border Patrol stations, these facilities house very few noncitizens who are subject to the asylum limitation. These small facilities will still post the relevant signs in the processing areas. And at these small facilities, resources are such that immigration officers will be able to devote a great deal of attention to observing individuals, including for any manifestations of fear or any indication that an individual requires assistance from a translator or reading assistance to understand the information provided at the facility, including the information provided on the signs. Immigration officers at these facilities are trained to provide such assistance as needed and will continue to do so under this rule.

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publications/final-cbp-language-access-plan.pdf*; CBP, *Supplementary Language Access Plan* (Oct. 30, 2023), *https://www.dhs.gov/sites/default/files/ publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publications/final-cbp-language-access-plan.pdf; see also* DHS, *DHS Language Access Resources, https://www.dhs.gov/publication/dhs-language-access-materials* (last updated July 17, 2023); DHS, *I Speak . . . Language Identification Guide, https:// www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last updated Mar. 10, 2021).

[199] These videos and signs will be presented in a manner that is consistent with how CBP provides other important notifications to individuals in its facilities. CBP utilizes posters for other critical information, such as ensuring that individuals are on the lookout for those who may commit suicide, advising all children in custody of the amenities available to them (*e.g.,* food, water, medical care, blankets, and hygiene products), communicating its zero tolerance regarding sexual assault, and conveying critical information about oversight entities such as the Office of the Inspector General. CBP also has a video targeted towards UCs explaining the process that they will go through. These signs and videos are similarly posted in the
Continued

IFR_Rule_000032

**JA133**

DHS's experience, based on the nature of CBP facilities and the utility of the existing signs, is that short, concise, and simple notifications are effective. This is because CBP holds individuals only for as long as it takes to complete inspection and processing, including conducting any basic medical screenings and making arrangements for transfer out of CBP custody. Particularly for those who are apprehended by USBP between POEs, noncitizens will go through a number of steps during their time in a CBP facility, including completion of processing paperwork, fingerprinting, and being interviewed by an inspecting immigration officer. In many USBP facilities, these steps occur at the same time as the facility provides showers and hygiene products, medical evaluations, and food and water. Given that noncitizens may move through other areas of the facility and do not remain in custody for a long period of time, DHS regularly places important signs in both the processing areas and the detention areas of its facilities, which are the locations where noncitizens spend time while being inspected or while in CBP custody; DHS is confident that noncitizens see these existing signs and that the new signs added as part of this rule are also likely to be seen. DHS has determined that more complicated videos and signs are less effective for conveying important information.

DHS acknowledges that these procedures represent a departure from the justification that the former Immigration and Naturalization Service ("INS") provided, in 1997, when it adopted the current procedures in 8 CFR 235.3(b)(2)(i). At the time, INS explained that adopting these procedures would "ensure that bona fide asylum claimants are given every opportunity to assert their claim[s]," and that it was including the requirement that immigration officers must provide advisals about the credible fear process and ask questions about fear as "safeguards" to "protect potential asylum claimants." *See* 62 FR at 10318–19. INS further explained that these procedures would "not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims." *Id.* at 10318. While such procedures have remained in place since 1997, this fact alone is not an indication that they are required by the statute, and DHS maintains discretion to update the procedures in a manner consistent with the statute. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S.

502, 515 (2009) (holding that an agency changing an established rule need not justify the change with a more detailed justification than that supporting the original so long as it can show "good reasons" for the new policy). Given the extraordinary circumstances currently facing the Departments, DHS has determined it is reasonable to change the procedures here.

When the existing regulations were adopted in 1997, the situation at the border was different. In 1998 (the first full year that statistics concerning the expedited removal process were available), approximately 80,000 noncitizens were processed for expedited removal.[200] In that same year, AOs conducted fewer than 3,000 credible fear interviews [201] and IJ reviews numbered around 100.[202] Additionally, at that time, expedited removal was applied only to "arriving aliens," noncitizens processed at a POE, not noncitizens encountered between POEs.[203] Expedited removal was not extended to certain noncitizens encountered after entering between POEs until 2004. *See* Designating Aliens for Expedited Removal, 69 FR 48877 (Aug. 11, 2004) (extending expedited removal to noncitizens encountered within 100 air miles of the border and within 14 days of entry). At that time, USBP apprehended approximately 1.1 million noncitizens between POEs annually.[204] The numbers have changed significantly since that time. In FY 2023, USBP apprehended more than 2 million noncitizens between POEs along the SWB.[205] In February 2024, USBP processed more than 33,000 individuals for expedited removal,[206] and USBP

processed more than 28,000 in March 2024.[207] Since May 2023, USCIS has completed about 3,300 credible fear interviews per week of individuals encountered at and between SWB POEs,[208] and in FY 2023, IJs reviewed over 34,000 credible fear decisions.[209] These high levels of encounters and credible fear referrals impose a significant burden on the expedited removal process and have strained DHS and EOIR resources, substantially impairing the Departments' ability to deliver timely decisions and timely consequences. At a processing time of approximately 2 hours per person, USBP agents spent approximately 56,000 hours—the equivalent of approximately 2,333 calendar days—processing the approximately 28,000 expedited removal cases in March 2024 under the current process. High numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded.[210] This type of crowding in USBP facilities creates health and safety concerns for noncitizens and Government personnel.[211]

Additionally, compared to 1997, today's high levels of migration impose a severe strain on the credible fear process. AOs and IJs must devote substantial resources to credible fear interviews and reviews.[212] Despite the strengthened consequences in place at the SWB through the Circumvention of Lawful Pathways rule and the complementary measures that have led to record returns and removals, encounter levels and credible fear referrals are exceeding the capacity of

---

[200] *See* INS, *1998 Statistical Yearbook of the Immigration and Naturalization Service* 203 (Nov. 1998), *https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_1998.pdf.*

[201] *See id.* at 91.

[202] EOIR, *Statistical Yearbook 2000,* at D1 (Jan. 2001), *https://www.justice.gov/sites/default/files/eoir/legacy/2001/05/09/SYB2000Final.pdf* (reporting that EOIR received 90 credible fear reviews in FY 1998).

[203] *See* 62 FR at 10318–19; *compare* INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i) (applying expedited removal to noncitizens arriving at ports of entry), *with* INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii) (permitting the application to designated noncitizens).

[204] CBP, *United States Border Patrol Nationwide Encounters Fiscal Year 1925–2020, https://www.cbp.gov/sites/default/files/assets/documents/2021-Aug/U.S.%20Border%20Patrol%20Total%20Apprehensions%20%28FY%201925%20-%20FY%202020%29%20%28508%29.pdf* (last accessed May 27, 2024).

[205] CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[206] OHSS analysis of data downloaded from UIP on April 2, 2024.

[207] OHSS analysis of data downloaded from UIP on April 2, 2024.

[208] OHSS analysis of data downloaded from UIP on April 2, 2024.

[209] *See* EOIR, *Adjudication Statistics: Credible Fear and Reasonable Fear Review Decisions* (Oct. 12, 2023), *https://www.justice.gov/d9/pages/attachments/2018/10/26/7_credible_fear_review_and_reasonable_fear_review_decisions.pdf.*

[210] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[211] *Id.*

[212] USCIS closed or adjudicated an estimated 135,000 credible fear interviews resulting from SWB encounters in FY 2023, up from an average of 52,000 from 2010 to 2019 and an average of 5,400 from 2005 to 2009. OHSS analysis of March 2024 OHSS Persist Dataset and Enforcement Lifecycle December 31, 2023. *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) (reflecting ever increasing numbers of credible fear interview screenings at the "SW Border Credible Fear Screenings Referred to USCIS by citizenship" tab); *see also* 88 FR at 31314, 31326, 31381.

---

areas of CBP facilities where DHS is confident they are likely to be seen by noncitizens being processed.

**JA134**

IFR_Rule_000033

the expedited removal process.[213] Therefore, DHS has determined that a different approach is needed here. The manifestation standard in the new rule is designed to reasonably help meet these challenges during emergency border circumstances. It is intended to help immigration officers process noncitizens more expeditiously, while still affording opportunities for those seeking protection to do so.

DHS acknowledges that, by implementing a manifestation standard in the circumstances outlined in this rule, it is temporarily eliminating the requirement to provide individualized advisals and ask affirmative questions via Forms I–867A and B. DHS has determined that, in light of the circumstances giving rise to the Proclamation and this rule, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek asylum. DHS is making the decision to use the manifestation standard consistent with the statute, as described above, and for the reasons outlined below. At bottom, based on DHS's long experience inspecting and interviewing individuals, DHS has determined that a manifestation approach is the most appropriate way to address emergency border circumstances while still sufficiently affording the ability to seek protection. Specifically, DHS makes this determination based on its significant experience relating to the inspection of individuals seeking entry and admission into the United States. DHS immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day. In FY 2019, prior to COVID–19, for example, the approximately 28,000 officers of CBP's Office of Field Operations[214] processed more than 1.1 million people at POEs every day.[215] USBP's 20,000 agents[216] encountered more than 2 million people on the SWB in FY 2023.[217]

In addition, DHS, including through its predecessor agencies, has been implementing the expedited removal provisions since 1997. It therefore has nearly 30 years of experience completing the Form I–867A advisals and asking the questions on Form I–867B.[218] Based on this experience, it is DHS's determination that, when individuals are asked affirmative questions, such as those on Form I–867B, individuals are more likely to respond in the affirmative, even if they do not in fact have a fear of return or intention of seeking asylum. Moreover, based on this experience, DHS concludes that providing noncitizens with specific advisals on fear claims—particularly given the emergency context of this rule and because few if any other advisals are provided—would be suggestive and prompt many individuals to respond in the affirmative even if they do not have any actual fear or intention to seek asylum. For this reason, as well, DHS has made the determination, based on its experience and expertise inspecting noncitizens, to temporarily adjust its approach to individualized advisals and questions about fear.

As part of this approach, DHS is temporarily forgoing asking the fear questions on Form I–867B with respect to noncitizens who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. DHS anticipates that this approach will likely lead to a higher proportion of those referred having colorable claims for protection. Based on the expertise of DHS in administering Form I–867B, it has determined that affirmative questions are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection.[219] DHS believes that those noncitizens who indicate a fear of return on their own, in the absence of suggestive questions, are more likely to be urgently seeking protection. Indeed, it is DHS's experience and assessment that asking questions is likely to lead individuals to answer yes, even if they do not actually have a fear of persecution or torture.[220] DHS acknowledges that there are mixed opinions on this point and that this may not be the case for all individuals, such that questioning may be helpful in order for some individuals to feel comfortable articulating a fear.[221] DHS recognizes

[213] See Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18 cv 6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶¶ 10–12, *Florida* v. *Mayorkas,* No. 3:22 cv 9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1); Decl. of Enrique M. Lucero ¶ 7, *Innovation Law Lab* v. *Wolf,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3).

[214] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices* (last updated Jan. 30, 2024).

[215] See CBP, *On a Typical Day in 2019, CBP . . . , https://www.cbp.gov/newsroom/stats/typical-day-fy2019* (last modified May 11, 2022).

[216] See CBP, *About CBP: Leadership & Organization, Executive Assistant Commissioners' Offices, https://www.cbp.gov/about/leadership-organization/executive-assistant-commissioners-offices* (last updated Apr. 19, 2024).

[217] See CBP, *Southwest Land Border Encounters, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters* (last modified May 15, 2024).

[218] See 62 FR at 10312, 10318–19.

[219] From 2014 through 2019, of total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. OHSS Enforcement Lifecycle December 31, 2023.

[220] This is also reflected in the behavioral science concept of ''acquiescence,'' in which individuals tend to ''consistently agree to questionnaire items, irrespective of item directionality.'' Shane Costello & John Roodenburg, *Acquiescence Response Bias—Yeasaying and Higher Education,* 32 Australian Ed. & Dev. Pysch. 105, 105 (2015). Studies have shown that this bias is higher amongst those with lower education levels and from countries that score higher on scales of corruption or collectivism. *See, e.g.,* Beatrice Rammstedt, Daniel Danner & Michael Bosnjak, *Acquiescence Response Styles: A Multilevel Model Explaining Individual-Level and Country-Level Differences,* 107 Personality & Individual Differences 190 (2017); Seth J. Hill & Margaret E. Roberts, *Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions,* 31 Pol. Analysis 575 (2023).

[221] DHS acknowledges that some studies of the expedited removal process concluded that the Form I–867A information and the Form I–867B questions are important protections, and that failure to read the advisals led to lower referrals for credible fear interviews. *See, e.g.,* Allen Keller et al., *Study on Asylum Seekers in Expedited Removal as Authorized by Section 605 of the International Religious Freedom Act of 1998: Evaluation of Credible Fear Referral in Expedited Removal at Ports of Entry in the United States* 16–18 (2005), *https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/evalCredibleFear.pdf* (''USCIRF Report'') (finding that noncitizens who are read the information in Form I–867A are seven times more likely to be referred for a credible fear interview and ''the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked''); *see also* U.S. Gov't Accountability Off., *Opportunities Exist to Improve the Expedited Removal Process,* No. GAO/GGD–00–176 (Sept. 2000). DHS acknowledges that one study concluded that there was ''little evidence'' that the advisals and fear questions prompted noncitizens to make fear claims, but rather most of the noncitizens whose cases were studied ''spontaneously expressed fear of returning to their home country.'' *See* USCIRF Report at 21. The same study noted that three quarters of those had been read the advisals on Form I–867A. *See id.* Given the small sample size (n=73) and the report's uncertain conclusion, this report does not alleviate CBP's long held ''concerns that [noncitizens] may be 'prompted' to express fears to officers by the I–867B fear questions.'' *Id.* As in 2005, at the time of the report, DHS continues to have such concerns, and DHS further believes that the individualized advisals on Form I–867A raise similar ''prompting'' concerns. And, even to the extent that the study concluded otherwise, DHS notes that, under the manifestation standard outlined in the rule, noncitizens continue to have the ability to affirmatively manifest a fear. Thus, considering the current situation at the border that gives rise to the Proclamation and this rule and the need to allocate limited resources to those urgently seeking protection, DHS believes that, notwithstanding the study's finding, the approach taken in this rule provides an appropriate standard for the emergency border circumstances at issue. As noted, CBP will be providing signs and videos advising, in a general matter, that individuals may express a fear of return. Accordingly, DHS has fully considered and weighed the contrary evidence and has concluded that the rule adopts the appropriate approach to help meet the challenge when emergency border circumstances are present.

IFR_Rule_000034

that the manifestation standard, as with any other screening standard, could result in some noncitizens with meritorious claims not being referred to a credible fear interview. However, in light of the emergency border circumstances facing the Departments and addressed by the Proclamation and this rule, DHS believes the standard is appropriate and necessary. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances.

Additionally, DHS is eliminating the requirement that officers and agents read the individualized advisals on Form I–867A. DHS plans to replace these advisals with a generalized notice—for all individuals in CBP facilities—of the ability to raise a claim of fear of persecution or torture. DHS is making this change based on its experience suggesting that, like with the Form I–867B questions, individualized Form I–867A advisals would be suggestive and would likely lead many individuals to claim a fear of return when they otherwise would not, particularly given the emergency context of this rule and because there are few if any other advisals provided. Based on its experience, DHS determines that receiving these advisals on their own is also suggestive.[222] Thus, in the context of inspecting individuals who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal, DHS has determined not to require the provision of such suggestive advisals. DHS acknowledges that, like with the Form I–867B questions, there are studies that show that such advisals make it more likely that a noncitizen will indicate a fear of return.[223] However, based on DHS's

experience, the nature of the emergency border circumstances facing the Departments, and the statutory requirements, DHS has determined that the approach taken here—eliminating the requirement to provide individualized advisals but providing signage and videos—is appropriate.[224]

Indeed, DHS notes that the manifestation standard has been used in other urgent and challenging situations to identify noncitizens with fear claims. This standard has long been used by the United States Coast Guard, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea.[225] This standard was also adopted by the United States Government to screen family units during the pendency of the Title 42 public health Order, when the Government was similarly dealing with urgent, exigent circumstances—the global pandemic—while still allowing noncitizens an opportunity to seek protection.[226]

DHS believes that the manifestation standard is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return. Manifestations may be verbal, non-verbal, or physical.[227] A manifestation of fear may present with non-verbal or physical cues, through behaviors such as shaking, crying, fleeing, or changes in tone of voice, or through physical injuries consistent with abuse.[228] An individual who may

not be comfortable answering a question about whether they have a fear of return may nevertheless manifest that fear through an unconscious behavior, which can be observed by the inspecting immigration officer, and the individual may then be referred for a fear screening. DHS acknowledges that, in some cases, these behaviors may reflect circumstances other than a fear of return—for instance, a noncitizen who has just arrived at the border may be physically tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear. In such cases, DHS immigration officers will use their expertise and training to determine whether the noncitizen is manifesting a fear. If there is any doubt, however, immigration officers will be instructed to err on the side of caution and refer the noncitizen to an AO for a credible fear interview.

Moreover, DHS will provide immigration officers with information on how to apply the standard, which will build on their existing training and experience. Indeed, as noted above, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. As a result of their experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. Agents and officers are also trained on identifying potential trafficking victims or victims of crimes and are trained on appropriate follow up action. Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. Agents and officers will also receive information on how to apply the manifestation standard, including that manifestation may occur verbally, non-verbally, or physically. DHS believes that this experience, coupled with guidance, will help agents and officers effectively

---

[222] This determination is based, in part, on CBP's experience that the language in specific, individualized advisals often serves as a prompt for noncitizens to express a fear while in CBP custody. This is, in part, because CBP understands that TCOs coach noncitizens and advise them to listen for certain words in the language of particular advisals as a prompt to express a fear. While it is possible that TCOs will provide noncitizens information about how to manifest fear, even in the absence of affirmative advisals, CBP believes that, at least at the outset of the process, individuals without such a fear or intent to seek asylum are less likely to remember the information a TCO provided in the absence of individualized advisals. Additionally, CBP believes that individuals who do have a fear of return or intend to seek asylum will generally make such a claim even in the absence of such advisals.

[223] See, e.g., USCIRF Report at 16–18.

[224] DHS considered whether to provide a short, individualized advisal to inform noncitizens of their ability to seek asylum, in addition to these signs and videos. But DHS determined that such a short, individualized advisal would be unlikely to convey information more effectively than the signs and videos that CBP already intends to use as a general notification, and that even a short advisal would take undue time to administer. Moreover, CBP assesses that the signs and videos providing general notification of the ability to seek asylum are less suggestive than short, individualized advisals would be.

[225] U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https:// 2009-2017.state.gov/j/prm/releases/factsheets/2013/ 211074.htm* (notifying the public that U.S. Coast Guard personnel were provided updated training "on identifying manifestations of fear by interdicted migrants").

[226] See *Huisha-Huisha* v. *Mayorkas*, 27 F.4th 718, 732–33 (D.C. Cir. 2022); CBP, Office of Field Operations, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022); USBP, *Guidance Regarding Family Units Moving Forward Under Title 42* (May 21, 2022).

[227] See U.S. State Dep't, Bureau of Population, Refugees, and Migration, *Fact Sheet: U.S. Commemorations Pledges* (June 24, 2013), *https:// 2009-2017.state.gov/j/prm/releases/factsheets/2013/ 211074.htm* (noting implementation of training that "demonstrates different ways a migrant might express a verbal or non-verbal manifestation of fear").

[228] *Id.*

IFR_Rule_000035

identify noncitizens with potential fear or asylum claims under a manifestation approach. Therefore, DHS believes that this rule remains consistent with the need to ''safeguard[]'' the rights of asylum seekers. *See* 62 FR at 10319. Because an immigration officer's observation of whether a noncitizen manifests a fear—rather than a noncitizen's answers to affirmative questions regarding asylum—will lead to a referral to an AO for a fear screening, this standard may result in a greater proportion of those referred to an AO being individuals with meritorious claims.

Additionally, the manifestation standard in the rule will enable DHS to streamline the process, allowing it to process noncitizens in a more expeditious manner during the emergency border circumstances identified in the Proclamation and this rule. In particular, DHS anticipates that omitting the requirement to complete Form I–867A and I–867B will save about 20 to 30 minutes per noncitizen, providing DHS with—based on the number of cases in March 2024—approximately 14,000 extra personnel hours per month.[229] This increased efficiency is critical for processing noncitizens in an expeditious way, and thus will better ensure that, given the immense challenges of irregular migration at the southern border, DHS's limited resources are used most effectively while still affording opportunities for noncitizens to seek asylum or protection. Indeed, this is particularly critical in the emergency border circumstances described in the Proclamation and the rule. As discussed above, given the number of noncitizens and the time it takes to process them during periods of heightened encounters, expediting the process is critical for avoiding overcrowding and ensuring safe conditions for those in custody.[230]

For all of these reasons, DHS believes that the ''manifestation of fear'' standard, as explained in the rule, will enable immigration officers to effectively identify noncitizens who require credible fear interviews while streamlining the process. During the emergency circumstances described in the Proclamation and the rule, it is important for immigration officers to

expeditiously process and swiftly apply consequences to noncitizens while still affording access to protection. Here, the Departments are currently facing such emergency circumstances, as explained above in Sections III.B.1 and 2 of this preamble. DHS believes that the approach taken in the rule is the most appropriate one in light of the situation at the southern border, as explained in this rule and as discussed in the Proclamation, balancing the need to protect those who may wish to seek protection in the United States against an urgent need to use DHS resources effectively.

c. Raising the Standard for Protection Screening

Under this rule, if the AO determines that, in light of the limitation on asylum eligibility under 8 CFR 208.35(a), there is not a significant possibility that the noncitizen could establish eligibility for asylum, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim. *See* 8 CFR 208.35(b)(1)(i). The AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b)(2) of the INA, 8 U.S.C. 1231(b)(2).[231] *See* 8 CFR 208.35(b)(2)(i). Likewise, when reviewing a negative credible fear determination, where the IJ concludes that there is not a significant possibility that the noncitizen could establish eligibility for asylum in light of the limitation on asylum eligibility, the IJ will assess whether the noncitizen has established a reasonable probability of persecution because of a protected ground or torture. *See* 8 CFR 1208.35(b)(2)(ii).

The Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and protection under the CAT. As the Departments observed previously, ''Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other

applications.'' 88 FR at 11742. In addition, ''the legislative history regarding the credible fear screening process references only asylum.'' *Id.* at 11743. By contrast, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening procedures are to be employed, while the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions, *see, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2).

Moreover, in past rules applying a ''reasonable possibility'' screening standard to claims for statutory withholding of removal or CAT protection, the Departments have noted that such a screening standard is used ''in other contexts where noncitizens would also be ineligible for asylum.'' 88 FR at 11743 (citing 8 CFR 208.31(c), (e)); *see also, e.g.,* Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 FR 36264, 36270 (June 15, 2020) (referencing ''the established framework for considering whether to grant statutory withholding of removal or CAT protection in the reasonable fear context''). Under the Circumvention of Lawful Pathways rule, ''[i]f a noncitizen is subject to the lawful pathways condition on eligibility for asylum and not excepted and cannot rebut the presumption of the condition's applicability, there would not be a significant possibility that the noncitizen could establish eligibility for asylum.'' 88 FR at 11742. For those noncitizens, the Departments implemented a ''reasonable possibility of persecution or torture'' screening standard for statutory withholding of removal and protection under the CAT. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). The Departments similarly believe that those who enter across the southern border during the emergency border circumstances identified in the Proclamation and this rule and who are not described in section 3(b) of the Proclamation, do not establish an enumerated exception, and are unable to establish a significant possibility of eligibility for asylum should be screened for protection under a higher screening standard.

The Departments' experience with the Circumvention of Lawful Pathways rule has validated the Departments' choice to use an elevated screening standard to narrowly focus limited resources on those who are likely to be persecuted or tortured and to remove those who are unlikely to establish eligibility for statutory withholding of removal or CAT protection. Under that rule, which

---

[229] At a time savings of 30 minutes per noncitizen, multiplied by 28,466 noncitizens processed for expedited removal in March 2024, *see* OHSS analysis of data downloaded from UIP on April 2, 2024, DHS would save approximately 14,000 hours per month.

[230] *See* Decl. of Matthew J. Hudak ¶¶ 7, 17–22, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[231] As noted above, DHS is also concurrently soliciting comment on the Application of Certain Mandatory Bars Notice of Proposed Rulemaking, which proposes that certain mandatory bars be considered at the screening stage under a reasonable possibility standard.

IFR_Rule_000036

uses a ''reasonable possibility of persecution or torture'' screening standard for statutory withholding of removal and CAT protection claims, the Departments have processed record numbers of noncitizens through expedited removal and have seen a significant decrease in the rate at which noncitizens receive positive credible fear determinations, showing greater operational efficiencies.[232] Between May 12, 2023, and March 31, 2024, USCIS completed more than 152,000 credible fear interviews resulting from SWB expedited removal cases—this is more than twice as many interviews during the span of ten and a half months than the 75,000 interviews resulting from SWB encounters that USCIS averaged each year from FY 2014 to FY 2019.[233] Between May 12, 2023, and March 31, 2024, 52 percent (approximately 57,000) of those who were subject to the rule's presumption were able to establish a credible fear of persecution or torture under the ''reasonable possibility'' standard,[234] compared to an 83 percent credible fear screen-in rate in the pre-pandemic period of 2014 to 2019.[235] From 2014 through 2019, of SWB expedited removal cases with positive fear determinations, less than 25 percent of EOIR case completions ultimately

resulted in a grant of protection or relief.[236]

Screening under the ''reasonable possibility'' standard has allowed the Departments to screen out and swiftly remove additional noncitizens whose claims are unlikely to succeed at the merits stage. Although fewer noncitizens are screened in under the ''reasonable possibility'' standard applied in the context of the Circumvention of Lawful Pathways rule, that screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule.[237] Under the emergency border circumstances described in the Proclamation and this rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed, and overall border security and immigration systems efficiencies outweigh any challenges related to training on a new screening standard and a possible marginal increase in interview length resulting from the application of a new standard in screening interviews. Likewise, the benefits of this rule, which is consistent with all statutory and regulatory requirements and the United States' international law obligations, outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard. Swiftly removing noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period. *See, e.g.,* 88 FR at 31324 (discussing the success of the CHNV parole processes as being in part due to imposing consequences for failing to use a lawful pathway, namely swift removal); 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).[238]

To allow for swift removals in the case of those noncitizens who the Departments are confident are unlikely to meet their ultimate burden to establish eligibility for statutory withholding of removal or protection under the CAT, the Departments have decided to raise the screening standard to ''reasonable probability of persecution or torture'' during the emergency border circumstances described in the Proclamation and this rule. The Departments define this ''reasonable probability'' standard as ''substantially more than a reasonable possibility, but somewhat less than more likely than not.'' 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(ii). Under this standard, a noncitizen would be screened in if they provide credible testimony[239] and set forth a credible claim with sufficient specificity for an AO or IJ to be persuaded that there is a reasonable probability that the noncitizen would be persecuted or tortured so as to qualify for statutory withholding of removal or CAT protection in an ultimate merits adjudication.

The Departments view the difference between the ''reasonable possibility'' standard and the new ''reasonable probability'' standard as being that the new standard requires a greater specificity of the claim in the noncitizen's testimony before the AO or the IJ. In particular, although claims based on general fears of return may at times be found to meet the ''reasonable possibility'' standard where evidence in the record of country conditions

[232] Decl. of Blas Nuñez-Neto ¶ 7, *M.A.* v. *Mayorkas,* No. 1:23–cv–01843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1). The screen-in rate refers to the percentage of cases with a positive fear determination calculated by dividing the number of cases that receive a positive fear determination by the total number of determinations made (*i.e.,* positive and negative fear determinations). *See id.* ¶ 7 n.2.

[233] Pre-May 12, 2023, data from OHSS Enforcement Lifecycle Dataset December 31, 2023; post-May 11, 2023, data from OHSS analysis of data downloaded from UIP on April 2, 2024.

[234] OHSS analysis of data downloaded from UIP on April 2, 2024. At this time, data on EOIR's grant rate under the Circumvention of Lawful Pathways rule is not available because only a small number of cases processed under that rule have been completed. From May 12 through November 30, 2023 (the most recent data for which fully linked records are available), a total of 61,000 SWB expedited removal cases have been referred to EOIR for section 240 removal proceedings, including 1,400 with case completions (2.2 percent). In addition, cases that are already completed are a biased sample of all future completions because in years since FY 2014, the median processing time for cases resulting in relief or other protection from removal has been, on average, about six times longer than the median processing time for cases resulting in removal orders, so reporting on the small data set of already completed cases would yield a relief rate that is artificially low. OHSS analysis of OHSS Enforcement Lifecycle Dataset December 31, 2023 and OHSS analysis of EOIR data as of January 31, 2024.

[235] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[236] OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[237] DHS OHSS Enforcement Lifecycle Dataset as of December 31, 2023.

[238] *See also, e.g.,* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* (''In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border

enforcement.''); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* (''Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.'').

[239] Credible testimony alone is sufficient in a credible fear screening, and AOs are trained to ask questions to elicit testimony to assist the noncitizen in meeting their burden with testimony alone. Although testimony alone could certainly meet the burden, it is not required that the burden be met solely through testimony. And even though corroborating evidence is not required, AOs will consider any additional evidence the noncitizen presents. Additionally, AOs are trained to conduct interviews of individuals with persecution or non-persecution-related injuries, traumas, or conditions that may impact their ability to provide testimony for themselves.

indicates instances of persecution or torture within the country, such claims are less likely to be sufficient under the "reasonable probability" standard when the noncitizen cannot provide greater detail in their statements and information as to the basis for their individual claim.

The Departments frequently see such general claims of fear that lack specificity at both the screening and merits stage. However, generalized fear of persecution is ultimately not sufficient to establish a claim. *See Sharma* v. *Garland,* 9 F.4th 1052, 1060 (9th Cir. 2023) ("[A]dverse country conditions are not sufficient evidence of past persecution, for the obvious reason that '[t]o establish past persecution, an applicant must show that he as individually targeted on account of a protected ground rather than simply the victim of generalized violence.'" (quoting *Hussain* v. *Rosen,* 985 F.3d 634, 646 (9th Cir. 2012))); *Prasad* v. *INS,* 101 F.3d 614, 617 (9th Cir. 1996) (stating that to establish past persecution, "[i]t is not sufficient to show [the applicant] was merely subject to the general dangers attending a civil war or domestic unrest"); *Al Fara* v. *Gonzales,* 404 F.3d 733, 740 (3d Cir. 2005) ("[G]enerally harsh conditions shared by many other persons do not amount to persecution. . . . [H]arm resulting from country-wide civil strife is not persecution on account of an enumerated statutory factor." (quotation marks omitted)); *see also Debab* v. *INS,* 163 F.3d 21, 27 (1st Cir. 1998) (citing cases).

Moreover, to establish ultimate eligibility for CAT protection, the noncitizen must demonstrate an individualized risk of torture—not a general possibility of it. *See Escobar-Hernandez* v. *Barr,* 940 F.3d 1358, 1362 (10th Cir. 2019) ("[P]ervasive violence in an applicant's country generally is insufficient to demonstrate the applicant is more likely than not to be tortured upon returning there."); *Bernard* v. *Sessions,* 881 F.3d 1042, 1047 (7th Cir. 2018) ("Evidence of generalized violence is not enough; the IJ must conclude that there is a substantial risk that the petitioner will be targeted specifically."); *Lorzano-Zuniga* v. *Lynch,* 832 F.3d 822, 830–31 (7th Cir. 2016) ("[G]eneralized violence or danger within a country is not sufficient to make a claim that it is more likely than not that a petitioner would be tortured upon return to his home country."); *Alvizures-Gomes* v. *Lynch,* 830 F.3d 49, 55 (1st Cir. 2016) (country reports demonstrating overall corruption and ineffectiveness of Guatemalan authorities "do not relieve

[the applicant] of the obligation to point to specific evidence indicating that he, personally, faces a risk of torture because of these alleged shortcomings"); *Delgado-Ortiz* v. *Holder,* 600 F.3d 1148, 1152 (9th Cir. 2010) ("Petitioners' generalized evidence of violence and crime in Mexico is not particular to Petitioners and is insufficient to meet th[e] standard [for eligibility for CAT protection].").

Under the "reasonable possibility" standard, a noncitizen presenting a claim based on general civil strife is sometimes found to pass the screening stage even where they provide only general testimony about their fear of harm. For example, a noncitizen may meet the "reasonable possibility" standard where he expresses a fear of being killed by the government upon his return to his native country, United States Government reports indicate the country may engage in human rights abuses, and the noncitizen has been involved in anti-government political activism for years, even absent specific information as to an individualized threat against the noncitizen or any other individuals who have been threatened or harmed. But to meet the "reasonable probability" standard, the noncitizen would either need to explain with some specificity why he thinks he, in particular, is likely to be harmed, or the record would have to reflect some specific information regarding the treatment of anti-government political activists similarly situated to the applicant. Such claims are assessed on a case-by-case basis. As an example, however, were the noncitizen to credibly state that he knew, and to provide details about, people who are similarly situated to him who have been killed, harmed, or credibly threatened, that testimony may be sufficient to meet the "reasonable probability" standard because it provides more specificity as to why the noncitizen believes he would be harmed. The Departments believe that the "reasonable probability" standard, by requiring additional specificity, will better identify claims that are likely to be meritorious in a full adjudication while screening out those whose claims are not likely to prevail.[240]

The Departments are confident that AOs and IJs can apply this heightened standard effectively to identify those who are likely to have viable claims on the merits while mitigating the possibility that those with a viable claim would be screened out. The level of specificity and certainty that the "reasonable probability" standard requires remains lower than the ultimate merits standard, and AOs and IJs have the training and experience necessary to elicit the information required to determine whether a case is sufficiently specific to meet the "reasonable probability" standard.[241] This is particularly the case because, in implementing such training, USCIS expects to adapt existing training, including on the ultimate merits standard, to prepare AOs on the "reasonable probability" screening standard, since the way evidence is evaluated remains the same, save for the degree of specificity required. AOs especially have significant training in non-adversarial interview techniques and are required to elicit testimony from the noncitizen—in effect, to help the noncitizen meet their burden through testimony alone.[242] If upon such questioning a noncitizen is unable to provide specific facts that lead the AO or IJ to believe that the noncitizen would be able to meet their burden with more opportunity to prepare, such claims are unlikely to prevail at the merits stage.

Moreover, this heightened screening standard targets information—specificity based on the noncitizen's own knowledge—that should generally be available at the screening stage. A noncitizen at the screening stage generally would have information regarding their fear of harm, such as whom they are afraid of and why, and an AO will elicit information regarding the claim that either is sufficiently specific to satisfy the heightened screening standard or is not. Credible

---

[240] Although the Departments believe the standard will better identify claims that are likely to be meritorious, for now the Departments do not seek to apply the "reasonable probability" standard outside the context of this rule—that is, to those who do not establish a significant possibility of eligibility for asylum because of the limitation on asylum eligibility or, if the limitation is rendered inoperative by court order, to those who are ineligible for asylum under the Circumvention of Lawful Pathways rule, *see* 8 CFR 208.35(b)(2)(i) and (3), 1208.35(b)(2)(iii) and (4)—because in this rule

the Departments are addressing emergency border circumstances rather than regulating to change the status quo. The Departments may consider such changes in future rulemaking.

[241] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[242] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Dec. 20, 2019). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

IFR_Rule_000038

testimony alone can satisfy the noncitizen's burden and is sometimes the only available evidence of persecution or torture. *See, e.g., Matter of Mogharrabi,* 19 I&N Dec. 439, 443 (BIA 1987). In most cases, noncitizens would have such information at the screening stage, and the Departments expect—and logic suggests—that such information could be shared through testimony. Instances of past harm or those that inform a future fear of return that caused a noncitizen to seek protection generally occur before entry and would not be expected to develop after the fact of entry or after the screening stage. Hence, the Departments believe that this standard will screen out claims that are likely to fail at the merits stage and poses only a minimal risk of screening out claims that could ultimately succeed. For example, if a noncitizen does not know who harmed or would harm them or why, in the Departments' experience, AOs and IJs will often be able to determine— depending on the facts of the case—that it is unlikely that the noncitizen will be able to provide answers to those critical questions at the merits stage.

In addition, AOs and IJs also receive training in, and have substantial experience weighing, country conditions, which will further help them assess whether and under what circumstances the lack of specificity in a noncitizen's testimony indicates that they have little prospect of meeting their ultimate burden.[243] For example, it may

be the case that where a noncitizen expresses only generalized fear of harm based on their ethnicity, but country conditions confirm serious, ongoing harm in the form of widespread, systematic persecutory acts by government institutions targeting individuals who are similarly situated to the noncitizen, adjudicators will rely on that information to deem the "reasonable probability" standard satisfied.

AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards, so they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage.[244] Moreover, all credible fear determinations must be concurred upon by a supervisory AO before they become final to ensure quality and consistency and will be subject to de novo IJ review if requested by the noncitizen. *See* 8 CFR 235.3(b)(7), 235.15(b)(2)(i)(B), 1208.35(b).

Although AOs, supervisory AOs, and IJs will have to be trained on applying the new "reasonable probability of persecution or torture" standard, the standard as explained above is not a

significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis. Rather, it is a matter of degree—to meet the "reasonable probability of persecution or torture" standard, the noncitizen must present more specificity than is required to meet the "reasonable possibility of persecution or torture" standard, but not so much as to establish ultimate eligibility for protection. Indeed, to meet the ultimate standard, noncitizens may still be required to provide more evidence— whether testimonial or documentary.

The Departments do not believe that applying the "reasonable probability of persecution or torture" standard will increase the time required for credible fear interviews by any great margin. AOs generally ask similar questions to elicit information from noncitizens during screening interviews regardless of the standard they will apply to the information elicited. The difference will be whether the information provided as a result of those questions reaches the required level of specificity. That said, there may be cases where an AO believes that the noncitizen may be able to meet the "reasonable probability of persecution or torture" standard after answering a few additional questions. But even if there is a marginal increase in the length of some interviews, the Departments believe that the interest in swift removal of those unlikely to establish eligibility for protection during emergency border circumstances outweighs the risk of some interviews taking longer.[245] This is because a higher standard will be more likely to create a deterrent: Those less likely to establish eligibility for statutory withholding of removal or CAT protection will be swiftly removed rather than being released and waiting years for a hearing, or in some cases, absconding and remaining in the United States unlawfully. And this deterrent effect could lead to lower encounter levels as noncitizens and smugglers realize that the process is functioning

---

[243] USCIS, *RAIO Directorate—Officer Training: Decision Making* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); 86 FR at 46918. IJs "receive extensive training upon entry on duty, annual training, and periodic training on specialized topics as necessary." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078, 18170 (Mar. 29, 2022); *see also* EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/ 1513996/dl?inline.* Moreover, IJs are required to maintain professional competence in the law, U.S. Dep't of Justice, Ethics and Professionalism Guide for Immigration Judges § IV (Jan. 26, 2011), *https:// www.justice.gov/sites/default/files/eoir/legacy/ 2013/05/23/ EthicsandProfessionalismGuideforIJs.pdf,* which necessarily includes the elements required to establish eligibility for relief or entitlement to protection from removal, *id.* Consistent with their role in adjudicating asylum and related protection applications, IJs have long been able to take administrative notice of commonly known facts, including country conditions evidence. *See* 8 CFR 208.12 (1997) (stating that the adjudicator may rely on information from a variety of sources ranging from the Department of State to credible international organizations or academic institutions); 8 CFR 208.1(a) (1997) (stating this part shall apply to all applicants for asylum whether before an AO or an IJ). Federal Government country

conditions reports, such as the U.S. Department of State country conditions reports, are longstanding, credible sources of information to which IJs often look. *See, e.g., Sowe* v. *Mukasey,* 538 F.3d 1281, 1285 (9th Cir. 2008) ("U.S. Department of State country reports are the most appropriate and perhaps the best resource for information on political situations in foreign nations." (quotation marks omitted)); *Xiao Ji Chen* v. *U.S. Dep't of Justice,* 471 F.3d 315, 341 (2d Cir. 2006) (Department of State country reports are "usually the best available source of information on country conditions" (quotation marks omitted)).

[244] *See* USCIS, *RAIO Directorate—Officer Training: Note Taking* (Feb. 12, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing— Survivors of Torture and Other Severe Trauma* (Nov. 2, 2023); USCIS, *RAIO Directorate—Officer Training: Children's Claims* (Dec. 20, 2020); USCIS, *RAIO Directorate—Officer Training: Interviewing— Introduction to the Non-Adversarial Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Dec. 20, 2019); USCIS, *RAIO Directorate—Officer Training: Interviewing— Working With an Interpreter* (Dec. 20, 2019); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), *https://www.justice.gov/eoir/page/file/1513996/ dl?inline.*

[245] In Section III.B.3.b of this preamble, the Departments conclude that there is a need to streamline immigration officers' processing of noncitizens through expedited removal while the Proclamation's suspension and limitation on entry is in effect. That reasoning is not inconsistent with the reasoning here. Because AOs interview only a subset of noncitizens processed through expedited removal, the Departments believe at most a portion of those noncitizens' credible fear interviews may be longer, and, as noted, any marginal increase in the time it takes to conduct some interviews is outweighed by improving deterrence and avoiding erroneous screen-ins, which result in noncitizens being added to the backlog of immigration cases and being released into and remaining in the United States for a significant period of time.

IFR_Rule_000039

more effectively.[246] Screening out those unlikely to establish eligibility for protection has the added benefit of saving United States Government resources overall because fewer noncitizens who are unlikely to establish eligibility for protection will be placed into section 240 removal proceedings before EOIR, which as of the end of December 2023 had a backlog of more than 2.7 million cases.[247]

In developing this rule, the Departments considered the possibility that the application of different screening standards to ''the same or a closely related set of facts'' might result in inefficiencies. *See* 87 FR at 18091; *see also* 88 FR at 11746. The Departments note, however, that under this rule, that is unlikely to be the case. The facts relevant to whether a noncitizen is subject to the rule's limitation on asylum eligibility will only rarely be relevant to the inquiry into whether the noncitizen has a fear of persecution or torture. For example, whether the noncitizen faced an acute medical emergency that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(A) or 1208.35(a)(2)(i)(A) will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal and so only the ''reasonable probability'' standard will be applied to the facts relevant to their persecution or torture claim. And where a noncitizen meets such an exception, they will continue to be eligible to pursue asylum in addition to any claim of persecution or torture,

and those claims will all be considered only under the ''significant possibility'' standard. Similarly, whether a noncitizen faced an imminent and extreme threat to life and safety that excepts them from the rule under 8 CFR 208.35(a)(2)(i)(B) or 1208.35(a)(2)(i)(B) will involve an evaluation of the discrete set of circumstances at the time of the noncitizen's arrival at the border, and will not likely be relevant to whether the noncitizen has a fear of persecution or torture in their designated country of removal. The question of an imminent threat relates to the situation immediately prior to the noncitizen's entry into the United States, rather than necessarily any fear of persecution or torture. Thus, the Departments do not believe there will generally be a need to apply multiple standards to the same set of facts.

d. The Scope of This Rule

The Departments have decided to tie the application of this IFR, including the limitation on asylum eligibility, to emergency border circumstances. The suspension and limitation on entry applies beginning at 12:01 a.m. eastern time on June 5, 2024. The suspension and limitation on entry will be discontinued 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. If encounters increase again (including during the 14-calendar-day period), the suspension and limitation will apply again (or continue to apply, as applicable) after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of more than 2,500 encounters, as defined by the Proclamation, but excluding noncitizens determined to be inadmissible at a SWB POE. These thresholds are consistent with those set forth in sections 2(a) and (b) of the Proclamation.[248] In order to maximize

the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims. However, as described below, DHS has been limited in its ability to do so as a result of capacity and resource constraints. The number of people who can be processed for expedited removal is dependent on the Departments' resources and can be impacted by several factors, including limited detention beds and holding capacity;[249] the presence or absence of sufficient AOs to conduct credible fear interviews for all those who claim a fear or indicate an intent to apply for asylum; the availability of IJs to review negative fear findings; and the ability to repatriate individuals ordered removed in a timely manner—an option that is not always available because, among other things, it relies on independent decisions made by foreign governments.

Sustained high encounter rates threaten to overwhelm the Departments' ability to effectively process, detain, and remove the migrants encountered, as appropriate, in a timely manner. *See* 88 FR at 31316. The President has determined that the suspension and limitation on entry is necessary to manage encounter levels. The Departments have determined that emergency border circumstances described in the Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard because, in such circumstances, DHS lacks the capacity to deliver timely consequences, and absent this rule, must resort to large-scale releases of noncitizens pending section 240 removal proceedings, which leads to significant harms and threatens to incentivize further migration by individuals who recognize the

---

[246] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* (''In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement.''); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* (''Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection from deportation, without a sound underlying claim to humanitarian protection.'').

[247] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[248] The 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained. The absence of a similar waiting period prior to a reactivation reflects the operational exigencies in a circumstance in which there has been a 7-consecutive-calendar-day average of more than 2,500 encounters and is necessary to avoid a surge to the border in advance of a reactivation. As the Departments have explained, the preliminary data pulled from DHS's operational systems have not undergone a full validation process. *See supra* note 5. But a rapid policy and operational response to emergency border circumstances requires relying on this more recent data when making factual determinations consistent with sections 2(a) and

2(b) of the Proclamation. Hence, the data used to make these factual determinations may differ somewhat from the more definitive numbers that ultimately emerge from DHS's full validation process.

[249] *See, e.g.,* Consolidated Appropriations Act, 2024, Public Law 118–47, 138 Stat. 460, 598 (2024). The joint explanatory statement states that the bill provides ''\$5,082,218,000 for Enforcement and Removal Operations (ERO)'' and ''\$355,700,000 for 41,500 beds for the full fiscal year and inflationary adjustments to support current detention facility operations.'' 170 Cong. Rec. H1807, H1812 (daily ed. Mar. 22, 2024).

IFR_Rule_000040

limitations on the ability to deliver timely consequences.[250]

DHS simply lacks sufficient resources to detain and conduct credible fear interviews for the number of noncitizens arriving each day who claim a fear of return when processed through expedited removal. This mismatch in available resources and encounters creates stress on the border and immigration systems and forces DHS to rely on processing pathways outside of expedited removal—limiting DHS's ability to swiftly deliver consequences on individuals who do not have a legal basis to remain in the United States.[251] The Departments have determined that the 1,500-encounter threshold is a reasonable proxy for when the border security and immigration system is no longer over capacity and the measures adopted in this rule are not necessary to deal with such circumstances.

At the outset, it is important to put the threshold in context. From FY 2000 through FY 2008, USBP encounters between POEs averaged approximately 3,000 per day, routinely including monthly averages over 3,500 for a few months most springs.[252] The vast majority (94 percent) of individuals encountered by USBP during this period were Mexican nationals, and very few of those who were processed for expedited removal claimed a fear of return or an intent to seek asylum during that process—fewer than one percent of all CBP SWB encounters.[253] As a result, DHS and its predecessor agency were able to swiftly remove or voluntarily return the vast majority of those

encountered at the SWB using comparatively few resources. *See* 88 FR at 11708, 11716.

From FY 2009 through FY 2020, USBP encounters between POEs declined substantially from these historical highs, averaging approximately 1,200 per day, and daily USBP encounters between the POEs averaged less than 3,500 per day in all but one month of that 12-year period—May 2019 when USBP encounters peaked at 4,300 during that year's surge.[254] Within that 12-year stretch, there were only four months (from March through June 2019) with average encounters between the POEs even above 2,500 per day.[255] In fact, for the 15 years prior to March 2021, DHS did not experience a single month with more than 5,000 total average daily encounters.[256] However, during that time, the demographics of these encounters changed significantly, with nationals from the northern Central American countries steadily increasing as a proportion of encounters, becoming a majority of individuals encountered between POEs for the first time in history in 2017—a trend that continued until 2020. Starting in 2014, families and UCs increased as a proportion of USBP encounters as well, reaching a high of 65 percent of encounters in 2019.[257] Finally, and as described in

greater detail in Section III.B.1 of this preamble, from 2021 to 2023, there was a historic surge in migration from other countries in the Western Hemisphere and from Eastern Hemisphere countries, which, for the first time ever, accounted for more than half of the encounters at the border in 2023—with Mexican nationals accounting for just 29 percent of encounters, an all-time low.[258]

The change in the nationalities and demographics being encountered at the border has coincided with a dramatic increase in the number of individuals who claim fear when they are processed at the border. Between 2005 and 2015, the proportion of noncitizens encountered by CBP and processed for expedited removal who claimed fear ranged from 5 percent at the low end to 26 percent at the high end.[259] Driven by the changing demographics at the border, both the percentage of those processed for expedited removal as well as the percentage of those processed for expedited removal who claimed a fear of return or an intent to seek asylum generally increased during this time frame.[260] This, in turn, has resulted in a steep increase in the number of credible fear interviews that USCIS is required to conduct.[261]

In 2023, a record 59 percent of encounters at and between POEs on the SWB that were processed for expedited removal resulted in fear claims. From 2016 to 2023, the percentage of SWB encounters processed for expedited removal who claimed a fear dipped below 41 percent just once, in FY 2020, the first year of the COVID–19

---

[250] *See* Section III.B.2 of this preamble. The Departments acknowledge that, despite the protections preserved by the rule and the available exceptions, the provisions adopted by this rule will result in the denial of some asylum claims that otherwise may have been granted and, as with all screening mechanisms, there is some risk that a case that might otherwise warrant protection might not proceed to a merits adjudication. However, in light of the emergency circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate and necessary. And given the Departments' experience with asylum and protection screenings and adjudications, the Departments believe the rule's provisions will produce accurate outcomes, although the Departments believe the rule continues to be justified even if that expectation turns out to be misplaced in close cases.

[251] *See* CBP, *Custody and Transfer Statistics* (May 15, 2024), *https://www.cbp.gov/newsroom/stats/custody-and-transfer-statistics* (detailing the number of individuals processed for expedited removal compared to another processing disposition, including section 240 proceedings).

[252] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 3,000 per day from FY 2004 to FY 2008; data on encounters at POEs are not available prior to FY 2004.

[253] OHSS analysis of March 2024 OHSS Persist Dataset.

[254] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) averaged approximately 1,500 per day during this period. For most of this period (from FY 2009 through FY 2018), the share of encounters processed for expedited removal and the share of those processed through expedited removal making fear claims generally increased, so that during FY 2018, 41 percent of SWB encounters were processed for expedited removal and 45 percent of those processed for expedited removal made fear claims, yielding an all-time high of 18 percent of all encounters making fear claims. OHSS analysis of March 2024 OHSS Persist Dataset. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is not available for years prior to FY 2013, but OHSS estimates that the vast majority (84 percent) of all fear claims made in prior years were made by SWB encounters. Even if 100 percent of fear claims made before FY 2013 were made by SWB encounters, FY 2018 would represent the all-time highest percentage of all encounters making fear claims.

[255] OHSS analysis of March 2024 OHSS Persist Dataset. Total CBP encounters (at and between POEs) also averaged approximately 2,700 per day and 2,600 per day in February and July 2019, respectively.

[256] OHSS analysis of March 2024 OHSS Persist Dataset.

[257] OHSS analysis of March 2024 OHSS Persist Dataset. Northern Central Americans accounted for 54 percent of encounters between POEs in 2017. Northern Central Americans' proportion of encounters between POEs continued to increase until it reached 71 percent of USBP encounters in 2019 but dropped at the onset of the pandemic, in 2020, to less than 26 percent. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/*

*immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship").

[258] OHSS analysis of OIS Yearbook of Immigration Statistics 1980–1999 and OHSS analysis of March 2024 OHSS Persist Dataset. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship"). Nationality breakouts of border encounters are not available prior to 1980, but Mexicans accounted for 97 percent of encounters for all of 1980 through 1999 and never accounted for less than 96 percent in any fiscal year during that period.

[259] OHSS analysis of March 2024 OHSS Persist Dataset.

[260] The percentage of those processed via expedited removal fell again in 2019 due to resource constraints. OHSS analysis of March 2024 OHSS Persist Dataset.

[261] The share of noncitizens encountered by CBP at and between POEs who were processed through expedited removal increased from 6 percent in FY 2005 to between 39 and 47 percent each year from FY 2012 to FY 2018, but then dropped in FY 2019 because DHS was unable to scale up expedited removal processing in proportion to the substantial increase in USBP encounters. OHSS analysis of March 2024 OHSS Persist Dataset.

IFR_Rule_000041

pandemic.[262] The global COVID–19 pandemic briefly interrupted this trend, which has continued after the lifting of the Title 42 public health Order in May 2023. Between May 12, 2023, and the end of March 2024, DHS processed a record number of individuals through expedited removal as it sought to maximize the consequences at the border, and 54 percent of noncitizens processed for expedited removal indicated a fear of persecution or intent to seek asylum.[263] As part of DHS's comprehensive effort to impose strengthened consequences at the border after the lifting of the Title 42 public health Order, USCIS reassigned a significant number of AOs to conduct credible fear interviews, which resulted in USCIS completing a record number of such interviews. In fact, USCIS conducted more interviews from SWB encounters during the span of ten and a half months after the lifting of the Title 42 public health Order than in any full fiscal year prior to 2023, and twice as many as the annual average from FY 2010 to FY 2019.[264]

As DHS transitioned from the enforcement of the Title 42 public health Order at the border to full use of its title 8 authorities after May 11, 2023, DHS's capacity constraints—and the impact of those constraints on DHS's ability to impose consequences on noncitizens who cross unlawfully or without authorization—have come increasingly into focus. Given these real resource constraints, DHS has had to make hard choices about whom it can prioritize for detention or refer into expedited removal.[265] As a result of a lack of sufficient holding spaces, detention beds, and AOs, DHS has only been able to refer certain noncitizens into expedited removal—which, as detailed above, is the most efficient tool available under title 8 authorities to impose swift consequences for irregular migration. This means that DHS cannot impose consequences swiftly or predictably on most people encountered at the border, feeding the narrative pushed by smugglers that irregular migrants will be able to stay in the United States.[266]

The expedited removal process requires the outlay of significant Government resources. When a noncitizen in expedited removal indicates an intention to seek asylum or a fear of persecution, rather than being swiftly removed, they are referred to an AO for a credible fear interview and may seek review of any negative screening by an IJ—all of which takes time and Government resources. As described in further detail above, DHS has made significant process enhancements to reduce the overall time it takes for individuals to proceed through this process. However, the availability of sufficient numbers of AOs to conduct credible fear interviews is critical to DHS's ability to quickly adjudicate fear claims and deliver consequences to those who do not have a credible fear of persecution or torture.

As described above, Congress has failed to provide the additional resources requested for USCIS that would have increased the number of AOs that are available to conduct credible fear interviews for SWB cases. This reality, combined with increases in encounters at the border, and increases in the proportion of noncitizens processed for expedited removal who claim fear of return, means that DHS cannot impose consequences swiftly or predictably on most people whom DHS encounters. Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings,[267] undercutting the effectiveness of the previous measures that have been implemented. This reality contributes to the vicious cycle described above in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are encountered at the border will be allowed to remain and work in the United States for long periods of time.

As a result of the changes to the nationalities and demographics being encountered at the border, and the associated increase in the rate of claiming fear by individuals encountered, the amount of resources required to deliver consequences quickly through referrals into expedited removal for the vast majority of individuals who claimed a fear in 2000 (when DHS's predecessor agency averaged 3,000 to 7,000 daily encounters between POEs) or in 2010 (when DHS averaged 1,000 to 2,000 daily encounters between POEs) was far lower than the amount of resources required to manage the same number of encounters today.[268]

Of course, as noted above, DHS has been experiencing much higher encounter levels,[269] and simply does not have the resources it would need to place into expedited removal the majority of those encountered by USBP who are amenable to such processing. Similarly, DHS has never had the resources to detain every individual encountered at the border through the pendency of their immigration removal proceedings—even during FY 2009 through FY 2020, when average encounters between POEs on the SWB were 1,200 a day. Encounters between POEs on the SWB are now more than triple that level, resulting in overcrowded USBP facilities, an immigration detention system that has regularly been at capacity, and an asylum system that has been crippled by enormous backlogs and cannot deliver timely decisions.[270] When DHS does not

---

[262] OHSS analysis of March 2024 OHSS Persist Dataset.

[263] OHSS analysis of data downloaded from CBP UIP on April 2, 2024.

[264] OHSS analysis of data downloaded from CBP UIP on April 2, 2024. Data on the exact number of SWB encounters processed for expedited removal who made fear claims is only available since FY 2013; for the years prior to FY 2013 there was no full fiscal year in which the total number of USCIS fear claims was equal to the number of fear claims completed for SWB encounters processed for expedited removal between May 12, 2023, and March 31, 2024.

[265] ICE, *Fiscal Year 2023 ICE Annual Report* 17–18 (Dec. 29, 2023), *https://www.ice.gov/doclib/eoy/iceAnnualReportFY2023.pdf.*

[266] March 2024 OHSS Persist Dataset.

[267] OHSS analysis of March 2024 OHSS Persist Dataset.

[268] March 2024 OHSS Persist Dataset. The most notable change has been the rising share of non-Mexican nationals as a share of encounters, with Mexican nationals accounting for 98 percent of USBP encounters in FY 2000 and 89 percent in 2010. OHSS Persist Database March 31, 2024; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

[269] Even as compared to the 2,000 to 7,000 daily encounters between POEs in 2000, the corresponding numbers in the recent past have been higher. In FY 2023, there were 3,300 to 7,300 such daily encounters, and from October 2023 through March 2024, the corresponding numbers are 4,000 to 8,300. March 2024 OHSS Persist Dataset.

[270] *See* OHSS analysis of data downloaded from UIP on April 2, 2024. CBP completed approximately 1.7 million total encounters at the SWB in FY 2021, 2.4 million in FY 2022, and 2.5 million in FY 2023, with each year exceeding the previous record high of 1.6 million in FY 2000. *See* OHSS analysis of March 2024 OHSS Persist Dataset. In December 2023, CBP also completed a single-month record of 302,000 encounters, almost one and a half times as many as the highest monthly number recorded prior to 2021 (209,000 in March 2000) based on records available in the OHSS Persist Dataset for FY 2000 to the present. Although some of the increase in encounters is explained by higher-than-normal numbers of repeat encounters of the same individual during the period in which noncitizens were expelled pursuant to the CDC's Title 42 public health Order, OHSS analysis of the March 2024 OHSS Persist Dataset indicates that unique encounters were also at record high levels. *See also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (last updated May 10, 2024) ("CBP SW Border Encounters by Citizenship" and "CBP SW Border Encounters by Family Status").

Continued

IFR_Rule_000042

have the capacity to process individuals through expedited removal or detain noncitizens to await their proceedings, releasing individuals into the interior of the United States is generally the only option that is left.[271] The need to release individuals at the border has increased over time and peaked during surges.

By contrast, when encounters (excluding UCs from non-contiguous countries and noncitizens determined to be inadmissible at a SWB POE) are below 1,500 per day, DHS will be able to refer most individuals it encounters into expedited removal and deliver a swift consequence to the majority of individuals it encounters who do not establish a legal basis to remain in the United States—in the form of a return or removal. Given limited congressional appropriations and agency funding levels, DHS has a finite capacity to deliver such consequences at the border, which is reflected in the number of individuals that can be processed through expedited removal on any given day. As detailed above, DHS over the past year has significantly streamlined the expedited removal process and has set records in terms of individuals placed in expedited removal by CBP at the SWB and credible fear interviews conducted by AOs. Given current resources, however, and in the absence of congressional action, there is a limit

on how many people can be put through the process—and that limit directly informs the 1,500 threshold.

From May 12, 2023, through March 2024, USBP has referred a daily average of over 900 individuals encountered at the SWB into the expedited removal process.[272] During the same period, about 17 percent of individuals encountered between POEs voluntarily returned to Mexico, had their removal orders reinstated at the border, or were subject to administrative removal pursuant to INA 238(b), 8 U.S.C. 1228(b).[273] This means that, at the 1,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements, DHS would be able to refer for expedited removal more than 70 percent of the individuals who are not quickly repatriated.[274] As discussed previously, of those individuals encountered by USBP and placed into expedited removal from May 12, 2023 to March 31, 2024, 65 percent have been quickly removable—either because they do not claim a fear, or because they are found not to have a credible fear and are ordered removed.[275] This means that, at 1,500 daily encounters between POEs, and assuming similar fear claim rates, DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.[276]

Simply put, at 1,500 daily encounters, DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries. DHS would also be able to minimize releases of those who are amenable to expedited removal or transfer them to ICE custody pending immigration proceedings. By contrast, above 2,500 encounters—the level at which the Proclamation and the rule would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level. At the 2,500-encounter level and assuming a similar level of voluntary repatriations and reinstatements described above, DHS would be able to place just 43 percent of the individuals who are not quickly repatriated into expedited removal—significantly less than the 70 percent under the 1,500-encounter threshold.[277] This would, in turn, lead to a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States, with DHS only able to quickly remove or return substantially less than half of the individuals it encounters.[278] Moreover, the percentage of people who can be referred to expedited removal and ultimately be quickly removed if they do not establish a legal basis to remain decreases rapidly as encounters increase beyond 2,500 given the baseline constraints outlined above.

This difficulty in imposing swift consequences on individuals without a legal basis to remain in the United States during periods of elevated

---

CBP held an average of 21,863 noncitizens in custody each day during December 2023, averaging 104 percent of CBP's daily custody capacity (21,042) roughly each day for the entire month. OHSS analysis of data downloaded from UIP on February 14, 2024.

EOIR had a backlog of over 2.7 million cases that were pending in the immigration courts at the end of the first quarter of FY 2024. *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Jan. 18, 2024), *https:// www.justice.gov/eoir/media/1344791/dl?inline; see also* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape,* Migration Pol'y Inst., at 1 (Jan. 2024), *https:// www.migrationpolicy.org/sites/default/files/ publications/mpi-contemporary-border-policy-2024_final.pdf* (''Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals.''); UNHCR, *Global Trends: Forced Displacement in 2022,* at 2, 8–9, 12 (June 14, 2023), *https://www.unhcr.org/ global-trends-report-2022* (showing rapid global increases in forcibly displaced persons and other persons in need of international protection in 2021 and 2022, and projecting significant future increases).

[271] Consistent with the Departments' conclusion in the Circumvention of Lawful Pathways rule, the Departments believe the emergency border circumstances described in the Proclamation and this rule cannot be addressed by relying on the programmatic use of its contiguous territory return authority at section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), due to resource constraints and foreign affairs considerations. *See* 88 FR at 31370; 88 FR at 11731.

[272] OHSS analysis of data downloaded from UIP on April 2, 2024.

[273] Based on comprehensive CBP processing dispositions for single adults, family units, and UCs from contiguous countries encountered May 12, 2023 to March 31, 2024; data downloaded from UIP on April 2, 2024.

[274] At 1,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 1,250 encounters would not be subject to rapid repatriation, including 1,240 who would potentially be amenable to expedited removal. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 72 percent of people not subject to rapid repatriation and 73 percent of potentially amenable single adults and family units into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024. Applying the rule even more broadly based on a lower threshold would also raise countervailing considerations, *see supra* note 250, and so the Departments have struck the balance reflected in the rule.

[275] OHSS analysis of data downloaded from UIP on April 2, 2024.

[276] At 1,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 250 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be

repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 830 repatriations (sums do not add due to rounding), or 56 percent of encounters.

[277] At 2,500 single adult, family unit, and UC from contiguous countries encounters between POEs per day and with 17 percent of such encounters voluntarily returning to Mexico or subject to reinstatement of a removal order or administrative removal, 2,080 encounters would not be subject to rapid repatriation. Further, assuming that CBP could process 900 people for expedited removal, the agency would have the ability to place 43 percent of people not subject to rapid repatriation into expedited removal. OHSS analysis of data downloaded from UIP on April 2, 2024.

[278] At 2,500 encounters of single adults, family units, and UCs from contiguous countries per day and assuming similar shares of encounters accept voluntary return or are subject to reinstatement of removal or administrative removal, about 420 people would be repatriated with one of these dispositions. Further, assuming 900 encounters would be processed for expedited removal, and that 65 percent of expedited removal encounters would be quickly removable, about 590 would be repatriated pursuant to an expedited removal order or withdrawal, yielding a total of about 1,010 repatriations (sums do not add due to rounding), or 40 percent of encounters.

IFR_Rule_000043

encounters is borne out by both recent experience, which is detailed in Sections III.B.1 and 2 of this preamble, and by historical data. DHS historical data also clearly show the dichotomy between the outcomes for individuals processed at the border at the 1,500- and 2,500-encounter levels. DHS data show that releases from CBP custody as a share of encounters have generally been highest during periods of sustained high-encounter levels, and lowest when encounters have been at 1,500 or below. For example, from FY 2013 through FY 2019, months with average daily USBP encounters of fewer than 1,500 per day resulted in a minimal level of releases due to capacity constraints at the border.[279] During the 2013 to 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. During that 7-year stretch, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 individuals released each day, while months in which daily encounters exceeded 2,500 resulted in approximately 1,300 releases each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings.[280]

It is important to note, however, the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals. During the 2013 to 2019 time frame—which forms the basis for the analysis in the preceding paragraph—the vast majority of encounters at the border were from Mexico, El Salvador, Guatemala, and Honduras—countries that are comparatively easy to return people to.[281] Today, a much higher proportion of SWB encounters are from other countries that are comparatively much more difficult to return people to, including record numbers from the Eastern Hemisphere.[282] At the same time, the proportion of encounters

involving family units and UCs, although still high, is lower today than it was during periods of high numbers of encounters and releases in FY 2019.[283] Although shifting demographics affect the Departments' capacity to deliver timely decisions and timely consequences at varying levels of encounters, it remains clear that with the challenging demographics being encountered today, DHS would have the ability to deliver a timely consequence to the majority of people it processes at the border when encounters are below 1,500—supporting the decision to suspend the application of the rule when DHS reaches that level of encounters over a 7-day average. Likewise, as discussed above, the Departments have concluded that it is reasonable to apply the rule when encounter levels rise above a 7-day average of 2,500 due to the sharp decrease in their ability to swiftly impose meaningful consequences at the border once encounters exceed that level.

Lastly, it is important to note that using a single threshold—for example, 1,500 encounters—to activate or deactivate the measures in this rule would pose significant challenges and not be operationally viable. Having a single threshold would likely lead to scenarios where the rule would be regularly activated and deactivated as the 7-day average rose above and below 1,500, which would have significant operational impacts for CBP, ICE, and USCIS, and be confusing for government personnel, migrants, and other key stakeholders. For example, the Departments will need to notify and provide guidance to their personnel to apply the provisions of this rule in connection with each activation and deactivation. These actions represent a burden on staff time and resources that would have negative operational impacts if activation or deactivation happened regularly. CBP and ICE will also face scenarios in which they would have many people in their custody some of whom would be subject to and others of whom would not be subject to the provisions of this rule, and CBP and ICE will need to keep track of which individuals needed to be processed under which procedures—something that could become extraordinarily complex and unwieldy if the rule were to be activated and deactivated regularly. Legal service providers and migrants would similarly face a great

deal of confusion about when the provisions of this rule were in effect based upon a single threshold of 1,500 encounters to activate or deactivate the measures in this rule. The burden of tracking, identifying, and applying different standards that change back and forth over a matter of days is significantly more complex for USCIS personnel as they consider protection claims.

For all of these reasons, it is important to ensure that there is a clear division between the levels at which the rule is deactivated and when it is activated. And to ensure that stakeholders are aware of when the rule is deactivated and activated, DHS will notify the public about Secretarial determinations of the encounter levels described in sections 2(a) and 2(b) of the Proclamation. As noted above, the 2,500-encounter level is a good proxy for when DHS's ability to quickly impose consequences at the border for individuals who do not establish a legal basis to remain is becoming so degraded that it is likely to further incentivize additional unlawful crossings. It also has the benefit of increasing the time that would elapse between deactivations and activations, allowing DHS to ensure that its personnel are not having to constantly switch back and forth between different procedures.[284]

The exclusion of those determined to be inadmissible at a SWB POE from the 1,500- and 2,500-encounter thresholds is also reasonable in light of recent policy decisions, processing experience, and operational needs. Since May 12, 2023, SWB daily POE encounters have averaged 1,650—largely because DHS has been incentivizing individuals to present at POEs in a safe, orderly manner.[285] This number has stayed relatively constant compared to the number of encounters between POEs, which have varied widely, from a low of 2,554 on May 21, 2023, to a high of 10,822 on December 18, 2023.[286] The predictability in the number of POE encounters, paired with the processing efficiencies gained by the widespread use of the CBP One app, improves CBP's

---

[279] For FY 2013 to FY 2019, in months with fewer than 1,500 encounters between POEs, USBP released an average of 11 encounters per day. OHSS analysis of March 2024 OHSS Persist Dataset.

[280] OHSS analysis of March 2024 OHSS Persist Dataset.

[281] OHSS analysis of March 2024 OHSS Persist Dataset.

[282] OHSS analysis of March 2024 OHSS Persist Dataset.

[283] UCs and family units accounted for 65 percent of USBP encounters in FY 2019, compared to 45 percent in FY 2024 through March. OHSS analysis of March 2024 OHSS Persist Dataset.

[284] The Departments recognize that, due to the rule's approach, at a given encounter level between 1,500 and 2,500 encounters per day—such as 2,000 encounters a day—whether the rule applies will be path dependent. If encounters have been above 2,500, the rule will apply. If encounters have been below 1,500, the rule will not apply. This is a necessary consequence of providing the clear division that the Departments have deemed necessary, and the Departments assess that adopting this approach best balances the relevant considerations.

[285] OHSS analysis of March 2024 OHSS Persist Dataset.

[286] OHSS analysis of March 2024 OHSS Persist Dataset.

IFR_Rule_000044

ability to manage encounters at POEs. The vast majority of noncitizens who present at a SWB POE have done so after having registered with the CBP One app.[287] Because such individuals have registered with the CBP One app, CBP can process these individuals more efficiently and in a more orderly way than individuals encountered between POEs.[288] This is a critical element of our strategy to encourage the use of safe, orderly, and lawful pathways, as described above, to incentivize noncitizens to seek out lawful pathways instead of attempting to cross into the United States irregularly. CBP officers will determine the most appropriate processing disposition on a case-by-case basis, although DHS expects to generally issue such individuals an NTA for removal proceedings under section 240 of the INA.

In short, DHS has assessed that the emergency border circumstances that are described by the Proclamation and this rule—and that the President has concluded warrant the step of suspending and limiting entry—reasonably capture the capacity of the border security and immigration systems to deliver consequences in a timely manner to individuals who cross unlawfully or without authorization. Thus, the Departments have determined to tie the application of the rule's provisions to the date that the Proclamation takes effect, and to include a mechanism to temporarily halt the application of the rule's provisions when encounters between POEs reach 1,500 and to restart the application of its provisions if they once again rise above 2,500. Because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation, the Departments intend for the Secretary of Homeland Security to continue to make the factual determinations regarding the 1,500 and 2,500 thresholds described in this rule and in sections 2(a) and 2(b) of the Proclamation, even if the Proclamation is enjoined, in order to provide continuity during emergency border circumstances. Lastly, the Proclamation may be revoked by the President upon a determination that it is no longer needed.[289]

*C. Section-by-Section Description of Amendments*

1. 8 CFR 208.13 and 1208.13

DHS and DOJ are adding a paragraph (g) to the end of 8 CFR 208.13 and 1208.13, respectively, *Establishing asylum eligibility,* to explain when a noncitizen is potentially subject to this IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13. Paragraph (g) refers the reader to the new regulatory provisions at 8 CFR 208.35 and 1208.35 that establish the limitation on eligibility for asylum where a noncitizen entered the United States across the southern border during emergency border circumstances.

2. 8 CFR 208.35

DHS is adding to 8 CFR part 208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DHS is adding a new § 208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and screening procedures related to the application of such limitation in expedited removal proceedings and the conduct of credible fear screenings during the emergency border circumstances. This provision applies notwithstanding any contrary provision of part 208.

Section 208.35 consists of the following provisions:

Paragraph (a) sets forth the limitation on asylum eligibility. Under the rule, a noncitizen is ineligible for asylum if the noncitizen is described in § 208.13(g) and not described in section 3(b) of the Proclamation. This approach is consistent with the general policy of the Proclamation and rule and provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways, such as for those who arrive in the United States at a southwest land border POE pursuant to a process approved by the Secretary of Homeland Security.[290]

Paragraph (a)(2) contains provisions regarding an exception to the limitation on asylum eligibility that aligns with the means for rebutting the presumption of asylum ineligibility in the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.33(a)(3)(i), 1208.33(a)(3)(i). The exception applies if the noncitizen, or the noncitizen's family member as described in § 208.30(c) with whom the noncitizen is traveling, demonstrates by a preponderance of the evidence exceptionally compelling circumstances, including that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in § 208.30(c) with whom the noncitizen is traveling:

• Faced an acute medical emergency;

• Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

• Satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11.

Paragraph (a)(2)(ii) makes clear that where a noncitizen establishes one of the above, they shall necessarily have established exceptionally compelling circumstances. This exception for exceptionally compelling circumstances limits the potential adverse effects of the limitation on asylum eligibility on certain particularly vulnerable populations, and family members with whom they are traveling, without undermining the key policy imperative to disincentivize irregular migration during a time when encounters are above certain benchmarks.[291] Paragraph (a)(2)(iii) deems those who have established exceptionally compelling circumstances for purposes of this asylum limitation or who are described in the provisions of the Proclamation as being excepted from its suspension and limitation on entry as having established exceptionally compelling circumstances for purposes of the Lawful Pathways condition. This provision is intended to simplify administration of this asylum limitation while it and the Circumvention of

---

[287] OHSS analysis of March 2024 OHSS Persist Dataset.

[288] *See, e.g.,* 88 FR at 11719.

[289] The Departments have not sought to apply the rule even after any revocation of the Proclamation by the President, because the Departments expect that any such revocation would only follow consultation with the Departments regarding the policy and operational implications of such an

action. Moreover, a decision by the President would reflect important changed circumstances, and the Departments would want to take into account those changed circumstances in assessing the appropriate policy as to the issues covered by this rule.

[290] *See* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures To Humanely*

*Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[291] *See, e.g.,* 88 FR at 31325 (''These exceptions and opportunities for rebuttal are meant to ensure that migrants who are particularly vulnerable, who are in imminent danger, or who could not access the lawful pathways provided are not made ineligible for asylum by operation of the rebuttable presumption. Those who are not excepted from and are unable to rebut the presumption of ineligibility may still pursue statutory withholding of removal and protection under the CAT.'').

IFR_Rule_000045

Lawful Pathways rule are both operative.

Paragraph (b) prescribes procedures for considering the limitation on asylum eligibility during the credible fear screening process and for applying the "reasonable probability" standard in the event the Proclamation or the limitation on asylum eligibility are rendered inoperable by court order. Under paragraph (b)(1), the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the limitation on asylum eligibility in paragraph (a). The paragraph sets forth three possible procedural scenarios depending on the AO's findings. First, where the AO determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a)—including that there is not a significant possibility, *see* INA 235(b)(1)(B)(iii), 8 U.S.C. 1225(b)(1)(B)(iii),[292] that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception to the limitation under paragraph (a)(2), the AO will enter a negative credible fear determination with respect to the noncitizen's asylum claim and continue to consider the noncitizen for potential eligibility for statutory withholding of removal and CAT protection under the procedures in paragraph (b)(2), as described below. *See* 8 CFR 208.35(b)(1)(i). Second, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 208.13(g), the AO will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 208.33(b). *See id.* 208.35(b)(1)(ii). This provides that those noncitizens who are not subject to the Proclamation because they did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 208.33(b)(1)(ii), if the noncitizen is not subject to that condition, they will be screened for a significant possibility of

eligibility for statutory withholding of removal or CAT protection consistent with § 208.30.[293] Third, where the AO determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the AO will conduct the screening consistent with 8 CFR 208.30. *See id.* 208.35(b)(1)(iii).

If the AO determines that the noncitizen is subject to paragraph (a) and cannot establish a significant possibility that they will be able to establish exceptionally compelling circumstances by a preponderance of the evidence per paragraph (a)(2), the AO will then assess whether the noncitizen has established a reasonable probability of persecution (meaning a reasonable probability of being persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion) or torture, with respect to the designated country or countries of removal identified pursuant to section 241(b) of the INA, 8 U.S.C. 1231(b). *See* 8 CFR 208.35(b)(2)(i). As noted above, for purposes of this section, reasonable probability means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the noncitizen would be persecuted because of his or her race, religion, nationality, membership in a particular social group, or political opinion, or tortured, with respect to the designated country or countries of removal. *See id.*

If the noncitizen establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, DHS will issue a positive credible fear determination and follow the procedures in § 208.30(f). *See id.* 208.35(b)(2)(ii). Under § 208.30(f), USCIS may issue an NTA for removal proceedings under section 240 of the INA, or, in its discretion, retain the application for an asylum merits interview pursuant to § 208.2(a)(1)(ii). Under the regulations governing the asylum merits interview process, where USCIS exercises its discretion to retain jurisdiction over an application for asylum of a noncitizen found to have a credible fear of persecution or torture

pursuant to § 208.30(f), the written record of the positive credible fear determination is treated as the asylum application. 8 CFR 208.3(a)(2). Under this IFR, however, noncitizens who are subject to the limitation on asylum eligibility under 8 CFR 208.35(a), and fail to show a significant possibility of being able to establish an exception by a preponderance of the evidence at the credible fear interview, will receive a negative credible fear determination with respect to their application for asylum, pursuant to § 208.35(b)(1)(i), but could go on to receive a positive credible fear determination with respect to a potential claim for statutory withholding of removal or protection under the CAT at the reasonable probability of persecution or torture standard. *See id.* 208.35(b)(2).

In the event that USCIS were to exercise its discretion to place such a case into the asylum merits interview process, the credible fear record in that case would have found the applicant unable to establish eligibility for asylum under § 208.35(a) and the positive determination would be based only on a potential statutory withholding of removal or protection under the CAT claim. USCIS may thus need supplementary information to constitute an application for asylum, as the asylum claim may not have been fully explored in the credible fear record given that the AO determined the applicant would have been ineligible for asylum based on the rule's limitation on asylum eligibility. Therefore, § 208.35(b)(2)(ii) allows USCIS to require a noncitizen who received a negative credible fear determination with respect to their application for asylum pursuant to § 208.35(b)(1)(i), but whose application is nonetheless retained by USCIS for asylum merits interview proceedings, to submit an asylum application to USCIS within 30 days of service of the positive credible fear determination, to ensure that there is a record of their potential asylum claim to serve as a substantive asylum application. For purposes of the filing and receipt date, the date of service of the positive credible fear determination will continue to serve as the date of filing pursuant to § 208.3(a)(2); however, if USCIS requires the submission of an asylum application, the timelines laid out in § 208.9(a)(1) and § 208.9(e)(2) may be delayed up to 15 days, considering the need to allow extra time for the submission of an asylum application to USCIS following service of the positive credible fear determination. *See id.* 208.35(b)(2)(ii). Under this IFR, if the applicant does not submit the

---

[292] In the Circumvention of Lawful Pathways rule, the Departments described how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory "significant possibility" standard. *See* 88 FR at 31380. That discussion in the Circumvention of Lawful Pathways rule also applies to AOs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, AOs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

[293] In such cases, consistent with the Circumvention of Lawful Pathways rule, DHS would also have discretion to refer the noncitizen to EOIR for section 240 removal proceedings. *See Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520 (BIA 2011); *see also* 88 FR at 31348.

IFR_Rule_000046

application within the time period required, USCIS will refer the noncitizen to section 240 removal proceedings before an IJ. USCIS does not foresee that it would be a prudent use of resources to place such cases into the asylum merits interview process, considering that USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the border. Nevertheless, the IFR preserves the flexibility for USCIS to exercise its discretion to potentially place such cases into the asylum merits interview process (albeit with the potential addition of a supplementary application for asylum) should available resources and circumstances ever be such that it would be prudent to place such cases into the asylum merits interview process.

If the noncitizen fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. *See id.* 208.35(b)(2)(iii). If the noncitizen indicates on the Record of Negative Fear that they request IJ review of the adverse finding, *see id.* 208.35(b)(2)(iv), the AO will serve the noncitizen with a Notice of Referral to Immigration Judge, *see id.* 208.35(b)(2)(v). *See* 88 FR at 11747; 88 FR at 31423. The record of determination, including copies of the Notice of Referral to Immigration Judge, the AO's notes, the summary of the material facts, and other materials upon which the AO based their determination regarding the applicability of the condition on asylum eligibility (which, in cases where the limitation on asylum eligibility created by this IFR applies, includes materials showing the relevant known entry date), will be provided to the IJ with the negative determination. *See* 8 CFR 208.35(b)(2)(v). The IJ would then review the case consistent with § 1208.35, described below.

If, following IJ review, the IJ makes a positive credible fear determination under § 1208.35(b)(2)(iii) or § 1208.35(b)(4), the case will proceed under § 1208.30(g)(2)(iv)(B). *See id.* 208.35(b)(2)(v)(A). The IJ may vacate the Notice and Order of Expedited Removal and refer the case back to DHS for further proceedings consistent with 8 CFR 1208.2(a)(1)(ii). *See id.* 1208.30(g)(2)(iv)(B). Alternatively, DHS may commence section 240 removal proceedings, during which time the noncitizen may file an application for

asylum, statutory withholding of removal, and CAT protection in accordance with § 1208.4(b)(3)(i). *See id.* 1208.30(g)(2)(iv)(B).

If the IJ makes a negative credible fear determination, however, the case will be returned to DHS for removal of the noncitizen. *See id.* 208.35(b)(2)(v)(B). Consistent with the purpose of the expedited removal process and this IFR, there would be no appeal from the IJ's decision and DHS would not accept requests for reconsideration. *See id.* USCIS may, however, in its sole discretion, reconsider a negative determination. *See id.;* 88 FR at 11747; 88 FR at 31418–19.

Paragraph (b)(3) applies in the event that the limitation on asylum eligibility in paragraph (a) is rendered inoperative by court order. In such circumstance, those who enter during emergency border circumstances and who are found not to have a significant possibility of eligibility for asylum because of the Lawful Pathways condition will be screened for eligibility for statutory withholding of removal and CAT protection under the "reasonable probability" screening standard. This will ensure continued applicability of that standard during emergency border circumstances, even absent the rule's limitation on asylum eligibility. The Departments acknowledge that under this approach, not all who would have been subject to the higher screening standard if the limitation remained in force would be subject to it in the event of an injunction—*i.e.,* those who do not travel through a country other than their country of citizenship, nationality, or, if stateless, last habitual residence; those excepted from the Lawful Pathways condition under the exceptions at 8 CFR 208.33(a)(2)(ii)(A) and (C); those excepted from the Lawful Pathways condition because they present at a POE without a pre-scheduled time and place and demonstrate that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle; and those who enter across the maritime borders covered by the Proclamation that are not covered by the Lawful Pathways condition. The Departments have adopted a somewhat narrower scope for the standard to avoid a circumstance where AOs and IJs would be required to analyze both the applicability of the Lawful Pathways condition and then also whether the noncitizen would otherwise be subject to the rule's limitation—which could complicate and increase the time required to conduct credible fear

screenings. The Departments believe the approach adopted strikes the right balance between the interest in applying the screening standard to those to whom it would otherwise apply and administrability in the event the limitation on asylum eligibility is rendered inoperative by court order. The Departments request comment on whether to expressly expand this provision to also apply to those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to asylum eligibility if the rule Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024), is finalized.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the DOJ family unity provision in the Circumvention of Lawful Pathways rule. *See* 8 CFR 1208.33(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met. The expressly permissive, discretionary nature of this provision, which owes in part to the considerations described earlier in this section with respect to asylum merits interviews, distinguishes it from the parallel DOJ provision in the Circumvention of Lawful Pathways rule and the parallel DOJ provision described in the next section of this preamble.

Paragraph (d) mirrors 8 CFR 208.33(c) and 1208.33(d) and specifies the ongoing applicability of the limitation on asylum eligibility by providing that it shall apply to "any asylum application" that is filed by a covered noncitizen "regardless of when the application is filed and adjudicated." *Id.* 208.35(d)(1). The Departments have excepted from this ongoing application of the limitation on asylum eligibility certain noncitizens who enter the United States during emergency border circumstances while under the age of 18 and who later seek asylum as principal applicants so long as the asylum application is filed after the period of time described in § 208.13(g) during which the noncitizen entered. *See id.* 208.35(d)(2). Commenters on the Circumvention of Lawful Pathways rule raised concerns about the impact of that rule on children who arrive as part of a family unit and who are thus subject to the decision-making of their parents. 88 FR at 31320. The Departments decided to adopt a provision excepting

IFR_Rule_000047

such children from that rule in certain circumstances after the two-year period ends. *See* 8 CFR 208.33(c)(2), 1208.33(d)(2). The Departments recognized that children who enter with their families are generally traveling due to their parents' decision-making. 88 FR at 31320. The Departments believe that these considerations are also relevant to this rule and have decided to adopt a similar approach as that adopted in the Circumvention of Lawful Pathways rule.

The Departments considered whether to except family units, or children who are part of family units, from the limitation on asylum eligibility entirely. The Departments decline to adopt such an approach. Excepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so. And excepting only the child could inadvertently lead to the separation of a family in many cases because every child would have to be treated separately from their family during the credible fear screening, as they would not be subject to the limitation but their parents could be. Although accompanied children remain subject to the limitation on asylum eligibility generally, the Departments have determined that the limitation should not apply to them in any application for asylum they file after the relevant period, but only if they apply as a principal (as opposed to a derivative) applicant.

The Departments also considered applying a specific calendar date to this provision, similar to the approach taken by the Departments in the Circumvention of Lawful Pathways rule.[294] The Departments determined that such a provision would be challenging to implement because the Departments have not identified a date certain upon which emergency border circumstances are expected to discontinue. The Departments believe that the key purpose of an asylum application waiting period—protecting against any perceived incentive for family units to migrate irregularly—is adequately served by a requirement that the applicable period of emergency border circumstances is no longer in place at the time of application. For that same reason, the Departments do not believe it is necessary to make this exception unavailable during any period of emergency border circumstances; instead, this exception will be available

after the end of the emergency border circumstance during which the applicant entered. Because noncitizens will not know in advance when the emergency border circumstance will end, and when another emergency border circumstance might occur, the approach adopted in the rule addresses noncitizens' incentives without restricting this exception more than is necessary.

The Departments believe this approach balances the interest in ensuring the limitation has an impact on behavior, while at the same time recognizing the special circumstance of children who enter in a manner that triggers the limitation, likely without intending to do so or being able to form an understanding of the consequences. Specifically, if the Departments were to extend this exception to children who filed as a derivative, the Departments would risk incentivizing families to seek to prolong their proceedings to file their asylum applications after the end of the circumstances leading to the suspension and limitation on entry, undermining the Departments' interest in efficient adjudications. In addition, any family that did so would be able to avoid the applicability of the limitation entirely, by virtue of the rule's family unity provision. The Departments have decided not to include such a broad exception, in light of the urgent need to gain efficiencies in the expedited removal process and dissuade entry during the circumstances described in the Proclamation and this rule.

Finally, DHS is including a severability clause in this provision. *See* 8 CFR 208.35(e). If any provision of this section, § 235.15, or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DHS intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. Indeed, in this rule, the Departments have sought to avoid describing "emergency border circumstances" as the time period during which the Proclamation is in effect, because the Departments intend for certain provisions of this rule to remain in effect in the event a court enjoins or otherwise renders inoperable the Proclamation or this rule's limitation on asylum eligibility. This

approach is consistent with the nature of the rule as an emergency measure and reflects DHS's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, even in the absence of the limitation on asylum eligibility, as expressly set forth in paragraph (b)(3), the Department intends that the "reasonable probability" standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. Similarly, even in the absence of the new provision at 8 CFR 235.15 discussed below, the changes made in § 208.35 are expected to prove helpful in the emergency circumstances described by the Proclamation and the rule. *See id.* 208.35(e).

3. 8 CFR 1208.35

Like DHS's addition to 8 CFR part 208, DOJ is adding to 8 CFR part 1208, *Procedures for Asylum and Withholding of Removal,* a new subpart D, *Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances.* Within subpart D, DOJ is adding a new § 1208.35, *Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.* This section sets forth a new limitation on asylum eligibility and procedures related to IJ review of credible fear determinations in expedited removal proceedings during emergency border circumstances. This provision applies notwithstanding any contrary provision in EOIR's regulations. Section 1208.35 consists of the following provisions:

Paragraph (a) mirrors new § 208.35(a), discussed above.

Paragraph (b) provides procedures for credible fear determinations. Under these procedures, when a noncitizen has requested IJ review of an AO's negative credible fear determination, the IJ will evaluate the case de novo, taking into account the credibility of the statements made by the noncitizen in support of the noncitizen's claim and such other facts as are known to the IJ. *See* 8 CFR 1208.35(b)(1). The paragraph sets forth three possible procedural scenarios depending on the IJ's determinations. First, where the IJ determines that the

---

[294] Under that rule, the Lawful Pathways condition does not apply to certain asylum applications filed after May 11, 2025—two years after that rule's initial issuance. 8 CFR 208.33(c)(2), 1208.33(d)(2); 88 FR at 31449.

IFR_Rule_000048

noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish that they are not described in § 1208.13(g), the IJ will follow the procedures for credible fear interviews relating to the Lawful Pathways condition in § 1208.33(b). *See id.* 1208.35(b)(2)(i).[295] This provides that those noncitizens who did not enter during emergency border circumstances are processed under the provisions governing the Lawful Pathways condition—and under § 1208.33(b)(2)(i), if the noncitizen is not subject to that condition they will be screened for a significant possibility of eligibility for statutory withholding of removal or CAT protection consistent with § 208.30. Second, where the IJ determines that the noncitizen is not subject to this IFR's limitation on asylum eligibility because there is a significant possibility that the noncitizen could establish either that they are described in section 3(b) of the Proclamation or exceptionally compelling circumstances exist under paragraph (a)(2), the IJ will follow the procedures in 8 CFR 1208.30. *See id.* 1208.35(b)(2)(ii). Third, where the IJ determines that the IFR's limitation on asylum eligibility applies—including that there is not a significant possibility that the noncitizen could establish an exception under section 3(b) of the Proclamation—and that there is not a significant possibility that the noncitizen could establish an exception under paragraph (a)(2) of the limitation, the IJ will apply the Circumvention of Lawful Pathways rule's procedures set forth in § 1208.33(b)(2)(ii), except that the IJ will apply a ''reasonable probability'' standard to parallel the standard adopted by DHS. *See id.* 1208.35(b)(2)(iii).

Paragraph (b)(4), mirrors new § 208.35(b)(3), discussed above.

Paragraph (c) contains a family unity provision that parallels and serves the same purposes as the family unity provision in the Circumvention of Lawful Pathways rule. *See id.* 1208.33(c), 1208.35(c). The paragraph specifies that a noncitizen who would be eligible for asylum but for the limitation on eligibility set forth in the

IFR, the condition set forth in the Circumvention of Lawful Pathways rule, or both, may meet the family unity exception where the other requirements are met.

Paragraph (d) mirrors new § 208.35(d), discussed above.

Paragraph (e) contains a severability provision that serves a similar purpose to the provision in § 208.35(e) described above. If any provision of this section or the Proclamation is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, DOJ intends that the provision be construed so as to continue to give the maximum effect to the provision permitted by law, unless such holding is that the provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances. This approach is consistent with the nature of the rule as an emergency measure and reflects DOJ's determination that the limitation on asylum eligibility will improve the border security and immigration systems' capacity to safely process migrants during the circumstances described in the Proclamation and this rule. For example, as set forth explicitly in paragraph (b)(4), even in the absence of the limitation on asylum eligibility, the Department intends that the ''reasonable probability'' standard be used for screening for eligibility for statutory withholding of removal and CAT protection for those who would have been subject to the limitation on asylum if they are otherwise unable to establish a credible fear of persecution for asylum purposes, including but not limited to because they are subject to the Lawful Pathways rebuttable presumption. *See id.* 1208.35(e).

### 4. 8 CFR 235.15

DHS is adding to 8 CFR part 235, *Inspection of Persons Applying for Admission,* a new § 235.15, *Inadmissible aliens and expedited removal during emergency border circumstances.* New 8 CFR 235.15 will further streamline aspects of the expedited removal process by effectively replacing paragraphs (b)(2)(i) and (b)(4)(i) of 8 CFR 235.3 for those individuals described in § 235.3(b)(1)(i) or (ii) and who are described in § 208.13(g) but not described in section 3(b) of the Proclamation. *See* 8 CFR 235.15. The changes would not affect implementation of 8 CFR 235.3(b)(4)(ii)

or any other portion of 8 CFR 235.3. *See id.* The changes are as follows.

First, under 8 CFR 235.3(b)(2)(i), the record of proceeding includes a sworn statement using Form I–867AB, *Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act.* Under the existing regulations, the examining immigration officer reads (or has read) to the noncitizen all information contained on Form I–867A. Following questioning and recording of the noncitizen's statement regarding identity, alienage, and inadmissibility, the examining immigration officer records the noncitizen's response to the questions contained on Form I–867B, and has the noncitizen read (or has read to the noncitizen) the statement, and the noncitizen signs and initials each page of the statement and each correction, if any.

DHS is adding a new 8 CFR 235.15(b)(2)(i) to apply to certain noncitizens instead of this current process during emergency border circumstances. Under this procedure, Forms I–867A and I–867B will no longer be mandated in such circumstances. Instead, the immigration officer shall advise the individual of the charges against them on the Form I–860 and give him or her an opportunity to respond to those charges. *See* 8 CFR 235.15(b)(2)(i)(B). This provision does not require that the response be done through a sworn statement. *See id.* Consistent with current regulations, however, the inspecting officer must obtain supervisory concurrence of an expedited removal order in accordance with § 235.3(b)(7). *Id.* Moreover, consistent with current regulations, the examining immigration official shall serve the noncitizen with Form I–860, and the noncitizen shall be required to sign the form acknowledging receipt. *Id.* The new 8 CFR 235.15(b)(2)(i) no longer mandates that the signature occur on the reverse, but preserves the requirement that the noncitizen be required to sign, allowing greater flexibility for location of signature blocks on the document. *See id.* 235.3(b)(2)(i). The new provision maintains the requirement that interpretative assistance shall be used if necessary to communicate with the noncitizen. *Id.* 235.3(b)(2)(i)(B). The new 8 CFR 235.15(b)(2)(i) also allows for greater flexibility regarding how DHS records the information that supports the finding that the noncitizen is inadmissible and subject to expedited removal. This operational flexibility is consistent with the President's determination that emergency border circumstances are present such that the suspension and limitation on entry is warranted.

---

[295] As explained above regarding AOs, the discussion in the Circumvention of Lawful Pathways rule regarding how AOs would apply the limitation on asylum eligibility at issue there consistent with the statutory ''significant possibility'' standard, *see* 88 FR at 31380, is equally applicable to IJs' application of the limitation on asylum eligibility created by this IFR. As explained above in Section III.B.3.a of this preamble, IJs will rarely have grounds to reach a different result from the CBP immigration officers as to the application of the Proclamation or its exceptions.

**JA150**

IFR_Rule_000049

Second, under 8 CFR 235.3(b)(4), if a noncitizen subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer does not proceed further with removal of the noncitizen until the noncitizen has been referred for an interview by an AO in accordance with 8 CFR 208.30.

Instead of this current process, DHS is adding a new 8 CFR 235.15(b)(4), applicable to those who (1) are described in § 208.13(g), (2) are not described in section 3(b) of the Proclamation, and (3) are processed for expedited removal. Under this provision the immigration officer would refer the noncitizen to an AO if the noncitizen manifests a fear of return or affirmatively expresses an intention to apply for asylum, or affirmatively expresses a fear of persecution or torture, or a fear of return to his or her country or the country of removal.

Third, under 8 CFR 235.3(b)(4)(i), the referring officer provides the noncitizen with a written disclosure on Form M–444, *Information About Credible Fear Interview,* describing (1) the purpose of the referral and description of the credible fear interview process; (2) the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; (3) the right to request a review by an IJ of the AO's credible fear determination; and (4) the consequences of failure to establish a credible fear of persecution or torture. New 8 CFR 235.15(b)(4) will simply require that an immigration officer provide "a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of the AO's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture." 8 CFR 235.15(b)(4)(i)(B). Thus, while maintaining the substance of the information that must be provided to the noncitizen, the regulation removes the requirement that it be on a particular form, allowing for greater flexibility in how the information is distributed.

Finally, DHS is including a severability clause in this provision. *See id.* 235.15(g). DHS believes that each of these changes can function sensibly without the others, given that each change is independently seeking to provide greater flexibility during a time when the suspension and limitation on entry is in effect, while still protecting the important ability of individuals to seek protection from removal. DHS further believes that even if a court order enjoins or vacates the Proclamation or provisions other than § 235.15 of this rule, the provisions in § 235.15 can continue to apply to those described in § 208.13(g) and not described in section 3(b) of the Proclamation, even if they cannot be subject to those provisions by operation of such court order.

## IV. Statutory and Regulatory Requirements

### A. Administrative Procedure Act

Under the Administrative Procedure Act ("APA"), agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). Consistent with the APA, the Departments have not invoked these procedures because (1) this rule involves a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments have found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3), for the reasons explained below. At the same time, the Departments seek and welcome post-promulgation comments on this IFR.

#### 1. Foreign Affairs

This rule is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question "is clearly and directly involved in a foreign affairs function." [296] In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d

Cir. 2008) (quotation marks omitted).[297] This rule satisfies both standards.

The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere. This strategy includes the Los Angeles Declaration on Migration and Protection, which was joined by leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[298] Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing, including on efforts to: expand access to, and increase, lawful pathways, such as the Safe Mobility Office initiative;[299] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols[300] with the Government of Mexico along

[296] *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up); *see Mast Indus., Inc.* v. *Regan,* 596 F. Supp. 1567, 1582 (Ct. Int'l. Trade 1984); *see also Am. Ass'n of Exps. & Imps.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that the exception applies where a rule is "linked intimately with the Government's overall political agenda concerning relations with another country").

[297] *See, e.g., Rajah,* 544 F.3d at 437 ("There are at least three definitely undesirable international consequences that would follow from notice and comment rulemaking. First, sensitive foreign intelligence might be revealed in the course of explaining why some of a particular nation's citizens are regarded as a threat. Second, relations with other countries might be impaired if the government were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger to our security. Third, the process would be slow and cumbersome, diminishing our ability to collect intelligence regarding, and enhance defenses in anticipation of, a potential attack by foreign terrorists."); *see also Yassini* v. *Crosland,* 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) ("For the [foreign affairs] exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."). *But see E.B.,* 583 F. Supp. 3d at 64–66 (rejecting the "provoke definitely undesirable international consequences" standard).

[298] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https:// losangelesdeclaration.com/endorsing-countries* (last visited May 27, 2024).

[299] *See* U.S. Dep't of State, *Safe Mobility Initiative, https://www.state.gov/refugee-admissions/safe-mobility-initiative* (last visited May 27, 2024).

[300] *See* CBP, *Readout: U.S.-Mexico meeting on joint actions to further enhance border security* (Sept. 24, 2023), *https://www.cbp.gov/newsroom/ national-media-release/readout-us-mexico-meeting-joint-actions-further-enhance-border* (noting that CBP encouraged mirrored patrols); U.S. Dep't of State, *Third Meeting of the U.S.-Mexico High-Level Security Dialogue—Fact Sheet* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/* (noting that "CBP and INM regularly coordinate enforcement efforts at the border through mirrored patrols," which suggests that those patrols were occurring).

IFR_Rule_000050

our shared border; [301] and share information, technical assistance, and best practices.[302] The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.[303]

This international coordination has yielded important results. A number of foreign partners, including Mexico, Panama, and Colombia, announced significantly enhanced efforts to enforce their borders in the days leading up to the end of the Title 42 public health Order.[304] These governments recognized that the United States was taking measures to strengthen border enforcement, specifically through application of the Circumvention of Lawful Pathways rule along with other complementary measures, and committed to taking their own actions to address irregular migratory flows in the region.[305] Additionally, immediately prior to the transition from DHS processing under the Title 42 public health Order to processing under title 8 authorities, the Government of Mexico announced that it had independently decided to accept the return into Mexico of nationals from CHNV countries under title 8 processes.[306] However, in the intervening months, Mexico and other partners' resources have been significantly strained by sustained high encounter levels, and at different times enforcement by our partners has been disrupted, leading to surges at our own border.[307]

In public messaging, the Government of Mexico linked its decision to accept return into Mexico of CHNV nationals to the success of the CHNV parole processes framework under the Title 42 public health Order,[308] which combined expansion of lawful pathways and processes for nationals of these countries with a meaningful consequence framework, and which reduced irregular border crossings.[309] Sustaining and, as appropriate, ramping up efforts to improve border security and stem arrivals to the southern border is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. This has been a key component of our diplomacy, as regional partner countries have regularly encouraged DHS to take steps to address migratory flows, including by channeling intending migrants into expanded lawful pathways and processes. For example, following the development of the parole process for Venezuelans announced in October 2022—an approach that was subsequently expanded to include processes for Cuban, Haitian, and Nicaraguan nationals in January 2023—regional partners urged the United States to continue building on this approach, which imposed consequences for irregular migration alongside the availability of a lawful, safe, and orderly process for migrants to travel directly to the United States.[310] Following the announcement of the Venezuela parole process in October 2022 and the subsequent announcement of the Cuba, Haiti, and Nicaragua parole processes in January 2023, migration flows through the region and at the U.S.-Mexico border slowed. *See* 88 FR at 31317 ("DHS estimates that the drop in CHNV encounters in January through March was almost four times as large as the number of people permitted entry under the parole processes.").

The United States has continued to build on this historic expansion of lawful pathways and processes, which include the humanitarian parole processes for CHNV nationals; [311] efforts to expand labor pathways and dedicate a set number of visas to nationals of countries in the hemisphere; [312] the implementation of new Family Reunification Parole ("FRP") processes for certain nationals of Colombia, Ecuador, El Salvador, Guatemala, and Honduras; and the modernization of FRP processes for certain nationals of Cuba and Haiti.[313]

---

[301] *See* DHS, *Trilateral Statement* (Apr. 11, 2023), *https://www.dhs.gov/news/2023/04/11/trilateral-joint-statement.*

[302] *See, e.g., Creating a Comprehensive Regional Framework To Address the Causes of Migration, To Manage Migration Throughout North and Central America, and To Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,* Exec. Order 14010, 86 FR 8267, 8270 (Feb. 2, 2021); The White House, *Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/;* The White House, *Fact Sheet: U.S.-Mexico High-Level Security Dialogue* (Oct. 8, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/08/fact-sheet-u-s-mexico-high-level-security-dialogue/;* U.S. Dep't of State, *Fact Sheet: Third Meeting of the U.S.-Mexico High-Level Security Dialogue* (Oct. 13, 2023), *https://www.state.gov/third-meeting-of-the-u-s-mexico-high-level-security-dialogue/.*

[303] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration On Migration and Protection in Guatemala* (May 7, 2024),

[304] Kathia Martínez, *US, Panama and Colombia Aim to Stop Darien Gap Migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Camilo Montoya-Galvez, *Mexico Will Increase Efforts To Stop U.S.-Bound Migrants as Title 42 Ends, U.S. Officials Say,* CBS News (May 10, 2023), *https://www.cbsnews.com/news/title-42-end-border-mexico-efforts-us-bound-migrants/.*

[305] 88 FR at 31444.

[306] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/;*

[307] *See* Charles G. Ripley III, *Crisis Prompts Record Emigration from Nicaragua, Surpassing Cold War Era,* Migration Pol'y Inst. (Mar. 7, 2023), *https://www.migrationpolicy.org/article/record-emigration-nicaragua-crisis;* James Fredrick, *Mexico Feels Pressure of Relentless Migration from South America,* N.Y. Times (Sept. 21, 2023) ("Similar scenes are playing out across the country as Mexico's immigration system strains under a tide of people desperately trying to go north. The relentless surge has led to a hodgepodge response in Mexico ranging from shutting down railways heading north to the busing of people to areas with fewer migrants."); Megan Janetsky & Javier Córdoba, *Central America scrambles as the international community fails to find solution to record migration,* AP News (Oct. 20, 2023), *https://apnews.com/article/costa-rica-migration-darien-gap-biden-420e2d1219d403d7feec6463a6e9cdae* (noting the resources pull migration flows place on certain Central American countries); María Verza, *Mexico halts deportations and migrant transfers citing lack of funds,* AP News (Dec. 4, 2023), *https://apnews.com/article/mexico-immigration-migrants-venezuela-17615ace23d0677bb443d8386e254fbc* (observing that the "head of Mexico's immigration agency . . . ordered the suspension of migrant deportations and transfers due to a lack of funds"); Valerie Gonzalez & Elliot Spagat, *The US sees a drop in illegal border crossings after Mexico increases enforcement,* AP News (Jan. 7, 2024), *https://apnews.com/article/mexico-immigration-enforcement-crossings-drop-b67022cf0853dca95a8e0799bb99b68a* (noting the disruption in enforcement that resulted from Mexico's lack of funding and quoting Andrew Selee, President of the Migration Policy Institute, as saying that "[t]he U.S. is able to lean on Mexico for a short-term enforcement effect at the border, but the long-term effects are not always clear").

[308] *See* Gobierno de México, *México y Estados Unidos fortalecen Plan Humanitario Conjunto sobre Migración* (May 2, 2023), *https://www.gob.mx/presidencia/prensa/mexico-y-estados-unidos-fortalecen-plan-humanitario-conjunto-sobre-migracion?state=published* (characterizing the effort of the Government of Mexico as a successful joint initiative and expressing the Government's commitment to continue to accept migrants back into Mexico on humanitarian grounds).

[309] *See id.* (describing a significant reduction in irregular migration following the implementation of CHNV parole processes, which pair an expansion of lawful pathways with consequences for irregular migration).

[310] *See* 88 FR at 31444; The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[311] *See* USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (Sept. 20, 2023), *https://www.uscis.gov/CHNV.*

[312] *See* DHS & U.S. Dep't of Labor, *Temporary Rule—Exercise of Time-Limited Authority To Increase the Numerical Limitation for FY 2024 for the H–2B Temporary Nonagricultural Worker Program and Portability Flexibility for H–2B Workers Seeking To Change Employers,* 88 FR 80394 (Nov. 17, 2023).

[313] DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10,

IFR_Rule_000051

**Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations    **48761**

Concurrently, the Governments of Colombia and Panama have made significant efforts to combat smuggling networks operating on both sides of the Darién Gap.[314] The Government of Mexico has likewise increased enforcement along its southern border and the transit routes north.[315] These enforcement campaigns have been implemented at substantial cost for those governments and, as with United States Government actions, reflect our shared regional responsibility to manage migration.[316]

Given the particular challenges facing the United States and its regional partners at this moment, the Departments assess that it is critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that this regulatory effort and the Presidential Proclamation—and the strong consequences they will impose at the border—will send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In addition to this IFR's clear and direct involvement in foreign affairs, the Departments believe that conducting a notice-and-comment process and providing a delayed effective date on this rule likely would lead to a surge to the border before the Departments could finalize the rule, which would adversely impact the United States' foreign policy priorities. Prior to the end of the Title 42 public health Order, regional partners expressed great concern about

the misperception that the end of the Order would mean an open U.S. border and result in a surge of irregular migration flowing through their countries as migrants sought to enter the United States. *See* 88 FR at 31444. One foreign partner, for example, expressed the strong concern that the formation of caravans during the spring of 2022 was spurred by rumors—and the subsequent official announcement—of the anticipated end of the Title 42 public health Order. *See id.* This view is consistent with the views of other regional partner countries that have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid.

The surge about which many foreign leaders were concerned happened sooner than expected. In the weeks leading up to the lifting of the Title 42 public health Order, hemispheric migration spiked. Entries into the Darién jungle by migrants staged in Colombia began increasing in the months leading up to May 12, 2023, from a little more than 24,600 in January 2023, to more than 40,000 in April 2023 immediately before the Order lifted.[317] And as described more fully above, total CBP encounters at the SWB increased to then-record levels in the days immediately preceding May 12, 2023, a situation that was fueled by noncitizens seeking to enter the United States before new policies were put into effect, as well as by smuggling organizations that disseminated misinformation.[318] The scale of regional migration in those weeks strained the immigration processes of all the affected countries, including those of the United States.

As noted above, the United States saw a similar scale of migration at the end of 2023. The surge in December 2023 led the United States Government and

the Government of Mexico to hold a series of engagements at the highest levels—including between the countries' Presidents and Cabinet Members—to address the shared challenge of migration confronting both countries.[319] These conversations included commitments by both governments to continue to expand efforts to coordinate enforcement actions on both sides of the border.[320] January, February, and March are typically slower months, but since these engagements, and the joint operational actions that resulted, there has been a decrease in USBP encounters at the border, as discussed in Section III.B.1 of this preamble.

The record-breaking hemispheric migration throughout the region has deeply affected governments from South America all the way to the U.S.-Mexico border. Panama has been encountering record numbers of migrants transiting one of the most dangerous smuggling corridors on the planet, the Darién Jungle.[321] Colombia, Peru, and Ecuador have hosted around 3 million,[322] over 1.5 million,[323] and more than 475,000 Venezuelans,[324] respectively, while Costa Rica has recently hosted hundreds of thousands of Nicaraguans.[325] Mexico has received record-breaking numbers of

---

2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

[314] *See* Kathia Martínez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7;* Juan Zamorano & Christopher Sherman, *Explainer: Panama launches operation against smugglers in Darien Gap,* AP News (June 3, 2023), *https://apnews.com/article/panama-colombia-darien-gap-migrants-d0ec93c4d4ddc91f34e31c704b4cf8ae.*

[315] *See, e.g.,* Associated Press, *U.S. Border Arrests Decline Amid Increased Enforcement in Mexico,* NPR (Apr. 13, 2024), *https://www.npr.org/2024/04/13/1244590706/mexico-border-arrests-fall-march* ("Mexico detained migrants 240,000 times in the first two months of the year, more than triple from the same period of 2023, sending many deeper south into the country to discourage them from coming to the United States. While Mexico hasn't released figures for March, U.S. officials have said Mexican enforcement is largely responsible for recent declines.").

[316] *See, e.g.,* The White House, Press Release, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[317] *See* Servicio Nacional de Migración Panamá, *Estadisicas, Tránsito Irregular por Darién 2023, https://www.migracion.gob.pa/inicio/estadisticas.*

[318] *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* (noting that "[m]any migrants were acutely aware of looming policy changes as they searched Thursday for an opportunity to turn themselves over to U.S. immigration authorities before the 11:59 EDT deadline . . . [and] [e]ven as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message . . . [and] offering to take migrants to the United States and telling them the border was open starting Thursday").

[319] *See supra* Section III.B.1 of this preamble.

[320] *See, e.g.,* White House, *Readout of Homeland Security Advisor Dr. Liz Sherwood-Randall's Trip to Mexico* (Feb. 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/07/readout-of-homeland-security-advisor-dr-liz-sherwood-randalls-trip-to-mexico/;* Amna Nawaz, *Mexico's foreign secretary discusses what her country is doing to ease border crisis,* PBS News Hour (Jan. 25, 2024), *https://www.pbs.org/newshour/show/mexicos-foreign-secretary-discusses-what-her-country-is-doing-to-ease-border-crisis* (quoting Foreign Secretary Bárcena as describing "much more law enforcement to bring down the pressure in the border" by Mexico in the preceding weeks).

[321] *See* Nick Paton Walsh et al., *On one of the world's most dangerous migrant routes, a cartel makes millions off the American dream,* CNN (Apr. 17, 2023), *https://www.cnn.com/2023/04/15/americas/darien-gap-migrants-colombia-panama-whole-story-cmd-intl/index.html;* Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us;* Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023.*

[322] *See* UNHCR, *Colombia Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/colombia.*

[323] *See* UNHCR, *Peru Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/peru.*

[324] *See* UNHCR, *Ecuador Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/ecuador.*

[325] *See* UNHCR, *Costa Rica Country Operations* (2024), *https://reporting.unhcr.org/operational/operations/costa-rica.*

IFR_Rule_000052

**JA153**

asylum applications in addition to the enforcement efforts it is undertaking.[326]

As described more fully above, DHS's internal projections suggest that SWB encounters may once again reach extremely elevated levels in the weeks to come, averaging in the range of approximately 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[327] Regional migration trends support these projections. For example, between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[328] Moreover, as noted above, the Government of Mexico has been receiving record-breaking numbers of asylum applications—reflecting the large number of migrants currently in Mexico.

The weeks leading up to May 12, 2023, demonstrated that when migrants anticipate major changes in border policy, there is the potential to ignite a rush to the border to arrive before the changes take effect.[329] Any delay between announcement of this rule and its implementation through notice and comment would almost certainly trigger a surge in migration that would undermine the principal goal of this entire effort: to reduce migratory flows to our border, and throughout the region.

The Departments believe that the emergency measures being taken here are needed to help address this regional challenge, and that any decrease in migration that results will help relieve the strain not just on the U.S.-Mexico border but on countries throughout the hemisphere. The actions the United States is taking in this regulation demonstrate a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration. The IFR changes key procedures to significantly streamline and strengthen the consequences delivered for unlawful or unauthorized entry at the southern border. The actions the Departments are taking are directly responsive to the shared challenge the United States and its regional partners are confronting and, equally important, it is critical to implement these actions without a lengthy period of advance notice before the actions go into effect.

2. Good Cause

The Departments have also found good cause to forego the APA's notice-and-comment and delayed-effective-date procedures. *See* 5 U.S.C. 553(b)(B), (d)(3). Such procedures are impracticable because the delays associated with such procedures would unduly postpone implementation of a policy that is urgently needed to avert significant public harm. Such procedures are likewise contrary to the public interest because an advance announcement of this rule would seriously undermine a key goal of the policy: It would incentivize even more irregular migration by those seeking to enter the United States before the rule would take effect.

First, the "impracticable" prong of the good cause exception "excuses notice and comment in emergency situations . . . or where delay could result in serious harm." [330] Findings of impracticability are "inevitably fact- or context-dependent," [331] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures [332] and the agency's diligence in addressing the problem it seeks to address.[333]

The critical need to immediately implement more effective border management measures is described at length in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble. Despite the strengthened consequences in place at the SWB, including the Circumvention of Lawful Pathways rule and other measures, the United States Government continues to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[334] DHS's ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's negative credible fear determination, which requires additional time and resources.

[326] *See* UNHCR, *Operational Update: Mexico* (Dec. 2023), *https://reporting.unhcr.org/mexico-operational-update-6421;* UNHCR, *Fact Sheet, Mexico* (Nov. 2023), *https://data.unhcr.org/en/documents/download/105202* ("From January to October 2023, Mexico received over 127,796 asylum applications, the highest ever number of asylum claims received in this time frame."); Daina Beth Solomon & Lizbeth Diaz, *Mexico seeks to curb 'abuse' of asylum system by migrants who do not plan to stay,* Reuters (Feb. 13, 2023), *https://www.reuters.com/world/americas/mexico-seeks-curb-abuse-asylum-system-by-migrants-who-do-not-plan-stay-2023-02-13/* ("Mexico has the world's third highest number of asylum applications after the United States and Germany, reflecting growing numbers of refugee seekers that have strained resources at the Mexican Commission for Refugee Assistance.").

[327] OHSS Southwest Border Encounter Projection, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[328] *See supra* note 122.

[329] Decl. of Blas Nuñez-Neto ¶¶ 9–10, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2); Decl. of Matthew J. Hudak ¶ 11, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[330] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[331] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[332] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[333] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[334] According to March 2024 OHSS Persist Dataset and OHSS analysis of historic CBP data for encounters prior to FY 2000, USBP completed 250,000 encounters along the SWB in December 2023, higher than any previous month on record. *See also* OHSS, *2022 Yearbook of Immigration Statistics,* tbls. 33 & 35, *https://www.dhs.gov/ohss/topics/immigration/yearbook.*

IFR_Rule_000053

Without adequate resources and tools to keep pace, the Departments cannot deliver timely decisions and timely consequences to all noncitizens encountered at the SWB who do not establish a lawful basis to remain. Instead, DHS is forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[335] Even then, it can take weeks, months, or years to execute a removal order depending upon the facts of the individual case.[336]

Quite simply, these historic levels of encounters and fear claims, combined with limited resources and tools to manage them, create a vicious cycle: The expectation of a lengthy stay in the United States and the inability to impose consequences for irregular migration close in time to entry inspires more people to make the dangerous journey north to take their chances at the border.[337] The USCIS affirmative asylum backlog has reached almost 1.2 million cases and is growing.[338] At the end of the first quarter of FY 2024, there were over 2.7 million cases pending in the immigration courts.[339] During FY 2023, IJs completed more cases than they ever had before in a single year, but more than twice as many cases were received by the immigration courts as were completed.[340]

Absent changes promulgated in this rule, recent encounter trends both in the region and at our southern border indicate a risk of further exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered, and exacerbating perceived incentives to migrate now. As noted above, DHS's current internal projections suggest that total encounters will average in the range of 3,900 to approximately 6,700 encounters at and between POEs per day from July to September, not including an additional 1,450 noncitizens per day who are expected to be encountered at POEs after making appointments though the CBP One app.[341] Even at the low end of such projections, such a volume of encounters would likely result in thousands of migrants per day being referred to section 240 removal proceedings; their cases would further exacerbate the immigration court backlog and perceived incentives to migrate irregularly, and would take many years to complete. Such harms would be mitigated by the additional measures put in place by this rule. If implementation of the rule is delayed, by contrast, the harms of such an increase would be immediate and substantial, even if such an increase would only last for the months needed to complete a very rapid notice-and-comment rulemaking. Thus, it is impracticable to delay the measures in this rule for even a few months to allow for notice and an opportunity to comment and a delayed effective date. In the interim, the heightened levels of migration and forced displacement that have resulted in the President's determination to apply the suspension and limitation on entry and the Departments adopting the provisions in this rule would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants [342]—only a small proportion of whom are likely to be granted asylum or other protection—would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. The Departments must immediately safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. This rule does just that.

Furthermore, current trends in migration, including through the Darién jungle between Colombia and Panama, indicate that a significant increase in encounters may be imminent. Between January and April 2024, UNHCR tracked 139,000 irregular entries, up from 128,000 for the same months in 2023 and a seven-fold increase over that period in 2022.[343] And the Departments believe that most of those migrants are on their way to seek entry into the United States.[344] Based on historical trends, the Departments expect that many of these migrants may already be proximate to the SWB, giving the Departments insufficient time to seek public comment and delay the effective date of this rule without immediate and substantial harm to U.S. interests. Indeed, as of May 2024, CBP estimates that there are more than 40,000 non-Mexican migrants in northern Mexico, proximate to the SWB, in addition to more than 100,000 such migrants in central and southern Mexico. These

---

[335] *See supra* note 25.

[336] OHSS analysis of March 2024 OHSS Persist Dataset.

[337] *See, e.g.,* Jordan, *supra* note 27.

[338] OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024. Almost all of this backlog is the result of cases filed since FY 2015. From FY 2015 through FY 2023, an average of 156,000 affirmative asylum cases were filed per year, versus an average of 49,000 cases completed. In FY 2024 through March 31, 2024, 191,000 cases have been filed versus 78,000 cases completed. OHSS analysis of USCIS Global Affirmative Data as of March 31, 2024.

[339] *See* EOIR, *Caseload: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[340] *See id.;* EOIR, *New Cases and Total Completions-Historical, https://www.justice.gov/eoir/media/1344801/dl?inline* (Jan. 18, 2024).

[341] OHSS Encounter Projections, April 2024. Note that the OHSS encounter projection excludes encounters of people who have registered with the CBP One app along with administrative encounters at POEs (*i.e.,* encounters in which removal proceedings are not considered), but includes non-CBP One enforcement encounters at POEs, which have averaged about 190 per day since May 2023. *See also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day* (last modified July 14, 2023).

[342] Decl. of Matthew J. Hudak, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[343] *See supra* note 122.

[344] *See* Sergio Martínez-Beltrán, *Despite a Fortified Border, Migrants Will Keep Coming, Analysts Agree. Here's Why.,* NPR, (Apr. 22, 2024), *https://www.npr.org/2024/04/22/1244381584/immigrants-border-mexico-asylum-illegal-immigration* (''[Analysts] keep a close eye on the Darién Gap in Panama and the borders between Central American countries, two key points to gauge the number of people venturing up north. 'In most countries (outward) migration has increased . . . particularly in Venezuela, and that's not really reflected yet in the U.S. numbers,' said [one analyst]. . . . Despite Mexico's cracking down on migrants, [the analyst] said people are still making their way up north, even if they need to pause for months at different points during their journey. 'There must be a huge number of people from Venezuela bottled up in Mexico right now,' he said.''); Diana Roy, *Crossing the Darién Gap: Migrants Risk Death on the Journey to the U.S.,* Council on Foreign Rels. (Feb. 1, 2024), *https://www.cfr.org/article/crossing-darien-gap-migrants-risk-death-journey-us* (''The surge across the Darién Gap is reflected in an influx at the southern U.S. border, where U.S. border authorities reported that they apprehended close to 2.5 million people during fiscal year 2023, a record high, while northern cities such as New York are also struggling to manage the arrivals.''); Mallory Moench, *Volume of Migrants Crossing the Dangerous Darién Gap Hit Record High in 2023,* Time (Dec. 22, 2023), *https://time.com/6547992/migrants-crossing-darien-gap-2023/* (''Laurent Duvillier, UNICEF's spokesperson for Latin America and the Caribbean based in Panama, tells TIME that many—driven to leave their homes by poverty, crime, or discrimination—aim to seek asylum in the U.S. or Canada, though they may never get there. This analysis is supported by refugee protection organization HIAS, with a spokesperson telling TIME that, by the group's estimations, between 90 to 95% of those crossing the Darién Gap aim to reach the U.S.''); Ariel G. Ruiz Soto, *Record-Breaking Migrant Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border* (''Record flows of extracontinental migrants through the Darien Gap jungle that connects Colombia to Panama foreshadow increases in migration through Central America and Mexico. The 28,000 Venezuelan migrants who trekked through the deadly jungle in August were mostly en route to the United States; with more than 34,000 Venezuelans recorded at the Darien Gap in September, it is very likely that many of them will be reaching the U.S.-Mexico border soon.'').

IFR_Rule_000054

numbers show that a very large number of migrants would likely have the ability and the incentive to travel to the U.S. border, and the Departments assess that announcing this rule in advance would likely yield the type of surges described in connection with prior changes in significant border policies affecting the availability of asylum for large numbers of migrants. For these reasons, consistent with the President's judgment, and given the emergency circumstances facing the Departments, the Departments assess that it would be impracticable to delay the policies set forth in this rule to allow time to complete notice-and-comment rulemaking or delay the rule's effective date.

Second, under the ''contrary to the public interest'' prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, where significant public harm would result from the notice-and-comment process.[345] If, for example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[346] A number of cases follow this logic in the context of economic regulation.[347] The same logic

applies here, where the Departments are responding to exceedingly serious challenges at the border, and advance announcement of this response—which will increase the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly— would significantly increase the incentive, on the part of migrants and others (such as smugglers), to engage in actions that would compound those very challenges. For the same reasons, ''the [need] for immediate implementation'' outweighs the ''principles'' underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forego it.[348] The Departments' experience has been that in some circumstances when official public announcements have been made regarding significant upcoming changes in immigration laws and procedures that would impact how individuals are processed at the border, such as changes that restrict access to immigration benefits to those attempting to enter the United States along the U.S.-Mexico land border, there have been dramatic increases in the numbers of noncitizens who enter or attempt to enter the United States—including, most recently, in the days preceding the lifting of the Title 42 public health Order in May 2023.[349] This is not only because, generally, would-be migrants respond to real and perceived incentives created by border management and immigration policies, such that many choose to seek entry under a border processing regime they think is preferable, prior to the implementation of a new system, including increasing the speed of their transit north in an effort to arrive before the implementation of any such measure. Additionally, smugglers routinely prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy, as highlighted by the many examples described below.[350]

The acuteness of such concerns is borne out by the facts. An influx of migrants occurred in the days following the November 15, 2022, court decision that, had it not been stayed on December 19, 2022, would have resulted in the lifting of the Title 42 public health Order effective December 21, 2022.[351] Leading up to the Order's expected termination date, migrants gathered in various parts of Mexico, including along the SWB, waiting to cross the border once the Title 42 public health Order was lifted.[352] According to internal Government sources, smugglers were also expanding their messaging and recruitment efforts, using the expected lifting of the Title 42 public health Order to claim that the border was open, thereby seeking to persuade would-be migrants to participate in expensive and dangerous human smuggling schemes. 88 FR at 31315. In that one-month period following the court decision, total CBP encounter rates jumped from an average of 7,800 per week (in mid-November) to over 9,100 per week (in mid-December), a change not predicted by normal seasonal effects.[353]

Similarly, on February 28, 2020, the Ninth Circuit lifted a stay of a

---

[345] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the ''contrary to the public interest'' prong of the ''good cause'' exception ''is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded'' (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) (''[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was 'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.'').

[346] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) (''[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase.'' (quotation marks omitted)).

[347] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) (''The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare.'' (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) (''On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can

be expected to precipitate activity by affected parties that would harm the public welfare.'').

[348] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[349] *See supra* Sections III.B.1 and III.B.2 of this preamble.

[350] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/*

national-security/theres-still-one-way-into-america/ 2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html; Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9* (''Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.'').

The Departments recognize that there has been reporting on the possibility of the policies set forth in the Proclamation and this IFR since February with no apparent month-over-month increase in encounters. *See, e.g.,* Myah Ward, *Biden considering major new executive actions for migrant crisis,* Politico (Feb. 21, 2024), *https://www.politico.com/news/2024/02/21/biden-considering-major-new-executive-actions-for-southern-border-00142524.* But such reporting about vague, possible plans differs significantly from officially proposed policy changes with timelines provided for implementation, such as those mentioned below.

[351] *See Huisha-Huisha* v. *Mayorkas,* 642 F. Supp. 3d 1 (D.D.C. 2022), *stay granted, Arizona* v. *Mayorkas,* __ S. Ct. __, 2022 WL 17750015 (U.S. Dec. 19, 2022); DHS, *Statement by Secretary Mayorkas on Planning for End of Title 42* (Dec. 13, 2022), *https://www.dhs.gov/news/2022/12/13/statement-secretary-mayorkas-planning-end-title-42.*

[352] *See, e.g.,* Leila Miller, *Asylum Seekers Are Gathering at the U.S.-Mexico Border. This Is Why,* L.A. Times (Dec. 23, 2022), *https://www.latimes.com/world-nation/story/2022-12-23/la-fg-mexico-title-42-confusion.*

[353] OHSS analysis of March 2024 OHSS Persist Dataset. Month-over-month change from November to December for all of FY 2013 to FY 2022 averaged negative two percent.

IFR_Rule_000055

nationwide injunction of the Migrant Protection Protocols (''MPP''), a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C).[354] Almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part.[355] Many others requested immediate entry into the country through their counsel, while others attempted to illegally cross the southern border between the POEs.[356] Absent immediate and resource-intensive action taken by CBP, the number of migrants gathered at the border, whether at or between the POEs, could have increased dramatically, especially considering there were approximately 25,000 noncitizens who were in removal proceedings pursuant to MPP without scheduled court appearances, as well as others in Mexico who could have become aware of CBP's operational limitations and sought to exploit them.[357] And while CBP officers took action to resolve the sudden influx of migrants at multiple POEs and prevent further deterioration of the situation at the border, in doing so they were diverted away from other critical responsibilities of protecting national security, detecting and confiscating illicit materials, and guarding efficient trade and travel.[358]

This same phenomenon occurred in the days leading up to the end of the Title 42 public health Order on May 12, 2023, when DHS saw a historic surge in migration as smugglers falsely advertised that those arriving before the Order ended and the Circumvention of Lawful Pathways rule took effect would be allowed to remain in the United States.[359] This surge culminated with

what were then the highest recorded USBP encounter levels in U.S. history over the days immediately preceding May 12, which placed significant strain on DHS's operational capacity at the border.[360] Encounters between POEs (which excludes arrival of inadmissible individuals scheduled through the CBP One app, who appear at POEs) almost doubled from an average of approximately 4,900 per day the week ending April 11, 2023, to an average of approximately 9,500 per day the week ending May 11, 2023, including an average of approximately 10,000 daily encounters immediately preceding the termination of the public health Order (from May 8 to May 11).[361] The sharp increase in USBP encounters during the 30 days preceding May 12 represented the largest month-over-month increase in almost two decades—since January 2004.[362]

Meanwhile, the current backlogs and inefficiencies in our border security and immigration systems render DHS unable to effect removals and apply consequences at a sufficient scale to deter migration by those whose claims may not ultimately succeed.[363] This, too, serves as an incentive for migrants to take a chance. And sudden influxes, which result in part from smugglers' deliberate actions, overload scarce United States Government resources dedicated to border security that, as reflected above, are already stretched extremely thin.[364] This rule is specifically designed to allow the United States Government to deliver consequences more swiftly, and with a reduced resource burden, during such an influx.

In a more manageable steady-state environment, when encounters surge in specific sectors, DHS manages its detention capacity using the other tools at its disposal, such as lateral decompression flights and similar efforts.[365] But the increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what

DHS resources and operations are designed to handle. They raised detention capacity concerns anew. At that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities. Given the nature of its facilities, increased numbers and times in custody increase the likelihood that USBP facilities will become quickly overcrowded.[366] Crowding, particularly given the way that USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[367]

The Departments assess that there would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for this rule or delayed its effective date. As demonstrated by the Departments' experience with the end of the Title 42 public health Order and MPP, significant shifts in U.S. border policies lead to an increase in migrants coming to the SWB that risks overwhelming the Departments' resources and operations. This rule is likewise a significant shift in U.S. border policy that affects the vast majority of noncitizens arriving at the southern border who do not have documents sufficient for lawful admission—a shift that may be viewed as similar to the end of the Title 42 public health Order and MPP. In addition, unlike the Lawful Pathways rebuttable presumption, the limitation on asylum eligibility in this rule would affect Mexican migrants, which may provide an additional perceived incentive for such migrants—who constitute a large and geographically proximate potential population [368]—to rush to the border during a notice-and-comment period. Finally, such a surge in migration would come at a time when our border security and immigration systems' resources are already stretched thin and severely backlogged.[369]

---

[354] *See Innovation Law Lab* v. *Wolf,* 951 F.3d 1073, 1077, 1095 (9th Cir. 2020), *vacated as moot sub nom. Innovation Law Lab* v. *Mayorkas,* 5 F.4th 1099 (9th Cir. 2021).

[355] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[356] *Id.* ¶¶ 4, 8.

[357] *Id.* ¶ 14.

[358] *Id.* ¶ 15.

[359] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2). Conversely, as noted above, smugglers also messaged that the border would be open starting on May 12. *See* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257c0220413b8e9cf9.* This conflicting messaging underscores smuggling organizations' tendency to deceptively message on changes in border policy to lure vulnerable migrants to pay for their services.

[360] Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–6810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

[361] *Id.*

[362] *Id.*

[363] *See* EOIR, *Adjudication Statistics: Pending Cases* (Jan. 18, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.*

[364] Decl. of Enrique Lucero ¶¶ 6–8, *Innovation Law Lab* v. *Wolf,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–3); Decl. of Robert E. Perez ¶ 15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2).

[365] *See* 88 FR at 11715.

[366] Decl. of Matthew J. Hudak ¶¶ 6, 14, 17, *Florida* v. *Mayorkas,* No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[367] *Id.* ¶ 17.

[368] U.S. Census Bureau, *Mexico, https://www.census.gov/popclock/world/mx* (last visited May 27, 2024).

[369] *See, e.g.,* Ariel G. Ruiz-Soto et al., *Shifting Realities at the U.S.-Mexico Border: Immigration Enforcement and Control in a Fast-Evolving Landscape,* Migration Pol'y Inst., at 1 (rev. Jan. 2024), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-contemporary-border-policy-2024_final.pdf* (''Insufficiently equipped to respond effectively to these and likely future changes, U.S. immigration agencies must perpetually react and shift operations according to their strained capacity and daily changes in migrant arrivals.''); The White House, *Fact Sheet: White*
Continued

Therefore, the Departments believe that a gap between when this rule is made public and when it becomes effective would create the same incentive for migrants to come to the United States before the rule takes effect.

The Departments' determination here is consistent with past practice. For example, in the Circumvention of Lawful Pathways rule, the Departments undertook a notice-and-comment rulemaking while the Title 42 public health Order remained in effect,[370] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. The Departments noted that such a gap "would likely result in a significant further increase in irregular migration," and that such an increase, "exacerbated by an influx of migrants from countries such as Venezuela, Nicaragua, and Cuba, with limited removal options, and coupled with DHS's limited options for processing, detaining, or quickly removing such migrants, would unduly impede DHS's ability to fulfill its critical and varied missions." *Id.* at 31445.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures,[371] and witnessed a drastic reduction in irregular migration by Venezuelans.[372] The process by which eligible Venezuelans could receive advance travel authorization to present at a POE was accompanied by a policy that those who entered the United States outside this process or who entered Mexico illegally after the

---

*House Calls on Congress To Advance Critical National Security Priorities* (Oct. 20, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/;* Letter for Kevin McCarthy, Speaker of the House of Representatives, from Shalanda D. Young, Director, Office and Management Budget (Aug. 10, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/08/Final-Supplemental-Funding-Request-Letter-and-Technical-Materials.pdf.*

[370] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[371] *See* DHS, Implementation of a Parole Process for Venezuelans, 87 FR 63507 (Oct. 19, 2022).

[372] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuelan encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

date of announcement would be ineligible for parole under this process, and was conditioned on Mexico continuing to accept the expulsion or removal of Venezuelan nationals seeking to irregularly enter the United States between POEs. *See* 87 FR at 63508. Thus, had the parole process been announced prior to a lengthy notice-and-comment period, it likely would have resulted in thousands of Venezuelan nationals attempting to cross the United States and Mexican borders before the ineligibility criteria went into effect, and before the United States was able to return Venezuelan nationals to Mexico in large numbers.

DHS also concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region."[373] DHS cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[374] DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities," "could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could result in significant loss of human life."[375]

Given the urgent circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for this rule would be contrary to the public interest because an advance announcement of the rule would incentivize even more irregular migration by those seeking to enter the United States before the IFR would take effect.

---

[373] DHS, Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[374] *Id.*

[375] *Id.; accord* U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Order 12866 ("Regulatory Planning and Review"), as amended by Executive Order 14094 ("Modernizing Regulatory Review"), and Executive Order 13563 ("Improving Regulation and Regulatory Review"), directs agencies to assess the costs, benefits, and transfers of available alternatives, and, if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, distributive impacts, and equity. Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

The Office of Information and Regulatory Affairs ("OIRA") of OMB reviewed this IFR as a significant regulatory action under Executive Order 12866, as amended by Executive Order 14094. The estimated effects of the rule are described and summarized qualitatively below. Consistent with OMB Circular A–4, the Departments assessed the impacts of this rule against a baseline. The baseline used for this analysis is the "no action" baseline, or what the world would be like absent the rule. For purposes of this analysis, the Departments assumed that the no-action baseline involved continued application of the Circumvention of Lawful Pathways rule.

The expected effect of this rule, as discussed above, is primarily to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish

IFR_Rule_000057

**JA158**

a reasonable probability of persecution or torture would still be able to seek statutory withholding or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for work authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek protection. In these cases, there may be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, the rule will require additional time for IJs during section 240 removal proceedings. However, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. The Departments welcome comments on the effects described above to inform analysis in a final rule.

### C. Regulatory Flexibility Act

The Regulatory Flexibility Act (''RFA''), as amended by the Small Business Regulatory Enforcement and Fairness Act of 1996, requires an agency to prepare and make available to the public a final regulatory flexibility analysis that describes the effect of a rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions) when the agency was required ''to publish a general notice of proposed rulemaking'' prior to issuing the final rule. *See* 5 U.S.C. 604(a). Because this IFR is being issued without a prior proposal, on the grounds set forth above, a regulatory flexibility analysis is not required under the RFA.

### D. Unfunded Mandates Reform Act of 1995

The Unfunded Mandates Reform Act of 1995 (''UMRA'') is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of the UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule, that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. The term ''Federal mandate'' means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 658(6), 1502(1). A ''Federal intergovernmental mandate,'' in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term ''Federal private sector mandate'' refers to a provision that would impose an enforceable duty upon

the private sector (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This IFR is not subject to the UMRA because the Departments did not publish a proposed rule prior to this action. In addition, this rule does not contain a Federal mandate, because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to an entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of the UMRA, therefore, do not apply, and the Departments have not prepared a statement under the UMRA.

### E. Congressional Review Act

OMB has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

### F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This IFR meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

### H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the

IFR_Rule_000058

**48768**    **Federal Register** / Vol. 89, No. 111 / Friday, June 7, 2024 / Rules and Regulations

stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

*I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)*

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

*J. National Environmental Policy Act*

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 (''NEPA''), 42 U.S.C. 4321 *et seq.,* applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 [376] and Instruction Manual 023–01–001–01, Revision 01 (''Instruction Manual 023–01'') [377] establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality (''CEQ'')

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[378]

The IFR effectuates the following three changes to the process for those seeking asylum, withholding of removal, or protection under the CAT during emergency border circumstances:

• For those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will provide general notice regarding the processes for seeking asylum, withholding of removal, and protection under the CAT, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

• During emergency border circumstances, persons who enter the United States across the southern border and who are not described in paragraph 3(b) of the Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and

extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.11.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the Proclamation and do not establish exceptionally compelling circumstances will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

Given the nature of the IFR, it is categorically excluded from DHS's NEPA implementing procedures, as it satisfies all three relevant conditions. First, the Departments have determined that the IFR fits clearly within categorical exclusions A3(a) and (d) of DHS's Instruction Manual 023–01, Appendix A, for the promulgation of rules of a ''strictly administrative or procedural nature'' and rules that ''interpret or amend an existing regulation without changing its environmental effect,'' respectively. The IFR changes certain administrative procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. Second, this IFR is a standalone rule and is not part of any larger action. Third, the Departments are not aware of any extraordinary circumstances that would cause a significant environmental impact. Therefore, this IFR is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this IFR is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01, Appendix A, because the IFR's asylum limitation and the reasonable probability standard will be applied by EOIR in substantially the same manner as it will be applied by DHS. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

*K. Paperwork Reduction Act*

This IFR does not adopt new, or revisions to existing, ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163,

---

[376] DHS, *Implementation of the National Environmental Policy Act, Directive 023–01, Revision 01* (Oct. 31, 2014), *https://www.dhs.gov/ sites/default/files/publications/DHS_ Directive%20023-01%20Rev%2001_ 508compliantversion.pdf.*

[377] DHS, *Implementation of the National Environmental Policy Act (NEPA), Instruction Manual 023–01–001–01, Revision 01* (Nov. 6, 2014), *https://www.dhs.gov/sites/default/files/ publications/DHS_Instruction%20Manual%20023- 01-001-01%20Rev%2001_ 508%20Admin%20Rev.pdf.*

[378] Instruction Manual 023–01 at V.B(2)(a) through (c).

IFR_Rule_000059

44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

## List of Subjects

### 8 CFR Part 208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 235

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

### 8 CFR Part 1208

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

## DEPARTMENT OF HOMELAND SECURITY

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR parts 208 and 235 as follows:

## PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. In § 208.13, add paragraph (g) to read as follows:

### § 208.13   Establishing asylum eligibility.

\*     \*     \*     \*     \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

■ 3. Add subpart D, consisting of § 208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this part, including §§ 208.2, 208.13, 208.30, and 208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in § 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this chapter.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 208.33(a)(3).

(b) *Application in credible fear determinations.* (1) *Initial determination.* The asylum officer shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the asylum officer determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, then the asylum officer shall enter a negative credible fear determination with respect to the alien's asylum claim and continue to consider the alien's claim under paragraph (b)(2) of this section.

(ii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 208.13(g), the asylum officer shall follow the procedures in § 208.33(b).

(iii) Where the asylum officer determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the asylum officer shall follow the procedures in § 208.30.

(2) *Protection eligibility screening.* (i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(ii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien establishes a reasonable probability of persecution or torture with respect to the designated country or countries of removal, the Department will issue a positive credible fear determination and follow the procedures in § 208.30(f). For any case in which USCIS retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii) for further consideration in an interview pursuant to § 208.9, USCIS may require aliens who received a negative credible fear determination with respect to their asylum claim under paragraph (b)(1)(i) of this section to submit a Form I–589, Application for Asylum and for Withholding of Removal, together with any additional supporting evidence in accordance with the instructions on the form, to USCIS within 30 days from the date of service of the positive credible fear determination. The date of service of the positive credible fear determination remains the date of filing and receipt of the asylum application under § 208.3(a)(2); however, for any case in which USCIS requires the alien to submit a Form I–589, it may extend the

IFR_Rule_000060

timelines in § 208.9(a)(1) and (e)(2) by up to 15 days. If USCIS requires the alien to submit a Form I–589 and the alien fails to do so within the applicable timeline, USCIS shall issue a Form I–862, Notice to Appear.

(iii) In cases described in paragraph (b)(2)(i) or (b)(3) of this section, if the alien fails to establish a reasonable probability of persecution or torture with respect to all designated countries of removal, the asylum officer will provide the alien with a written notice of decision and inquire whether the alien wishes to have an immigration judge review the negative credible fear determinations.

(iv) The alien must indicate whether he or she desires such review on a Record of Negative Fear Finding and Request for Review by Immigration Judge.

(v) Only if the alien requests such review by so indicating on the Record of Negative Fear shall the asylum officer serve the alien with a Notice of Referral to Immigration Judge. The record of determination, including copies of the Notice of Referral to Immigration Judge, the asylum officer's notes, the summary of the material facts, and other materials upon which the determination was based shall be provided to the immigration judge with the negative determination. Immigration judges will evaluate the case as provided in 8 CFR 1208.35(b). The case shall then proceed as set forth in paragraphs (b)(2)(v)(A) and (B) of this section.

(A) Where the immigration judge issues a positive credible fear determination under 8 CFR 1208.35(b)(2)(iii) or (b)(4), the case shall proceed under 8 CFR 1208.30(g)(2)(iv)(B).

(B) Where the immigration judge issues a negative credible fear determination, the case shall be returned to the Department for removal of the alien. No appeal shall lie from the immigration judge's decision and no request for reconsideration may be submitted to USCIS. Nevertheless, USCIS may, in its sole discretion, reconsider a negative determination.

(3) *Procedures in the absence of the limitation on asylum eligibility.* If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 208.13(g), the asylum officer shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 208.33(b)(2).

(c) *Family unity in the asylum merits process.* In cases where the Department

retains jurisdiction over the application for asylum pursuant to § 208.2(a)(1)(ii), where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 208.16(c)(2) and would be granted asylum but for the limitation on asylum in paragraph (a)(1) of this section or § 208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the Act, the asylum officer may deem the principal applicant to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any provision of this section, § 235.15, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 235.15 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 4. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806 and notes, 1807, and 1808 (Title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

■ 5. Add § 235.15 to read as follows:

**§ 235.15  Inadmissible aliens and expedited removal during emergency border circumstances.**

(a) *Applicability.* Notwithstanding §§ 235.3(b)(2)(i) and 235.3(b)(4)(i) (but not § 235.3(b)(4)(ii)), the provisions of this section apply to any alien described in § 235.3(b)(1)(i) through (ii) if the alien is described in § 208.13(g) and is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border.

(b) *Expedited removal.* (1) [Reserved]

(2) *Determination of inadmissibility*— (i) *Record of proceeding.* (A) A noncitizen who is arriving in the United States, or other alien as designated pursuant to § 235.3(b)(1)(ii), who is determined to be inadmissible under section 212(a)(6)(C) or 212(a)(7) of the Act (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter) shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien.

(B) The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges. After obtaining supervisory concurrence in accordance with § 235.3(b)(7), the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

(ii) [Reserved]
(iii) [Reserved]
(3) [Reserved]
(4) *Claim of asylum or fear of persecution or torture.* (i) If an alien subject to the expedited removal

IFR_Rule_000061

provisions manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with part 208 of this chapter.

(A) The inspecting immigration officer shall document whether the alien has manifested or affirmatively expressed such intention, fear, or concern.

(B) The referring officer shall provide the alien with a written disclosure describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an immigration judge of the asylum officer's credible fear determination; and the consequences of failure to establish a credible fear of persecution or torture.

(ii) [Reserved]

(c)–(f) [Reserved]

(g) *Severability.* The Department intends that in the event that any provision of paragraphs (a), (b)(2)(i), and (b)(4) of this section, § 208.35, or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section and § 208.35 should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

## DEPARTMENT OF JUSTICE

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR part 1208 as follows:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 7. In § 1208.13, add paragraph (g) to read as follows:

### § 1208.13   Establishing asylum eligibility.

\*    \*    \*    \*    \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier) refer to the provisions on asylum eligibility described in § 1208.35.

■ 8. Add subpart D, consisting of § 1208.35, to read as follows:

## Subpart D—Eligibility for Aliens Who Enter the United States During Emergency Border Circumstances

### § 1208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

Notwithstanding any contrary section of this chapter, including §§ 1003.42, 1208.2, 1208.13, 1208.30, and 1208.33—

(a) *Limitation on eligibility.* (1) *Applicability.* An alien who is described in § 1208.13(g) and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024, Securing the Border, is ineligible for asylum.

(2) *Exceptions.* (i) This limitation on eligibility does not apply if the alien demonstrates by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the alien, or the alien's family member as described in 8 CFR 208.30(c) with whom the alien is traveling, demonstrates by a preponderance of the evidence that, at the time of entry, the alien or a member of the alien's family as described in § 208.30(c) with whom the alien is traveling:

(A) Faced an acute medical emergency;

(B) Faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or

(C) Satisfied the definition of "victim of a severe form of trafficking in persons" provided in § 214.11 of this title.

(ii) An alien who demonstrates by a preponderance of the evidence any of the circumstances in paragraph (a)(2)(i) of this section shall necessarily establish exceptionally compelling circumstances.

(iii) An alien described in section 3(b) of the Presidential Proclamation of June

3, 2024, Securing the Border, or who establishes exceptionally compelling circumstances under paragraph (a)(2)(i) of this section has established exceptionally compelling circumstances under § 1208.33(a)(3).

(b) *Application in credible fear determinations.* (1) Where an asylum officer has issued a negative credible fear determination pursuant to 8 CFR 208.35(b), and the alien has requested immigration judge review of that credible fear determination, the immigration judge shall evaluate the case de novo, as specified in paragraph (b)(2) of this section. In doing so, the immigration judge shall take into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the immigration judge.

(2) The immigration judge shall first determine whether the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section.

(i) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is not described in § 1208.13(g), the immigration judge shall follow the procedures in § 1208.33(b).

(ii) Where the immigration judge determines that the alien is not subject to the limitation on asylum eligibility under paragraph (a) of this section because the alien is described in section 3(b) of the Proclamation or is excepted from the limitation on asylum eligibility under paragraph (a)(2) of this section, the immigration judge shall follow the procedures in § 1208.30.

(iii) Where the immigration judge determines that the alien is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the alien under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.

(3) Following the immigration judge's determination, the case will proceed as indicated in 8 CFR 208.35(b)(2)(v)(A) and (B).

(4) If the limitation on asylum eligibility in paragraph (a) of this section is held to be invalid or

IFR_Rule_000062

unenforceable by its terms, or as applied to any person or circumstance, then during the period(s) described in § 1208.13(g), the immigration judge shall, as applicable, apply a reasonable probability screening standard for any protection screening under § 1208.33(b)(2)(ii).

(c) *Family unity and removal proceedings.* In removal proceedings under section 240 of the Act, where a principal asylum applicant is found eligible for withholding of removal under section 241(b)(3) of the Act or withholding of removal under § 1208.16(c)(2) and would be granted asylum but for the limitation on asylum eligibility in paragraph (a)(1) of this section or § 1208.33(a), or both, and where an accompanying spouse or child as defined in section 208(b)(3)(A) of the Act does not independently qualify for asylum or other protection from removal or the principal asylum applicant has a spouse or child who would be eligible to follow to join that applicant as described in section 208(b)(3)(A) of the

Act, the alien shall be deemed to have established exceptionally compelling circumstances under paragraph (a)(2)(i) of this section and § 1208.33(a)(3)(i).

(d) *Continuing applicability of limitation on eligibility.* (1) Subject to paragraph (d)(2) of this section, the limitation on asylum eligibility in paragraph (a) of this section shall apply to any asylum application filed by an alien who entered the United States during the time and in the manner described in § 1208.13(g) and who is not covered by an exception in paragraph (d)(2) of this section, regardless of when the application is filed and adjudicated.

(2) The limitation on asylum eligibility in paragraph (a) of this section shall not apply to an alien who was under the age of 18 at the time of the alien's entry, if—

(i) The alien is applying for asylum as a principal applicant; and

(ii) The asylum application is filed after the period of time in 1208.13(g) during which the alien entered.

(e) *Severability.* The Department intends that in the event that any

provision of this section or the Presidential Proclamation of June 3, 2024, Securing the Border, is held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, the provisions of this section should be construed so as to continue to give the maximum effect to those provisions permitted by law, unless such holding is that a provision is wholly invalid and unenforceable, in which event the provision should be severed from the remainder of this section and the holding should not affect the remainder of this section or the application of the provision to persons not similarly situated or to dissimilar circumstances.

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*
[FR Doc. 2024–12435 Filed 6–4–24; 4:15 pm]
**BILLING CODE 4410–30–P; 9111–97–P**

IFR_Rule_000063



U.S. Customs and Border Protection

# CBP One™ Appointments Increased to 1,450 Per Day

**Release Date:** Fri, 06/30/2023

*App offers a safe, orderly, and humane lawful process for noncitizens*

**WASHINGTON –** U.S. Customs and Border Protection today announced the expansion of available appointments for noncitizens through the CBP One™ app to 1,450 per day, up from 1,250. This represents a nearly 50 percent increase from May 12 when CBP processed 1,000 appointments per day. Scheduling an appointment in CBP One™ continues to provide a safe, orderly, and humane process for noncitizens to access ports of entry, where CBP Officers receive advance information for screening and vetting and to determine admissibility on a case-by-case basis. CBP One™ is a key component of DHS efforts to incentivize migrants to use lawful processes and disincentivize attempts at irregular or unlawful entry to the United States. Because the app provides a direct system to request appointments, it reduces the potential for smugglers or others to exploit migrants.

"CBP is expanding the number of available appointments at ports of entry for the second time in less than two months, through scheduling enhancements and operational efficiencies," said Troy A. Miller, Senior Official Performing the Duties of Commissioner. "By utilizing innovative technologies like CBP One™, we are improving the delivery of our homeland security mission and providing for safe and efficient processes at ports of entry."

From May 12 through June 23, more than 49,000 noncitizens have presented at Southwest border ports of entry through scheduled CBP One™ appointments for inspection under Title 8 and determination of admissibility on a case-by-case basis, while unlawful entries between ports of entry have declined by 64 percent. CBP One™ provides meaningful access to noncitizens seeking to present at a port of entry, consistent with the law. Appointments can be made from Central Mexico, which means migrants do not have to go to Northern Mexico until they have a confirmed appointment. appointment.

Noncitizens may schedule appointments for free in CBP One™ using a two-step process: Noncitizens first may request appointments at any point during a 23-hour period each day and, if allocated an appointment, will have another 23-hour period to confirm that appointment.

Case 1:24-cv-01702-RC    Document 53    Filed 09/27/24    Page 636 of 1372

JA166

IFR_AR_002089

Each day, CBP One™ allocates the majority of appointments randomly to those who requested an appointment at each port of entry. The remainder are allocated to the requestors with the oldest accounts who have been waiting the longest for an appointment. Appointments do not guarantee admission and a determination of admissibility is made on a case-by-case basis by CBP Officers.

Noncitizens who cross between the ports of entry, or who present at a port of entry without making a CBP One™ appointment, will be subject to the Circumvention of Lawful Pathways rule which places a common-sense condition on asylum eligibility for those who fail to use lawful processes, with certain exceptions. Individuals who appear at a port of entry with a CBP One™ appointment are excepted from the Circumvention of Lawful Pathways rule, are issued a Notice to Appear before an immigration judge, and processed under Title 8 immigration authorities.

Appointments are available at eight ports of entry: Brownsville, Paso Del Norte in El Paso, Eagle Pass, Hidalgo, and Laredo in Texas; Calexico and San Ysidro in California; and Nogales in Arizona.

More information on the CBP One™ mobile application is available in English, Spanish, Haitian Creole, Portuguese, and Russian. The CBP One™ application can be downloaded for free from the Apple and Google Application Stores as well from the CBP website.

*U.S. Customs and Border Protection is the unified border agency within the Department of Homeland Security charged with the comprehensive management, control, and protection of our nation's borders, combining customs, immigration, border security, and agricultural protection at and between official ports of entry.*

**Last Modified: Jul 14, 2023**

IFR_AR_002090





*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

October 29, 2021

MEMORANDUM TO:       Tae D. Johnson
                     Acting Director
                     U.S. Immigration and Customs Enforcement

                     Troy A. Miller
                     Acting Commissioner
                     U.S. Customs and Border Protection

                     Ur M. Jaddou
                     Director
                     U.S. Citizenship and Immigration Services

                     Robert Silvers
                     Under Secretary
                     Office of Strategy, Policy, and Plans

FROM:                Alejandro N. Mayorkas
                     Secretary

SUBJECT:             **Termination of the Migrant Protection Protocols**

---

On January 25, 2019, then-Secretary of Homeland Security Kirstjen Nielsen issued a memorandum entitled "Policy Guidance for Implementation of the Migrant Protection Protocols." On February 2, 2021, President Biden issued Executive Order (EO) 14010, *Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border*.  In this Executive Order, President Biden directed the Secretary of Homeland Security "to promptly review and determine whether to terminate or modify the program known as the Migrant Protection Protocols."  After completing a comprehensive review as directed by EO 14010, I concluded that the Migrant Protection Protocols (MPP) should be terminated and, on June 1, 2021, issued a memorandum to that effect (the "June 1 memo").

1
IFR_AR_007309
AR00939

On August 13, 2021, the U.S. District Court for the Northern District of Texas determined that the June 1 memo was not issued in compliance with the Administrative Procedure Act (APA) because it failed to address all the relevant considerations. *See Texas v. Biden*, No. 2:21-cv-067, 2021 WL 3603341 (N.D. Tex. Aug. 13, 2021). As a result, the District Court vacated the June 1 memo in its entirety and remanded the matter to the Department for further consideration. *Id.* at *27. The District Court additionally ordered DHS to "enforce and implement MPP *in good faith*" until certain conditions are satisfied, including that MPP be "lawfully rescinded in compliance with the APA." *Id.* (emphasis in original). The Department is fully complying with the District Court's order. At the same time, the Department has filed a notice of appeal and continues to vigorously contest several of the District Court's conclusions.

Pursuant to the District Court's remand and in continuing compliance with the President's direction in EO 14010, I have once more assessed whether MPP should be maintained, terminated, or modified in a variety of different ways. In conducting my review, I have studied multiple court decisions, filings, and declarations related to MPP; considered relevant data regarding enrollments in MPP, encounters at the border, and outcomes in removal proceedings; reviewed previous Departmental assessments of MPP, as well as news reports and publicly available sources of information pertaining to conditions in Mexico; met with a broad and diverse array of internal and external stakeholders, including officials from across the federal government working on border management, state and local elected officials from across the border region, border sheriffs and other local law enforcement officials, and representatives from nonprofit organizations providing legal access and humanitarian aid across the southwest border; and considered the impact of other Administration initiatives related to immigration and the southern border. I also examined considerations that the District Court determined were insufficiently addressed in the June 1 memo, including claims that MPP discouraged unlawful border crossings, decreased the filing of non-meritorious asylum claims, and facilitated more timely relief for asylum seekers, as well as predictions that termination of MPP would lead to a border surge, cause the Department to fail to comply with alleged detention obligations under the Immigration and Nationality Act, impose undue costs on states, and put a strain on U.S.-Mexico relations.

After carefully considering the arguments, evidence, and perspectives presented by those who support re-implementation of MPP, those who support terminating the program, and those who have argued for continuing MPP in a modified form, I have determined that MPP should be terminated. In reaching this conclusion, I recognize that MPP likely contributed to reduced migratory flows. But it did so by imposing substantial and unjustifiable human costs on the individuals who were exposed to harm while waiting in Mexico. The Biden-Harris Administration, by contrast, is pursuing a series of policies that disincentivize irregular migration while incentivizing safe, orderly, and humane pathways. These policies—including the ongoing efforts to reform our asylum system and address the root causes of migration in the region—seek to tackle longstanding problems that have plagued our immigration system for decades and achieve systemic change. Once fully implemented, I believe these policies will address migratory flows as effectively, in fact more effectively, while holding true to our nation's values.

To reiterate what the President has stated previously, the United States is a nation with borders and laws that must be enforced. It is also a nation of immigrants. This Administration is, as a result, committed to the twin goals of securing our borders and offering protection to those fleeing persecution and torture. MPP is neither the best, nor the preferred, strategy for achieving

either of these goals.  Significant evidence indicates that individuals awaiting their court hearings in Mexico under MPP were subject to extreme violence and insecurity at the hands of transnational criminal organizations that profited by exploiting migrants' vulnerabilities.  It is possible that such humanitarian challenges could be lessened through the expenditure of significant government resources currently allocated to other purposes.  Ultimately, however, the United States has limited ability to ensure the safety and security of those returned to Mexico.  Other significant issues with MPP, including the difficulties in accessing counsel and traveling to courts separated by an international border, are endemic to the program's design.

In reaching my determination, I have carefully considered what I deem to be the strongest argument in favor of retaining MPP: namely, the significant decrease in border encounters following the determination to implement MPP across the southern border.  Of course, correlation does not equal causation and, even here, the evidence is not conclusive.  I have nonetheless presumed, for the sake of this review, that MPP resulted in a significant decrease in irregular border crossings and persons approaching the U.S. border to pursue non-meritorious asylum claims.  I still conclude that the benefits do not justify the costs, particularly given the way in which MPP detracts from other regional and domestic goals, foreign-policy objectives, and domestic policy initiatives that better align with this Administration's values.

Importantly, the effective management of migratory flows requires that we work with our regional partners to address the root causes that drive migrants to leave their countries and to tackle this challenge before it arrives at our border.  This is a shared responsibility of all countries across the region.  MPP distracts from these regional efforts, focusing resources and attention on this singular program rather than on the work that is needed to implement broader and more enduring solutions.

Efforts to implement MPP have played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration.  This was true under the previous implementation of MPP, and it is even more true today given the shared belief that the program should not be implemented without, at the very least, significant improvements.  Notably, Mexico has made clear that it will not agree to accept those the United States seeks to return to Mexico under MPP unless substantial improvements are made to the program.  But these much-needed efforts to enhance humanitarian protections for those placed in MPP are resource-intensive, exacerbating one of the flaws of the program: the concentration of resources, personnel, and aid efforts on the northern border of Mexico rather than on broader regional assistance efforts that would more effectively and systematically address the problem of irregular migration and better protect our border.

Moreover, the personnel required to adequately screen MPP enrollees to ensure they are not returned to persecution or torture in Mexico, process them for court hearings, and manage their cases pulls resources from other priority efforts, including the ongoing efforts to implement effective, fair, and durable asylum reforms that reduce adjudication delays and tackle the immigration court backlog.  Both the Dedicated Docket, designed so that immigration judges can adjudicate cases within 300 days, and the proposed Asylum Officer Rule, which would transfer the initial responsibility for adjudicating asylum claims from immigration judges to USCIS asylum officers to produce timely and fair decision-making, are expected to yield transformative

and lasting changes to the asylum system. MPP, which can require unproductive, redundant screenings per case given the many different times individuals are returned to Mexico during the pendency of a single removal proceeding, diverts asylum officers and immigration judges away from these priority efforts. MPP not only undercuts the Administration's ability to implement critically needed and foundational changes to the immigration system, but it also fails to provide the fair process and humanitarian protections that all persons deserve.

Having assessed the benefits and costs of the previous implementation of MPP, including how the program could potentially be improved, I have concluded that there are inherent problems with the program that no amount of resources can sufficiently fix. Others cannot be addressed without detracting from key Administration priorities and more enduring solutions.

It is, as a result, my judgment that the benefits of MPP are far outweighed by the costs of continuing to use the program on a programmatic basis, in whatever form. For the reasons detailed more fully in the attached memorandum, the contents of which are adopted and incorporated into the decision contained here, I am hereby terminating MPP. Effective immediately, I hereby supersede and rescind the June 1 memorandum, Secretary Nielsen's January 25, 2019 memorandum, and any other guidance or other documents prepared by the Department to implement MPP. The Department will continue complying with the *Texas* injunction requiring good-faith implementation and enforcement of MPP. But the termination of MPP will be implemented as soon as practicable after a final judicial decision to vacate the *Texas* injunction.

May 8, 2023

MEMORANDUM FOR THE FILE

FROM:                    Diane Sabatino    ███████████
                         Deputy Executive Assistant Commissioner
                         Office of Field Operations
                         U.S. Customs and Border Protection

SUBJECT:                 CBP One Scheduling Functionality Changes

This memorandum explains forthcoming changes to the process for noncitizens to schedule their
presentation at certain land ports of entry (POEs).  The new process discussed below will be
implemented into the CBP One application scheduling functionality following the lifting of the
Centers for Disease Control and Prevention's (CDC) Title 42 public health Order at the end of
the day on May 11, 2023.

## I.    CBP One Scheduling Background

Since the CBP One app was expanded to permit undocumented noncitizens to schedule an
appointment directly in CBP One, significantly more noncitizens have been seeking to schedule
an appointment via CBP One than available appointment slots.  Additionally, despite multiple
changes to the CBP One Individual Advance Information Submission workflow, there continue
to be challenges for users associated with the scheduling process.  Specifically, end users, non-
governmental organizations (NGOs) and other external stakeholders continue to provide
feedback on bandwidth and connectivity issues, including the perception that a user's
connectivity impacts their ability to receive an appointment.  These stakeholders also report that
the daily rush to schedule an appointment causes anxiety and frustration as noncitizens have
limited opportunity to complete the process because all available appointments are filled within
minutes.  In response to this feedback, U.S. Customs and Border Protection (CBP) is adjusting
the scheduling mechanism to a daily appointment allocation process to provide noncitizens
additional time to complete their submission and further ensure equitable access for noncitizens.

## II.    CBP One Daily Appointment Allocation Process

Under the updated process, CBP will allocate appointments to noncitizens who have requested
an appointment on a daily basis.  Noncitizens who are allocated an appointment will be required
to confirm acceptance of the appointment by completing the photo capture and liveness detection
process.

***Process Outline***

*Registration and Advance Information Submission*

    a)  All steps to create a registration in CBP One will remain the same as current procedures,
        except there will be a required field for individuals and families to request a preferred

IFR_AR_007341

**JA173**

2

POE as part of the advance information submission. In keeping with the current process, one member of a family or group of co-travelers may register on behalf of the entire family or group. Similarly, as under the current process, a user may create multiple registrations.

b) Registrations must be complete to request an appointment.

*Request Appointment:*

a) To be considered for the daily appointment allocation, noncitizens with a completed registration must request an appointment. This will be done on a daily basis, and can be done anytime during a 23-hour window. To request an appointment, the noncitizen will log into their CBP One account, select the appropriate registration record, and click on "ask for an appointment." This step will request an appointment on behalf of all members of the submitted family or group of co-travelers associated with the registration. For example, if there is a registration tied to a family of four, the "ask for an appointment" step will request appointments for all four family members.

b) New appointments will continue to be released 13 days in advance, and users will be asking for an appointment for any day up to the next 13 days. This means they are eligible to fill any open slots where individuals who were allocated appointments did not confirm them within the allotted time.

c) To request an appointment, noncitizens must successfully geolocate in Central or Northern Mexico. Geolocation is captured at the time an individual logs in to "ask for an appointment."

d) Noncitizens can change their requested POE, if desired, when they "ask for an appointment"; otherwise, it will default to the POE they requested as part of the advance information submission.

e) CBP One will prevent noncitizens from selecting multiple registrations and therefore attempting to request multiple appointments, increasing their chances of being allocated an appointment or potentially securing multiple appointments.

f) In the event a noncitizen does not receive an allocated appointment during the process outlined, they must "ask for an appointment" again during a subsequent 23-hour window to be considered for that day's allocation.

   i. This process of requesting an appointment daily is being implemented in an effort to ensure that only noncitizens who are in a geofenced area and actively seeking an appointment are considered. In addition, NGOs have advised that a one-time request, which remains open indefinitely, would pose a larger risk for fraud and abuse.

*Schedule an Appointment:*

a) Each day, appointments will be allocated from the registrations of noncitizens who have "asked for an appointment" the previous day.

b) Allocations will be conducted in two groups:

   i. First, a percentage of the appointments will be offered, in order, to noncitizens who have been in the process the longest (calculated by registration create date.)

IFR_AR_007342

**JA174**

3

    ii.  Second, a percentage of the appointments will be offered randomly to all noncitizens who have selected "ask for an appointment" in the prior 23-hour registration period.

c)  A family or group of co-travelers will only be allocated an appointment if there is sufficient capacity to accommodate the entire family or group.  For example, if there is a group of six, they will only be offered appointments on a date and time with six available slots.

d)  Those who are offered an appointment will receive:
    i.  An email notification directing the noncitizen to log into CBP One and respond to the appointment offer;
    ii.  A push notification to their phone directing the noncitizen to log into CBP One and respond to the appointment offer; and
    iii.  An in-app CBP One notification alerting the noncitizen they received an appointment offer.

e)  Noncitizens will have 23 hours from the time of notification of an available appointment to accept the appointment offer by completing another geolocation check, photo capture, and liveness detection process.
    i.  This 23-hour period runs at the same time as the "request an appointment" period each day.  In other words, on any given day, there will be noncitizens "asking for an appointment" for a period of 23 hours.  There will also be noncitizens confirming appointments that were allocated to them over the same 23 hours.  There is a 1-hour window where new appointments are randomly allocated and any non-confirmed appointments from the previous day are reallocated among the current registrations who "asked for an appointment."  At the end of the 1 hour, the whole 23-hour cycle starts again.

*Additional Requirements:*

Noncitizens who experience technical issues and cannot complete the photo process to accept an appointment offer can request an extension beyond the 23-hour window directly through the app. CBP continues to explore additional options for noncitizens who continue to have difficulties with the facial photograph matching to be able to verify their information and accept an appointment.

**III.    Impact to Noncitizens and POE Operations**

The allocation process reduces the burden on the noncitizen to complete the process to schedule an appointment within minutes. Those with low connectivity, older technology, or vulnerabilities will have a more equal opportunity to schedule an appointment compared to those with stable and strong connections. The 23-hour window to confirm an appointment allows additional time to seek assistance and successfully complete the process.

The split allocation groups provide a process to attempt to ensure that all who "ask for an appointment" will be offered an appointment over time. This will improve noncitizens' opportunities to schedule an appointment compared to the current system.

IFR_AR_007343

**JA175**

4

Additionally, the allocation process provides cybersecurity benefits by reducing bad actors' ability to schedule and sell appointments. Under the current first-come, first-serve system, CBP is aware of attempts to "spoof" the app or use bots and other programs to schedule available appointments immediately upon their release and then subsequently sell those available appointments, reducing the ability for noncitizens to successfully schedule. In contrast, the allocation process removes the ability to utilize bots to obtain appointments as CBP will allocate and issue the appointments only to those who are in the registration pool.

OFO will prepare public messaging, which will make clear that selection is random and that CBP does not individually select noncitizens for appointments, other than by weighting some slots for those who have been waiting the longest.

This process change would not impact the daily POE operations or the way an individual demonstrates they have an appointment to the CBP officer.

## IV.    Conclusion

Following considerations of the potential impacts of adjusting the CBP One scheduling process, the agency has concluded that introducing a random allocation system in combination with a system that accounts for the length of time an individual has been attempting to obtain an appointment will be an improvement over the current CBP One scheduling process.

IFR_AR_007344

May 8, 2023

MEMORANDUM FOR THE FILE

FROM:                          Tricia Kennedy
                               Program Manager    TRICIA B KENNEDY    Digitally signed by TRICIA B KENNEDY
                                                                     Date: 2023.05.08 12:05:13 -04'00'
                               Office of Field Operations (OFO)
                               U.S. Customs and Border Protection (CBP)

SUBJECT:                       CBP One^TM Application

I am the CBP One^TM (CBP One) application Product Owner for OFO.  I have been in this role
since development started for this application in 2019.  I am responsible for providing and
prioritizing requirements for the Emerging Technology Team within the Office of Information
Technology (OIT).  I am also the lead for testing and deploying most of the capabilities within
the application, including the deployment of the ability of noncitizens to use the app to schedule
an appointment to present themselves at a land POE.  This memo provides certain data and
information about the CBP One application and that capability.  This information was confirmed
and relied upon in rulemaking.

## I.    CBP One Application Background

In October 2020, CBP launched the free CBP One mobile and desktop application to modernize
and streamline access to CBP services.  CBP One is intended to provide one common portal for
travelers and stakeholders to interact with CBP across a wide range of mission sets, with an
intuitive interface.  The application includes defined user roles for different functionality for
travelers, importers, brokers, carriers, International Organizations, and additional stakeholders to
improve access to and experience with CBP services.  From a traveler and trade perspective,
CBP One facilitates the advance submission and payment for Form I-94s, advance information
for biological or other permitted agriculture products for travelers, as well as the ability to
quickly create and submit manifests for bus passengers or schedule perishable inspections.  Key
capabilities for stakeholders and travelers include scheduling exams with live status updates and
chat capability, instant access to proof of admission status and remaining days for their
authorized length of stay and advance submission of import documents to streamline their
inspection upon arrival.

Since the app's launch, CBP has instituted several functionalities specific to noncitizens who
lack documents sufficient for admission (referred to throughout this memo as "migrants" or
"undocumented noncitizens").  Specifically, in February 2021, CBP One offered International
Organizations (IOs) the capability to check case status for individuals during the winddown of
the Migrant Protection Protocols (MPP).  In April 2021, CBP developed a capability to permit
IOs to assist individuals in submitting advance information and scheduling a time to present at a

IFR_AR_007414

**JA177**



### III.    CBP One App Feedback on, and Evolution of Workflow and Technical Issues

CBP primarily receives reports of errors or other concerns through three mechanisms.  First, the CBP One email inbox, is the primary mechanism by which users send an inquiry or concern about any capability within the CBP One application.  Since CBP One has many capabilities and functionalities, and is available to a diverse audience, the inbox initially responds to the author by asking them to select the appropriate topic pertaining to their specific issue.  Emails related to the scheduling capability s are addressed by one of three teams: CBP Customer Service, Office of Information Technology, or the CBP One team within OFO.  My team is responsible for the overall management of this inbox.   CBP also receives reports of errors or issues through recurrent briefings and sessions with NGOs.  Third, CBP personnel both at local POEs and within CBP Headquarters receive direct email communications from the NGOs.

CBP has made several changes to the app in response to user feedback.  In particular, there have been several technical changes since February 2023.  When the advance scheduling functionality was implemented on January 12, 2023, it was originally implemented as a single workflow.  Therefore, in contrast to the process described above, from January 12, 2023 through February 23, 2023, the "Submit Advance Information" capability to register and schedule an appointment was completed in the same workflow.  In other words, all steps were completed at the same time: as part of the registration process, the user had to take a live photo and the app captured the phone's geolocation.  At that time, the user was immediately presented the option to schedule an appointment. If there were no available appointments during the initial registration, the user was required to return to CBP One at a later time to separately access the previously-submitted registration to schedule an appointment.  The user had to provide a new live photo, and the app re-verified the geolocation before the user could access the calendar again to seek an appointment.

During this initial period, users were experiencing a high number of error codes, or the app was "timing out," or "crashing," primarily around the process of submitting a photograph to verify liveness.  Through NGO assistance and user feedback, CBP was made aware that the registration process was having particular "timing out" issues for families with babies or young children.  While CBP had conducted internal load testing of the app prior to its launch, as well as testing in partnership with an NGO partner, such internal testing did not include testing the bandwidth of other technological platforms that supported the app.  Following the reports of error messages, CBP was able to identify that they were primarily caused by bandwidth/connectivity issues in our support services.  CBP utilizes a third-party software to verify liveness from a company called iProov through a Silicon Valley Innovation Program Pilot with the Department of Homeland Security.  Based on the significant demand and predefined service requirements with the vendor, iProov was forced to reduce the rate at which they were processing liveness verification, which created an excess number of errors for users as maximum bandwidth was exceeded.

6

For these reasons, CBP made the decision to reduce the requirement to validate liveness for each user during registration and scheduling and increase bandwidth for users. On February 18, 2023, CBP modified the process in an attempt to collect liveness and geolocation at the same time However, this change was not successful at reducing the errors users were experiencing. Therefore, CBP implemented a new workflow change on February 23, 2023, to separate the workflow into two distinct steps: registration and scheduling. This process is described above. This new workflow allowed for the removal of the liveness verification process from the registration completely, as the users could no longer schedule during that workflow. Liveness was now restricted to the scheduling workflow only, and only if the application found available appointments for the Port of Entry requested. This change has resulted in a smaller technical burden for the liveness software, and CBP has received feedback from NGOs that there are fewer reported errors as a result of the liveness detection, however users still experience errors in low bandwidth and connectivity scenarios and navigating the daily scheduling process. Users continue to utilize unauthorized old versions of the app to circumvent the changes. CBP has received feedback from NGOs and noncitizens that individuals attempt to access older version of the app that allows them to schedule via previous workflows with different photo requirements. They have reported using older versions has a perceived advantage to scheduling an appointment compared to those on newer versions.

During this same time frame, CBP also consolidated appointment slots to provide the same number of appointments per day, but with more available at a particular time, to make it easier for families to schedule an appointment. For example, Brownsville started with 5 different time slots. On February 16, 2023, based on a request from the OFO Operations Directorate, I combined those time slots into two larger time slots while maintaining the same number of appointments. CBP also continues to advise that all members of a family seeking to travel together make an appointment in a single submission, as families or groups who do not register together on one CBP One account may not be accommodated at the same POE or on the same date.

In addition, CBP has made and is continuing to make several changes or enhancements to the application to address technical concerns or enhance the user experience. Below is a list of some of those issues as well as their associated resolution and implementation date.

| Issue | Comments | Resolution | Date Resolved |
|---|---|---|---|
| Log-on issues when Sharing Devices | When sharing devices, users were not logging out of their account, resulting in new users canceling or rescheduling the previous users existing appointments. | Enhancement implemented to mitigate this issue including requiring the user to sign out of their account when they close the application. | 1/24/2023 |

IFR_AR_007419

**JA180**





# UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

## Report on Asylum Seekers in Expedited Removal

### VOLUME II: EXPERT REPORTS

*As authorized by Section 605 of the International Religious Freedom Act of 1998*

IFR_AR_008170

205-851 CRF cover.indd   2

2/1/05   1:18:01 PM



# STUDY ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
*As Authorized by Section 605 of the International Religious Freedom Act of 1998*

# EVALUATION OF CREDIBLE FEAR REFERRAL IN EXPEDITED REMOVAL AT PORTS OF ENTRY IN THE UNITED STATES

## FEBRUARY 2005

Allen Keller, M.D.[1,2], Andrew Rasmussen, Ph.D.[1,2], Kim Reeves[1,2], & Barry Rosenfeld, Ph.D.[2,3]

1    Bellevue/NYU Program for Survivors of Torture, New York, NY
2    New York University School of Medicine, New York, NY
3    Fordham University Department of Psychology, Bronx, NY

IFR_AR_008177

TABLE OF CONTENTS

Overview.................................................................................3

Background.............................................................................4

I.    Study Methodology ...........................................................5
      Participants.................................................................8
            Basis for Secondary Inspection and Case Outcome ...........................9
            Use of Interpreters and Bilingual Officers........................................10
            Representativeness of Study Samples................................................11

II.   Use and Adherence to the I-867 Format ....................................................13
      Relation to Credible Fear Referrals ..........................................................17
      Confirming Statements Made in Secondary Inspection Interviews..........................18

III.  Expressing Fear and Referral.............................................................20
      Officers Encouraging Aliens to Retract their Fear Claims .........................................23

IV.   Understanding the Result of Secondary Inspection Interviews ...................................25

V.    Officers' Behavior During Secondary Inspection Interviews ........................................26

VI.   Discussion of Findings ..............................................................28
      Study Limitations..................................................................31
      Conclusion ......................................................................33

References Cited.....................................................................35

Appendices............................................................................36
      Appendix A: Demographic Characteristics of Samples .............................................36
      Appendix B: Participant Cases Versus Non-participant Cases..............................37
      Appendix C: Data Analyses Excluding San Ysidro ..................................................40
      Appendix D: Aliens Who Expressed a Fear and Were Not Referred...................43

IFR_AR_008178

OVERVIEW

Between May and July of 2004, the Bellevue/NYU School of Medicine Program for Survivors of Torture conducted a study of Credible Fear referral in the Expedited Removal process. Section 605 of the International Religious Freedom Act of 1998 authorized the United States Commission on International Religious Freedom (USCIRF) to appoint experts to study the treatment of asylum seekers subject to Expedited Removal. Pursuant to this authority, the Commission appointed Dr. Allen Keller as the "lead" expert with regard to monitoring ports of entry. Under Dr. Keller's supervision, and employing a methodology developed by the authors of this report in consultation with the other experts appointed by the Commission, two dozen trained research assistants observed more than 400 cases over several months in seven ports of entry (airports and border crossings) in the continental United States. The study integrated data from observations of Secondary Inspection interviews, independent interviews with aliens conducted by our research staff, and a review of official records from these interviews (A-files). A draft of this report was reviewed by Customs and Border Protection (CBP) administrators and port directors, and their comments were used in making revisions.

Our findings suggest that when procedures are followed, appropriate referrals are more likely to be made. However, there was frequent failure on the part of CBP officers to provide required information to aliens during the Secondary Inspection interview and occasional failures to refer eligible aliens for Credible Fear interviews when they expressed a fear of returning to their home countries. In addition, researchers noted a number of inconsistencies between their observations and the official records prepared by the investigating officers (A-files). Finally, on a handful of occasions, researchers observed overt attempts by CBP officers to coerce aliens to retract their fear claim and withdraw their applications for admission.

The results of this study shed light on the first three of the four questions posed to the Experts by the Congress in Section 605 of IRFA. Those questions are, whether immigration officers exercising authority pursuant to the Expedited Removal provisions (Section 235(b)) of the Immigration and Nationality Act are, with respect to aliens who may be eligible for asylum, (1) improperly encouraging such aliens to withdraw their applications for admission; (2) incorrectly failing to refer such aliens for an interview by an asylum officer for a determination of whether they have a credible fear of persecution; (3) incorrectly removing such aliens to a country where they may be persecuted; or (4) are detaining such aliens improperly or under inappropriate conditions.

IFR_AR_008179

BACKGROUND

In 1996, the United States Congress passed the Illegal Immigration Reform and Immigration Responsibility Act. One of the results of this law was the creation of the Expedited Removal process for aliens entering the country by fraudulent means, misrepresentation, or without proper travel documents.  The Expedited Removal process, which was implemented in April of 1997, was intended to expeditiously identify and remove improperly documented aliens at ports of entry but, at the same time, ensure that bona fide asylum seekers would have access to an asylum hearing (GAO, 2000). All aliens entering the U.S. without proper travel documents or under fraud or misrepresentation are subject to immediate return (Expedited Removal) and are subsequently barred from entering the U.S. for a minimum of five years. However, if at the port of entry (i.e., during the Secondary Inspection interview) the alien states that he/she wishes to seek asylum or expresses fear of returning to the country he or she left, then the person is entitled to further consideration to determine the validity of his or her claim. This process begins with a referral for a Credible Fear interview with an asylum officer, who is charged with assessing the legitimacy of the alien's claimed fear. This initial screening process at ports of entry has been the subject of debate among legal scholars and human rights activists.

One of the primary concerns raised by critics of the Expedited Removal process is the possibility that individuals with a genuine asylum claim may not be identified by the screening procedures and will be erroneously returned to their native country, possibly facing further danger or even death (U.N. High Commissioner for Refugees, 2003). Human rights organizations have provided anecdotal reports of individuals fearing persecution who were removed at the time of entry into the U.S. (ABA, 2004; Lawyers Committee for Human Rights, 2000), and several lawsuits have been brought alleging mistreatment at ports of entry (Wang, personal communication, July 2004). The General Accounting Office (GAO) reviewed 365 case files randomly selected from 47,791 fiscal year 1999 case files of aliens who attempted entry at Los Angeles, John F. Kennedy, and Miami airports, and San Ysidro border station and were charged under the Expedited Removal provisions (GAO, 2000). Although this study showed that inspectors at these ports generally complied with established procedures, the reliance on archival data (i.e., official records or A-files) presupposes that official records provide a reliable account of the actual procedures, behaviors and interactions that occurred.

The present study was designed to overcome some of the limitations of GAO's methodology by integrating observational data and independent interviews in order to analyze the practices of Department of Homeland Security (DHS), Customs and Border Protection (CBP) officers at airport and land port border crossings across the U.S. This represents the first systematic study of the Expedited Removal process using direct observations of CBP officers and aliens during Secondary Inspection interviews and comparing these data with the official records generated from these interviews. The goals of this study were to assess the extent to which existing procedures enabled the identification of aliens with a credible fear of returning to their home country, to assess potential obstacles to accurate identification, and to assess the accuracy of data contained in the official records of these interviews. CBP administrators and port directors were consulted in the implementation of the study (e.g., optimal hours for collecting data) and, after reviewing a draft of the report, provided feedback.

IFR_AR_008180

## I.  STUDY METHODOLOGY

Data were collected from seven sites across the country: Atlanta Hartsfield International Airport, Houston International Airport, John F. Kennedy International Airport (JFK), Los Angeles International Airport, Miami International Airport, Newark Liberty International Airport, and the San Ysidro Border Station. These sites were selected because of both the high volume of Secondary Inspections conducted and to obtain a representative cross-section of aliens entering the U.S. Across these sites, four sources of data were collected, some of which were integrated for subsequent analysis and others that were analyzed separately. Data collection involved a) observation of Secondary Inspection interviews conducted by CBP officers at several ports across the U.S. (JFK, Los Angeles, Miami, Newark, and San Ysidro), b) observation of videotaped Secondary Inspection interviews (Atlanta and Houston), c) interviews with aliens following a completed Secondary Inspection interview but prior to ultimate disposition (at JFK, Los Angeles, Miami, Newark, and San Ysidro), and d) review of official documents generated by CBP officials for all aliens who were interviewed or observed at the above-named locations (all sites). The decision to use live observation versus videotape was based on the availability of videotaped interviews at the sites as well as the amount and type of access provided to research staff.[1] When videotaped observations were reviewed, we provided extra videotapes to the ports of entry in order to permit retention of those videotapes that had been coded in case further review was necessary.[2] Prior to initiating data collection, the observational rating scale developed for this study was pilot-tested using videotaped Secondary Inspection interviews conducted at Houston International Airport. Because study investigators were prohibited from interfering with the tasks of CBP officers, no data were collected directly from the CBP officers (i.e., we did not interview officers about their opinion or decision-making).

In order to complete this large, multi-site research project, 26 research assistants were recruited and trained by the Principal Investigators (Drs. Keller and Rosenfeld), Project Coordinator (Dr. Rasmussen), and Site Supervisor (Ms. Reeves). Research assistants were recruited from local universities and graduate schools, and participated in an initial two-day orientation and training regarding immigration policies, study goals, past research findings, and the instruments and design involved in the current investigation. In addition, on-site supervision was provided on a regular basis by supervisory staff (Dr. Rasmussen and Ms. Reeves) in order to supplement this initial training and address general and site-specific research issues that arose during the course of the study. Efforts were made to recruit researchers that had experience with social and policy research, and were fluent in languages relevant to the particular ports of entry. In addition to English, the languages spoken by research staff included Spanish, French, Mandarin, Haitian Creole, Farsi, Serbo-Croatian, and German. When research interviews required fluency in a language that was not spoken by the available study personnel, telephonic interpreters were used. Study design logistics are presented in Table 1.1.[3]

---

[1] We requested permission to videotape all interviews at each site. Unfortunately, approval was given by DHS after data collection had already been completed at most sites.

[2] Standard procedure at both Atlanta and Houston was to retain videotapes for 90 days in case a need for review arose (although review reported to be extremely rare). All tapes were re-used after this 90 day period.

[3] Because this study presents data that concern individuals who may be in danger if they are identified or have been returned to their country of origin, data are presented with as little identifying information as possible.

IFR_AR_008181

Table 1.1: Study Design

| Study Site | Data | Study Period (# Weeks) | Number of Cases |
|---|---|---|---|
| Atlanta Int'l Airport | Video Obs. | All videotaped interviews conducted from May 30 to June 7, 2004 were reviewed | 43 |
| Houston Int'l Airport | Video Obs. Interview | A random subset of all videotaped interviews conducted from May 4, 2004 to June 20, 2004 were reviewed | 27 |
| JFK Int'l Airport (JFK) | Direct Obs. Interview | June 16 to July 7, 2004 (3 wks) Weds-Mon, 2pm-10pm | 13 |
| Los Angeles Int'l Airport | Direct Obs. Interview | July 7 to 25, 2004 (3 wks) Weds-Mon, 2pm-10pm | 27 |
| Miami Int'l Airport | Direct Obs. Interview | May 19 to June 27, 2004 (6 wks) Thurs-Mon, 6am-10pm | 110 |
| Newark Int'l Airport | Direct Obs. Interview | May 5 to June 13, 2004 (6 wks) Weds-Sun, 2pm-10pm | 32 |
| San Ysidro Border Station | Direct Obs. Interview | May 26 to July 5, 2004 (6 wks) Weds-Sun 9am-10pm | 191 |

Research assistants monitored the study sites for over 1500 hours, generating data on several hundred cases (described in detail below). The amount of time spent collecting data and the number of staff available varied across sites, ranging from a minimum of two researchers at Atlanta for a two-week period to a maximum of six researchers at Newark, Miami, and San Ysidro for six-week periods at each site. In all ports where live observation and interviews were conducted, staff were present during the hours and days in which the maximum volume of Secondary Inspections were conducted. As a result of space constraints and concerns about interference with port operations, USCIRF agreed to CBP requests to limit both the number of research assistants who could be present in a given site at any time, as well as the number of weeks that research staff could collect data.

National estimates of the number of aliens sent to Secondary Inspection per year approximate 10 million, and 90 percent of these individuals are ultimately allowed to enter the U.S. after being processed through an initial triage, usually at a counter in a large waiting room (Congressional Research Service Analysis of INS Workload Data, 2004). Our focus was confined to the 10 percent not allowed past this triage stage—i.e., those sent to Secondary Inspection interviews. Research assistants observed as many Secondary Inspection interviews that time and personnel restrictions allowed (provided they were informed that these interviews were occurring), and conducted independent interviews with aliens after the Secondary Inspection interviews were complete whenever possible. The length of observations ranged from 3 to 386 minutes, with an overall average of 54 minutes, although there was considerable variation across ports of entry. Interviews averaged 18 minutes at San Ysidro (range: 3 to 150) compared to 2 hours and 53 minutes at Houston (range: 79 to 380). Post-inspection interviews lasted, on average, one hour each. Roughly 10 percent of all observations were observed simultaneously by two researchers in order to assess the reliability of the ratings generated. Variables that could not be reliably rated were not used in subsequent data analysis (described below).

In sites where live observation was used to collect data (JFK, Los Angeles, Miami, Newark, and San Ysidro), aliens were asked to consent to allow research assistants to observe the Secondary Inspection interview.  Of the aliens who were asked to consent to live

IFR_AR_008182

observations, only two (0.4 percent) refused to allow an observer to be present. A substantially larger proportion of aliens refused to consent to an individual interview after completion of the Secondary Inspection interview, as 64 of the 266 aliens (24 percent) approached refused. The most common reason cited for refusing to participate in an individual interview was feeling tired (n=8), although 21 people did not offer an explanation for refusing to participate in the research interview. Because researchers at Atlanta and Houston reviewed videotaped Secondary Inspection interviews that had already been completed, no individual interviews were conducted at Atlanta and only four were conducted at Houston. Once interviews or observations were complete, researchers requested official immigration files (A-Files) prepared on the basis of these same secondary interviews in order to compare the A-Files of the Secondary Inspection interview and the direct observations of our research team. Thus, a maximum of three data sources were available for analysis: observation (direct or videotaped) of the Secondary Inspection interview, independent interview with the alien and official records produced on the basis of the Secondary Inspection interviews (A-files).

Although the study methodology centered around obtaining a consecutive sample of Secondary Inspection interviews conducted at the research sites, we deliberately under-sampled Mexican cases processed at San Ysidro. Because of the high volume of Mexicans involved in Expedited Removal at San Ysidro, and the potential for these data to dwarf data collected at the other sites, we included data from only a subset of all Mexican cases and prioritized observations and interviews of non-Mexican aliens. This under-sampling was handled in several ways. First, after collecting observational data on 200 Mexican cases (far exceeding the volume of cases from other sites), we stopped conducting individual interviews with individuals from Mexico in order to focus our resources on interviews with non-Mexican aliens (although direct observation of Secondary Inspection interviews continued). Second, in order to reduce the disparity between Mexican aliens and those from other countries, we included only a random subset of these cases in the dataset analyzed (roughly one fourth of all Mexican cases observed; n=150). Finally, a number of analyses were conducted twice, once using the total sample and once after eliminating the San Ysidro sample. The analyses excluding San Ysidro are noted throughout the report and can be found in Appendix C.  Thus, although the sample described below still contains a large number of Mexican aliens interviewed or observed at San Ysidro, it contains only a fraction of all Mexican cases for which data were collected.

Logistical difficulties also hindered data collection at some sites. For example, JFK has five terminals that process international flights and most regularly conduct Secondary Inspection interviews at counters rather than in individual rooms. Because these factors presented methodological challenges not present at other sites, we were unable to collect a sufficient amount of data to estimate an accurate picture of the frequency of behaviors and processes at this site. We observed cases at one terminal only (Terminal Four), and scheduled our research assistants to be present during the late afternoon and evening (high traffic periods). Because of the limited number of cases, JFK data are excluded from port-by-port statistical analyses, although they are included in analyses using the total sample.

In several data collection sites (Atlanta, Houston, and San Ysidro), Secondary Inspection interviews (live or videotaped) were observed by two researchers in order to establish inter-rater reliability. At San Ysidro and Houston, two researchers observed every 10th secondary

IFR_AR_008183

investigation interview while at Atlanta every interview was observed by two raters. In total, 93 paired ratings were available for analysis. Inter-rater reliability varied across the data collected with many variables being reliably assessed and others that were more difficult to establish reliable coding. When reliability was unacceptable (Kappa coefficient below .4 or intraclass correlation coefficient below .6), variables were excluded from subsequent data analysis.[4] Of the data reported here, the average inter-rater reliability coefficient for dichotomous variables (Kappa) was .63 (range .42-1.00) and for variables with more than two categories (intra-class correlation coefficients) was .90 (range .65-1.00).

All data were initially entered into an Excel spreadsheet. Supervisory staff (Dr. Rasmussen and Ms. Reeves) monitored data entry, reviewing all data for incorrect entries and comparing 10 percent of all records against original sources to insure data accuracy. Excel spreadsheets were then converted to SPSS for subsequent data analyses.

**Participants**

In total, data were analyzed for 443 different cases across the seven data collection sites. These cases included 404 direct observations of Secondary Inspection interviews (341 live observations and 63 observations of videotaped interviews; because the same data was available from these two sources, these were collapsed into a single "observation" dataset for most analyses) and 194 individual interviews with aliens. Both interview and observation data were available for 155 cases; 39 cases had only an interview with our staff without direct observation of the CBP secondary investigation interview. A-files were available for 435 of these 443 cases (A-files were not provided for 8 cases). Figure 1 presents a schematic representation of the overlap between the three data sources.

Figure 1.1: Participant cases observed and interviewed



<hr>

[4] This process resulted in the exclusion of relatively few variables with the exception of observational ratings of several officer behaviors (described in Section IV), where a moderate number of potential variables were excluded because of inadequate reliability. Much of the difficulty in establishing reliability for these variables was attributable to the low frequency of the behaviors although some were also subjective in nature, increasing the potential variability in rater coding. Variables that were analyzed are found in Section IV of this report.

IFR_AR_008184

Because some important differences emerged across sites while other issues were consistent across all or most sites, data are described in some places for the entire sample and in other instances are reported for specific sites.

Demographics for the three samples are presented in Appendix A. Males comprised 58 percent of the sample. Participants came from 56 countries, although the vast majority originated from Central and South America and the Caribbean (roughly 80 percent). Over half the cases from each sample resulted in an Expedited Removal while another 24 percent were labeled Withdrawals (i.e., the alien voluntarily returned to his or her country of origin without requesting asylum or being banned from re-entry); roughly one sixth of all cases resulted in a referral for a Credible Fear interview. The initial intent of this study was to focus on both Expedited Removal proceedings as well as the processing of aliens bearing documentation from a Visa Waiver Program (VWP) country who were suspected of actually being from a non-VWP country.[5] However, because only a small number of VWP refusal cases (i.e., where an individual bearing documentation from a VWP country was refused entry because of suspected fraud or misrepresentation) were found (n=19), these data were excluded from analyses.[6]

*Basis for Secondary Inspection and Case Outcome*

Because many aliens were unaware of the basis for their Secondary Inspection interview, data on the reasons for Secondary Inspection across the different ports of entry were taken only from cases in which direct observation of Secondary Inspection interviews occurred. Of note, these data were missing in five percent of cases (n=20). The most common reasons for a Secondary Inspection interview included clearly false or missing documents, cases in which the travel visa appeared suspicious or may have misrepresented the alien's intent, or when the alien had overstayed his or her visa during a previous visit to the U.S. Cases in which the CBP officer characterized the alien's documents (passport and/or visa) as false (i.e., were clearly

Table 1.2: Basis for the Secondary Inspection Interviews by Port of Entry

| Port of Entry | Objective | Discretionary | Prior Overstay | Other[a] | Total |
|---|---|---|---|---|---|
| Atlanta | 3 (7.1%) | 17 (40.4%) | 8 (19.0%) | 14 (33.0%) | 42 |
| Houston | 6 (23.0%) | 16(61.6%) | 2 (7.7%) | 2 (7.7%) | 26 |
| Los Angeles | 10 (50.0%) | 4 (20.0%) | 2 (10.0%) | 4 (20.0%) | 20 |
| Miami | 34 (36.2%) | 15 (16.0%) | 36 (38.3%) | 9 (9.6%) | 94 |
| Newark | 16 (53.4%) | 4 (13.3%) | 7 (23.3%) | 3 (10.0%) | 30 |
| San Ysidro | 107 (62.2%) | 52 (30.3%) | 1 (.6%) | 12 (7.0%) | 172 |
| Total | 176 | 108 | 56 | 44 | 384 |

[a] Other reasons included attempting to evade inspection, being arrested during prior visa extensions, and failing to register with immigration authorities on a prior visit.

---

[5] Under the standing interpretation of DHS regulations, aliens who use false passports from visa waiver countries will be returned unless they step forward and identify themselves as asylum-seekers. In contrast, aliens who use other false documents are subject to expedited removal, and must be asked if they have any fear of return before they can be expeditiously removed. (*See* 8 CFR 217.4; DHS Inspector Field Manual Section 15.7 (2003), In re Kanagasundram, BIA Interim Decision 3407 (1999)).

[6] Of the 19 VWP cases observed in the course of this study, three were referred for an "asylum only" interview (i.e., three requested asylum upon interview). Although this sample is small, the findings highlight the possibility that some individuals seeking asylum enter the U.S. bearing documentation from a VWP country.

IFR_AR_008185

fraudulent) or were absent (i.e., no passport) were subsequently classified as "objective" reasons for Secondary Inspection whereas cases in which a legal passport was presented but the CBP officer suspected that the visa did not accurately reflect the alien's intent (e.g., an adult traveling on a student visa who is suspected of intending to remain indefinitely) or that the alien committed a material misrepresentation as "discretionary" reasons for a Secondary Inspection interview. In addition, we categorized Prior Overstay as a separate category since these decisions are often at the discretion of the CBP officer, although the bases for such decisions are typically more objective than cases of misrepresentation. Ports of entry differed in reasons offered for a Secondary Inspection interview, with Houston and Atlanta being more likely to refer aliens based on discretionary reasons than other ports of entry (see Table 1.2).

Case outcome also varied by port of entry. In most ports, Expedited Removal comprised the vast majority of case outcomes although both Atlanta and Houston had much higher rates of withdrawals. The proportion of Credible Fear referrals was also much higher in Miami than in the other ports of entry studied (see Table 1.3).

Table 1.3: Case Outcome by Port of Entry

| Port of Entry | Expedited Removal | Withdrawal | Credible Fear Referral | Total |
|---|---|---|---|---|
| Atlanta | 13 (30.2%) | 30 (69.8%) | 0 | 43 |
| Houston | 11 (40.7%) | 14 (51.9%) | 2 (7.4%) | 27 |
| Los Angeles | 11 (40.7%) | 7 (25.9%) | 9 (33.3%) | 27 |
| Miami | 38 (34.5%) | 34 (30.9%) | 38 (34.5%) | 110 |
| Newark | 12 (37.5%) | 12 (37.5%) | 8 (25.0%) | 32 |
| San Ysidro | 168 (88.0%) | 10 (5.2%) | 13 (6.8%) | 191 |
| Total | 253 | 107 | 70 | 430 |

*Use of Interpreters and Bilingual Officers*

Less than one fifth of all cases (16.7 percent) were processed solely in English (i.e., when the alien spoke English). Cases were processed in 27 other languages, with the most common languages being Spanish (61.6 percent of all cases analyzed), followed by Portuguese (5.7 percent), Mandarin (4.1 percent), Haitian Creole (4.5 percent), and Arabic (1.1 percent). Information regarding the use of interpreters and bilingual officers are presented in Table 1.4 and 1.5. There was only one case processed during the study period in which a non-English speaking alien reported (during the interview with research staff) that no interpreter had been provided despite the inability of the interviewing officer to speak his language, however direct observation of this case did not occur[7].

Table 1.4: Interpreters, Bilingual officers, and interviews in English

| | Frequency | Percent |
|---|---|---|
| Interpreter used | 131 | 30.6 |
| Interview done in English | 79 | 18.5 |
| Interview done by bilingual officer only | 218 | 50.9 |
| Total | 428 | 100.0 |

---

[7] There were two cases where aliens were provided interpreters but only after repeated requests by the alien. In a third case, it is unclear whether an interpreter was provided after repeated requests by the alien.

IFR_AR_008186

Table 1.5: Number of cases and languages in which officers were bilingual

|  | Frequency | Percent |
|---|---|---|
| Spanish | 199 | 91.3 |
| Haitian Creole | 13 | 6.0 |
| Mandarin | 4 | 1.9 |
| Russian | 1 | 0.5 |
| French | 1 | 0.5 |

Types of interpreters used for those cases conducted in a language not shared between officer and alien by ports of entry are presented in Table 1.6. Clearly there were differences across sites, with Miami relying on telephonic interpretation, Atlanta on in-person staff, and Los Angeles, using all methods available.

Table 1.6: Type of Interpreters by Ports of Entry

|  | Atlanta | Houston | Los Angeles | Miami | Newark | San Ysidro | Total |
|---|---|---|---|---|---|---|---|
| Interviewing officer[a] | 2 (6.7%) | 1 (33.3%) | 4 (19.0%) | 2 (4.1%) | 2 (22.2%) | 1 (7.7%) | 12 (9.6%) |
| Another CBP officer | 0 | 1 (33.3%) | 3 (14.3%) | 1 (2.0%) | 1 (11.1%) | 1 (7.7%) | 7 (5.6%) |
| Telephonic interpreter | 0 | 0 | 5 (23.8%) | 46 (93.9%) | 5 (55.6%) | 11 (84.6%) | 67 (53.6%) |
| Airline employee | 3 (10.0%) | 0 | 5 (23.8%) | 0 | 1 (11.1%) | 0 | 9 (7.2%) |
| In-person interpreter | 24 (80.0%) | 0 | 3 (14.3%) | 0 | 0 | 0 | 27 (21.6%) |
| Unknown | 1 (3.3%) | 1 (33.3%) | 1 (4.8%) | 0 | 0 | 0 | 3 (2.4%) |
| Total cases | 30 | 3 | 21 | 49 | 9 | 13 | 125 |

[a]Interviewing officers both interviewed aliens themselves and interpreted for the primary officer

*Representativeness of study samples*

Most ports of entry provided basic demographic and case outcome information for cases that were processed during the study period but were not included in our study. Reasons for the failure to observe a Secondary Inspection interview or conduct a separate interview with the alien included the lack of research investigators on site at the time a case was processed, a volume of cases processed that exceeded the number of study investigators available, or a refusal on the part of the alien to participate in the study. Because the data provided varied somewhat across the study sites, comparisons were made on a port-by-port basis rather than using the aggregated dataset. Moreover, comparison data were not provided prior by Newark, and at Atlanta there was no comparison data because observations included all of the cases that were processed during the study period. Detailed data comparing cases observed during the course of the study versus those cases processed but not observed or interviewed are presented in Appendix B.

Across the sites that provided basic demographic data on Secondary Inspection interviews (Houston, JFK, Miami, San Ysidro), there were no significant differences in the gender or age of aliens who were observed or interviewed by our research staff compared to those processed but not included in our study. Case outcome differed between cases processed and those not observed at some ports of entry but not others. The proportion of Credible Fear referrals in our sample was greater at Miami and San Ysidro compared to cases not studied (i.e., we observed a disproportionately greater number of cases that resulted in a referral for Credible Fear interview) but there were no differences at the other sites. The proportion of Expedited Removals was greater among cases observed compared to those not observed at Houston but did

IFR_AR_008187

not appear to differ at other sites. There were no differences with regard to case outcome between cases included in this study and cases processed but not included at JFK and Los Angeles. Region of origin for aliens included in our study differed from those processed but not included at San Ysidro but not at the other study sites. At San Ysidro, the proportion of aliens from Latin America was lower in our sample than in the group not observed or interviewed, although this discrepancy was deliberate, due to our intentional under-sampling of Mexicans described above. Country of origin data were not available for JFK or Los Angeles. Given the modest, and non-systematic differences (with the exception of region of origin at San Ysidro), the data collected in the present study appears to provide a representative sample of the population of cases processed at these ports during the study period.

Relative to national statistics for 2000-2003 (summarized in Fleming and Scheuren, Statistical Report on Expedited Removal, Credible Fear, and Withdrawal, FY 2000-2003), our sample includes a higher proportion of women, of Expedited Removal cases at airports, and includes four of the top ten countries of origin for Credible Fear cases for 2000-2003. In addition, the patterns of case outcomes at particular ports of entry were similar.

IFR_AR_008188

## II.    USE AND ADHERENCE TO THE I-867 FORMAT

The I-867A form provides information to arriving aliens concerning the Expedited Removal process, the consequences of providing false information, and the protections given by the U.S. for those individuals fleeing persecution. The I-867B form consists of questions designed to assess whether or not the alien has any fear of returning to his or her country—the "fear questions." CBP Expedited Removal Training Materials (September, 2003) state that "Form I-867A&B must be used in every case in which an alien is determined to be subject to Expedited Removal. It is not an optional form" (p. 15; emphasis in original). Box 2.1 reproduces the text provided in the I-867A and B forms.

Box 2.1: Information that officers are obliged to read to aliens

| I-867A | 2nd paragraph | You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, barred from reentry for a period of 5 years or longer. |
|---|---|---|
| | 3rd paragraph | This may be your only opportunity to present information to me and the Immigration and Naturalization Service [sic.] to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future. |
| | 4th paragraph | U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear. |
| I-867B Fear Questions | Question 1 | Why did you leave your home country or country of last residence? |
| | Question 2 | Do you have any fear or concern about being returned to your home country or being removed from the United States? |
| | Question 3 | Would you be harmed if you are returned to your home country or country of last residence? |

Although reading the I-867A form is a required element of every Secondary Inspection interview in which Expedited Removal will be applied, we observed many cases in which the requisite information was not provided to the alien. In many other cases the alien was simply handed a photocopy containing the necessary information but was not read the information or offered any further explanation (see Table 2.1). The column labeled "Not read but presented in text" refers to cases in which the I-867A form was given to the alien without instructions or explanation of its content (i.e., placed in front of them). This was a common practice at Houston, which accounted for virtually all of the cases in which this material was presented in written form (see Table 2.1).

IFR_AR_008189

Table 2.1: Information conveyed and questions asked from the I-867A and B forms

| Obligatory Statements | Observation | | | A-File | |
|---|---|---|---|---|---|
| | Read or Paraphrased | Not read | Not read but presented in text | Question/response in record | Question/response not in record |
| I867A 2nd paragraph | 278 (75.3%) | 72 (19.5%) | 19 (5.1%) | -- | -- |
| I867A 3rd paragraph | 206 (56.0%) | 142 (38.6%) | 20 (5.4%) | -- | -- |
| I867A 4th paragraph | 164 (44.1%) | 188 (50.5%) | 20 (4.5%) | -- | -- |
| I867B: Why did you leave...? | 325 (89.8%) | 37 (10.2%) | -- | 376 (95.2%) | 22 (5.5%) |
| I867B: Do you have any fear...? | 336 (94.1%) | 21 (5.9%) | -- | 379 (95.2%) | 19 (4.8%) |
| I867B: Would you be harmed..? | 311 (87.1%) | 46 (12.9%) | -- | 379 (95.2%) | 19 (4.8%) |
| I867B: At least one fear question asked | 362 (95.0%) | 19 (5.0%) | -- | 379 (94.8%) | 21 (5.3%) |

To examine the use and adherence to the I-867 format at each port of entry, these figures were obtained for each port of entry. Table 2.2 presents the same information as Table 2.1 port-by-port.[8]

Table 2.2: Information presented from the I-867A and B forms by Port of Entry

| Item Read or Paraphrased | Atlanta | Houston | Los Angeles | Miami[9] | Newark | San Ysidro |
|---|---|---|---|---|---|---|
| I867A 2nd paragraph | 37 (94.9%) | 22 (91.7%) | 12 (75.0%) | 86 (97.7%) | 19 (67.9%) | 120 (69.4%) |
| I867A 3rd paragraph | 35 (89.7%) | 23 (95.8%) | 12 (75.0%) | 87 (97.8%) | 14 (50.0%) | 55 (32.2%) |
| I867A 4th paragraph | 35 (89.5%) | 23 (95.8%) | 11 (68.8%) | 86 (96.6%) | 13 (46.4%) | 17 (9.7%) |
| Why did you leave..? | 34 (91.4%) | 20 (87.0%) | 17 (85.0%) | 71 (98.6%) | 25 (83.3%) | 157 (88.2%) |
| Do you have any fear..? | 34 (89.5%) | 22 (91.7%) | 18 (90.0%) | 69 (97.2%) | 29 (96.7%) | 163 (94.2%) |
| Would you be harmed..? | 33 (89.2%) | 20 (83.3%) | 17 (85.0%) | 70 (98.6%) | 26 (86.7%) | 144 (82.8%) |
| At least one fear question asked | 34 (91.4%) | 22 (91.6%) | 18 (90%) | 95 (96.9%) | 29 (96.7%) | 169 (94.4%) |

Rates of reading information in the three paragraphs of the I-867A form varied across ports of entry,[10] as did the rate associated with asking the third fear question ("Would you be harmed...?").[11] While rates for conveying this information were lower in Newark and Los Angeles than Miami, Houston and Atlanta, the lowest rates of compliance with I-867 requirements were observed at San Ysidro. At this site, aliens were read the 2nd paragraph from

[8] The number and corresponding percentages vary somewhat because of missing data.
[9] Language limitations of research assistants resulted in a number of missing cases for this variable at Miami.
[10] Categorical association was measured using chi-square analysis; $\chi^2=36.12$, p<.001; $\chi^2=121.70$, p<.001; and $\chi^2=213.09$, p<.001; for the 2nd, 3rd, and 4th paragraphs, respectively.
[11] Categorical association was measured using chi-square analysis; $\chi^2=12.75$, p<.05

IFR_AR_008190

the I-867A form in roughly two thirds of all cases but only one in ten aliens were read the 4th paragraph pertaining to U.S. providing protection to those fleeing persecution.[12] San Ysidro personnel reported (after data collection had been completed) that staff periodically show an informational video that contains I-867A content (in both Spanish and English) to aliens awaiting Secondary Inspection in lieu of reading the information. San Ysidro personnel reported that officers are expected to read the I-867A to the alien when this video is not shown. Because this video was not observed by our research staff, we could not determine whether aliens watched this video when officers did not read the I-867A, and there is no information in A-files to indicate whether or not the video was shown. Moreover, it is not clear if officers conducting Secondary Inspection interviews are aware of whether or not this video has been shown to an alien when they begin their Secondary Inspection interviews. For subsequent analyses, we compared those cases in which the officer was observed to read the I-867A information versus those that were either not read or presented only with a written copy of the information (consistent with CBP policy and DHS regulations that require officers to read this information to the aliens out loud, IFM 17.15(b)(2003) and 8 CFR 235.3(b)(2)(2004)).

In order to judge whether officers' adherence to the I-867A and B differed when a live observer was present versus when observations were videotaped, we compared data from videotaped observation sites (Atlanta and Houston) to those where live observation was used. Contrary to our expectation that the presence of study interviewers would result in greater compliance with established policies, two of the three I-867A paragraphs (the 2nd and 4th) were actually read more often in videotaped observations compared to direct observation.[13] There was no significant difference in the rates of asking the I-867B fear questions. These findings were largely unchanged when data from San Ysidro were excluded (see Appendix C).

Officer utilization of the I-867B questions was substantially greater than provision of the I-867A information, as these questions were only omitted in between six and 13 percent of all cases (see Table 2.1). However, despite the observation of a number of cases in which the I-867B Fear questions were not asked, official documents prepared during these interviews (A-files) indicated that questions were asked and answered in most of the cases in which our research team did not observe any such questioning (see Tables 2.3-2.5). Notably, in some cases where the file did *not* indicate that the question had been asked or answered, our observers documented that the question had actually been asked. In 37 of 356 cases observed, the first question regarding why the individual left his or her home country or country of last residence was not read to the individual being interviewed (data were missing in 48 cases). Yet in 32 of those 37 cases (86.5 percent), the A-file incorrectly indicated that the question had been asked and answered. Of note, there was no indication in any of these files that this question was deliberately omitted because the information had been offered spontaneously during an earlier portion of the interview. Moreover, for the subset of these 37 cases in which a second researcher observed the same interview, both observers agreed that the question had not been asked.

---

[12] All but 10 cases in the study sample at San Ysidro were subject to Expedited Removal proceedings. While there are ports of entry that regularly provide I-867 material to Withdrawal cases, there is some disagreement whether or not this practice is required. In any case, the 10 cases at San Ysidro (which were not provided I-867 information) are too few to substantially influence study results.

[13] The association between observation type and proportion of cases in which I-867A information was read to the alien was analyzed using the chi-square test of association; $\chi^2=5.38$, $p < .05$; $\chi^2=0.37$, $p = .54$; and $\chi^2=6.61$, $p < .01$ for the 2nd, 3rd, and 4th paragraphs, respectively.

IFR_AR_008191

Table 2.3: "Why did you leave..."

| | | Question in file | | Total |
|---|---|---|---|---|
| | | Yes | No | |
| Question | Yes | 304 (95.3%) | 15 (4.7%) | 319 |
| observed | No | 32 (86.5%) | 5 (13.5%) | 37 |
| Total | | 336 | 20 | 356 |

Table 2.4: "Do you have any fear..."

| | | Question in file | | Total |
|---|---|---|---|---|
| | | Yes | No | |
| Question | Yes | 324 (98.2%) | 6 (1.8%) | 330 |
| observed | No | 10 (47.6%) | 11 (52.4%) | 21 |
| Total | | 334 | 17 | 351 |

Table 2.5: "Would you be harmed..."

| | | Question in file | | Total |
|---|---|---|---|---|
| | | Yes | No | |
| Question | Yes | 300 (98.0%) | 6 (2.0%) | 306 |
| observed | No | 34 (75.6%) | 11 (24.4%) | 45 |
| Total | | 334 | 17 | 351 |

Because records of Secondary Inspection are relied upon in Credible Fear determinations and subsequent asylum hearings, we looked closely at any information concerning the consistency of A-files and observations of these cases. Although not asked to specifically note inconsistency in case notes, research assistants noted seven cases (out of 69 referred for a Credible Fear interview) in which, upon review of A-files, there were marked differences between what was observed and the information contained in the official records. In five cases considerable detail about the aliens' fears was not present in the A-file despite having been offered by the alien (and in one of these cases the officer specifically instructed the alien not to give details and to simply respond "yes" or "no" to questions). In three cases, the information recorded in A-files was qualitatively different from the responses observed in Secondary Inspection (e.g., one person responded to a fear question that "Falun Gong teaches me to help people" and the file states that this person simply answered "yes"). It should be emphasized that research assistants' notes were not structured to investigate inconsistency between A-file and observations, and therefore these discrepancies are likely to represent a conservative estimate of the actual magnitude of this phenomena.

**Relationship between I-867 and Credible Fear Referrals**

In order to investigate the impact of reading I-867 materials, we explored the relationship between providing this information and Credible Fear referrals. There was no association between whether the interviewing officer read the 2nd paragraph (pertaining to the potential for removal and a 5-year bar on re-entry) and Credible Fear referral. However, Credible Fear referrals were significantly associated with reading the 3rd and 4th paragraphs of the I-867 ("This may be your only opportunity to present information …" and "U.S. law provides protection to certain persons who face persecution, harm or torture …" respectively). These data are detailed in Tables 2.6 and 2.7. For the 3rd paragraph, the likelihood of being referred for a Credible Fear interview was four times greater when the information was read to aliens compared to cases in

IFR_AR_008192

which this information was not provided.[14] The odds of being referred for a Credible Fear interview increased seven times when the 4th paragraph was read to aliens relative to when it was not.[15]

Table 2.6: Association between 3rd paragraph ("This may be your only opportunity to present information…") and referral for Credible Fear

|  | Referred | Not referred |
|---|---|---|
| Read 3rd paragraph | 51 (24.8%) | 155 (75.2%) |
| Not read 3rd paragraph | 13 (8.0%) | 149 (92.0%) |

Table 2.7: Association between reading the 4th paragraph ("US law provides protection…") and referral for Credible Fear

|  | Referred | Not referred |
|---|---|---|
| Read 4th paragraph | 51 (31.1%) | 113 (68.9%) |
| Not read 4th paragraph | 13 (6.3%) | 195 (93.8%) |

With cases from San Ysidro excluded, associations between reading these paragraphs and referral showed a similar pattern of results, although the associations were no longer statistically significant because of the reduced sample size (see Appendix C).

In order to investigate whether the failure to ask the I-867 questions pertaining to fear had an impact on case outcome, we analyzed rates of referral for a Credible Fear interview among three sub-groups of individuals: those who were asked *both* fear-related questions ("Do you have any fear of returning …" and "Would you be harmed if you returned …"; n=327), those who were asked *neither* of these questions (n=20), and a third group who were asked only one of the two questions (n=35).  As evident from Table 2.8, the likelihood of a Credible Fear referral increased with each additional fear question asked.[16]

Table 2.8: Fear inquired about directly by officer

|  | Referred | Not Referred |
|---|---|---|
| Both "Fear" and "Harm" asked | 59 (18.0%) | 268 (82.0%) |
| Either "Fear" or "Harm" asked | 3 (8.6%) | 32 (91.4%) |
| Neither Fear Question asked | 1 (5.3%) | 18 (94.7%) |

Of the 54 cases in which one or both of the fear questions were not asked, only four were referred for a Credible Fear interview. Eighteen of the 19 cases in which neither fear question was read either withdrew their application for admission to the U.S. or were ordered removed; only one was referred for a Credible Fear interview. Of the 35 cases in which one of the two questions were asked, 32 were ordered removed or withdrew their application for admission, and three were referred for a Credible Fear interview. With San Ysidro cases removed from the sample, these effects were roughly comparable (although again, the association was no longer statistically significant). In both the analyses with and without San Ysidro data, the likelihood of referral for a Credible Fear interview was roughly doubled for each fear question asked (i.e., the

---

[14] This association was measured using the chi-square test of association; effect size was estimated with an odds ratio (OR); $\chi^2$=17.67, $p$<.01, OR=3.77.

[15] This association was measured using the chi-square test of association; effect size was estimated with an odds ratio (OR); $\chi^2$=34.83, $p < .001$, OR=7.09

[16] Spearman's Rho ($\rho$)=.10, $t$=1.97, $p$ <.05, OR=2.14

IFR_AR_008193

likelihood was 4 times greater for individuals who were asked both fear questions compared to those who were asked neither question).[17]

**Confirming statements made in Secondary Inspection interviews**

The statements taken during Secondary Inspection interviews and recorded in the I-867 form comprise an official record of the content of interviews between officers and aliens. Following the conclusion of the Secondary Inspection interview, aliens are asked to sign a statement attesting that the transcript of the statements made is correct. Confirming the accuracy of the statements is thus a required step for those referred for a Credible Fear interview, since these statements may be introduced as evidence during subsequent proceedings. According to the regulations:

> Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on the Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. 8CFR 235.3(b)(2)(i)

Table 2.9: Observed being asked to confirm statements

|       | Frequency | Valid Percent |
|-------|-----------|---------------|
| Yes   | 319       | 84.4          |
| No    | 59        | 15.6          |
| Total | 378       | 100.0         |

Table 2.10: Confirming statements and Referral for Credible Fear

|                      | Referred    | Not referred  |
|----------------------|-------------|---------------|
| Asked to confirm     | 44 (13.8%)  | 275 (86.2%)   |
| Not asked to confirm | 15 (25.4%)  | 44 (74.6%)    |

Overall, 84.4 percent of aliens observed were asked to confirm the truth of statements recorded by officers during Secondary Inspection. However, *every* statement was signed by aliens being interviewed – 15.6 percent were simply not informed of the reason for their signature. Being asked to confirm the truth of their statements was significantly *less* common for individuals who were referred for a Credible Fear interview hearing compared to cases in which the alien was being removed.[18] More than a quarter of all aliens referred for a Credible Fear interview were not asked to confirm their statements, despite the potential use of these statements in subsequent asylum proceedings. With cases from San Ysidro removed, the rate of being asked to confirm statements was lower still (73.3 percent; the association between being asked to confirm statements and Credible Fear referral was not statistically significant when these data were excluded from the analysis; see Appendix C).

We also analyzed whether aliens actually read or had their statements read to them during the process of confirming the statement. In only 28.2 percent of cases, aliens were observed to

---

[17] Ordinal association was measured by Spearman's Rho; $\rho$=.10, $p$=.16; OR=1.91.
[18] $\chi^2$=5.11, $p < .05$, OR=.47. This finding is particularly worrisome given that Credible Fear referrals are precisely those instances in which the sworn statement may become relevant.

IFR_AR_008194

read their statements or had their statements read to them before signing the confirmation.[19] When analyzing only those cases in which aliens were actually asked to confirm their statements (319 cases, or 84.4 percent of all observations), the rate of reading statements is only slightly higher (29.8 percent). Reading statements to aliens was a problem identified at all ports of entry studied. There was no association between being informed of the content of statements and referral for a Credible Fear interview. Of note, when asked during our interviews whether the content of statements was accurate, several of the aliens who reported having read the statements indicated that they had identified errors in their accuracy. Unfortunately, because videotaped interviews were not possible in most ports of entry, and A-file records were not available during the time when research staff reviewed videotaped interviews, it was not possible to compare written statements against the actual interview transcript.

Table 2.11: Were the statements read and by whom

|  | Frequency | Valid Percent |
|---|---|---|
| Alien read statements | 34 | 9.1 |
| Interpreter read statements | 36 | 9.7 |
| Officer read statements | 30 | 8.0 |
| Statements not read | 268 | 71.8 |
| Total | 373 | 100.0 |

---

[19] Despite short Secondary Inspection interviews at San Ysidro, the rate of confirming statements was higher. However, when cases from San Ysidro were excluded the rate of reading statements was also higher, (46.2%; see Appendix C).

IFR_AR_008195

## III.   EXPRESSING FEAR AND REFERRAL

Referral for a Credible Fear interview is triggered when an alien expresses a fear of returning to his or her country of origin. In the process of this study we became aware of a significant discrepancy between DHS Regulations (8 CFR 235.3, 2004) and the CBP Inspectors' Field Manual (CBP, 2003) as to whether or not there are types of fear that need not result in a Credible Fear referral (versus a presumption that *any* expression of fear must result in a Credible Fear referral). Specifically, Federal Regulations require that a Credible Fear referral occur regardless of the nature of the fear expressed. The CBP Field Manual, however, indicates that instances where the fear would clearly not qualify an individual for asylum need not necessarily be referred. Because this study could not resolve these complex policy issues, we sought to analyze the relationship between Credible Fear referrals and the nature of fears expressed by the aliens.

Among all cases for which data were available, we identified 69 cases where a referral for a Credible Fear interview occurred.[20] Interestingly, in two of these cases no fear was expressed during the interview but the individual was referred for a Credible Fear interview nonetheless.  Not surprisingly, the likelihood of a Credible Fear referral was significantly higher when an alien expressed some type of fear compared to cases in which he or she did not.[21] However, in roughly one sixth of cases in which an alien expressed a fear of returning to his or her native country, no referral for a Credible Fear interview was made and the alien was either ordered removed or allowed to withdraw his or her application for entry. Of note, these data reflect the combined sample of interview and/or observational data (i.e., including the 39 individuals for whom a research interview was available but were not observed in the secondary investigation interview conducted by CBP). Table 3.1 presents the relationship between expressed fear and Credible Fear referrals. This association was essentially unchanged when San Ysidro cases were excluded (see Appendix C).

Table 3.1: Expressing fear to officer and Referral for Credible Fear Interview

|  | Referred | Not referred |
| --- | --- | --- |
| Fear expressed to officer | 67 (84.8%) | 12 (15.2%) |
| No fear expressed to officer | 2 (0.6%) | 309 (99.4%) |

Twelve individuals who expressed a fear of returning to their native country to officers were nonetheless returned without a referral for a Credible Fear interview (i.e., to determine if the fear expressed was sufficiently severe and valid as to warrant an asylum hearing in front of an immigration judge). These cases represented roughly three percent of all cases observed by our research staff but nearly one sixth of all cases in which a fear was expressed to officers. In seven of these 12 cases, the A-file did not indicate that any fear had been expressed. These 12 cases were no more or less likely to have been read I-867A information, or to be directly asked about their fear. In addition, there were 10 cases in which aliens expressed fear during our research interview when they had not mentioned any fear to the interviewing officer when asked.

---

[20] This total did not include the 3 "Asylum Only" referrals of individuals arriving from Visa Waiver Program countries.

[21] Categorical association was measured using chi-square analysis and effect size estimated with an odds ratio (OR); $\chi^2=306.47$, $p < .0001$, $OR=862.63$

IFR_AR_008196

All of these individuals, when asked if they wanted to alert the CBP officer of their fear, declined (these cases are thus not included in among "Fear expressed to officer" in Table 3.1).[22]

In response to CBP concerns that aliens may be "prompted" to express fears to officers by the I-867B fear questions, we further examined A-files of the 79 cases in which aliens were observed to express fear directly to officers. For six cases, either A-files were missing Q & A records (n=4) or the entire A-files were missing at the time of review (n=2). For 73 cases we were able to determine whether or not fear was expressed before the I-867B questions had been asked, or was only stated in response to the fear questions. According to A-files, 50 of these individuals (63.3 percent) spontaneously expressed a fear of returning to their home country during the question and answer session or in response to the question "Why did you leave your home country or country of last residence." Three quarters of these (n=38), however, had been told that US provides protection to persecuted individuals (i.e., they were read the 4th paragraph of the I-867A). In another 17 cases (21.5 percent) aliens' fear claims appear in records only in response to asking directly about fear, and for six cases, no fear was recorded in the A-files (these individuals were all returned to their countries of origin). It should be noted that interpreting these findings as evidence that most aliens (at least two-thirds) who claim fear are not prompted by the fear questions must be done in light of our previous findings of considerable discrepancies between direct observation and the A-files (see Section II). Nevertheless, there was little evidence that aliens are prompted to claim fear by the I-867 information and questions.

Types of fear expressed by those individuals who expressed a fear to officers are presented in the Table 3.2, and abbreviated descriptions of the 12 individuals who expressed fear yet were not referred for a Credible Fear interview, as well as the ten individuals who expressed fear to our research assistants only, are provided in Appendix D. It should be noted that among the countries to which the 12 aliens who expressed fear were returned, five of them (of nine) are noted to have extrajudicial killings and human rights abuses in recent reports from the US Department of State and Amnesty International, and two of the countries have significant limitations on religious expression as cited in reports by the US Commission on International Religious Freedom.[23]

---

[22] Seven of the ten individuals who expressed fear in the research interview but did not express their fear to interviewing CBP officer were asked to explain why they withheld this information. Two with a fear of economic hardship reported that their understanding of the officers' questions were that they pertained only to "physical damage" and "life being in danger." A third with an economic fear stated that he though the officers would not care and were going to deport him anyways. A woman who was afraid for her sick child reported that she thought "there was nothing [the officer] could do about" her situation. Another reported that he thought he actually had informed the officer of his fear but then declined the opportunity to relate his fear to the officers when given the opportunity. Two did not provide an explanation as to why they did not inform the officer of their fear, although both expressed considerable distrust of the interviewing officers. One indicated a belief that the officers were lying to him and the second reported that officers "screamed" at her while she was waiting for her interview and that they were "very inconsiderate" during the interview (the research assistant observing the interview corroborated this report, noting that an officer in the secondary waiting area was "sarcastic, demeaning" and "repeatedly shouted at her"). Three cases were missing information as to why they did not express their fear.

[23] Because of concerns about the confidentiality of the participants, the countries are not identified—regions of origin for these participants are presented in Appendix D.

IFR_AR_008197

Table 3.2: Expressed Fear for those referred to a Credible Fear Interview

|  | Referred | Not referred |
|---|---|---|
| Political Persecution | 29 (43.3%) | 1 (8.3%) |
| Coercive Family Planning | 5 (7.5%) | 0 |
| Religious Persecution | 9 (13.4%) | 0 |
| Membership in a Particular Social Group[a] | 9 (13.4%) | 1 (8.3%) |
| Nationality | 2 (3.0%) | 0 |
| Race | 2 (3.0%) | 0 |
| Not Specified | 4 (6.0%) | 3 (25.0%) |
| Economic Hardship | 2 (3.0%) | 3 (25.0%) |
| Other | 5 (7.5%) | 4 (33.3%) |
| Total | 67 | 12 |

[a] This includes domestic violence and female genital mutilation.

In many of the cases in which fear was expressed during the Secondary Inspection interview but no referral was made, the nature of the fear expressed may not have been sufficient justification for an asylum hearing.[24] For example, three of the 12 cases in which aliens expressed fear directly to officers involved fears that were best characterized as economic hardship and one individual expressed a "fear" that concerned the health of a family member living in the U.S. However, two individuals articulated fears that may have formed the basis for a legitimate asylum claim, such as a fear of the government or concern about persecution by religious fundamentalists (one of these two individuals eventually declined referral for a Credible Fear interview after a lengthy discussion with interviewing officers).[25] Other cases involved individuals whose fears were more ambiguous, such as cases where the nature of the fear was not described or where the individual expressed fear of harm because of debts owed or using a false passport to leave the country.

In order to gage the prevalence of referring cases which may have formed the basis of an asylum claim, we identified instances involving a clearly articulated fear of political persecution, coercive family planning, religious persecution, persecution based on nationality or racial discrimination, membership in a particular social group (including violence against women). Of the 58 cases that fell into these six categories, two aliens (3.4 percent) were not referred for a Credible Fear interview. In addition, there were seven cases in which the nature of the fear was not specified, and three of these individuals were also returned. When these two groups were combined (i.e., possibly "legitimate" fears based on asylum law and those cases in which the

[24] Although our research methodology was not intended to ascertain the "validity" of fears expressed, we attempted to differentiate cases on the basis of the apparent legitimacy of the fears expressed in order to assess whether Credible Fear referral decisions were influenced by similar judgments made by CBP officers.

[25] One man from South Asia characterized himself as a political activist and expressed fear of Islamic fundamentalists who had threatened him in the past. He acknowledged having applied for asylum during a previous visit but had been denied and subsequently removed. The research team observer noted that this individual clearly articulated a fear of returning to his country because of political persecution but also stated that he did not want to be detained. He indicated that he would prefer to return to his country rather than face detention in the U.S. The investigating officer informed the man that he could not be returned if he claimed fear, and was asked a second time whether he indeed feared returning. Upon this second inquiry the man denied having a fear of harm and was subsequently returned. Another individual, a male from Central America, expressed a fear of the government. When the CBP officer asked for more information this man was unable to give further explanation and subsequently retracted his claim. Of note, the A-file from this case indicated that the man's concern pertained to his sons who were U.S. citizens and his wife who was ill. The file noted that his reply to the question about fear of harm was "it could be possible."

IFR_AR_008198

legitimacy of the fear could not be determined due to a lack of information) the rate of return was 7.7 percent (five of 65).[26] A more general reading of U.S. Expedited Removal policies, in which anyone answering affirmatively to one of the "fear questions" should be referred for a Credible Fear interview, would result in a substantially higher rate of erroneous removals (roughly 15 percent, 12 of 79).

**Officers encouraging aliens to retract their fear claims**

While most individuals who expressed fear during Secondary Inspection were referred for a Credible Fear interview, there were four cases (all at Houston) in which CBP officers appeared to encourage aliens to withdraw their applications for admission after they had expressed a fear of returning to their home country and one case (at San Ysidro) in which officers encouraged an alien to retract his fear claim and removed him. In two of these cases aliens withdrew their application for entry into the US. One case in which an alien withdrew involved a woman from Central America who spontaneously expressed a fear of her ex-husband, crying and asking the officer to help her. The interviewing officer repeatedly told her that if she did not cooperate she would be "in trouble" and refused to answer her questions. Before asking the I-867B fear questions, the officer warned her that she would not see her family for a long time if she made a fear claim. The A-file indicated that the alien's response to being asked about fear was, "Not a real fear. My ex-husband does not like me." Another woman from Central America claimed a fear but did not specify the basis of that fear. The CBP officer handling the case informed her that she needed to state a reason for her fear and added "we can't let everybody in." The alien asked how long she would be in custody and what would happen to her son. The officer reportedly responded, "If you say you're afraid you will go into detention for an unknown number of days until you have a hearing" and that she would not be able to have contact with her son (who lived in her home country).

Two other aliens were encouraged to retract their fear claims but did not and were ultimately referred for a credible fear interview. In one case a CBP officer told an African man that because he had tried to obtain an R-1 (Religious Worker) Visa, he *must not* have a fear of returning to his native country. This man had already expressed a fear of government officials because of his prior associations with Americans working in his country of origin. In addition, officers described in detail negative aspects of detention and repeatedly asked whether he had a fear of returning (despite his having already expressed such a fear), seemingly attempting to elicit a different (negative) response. The man maintained his request for admission and was eventually referred for a Credible Fear interview. Another potential withdrawal case involved a Central American man who feared being harmed by his in-laws, who had threatened him repeatedly. The officer told him, "What you are experiencing is a personal problem, not one the US offers people asylum for" and that "I know for sure you will be deported." The officer then told the alien that if he claimed fear he would be in detention for three months. The alien maintained his claim and was referred.

---

[26] Extrapolating from our sample, the "error rate" among expedited removal cases at these ports of entry (which are the busiest in the U.S.) , using this more conservative estimate and excluding cases that appear unlikely to justify a legitimate asylum claim, would likely fall between 1 and 13 percent (95% confidence interval: .01, .13).

IFR_AR_008199

There was one case in which officers encouraged an alien to retract his fear and then removed him via Expedited Removal (i.e., without the option of withdrawing). This South Asian man (who is referenced above in footnote 25) was a political activist and feared of Islamic fundamentalists who had threatened him in the past. He had reportedly applied for asylum during a previous visit but his application had been denied and he was subsequently removed. He clearly articulated a fear that "enemy parties would kill" him, stated that he also feared being detained in the US, and asked the officer for advice. The officer said she could not help him make a decision and that he had already taken up too much of her time. The supervisor told the officer to ask the "fear" question again and the alien then said no. The officer told him that he would be processed for removal, not for political asylum because he already asked for political asylum and had been denied.

In addition to the cases described above, there were cases in which CBP officers told aliens about other negative consequences of pursuing asylum claims that could have been prohibitive. Two were told that because they entered illegally they might not have a chance to present their cases. Five were told they would be held in detention for three weeks or more and three of these were told that detention would last at least one month. Because it was sometimes difficult to differentiate between appropriate factual responses to alien questions and deliberate attempts to discourage fear claims, we did not consider these disclosures to reflect deliberate coercion.

In addition to the above incidents, our researchers were informed of two incidents at San Ysidro in which asylum seekers were reportedly turned away at Primary Inspection. Five aliens we interviewed reported having been turned away at the border the previous day. These cases involved two African men and one African woman who claimed to be fleeing political persecution and two Middle Eastern man expressing fears of religious persecution by "people in power." These aliens reported having approached the CBP officer at Primary Inspection and requesting asylum but being told to "go away." One of the Africans stated that the CBP officer "told us to go back from where we came from," forcing them to return to Mexico. The next day, Primary Inspection officers stopped and handcuffed them briefly until the aliens refused to leave. One African reported that he cried and begged the officer to allow him to enter and all three were subsequently brought to the Secondary Inspection area. A Middle Eastern man described a similar incident, stating that a CBP officer at Primary Inspection refused him entry, telling him that he and his companion would need a Visa in order to proceed. The next day they returned and were brought to the Secondary Inspection area. In all of these cases, a referral for Credible Fear interview was subsequently made, albeit on the second attempt to enter the U.S.

IFR_AR_008200

IV.   UNDERSTANDING THE RESULT OF SECONDARY INSPECTION INTERVIEWS

In our interviews with aliens, research assistants also asked about the individual's understanding of what would happen to them after completion of the Secondary Inspection interview. This question is particularly important because section 17.15(a) of the Inspector Field Manual requires that the inspector "must be absolutely certain…that the alien has understood the proceedings against him or her." Nonetheless, nearly one third of the aliens we interviewed (n=56) reported having no knowledge of what was going to happen to them after the Secondary Inspection interview, despite having signed the statement (see Table 4.1). Understanding of the outcome of their interview did not vary by port of entry.

Table 4.1: Aliens' reports of what will happen to them next

|                                               | Frequency | Valid Percent |
|-----------------------------------------------|-----------|---------------|
| Expected to be returned to country of origin  | 88        | 48.4          |
| Expected to be detained                       | 12        | 6.6           |
| Expected another interview                    | 8         | 4.4           |
| Did not know                                  | 56        | 30.8          |
| Other                                         | 12        | 6.6           |
| Expected nothing                              | 6         | 3.3           |
| Total                                         | 182       | 100.0         |

Aliens' expectations regarding the outcome of their case was not associated with their case outcomes (see Table 4.2). Indeed, many aliens expected to be removed despite the fact that a large proportion of these individuals were actually going to be referred for a Credible Fear interview. More than half of the aliens referred for a Credible Fear interview expected to be returned to their country of origin while only one individual actually expected to have another interview.  Conversely, less than half of the individuals being removed were aware that this would be the outcome of their interview (despite having signed a statement indicating that they had been informed). Even among the subset of individuals who withdrew their application for admission to the U.S., roughly a third did not realize that they were going to be returned to their country of origin. In short, our interviews with aliens revealed considerable confusion about what was going to happen to them and this confusion was present regardless of the actual outcome of the case.

Table 4.2: Aliens' reports of what will happen to them next by case outcome

|                                               | Credible Fear referral | Expedited Removal | Withdrawal  |
|-----------------------------------------------|------------------------|-------------------|-------------|
| Expected to be returned to country of origin  | 23 (53.5%)             | 41 (39.8%)        | 24 (66.7%)  |
| Expected to be detained                       | 2 (4.7%)               | 8 (7.8%)          | 2 (5.6%)    |
| Expected another interview                    | 1 (2.3%)               | 6 (5.8%)          | 1 (2.8%)    |
| Did not know                                  | 11 (25.6%)             | 38 (36.9%)        | 7 (19.4%)   |
| Other                                         | 5 (11.6%)              | 6 (5.8%)          | 1 (2.8%)    |
| Expected nothing                              | 1 (2.3%)               | 4 (3.9%)          | 1 (2.8%)    |
| Total                                         | 43                     | 103               | 36          |

IFR_AR_008201

V.    OFFICERS' BEHAVIOR DURING SECONDARY INSPECTION INTERVIEWS

Research assistants were also instructed to note a number of behaviors that might arise during Secondary Inspection interviews. These behaviors included several behaviors thought to be consistent with aggressive or intimidating interrogation procedures, as well as behaviors that reflected positive or helpful behaviors on the part of the officer.[27] The frequency of these behaviors is presented in Tables 4.3 and 4.4.

Table 5.1: Aggressive or Intimidating Behaviors Observed during Secondary Inspection

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Raising voice | 41 (10.4%) | 13 (19.7%) |
| Interrupting | 40 (10.1%) | 10 (15.2%) |
| Grabbing/threatening touches | 1 (0.3%) | 0 |
| Accusations | 28 (7.1%) | 4 (6.1%) |
| Verbal threats | 20 (5.1%) | 2 (3.0%) |
| Sarcasm/Ridicule | 37 (9.4%) | 7 (10.6%) |
| Being demanding | 36 (9.1%) | 5 (7.6%) |
| Standing over alien | 9 (2.3%) | 1 (1.5%) |
| Leaving room without explanation | 63 (15.9%) | 9 (13.6%) |

Table 5.2: Helpful Behaviors Observed during Secondary Inspection Interviews

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Offering comforting words | 41 (10.4%) | 8 (12.1%) |
| Friendly joking | 61 (15.4%) | 14 (21.2%) |
| Small talk | 44 (11.2%) | 3 (4.6%) |
| Explaining actions | 96 (24.3%) | 16 (24.2%) |

Most of the behaviors characterized as aggressive or intimidating behaviors were observed relatively infrequently, rarely exceeding ten percent of all cases. Helpful behaviors, on the other hand, were more frequent. In addition, our observers noted a number of occasions where interviewing officers engaged in helpful or comforting behaviors that were not systematically coded in the study. For example, research assistants were particularly impressed with a number of the CBP officers in Miami, who appeared to go to great lengths to make the aliens being interviewed more comfortable. On one occasion, an officer interviewing a pregnant Caribbean woman, appeared particularly sensitive to her physical condition and was both reassuring and helpful. At Newark, officers took special care to explain the Credible Fear process to two African men fleeing ethnic violence, and offered refreshments at several points during the interview. At Houston, an officer took time to discuss personal concerns about removal with a woman from South America. At San Ysidro, the Middle Eastern men (discussed above in Section III) were offered refreshments almost immediately after their arrival in the Secondary Inspection area.

However, a number of other aggressive or intimidating behaviors that were not systematically assessed were also noteworthy. For example, while not necessarily inappropriate

---

[27] Some of these behaviors were not reliably coded, either because of ambiguous descriptions or because of exceptionally low frequency, and were excluded from subsequent analyses.

IFR_AR_008202

for criminal aliens, multiple occasions of shackling aliens being processed for Expedited Removal was observed at JFK. This practice was not observed at any other port of entry during the study period. It should be noted that during the preparation of this report, the CBP New York Field Office informed our staff that CBP has since issued clear guidelines as to the use of physical restraint and that shackling is now extremely rare at JFK. In Houston, there were a number of incidents observed (on videotape) that appeared to reflect frankly inappropriate behaviors. One Central American man was told that he was a "woman," and a "sissy," and that he sat "like a girl." In another incident, also at Houston, an officer referred to an alien who was not in the room as a "motherfucker" to a second officer, but in the presence of another alien who was involved in his own Secondary Inspection interview (which was occurring in English).

Of course, it is often difficult to accurately assess the appropriateness of officer behaviors outside of the context in which it occurs. Although not the focus of this study, we also coded aggressive or seemingly inappropriate behaviors on the part of the aliens being interviewed. Although inappropriate behavior on the part of aliens was occasionally noted, these behaviors typically comprised interruptions of the interviewing officers, raised voices, and a demanding tone. We did not observe any aggressive physical behaviors, disruptive behaviors, or threatening behaviors by aliens during the Secondary Inspection interview.[28]

---

[28] It is possible that problematic alien behaviors occurred outside of the Secondary Inspection interview itself. However, our observers, who were present for extended periods of time, did not record any such behaviors.

IFR_AR_008203

## VI.    DISCUSSION OF FINDINGS

Inspectors who work for the Bureau of Customs and Border Protection are the United States' first line of defense at the border, charged with the challenge of ensuring that inadmissible aliens are not permitted to enter. At the same time, inspectors are required to ensure that individuals fleeing persecution, including torture, are offered the opportunity to seek protection, in accordance with U.S. laws and treaty obligations toward refugees and asylum seekers. In guidance in implementing Expedited Removal, the Department of Homeland Security (and its predecessor, the Immigration and Naturalization Service) emphasizes to its inspectors the importance of both of these missions:

> "Because of the sensitivity of the program and the potential consequences of a summary (expedited) removal, you must take special care to ensure that the basic rights of all aliens are preserved, and that aliens who fear removal from the United States are given every opportunity to express any concerns at any point during the process. Since a removal order under this process is subject to very limited review, you must be absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her." (Inspector's Field Manual 17.15(a) (2003)."

Many inspectors who were observed during this study appeared to take this responsibility very seriously. In one particularly busy port of entry, Miami, in all but a very small number of cases observed, officers consistently demonstrated that most required procedures directly relating to the Credible Fear referral process were adhered to (one exception concerned reading sworn statements back to aliens, a problem area for all ports of entry). In other ports, however, inspectors' adherence to these procedures was more variable, with some requirements being fulfilled the majority of the time and others frequently being neglected.

This study is the first systematic evaluation of the Expedited Removal process utilizing direct observation of Secondary Inspection interviews with arriving aliens. This study attempted to address a number of important issues in the Expedited Removal process, including the extent to which required information is being presented to aliens, whether official documents (e.g., A-files) accurately recount the Secondary Inspection interview, and whether a significant risk of erroneous removals of aliens who might otherwise qualify for an asylum hearing exist. Shortcomings observed in this study include the frequent failure on the part of CBP officers to provide required information to aliens during the Secondary Inspection interview, occasional failures to refer eligible aliens for Credible Fear interviews when they expressed a fear of returning to their home countries, inconsistencies between the official records prepared by the investigating officers and the observations made by our research team, and on a handful of occasions, overt attempts to coerce aliens to retract their fear claim and withdraw their applications for admission.

In a large proportion of cases observed, CBP officers did not provide information contained in the I-867A form to aliens who were being processed. For example, in roughly half of all cases observed, officers did not read the obligatory paragraph informing aliens that U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. These statements are particularly important given that many aliens may not

**JA211**

IFR_AR_008204

understand the purpose of the Secondary Inspection interview and may not realize that this interview is their primary, if not sole opportunity to express concerns or seek asylum. The importance of these paragraphs is evident in the association between providing the I-867A information and referral for a Credible Fear interview, as individuals who did not receive this information were significantly less likely to be referred for a Credible Fear interview.

Although far less common, the finding that CBP officers did not specifically inquire about fear of returning to their country in approximately five percent of the cases observed may be of even greater concern. Given the potential importance of these questions in eliciting aliens' fears, it is unclear why some officers would fail to ask these questions. Particularly given the length of time typically used in Secondary Inspection interviews at the airports, the failure to ask these important and mandatory questions is simply inexplicable. Not surprisingly, the likelihood of a Credible Fear referral increased with each of the fear questions asked. If officers fail to provide an explanation and opportunity for aliens to express their concerns, this crucial step in the asylum process may not occur.

Even when the alien expressed a fear of return, referral for a Credible Fear interview was not guaranteed. One in six aliens who expressed a fear of return during the Secondary Inspection interview were placed in Expedited Removal or allowed to withdraw their application for admission. However, understanding the failure to refer aliens who expressed fear is complicated by the apparently conflicting positions expressed in different CBP guidelines. While some DHS regulations (8 CFR 235.3(b)(4)) indicate that any alien who expresses a fear must be referred for a credible fear interview, the Inspectors' Field Manual instructs that the case should not be referred if "the alien asserts a fear or concern which is clearly unrelated to an intention to seek asylum or a fear of persecution." Indeed, many of the cases that we observed in which an alien expressed fear but was not referred appeared to be "unrelated to an intention to seek asylum" (e.g., cases in which the alien expressed primarily economic concerns[29]). On the other hand, we observed some cases that appeared to be unequivocal cases of CBP error, returning precisely the sort of individuals that U.S. policy is designed to protect (e.g., a South Asian man who expressed fear of retaliation from religious fundamentalists because of his political affiliation). Although we would not deign to assess the credibility of the claims made by these individuals, it is clear that clarity is needed within CBP as to precisely when referral for a Credible Fear interview is warranted. When only the cases of fears voiced in Secondary Inspections that clearly fell into categories set out by asylum law were analyzed, we found an error rate of 3.4 percent, suggesting that a substantial number of individuals seeking asylum risk being returned, despite expressing a fear of return precisely as they are required (this rate increased to 7.2 percent when cases in which the nature of fear was not articulated were included). In essence, these findings suggest that some CBP officers make *de facto* assessments of the legitimacy of expressed fears, returning aliens that they perceive to be inappropriate and referring those that they perceive as warranting asylum (including two individuals who did not express any fear, but were from countries where legitimate fears are common). These practices suggest an important gap in the Expedited Removal process that should be addressed. However, even with absolute clarity regarding the procedures and policies (as apparently exists for the reading of the I-867 paragraphs and

---

[29] However, we should note that economic hardship may occur within a broader context of persecution, as acknowledged by the USCIS Credible Fear Manual: "The statement by an applicant that 'I left my country because I can't work' is insufficient to judge the merits if a case and should lead to further inquiry." (Eligibility, Part I, p. 24)

IFR_AR_008205

questions), our data suggest that errors will likely remain, albeit perhaps less frequently.

The lack of congruence between the observations of our research assistants and the official records prepared by the investigating officers (A-files) suggests that the asylum process itself may be compromised by the use of these documents as official transcripts. We found that when CBP officials failed to ask the relevant fear questions, the official record frequently indicated that these questions had been asked and answered, typically containing just the word "no" in response to fear questions that had not been asked. Likewise, on some occasions the A-files did not indicate that the relevant questions had been asked (i.e., were left blank) when our observers noted that they had been, or contained only a portion of the information that had been disclosed in response to a given question. These discrepancies, however, only reflect the most simplistic level of analysis, since the A-files might have provided incorrect information in many more cases but could not be detected because of our inability to simultaneously observe Secondary Inspection interviews and compare them with A-files. Nevertheless, these data demonstrate that A-files do not necessarily present an accurate record of Secondary Inspection interviews, despite the temptation to assume their accuracy. This issue is particularly important given the evidence observed in other studies in this report that the content of A-files is relied upon during the Credible Fear interview and subsequent Asylum hearings. Officials may present statements from the Secondary Inspection interview as evidence to impeach an aliens' testimony, citing contradictions between their statements and the official records as evidence of a changing story (see Jastram and Hartsough, A-file and Record of Proceeding Analysis of Expedited Removal, this report), when the "evidence" is an erroneous official record.

The safeguard against inaccurate A-file records, asking aliens to attest to the accuracy of their statements, also appears inadequate as currently implemented. Roughly one in six cases in which statements were taken by CBP officers and recorded in A-files were not confirmed by aliens, despite the presence of signatures in the required place. When they were asked to confirm their statements, most aliens were neither asked to read the statements, nor had their statements read to them, but were simply told to sign forms. Aliens were often told to sign documents with little or no explanation of what they were signing or what the implications might be, and in most cases these documents were written in a language they were not able to read (English). Failure to confirm statements was more common in cases where the individual was referred for Credible Fear interviews, despite the fact that these statements have the potential to be used in subsequent Asylum Interviews and Hearings.

It is impossible to know how the presence of our observers influenced the behavior of CBP officers. It certainly seems likely that compliance with required policies could be greater and inappropriate behaviors would be fewer when observers were monitoring their interviews. Thus, the rates of problems observed in this study likely underestimate the actual rate of problem behaviors and failures to adhere to established policies. We attempted to investigate the effect of our presence by comparing cases in which live observation was used to those in which videotaped interviews were reviewed. In this analysis, when the data from San Ysidro were excluded (since the border crossing is quite different in many respects from the airports), although different rates of reading required material remained, we found no significant differences in the rates of failure to ask required questions, or the frequency of referrals for a Credible Fear interview. This may reflect the fact that 24-hour video surveillance of the

IFR_AR_008206

interview rooms is not markedly different than live observation, indicating that both are vulnerable to the Hawthorne effect (where observers, by their mere presence, influence the behavior under investigation). Alternatively, officers may simply have behaved as they normally do, despite the presence of our research team. If so, the port-by-port variation observed in some variables may reflect differences in the training and supervision practices across ports. Ultimately, of course, we cannot know what the behavior of officers would be like without any form of observation. Nevertheless, given that it is virtually unimaginable that officers would have deliberately violated policies or required procedures *more often* while being monitored, it is likely that our observations represent some degree of underestimation of the problems observed in this study.

Perhaps most surprising is that, despite the presence of researchers observing Secondary Inspection interviews, our observers witnessed a number of incidents of seemingly serious problem behaviors. For example, our observers noted that on more than one occasion aliens were refused interpreters at Houston, even when they requested them. The report that aliens who claimed to have expressed a fear of persecution were initially turned away at the San Ysidro border crossing is an additional concern. In addition, aggressive or hostile interview techniques, sarcasm and ridicule of aliens, and verbal threats or accusations, while not common, were not infrequent in our sample. The fact that these behaviors occurred *while observers were present* suggests that such behavior may not even be perceived as problematic by some CBP officers.

## Study Limitations

In addition to the possibility that officer behavior and adherence to policies improved simply because our research team was present, a number of methodological issues limit the conclusiveness of this study. Perhaps the most significant issue pertains to sample size. Although our initial intent was to have researchers present in each site for three to four months, USCIRF and CBP agreed to limitations in terms of both the volume of research staff that could be present as well as the length of time that study investigators could remain in each site. Thus, many of the study sites yielded an inadequate sample to permit reliable comparisons across sites or to allow for an accurate estimate of the prevalence of problems observed. Estimates of the frequency with which aliens are removed despite having expressed a seemingly legitimate fear are thus limited (particularly when only the airport study sites are considered). Nonetheless, this study represents the largest systematic analysis of the Expedited Removal process and the only study to apply a multi-method approach to these important issues.

A second limitation to our study concerns the small number of Visa Waiver Program (VWP) refusal cases that were observed by our researchers. Our initial intent was to systematically analyze this subset of VWP cases along with ER cases, particularly because of our expectation that individuals with a legitimate asylum claim may enter the U.S. with documentation from a VWP country. That we observed three (of 19) VWP cases in which aliens were referred for an "asylum only" hearing to determine the legitimacy of their claim offers some support for this belief. However, the small number of VWP cases observed was inadequate to reliably assess the frequency with which this occurs or whether different problems exist in the processing of ER and VWP cases. Further research focusing specifically in VWP cases is necessary to clarify differences and similarities between these types of cases.

IFR_AR_008207

Another limitation in the present study was our reliance on live observations or one-time viewings of videotaped observations for most aspects of data collection. Our original intent was to videotape all Secondary Inspection interviews at all ports of entry during the study periods (i.e., to install cameras in those ports that did not already videotape and to archive videotapes in ports that already routinely videotape).[30] We also hoped to retain these videotapes after completion of the study, in order to permit re-analysis of the data whenever questions or important findings occurred. Such a method would have allowed, among other things, for a more detailed analysis of the accuracy of A-files, as well as help resolve observations that our researchers were unsure how to code. Although our inter-rater reliability data indicated that our researchers were quite consistent in their application of our coding system, reliability would have been further improved by the availability of videotapes (i.e., to review interactions that occurred too rapidly for the observer to perceive or when translation issues made comprehension difficult). Unfortunately, DHS administrators did not approve our request to videotape in advance of our required study timeline.[31]

At some sites, CBP officers themselves imposed additional study limitations. The most notable example was in Houston, where CBP officials were initially quite receptive.[32] Once data collection began, however, Houston CBP officers were less cooperative. Early in the data collection process it became clear that many aliens had been interviewed in the Secondary Inspection area but that CBP staff had not notified our research assistants. This omission was brought to the attention of the Chief, and we were permitted to remain in Houston for an additional week of data collection. However, our research assistants were still not informed when aliens were present to be interviewed, resulting in only four post-inspection interviews during the 4-week study period in which dozens of aliens were processed. Moreover, our researchers described a number of overtly hostile behaviors, including one incident where a CBP supervisor attempted to physically remove a research assistant, grabbing her arm and escorting her from an area that had been previously designated as open to our personnel. Although it is not clear how or if this tension impacted our study findings, it is possible that this small sample of interviews with aliens arriving at Houston was not representative of all arrivals to this port.

Data collection at JFK was also limited, largely by the structure of the Secondary Inspection facilities. Because JFK utilizes a counter with several interview stations, and processes a large volume of cases of which Expedited Removal cases comprise only a small subset, we were unable to determine which among the many cases in Secondary Inspection were Expedited Removal interviews. These logistical difficulties preclude us from drawing any conclusions about the frequency of behaviors or problems at JFK.

---

[30] Although Houston and Atlanta routinely videotape each Secondary Inspection interview, these videotapes are only archived for 2-3 months and then taped over. We requested these ports maintain copies of the videotapes our researchers reviewed, in case further review was desired, but we were not permitted to retain copies ourselves.

[31] CBP officials eventually approved videotaping but not until two months after data collection had begun and our time constraints did not permit the application of this technology (i.e., we were unable to install and test equipment in the limited time left for data collection).

[32] During the study design phase, Houston CBP staff allowed us to pilot our measurement instruments on videotaped Secondary Inspections and provided our research team with suggestions on how to best coordinate file review and live observations.

IFR_AR_008208

A final limitation concerns the prohibition to measure the opinions of the CBP officers themselves. As those charged with carrying out the credible fear referral provisions of Expedited Removal policy, it may be that there are some officers who rely on their opinions of asylum and asylum seekers rather than the provisions as set forth in regulations. While our researchers reported that most of the officers they encountered were professional and did not seem to let preconceptions about the legitimacy of the asylum process or asylum seekers affect their work, further research addressing officer knowledge, attitudes and behaviors and the relationship between Expedited Removal practices would be helpful.

**Conclusions**

Our findings suggest that when procedures are followed, appropriate referrals are more likely to be made. These findings present a picture of a system that, with several notable exceptions, generally seems to function by the rules set out for it. This conclusion is applicable to each port of entry in our study to varying degrees. Research assistants often expressed admiration for officers who were able to balance the twin duties of interrogating aliens without proper documents and then providing protection to them when necessary. This conflicting dual nature of CBP officers' role in the Expedited Removal process cannot be stressed enough, and it is with appreciation for the difficulty of this job, particularly in an era of heightened awareness and need for vigilance against international terrorism, that these findings are presented. While we cite shortcomings in the implementation of Expedited Removal, it is our hope that these observations will be perceived not as a criticism of CBP Inspectors, but as encouragement to better enforce those rules which are clear, and to more clearly articulate those which are not. This is particularly important with the creation of the Department of Homeland Security, in which INS inspection duties are being absorbed by many individuals who formerly worked as Customs or Agricultural inspectors.

This study identified a number of strengths and several disconcerting weaknesses in the Expedited Removal process concerning Credible Fear referral. Many ports employed practices which, if adopted by other ports, may result in much better compliance with CBP rules and reduce the chances that asylum seekers are returned to places where they may face persecution. For example, in Houston and Atlanta, the practice of videotaping all secondary inspections was associated with a higher tendency to comply with the requirement of explaining the Expedited Removal process to the alien, as articulated on the Form I-867A. In Atlanta and Los Angeles, the use of professional on-site interpreters was noteworthy, and may reduce the likelihood of communication problems during the interviews. Given that some asylum seekers come to the U.S. bearing documentation from Visa Waiver Program countries, the practices described by Newark and JFK personnel, in which all Visa Waiver Program cases are asked fear questions, appear appropriate and useful in identifying possible asylum seekers. Despite the high volume and short amount of time allotted for Secondary Inspection interviews, many San Ysidro officers were more diligent than some of those at airports. Finally, Miami International Airport deserves further study as a model. Without employing any of the above tools, Miami was much more compliant than any other port of entry in following the rules to ensure that asylum seekers are identified, and that aliens subject to Expedited Removal understand the nature of the proceedings.

IFR_AR_008209

As is clear in this report, DHS procedures designed to identify and refer asylum seekers subject to Expedited Removal are not always followed by immigration inspectors. Since these procedures are not always followed, it is impossible not to conclude that some proportion of individuals with a genuine asylum claim are turned away. Given the vulnerable nature of many aliens who seek asylum in the U.S., adherence to established protocol should be a minimum requirement.

IFR_AR_008210

REFERENCES CITED

American Bar Association Commission on Immigration and the Leadership Conference on Civil Rights Education Fund (ABA), "American Justice Through Immigrants' Eyes", 2004.  Link: http://www.abanet.org/publicserv/immigration/Due_Process.html

Department of Homeland Security, Bureau of Customs and Border Protection (CBP), Inspector's Field Manual (M-450), Chapter 17.15 (September 2003).

Lawyers Committee for Human Rights, "Is this America - The Denial of Due Process to Asylum Seekers in the United States" (October 2000).

Letter to Mark Hetfield, USCIRF, from Phillip Huang, Staff Attorney, Lawyers Committee for Civil Rights of the San Francisco Bay Area (July 8, 2004).

Regulations: 8 CFR 235.3 (2004).

United Nations High Commissioner for Refugees (UNHCR), "Study of the U.S. Expedited Removal Process:  Report to the U.S. Department of Homeland Security" (24 October 2003) (Unreleased).

United States General Accounting Office (GAO), Report to Congressional Committees: ILLEGAL ALIENS Opportunities Exist to Improve the Expedited Removal Process (GAO/GGD-00-176) (September 1, 2000).

IFR_AR_008211

APPENDICES

## Appendix A: Demographic characteristics of samples

| | Observed | | Interviewed | | File | |
|---|---|---|---|---|---|---|
| | # | Valid % | # | Valid % | # | Valid % |
| **Gender** | | | | | | |
| Male | 237 | 58.7 | 110 | 56.7 | 253 | 58.2 |
| Female | 167 | 41.3 | 84 | 43.3 | 182 | 41.8 |
| **Region of Origin** | | | | | | |
| Africa | 13 | 3.2 | 9 | 4.6 | 15 | 3.4 |
| Americas | 332 | 82.2 | 160 | 82.5 | 358 | 82.3 |
| Asia | 49 | 12.1 | 20 | 10.3 | 52 | 12.0 |
| Europe | 9 | 2.2 | 5 | 2.6 | 9 | 2.1 |
| Pacific Islands | 1 | .2 | | | 1 | .2 |
| **Race:** | | | | | | |
| Black | 49 | 12.4 | | | | |
| White | 256 | 64.6 | | | | |
| Asian | 38 | 9.6 | | | | |
| Native Am. | 9 | 2.3 | | | | |
| Mestizo | 44 | 11.1 | | | | |
| **Latino ethnicity** | | | | | | |
| Not Latino | 117 | 29.0 | | | | |
| Latino | 286 | 71.0 | | | | |
| **Marital status** | | | | | | |
| Single | 93 | 48.2 | 120 | 61.9 | | |
| Married | 100 | 51.8 | 74 | 38.1 | | |
| **Religion** | | | | | | |
| Buddhist | | | 6 | 3.1 | | |
| Christian | | | 162 | 83.9 | | |
| Hindu | | | 4 | 2.1 | | |
| Jewish | | | 7 | 3.6 | | |
| Muslim | | | 10 | 5.2 | | |
| None | | | 4 | 2.1 | | |
| Other | | | 6 | 3.1 | | |
| **Education** | | | | | | |
| No High School | | | 81 | 42.0 | | |
| High School | | | 50 | 25.9 | | |
| Some College | | | 29 | 15.0 | | |
| College Degree | | | 23 | 11.9 | | |
| Graduate/Professional Degree | | | 7 | 3.6 | | |
| No Education | | | 3 | 1.6 | | |
| **Case outcome** | | | | | | |
| Credible Fear referral | 67 | 16.6 | 50 | 25.8 | 69 | 15.9 |
| Expedited Removal | 241 | 59.7 | 102 | 52.6 | 261 | 60.0 |
| Withdrawal | 96 | 23.8 | 42 | 21.6 | 105 | 24.1 |
| Mean age (SD) | 33.3 (10.7) | | 34.0 (11.1) | | | |

IFR_AR_008212

## Appendix B: Participant cases versus non-participant cases

Houston

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Case outcome | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 0 | 0.0 | 2 | 7.4 |
| Expedited Removal | 3 | 10.3 | 11 | 40.7 |
| Withdrawal | 26 | 89.7 | 14 | 51.9 |
| Total | 29 | 100.0 | 27 | 100.0 |

The case outcomes between the two samples were significantly different[33].  Specifically, in our sample there were more Expedited Removal cases and fewer Withdrawals.  In addition, there were two Credible Fear referral cases in our sample.

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Gender | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 19 | 65.5 | 19 | 70.4 |
| Female | 10 | 34.5 | 8 | 29.6 |
| Total | 29 | 100.0 | 27 | 100.0 |

Gender between the two samples did not differ.

| | Mean | Std. Deviation | Mean | Std. Deviation |
|---|---|---|---|---|
| Age | 32.86 | 11.04 | 32.70 | 11.00 |

These samples did not differ by age.

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Global Region | Frequency | Valid Percent | Frequency | Valid Percent |
| Africa | 1 | 3.4 | 1 | 3.7 |
| Americas | 22 | 75.9 | 22 | 81.5 |
| Asia | 6 | 20.7 | 4 | 14.8 |
| Total | 29 | 100.0 | 27 | 100.0 |

Global region of origin did not differ between the two samples.

John F. Kennedy

| | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| Case outcome | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 18 | 11.4 | 1 | 7.7 |
| Expedited Removal | 94 | 59.5 | 11 | 84.6 |
| Withdrawal | 46 | 29.1 | 1 | 7.7 |
| Total | 158 | 100.0 | 13 | 100.0 |

The case outcomes between the two samples were not significantly different.

---

[33] $\chi^2=10.14$, p < .01

IFR_AR_008213

| Gender | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 100 | 63.3 | 9 | 69.2 |
| Female | 58 | 36.7 | 4 | 30.8 |
| Total | 160 | 100.0 | 14 | 100.0 |

Gender between the two samples did not differ.

Age and global region information was not available from JFK records.

Los Angeles

| Case outcome | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 21 | 29.6 | 9 | 33.3 |
| Expedited Removal | 22 | 31.0 | 11 | 40.7 |
| Withdrawal | 28 | 39.4 | 7 | 25.9 |
| Total | 71 | 100.0 | 27 | 100.0 |

Case outcome between the two samples did not differ. Gender, age, and global region information was not available from Los Angeles records.

Miami

| Case outcome | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 96 | 22.0 | 38 | 34.5 |
| Expedited Removal | 176 | 40.3 | 38 | 34.5 |
| Withdrawal | 165 | 37.8 | 34 | 30.9 |
| Total | 437 | 100.0 | 110 | 100.0 |

The proportion of Credible Fear cases among those we interviewed was higher than among those we did not interview[34].

| Gender | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 262 | 60.0 | 55 | 50.0 |
| Female | 175 | 40.0 | 55 | 50.0 |
| Total | 437 | 100.0 | 110 | 100.0 |

Gender between the two samples did not differ.

| | Mean | Std. Deviation | Mean | Std. Deviation |
|---|---|---|---|---|
| Age | 36.10 | 12.54 | 35.72 | 11.77 |

These samples did not differ by age.

---

[34] $\chi^2 = 7.55$, p < .05

IFR_AR_008214

| Global Region | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Africa | 4 | 0.9 | 0 | 0 |
| Americas | 386 | 88.3 | 96 | 87.3 |
| Asia | 36 | 8.2 | 11 | 10.0 |
| Europe | 11 | 2.5 | 3 | 2.7 |
| Total | 437 | 100.0 | 110 | 100.0 |

The two samples did not differ with regards to global region of origin.

San Ysidro

| Case outcome | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Credible Fear referral | 9 | 1.7 | 13 | 6.8 |
| Expedited Removal | 531 | 98.2 | 168 | 88.0 |
| Withdrawal | 1 | 0.2 | 10 | 5.2 |
| Total | 541 | 100.0 | 191 | 100.0 |

The two samples differed by case outcome[35], with higher proportions of Credible Fear referrals and Withdrawals among the group we observed or interviewed.

| Gender | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Male | 295 | 62.5 | 117 | 61.3 |
| Female | 177 | 37.5 | 74 | 38.7 |
| Missing | 69 | | 0 | 0.0 |
| Total | 541 | 100.0 | 197 | 100.0 |

The two samples did not differ on gender, although missing data on the group that was not observed or interviewed may have biased this finding.

| | Mean | Std. Deviation | Mean | Std. Deviation |
|---|---|---|---|---|
| Age | 29.82 | 9.13 | 30.78 | 9.61 |

These samples did not differ by age.

| Global Region | Not observed/interviewed | | Observed/Interviewed | |
|---|---|---|---|---|
| | Frequency | Valid Percent | Frequency | Valid Percent |
| Africa | 1 | 0.2 | 4 | 2.0 |
| Americas | 530 | 98.0 | 179 | 93.4 |
| Asia | 7 | 1.3 | 8 | 4.1 |
| Europe | 2 | 0.4 | 0 | 0.5 |
| Pacific Islands | 1 | 0.2 | 0 | 0.0 |
| Total | 541 | 100.0 | 191 | 100.0 |

The two samples differed by global region of origin[36], with a higher proportion of cases from Latin America among those we did not observe or interview.

---

[35] $\chi^2 = 37.95$, $p < .001$
[36] $\chi^2 = 14.68$, $p < .01$

IFR_AR_008215

**Appendix C: Data analyses excluding San Ysidro** (Tables correspond to tables in the report)

Table 2.1a: Information conveyed and questions asked from the I-867A and B forms

| | Observation | |
|---|---|---|
| Obligatory Statements | Read or Paraphrased | Not Read |
| I867A 2nd paragraph | 158 (80.6%) | 38 (19.4%) |
| I867A 3rd paragraph | 151 (76.6%) | 46 (23.4%) |
| I867A 4th paragraph | 147 (74.6%) | 50 (25.4%) |
| Why did you leave...? | 168 (91.3%) | 16 (8.7%) |
| Do you have any fear...? | 173 (94.0%) | 11 (6.0%) |
| Would you be harmed..? | 167 (91.3%) | 16 (8.7%) |
| At least one fear question asked | 196 (95.1%) | 10 (4.9%) |

Table 2.2a "Why did you leave…"

| | | Question in file | | Total |
|---|---|---|---|---|
| | | yes | no | |
| Question | yes | 158 (97.5%) | 4 (2.5%) | 162 |
| observed | no | 13 (81.3%) | 3 (18.8%) | 16 |
| Total | | 171 | 7 | 178 |

Table 2.3a "Do you have any fear…"

| | | Question in file | | Total |
|---|---|---|---|---|
| | | yes | no | |
| Question | yes | 165 (98.8%) | 2 (1.2%) | 167 |
| observed | no | 8 (72.7%) | 3 (27.3%) | 11 |
| Total | | 173 | 5 | 178 |

Table 2.4a "Would you be harmed…"

| | | Question in file | | Total |
|---|---|---|---|---|
| | | yes | no | |
| Question | yes | 160 (98.8%) | 2 (1.2%) | 162 |
| observed | no | 11 (73.3%) | 4 (26.7%) | 15 |
| Total | | 171 | 6 | 177 |

Table 2.6a: Association between 3rd paragraph ("This may be your only opportunity to present information…") and referral for Credible Fear[37]

| | Referred | Not referred |
|---|---|---|
| Read 3rd paragraph | 44 (29.1%) | 107 (70.9%) |
| Not read 3rd paragraph | 8 (17.4%) | 38 (82.6%) |

Table 2.7a: Association between reading the 4th paragraph ("US law provides protection…") and referral for Credible Fear[38]

| | Referred | Not referred |
|---|---|---|
| Read 4th paragraph | 43 (29.3%) | 104 (70.7%) |
| Not read 4th paragraph | 9 (18.0%) | 41 (82.0%) |

---

[37] $\chi^2 = 2.51$, $p = .11$, OR = 1.95
[38] $\chi^2 = 2.43$, $p = .12$, OR = 1.88

IFR_AR_008216

Table 2.8a: Fear inquired about directly by officer[39]

|  | Referred | Not Referred |
|---|---|---|
| "Fear" and "Harm" asked | 49 (26.2%) | 138 (73.8%) |
| "Fear" or "Harm" asked | 1 (12.5%) | 7 (87.5%) |
| Fear not asked | 1 (10.0%) | 9 (90.0%) |

Table 2.9a: Observed being asked to confirm statements

|  | Frequency | Valid Percent |
|---|---|---|
| No | 52 | 26.7 |
| Yes | 143 | 73.3 |
| Total | 195 | 100.0 |

Table 2.10a: Confirming statements and Referral for Credible Fear

|  | Referred | Not referred |
|---|---|---|
| Asked to confirm | 34 (72.3%) | 109 (73.6%) |
| Not asked to confirm | 13 (27.7%) | 39 (26.4%) |

Table 2.11a: Were the statements read and by whom: Observational sample.

|  | Frequency | Valid Percent |
|---|---|---|
| Alien read statements | 32 | 16.4 |
| Interpreter read statements | 36 | 18.5 |
| Officer read statements | 22 | 11.3 |
| Statements not read | 105 | 54.1 |
| Total | 195 | 100.0 |

Table 3.1a: Expressing fear and referral for Credible Fear Interview[40]

|  | Referred | Not referred |
|---|---|---|
| Fear expressed | 54 (93.1%) | 4 (6.9%) |
| No fear expressed | 2 (1.3%) | 153 (98.7%) |

Table 4.1a: Aliens' reports of what will happen to them next

|  | Frequency | Valid Percent |
|---|---|---|
| Will be removed | 63 | 56.8 |
| Will be detained | 4 | 3.6 |
| Will have another interview | 4 | 3.6 |
| Nothing will happen | 3 | 2.7 |
| Do not know | 29 | 26.1 |
| Other | 8 | 7.2 |
| Total | 111 | 100.0 |

[39] $r_s = .10, p = .16$
[40] $\chi^2 = 183.60, p < .0001, OR = 1032.75$

IFR_AR_008217

Table 5.1a: Aggressive or Intimidating Behaviors Observed during Secondary Inspection Interviews

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Raising voice | 35 (16.4%) | 13 (24.1%) |
| Interrupting | 35 (16.4%) | 10 (18.5%) |
| Grabbing/threatening touches | 1 (0.5%) | 0 |
| Accusations | 25 (11.7%) | 3 (5.6%) |
| Verbal threats | 18 (8.5%) | 1 (1.9%) |
| Sarcasm/Ridicule | 30 (14.1) | 7 (13.0%) |
| Being demanding | 33 (15.4%) | 5 (9.3%) |
| Standing over alien | 9 (4.2%) | 1 (1.9%) |
| Leaving room without explanation | 58 (27.1%) | 9 (16.7%) |

Table 5.2a: Helpful Behaviors Observed during Secondary Inspection Interviews

| Behavior | All cases | Cases referred for Credible Fear |
|---|---|---|
| Offering comforting words | 33 (15.4%) | 7 (13.0%) |
| Friendly joking | 48 (22.4%) | 11 (20.4%) |
| Small talk | 33 (15.5%) | 2 (3.8%) |
| Explaining actions | 75 (35.0%) | 16 (29.6%) |

IFR_AR_008218

**Appendix D: Aliens who expressed a fear and were not referred**

| Port of Entry | Gender | Region of origin | Fear expressed to officer | Fear recorded in file | Case Outcome |
|---|---|---|---|---|---|
| Newark | female | South America | Economic Hardship | no | Expedited Removal |
| Miami | male | South America | Economic Hardship | no | Expedited Removal |
| Houston | female | Central America | Not specific | no | Withdrawal |
| Houston | female | Central America | Fears ex-husband (Social Group) | Fears ex-husband | Withdrawal |
| San Ysidro | male | Central America | Not Specific | no | Expedited Removal |
| San Ysidro | male | Central America | Police will harass him at border (Other) | "Yes, on the border because of police" | Expedited Removal |
| San Ysidro | male | East Asia | Economic Hardship | no | Expedited Removal |
| San Ysidro | male | Central America | Scared of government (Not Specific) | "It could be possible" | Expedited Removal |
| San Ysidro | male | Central America | Economic Hardship | "Yes, there's no jobs back home" | Expedited Removal |
| San Ysidro | female | Central America | Ill child in US (Other) | "My daughter is sick" | Expedited Removal |
| San Ysidro | male | South Asia | Threats by fundamentalist political party (Political Persecution) | no | Expedited Removal |
| San Ysidro | male | Central America | Does not know Mexico (Other) | no | Expedited Removal |

| Port of Entry | Gender | Region of origin | Fear expressed to researcher only | Fear recorded in file | Case Outcome |
|---|---|---|---|---|---|
| Newark | female | West Africa | Passport problems (Other) | no | Withdrawal |
| Miami | male | South America | Economic Hardship | no | Expedited Removal |
| Miami | female | South America | Not specific | no | Expedited Removal |
| Miami | male | South America | Economic Hardship | no | Expedited Removal |
| Miami | female | South America | Ill child in US (Other) | no | Expedited Removal |
| JFK | male | South America | Police would learn about US immigration case (Other) | no | Expedited Removal |
| JFK | male | Caribbean | Economic Hardship | no | Expedited Removal |
| San Ysidro | female | Central America | Economic Hardship | no | Withdrawal |
| San Ysidro | female | South America | Economic Hardship | no | Expedited Removal |
| San Ysidro | male | Central America | Economic Hardship | no | Expedited Removal |

43

**JA226**

IFR_AR_008219



We did not attempt to answer the first Study question, which concerns immigration officers improperly encouraging asylum seekers to withdraw their applications for admission. In reviewing files, which are created by the immigration officer, we would not expect the immigration officer's improper behavior, if any, to be self-reported.[7]

The second Study question concerns failure to refer for a credible fear determination. Our goal in analyzing files was to determine if certain questions intended to identify asylum seekers eligible for such a determination were asked and answered. Without asking the questions and recording the answers, immigration officers would not know which aliens should be referred for a credible fear determination and might fail to make the correct referral.

The third Study question concerns whether asylum seekers are being incorrectly removed to a country where they may be persecuted. The decision on whether an asylum seeker is granted protection or is ordered removed from the U.S. is made by an immigration judge.[8] A mistaken decision by an immigration judge could result in the asylum seeker being incorrectly returned to persecution.

We therefore analyzed files containing transcripts of asylum hearings conducted by immigration judges. We examined the use of Expedited Removal records created by immigration officers at ports of entry and during the credible fear determination with the goal of assessing how they were used at the immigration court hearing. These Expedited Removal records do not contain the asylum seeker's full story, and can be inaccurate.[9] Reliance on them increases the risk of an incorrect decision that could return the asylum seeker to persecution.

---

[7] This question is more directly addressed by the component of the Study conducted through observations at ports of entry. *See* Keller 2005.

[8] Subject to review by the Board of Immigration Appeals and then a U.S. court of appeals. The immigration judge does not have jurisdiction over the claim until the asylum seeker is referred for a credible fear determination and is found to have a credible fear of persecution. Referral for a credible fear determination relates to the second Study question discussed below as well as to the component of the Study conducted through observations at ports of entry. *See* Keller 2005. Credible fear determinations are made by an asylum officer. We did not analyze these decisions in detail because there is a high rate of positive finding of credible fear. *See* Fleming and Scheuren, *Statistical Report on Expedited Removal, Credible Fear, and Withdrawal (FY2000-2003).*

[9] The reliability of these records is discussed below and is also addressed by the component of the Study conducted through observations at ports of entry. *See* Keller 2005.

IFR_AR_008225



required to provide minimal information relevant to his or her asylum claim to the inspector at the port of entry during secondary inspection in order to obtain a referral for a credible fear determination.[75]  The alien is then required to provide information about his or her claim to the asylum officer during a brief credible fear interview in order to establish a credible fear of persecution.[76]  A positive credible fear determination is what allows the alien to proceed to a full removal hearing before an immigration judge where he or she may raise the defense of a claim for protection.

The DHS Expedited Removal record is narrow in scope.  The limited screening function of CBP inspectors and the credible fear determinations made by asylum officers require lower standards of proof than the well-founded fear of persecution standard for asylum applied by immigration judges during removal hearings.

Table 3 is a comparison of the legal standard an asylum seeker in Expedited Removal must meet at each step of the removal process.  There are three different standards, increasingly complex and difficult to meet, as the alien progresses from the port of entry, to the credible fear determination, and finally to the immigration court itself.

---

[75] Regarding the appropriate standard for CBP inspectors, the Office of Programs, INS, Memorandum: Supplemental Training Materials on Credible Fear Referrals (Feb. 6, 1998) instructs inspectors to refer applicants for credible fear interviews based on as little as an affirmative answer to one of the four "protection-related questions" on the form I-867B, "even if the applicant provides no additional information related to the fear of return."  A credible fear referral may also be based solely on non-verbal cues of fear of return.  Office of Programs, INS, Memorandum: Supplemental Training Materials on Credible Fear Referrals (Feb. 6, 1998) at 1-2.  In most cases, inspectors at ports of entry are only establishing inadmissibility and do not probe the fear issues.  Letter from Mr. Michael Hrinyak (CBP) to Mr. Mark Hetfield (USCIS), Jan. 21, 2005, on file with the authors.  A Study questionnaire administered to all eight regional asylum offices summarized the general agreement that port of entry statements are brief and do not contain the alien's full story.

[76] A Study questionnaire, attached as Appendix A, was administered to all eight regional asylum offices in the United States.  It found that the average time for a typical credible fear determination, without an interpreter, was 36 minutes; with an interpreter, it was 46 minutes.  The average time for a typical affirmative interview, without an interpreter, was 53 minutes; with an interpreter, it was 83 minutes.  When asked the purpose of the credible fear write-up (Form I-870) all eight asylum offices answered #1 and #2 but *not* #3.

> #1 To justify the decision of a positive or negative credible fear determination;
> #2 To record just the basics of a positive determination, to show whether the alien has met the threshold for credible fear.  The credible fear statement does not generally represent a complete description of the alien's asylum claim;
> #3 To pursue and record every material detail of the alien's asylum claim.

IFR_AR_008241



Personality and Individual Differences 107 (2017) 190–194



Contents lists available at ScienceDirect

# Personality and Individual Differences

journal homepage: www.elsevier.com/locate/paid



# Acquiescence response styles: A multilevel model explaining individual-level and country-level differences



Beatrice Rammstedt *, Daniel Danner, Michael Bosnjak

*GESIS – Leibniz Institute for the Social Sciences, Germany*

## ARTICLE INFO

*Article history:*
Received 2 September 2016
Received in revised form 9 November 2016
Accepted 15 November 2016
Available online 29 November 2016

*Keywords:*
Acquiescence
Multilevel model
Individual-level determinants
Country-level determinants
European Social Survey

## ABSTRACT

Acquiescence has been found to distort the psychometric quality of questionnaire data. Previous research has identified various determinants of acquiescence at both the individual and the country level. We aimed to synthesize the scattered body of knowledge by concurrently testing a multilevel model encompassing a set of presumed predictors of acquiescence. Based on a representative sample comprising almost 40,000 respondents from 20 European countries, we analyzed the effects of the country-level indicators economic wealth, corruption level, and collectivism and the individual-level indicators age, gender, educational attainment, and conservatism. Results revealed that 15% of the variance in acquiescence was due to country-level variations in corruption levels and collectivism. Differences among individuals within countries could be partially explained by conservatism and educational attainment.

© 2016 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

## 1. Introduction

Acquiescence—that is, the tendency to respond to descriptions of conceptually distinct attributes or attitudes with agreement/affirmation (agreement acquiescence) or disagreement/opposition (counter-acquiescence) regardless of their content—has been widely recognized as a threat to the validity of questionnaire-based data (e.g., Rammstedt, Goldberg, & Borg, 2010; Soto, John, Gosling, & Potter, 2008). Specifically, acquiescence can affect mean levels in item responding, thereby yielding misleading mean differences. For example, Van Vlimmeren, Moors, and Gelissen (2015) showed that country-level differences in trust in NATO differed substantially before and after controlling for acquiescence. Such effects of acquiescence on mean-level differences can occur if acquiescence differentially affects item responding across countries. Moreover, acquiescence may blur the intended factorial structure of a questionnaire by biasing item variances and covariances (Rammstedt et al., 2010). Finally, it has been shown that acquiescence can substantially bias the associations between personality items and behavioral criteria, thereby attenuating predictive validity (Danner, Aichholzer, & Rammstedt, 2015).

Given the threats that acquiescence poses to the validity of questionnaire-based data, the overall aim of the study reported here was to summarize and integrate the available body of knowledge with regard to central socio-demographic and social indicators into one single conceptual model encompassing the presumed determinants of acquiescence.

In what follows, we begin by summarizing the reported evidence on individual-level determinants and then address country-level predictors.

### 1.1. Individual-level predictors of acquiescent responding

Numerous studies have revealed that individuals differ systematically in their tendency to acquiesce. However, the empirical evidence is not univocal. While some studies have suggested that age is positively related to acquiescence (e.g., Meisenberg & Williams, 2008; Weijters, Geuens, & Schillewaert, 2010), others have failed to find evidence in support of this notion (e.g., Eid & Rauber, 2000). Findings with regard to possible effects of gender on acquiescent responding are even more heterogeneous. Some studies have suggested that women show, on average, a higher tendency toward acquiescent responding than men (e.g., Weijters et al., 2010), whereas others have found no gender effect (e.g., Marin, Gamba, & Marin, 1992). However, a broad consensus exists that educational attainment is a source of systematic differences in the tendency to acquiesce. Results of several studies have indicated that acquiescence appears to be more frequent among persons with a lower level of educational attainment (e.g., Narayan & Krosnick, 1996; Rammstedt et al., 2010; Rammstedt & Kemper, 2011). It has been suggested that persons with relatively low education have less clear self-concepts, smaller vocabularies, and less developed verbal comprehension skills than more highly educated persons. This may make them relatively uncertain when it comes to responding to questionnaire items, and may thus leave more room for the influence of systematic response biases (e.g., Goldberg, 1963). For some countries (e.g., Germany), this inverse effect of education on acquiescence has been widely replicated. Moreover, there is evidence to suggest that this effect can be replicated in several other countries, albeit with some exceptions (Danner et al.,

\* Corresponding author at: GESIS – Leibniz Institute for the Social Sciences, PO Box 12 21 55, 68072 Mannheim, Germany.
*E-mail address:* beatrice.rammstedt@gesis.org (B. Rammstedt).

http://dx.doi.org/10.1016/j.paid.2016.11.038
0191-8869/© 2016 The Authors. Published by Elsevier Ltd. This is an open access article under the CC BY license (http://creativecommons.org/licenses/by/4.0/).

IFR_AR_011905

JA232

2015; Rammstedt, Kemper, & Borg, 2013). However, results do not indicate a simple generalizability of the inverse effect of education on acquiescence across all countries (Meisenberg & Williams, 2008; Rammstedt et al., 2013). Rather, countries appear to differ systematically in this regard. Moreover, Smith and Fischer (2008) were able to show that individual-level interdependence, used as a proxy for a collectivistic cultural orientation, was positively related to acquiescence. Taken together, the literature on individual-level determinants of acquiescence partially supports the role of age, gender, level of educational attainment, and degree of conservatism in acquiescent responding.

### 1.2. Country-level predictors of acquiescent responding

In addition to individual differences in acquiescent responding, recent research has identified cross-national differences in the tendency to acquiesce, as reflected by mean-level differences (e.g., Javeline, 1999; Johnson, Kulesa, Cho, & Shavitt, 2005). For example, Van Herk, Poortinga, and Verhallen (2004) investigated acquiescent response tendencies in six European countries. The results revealed that respondents in the Mediterranean countries scored higher on acquiescence than those in the Northwestern European countries. A worldwide investigation of acquiescence was conducted by Meisenberg and Williams (2008). Based on the World Value Survey conducted in 80 countries, they showed that response styles were most prevalent in less developed countries and that—at the country level—acquiescence could best be explained by the country's corruption level. The authors interpreted their findings by suggesting that people who live in corrupt societies tend to be subservient to powerful others—a tendency that carries over into their survey responses. A similar effect was reported by Smith (2004), suggesting that acquiescence is significantly less pronounced in certain European countries than in countries with lower levels of economic development such as Panama, Nigeria, or the Philippines.

In addition, there is a broad consensus that response styles are systematically related to cultural variables (Hofstede, 2001; Schwartz, 1994) and that they tend to be more pronounced in traditional cultures (Javeline, 1999). Specifically, several studies have suggested that the prevalence of acquiescence differs across countries and depends on cultural orientations. For example, a study by Johnson et al. (2005) indicated that collectivistic cultures were especially prone to acquiescent responding. The authors hypothesized that members of collectivistic nations experienced greater cultural pressure to acquiesce (Smith & Fischer, 2008). Support for this association was also provided by Harzing (2006), who investigated 26 countries from all major cultural clusters in the world. However, Grimm and Church (1999) could not confirm the effect of collectivism on acquiescence response style.

In sum, the results of cross-national comparative research suggest that there are systematic differences between countries with regard to the mean tendency to acquiesce and that these differences are a function of the country's social and economic situation and its cultural orientations—in particular, the degree to which collectivistic values are endorsed. Thus, we expect that individual differences at the country level can be explained by these variables.

### 1.3. Assessing acquiescent responding

Even though the nature of, and the reasons for, acquiescence are still unclear, different approaches are used to investigate a person's tendency toward acquiescence. Some studies—especially those that use only positively keyed items—use the percentage or ratio of items agreed with (e.g. Harzing, 2006). For this approach, too, different methods of including and weighting the responses are employed across studies. Instead of using only positively keyed items, recent studies (e.g. Johnson et al., 2005, Rammstedt & Kemper, 2011; Rammstedt & Farmer, 2013; Rammstedt et al., 2010, 2013; Soto et al., 2008) have used, whenever possible, pairs of positively and negatively coded items assessing the same construct (e.g., *Prefer to be with others* and *Like to be all by oneself*).

Persons with a high tendency toward acquiescence should have comparatively higher mean scores across these item pairs than those with a lower tendency to acquiesce. Even though some studies report only a weak consistency of acquiescence across different scales in general (e.g. Ferrando, Condon, & Chico, 2004), other studies report latent correlations $r > 0.71$ between acquiescence indicators of such pairs of negatively and positively keyed items (Danner et al., 2015).

### 1.4. The present study

As summarized above, past research has yielded evidence of individual-level determinants (age, gender, and educational attainment) and country-level predictors (economic development, degree of collectivism, corruption level) of the tendency to acquiesce. However, previous studies have yielded inconsistent findings with regard to these characteristics. These inconsistencies may be due to the fact that most of these studies used highly selective samples that were not representative of the respective populations. In addition, to date no study has concurrently and systematically investigated these country-level and individual-level characteristics, taking into account the multilevel interrelationships between them.

The present study aimed to fill this gap by investigating potential determinants of acquiescence by simultaneously analyzing the different country-level and individual-level characteristics and by relying on data that were representative of the population in 20 European countries. Specifically, we investigated the impact on the tendency toward acquiescent responding of the country-level characteristics economic wealth (GDP), corruption level, and level of collectivism in combination with the individual characteristics age, gender, educational level, and degree of conservatism. Individual-level and country-level predictors can be combined in one multilevel model where respondents ($i$) are nested within countries ($j$), and differences in acquiescence at the respondent level are modeled as acquiescence $_{ij} = \beta_{0j} + \beta_1(\text{age}) + \beta_2(\text{gender}) + \beta_3(\text{education}) + \beta_4(\text{conservatism}) + \varepsilon_{ij}$, and differences at the country level are modeled as $\beta_0 j = \gamma_{00} + \gamma_{01}(\text{wealth}) + \gamma_{02}(\text{corruption}) + \gamma_{03}(\text{collectivism}) + \upsilon_{0j}$.

## 2. Method

### 2.1. Data source

The present analyses are based on data of the European Social Survey (ESS; www.europeansocialsurvey.org/data). The ESS is a cross-national survey that investigates changes in social structure, conditions, and attitudes in Europe. A key aim of the ESS is to implement high quality standards in its methodology. These high quality standards are especially relevant for the translation and adaptation of the questionnaires to guarantee comparability across the different countries. The survey has been conducted every two years since 2001.

To test our conceptual multilevel model, we selected Round 1 of the ESS (European Social Survey Round 1 Data, 2002) as a data source because it included several contrasting item pairs that had already been used in an earlier study as an indicator for acquiescence (Johnson, Mohler, Harkness, & Braun, 2010).

### 2.2. Samples

The 2002 round of the ESS collected data from 22 European countries. For the present analyses, only those countries for which all relevant indicators were available were included. Therefore, Italy and Luxembourg were excluded from our analyses because conservatism was not assessed in these countries. A list of the countries included in our analyses can be found in Table 1. In each country, a sample representative of the population aged 15 years and over was drawn. Design weights provided in the data set were applied to adjust for different selection probabilities. The number of interviews conducted ranged

IFR_AR_011906

192                B. Rammstedt et al. / Personality and Individual Differences 107 (2017) 190–194

**Table 1**
Sample characteristics for the 20 countries investigated.

| | N | Country indicators | | | Individual indicators | | | | Acquiescence | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | GDP | CL | Collectivism | Age (M) | Female (%) | LE (M) | Conservatism (M) | Mean | SD |
| Austria | 2257 | 198 | 7.8 | 55 | 46.59 | 54 | 2.92 | 2.88 | | |
| Belgium | 1899 | 244 | 7.1 | 75 | 44.83 | 49 | 3.05 | 2.71 | 3.28 | 0.38 |
| Switzerland | 2040 | 216 | 8.5 | 68 | 47.56 | 52 | 3.32 | 2.96 | 3.24 | 0.32 |
| Czech Republic | 1360 | 148 | 3.7 | 58 | 51.91 | 52 | 3.10 | 2.50 | 3.38 | 0.36 |
| Germany | 2919 | 1939 | 7.3 | 67 | 47.31 | 52 | 3.36 | 2.83 | 3.27 | 0.30 |
| Denmark | 1506 | 130 | 9.5 | 74 | 46.43 | 49 | 3.31 | 3.07 | 3.08 | 0.34 |
| Spain | 1729 | 720 | 7.1 | 51 | 48.60 | 53 | 2.39 | 2.36 | 3.44 | 0.36 |
| Finland | 2000 | 110 | 9.7 | 63 | 45.63 | 52 | 2.89 | 2.75 | 3.36 | 0.38 |
| France | 1503 | 1327 | 6.3 | 71 | 47.32 | 55 | 2.96 | 2.80 | 3.45 | 0.40 |
| United Kingdom | 2052 | 1329 | 8.7 | 89 | 48.57 | 53 | 2.78 | 2.80 | 3.28 | 0.32 |
| Greece | 2566 | 178 | 4.2 | 35 | 49.66 | 57 | 2.30 | 2.03 | 3.59 | 0.37 |
| Hungary | 1685 | 107 | 4.9 | 80 | 46.14 | 52 | 2.81 | 2.45 | 3.44 | 0.37 |
| Ireland | 2046 | 80 | 6.9 | 70 | 45.71 | 54 | 2.90 | 2.53 | 3.35 | 0.33 |
| Israel | 2499 | 114 | 7.3 | 54 | 41.77 | 54 | 3.31 | 2.45 | 3.33 | 0.37 |
| Netherlands | 2364 | 395 | 9 | 80 | 48.07 | 56 | 2.98 | 2.85 | 3.15 | 0.33 |
| Norway | 2036 | 119 | 8.5 | 69 | 45.82 | 46 | 3.44 | 3.01 | 3.16 | 0.31 |
| Poland | 2110 | 318 | 4 | 60 | 42.9 | 51 | 2.94 | 2.26 | 3.48 | 0.32 |
| Portugal | 1511 | 150 | 6.3 | 27 | 47.86 | 58 | 1.88 | 2.78 | 3.58 | 0.34 |
| Sweden | 1999 | 214 | 9.3 | 71 | 46.26 | 49 | 2.93 | 3.17 | 3.21 | 0.28 |
| Slovenia | 1519 | 33 | 6 | 20 | 44.42 | 52 | 2.94 | 2.51 | 3.35 | 0.33 |
| Mean | 1980 | 145 | 7.1 | 62 | 46.67 | 53 | 2.93 | 2.69 | 3.34 | 0.34 |
| SD | 409 | 139 | 1.9 | 18 | 2.28 | 3 | 0.38 | 0.29 | 0.14 | 0.03 |

Notes. GDP = gross domestic product in billion EUR adjusted for purchasing power; CL = Corruption level from 0 (highly corrupt) to 10 (very clean); collectivism scale from 0 (collectivistic) to 100 (individualistic); age = mean age; LE = level of education from 1 (less than lower secondary education) to 5 (tertiary education completed); conservatism from 1 (individualistic) to 6 (conservative).

between 1360 in the Czech Republic and 2919 in Germany, with a total sample size of 39,600 respondents.

ESS questionnaires are administered as face-to-face interviews. Participation is voluntary and not usually incentivized—although some countries offer small incentives in order to increase participation. (For a detailed description of the samples and the assessment design, see European Social Survey Round 1 Data, 2002).

### 2.3. Measures and procedure

#### 2.3.1. Individual-level characteristics

*2.3.1.1. Demographics.* Respondents' age was assessed in ESS Round 1 via the year of birth. Gender was assessed in ESS Round 1 with a dichotomous variable (1 = men, 2 = women). Levels of educational attainment were assessed in all countries on the basis of the national education system. Later, the ESS researchers harmonized these national data into one variable with reference to the International Standard Classification of Education (ISCED) 1997 levels, which yielded five categories: (1) "Less than lower secondary education (ISCED 0–1)"; (2) "Lower secondary education completed (ISCED 2)"; (3) "Upper secondary education completed (ISCED 3)"; (4) "Post-secondary, non-tertiary education completed (ISCED 4)"; (5) "Tertiary education completed (ISCED 5)".

*2.3.1.2. Conservatism.* As a supplement to the ESS, the Portrait Values Questionnaire (PVQ; Schwartz, Melech, Lehmann, Burgess, & Harris, 2001) was administered, allowing, among other things, the assessment of the higher order value dimension *conservatism*, which overlaps strongly with the cultural orientation *collectivism* as defined by Hofstede (see, e.g., Schwartz & Ros, 1996). The conservatism dimension includes the lower order scales *conformity*, *tradition*, and *security*. It includes items such as "She/he believes that people should do what they're told" (conformity). All items are to be answered on a six-point scale ranging from *not like me at all* to *very much like me*. Cronbach's alpha ranged between 0.67 (Hungary) and 0.78 (Austria).

#### 2.3.2. Country-level characteristics

*2.3.2.1. Economic wealth.* As an indicator for the economic wealth of each country, the logarithm of its gross domestic product (GDP, adjusted for purchasing power) averaged across the years 1990 to 2002 (as suggested by Meisenberg & Williams, 2008), was used. Information was retrieved from the World Development Indicators of the World Bank (data.worldbank.org/data-catalog/world-development-indicators).

*2.3.2.2. Corruption level.* A measure of the corruption level per country was obtained based on averaged scores of Transparency International's Corruption Perceptions Index for the years 1999–2005 (transparency.org).

*2.3.2.3. Collectivism.* Country-level scores on an individualism-collectivism scale for the 20 countries investigated in the present study were taken from Hofstede (2001).

#### 2.3.3. Acquiescence

As an indicator of acquiescent responding, an acquiescence measure was constructed on the basis of eight pairs of survey responses from the ESS questionnaire. These item pairs, which constituted sets of statements that clearly represented opposing opinions, stem from different question blocks within the ESS questionnaire and are intended to measure different constructs ranging from socio-political evaluations to attitudes toward migrants. A full list of these item pairs can be found in Table S1. All items were to be answered on a five-point Likert scale ranging from *agree strongly* to *disagree strongly*.

In line with earlier research (Aichholzer, 2014; Billiet & McClendon, 2000; Danner et al., 2015; Rammstedt et al., 2010; Rammstedt & Kemper, 2011; Rammstedt & Farmer, 2013), we scored the acquiescence scale by averaging all 16 items. Given that eight items were positively keyed and eight items were negatively keyed, the resulting mean score does not reflect any construct variance but rather only acquiescence (and random measurement error). We estimated the reliability of the acquiescence index by subtracting each item from its opposing item and subsequently calculated Cronbach's alpha.

IFR_AR_011907

B. Rammstedt et al. / Personality and Individual Differences 107 (2017) 190–194

Cronbach's alpha was 0.47 on average and varied between 0.39 (Denmark) and 0.58 (Greece).[1]

Table 1 provides an overview of the distribution of the different indicators investigated in the 20 countries.

## 3. Results

In a first step, we investigated whether the 20 countries differed in their tendency toward acquiescent responding. We specified a baseline multilevel model with respondents ($i$) being nested within countries ($j$), $\text{acquiescence}_{ij} = \beta_{0j} + \varepsilon_{ij}$ that allowed acquiescence differences between countries, $\beta_{0j} = \gamma_{00} + \upsilon_{0j}$. The model parameters were estimated using the residual maximum likelihood estimator implemented in SAS 9.3. The model revealed an intra-class correlation of ICC = 0.15, which indicates that 15% of the total acquiescence variance can be explained by systematic country differences. Hence, the 20 European countries investigated differed systematically in their mean tendency toward acquiescent responding. On average, the highest acquiescence scores were found in Greece, followed by Portugal and Poland; the lowest mean acquiescence scores were found in Norway, the Netherlands, and Denmark (see Table 1).

In a second step, we concurrently investigated different possible determinants of these between-country and within-country differences in acquiescent responding: We conducted a second multilevel analysis with age, gender, educational level, and the degree of conservatism as individual factors: $\text{acquiescence}_{ij} = \beta_{0j} + \beta_1(\text{age}) + \beta_2(\text{gender}) + \beta_3(\text{education}) + \beta_4(\text{conservatism}) + \varepsilon_{ij}$. At the country level, we investigated economic wealth, corruption level, and degree of collectivism: $\beta_{0j} = \gamma_{00} + \gamma_{01}(\text{wealth}) + \gamma_{02}(\text{corruption}) + \gamma_{03}(\text{collectivism}) + \upsilon_{0j}$. The intercorrelations between the individual-level predictor variables and between the country-level predictors are shown in Table S2. They indicate that GDP and collectivism, in particular, are moderately interrelated ($-0.42$). The results of the second multilevel model fitted to the data are shown in Table 2.

With the exception of GDP, all country-level predictors contributed significantly to explaining the tendency to acquiesce. The highest—and following Cohen (1992) a large — effect on acquiescence was estimated for the country's corruption level ($\eta = 0.473$): The higher the level of corruption, the greater was the tendency toward acquiescence in that country. A country's level of collectivism also had a large effect on acquiescence ($\eta = 0.187$): The more collectivistic the country, the higher was the overall tendency to acquiesce. In addition to the country's cultural orientation, the individual's degree of conservatism was the strongest predictor of acquiescence at the individual level ($\eta = 0.045$) although this effect was small to moderate in size. Further variance in acquiescence could be explained by the individual's level of education ($\eta = 0.029$). Thus, at the individual level, respondents with a low degree of conservatism and with a lower level of educational attainment exhibited a higher tendency toward acquiescent responding. Most likely due to the large sample size, the effect of age and gender was also statistically significant. However, age contributed only marginally ($\eta = 0.004$) to explaining the variance in our model, and gender did not explain a substantial portion of the variance at all. Overall, at respondent level, education, age, gender, and degree of conservatism explained 10% of acquiescent responding, and at country level, wealth, degree of collectivism, and corruption level explained 74% of acquiescent responding.

To ensure that our results were not due to capitalizing on chance and that they were not biased by the correlation between GDP, collectivism, and conservatism at the country level, in particular, we conducted a set of robustness checks. First, we cross-validated the results of the multilevel analyses by randomly splitting each country sample into two subsamples and then replicated the analyses for both splits. The pattern of

**Table 2**
Acquiescence regressed on country-level and respondent-level predictors.

| Level | Predictor | Regression coefficient ($b$) | $p$ Value | Partial variance explained at country level | Partial variance explained at respondent level |
|---|---|---|---|---|---|
| Country | GDP | 0.013 | 0.450 | 0.000[b] | 0.000 |
| | Collectivism | 0.002 | 0.041 | 0.187 | 0.000 |
| | Corruption[a] | 0.039 | 0.001 | 0.473 | 0.000 |
| Respondent | Education | −0.043 | <0.001 | 0.176 | 0.029 |
| | Age | 0.001 | <0.001 | 0.000[b] | 0.004 |
| | Gender | −0.010 | 0.002 | 0.000[b] | 0.000 |
| | Conservatism | 0.073 | <0.001 | 0.085 | 0.045 |
| Complete model | | | | 0.737 | 0.097 |

[a] For the regression analysis, the corruption index was multiplied by $-1$, so that a high value on the corruption scale corresponds to a high level of corruption in the country. Gender: 1 = male, 2 = female. Variance explained at country level was calculated as $[\upsilon_{0j}(\text{without predictor}) - \upsilon_{0j}(\text{with predictor})] / \upsilon_{0j}(\text{without predictor})$. Variance explained at respondent level was calculated as $[\varepsilon_{ij}(\text{without predictor}) - \varepsilon_{ij}(\text{with predictor})] / \varepsilon_{ij}(\text{without predictor})$.
[b] Values <0 were fixed to 0.

results was very similar for both splits, which suggests no effect of capitalization on chance (see Table S3). In addition, we investigated the biasing effect of the intercorrelations of our predictors at the country level. We therefore excluded each of these three variables in turn from the analyses. The pattern of the results was highly comparable to that originally found (see Table S4). We also investigated whether the association between acquiescence and age, gender, education, or conservatism differed between countries and specified the associations as random effects which did not change the pattern of results (all $\Delta\beta < 0.002$). Finally, we also investigated whether our measure of acquiescence and our conservatism measure were invariant across countries. In particular, we investigated configural invariance (same factor structure), metric invariance (same factor loadings), and scalar invariance (same factor loadings and same intercepts) with multi-group structural equation models. The metric invariance models showed acceptable model fits (RMSEA < 0.07, SRMR ≤ 0.05), whereas the scalar invariance model revealed a poor model fit for both scales (RMSEA > 0.11, SRMR > 0.10). Likewise, the change in RMSEA ($\Delta$RMSEA < 0.015) and SRMR ($\Delta$SRMR < 0.030) also suggest accepting metric invariance for both scales (Chen, 2007).[2]

## 4. Discussion

The aim of the present study was to develop and test a comprehensive model encompassing individual-level determinants and country-level predictors of the tendency toward acquiescent responding in surveys.

Our results corroborate systematic differences in acquiescence between countries: 15% of the variance in acquiescence could be explained by country differences, while the remaining 85% was due to individual variations among the respondents within countries. Thus, the European countries included in our study differed substantially in their tendency toward acquiescence. With our set of predictors we were able to explain three-quarters of the country-level differences. The most central indicator explaining these differences in acquiescence between countries was the corruption level of the respective countries, followed by differences in their respective cultural orientations. The higher the corruption level and the level of collectivism of a country, the greater was the overall

---

[1] Even though these reliability estimates are too low to make inferences about individual respondents, they are in line with previous research (e.g., Danner et al., 2015) and thus can be seen as sufficient for regression analyses.

[2] We did not use $\chi^2$-cifference tests because in large samples (as the ESS) the $\chi^2$-difference test is likely to be statistically significant even if the magnitude of the differences in not meaningful.

IFR_AR_011908

194    B. Rammstedt et al. / Personality and Individual Differences 107 (2017) 190–194

tendency to acquiesce. By contrast, the economic wealth of the country had no significant additional effect on acquiescence. These results support Meisenberg and Williams' (2008) assumption that people living in corrupt societies are more subservient to powerful others. However, it has to be kept in mind that the present study investigated only European and thus comparatively wealthy countries. It needs, therefore, to be investigated in future studies if economic wealth has an additional effect on acquiescence based on a more heterogeneous set of countries.

Individual indicators such as educational level and degree of conservatism differed systematically across the countries and thus contributed to the explanation of the between-country differences in this response style.

Moreover, besides these differences between countries, our results revealed systematic differences between subpopulations: Some subpopulations within countries were more prone to acquiescence than others. Ten percent of these individual differences could be explained by our set of predictors. In line with previous research (e.g., Narayan & Krosnick, 1996; Rammstedt et al., 2010), our results revealed that—across all countries—individuals with lower levels of educational attainment and less conservative individuals were more prone to acquiescent responding than higher educated and more conservative individuals.

In contrast, the effect reported in earlier studies (see Weijters et al., 2010) that females have, on average, a higher tendency toward acquiescence could not be replicated. Rather, we found a statistically significant but not substantial effect of gender that indicated a slightly greater tendency toward acquiescence on the part of males compared to females.

Earlier findings with regard to the effects of age on acquiescence were inconsistent. While some studies suggested that older individuals have a greater tendency toward acquiescence (e.g., Meisenberg & Williams, 2008; Weijters et al., 2010), others identified no substantial effect of age (e.g., Eid & Rauber, 2000). Our results support these albeit somewhat contradictory findings insofar as we found a small statistically, but not practically, significant effect of age in the suggested direction.

In sum, our results support the notion that the corruption level and the cultural orientation of a country, in particular, explain cross-national differences in acquiescent responding. Taking these indicators into account, the economic wealth of a country was not found to contribute to the explanation of cross-national differences. This contrasts with findings of previous studies that did not control for other indicators.

Overall, our study substantially contributes to an understanding of cross-national differences in acquiescent responding. Systematic cross-national response artifacts, as detected in our study, may be misinterpreted as substantive differences across countries or cultures. Therefore, before drawing any conclusions from cross-national surveys, due caution should be taken to reduce acquiescence ex ante (e.g., by using balanced scales; Billiet & McClendon, 2000) or to control for acquiescence ex post (e.g., by using ipsatized data; Brown & Maydeu-Olivares, 2011). Typical areas of application for such ex-ante or post-hoc measures aimed at reducing acquiescence are all questionnaire-based data collections performed in multinational, multicultural, and multiregional contexts. Examples include, but are not limited to, international employee surveys (e.g., Johnson et al., 2005), cross-national media usage studies (e.g., Kuru & Pasek, 2016), and cross-cultural health surveys (Shavitt et al., 2016). In all these areas, variations in acquiescence carry the danger of being misinterpreted as differences in organizational commitment, media exposure habits, or health-related compliance. Therefore, mindfully considering and correcting for acquiescence should yield a more accurate picture about 'true' differences, and help to prevent deriving inappropriate subsequent measures.

## Appendix A. Supplementary data

Supplementary data to this article can be found online at http://dx.doi.org/10.1016/j.paid.2016.11.038.

## References

Aichholzer, J. (2014). Random intercept EFA of personality scales. *Journal of Research in Personality, 53*, 1–4.

Billiet, J. B., & McClendon, M. J. (2000). Modeling acquiescence in measurement models for two balanced sets of items. *Structural Equation Modeling, 7*, 608–628.

Brown, A., & Maydeu-Olivares, A. (2011). Item response modeling of forced-choice questionnaires. *Educational and Psychological Measurement, 71*, 460–502.

Chen, F. F. (2007). Sensitivity of goodness of fit indexes to lack of measurement invariance. *Structural Equation Modeling, 14*, 464–504.

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112*, 151–159.

Danner, D., Aichholzer, J., & Rammstedt, B. (2015). Acquiescence in personality questionnaires: Relevance, domain specificity, and stability. *Journal of Research in Personality, 57*, 119–130.

Eid, M., & Rauber, M. (2000). Detecting measurement invariance in organizational surveys. *European Journal of Psychological Assessment, 16*, 20–30.

European Social Survey Round 1 Data (2002). *Data file edition 6.4.* Norway: Norwegian Social Science Data Services (Data Archive and distributor of ESS data for ESS ERIC).

Ferrando, P. J., Condon, L., & Chico, E. (2004). The convergent validity of acquiescence: An empirical study relating balanced scales and separate acquiescence scales. *Personality and Individual Differences, 37*, 1331–1340.

Goldberg, L. R. (1963). A model of item ambiguity in personality assessment. *Educational and Psychological Measurement, 23*, 467–492.

Grimm, S. D., & Church, A. T. (1999). A cross-cultural study of response biases in personality measures. *Journal of Research in Personality, 33*, 415–441.

Harzing, A. -W. (2006). Response styles in cross-national survey research: A 26-country study. *International Journal of Cross Cultural Management, 6*, 243–266.

Hofstede, G. (2001). *Culture's consequences* (2nd ed.). Thousand Oaks, CA: Sage.

Javeline, D. (1999). Response effects in polite cultures: A test of acquiescence in Kazakhstan. *Public Opinion Quarterly, 63*, 1–28.

Johnson, T., Kulesa, P., Cho, Y. I., & Shavitt, S. (2005). The relationship between culture and response styles: Evidence from 19 countries. *Journal of Cross-Cultural Psychology, 36*, 264–277.

Johnson, T. P., Mohler, P. P., Harkness, J., & Braun, M. (2010). *Cultural values and survey response styles in the European Social Survey.* (Paper presented at the XVII World Congress of Sociology, Gothenburg, Sweden, July 2010).

Kuru, O., & Pasek, J. (2016). Improving social media measurement in surveys: Avoiding acquiescence bias in Facebook research. *Computers in Human Behavior, 57*, 82–92.

Marin, G., Gamba, R. J., & Marin, B. V. (1992). Extreme response style and acquiescence among Hispanics: The role of acculturation and education. *Journal of Cross-Cultural Psychology, 23*, 498–509.

Meisenberg, G., & Williams, A. (2008). Are acquiescent and extreme response styles related to low intelligence and education? *Personality and Individual Differences, 44*, 1539–1550.

Narayan, S., & Krosnick, J. A. (1996). Education moderates some response effects in attitude measurement. *Public Opinion Quarterly, 60*, 58–88.

Rammstedt, B., & Farmer, R. (2013). The impact of acquiescence on the evaluation of personality structure. *Psychological Assessment, 25*, 1137–1145.

Rammstedt, B., & Kemper, C. J. (2011). Measurement equivalence of the Big Five: Shedding further light on potential causes of the educational bias. *Journal of Research in Personality, 45*, 121–125.

Rammstedt, B., Goldberg, L. R., & Borg, I. (2010). The measurement equivalence of Big Five factor markers for persons with different levels of education. *Journal of Research in Personality, 44*, 53–61.

Rammstedt, B., Kemper, C. J., & Borg, I. (2013). Correcting Big Five measurements for acquiescence: An 18-country cross-cultural study with representative samples. *European Journal of Personality, 27*, 71–81.

Schwartz, S. (1994). Are there universal aspects in the content and structure of values? *Journal of Social Issues, 50*, 19–45.

Schwartz, S. H., & Ros, M. (1996). Values in the West: A theoretical and empirical challenge to the individualism-collectivism cultural dimension. *World Psychology, 1*, 91–122.

Schwartz, S. H., Melech, G., Lehmann, A., Burgess, S., & Harris, M. (2001). Extending the cross-cultural validity of the theory of basic human values with a different method of measurement. *Journal of Cross-Cultural Psychology, 32*, 519–542.

Shavitt, S., Cho, Y. I., Johnson, T. P., Jiang, D., Holbrook, A., & Stavrakantonaki, M. (2016). Culture moderates the relation between perceived stress, social support, and mental and physical health. *Journal of Cross-Cultural Psychology, 47*, 956–980.

Smith, P. B. (2004). Acquiescent response bias as an aspect of cultural communication style. *Journal of Cross-Cultural Psychology, 35*, 50–61.

Smith, P. B., & Fischer, R. (2008). Acquiescence, extreme response bias and culture: A multilevel analysis. In F. J. R. van de Vijver, D. A. van Hermert, & Y. H. Poortinga (Eds.), *Multilevel analysis of individuals and cultures* (pp. 285–314). New York: Lawrence Erlbaum.

Soto, C. J., John, O. P., Gosling, S. D., & Potter, J. (2008). The developmental psychometrics of Big Five self-reports: Acquiescence, factor structure, coherence, and differentiation from ages 10 to 20. *Journal of Personality and Social Psychology, 94*, 718–737.

Van Herk, H., Poortinga, Y. H., & Verhallen, T. M. M. (2004). Response styles in rating scales: Evidence of method bias in data from six EU countries. *Journal of Cross-Cultural Psychology, 35*, 346–360.

Van Vlimmeren, E., Moors, G., & Gelissen, J. (2015). *Developing a diagnostic tool for detecting response styles, and a demonstration of its use in comparative research of single item measurements.* (Paper presented at the 6th Conference of the European Survey Research Association (ESRA), Reykjavik).

Weijters, B., Geuens, M., & Schillewaert, N. (2010). The stability of individual response styles. *Psychological Methods, 15*, 96–110.

IFR_AR_011909

**JA236**



 _(/)_

- LinkedIn (https://www.linkedin.com/company/tahirih-justice-center)
- YouTube (http://www.youtube.com/channel/UCijnWEiM_0yc0-DHoRQoWdQ)
- Instagram (https://www.instagram.com/tahirihjustice/)
- Twitter (https://twitter.com/tahirihjustice)
- Facebook (http://www.facebook.com/pages/Tahirih-Justice-Center/142257595231)

Search

About Us (/about-us)    What We Do (/what-we-do)

Who We Serve (/who-we-serve)    Get Involved (/get-involved)    Give (/give)

News (/news-media)    Locations (/locations)

Tahirih Updates

# Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way

February 21st, 2023

IFR_AR_011937

JA238



**Focus Area Filter:** Direct Services (https://www.tahirih.org/focus_area/direct-services/), Policy Advocacy (https://www.tahirih.org/focus_area/policy-advocacy/)
**Location Filter:** National (https://www.tahirih.org/location/national/)
**Topic Filter:** Asylum (https://www.tahirih.org/tag/asylum/), Fair Immigration Laws (https://www.tahirih.org/tag/fair-immigration-laws/)

This article was originally published on February 21, 2023.

**Washington, D.C.** – Today, the Department of Homeland Security issued a proposed rule that would drastically limit eligibility for asylum for many people seeking safety at our Southern border. Under these new regulations, a person seeking asylum at a U.S. port of entry on the Southern border who does not have an appointment or traveled through another country without applying for protection there first will be considered ineligible for asylum here – with few exceptions. **This asylum ban cuts off a critical path to safety for survivors and sends them back to dangerous conditions where they often face further violence and trauma.**

> "The purpose of asylum is to protect, not punish, people in desperate circumstances fleeing for their lives," said **Casey Carter Swegman, Director of Public Policy**. "While the administration has repeatedly promised to promote a fair and humane asylum system, the impact of this new rule will mean that many survivors of gender-based and other violence will be swiftly sent back into harm's way. This rule would extinguish the last beacon of hope for some of the world's most vulnerable people."

IFR_AR_011938

**JA239**

Deciding whether someone *could have* successfully obtained protection from another country or made an appointment is a matter best left to a U.S. asylum officer or immigration judge in the context of a fair hearing that promotes due process. An outright ban simply keeps out those who might qualify under the law.

Everyone who comes to the U.S. seeking safety – no matter where they are from or how they arrived – must be given a fair chance to show why they fear persecution in their home country, and policies that aim to stop migrants from seeking asylum in the U.S. like this latest asylum ban rarely succeed at deterring migration (https://immigrationimpact.com/2021/04/02/immigrants-coming-to-the-border-deterrence-policies/). Instead, they greatly exacerbate the risk and prevalence of gender-based violence (GBV) at the border harming the most vulnerable groups of people, including women, girls, and LGBTQIA+ individuals.

It is a fact that **migrants turned away at the U.S.-Mexico border are more vulnerable to GBV at the hands of cartels and other organized crime groups.** In our recent study (https://www.tahirih.org/wp-content/uploads/2022/10/Oxfam_Tahirh_Surviving-Deterrence_English_2022.pdf), service providers noted that between 30% and 90% of their clients have experienced GBV while at the border, and 68% indicated that their clients frequently report that they have been raped and/or sexually assaulted at the border. President Biden has stated that ending violence against women is the cause of his life (https://www.whitehouse.gov/briefing-room/statements-releases/2022/11/23/statement-by-president-joe-biden-on-the-occasion-of-international-day-for-the-elimination-of-violence-against-women-2/) and this administration has positioned itself as champions of that cause and yet immigrant survivors seeking asylum continue to be forgotten.

President Biden and Congress must stop pointing fingers and work together to fix our broken immigration system instead of doubling down on harmful, failed policies that place migrants at increased danger.

For media inquiries, please email Karla Flores at media@tahirih.org (mailto:media@tahirih.org).

*The Tahirih Justice Center is a national, nonprofit organization that serves immigrant survivors of gender-based violence. By amplifying the experiences of survivors in communities, courts, and Congress, Tahirih's mission is to create a world in which all people share equal rights and live in safety and with dignity.*

MORE Tahirih Updates

IFR_AR_011939

Project Empower: A Guaranteed Income Program for Survivors of Gender-Based Violence (https://www.tahirih.org/news/project-empower-a-guaranteed-income-program-for-survivors-of-gender-based-violence/)

February 15th, 2023

First-of-its-Kind Guaranteed Income Pilot Provided Financial Support and Long-Term Stability to Domestic Violence Survivors and their Children (https://www.tahirih.org/news/first-of-its-kind-guaranteed-income-pilot-provided-financial-support-and-long-term-stability-to-domestic-violence-survivors-and-their-children/)

February 15th, 2023

- **Latest News**

  - Biden's Asylum Ban Will Continue to Place Survivors in Harm's Way (https://www.tahirih.org/news/bidens-asylum-ban-will-continue-to-place-survivors-in-harms-way/)

    Today, the Department of Homeland Security issued a proposed rule that would drastically limit eligibility for asylum for many people seeking safety at our Southern border. Under these new regulations, a person seeking asylum at a U.S. port of entry on the Southern border who does not have an appointment or traveled through another country without applying for protection there first will be considered ineligible for asylum here – with few exceptions. This asylum ban cuts off a critical path to safety for survivors and sends them back to dangerous conditions where they often face further violence and trauma.

    February 21, 2023

  - Project Empower: A Guaranteed Income Program for Survivors of Gender-Based Violence (https://www.tahirih.org/news/project-empower-a-guaranteed-income-program-for-survivors-of-gender-based-violence/)

    Project Empower is a first-of-its-kind guaranteed income (GI) program designed to support immigrant survivors of gender-based violence. This program offered unconditional, regular cash transfers of $1000 per month to 10 […]

    February 15, 2023

IFR_AR_011940

**JA241**

- **Survivor Voices**

  -  (https://www.tahirih.org/survivor-voices/camila/)

    Camila (https://www.tahirih.org/survivor-voices/camila/)

    "I hope my story is helpful to someone else…and can inspire many women to be stronger. We need to help young women identify toxic relationships, so that there are fewer Camilas that go through such difficult things, let alone have our children suffer."

    November 21, 2022

  -

    (https://www.tahirih.org/survivor-voices/brenda/)

    Brenda (https://www.tahirih.org/survivor-voices/brenda/)

    When I was 15 years old, I left my parents' home in Mexico. I was sexually abused by my stepfather, and I thought I would be safer moving out with […]

    November 14, 2022

IFR_AR_011941

**JA242**

Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 617 of 660

☰                              **Los Angeles Times**                    SUBSCRIBE    LOG IN    🔍

POLITICS

# Asylum seekers face decision to split up families or wait indefinitely under new border policy

IFR_AR_012388

**JA243**

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 618 of 660



JA244

Russian asylum seekers warm up by a small fire at the U.S.-Mexico border fence near Somerton, Ariz., on Dec. 26.
(Rebecca Noble / AFP via Getty Images)

BY ANDREA CASTILLO  |  STAFF WRITER

FEB. 24, 2023 **UPDATED** 2:20 PM PT

WASHINGTON —  Inside a tent near the Rio Grande in Matamoros, Mexico, Jeyson woke up every day for a month before 3 a.m. to fill out applications to request asylum for his family of four through a U.S. government mobile app.

The 25-year-old from Venezuela eventually secured appointments for himself and his wife, but the slots filled up so quickly that he couldn't get two more for their children. They weren't worried though — they had heard about families in similar situations being waved through by border officials.

IFR_AR_012389

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 619 of 660

Instead, he said, a U.S. Customs and Border Protection agent told them last week that because each member of the family did not have an appointment: "You two can enter, but not your children." Jeyson asked The Times to withhold his last name out of fear for his family's safety.

ADVERTISEMENT

Now many families like Jeyson's have found themselves confronted with a seemingly impossible decision: Wait indefinitely for enough appointments for the whole family, or split up. It is unclear just how many migrants have been affected.

IFR_AR_012390

JA245

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 620 of 660



Venezuelan and Nicaraguan migrants are transferred by agents of the Border Patrol after crossing the Rio Grande from Ciudad Juarez, Chihuahua state, Mexico, to El Paso, Texas, to ask for political asylum on Dec. 27. (Herika Martinez / AFP via Getty Images)

The CBP One mobile application, which was rolled out last month, was intended to reduce the number of illegal crossings between ports of entry. Now the only government-sanctioned way to request humanitarian protection at the border, it requires all members of a family to have confirmed appointments. But with such high demand, families have found it practically impossible to secure enough slots.

Migrants and advocates near the Texas, Arizona and California borders said that initially, CBP agents overlooked the requirement and accepted families as long as at least one person had a registered appointment. Earlier this month, however, as demand for appointments grew, agents began enforcing the policy.

"Now what you have is a system that privileges single people," said Priscilla Orta, a supervising attorney at Lawyers for Good Government in Brownsville, Texas, IFP_AR_012391

JA246

Migrants in northern Mexico near the U.S. border say they've encountered a variety of technical issues while attempting to secure appointments with border agents: Daily appointments run out within minutes on the app, which has been prone to crashing and is unavailable in most languages. Users of the app have also reported that the facial recognition feature has failed to capture users with darker skin or fidgeting babies.

The Department of Homeland Security, which oversees CBP, said errors during submission are due to appointments no longer being available, not problems with facial recognition, and that the feature thwarts scammers who could book appointments to later sell them. CBP said it has updated the face capture process to resolve the issue, now allowing migrants to submit still photos during registration.

DHS spokesman Luis Miranda said the free app cuts out smugglers, decreases migrant exploitation and improves security and efficiency. He said CBP updated the app this week to make it easier for family units to secure appointments by releasing them in larger batches at fewer intervals of time. For example, instead of 20 appointments released every 15 seconds, 40 appointments could be released every 30 seconds, giving families a better chance to compete before the slots run out.

"DHS is committed to family unity," he said. "The CBP One app is a transparent and publicly accessible way to schedule appointments for migrants seeking to arrive at a land port of entry."

Seeking asylum is a legal right under U.S. and international law, regardless of how someone arrives on U.S. soil. But under a pandemic-era public health policy called Title 42, migrants are prevented from seeking asylum at the border. On Jan. 12, immigration authorities started allowing migrants to request exceptions to the policy if they met certain "vulnerability criteria" such as having immediate safety or medical concerns.

Use of Title 42 at the border is expected to end on May 23, and officials have said they are negotiating a deal to deport non-Mexican migrants to Mexico after that time. On

IFR_AR_012392

JA247

Tuesday, the Biden administration announced a policy that would limit asylum access for migrants who cross into the U.S. without authorization and fail to apply for protections on the way to the southern border.

Meanwhile, many migrants live in unsanitary tent encampments without regular access to food and clean water. Human Rights First has tracked more than 13,480 reports of violent attacks on migrants blocked in or expelled to Mexico, including murder, kidnapping and rape, since President Biden took office in January 2021.

DHS is under federal court order to track and report the number of people allowed into the country through exceptions. Filings show nearly 21,900 people used CBP One to enter the U.S. in January, a slight decrease from just over 23,000 people who entered under a similar process in December. Republican-led states that sued to keep Title 42 in place have closely monitored those monthly reports and in November filed a motion accusing DHS of increasing exceptions without properly notifying the court, which the federal government denied.

IFR_AR_012393

JA248

Case 1:24-cv-01702-RC     Document 53-1     Filed 09/27/24     Page 623 of 660



Mostly Haitian migrants prepare to board a bus taking them from a shelter to a U.S. port of entry to start legal paperwork in Reynosa, Tamaulipas state, Mexico, on the border with McAllen, Texas, on May 19. (Pedro Pardo / AFP via Getty Images)

DHS officials said that border agents have occasionally used their discretion to allow unscheduled family members entry, but that large numbers of people recently began showing up with just one appointment scheduled for an entire family. The agency hasn't seen an indication that any particular group is being disadvantaged based on appointment data, officials said, and more improvements to streamline scheduling will roll out soon.

Pedro de Velasco, advocacy director at the Kino Border Initiative, a Catholic humanitarian aid group based in Nogales, Ariz., disagreed that migrants intentionally failed to schedule enough appointments. He said CBP should dedicate some employees to process migrants who need help troubleshooting the app, much like cashiers available to help customers who get stuck when using the self-checkout line at a grocery

IFR_AR_012394

JA249

Case 1:24-cv-01702-RC     Document 53-1     Filed 09/27/24     Page 624 of 660

store. He also recommended the agency designate appointments each day for larger families.

Tom Cartwright, who tracks deportation flights for the organization Witness at the Border, said DHS should publicly communicate all changes to the process so applicants aren't left in the dark and have a clear understanding of the requirements.

Applying for asylum through the app is a two-step process: Migrants must first register and then schedule an appointment, which could require trying daily until a sufficient number of spots are secured. Many migrant families were unaware that they should register as individuals under the same group.

Jean, 31, of Haiti, who asked to be identified by his first name for his safety, had scheduled two appointments last week in Laredo, Texas, which was six hours from the shelter in Reynosa, Mexico, where his family has lived for the past three months. He, his wife and daughter rode two buses to avoid cartel-controlled roads and paid about $300 in transportation and lodging to get to the appointments, only to be turned back. Despite daily attempts on the app for the past week, they haven't been able to secure three new appointments.

"It's too complicated, too difficult," he said of the app. "Now we have nothing. When I returned here, I asked a woman for a little food to eat."

Jeyson said his family's journey to the U.S.-Mexico border was harrowing. They left Venezuela in September after government-affiliated armed groups threatened them, he said, crossed the dangerous jungle between Colombia and Panama, were jailed three times in southern Mexico and arrived in Matamoros to find migrant shelters full.

Some days, they don't eat, he said. The squalid living conditions at their tent encampment, where hundreds of migrants share five portable toilets, left his son with an eye infection and his wife with a urinary tract infection.

IFR_AR_012395

JA250

Case 1:24-cv-01702-RC   Document 53-1   Filed 09/27/24   Page 625 of 660

Penniless and too afraid to travel to a different city, Jeyson hoped four spots would open up at the Brownsville, Texas, port of entry. On the international bridge last week, they and several other families tearfully pleaded with a CBP agent, who replied that he would start taking photos of those who refused to leave, Jeyson said. His family fled, forgetting a suitcase that contained all their spare clothes.

Jeyson's wife has since managed to secure a single appointment for next month. Their new plan is for her to go alone and Jeyson to stay behind with their children until he can get three additional appointments.

"We already risked it all," he said. "What can we do? We are hopeful that we can get three appointments. Three, in the end, is less than four."

Advocates said some parents are making the decision to leave their children in the care of extended family or friends and keep their appointments with CBP.

Jeyson said another couple from the tent encampment did just that, leaving their five children at the border bridge and entering the U.S. after managing to get only two appointments.

Children who are unaccompanied by a parent are exempt from Title 42. Those in the care of adults who are not their legal guardian — even if they are extended family — are separated until a guardian can be properly vetted. Jeyson said he watched as the children walked up to a border agent and were taken into custody.

Felicia Rangel-Samponaro, director of the Sidewalk School, a nonprofit that offers education, medical care and other assistance to migrants in Mexican border towns, has organized sessions with parents at various shelters and encampments in Matamoros and Reynosa to explain what will happen if they send their child across the border unaccompanied.

IFR_AR_012396

JA251

Case 1:24-cv-01702-RC    Document 53-1    Filed 09/27/24    Page 626 of 660

"We don't want them to think you cross and then your child crosses and will come back to you a day later," she said. "We were surrounded by parents who were showing us, one after the other, how they have an appointment but their child does not."

Rangel-Samponaro recommended to parents that they cancel the appointment and restart their search. But after the sessions, some parents told her they would separate from their kids anyway.

"Family separation has never stopped," she said, referencing the Trump administration's "zero tolerance" border policy that led to <u>thousands of migrant children being taken from their parents</u>, prompting outrage and investigation. "The only difference here is that CBP One is now doing it instead of the other ways it's been done since 2018."

POLITICS    WORLD & NATION    CALIFORNIA    IMMIGRATION AND THE BORDER

---



## Get Group Therapy

Life is stressful. Our weekly mental wellness newsletter can help.

| Enter email address |
| --- |

| SIGN ME UP |
| --- |

You may occasionally receive promotional content from the Los Angeles Times.



Andrea Castillo

🐦 Twitter    📷 Instagram    ✉ Email    f Facebook

Andrea Castillo covers immigration. Before joining the Los Angeles Times, she covered immigrant, ethnic and LGBT communities for the Fresno Bee. She got her

IFR_AR_012397

JA252



JA253

Case 1:24-cv-01702-RC Document 53-2 Filed 09/27/24 Page 12 of 200

 Human Rights First

Donate

AUTHORITARIANISM / SYSTEMIC INJUSTICE

# NEW REPORT DOCUMENTS DEVASTATING TOLL OF COURT–ORDERED REIMPLEMENTATION OF REMAIN IN MEXICO

WASHINGTON, DC -- A new report, Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived, finds that asylum seekers subjected to the court-ordered reimplementation of the Remain in Mexico (RMX) policy suffered kidnappings and other violent attacks in Mexico. The report comes as the federal district court in Texas that had enjoined the initial termination of Remain in Mexico considers a request by Trump-aligned attorneys general to force the Biden administration to halt the policy's end again.

**WASHINGTON, DC —** A new **report**, *Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived*, finds that asylum seekers subjected to the court-ordered reimplementation of the Remain in Mexico (RMX) policy suffered kidnappings and other violent attacks in Mexico. The report comes as the federal district court in Texas that had enjoined the initial termination of Remain in Mexico considers a request by Trump-aligned attorneys general to force the Biden administration to halt the policy's **end** again.

"The Remain in Mexico policy was, and remains, an unmitigated human rights and refugee protection disaster. U.S. policies that return asylum seekers to Mexico cannot be implemented lawfully, safely, or humanely," said **Kennji Kizuka, associate director for refugee protection research at Human Rights First and co-author of the report.** "Just like the initial policy, the court-ordered reimplementation of Remain in Mexico delivered asylum seekers to brutal, targeted attacks. This policy should never be resurrected by a future administration, adopted in law by Congress, or again forced by the courts into use."

*Fatally Flawed* draws on interviews conducted by Human Rights First with asylum seekers returned to Mexico as well as nearly 2,700 interviews conducted by pro bono legal staff with migrants and asylum seekers enrolled in RMX during the court-ordered reimplementation ("RMX 2.0"). These interviews reveal brutal attacks on asylum seekers, including kidnappings, rapes, torture, and other violence after returning to Mexico under the court-imposed reimplementation of RMX.

"Every day that asylum seekers are forced to wait in Mexico for the policy to be fully unwound is another day they are at risk of being kidnapped, raped, or tortured," said **Julia Neuser, research and policy associate attorney at Human Rights First and co-author of the report.** "The Biden administration was right to end this brutal policy that returned thousands of asylum seekers to horrific violence."

Key findings from the **report** include:

- Staggering statistics of targeted violence in Mexico against migrants and asylum seekers. Of nearly 2,700 interviews reviewed by Human Rights First of people initially enrolled in RMX during its court-ordered reimplementation, ___ent (1,109 people) reported violent attacks in Mexico.

Skip to content

IFR_AR_013607

JA254

 Human Rights First

Donate

- Despite steps announced by the Department of Homeland Security (DHS) to "**enhance**" security, kidnappings, rapes, and other violent assaults continued against people after DHS had returned them to Mexico under RMX 2.0. Recent attacks include: a Nicaraguan woman kidnapped and sexually assaulted, a Venezuelan asylum seeker beaten and shot at, a teenage girl sexually assaulted, and two Nicaraguans kidnapped by a cartel and forced to watch as cartel members put a gun in another man's mouth and threatened to kill him.

- RMX 2.0 remained a due process farce:
  -Only **five percent** of people returned under RMX 2.0 had a lawyer – an even lower rate than the eight percent represented during RMX under the Trump administration.
  -Recent government data shows only **63** asylum seekers in RMX 2.0 have been granted relief out of 1,600 completed cases. This rate is nearly identical to the **4.1 percent** grant rate for RMX cases completed during the Trump administration.

- Of those subjected to RMX 2.0, **78 percent** were from Cuba, Nicaragua, and Venezuela – countries from which many refugees are fleeing.

- Black and Indigenous migrants continue to be targeted for kidnappings, violence and discrimination in Mexico due to their race and/or Indigenous identity.

- Mexican police, immigration officers, and other government authorities continue to be responsible, often in collusion with cartels, for brutal attacks on migrants and asylum seekers after being returned to, or while passing through, Mexico.

---

**PRESS**

Published on September 15, 2022

**SHARE**

in  f  🐦  🔗

**RELATED POSTS**                                                                                    ←  →

Skip to content

IFR_AR_013608

JA255



Case 1:24-cv-01702-RC   Document 53-2   Filed 09/27/24   Page 46 of 200



EXCLUSIVE

IMMIGRATION

# Mexico is stopping nearly three times as many migrants now, helping keep U.S. border crossings down

Biden administration officials say the increased help from Mexico in slowing migration is proof their relationship with Mexico is more productive than Trump's approach.

— Migrants arrive in El Ceibo, Guatemala, from Mexico after being deported.

Johan Ordonez / AFP via Getty Images file

May 15, 2024, 6:30 AM EDT

## By Julia Ainsley and Chloe Atkins

Mexico is stopping nearly three times as many migrants who have crossed its southern border as it was a year ago, a trend that U.S. officials say has helped blunt the surge in crossings of the U.S.

IFR_AR_014219

JA257

border usually seen at this time of year.

Biden administration officials also point to the increased help from Mexico in slowing migration as proof that their relationship with their southern neighbors is more effective than the Trump administration's.

Former President Donald Trump has derided President Joe Biden's record and claimed that his administration was more successful at controlling the border.

Early last year, Mexico interdicted roughly 100,000 migrants at its southern border or inside Mexico per month, while the U.S. was apprehending over 193,000 migrants monthly at the U.S.-Mexico border. This year, more migrants are being stopped inside Mexico than in the U.S., with over 280,000 being interdicted in Mexico and 189,000 in the U.S. in March, according to figures obtained by NBC News.

The Mexican government doesn't publicly share its migrant interdiction numbers like the U.S. does.

The high numbers of migrants stopped in Mexico show how chaotic the U.S. border could become if Mexico cannot sustain its interdiction efforts. Another spike in border crossings could hurt Biden in the coming election.

Top border officials under investigation over ties to tequila maker

01:59



IFR_AR_014220

JA258

According to Customs and Border Protection officials, April's figures, which have yet to be publicly released, are expected to continue to show relatively low numbers compared to the seasonal uptick typically seen in April and May.It isn't known how many of the migrants Mexico intercepts are actually deported. Many migrants are stopped by Mexican officials at the Guatemala-Mexico border and promptly returned to Guatemala, immigration advocates told NBC News.

Many others are being stopped in northern Mexico and bused to the southern end of the country. From there, they can't use the CBP One app on their mobile phones to make appointments for U.S. asylum hearings, since the app doesn't work south of Mexico City, said Amy Fischer, director of refugee and migrant rights at Amnesty International USA.

"In one way, they are doing the dirty work of the U.S. in order to keep people from accessing the U.S. southern border and exercising their right to seek safety," Fischer said.

Certain groups, like unaccompanied children and migrants traveling as families, receive special protection under Mexican law that limits their deportation.

U.S. officials say Mexico's willingness to interdict more migrants, a costly process, is in large part due to increased dialogue between the two countries on issues like immigration, fentanyl and illegal firearms trafficking.

Both Biden and Mexican President Andrés Manuel López Obrador, known as AMLO, recognized the severity of the problem at the end of last year when Mexico's funding to stop migrants ran low and the number of migrants crossing the U.S.-Mexico border surged to record highs.

IFR_AR_014221

JA259



20 Geo. Immigr. L.J. 167

**Georgetown Immigration Law Journal**
Winter, 2006

**Article**

Michele R. Pistone, John J. Hoeffner [a1]

Copyright © 2006 by The Georgetown Immigration Law Journal; Michele R. Pistone, John J. Hoeffner

# RULES ARE MADE TO BE BROKEN: HOW THE PROCESS OF EXPEDITED REMOVAL FAILS ASYLUM SEEKERS

Expedited removal, whereby a person arriving in the United States can be removed within forty-eight hours and barred from returning for up to five years without any judicial oversight or review, [1] is one of the greatest powers any agency of the United States government possesses. This power was originally granted to the Immigration and Naturalization Service (INS) in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). [2] Since the expedited removal provisions of IIRIRA became effective in April 1997, the INS and its successor agency, Customs and Border Protection (CBP) -- a division of the Department of Homeland Security (DHS) [3] -- have removed more than 500,000 persons from the United States via the expedited removal process. [4] This Article examines and explains the impact of the expedited removal process on genuine asylum seekers and explores possibilities for improving the system.

In addition to the potentially enormous consequences for individuals subject to expedited removal -- genuine asylum seekers who are wrongly removed, for example, are by definition at risk of suffering persecution, torture or death -- what makes the expedited removal authority perhaps **\*168** uniquely weighty is not simply the lack of judicial oversight, but the near absence of oversight of any kind. This combination of circumstances does not exist with other substantial powers. The criminal justice authority, an analogous power in terms of its focus on individuals and its impact on them, is circumscribed by appellate review, the right to trial by jury and the right to counsel, as well as by the accessibility of the process to the press and public. Expedited removal, however, typically takes place out of public view, with only CBP inspectors -- acting as judge, jury and oftentimes prosecutor -- present.

The importance of the expedited removal process to the individuals affected and the unreviewable finality of CBP's decisions make it imperative that CBP err as little as possible. Yet, to ensure removal and due to economic and security-based concerns, CBP also expects to make and *implement* most of its deportation decisions under expedited removal within forty-eight hours of an applicant's arrival. [5] There is considerable tension between high speed and high accuracy and fairness, and no one could reasonably expect perfection from any system that is subjected to these dueling demands. Some errors, in other words, may be necessary evils.

The history of the development of expedited removal makes clear that the inherent conflict between speedy decision-making and accurate and fair decision-making was well understood at the procedure's inception. [6] The formidable task that befell those charged with creating the administrative rules to implement the mostly vague directive of Congress was to make expedited removal approximate, *as much as possible*, the much lengthier and more considered review formerly available as a matter of course in formal hearings before immigration judges. At those hearings, the goals of accuracy and fairness in decision-making were advanced by, among other things, affording applicants for admission the right to present witnesses and evidence in support of their defense to removal, the right to cross-examine any government witnesses, and the right to be represented by counsel (at no expense to the government). In addition, the deportation decisions of immigration judges were subject to review by the Board of Immigration Appeals and the federal courts. [7]

Under expedited removal, these rights had to be approximated rather than duplicated because duplication would destroy the summary nature of the **\*169** process. Full rights could not be afforded without ignoring both congressional legislative intent as



Case 1:24-cv-01702-RC    Document 53-2    Filed 09/27/24    Page 78 of 200

RULES ARE MADE TO BE BROKEN: HOW THE..., 20 Geo. Immigr. L.J. 167

### 1. *Inspectors Fail to Communicate Required Information*

CBP training materials state that secondary inspectors must use the I-867A & B forms "in every case in which an alien is determined to be subject to Expedited Removal."[38] The following paragraphs of the I-867A must be read to persons subject to expedited removal:

> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, barred from reentry for a period of 5 years or longer.

> This may be your only opportunity to present information to me and the Immigration and Naturalization Service [sic] to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.[39]

Nothing is more crucial in preventing the deportation of genuine asylum seekers via expedited removal than ensuring that the I-867A information is communicated; hence, the controlling regulation requires that the information be read out-loud by the secondary inspector or a translator.[40] The need to do this is particularly acute in the case of the paragraph that informs individuals that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their **\*177** home country." Many victims of persecution are from countries that tightly control information about the ability of victims of persecution to seek refuge in other countries. Thus, for this or other reasons, many applicants for admission are unaware of their right to ask for protection from return and must affirmatively be told about this right by the inspections officer.[41]

The same paragraph also contains important information stating that expressions of fear about returning home will be treated confidentially. Especially given the prevalence of post-traumatic stress disorder (PTSD) among true victims of persecution,[42] as well as the fear that inspectors may relay claims of persecution back to the home government (and thereby possibly endanger the applicant, if returned, or his or her family), many applicants may need to receive the assurance of confidentiality before they will communicate with their interrogators.

The other paragraphs of the I-867A form are also important and failure to read them reduces the accuracy of the secondary inspection process as well.[43] Unfortunately, if an inspector fails to read the form aloud, or any part of it, nothing is likely to be done because the omission will likely never be revealed; the file reviewed by supervisors does not require any assurance that the I-867A was read. It is perhaps unsurprising, then, that the form often is not read at all.

The recent report by USCIRF notes both the extent of the failure to read the I-867A aloud and the consequences of this omission. For example, with respect to the failure to read the paragraph informing the applicant of the availability of protection to people who face persecution, the report states:

> DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has **\*178** a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this

IFR_AR_014510





# Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions

## Seth J. Hill[1] and Margaret E. Roberts[2]

[1] Department of Political Science, University of California San Diego, 9500 Gilman Drive #0521, La Jolla, CA 92093-0521, USA. E-mail: sjhill@ucsd.edu, www.sethjhill.com.
[2] Department of Political Science and Halıcıoğlu Data Science Institute, University of California San Diego, 9500 Gilman Drive #0521, La Jolla, CA 92093-0521, USA. E-mail: meroberts@ucsd.edu, www.margaretroberts.net.

## Abstract

Scholars, pundits, and politicians use opinion surveys to study citizen beliefs about political facts, such as the current unemployment rate, and more conspiratorial beliefs, such as whether Barack Obama was born abroad. Many studies, however, ignore acquiescence-response bias, the tendency for survey respondents to endorse any assertion made in a survey question regardless of content. With new surveys fielding questions asked in recent scholarship, we show that acquiescence bias inflates estimated incidence of conspiratorial beliefs and political misperceptions in the United States and China by up to 50%. Acquiescence bias is disproportionately prevalent among more ideological respondents, inflating correlations between political ideology such as conservatism and endorsement of conspiracies or misperception of facts. We propose and demonstrate two methods to correct for acquiescence bias.

*Keywords:* political beliefs, misperceptions, rumors and conspiracies, acquiescence-response bias, survey methodology

***Political Analysis (2023)***
**vol. 31: 575–590**
**DOI:** 10.1017/pan.2022.28

**Published**
9 January 2023

**Corresponding author**
Seth J. Hill

**Edited by**
Jeff Gill

© The Author(s), 2023. Published by Cambridge University Press on behalf of the Society for Political Methodology. This is an Open Access article, distributed under the terms of the Creative Commons Attribution licence (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted re-use, distribution and reproduction, provided the original article is properly cited.

The rise of social media and the spread of partisan news and disinformation have increased the importance of conspiratorial beliefs and factual misperceptions. Scholars have responded to these trends by estimating the incidence, sources, and correlates of these beliefs.[1] Social scientists and journalists express concern that the public is misinformed about public affairs and unable to distinguish truth from innuendo. Findings generate news headlines such as "Even If It's 'Bonkers,' Poll Finds Many Believe QAnon And Other Conspiracy Theories" (National Public Radio 2020) and "Half of Americans Believe in 9/11 Conspiracy Theories" (Gohse 2016).

The evidence generating these troubling conclusions, however, comes from opinion surveys, a measurement tool that existing research finds poses many challenges to studying political beliefs. Survey responses can be influenced by partisan cheerleading, shirking, lack of incentives, expressive responding, survey trolling, social desirability bias, and idiosyncratic error (e.g., Ansolabehere, Rodden, and Snyder 2008; Berinsky 2018; Bullock *et al.* 2015; Graham and Huber 2020; Krosnick 1991; Lopez and Hillygus 2018; Prior and Lupia 2008; Smallpage *et al.* 2022). These challenges can specifically influence issues surrounding rumors and misperceptions (e.g., Graham 2022; Westwood *et al.* 2022).

Here, we demonstrate an additional first-order challenge to measuring conspiratorial and political beliefs. We return to an old literature on "acquiescence-response bias"—the phenomenon where survey respondents are more likely to answer True, Agree, and Yes than False, Disagree, or No regardless of the question asked. We find that acquiescence-response bias can have important effects not only on estimates of the population rate of beliefs, but also on the correlation between beliefs and individual characteristics such as education and political ideology.

---

1  For recent examples, see Allcott and Gentzkow (2017), Berinsky (2017), Flynn, Nyhan, and Reifler (2017), Guess, Nyhan, and Reifler (2020), Huang (2017), Jerit and Zhao (2020), Lazer *et al.* (2018), Oliver and Wood (2014), Pennycook and Rand (2019), Nyhan and Reifler (2010), and Vosoughi, Roy, and Aral (2018).

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015111

JA265

The current literature studying conspiracies, misperceptions, and disinformation could benefit from increased attention to acquiescence bias. Studies often measure beliefs by asking survey respondents if they endorse or agree with a particular statement. For example, does the respondent "Agree or Disagree" that 9/11 was a conspiracy by global elites? Is the rumor that Barack Obama was born abroad "True or False?" "Yes or no, is the following statement correct?" To document the typicality of such questions, we reviewed 60 published articles that study predictors of false beliefs summarized in a recent review of psychological drivers of misinformation (Ecker *et al.* 2022, "Drivers of False Beliefs" section). Twenty-eight of the cited studies fielded survey questions that asked about a conspiratorial or false statement and 27 of the 28 asked the question with an Agree–Disagree, Yes–No, or True–False instrument. When questions are written so that the acquiescent response indicates endorsement of a false belief or conspiracy theory, the bias can cause overestimates of the population rate of endorsement.

In addition, acquiescence bias is thought to be a dispositional trait driven by personality, education, or life experience (Schuman and Presser 1981). Some respondents might default to the acquiescent option as they try to answer survey questions that they have not before encountered or about which they are uncertain. This means that acquiescence bias varies across the population in ways that correlate with individual characteristics—for example, with partisanship, ideology, or education. Correlation between acquiescence bias and individual characteristics then biases estimates of correlations between individual characteristics and conspiratorial and false beliefs.

We first present new evidence that acquiescence bias can impact the inferences scholars draw from survey evidence on political beliefs, sometimes causing overestimates of 40 and 50 percentage points. Across six new surveys, we fielded the same questions asked in recent studies about political rumors and facts along with our own questions on political beliefs. We fielded surveys to thousands of respondents in the United States and China sampled from different online survey firms (Lucid, Qualtrics, and NORC) as well as Mechanical Turk. We asked about beliefs on matters of objective statistics, such as GDP growth and currency exchange rates, as well as beliefs of conspiratorial nature such as airplane contrails being government-sponsored chemicals. We used different instruments to elicit beliefs: binary True/False, agreement Likert scales, and continuous subjective probabilities, with and without monetary incentives for accuracy. We find evidence of acquiescence bias across all factors. Because our surveys cover a range of topics, samples, elicitation instruments, and types of misperceptions and conspiracies, we have greater confidence that acquiescence bias contaminates inferences for scholars across many settings and that our results are not driven by one or two idiosyncratic wordings or samples.

To estimate the incidence of acquiescence bias, we implement a simple research design. For each question on each survey, we fielded both the version of the question from the original study and an alternative version. The alternative version flips the meaning of the agreeable response so that acquiescence bias works in the opposite direction as it does in the original item. Instead of eliciting respondent beliefs that "Pope Francis endorsed Donald Trump," the alternative question elicited beliefs that "Pope Francis did not endorse Donald Trump." As best we could, we wrote each alternative version to be logically equivalent to the original wording. Absent acquiescence bias, respondents should return the same rate of endorsement to each version of the question.

We find that survey respondents do not return the same rate of endorsement to the two versions on the majority of questions across samples, topics, instruments, and types of belief. The magnitude of difference can be substantively large. Thus, inferences about the magnitude of conspiracy theory endorsement or misperception of political facts can depend importantly on whether the question is worded with affirmative belief measured with an acquiescent response. We also find large acquiescence bias on questions fielded to respondents in China and on questions about

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015112



democratic norms and the transition of power following the 2020 American presidential election (asked in Clayton *et al.* 2021).[2]

We then show how acquiescence bias obscures estimates of correlations between characteristics of individuals and conspiratorial thinking. For example, we find that acquiescence bias magnifies the partisan differences of beliefs in conspiracy theories. We field questions from a highly cited work on fake news and rumors (Allcott and Gentzkow 2017) and find that partisan differences for some beliefs are halved in the alternative version.

In recent years, many prominent studies and news stories have reported on troubling magnitudes of conspiracy theory beliefs by ideological conservatives (e.g., Garrett and Bond 2021). We find that subjects who identify as very conservative exhibit larger acquiescence bias than those with less ideological identification. Our results suggest that existing conclusions are driven in part by greater acquiescence bias by survey respondents with conservative leanings. We also find greater acquiescence bias by strong liberals relative to less ideological subjects.

After documenting bias in both extent and correlation, we present two simple and easy-to-use methods to correct for acquiescence bias. The first method generates estimates of both the population rate of the belief purged of acquiescence bias and of the average magnitude of bias. The second method generates estimates of population correlations between characteristics and conspiratorial beliefs purged of acquiescence bias. Each method rests on a simple assumption that acquiescence bias is on average symmetric between positive- and negative-keyed questions. To implement the fix, scholars simply field two versions of each question, one positive- and one negative-keyed, and apply the statistical correction.

## 1 Acquiescence-Response Bias

Acquiescence bias—"the tendency to endorse any assertion made in a question, regardless of its content" (Krosnick 1999, 552)—inflates endorsement and agreement in survey response. Acquiescence bias has long been appreciated by psychologists and varies in magnitude across the population (e.g., Billiet and McClendon 2000; Krosnick 1999; Schuman and Presser 1981; Watson 1992). Schuman and Presser (1981, Chapter 8) summarize three interpretations of this heterogeneity. First, tendency to agree might be an individual personality trait generated by genes and environment. Second, acquiescence bias might follow from status differentials between participant and surveyor. Third, acquiescence bias might be a heuristic response rule for participants when they do not know how to respond to a question.

Because magnitude of acquiescence bias correlates with individual characteristics such as education, inferences about the relationship between political characteristics and beliefs might also be inaccurate in the presence of acquiescence bias. This problem, in fact, was appreciated by survey researchers in political science in the 1960s. The authors of *The American Voter* found that acquiescence bias undermined conclusions others had drawn about the psychological authoritarianism scale. They showed that the existing finding that those with less education were more authoritarian was due only to the higher rate of acquiescence bias among those with less education (Campbell *et al.* 1960, 512–514).

Acquiescence bias is a common concern in psychometrics where researchers construct psychology indices based on responses to multiple Agree/Disagree Likert items. To improve measurement and validity, psychologists field multiple items thought related to the underlying index. But, if all items are coded such that the agree response indicates one end of the index and disagree the other, then the subset of respondents who exhibit acquiescence bias will be improperly placed toward the agree end of the index.[3]

---

2  It is important to note that the beliefs measured in China do not touch on the Chinese Communist Party or sensitive domestic political issues, suggesting against acquiescence bias driven by repression.

3  The symmetry of the response scale may also be consequential, as shown in Sutton and Douglas (2022).

IFR_AR_015113

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

Psychometricians use a variety of techniques to ameliorate acquiescence bias when scaling indices. These solutions generally field multiple items to construct within-subject corrections. Methods applied include Item Response Theory models, factor analysis, or simple summing across within-subject randomization. For a review, see Billiet and McClendon (2000).

Unfortunately, psychometric methods for scaling indices can be less useful for social scientists interested in beliefs about specific items. Of the 28 studies we mentioned above that surveyed respondents about conspiratorial beliefs, only 3 created indices of belief. Most studies were interested in particular beliefs or specific sets of questions. While some studies are careful to include both true and false statements in the survey, no studies used within-question randomization by negating the statement, the approach we propose below. Furthermore, most of the studies subsequently conducted separate analyses of true and false statements, making it difficult to balance acquiescence bias across the two types of statements.

Social scientists often ask questions about political beliefs giving respondents agreeable response options ("True," "Yes," "Agree," "Likely so," etc.). If acquiescence arises as a heuristic response when subjects do not know how to answer, bias could be prevalent when (a) asking about topics the subject has not before encountered such as political rumors or conspiracies, or (b) eliciting beliefs about complicated matters of fact beyond the subject's personal experience (e.g., Schaffner 2020).[4] The consequences of bias increase in the rarity of the target belief. The smaller the fraction of the population that holds a belief—e.g., when asking about outlandish conspiracies—the more likely agreeable responses are due to acquiescence bias rather than actual belief.

For example, what should we conclude if we found that 30% of subjects respond "True" to the question "True or False: Changes to the health care system enacted by Congress and the Obama administration created 'death panels' which have the authority to determine whether or not a gravely ill or injured person should receive health care?" It might be that 30% did not know how to respond to the question and so used the agreeable response "True" as a default, that 30% truly believe that the Obama administration created death panels, or that it is one of the many combinations of the two types that sum to 30%. Acquiescence bias poses a fundamental threat to inference about political conspiracies and factual beliefs about politics.

## 2    Measuring Acquiescence Bias in Studies of Conspiracies, Rumors, and Facts

In this section, we provide a broad overview of our data and initial results before presenting details on different elicitation methods, studies, and sample populations.

To understand the extent of acquiescence bias in studies of conspiracies, rumors, and facts, we fielded six surveys in China and the United States eliciting subject beliefs about political conspiracies and politically relevant facts. Details of all surveys are in Section B of the Supplementary Material.

We asked three types of questions: (1) questions fielded by other scholars on conspiracies and beliefs in rumors, (2) questions fielded by other scholars on beliefs in political facts, and (3) questions of interest to our own substantive research agendas on factual beliefs and political learning in which we elicited probabilistic beliefs (e.g., Hill 2017). In total, we asked 53 questions across the six surveys. All surveys included at least one attention check, and data were not collected and/or not analyzed for respondents who failed these checks.[5] We present results on conspiratorial beliefs in the main text and on misperceptions and political facts in the Supplementary Material.

---

4   We might be especially concerned about acquiescence bias when eliciting beliefs about complicated or controversial quantities such as political rumors and facts. For example, Westwood *et al.* (2022) find that survey satisficing—or random responses by disengaged survey takers—and question wording can result in overestimating support for political violence in surveys.

5   Acquiescence bias may be larger for surveys where attention checks do not filter out responses.

IFR_AR_015114

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

We fielded two versions of each question. First, we fielded the version as written by the original study, we call this version "positive-keyed." Second, we fielded an alternative version that was the negative of the original question so that the agreeable response had the opposite meaning ("negative-keyed"). For example, Allcott and Gentzkow (2017) asked a nationally representative sample after the 2016 election "At the time of the 2016 election, would your best guess have been that this statement was true?":

Pope Francis endorsed Donald Trump.

The response options were "Yes, true," "Not sure," or "No, false." We randomized whether our respondents received the original version or the alternative version:

Pope Francis DID NOT endorse Donald Trump.

It is important to note that positive-keyed does not mean the content of the statement or conspiracy theory is positive, but rather that the agreeable response option aligns with the original version of the question. In other words, some positive-keyed questions include a "NOT" phrase, and some negative-keyed questions do not. For example, the positive-keyed question of the conspiracy theory surrounding Barack Obama's birth certificate is phrased, "President Barack Obama was not really born in the United States and does not have an authentic Hawaiian birth certificate," because this was the original version of the question; whereas the negative-keyed version is phrased, "President Barack Obama was born in the United States and has an authentic Hawaiian birth certificate."

Randomization occurred at the subject-question level, so each subject received a mix of positive-keyed and negative-keyed questions. Creating a negated version of each item was not always trivial. In the Supplementary Material, we limit analysis to unambiguous negations without consequence to substantive conclusions. We present question wordings in Tables A1–A4 in the Supplementary Material.

For each question with an Agree/Disagree, True/False, or Yes/No response, we calculated the proportion of subjects agreeing with the positive-keyed statement—the original version of the conspiracy theory, rumor, or fact. For ease of comparison, we recode the negated question so that responses have the same target belief as the original, an endorsement of the statement presented in the positive-keyed version. We then code "don't know" and "not sure" responses as not agreeing. To make this concrete, suppose that a statement had three response options: True, False, and Don't Know. We code as agreement either answering True to the positive-keyed version or False to the negative-keyed version. In each case, Don't Know is pooled with disagreement.[6]

Absent acquiescence bias, the two percentages should be equivalent, subject to sampling variability. Acquiescence bias, in contrast, would push responses to the two versions in opposite directions with greater estimated endorsement for the positive-keyed wording.

The American National Election Studies (ANES) in recent years, to its credit, has fielded an instrument to elicit beliefs on misinformation with a feature to counteract acquiescence bias. This instrument is similar in spirit to our approach. In a first question, the instrument asks the respondent to indicate which of the two versions, roughly positive- and negative-keyed, they believe more likely true. In a second question, the instrument asks how confident they are in that position.[7] We discuss the benefits to this approach in Section D of the Supplementary Material and conclude that the instrument is likely to more effectively mitigate acquiescence bias than the instruments commonly fielded by other researchers. We also show, however, that scholars might want to use our methods with the ANES instrument to mitigate acquiescence bias in the second confidence question.

---

6  For the questions where we elicited probabilistic beliefs, where we ask respondents the probability they believe something to be true, we averaged the probability reported of agreeing with the positive-keyed statement.

7  See, e.g., https://electionstudies.org/anes_timeseries_2020_questionnaire_20210719/.

**JA269**

IFR_AR_015115

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press





| 1 | Pope endorse (US 2020) * | 20 | FBI Clinton charges (US 2020) * | 39 | ZTE Fine (China 2019) * |
|---|---|---|---|---|---|
| 2 | US created coronavirus (US 2020) | 21 | Coronavirus weapon (US 2020) | 40 | Scholarships (China 2019) * |
| 3 | Ireland asylum (US 2020) * | 22 | Clinton stumbled (US 2020) * | 41 | Hong Kong Work Week (China 2019) * |
| 4 | FBI agent (US 2020) | 23 | Beyonce rally (US 2020) * | 42 | Exports (China 2019) * |
| 5 | Contrails conspiracy (US 2020) * | 24 | Trump concede (US 2020) * | 43 | Military Parade (China 2019) * |
| 6 | Vitamin C (US 2020) * | 25 | Clinton deplorables (US 2020) * | 44 | Overseas Students (China 2019) * |
| 7 | Hand wash (US 2020) * | 26 | FBI director (US 2020) * | 45 | Jobs 2016 (US 2016) * |
| 8 | Violence for votes (US 2020) * | 27 | Accept election loss (US 2020) * | 46 | GDP 2014 (US 2016) * |
| 9 | RuPaul groped (US 2020) | 28 | Obama birth (China 2021) * | 47 | Currency devaluation (US 2016) * |
| 10 | 9/11 conspiracy (US 2020) * | 29 | GMO Bioterrorism (China 2021) * | 48 | Jobs 2016 (US 2017-18) * |
| 11 | Clinton Foundation (US 2020) | 30 | Soros conspiracy (China 2021) * | 49 | Currency devaluation (US 2017-18) * |
| 12 | Pence vulgar (US 2020) | 31 | 9/11 conspiracy (China 2021) * | 50 | GDP 2014 (US 2017-18) * |
| 13 | Iraq conspiracy (US 2020) * | 32 | GMO Increase Yield (China 2021) * | 51 | Food stamps 2018 (US 2017-18) * |
| 14 | Obama birth certificate (US 2020) * | 33 | 2016 GDP Growth (China 2017) * | 52 | Currency devaluation (US 2020) * |
| 15 | Soros conspiracy (US 2020) | 34 | Qualcomm Fine (China 2017) * | 53 | Food stamps 2018 (US 2020) * |
| 16 | Death panels (US 2020) * | 35 | Currency devaluation (China 2017) * | | |
| 17 | Immigrant pop Canada (US 2020) * | 36 | Military Spending (China 2017) * | | |
| 18 | Immigrant pop US (US 2020) * | 37 | IMF Currency Basket (China 2017) * | | |
| 19 | Iraq WMD (US 2020) * | 38 | GDP 2015 (China 2017) * | | |

**Figure 1.** Effect of question wording on agreement with rumors and facts. "*" indicates positive and negative-keyed estimates statistically distinct at $p < .05$ two-tailed.

In Figure 1, we present the results of the 53 survey questions we fielded. On the *x*-axis, we plot the estimated agreement with the conspiracy theory, rumor, or fact when the question is positive-keyed. On the *y*-axis, we plot estimated agreement with the conspiracy theory, rumor, or fact when the question is negative-keyed, the negated form of the original version. Note that the responses of the negative-keyed version have been recoded, so they exist on the same scale as the positive-keyed and, therefore, absent bias the points in this plot should fall approximately on the 45 degree line.

All but one point falls below the 45 degree line, meaning that the positive-keyed version of the question has a larger estimate of endorsement than the negative-keyed version.[8] In some

---

8 The probability of 52 out of 53 points falling randomly below the 45 degree line if there were equal probability of falling on either side of the line, is quite close to zero, on the order of $1 \times 10^{-16}$.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

questions, the points are quite close to the line; for example, Question 21 fielded in the United States on whether the Chinese government created the coronavirus as a biological weapon does not exhibit large amounts of acquiescence bias. In other questions, the positive-keyed version of the question produces a drastically larger estimate of belief. For example, Question 26 on whether or not the FBI director alerted Congress about new emails on Hillary Clinton's server on October 28, 2016 yielded an agreement of 64% when asked in the positive-keyed version, but only 22% when asked in a negative-keyed version.

## 2.1  Refielding of Previous Surveys

In two studies fielded in 2020 and 2021, we asked about conspiratorial and factual beliefs in online surveys in the United States and China.[9] The first was fielded using the online survey platform Lucid, which provided a nationally representative sample of 2,055 respondents in December 2020. The second was fielded using the online survey platform Qualtrics in China in March–April 2021. Qualtrics provided a quota-based sample matched to population targets. We present details on the two samples in Section B of the Supplementary Material.

*2.1.1  Rumors and Conspiracies.*  We roughly categorize our questions into three types. For rumors and conspiracies in the United States, we field questions of Allcott and Gentzkow (2017), who analyze consumption of fake news and its relation to beliefs about conspiracy theories, Berinsky (2017), who considers misinformation surrounding national health care policy, Clayton *et al.* (2021), who present results from survey experiments on population endorsement of democratic norms, Oliver and Wood (2014), who examine conspiracy theories and paranoia, and Jamieson and Albarracin (2020), who consider misinformation and media consumption about the COVID-19 pandemic.

In China, we ask questions similar to Cui and Shoemaker (2018), who study attitudes toward conspiracies and facts about genetically modified food in China. We also ask questions related to some U.S. conspiracies from Oliver and Wood (2014) to the China sample. Although we ask the same questions, we do not pool respondents from the two countries in any individual-level regressions so that we do not make comparisons of covariates in the two samples.

The studies we based our surveys upon fielded different question designs. Some used binary True/False response options while others used Agree/Disagree with between two and seven categories. We used the original response options in our surveys, but for presentation here, we compute for each item the percentage of responses indicating agreement, meaning "True," "Agree," or "Yes," with or without qualification ("definitely" as well as "probably").

The circled dots in Figure 1 represent results for the rumor and conspiracy theory items (see also Figure A1 in the Supplementary Material). The difference between percentage agreeing to positive- and negative-keyed versions varies across questions from 43 points on the Obama born abroad question in China to −12.5 points on the Oliver and Wood (2014) question on government planning of the 9/11 terrorist attacks.[10] All but this one difference is positive. In general, the questions in the China sample had greater levels of acquiescence bias than the U.S. sample, perhaps because many of the conspiracies asked were related to the United States and so were unfamiliar to respondents.

On some questions, the divergent estimates from the original versus negated version of the question are of political importance. In the original question of Allcott and Gentzkow, our sample indicates more than half (53%) believed "At the third presidential debate, Donald Trump refused to say whether he would concede the election if he lost" versus less than one third (32%) in the negated version. In the original question of Clayton *et al.*, our sample indicates that 80% of the public believes "Presidential candidates should accept the outcome of elections even if

---

9   As in the United States, there is a growing literature about belief in rumors and conspiracies in China (Chen *et al.* 2020; Chen, Jin, and Shao 2022; Huang 2017; Wang and Huang 2021).

10   We suspect the latter result might be due to poor phrasing in negation on our part.



https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

they narrowly lose," whereas only 52% disagree that "Presidential candidates need not accept the outcome of elections if they narrowly lose." The percentage who agreed that "Sometimes regular people need to be a little violent to make sure votes are counted correctly" was double (24% vs. 12%) the percentage who disagreed that "Regular people DO NOT need to be a little violent to make sure votes are counted correctly."[11]

In Section C of the Supplementary Material, we summarize results for misperceptions about political facts, which are also presented in Figure 1. We find similar levels of acquiescence bias as for conspiratorial beliefs, even when respondents are provided with monetary incentives for correct answers.

The results here and in the Supplementary Material show that acquiescence bias can be of substantive importance for conclusions (a) about population beliefs about objective facts, (b) for different instruments that elicit beliefs, and (c) does not seem to be resolved by the use of incentives. While acquiescence bias does not always influence inferences about conspiratorial or factual beliefs, in many cases scholars would come to substantively different conclusions about population beliefs if they asked a positive- rather than a negative-keyed question. These biases exist across instruments of measurement, source of population samples, topics, and in both the United States and in China.

## 3    Robustness of Main Findings to Question Negation and Country of Sample

Not all original questions yielded a simple alternative wording of unambiguous logical equivalence. Skeptical readers might wonder if the divergence in rates of endorsement between positive- and negative-keyed versions is due to logical non-equivalence rather than acquiescence bias. To evaluate this possibility, we reproduce Figure 1 in Section F of the Supplementary Material for 35 questions that we identified of unambiguous logical equivalence. The alternative version of these questions simply adds or subtracts the word "not" along with minor modification of verb tenses. Figure A4 in the Supplementary Material reproduces the pattern of Figure 1 with all items below the 45 degree line and many far below. We find that, if anything, ambiguous alternative question wordings lead to less acquiescence bias with mean magnitudes of 8.9 (unambiguous) and 7.3 (ambiguous). We also find that our results hold separately for U.S. and China samples (Table A6 in the Supplementary Material).

## 4    Correlates of Conspiracy Theory Beliefs and Acquiescence Bias

In addition to the incidence of conspiratorial beliefs and misperceptions in the population, correspondence between such beliefs and citizen characteristics interests scholars. For example, Allcott and Gentzkow (2017) report that having beliefs aligned with the partisan or ideological implications of a news headline corresponds to greater endorsement of the veracity of that headline. We replicate the Allcott and Gentzkow (2017) finding first with responses from our subjects assigned the original version of the question. We then compare conclusions with analysis of negative-keyed questions.

Table 1 presents ordinary least-squares (OLS) regression results of the relationship between subject ideological alignment with the news headline (as coded by the original authors) and endorsement of the news headline, for both positive-keyed and negative-keyed versions of the questions we repeated from Allcott and Gentzkow (2017) in our U.S. 2020 survey. As before, we recode responses to negative-keyed versions so that "agreement" indicates agreement with the

---

11   Some of our readers have reacted that the Clayton *et al.* (2021) questions read more like opinions than beliefs. We fielded the items thinking about the construct as "beliefs about how democracies operate" but acknowledge the alternative classification is also reasonable.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015118

JA272

**Table 1.** Analysis of responses to questions we repeated from Allcott and Gentzkow (2017) in our U.S. 2020 survey. Correlation between aligned ideology and belief in news headlines, positive-keyed versus negative-keyed items. Left two regression show results for all news headlines, and right two regression show results only for items labeled by Allcott and Gentzkow (2017) as "Big Fake." Standard errors clustered on the respondent in parentheses.

| | Dependent variable: Agreement with the conspiratorial headline | | | |
| --- | --- | --- | --- | --- |
| | Pos keyed | Neg keyed | Pos keyed, big fake | Neg keyed, big fake |
| Aligned | 0.094 | 0.069 | 0.150 | 0.083 |
| | (0.008) | (0.009) | (0.011) | (0.013) |
| Constant | 0.550 | 0.410 | 0.380 | 0.380 |
| | (0.006) | (0.007) | (0.009) | (0.009) |
| No. of observations | 8,411 | 7,020 | 4,262 | 3,445 |
| $R^2$ | 0.015 | 0.008 | 0.040 | 0.013 |
| Adjusted $R^2$ | 0.015 | 0.008 | 0.039 | 0.012 |

original wording of the question. Following Allcott and Gentzkow (2017), we code agreement with the original wording as 1, "Don't know" as .5, and disagreement as 0. Standard errors are clustered on the respondent because each answers more than one question.

The negative-keyed questions (columns 2 and 4) suggest substantively smaller correlation between ideological alignment and reported belief. The magnitude of decline is especially large among the subset of news headline described by Allcott and Gentzkow (2017) as "Big Fake," fake news stories that were mentioned in at least three mainstream media articles. Among these stories, the relationship to ideological alignment is 45% smaller with the negative-keyed question.

The cause of the divergent correlations in Table 1 is that acquiescence bias varies substantially between groups. We evaluate how bias varies by four characteristics of the respondent drawn from existing work on acquiescence bias and misperceptions. First, we consider how it varies with political ideology. Second, we consider the relationship with age and education, two factors that the older survey methodology literature on acquiescence bias suggests. Third, we consider variation with respondent aptitude at numerical thinking following the measurement instrument of Frederick (2005) and arguments about the relationship between reasoning and accepting fake news made by Pennycook and Rand (2019) and Stanley *et al.* (2021).

In Table 2, we present regressions pooling positive- and negative-keyed questions and interacting an indicator of positive-keyed with ideological alignment and with characteristics of the subject. We find substantively large interactions with ideological alignment. Questions aligned with respondent ideology exhibit more acquiescence bias, especially for "Big Fake" statements.

In Tables A7 and A8 in the Supplementary Material, we evaluate how acquiescence bias affects correlations for questions from Oliver and Wood (2014) and Jamieson and Albarracin (2020). We find similar results. The magnitudes of correlation between endorsement of conspiracies and covariates and between misperception of facts and covariates depend on whether the question was fielded as original or negated.

In sum, for each of the studies that we refielded, we find that magnitude of acquiescence bias varies by characteristics of the respondent. Acquiescence bias for these questions is more common among very conservative subjects, very liberal subjects, younger subjects, those with innumeracy, and those with lower education.

JA273

IFR_AR_015119

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

**Table 2.** Analysis of responses to questions we repeated from Allcott and Gentzkow (2017) in our U.S. 2020 survey. Impact of Allcott and Gentzkow (2017) question wording on belief varies by ideological alignment. Left regression is all statements, and right regression is "Big Fake" statements. Standard errors clustered on the respondent in parentheses.

| | Dependent variable: Agreement with the conspiratorial headline | | | |
| --- | --- | --- | --- | --- |
| | **All** | **Big fake** | **All** | **Big fake** |
| Aligned | 0.069 | 0.083 | 0.069 | 0.083 |
| | (0.009) | (0.013) | (0.009) | (0.012) |
| Pos keyed | 0.140 | −0.006 | 0.170 | 0.140 |
| | (0.010) | (0.013) | (0.023) | (0.029) |
| Numeracy | | | −0.005 | −0.022 |
| | | | (0.007) | (0.009) |
| Age | | | −0.0002 | −0.001 |
| | | | (0.0003) | (0.0004) |
| Education | | | 0.00002 | 0.00002 |
| | | | (0.00001) | (0.00002) |
| Pos keyed × Aligned | 0.024 | 0.068 | 0.025 | 0.069 |
| | (0.012) | (0.016) | (0.012) | (0.016) |
| Pos keyed × Numeracy | | | −0.002 | −0.007 |
| | | | (0.010) | (0.012) |
| Pos keyed × Age | | | −0.001 | −0.003 |
| | | | (0.0004) | (0.001) |
| Pos keyed × Education | | | −0.0001 | −0.00003 |
| | | | (0.00002) | (0.00002) |
| Constant | 0.410 | 0.380 | 0.420 | 0.450 |
| | (0.007) | (0.009) | (0.015) | (0.020) |
| No. of observations | 15,431 | 7,707 | 15,419 | 7,701 |
| $R^2$ | 0.046 | 0.029 | 0.048 | 0.060 |
| Adjusted $R^2$ | 0.046 | 0.029 | 0.047 | 0.059 |

## 5 Accounting for Acquiescence Bias

Fielding positive- and negative-worded versions of 53 questions eliciting beliefs shows that acquiescence bias influences survey estimates of three quantities of interest to political scientists: rates of endorsement of conspiracies, rates of political misperceptions, and correlations between features of individuals and their beliefs. In this section, we present two simple statistical procedures to estimate (a) population beliefs controlling for acquiescence bias and (b) correlations purged of acquiescence bias.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015120

Our methods correct sample data to provide an acquiescence-free estimate of population quantities. We show how random assignment of positive- and negative-keyed versions of each item allows for estimation of the magnitude of and a correction for bias.

Consider a conspiratorial or factual statement about the world, for example, that Barack Obama was born in the United States. Let the random variable $Y_i$ represent the response by subject $i$ to a measurement instrument—e.g., a survey question—used to measure subject $i$'s belief about the statement. Let $Y_i^*$ be the subject's belief about the statement could it be elicited without acquiescence bias.

Our replication studies strongly suggest that the response $Y_i$ in many cases is perturbed by acquiescence bias such that $E(Y_i) \neq Y_i^*$. To characterize the bias $E(Y_i - Y_i^*)$, define $Y_i(p)$ and $Y_i(n)$ as the responses of subject $i$ were she asked the positive-keyed ($p$) or negative-keyed ($n$) version of the measurement instrument. $Y_i(p)$ and $Y_i(n)$ should be coded so that increasing values indicate increasing endorsement of the belief, not increasing agreement with the question asked. For example, if question version $p$ is "True or False: Barack Obama was born in the United States" and version $n$ is "True or False: Barack Obama was not born in the United States," and if $Y_i(p) = 1$ represents response "True" and $Y_i(p) = 0$ represents the response "False," then $Y_i(n) = 1$ would represent "False" and $Y_i(n) = 0$ would represent "True." For both versions, the original response "True" is the agreeable response possibly subject to acquiescence bias.

The data-generating process of subject $i$ measured response $Y_i$ is

$$Y_i(p) = Y_i^* + \delta_i,$$
$$Y_i(n) = Y_i^* - \delta_i \tag{1}$$

with $\delta_i$ acquiescence bias for subject $i$.

Let $D_i$ represent the version of instrument fielded such that $D_i = 1$ if $i$ responds to the positive-key version $p$ and $D_i = -1$ if $i$ responds to the negative-key version $n$. We then consolidate (1) into

$$Y_i(D_i) = Y_i^* + D_i \delta_i. \tag{2}$$

The observed response $Y_i(D_i)$ is the acquiescence-free belief $Y_i^*$ plus (when $D_i = 1$) or minus (when $D_i = -1$) the subject's acquiescence-bias $\delta_i$. Given data-generating Equation (2), consider an OLS regression of $Y$ on $D$ with a representative sample from the target population

$$Y_i = \alpha + \beta D_i + \varepsilon_i$$

with $\varepsilon_i$ an independent and identically distributed error term. When the expected value of $\varepsilon_i$ is zero, the coefficient $\alpha$ estimates the population average belief $E(Y_i^*)$ purged of acquiescence bias. The coefficient $\beta$ estimates the population average acquiescence bias $\Delta = E(\delta_i)$ under the usual assumptions for ordinary least-squares regression. This regression might also use post-stratification survey weights to target a population-level average in the presence of individual heterogeneity (assuming random assignment of $D$).

## 5.1 Correlates

In addition to population rates, our method can be extended to mitigate bias in correlations. To model the relationship between beliefs and characteristics of the subject, substitute the quantity $Y_i^*$ in Equation (2) with the linear combination $x_i'\gamma$, $x$ a $k$-vector of covariates and $\gamma$ a $k$-vector of coefficients. Thus, $\gamma$ represents the expected correspondence between individual characteristics $x_i$ and acquiescence-free beliefs $Y_i^*$. This substitution leads to the updated data-generating process

$$Y_i(D_i) = x_i'\gamma + D_i \delta_i. \tag{3}$$

IFR_AR_015121

JA275

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

To see the problem of acquiescence bias for estimating correlates of political beliefs, consider a sample of size $\mathcal{N}$. Define the $\mathcal{N}$-vectors $Y$, $D$, and $\delta$ for the sample values of $Y_i$, $D_i$, and $\delta_i$. Define $X$ the $\mathcal{N}$-by-$k$ matrix of covariates. The OLS estimate of $\gamma$ is

$$\hat{\gamma} = (X'X)^{-1}X'Y.$$

Substituting the known data-generating process of $Y$, we have

$$\hat{\gamma} = (X'X)^{-1}X'(X\gamma + D\delta)$$
$$= \gamma + (X'X)^{-1}X'D\delta. \tag{4}$$

The OLS estimator of the $k$ correlations $\gamma$ is biased by the second term in (4), the covariance between $x_i$ and $\delta_i$. Covariance between $x_i$ and $\delta_i$ was exactly the problem diagnosed by the *The American Voter* discussed in Section 1; because studies had fielded only positive-keyed versions of questions measuring authoritarianism, correlation between acquiescence bias and education inflated estimates of the relationship between authoritarianism and education.

Equation (4) suggests two options to ameliorate bias in $\hat{\gamma}$. In each, the analyst assigns at-random positive- and negative-keyed versions of each item. In the first solution, regress $Y_i$ on covariates of interest $x_i$, a variable $D_i$ taking the values 1 and $-1$ indicating version positive and negative, and an interaction between $D_i$ and $x_i$:

$$Y_i = \beta_0 + \beta_1 x_i + \beta_2 D_i + \beta_3 D_i x_i + \epsilon_i.$$

The coefficient(s) on $x_i$, $\beta_1$, estimates the correlation between $x_i$ and $Y_i^*$ free of acquiescence bias. The coefficient $\beta_2$ is an estimate of average acquiescence bias, and the coefficient(s) $\beta_3$ estimate heterogeneity of acquiescence bias related to $x_i$. As before, one could estimate this regression with post-stratification survey weights.

Second, the analyst can implement weighted least-squares (WLS) without including the variable $D_i$ in the regression. When the vector $D$ is perfectly balanced—when the number of positive- and negative-keyed responses is exactly equal—its expected value is zero because one $D_i = 1$ offsets each $D_i = -1$. When the vector $D$ is assigned at random, the expected covariance of $D_i$ and $\delta_i$ is zero. When the covariance of $D_i$ and $\delta_i$ is zero, the expected values of their product, $D_i\delta_i$, is zero. Therefore, the expected value of the bias terms in (4) is zero when $D$ is balanced and assigned at random.

To achieve exact balance on $D$, define the matrix $W$ with elements on the diagonal $\frac{\mathcal{N}}{2N}$ for the $N$ subjects asked question version $p$ and $\frac{\mathcal{N}}{2\tilde{N}}$ for the $\tilde{N}$ subjects asked question version $n$, off-diagonal cells zero, $N + \tilde{N} = \mathcal{N}$. Then

$$\hat{\gamma}_{WLS} = (X'WX)^{-1}X'WY \tag{5}$$

is an unbiased estimate of $\gamma$. If the dataset includes post-stratification weights, the values $N$ and $\tilde{N}$ should be the sum of the weights in each assignment rather than the count of observations, and the diagonals of the weight matrix $W$ should be the product of the terms above and the original survey weight. With survey weights, the regression method is likely to be easier to implement than weighting.[12]

We emphasize that these fixes depend on the untested assumption that acquiescence bias does not vary by key. Because of this assumption, we recommend that researchers present analysis separately by version of the question in addition to implementing the proposed solutions.

---

12  A reader has noted a third method: run two separate regressions on the positive- and negative-keyed samples, then combine coefficient estimates by precision-weighted averages.

**JA276**

IFR_AR_015122

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press



**Figure 2.** Coefficient indicating the correlation between very conservative and belief in the conspiracy theory. Questions refielded from Allcott and Gentzkow (2017), Oliver and Wood (2014), and Jamieson and Albarracin (2020). The thick and thin lines extend to 84% and 95% confidence intervals.

## 6    Applying the Method

We apply the WLS approach to examine the correlation between ideology and belief in conspiracy theory in each of the studies. For each question, we calculated the weights for positive-keyed and negative-keyed responses as $\frac{N}{2N}$ and $\frac{N}{2\bar{N}}$. Because of the large number of items, we present coefficient plots instead of regression tables. While we plot and discuss the correlation between conspiratorial belief and the subject identifying as very conservative in the main body, we apply the method to coefficients for very liberal, numeracy, age, and education and present full regression tables in Section I of the Supplementary Material.

In Figure 2, we plot coefficients, 84% confidence intervals (thick line), and 95% confidence intervals (thin line) on the *very conservative* indicator for each question for (1) the sample assigned the positive-keyed version of the question, (2) the sample assigned the negative-keyed version of the question, and (3) the WLS method combining the two (point with solid line). To be consistent with the original coding in Allcott and Gentzkow (2017), we coded agreement with the original version of the question as 1, don't know as .5, and 0 as disagreement, although coding don't know as zero produces very similar results. We shade the background for coefficients where we would reject the null hypothesis of no relationship between very conservative and agreement with one question wording but not reject with another. For half of the questions, the result of this statistical test depends on question wording.

## 7    Recommendations and Conclusion

We believe that our evidence suggests that acquiescence bias causes substantively important problems for research on political conspiracies and beliefs. We hope to have brought this

IFR_AR_015123

challenge to the attention of scholars and to have provided knowledge and methods to improve future research. We see as particularly promising the possibility that acquiescence bias might be related to findings on framing effects (e.g., Druckman 2001) if different frames might be keyed in positive versus negative directions. We would also be interested to see new work on the potential influence of acquiescence bias on survey measurement of citizen policy views.

While we do not believe there is a one-size-fits-all recommendation because each topic of interest will have its own idiosyncracies, our investigation brings forward a set of suggested practices.

First, we recommend fielding both positive- and negative-keyed instruments to elicit beliefs. Examining differences in estimates and presenting them to readers should be the first practice. We would then, in general, recommend combining results from the two instruments with one of our proposed estimators.

Second, we would encourage scholars to consider multiple-choice or other instruments without agreeable responses. This approach, however, presents the first-order challenge of selecting the appropriate set of response options. In Section G of the Supplementary Material, we analyze an alternative multiple-choice approach we fielded in our surveys similar to the suggestion in Clifford, Kim, and Sullivan (2019). We do not find evidence that the approach is superior but would advocate future research.

The third option is to field an instrument similar to recent American National Election Studies misinformation items (see Section D of the Supplementary Material). We would advocate future research to determine the trade-offs between the ANES two-question approach and our single-question approach. We show in the Supplementary Material that both approaches can benefit from our WLS statistical fix. One challenge for future work is that there is no absolute benchmark with which to evaluate different instruments.

We close with a more general recommendation. Measurement challenges should be of central concern for scholars interested in sensitive or complicated political beliefs. Best practice in survey research is to pilot, test, and evaluate different measurement instruments. Too often scholars put one question on a survey without testing and validating and then assume the responses to that particular item accurately reflect the beliefs of their subjects. We encourage scholars to consider how the choice of instrument might materially influence the inferences they draw about political conspiracies and beliefs.

## Funding and Research with Human Subjects
Data collected for the 2017–2018 U.S. study by Time-Sharing Experiments for the Social Sciences, NSF Grant 0818839, Jeremy Freese and James Druckman, Principal Investigators. We thank in part UC San Diego (UCSD), Academic Senate Research Award for support. In addition, for support for some of our surveys, we thank the "China from the Ground Up" project under the auspices of the China Data Lab at UCSD, supported by the Carnegie Corporation of New York, Henry Luce Foundation, and private donors to the 21st Century China Center. The experiments presented here are approved by the UCSD Human Research Protections Program.

## Acknowledgments
We thank participants at APSA, the UC Riverside Behavior Conference, the faculty seminar at UCSD Political Science, the UCSD Cognitive Psychology lunch, SMAPP Global, NYU, John Bullock, Taylor Carlson, Alex Coppock, Tiberiu Dragu, Matt Gentzkow, Matt Graham, Andy Guess, Haifeng Huang, Greg Huber, Brendan Nyhan, Doug Rivers, Arturas Rozenas, Jake Shapiro, Chris Tausanovitch, Dustin Tingley, Lynn Vavreck, and Yiqing Xu for feedback. We also thank Yingjie Fan, Zhenyun Guo, and Kennedy Middleton for excellent research assistance.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015124

## Data Availability Statement

Replication code for this article is available in Hill and Roberts (2022) at https://doi.org/10.7910/DVN/TVJCTX.

## Supplementary Material

For supplementary material accompanying this paper, please visit https://doi.org/10.1017/pan.2022.28.

## References

Allcott, H., and M. Gentzkow. 2017. "Social Media and Fake News in the 2016 Election." *Journal of Economic Perspectives* 31 (2): 211–236.

Ansolabehere, S., J. Rodden, and J. M. Snyder. 2008. "The Strength of Issues: Using Multiple Measures to Gauge Preference Stability, Ideological Constraint, and Issue Voting." *American Political Science Review* 102 (2): 215–232.

Berinsky, A. J. 2017. "Rumors and Health Care Reform: Experiments in Political Misinformation." *British Journal of Political Science* 47 (2): 241–262.

Berinsky, A. J. 2018. "Telling the Truth about Believing the Lies? Evidence for the Limited Prevalence of Expressive Survey Responding." *The Journal of Politics* 80 (1): 211–224.

Billiet, J. B., and M. J. McClendon. 2000. "Modeling Acquiescence in Measurement Models for Two Balanced Sets of Items." *Structural Equation Modeling* 7 (4): 608–628.

Bullock, J. G., A. S. Gerber, S. J. Hill, and G. A. Huber. 2015. "Partisan Bias in Factual Beliefs about Politics." *Quarterly Journal of Political Science* 10 (4): 519–578.

Campbell, A., P. E. Converse, W. E. Miller, and D. E. Stokes. 1960. *The American Voter*. New York: Wiley.

Chen, K., A. Chen, J. Zhang, J. Meng, and C. Shen. 2020. "Conspiracy and Debunking Narratives about COVID-19 Origins on Chinese Social Media: How It Started and Who Is to Blame." Harvard Kennedy School Misinformation Review.

Chen, K., Y. Jin, and A. Shao. 2022. "Science Factionalism: How Group Identity Language Affects Public Engagement With Misinformation and Debunking Narratives on a Popular Q&A Platform in China." Social Media+ Society 8.1.

Clayton, K., N. T. Davis, B. Nyhan, E. Porter, T. J. Ryan, and T. J. Wood. 2021. "Elite Rhetoric Can Undermine Democratic Norms." *Proceedings of the National Academy of Sciences of the United States of America* 118 (23): e2024125118.

Clifford, S., Y. Kim, and B. W. Sullivan. 2019. "An Improved Question Format for Measuring Conspiracy Beliefs." *Public Opinion Quarterly* 83 (4): 690–722.

Cui, K., and S. P. Shoemaker. 2018. "Public Perception of Genetically-Modified (GM) Food: A Nationwide Chinese Consumer Study." *npj Science of Food* 2 (1): 1–8.

Druckman, J. N. 2001. "On the Limits of Framing: Who Can Frame?" *Journal of Politics* 63 (4): 1041–1066.

Ecker, U. K., et al. 2022. "The Psychological Drivers of Misinformation Belief and its Resistance to Correction." *Nature Reviews Psychology* 1 (1): 13–29.

Flynn, D., B. Nyhan, and J. Reifler. 2017. "The Nature and Origins of Misperceptions: Understanding False and Unsupported Beliefs about Politics." *Political Psychology* 38: 127–150.

Frederick, S. 2005. "Cognitive Reflection and Decision Making." *Journal of Economic Perspectives* 19 (4): 25–42.

Garrett, R., and R. M. Bond. 2021. "Conservatives' Susceptibility to Political Misperceptions." *Science Advances* 7 (23): eabf1234.

Gohse, T. 2016. "Half of Americans Believe in 9/11 Conspiracy Theories." http://www.livescience.com/56479-americans-believe-conspiracy-theories.html.

Graham, M. H. 2022. "Measuring Misperceptions?" *American Political Science Review*, 1–23. doi:10.1017/S0003055422000387.

Graham, M. H., and G. A. Huber. 2020. "The Expressive Value of Answering Survey Questions." In *The Politics of Truth in a Polarized Era*, edited by D. C. Barker and E. Suhay. New York: Oxford University Press.

Guess, A. M., B. Nyhan, and J. Reifler. 2020. "Exposure to Untrustworthy Websites in the 2016 US Election." *Nature Human Behaviour* 4 (5): 472–480.

Hill, S. J. 2017. "Learning Together Slowly: Bayesian Learning about Political Facts." *Journal of Politics* 79 (4): 1403–1418.

Hill, S. J., and M. E. Roberts. 2022. "Replication Data for: Acquiescence Bias Inflates Estimates of Conspiratorial Beliefs and Political Misperceptions." Harvard Dataverse. https://doi.org/10.7910/DVN/TVJCTX

Huang, H. 2017. "A War of (Mis)Information: The Political Effects of Rumors and Rumor Rebuttals in an Authoritarian Country." *British Journal of Political Science* 47 (2): 283–311.

**JA279**

IFR_AR_015125

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

Jamieson, K. H., and D. Albarracin. 2020. "The Relation between Media Consumption and Misinformation at the Outset of the SARS-CoV-2 Pandemic in the US." *Harvard Kennedy School Misinformation Review* 1.

Jerit, J., and Y. Zhao. 2020. "Political Misinformation." *Annual Review of Political Science* 23 (1): 77–94.

Krosnick, J. A. 1991. "Response Strategies for Coping with the Cognitive Demands of Attitude Measures in Surveys." *Applied Cognitive Psychology* 5 (3): 213–236.

Krosnick, J. A. 1999. "Survey Research." *Annual Review of Psychology* 50: 537–567.

Lazer, D. M., et al. 2018. "The Science of Fake News." *Science* 359 (6380): 1094–1096.

Lopez, J., and D. S. Hillygus. Why So Serious?: Survey Trolls and Misinformation (March 14, 2018). Available at SSRN: https://ssrn.com/abstract=3131087 or http://doi.org/10.2139/ssrn.3131087.

National Public Radio. 2020. "Even If It's "Bonkers," Poll Finds Many Believe QAnon and Other Conspiracy Theories." http://www.npr.org/2020/12/30/951095644/even-if-its-bonkers-poll-finds-many-believe-qanon-and-other-conspiracy-theories.

Nyhan, B., and J. Reifler. 2010. "When Corrections Fail: The Persistence of Political Misperceptions." *Political Behavior* 32 (2): 303–330.

Oliver, J., and T. J. Wood. 2014. "Conspiracy Theories and the Paranoid Style(s) of Mass Opinion." *American Journal of Political Science* 58 (4): 952–966.

Pennycook, G., and D. G. Rand. 2019. "Lazy, Not Biased: Susceptibility to Partisan Fake News Is Better Explained by Lack of Reasoning than by Motivated Reasoning." *Cognition* 188: 39–50.

Prior, M., and A. Lupia. 2008. "Money, Time, and Political Knowledge: Distinguishing Quick Recall and Political Learning Skills." *American Journal of Political Science* 52 (1): 169–183.

Schaffner, B. F. 2020. "QAnon and Conspiracy Beliefs." Institute for Strategic Dialogue. www.isdglobal.org/isd-publications/qanon-and-conspiracy-beliefs/.

Schuman, H., and S. Presser. 1981. *Questions and Answers in Attitude Surveys*. San Diego: Academic Press.

Smallpage, S. M., A. M. Enders, H. Drochon, and J. E. Uscinski. 2022. "The Impact of Social Desirability Bias on Conspiracy Belief Measurement across Cultures." *Political Science Research and Methods*: 1–15.

Stanley, M. L., N. Barr, K. Peters, and P. Seli. 2021. "Analytic-Thinking Predicts Hoax Beliefs and Helping Behaviors in Response to the COVID-19 Pandemic." *Thinking and Reasoning* 27 (3): 464–477.

Sutton, R. M., and K. M. Douglas. 2022. "Agreeing to Disagree: Reports of the Popularity of Covid-19 Conspiracy Theories Are Greatly Exaggerated." *Psychological Medicine* 52 (4): 791–793.

Vosoughi, S., D. Roy, and S. Aral. 2018. "The Spread of True and False News Online." *Science* 359 (6380): 1146–1151.

Wang, C., and H. Huang. 2021. "When Fake News Becomes Real: The Consequences of False Government Denials in an Authoritarian Country." *Comparative Political Studies* 54 (5): 753–778.

Watson, D. 1992. "Correcting for Acquiescent Response Bias in the Absence of a Balanced Scale: An Application to Class Consciousness." *Sociological Methods & Research* 21 (1): 52–88.

Westwood, S., J. Grimmer, M. Tyler, and C. Nall. 2022. "Current Research Overstates American Support for Political Violence." *Proceedings of the National Academy of Sciences* 119 (12): e2116870119.

https://doi.org/10.1017/pan.2022.28 Published online by Cambridge University Press

IFR_AR_015126



# Acquiescence Response Bias — Yeasaying and Higher Education

Shane Costello and John Roodenburg

*Faculty of Education, Monash University, Melbourne, Australia*

Acquiescence response bias is the tendency to agree to questionnaires irrespective of item content or direction, and is problematic for both researchers and clinicians. Further research is warranted to clarify factors relating to the confounding influence of acquiescence. Building on previous research that investigated the interaction between acquiescence, age, and secondary education, the current study has considered the role of adult higher educational achievement and acquiescence. Using the Big Five Inventory (BFI), acquiescence scores were calculated for a sample of 672 Australian adults (age $M = 41.38$, $SD = 12.61$). There was a significant inverse relationship between the variance in acquiescence scores and formal education. The greatest difference was found between the lowest education groups and the highest education groups, with the variance of the lower groups more than twice as large as the higher groups. The confounding influence of acquiescence was demonstrated using the BFI and targeted rotation to an ideal matrix, where worse model fit was found in the lower education group compared to the higher group. Implications for both researchers and clinicians are explored.

■ **Keywords:** acquiescence, response bias, education, measurement error, Big Five inventory

Observed scores of latent traits are derived from true scores and measurement error (Spearman, 1904). When Spearman penned his immutable theory, the mantra of modern psychometrics was born, challenging researchers to continually strive to reduce measurement error. To this end, a variety of methods have been employed, including standardised administration and rigorous statistical evaluation of measures. Others have taken the opposite approach, pausing to consider what meaning may lie within the error itself. One such area of interest to psychometricians is acquiescence response bias, and the current study considers acquiescence and considers what role education may play in this source of measurement 'error'.

Acquiescence is the tendency of an individual to consistently agree to questionnaire items, irrespective of item directionality (Jackson & Messick, 1965; Javeline, 1999). Acquiescence's less agreeable cousin (termed *counter-acquiescence*) creates the opposite pattern of response, with a tendency towards disagreement regardless of item directionality. Acquiescence is problematic for both researchers and clinicians,

Received 21 April 2015; Accepted 18 August 2015; First published online 30 September 2015

**Address for correspondence:** Shane Costello, Krongold Building, Faculty of Education, 57 Scenic Boulevard, Clayton Campus, Monash University VIC 3800, Australia. Email: shane.costello@monash.edu.

introducing a source of error into the measurement of the construct of interest that varies within individuals (Rammstedt & Farmer, 2013). A pattern of responses that leads an individual to be biased towards the upper or lower end of a measurement scale challenges the validity of the measure. For clinicians, an inaccurate measure may negatively affect client outcomes, while researchers may draw inaccurate conclusions from research using measures confounded by acquiescence.

There are two conflicting positions in regard to acquiescence. The traditional position holds that acquiescence is an artefact of little interest, confounding the measured constructs with error that is best removed or controlled for (Nunnally, 1978). Other researchers consider acquiescence to be a trait worthy of further investigation within the context of individual differences — a trait that maintains a certain degree of stability, consistency, and generalisability across settings (Eysenck & Eysenck, 1963; Morf & Jackson, 1972).

As a trait, acquiescence is both temporally stable (Billiet & Davidov, 2008) and able to significantly alter the covariance of item pairs, irrespective of item content (Bentler, Jackson, & Messick, 1971; McCrae, Herbst, & Costa, 2001). The confounding effect of acquiescence on both predictor and outcome variables can lead to inflated predictive validity (Rammstedt & Farmer, 2013). To a certain extent, the effect of acquiescence is somewhat mitigated by scales that contain balanced numbers of positively and negatively worded items; however, researchers disagree as to the true effectiveness of balanced item sets in controlling for acquiescence (Sonderen, Sanderman, & Coyne, 2013). Acquiescence has been shown to account for up to 10% of the variance in factor structures (Hendriks, 1997; ten Berge & Hofstee, 1999).

Meisenberg and Williams (2008) conducted a large, cross-cultural study into acquiescence at both the individual and country level. At the individual level, acquiescence was greatest in older individuals, those with less education, and those from low socioeconomic backgrounds. At the country level, higher acquiescence was also associated with lower intelligence, corruption, and lack of political freedom and democracy. It was suggested that acquiescence was facilitated by a lack of self-confidence or assertiveness and the desire to comply, rather than directly by intelligence. Given the somewhat circular relationship between intelligence and education (Hatch, Feinstein, Link, Wadsworth, & Richards, 2007), the mechanism by which acquiescence operates is not yet fully understood. Increased academic achievement may foster traits such as confidence (Stankov & Lee, 2014), resulting in a lower tendency to acquiesce.

Several studies have shown a relationship between education and acquiescence. Rammstedt, Goldberg, and Borg (2010) found that acquiescence bias was worse in lower education groups, and that a five-factor model of personality was considerably less well defined in the lower group. After accounting for acquiescence, the structure emerged equally well in the lower and higher education groups, although it should be noted that the study only considered secondary education levels. Specifically, the study compared only those who had completed lower secondary school; those with intermediate secondary school education; and higher secondary education, including those with university entrance qualifications.

To investigate whether acquiescence was related to reading comprehension, Rammstedt and Kemper (2011) conducted a study using an instrument presented verbally. A consistent pattern of acquiescence was demonstrated, with larger variance evident in the lower education group. This is consistent with the findings of Meisenberg and Williams (2008), who suggested that intelligence was not directly implicated in

JA283

IFR_AR_015164

acquiescence. These results support the suggestion that acquiescence is more than simply measurement error that may have resulted from difficulties in reading comprehension or intelligence.

While education has been shown to play a role in acquiescence, it is worth considering the extent to which age may confound educational achievement. Acquiescence has been shown to decrease in absolute magnitude as age increased from 10 and 20 years (Soto, John, Gosling, & Potter, 2008), and this effect was independent of any item complexity due to word comprehension. When considering adult educational achievement within an Australian context, it is possible but highly unlikely that many individuals would have completed a higher degree such as a doctor of philosophy before the age of 24 years (allowing 4 years for undergraduate study and 4 years for doctoral studies after completing school at age 17 years). When considering the highest level of education achieved, any impact of age cannot be simply ignored, given that higher levels of education are generally not able to be attained by younger adults. For this reason, any consideration of acquiescence and adult educational achievement would be best conducted after accounting for any variance explained by age alone.

The aim of the current study was to investigate the stability of age-corrected acquiescence in adults of differing educational achievements within an Australian context. It was expected that acquiescence would reduce as formal education increased. Similarly, it was expected that due to the confounding nature of acquiescence, the factor structure of a five-factor model of personality would emerge with greater clarity in higher educated individuals compared with those of lower levels of education.

## Method

### Participants

Online survey data were collected from 672 participants using a snowball method of recruiting. Participation was restricted to residents of Australia who were over the age of 18 years. The survey was collected with the approval of the Monash University Human Research Ethics Committee. The demographic distribution of the sample is provided in Table 1.

Details of participants' self-reported highest education level attained were collected in free form, and recoded into five categories. Categorisation was conducted with the intent to maximise the equivalency within educational achievement groups in an Australian context. Categorising most levels of achievement, such as whether a participant had or had not completed high school, was straightforward, differing primarily in the language used (such as year or grade) and geographical differences (such as High School Certificate or Victorian Certificate of Education for New South Wales and Victoria respectively). Vocational and technical qualifications completed through Technical and Further Education (TAFE) training were combined in one category. Examples of the educational achievements by category are provided in Table 2, and the descriptive statistics of the categories are provided in Table 3.

### Materials

The Big Five Inventory (BFI; John, Naumann, & Soto, 2008) was used to obtain personality self-reports. The 44 BFI items are short, easy to understand phrases that assess personality traits related to each of the Big Five factors of personality: Extraversion, Agreeableness, Conscientiousness, Neuroticism, and Openness to Experience.

IFR_AR_015165
JA284

Shane Costello and John Roodenburg

**TABLE 1**
Demographic Details for Sample ($N = 672$)

| Demographic | | $N$ | % |
|---|---|---|---|
| Gender | Male | 167 | 24.90% |
| | Female | 505 | 75.10% |
| | Total | 672 | 100% |
| Age | Minimum | 18 | — |
| | Maximum | 74 | — |
| | Mean | 41.32 | — |
| | Standard deviation | 12.70 | — |
| Education | Did not complete high school | 55 | 8.18% |
| | TAFE certificate or diploma | 164 | 24.40% |
| | Completed high school (Year 12) | 84 | 12.50% |
| | Bachelor degree | 266 | 39.58% |
| | Postgraduate or higher degree | 103 | 15.33% |
| | Total | 672 | 100% |
| Employment | Student | 85 | 12.65% |
| | Part- or full-time work | 457 | 68.01% |
| | Not currently in the work force | 71 | 10.57% |
| | Retired | 17 | 2.53% |
| | Did not state | 42 | 6.25% |
| | Total | 672 | 100% |

**TABLE 2**
Examples of Education Groups

| Category | Example |
|---|---|
| Did not complete high school | Years less than 12 |
| | Grades less than 12 |
| | Form less than 6 |
| | Junior Certificate |
| TAFE certificate or diploma | Certificate I-IV |
| | Advanced certificate |
| | Diploma |
| | Advanced diploma |
| | Trade |
| Completed high school | Year 12 |
| | Grade 12 |
| | Form 6 |
| | Senior Certificate |
| | High School Certificate (HSC) |
| | Victorian Certificate of Education (VCE) |
| Bachelor degree | Bachelor degree |
| | Double/combined bachelor degree |
| Postgraduate qualification | Graduate certificate |
| | Graduate diploma |
| | Postgraduate diploma |
| | Honours degree |
| Higher degree | Master degree |
| | Professional doctorate |
| | Doctor of philosophy |

Note: TAFE = Technical and Further Education.

JA285

IFR_AR_015166

**TABLE 3**

Descriptive Statistics by Education Group

| Category | Male | | Female | | Age (years) | | | |
|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | Mean | SD | Min | Max |
| Did not complete high school | 15 | 27.3% | 40 | 72.7% | 41.64 | 11.54 | 19 | 65 |
| TAFE certificate or diploma | 36 | 28.8% | 89 | 71.2% | 42.32 | 11.84 | 18 | 68 |
| Completed high school | 20 | 23.5% | 65 | 76.5% | 35.79 | 13.49 | 18 | 63 |
| Bachelor degree | 53 | 26.1% | 150 | 73.9% | 40.07 | 12.8 | 20 | 74 |
| Postgraduate qualification | 18 | 17.6% | 84 | 82.4% | 44.71 | 11.89 | 23 | 73 |
| Higher degree | 25 | 24.5% | 77 | 75.5% | 44.03 | 11.98 | 25 | 72 |

The BFI scales have shown substantial internal consistency, retest reliability, and clear factor structure, as well as considerable convergent and discriminant validity with longer Big Five measures, and substantial agreement between self and peer reports (Rammstedt & John, 2007). Each item was rated on a scale ranging from 1 (*strongly disagree*) to 7 (*strongly agree*).

Procedures

With the exception of the targeted rotation for the five factor model fit, all statistical analyses were conducted using SPSS version 22. Prior to any analysis, the data was screened for missing and extreme values. Imputation of missing values was conducted using the SPSS expectation-maximisation (EM) imputation algorithm, which uses a maximum likelihood approach to iteratively generate values using a normal distribution (Little & Rubin, 2002; Pigott, 2001). The extent of missing data was minimal, with a mean rate of missing data of 1.06% across all items, and no item missing more than 1.9%. No significant difference was obtained between variable means both before and after applying the EM imputation method (Little's MCAR $\chi^2 = 1.346$, $df = 1.371$, $p = .68$), and therefore it was concluded there was no pattern for the missing data.

Hofstee, ten Berge, and Hendriks (1998) described a method of determining individual acquiescence scores, using logically and semantically opposite pairs of items, and taking the grand average of each individual's responses over the set, expressed as a deviation from the midpoint score. Consider the semantic pair 'bfi1 (talkative) – bfi21 (quiet)', and an individual who might score them 2 and 7 respectively. Acquiescence was taken to be the deviation of the sum of scores from 8 (as the scale midpoint was 4), therefore 8-(2+7) = -1, indicating a slight tendency to acquiesce for that item pair. The acquiescence score of each individual participant would represent an unweighted mean over the pairs of items. Soto et al. (2008) identified 16 opposing item pairs within the BFI, and these item pairs were used to estimate acquiescence. Using an acquiescence score that is anchored at the scale midpoint, negative scores indicate the presence of acquiescence while positive scores indicate the presence of counter-acquiescence.

## Results

Calculating Acquiescence

To evaluate the appropriateness of the opposing item pairs for determining acquiescence, bivariate correlations between pairs were calculated. A minimum correlation

Shane Costello and John Roodenburg

**TABLE 4**
Correlations Between Age and Acquiescence by Level of Education Group

| Category | N | R | $R^2$ | p |
|---|---|---|---|---|
| Did not complete high school | 55 | .40 | .16 | .002 |
| TAFE certificate or diploma | 124 | .16 | .02 | .08 |
| Completed high school | 85 | .41 | .17 | <.001 |
| Bachelor degree | 203 | .21 | .04 | .003 |
| Postgraduate qualification | 102 | .17 | .03 | .10 |
| Higher degree | 103 | .37 | .14 | <.001 |

score of -.316 (negative correlations expected due to item reversal) was established, which is 10% of the shared variance between items. Correlations between all item pairs exceeded -.316, $p < .001$, with the exception of item pair bfi30 (values artistic, aesthetic experiences) and bfi41 (has few artistic interests), which contained only 9% shared variance. Consequently, the total acquiescence score was calculated using 15 item pairs, rather than the 16 pairs identified by Soto et al. (2008).

Hofstee et al. (1998) recommend that the reliability of acquiescence (as determined by coefficient alpha over the item pairs) needs to be high if the acquiescence score is to be meaningful. For each of the item pairs, acquiescence was taken to be the deviation of the sum of scores from 8 (as the midpoint of the scale was 4). Since 8 is a constant for all variables, there was no need to incorporate it into any computation of alpha, and a total score of 8 for any item pair can be interpreted as an absence of acquiescence. Coefficient alpha over the pairs of items was .78, suggesting that acquiescence was quite consistent over the 15 item pairs and that acquiescence could be considered a single factor.

Investigating Age and Acquiescence

The relationship between age and acquiescence was considered. A bivariate correlation between age and acquiescence revealed a significant positive relationship ($R = .27$, $p < .001$), suggesting that acquiescence reduces with age. Bivariate correlations were then calculated for age and acquiescence for each level of education achievement group separately. Each relationship was significant, and the results demonstrated a clear interaction between age and level of education achievement group. The results of the correlations are presented in Table 4.

Participant age explained a significant amount of variance, particularly in the lowest and highest education achievement groups. Given that age acts as a confounding variable in educational achievement, the decision was made to regress participants' acquiescence scores on age, leaving the remaining unstandardised residuals as a measure of acquiescence free from any relationship with age.

Individual Differences in Acquiescence

Previous research suggests that level of education achievement is related to individual differences in acquiescence. This was investigated in the current study by comparing age-residualised acquiescence scores across six levels of educational achievement. As expected, variance in acquiescence scores was larger in lower education groups, and

JA287

IFR_AR_015168

**TABLE 5**

Mean Acquiescence Scores by Education Group

| Group | N | Mean | SD | Min | Max |
| --- | --- | --- | --- | --- | --- |
| Did not complete high school | 55 | − 0.01 | 0.80 | − 2.22 | 1.94 |
| TAFE/Vocational education | 124 | − 0.13 | 0.80 | − 2.57 | 1.94 |
| Completed high school | 85 | − 0.01 | 0.75 | − 1.95 | 1.62 |
| Bachelor degree | 203 | − 0.03 | 0.64 | − 1.98 | 1.78 |
| Postgraduate degree | 102 | 0.09 | 0.55 | − 1.52 | 1.55 |
| Higher degree | 102 | 0.15 | 0.52 | − 1.26 | 1.23 |



**FIGURE 1**

Variance in acquiescence scores by level of education group.

demonstrated a consistent trend towards lower acquiescence scores with increasing levels of educational achievement. Levene's test for the equality of variances was significant, $F(5, 665) = 5.25$, $p < .001$, providing further support for the differences in variance across levels of education (see Figure 1).

A oneway analysis of variance (ANOVA) was conducted for acquiescence and education group, and a significant difference was noted with $F(5, 665) = 2.36$, $p = .04$. Given that Levene's test was significant, post-hoc analyses were conducted using the Games-Howell test, which accounts for unequal variances. The only significant mean difference in acquiescence was between the TAFE ($M = -0.13$, $SD = 0.80$) and higher degrees groups ($M = 0.15$, $SD = 0.52$), with the TAFE group demonstrating higher levels of acquiescence than the higher degrees group, $p = .02$, $d = -.41$, 95% CI [-.31,-.55], which was a small-to-moderate effect size according to Cohen (1992). The descriptive statistics are presented in Table 5.

Factor Structure in Education Groups

To investigate the extent to which acquiescence impacts the factorial validity of the BFI, participants were separated into two groups. The lower education group included

IFR_AR_015169
JA288

Shane Costello and John Roodenburg

participants who had not completed high school, completed TAFE or vocational studies, and those who completed high school. The higher education group included those who had completed bachelor degrees and higher qualifications. The lower group contained 71 males and 194 females (mean age 40.08 years, *SD* 12.64) while the higher group contained 96 males and 311 females (mean age 42.22 years, *SD* 12.53).

To be consistent with previous research conducted using the BFI, principal components analysis with Varimax rotation was conducted for each group. Procrustes rotation to an ideal a priori structure was used (Hopwood & Donnellan, 2010; McCrae, Zonderman, Costa, Bond, & Paunonen, 1996), which compares the rotated solution to an ideal matrix where items either load completely or not at all, providing an estimate of how well items fit. Kaiser-Meyer-Olkin values of .846 and .897 for the lower and higher groups respectively (Kaiser, 1970, 1974), and significant Bartlett's Test of Sphericity (Bartlett, 1954) results supported the factorability of the correlation matrix. Cattell's (1966) scree test and Parallel Analysis (Watkins, 2000) suggested that up to six components could be retained; however, in accordance with personality theory only five components were extracted.

The five-factor models explained 52.61% and 52.69% of the variance in the data for the lower and higher groups respectively. Following Procrustes rotation using Orthosim version 2.01 (Barrett, 2006), the overall model fit was .84 for the lower group and .89 for the higher group. Factor level congruences were also considerably better for the higher education group, with the facets of Extraversion and Neuroticism demonstrating the highest increase. At the item level, the lower education group had 13 items with less than adequate congruence, while the higher education had 7 items. While item level congruences can be somewhat lower, factor congruence and overall congruence values of .85 and above indicate similarity between the actual factor matrix and the hypothesised ideal factor matrix (Barrett, 2005; Hastie, Tibshirani, & Friedman, 2009; Mulaik, 1972; ten Berge, 1986). The communalities, loadings, and congruences can be found in Tables 6 and 7.

## Discussion

The aim of the study was to investigate the role of education in trait acquiescence. Given that participants' highest level of education achieved was confounded by age, acquiescence was considered after the effects of age had been controlled. As level of education increased, the variance in acquiescence reduced, with the most noticeable change occurring between TAFE education (such as certificates, diplomas and trade qualifications) and postgraduate qualifications (such as postgraduate diplomas and honour degrees). As expected, when the factor structure of the BFI was compared between the lower and higher educational achievement groups, poorer model fit, factor congruence, and item congruence was noted in the lower group compared to the higher group.

Soto et al. (2008) investigated the change in acquiescence from 10 to 20 years of age and found that acquiescence variance reduced with age. In comparison, the current study found that while age did significantly correlate with acquiescence, only 7.29% of the variance was shared overall. The age-acquiescence variance differed across educational achievement groups, and the removal of age-related variance allowed for a more thorough investigation of the influence of education alone. While Soto et al. found a relationship between age and acquiescence, the current study demonstrated

JA289

IFR_AR_015170

**TABLE 6**
PCA With Varimax and Procrustes Congruences for Lower Education Group ($N = 265$)

| Item | Communalities | EXT | AGR | CON | NEU | OPE | Congruence |
|---|---|---|---|---|---|---|---|
| bfi1 | .73 | **.84** | .09 | − .02 | .06 | .08 | .96 |
| bfi6 | .63 | − **.68** | − .06 | .02 | .40 | .11 | .83 |
| bfi11 | .48 | **.44** | − .02 | .26 | − .29 | .37 | .74 |
| bfi16 | .55 | **.46** | .18 | .26 | − .09 | *.48* | .71 |
| bfi21 | .64 | − **.71** | − .01 | .00 | .34 | .13 | .87 |
| bfi26 | .53 | **.46** | − .35 | .29 | − .18 | .28 | .77 |
| bfi31 | .63 | − **.60** | − .05 | − .03 | .49 | .16 | .74 |
| bfi36 | .67 | **.79** | .12 | .08 | − .14 | .08 | .96 |
| bfi2 | .49 | .16 | − **.63** | .03 | .26 | − .05 | .87 |
| bfi7 | .60 | .10 | **.65** | .28 | .08 | .30 | .84 |
| bfi12 | .52 | .24 | − **.57** | − .15 | .34 | .02 | .75 |
| bfi17 | .53 | .20 | **.68** | .08 | .04 | .15 | .95 |
| bfi22 | .38 | .34 | **.46** | .18 | .15 | .00 | .80 |
| bfi27 | .51 | − .19 | − **.60** | .04 | .32 | .10 | .86 |
| bfi32 | .63 | .05 | **.72** | .24 | .10 | .21 | .91 |
| bfi37 | .60 | .16 | − **.68** | − .06 | .34 | .03 | .85 |
| bfi42 | .37 | .33 | **.45** | .22 | .00 | .08 | .80 |
| bfi3 | .69 | .09 | .18 | **.79** | .11 | .15 | .91 |
| bfi8 | .45 | .29 | − .22 | − **.35** | .36 | .25 | .61 |
| bfi13 | .47 | .10 | .30 | **.61** | − .05 | − .01 | .86 |
| bfi18 | .53 | .11 | .02 | − **.56** | .32 | .33 | .81 |
| bfi23 | .47 | .00 | − .20 | − **.52** | .38 | .10 | .80 |
| bfi28 | .61 | .09 | .11 | **.74** | − .02 | .23 | .91 |
| bfi33 | .70 | .05 | .06 | **.81** | − .06 | .20 | .95 |
| bfi38 | .54 | .13 | .04 | **.71** | − .15 | .03 | .94 |
| bfi43 | .55 | .15 | .01 | − **.48** | .47 | .29 | .71 |
| bfi4 | .53 | − .22 | − .05 | − .21 | **.66** | .04 | .88 |
| bfi9 | .46 | .31 | .06 | .20 | − **.48** | .30 | .68 |
| bfi14 | .60 | − .11 | − .26 | .11 | **.71** | .04 | .92 |
| bfi19 | .58 | − .10 | .02 | − .12 | **.75** | − .04 | .96 |
| bfi24 | .48 | .15 | .03 | .28 | − **.58** | .19 | .81 |
| bfi29 | .61 | − .02 | − .38 | − .05 | **.68** | .08 | .86 |
| bfi34 | .47 | .09 | .05 | .47 | − **.34** | .35 | .45 |
| bfi39 | .59 | − .27 | .06 | − .08 | **.71** | − .03 | .91 |
| bfi5 | .65 | .12 | − .06 | .26 | − .11 | **.74** | .90 |
| bfi10 | .52 | .03 | .09 | .09 | .01 | **.71** | .98 |
| bfi15 | .43 | − .04 | − .06 | .09 | .09 | **.64** | .97 |
| bfi20 | .54 | .10 | .14 | − .09 | .10 | **.70** | .93 |
| bfi25 | .62 | .07 | − .07 | .16 | − .14 | **.75** | .94 |
| bfi30 | .45 | − .07 | .15 | − .05 | .03 | **.65** | .98 |
| bfi35 | .27 | .02 | − .02 | .19 | .34 | − **.34** | .65 |
| bfi40 | .49 | − .05 | .06 | .08 | .05 | **.69** | .99 |
| bfi41 | .09 | *.17* | − .14 | .13 | .09 | − **.14** | .53 |
| bfi44 | .40 | − .04 | .12 | − .11 | − .01 | **.61** | .97 |
| Factor congruence | | .81 | .89 | .86 | .76 | .87 | |

Note: Theorised primary loadings are bolded; where an actual primary loading differs it has been italicised.

Shane Costello and John Roodenburg

**TABLE 7**
PCA with Varimax and Procrustes Congruences for Higher Education Group ($N = 407$)

| Item | Communalities | EXT | AGR | CON | NEU | OPE | Congruence |
|---|---|---|---|---|---|---|---|
| bfi1 | .72 | **.80** | .20 | − .05 | .06 | .18 | .95 |
| bfi6 | .72 | **− .82** | − .11 | − .01 | .17 | .01 | .96 |
| bfi11 | .52 | **.49** | .03 | .26 | − .27 | .37 | .71 |
| bfi16 | .60 | **.53** | .18 | .16 | − .15 | .48 | .72 |
| bfi21 | .77 | **− .87** | − .04 | .03 | .11 | .04 | .98 |
| bfi26 | .50 | **.57** | − .21 | .06 | − .15 | .32 | .85 |
| bfi31 | .69 | **− .76** | − .16 | − .10 | .27 | .07 | .90 |
| bfi36 | .71 | **.75** | .24 | .01 | − .09 | .28 | .90 |
| bfi2 | .50 | .04 | **− .44** | − .06 | .53 | .14 | .67 |
| bfi7 | .43 | .12 | **.53** | .24 | .02 | .28 | .81 |
| bfi12 | .47 | .11 | **− .56** | − .11 | .34 | .13 | .84 |
| bfi17 | .47 | .20 | **.60** | .03 | − .13 | .23 | .90 |
| bfi22 | .40 | .15 | **.61** | .08 | − .09 | − .03 | .97 |
| bfi27 | .58 | − .47 | **− .52** | − .06 | .27 | .11 | .73 |
| bfi32 | .63 | .10 | **.70** | .23 | .00 | .29 | .88 |
| bfi37 | .43 | .01 | **− .56** | − .16 | .30 | .08 | .88 |
| bfi42 | .50 | .12 | **.66** | .17 | .00 | .14 | .94 |
| bfi3 | .55 | .05 | .16 | **.71** | − .01 | .15 | .95 |
| bfi8 | .43 | .03 | − .14 | **− .54** | .29 | .19 | .83 |
| bfi13 | .53 | .01 | .32 | **.66** | − .05 | .02 | .90 |
| bfi18 | .63 | − .03 | .07 | **− .69** | .27 | .27 | .88 |
| bfi23 | .48 | − .08 | − .17 | **− .62** | .25 | − .05 | .90 |
| bfi28 | .51 | − .04 | .09 | **.67** | − .05 | .23 | .94 |
| bfi33 | .58 | .05 | .05 | **.74** | − .13 | .09 | .98 |
| bfi38 | .48 | .13 | .13 | **.63** | − .18 | .10 | .92 |
| bfi43 | .49 | .03 | − .06 | **− .54** | .41 | .18 | .79 |
| bfi4 | .56 | − .21 | − .15 | − .20 | **.67** | .06 | .87 |
| bfi9 | .60 | .12 | .10 | .13 | **− .73** | .19 | .92 |
| bfi14 | .61 | − .18 | − .23 | − .07 | **.72** | − .01 | .90 |
| bfi19 | .69 | − .12 | .02 | − .13 | **.81** | − .04 | .97 |
| bfi24 | .50 | .02 | .14 | .19 | **− .67** | .02 | .91 |
| bfi29 | .59 | − .21 | − .36 | − .08 | **.64** | .05 | .79 |
| bfi34 | .48 | .04 | − .01 | .18 | **−0.6** | .28 | .86 |
| bfi39 | .54 | − .28 | .07 | − .17 | **.65** | − .09 | .88 |
| bfi5 | .64 | .17 | .05 | .02 | − .14 | **.77** | .94 |
| bfi10 | .46 | .16 | − .01 | .00 | − .02 | **.66** | .95 |
| bfi15 | .48 | − .07 | − .09 | .02 | .06 | **.68** | .99 |
| bfi20 | .53 | .06 | .10 | − .07 | .14 | **.70** | .96 |
| bfi25 | .60 | .08 | − .02 | .03 | − .20 | **.75** | .95 |
| bfi30 | .35 | .06 | .12 | .07 | − .06 | **.57** | .95 |
| bfi35 | .26 | − .07 | .09 | .30 | .21 | **− .34** | .67 |
| bfi40 | .43 | − .02 | .15 | .01 | − .01 | **.64** | .97 |
| bfi41 | .09 | − .02 | − .06 | .00 | .03 | **− .29** | .96 |
| bfi44 | .31 | .07 | − .03 | .06 | .10 | **.54** | .96 |
| Factor congruence | | .90 | .89 | .92 | .85 | .90 | |

Note: Theorised primary loadings are bolded.

JA291

IFR_AR_015172

that age contributed relatively little to acquiescence, and after the removal of the influence of age, education continued to play a significant role in acquiescence.

With the current study, increases in formal education were associated with a decrease in the absolute magnitude of acquiescence variance. The most notable decrease occurred between completion of high school and postgraduate levels. There was a marginal increase between those who had not completed high school and those who had completed a TAFE qualification, and further increases in education led to a reduction in acquiescence variance. The trend towards a reduction in variance slowed as education progressed beyond bachelor to postgraduate degrees, which offers valuable insight into the impact of education on acquiescence. The change in trend suggests that there may be some inherent ceiling effect in the relationship between acquiescence and education. This reduction in variance doubtlessly contributed to the difference in model fit between the lower and higher education groups, demonstrating an inherent risk in the use of highly educated samples in psychometric research.

Interestingly, there was very little difference in mean acquiescence scores found across educational groups. Given that the mean acquiescence scores deviated little from zero, this suggests that there is no real tendency towards a prevalence of acquiescence or counter-acquiescence across groups. While a significant mean difference was noted between the TAFE group and higher degree group, the implications for this difference are only likely to be evident when administering an instrument developed and validated solely in one of these populations for the other. For example, an instrument with balanced positive and negative items that was developed for use in a higher degree population (who have a slight tendency to counter-acquiesce) will likely demonstrate inflated mean results in a TAFE population (who have a slight tendency to acquiesce).

The factorial validity of the BFI was shown to be less in the lower education group compared to the higher group. This is consistent with previous research by Rammstedt et al. (2010), who found that the hypothesised Big Five factor structure emerged well in samples with university entrance qualifications and higher, and poorly in samples of lower education. In the current study, the overall fit of the lower education group to the hypothesised model was marginal at best, with a high number of items demonstrating poor fit. The higher education group demonstrated much better fit to the hypothesised model despite the confounding influence of acquiescence in the data. This demonstrates the risk posed by psychometric validation of instruments using samples drawn from higher educated populations — when variables such as response bias are not accounted for, even a robust and well validated instrument such as the BFI will not necessarily perform as intended. The results of the lower education group in the current study are likely to be inflated, given that the group also included individuals who had completed high school. Due to sample size limitations, it was deemed necessary to include those who had completed high school in this group; however, it is likely that had the sample size been sufficient and a qualitatively different lower group able to be selected, the factorial validity would have been even lower.

Is the difference in variance between educational groups actually due to underlying differences in cognitive abilities rather than education? It is beyond the scope of this study to comment definitively; however, some discussion is warranted. Early research by Messick and Frederiksen (1958) found that the relationship between acquiescence and education was moderated by reading ability. To investigate this further,

IFR_AR_015173

JA292

Rammstedt and Kemper (2011) tested acquiescence using a verbally administered version of the BFI to eliminate any effects of reading ability. Acquiescence was found to be larger in both magnitude and variance in the lower education group compared to the higher education group, which was consistent with the results in the current study, suggesting that reading ability does not play a substantial role in acquiescence. Hatch et al. (2007) suggested that there was a somewhat circular relationship between cognitive abilities and educational achievement, and from the perspective of psychometric investigations, the fact that a relationship between educational achievement and acquiescence has been identified may serve as a functional explanation at this time. However, the extent to which acquiescence may be shaped by education or cognitive ability is not able to be inferred from the current study.

One of the challenges with determining a value for acquiescence is the influence of differences in item-pair responses, which is derived from meaningful differences between items within a construct. For example, an individual's acquiescence score of -1 for one item-pair may suggest a tendency to acquiesce, or it may reflect a meaningful difference on items within that construct. To a considerable extent, this was managed in the current study through the averaging of 15 pairs of opposing items, which was found to form a reliable measure of acquiescence. However, the extent to which meaningful construct differences confound a nested measure of acquiescence is yet to be quantified.

Quantifying educational achievement remains a challenge for researchers. Within the current sample, slightly more than 12% of the participants stated that they were students, and for this subset, the highest educational level attained does not necessarily reflect the highest level that will be attained in the future. Similarly, the current highest level of education attained is not a limiting factor of potential achievement for any participant. If formal education itself plays a role in shaping acquiescence, we believe that any confounding impact of including students was at least minimal in the current study, given the relatively small number of participants who indicated that they were currently studying.

The order in which educational achievement groups were presented is worthy of further comment. It is a challenging concept to accept that education can be agglomerated in a manner that depicts a linear progression from lower to higher levels. For example, the time taken to achieve similar educational standards may vary considerably, such as the student who undertakes a double degree part time over a number of years, compared to the diligent student who completes a conventional degree within 3 years. Within the TAFE and vocational qualification group, courses may vary from several weeks up to 2 years, and therefore equivalency within the educational groups is somewhat limited. However, given the limited sample sizes so commonly encountered in research, it was necessary to apply some degree of agglomeration for the purposes of improving interpretability. Future research with access to larger samples may improve on this process, and aid in further understanding the impact of education on acquiescence.

Similarly, in the current study, the levels of education were separated into two groups to investigate the model fit of the BFI. Due to the current sample size, the groups were separated at the completion of secondary school level. Given the trend in acquiescence scores, it would have been preferable to investigate the model fit by comparing three or more education groups, with a more clearly defined lower

JA293

IFR_AR_015174

education group. This is a limitation in the current study, and future research will seek to address this by investigating model fit across a more homogenous lower education group.

The implications of acquiescence affect both researchers and clinicians alike. For researchers engaged in the development of psychological assessment tools, the current study serves to highlight again the importance of developing scales that allow for the measurement of acquiescence, as well as highlighting the risk to generalisability of research that has focused on more highly educated populations such as university students. The extent to which constructs are confounded by acquiescence varies across levels of education, and what may operate as a sound measure in a highly educated population may be considerably less valid in a different population. For clinicians, the knowledge that education plays a discrete and measurable role in response style can be used to better aid interpretation of psychological instruments. The results of the current study may serve to highlight risk factors that challenge the validity of an instrument; specifically, the education of the instrument rater.

The tendency to agree or disagree with questionnaire items regardless of directionality or content has been shown to be a reliable individual difference that is related to formal education, although the exact mechanism remains unclear. As formal education increases, acquiescence decreases, becoming less problematic and demonstrating some evidence of a ceiling effect in individuals who have reached a postgraduate level of education. For this knowledge to be of use, researchers are challenged to consider the use of appropriate item-pairs in instruments so as to allow for individual acquiescence scores to be calculated. Building on this practice will allow for greater evaluation and better practices in interpretation, perhaps through controlling or removal of acquiescence prior to calculating normative values for clinical use. In the immediate absence of such values, clinicians are challenged to ensure that they are aware of client educational achievement as a screen for likelihood of exhibiting response bias.

## Financial Support

This research received no specific grant from any funding agency, commercial, or not-for-profit sectors. The data used in this research was collected in the course of a Doctor of Philosophy program, for which the first author receives an Australian Postgraduate Award scholarship.

## Conflicts of Interest

None.

## Ethical Standards

The authors assert that all procedures contributing to this work comply with the ethical standards of the relevant national and institutional committees on human experimentation and with the Helsinki Declaration of 1975, as revised in 2008.

## References

Barrett, P. (2005). Person-target profiling. In A. Beauducel et al. (Eds.), *Multivariate research strategies: A festschrift for Werner Wittmann* (pp. 63–118). Aachen, Germany: Shaker Verlag GmbH.

IFR_AR_015175

JA294

Shane Costello and John Roodenburg

Barrett, P. (2006). Orthosim 2.01. Auckland NZ: Author.

Bartlett, M. (1954). A note on the multiplying factors for various chi square approximations. *Journal of the Royal Statistical Society (Series B), 16*, 296–298.

Bentler, P.M., Jackson, D.N., & Messick, S. (1971). Identification of content and style: A two dimensional interpretation of acquiescence. *Psychological Bulletin, 76*, 186–204.

Billiet, J.B., & Davidov, E. (2008). Testing the stability of an acquiescence style factor behind two inter-related substantive variables in a panel design. *Sociological Methods and Research, 36*, 542–562. doi:10.1177/0049124107313901

Catell, R. (1966). The scree test for number of factors. *Multivariate Behavioural Research, 1*, 245–276.

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112*, 155–159. doi:10.1037/0033-2909.112.1.155

Eysenck, S.B.G., & Eysenck, H.J. (1963). Acquiescence response set in personality questionnaires. *Life Sciences, 2*, 144–147. doi: http://dx.doi.org/10.1016/0024-3205(63)90026-2

Hastie, T., Tibshirani, R., & Friedman, J. (2009). *The elements of statistical learning: Data mining, inference, and prediction* (2nd ed.). New York, NY: Springer.

Hatch, S.L., Feinstein, L., Link, B.G., Wadsworth, M.E.J., & Richards, M. (2007). The continuing benefits of education: Adult education and midlife cognitive ability in the British 1946 birth cohort. *The Journals of Gerontology Series B: Psychological Sciences and Social Sciences, 62*, S404–S414.

Hendriks, A.A. (1997). *The construction of the Five-Factor Personality Inventory (FFPI)* (Unpublished doctoral thesis). Rijksuniversiteit Groningen, Groningen, The Netherlands.

Hofstee, W.K.B., ten Berge, J.F., & Hendriks, A.A. (1998). How to score questionnaires. *Personality and Individual Differences, 25*, 897–909.

Hopwood, C.J., & Donnellan, M.B. (2010). How should the internal structure of personality inventories be evaluated? *Personality and Social Psychology Review, 14*, 332–346. doi:10.1177/1088868310361240

Jackson, P.W., & Messick, S. (1965). The person, the product, and the response: Conceptual problems in the assessment of creativity. *Journal of Personality, 33*, 309–329. doi:10.1111/j.1467-6494.1965.tb01389.x

Javeline, D. (1999). Response effects in polite cultures: A test of acquiescence in Kazakhstan. *Public Opinion Quarterly, 63*, 1–28. doi:10.1086/297701

John, O.P., Naumann, L.P., & Soto, C.J. (2008). Paradigm shift to the integrative Big Five trait taxonomy: History, measurement, and conceptual issues. In O.P. John, R.W. Robins, & L.A. Pervin (Eds.), *Handbook of personality: Theory and research*. New York, NY: Guilford Press.

Kaiser, H. (1970). A second generation little jiffy. *Psychometrika, 35*, 401–415.

Kaiser, H. (1974). An index of factorial simplicity. *Psychometrika, 39*, 31–36.

Little, R.J.A., & Rubin, D.B. (2002). *Statistical analysis with missing data*. New York, NY: Wiley.

McCrae, R., Herbst, J.H., & Costa, P.T. (2001). Effects of acquiescence on personality factors structures. In R. Riemann, F.M. Spinath, & F. Ostendorf (Eds.), *Personality and temperament: Genetics, evolution, and structure* (pp. 217–231). Berlin, Germany: Pabst Science.

McCrae, R., Zonderman, A., Costa, P., Bond, M., & Paunonen, S. (1996). Evaluating replicability of factors in the Revised NEO Personality Inventory: Confirmatory factor analysis versus Procrustes rotation. *Journal of Personality and Social Psychology, 70*, 552–566. doi:10.1037/0022-3514.70.3.552

Meisenberg, G., & Williams, A. (2008). Are acquiescent and extreme response styles related to low intelligence and education? *Personality and Individual Differences, 44*, 1539–1550. doi:http://dx.doi.org/10.1016/j.paid.2008.01.010

Messick, S., & Frederiksen, N. (1958). Ability, acquiescence, and 'authoritarianism'. *Psychological Reports, 4*, 687–697. doi:10.2466/pr0.1958.4.3.687

Morf, M.E., & Jackson, D.N. (1972). An analysis of two response styles: True responding and item endorsement. *Educational and Psychological Measurement, 32*, 329–353. doi:10.1177/001316447203200210

Mulaik, S. (1972). *The foundations of factor analysis*. New York, NY: McGraw-Hill.

Nunnally, J.C. (1978). *Psychometric theory*. New York, NY: McGraw-Hill.

Pigott, T.D. (2001). A review of methods for missing data. *Educational Research and Evaluation, 7*, 353–383.

Rammstedt, B., & Farmer, R.F. (2013). The impact of acquiescence on the evaluation of personality structure. *Psychological Assessment, 25*, 1137–1145. doi:10.1037/a0033323

JA295

IFR_AR_015176

Rammstedt, B., Goldberg, L.R., & Borg, I. (2010). The measurement equivalence of Big-Five factor markers for persons with different levels of education. *Journal of Research in Personality, 44*, 53–61. doi:http://dx.doi.org/10.1016/j.jrp.2009.10.005

Rammstedt, B., & John, O.P. (2007). Measuring personality in one minute or less: A 10-item short version of the Big Five Inventory in English and German. *Journal of Research in Personality, 41*, 203–212. doi:10.1016/j.jrp.2006.02.001

Rammstedt, B., & Kemper, C.J. (2011). Measurement equivalence of the Big Five: Shedding further light on potential causes of the educational bias. *Journal of Research in Personality, 45*, 121–125. doi:http://dx.doi.org/10.1016/j.jrp.2010.11.006

Sonderen, E., Sanderman, R., & Coyne, J.C. (2013). Ineffectiveness of reverse wording of questionnaire items: Lets learn from cows in the rain. *PLoS One, 8*, e68967. doi:10.1371/journal.pone.0068967

Soto, C.J., John, O.P., Gosling, S.D., & Potter, J. (2008). The developmental psychometrics of big five self-reports: acquiescence, factor structure, coherence, and differentiation from ages 10 to 20. *Journal of Personality and Social Psychology, 94*, 718–737. doi:10.1037/0022-3514.94.4.718

Spearman, C. (1904). The proof and measurement of association between two things. *The American Journal of Psychology, 15*, 72–101.

Stankov, L., & Lee, J. (2014). Quest for the best non-cognitive predictor of academic achievement. *Educational Psychology, 34*, 1–8. doi:10.1080/01443410.2013.858908

ten Berge, J.F. (1986). Rotation to perfect congruence and the cross validation of component weights across populations. *Multivariate Behavioral Research, 21*, 41–64. doi:10.1207/s15327906mbr2101_3

ten Berge, J.F., & Hofstee, W.K.B. (1999). Coefficients alpha and reliabilities of unrotated and rotated components. *Psychometrika, 64*, 83–90.

Watkins, M. (2000). *MonteCarlo PCA for parallel analysis.* State College, PA: Ed & Psych Associates.

View publication stats





# Unintended Consequences: How US Immigration Policy Foments Organized Crime on the US-Mexico Border

JA298

IFR_AR_015332





# Impacts

## 1. Smuggling Prices, Profits Explode

US policies have blocked legal migration pathways and pushed migrants into new, riskier corridors controlled by more sophisticated criminal organizations. Higher risks, more infrastructure, and multi-layered networks have meant higher fees for migrants.

Take the case of Ricardo Montes.[15] Many people he knew from his hometown in Guatemala made the journey to the United States numerous times years earlier for about $5,000. But when he migrated near the end of 2019, smugglers were charging about $10,000.[16] Still, Montes felt like he had little choice. He was facing harassment and threats from local police in Guatemala City, where he lived.

Montes' experience is indicative of the industrialization of migrant smuggling. Since the 1990s, migrant smuggling has gone from intimate "mom-and-pop" operations to possibly a multibillion-dollar industry controlled in large part by organized crime groups.[17] In recent years, DHS made a conservative estimate that criminal organizations earned $500 million annually from migrant smuggling.[18] For its part, the United Nations Office on Drugs and Crime (UNODC) has said that globally, smugglers made between about $5 and $7 billion.[19] As we shall see from Montes' journey, both may be underestimates.

What was once a manageable journey -- though still fraught with serious abuses and dangers -- has metastasized into a gauntlet controlled by vast networks of smugglers, intermediaries, corrupt government officials, and transnational criminal organizations.[20] With access to ports of entry severely limited for migrants and asylum seekers because of US policy, irregular border crossings are practically the only viable option.

---

15   The name of this individual has been changed for security reasons.

16   InSight Crime interview, Guatemalan asylum seeker, 18 April 2023.

17   InSight Crime interview, US-Mexico border researcher at Human Rights Watch, 12 April 2023.

18   Then-Homeland Security Secretary Kirstjen Nielsen, "Homeland Security and Immigration Testimony," 15 May 2018.

19   UNODC, "Global Study on Smuggling of Migrants," 2018.

20   Parker Asmann and Steven Dudley, "Desperation in the Desert: The Industrialization of Migrant Smuggling on the US-Mexico Border," InSight Crime, 5 October 2022.

IFR_AR_015341



*Smugglers market their services to migrants on social media platforms like TikTok and Telegram*
*(Collage: InSight Crime)*

"It creates a market for people to be able to find ways to cross our border outside of the ports of entry, and that market is being filled by organized crime," said one attorney working with asylum seekers.[21]

In Matamoros, for example, factions of the Gulf Cartel extract profits "from all the migrants that are going through their area," according to one US Homeland Security Investigations special agent.[22] Sometimes these fees are collected directly from the migrants, other times the group targets the organizations that are bringing migrants through their area of control.

Not every trip is the same. Smugglers provide migrants with a menu of options at different price points that depend on the services provided, ranging from a few hundred to a few thousand dollars just for permission to cross the US-

---

21   InSight Crime interview, Rebekah Wolf, Policy Counsel with the Immigration Justice Campaign at the American Immigration Council, 6 April 2023.

22   InSight Crime interview, Homeland Security Investigations (HSI), San Antonio Field Office, Assistant Special Agent in Charge Mark Lippa, 8 May 2023.

IFR_AR_015342

JA301

Mexico border, to more than $10,000 for a guided journey to a particular US city.[23] Montes, for example, was on the higher end of that scale and was forced to pay for the trip in three tranches.

First, Montes drove his car from Guatemala's capital city to Gracias a Dios, a small, isolated village in the department of Huehuetenango on the border with the Mexican state of Chiapas. There, he gave his car to the coyote. That would pay for the first leg of the journey to the US-Mexico border. This is common, experts told InSight Crime -- migrants often use their homes, land deeds, and other assets as collateral or to pay smuggling networks.

Montes waited in Gracias a Dios for six days before his handlers picked him up and helped him cross into Mexico. Officials stood by as he crossed, he said. From there, he was moved through a patchwork of safe houses run by individuals that his smuggling network contracted to facilitate his journey through Chiapas to the capital city of Tuxtla Gutiérrez. From there, he boarded a series of vans, cars, and trucks alongside dozens of other migrants. They were stopped several times by Mexican authorities, who collected their own small and large payments for permission to keep moving north. In all, Montes said he would pay about $1,000 in bribes, either directly or through the drivers that often handled paying the officials.

Seventeen days later -- after going through Puebla, Mexico City, and Monterrey -- he arrived in Reynosa, Tamaulipas, at the US-Mexico border. At this point, he had to pay the second tranche of $3,000 to his coyote network, but he was a little worried. Montes knew nothing about his smuggler or the broader network.

> *"[The coyote] was just the one I found on Facebook when I started looking for travel options."*

"It's completely different from how it once was," he explained. "[The coyote] was just the one I found on Facebook when I started looking for travel options."[24] In total, Montes said he interacted with seven different guides along the way who worked for the same network he originally paid in Guatemala.

This is typical of the journey these days and can cause problems. Prices, for instance, can change on a whim. At one point, one of the guides told Montes that the money he paid his smugglers had not arrived. The guide demanded an extra 1,000 pesos from Montes and 24 other migrants they were transporting, or about $1,500 total. As is evident in the next section, danger lurks, especially for those who do not have the extra money. These charges may also include

---

23   InSight Crime interview, US-Mexico border researcher at Human Rights Watch, 12 April 2023.

24   InSight Crime interview, Guatemalan asylum seeker, 18 April 2023.

IFR_AR_015343





**UNHCR ACNUR**
La Agencia de la ONU
para los Refugiados

## OPERATIONAL UPDATE
No. 3 **l** December 2023

Little Amal inTijuana.
Photo credits: Rodrigo Dardon

# KEY FIGURES



### ASYLUM & ACCESS TO TERRITORY

A total of **140,982** people applied for asylum in Mexico in 2023 as of 31 December, including **44,239** individual asylum applications from **Haitians,** followed by **41,935** applications from **Hondurans, 18,386** applications from **Cubans, 6,117 from Salvadorans,** and **5,517** applications from **Venezuelans.**



### PROTECTION & RECEPTION CONDITIONS

So far in 2023, **16,869** individuals have been assisted through cash-based interventions and multi-purpose cash grants as part of UNHCR's Humanitarian Assistance Programme.

UNHCR and partners distributed **563,134** non-food items across **89 shelters** in 2023 as of December 2023.

Between July to December 2023, **2,704** people in migratory detention received orientation on their right to request asylum.

During 2023, El Jaguar reached **4,638,394** Facebook users (a monthly average of **386,000** users), registered **7,428,296** visits to its page (a monthly average of **619,000** visits) and its publications generated **331,164** interactions (a monthly average of **28,000** interactions).

### ENSURING SUSTAINABLE INTEGRATION

UNHCR has been working closely with the Ministry of Foreign Affairs to facilitate the access of refugees to the acquisition of Mexican nationality. Since 2022 to date, **846 refugees** have entered their naturalization process with the accompaniment of UNHCR, of which **65%** are Venezuelans, **16%** from El Salvador, **11%** from Honduras, **2%** from Guatemala, **2%** from Cuba, **1%** from Nicaragua and **3%** from other nationalities. Additionally, a significant number of people entered the process on their own. From January 2022 to December 2023, **more than 680 refugees** obtained their naturalization letters, of which **222** were accompanied by UNHCR and its partners.

In 2023, UNHCR conducted **26 relocations** as part of the Local Integration Program and has relocated **more than 35,000 people** since the program's inception in 2016.



### FUNDING

As of 31 October 2023, the Mexico Operation is **50%** funded with **59.85 million USD.**

JA304

IFR_AR_016116

1

# HUMAN MOBILITY AND ASYLUM TRENDS

The number of asylum applications in Mexico surpassed **140,982** since the beginning of the year as of 31 December, 2023. This figure exceeds the total number of claims filed during the same period in 2022 by nearly **19%.** The arrival of people on the move across **southern Mexico** was particularly noticeable at the main entry point into Mexico, the border town of Tapachula in Chiapas. As of October 2023, three southern states of Mexico (Chiapas, Tabasco, and Veracruz) accounted for **72.5% of all claims processed** in the country. In recent months, arrivals grew from **650 individuals** daily to over **1,500-3,000** per day in September and October. Most people from Cuba and Haiti are adults traveling alone (over **67%** for Cuba and more than **82%** for Haiti). On 30 October, more than **3,000 people,** mostly families and children, departed in a **"caravan" from Tapachula.** On 24 December, they moved 40 km over a period of three days, arriving in Huixtla, Chiapas. Most of the persons were Honduran (up to **80-90**%), followed by other Central Americans, Cubans, Venezuelans, and very few Haitians.

Between July and November 2023, **Mexico City** has seen an ever-growing number of asylum claims, Venezuelans being the main nationality, followed by Haitians and Hondurans. From July to December 2023, approximatively **20.5 percent** of all asylum applications in the whole country were filed in Mexico City, which amounts to an estimation of **10,585** asylum claims. UNHCR supported COMAR to reinforce its capacity in Mexico City to implement simplified and more efficient processing measures, and coordinated efforts with local partners to reach the population with the information they need to make well-informed decisions to access protection, their rights or local integration perspectives. UNHCR and its partner Programa

Casa Refugiados (PCR) successfully established a **fast-track for pre-registration and priority reception** in collaboration with COMAR for asylum seekers staying in partner-shelters. This measure contributes to secure access and to reduce waiting time for the asylum procedure to persons in situations of high vulnerability and with specific needs. Shelters in Mexico City continue to be oversaturated at **500%** capacity at the main shelter in the city CAFEMIN and the government Shelter Tláhuac, hosting up to **3,000** people even if built for **150.**

In **Northern Mexico**, several hundred persons arrived by train to Piedras Negras and Ciudad Juarez during September and October to cross the border to the U.S. When numbers peaked and **1,500 people** were waiting for the trains in Coahuila state, the train company Ferromex temporarily suspended the service of trains for several days. As winter approaches, low temperatures are expected to become an increasing challenge for individuals currently living in informal settlements and shelters across the northern border. UNHCR is supporting shelters to improve their reception standards with the delivery of non-food items, such as sleeping mats.

In recent months, Mexico has also experienced an increase in **internal displacement**, generated by a rise in violence perpetrated by criminal groups and land disputes in at least seven states. According to the Mexican Commission for the Defence and Promotion of Human Rights (CMDPDH), over **379,000 people** were displaced in Mexico due to incidents of violence from 2006 to 2021. Based on the NGO's figures, an estimated **30,000 more individuals** are expected to be internally displaced by the end of 2023.



**Four refugee children participated in the protocol entrance holding hands with FC Barcelona and Tigres players. Photo credits: Club Tigres**

JA305

IFR_AR_016117

2

## OPERATIONAL HIGHLIGHTS



UNHCR team in Tapachula, © UNHCR/File



On 22 November, **UNHCR, COMAR and the Mexican Foreign Ministry organized a meeting** to preview the governmental commitments that were to be presented at the Global Refugee Forum (GRF) a few weeks later. Some **30 members** of the diplomatic corps and UN agencies, as well as representatives from Guanajuato, Baja California, Monterrey and Tapachula attended to present the commitments at the state and municipal levels.

At the second GRF in Geneva from 13-15 December, **more than 4,000 participants,** including **300 refugees,** gathered. The Mexican delegation announced **eight commitments at the federal and local levels.** Mexico had a strong presence in nine events, including the participation  from the company FEMSA, which has hired **2,800 refugees.** COMAR was represented at events on inclusion and MIRPS, respectively.  Representatives from Nuevo León, Guanajuato and the Undersecretary for Migratory Affairs also participated as speakers.



To support young refugees to access higher education in Mexico, UNHCR has implemented **tertiary education program** since more than five years. So far in 2023, UNHCR supported another 120 students, including 32 students who were referred to university programmes by partner DIME. Under the Global **DAFI Programme, 62 students** are being supported in 2023. In September 2023, **ten new scholarships** were granted and during 2023, already **16 DAFI students** have graduated.



**Shelters** across all Mexico continue to operate near or at full capacity, although occupancy rates are constantly in flux. **Informal settlements are widespread,** particularly in cities like Matamoros and Reynosa. Informal settlements raise **grave protection concerns** for the people living there,

including security, access to WASH, overall living conditions, and risk of infectious disease. **UNHCR has contributed to strengthening and improving reception conditions in shelters** by delivering core relief and other non-food items, as well as infrastructure projects. From January to December 2023, UNHCR and partners distributed a total of **9,017** mattresses, bunk beds and mats, **125,401** cleaning and **358,060** personal cleaning/hygiene items, **5,029** kitchen and office equipment and **1,530** clothing items to **89** shelters across the country this year.



UNHCR implemented **the stoplight protection tool in 102 shelters.** Covering more than **14** key protection areas such as Protection, WASH, Health, PSEA, among others, the tool categorizes shelters in green, yellow and red. The results showed that **86.27%** of the shelters were classified as "yellow" or "green" which means they have adequate or optimal protection conditions. **13.73%** of all shelters reviewed have been classified under the "red light" indicating that protection standards need to be worked on. UNHCR prioritizes shelters with yellow or red results to improve their overall reception and protection conditions.



UNHCR continues to provide **capacity-building regarding refugee protection.** Between July-November 2023, UNHCR and partner Scalabrini International Migration Network, delivered **specialized training** for Human Rights Defenders to **36 shelters across the country,** in which shelter personnel received tools to mitigate security risks. To assure a **coordinated response** and jointly strengthen accommodation spaces for persons on the move in Mexico, UNHCR shelters team coordinates a working group with civil society and other UN agencies working with shelters across the country.

IFR_AR_016118

**JA306**

## NORTHERN MEXICO

On 6 November, **Little Amal** crossed the border from the U.S. to Mexico through Tijuana, with the support of UNHCR and other UN agencies. Amal was welcomed in Baja California and Tijuana by the Governor of the State and the Mayor of the City. The commitment of State authorities to continue working on the protection and integration of asylum seekers, refugees and IDPs in Baja California, was reflected in the signature of a Memorandum of Understanding with UNHCR, having Amal and refugee children as witnesses of the event.   The events allowed a large-scale sensitization on refugee and migrant issues in Baja California. Amal travelled through Mexico for two weeks during the month of November, visiting **Mexico City, Oaxaca, Tapachula and Ciudad Hidalgo.** Her journey was accompanied by UNHCR throughout and broadly covered by the local press.



Little Amal in Tijuana, Photo credits to: Rodrigo Dardon

## FC BARCELONA AND TIGRES MATCH WITH PARTICIPATION OF REFUGEE CHILDREN

Four refugee children participated in the protocol entrance holding hands with FC Barcelona and Tigres players. Photo credits: Mayumi Kimura Meguro

On 1 September, the FC Barcelona and Tigres women's football teams played a match in Monterrey attended by more than **39,500 people** (about twice the seating capacity of Madison Square Garden) – **a historical record in Mexico's women's football.** In collaboration with the FC Barcelona and Tigres football teams, UNHCR coordinated the **participation of four refugee children** during the initial protocol ceremony when both teams entered the field holding hands with the children. All four participants had previously shared with UNHCR they were huge fans of football and both teams. One of the kids even shared that he would not wash his hand for a whole month after receiving this honor. Thanks to a donation of tickets by Tigres, UNHCR also facilitated the **attendance of 80 refugees,** including **26 refugees** who had just relocated to Monterrey through UNHCR local integration program. Throughout the match, the Tigres football players wore UNHCR's blue ribbons in solidarity with refugees, FC Barcelona players had their jerseys with the UNHCR logo, and a UNHCR video was played at the football stadium screen.

IFR_AR_016119

JA307

4

## SOUTHERN MEXICO

The UNHCR Registration team has conducted numerous activities between July and December 2023 to **provide support to the Mexican authorities.** For example, in July, UNHCR **supported the COMAR office in Tenosique** to enable biometric registration, to enhance capacity and train personnel in biometric registration standards. These efforts allowed COMAR to secure the population registration for all asylum seekers to obtain a unique population number (CURP) and their biometric data, easing their access to public services and local integration.

 UNHCR supports COMAR piloting new technologies in Tapachula. For example, through **COMAR Digital´s platform** through which pre-registrations and appointments are digitalized which saves valuable time and resources. Also, **COMAR´s unique case management and database system (SIRE)** simplifies reception and processing of asylum claims. Migration authorities will be able to access the database in the future, to prevent possible refoulement of asylum-seekers.

 UNHCR and the International Rescue Committee (IRC) have trained staff from OXXO, Veterinaria Santa Cruz, Farmacias Yireh, Concesionaria COMEX, Bodega Aurrera, Megacable and other companies in the private sector regarding the possible **labour Inclusion of refugees.**

 In Tapachula, UNHCR held **5 workshops for 169 social workers, nurses and doctors** from health centers and hospitals and staff from Health District VII and Health City Hospital to increase knowledge and improve care for refugees, asylum-seekers and the local community.

 As a result of collaboration with the municipality to improve peaceful coexistence in Tapachula, UNHCR inaugurated a **cinema in Territorio Joven Tapachula with a capacity to receive 40 people.** In Cine Joven, as the community has named it, movie forums are held to address issues of forced displacement with an awareness-raising approach to mitigate conflict in a community with a high presence of people on the move. So far, UNHCR and the municipality organized **4 movie forums** attended by **117** local and refugee youth.

## LEGAL ASSISTANCE

This year, UNHCR has initiated new partnerships with **17 Law Clinics of Mexican universities.** In October, the first national meeting of all legal clinics countrywide and UNHCR was held in the facilities of the Universidad Iberoamericana in Mexico City. This has been a groundbreaking momentum, activating a huge network of legal aid for asylum-seekers and refugees and founding a working group of legal clinics for the first time. Between July and November 2023, **1,516 asylum-seekers** were represented by UNHCR's network of lawyers and **73,110** asylum-seekers and persons with international protection needs received legal advice, orientation or assistance by lawyers and paralegals cooperating with UNHCR.


**Regional Judgement Award. Photo credits to:S Uriel Salas**


**Nationwide first meeting of all law clinics. Photo credits to: Tiffany Tinoco, Ibero Law Clinic**

**On 20 October, UNHCR legal unit participated in the eighth edition of the Regional Judgements Award.** The National Supreme Court of Justice of Mexico won the award with the writ of constitutional protection (amparo) stating the maximum time persons on the move could be held in detention centers. The Court concluded that the established deadlines in the Law for maintaining persons under detention contradicted the maximum constitutional time limit for deprivation of liberty for administrative reasons.

IFR_AR_016120

JA308

5


**Participation of the Special Rapporteur for IDPs in the International Meeting on Human Mobility 2023, Photo credits to: Ministry of the Interior of Mexico, 2023.**

# INTERNAL DISPLACEMENT

Between July and December 2023, UNHCR provided **technical assistance on registration of IDPs to the authorities and four federal states of Mexico.** In the state of **Michoacan,** an emergency response was required due to the displacement of around **800 persons** due to clashes between organised crime groups. UNHCR facilitated a training and presented a rapid registration tool allowing for the quick identification of heightened risks. The tool was accepted in September 2023 by the authorities. On the request of the state of **Tamaulipas,** from 11-12 October, UNHCR facilitated a training regarding international standards for the protection of IDPs, including the Protection Information Management Principles and registration standards. The state of **Sinaloa** intends to initiate a registration system of IDPs, a process which UNHCR has been supporting. In the reporting period, the new system could already be implemented in several IDP communities. UNHCR facilitated a training for government officials who will conduct the IDP registration interviews. Technical assistance was also provided to the state of **Chihuahua** to improve the registration process and define the data sets according to their needs and capabilities to respond. The government of Chihuahua aims at having their own registration software, as they are currently using KOBO under a Data Sharing Agreement with UNHCR.

From 11-13 July, the current **Special Rapporteur on the Human Rights of IDPs,** Paula Gaviria Betancur, did an academic visit to Mexico at the request of the Ministry of the Interior of Mexico. The Special Rapporteur participated in the International Meeting on Human Mobility 2023, where she presented the country report derived from her predecessor's 2022 official visit. The Special Rapporteur highlighted that the causes of internal displacement in Mexico are diverse and multifactorial, often caused by organised crime, development

projects, including mining and illegal logging, community and land conflicts as well as climate change and natural disasters. She highlighted that the most affected were indigenous communities and that there was a differentiated impact on women and girls, children and adolescents, relatives of disappeared persons, human rights defenders and journalists, and LGBTIQ+ persons.

On 13 October, UNHCR participated in the session of the **Inter-Institutional Committee for Attention to Forced Displacement in Michoacan.** The local law Initiative on IDPs, a result of seven working groups co-chaired by UNHCR and the Secretariat for Migrants of the State of Michoacán, was approved and will be presented to the State Congress. UNHCR has continuously provided technical assistance to ensure that this initiative is in line with the Guiding Principles on Internal Displacement and other relevant international standards.


**Report on IDPs in Chihuahua, Photo credits to: Government of Chihuahua.**

IFR_AR_016121

**JA309**

6

From 24 - 26 October, **UNHCR participated in a learning encounter for the Internal Displacement Working Group within the Comprehensive Regional Protection and Solutions Framework (MIRPS) and the Government of Colombia,** held in Bogotá, Colombia with authorities from Mexico, Honduras and El Salvador. The event aimed at exchanging and challenges in protecting internally displaced persons and persons in confinement were shared; experiences and dialogues were also exchanged and will continue in the framework of the MIRPS Working Group on Internal Displacement.

## COMMUNICATION WITH COMMUNITIES (CWC)

Another ongoing challenge for UNHCR is the ***provision of information to ensure that individuals can make informed decisions.*** **UNHCR's Communications with Communities** team has produced informative materials about asylum procedures in Mexico to give persons on the move the best possibilities to inform themselves. The Helpdesk team handled **35,152** queries from January to December 2023. During 2023, El Jaguar reached **4,638,394** Facebook users (a monthly average of **386,000** users), registered **7,428,296** visits to its page (a monthly average of **619,000** visits) and its publications generated **331,164** interactions (a monthly average of **28,000** interactions).

With the objective of informing and mobilizing the refugee community so that persons on the move can make informed decisions, the **Outreach Volunteers** Program was re-initiated during the reporting period. Refugee volunteers of diverse backgrounds serve as an inter-phase between UNHCR and the communities and help for example to identify protection risks informing mitigation strategies for UNHCR and partners.

**3,200 refugee children and adults laughed with Payasos sin Fronteras (PSF).** As part of the Communication with Communities strategy, PSF performed the "Mexico 2023 Tour" comprising **20** shows in shelters, schools and other community spaces in Mexico City and Tapachula from 9-20 October. The initiative aims at bringing joy to refugee children and adults as well to build resilience.

**The peaceful coexistence project** 'Let's host the opera' seeks to raise awareness about the reality of refugees among the Mexican host community through a musical. The piece they present features forced displacement has reached more than **400** people in its first three presentations.



Clown performance for children in Tlahuac, Mexico City, Photo credits to Juan Sotomayor

IFR_AR_016122

7

# GENDER-BASED VIOLENCE AND PREVENTION OF SEXUAL EXPLOITATION AND ABUSE



All UNHCR staff in Mexico City, Tapachula, Tijuana, Tenosique, Villahermosa, and Guanajuato, participated in a Training of Trainers workshop on the Prevention of Sexual Exploitation and Abuse in the reporting period. There are upcoming sessions for staff in Monterrey, Saltillo and Aguascalientes. The "I act" strategy was designed for UNHCR personnel to raise awareness of the commitment and obligation to prevent, act and report sexual exploitation and abuse. UNHCR is contributing to disseminating the "All Voices" campaign within the framework of the 16 Days of Activism against Gender-based Violence.

UNHCR is grateful for the support provided by donors who have contributed to this operation as well as those who have contributed to UNHCR programmes with broadly earmarked and unearmarked funds. As of 31 October 2023, UNHCR Mexico is **50%** funded having required **US$119.7 million** to respond to the needs of thousands of asylum-seekers, refugees and those internally displaced in Mexico. Timely funding is urgent to ensure the continuity of our activities.  UNHCR's humanitarian and durable solutions response in Mexico is made possible thanks to the generous support of major donors who have contributed unrestricted funding to UNHCR's global operations, and to donors who have generously contributed directly to UNHCR operations in Mexico.



## SPECIAL THANKS ALL OUR DONORS IN 2023
**(as of 31 October):**

Belgium | Canada | Denmark | European Union | France | Germany | Ireland | Mexico |  Norway | Netherlands | Sweden | Switzerland | United Kingdom | United States of America

Private donors Australia | Private donors Germany | Private donors Italy | Private donors Japan | Private donors Mexico | Private donors Republic of Korea | Private donors Spain | Private donors Sweden | Private donors United Kingdom | Private donors United States of America

## CONTACTS

**Jelena Hawellek – External Relations**
hawellek@unhcr.org

**Uriel Salas Segovia – Government Liaison**
salasseg@unhcr.org

**Isabel Sorela - Donor Relations**
sorelazu@unhcr.org

**Anouck Bronee – Inter-Agency**
bronee@unhcr.org

**Silvia Garduno Garcia – Public Information**
garduno@unhcr.org

**Links: UNHCR Mexico Webpage**
Mexico I Global Focus      UNHCR Mexico Twitter
https://data.unhcr.org/en/country/mex

IFR_AR_016123

8



Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 401 of 513

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/violence-plagues-migrants-under-u-s-remain-in-mexico-program-11577529000

### LATIN AMERICA

# Violence Plagues Migrants Under U.S. 'Remain in Mexico' Program

Migrants seeking shelter in the U.S. under Trump administration policy report rising numbers of kidnappings by criminal groups

*By Robbie Whelan* ⟨Follow⟩ | *Photographs by Scott Dalton for The Wall Street Journal*

Dec. 28, 2019 5:30 am ET

NUEVO LAREDO, Mexico—Every morning, Lorenzo Ortíz, a Baptist pastor who lives in Texas, drives a 12-seat passenger van packed with food and blankets across the border to pick up migrants who have been dropped off in Mexico and ferry them to shelters.

His mission is to keep the migrants safe from organized crime groups that prowl the streets of this violent Mexican border town. Since the Trump administration began implementing its Migrant Protection Protocols program at the start of 2019—widely known as Remain in Mexico—some 54,000 migrants, mostly from Central America, have been sent back to northern Mexico to wait while their asylum claims are processed. Mexico's government is helping implement it.

But in cities like Nuevo Laredo, migrants are sitting ducks. Over the years, thousands have reported being threatened, extorted or kidnapped by criminal groups, who prey upon asylum seekers at bus stations and other public spaces.



IFR_AR_016862

JA313

"Over the last year, it's gotten really bad," Mr. Ortíz said.

A typical scheme involves kidnapping migrants and holding them until a relative in the U.S. wires money, typically thousands of dollars, in ransom money. Gangs have also attacked shelters and even some Mexican clergy members who help migrants.

There have been 636 reported cases of kidnapping, rape, torture and other violent crimes against migrants returned to Mexico under Remain in Mexico, according to Human Rights First, which interviews victims in border cities and advocates for migrants' due process rights. At least 138 of these incidents involved kidnappings of children.

Many more cases of extortion and violence go unreported for fear of retribution. As more migrants are returned to dangerous areas such as Nuevo Laredo under Remain in Mexico, the situation is expected to worsen, the nonprofit Human Rights First said in a recent report.

The Mexican government has played down the violence. Foreign Minister Marcelo Ebrard recently acknowledged kidnapping incidents, but said that "it's not a massive number." Only 20 such cases have been investigated by the government, he added.

The Trump administration has credited the program with deterring migrants from attempting to cross into the U.S. Monthly apprehensions of migrants at the U.S. Southern border have plunged from more than 144,000 in May to 33,500 in November. The Remain in Mexico program was expanded in June.

On a recent visit to the border, acting Department of Homeland Security Secretary Chad Wolf said the program has been a "game-changer" for U.S. Customs and Border Protection officers because it has freed them from having to perform humanitarian duties.



IFR_AR_016863

JA314

But Mr. Ortíz's daily commute back and forth over the border highlights what migrants' advocates say is a key element of the program—it isolates migrants not only from the legal counsel they need to argue their asylum claims, but from resources like food, shelter and medical care that are abundant on the U.S. side, but near-nonexistent in Mexico.

"You have all this infrastructure to help feed and clothe and house people set up on this side, in Laredo and Del Rio and Eagle Pass, and then suddenly the administration changes the policy, and you have to send it all to Mexico, because now everyone is on the other side," said Denise LaRock, a Catholic Sister who helps distribute donations to asylum seekers through the nonprofit Interfaith Welcome Coalition. Mexico has been unable to provide enough safe shelter and other resources to migrants.

In Matamoros, another large recipient of asylum seekers under the program across the border from Brownsville, Texas, a tent city of more than 3,000 people has sprung up. Migrants there have complained of overcrowding, unsanitary conditions and insufficient medical treatment. In November, a migrant from El Salvador was murdered in Tijuana, opposite San Diego, while waiting with his wife and two children for an asylum hearing under the Remain in Mexico program.



On a recent, briskly-cold Wednesday, Mr. Ortíz, dressed in a ski vest and a baseball cap with the logo of the U.S. Chaplain International Association, picked up six migrants, including two children aged 8 and 14, at the immigration office in Nuevo Laredo. All were from El Salvador, Guatemala or Honduras, and were returning from legal appointments in the U.S. Hearings take place in makeshift courts set up in tents in Laredo, just across the bridge over the Rio Grande that separates the two cities.

IFR_AR_016864

JA315



Case 1:24-cv-01702-RC    Document 53-3    Filed 09/27/24    Page 405 of 513

At the front door of the office, six young men sat idly around a motorcycle, hats pulled low over their heads, watching the scene unfold, periodically walking up to the church van and peering in. Mr. Ortíz said these men were "hawks" or lookouts for criminal gangs.

"They know who I am, I know who they are," he said. "You have to know everyone to do this work. The cartels respect the church. I've driven all around Nuevo Laredo in this van, full of migrants, and they never mess with me."

At one point two of the lookouts asked the pastor for some food. He gave them two boxes of sandwich cookies. They clapped him on the shoulder, eating the treats as they walked back to their observation post.

Mr. Ortíz, a native of central Mexico, came to the U.S. at age 15 and eventually built a small contracting business in Texas. He became an ordained Baptist minister about a decade ago and three years ago began ministering to migrants full time. This year, he converted several rooms of his home in Laredo, Texas, into a dormitory for migrants and built men's and women's showers in his backyard.



After picking up the migrants, Mr. Ortíz ferried the group to an unmarked safe house with a chain-locked door on a busy street in the center of Nuevo Laredo, Mexico.

Inside, about 90 migrant families crowded into rows of cots set up in a handful of bedrooms and a concrete back patio. Among the Central Americans are also migrants from Peru, Congo, Haiti, Angola and Venezuela.

IFR_AR_016866

JA317

Case 1:24-cv-01702-RC   Document 53-3   Filed 09/27/24   Page 406 of 513

Reports of migrant kidnappings have increased since the Remain in Mexico program began, Mr. Ortíz said. In September, armed men stormed the safe house—one of two that the pastor brings migrants to—and detained the shelter's staff for about an hour.

Since then, Mr. Ortíz said, the volunteer staff has stopped allowing migrants to leave the house unaccompanied, even to buy milk for young children at a nearby store.

Rosa Asencio, a schoolteacher fleeing criminal gangs in El Salvador and traveling with her two children ages 4 and 7, was returned to Nuevo Laredo under Remain in Mexico. She says she hasn't been outside the shelter for nearly three weeks. "They can kidnap you anywhere," she said.



María Mazariegos, an Honduran housekeeper, said she was kidnapped along with her 12-year-old daughter Alexandra from the bus station in Nuevo Laredo in September.

Gang members held her in a windowless cinder-block room that bore signs of torture for three days with one meal of tortillas and beans. She was released after her family members in the U.S. convinced her captors that they didn't have the money to pay a ransom.

Then, two weeks later, while she was returning from a court appointment in the U.S., a shelter staff member confirmed, another group tried to kidnap her. An escort from the shelter was able to talk the kidnappers out of it.

She has court hearing under Remain in Mexico rules on Jan. 22, where a judge is expected to decide on her asylum case. If she is rejected, she plans to move to the Mexican city of Saltillo, where she has heard there are more jobs and less violence.

"Just about anywhere is better than here," Ms. Mazariegos added.

IFR_AR_016867

JA318



**FOR OFFICIAL USE ONLY**

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Refugee, Asylum, and International Operations Directorate*



**U.S. Citizenship and Immigration Services**

INFORMATION MEMORANDUM

TO:            Jennifer B. Higgins
               Deputy Director

FROM:          Ted Kim, Associate Director                          TED H    Digitally signed
               Refugee, Asylum, and International Operations Directorate    KIM    by TED H KIM
                                                                                   Date: 2024.06.04
                                                                                   11:05:09 -04'00'

DATE:          June 4, 2024

SUBJECT:       **Scheduling of Credible Fear Interviews While the Measures in the
               Securing the Border Interim Final Rule Apply**

---

**Purpose:** To inform you that while the measures in the Securing the Border Interim Final Rule apply, USCIS will reduce the credible fear (CF) consultation period to a minimum of 4 hours for all noncitizens who enter across the southern border, are not described in an exception to the Presidential Proclamation of June 3, 2024, and are processed for expedited removal, as long as the period falls between 7 a.m. and 7 p.m. local time, starting from the time CBP or ICE provides the individual with an opportunity to consult – i.e., when the individual is provided access to a phone – and will deny requests for extensions as unreasonably delaying the process except in extraordinary circumstances.[1]

**Background:** The Immigration and Nationality Act (INA) authorizes the expedited removal of certain noncitizens seeking admission who are determined to be inadmissible under certain grounds of inadmissibility.  INA § 235(b)(1).  During circumstances in which the measures in the Securing the Border IFR apply, if noncitizens in expedited removal proceedings manifest a fear of return, or express an intention to apply for asylum or protection, or express a fear of return to their country of removal, they are referred to a USCIS asylum officer for a credible fear interview, INA § 235(b)(1)(A)(ii), *see* new 8 C.F.R. § 235.15(b)(4)(i); and generally will be

---

[1] *See* Section III.D. of the Credible Fear Procedures Manual, which sets forth guidance on such extraordinary circumstances.

**FOR OFFICIAL USE ONLY**

www.uscis.gov

**JA320**                                              USCIS_4-Hour_AR_000001

FOR OFFICAL USE ONLY

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 2

detained throughout the credible fear screening process, INA § 235(b)(1)(B)(iii)(IV), 8 C.F.R. § 235.3(b)(4)(ii), *see also* new 8 C.F.R. § 235.15(a).

The INA requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted "according to regulations prescribed by [DHS]." INA § 235(b)(1)(B)(iv). Under those regulations, including during circumstances in which the measures in the Securing the Border IFR apply, consultation shall be at no expense to the government, and consultations "shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, and […] shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii); *see also* new 8 C.F.R. § 235.15(a). The regulations do not require that the noncitizen be allowed a particular amount of time to consult with the person or persons of their choosing. *Id.*

DHS currently provides a consultation period of at least 24 hours from the time when a noncitizen acknowledges receipt of the M-444, Information About Credible Fear Interview. Noncitizens are not interviewed until 24 hours after CBP or ICE refers a noncitizen to USCIS, unless the noncitizen, at their request, voluntarily waives the consultation period, to provide the noncitizen with the opportunity to consult before the CF interview takes place. This 24-hour consultation period is currently subject to challenge in *M.A. v. Mayorkas*, No. 23-CV-1843 (D.D.C.).

**Considerations:** In recognition that encounter levels are exceeding our capacity to deliver consequences to those encountered at the border in a timely manner due to the limited resources we have available, President Biden issued a Proclamation directing DHS to promptly consider issuing instructions, orders, and regulations to address the circumstances at the border. In response to the Proclamation, DHS and DOJ are issuing an IFR and taking complementary actions.

To support the implementation of these provisions, while the measures in the Securing the Border IFR apply, USCIS will reduce the minimum consultation period for noncitizens subject to the rule to four hours beginning at the time ICE or CBP provides the noncitizen with the opportunity to consult and continuing only during the hours of 7 a.m. and 7 p.m. local time. The 4-hour consultation period is the four hours counted between the hours of 7 a.m. and 7 p.m. local time, such that the four hours counted can be bifurcated and not consecutive. For example, if a noncitizen subject to the 4-hour consultation period is provided access to a phone at 6 p.m., the 4-hour consultation period will constitute: 6 p.m. to 7 p.m. that day and 7 a.m. to 10 a.m. the following day.

As part of a whole-of-DHS approach, this change to the minimum consultation period will support DHS with operationalizing across its components the requirements set forth in the Presidential Proclamation of June 3, 2024 and the Securing the Border IFR. When the conditions at the southern border are such that the suspension and limitation on entry enacted by the Proclamation and the Securing the Border IFR applies, DHS and USCIS's resources are

**JA321**

FOR OFFICAL USE ONLY

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 3

strained, and reasonable attempts must be made to expeditiously conduct expedited removal proceedings for noncitizens arriving during circumstances described in the Presidential Proclamation.  To support expeditious processing, DHS is maximizing the use of expedited removal, and in turn, the number of credible fear screenings that can be conducted.  Lengthy consultation periods, including the 24-hour consultation period, cause credible fear screenings to be delayed, increasing the amount of time noncitizens remain in immigration detention.  Delays in the credible fear screening under such circumstances directly contribute to a situation where DHS's capacity can quickly become overwhelmed.  These factors in circumstances described in the Securing the Border IFR constitute unreasonable delays in the CF process.  Thus, a minimum 4-hour consultation period will support completing expedited removal proceedings at the border in a safe, orderly, and humane manner in order to maximize the number of noncitizens who can be processed during times while the measures in the Securing the Border IFR apply.

The 4-hour consultation period under this guidance will be initiated at the time CBP or ICE provides the individual with an opportunity to consult with a person(s) of the detained noncitizen's choosing– i.e., when the individual is provided access to a phone.  The 4-hour consultation period does not guarantee that a detained noncitizen will be able to reach the person(s) they wish to consult with; however, it does allow sufficient[2] time for individuals to make multiple phone calls and have in-depth conversations.  Although shorter than the period currently in place, the 4-hour consultation period during the above-referenced hours provides noncitizens with an opportunity to consult with a person(s) of their choosing during times when legal service providers are most likely to be available.  The new 4-hour period, like the current 24-hour period, includes Saturdays, Sundays, and holidays.  While USCIS recognizes that it may be more difficult for detained noncitizens to connect with the person(s) they wish to consult on these days, the expediency of the process would be compromised should these days be excluded from the calculation and the inclusion of Saturdays, Sundays, and holidays is also standard practice when the measures in the Securing the Border IFR do not apply.  This shortened consultation period will enable the screening of a majority of migrants on the same day that they are processed, reducing the time such individuals must remain in custody by approximately one day and helping to mitigate overcapacity circumstances which require the release of individuals into immigration proceedings before they receive a credible fear interview.

In addition, as required by statute and regulation, the *Information About Credible Fear Interview Sheet* is provided to the noncitizen prior to the start of the consultation period to inform them of the credible fear interview process, the right to consult with other persons prior to the interview, and the right to seek review by an immigration judge of any negative credible fear determination

---

[2] *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020).  "The Court explained that "asylum seekers shall have access to telephones 'as often as operationally feasible' to 'consult with any person of their choosing, including an attorney', and that '[t]he alien's consultant or attorney may participate in the interview telephonically."  *Id*. at 30.  The Court further noted that asylum seekers have an "opportunity to contact an attorney" through an initial one-hour period for telephonic consultation, with "30-minute follow-up as needed[,]" and instructs that "[t]he location for consultation calls must allow sufficient privacy to allow for discussion of confidential matters."  *Id.* at 30.  The Court concluded that both provided "a legally sufficient opportunity to consult with others, including a lawyer, before their credible fear interviews or immigration judge review."

USCIS_4-Hour_AR_000003

**FOR OFFICAL USE ONLY**

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 4

made by an asylum officer.  Noncitizens are also given the opportunity to gain information that they need from their personal property, including contact information, and the EOIR list of free legal service providers is provided in all phone booths in CBP facilities and posted in ICE detention facilities.  These practices will continue while the measures in the Securing the Border IFR apply.

The approach described in this memorandum is an internal general policy that USCIS is pursuing in order to effectively implement the measures in the Securing the Border IFR during periods in which it applies, providing for improved procedural efficiency and ensuring appropriate disincentives for irregular migration and strengthening DHS's imposition of consequences.  It does not set or modify any binding standard.  It is not intended to, shall not be construed to, may not be relied upon to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable by any party against the United States, its departments, agencies, or other entities, its officers or employees, or any other person.

**JA323**

FOR OFFICAL USE ONLY

Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply Page 5

## APPENDIX: Legal Background

As an initial matter, noncitizens seeking entry generally, and those subject to expedited removal more specifically, are entitled only to those due process rights provided by the statute. *See, e.g.*, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950) ("[A]n alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government. Such privilege is granted only upon such terms as the United States shall prescribe."); *see also Landon v. Plasencia*, 459 U.S. 21, 32 (1982). A noncitizen subject to expedited removal under section 235 of the INA, 8 U.S.C. § 1225, is "at the threshold of initial entry [and] cannot claim any greater rights under the Due Process Clause." *Dep't of Homeland Sec. v. Thuraissigiam,* 140 S. Ct. 1959, 1964 (2020).

The expedited removal provision at section 235(b)(1)(B)(iv) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1225(b)(1)(B)(iv), provides the right for noncitizens in the credible fear process to consult with a person(s) of their choosing prior to their CF interview or any review of the interview, as long as the consultation is at no expense to the government and does not unreasonably delay the process. To implement the statutory provision on consultation, DHS exercised its authority to promulgate the regulation at 8 C.F.R. § 235.3(b)(4)(ii), which provides that noncitizens "shall be given time to contact and consult" such person(s), and a "consultation shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, shall be at no expense to the government, and shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). Neither the statute nor the regulation provides a specific minimum time period in which consultation must occur.

A 24-hour consultation period was the subject of significant litigation in *Las Americas Immigrant Advoc. Ctr. v. Wolf*, 507 F. Supp. 3d 1 (D.D.C. 2020). There, looking at the statutory consultation provisions, together with 8 C.F.R. § 235.3(b)(4)(ii), the Court determined that "[r]ead together, the text of these provisions provide noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained." *Las Americas*, 507 F. Supp. 3d at 25. The Court noted that the procedural rights at this initial stage of the process are necessarily lesser than those further on in the process. *Id*. at 26.

The Court explained that "asylum seekers shall have access to telephones 'as often as operationally feasible' to 'consult with any person of their choosing, including an attorney', and that '[t]he alien's consultant or attorney may participate in the interview telephonically." *Id*. at 30. The Court further noted that asylum seekers have an "opportunity to contact an attorney" through an initial one-hour period for telephonic consultation, with "30-minute follow-up as needed[,]" and instructs that "[t]he location for consultation calls must allow sufficient privacy to allow for discussion of confidential matters." *Id.* at 30. The Court concluded that both provided "a legally sufficient opportunity to consult with others, including a lawyer, before their credible fear interviews or immigration judge review."

**JA324**



(2) either be translated into a language the noncitizen understands or have a completed interpreter certification. The Asylum Division cannot proceed with a credible fear interview of a noncitizen unless the credible fear referral packet includes a completed Form M-444.

Once the asylum office receives the above forms and verifies that the asylum office has jurisdiction to conduct a credible fear interview and make a credible fear determination, asylum office staff accept the credible fear referral and enter the case into Global. The "Clock-in Date" field on the Entry tab is the date the asylum office receives a complete referral from CBP or ICE. Asylum office staff must enter the credible fear case into Global within one (1) business day of receiving a complete referral packet.

## III.D. ASYLUM OFFICE SCHEDULES INTERVIEW

| Reviewed, No Substantive Changes since 03/31/2023 | Will be Updated, Changes Pending Review | Finalized Updates |
|---|---|---|
| Sections: | Sections: | Sections: III.D.1.b. |

### 1. Consultation Period (previously titled "48-Hour Hiatus")

It is a policy of the Asylum Program to allow a minimum of 48 hours to transpire between the arrival of an alien at a detention site and any credible fear interview.  This 48-hour period provides an alien an opportunity to rest, collect his or her thoughts, and contact a relative, representative, attorney, or friend whom the alien may want to act as a consultant during the credible fear interview.

If DHS transfers an alien to a new detention site, the 48-hour period begins anew from the alien's arrival at the new detention location.

#### a. Waiver of Consultation Period (previously titled "Waiver of 48-Hour Period")

Although an asylum office must wait at least 48 hours from the alien's arrival at a detention site before interviewing the alien, an alien may, at his or her request, waive the 48-hour period before a credible fear interview.  The asylum office should make every effort to interview the alien as soon as possible after receiving such a request.

If the interview takes place within the 48-hour period, the APSO asks the alien to sign a *Waiver of the 48-Hour Period*. [Appendix F: Waiver of the 48-Hour Period.](#)

#### b. Orientation

Before beginning the substantive part of the credible fear interview, the asylum officer must verify that the noncitizen received Form M-444 and understands the credible fear determination process (see 8 CFR 208.30(d)(2)). The asylum officer should remind the noncitizen of the date that they received Form M-444 based on the date the noncitizen signed the form and ask the noncitizen if they have any questions relating to the credible fear process. If the noncitizen indicates that they do not understand the credible fear process, the asylum officer should read verbatim the below explanation to the noncitizen, include the below explanation verbatim in the interview notes, and document in the interview notes that the explanation was read to the noncitizen. The asylum officer does not need to re-

**JA326**

read the full M-444 where there is an M-444 in the referral packet signed by the noncitizen or where there is a notation that the noncitizen refused to sign. Note, the asylum officer must provide and read the full M-444 in cases where the noncitizen is eligible for a credible fear interview following a Safe Third Country Agreement Threshold Screening.

> You have been placed in expedited removal proceedings because the U.S. Department of Homeland Security (DHS) believes that you may not have the right to stay in the United States. However, you indicated that you fear return to your country, so I will interview you for credible fear. At the credible fear interview, I will ask you questions about the reasons you fear return to your country. It is important that you tell me about any harm you may have suffered in the past or any harm you fear in the future. To demonstrate a credible fear of persecution or torture, you must show that you have a credible fear of being persecuted because of your race, religion, nationality, membership in a particular social group or political opinion, or a credible fear of being tortured in your country.

> You may request an officer of a specific gender. You may also ask to speak to me separately from your family. You may have a consultant of your choice with you at your interview, or present telephonically. If you need additional time before your credible fear interview to contact someone, let me know and explain the reason you need more time. I will determine whether your circumstances merit providing you with additional time. DHS will provide an interpreter for the interview if you require one. The interpreter will be sworn to keep the information you discuss confidential. You may request another interpreter if you are not comfortable or if you do not understand them.

> If I determine that you have a credible fear of persecution or torture, you will either receive a charging document for a hearing in immigration court or you will be scheduled for an Asylum Merits Interview with a USCIS asylum officer. At the immigration court hearing or USCIS Asylum Merits Interview, the immigration judge or asylum officer will determine whether to grant you asylum or whether you are eligible for other protection from removal. You will receive information about the date, time, and location of this hearing or interview. If I determine that you do not have a credible fear of persecution or torture, you may ask to have an immigration judge review the negative determination. If you decline this review, or after immigration judge review, you are still found to not have a credible fear of persecution or torture, you may be removed from the United States.

> Do you have any questions about what I just explained?

> Do you understand the credible fear determination process?

The asylum officer should answer questions posed by the noncitizen to ensure understanding of the credible fear process.

If ICE transfers a detained noncitizen who has already been referred to the Asylum Division to a detention facility located in another asylum office's jurisdiction, asylum office personnel at the new asylum office should ensure the noncitizen receives a list of legal service providers for the new location.

**JA327**



**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

D.G.                                                              )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )
                                                                     )
E.R.                                                               )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )
                                                                     )
P.S.                                                               )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )
                                                                     )
D.C. and her minor daughter, L.R.          )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )          Case No. 24-cv-1702
                                                                     )
A.E. and her minor son, E.D.                   )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )
                                                                     )
T.R.                                                               )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )
                                                                     )
S.G.                                                               )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )
                                                                     )
J.C.                                                               )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )
Chicago, IL 60604                                      )
                                                                     )
J.R.                                                               )
c/o National Immigrant Justice Center      )
111 W. Jackson Blvd., Suite 800               )

**JA329**

Chicago, IL 60604                                      )
                                                       )
L.B.                                                   )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
J.G.                                                   )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
E.M.                                                   )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
R.R. and her minor children, A.L. and J.L.             )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
L.Q.                                                   )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
S.O. and her minor children W.O. and G.F.              )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
J.N. and her minor children J.S. and K.C.              )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
E.C.                                                   )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )
                                                       )
J.E.                                                   )
c/o National Immigrant Justice Center                  )
111 W. Jackson Blvd., Suite 800                        )
Chicago, IL 60604                                      )

R.C.                                                          )
c/o National Immigrant Justice Center                        )
111 W. Jackson Blvd., Suite 800                              )
Chicago, IL 60604                                            )
                                                             )
M.F.                                                         )
c/o National Immigrant Justice Center                        )
111 W. Jackson Blvd., Suite 800                              )
Chicago, IL 60604                                            )
                                                             )
LAS AMERICAS IMMIGRANT ADVOCACY                              )
CENTER                                                       )
1500 East Yandell Drive                                      )
El Paso, TX 79902;                                           )
                                                             )
REFUGEE AND IMMIGRANT CENTER FOR                             )
EDUCATION AND LEGAL SERVICES                                 )
P.O. Box 786100                                              )
San Antonio, TX 78278                                        )
                                                             )
       *Plaintiffs*,      )
                                                             )
       v.                  )
                                                             )
U.S. DEPARTMENT OF HOMELAND                                  )
SECURITY,                                                    )
245 Murray Lane, SW                                          )
Washington, DC 20528;                                        )
                                                             )
U.S. CITIZENSHIP AND IMMIGRATION                             )
SERVICES,                                                    )
5900 Capital Gateway Drive                                   )
Camp Springs, MD 20746;                                      )
                                                             )
U.S. CUSTOMS AND BORDER                                      )
PROTECTION,                                                  )
1300 Pennsylvania Ave, NW                                    )
Washington, DC 20229;                                        )
                                                             )
U.S. IMMIGRATION AND CUSTOMS                                 )
ENFORCEMENT,                                                 )
500 12th Street, SW                                          )
Washington, DC 20536;                                        )
                                                             )
U.S. DEPARTMENT OF JUSTICE,                                  )
950 Pennsylvania Avenue, NW                                  )

**JA331**

Washington, DC 20530;     )
           )
EXECUTIVE OFFICE FOR IMMIGRATION )
REVIEW,        )
5107 Leesburg Pike     )
Falls Church, VA 22041;    )
           )
ALEJANDRO MAYORKAS, Secretary of the )
Department of Homeland Security, in his )
official capacity      )
245 Murray Lane, SW     )
Washington, DC 20528;    )
           )
UR JADDOU, Director of U.S. Citizenship and )
Immigration Services, in her official  )
capacity,5900 Capital Gateway Drive Camp )
Springs, MD 20746;     )
           )
TROY A. MILLER, Senior Official Performing )
the Duties of Commissioner for U.S. Customs )
and Border Protection, in his official capacity, )
1300 Pennsylvania Ave, NW   )
Washington, DC 20229;    )
           )
PATRICK J. LECHLEITNER, Acting Director )
of Immigration and Customs Enforcement, in )
his official capacity,     )
500 12th Street, SW     )
Washington, DC 20536;    )
           )
MERRICK GARLAND, Attorney General of )
the United States, in his official capacity, )
950 Pennsylvania Avenue, NW   )
Washington, DC 20530;    )
           )
MARY CHENG, Acting Director of the  )
Executive Office for Immigration Review, in her )
official capacity,      )
5107 Leesburg Pike     )
Falls Church, VA 22041;    )
           )
   *Defendants*.     )
           )
_____ )

**JA332**

**SECOND AMENDED COMPLAINT**

1.      The United States has long sheltered refugees seeking a haven from persecution. The 1980 Refugee Act enshrined that national commitment in law. While Congress has placed some limitations on the right to seek asylum over the years, it has never permitted the Executive Branch to categorically ban asylum based on where a noncitizen enters the country. To the contrary, Congress has expressly provided that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival…*), irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). That plain statutory text precludes the President and the Executive Branch from barring noncitizens from asylum based on their manner of entry into the United States.

2.      This case challenges a September 30, 2024, Final Rule ("Rule"),[1] 89 Fed. Reg. 81156, a corresponding June 4, 2024, Interim Final Rule ("IFR"),[2] 89 Fed. Reg. 48487, and accompanying Implementation Guidance ("Guidance"), *see* Dep't Homeland Security, Information Memorandum, *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule* (June 4, 2024) at Guidance AR1-5, that categorically exclude an entire group of asylum seekers from access to that protection because of where they entered the country, directly contrary to the statute's mandate. Under the Rule, which incorporates a September 27, 2024, Amended Presidential Proclamation ("Amended Proclamation"), 89 Fed. Reg. 80351, noncitizens arriving between ports of entry at the southern border are, with extremely limited exceptions, categorically ineligible for asylum unless a 7-consecutive-calendar-day

---

[1] The Final Rule was issued on September 30, 2024, and published on October 7, 2024. It took effect on October 1, 2024.

[2] The Interim Final Rule was issued on June 4, 2024, and published on June 7, 2024. It took effect on June 5, 2024.

1

**JA333**

average of daily "encounters" of inadmissible noncitizens between ports of entry is below a 1500-encounter threshold for 28 days. This policy further entrenches the identical categorical ban in place under the IFR.[3] The threshold has been exceeded continuously since July 2020.[4] The policy blatantly violates the plain language of Section 1158(a)(1).

3.      The Rule also finalizes unlawful regulations, previously imposed by the IFR, governing how arriving noncitizens are screened to determine whether they are eligible for two other more limited forms of protection against removal to persecution or torture (or "*refoulement*"): (1) withholding of removal under 8 U.S.C. § 1231(b)(3), and (2) protection under the Convention Against Torture. Prior to the IFR, an immigration officer interviewed each noncitizen encountered to ascertain whether the noncitizen had an intention to apply for asylum or a fear of persecution. If the person was ineligible for asylum, an asylum officer then determined whether the noncitizen had a credible fear, defined as a "significant possibility," of persecution or torture. 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30 (e)(2)-(3). That screening threshold helped to mitigate the risk that noncitizens would be erroneously returned to persecution or torture in their home countries.

4.      The Rule, however, adopts a screening policy that will systematically lead to the *refoulement* of people seeking protection from persecution, torture, and death. First, under the Rule, a noncitizen can be quickly removed from the United States without any process whatsoever unless an immigration officer—usually a Border Patrol agent—determines that the person has

---

[3] The IFR incorporated a June 3, 2024, Presidential Proclamation ("Original Proclamation"). Under the Original Proclamation, the categorial ban on asylum was lifted after the number of encounters was, on average, below the threshold for 7 consecutive calendar days.

[4] *See* "The Futility of 'Shutting Down Asylum' by Executive Action at the U.S.-Mexico Border," WOLA (Jun. 4, 2024), https://www.wola.org/analysis/futility-of-shutting-down-asylum-by-executive-action-us-mexico-border/.

"manifested" a fear of return. Under this requirement, individuals must "manifest" a fear of persecution or torture, without being asked if they have a fear. In practice, noncitizens who have just crossed the border, and may be hungry, exhausted, ill, or traumatized after fleeing persecution in their home countries and danger in Mexico, are likely to be intimidated by armed, uniformed Border Patrol officers, and are thus unlikely to "manifest" their fear of return. Experience, including from the period when this same requirement was in effect under the IFR, shows that, when in the past a "manifestation of fear" standard or similar directives not to ask about fear of removal were imposed, asylum seekers' fear of return has gone unrecognized.

5.      Second, even if a Border Patrol agent finds that a noncitizen adequately "manifests" a fear, the noncitizen still will not avoid removal unless an asylum officer determines that the noncitizen meets a new, more stringent screening standard: instead of satisfying the "significant possibility" standard, the noncitizen will need to show a "reasonable *probability*" of torture or persecution. As was borne out during the period the IFR was in effect, the practical impact of this policy is the return of many victims of torture and persecution to dangerous conditions.

6.      What is more, even if a noncitizen "manifests" a fear and gets screened for some form of protection, the corresponding Guidance drastically reduces the minimum time noncitizens have to find and consult with a lawyer before a credible fear interview. Previously, noncitizens had at least 24 hours, reduced from 48 hours just one year ago. Now, noncitizens may have as few as four hours, which will be spent in a border facility without meaningful access to family or counsel. In practice, this removes any chance of receiving a legal consultation, much less representation, for the overwhelming majority of noncitizens in Defendants' custody, greatly increasing the risk of *refoulement*.

7.     The Rule, IFR, and Guidance violate the Immigration and Nationality Act ("INA") and are contrary to law under the Administrative Procedure Act ("APA"). In addition, they are arbitrary and capricious in violation of the APA, and the IFR was promulgated in violation of the APA's procedural notice-and-comment requirements.

## JURISDICTION AND VENUE

8.     This case arises under the APA, 5 U.S.C. § 701 *et seq.*; the INA, 8 U.S.C. § 1101 *et seq.*; and regulations implementing the INA. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 8 U.S.C. § 1252(e)(3).

9.     Venue is proper under 28 U.S.C. § 1391(e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official capacity, many Defendants reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District. Venue is also appropriate under 8 U.S.C. § 1252(e)(3)(A).

## PARTIES

10.     The Individual Plaintiffs are noncitizens who came to the United States to seek asylum, withholding of removal, and protection under the Convention Against Torture.[5] They were unlawfully issued expedited removal orders because of the IFR or the Rule. The Organizational Plaintiffs are organizations that serve asylum seekers.

### I.     Individual Plaintiffs

11.     Plaintiff D.G. is an asylum seeker from Colombia who fears persecution in that country by a criminal organization. Members of this criminal organization tried to stop D.G. from

---

[5] The Individual Plaintiffs added in this Second Amended Complaint are seeking leave to proceed under their initials in this case in a motion contemporaneously filed as to that issue, with declarations, filed under seal, setting forth the details. They are referred to in this Second Amended Complaint using their initials.

selling property and instead tried to claim it for themselves. When D.G. refused, the organization attempted to kill D.G. and her husband and held her son at gunpoint.  The family fled Colombia. While in Mexico, D.G.'s son evaded an attempted kidnapping. Fearing for their safety, the family fled to the United States. D.G. did not attempt to secure a CBP One appointment because she did not know about that option. After D.G. entered the United States and turned herself in to immigration officers on or about June 6, 2024, she was separated from her family. Unlike her husband, who was given a credible fear interview and released into the United States, and unlike her son, who was placed directly into full removal proceedings, D.G. was denied a credible fear interview based on the IFR. Despite her statements to immigration officers that she feared for her safety, they concluded that she did not affirmatively manifest a fear of harm. D.G. was deported to Colombia without her family.

12.    Plaintiff E.R. is an asylum seeker from Mexico who fears persecution in that country because of domestic violence and her sexual orientation. She had a relationship with a woman whose brother is a member of a criminal organization. The brother surveilled her and threatened to kill her. E.R. also fears her former partner, who cut her with a knife and beat her when she tried to leave the relationship. She fled to northern Mexico, where she was threatened with rape because of her sexual orientation. E.R. spent three months unsuccessfully attempting to obtain a CBP One appointment. E.R. then entered the United States at a port of entry without a CBP One appointment and turned herself in to immigration officers on or about June 8, 2024. E.R. attempted to tell immigration officers about her fear of returning to Mexico, but they disregarded her. E.R. was deemed ineligible for asylum based on the IFR. Even though she feared for her safety, she was denied a credible fear interview after an officer concluded that she did not affirmatively manifest a fear of harm. E.R. was deported to Mexico.

5

**JA337**

13.     Plaintiff P.S. is an asylum seeker from Nicaragua who experienced frequent harassment and violence by the Sandinista regime. When P.S. denied the Sandinistas' request to join their movement, they called him a traitor and threatened to kill him. One day, when P.S. had the Nicaraguan flag hanging outside his home instead of the Sandinista flag, those threats evolved into physical violence. P.S. tried unsuccessfully to relocate to different parts of Nicaragua. When Nicaraguan officers aligned with the Sandinistas tried to recruit him yet again, P.S. fled to Mexico with his wife. He attempted for two weeks to get a CBP One appointment, but without success. P.S. and his wife entered the United States without a CBP One appointment and turned themselves in to immigration officers on or about June 11, 2024. He was then separated from his wife. P.S. tried multiple times to manifest his fear of harm by explaining to CBP officers that his life was in danger, including by presenting a letter expressing his fear of harm. Yet every attempt was either ignored or dismissed. P.S. was deemed ineligible for asylum based on the IFR. He was denied a credible fear interview after a CBP officer concluded that he did not affirmatively manifest a fear of harm. P.S. was deported to Mexico. By contrast, P.S.'s wife, who fled Nicaragua for the same reasons, is now in full removal proceedings where she will have an opportunity to seek protection.

14.     Plaintiff D.C. is an asylum seeker from Mexico who fears persecution in that country, and Plaintiff L.R. is D.C.'s minor daughter. D.C. fled her hometown due to her former partner's involvement with a criminal organization. D.C.'s partner was incarcerated after their relationship began, but even from custody, he was violent. On one of her visits to see him in prison, D.C.'s partner raped her, leading her to become pregnant with L.R. When D.C. refused to smuggle contraband into the prison, her partner threatened her life and enlisted people not in custody to do the same. D.C. fled to the United States with L.R., but she did not use the CBP One app because she did not know about it. D.C. and her daughter entered the United States without authorization

6

**JA338**

and turned themselves in to immigration officers on or about June 8, 2024. They were detained for about eight days. At one point, a CBP officer told D.C. to sign a form so she could be released, without explaining or reading it to her. When the officer later stated that D.C. and her daughter would be "released" back to Mexico on the basis of her signature, she frantically told him that she feared for her life. The officer responded that asylum was "over" because of the number of people arriving at the border. D.C. was deemed ineligible for asylum based on the IFR. She was denied a credible fear interview after the officer concluded that she did not affirmatively manifest a fear of harm. D.C. and her daughter were deported to Mexico.

15.     Plaintiff L.R. is the minor daughter of Plaintiff D.C. As a derivative on her mother's case, L.R. was subjected to the IFR. She was removed to Mexico.

16.     Plaintiff A.E. is an indigenous woman from Mexico who fears persecution by a criminal organization, and Plaintiff E.D. is her minor son. This organization twice demanded that A.E. pay a substantial amount of money to them from the proceeds of a business that she ran. When A.E. first refused payment, members of the organization struck her in the face and mouth, requiring a hospital visit. When A.E. refused a second time, they threatened to burn down her house and business. The next morning, A.E. learned this same organization had killed her relatives. She therefore fled immediately to the border with her son. She did not attempt to relocate in Mexico because the criminal organization's widespread influence made doing so unsafe. A.E. did not apply for a CBP One appointment because she did not know she could. A.E. and her son entered the United States without authorization and turned themselves in to immigration officers on or about June 12, 2024. A.E. had a credible fear interview, but she did not have an opportunity to speak to an attorney beforehand, and she could not provide full answers during the interview because the officer asked primarily yes or no questions. She was deemed ineligible for asylum under the IFR.

7

**JA339**

She was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld that decision in a hearing that lasted just a few minutes. A.E. and her son were deported to Mexico.

17. Plaintiff E.D. is the son of A.E. and a minor. In addition to the persecution experienced by his mother, a criminal organization attempted to recruit him. In the credible fear interview, he did not mention this fact to the asylum officer and was not given the opportunity to speak to the immigration judge.

18. Plaintiff T.R. is a Cuban of African descent who fears persecution due to her political opinion and because she was involved in a same-sex relationship. T.R. worked in a government-run facility, but she was fired and subjected to surveillance after she complained about issues arising at work. When she later raised similar concerns at another job in the same field, she was pressured into resigning. In addition, T.R. was kidnapped and raped twice because of her romantic relationship with a female. When she reported these rapes to the police, they did nothing. She fled to Mexico where she was robbed, including by people she believed were police officers, and witnessed the rape of a teenage girl who was traveling with her. When T.R. screamed for help, the men beat her. As a result, T.R. feared for her safety in Mexico. For several months, T.R. tried to make a CBP One appointment without success. T.R. entered the United States without authorization on or about June 16, 2024. At her credible fear interview, T.R. was deemed ineligible for asylum based on the IFR. T.R. wanted to explain that she had been raped, but the officer seemed to be laughing at her, so she felt too uncomfortable and embarrassed. She was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture. An immigration judge

8

**JA340**

upheld that decision. T.R. was deported to Mexico; she subsequently obtained an appointment using CBP One and has reentered the United States.

19.    Plaintiff S.G. is an asylum seeker from Colombia who fears persecution in that country by a criminal organization that murdered his father. After his father's killer was released from prison, the rest of S.G.'s immediate family fled to the United States. The criminal organization then began to target S.G. Members of the criminal organization murdered another of S.G.'s family members, thinking it was him, and later shot at S.G. He fled to Mexico but feared staying there because of the criminal organization's connections in Mexico. S.G. entered the United States without authorization. He did not know about the option to make a CBP One appointment. He turned himself in to immigration officials on or about June 6, 2024. He was unable to speak to a lawyer before his credible fear interview. At his credible fear interview, S.G. was deemed ineligible for asylum based on the IFR. He had trouble explaining his story because he was told to answer yes or no questions. S.G. was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld that decision. S.G. was deported to Colombia.

20.    Plaintiff J.C. is an asylum seeker from Mexico where he fears persecution and torture. J.C. was shot twice while playing soccer with his friends. Consequently, J.C. spent about two weeks in a coma and lost one of his eyes. J.C. does not know who attacked him and his friends but believes they were associated with organized crime. After he was released from the hospital, J.C. was subject to harassment, bullying, and targeting because of his visible impairment from the loss of his eye. One day, he was stopped by police, who accused him of selling drugs and beat him when he denied it. J.C. believes the police thought he was affiliated with organized crime because

9
**JA341**

of his eye injury. Afraid for his life, J.C. entered the United States without authorization and without a CBP One appointment on or about June 25, 2024. J.C. did not have the opportunity to consult with an attorney before his credible fear interview, which occurred less than 24 hours after he expressed his fear of being deported. At his credible fear interview, J.C. was deemed ineligible for asylum based on the IFR. He was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that he did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld the decision. J.C. was deported to Mexico.

21.    Plaintiff J.R. is an asylum seeker from Colombia. J.R. and her partner co-own a business. A criminal organization demanded that J.R.'s partner pay ten percent of the business's overall revenue to them as a fee for staying in business. After J.R.'s partner refused their demands, the group gave them one month to pay or be killed. J.R.'s partner kept certain details about the group from J.R. to protect her. J.R. did not contact the police because the group is well known, and the police are unable to provide protection. Before the one-month payment deadline was up, J.R. and her partner fled to Mexico. They did not know about the CBP One app, so they entered the United States without authorization and turned themselves in to immigration officers on Saturday, July 6, 2024. They were separated upon entry. J.R. had her credible fear interview on Sunday July 7, 2024, less than 24 hours after J.R. was processed by border officers. In her interview, J.R. was allowed to provide short answers and was limited mostly to answering yes or no questions. She was deemed ineligible for asylum based on the IFR. J.R. was denied the opportunity to seek withholding of removal and CAT protection after the officer concluded that she did not demonstrate a reasonable probability of persecution or torture. An immigration judge upheld the credible fear denial, but Defendants issued her a Notice to Appear and released her into the United States. She remains subject to the IFR and Rule in her ongoing removal proceedings.

22.     Plaintiffs L.B. and J.G. are an adult couple seeking asylum from Colombia. There, a criminal organization kidnapped them, raped L.B. and brutally assaulted J.G. at gunpoint, and threatened to kill them both. That led L.B. and J.G. to flee Colombia. They did not know about the CBP One app so they entered the United States without authorization on or around October 1, 2024, and waited for border patrol officers to pick them up. They failed their credible fear interviews and were deemed ineligible for asylum based on the Rule. L.B. and J.G. were removed to Colombia, where they fear for their lives.

23.     Plaintiff E.M. is a Mexican man who has been targeted by a drug cartel. After members of the cartel assaulted E.M., threatened him and his mother, and ransacked their home, E.M. and his mother fled to the United States. They entered the United States without authorization and turned themselves in to immigration officers on October 7, 2024, to seek asylum. E.M. failed his credible fear interview and was deemed ineligible for asylum based on the Rule. E.M. was removed to Mexico, where he again began receiving death threats and fears for his life. E.M.'s mother, however, was permitted to proceed with the process for seeking protection.

24.     Plaintiff R.R. is a Mexican woman who fled to the United States with her two young children, Plaintiffs A.L. and J.L., after members of a cartel forcibly took her home and threatened physical and sexual violence against R.R. and physical violence against her children. R.R. did not feel that it was safe to wait for a CBP One appointment, so on October 16, 2024, she and her children entered the United States on foot and waited for officials to find them. R.R. and her children were deemed ineligible for asylum based on the Rule. R.R. had her credible fear interview on October 16, 2024, less than 24 hours after R.R. was processed by border officials. They were deported to Mexico October 23, 2024, where R.R. fears that she and her children will be harmed or killed by the cartel.

25.     Plaintiffs A.L. and J.L. are Plaintiff R.R.'s minor children. As a derivative on their mother's case, A.L. and J.L. were subjected to the Rule and have been removed to Mexico.

26.     Plaintiff L.Q. is an indigenous Ecuadorian man who fled to the United States after a powerful and racist criminal organization targeted, extorted, threatened to kill, and severely beat him. On his path to the United States, L.Q. faced threats in Guatemala and was robbed at gunpoint in Mexico. L.Q. entered the United States on approximately October 4, 2024, and had his credible fear interview on October 13. L.Q failed his credible fear interview and was deemed ineligible for asylum based on the Rule. L.Q. is now in immigration detention in Laredo, Texas, and fears that if he is deported to Ecuador, the criminal organization will find and kill him.

27.     Plaintiff S.O. is a Venezuelan woman and political dissident who fled to the United States with her two minor children, Plaintiffs W.O. and G.F., after an armed group allied with the Maduro regime ransacked her home, threatened her, and physically attacked her and her family. To escape persecution, S.O., W.O., and G.F. traveled through numerous countries. In Mexico, they were kidnapped, extorted, and threatened by a cartel. Fearing the cartel, S.O. tried without success to get a CBP One appointment for five months. On or about October 18, 2024, S.O., W.O., and G.F. crossed the border into the United States. Despite telling multiple officers about her past persecution and fear of returning to Venezuela, S.O., W.O., and G.F., were denied a credible fear interview and deemed ineligible for asylum based on the Rule and removed to Mexico, where they live in fear.

28.     Plaintiffs W.O. and G.F. are Plaintiff S.O.'s minor children. As a derivative on their mother's case, W.O. and G.F. were subjected to the Rule and have been removed to Mexico.

29.     Plaintiff J.N. is a Mexican woman who fled to the United States with her partner, Plaintiff E.C., and their minor children, Plaintiffs J.S. and K.C., after a drug cartel threatened their

12

**JA344**

lives and fired bullets into their home because E.C. refused to work for the cartel. J.N., E.C., J.S., and K.C., entered the United States late in the evening on October 21, 2024. They were picked up by immigration officials and taken to a detention center in Arizona on October 22. Immigration officials instructed J.N and E.C. to sign deportation orders, but they refused because they sought protection. Without explanation, on October 23 officers woke up J.N., E.C., J.S., and K.C., loaded them into a truck with many other people, and removed them to Mexico. J.N., E.C., J.S., and K.C. were deemed ineligible for protection based on the Rule. They are currently in Mexico, where they fear the threat to their lives posed by the cartel.

30.    Plaintiffs J.S. and K.C. are Plaintiffs J.N. and E.C.'s minor children. As a derivative on their parents' case, J.S. and K.C. were subjected to the Rule and have been removed to Mexico.

31.    Plaintiff J.E. is a Mexican man who fled to the United States for protection from a drug cartel that kidnapped, relentlessly beat, and threatened to kill J.E. and his family after J.E. refused to work for the cartel. Unable to hide from the cartel, J.E. fled to the United States, entering on October 20, 2024 with his sister and his sister's minor child.  The cartel later killed members of J.E.'s family. J.E. immediately and repeatedly told officers he could not go back to Mexico because he feared for his life; he was ignored and told to shut up. J.E. was denied a credible fear interview and deemed ineligible for protection based on the Rule. On October 22, 2024, J.E. was placed on a bus and removed to Mexico, where he fears for his life. J.E.'s sister and niece, however, were permitted to seek protection.

32.    Plaintiff R.C. is a Venezuelan dissident who fled the country out of fear of being harmed or killed by the Maduro regime for participating in political organizing and opposition to the administration. R.C. and his brother, M.F., fled to Mexico in April 2024, where they were threatened with deportation, robbed, and physically assaulted by government officials. On or

13

**JA345**

around October 5, 2024, R.C. and M.F. crossed the U.S.-Mexico border. R.C. was separated from his brother, deemed ineligible for protection, and deported without a credible fear interview, even though he repeatedly told border agents that he was afraid and wanted to seek asylum in the United States.

33.   Plaintiff M.F., the brother of Plaintiff R.C., is a Venezuelan political dissident who fled the country out of fear of being harmed or killed by the Maduro regime for participating in political organizing and opposition to the administration. M.F. and R.C. fled to Mexico in April 2024, where they were threatened with deportation, robbed, and physically assaulted by government officials. On or around October 5, 2024, M.F. and R.C. crossed the U.S.-Mexico border. M.F. was separated from his brother, deemed ineligible for protection based on the Rule, and deported without a credible fear interview even though he repeatedly expressed fear to border agents. He was removed to Mexico, where he is currently homeless and fears for his safety.

## II.   Organizational Plaintiffs

34.   Plaintiff Las Americas Immigrant Advocacy Center ("Las Americas") is a nonprofit legal services organization based in El Paso, Texas, dedicated to serving the legal needs of low-income immigrants, including asylum seekers. An essential part of Las Americas' mission is to provide immigration counseling and legal services to asylum seekers subjected to expedited removal. This work includes assisting asylum seekers in preparing for credible fear interviews, representing them during those interviews, and representing them throughout the process of obtaining immigration judge review of negative credible fear determinations. Las Americas also counsels people in Mexico who are trying to seek asylum in the United States so that they are aware of the CBP One app and know what to expect in a credible fear interview.

35.   Las Americas' mission is significantly frustrated by the Rule, IFR, and Guidance.

14
**JA346**

Because the Rule, IFR, and Guidance reduce the number of people eligible for asylum, and significantly shorten the time that noncitizens referred for credible fear interviews have to find counsel, Las Americas is impeded in its ability to provide counseling and legal services to those seeking protection and subject to expedited removal. Las Americas is likewise harmed by Defendants' decision to issue the IFR without first providing notice and an opportunity to comment. In addition to providing legal services to noncitizens on both sides of the U.S.-Mexico border, Las Americas strives to advocate and educate the public about changes to immigration law, but that work was rendered impossible by Defendants' failure to provide advance notice regarding these illegal changes.

36.    Plaintiff Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a nonprofit, non-partisan organization headquartered in San Antonio, Texas. RAICES' mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice. RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals, and is the largest immigration legal services provider in Texas. RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from DHS custody. A central piece of RAICES' work with detained people involves helping them prepare for the credible fear process.

37.    RAICES' mission is also frustrated by the Rule, IFR, and Guidance. The significant reduction in the number of people eligible for asylum, and of the time that noncitizens will have to find legal counsel prior to a credible fear interview, will reduce its ability to provide free and low-cost legal services to underserved immigrant communities. And the decision by Defendants to issue the IFR without first giving notice and an opportunity to comment prevented

15
**JA347**

RAICES from engaging in advocacy regarding these changes and likewise prevented RAICES from raising important factors that Defendants should have considered before moving forward with these illegal changes.

### III.    Defendants

38.    Defendant Department of Homeland Security ("DHS") is a cabinet-level department of the U.S. federal government. Its components include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE").

39.    Defendant USCIS is the sub-agency of DHS that, through its asylum officers, conducts interviews of individuals seeking asylum or other protection and adjudicates affirmative applications for asylum.

40.    Defendant CBP is the sub-agency of DHS that is responsible for the apprehension, processing, and detention of individuals seeking asylum or other relief at or near the U.S. border.

41.    Defendant ICE is the sub-agency of DHS that is responsible for executing removal orders and overseeing immigration detention.

42.    Defendant U.S. Department of Justice ("DOJ") is a cabinet-level department of the United States federal government.

43.    Defendant Executive Office for Immigration Review ("EOIR") is the sub-agency of DOJ that, through its immigration judges and appellate immigration judges, both conducts limited review of negative credible fear determinations in expedited removal proceedings and adjudicates regular removal proceedings and appeals.

44.    Defendant Alejandro Mayorkas is the Secretary of Homeland Security. He is sued in his official capacity. Defendant Mayorkas directs each of the component agencies within the

DHS. In his official capacity, Defendant Mayorkas is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103 and is empowered to grant asylum or other relief.

45.     Defendant Ur Jaddou is the Director of USCIS. She is sued in her official capacity.

46.     Defendant Troy A. Miller is the Senior Official Performing the Duties of the Commissioner for CBP. He is sued in his official capacity.

47.     Defendant Patrick J. Lechleitner is the Acting Director of ICE. He is sued in his official capacity.

48.     Defendant Merrick Garland is the Attorney General of the United States. He is sued in his official capacity. Defendant Garland oversees each of the component agencies within the Department of Justice. In his official capacity, Defendant Garland is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

49.     Defendant Mary Cheng is the Acting Director of the Executive Office for Immigration Review ("EOIR"). She is sued in her official capacity.

## FACTS

## I.     Background

50.     The modern U.S. asylum system was established by the Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102. The Act reflects "one of the oldest themes in America's history—welcoming homeless refugees to our shores," and it "gives statutory meaning to our national commitment to human rights and humanitarian concerns." S. Rep. No. 96-256, 1st Sess. at 1 (1979), reprinted in 1980 U.S.C.C.A.N. 141. One of Congress's "primary purposes" was "to bring United States refugee law into conformance" with international refugee treaties and the bedrock principle of non-*refoulement*. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987).

51.     Federal law provides three primary forms of protection for individuals fleeing

17

**JA349**

persecution and torture: asylum under 8 U.S.C. § 1158; withholding of removal under 8 U.S.C. § 1231(b)(3); and protection under the Convention Against Torture ("CAT"), *see* Note to 8 U.S.C. § 1231; 8 C.F.R. § 1208.

### A.    Three Forms of Protection for Individuals Fleeing Persecution and Torture

#### i.    Asylum

52.    "Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival …), irrespective of such [noncitizen's] status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Noncitizens are eligible for asylum if they can show a "well-founded fear of persecution" on account of one or more of five protected grounds and that their country is unable or unwilling to protect them from that harm. 8 U.S.C. § 1101(a)(42)(A).

53.    A "well-founded fear of persecution" has been construed to encompass even a ten percent chance that the applicant will be persecuted based on a protected characteristic.

54.    Section 1158 contains a handful of narrow bars to asylum eligibility. Entering the United States without inspection between ports of entry is not, and has never been, the basis for a bar on asylum. 8 U.S.C. § 1158(a)(2), (b)(2)(A). Although the Executive Branch may create additional eligibility restrictions on asylum, such restrictions must be "consistent with" the overall scheme of 8 U.S.C. § 1158. *Id.* § 1158(b)(2)(C).

55.    A person placed in regular removal proceedings under 8 U.S.C. § 1229a may submit an asylum application to the immigration judge to seek relief from removal. 8 C.F.R. § 208.2(b).

56.    A person who has been placed in "expedited removal"—a truncated removal process that may be applied to certain noncitizens who are arriving in the United States or who

18
**JA350**

have entered without inspection, 8 U.S.C. § 1225(b)(1)—may also raise an asylum claim through the credible fear screening process. If the person is found to have a credible fear of persecution, the noncitizen is then generally placed in regular removal proceedings under Section 240, where they can submit an asylum application.

### ii.    Withholding of Removal and CAT Protection

57.    The withholding of removal statute prohibits the government from removing a noncitizen "to a country if . . . the [noncitizen's] life or freedom would be threatened in that country because of the [noncitizen's] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3).

58.    Whereas asylum can be obtained based on a well-founded fear of persecution, the withholding of removal statute requires the applicant to show that persecution is more likely than not—a higher standard. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984). The withholding statute bars removal to any country as to which this showing is made. It is possible to receive withholding of removal as to multiple countries.

59.    Regulations implementing the Convention Against Torture prohibit the removal of a noncitizen to any country where "it is more likely than not that he or she would be tortured." 8 C.F.R. § 208.16(c)(2).

60.    Withholding of removal and CAT protection are available to people who do not qualify for asylum. But the denial of asylum has major implications, notwithstanding the availability of these other forms of protection. In addition to the higher burden of proof these forms of protection impose, withholding of removal and CAT relief can be granted only after a person is ordered removed, and the grant of protection simply prevents the government from executing the removal order to the specific country or countries where the applicant has demonstrated a

likelihood of persecution or torture. By contrast, people granted asylum do not receive a removal order and may become lawful permanent residents, 8 U.S.C. § 1159(b), and eventually U.S. citizens, *id.* § 1427.

61.    In addition, the spouse and children of a person granted asylum may receive asylum as derivative family members, whether or not they accompanied the principal applicant to the United States. 8 U.S.C. § 1158(b)(3)(A). By contrast, withholding of removal and CAT protection do not permit derivative beneficiaries. Instead, spouses or children must be present in the United States, apply separately, and be granted withholding of removal or CAT protection independently, a process that can result in long-term family separation.

### iii.    The Expedited Removal System and Credible Fear Screening Interviews

62.    In 1996, Congress established expedited removal to "substantially shorten and speed up the removal process" for certain noncitizens arriving without immigration documents. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); *see* 8 U.S.C. § 1225(b)(1). Expedited removal may be applied to certain noncitizens who arrive at the border without valid entry documents or who enter without inspection. 8 U.S.C. § 1225(b)(1)(A)(i). Absent further proceedings to assess any fear claims, people subjected to expedited removal are ordered removed by an immigration officer "without further hearing or review." *Id.*

63.    But Congress's interest in "efficient removal" was balanced against "a second, equally important goal: ensuring that individuals with valid asylum claims are not returned to countries where they could face persecution." *Grace v. Barr*, 965 F.3d 883, 902 (D.C. Cir. 2020). Thus, Congress took care to safeguard access to asylum by ensuring that noncitizens were screened to determine whether they had a "credible fear" of returning to their country of origin.

64.    The original agency regulations implementing the expedited removal statute in

1997 were designed to serve this interest, including by requiring immigration officers to advise noncitizens of their right to seek asylum and to ask if they feared removal. If so, they were referred for a credible fear interview. In the expedited removal process, noncitizens are entitled to "consult" with a person of their choosing "prior to the interview or any review thereof" as long as that review does not cause "unreasonable delay." 8 U.S.C. § 1225(b)(1)(B)(iv). The original regulations provided noncitizens a minimum of 48 hours to consult an attorney before a credible fear interview. 62 Fed. Reg. 10312, 10318-20 (Mar. 6, 1997).

65.    Because the credible fear interview is only a threshold screening device, a noncitizen needs to show only a "significant possibility" that the individual "could establish eligibility for asylum" in removal proceedings. *See* 8 U.S.C. § 1225(b)(1)(B)(v); 8 C.F.R. § 208.30(e)(2)-(3).

66.    If the asylum officer finds a credible fear, the noncitizen is taken out of the expedited removal process. 8 U.S.C. § 1225(b)(1)(B)(v). The person's case, including claims for asylum and other forms of protection, is then generally considered in regular removal proceedings before an immigration judge under INA Section 240.

67.    In regular removal proceedings, noncitizens have the right to counsel, to present evidence, to cross-examine witnesses, and to appeal, if necessary, to the Board of Immigration Appeals and a federal court of appeals. 8 U.S.C. §§ 1229, 1229a, 1252(a), (b); 8 C.F.R. §§ 1003.12-1003.47. They also have substantially more time to gather evidence, find and consult with counsel, develop arguments, and otherwise prepare.

68.    By contrast, if the asylum officer finds no credible fear, the noncitizen can request review of that decision by an immigration judge. If the immigration judge finds a credible fear, the noncitizen is then generally placed in regular Section 240 removal proceedings. 8

CFR § 1208.30(g)(2)(iv)(B). If, however, the immigration judge affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(B)(i), (iii); *see* 8 U.S.C. § 1252(a)(2)(A), (e).

69.     In addition to screening for asylum, the credible fear interview has generally been used to screen claims for withholding of removal and CAT relief.

**B.     The Rule and IFR Model Previous Illegal Rules.**

70.     The Amended Proclamation, Original Proclamation, Rule, and IFR reprise previous efforts to restrict asylum eligibility based on manner of entry, which courts have held unlawful.

71.     In November 2018, DHS and DOJ attempted to bar asylum for any person who entered via the U.S.-Mexico border between ports of entry. As here, they issued this ban as an interim final rule concurrent with a presidential proclamation. These actions were challenged, and they were enjoined and later vacated as incompatible with 8 U.S.C. § 1158(a)(1) and procedurally improper. *See East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 844 (N.D. Cal. 2018) (finding an "irreconcilabl[e] conflict[]" with 8 U.S.C. § 1158(a)(1))*; O.A. v. Trump*, 404 F. Supp. 3d 109, 150 (D.D.C. 2019) (holding that the entry ban "is not compatible with the congressional mandate that all [noncitizens] present in the United States may apply for asylum, regardless of whether they entered the United States at a designated port of entry" (internal quotation marks omitted)). The government's appeals failed. *See East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) (refusing to stay the injunction); *Trump v. East Bay Sanctuary Covenant*, 139 S. Ct. 782 (2018) (same); *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 671, 675-77 (9th Cir. 2021) (upholding injunction on the merits).

72.     In May 2023, following a truncated comment period, DHS and DOJ issued a rule entitled "Circumvention of Lawful Pathways," 88 Fed. Reg. 31314 ("Lawful Pathways Rule").

The rule had numerous components, but as relevant here, it effectively barred asylum to non-Mexican adults and families who either entered outside of a port of entry or approached a port without an appointment made via a smartphone app called CBP One. *See* 8 C.F.R. § 208.33(a)(1), (a)(2)(i)-(ii). That rule included a narrow exception for "exceptionally compelling circumstances," defined to include an "acute medical emergency," an "imminent and extreme threat to life or safety," or being a "victim of a severe form of trafficking in persons," 8 C.F.R. § 208.33(a)(3)(i). It also included limited exceptions for people who were unable to use CBP One or who applied for and were denied asylum in a country through which they transited. DHS also introduced implementation guidance concurrent with the Lawful Pathways Rule that reduced the time people would have to consult with counsel or other representatives before credible fear interviews from 48 hours to 24 hours. *See* DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023).

73.    A court vacated the Lawful Pathways Rule as, among other things, contrary to 8 U.S.C. § 1158(a)(1) and procedurally improper. *East Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025 (N.D. Cal. 2023), *stayed pending appeal*, 2023 WL 11662094 (9th Cir. Aug. 3, 2023), *appeal held in abeyance*, 93 F.4th 1130 (9th Cir. 2024).

**C.    The Proclamations, Rule, Interim Final Rule, and Guidance**

74.    On June 3, 2024, President Biden issued the Original Proclamation. 89 Fed. Reg. 48487. It announced that the entry of any noncitizen into the United States across the southern border was suspended "at 12:01 a.m. eastern daylight time on June 5, 2024," and that the suspension will continue if "the Secretary has made a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more." *Id.* at 48491. Per the announcement, the suspension will be lifted "14 calendar days after the Secretary makes a factual

determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters" a day.[6] *Id.* at 48491.

75. According to the Original Proclamation, the need for executive action was the "direct result of the Congress's failure to update" the asylum system. *Id.* at 48488.

76. Based on the Original Proclamation, the Department of Homeland Security and Department of Justice jointly issued the IFR on June 4, 2024, effective the next day. 89 Fed. Reg. 48710. The IFR incorporated the Original Proclamation by reference and applied the label "emergency border circumstances" to time periods when the Original Proclamation purports to suspend entry across the southern border. *Id.* at 48711.

77. On September 27, 2024, the President issued the Amended Proclamation. The Amended Proclamation changed the Original Proclamation in two ways. 89 Fed. Reg. at 81164. First, it stated that the categorical ban on asylum would remain in place until the 7-day-average of encounters was below 1,500 for at least 28-consective-days. *Id.* And, when that threshold was met, the ban would not be lifted for an additional two weeks. *Id.* Second, it declared that unaccompanied children from non-contiguous countries would be used to calculate the number of "encounters" each day, making the 1,500-day threshold even harder to achieve. Previously, unaccompanied children from non-contiguous countries were not included in this count. *Id.*

78. The Rule and IFR cite 8 U.S.C. § 1158(b)(2)(C) as authority. That provision gives the Attorney General the power "by regulation [to] establish additional limitations and conditions,

---

[6] An "encounter" refers to a noncitizen who: (i) is physically apprehended by CBP immigration officers within 100 miles of the southwest border during the 14-day period immediately after entry between ports of entry; (ii) is physically apprehended by DHS personnel at the southern coastal border during the 14-day period immediately after entry between ports of entry; or (iii) is determined to be inadmissible at a port of entry. Noncitizens in the third category are excluded from the DHS Secretary's threshold calculation. 89 Fed. Reg. 48710, 48715 n.33.

consistent with [§ 1158], under which [a noncitizen] shall be ineligible for asylum." The Rule and IFR also rely on 8 U.S.C. § 1158(d)(5)(B), which gives the Attorney General the power to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter." These provisions, however, require new regulations to be "consistent with" existing statutes. *Id.* § 1158(b)(2)(C). By contrast, the Rule and IFR effectively eliminate asylum for virtually every noncitizen who crosses into the United States without first obtaining an appointment at a port of entry using the CBP One app, in violation of the statute.

79.    The CBP One app has been plagued with problems. For many noncitizens, making an appointment to present at a port of entry is impossible. Some lack access to up-to-date smartphones, Wi-Fi, a cellular data plan, or reliable electricity, all of which are necessary to use CBP One. Others do not understand the few languages used in the app, are illiterate, lack technological know-how, or have disabilities that prevent them from successfully navigating the app. And the U.S. government has artificially capped the number of appointment slots far below the number of noncitizens who need them, meaning that even those who are able to use the app are repeatedly denied appointments. As a result, countless asylum seekers have been forced to wait indefinitely under precarious conditions in Mexico in the hope of obtaining scarce appointments.

80.    The Departments imposed the requirement to use CBP One in the Lawful Pathways Rule, but that rule—unlike the Rule here—did not apply to citizens of Mexico. Under this Rule and IFR, Mexican citizens who wish to seek asylum in the United States are now expected to wait, *in the country where they fear persecution*, for some unknown amount of time to preserve their right to pursue this remedy.

81.    The Rule and IFR create a narrow exception to the asylum bar for individuals who

25
**JA357**

enter between ports of entry due to "exceptionally compelling circumstances." 89 Fed. Reg. 48710, 48718, 48733, 81164, 81168. These circumstances are extremely limited. Exceptionally compelling circumstances are defined to include situations where noncitizens can show they or a family member with whom they are traveling are experiencing acute medical emergencies, imminent and extreme threats to life or safety, or severe forms of trafficking in persons at the time of their entry into the United States. *Id.*

82.     Under the Rule and IFR, DHS will apply this asylum bar during credible fear interviews in expedited removal. In those interviews, the Rule places the burden on the asylum seeker to demonstrate an "exceptionally compelling circumstance[]" by a preponderance of the evidence. *Id.* This is inconsistent with the "significant possibility" standard that Congress established for credible fear interviews to safeguard a person's opportunity to fully present potentially viable asylum claims.

83.     The Rule and IFR also implement policy changes governing expedited removal that create significant hurdles to obtaining the other two forms of protection that theoretically are still available: withholding of removal and CAT relief.

84.     First, to seek such protection, noncitizens must "manifest[] a fear of return, express[] an intention to apply for asylum or protection, or express[] a fear of persecution or torture." *Id.* at 48718, 81168. Border Patrol agents and other immigration officers will no longer "provide individualized advisals on asylum or ask the noncitizen questions related to whether they have a fear of return." *Id.* at 48740; *see also id.* at 81240.

85.     Evidence from prior experience shows that when the manifestation of fear standard is used, noncitizens' statements of fear are routinely ignored, even assuming noncitizens know that they must manifest a fear without being asked. The practical effect is that noncitizens with genuine

fear are removed without being referred for credible fear interviews. Noncitizens may not know that they need to "manifest" a fear of return in order to avoid removal; they may not manifest their fear in words or actions that immigration officers expect or require; they may speak a language that immigration officers cannot understand; they may be intimidated by a show of force from voicing such fear; and they may be hungry, thirsty, ill, or disoriented, and so be unable to demonstrate a manifestation of fear observable by an immigration officer. And even in situations where a person plainly attempts to manifest a fear, like Plaintiffs D.G. and P.S. did, sometimes the officers simply ignore them. That is exactly why regulations have long required individualized advisals and questioning, which the Rule and IFR eliminate.

86.    Even where noncitizens are able to manifest a fear and given a credible fear interview, they must now meet a heightened "reasonable probability of persecution" standard to pass screening for withholding of removal or CAT protection. *Id.* at 48718, 48746, 81279-80. The Rule defines "reasonable probability" as "substantially more than a reasonable possibility, but somewhat less than more likely than not." *Id.* at 46746 (citing 8 C.F.R. 208.35(b)(2)(i), 1208.35(b)(2)(ii)); 89 Fed. Reg. at 81285. The Rule and IFR state that this new standard "requires a greater specificity of the claim in the noncitizen's testimony" than previously necessary under the "reasonable possibility" standard imposed by the Lawful Pathways rule—a standard that was left undefined. *Id.* at 46746, 81247-48.

87.    The Guidance further constrains this process. Until last year, noncitizens were given a minimum of 48 hours to consult with a lawyer or other person of their choosing before their credible fear interview. This consultation is crucial to ensuring that noncitizens have a meaningful opportunity to present their claims. Noncitizens who are unfamiliar with the U.S. immigration system will be unprepared to properly explain the basis for their fear to an

27
**JA359**

immigration officer. Last year, DHS shortened that consultation period to a minimum of 24 hours. The Guidance now requires that noncitizens be given a minimum of only *four hours* to consult with a lawyer or other individual. The result will inevitably be a large increase in erroneous negative credible fear findings and a correspondingly large increase in the number of noncitizens illegally returned to persecution and torture.

88.     All key aspects of the Rule and IFR—including the asylum bar, the manifestation of fear test, and the reasonable probability screening standard—are arbitrary and capricious. Defendants failed to consider critical factors, including the harm the Rule and IFR would cause asylum seekers in need of protection and the interaction of the Rule and IFR with other policies. They likewise ignored or contradicted significant evidence undermining the reasons for the Rule and IFR including, for example, evidence that the Rule and IFR will breach the government's *non-refoulement* obligations. Defendants departed from prior practice, including by raising the border screening standard to an unprecedented level, without adequate explanation. And they repeatedly relied on impermissible considerations contrary to Congress's policy choices. Defendants made these same errors in adopting the Guidance and unreasonably reducing the credible fear consultation period to just 4 hours. Accordingly, the Rule, IFR, and Guidance are arbitrary and capricious under the APA.

89.     What is more, the IFR's momentous regulatory changes and the accompanying Guidance were all issued without going through notice-and-comment procedures under the APA. Defendants claimed "good cause" to bypass the notice-and-comment procedures normally required for a rulemaking pursuant to 5 U.S.C. § 553(b)(B), and they likewise dispensed with the 30-day waiting period that is required even where a notice and comment period is provided, 5 U.S.C. § 553(d). Defendants also invoked the "foreign affairs" exception to those procedures. 5

U.S.C. § 553(a)(1). The record does not establish either the "good cause" or "foreign affairs" exception.

## II.    Harms to Plaintiffs

### A.    Harms to Individual Plaintiffs

90.    Absent relief, Plaintiffs have been and will continue to be severely and irreparably harmed by the Rule, IFR, and Guidance. First and foremost, the Individual Plaintiffs will be severely limited in their ability to access protection from persecution and torture. Plaintiffs have claims to asylum. Some claims, like those of P.S., T.R., R.C. and M.F., are based on anti-government political opinions. T.R. faces additional harm based on a past same-sex relationship, and Plaintiff E.R. similarly fears persecution based on her sexual orientation. Plaintiff L.Q. faced serious harm based in part on his indigenous identity. Plaintiffs S.G., J.E., E.M., S.O., and S.O.'s children face harm based on family relationships. And claims from many Plaintiffs turn on past opposition to gang or criminal activity that has caused them significant harm, including threats to their lives. Plaintiff D.C. experienced serious domestic violence from her partner, who is also involved with a criminal organization, and that harm presents ongoing danger to both her life and to that of her daughter, Plaintiff L.R. Yet, none of these Plaintiffs has had the opportunity to seek asylum because of the Rule and IFR.

91.    In addition to being barred from seeking asylum based on the Rule and IFR, all Plaintiffs but two, J.R. and L.Q., have already been removed from the United, and only one, T.R., has been able to subsequently obtain an appointment to return using CBP One. The remaining 24 individuals and are presently facing dangerous situations involving potential persecution or worse. Many of them, T.R., P.S., S.O., W.O., G.F., R.C. and M.F., are not from Mexico but have been removed to that country even though have experienced harm there already. Their own experience

is borne out by data. As DHS has acknowledged, nearly 13,500 instances of kidnapping, rape, torture, murder, and other violent attacks on asylum seekers expelled from the United States to Mexico were documented in 2021 and 2022.

92.    Other Plaintiffs have been removed to their home countries, the very places they fled. The Plaintiffs who are from Mexico—E.R., D.C, L.R., A.E., E.D., J.C., E.M., R.R., A.L., J.L., J.N., E.C., J.S., K.C., and J.E.—have been harmed not only by being removed to the dangerous situations that they fled but also by the very premise of the Rule. That is because the Rule and IFR bar access to asylum to any person, absent exceptionally narrow circumstances, who failed to enter the United States at a port of entry with a CBP One appointment. Getting such an appointment can only be done from within circumscribed regions of Mexico. It can take months, and for some it is outright impossible. Yet, under the Rule, Mexican nationals are expected to wait for months in the very country where they fear persecution until they can get an appointment to enter the United States.

93.    Finally, some Plaintiffs, including J.C., J.R., and R.R. and her children, had less than 24 hours before their credible fear interviews. And for J.R., the entire duration of the minimal consultation window she did have occurred over a holiday weekend. As a result, J.C., J.R., and R.R., along with other Plaintiffs in this case, never had an opportunity to consult with any person, much less an attorney, before their interviews.

**B.    Harms to Organizational Plaintiffs**

94.     Under the IFR and Rule, Las Americas' clients must now "manifest" an intent to apply for asylum or a fear of return before receiving a credible fear interview. As a result, Las Americas must revamp its representation strategy and divert resources to preparing individuals who have a genuine fear to manifest such a fear before entering the United States, significantly

limiting the number of clients it can serve.

95. The quick timeframe for removal under the Guidance also impedes Las Americas' mission. It now has just four hours, some of which are outside its business hours, to reach and confer with clients, which significantly reduces its ability to effectively represent them.

96. The strain on Las Americas' ability to represent its clients is exacerbated by the heightened standard for establishing credible fear. Such preparation takes more time—not less—and will be difficult, and often impossible, to do effectively in the limited time the Proclamations, IFR, Rule, and Guidance give to consult with clients before credible fear interviews.

97. The heightened standard also will result in more negative fear findings. This increase, in turn, means Las Americas will have to spend more time with each client challenging an asylum officer's negative fear findings before an immigration judge at the final stage of the expedited removal process. As a result, Las Americas will have to both reduce the number of clients it serves and will be unable to represent clients as effectively as in the past.

98. Even for the clients who manage to both manifest a fear and also overcome the higher reasonable probability standard, the Proclamations, IFR, Rule, and Guidance will harm Las Americas' ability to engage in full representation of these individuals in removal proceedings. First, because people who were previously eligible for asylum are now limited to withholding of removal and CAT protection, which require a more stringent burden of proof than asylum, Las Americas will have to spend more time developing evidentiary records in those cases. Second, because withholding of removal and CAT protection do not allow family members to receive derivative benefits, Las Americas will have to engage in full representation

for each member of a family, which will substantially increase the number of overall applications it has to complete.

99.    The new policy also jeopardizes some of Las Americas' most critical funding streams. Many of Las Americas' existing grants require it to serve a certain number of clients each year. The need to spend additional resources on each client, reducing the number of clients served, risks placing Las Americas below the threshold required for these grants. A loss of funding will further hamper Las Americas' ability to fulfill its mission.

100.    The Proclamations, IFR, Rule, and Guidance similarly harm RAICES' work. These changes will require RAICES to revamp its representation strategy and to spend more time with each individual client. The heightened standard will also increase the number of clients for whom RAICES will need to challenge an asylum officer's negative credible fear finding before an immigration judge. This additional time spent will limit its client population and its ability to fulfill its mission.

101.    RAICES is also one of the very few organizations that provides counsel to individuals facing the credible fear process while detained in CBP custody. The changes in the Rule and IFR will make it harder for RAICES to provide those services, and the four-hour consultation window will make doing so all-but-impossible—rendering obsolete the system for that work that RAICES has spent the last year developing.

102.    In addition, RAICES will be harmed by the expedited timeline for removal. Less time to reach and prepare clients will result in less effective representation. As with Las Americas, this strain on effective representation is made worse by the Rule and IFR's heightened standard for establishing credible fear, which requires more time with clients to prepare them for interviews with asylum officers. The increased need and decreased time

frame hampers RAICES' ability to effectively serve its clients.

103.    The new policy also jeopardizes some of RAICES' critical funding streams. Much of the funding in certain RAICES' programs is tied to the number of clients it is able to serve. If RAICES must divert its resources to spend more time assisting fewer clients, that funding may be put in jeopardy. A loss of funding will further reduce RAICES' ability to fulfill its mission.

104.    For both organizations, the issuance of these changes via the IFR deprived them of an opportunity to comment on the changes before they took effect. As a result, neither organization had an opportunity to put relevant information in front of Defendants that might have informed their choices or prompted them to abandon these changes completely.

105.    For both organizations, these changes are likely to cause additional harm as staff become frustrated with their inability to provide meaningful assistance to impacted noncitizens because of the Rule and IFR's new limits and the Guidelines' imposition of an impossible timeline. This frustration is likely to lead to vicarious trauma, burnout, and an inability to sustain staffing to fulfill the organizations' respective missions.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**(Violation of Immigration and Nationality Act and Administrative Procedure Act –
Rule Eliminating Asylum Between Ports is Contrary to Law, 8 U.S.C. § 1158)**

106.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

107.    The INA provides, with certain exceptions not relevant here, that "[a]ny [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including [a noncitizen] who is brought to the

33

**JA365**

United States after having been interdicted in international or United States waters), irrespective of such [noncitizen's] status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1).

108.    The Administrative Procedure Act, 5 U.S.C. § 706, provides that courts "shall … hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

109.    The Rule and IFR are contrary to law, including 8 U.S.C. § 1158(a)(1). With limited exceptions, the Rule and IFR categorically bar noncitizens from asylum merely because they enter without inspection between ports or at ports but without a CBP One appointment.

## SECOND CLAIM FOR RELIEF

### (Violation of Immigration and Nationality Act and Administrative Procedure Act – Rule is Contrary to Law, 8 U.S.C. § 1225(b))

110.    The INA requires that any noncitizen subjected to expedited removal procedures who "indicates either an intention to apply for asylum . . . or a fear of persecution" must be referred for a credible fear screening interview with an asylum officer. 8 U.S.C. § 1225(b)(1)(A)(ii).

111.    In that screening interview, the asylum officer is to determine whether the noncitizen has a "credible fear of persecution." *Id.* § 1225(b)(1)(B)(ii), (iii). A credible fear of persecution is defined by statute as "a significant possibility, taking into account the credibility of the statements made by the [noncitizen] in support of the [noncitizen's] claim and such other facts as are known to the officer, that the [noncitizen] could establish eligibility for asylum under [8 U.S.C.] section 1158." *Id.* § 1225(b)(1)(B)(v).

112.    The Rule and IFR improperly require asylum officers conducting credible fear interviews and immigration judges reviewing negative credible fear determinations to apply standards other than the "significant possibility" standard, including when applying the Rule and

34
**JA366**

IFR's exceptions at the credible fear stage. For example, the Rule and IFR require asylum officers conducting credible fear interviews and immigration judges reviewing negative credible fear determinations to determine whether a noncitizen has established an "exceptionally compelling circumstance" by preponderance of the evidence rather than under a "significant possibility" standard.

113.    The APA provides that a Court "shall hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" [or] "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

114.    The Rule and IFR are contrary to law, including 8 U.S.C. § 1225(b)(1)(A)(ii), (B)(ii), (B)(iii), and (B)(v).

## THIRD CLAIM FOR RELIEF

### (Violation of Immigration and Nationality Act and Administrative Procedure Act – Rule is Arbitrary and Capricious)

115.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

116.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

117.    All key aspects of the Rule and IFR—including the asylum bar, the manifestation of fear test, and the reasonable probability screening standard—are arbitrary and capricious. Defendants failed to consider critical factors, including the harm the Rule and IFR would cause asylum seekers in need of protection and the interaction of the Rule and IFR with other policies. They likewise ignored or contradicted significant evidence undermining the reasons for the Rule

and IFR including, for example, evidence that the Rule and IFR will breach the government's *non-refoulement* obligations. Defendants departed from prior practice, including by raising the fear screening standard to an unprecedented level, without adequate explanation. And they repeatedly relied on impermissible considerations contrary to Congress's policy choices. Defendants made these same errors in adopting the Guidance and unreasonably reducing the credible fear consultation period to just four hours.

118.    Accordingly, the Rule and IFR are arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

### FOURTH CLAIM FOR RELIEF

### (Violation of the Administrative Procedure Act – Failure to Observe Required Procedures)

119.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

120.    The APA requires notice and opportunity for comment prior to the promulgation of regulations. 5 U.S.C. § 553(b), (c). The Attorney General and Secretary of Homeland Security failed to provide notice and an opportunity to comment on the Interim Final Rule and Guidance in a timely manner.

121.    The APA also requires that a regulation be published "no less than 30 days before its effective date." 5 U.S.C. § 553(d). The Attorney General and Secretary of Homeland Security failed to publish the IFR and Guidance 30 days before their effective date.

122.    The Attorney General and Secretary of Homeland Security have not articulated reasons sufficient to show good cause why these requirements are inapplicable, or why the foreign affairs exception is applicable.

**JA368**

## FIFTH CLAIM FOR RELIEF

### (Violation of Administrative Procedure Act –
### Guidance is Contrary to Law and Arbitrary and Capricious)

123.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

124.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

125.    The INA provides that a noncitizen "who is eligible for [a credible fear] interview may consult with a person or persons of the [noncitizen's] choosing prior to the interview or any review thereof." 8 U.S.C. § 1225(b)(1)(B)(iv); *see also* 8 C.F.R. § 208.30(d)(4).

126.    The statute and implementing regulations require meaningful access to a consultation and time to prepare for the credible fear interview. 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 208.30(d)(2), (4).

127.    The Guidance makes meaningful access to a consultation and time to prepare for the credible fear interview effectively unavailable. It is therefore contrary to law. *See* 5 U.S.C. § 706(2)(A).

128.    The Guidance is also arbitrary and capricious because, in adopting a 4-hour consultation period, Defendants failed to articulate reasoned explanations for their decisions, which represent changes in agency policy; considered factors that Congress did not intend to be considered; entirely failed to consider important aspects of the problem; and offered explanations for their decisions that run counter to the evidence before the agencies.

129.    Accordingly, the Guidance is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

37

**JA369**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for the following relief:

a. Vacatur of the Rule, IFR, and Guidance;

b. Declaratory judgment finding the IFR and Guidance procedurally invalid and the Rule, IFR, and Guidance contrary to law and arbitrary and capricious;

c. An order vacating the removal orders issued to each of the Individual Plaintiffs;

d. For any Individual Plaintiffs who have been removed prior to the Court's Order, an order paroling those Individual Plaintiffs into the United States for the duration of their removal proceedings so that they may apply for asylum, withholding of removal, and/or CAT protection in the United States;

e. An order awarding Plaintiffs' costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law;

f. Such other and further relief as the Court deems equitable, just, and proper.

38

**JA370**

Dated: November 1, 2024

Respectfully submitted,

Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat*
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: 212-549-2660
*lgelernt@aclu.org*
*ojadwat@aclu.org*

Morgan Russell*
Katrina Eiland*
Cody Wofsy (D.D.C. Bar No. CA00103)
Spencer Amdur*
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
T: 415-343-0770
*mrussell@aclu.org*
*keiland@aclu.org*
*cwofsy@aclu.org*
*samdur@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
American Civil Liberties Union Foundation
of the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
T: 202-457-0800
*aspitzer@acludc.org*
*smichelman@acludc.org*

*Attorneys for Plaintiffs*

By: /s/ Matthew E. Price
Matthew E. Price (D.C. Bar # 996158)
Lindsay Harrison (D.C. Bar #977407)
Mary E. Marshall (D.C. Bar #1739058)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*
*lharrison@jenner.com*
*mmarshall@jenner.com*

Melissa Root*
Andrew L. Osborne*
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
T: 312-222-9350
*mroot@jenner.com*
*aosborne@jenner.com*

*Attorneys for Organzational Plaintiffs*

Keren Zwick (D.D.C. Bar. No. IL0055)
Richard Caldarone (D.C. Bar No. 989575)*
Mary Georgevich*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
*kzwick@immigrantjustice.org*
*rcaldarone@immigrantjustice.org*
*mgeorgevich@immigrantjustice.org*

*Attorneys for Plaintiffs*

39
**JA371**

Tamara Goodlette
(D.C. Bar. No. TX24117561)
Texas Civil Rights Project
P.O. Box 219
Alamo, Texas 78516
T: 512-474-5073, ext. 207
*tami@texascivilrightsproject.org*

Blaine Bookey*
Center for Gender & Refugee Studies
200 McAllister Street
San Francisco, CA 94102
T: 415-581-8825
*bbookey@uclawsf.edu*

Ashley Alcantara Harris*
David A. Donatti*
American Civil Liberties Foundation of Texas
P.O. Box 8306
Houston, TX 77288
T: 713-942-8146
*aharris@aclutx.org*
*ddonatti@aclutx.org*

*Attorneys for Plaintiffs*

Melissa Crow (D.C. Bar. No. 453487)
Center for Gender & Refugee Studies
1121 14th Street NW
Suite 200
Washington, D.C. 20005
T: 202-355-4471
*crowmelissa@uclawsf.edu*

Edith Sangueza*
Center for Gender and Refugee Studies
26 Broadway, 3rd Floor
New York, NY 10004
T: 415-581-8835
*sanguezaedith@uclawsf.edu*

Robert Pauw*
Center for Gender and Refugee Studies
c/o Gibbs Houston Pauw
1000 Second Avenue, Suite 1600
Seattle, WA 98104
T: 206-682-1080
*rpauw@ghp-law.net*

*Attorneys for Plaintiffs*
*\*Admitted via certificate of pro bono*
*representation or pro hac vice*

**JA372**

**CERTIFICATE OF SERVICE**

I hereby certify on November 1, 2024, I caused a copy of the foregoing to be transmitted

to all Defendants through the CM/ECF filing system.

/s/ Matthew E. Price
Matthew E. Price (D.C. Bar # 996158)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
T: 202-639-6000
*mprice@jenner.com*

**DECLARATION OF JENNIFER BABAIE**
**LAS AMERICAS IMMIGRANT ADVOCACY CENTER**

I, Jennifer Babaie, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise.  If called as a witness, I could and would testify competently and truthfully.

2.      I am an attorney licensed to practice law in California and focused on immigration practice.  Since January 2023, I have been the Advocacy and Legal Services Director at Las Americas Immigrant Advocacy Center (Las Americas).  Prior to joining Las Americas, I worked in various related positions.  Starting in 2018, I worked as a supervising attorney and program director at the International Refugee Assistance Project, where I represented refugees, asylum seekers, and others seeking humanitarian assistance and family reunification, and I ran a cross-border program focused on providing direct legal services to persons in Ciudad Juarez seeking access to safety and family reunification in the United States.

3.      Las Americas is a nonprofit legal services organization based in El Paso, Texas.  Our mission is to provide high-quality legal services to low-income immigrants, and to advocate for human rights.  We provide immigration counseling and representation to immigrants seeking asylum and those detained by the U.S. government in and around West Texas, New Mexico, and Ciudad Juarez, Mexico, including by representing individuals facing expedited removal who are undergoing Credible Fear Interviews ("CFIs").  We also assist individuals who are awaiting a CBP One appointment in Mexico with preparing for CFIs.  Our goal is to ensure that individuals have a fair opportunity to establish their eligibility for protection and are not wrongfully removed to persecution or torture.

4.      I submit this declaration as a supplement to my earlier declaration in *Las Americas v. Department of Homeland Security*, which was executed on July 26, 2024.

1
**JA374**

5.    Las Americas has and will continue to experience substantive harm because of the rule issued by U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS") and Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ") entitled "Securing the Border" (the "Rule"); and contemporaneous memoranda issued by U.S. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") (collectively, the "Guidance").  Like the Interim Final Rule ("IFR"), the Rule and Guidance collectively impose new bars to asylum eligibility that threaten Las Americas' ability to execute its mission.  According to the Guidance, noncitizens arriving between ports of entry at the southwest border are categorically ineligible for asylum whenever a rolling seven-day average of the number of daily "encounters" of inadmissible noncitizens who entered between ports of entry exceeds a certain numerical threshold at any point in a 28-day window.  That threshold has been exceeded continuously since July 2020.  Moreover, the Guidance does nothing to institute or pave the way for increasing CBP One appointments, which is the sole means of accessing asylum in the United States during suspension periods.

6.    Even individuals who meet one of the narrow exceptions to this categorical ban may only apply for asylum if they present at a port of entry and obtain an appointment with CBP through a smartphone app called "CBP One." As discussed below, CBP One is a complex, error-prone, smartphone application, and it is difficult for noncitizens to use CBP One and to obtain an appointment. The app has numerous accessibility issues already known to the government thanks to feedback from advocates, including our organization, making it so that the suspension of asylum under the Rule leaves no pathway for asylum seekers who cannot obtain an appointment through no fault of their own.

7.      The Rule also imposes burdens on noncitizens who are eligible for withholding of removal or protection against removal under the Convention Against Torture ("CAT").  Prior to the IFR that preceded the Rule, an immigration officer was required to inform any individual encountered of their rights to seek protection in the United States and would conduct an interview to determine whether the noncitizen had a fear of persecution before initiating their removal. This added protection afforded individuals a means of accessing the asylum system and a chance at speaking with a licensed legal advocate—for example, through our programs for asylum seekers in expedited removal—who could explain the requirements for seeking asylum in the United States. Under the Rule, a noncitizen can be quickly removed from the United States unless an immigration officer determines that the person has affirmatively "manifested" a fear of return. Not only does this prevent an individual from receiving any information about their rights once they are on U.S. soil by keeping them away from venues where attorneys such as myself have access, but it keeps these individuals in the shadows and more vulnerable to victimization at the border by criminal groups and smugglers. Simply because the United States refuses to recognize a person's protection concerns doesn't negate the reality that they are in danger of being harmed, and advocates such as myself must now find new ways to gain access to these people so that we can study their situations and make meaningful attempts at advocating on their behalf and on behalf of others like them.

8.      For the few people that do manifest such fear, the Guidance permits them as little as 4 hours to consult an attorney before an immigration officer conducts a CFI—down from at least 24 hours before the Guidance, and a minimum of 48 hours just a year ago.  In that interview, a noncitizen must now establish that there is a "reasonable probability" they will be tortured or persecuted if they are removed from the United States.  This is a significantly more stringent

standard than the "significant possibility" and "reasonable possibility" standards previously applied in these interviews.

9. All of these aspects of the Rule and Guidance are significantly interfering with Las Americas' work and are requiring us to spend significant amounts of time in the attempt to counteract that harm.

### Las Americas' Mission & Programs

10. Las Americas has served people in our community from over 80 countries since 1987. We are dedicated to serving the legal needs of low-income noncitizens and asylum seekers in West Texas, New Mexico, and Ciudad Juarez, Mexico. We assist individuals seeking legal entry to the United States by providing targeted legal information, advice, and translation and referral support, to help these individuals preserve eligibility for asylum. We also provide legal information presentations centered on clarifying the purpose and consequences of documents received upon crossing the border.

11. Our goal is to ensure that all asylum seekers have a fair opportunity to establish their eligibility for protection and that they are not wrongfully removed to persecution or torture. It is essential to our mission that all asylum seekers have a meaningful chance to fully develop and present their claims. To advance this mission, our goal is to serve asylum seekers with our limited resources.

12. We are one of the only organizations providing *pro bono* representation to immigrants, asylum seekers, and other persons migrating or in removal proceedings in the West Texas, New Mexico, and Ciudad Juarez area. We receive a significant number of referrals and play a critical role in the community. Whenever we are suddenly forced to significantly limit or change our services, which has been necessary to respond to the Rule and Guidance, it has a palpable and adverse impact on our ability to serve these migrant communities.

4
**JA377**

13.     Las Americas' total budget in the fiscal year ending 2024 was about $1,799,000.[1] The grants we receive make up approximately 85% of our revenues, and some of them have requirements regarding the number of people we serve as well as limitations on the geography and types of services provided.  For example, one grant requires us to serve 650 people per year while another requires us to provide direct representation to 60 people and pro se support to an additional 120 people in ICE custody in New Mexico.  Low bono client fees and other individual contributions make up the remainder of our income sources, but all of our detention-related services, including CFI services, and our services in Mexico are provided at no cost to the individual.

14.     Las Americas' U.S. staff consists of 18 people, including attorneys, accredited representatives, and paralegals.  Two additional staff members work in Mexico.  We have several programmatic areas; those most relevant to the Rule and Guidance are detailed here.

15.     Las Americas' asylum work straddles the U.S.-Mexico border.  We assist individuals and families who have entered the United States, as well as people who are or have been stranded in Mexico due to U.S. policies, including the Rule and Guidance.

16.     Our Detained Program serves migrants in the El Paso Processing Center, Otero Service Center, and the Torrance and Cibola detention facilities, in New Mexico.  The heart of our Detained Program is helping individuals in expedited removal proceedings through the credible fear process and then seeking their release from detention.  Due to the overwhelming need for our CFI-related services, in April 2023 we added a legal fellow whose work focuses entirely on CFI services. Those services are now only able to continue as a result of daily collaboration between

---

[1] As of the time of filing this declaration, this number had not been finalized, and is therefore approximate.

Las Americas staff and students, and they must overcome constant logistical hurdles to remain a meaningful form of legal assistance. In 2023-2024, we have partnered with the CUNY School of Law to pilot a remote CFI preparation model that includes resources to support representation during CFIs and immigration judge (IJ) review hearings. Although we hope to continue this partnership, the challenges of finding students available to remain on call for major swaths of time throughout the week just in case we learn of a CFI being scheduled has proven difficult and requires flexibility and support on the part of CUNY's school administrators and professors. Moreover, the changes to the CFI process make it so complex that students will not be able to provide meaningful assistance without a lawyer present, which makes the program virtually impossible to implement.

17. We have also attempted to initiate a pilot remote CFI preparation model with a private law firm with the assistance of the International Refugee Assistance Project, but that project has been paused for multiple reasons. First, detention centers often take 24-48 hours to schedule calls, and many times our clients are either moved to another detention center or have received their CFI interview before the calls can be scheduled. Certain detention centers place even further restrictions on scheduling calls, with only certain days when women can be interviewed, for example. Second, even when we can speak to the client, there is not enough time to prepare them—we need a minimum of two hours, but that is just the bare minimum. Truly adequate preparation would require more than one interview over multiple days. Finally, some detention centers allow only one-on-one calls, which prevents an interpreter from joining the call.

18. For individuals who can clear the CFI hurdle, our detained team helps with subsequent stages of the immigration process when capacity allows, including asylum applications, evidence gathering, appeals, bond and parole requests, mental health screenings,

competency evaluations, and more. Where resources allow, we provide these services as part of full representation in immigration court and before the Board of Immigration Appeals. In other cases, we offer these services as *pro se* assistance. For *pro se* individuals, we also provide assistance with document preparation and translation.

19. In early 2019, Las Americas created the Las Americas Mexico Program (LAMX). LAMX was created as a temporary measure to assist noncitizens who were subject to the MPP or "Remain in Mexico" Program and thus required to wait in Mexico for their asylum cases to be considered. As U.S. immigration policy has changed, we have adapted LAMX's services and formalized LAMX as an incorporated entity in Mexico. While Title 42 was in place and prevented asylum seekers from presenting at the ports to request asylum, we helped people seeking exemptions to that policy as well as parole. Now, LAMX provides *pro se* asylum support and Know Your Rights presentations in shelters and other community spaces. In these presentations, we teach people about the CFI process, advise them about what to expect in the expedited removal process, and field questions from people who are trying to understand how to navigate this process.

20. In 2023, Las Americas served over 5,000 people. We helped 3,381 people navigate the CBP One application in order to make an appointment to request asylum at a port of entry. We also served nearly 303 individuals in Immigration and Customs Enforcement (ICE) custody. This work occurred alongside our casework on behalf of people seeking immigration benefits from USCIS or the immigration courts. Across programs, we opened over 688 new cases last year. More than half of the clients that Las Americas serves are asylum seekers, and at present, we have

about 171 open cases in our Detained Program.[2] Additionally, we serve hundreds of people each month with Know Your Rights presentations in shelters, both in El Paso and in Mexico.

21.     Thus far in 2024, we have served more than 4,600 individuals. We have helped 1,100 individuals request with CBP One appointments, 93 individuals with CFI prep while in Immigrations and Custom Enforcement ("ICE") custody, and have served 288 total people in ICE custody. Across programs, we opened more than 700 new cases, with 231 opened in our detained program alone. We continue to serve hundreds of individuals in our weekly Know Your Rights presentations, which have been taking place three times a week since September.

22.     In addition to this work helping people prepare for the expedited removal process on the front end, we have also worked with many people who were deported or "voluntarily" returned to Mexico even though they are not Mexican nationals.  We are continuously working to develop systems to serve these individuals, as discussed in greater detail below.

23.     For several years now, Las Americas has been focused on helping people prepare for CFIs on both sides of the U.S.-Mexico border.   From May 12, 2023, to September 20, 2023, our cross-border program assisted more than 2,500 people in this manner, and we have assisted over 1,100 people thus far in 2024.

24.     As set forth in more detail below, however, because of the Rule and Guidance, that work is now immensely more complex and time consuming.  For example, our team in Mexico must now educate people on ways in which the Rule impedes access to asylum, explain the significance of the manifestation requirement for withholding and CAT protection, and prepare

---

[2] We collected information for the 2023 and 2024 calendar years on July 1, 2024.  Please note that due to the tight capacity of the organization and the general difficulty of allocating sufficient resources to administrative and technological support, all data reported should be taken as estimates reflecting current case data to the best of my knowledge.

them to manifest a fear when they encounter a Border Patrol officer. If a noncitizen obtains a CFI, the reduced pre-CFI consultation period (down from a minimum of two days in early 2023 to as little as 4 hours under the Rule) strains our ability to provide meaningful CFI-related services in a manner that will actually reach the individual prior to the scheduling of their appointment. This significantly limits the number of individuals we are able to prepare for a CFI, and, in turn, jeopardizes our ability to receive funding.

**The Rule Harms Las Americas' General Operations**

25.     The Rule and Guidance challenged in this suit have caused and will continue to cause harm to Las Americas' mission. In particular, the Rule has forced us to divert limited resources away from individual representation in immigration court to continue to meet the most urgent needs of the community, which currently means aiding people attempting to navigate the manifestation of fear and CFI process.

26.     In addition, because our mission is premised on ensuring access to asylum for people who are coming to the United States, the Rule fundamentally frustrates our organization's purpose by cutting off the right to seek asylum in the United States for huge numbers of people based on factors unrelated to a person's need for protection.

*The Rule's Reliance on CBP One*

27.     As noted above, with certain exceptions that are almost never applicable, the Rule requires everyone—including people from Mexico—to make an appointment using CBP One to preserve the right to seek asylum at the border. The harms imposed by this requirement impair the operations of Las Americas before an asylum seeker ever reaches the United States.

28.     First, the CBP One requirement has caused a dramatic diversion of resources in our Mexico office. While we have consistently provided Know Your Rights assistance in Mexico, that work has existed alongside direct legal representation. Now, many of those resources are diverted

to explaining the Rule, addressing the CBP One requirement, and helping people to understand the new procedural hurdles that they face, whether that be in managing to find a way to utilize the app successfully, or by explaining in detail the negative consequences of seeking asylum outside of a formal port of entry. In my experience, asylum seekers prefer to come to the United States through a port of entry; however, hard realities such as lack of timely access to an appointment, violence, kidnapping attempts, lack of safe housing or potable water, threats of deportation by Mexican officials, refusals by CBP to speak to anyone who appears at the port of entry without an appointment, and misinformation lead to individuals and families being forced to seek asylum between ports of entry.

29. With the introduction of CBP One, moreover, we have received hundreds of requests for assistance with the app. Non-Mexican asylum seekers were required to use the CBP One app under the Circumvention of Lawful Pathways regulation beginning in May 2023, and the new Rule now requires all asylum seekers to use the app. Because of the Rule's CBP One requirement, our staff in Mexico primarily provide assistance with using the app, education as to the purpose of scheduling an appointment with the app, warnings on notario fraud and other bad actors charging money to register appointments on the app, and guidance as to consequences for entering without an appointment. While we have continued to flag highly vulnerable cases directly with CBP in an attempt to seek humanitarian protection for them without the need to wait for an appointment, our capacity to do so is limited by the amount of time we must spend helping those trying to understand the Rule's CBP One requirements.

30. We have also had to divert resources to overhaul the content of the legal presentations we provide to people preparing to enter the United States. Historically, we have focused our presentations on clarifying the purpose and consequences of documents received upon

crossing the border, educating people about what to expect during expedited removal, and preparing for the credible fear process. We have also historically acted as a referral partner whenever clients indicate a need for housing or other psycho-social support in Ciudad Juarez.

31. With the advent of the Rule, this work has become immensely more complex. On top of having to change our work to educate people about the substantive changes to asylum requirements imposed by the Rule (discussed below), we now spend a great deal of time providing direct assistance to people unable to navigate CBP One on their own.

32. Because the app is riddled with technical issues and difficult to use in general, our work in this arena is in incredibly high demand. As mentioned above, in the last four months, we have assisted more than 1,000 individuals in Mexico in understanding the Rule and the CBP One requirement.

33. Simply put, the Rule's requirement that people use the app to preserve asylum eligibility has forced Las Americas to spend resources helping people use the app rather than putting those resources toward its mission of assisting asylum seekers with CFIs, reviews of negative fear determinations, and representation in immigration court.

***The Rule's Changes to the Credible Fear System***

34. The changes brought by the Rule and Guidance have impaired and will continue to impair our work helping individuals who are seeking asylum and subject to the credible fear process.

35. To begin, noncitizens will not even be interviewed for credible fear unless they affirmatively manifest a fear of persecution—and even then, their explicit statements of fear are often ignored. As a result, we need to educate individuals in Mexico who intend to seek asylum in the United States about the manifestation standard. Based on our experience working with noncitizens seeking asylum, we know firsthand that manifesting a fear can be an extremely

difficult task. Noncitizens normally travel thousands of miles to reach the border, are tired and often starved, and have experienced significant trauma in their home country and on their journey north. In addition, they are often afraid when encountering CBP or other officials. By the time many actually reach a CBP official to express fear, they have already encountered and been turned back by Mexican officials operating on the Mexico side of the border and seeking to prevent them from ever reaching U.S. soil. Helping these individuals to prepare to manifest a fear immediately upon encountering a U.S. border official often requires helping them to process that fear and trauma, which is an extremely time-consuming process.

36. Moreover, even if a noncitizen manifests a fear, they are now required to reach an even higher threshold to establish a credible fear during the CFI. Prior to the implementation of a 2023 rule, which raised the standard for most applicants to a "reasonable possibility," applicants for withholding or CAT protection needed only to establish a "significant possibility" that they would be persecuted or tortured if removed from the United States. Under the Rule, they must now establish a "reasonable probability" of torture or persecution.

37. These changes make many fewer applicants eligible for asylum or other protection and in turn make our consultations more emotionally and substantively complex. Now, Las Americas must prepare people for a realistic chance that they will not be permitted to seek asylum, and that they face removal if they cannot overcome the higher standard.

38. These changes have injured our operations because our procedures for educating people on how to proceed through this system are more complicated and time-consuming. We must prepare people for multiple potential scenarios and outcomes. Since the Rule and Guidance took effect, the duration of our CFI screening consultations has significantly increased, and it has become difficult for us to conduct such screening conversations in fewer than two hours.

39.     Moreover, the fact that noncitizens are only guaranteed 4 hours to obtain and consult with a lawyer before a CFI means we need to have two workflows.     For people in ICE custody, we have to increase the number of individuals conducting intake to attempt to provide noncitizens with services before their CFI interview.  At the same time, to effectively serve clients knowing we will only have a short window to prep noncitizens for their CFI, we must try to assist them in Mexico, *before* they even enter the United States.  This issue is discussed in detail below.

40.     Because of these complexities, it is harder for us to serve as many people, which undermines our mission and complicates our ability to run a sustainable legal department. Additionally, with limited knowledge of how DHS is implementing the Rule, we are left with no means of adequately clarifying for asylum seekers what to expect when reaching the border and claiming fear of return.

41.     In addition to making CFI preparation harder and more time-consuming, the Rule and Guidance have increased demand for Las Americas' representation for people who have failed their CFIs and need IJ review and requests for review by USCIS.  But our capacity to provide this representation is diminished because we must spend so much of our time and resources providing pre-CFI support.  Previously, the need to provide this post CFI-work was more modest because many clients received a positive result from the CFI.

***The Rule's Cascading Impact Beyond the Credible Fear Interview***

42.     In response to the Rule's heightened burdens and convoluted processes that impede access to asylum at our southern border, it is fair to say that *all* of Las Americas' work has been forced to change.

43.     Las Americas has already diverted, and will continue to be forced to divert, significant resources to understanding the new Rule and Guidance, and their impact on the communities we serve, training staff and volunteers, and advising our clients, prospective clients,

and immigration communities. In addition, we continue to spend resources developing educational materials, including internal training materials, external training, and *pro se* materials designed to help the impacted communities. We also need to reroute resources towards helping our non-legal partners on both sides of the border have a better understanding of access to asylum in the United States, so that they are able to appropriately direct individuals for referrals. I have spoken with several civil society partners on both sides of the border, and witnessed firsthand the frustration and confusion over how the U.S. is managing the ports of entries and sections of the wall in our sector.

44. For example, we have had to devote considerable resources to creating a system to educate individuals on the manifestation standard. We further had to create a system to contact individuals who are still waiting for a CFI to be scheduled. As part of that, we have had to divert staff from other programs to be available for CFI preparation because of the four-hour timeframe before an individual may be subject to a CFI interview.

45. Even with that increase in staff, we are unable to assist as many individuals as we had previously because CFI prep sessions take considerably more time. In these sessions, we have to help individuals understand whether they fall into one of the few narrow exceptions to the Rule's asylum bar for people who entered without CBP One appointments. And if they do not, we need to prepare them to meet the significantly higher "reasonable probability" screening standard for withholding and CAT. This is dramatically more time-consuming work than was required previously, which means we can serve fewer clients.

46. As a result of these changes, we have also been forced to significantly reduce the number of individuals we can assist in their efforts to obtain lasting protection or relief. For example, we now have fewer resources to represent people who have received negative credible

fear determinations and seek review of those findings.  Previously we also provided our clients assistance in applying for work authorization, but we are now forced to choose between trying to help some people navigate the Rule over helping other people secure this more lasting benefit.  We have also had to reduce the number of individuals we can represent who remain in immigration custody and who are in need of full representation.  While resource limitations have always existed for Las Americas, the Rule has brought that strain to a new breaking point.

**The Guidance's Impact on the CFI Process**

47.     The Guidance also impacts the implementation of the Rule and has made it significantly more difficult to further our mission and assist our clients.

48.     As mentioned above, CFI consultations and representation are central to Las Americas' detained legal services.  While we continue to provide this service, there is an entire population of people undergoing the CFI process in CBP custody that we can no longer feasibly help.  That is because access to individuals in CBP custody is virtually impossible, particularly on the extremely expedited CFI-scheduling timeline imposed by the Guidance.  We are not allowed to enter CBP facilities, nor do we have direct access to people detained there via telephone.  Even if a family member contacts us about a loved one in CBP custody, we are unable to make arrangements to communicate with them.

49.     The less than 4-hour timeline for trying to communicate with people in CBP custody exacerbates the communication problem.  Because people detained in those facilities will have their CFIs so quickly, it is not possible for us to provide a CFI consultation before the interview actually occurs, forcing us to make the difficult decision to move forward with CFI legal services exclusively for individuals in ICE custody.

50.     While people in CBP custody may be able to make a limited number of outbound calls, the only numbers that they see are for organizations who have been able to set up special

hotlines with phone numbers designated solely for CBP custody. Because we do not have the staff capacity or resources to hire support to operate such a hotline, asylum seekers in CBP custody often do not have any way to contact us before their CFIs or even after the interview if the result was negative and they wish to challenge it.

51. As mentioned above, the government-created impediments to helping people in CBP custody before they have a CFI has forced us to move some of our CFI consultation work to Mexico. Even when we try to help people prepare for CFIs while in Mexico and even when we agree to represent them in their CFIs, we are often unable to do so because of the speed with which CFIs occur in CBP custody. Several Las Americas clients have been forced to forego having their attorney present during their CFI because the asylum office scheduled it without providing us any advance notice, even in cases where an attorney has entered an appearance.

52. In these circumstances, where there is a negative CFI determination because we were denied notice and thus precluded from representing the individuals during their fear interview, we are limited to assisting clients with the immigration judge ("IJ") review of a negative CFI determination. This assistance is also hindered by lack of information and notice. Staff who plan to attend IJ reviews must spend time and resources keeping track of whether a hearing has been scheduled, as well as preparing substantively for arguing exceptions and eligibility for asylum, withholding of removal, and protection under CAT.

**<u>Overarching Harms from the Rule & Guidance</u>**

53. The combined impact of the Rule and Guidance changes have fundamentally altered access to asylum at the U.S-Mexico border. As policy has shifted and immigration legal services work has become more difficult, Las Americas needs to hire more staff to try to meet the demands of our community. While we strive to increase *pro bono* representation and provide high quality legal representation, we are not government-funded and none of our grants are guaranteed

beyond two to three years. Moreover, it is difficult to secure funding for legal services, even in areas such as El Paso with clear needs and broad gaps in *pro bono* providers.

54. Additionally, many funders are interested in funding work that reaches the greatest number of people possible. Because the Rule has increased the workload for each case and prohibits us from taking as many cases, we risk losing out on grants that expect the reach of our work to maintain a growth trajectory in terms of the number of different people served. For example, we have one funding source that has a stated goal of decreasing the amount of time staff take to provide services. This Rule has the opposite effect on our work.

55. Additionally, our programs rely on volunteers. We already spend significant resources to coordinate, manage, and train volunteers. These changes injure our ability to rely on volunteers because the pace and complexity of the issues presented at the border continue to grow. The result is that many people on staff, myself included, have to devote resources to volunteer training and management, to the detriment of other work.

56. Further, as mentioned above, the need for Las Americas to focus on the front end of the expedited removal process detracts from our ability to provide ongoing legal representation in full removal proceedings in immigration court, appeals before the Board of Immigration Appeals, and on related benefits applications with USCIS. This change will result in more denied asylum applications without fully developed records, more appeals, and less capacity to do that work both for Las Americas and similar organizations.

57. In essence, the Rule and related border policies force Las Americas into full-time triage mode. We are now in a position of having to choose between preparing a larger number of noncitizens for the new screening processes, and providing full representation to people who are actually proceeding with their substantive claims.

58.     Last, Las Americas' staff has experienced a mental and physical toll as a result of the Rule and Guidance, and the harm to Las Americas' mission. Living and working on the border, our staff are closely connected to the communities they serve. We witness firsthand the harmful effects of asylum bans and related enforcement-oriented policies. Attempting to lead a team that is already inundated with work through more tumult is having a serious, detrimental impact. Since the Rule and Guidance went into effect, I have observed many staff members foregoing their paid leave because of the volume of work. And because so much of our time is spent on the front end of the expedited removal process, staff are feeling less satisfied by the work because we do not have resources to provide longer-term services with the same frequency. The sense that people cannot devote their energy to the work that meaningfully advances Las Americas' mission is already leading to a sense of frustration and burnout. These harms will only persist as time goes on.

## Conclusion

59.     It is difficult for me to overstate the detrimental impact that this Rule and the Guidance have had, and will continue to have, on Las Americas' clients, staff, operations, and mission. These changes will do nothing to improve the functioning of our immigration system and will instead infringe on our clients' rights to seek asylum, strain our resources thus forcing us to cut back on our services, and impose insurmountable bureaucratic obstacles on people with legitimate asylum claims seeking refuge from persecution and torture.

Jennifer Babaie
Director of Advocacy and Legal Services
Las Americas Immigrant Advocacy Center

Executed this 14th day of November 2024 in El Paso, Texas

**DECLARATION OF JAVIER HIDALGO,**
**THE REFUGEE AND IMMIGRANT CENTER FOR**
**EDUCATION AND LEGAL SERVICES (RAICES)**

I, Javier Hidalgo, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I make this declaration based on my personal knowledge except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.      I am the Legal Director at the Refugee and Immigrant Center for Education and Legal Services (RAICES).  I joined RAICES in 2018 and have served in my current role since 2023.  Before I assumed my current position, I worked as a unit director, before that as a supervisor, and previously, as a staff attorney.  In my role as Legal Director, I work closely with and oversee the work of our Asylum Access Services program, which (among other things) serves people facing expedited removal from the United States.

3.      RAICES is a 50l(c)(3) nonprofit, non-partisan organization headquartered in San Antonio, Texas.  RAICES' mission is to defend the rights of immigrants and refugees; empower individuals, families, and communities of immigrants and refugees; and advocate for liberty and justice.  This mission encompasses striving to ensure access to asylum and protection for noncitizens, including those arriving at the border and subject to expedited removal.  RAICES provides free and low-cost immigration legal services to underserved immigrant children, families, and individuals.  RAICES also conducts social services programming for immigrants, engages in advocacy work, and provides bond assistance to individuals seeking release from the custody of the Department of Homeland Security (DHS).  To execute our mission, we strive to serve as many noncitizens as possible through our various avenues of work.

4.      I submit this declaration as a supplement to my previous declaration in *Las Americas v. Department of Homeland Security*, which was executed on July 24, 2024.

1

5.     As discussed in detail below, RAICES has and will continue to experience substantive harm under the Final Rule issued by U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security ("DHS") and the Executive Office for Immigration Review ("EOIR"), Department of Justice ("DOJ"), entitled "Securing the Border" ("Rule"); and contemporaneous memoranda issued by DHS (collectively, "Guidance"). As with the Interim Final Rule ("IFR") many aspects of the Rule and Guidance directly impact and interfere with RAICES' core work. These aspects include (a) the suspension of asylum eligibility for virtually all noncitizens who present at ports of entry without a prescheduled appointment, or who enter the United States between ports of entry; (b) the requirement that all noncitizens seeking asylum use the CBP One application; (c) the requirement that noncitizens manifest fear in order to even qualify for a credible fear interview (CFI); (d) the new, heightened "reasonable probability" CFI screening standard for withholding and CAT protection; and (e) the reduction of the consultation time before a CFI from at least 24 hours to as little as 4 hours.

**RAICES' Mission & Scope**

6.     Founded in 1986 as the Refugee Aid Project by community activists in South Texas, RAICES has grown to be the largest immigration legal services provider in Texas. With offices in Austin, Corpus Christi, Dallas, Fort Worth, Houston, and San Antonio, RAICES is a frontline organization that combines expertise developed from the daily practice of immigration law with a deep commitment to advocacy. Its staff includes nearly 300 people, including attorneys, legal assistants, social workers, advocates, and support staff.

7.     Since RAICES' founding, its staff, volunteers, and pro bono attorneys have counseled and represented thousands of noncitizens throughout Texas. RAICES offers a wide array of legal services. The scope of RAICES' services includes filing "affirmative" asylum applications, which can be submitted to U.S. Citizenship and Immigration Services (USCIS) by

noncitizens who are not in removal proceedings. It also includes representing noncitizens—including adults, children, and families—in regular removal proceedings under 8 U.S.C. § 1229a and in bond proceedings before the EOIR and before the Board of Immigration Appeals (BIA). In regular proceedings, also known as defensive proceedings, we represent people seeking asylum, withholding of removal, and protection under the Convention Against Torture (CAT), among other forms of relief from removal. RAICES' defensive legal representation also continues into the federal courts, where we represent clients before the United States Court of Appeals for the Fifth Circuit and the Supreme Court, where appropriate.

8. RAICES also provides services to hundreds of people in expedited removal proceedings, including those assessed for protection through the CFI screening process. Our Asylum Access Services team is most involved in our work serving individuals facing expedited removal. The team represents detained individuals in the expedited removal process. That team currently consists of a managing attorney, one senior attorney, one staff attorney, a DOJ accredited representative, four legal assistants, and two data entry clerks.[1] We currently operate hotlines specifically for individuals detained at the South Texas Detention Center, in Pearsall, Texas; Laredo Detention Center in Laredo, Texas; and the Karnes County Immigration Processing Center in Karnes, Texas, as well as individuals detained in CBP facilities who are subject to enhanced expedited removal.

9. Last year, we added our hotline number to a list distributed by EOIR to asylum seekers who are required to undergo their CFI while in CBP custody. We also post signup sheets in ICE detention centers and receive referrals from both the family members of detained people and other nongovernmental organizations (NGOs).

---

[1] Current as of the date this declaration was executed.

10.     From January 1, 2024, through November 11, 2024, the Asylum Access Services team provided legal consultation or representation to 1,332 individuals in expedited removal proceedings.  During the approximately four-month period the IFR was in effect, Asylum Access Services team consulted with at least 169[2] individuals adversely affected by the IFR and Guidance. In the period since the Final Rule took effect on October 1, 2024, the Asylum Access Services team has served 21 individuals adversely affected by the Rule and Guidance.

### The Rule Harms RAICES and Our Clients

11.     Similar to the IFR, the Rule and Guidance challenged in this suit have directly impacted and interfered with RAICES' ability to provide its core services to noncitizen clients navigating the U.S. Immigration system, and will continue to have these effects.  The changes imposed by the Rule have forced us to divert our limited resources to preparing the relevant teams to properly and ethically represent clients impacted by the Rule.  We have devoted internal resources to training staff on the Rule and related policies, as well as on how to advocate for clients impacted by these changes.  We have also had to redirect staff resources.  For example, during the period that the IFR was in effect, we trained and relocated employees previously working on non-expedited-removal representation to provide consultations to callers in CBP custody.  Now that the Rule is finalized, we will have to make these diversions permanent. This shift in resources significantly hampered our ability to faithfully serve clients in non-expedited removal proceedings. Even with these reallocations of staff, we are not able to fully support people impacted by the Rule.

---

[2] This number is likely artificially low due to how we track clients. They are provided a designation at intake based on our best assessment of their status at the time, but many individuals who we identify as falling under an exception to the Rule's asylum ban are ultimately denied asylum because of the Rule's changes.

4

**The Rule's Changes to the Fear Interview Process**

12. The Rule has caused and will continue to cause significant disruption to our work on behalf of individuals facing expedited removal, making it nearly impossible for us to serve our client population.

13. As mentioned above, before individuals even receive a CFI, they must affirmatively manifest a fear of harm. RAICES has observed asylum seekers who would have been ignored by immigrations officers if they had not gone to great lengths to advocate for themselves. For example, in one case, a noncitizen was only determined to have manifested fear of harm after begging an asylum officer to allow her to pursue asylum. The officer initially told her that she did not manifest because she "did not use the word asylum," that the government is not interested in helping people "coming here to take U.S. jobs" who are sick or injured, and that she should "stop crying and speak like normal, decent people." This was despite her stating that she was "afraid," "wanted refuge," and "feared death." It was not until the officer observed her nearly begging on her knees that he allowed her to proceed to a CFI.

14. Historically, CFIs were conducted while people were in ICE custody. When CFIs were done exclusively in ICE custody, we were consistently able to schedule consultations—either in person or remotely—with noncitizens identified through our hotline or referral systems *before* their CFIs (which must be conducted by Asylum Officers from USCIS). We were also able to consistently consult with individuals in ICE custody who received a negative CFI and prepare them for an immigration judge review of that determination. We were even sometimes able to attend these interviews and review hearings with clients. In addition, we were able, on a limited basis, to enter appearances to file requests for reconsideration with USCIS for individuals who received negative credible fear determinations.

15.     In our experience, RAICES' work providing consultations (and in some cases representation) is critically important at each step of the expedited removal process.  In particular, our consultations advance our mission by helping people understand and prepare for the CFI process.  People fleeing persecution generally have little knowledge of the U.S. immigration system and often find it difficult to speak of past traumatic experiences with agents of a foreign government, particularly when they are detained, when the interview takes place shortly after the frequently horrendous journey to this country, and when they have had minimal time to rest, recover, and prepare.  Noncitizens are also unaware of what specific information is most relevant to the CFI process and are at risk of omitting critical details because they do not know where to focus their answers in the limited time allotted to them during a CFI.  We know of other instances in which people's clear verbal statements of fear have been ignored entirely and they have been removed without ever getting a CFI.

16.     The Rule makes this already difficult process much more challenging.  It significantly changes the content of a CFI, as well as the immigration judge's review.  To receive protection in the United States, noncitizens must now establish that they fit within one of the narrow exceptions for asylum applications, and, if they do not, that they qualify for withholding or CAT protection.  Whereas asylum can be obtained based on a well-founded fear of persecution, the withholding-of-removal statute requires the applicant to show that persecution is more likely than not—a higher standard.  *INS v. Stevic*, 467 U.S. 407, 429-30 (1984).  Because of this heightened standard, we have had to spend additional time explaining the changes and preparing people to answer questions about their fear of persecution or torture in their home countries.  Because many of the asylum seekers we advise have experienced violence and exploitation, these inquiries take a good deal of time, analysis, and trauma-informed services.  As a result, RAICES'

6

staff must now engage in much more complex and cumbersome consultations and screening interviews.

17.    For example, in one case, a consultation with an asylum seeker detained in CBP custody lasted nearly three hours—far longer than normal. The caller had received an initial negative credible fear determination, and RAICES was attempting to prepare her for a hearing challenging that determination. She had been unable to consult with an attorney beforehand because she was given access to a phone for only seven minutes prior to the CFI. We were only able to speak with her after a negative CFI determination in order to prepare her to challenge that finding prior to review of the determination by an immigration judge. That preparation call was extended largely because of the detailed conversation needed to prepare the noncitizen to explain how she fit within the narrow exceptions to the Rule. What is more, the hearing was scheduled to take place the very next morning, on a Saturday. This required RAICES staff to work outside of traditional business hours to prepare for the hearing after hours and offer representation over the weekend. This is just one of many examples of how the impossibly fast pace of proceedings, combined with the practical roadblocks created by the Rule and Guidance, force RAICES staff to drop everything to provide emergency representation all in one meeting. Attorneys must continuously check the EOIR webpage at all hours to receive notice of an upcoming hearing that is often not posted until a few hours before the hearing. This creates incredible strain on the Asylum Access Services team and limits the number of clients to whom they are able to provide ethical representation.

18.    In addition to these substantive complexities, as explained below, the timeline for us to do our much more complicated work is now very condensed. RAICES staff typically only have one phone call with an asylum seeker to cover this more complex set of information. This

leads to not being able to prepare asylum seekers as thoroughly for their CFIs and immigration judge reviews and can also lead to having to spend additional time on the phone with each asylum seeker.

19.     Finally, it is important to note just how broadly this Rule is impacting RAICES and our clients.  In our experience, the Rule leads to people receiving negative credible fear findings.  In turn, that means that RAICES must prepare many more individuals for immigration judge review.  These changes have significantly impeded our efforts to serve recently arrived noncitizens, as explained more fully below.

**Impact of Guidance on RAICES' Work**

20.     In addition to the Rule itself, the Guidance has altered the expedited removal process in ways that have significantly impaired our ability to access noncitizens and have frustrated our efforts to assist these people in the process.

21.     Under the Guidance, DHS has shifted to giving individuals in CBP custody as little as 4 hours for consultation, instead of at least 24 hours, itself a reduction from the minimum of 48 hours required until a year ago.  As described in more detail below, that has significantly impaired our ability to connect with clients before their CFIs.

22.     The pre-CFI consultation is vitally important for all the reasons explained above.  Under this new policy, people are guaranteed only 4 hours to consult after they are given the initial information about the CFI process (including a list of legal service providers, which lists RAICES as one of just a few options).  There are numerous reasons why holding CFIs in CBP custody after a reduced 4-hour consultation period disrupts our critical work.

23.     First, the limitations on communication with the outside world are much more severe in CBP facilities—where most of our client population is now detained during the CFI

process—as compared to ICE facilities.[3]  This makes 4 hours a virtually impossible time frame for consultations, particularly because it includes weekends.  Unlike in ICE facilities, NGOs cannot enter CBP facilities, which means we cannot post signup sheets there or receive referrals from other legal service providers.

24.     Second, unlike in ICE facilities, we are unable to schedule specific times for calls with people who are in CBP custody; instead, noncitizens must call us on our hotline.  Moreover, noncitizens are not permitted unlimited access to a phone; instead, they are provided limited windows in which they may contact us, often outside of normal business hours, meaning that unfortunately people often cannot reach us or other providers.  In fact, since the Rule and Guidance have come into effect, the vast majority of the calls we have received from people in CBP custody have come in before 8 AM or after 5:30 PM.  We have been able to schedule follow-up calls with only a limited number of individuals in CBP custody before they receive their CFIs, and even when we can it is a time-intensive, cumbersome, and impractical process.

25.     Third, CBP facilities are not set up to hold people who have counsel or may be trying to access attorneys.  We can email requests for signatures on forms like the DHS form for entering an appearance as counsel (form G-28) and make email requests for follow-up calls to the CBP office with authority over the facility where an individual is detained.  However, we cannot call directly to a CBP facility and ask to speak to someone detained there, even if we have already entered an appearance on their behalf.  We must instead request that CBP arrange for the noncitizen to call us back.  Often, however, CBP does not respond quickly enough to these email requests for RAICES attorneys to be able to properly represent an individual.  RAICES staff often must send many follow-up emails to eventually get a response.  When our lawyers attempt to ensure access

---

[3] A previous version of this declaration stated that ICE facilities were more severe than CBP facilities. This was a typographical error.

9

to follow-up calls by entering a notice of appearance, this often does not work. There do not seem to be protocols in place to allow or facilitate noncitizens' ability to return phone calls or send us signed forms in a timely manner. In addition, in our experience, some people in CBP custody have not even been given access to a pen and paper, which means that even if they do reach us, they cannot take notes about their interview or how to arrange to call us back for follow up.

26. Fourth, referrals from family members also are of little help for those detained by CBP because it is functionally impossible to track a person's whereabouts when in CBP custody, so we do not know where a referred person is located. Unlike with ICE custody, there is no universal "online detainee locator" for people in CBP custody. While the online detainee locator will now indicate if someone is in CBP custody, it does not specify which CBP facility the person is detained in, and thus does not help to locate and contact someone who is in CBP custody in the way it does with noncitizens in ICE facilities. Moreover, the transfers and CFI process in CBP custody happen so quickly that people do not have time to even learn whether DHS has assigned them a critically important "Alien Registration Number," memorize it, and communicate it to us or their families in the highly limited opportunities they have to make phone calls. Notably, some are not even provided with their Alien Registration Number before calling and are instead given ID numbers that cannot be used to trace their cases. The result is that we often have nothing to work with when attempting to locate clients, other than their names. The best we can do is ask families to try to pass our hotline number on to their family member seeking legal help from CBP custody and hope they are able to access a legal visitation call prior to their CFI or removal. This presents an enormous obstacle because we have learned that individuals are often only given one call for the entirety of their time in CBP custody.

10

27. The reduction of the pre-CFI consultation time to as little as 4 hours significantly exacerbates these problems. These restrictions mean that people simply do not have enough time to reach us before their CFI. In particular, including weekends in the consultation period ensures that many asylum seekers will have no real opportunity to reach an attorney before their interview and possibly consequently, before their removal.

28. Because we are seeing many people only after they have already received a negative CFI, we are limited to helping the individual prepare for immigration judge review.

29. Our routine inability to provide CFI consultations is a significant problem. RAICES is one of just a few organizations that offers CFI consultations to people in CBP custody, and yet the timeline makes that extremely difficult and impracticable. And without access to our services, the right to a consultation prior to the CFI is illusory at best for many asylum seekers.

30. We have also had to overhaul our processes to handle an increased number of calls coming into our hotline from CBP because of the shortened time frame for CFI consultations and the general nature of the expedited removal process in CBP custody. These calls are our only means of communicating with this group of asylum seekers preparing for a CFI interview. Previously, we would accept hotline calls from individuals in ICE custody based on our capacity and then schedule follow-up calls or visits. This system worked because we knew people could try reaching us several times over the course of a few days, and that if we were unable to answer those calls immediately, people could leave a message that we could return by setting up a call with them in ICE detention. Now, however, we have had to shift our hotline staffing and operations to handle a significant number of calls coming from individuals in CBP custody. The super-expedited nature of CFIs in CBP custody under the Guidance has required us to make this shift: because noncitizens will have as little as 4 hours to attempt to contact and consult with us

before their CFI (and a similarly short window for immigration judge review), if we do not focus our resources in this way to catch as many calls as possible, we will never be able to communicate with people in this posture at all.

31.     Even with these changes to our procedures, the Rule and Guidance are greatly impeding our ability to serve noncitizens in expedited removal.  If we do not answer a call on the spot, at times the CBP agents decline to leave voicemails and do not provide any information about the people trying to reach us.  Without any information about the client, we cannot email the relevant CBP sector office to try to set up a consultation call, and because of the shortened 4-hour time frame, we cannot track people down before their interviews happen.  Even when we do receive a voicemail with client information, it is extremely difficult with the current constraints on our capacity to get a scheduled follow-up call with individuals for whom we do not have a signed G-28.  Indeed, CBP often will not allow us to speak with anyone for whom we do not have a G-28—and they have largely stopped coordinating the pre-representational counseling required to get the form signed.  As noted above, we often receive voicemails with timestamps well before and after normal business hours, meaning individuals given access to phone calls at these times have no real chance of securing legal consultation or representation prior to their CFI.

32.     Essentially, our staff must strive to immediately answer every call to our hotline because that is our sole means of advising asylum seekers in CBP custody both before and after CFIs.  This has required us to devote a dramatically increased amount of staff time—including the time of staff from RAICES programs who do not generally conduct in-depth orientations and instead focus on longer-term representation in immigration court—to ensure that we can answer and respond to hotline calls.  We have increased the number of hours our staff work in a day, and have asked people to come in on weekends.  Staff who are trained to take these CBP calls take, on

**JA404**

an ad hoc basis, as many calls as possible between scheduled meetings with clients in ICE custody, court dates, and other work duties. But we are still unable to answer each call and provide support.

33. Responding to this stream of calls, each of which is incredibly urgent because of the 4-hour consultation window, prevents us from supporting potential clients in ICE custody that RAICES staff would have otherwise had time and capacity to assist. Each call is extremely high stakes given the short window, and there is often not enough time to do the extensive preparation required for a CFI. That frustrates our ability to advance our mission of providing services to other noncitizens facing removal, such as those in regular removal proceedings in immigration court and those held in ICE custody.

34. Despite the expenditure of significant extra resources diverted from our work with clients in ICE custody, we still lack capacity to answer many calls, and many people are unable to call us before their CFIs in any event. Thus, we are frequently unable to assist clients before their CFIs, which is a critical part of our service mission for individuals subject to expedited removal. The reduced, 4-hour consultation period means that we will miss many potential clients entirely and will never know that they were in CBP custody or that they had a CFI.

35. Further, although we try (in addition to providing consultations) to represent as many people as we can at their CFIs, we have been able to do so for only one or two individuals in CBP custody out of hundreds who have contacted us. That is both because our resources are stretched so thin by the need to answer hotline calls, and also because the extremely short notice with which CFIs are scheduled makes it practically impossible to arrange to appear at a CFI. Prior to the policies at issue in this case, RAICES staff had more time to meet with and prepare clients. Because the Rule significantly limits our ability to meet with individuals in CBP custody, more noncitizens are going to their CFIs both unprepared and unrepresented. The lack of access to legal

13

support, particularly when coupled with the new hurdles imposed by the Rule, makes it much harder for individuals to receive a positive credible fear determination and/or vacate a negative credible fear determination.

36.    Because of the challenged policy changes, our work has heavily shifted to helping people prepare for immigration court review *after* they have a CFI denial from an asylum officer. But that impedes our work by depriving noncitizens of a fair chance to prepare for *both* stages, if necessary. And many of the same barriers that exist in pre-CFI representation exist for clients at this stage, and in our experience our ability to intervene and achieve a positive outcome is limited once an asylum officer has already found no credible fear. Simply put, the compression at the front end of the expedited removal process to as little as 4 hours for the pre-CFI consultation period forces us to engage in much more work at the end of that process where our ability to provide meaningful assistance and consultation to noncitizens is diminished.

37.    In addition, significant procedural hurdles make limiting our assistance to immigration judge review less effective than it would be if we could prepare our clients before the CFI. It is difficult for RAICES attorneys to submit an appearance for the immigration judge review because hearing dates are scheduled and completed on an extremely tight timeline. Typically, immigration judge review hearings are scheduled and completed within 24 to 48 hours of the time an individual receives notice of a negative CFI determination. The timing of this hearing is posted in an online portal, but often only 4 hours before the hearing. This makes it difficult to plan, within our limited capacity, for attorney representation with such little notice. It therefore significantly limits the number of people we are able to represent because we cannot know if an attorney will be available at an unknown date and time.

**Additional Harms Flowing from Expedited Removal Changes**

38. The Rule and Guidance have impacted RAICES' work in the expedited removal process and have impacted our ability to fulfill our mission, while impacting our resources and other aspects of our work.

39. First, the additional complexities mentioned above mean that our hotline calls now take much longer than they did before, reducing the number of hotline callers we can serve and increasing the number of potential clients with whom we can never speak at all. That is true even though we have scaled up the staff resources we commit, including some of our removal defense attorneys' time, to cover the hotline.

40. Second, because the impact of the reduced consultation period is felt nearly exclusively by people undergoing CFIs in CBP custody, we have had to focus heavily on helping this population with CFI preparation. This means we can serve significantly fewer individuals facing expedited removal in ICE custody.

41. Both the Rule and the Guidance have required staff to spend less time on other aspects of their work.

42. In addition to the substantive additional time that doing this extra work entails, we have also been forced to divert resources in order to redesign our training materials, both for our own staff and for *pro bono* attorneys and other volunteers.

43. Everything described above is taking a serious toll on RAICES' staff. The new credible fear procedures mean that our staff are in a constant fire drill. Legal assistants anxiously monitor the hotline to make sure we never miss a call, as it could be our only chance to speak with someone before they are rushed through a CFI and deported, potentially to a place where they face persecution or torture. Our hotline is also where the Asylum Office can reach us to participate in

15

CFIs. Should we miss an unexpected call, that noncitizen may have to go forward with an interview without preparation or the opportunity to seek representation. The unpredictability of the calls has placed intense stress on our processes and infrastructure.

44. When we do receive calls—and they often come in bursts—our attorneys must immediately drop all their other work and do their best to talk a client through all of the Rule's exceptions, which almost never apply, as well as withholding and CAT claims on the spot. Staff must also spend a great deal of time trying to track down clients who previously called and determine if, and when, those clients have further hearings scheduled. It is difficult to plan for capacity under these constraints and unknowns. Our staff are suffering from burnout due to the chaotic, frenetic pace of work that the Rule and Guidance necessitate.

## Conclusion

45. Overall, RAICES has been harmed by the Rule and Guidance because, together and independently, they severely restrict our ability to effectively serve people who are facing expedited removal and denial of protection. These policies are unrealistic and dangerous and send the message that the United States does not welcome asylum seekers. All of these changes are fundamentally contrary to our organization's mission and vision, and they are devastating RAICES' ability to serve asylum seekers, particularly those facing expedited removal.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Javier Hidalgo

Executed on the 14th day of November, 2024, in San Antonio, TX

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, et al., | ) ) ) |
| *Plaintiffs*, | ) No. 1:24-cv-01702 |
| v. | ) ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) |
| *Defendants.* | ) ) ) |

**SUPPLEMENTAL JOINT APPENDIX FILED PURSUANT TO LOCAL RULE 7(N)**

**JA409**

**SUPPLEMENTAL JOINT APPENDIX INDEX**

| Rulemaking Documents | |
|---|---|
| *Securing the Border*, 89 Fed. Reg. 81,156 (Oct. 7, 2024) (Final Rule), https://www.federalregister.gov/documents/2024/10/07/2024-22602/securing-the-border. | STB_AR1_000001–130 |
| *Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024) (IFR), https://www.federalregister.gov/documents/2024/06/07/2024-12435/securing-the-border. | STB_AR1_000131–193 |
| **Proclamations** | |
| Proclamation 10773, *Securing the Border* (June 3, 2024). | STB_AR1_000194–207 |
| Proclamation 10817, *Amending Proclamation 10773* (Sept. 27, 2024). | STB_AR1_000208–213 |
| **U.S. Government Sources** | |
| CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), https://www.cbp.gov/about/mobileapps-directory/cbpone | STB_AR1_000425–26 |
| CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance*. | STB_AR1_000502–03 |
| ICE, Securing the Border Facility Posting Four Languages (June 4, 2024). | STB_AR1_001381 |
| Memorandum for Daniel A. Bible, Exec. Assoc. Dir., Enforcement and Removal Operations, ICE, from Patrick J. Lechleitner, Deputy Dir. and Senior Official Performing the Duties of the Dir., ICE, Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, Securing the Border, and Interim Final Rule, Securing the Border (June 4, 2024). | STB_AR1_001418–22 |
| Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, Processing Expedited Removal Cases & attach. (Oct. 2, 2014). | STB_AR1_001423–26 |
| Memorandum for Exec. Assistant Comm'rs, et al., from Chris Magnus, Comm'r, U.S. Customs and Border Protection, *Directive for U.S. Customs and Border Protection Approach to Trauma-Informed Care for Persons in Custody* (Apr. 29, 2022). | STB_AR1_001427–31 |
| Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Office of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, Implementation of Expedited Removal (Mar. 31, 1997). | STB_AR1_001450–54 |
| Memorandum from Nathaniel Kaine, Chief of Staff, CBP, *CBP Operational Information – Securing the Border Final Rule* (Sept. 26, 2024). | STB_AR1_001456–69 |
| OHSS, Data for Securing the Border Final Rule (Sept. 3, 2024). | STB_AR1_001492-862 |

| | |
|---|---|
| USCIS, *RAIO Directorate—Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024). | STB_AR1_002396–420 |
| USCIS, *RAIO Directorate – Officer Training: Interviewing – Eliciting Testimony* (Apr. 24, 2024). | STB_AR1_002699–755 |
| USCIS, *RAIO Directorate – Officer Training: Interviewing – Introduction to the Non-Adversarial Interview* (Apr. 24, 2024). | STB_AR1_002797–843 |
| USCIS, *RAIO Directorate – Officer Training: Interviewing – Working With An Interpreter* (Apr. 24, 2024). | STB_AR1_002883-932 |
| U.S. Dep't of State, Bureau of Democracy, Human Rights, & Labor, Country Reports on Human Rights Practices: Mexico Human Rights Report (2023). | STB_AR1_003183, 3207 |
| U.S. General Servs. Admin., Login.gov, https://login.gov/ (last visited Aug. 10, 2024). | STB_AR1_003283–85 |
| **Non-U.S. Government Sources** | |
| Amnesty International, CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States (May 9, 2024), https://www.amnesty.org/en/latest/news/2024/05/cbp-one-mobile-applicationviolates-the-rights-of-people-seeking-asylum-in-the-united-states/. | STB_AR1_004406–12 |
| Ana Lucia Verduzco & Stephanie Brewer, Kidnapping of Migrants and Asylum Seekers at the Texas-Tamaulipas Border Reaches Intolerable Levels, Wash. Off. on Latin Am. (Apr. 4, 2024). | STB_AR1_004413, 4419–20 |
| Ctr. for Gender & Refugee Studies, "Manifesting" Fear at the Border: Lessons from Title 42 Expulsions, Jan.30, 2024, https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fearborder-lessons-title-42-expulsions. | STB_AR1_004462–63 |
| Human Rights Watch, US: Digital Metering System Exposes Migrants to Harm (May 1, 2024). | STB_AR1_004594–96 |
| **Public Submissions** | |
| Comment of Human Rights First and attachments, DHS Dkt. No. USCIS-2024-0006 (July 2, 2024) | STB_AR1_006227, 6238–39, 6247–50, 6253–58, 6278, 6284–86, 6289–93, 6321, 6349–55, 6364–65, 6593, 6634 |
| Comment of American Immigration Council (the Council) and the American Immigration Lawyers Association (AILA) and attachments, DHS Dkt. No. USCIS-2024-0006 (July 3, 2024) | STB_AR1_006704–05 |

| | |
|---|---|
| Comment of Center for Gender & Refugee Studies and attachments, DHS Dkt. No. USCIS-2024-0006 (July 3, 2024) | STB_AR1_006757-58, 6762–64, 6842, 6851–62, 7477, 7485–86, 7513–16, 7522–28 |
| Comment of National Immigrant Justice Center and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_007802, 7815, 7818, 7820–44, 7906, 7930–32, 8074–75, 8185, 8200, 8530, 8544–53, 8942, 8945–46 |
| Comment of Richard Caldarone and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_009353, 9421–22, 9545–46, 9572, 9583–85, 10151–52, 10371, 10380–97, 10531, 10535–36, 10549, 10702-65, 010713–731, 10896, 10915, 11005-31, 11113, 11122-23, 11439, 11442-43, 11449-50, 11452, 11455-56, 11673, 11699, 11946, 11950-51, 12116, 12129-30, 12456, 12460, 12508, 12513, 12631, 12640-41 |
| Comment of United Nations High Commissioner for Refugees (UNHCR) and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_012802, 12817 |
| Comment of Las Americas Immigrant Advocacy Center and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_012881, 12884-86, 12889, 12892, 12898-901 |
| Comment of Americans for Immigrant Justice and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013016, 13021-24 |
| Comment of Immigration Equality and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013028, 13050-53 |
| Comment of Human Rights Campaign and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013094, 13104-05 |
| Comment of Refugees International and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013148-50 |
| Comment of Florence Immigrant & Refugee Rights Project and attachments, DHS Dkt. No. USCIS-2024-0006 (July 8, 2024) | STB_AR1_013247, 13254-55 |

| **Other U.S. Government Sources** | |
|---|---|
| DHS, USCIS, *RAIO Combined Training Program: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024) | STB_AR2_00002943 –79 |
| Memorandum from Tricia Kennedy, Program Manager, Off. of Field Operations, U.S. Customs & Border Prot., *CBP OneTM Application* (May 8, 2023). | STB_AR2_00007414 –24 |
| U.S. Dep't of Homeland Sec., Press Release, *CBP Makes Changes to CBP One App* (May 5, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-makes-changes-cbp-one-app?s=03. | STB_AR2_00009346 –50 |

**81156**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Parts 208 and 235**

[CIS No. 2778–24; Docket No: USCIS–2024–0006]

**RIN 1615–AC92**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Part 1208**

[A.G. Order No. 6053–2024]

**RIN 1125–AB32**

**Securing the Border**

**AGENCY:** U.S. Citizenship and Immigration Services (''USCIS''), Department of Homeland Security (''DHS''); Executive Office for Immigration Review (''EOIR''), Department of Justice (''DOJ'').

**ACTION:** Final rule; request for comments.

---

**SUMMARY:** On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the Immigration and Nationality Act (''INA'') suspending and limiting the entry of certain noncitizens into the United States during emergency border circumstances. DHS and DOJ (''the Departments'') issued a complementary interim final rule (''IFR'') shortly thereafter. This final rule responds to public comments received on the IFR, makes certain revisions to the regulatory text, and seeks comment on potential changes to the Circumvention of Lawful Pathways rule as well as changes that parallel modifications made by the subsequent Proclamation.

**DATES:**

*Effective date:* This rule is effective at 12:01 a.m. eastern daylight time on October 1, 2024.

*Comment period for solicited comments:* Comments on the extended and expanded applicability of the Circumvention of Lawful Pathways rebuttable presumption in Section IV of this preamble and changes that parallel modifications made by the subsequent Proclamation described in Section II.C.1 of this preamble must be submitted on or before November 6, 2024. The electronic Federal Docket Management System will accept comments prior to midnight eastern time at the end of that day.

**ADDRESSES:**

*Docket:* To view comments on the IFR that preceded this rule, search for

docket number USCIS–2024–0006 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

*Comment period for solicited additional comments:* You may submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble via the electronic Federal Docket Management System at *https://www.regulations.gov,* to DHS Docket Number USCIS–2024–0006. Follow the website instructions for submitting comments. Comments submitted in a manner other than the one listed above, including emails or letters sent to the Departments' officials, will not be considered comments on the rulemaking and may not receive a response from the Departments. Please note that the Departments cannot accept any comments that are hand-delivered or couriered. In addition, the Departments cannot accept comments contained on any form of digital media storage device, such as CDs/DVDs and USB drives. The Departments are not accepting mailed comments at this time. If you cannot submit your comment by using *https://www.regulations.gov,* please contact the Regulatory Coordination Division, Office of Policy and Strategy, USCIS, DHS, by telephone at (240) 721–3000 for alternate instructions.

**FOR FURTHER INFORMATION CONTACT:**

*For DHS:* Daniel Delgado, Acting Deputy Assistant Secretary for Immigration Policy, Office of Strategy, Policy, and Plans, DHS; telephone (202) 447–3459 (not a toll-free call).

*For EOIR:* Lauren Alder Reid, Assistant Director, Office of Policy, EOIR, DOJ, 5107 Leesburg Pike, Falls Church, VA 22041; telephone (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Public Participation
II. Executive Summary
   A. Background and Purpose
   1. Basis for the IFR
   2. The Departments' Experience With the IFR
   B. Legal Authority
   C. Changes From the IFR to Final Rule
   1. Changes to the IFR's Thresholds
   2. Clarifying Changes to Regulatory Text
   3. Other Technical Changes
   D. Rule Provisions
   E. Severability
III. Public Comments and Responses
   A. Legal Authority and Background
   1. Legality Concerns
   a. General Comments on Domestic Law
   b. Statutory Conditions and Limitations on Asylum Eligibility
   c. Expedited Removal
   d. General Comments on International Law
   e. UNHCR Guidelines on International Protection

f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children
2. Justification and Statements on Need for the Rule
a. Rule Is Unjustified, Unsubstantiated, or Arbitrary
b. Lack of Resources Does Not Justify the Rule
c. Rule Does Not Acknowledge Factors Contributing to Migration
d. Other Comments Related to the Departments' Justification
B. General Feedback on the IFR
1. General Support
2. General Opposition
a. Negative Impacts on Noncitizens and Others
i. Conflicts With Humanitarian Values
ii. Procedural and Due Process Concerns
(1) General Concerns
(2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare
(3) Noncitizens' Ability to Have Their Claims Heard
(4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations
(5) Fairness or Risks Associated With Process
iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns
iv. Impacts on Criminal Enforcement
v. Negative Impacts on Other Affected Entities
b. Negative or Minimal Impacts on Immigration System and Government Operations
i. Undermines the Administration's Promises and Goals
ii. Similarity to Actions of Past Administration
iii. Would Be Ineffective or Not Achieve Its Intended Outcomes
c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety
d. Other General Opposition
C. Provisions of the Rule
1. Limitation on Asylum Eligibility
a. Proclamation Exceptions—Section 3(b) of Proclamation
i. Legal Concerns Related to CBP One and the Lack of Exceptions
ii. Wait Times for CBP One Appointments
iii. Availability of and Access to CBP One Appointments and Concerns about Discrimination
b. Regulatory Exception—Exceptionally Compelling Circumstances
c. Implementation by CBP Officers
d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR
e. Family Unity Provisions
2. Manifestation of Fear Standard
a. Legality Concerns
b. Concerns About the Efficiency and Complexity of the Manifestation Standard
c. Implementation Guidance and Accuracy of Manifestation To Identify Fear of Return
d. Trauma Impacting Manifestation and Vulnerable Populations

STB_AR1_000001

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum
f. Noncitizens May Not Understand Their Legal Right to Seek Asylum
3. ''Reasonable Probability'' Screening Standard for Statutory Withholding of Removal and CAT Protection
4. Other Comments on the Regulatory Provisions
a. Application to Mexican Nationals
b. Adequacy of Statutory Withholding of Removal and CAT Protection
c. Requests for Reconsideration
D. Other Issues Relating to the Rule
1. Scope of the Rule and Implementation
a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary
b. Concerns Regarding Exceptions From the Encounter Thresholds
c. Other Concerns About the Encounter Thresholds
2. Other Comments on Issues Relating to the Rule
E. Statutory and Regulatory Requirements
1. Administrative Procedure Act
a. Foreign Affairs Exception
b. Good Cause Exception
c. Length and Sufficiency of Comment Period
2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)
3. Alternatives
a. Address Root Causes of Migration
b. Prioritize Funding and Other Resources
c. Further Expand Refugee Processing or Other Lawful Pathways
d. Expand Asylum Merits Process
e. Other Congressional Action
f. Additional Suggested Measures or Revisions
F. Out of Scope
IV. Requests for Comments
A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule
B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption
V. Regulatory Requirements
A. Administrative Procedure Act
B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)
1. Effects Under a Without-IFR Baseline
2. Effects Under a With-IFR Baseline
3. Discontinuation Analysis Under a Without-IFR Baseline
4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption
C. Regulatory Flexibility Act
D. Unfunded Mandates Reform Act of 1995
E. Congressional Review Act
F. Executive Order 13132 (Federalism)
G. Executive Order 12988 (Civil Justice Reform)
H. Family Assessment
I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)
J. National Environmental Policy Act
K. Paperwork Reduction Act

**List of Abbreviations**

AO    Asylum Officer
AMI    Asylum Merits Interview
APA    Administrative Procedure Act
BIA    Board of Immigration Appeals (DOJ, EOIR)
CAT    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment
CBP    U.S. Customs and Border Protection
CBP One app    CBP One mobile application
CDC    Centers for Disease Control and Prevention
CHNV    Cuba, Haiti, Nicaragua, and Venezuela
DHS    Department of Homeland Security
DOJ    Department of Justice
EOIR    Executive Office for Immigration Review
ERO    Enforcement and Removal Operations
FARRA    Foreign Affairs Reform and Restructuring Act of 1998
FERM    Family Expedited Removal Management
FY    Fiscal Year
HSA    Homeland Security Act of 2002
ICE    U.S. Immigration and Customs Enforcement
IFR    Interim Final Rule
IIRIRA    Illegal Immigration Reform and Immigrant Responsibility Act of 1996
IJ    Immigration Judge
INA    or the Act Immigration and Nationality Act
LGBTQI+    Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex
MPP    Migrant Protection Protocols
NGO    Non-Governmental Organization
NEPA    National Environmental Policy Act of 1969
NTA    Notice to Appear
OFO    Office of Field Operations
OHSS    Office of Homeland Security Statistics
POE    Port of Entry
RFA    Regulatory Flexibility Act
SWB    Southwest Land Border
TCO    Transnational Criminal Organization
TVPA    Trafficking Victims Protection Act of 2000
UC    Unaccompanied Child, having the same meaning as Unaccompanied Alien Child as defined at 6 U.S.C. 279(g)(2)
UDHR    Universal Declaration of Human Rights
UIP    U.S. Customs and Border Protection Unified Immigration Portal
UMRA    Unfunded Mandates Reform Act of 1995
UNHCR    United Nations High Commissioner for Refugees
USBP    U.S. Border Patrol
USCIS    U.S. Citizenship and Immigration Services
USCG    U.S. Coast Guard

**I. Public Participation**

Interested persons are invited to submit comments on the specific issues identified in Sections II.C.1 and IV of this preamble by submitting relevant written data, views, comments, and arguments by the deadline stated above. To provide the most assistance to the Departments, comments should explain the reason for any recommendation and include data, information, or authority that supports the recommended course of action. Comments must be submitted in English, or an English translation must be provided. Comments submitted in a manner other than pursuant to the instructions, including emails or letters sent to the Departments' officials, will not be considered comments on the rule and may not receive a response from the Departments.

*Instructions:* If you submit a comment, you must include the USCIS Docket No. USCIS–2024–0006 for this rulemaking. All submissions may be posted, without change, to the Federal eRulemaking Portal at *https://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary public comment submission you make to the Departments. The Departments may withhold information provided in comments from public viewing that they determine may impact the privacy of an individual or is offensive. For additional information, please read the Privacy and Security Notice available at *https://www.regulations.gov.*

*Docket:* For access to the docket and to read background documents or comments received, go to *https://www.regulations.gov,* referencing USCIS Docket No. USCIS–2024–0006. You may also sign up for email alerts on the online docket to be notified when comments are posted, or a final rule is published.

**II. Executive Summary**

*A. Background and Purpose*

1. Basis for the IFR

On June 3, 2024, the President signed Proclamation 10773 (''June 3 Proclamation'')[1] under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and

[1] As discussed in Section II.C.1 of this preamble, the President has since issued a proclamation amending portions of the June 3 Proclamation. That amending proclamation is referred to as the ''September 27 Proclamation'' in this preamble. Where the preamble refers to ''the Proclamation'' without specifying a date, it is referring to Proclamation 10773 as amended by the September 27 Proclamation.

**JA415**

STB_AR1_000002

suspending and limiting the entry of such noncitizens. 89 FR 48487, 48487–91 (June 7, 2024). The June 3 Proclamation directed DHS and DOJ to promptly consider issuing regulations addressing the circumstances at the southern border of the United States, including any warranted limitations and conditions on asylum eligibility. *Id.* at 48492. The Departments subsequently promulgated an IFR, effective June 5, 2024, "designed to implement the policies and objectives of the Proclamation by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances."[2] Securing the Border, 89 FR 48710, 48718 (June 7, 2024) ("the IFR").

The June 3 Proclamation and the IFR explain that, since 2021, as a result of political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, including at the southwest land border ("SWB"). 89 FR at 48487; *id.* at 48711 & n.3. In December 2023, migration levels at the SWB surged to the highest monthly total on record.[3] *Id.* at 48712 n.5. DHS assessed that the surge in late 2023 was likely the result of a number of factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools made available by Congress and the Government of Mexico's operational constraints caused by a lack of funding at the end of the 2023 calendar year, which limited its ability to enforce its own immigration laws. *Id.* at 48725 & n.115.

These sustained high encounter rates outstripped the Departments' abilities—based on available resources—to deliver timely decisions and consequences in significant numbers for those without a legal basis to remain in the United States. 89 FR at 48714. Due to its funding shortfall, DHS lacked adequate resources such as sufficient USCIS asylum officers ("AOs") to conduct fear screenings and sufficient temporary processing facilities, often called "soft-sides." *Id.* These factors limited DHS's ability to conduct credible fear interviews for individuals in U.S. Customs and Border Protection ("CBP") custody and to process and hold individuals in U.S. Immigration and Customs Enforcement ("ICE") custody during the expedited removal process. *Id.* The substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to impose timely consequences through expedited removal, the main consequence Congress has made available at the border under title 8 authorities. 89 FR at 48713–14. Consistent with past practice prior to the Title 42 public health Order, individuals who are subject to but cannot be processed under expedited removal due to resource constraints are instead generally released, after screening and vetting, pending removal proceedings under section 240 of the INA, 8 U.S.C. 1229a ("section 240 removal proceedings"), before an immigration judge ("IJ").

These higher encounter rates also place significant strain on the immigration courts. Recently, despite significant increases in the total number of IJs and case completions since Fiscal Year ("FY") 2021, newly initiated cases have far outpaced such completions.[4] Placing more noncitizens in section 240 removal proceedings before an IJ—rather than processing eligible noncitizens through the expedited removal process—only further contributes to the immigration court backlog, and those cases can take several years to conclude.[5] This strain is also particularly acute in light of EOIR's current underfunding. Rather than increase funding to support IJ team hiring, EOIR's FY 2024 budget was $16 million less than in FY 2023 and was $94.3 million less than its inflation-adjusted funding requirements (referred to as "Current Services").[6]

The Departments reasoned that their capacity to predictably deliver timely decisions and consequences is jeopardized by emergency border circumstances, which, left unmitigated, further add to the incentives and motivations for migrants to make the dangerous journey to the SWB, regardless of their ultimate likelihood of success on an asylum or protection application, and that the current immigration and asylum systems had become a driver for irregular migration[7] throughout the region and an increasingly lucrative source of income for dangerous transnational criminal organizations ("TCOs"). 89 FR at 48714. Despite the Departments' efforts to address these substantial levels of migration, strengthen the consequences in place at the border, and enhance the overall functioning of the immigration system, including through the

---

[2] The Departments use the term "emergency border circumstances" in this preamble to generally refer to situations in which high levels of encounters at the southern border exceed the Department of Homeland Security's ("DHS's") capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States. *See* 89 FR at 48711 & n.2.

[3] There were nearly 302,000 U.S. Customs and Border Protection ("CBP") encounters at and between ports of entry ("POEs") along the southwest land border ("SWB") in December 2023, higher than any previous month on record. Office of Homeland Security Statistics ("OHSS") analysis of July 2024 OHSS Persist Dataset [Encounters Fiscal Year ("FY") 2000–2024]; 89 FR at 48714 n.21; *see also* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables* (last updated Sept. 6, 2024), *https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables* (SWB encounters from FY 2014 through December 2023). OHSS figures are generally rounded throughout this preamble.

[4] *See* Executive Office of Immigration Review ("EOIR"), *Adjudication Statistics: New Cases and Total Completions* (July 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline*; EOIR, *Adjudication Statistics: Immigration Judge (IJ) Hiring* (July 2024), *https://www.justice.gov/eoir/media/1344911/dl?inline.*

[5] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated during that time were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR Strategic Plan 2024, EOIR's Strategic Context, Current Operating Environment, https://www.justice.gov/eoir/*

*strategic-plan/strategic-context/current-operating-enviroment* (last visited Sept. 20, 2024) ("EOIR . . . suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). Although EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving unaccompanied children ("UCs"). *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,254 days); EOIR, *Median Completion Times for Detained Cases* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 46 days in the second quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months).

[6] *See* Consolidated Appropriations Act, 2024, Public Law 118–42, 138 Stat. 25, 133; EOIR, *FY 2024 Budget Request at a Glance, https://www.justice.gov/d9/2023-03/eoir_fy_24_budsum_ii_omb_cleared_03.08.23.pdf.*

[7] As used in this preamble, "irregular migration" refers to the movement of people into another country unlawfully or without authorization. With respect to the United States' borders, the term "irregular" is used in this preamble to refer to physically entering between POEs or otherwise entering without documents sufficient for lawful admission, unless entering with advance authorization to travel or at a pre-scheduled time and place to present at a POE.

STB_AR1_000003

Circumvention of Lawful Pathways rule, 88 FR 31314 (May 16, 2023), these circumstances still existed as a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. 89 FR at 48711–13, 48715.

In the absence of congressional action, and consistent with the President's direction in the June 3 Proclamation to consider issuing regulations, the Departments adopted the provisions in the IFR, which were intended to address the emergency border circumstances and to substantially improve the Departments' ability to deliver timely decisions and consequences during such circumstances. *See* 89 FR at 48710. The IFR established a limitation on asylum eligibility that applies to certain individuals who enter irregularly across the southern border during emergency border circumstances and revised certain procedures applicable to the expedited removal process during such periods to reduce the time required to apply consequences to those individuals and remove noncitizens who do not have a legal basis to remain in the United States. *Id.* at 48715. The IFR was expected to achieve several benefits: reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; protect against overcrowding in border facilities; and reduce the ability of exploitative TCOs and smugglers to operate. *Id.* at 48745, 48767.

2. The Departments' Experience With the IFR

The IFR's limitation on asylum eligibility and revised procedures are working as intended, though as discussed below, the Departments have determined that modest adjustments to the threshold calculations are warranted. As explained in the paragraphs that follow, in the weeks since June 5, 2024, U.S. Border Patrol ("USBP") encounters between the ports of entry ("POEs") have dropped markedly. Although the Departments believe that this has occurred for a range of reasons, one important reason is that the rule itself has significantly shifted incentives at the southern border. As explained further below, and consistent with the explanation provided in the IFR, the rule has, at least in part, significantly improved DHS's ability to place into expedited removal a majority of single adults and individuals in family units encountered by USBP; to

avoid large-scale releases of such individuals into the United States pending section 240 removal proceedings; and to allow for swift resolution of such individuals' cases and, where appropriate, their removal. *See id.* At the same time, the Departments have continued to implement the largest expansion of lawful, safe, and orderly pathways and processes [8] for individuals to come to the United States and to uphold the United States' non-refoulement obligations under international law.

In the period between June 5, 2024, and August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and IFR have fallen 59 percent from the level of average daily encounters during the immediate post-pandemic period, *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023,[9] and before the IFR entered into effect on June 5, 2024.[10] This dramatic decrease in encounters has spanned multiple demographic categories. For instance, DHS has observed a drop in encounters of family units, a demographic category that presents particular operational challenges. During the immediate post-pandemic period, DHS experienced an average of about 2,000 daily encounters of individuals in family units.[11] Since the Departments issued the IFR, that daily average has dropped 70 percent to

about 600 individuals in family units encountered daily.[12] Other significant drops in encounter numbers occurred with single adults and unaccompanied children ("UCs").[13]

In contrast to processing before the IFR, DHS is now placing the majority of single adults and individuals in family units encountered by USBP at the SWB into expedited removal. Between June 5, 2024, and August 31, 2024, DHS placed 59 percent of these noncitizens into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order.[14] In the pre-pandemic period,[15] DHS placed 41 percent of such noncitizens into expedited removal proceedings.[16] The decrease in the number of encounters at the SWB directly enabled DHS's increased placement rate of noncitizens into expedited removal proceedings. Because encounter levels have decreased, DHS is able to use its operational resources to refer a higher percentage of noncitizens into expedited removal proceedings and deliver timely consequences in a greater proportion of cases.[17] The IFR is remedying the

---

[8] The terms "lawful pathways," "lawful, safe, and orderly pathways," "lawful pathways and processes," and "lawful, safe, and orderly pathways and processes," as used in this preamble, refer to the range of pathways and processes by which migrants are able to enter the United States or other countries in a lawful, safe, and orderly manner, including to seek asylum and other forms of protection or other immigration benefits for which they may be eligible.

[9] While the rule's effective date was May 11, 2023, 88 FR at 31314, the rule only applies to noncitizens who enter the United States "[s]ubsequent to the end of implementation of the Title 42 public health Order[,]" 8 CFR 208.33(a)(1)(ii), which expired at 11:59 p.m. on May 11, 2023, *see* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Security Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.* Therefore, the Circumvention of Lawful Pathways rule began to apply on May 12, 2023.

[10] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from the U.S. Customs and Border Protection Unified Immigration Portal ("UIP") on September 3, 2024 (Summary Statistics tab). There was an average of about 2,100 total encounters per day (including all demographic groups) between POEs at the SWB from June 5, 2024, to August 31, 2024, compared to around 5,100 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

[11] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[12] OHSS analysis data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[13] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[14] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[15] Throughout this preamble the "pre-pandemic period" refers to FY 2014 to FY 2019.

[16] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab). DHS reinstated removal orders for a larger share of single adults and individuals in family units during the pre-pandemic period (26 percent during the pre-pandemic period compared to 14 percent under the interim final rule ("IFR")), which is unsurprising given that the Departments are seeing fewer repeat encounters as a result of the higher proportion of non-Mexicans/non-northern Central Americans—with more limited migration histories—as a share of total encounters. *Id.;* 89 FR at 48721 n.49. Notably, the sum of reinstatements and expedited removals is still higher during the IFR (a combined 73 percent) than it was during the pre-pandemic period (67 percent). OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[17] The most effective way to deliver timely consequences to noncitizens who enter irregularly is through the expedited removal system, but DHS's capacity to use that system on a large scale is subject to resource constraints. One such constraint is space to hold noncitizens in DHS custody during the expedited removal process. Because noncitizens in expedited removal are subject to detention, including during the pendency of their credible fear proceedings, the use of expedited removal may lead to an increase in the time that an individual spends in CBP custody. This is particularly the case when the individual is receiving their credible fear interview while in CBP custody. When there are high numbers of individuals placed in expedited removal, the number of individuals who remain in CBP custody for a lengthier period can increase rapidly, leading to overcrowded conditions. In

Continued

**STB_AR1_000004**

negative effects of the previously sustained high encounter numbers described in the IFR and in this rule. *See, e.g.,* 89 FR at 48749 ("In order to maximize the consequences for those who cross unlawfully or without authorization, DHS endeavors to deliver consequences swiftly to the highest proportion of individuals who fail to establish a legal basis to remain in the United States. This includes, subject to available resources, referring the maximum number of eligible individuals possible into expedited removal to quickly adjudicate their claims.").

Relatedly, the IFR has also significantly reduced the percentage of noncitizens encountered between POEs at the SWB who are released into the United States pending completion of their section 240 removal proceedings. For instance, from June 5, 2024, through August 31, 2024, USBP placed 25 percent of noncitizens encountered at the SWB into section 240 removal proceedings.[18] This is down 41 percentage points from the immediate post-pandemic period, when USBP placed 66 percent of such noncitizens into section 240 removal proceedings, translating to a reduction of over 60 percent.[19] Similarly, between June 5, 2024, and August 31, 2024, 33 percent of all noncitizens encountered at the SWB were sent to Enforcement and Removal Operations ("ERO"); this figure is up from 19 percent during the immediate post-pandemic period.[20]

_____

addition, given the nature of CBP facilities—which are designed for short-term temporary holding—CBP endeavors to move all individuals out of custody in an expeditious manner and to avoid overcrowding.

Thus, if high encounter levels result in a significant number of individuals in CBP custody, or if those individuals have been in custody for a significant period of time, CBP may lose optionality: having lost the capacity to place additional noncitizens into the expedited removal process, CBP generally must take steps to release some individuals from custody to ensure safe and sanitary conditions and appropriate time in custody. In cases when release is appropriate or warranted, CBP generally issues an individual a Notice to Appear ("NTA") before an immigration judge ("IJ") prior to their release from custody. Although in some circumstances transfer of such noncitizens to U.S. Immigration and Customs Enforcement ("ICE") for detention for the duration of the credible fear process is possible, the ability to do so is dependent on the availability of space in ICE's already significantly strained detention network. Therefore, when ICE detention space is unavailable, noncitizens must then be processed by CBP through non-expedited removal pathways.

[18] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[19] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[20] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

The IFR's change to how DHS immigration officers identify and refer noncitizens for credible fear interviews has resulted in a reduction of such referrals. Under the IFR, during emergency border circumstances, instead of asking specific questions about fear or providing lengthy advisals, DHS refers a noncitizen for such an interview if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to the noncitizen's country or the country of removal. From June 5, 2024, through August 31, 2024, 27 percent of noncitizens encountered between POEs at the SWB and processed for expedited removal indicated an intention to apply for asylum or a fear of persecution or torture, compared with a 37 percent fear-claim rate during the pre-pandemic period and 57 percent during the immediate post-pandemic period.[21] In the IFR, DHS explained that based on its extensive experience administering the expedited removal process, it concluded that the affirmative questions asked under steady state operations are suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection. 89 FR at 48743.[22] The shift to a manifestation standard has, as intended, reduced the gap between high rates of referrals and screen-ins and historic ultimate grant rates as well as increased processing efficiency for DHS, and noncitizens who manifest or claim a fear, or who indicate an intention to apply for asylum, still have their claims adjudicated as required by the INA.

The shift to a "reasonable probability" standard for screening for statutory withholding of removal and protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465

_____

[21] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[22] From FY 2014 through 2019, of total SWB encounters processed for expedited removal and then referred to section 240 proceedings, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n.219; OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab). During that same period, 37 percent of SWB encounters processed for expedited removal claimed fear, and 76 percent of those who claimed fear were screened in and referred to section 240 removal proceedings. OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

U.N.T.S 85,[23] has further reduced the difference between high screen-in rates and historically low ultimate grant rates of protection or relief. Overall, of those USBP has referred for credible fear interviews, the comprehensive screen-in rate has dropped to 57 percent, compared to 83 percent during the pre-pandemic period and 62 percent during the immediate post-pandemic period.[24] Of USBP encounters screened by USCIS under the rule's "reasonable probability" standard, the screen-in rate has decreased to approximately 48 percent[25] compared to 76 percent[26] under the "significant possibility" standard during the pre-pandemic period, and approximately 51 percent[27] for those screened under the Circumvention of Lawful Pathway rule's lower "reasonable possibility" standard.[28] The Departments believe the lower screen-in rate under the IFR better

_____

[23] In this preamble, consistent with the IFR, the Departments generally refer to protection under the regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") as "CAT protection." *See, e.g.,* 89 FR at 48716.

[24] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Data for immediate post-pandemic and IFR periods are limited to SWB encounters between POEs. The comprehensive screen-in rate includes positive determinations issued by U.S. Citizenship and Immigration Services ("USCIS"), cases where an IJ vacated USCIS's negative determination, and cases administratively closed by USCIS in which a discretionary NTA was issued. For cases processed under either the Circumvention of Lawful Pathways rule or the IFR, the comprehensive screen-in rate encompasses cases where USCIS or an IJ determined that the noncitizen was found not subject to the Circumvention of Lawful Pathways rule's rebuttable presumption or the IFR's limitation on asylum eligibility under the significant possibility standard, in addition to cases screened-in under the "reasonable possibility" or "reasonable probability" standards, as applicable.

[25] OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab, Line 9 divided by Line 8). Data are limited to SWB encounters between POEs.

[26] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Historic ERCF Results tab). Data are limited to SWB encounters between POEs.

[27] OHSS analysis of July 2024 Persist Dataset (Fear Screening—CLP tab, Line 13 divided by Line 12). Data are limited to SWB encounters between POEs.

[28] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Although in the preamble to the IFR, DHS anticipated that the manifestation approach "will likely lead to a higher proportion of those referred having colorable claims for protection[,]" *see* 89 FR at 48743, USCIS screen-in rates have dropped slightly, as noted above, *see* OHSS analysis of June 2024 Enforcement Lifecycle dataset, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Historic ERCF Results, Fear Screening—STB, and Fear Screening—CLP tabs). There could be multiple reasons for this development, including the effects of the "manifestation" and "reasonable probability" provisions, which are difficult to disentangle.

STB_AR1_000005

aligns with the percentage of noncitizens who have historically been granted protection or relief. That is to say, noncitizens screened under the higher ''reasonable probability'' standard that receive positive findings are more likely to have meritorious claims in ultimate adjudications.

As a result of the IFR, DHS is able to more quickly remove a greater percentage of those who do not have a legal basis to remain in the United States. In the pre-pandemic period, the median processing time for a noncitizen encountered by USBP with a negative fear determination in expedited removal was 75 days from encounter to removal.[29] During the immediate post-pandemic period, this metric dropped to 44 days.[30] From June 5, 2024, through August 31, 2024, the metric dropped again to 32 days.[31] Similarly, the processing time from when a noncitizen is referred for a credible fear interview to when the noncitizen receives a fear determination is down 58 percent compared to the immediate post-pandemic period and down 71 percent compared to the pandemic period.[32] The Departments attribute the decreased processing time to key provisions of the IFR. For instance, the manifestation of fear provision has resulted in streamlined processing and a lower percentage of individuals indicating fear, thereby shortening the average processing time as those who do not indicate fear do not receive a screening by an AO or review by an IJ prior to removal. Then, for those who indicate fear, following a minimum consultation period that DHS reduced through separate guidance,[33] AOs, supervisory

AOs, and IJs have been applying the IFR's reasonable probability screening standard. In addition, between June 5, 2024, and August 31, 2024, 32 percent of all noncitizens encountered at the SWB were removed or returned to their home country or to Mexico directly from USBP custody.[34] This is double the rate of repatriations from USBP custody (16 percent) that occurred during the immediate post-pandemic period.[35] Overall, from June 5, 2024, through August 31, 2024, DHS has removed or returned 70 percent of single adults and individuals in family units encountered by USBP.[36] This contrasts with a 28-percent rate during the immediate post-pandemic period.[37] Viewed in terms of daily averages, under the IFR through August 31, 2024, there have been about 1,880 daily encounters of single adults and individuals in family units.[38] And DHS has averaged about 1,320 total daily repatriations and 580 releases from CBP custody pending immigration proceedings over that time frame.[39]

Faster repatriations free up DHS resources and capacity for processing new arrivals, allowing for further increases in the use of expedited removal and fewer releases pending completion of section 240 removal proceedings. These successes disrupt the ''vicious cycle'' the Departments sought to counteract in issuing the IFR. 89 FR at 48714; *see id.* at 48751 (''This reality contributes to the vicious cycle . . . in which increasing numbers of releases lead to increased migration, fueled by the narrative, pushed by smugglers, that migrants who are

encountered at the border will be allowed to remain and work in the United States for long periods of time.'').

Meanwhile, noncitizens have continued to use lawful, safe, and orderly pathways and processes to seek entry to the United States. For example, the use of the CBP One mobile application (''CBP One app'') to schedule an appointment at a SWB POE is an available tool that permits noncitizens to present themselves at the border in a lawful, safe, and orderly manner. From June 5, 2024, through August 31, 2024, approximately 123,500 noncitizens with CBP One appointments presented at SWB POEs and were accordingly processed outside of the procedures set forth in the IFR.[40] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); section 3(b)(v)(D) of the Proclamation. During the pre-pandemic period, approximately 300 encounters were processed at SWB POEs per day.[41] Since the launch of the CBP One app in January 2023, approximately 1,500 encounters have been processed at SWB POEs each day (with and without CBP One appointments).[42] And from the start of FY 2024 through August 31, 2024, that average increased to approximately 1,700 per day.[43] Other lawful pathways that continue to be available include expanded parole processes for specific populations and demographics such as nationals of Cuba, Haiti, Nicaragua, and Venezuela (''CHNV''), which allow certain individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit; [44] the Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other services, access to information and referrals for humanitarian and family parole processes, labor pathways, expedited refugee processing, and other lawful, safe, and orderly pathways for eligible

---

[29] OHSS analysis of June 2024 Enforcement Lifecycle dataset (Summary Statistics tab).

[30] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[31] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[32] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[33] The Immigration and Nationality Act (''INA'') requires that the noncitizen be given information about the credible fear interview and provides the right for noncitizens in the credible fear process to consult with a person or persons of their choosing prior to the interview, so long as the consultation is conducted ''according to [duly prescribed] regulations.'' INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); *see* INA 103(a), 8 U.S.C. 1103(a); 6 U.S.C. 557. Under those regulations, including during circumstances in which the measures in the IFR apply, consultation shall be at no expense to the Government, and consultations ''shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, . . . and shall not unreasonably delay the process.'' 8 CFR 235.3(b)(4)(ii), 235.15(a). The regulations do not require that the noncitizen be allowed a particular amount of time to consult with the person or persons of their choosing. *Id.* On June 4, 2024, to support implementation of the

Proclamation and IFR, as a matter of internal policy, USCIS reduced the minimum consultation period for noncitizens subject to the rule's provisions from at least 24 hours to at least 4 hours beginning at the time ICE or CBP provides the noncitizen with the opportunity to consult and continuing only during the hours of 7 a.m. and 7 p.m. local time. *See* Memorandum for Jennifer B. Higgins, Deputy Dir., USCIS, from Ted Kim, Assoc. Dir., Refugee, Asylum, and Int'l Operations Directorate, USCIS, *Re: Scheduling of Credible Fear Interviews While the Measures in the Securing the Border Interim Final Rule Apply* (June 4, 2024).

[34] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[35] OHSS analysis of July 2024 Persist Dataset (Summary Statistics tab).

[36] DHS encountered 165,000 single adults and individuals in family units between June 4, 2024, and August 31, 2024, and had repatriated 119,000 of them as of September 3, 2024. OHSS analysis of data downloaded from UIP on Sept. 3, 2024 (IFR Details tab).

[37] During that time period, there were 1.87 million such encounters with noncitizens other than UCs, of which 511,000 noncitizens were repatriated. OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab).

[38] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab).

[39] *Id.*

---

[40] *Id.*

[41] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[42] *Id.* On June 30, 2023, CBP announced the expansion of available appointments for noncitizens through the CBP One mobile application (''CBP One app'') to 1,450 per day, up from 1,250. Cumulatively, the expansion to 1,450 appointments represented a nearly 50 percent increase from May 12, 2023, when CBP processed 1,000 appointments per day. *See* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day.*

[43] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[44] USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last reviewed/updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

STB_AR1_000006

**JA419**

individuals to the United States and other countries; [45] country-specific family reunification parole processes for certain nationals of Colombia, Cuba, Ecuador, El Salvador, Guatemala, Haiti, and Honduras who have qualifying U.S. citizen relatives in the United States; [46] and temporary nonimmigrant worker visas, which provide employment opportunities for eligible individuals.[47]

Thus, the provisions of the IFR and other measures taken to assist in the IFR's implementation are effective tools in managing levels of irregular migration that, absent key policy interventions like this rule, severely strain the Departments' abilities to safely, effectively, and humanely enforce and administer U.S. immigration laws. The historically high level of encounters that DHS experienced in the months before the IFR's implementation has decreased markedly, and DHS's ability to expeditiously process noncitizens and deliver swift consequences to those who do not establish a legal basis to remain in the United States has therefore improved significantly.

*B. Legal Authority*

The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning consideration of claims for asylum, statutory withholding of removal, and protection under regulations implemented pursuant to U.S. obligations under Article 3 of the CAT. The Homeland Security Act of 2002 (''HSA''), Public Law 107–296, 116 Stat. 2135, as amended, created DHS and transferred to the Secretary of Homeland Security many functions related to the administration and enforcement of Federal immigration law while maintaining some functions and authorities with the Attorney General, including some shared concurrently with the Secretary.[48]

The INA, as amended by the HSA, charges the Secretary ''with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens,'' except insofar as those laws assign functions to certain other officers. INA 103(a)(1), 8 U.S.C. 1103(a)(1). The INA grants the Secretary the authority to establish regulations and take other actions that the Secretary deems ''necessary for carrying out'' the Secretary's authority under the immigration laws. INA 103(a)(3), 8 U.S.C. 1103(a)(3); *see also* 6 U.S.C. 202.

The HSA provides the Attorney General with ''such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by [EOIR], or by the Attorney General with respect to [EOIR].'' INA 103(g)(1), 8 U.S.C. 1103(g)(1); *see also* 6 U.S.C. 521(a). In addition, under the HSA, the Attorney General retains authority to ''establish such regulations, . . . issue such instructions, review such administrative determinations in immigration proceedings, delegate such authority, and perform such other acts as the Attorney General determines to be necessary for carrying out'' the Attorney General's authorities under the immigration laws. INA 103(g)(2), 8 U.S.C. 1103(g)(2).

Under the HSA, the Attorney General retains authority over the conduct of section 240 removal proceedings. These adjudications are conducted by IJs within DOJ's EOIR. *See* 6 U.S.C. 521(a); INA 103(g)(1), 8 U.S.C. 1103(g)(1); 8 CFR 1240.1. With limited exceptions, IJs adjudicate asylum, statutory withholding of removal, and CAT protection applications filed by noncitizens during the pendency of section 240 removal proceedings, including asylum applications referred by USCIS to the immigration court. INA 101(b)(4), 8 U.S.C. 1101(b)(4); INA 240(a)(1), 8 U.S.C. 1229a(a)(1); INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 1208.2(b), 1240.1(a); *see also Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals (''BIA''), also within DOJ's EOIR, in turn hears appeals from IJ decisions. *See* 8 CFR 1003.1(a)(1), (b)(3); *see also Garland* v. *Ming Dai,* 593 U.S. 357, 366–67 (2021) (describing appeals from IJs to the BIA). And the INA provides that the ''determination and ruling by the Attorney General with respect to all questions of law shall be controlling.'' INA 103(a)(1), 8 U.S.C. 1103(a)(1).

In addition to the separate authorities discussed above, the Attorney General and the Secretary share some authorities. Section 208 of the INA, 8 U.S.C. 1158, authorizes the ''Secretary of Homeland Security or the Attorney General'' to ''grant asylum'' to a noncitizen ''who has applied for asylum in accordance with the requirements and procedures established by'' the Secretary or the Attorney General under section 208 if the Secretary or the Attorney General determines that the noncitizen is a ''refugee'' within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A). INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A). Section 208 thereby authorizes the Secretary and the Attorney General to ''establish[ ]'' ''requirements and procedures'' to govern asylum applications. *Id.* The statute further authorizes them to ''establish,'' ''by regulation,'' ''additional limitations and conditions, consistent with'' section 208, under which a noncitizen ''shall be ineligible for asylum.'' INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to ''provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]'').[49] The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2); *see also, e.g.,* INA 235(b)(1)(B)(iii)(III), (B)(iv), (C), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (B)(iv), (C).

The INA and HSA grant DHS the authority to adjudicate asylum applications and to conduct credible fear interviews, make credible fear determinations in expedited removal proceedings, and establish procedures for further consideration of asylum applications after an individual is found to have a credible fear. INA 103(a)(1), (a)(3), 8 U.S.C. 1103(a)(1), (a)(3); INA 208(b)(1)(A), (d)(1), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (d)(1), (d)(5)(B); INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B); *see also* 6 U.S.C. 271(b)(3) (providing for the transfer of adjudication of asylum and

---

[45] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Aug. 23, 2024).

[46] *See* USCIS, *Family Reunification Parole Processes* (last reviewed/updated Sept. 10, 2024), *https://www.uscis.gov/FRP.*

[47] *See* USCIS, *Temporary (Nonimmigrant) Workers* (last reviewed/updated July 24, 2024), *https://www.uscis.gov/working-in-the-united-states/temporary-nonimmigrant-workers.*

[48] The Homeland Security Act of 2002 (''HSA'') further provides, ''Nothing in this Act, any amendment made by this Act, or in section 103 of the [INA], as amended . . . , shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General.'' 116 Stat. at 2274 (codified at 6 U.S.C. 522).

[49] Under the HSA, the references to the ''Attorney General'' in the INA also encompass the Secretary with respect to statutory authorities vested in the Secretary by the HSA or subsequent legislation, including in relation to immigration proceedings before DHS. 6 U.S.C. 251, 271(b)(3), (5), 557.

**STB_AR1_000007**

refugee applications from the Commissioner of Immigration and Naturalization to the Director of the Bureau of Citizenship and Immigration Services, now USCIS); 6 U.S.C. 557 (providing that references to any officer from whom functions are transferred under the HSA are to be understood as referring to the Secretary of Homeland Security). Within DHS, AOs conduct credible fear interviews, make credible fear determinations, and determine whether a noncitizen's asylum application should be granted, all of which are subject to review by a supervisory AO. *See* 8 CFR 208.2(a), 208.9, 208.14(b), 208.30(b), (e)(6)(i), (e)(8). The INA grants IJs the authority to review AO negative credible fear determinations. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (''Refugee Protocol''), which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (''Refugee Convention''). Article 33.1 of the Refugee Convention generally prohibits parties to the Convention from expelling or returning (''refouling'') ''a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.'' Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176.

Because the Refugee Protocol is not self-executing,[50] Congress implemented these non-refoulement obligations through the INA, as amended by the Refugee Act of 1980, Public Law 96–212, 94 Stat. 102 (''Refugee Act''). *See* 8 U.S.C. 1253(h) (1952); *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 174–77 (1993) (describing the history of the statutory withholding provision and the Refugee Act amendments). The Supreme Court has long recognized that the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (''statutory withholding of removal''), which provides that a noncitizen may not be removed to a country where their life or freedom would be threatened on account of one

of the protected grounds listed in Article 33 of the Refugee Convention.[51] *See* INA 241(b)(3), 8 U.S.C. 1231(b)(3); *see also* 8 CFR 208.16, 1208.16. The INA also authorizes the Secretary and the Attorney General to implement statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* INA 103(a)(1), (3), (g)(1)–(2), 8 U.S.C. 1103(a)(1), (3), (g)(1)–(2).

The Departments also have authority to implement Article 3 of the CAT, which is likewise not self-executing.[52] The Foreign Affairs Reform and Restructuring Act of 1998 (''FARRA'') delegates to the Departments the authority to ''prescribe regulations to implement the obligations of the United States under Article 3 of the [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention.'' Public Law 105–277, div. G, sec. 2242(b), 112 Stat. 2681, 2681 (codified at 8 U.S.C. 1231 note). Consistent with FARRA, DHS and DOJ have implemented in the Code of Federal Regulations the United States' obligations under Article 3 of the CAT. *See, e.g.,* 8 CFR 208.16(c)–208.18, 1208.16(c)–1208.18; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999), amended by 64 FR 13881 (Mar. 23, 1999).

This rule is necessary because, although the Proclamation recognizes that the asylum system has contributed to the border emergency, the Proclamation itself does not and cannot affect noncitizens' right to apply for asylum, their eligibility for asylum, or asylum procedures. This recognition that section 212(f) does not affect the right to pursue a claim for asylum has been the Executive Branch's consistent position for four decades.[53] That

longstanding understanding follows from the text and structure of the governing statutes. Section 212(f) provides that under certain circumstances, the President may ''suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.'' INA 212(f), 8 U.S.C. 1182(f). Although this provision—first enacted in 1952—''grants the President broad discretion,'' it ''operate[s]'' only within its ''sphere.'' *Trump* v. *Hawaii,* 585 U.S. 667, 683–84, 695 (2018). Section 212 of the INA, 8 U.S.C. 1182 (entitled ''Inadmissible aliens''), generally ''defines the universe of aliens who are admissible'' and ''sets the boundaries of admissibility into the United States.'' *Id.* at 695. Hence, when section 212(f) authorizes the President to suspend ''entry,'' it ''enabl[es] the President to supplement the other grounds of inadmissibility in the INA,'' *id.* at 684 (citing *Abourezk* v. *Reagan,* 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986)), and to bar individuals from entry into the United States.

This authority, though broad, does not authorize the President to override the asylum statute.[54] First enacted in the Refugee Act, the asylum statute today provides that ''[a]ny alien who is physically present in the United States or who arrives in the United States[,]

---

[51] *See* INS v. *Aguirre-Aguirre,* 526 U.S. 415, 426–27 (1999); *see also* INS v. *Cardoza-Fonseca,* 480 U.S. 421, 440–41 (1987) (distinguishing between Article 33's non-refoulement prohibition, which aligns with what was then called withholding of deportation, and Article 34's call to ''facilitate the assimilation and naturalization of refugees[,]'' which the Court found aligned with the discretionary provision in section 208 of the INA, 8 U.S.C. 1158).

[52] *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) (''This multilateral treaty is non-self-executing and thus does not itself create any rights enforceable in U.S. courts.'' (citation omitted)).

[53] In 1984, then-Assistant Attorney General for the Office of Legal Counsel Theodore B. Olson advised that section 212(f) did not permit the President to eliminate the asylum rights of noncitizens who had hijacked a plane and, as a condition of the plane's release, been flown to the United States. And in 2018, the Departments reaffirmed that ''[a]n alien whose entry is suspended or restricted under . . . a [section 212(f)]

proclamation, but who nonetheless reaches U.S. soil contrary to the President's determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws[,]'' including ''expedited-removal proceedings'' where they could ''raise any claims for protection[.]'' *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55940 (Nov. 9, 2018). Although Presidents have invoked section 212(f) at least 90 times since 1981, to the Departments' knowledge, none of those proclamations were understood to affect the right of noncitizens on U.S. soil to apply for, or noncitizens' statutory eligibility to receive, asylum. Kelsey Y. Santamaria et al., Cong. Rsch. Serv., *Presidential Authority to Suspend Entry of Aliens Under 8 U.S.C. 1182(f)* (updated Feb. 21, 2024). At the same time, nothing in the proclamations or the INA has precluded the Departments from considering as an adverse discretionary criterion that a noncitizen is described in a section 212(f) proclamation.

[54] The Supreme Court, though it has never squarely addressed this issue, has also never indicated that section 212(f) confers power to affect asylum rights of those present in the United States. *Cf., e.g., Sale,* 509 U.S. at 164 n.13, 174–77, 187–88 (upholding a Coast Guard program of intercepting migrant vessels and returning migrants to their home country, authorized in part by section 212(f), on the basis that statutory rights under the withholding of removal statute did not have ''extraterritorial application'' to migrants who were not physically present); *Hawaii,* 585 U.S. at 689, 695 (assuming, without deciding, that section 212(f) ''does not allow the President to expressly override particular provisions of the INA[,]'' while emphasizing the particular ''sphere[ ]'' in which it operates).

---

[50] *E.g., Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.'' (citations omitted)).

**STB_AR1_000008**

. . . irrespective of such alien's status, may apply for asylum.'' INA 208(a)(1), 8 U.S.C. 1158(a)(1). The right to apply for asylum thus turns on whether a noncitizen is ''physically present'' or has ''arrive[d] in the United States.'' [55] *Id.* As a result, the power under section 212(f) to suspend ''entry'' does not authorize the President to override the asylum rights of noncitizens who have already physically entered the United States and who are entitled to an adjudication of eligibility under the applicable statutory and regulatory rules and standards.[56]

[55] Section 212(f) of the INA, 8 U.S.C. 1182(f), contrasts with 42 U.S.C. 265, which authorizes the Centers for Disease Control and Prevention (''CDC'') to temporarily suspend ''the right to introduce . . . persons and property'' into the United States if such suspension ''is required in the interest of the public health.'' During the COVID–19 pandemic and to prevent the ''serious danger of the introduction of [the] disease into the United States,'' 42 U.S.C. 265, the CDC issued a public health Order invoking section 265 to expel certain noncitizens generally without title 8 protections, including asylum applications. As the final rule implementing section 265 explained, that provision originates in a ''broad public health statute'' that Congress intended to ''operate[ ] separately and independently of the immigration power'' and authorizes the CDC ''to temporarily suspend the effect of any law[ ] . . . by which a person would otherwise have the right to be introduced . . . into the U.S.,'' *Control of Communicable Diseases; Foreign Quarantine: Suspension of the Right To Introduce and Prohibition of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes,* 85 FR 56424, 56426, 56442 (Sept. 11, 2020), including the immigration laws, *id.* at 56426 (noting that legislative history indicates that section 265's predecessor was intended to suspend immigration if public health required it). The drafting history of section 265 also confirms that Congress conferred authority to prohibit ''the introduction of persons'' in order to broaden this provision and that this provision subsumed but was not limited to the authority to ''suspend immigration[.]'' Br. for Appellants at 41–43, *Huisha-Huisha* v. *Mayorkas,* 27 F.4th 718 (D.C. Cir. 2022) (No. 21–5200); *see Huisha-Huisha,* 27 F.4th at 730–31 (determining plaintiffs not likely to succeed on their challenge to the CDC Order on the ground that it improperly suspended migrants' right to apply for asylum). Section 265 is a public-health authority under the Public Health Service Act. Its grant of authority to allow the CDC to temporarily suspend immigration laws in case of a public health emergency has no relevance to the interpretation of section 212(f), which is in title 8.

[56] For similar reasons, section 215(a) of the INA, 8 U.S.C. 1185(a), which the Proclamation also invokes, does not authorize the President to impose the condition and limitation on asylum eligibility created by this rule. *Cf. United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 540–47 (1950) (holding that under the precursor to section 215(a)(1) of the INA and the presidential proclamation and regulations issued pursuant to that provision, which during times of national emergency made it unlawful for ''any alien to . . . enter or attempt to . . . enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President shall prescribe[,]'' the Attorney General could issue regulations governing entry during such an emergency to ''deny [certain noncitizens] a hearing . . . in special cases'' notwithstanding the ordinary exclusion hearing

This rule, as discussed in the IFR and this preamble, is authorized because Congress has conferred upon the Secretary and the Attorney General express rulemaking power to create new conditions and limitations on asylum eligibility and create certain procedures for adjudicating asylum claims. INA 103(a)(1), (a)(3), (g), 8 U.S.C. 1103(a)(1), (a)(3), (g); INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B); INA 235(b)(1)(B)(iii)(III), (iv), 8 U.S.C. 1225(b)(1)(B)(iii)(III), (iv).

*C. Changes From the IFR to Final Rule*

The Departments issued the IFR, effective June 5, 2024, adopting provisions at 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), and 1208.35 that effectuated three key changes to eligibility for asylum and the expedited removal process for noncitizens who are encountered at the southern border during the emergency border circumstances giving rise to the suspension and limitation on entry under the June 3 Proclamation: (1) adding a limitation on asylum eligibility, subject to an exception for exceptionally compelling circumstances, that is considered during credible fear screenings in addition to its application during adjudications on the merits; (2) rather than asking specific questions of every noncitizen encountered and processed for expedited removal, providing general notice regarding the process for seeking asylum, statutory withholding of removal, or CAT protection and referring a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to his or her country or the country of removal; and (3) for those found not to have a credible fear of persecution for asylum purposes because they could not establish a significant possibility that they are not subject to or are exempt from the limitation on asylum eligibility, screening for potential eligibility for statutory withholding of removal and CAT protection under a ''reasonable probability'' standard.

Following careful consideration of public comments received and the Departments' experiences implementing the IFR's provisions since early June 2024, the Departments have made

provisions governing entry). This does not mean, however, that the President is prohibited from invoking section 215(a) as authority to impose reasonable rules, regulations, and orders on asylum applicants and asylees, such as travel document requirements for re-entry and departure controls.

modifications to the regulatory text adopted in the IFR, as described below. The rationale for the provisions adopted in the IFR and the reasoning provided in the IFR's preamble remain valid, except as distinguished in this regulatory preamble.

1. Changes to the IFR's Thresholds

On September 27, 2024, the President issued a proclamation amending the June 3 Proclamation. *See* Presidential Proclamation of September 27, 2024, *Amending Proclamation 10773* (''September 27 Proclamation''). Following the issuance of the IFR, the Departments have closely monitored its implementation and results across the southern border. The Departments recommended to the President adjustments to the Proclamation based on their experiences implementing the Proclamation and IFR. Following those recommendations, the President issued the September 27 Proclamation, which amended section 2 of the June 3 Proclamation in two ways. First, section 2(a) of the June 3 Proclamation provided that the suspension and limitation on entry would be discontinued at 12:01 a.m. eastern time on the date that is 14-calendar-days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of fewer than 1,500 encounters between POEs. As amended by the September 27 Proclamation, the 7-consecutive-calendar-day average must remain below 1,500 encounters between POEs for 28-consecutive-calendar-days before the 14-calendar-day waiting period is triggered.[57] Second, the September 27 Proclamation deleted section 2(c) of the June 3 Proclamation, which provided that UCs [58] from non-contiguous countries shall not be included in calculating the number of encounters for purposes of section 2(a) and 2(b) of the June 3 Proclamation.

The Departments are implementing changes in this final rule that parallel those made in the September 27 Proclamation. Specifically, the Departments are revising §§ 208.13(g) and 1208.13(g) to refer to ''the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section.'' Paragraph (h) of each section now defines ''Presidential Proclamation of June 3, 2024'' as referring to

[57] As an illustration, for any given day, DHS will calculate the average number of encounters for that day and the prior 6 calendar days *i.e.,* the 7-consecutive-calendar-day average. If that average remains below 1,500 for 28 consecutive calendar days, the 14-day waiting period will begin.

[58] In this preamble, as in the Proclamation, the terms ''unaccompanied children'' or ''UCs'' have the same meaning as the term ''unaccompanied alien child[ren]'' under 6 U.S.C. 279(g)(2).

STB_AR1_000009

''Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024[ ]'' for the purpose of §§ 208.13(g), 208.35, and 235.15 (in the case of § 208.13(h)) and §§ 1208.13(g) and 1208.35 (in the case of § 1208.13(h)). The Departments are also making conforming changes in §§ 208.35, 235.15, and 1208.35. To ensure that the rule can function even if the September 27 Proclamation were rendered inoperative by court order, and consistent with the September 27 Proclamation, the Departments have also included a severability clause in both §§ 208.13(h) and 1208.13(h).

The Departments believe that shifting to the 28-consecutive-calendar-day requirement for this rule, in parallel with the changes made in the September 27 Proclamation, is necessary to ensure that the rule's measures discontinue only once there has been a durable and sustained decrease in encounters at the southern border such that the emergency border circumstances have in fact abated. Premature and frequent discontinuations of the rule's measures, as discussed below, would increase the risk of sizeable and disruptive surges and could undermine the message the Departments intend the rule to send, which is to discourage noncitizens from utilizing irregular migration and the services of smugglers and TCOs to enter the United States. In the IFR, the Departments explained that at 1,500 daily encounters between POEs, ''DHS would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries.'' 89 FR at 48752. The Departments further explained that ''[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained.'' 89 FR at 48749 n.248. The changes made here further both purposes.

Requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters for 28 consecutive calendar days instead of one calendar day will guard against a circumstance in which the threshold for discontinuation is met solely due to a short-term, erratic decrease (such as a short-term holiday downturn [59] or a decrease due to an

extreme weather event) that does not signal a meaningful reduction in overall migration pressures. Such short-term decreases could force the provisions of the rule to trigger on and off more frequently, causing operational strain while also signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided by waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing. Moreover, if the Departments had opted for a substantially smaller number of consecutive days, there is a significant risk that the rule would deactivate due to a transient drop due to holidays, weather, or another cause, which can lead to several weeks of uncharacteristically low encounters. At the same time, a 28-day period is still a short enough period to ensure a timely response when an actual, sustained downturn occurs. The Departments have therefore decided that 28 days strikes an appropriate balance.

The Departments' experience since the IFR's implementation has informed their view that the limited changes made by this rule are necessary to provide greater assurance that a decrease is likely to be sustained and to guard against costly toggling of the rule when a brief decrease proves not to be sustained. For one thing, this experience highlights the risk that under an approach that looks only to a 7-consecutive-calendar-day average, the rule might discontinue even though a reduction is unlikely to be sustained. Comparing the week ending June 4, 2024, to the week ending August 31, 2024, the Departments observed (as expected) a significant decrease in encounters at the southern border, but Mexico's government reported a much smaller decrease in encounters within Mexico.[60] This trend suggests that even

though the IFR has affected incentives for migrants to try to cross the U.S. border, migrants continue to travel towards the U.S. border in large numbers, and that even if the 7-consecutive-calendar-day average dropped below 1,500 encounters, that drop likely would not be sustained given the large and growing population of migrants in Mexico who could relatively quickly reach the U.S. border. Moreover, if the IFR's provisions did deactivate, that large and growing population in Mexico would be a ready target for smugglers and TCOs, increasing the risk of a surge following a discontinuation that does not reflect a truly sustained decrease in migration flows.

Adding this rule's 28-consecutive-day requirement reduces those concerns by providing for greater stability. With that change, the rule's provisions will not be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the IFR's 14-day waiting period after the Secretary makes the factual determination necessary to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy. Although the Departments recognize that this change does not eliminate the risk of the rule discontinuing even when regional migration flows remain high, they assess that this rule's approach better balances this risk against this rule's purpose as an exceptional measure to address emergency border circumstances that should not apply when encounters have fallen for a sustained period. The Departments further discuss later in this subsection why the rule's approach appropriately balances those considerations.

The Departments' concern is also consistent with some of the public comments received on the IFR. For instance, one commenter remarked that some migrants had concluded that they should congregate near the border in preparation for the Proclamation and IFR's measures to discontinue. Other commenters expressed concern regarding potential misunderstandings about the threshold for discontinuation. Given the reality that a surge remains possible, the Departments seek to avoid a situation where the emergency

---

[59] Short-term decreases that are not associated with changes in the fundamental drivers of migration have been especially notable during the end-of-year holiday season. From FY 2013 through FY 2024, SWB encounters fell by an average of 42 percent in the two weeks between December 23 and January 5, only to be followed by an average

increase of 41 percent in the two weeks between January 5 and January 18. *See* OHSS analysis of July 2024 Persist Dataset (USBP Encounters—Holiday Dip tab). Although the January rebound was less dramatic in 2023 and 2024, this historic pattern suggests that if average encounters heading into the holidays are even as low as the mid-2000s—well above the intended threshold for discontinuation of emergency circumstances—a short-term decrease could push the 7-day average number of encounters below 1,500 even though the fundamental drivers of high levels of migration have not changed. A metric based on a 7-day average would trigger a discontinuation of emergency circumstances in this scenario, but the likely January rebound means a 28-day metric would not.

[60] *See* OHSS analysis of data downloaded from UIP on September 3, 2024, and data provided by the Government of Mexico as of August 31, 2024 (Mexican Enforcement tab) (showing that comparing the week ending June 4, 2024, to the week ending August 31, 2024, total Mexican

enforcement apprehensions dropped 19 percent, while total U.S. Border Patrol (''USBP'') encounters dropped 48 percent).

STB_AR1_000010

measures in this rule are discontinued prematurely.

The Departments note that the existing 14-day waiting period before discontinuation once this threshold is reached will continue to help the Departments complete processing of noncitizens encountered during emergency border circumstances and to confirm that a sustained downward trend in encounters has been achieved. *See* 89 FR at 48749 n.248. At the same time, under the prior standard for discontinuation, a rapid shift between discontinuing and reactivating the rule's provisions would remain possible.[61] Such a shift would pose significant operational challenges.

Experience with the IFR suggests that rapidly switching between the rule's provisions discontinuing and reactivating would result in harmful operational burdens. For instance, upon implementation of the Proclamation and IFR, the Departments had to prioritize processing of individuals encountered prior to June 5. Therefore, USBP was unable to immediately maximize processing of the desired number of noncitizens through expedited removals.[62] USBP took 6 days to ramp up processing for expedited removal under the IFR, from about 60 encounters processed under the rule on June 5 to about 1,500 on June 10, which was the first day that a majority of encounters were processed for expedited removal under the rule.[63] Similarly, USBP released an average of about 930 post-June 4 encounters per day between June 5 and June 17, including 8 days of over 1,000 releases, before releases fell to an average of about 510 per day between June 18 and August 31, including an average of about 410 per day in August.[64] And although ICE repatriated approximately 38,500 single adults and members of family units from June 5 through July 31, 2024, only around

15,400 (40 percent) of them were encountered by USBP after June 4, 2024.[65] The rest were pre-June 5th USBP SWB encounters and pre- and post-June 5th Office of Field Operations ("OFO") encounters (39 percent) or non-SWB encounters and interior enforcement (21 percent).[66] USCIS did not complete its first credible fear interview under the IFR until June 9, 2024, and completed an average of about 20 interviews per day for the first two weeks after June 4, compared to an average of roughly 330 per day in the month of August.[67] EOIR did not conduct its first review of an adverse credible fear determination under the IFR until June 11, 2024, and averaged approximately 9 reviews per day in the first 3 weeks after June 4 compared to an average of about 90 per day in August.[68] The lag between the rule's activation and the Departments' ability to fully avail themselves of the rule's efficiencies means that when the provisions of the rule discontinue and then reactivate, the Departments' abilities to deliver timely decisions and consequences consistent with the rule's purpose may be unnecessarily impaired.

In addition, although the Departments continue to believe that the burden of shifting between applying this rule and the Circumvention of Lawful Pathways rule is warranted when there has been a sustained reduction in irregular migration, such a burden is much harder to justify in the context of a short-lived reduction in encounters followed by very high levels of encounters. For instance, USCIS required time to provide training, procedures, and guidance to the field before its staff could process credible fear referrals under the IFR. Additionally, EOIR required time to ensure IJs have sufficient docket capacity for any increase in credible fear reviews in response to any increased number of expedited removal cases. EOIR also required time to provide training to IJs who conduct credible fear reviews or who adjudicate cases involving individuals who enter the United States while the Proclamation and rule are in effect. To be sure, subsequent reactivation of the rule's measures will be easier given that the Departments' personnel will have become familiar with the rule's provisions. Nonetheless, reactivation will always require resources and

coordination within the workforce necessitating the need to ensure that discontinuations and reactivations do not occur with undue frequency.[69]

The Departments have also determined that it is appropriate and necessary to include UCs from non-contiguous countries in the encounter calculations relevant to discontinuing and continuing or reactivating the provisions of this rule, in parallel with the changes made in the September 27 Proclamation. Under the June 3 Proclamation and the IFR, the thresholds for such discontinuation and continuation or reactivation did not include encounters of such UCs. But as some commenters on the IFR correctly noted, excluding such encounters results in an unrealistic assessment of the Departments' resources and capabilities. All UCs (regardless of whether they came from a contiguous country or a non-contiguous country) require a greater proportion of resources to process and hold safely in CBP facilities and merit inclusion in the threshold calculations to accurately reflect this reality. For example, UCs in CBP custody generally must be referred to the Department of Health and Human Services' Office of Refugee Resettlement and transferred to its care within 72 hours after determining that the noncitizen is a UC, absent exceptional circumstances. 8 U.S.C. 1232(b)(3); *see also* 6 U.S.C. 279. Because of this, UCs are generally prioritized for processing in CBP facilities. The processing and treatment of UCs also include a number of other unique legal and policy requirements, such as conducting a thorough screening for trafficking and any claims of fear of return.[70] During their time in custody, UCs receive medical screenings and child-appropriate activities and humanitarian supplies. They also must generally be held separately from unrelated adults, impacting CBP's holding capacity. This means that DHS must expend resources to quickly process, refer, and transfer UCs to the Office of Refugee Resettlement's care. This time-consuming and resource-intensive process must always be followed for

---

[61] From FY 2013 through FY 2019, there were 2,014 days where the 7-consecutive-calendar-day average of USBP encounters (including encounters of UCs from non-contiguous countries) was below 1,500. OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab). Of those 2,014 days, 1,813 days (90 percent of the total) were also part of a period of time when the 7-consecutive-calendar-day average had remained below 1,500 for 28 consecutive days. *Id.* Thus, considering hypothetical lower-bound thresholds for the period FY 2013 through FY 2019, switching from the IFR's approach to this rule's approach would have reduced the number of below-threshold days by only 10 percent. *Id.* While it is too early in the post-IFR period to know the precise reduction in volatility it has brought about, requiring the 7-day average to remain below 1,500 encounters for 28 consecutive days may have a broadly similar effect.

[62] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[63] *Id.*

[64] *Id.*

[65] OHSS analysis of July 2024 Persist Dataset (IFR Ramp Up tab).

[66] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Ramp Up tab).

[67] *Id.*

[68] *Id.*

[69] The Departments acknowledge that they have not made a similar change to require 28 consecutive days of a 7-day average of encounters above 2,500 for the rule's provisions to be reactivated. The absence of a similar requirement prior to reactivation reflects the operational exigencies in a circumstance where there has been a 7-consecutive-calendar-day average of more than 2,500 encounters. *See* 89 FR at 48749 n.248. The Departments have determined that those operational exigencies require the rule's provisions to be reactivated and outweigh the resources and coordination that reactivation requires.

[70] *See* 8 U.S.C. 1232(a)(2)(A)(ii).

**STB_AR1_000011**

UCs encountered at the southern border, regardless of whether emergency border circumstances are present.

In addition, UCs who are nationals or habitual residents of a contiguous country may, in certain circumstances, be permitted to withdraw their applications for admission and voluntarily return to their respective countries of nationality or habitual residence. *See* 8 U.S.C. 1232(a)(2). To determine whether such an outcome is permissible, such UCs are screened for indicators of trafficking or credible evidence that they are at risk of being trafficked upon return, whether they are able to make an independent decision to withdraw their applications, and whether they have any fear of return owing to a credible fear of persecution. *See* 8 U.S.C. 1232(a)(2)(A), (a)(4). However, as a matter of longstanding policy, CBP screens all UCs—even those from non-contiguous countries—in this manner.

Because one of the primary purposes of the rule is to alleviate undue strain on the limited resources of the border security and immigration systems, the Departments found that they must consider the operational burden that results from all UC encounters at the border. That is why UC encounters from all countries, not just from contiguous countries, should be considered by the Secretary when making a factual determination that average daily encounters at the southern border have exceeded or fallen below the requisite thresholds contained in the rule and the Proclamation.

Also informing the Departments' decision to reconsider the IFR's approach is that in recent months, encounters of UCs from non-contiguous countries have grown relative to other encounters. That growth, which adds operational burdens separate from those inherent in the processing of individuals for expedited removal, increases the distorting effects of excluding these UCs. Specifically, the Departments had observed from June 2023 through May 2024 that rates of encounters of UCs from non-contiguous countries had generally accounted for about 6.5 percent of total encounters of all non-contiguous nationalities, and comprised about 15 percent of encounters of nationals of El Salvador, Guatemala, and Honduras.[71] However, while encounters of UCs from non-contiguous countries have decreased in absolute terms since June 2024, such

encounters have not decreased in proportion with the decreases seen among single adults and individuals in family units. Rather, the UCs' share of total non-contiguous encounters has increased to 8.9 percent, including 24 percent of all encounters of nationals of El Salvador, Guatemala, and Honduras.[72] As a result, the share of total encounters attributable to UCs from non-contiguous countries increased from 4.6 percent from June 2023 to May 2024 to 6.4 percent from June 2024 to August 2024, and the share of all UCs increased from 6.2 percent to 9.4 percent.[73]

With the two changes just described, the rule will continue to serve the purposes that the IFR pursued from the start. First, the rule continues to target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered; Section III.D.1 of this preamble describes why the rule's thresholds continue to reflect those circumstances, accounting for the inclusion of UCs from non-contiguous countries.

Second, the rule will continue to deactivate when a decrease in encounters means that those emergency border circumstances no longer exist. Although the change to require that the 7-consecutive-calendar-day average must remain below 1,500 encounters for 28 consecutive days appropriately ensures that the rule does not deactivate prematurely, the rule will continue to deactivate where a decrease is likely to be genuinely sustained. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as natural disasters, economic changes, and political instability. However, the Departments believe, based on past experience, that the Departments may experience an average daily encounter rate below 1,500 for 28 consecutive days. In fact, from FY 2013 through FY 2019, the 7-consecutive-calendar-day USBP encounter average was below 1,500 encounters for 28 consecutive days 71 percent of the

time.[74] Even since the IFR was promulgated, encounters have dropped to levels indicating that the threshold in section 2(a) of the Proclamation will be met if migration dynamics change for a sustained period. If, consistent with the June 3 Proclamation, one excludes UCs from non-contiguous countries, the Departments have observed 40 separate days between June 5, 2024, and August 31, 2024, with encounters within 15 percent of 1,500 (*i.e.,* below 1,725).[75] And if, consistent with the September 27 Proclamation, one includes such UCs, the Departments have observed 15 such days.[76] These single-day figures suggest that the threshold for discontinuation, as revised, will be met if migration dynamics change for a sustained period.

## 2. Clarifying Changes to Regulatory Text

This final rule also makes clarifying changes to the regulatory text. In §§ 208.35(b)(2) and 1208.35(b)(2)(iii), the Departments removed from the definition of ''reasonable probability'' the clause: ''that the alien would be persecuted because of his or her race, religion, nationality, membership in a particular social group or political opinion, or tortured, with respect to the designated country or countries of removal.'' The Departments believe that the remaining definition of ''reasonable probability''—''substantially more than a reasonable possibility, but somewhat less than more likely than not''— accurately defines the reasonable probability standard. The deleted clause describes what the AO or IJ is assessing for rather than what the standard means, so it need not be part of the standard's definition.

## 3. Other Technical Changes

The final rule also implements two technical changes. First, the rule replaces the term ''alien'' with ''noncitizen'' where it appears in 8 CFR 1208.35. *See* 8 CFR 1001.1(gg). Second, the rule amends 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) as well as the provisions of the Circumvention of Lawful Pathways rule at 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) to update the cross-references to the definition of ''victim of a severe form of trafficking in persons.'' Specifically, the rule replaces the cross-references to 8

---

[71] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[72] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab). While the monthly average single adult encounters fell 53 percent between June 2023–May 2024 and June 2024–August 2024, and the monthly average number of encounters of individuals in family units fell 69 percent, encounters of non-contiguous UCs fell just 42 percent, and encounters of UCs overall fell just 37 percent. *Id.*

[73] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam status tab).

[74] *See* OHSS analysis of July 2024 OHSS Persist Dataset (Trigger Analysis tab). The Departments rely on data from FY 2013 through FY 2019 and not data from the pandemic period given the unique circumstances dictating migratory trends during the latter time.

[75] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters tab).

[76] *See id.*

STB_AR1_000012

CFR 214.11 with cross-references to 8 CFR 214.201. This change recognizes that on August 28, 2024, after the Departments published the IFR, DHS's rule Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for ''T'' Nonimmigrant Status, 89 FR 34864 (Apr. 30, 2024),[77] became effective, which moved the definition of ''victim of a severe form of trafficking in persons'' from § 214.11 to § 214.201. *See id.* at 34931–32.

*D. Rule Provisions*

The rule contains the following key provisions:

• The rule applies to certain individuals who seek asylum, statutory withholding of removal, or CAT protection during emergency border circumstances giving rise to this rule and to the suspension and limitation on entry under the June 3 Proclamation, as amended by the September 27 Proclamation. *See* 8 CFR 208.13(g), 208.35, 235.15, 1208.13(g), 1208.35.

• The rule establishes that those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation will be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.201. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Exceptionally compelling circumstances may also be established for noncitizens in section 240 removal proceedings or the asylum merits interview (''AMI'') process under specified conditions to ensure family unity. *See* 8 CFR 208.35(c), 1208.35(c).

• The rule also establishes that, during emergency border circumstances, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, for those who enter across the southern border and are not described in section 3(b) of the June 3 Proclamation, DHS will provide general notice regarding the process for seeking asylum, statutory withholding of removal, and protection under the CAT and will refer a noncitizen for a credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to their country or the country of removal. *See* 8 CFR 235.15.

• The limitation on asylum eligibility will be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation will receive a negative credible fear determination with respect to their asylum claim unless there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet an exception. Such noncitizens will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule. The ''reasonable probability'' standard is defined to mean substantially more than a ''reasonable possibility'' but somewhat less than more likely than not. 8 CFR 208.35(b), 1208.35(b).

*E. Severability*

As stated in 8 CFR 208.13(h), 208.35(b)(3), 208.35(e), 235.15(g), 1208.13(h), 1208.35(b)(4), and 1208.35(e), the Departments intend for the provisions of the rule to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the other provisions will remain in effect as to any other person or circumstance.[78] *See* 89 FR at 48757–59. During emergency border circumstances, the Departments' abilities to refer and safely process noncitizens through expedited removal is overwhelmed and prevents the border security and immigration systems from delivering timely decisions and consequences to noncitizens arriving at the southern border. *See* 89 FR at 48714. Consequently, each provision of the rule is designed to function sensibly without the others, and the Departments intend for them to be severable so that each can operate independently.

For example, the Departments intend for the ''reasonable probability'' screening standard to be used—even in the absence of a limitation on asylum eligibility, the manifestation of fear procedures, or the Proclamation—to screen for statutory withholding of removal and CAT protection claims if a noncitizen was otherwise unable to establish a credible fear of persecution for asylum purposes due to the Lawful Pathways rebuttable presumption. 8 CFR 208.35(b)(3), 1208.35(b)(4); *see* 8 CFR 208.35(b)(2), (e), 1208.35(b)(2), (e), 235.15(g); 89 FR at 48757. That approach ensures that, during emergency border circumstances, the Departments will continue to be able to benefit from the higher screening standard, even without the limitation on asylum eligibility this rule adopts.

To maintain operational flexibility, DHS similarly intends for manifestation of fear procedures under 8 CFR 235.15 to remain in effect, even without a limitation on asylum eligibility, the reasonable probability standard, or the Proclamation. *See* 8 CFR 235.15(g). As with the reasonable probability standard, allowing for the continued use of the manifestation of fear provisions absent the other portions of the rule or Proclamation ensures that such a tool remains available to the Departments during emergency border circumstances.

Finally, the Departments intend for the limitation on asylum eligibility to be severable from the manifestation of fear procedures, the reasonable probability standard, and the Proclamation because the limitation on asylum eligibility operates independently of those provisions and the Proclamation, and in the absence of those tools would likewise continue to be an important tool for addressing emergency border circumstances at the southern border. *See* 8 CFR 208.35(e), 1208.35(e).

**III. Public Comments and Responses**

The Departments received 1,067 comments on the IFR, the majority of which expressed opposition. A range of governmental and non-governmental entities, public officials, and private persons submitted comments. The Departments summarize and respond to the public comments below.

*A. Legal Authority and Background*

1. Legality Concerns

a. General Comments on Domestic Law

*Comment:* Commenters asserted that the rule violates domestic law and

---

[77] *See also* 89 FR 68081 (Aug. 23, 2024) (making corrections).

[78] Courts have uniformly held that the Administrative Procedure Act (''APA''), 5 U.S.C. 706(2), authorizes courts to sever and set aside ''only the offending parts of the rule.'' *Carlson* v. *Postal Regulatory Comm'n,* 938 F.3d 337, 351 (D.C. Cir. 2019); *see, e.g., K Mart Corp.* v. *Cartier, Inc.,* 486 U.S. 281, 294 (1988).

**STB_AR1_000013**

emphasized that U.S. law allows noncitizens to apply for asylum regardless of where they entered the United States. Some commenters described a fundamental right to apply for asylum for anyone inside the United States and stated that analysis of an asylum application should focus on the applicant's reasonable fear of persecution rather than manner of entry, criticizing what a commenter characterized as a categorical exclusion of those ''apprehended between ports of entry from asylum eligibility, barring narrow exceptions.'' Commenters asserted that entering the United States either through a POE or across the southern border between POEs and asking for asylum constitutes a ''lawful pathway.'' Other commenters stated that the Departments should not and cannot categorically deny asylum for reasons unrelated to the merits of the claim itself. One commenter claimed that the rule effectively closes the border and asserted that closing the border is unconstitutional.

Although some commenters agreed that the rule is within the scope of the Departments' authority and is consistent with the INA, other commenters claimed that the rule would violate the Refugee Act of 1980 and the INA, specifically section 208 of the INA, 8 U.S.C. 1158. Commenters claimed that the rule conflicts with the plain language of these provisions, which permit a noncitizen ''physically present in the United States'' to apply for asylum. Refugee Act of 1980, 94 Stat. at 105; INA 208(a)(1), 8 U.S.C. 1158(a)(1). Commenters asserted that the INA does not require those seeking protection to apply before entering or at a POE or to schedule an appointment through a website or app in order to make an application, but instead allows applications from anywhere along the border. Commenters also stated that, although Congress gave the Attorney General and the Secretary authority to impose additional limitations on asylum eligibility, such limitations must be consistent with legislation and congressional intent. Along the same lines, a commenter stated that the IFR undermines the separation of powers between Congress and the Executive Branch because it is Congress, not the Executive Branch, that enacts laws, and the IFR rewrites the INA.

*Response:* The Departments disagree that this rule is inconsistent with U.S. law or congressional intent. The rule does not effectively close the border, require the Departments to turn away migrants at the southern border, or categorically deny all asylum applications filed by noncitizens who

enter the United States across the southern border. Nor does the rule prohibit any noncitizen from seeking protection solely because of the manner or location of their entry into the United States. Rather, the rule is a limitation on asylum eligibility, as authorized by sections 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), and the Departments' other discretionary authorities, *e.g.,* sections 103(a)(3), (g)(2), and 208(b)(1)(A) of the INA, 8 U.S.C. 1103(a)(3), (g)(2), and 1158(b)(1)(A). Given these authorities for the Departments to act, the Departments disagree that the IFR (or the final rule) violates the principle of separation of powers.

The rule's limitation on asylum eligibility does not prevent anyone from pursuing a claim for asylum, nor does it categorically foreclose eligibility for asylum. The Departments have authority to impose limitations on asylum eligibility. As explained above, the INA authorizes the Secretary and the Attorney General to establish, by regulation, ''additional limitations and conditions, consistent with'' section 208, under which a noncitizen ''shall be ineligible for asylum.'' INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see also* INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B) (authorizing the Secretary and the Attorney General to ''provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with [the INA]''). And section 208(b)(1)(A) of the INA, 8 U.S.C. 1158(b)(1)(A), authorizes the Secretary or the Attorney General to grant asylum in their discretion. The INA also provides the Secretary and the Attorney General authority to publish regulations governing their respective roles regarding apprehension, inspection and admission, detention and removal, withholding of removal, deferral of removal, and release of noncitizens encountered in the interior of the United States or at or between POEs. *See* INA 103(a)(3), (g)(2), 235(b)(1)(B)(iii)(III), (B)(iv), (C), 241(a)(3), (d)(2)(B), 8 U.S.C. 1103(a)(3), (g)(2), 1225(b)(1)(B)(iii)(III), (B)(iv), (C), 1231(a)(3), (d)(2)(B); *see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A).

Consistent with these authorities, the Departments have promulgated other limitations or conditions on asylum eligibility, including some provisions that Congress later adopted and codified in the INA. *See* Aliens and Nationality; Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) (imposing firm resettlement bar); Aliens and Nationality; Asylum and Withholding of Deportation Procedures, 55 FR 30674,

30678, 30683 (July 27, 1990) (promulgating 8 CFR 208.14(c) (1990), which provided for mandatory regulatory bars to asylum for those convicted in the United States of a particularly serious crime or those who constitute a danger to the security of the United States while retaining a prior regulatory bar to asylum for noncitizens who were firmly resettled in a third country prior to arriving in the United States); Asylum Procedures, 65 FR 76121, 76134 (Dec. 6, 2000) (providing that an applicant does not have a well-founded fear of persecution if they could avoid persecution by internally relocating); *see also, e.g., Afriyie* v. *Holder,* 613 F.3d 924, 934–36 (9th Cir. 2010) (discussing internal relocation), *overruled on other grounds by Bringas-Rodriguez* v. *Sessions,* 850 F.3d 1051 (9th Cir. 2017) (en banc); *Yang* v. *INS,* 79 F.3d 932, 935–36 (9th Cir. 1996) (holding that the regulatory firm resettlement limitation was a permissible exercise of the Attorney General's authority under the asylum statute). Restraining the Departments' authority to promulgate additional limitations and conditions on the ability to establish eligibility for asylum consistent with section 208 of the INA, 8 U.S.C. 1158, would be contrary to Congress' intent that the Departments' only constraint be that additional limitations and conditions are consistent with section 208, 8 U.S.C. 1158, and ''this chapter.'' INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B); *see also DHS* v. *Thuraissigiam,* 591 U.S. 103, 112 (2020) (recognizing that the ''theme'' of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (''IIRIRA'') ''was to protect the Executive's discretion from undue interference by the courts'' (alteration and internal quotation marks omitted)); *R–S–C* v. *Sessions,* 869 F.3d 1176, 1187 (10th Cir. 2017) (reasoning that the ''delegation of authority'' in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), ''means that Congress was prepared to accept administrative dilution'' of section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)); *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 444–45 (1987); Circumvention of Lawful Pathways, 88 FR 11704, 11740 (Feb. 23, 2023).

The rule is within the scope of the Departments' authority and does not conflict with the statutory requirement that noncitizens ''physically present in the United States'' be permitted to apply for asylum because it adds a limitation on asylum eligibility as permitted under section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and

**STB_AR1_000014**

(d)(5)(B). The limitation is not a sweeping categorical bar that would preclude a grant of asylum solely based on manner of entry, which some courts have found to conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). *E.g., East Bay Sanctuary Covenant* v. *Biden (East Bay III),* 993 F.3d 640, 669–70 (9th Cir. 2021) (concluding that a prior regulation that enacted a bar on asylum eligibility for those who entered the United States between designated POEs was ''effectively a categorical ban'' on migrants based on their method of entering the United States, in conflict with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1)).

Under this rule—and contrary to commenter assertions—manner of entry alone is never dispositive. Rather, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Specifically, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States Government has established, or shown exceptionally compelling circumstances, when it is essential that noncitizens use such pathways to ensure the Government's ability to manage the border.

Limitations and conditions on asylum eligibility do not need to directly relate to whether a noncitizen satisfies the definition of a ''refugee'' within the meaning of section 101(a)(42)(A) of the INA, 8 U.S.C. 1101(a)(42)(A), but instead can embrace policy considerations that justify a finding of ineligibility. *See, e.g., Zheng* v. *Mukasey,* 509 F.3d 869, 871 (8th Cir. 2007) (noting that IIRIRA included several provisions, including the one-year bar, ''intended to reduce delays and curb perceived abuses in removal proceedings''); *Ali* v. *Reno,* 237 F.3d 591, 594 (6th Cir. 2001) (recognizing that asylum law ''was never intended to open the United States to refugees who had found shelter in another nation and had begun to build new lives'' (internal quotation marks and citation omitted));

*Matter of Negusie,* 28 I&N Dec. 120, 125 (A.G. 2020) (discussing the persecutor bar, and noting that Congress intended to make ''certain forms of immigration relief,'' including asylum, ''unavailable to persecutors''), *stayed by Matter of Negusie,* 28 I&N Dec. 399, 399 (A.G. 2021); *Singh* v. *Nelson,* 623 F. Supp. 545, 556 (S.D.N.Y. 1985) (''[A]ttempting to discourage people from entering the United States without permission . . . provides a rational basis for distinguishing among categories'' of noncitizens who are not lawfully present.).

In sum, as with other conditions and limitations imposed by section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with meritorious asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that will overwhelm the Departments' ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. In seeking to enhance the overall functioning of the immigration system and to improve processing of asylum applications, the Departments are, in the exercise of their authority to promulgate limitations on asylum eligibility and in recognition of the limited resources provided by Congress, electing to implement a limitation on asylum eligibility that places greater weight on manner of entry. This limitation on asylum eligibility is expected to disincentivize irregular migration by those unlikely to establish exceptionally compelling circumstances during times when encounters exceed certain benchmarks and therefore challenge the Departments' ability to swiftly process single adults and individuals in family units encountered by USBP at the SWB through expedited removal. See Section II.A.2 of this preamble for further discussion of the Departments' experience with the IFR.

*Comment:* Commenters claim that the rule violates the principles of non-refoulement and nondiscrimination in the Refugee Act and other U.S. laws. Some commenters claimed the rule conflicts with congressional intent to create a uniform procedure for noncitizens applying for asylum regardless of manner of entry.

*Response:* The Departments disagree that the rule conflicts with U.S. law or congressional intent. The rule does not violate the principles of non-refoulement and nondiscrimination. And the rule does not conflict with what commenters describe as a congressional intent to create a uniform

procedure for noncitizens applying for asylum. *See Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 258 (3d Cir. 2017). The Departments may create additional substantive limitations and conditions on asylum eligibility—as Congress itself has done, and as Congress expressly authorized the Departments to do. INA 208(b)(2)(A), (b)(2)(C), 8 U.S.C. 1158(b)(2)(A), (b)(2)(C). Moreover, all noncitizens to whom the rule applies are subject to the same procedures for adjudicating their asylum claims as those who are not subject to the rule. The United States has implemented its non-refoulement obligations through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3) (which is referred to as statutory withholding of removal) and the regulations implementing U.S. obligations under Article 3 of the CAT at 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, and 1208.18. The INA's provision in section 208, 8 U.S.C. 1158, for the discretionary granting of asylum instead aligns with Article 34 of the Refugee Convention, which is precatory and does not require any signatory to actually grant asylum to all those who are eligible. *See, e.g., Cardoza-Fonseca,* 480 U.S. at 441.

*Comment:* Commenters asserted that, under *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), manner of entry may not be the dispositive factor in deciding whether a noncitizen is eligible for asylum. Similarly, commenters argued that *Matter of Pula* is binding precedent and precludes consideration of manner of entry over all other factors. A commenter claimed that manner of entry can only be considered in determining whether a noncitizen merits asylum as a matter of discretion and not in determining whether the noncitizen is eligible for asylum.

*Response:* The rule is consistent with historical consideration of manner of entry as a relevant factor in considering whether to grant asylum as a matter of discretion. In *Matter of Pula,* the BIA identified—as relevant factors as to whether a noncitizen warrants the favorable exercise of discretion in granting asylum—the noncitizen's ''circumvention of orderly refugee procedures,'' including their ''manner of entry or attempted entry''; whether they ''passed through any other countries or arrived in the United States directly''; ''whether orderly refugee procedures were in fact available to help'' in any transit countries; and whether they ''made any attempts to seek asylum before coming to the United States.'' 19 I&N Dec. at 473–74. The BIA explained that section 208(a) of the INA, 8 U.S.C. 1158(a), required the Attorney General to establish procedures for adjudicating

STB_AR1_000015

applications filed by any noncitizen, ''irrespective of such alien's status,'' but the BIA did not preclude consideration of the manner of entry in assessing whether to grant asylum. *Id.* at 473. The BIA also stated that while the manner of entry could ''be a serious adverse factor, . . . it should not be considered in such a way that the practical effect is to deny relief in virtually all cases.'' *Id.* at 473. The BIA cautioned against placing ''too much emphasis on the circumvention of orderly refugee procedures'' as ''the danger of persecution should generally outweigh all but the most egregious of adverse factors.'' *Id.* at 473–74.

While the Departments acknowledge that the rule places greater weight on manner of entry under certain emergency circumstances, this decades-old precedent establishes that the Departments can permissibly take into account manner of entry. Both how much weight to place on that factor and whether to do so in weighing asylum eligibility fall well within the broad discretion conferred on the Departments by section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). *Cf. Lopez* v. *Davis,* 531 U.S. 230, 243–44 (2001) (government can rely on rulemaking to ''resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority'' (quoting *Am. Hosp. Ass'n* v. *NLRB,* 499 U.S. 606, 612 (1991)); *Reno* v. *Flores,* 507 U.S. 292, 313 (1993) (noting that INS need not ''forswear use of reasonable presumptions and generic rules'' even where the statute ''requires some level of individualized determination'' (citations and quotation marks omitted)).

Under this rule, manner of entry, standing alone, is never dispositive. Rather, the limitation at issue here turns on whether—during the emergency border circumstances described in the Proclamation and this rule—an individual has followed the lawful, safe, and orderly pathways that the United States has established when it is essential that noncitizens use such pathways to ensure the United States' ability to manage the border. And even during these situations, the rule's limitation on asylum eligibility does not apply if a noncitizen establishes that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The rule provides that such exceptionally compelling circumstances include where the noncitizen, or a family member with whom they are traveling, faced an acute medical emergency; faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was

a victim of a severe form of trafficking in persons. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

In line with *Matter of Pula,* then, the rule considers factors other than manner of entry. And, like *Matter of Pula,* this rule provides for consideration of manner of entry in assessing eligibility for some asylum seekers in ''a way that the practical effect is'' not ''to deny relief in virtually all cases.'' 19 I&N Dec. at 473. Rather, the manner of entry reduces the availability of relief only in limited circumstances—during emergency border circumstances described in the Proclamation and this rule—and only for those unable to establish exceptionally compelling circumstances.

The Departments also recognize that the specific analysis discussed in *Matter of Pula* (considering manner of entry in the discretionary decision of whether to grant asylum) is distinct from how this rule considers manner of entry (as part of provisions governing asylum eligibility). *See* 19 I&N Dec. at 472. The Departments, in exercising their broad discretion to issue regulations adopting additional limitations on asylum eligibility, are not bound to consider manner of entry only as a factor contributing to whether a particular noncitizen warrants a favorable exercise of discretion. While *Matter of Pula* allows manner of entry to be one factor in the consideration of whether a noncitizen merits a grant of asylum as a matter of discretion, it does not purport to restrict the Departments from considering a noncitizen's manner of entry in assessing eligibility. *Id.* at 473–74.

Moreover, while *Matter of Pula* considered manner of entry for purposes of a discretionary grant whereas the rule considers manner of entry as a limitation on asylum eligibility, adjudicators are not precluded from considering the same facts when evaluating both eligibility and discretion. Indeed, it is possible for a single fact to be relevant to both determinations. *See Kankamalage* v. *INS,* 335 F.3d 858, 864 (9th Cir. 2003) (concluding that a conviction did not render a noncitizen ineligible for asylum, but stating that the Board was ''not prohibited from taking into account Kankamalage's robbery conviction when it decides whether or not to grant asylum as a matter of discretion''); *Matter of Jean,* 23 I&N Dec. 373, 385 (A.G. 2002) (concluding that even a noncitizen who ''qualifies as a 'refugee' '' and whose criminal conviction did ''not preclude her eligibility'' for asylum could

nevertheless be ''manifestly unfit for a *discretionary* grant of relief'').

The Departments conclude that this rule does not conflict with *Matter of Pula,* which remains the applicable standard for discretionary determinations in the absence of a regulation that otherwise governs the discretionary determination. *See, e.g., Thamotar* v. *U.S. Att'y Gen.,* 1 F.4th 958, 970–71 (11th Cir. 2021) (observing that discretionary asylum determinations continue to be governed by *Matter of Pula*); *Hussam F.* v. *Sessions,* 897 F.3d 707, 718 (6th Cir. 2018) (stating that ''circumvention [of proper immigration procedures] may be taken into account as a 'serious adverse factor''' (quoting *Matter of Pula,* 19 I&N Dec. at 473)); *see also Andriasian* v. *INS,* 180 F.3d 1033, 1043–44 (9th Cir. 1999) (finding that reliance on certain *Matter of Pula* factors was inappropriate once regulations controlling discretionary denials of asylum on the basis of a petitioner's stay or opportunity to stay in a third country had been promulgated). And the Departments view *Matter of Pula* as providing support for the proposition that it is lawful to consider manner of entry for asylum applicants.

b. Statutory Conditions and Limitations on Asylum Eligibility

*Comment:* Commenters stated that the rule would be inconsistent with or would otherwise render superfluous the statutory firm-resettlement bar and safe-third-country bar. *See* INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

*Response:* This rule is within the Departments' broad authority to create new limitations on asylum eligibility, and the Departments disagree that the rule conflicts with any of the exceptions to a noncitizen's ability to apply for asylum or limitations on a noncitizen's eligibility for a grant of asylum under section 208(a)(2) or (b)(2) of the INA, 8 U.S.C. 1158(a)(2) or (b)(2).

The INA's firm-resettlement provision precludes a noncitizen who ''was firmly resettled in another country prior to arriving in the United States'' from demonstrating eligibility for asylum. INA 208(b)(2)(A)(vi), 8 U.S.C. 1158(b)(2)(A)(vi); *see also* 8 CFR 208.15, 1208.15 (2020).[79] The INA's safe-third-

---

[79] These regulations were amended by *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review,* 85 FR 80274 (Dec. 11, 2020), but the amendments were preliminarily enjoined. *See Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 512 F. Supp. 3d 966, 969 (N.D. Cal. 2021). This order remains in effect, Continued

country provision prohibits a noncitizen from applying for asylum if the noncitizen ''may be removed, pursuant to a bilateral or multilateral agreement'' to a safe third country in which the noncitizen would not be subject to persecution and ''would have access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'' INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A).

The rule does not conflict with or otherwise render the firm-resettlement bar or safe-third-country bar superfluous; instead, this rule and the statutory bars apply independently.

First, this rule has a different scope. In contrast to those statutory bars, this limitation on asylum eligibility only applies to those who enter the United States during emergency border circumstances. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). Additionally, unlike those who are subject to the firm-resettlement or safe-third-country bars, those who are subject to this limitation on asylum eligibility are not categorically barred from applying for asylum or from being eligible for asylum, as application of the rule's limitation on asylum eligibility will be considered on a case-by-case basis, including to determine if exceptional circumstances apply to overcome this limitation.

The rule also serves a different purpose than those statutory bars. The INA's firm resettlement and safe-third-country provisions limit asylum eligibility and applications, respectively, for noncitizens who have available sustained protection in another country, and they help protect against forum shopping. *See Rosenberg* v. *Yee Chien Woo,* 402 U.S. 49, 55–56 (1971) (noting that the concept of firm resettlement is historically rooted in the notion of providing ''a haven for the world's homeless people'' while encouraging ''other nations to do likewise''); *see also Maharaj* v. *Gonzales,* 450 F.3d 961, 988–89 (9th Cir. 2006) (en banc) (O'Scannlain, J., concurring in part and dissenting in part) (recognizing that the firm-resettlement provision protects against forum shopping, an issue ''that our immigration laws have long sought to avoid''). The limitation on asylum eligibility adopted in this rule, by contrast, seeks to streamline the Departments' processing of noncitizens while upholding all screening and protection requirements, thereby conserving limited resources during the emergency border circumstances

and thus the 2020 version of these provisions—the version immediately preceding the enjoined amendment—is currently effective.

described in the Proclamation and this rule and allowing for enough resources to continue to process lawful cross-border trade and travel and noncitizens who present in a safe and orderly manner at a POE. The rule is also designed to encourage noncitizens to use lawful, safe, and orderly pathways to the United States during emergency border circumstances or to wait until such circumstances have abated, to the extent possible. Thus, the limitation has a different object and purpose, and it is consistent with those statutory provisions.

Moreover, the INA permits the Attorney General and the Secretary to create new eligibility limitations and does not limit this authority from overlapping with existing statutory conditions. *See R–S–C,* 869 F.3d at 1187 (noting that Congress's delegation of authority in section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), ''means that Congress was prepared to accept administrative dilution'' of the right to seek asylum); *cf. Hawaii,* 585 U.S. at 690–91 (recognizing that the existence of the Visa Waiver Program ''did not implicitly foreclose the Executive from imposing tighter restrictions'' in ''similar'' areas).

Indeed, section 208(b)(2)(C) and (d)(5)(B) of the INA, 8 U.S.C. 1158(b)(2)(C) and (d)(5)(B), provide no subject-matter limit other than requiring any regulation be ''consistent with'' section 208 of the INA, 8 U.S.C. 1158, and the INA generally. *See R–S–C,* 869 F.3d at 1187 n.9. The limitation on asylum eligibility established by this rule is consistent with section 208 of the INA, 8 U.S.C. 1158, as a whole, and the INA generally, and it is consistent with the firm-resettlement and safe-third-country bars in particular.

c. Expedited Removal

*Comment:* Several commenters claimed that the rule conflicts with the expedited removal process created by Congress in IIRIRA. Commenters noted that the statutory framework provides for preliminary screening of noncitizens in credible fear interviews, where noncitizens may apply for asylum after demonstrating a ''significant possibility'' that the noncitizen could establish eligibility for asylum. In this regard, one commenter asserted that Congress had intended the ''significant possibility'' standard to be a ''low screening standard,'' but that the IFR ''would convert the preliminary screening into a full adjudication'' of whether the IFR applied and would eliminate the ''significant possibility'' standard ''entirely for all asylum seekers covered[,] . . . forc[ing] them to meet an

even higher 'reasonable probability' standard.'' Commenters asserted that the rule's requirement that noncitizens instead show a ''reasonable probability'' of persecution or torture is in conflict with this statutory framework. Commenters further asserted that the rule effectively creates a new legal framework by which to evaluate asylum claims in conflict with the statutory process. One commenter claimed that the rule unlawfully shuts down the U.S. asylum system.

*Response:* The Departments disagree that the rule conflicts with the expedited removal process created by Congress. The expedited removal process is applicable to certain noncitizens arriving in the United States (and, in the discretion of the Secretary, certain other designated classes of noncitizens) who are found to be inadmissible under either section 212(a)(6)(C) of the INA, 8 U.S.C. 1182(a)(6)(C), which renders inadmissible noncitizens who make certain material misrepresentations, or section 212(a)(7) of the INA, 8 U.S.C. 1182(a)(7), which renders inadmissible noncitizens who lack documentation required for admission. INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i). Upon being subject to expedited removal, such noncitizens may be ''removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution.'' *Id.*

Congress created a screening process, known as ''credible fear'' screening, to identify potentially valid claims for asylum by noncitizens in expedited removal proceedings. *See* INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B). But Congress has not provided for such a screening for statutory withholding of removal or CAT protection. In the absence of a statutory process for screening for potential eligibility for statutory withholding of removal and CAT protection, the Departments have also used the credible fear screening process to identify potentially valid claims for such protection. *See generally* 8 CFR 208.30, 1003.42, 1208.30 (providing for screenings for potential eligibility for statutory withholding of removal and CAT protection alongside screening for potential asylum eligibility). If a noncitizen indicates a fear of persecution or torture, a fear of return, or an intention to apply for asylum during the course of the expedited removal process, DHS refers the noncitizen to an AO to determine whether the noncitizen has a credible fear of persecution or torture in the

STB_AR1_000017

country of nationality or removal. INA 235(b)(1)(A)(ii), (B), 8 U.S.C. 1225(b)(1)(A)(ii), (B); *see also* 8 CFR 208.30(e)(2), 235.3(b)(4); *id.* 208.13(b)(1)–(2), 1208.13(b)(1)–(2) (defining the grounds for asylum eligibility); *id.* 208.16(b)–(c), 1208.16(b)–(c) (defining the grounds for statutory withholding of removal and CAT protection). A noncitizen has a ''credible fear of persecution'' if ''there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum.'' INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v).

Just as the statute is silent on the availability of screening procedures for statutory withholding of removal and CAT protection, it is also silent on the standard applied during such screenings. By regulation, the Departments have applied the ''significant possibility'' standard to also screen for potential eligibility for statutory withholding of removal and CAT protection, *see* 8 CFR 208.30(e)(2)–(3), 1003.42(d): AOs must determine whether ''there is a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien can establish eligibility . . . for withholding of removal under section 241(b)(3) of the Act,'' 8 CFR 208.30(e)(2), and whether the noncitizen ''shows that there is a significant possibility that the alien is eligible for withholding of removal or deferral of removal under the Convention Against Torture, pursuant to § 208.16 or § 208.17,'' 8 CFR 208.30(e)(3). If the AO determines that the noncitizen does not have a credible fear of persecution or torture in the proposed country of removal, the noncitizen may request that an IJ review that determination. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.16(b)–(c), 208.30(g), 208.33(b)(2)(v), 1208.16(b)–(c), 1208.30(g).

To the extent commenters allege that the Departments are not applying the ''significant possibility'' standard to screen for asylum eligibility—such as for application of the limitation on asylum eligibility—the commenters are mistaken. Under this rule, the AO or IJ determines whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation does not apply or that they meet the exception

for exceptionally compelling circumstances. The ''significant possibility'' standard applies by statute, section 235(b)(1)(B)(v) of the INA, 8 U.S.C. 1225(b)(1)(B)(v), and the regulation does not in any way displace that standard, by its terms or otherwise. The Departments did not explicitly include this language in the regulation itself. This is because the provisions regarding credible fear screenings at 8 CFR 208.35(b) and 1208.35(b)(2) generally explain the order of operations—instructing the AO or IJ to consider the limitation first before considering the rest of the asylum claim. In other rules adopting conditions and limitations on asylum eligibility, the Departments have consistently used the regulatory text to explain the order of operations for consideration of the limitations during credible fear screenings without explicitly restating the applicable statutory standard,[80] while at the same time explaining that the ''significant possibility'' standard applies in the preamble.[81] Deviating from the Departments' practice here could wrongly imply that, in other regulations pertaining to the credible fear process, the default standard of proof for AO and IJ determinations is something other than the ''significant

---

[80] For example, under the Circumvention of Lawful Pathways rule, ''[t]he asylum officer shall first determine whether the alien is covered by the presumption . . . and, if so, whether the alien has rebutted the presumption[.]'' 8 CFR 208.33(b)(1); *see also* 8 CFR 1208.33(b)(2) (''The immigration judge shall first determine whether the alien is covered by the presumption at 8 CFR 208.33(a)(1) and 1208.33(a)(1) and, if so, whether the alien has rebutted the presumption in accordance with 8 CFR 208.33(a)(3) and 1208.33(a)(3).''); *Asylum Eligibility and Procedural Modifications,* 84 FR 33829, 33843–45 (July 16, 2019) (interim final rule amending and adding provisions at 8 CFR 208.30(e)(5)(ii) through(iii), 1003.42(d)(2) and(3), and 1208.30(g)(1)(i) through (ii), providing the order of operations for applying two now-rescinded bars to asylum eligibility); 88 FR at 31319; *id.* at 31449 (adding amendatory instructions to remove regulatory provisions added to implement the bars to asylum eligibility adopted in two prior rules).

[81] *See, e.g.,* 89 FR at 48755 (explaining that, during the credible fear interview, ''the AO will first determine whether there is a significant possibility that the noncitizen is eligible for asylum in light of the [rule's] limitation on asylum eligibility''); *id.* at 48757–58 (discussing the application of the ''significant possibility'' standard under the rule during IJ review of a negative credible fear determination); 84 FR at 33837 (''If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates that there is a significant possibility that he or she can establish eligibility for asylum), then the alien will have established a credible fear.''); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims,* 83 FR 55934, 55943 (Nov. 9, 2018) (''If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.'').

possibility'' standard. To avoid that unwanted implication, the Department declines to modify the text of §§ 208.35 and 1208.35 as well. The ''reasonable probability'' standard does not affect or change the ''significant possibility'' standard used to screen for asylum eligibility, which, as discussed above, is set by statute and remains in effect for asylum claims in the credible fear process. Accordingly, the Departments disagree with the claim that the use of the ''reasonable probability'' standard for the purposes of screening for potential eligibility for statutory withholding of removal and CAT protection would eliminate, or in any way affect, the ''significant possibility'' standard as it applies to screening for asylum eligibility.

The Departments also disagree that the rule's application of the ''reasonable probability'' standard to screen for potential eligibility for statutory withholding of removal or CAT protection is inconsistent with the ''significant possibility'' standard under the expedited removal statute. As the Departments observed previously, ''Congress clearly expressed its intent that the 'significant possibility' standard be used to screen for asylum eligibility but did not express any clear intent as to which standard should apply to other applications.'' 88 FR at 11742. Section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening standards and procedures are to be employed in determining potential eligibility for statutory withholding of removal or CAT protection, and the INA elsewhere confers broad discretionary authority to establish rules and procedures for implementing those provisions. *See, e.g.,* INA 103(a)(3), (g)(2), 8 U.S.C. 1103(a)(3), (g)(2). Accordingly, the Departments have some discretion to articulate the screening standard for claims for statutory withholding of removal and CAT protection. As further discussed in Section III.C.3 of this preamble, the Departments continue to believe that during the emergency border circumstances described in the IFR and this rule, the ''reasonable probability'' screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection and better captures the population of noncitizens with potentially valid claims for such protection. *See* 89 FR at 48745–47.

Thus, despite the claims of some commenters, the rule does not effectively shut down the U.S. asylum system or deviate from applicable statutory standards. Noncitizens still

**STB_AR1_000018**

may seek asylum and protection in the United States.

d. General Comments on International Law

*Comment:* Commenters generally asserted that the rule violates international law. A commenter wrote that seeking asylum is a human right guaranteed by international law and the rule unjustly denies people this right. In this regard, a commenter asserted that the use of emergency border circumstances as a justification for promulgating the rule is insufficient to justify violating international law and that the lack of a time frame or sunset provision denies access to migrants seeking asylum and places them at risk of refoulement. Commenters claimed that the rule imposes prohibited penalties on asylum seekers, bars refugees from a path to citizenship, and impermissibly discriminates based on manner of entry, race, and nationality. A commenter stated that regulations that deny access to asylum based on arbitrary factors that do not relate to a person's status as a refugee are inconsistent with the Refugee Convention and that the United States has an obligation under the Convention to provide a "fair and efficient refugee status determination procedure" to individuals in the U.S. asylum process.

Commenters were concerned that the rule violates the United States's non-refoulement obligations under the Refugee Convention (through the Refugee Protocol) and Article 3 of the CAT. For example, commenters predicted many noncitizens would not be able to satisfy the comparatively higher standards of proof for statutory withholding of removal and CAT protection claims and that, in turn, would lead to the refoulement of persons who, if not for the rule's limitation on asylum eligibility, would have been granted asylum. Several of these commenters also asserted that statutory withholding of removal and CAT protection are insufficient to satisfy the United States's non-refoulement obligations because they afford lesser protection than asylum. Commenters expressed apprehension that the rule would result in the turning away of migrants who seek refuge at the southern border.

Another commenter wrote that the rule is consistent with U.S. commitments under the Refugee Protocol and the CAT, reasoning that neither is self-executing and therefore the United States is bound only by its own law implementing these treaties. The commenter acknowledged that the United States implements its non-

refoulement obligations through the withholding of removal statute at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). Another commenter, however, asserted that the argument that asylum is discretionary under U.S. law and therefore the rule does not violate the Refugee Protocol is incorrect as a matter of international law, even if true under domestic law, because parties to the Refugee Convention must provide asylum and protection from refoulement to those who meet the definition of "refugee."

*Response:* This rule is consistent with the United States' international treaty obligations. Three primary documents govern the rights of refugees and corresponding obligations of states in international law: the Refugee Convention; the Refugee Protocol, which incorporates Articles 2 through 34 of the Refugee Convention; and the CAT. 88 FR at 31384. Together, these documents provide a framework for states to provide protection to noncitizens fleeing persecution or torture and establish the principle of non-refoulement, which prohibits states from returning refugees to territories in specific circumstances. *Id.*

These treaties, however, do not prescribe or impose any particular minimum procedures for implementation of non-refoulement obligations. Although the United States is a party to the 1967 Refugee Protocol [82] and the CAT, these treaties are not directly enforceable in U.S. law. *See INS* v. *Stevic,* 467 U.S. 407, 428 & n.22 (1984); *Al-Fara* v. *Gonzales,* 404 F.3d 733, 743 (3d Cir. 2005) ("The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation."); *Omar* v. *McHugh,* 646 F.3d 13, 17 (D.C. Cir. 2011) (explaining that the CAT "is non-self-executing and thus does not itself create any rights enforceable in U.S. courts"). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations. The Refugee Convention's non-refoulement obligation is contained in Article 33.1, which prohibits contracting states from returning a refugee to a territory "where his life or freedom would be threatened" on account of an enumerated ground. 19 U.S.T. at 6276,

---

[82] *See Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 169 n.19 (1993) ("Although the United States is not a signatory to the [1951 Refugee] Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951." (citation omitted)).

189 U.N.T.S. at 176. The United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. *See Cardoza-Fonseca,* 480 U.S. at 429, 440–41. The CAT's non-refoulement provision is in Article 3, which prohibits the return of a person to a country where there are "substantial grounds for believing" the person will be tortured. S. Treaty Doc. No. 100–20 at 20, 1465 U.N.T.S. 85, 114. The United States has implemented its obligations under Article 3 of the CAT through regulations. *See* FARRA, Public Law 105–277, sec. 2242(b), 112 Stat. 2681–761, 2681–822 (codified at 8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18. The rule does not change or limit ultimate eligibility for statutory withholding of removal or CAT protection. Instead, applicants subject to the rule's limitation on asylum eligibility will be screened for potential eligibility for statutory withholding of removal and CAT protection under a "reasonable probability" standard, which is lower than the ultimate statutory or regulatory standard of proof for those forms of protection.

The rule will limit asylum eligibility for some noncitizens. But, as the Supreme Court has explained, asylum "does not correspond to Article 33 of the Convention, but instead corresponds to Article 34[,]" which provides that contracting countries "shall as far as possible facilitate the assimilation and naturalization of refugees." *Cardoza-Fonseca,* 480 U.S. at 441 (quoting Refugee Convention art. 34, 19 U.S.T. at 6276, 189 U.N.T.S. at 176); *see also* United Nations High Commissioner for Refugees ("UNHCR"), *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* 16 para. 25 (2019 ed.) ("[T]he granting of asylum is not dealt with in the 1951 Convention or the 1967 Protocol"). Article 34 "is precatory; it does not require the implementing authority actually to grant asylum to all those who are eligible." *Cardoza-Fonseca,* 480 U.S. at 441. Because the limitation on asylum eligibility does not affect ultimate eligibility for statutory withholding of removal or protection under the CAT regulations, the rule is consistent with U.S. non-refoulement obligations under the Refugee Protocol (incorporating,

STB_AR1_000019

among other things, Article 33 of the Refugee Convention) and the CAT. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that ''the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution—is given full effect by the Attorney General's withholding-only rule''); *Cazun* v. *Att'y Gen. U.S.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

The Departments agree that asylum is an important form of protection and acknowledge that the right to seek asylum has been recognized under the Universal Declaration of Human Rights (''UDHR''), art. 14, G.A. Res. 217A (III), U.N. Doc. A/810 (1948). The UDHR is a nonbinding human rights resolution of the UN General Assembly, and thus it does not impose legal obligations on the United States. *See Sosa* v. *Alvarez-Machain,* 542 U.S. 692, 734–35 (2004) (''[T]he [UDHR] does not of its own force impose obligations as a matter of international law.'').

Moreover, although the rule creates a limitation on eligibility for asylum, the rule does not bar those seeking asylum from taking part in procedures that protect them from refoulement. Under the rule, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. Even in those cases where the AO determines that the noncitizen has not established a significant possibility that they could ultimately demonstrate by a preponderance of the evidence that they are not subject to the limitation on asylum eligibility or are excepted from it, the noncitizen may still demonstrate credible fear by showing a reasonable probability of persecution or torture. Similarly, even if found ineligible for asylum by an IJ due to the application of the limitation on asylum eligibility, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

The rule is also consistent with the Refugee Convention and the corresponding obligations under international law, including the specific provisions cited by commenters. The rule does not violate the nondiscrimination requirement in Article 3 of the Refugee Convention. Article 3 prohibits discrimination on the basis of ''race, religion or country of origin.'' 19 U.S.T. at 6264, 189 U.N.T.S.

at 156. The rule does not discriminate on the basis of any of the protected characteristics described in Article 3. This rule is limited to the southern border because that is the U.S. border where emergency circumstances exist. The Departments acknowledge that this limitation will affect those noncitizens with easier access to the southern border and not those with easier access to other borders of the United States. However, the rule does not treat such noncitizens differently on that basis; the rule applies equally based on the actions of a noncitizen during emergency border circumstances. Specifically, the application of this rule is limited to those who enter the United States across the southern border during emergency border circumstances described in the Proclamation and this rule, are not described in section 3(b) of the Proclamation, and do not establish the existence of exceptionally compelling circumstances. For the same reason, the rule does not violate other antidiscrimination principles described in other international human rights treaties, including the International Convention on the Elimination of All Forms of Racial Discrimination, arts. 2–5, Dec. 21, 1965, T.I.A.S. No. 94–1120, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights, arts. 2–3, Dec. 16, 1966, T.I.A.S. No. 92–908, 999 U.N.T.S. 171.

Similarly, the rule is consistent with Article 31.1 of the Refugee Convention, which prohibits states from ''impos[ing] penalties'' on refugees based on ''illegal entry or presence'' if such refugees are ''coming directly from a territory where their life or freedom was threatened'' and ''present themselves without delay to the authorities and show good cause for their illegal entry or presence.'' 19 U.S.T. at 6275, 189 U.N.T.S. at 174. As the commentary to the Refugee Convention explains, the term ''penalties'' in Article 31.1 refers ''to administrative or judicial convictions on account of illegal entry or presence, not to expulsion.'' UNHCR, *The Refugee Convention, 1951: The Travaux Préparatoires Analyzed with a Commentary by Dr. Paul Weis* 219, *https://www.unhcr.org/us/media/ refugee-convention-1951-travaux-preparatoires-analysed-commentary-dr-paul-weis; see Cazun,* 856 F.3d at 257 & n.16 (rejecting argument that the reinstatement bar on asylum was a ''penalty'' within the meaning of Article 31.1). The rule does not change any rules or policies relating to detention or convictions for unlawful entry or presence. The Departments acknowledge that the Ninth Circuit

concluded in *East Bay III,* 993 F.3d at 674, that the bar to asylum at issue in that case violated Article 31.1 of the Refugee Convention because it imposed a ''penalty.'' As described in the IFR, the rule here does not create a categorical bar to asylum, but instead a limitation on asylum eligibility, and *East Bay III* accordingly does not address the lawfulness of this rule. 89 FR at 48735. Moreover, the Ninth Circuit's conclusion was erroneous because the denial of discretionary relief is not a penalty within the meaning of Article 31.1. *Id.* at 48736.

*Comment:* One commenter asserted that the IFR conflicts with the United States Supreme Court's decisions in *Murray* v. *Schooner Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 (1804), which generally states that ambiguous U.S. statutes should be interpreted to avoid conflicts with international law where possible, and *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 436–37 (1987), which explained that ''one of Congress' primary purposes'' when passing the Refugee Act of 1980 ''was to bring United States refugee law into conformance with the 1967 [Refugee Protocol].''

*Response:* The Departments disagree with the commenter that the IFR conflicts with *Charming Betsy* or *Cardoza-Fonseca.*[83] As explained above, the rule is consistent with the United States' obligations under international law, specifically the Refugee Convention, the Refugee Protocol, and the CAT. The rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection and is consistent with the United States' non-refoulement obligations. Moreover, the rule does not prohibit any person from seeking asylum or, more importantly for purposes of U.S. non-refoulement obligations, from seeking or obtaining statutory withholding of removal or CAT protection. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview. Even in cases in which the AO determines that the noncitizen is subject to the limitation on eligibility for asylum, the noncitizen may still receive a positive credible fear determination by

---

[83] For purposes of this response, the Departments assume *arguendo* that the *Charming Betsy* canon applies with respect to non-self-executing treaties. *See, e.g., Saleh* v. *Bush,* 848 F.3d 880, 891 n.9 (9th Cir. 2017) (noting that the question remains unsettled).

STB_AR1_000020

showing a reasonable probability of persecution or torture. Similarly, after applying for asylum before an IJ, a noncitizen may still demonstrate eligibility for statutory withholding of removal or CAT protection.

e. UNHCR Guidelines on International Protection

*Comment:* Commenters stated that the rule violates UNHCR statements and guidelines and the right to seek asylum guaranteed by Article 14 of the UDHR. Commenters also claimed that the pre-screening procedures in expedited removal proceedings are contrary to UNHCR guidelines and that adjudicators must instead provide full and individualized assessments of each asylum case.

*Response:* The Departments agree that asylum is an important protection in international law and acknowledge that the right to seek asylum has been recognized under article 14 of the UDHR. However, the UDHR is a nonbinding human rights resolution of the UN General Assembly and does not impose legal obligations on the United States. *See Sosa,* 542 U.S. at 734–35 (''[T]he [UDHR] does not of its own force impose obligations as a matter of international law.''). Moreover, UNHCR's interpretations of, or recommendations regarding, the Refugee Convention and Refugee Protocol are ''not binding on the Attorney General, the BIA, or United States courts.'' *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 427 (1999). UNHCR's Handbook on Procedures and Criteria for Determining Refugee Status ''itself disclaims such force, explaining that 'the determination of refugee status under the 1951 Convention and the 1967 Protocol . . . is incumbent upon the Contracting State in whose territory the refugee finds himself.''' *Id.* at 427–28 (quoting *Cardoza-Fonseca,* 480 U.S. at 439 n.22). Such guidance ''may be a useful interpretative aid,'' *id.* at 427, but it does not impose obligations on the United States.

*Comment:* Commenters stated that the rule violates the Refugee Convention because the exclusion grounds in Article 1(F) of the Refugee Convention are exhaustive, yet the rule creates an exclusion ground not found in Article 1(F). The commenters acknowledged that the rule's limitation on asylum eligibility contains an exception but asserted that the exception is insufficient to comply with the Refugee Convention. Along the same lines, a commenter asserted that such exclusionary grounds should only be considered after an assessment of whether the noncitizen is a ''refugee''

and be balanced against the need for protection itself, as is the order of procedures in a full merits hearing.

*Response:* The Departments disagree with the commenters' characterization of the limitation on asylum eligibility in this rule as a ground of exclusion like those in Article 1(F) of the Refugee Convention. Article 1(F) of the Refugee Convention provides that the provisions of the Convention ''shall not apply to any person with respect to whom there are serious reasons for considering that'' they have: (1) ''committed a crime against peace, a war crime, or a crime against humanity''; (2) ''committed a serious non-political crime outside the country of refuge prior to [their] admission to that country as a refugee''; or (3) ''been guilty of acts contrary to the purposes and principles of the United Nations.'' As explained above, the United States has implemented the non-refoulement provisions of Article 33.1 of the Refugee Convention through the withholding of removal provisions at section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through the asylum provisions at section 208 of the INA, 8 U.S.C. 1158. This rule's limitation on asylum eligibility does not extend to statutory withholding of removal and therefore does not implicate the application of the Convention's exclusion grounds to the mandatory non-refoulement obligation of Article 33. *See R–S–C,* 869 F.3d at 1188 n.11 (explaining that ''the Refugee Convention's nonrefoulement principle—which prohibits the deportation of aliens to countries where the alien will experience persecution— is given *full effect* by the Attorney General's withholding-only rule'' (emphasis added)). Nor does the rule restrict who qualifies as a refugee. *Cf.* INA 101(a)(42), 8 U.S.C. 1101(a)(42) (excluding those who ''ordered, incited, assisted, or otherwise participated in the persecution of any person on account of'' a protected ground from the ''refugee'' definition); UNHCR, *UNHCR Statement on Article 1F of the 1951 Convention* at 1 (July 2009), *https:// www.unhcr.org/us/media/unhcr-statement-article-1f-1951-convention* (providing that the exclusion grounds ''exclude a person from being a refugee where there are serious reasons for considering that she/he has committed certain heinous acts'').

In any event, the exclusion clauses of Article 1(F) of the Refugee Convention do not limit the United States from adopting additional or different limitations on asylum eligibility. Congress has implemented Article 1(F) in establishing mandatory bars to eligibility for statutory withholding of

removal. *See* INA 241(b)(3)(B), 8 U.S.C. 1231(b)(3)(B). Congress adopted certain parallel bars to asylum eligibility, *see, e.g.,* INA 208(b)(2)(A), 8 U.S.C. 1158(b)(2)(A), but also authorized the Departments to establish additional limitations on asylum eligibility, *see* INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As discussed earlier in this preamble, the asylum statute implements the precatory provision in Article 34 of the Convention, but neither the mandatory nor the precatory provisions of the Convention and Protocol are directly enforceable in U.S. law. *See Stevic,* 467 U.S. at 428 & n.22; *Al-Fara,* 404 F.3d at 743 (''The 1967 Protocol is not self-executing, nor does it confer any rights beyond those granted by implementing domestic legislation.'' (citations omitted)). Instead, the United States has implemented its obligations through domestic legislation and implementing regulations, and the Protocol ''serves only as a useful guide in determining congressional intent in enacting the Refugee Act.'' *Barapind* v. *Reno,* 225 F.3d 1100, 1107 (9th Cir. 2000) (citations omitted). Thus, the Refugee Protocol does not circumscribe the United States' prerogative to establish limitations on asylum eligibility that extend beyond the exclusion grounds described in Article 1(F).

f. 2000 Protocol To Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children

*Comment:* A commenter stated that the rule conflicts with the United States' obligations under the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Nov. 15, 2000, 2237 U.N.T.S. 319 (''Trafficking Protocol''), and the Trafficking Victims Protection Act of 2000 (''TVPA''), 22 U.S.C. 7101 *et seq.,* because the rule will not prevent human trafficking and will instead drive trafficking networks further underground and make people more vulnerable to exploitation. The commenter stated that the reality of human movement and escape from harm will drive people to take other routes and reported that they had handled cases involving individuals who were mistreated after being forced to take on large debts to pay smuggling networks to seek safety in the United States. The commenter also claimed the rule will exacerbate violent crime, which increases asylum seekers' vulnerabilities to trafficking.

*Response:* The Departments disagree that the rule conflicts with U.S.

STB_AR1_000021

obligations under the Trafficking Protocol or the TVPA. At the outset, the Departments note that the Trafficking Protocol is separate from the Refugee Convention and Refugee Protocol; the Trafficking Protocol explicitly disclaims any impact upon those agreements or on the non-refoulement principle they contain. *See* Trafficking Protocol art. 14(1) ("Nothing in this Protocol shall affect the rights, obligations and responsibilities of States and individuals under international law, including . . . , in particular, where applicable, the 1951 Convention and the 1967 Protocol relating to the Status of Refugees and the principle of non-refoulement as contained therein.").

In addition, the rule is consistent with the Trafficking Protocol and TVPA. Nothing in the IFR or the rule is implicated by or conflicts with the provisions of the Trafficking Protocol, none of which relate to limitations on asylum eligibility. Moreover, the IFR and this rule remain in line with the purpose of the Trafficking Protocol in protecting and assisting the victims of human trafficking,[84] as they specify that any person who can demonstrate by a preponderance of the evidence that they are a "victim of a severe form of trafficking in persons" as defined in 8 CFR 214.201 will thereby show exceptionally compelling circumstances, and will therefore not be subject to the rule's limitation on asylum eligibility. Similarly, the IFR and this rule are entirely consistent with the TVPA, which provides immigration relief to certain victims of a severe form of trafficking in persons who assist law enforcement (or meet certain exceptions), Public Law 106–386, sec. 107(e), 114 Stat. 1464, 1477, but does not otherwise implicate immigration authorities under title 8.

Regarding the commenter's concerns about smuggling and trafficking, the Departments believe the most helpful approach to prevent migrants from falling victim to smugglers and traffickers is to both discourage attempts to enter the United States irregularly and, ultimately, to increase the availability of lawful pathways for migration.

This rule is expected to continue to reduce irregular migration, which benefits human smuggling and trafficking organizations. The rule is also expected to reduce human trafficking and smuggling by reducing overall flows of migrants, thereby allowing the Departments to better manage their limited resources while

delivering consequences more swiftly through expedited removal for those without a legal basis to remain. *Id.* at 48762, 48766–67.

Moreover, CBP immigration officers (both USBP agents and CBP officers) have extensive experience interviewing and observing individuals. *Id.* at 48744. They are trained to identify potential trafficking victims or victims of crimes and to take appropriate follow up action. *Id.* The commenter's prediction that the rule may increase asylum seekers' vulnerabilities to trafficking is speculative and ignores CBP immigration officers' training and experience in combating and preventing human trafficking. Additionally, without this rule, incentives for irregular migration would likely increase, which would likely exacerbate the very vulnerabilities about which the commenter expressed concern, including by driving more migrants into the hands of human traffickers promising a pathway to the United States. *See id.* at 48714–15.

Regarding the commenter's concerns about the safety of noncitizens attempting to enter the United States, one cause of recent surges in irregular migration is smugglers and migrants' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. *Id.* at 48714. The Departments assess that the IFR has significantly increased the ability to deliver timely decisions and consequences, combating contrary messaging and perceptions. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. Additional discussion of the rule's incentive effects is found at Sections III.A.2 and III.B.2 of this preamble.

2. Justification and Statements on Need for the Rule

a. Rule Is Unjustified, Unsubstantiated, or Arbitrary

*Comment:* Several commenters argued that the Departments' reliance on the success of the Circumvention of Lawful Pathways rule to justify the IFR is erroneous because the evidence regarding the high levels of encounters at the border does not support implementing such "extreme" measures as those contained in the IFR. One commenter stated that the Departments cannot argue that the Circumvention of Lawful Pathways rule has been successful at alleviating the stress on the border and immigration systems while at the same time arguing that the measures in the IFR are needed to

address the surge in high levels of migration at the southern border. Another commenter argued that (1) the increase in encounters prior to the end of the Title 42 public health Order does not necessarily mean that encounters would have remained high after the Title 42 public health Order ended, and (2) it is implausible that the Circumvention of Lawful Pathways rule led to higher encounters prior to its implementation and lower encounters after its implementation, as most migrants did not know what the Circumvention of Lawful Pathways rule was before it was implemented. Thus, the commenter claimed, it is more likely that the end of the Title 42 public health Order was the reason for higher encounters prior to its end and lower encounters after its end. The commenter concluded that, as there is insufficient evidence to support the asserted success of the Circumvention of Lawful Pathways rule, a fundamental justification of the IFR, it is not justifiable to institute more stringent processes under the IFR.

Another commenter similarly took issue with the effectiveness of the Circumvention of Lawful Pathways rule, stating that it is well understood that the Title 42 public health Order drove border crossings to record highs, and the end of the Title 42 public health Order would therefore have led to a substantial decrease in border crossings without further policy changes. However, the commenter said the Departments claimed, without any evidence, that crossing levels under the Title 42 public health Order were somehow predictive of crossing levels after the Title 42 public health Order ended; the commenter said this assertion is contrary to the record.

*Response:* The Departments disagree with commenters' claim that there is not enough evidence demonstrating the Circumvention of Lawful Pathways rule's impact on encounters at the SWB. In the first month following the implementation of the Circumvention of Lawful Pathways rule, encounters between POEs along the SWB decreased by 69 percent compared to their peak just before the end of the Title 42 public health Order.[85] The Departments believe that overall encounters would not have decreased after the end of the Title 42 public health Order absent their implementation of policy changes, including the Circumvention of Lawful Pathways rule, to address the level of irregular migration. The Departments

---

[84] Trafficking Protocol art. 2.b, 2237 U.N.T.S. at 344.

[85] *See* Decl. of Blas Nuñez-Neto ¶ 13, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2).

STB_AR1_000022

agree with commenters that the Title 42 public health Order increased repeat crossing attempts, but as noted in the Circumvention of Lawful Pathways rule, repeat crossings were a contributing factor, but not the only reason, for the increase in overall encounters: for example, unique encounters with nationals of countries outside of Mexico and Northern Central America were also rising also increased in each of FYs 2022–2024, as compared with the pre-pandemic period.[86] In addition to the overall increase in encounters and unique encounters, several other factors caused the Departments to project a spike in average daily encounters in the run-up to the end of the Title 42 public health Order, including: (1) the prospect that DHS would no longer have a means to promptly expel migrants without a legal basis to stay in the United States following the termination of the Title 42 public health Order; (2) the presence of several large diaspora populations in Mexico and elsewhere in the hemisphere; (3) the unprecedented recent growth in migration from countries of origin not previously typically encountered; (4) the already large number of migrants in proximity to the SWB; and (5) the general uncertainty surrounding the expected impact of the termination of the Title 42 public health Order. *See* 89 FR at 48723; *see also* 88 FR at 31316. Consistent with their projections, the Departments planned for, and briefly observed, a very significant spike in average daily encounters. *See* 89 FR at 48723. Had these levels of migration persisted without the incentives put in place by the Circumvention of Lawful Pathways rule, encounters may have exceeded even the very high levels of irregular migration that the Departments observed under that rule. *See id.* at 48723–24. The Departments believe the Circumvention of Lawful Pathways rule mitigated the overall impact on the border security and immigration systems that would have been caused by an expected surge following the end of processing under the Title 42 public health Order. This is evidenced by the sharp initial drop CBP saw in overall encounters at the SWB in the weeks following the expiration of the Title 42 public health Order and when the Circumvention of Lawful Pathways rule

went into effect.[87] Instead of seeing a surge of migrants arriving at the border following the end of the Title 42 public health Order, there was a precipitous drop that lasted through June 2023.[88] At about the same time DHS assessed, and public reporting confirmed, that DHS messaging about the Circumvention of Lawful Pathways rule and associated measures were effective in dissuading potential migrants from attempting to cross the U.S. border due to the disincentives created by that rule.[89]

The Departments recognize that while the Circumvention of Lawful Pathways rule is a valuable tool available to the Departments to reduce irregular migration, it is not, by itself, able to mitigate all the factors influencing migration trends. Despite the success of the Circumvention of Lawful Pathways rule and complementary measures, for much of the immediate post-pandemic period until issuance of the IFR, border encounters remained higher than the Departments' abilities to consistently deliver timely decisions and consequences.[90] Therefore, even if the

evidence supporting the Circumvention of Lawful Pathways rule's success was inconclusive (which the Departments do not believe), the Departments would have adopted the IFR in response to the high number of migrants subsequently arriving at the southern border, overwhelming the Departments' resources and preventing them from delivering timely decisions and consequences to those who lack a lawful basis to remain.

The rule is a tailored approach designed to substantially improve the Departments' abilities to process noncitizens more expeditiously and deliver timely decisions and consequences to most noncitizens who cross between POEs into the United States during emergency border circumstances. As discussed in Section II.A.2 of this preamble, the IFR is working as intended. DHS is placing into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB, the rule has reduced the percentage of noncitizens encountered at the SWB who are released, and DHS is more quickly removing a greater percentage of those without a legal basis to remain in the United States than during the immediate post-pandemic period, which in turn discourages additional crossings.[91] Since promulgating the IFR,

---

[86] Unique USBP SWB encounters of nationals of countries other than Mexico and Northern Central America were more than 30 times higher in each of FY 2022–FY 2024 (through May 2024) than in the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset (USBP Encounters by Citizenship tab).

[87] Average daily CBP SWB encounters fell 68 percent from their May 12, 2023, level in the first 11 days after the CLP rule went into effect and remained at similar low levels throughout May and June 2024. OHSS analysis of July 2024 OHSS Persist Dataset (Encounters FY2000–2024 tab).

[88] *Id.* In July 2023, total monthly CBP SWB encounters remained below 200,000. While total encounters increased from August 2023 through December 2023, the same increase occurred between August 2022 and December 2022 while the Title 42 public health Order was still in place, suggesting that these surges are more consistent with seasonal migration trends that changes in U.S. immigration policy cannot unilaterally mitigate. *Id.*

[89] *See* Mary Beth Sheridan, Reyes Mata III, Maria Sacchetti & Nick Miroff, *End of Title 42 Pandemic Border Policy Brings Reset, But No Sudden Rush,* Wash. Post (May 12, 2023), *https://www.washingtonpost.com/nation/2023/05/12/title-42-pandemic-ends-border-migrants/; see also* Valerie Gonzalez, *Migrants Rush Across U.S. Border in Final Hours Before Title 42 Asylum Restrictions are Lifted,* PBS (May 11, 2023), *https://www.pbs.org/newshour/politics/migrants-rush-across-u-s-border-in-final-hours-before-title-42-asylum-restrictions-are-lifted;* Decl. of Blas Nuñez-Neto ¶ 22, *E. Bay Sanctuary Covenant* v. *Biden,* No. 18-cv-6810 (N.D. Cal. June 16, 2023) (Dkt. 176–2); *Testimony of Blas Nuñez-Neto Before U.S. House of Representatives Committee on Homeland Security Subcommittee on Border Security and Enforcement on "Examining DHS' Failure to Prepare for the Termination of Title 42"* (June 6, 2023), *https://www.congress.gov/118/meeting/house/115908/witnesses/HHRG-118-HM11-Wstate-Nuez-NetoB-20230606.pdf.*

[90] Total daily SWB encounters averaged about 5,700/day in April and May 2024 and USBP SWB encounters averaged about 4,100/day, compared to averages of 1,600 and 1,300/day, respectively, in the pre-Pandemic period (OHSS analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab)). In late 2023, while the Title 42 public health Order was in place, total encounters at the SWB reached all-time highs. OHSS's analysis of July 2024 Persist Dataset (Encounters FY2000–2024 tab) shows that total SWB encounters reached over 242,000 in November 2023 and over 301,000 in December

2023. Total SWB encounters for the month of May 2023 were approximately 207,000. This was the month the Title 42 public health Order ended and when the Circumvention of Lawful Pathways rule went into effect. Total SWB encounters for the following month (June 2023) dropped precipitously to 145,000 encounters, but total SWB encounters climbed back to 233,000 in August 2023 and remained at highly elevated levels through December 2023.

[91] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP August 6, 2024, for encounters since May 1, 2024 (Summary Statistics tab). For encounters under the IFR through July 31, 2024, 34 percent of bookouts of single adults and individuals in family unit were releases, compared to 64 percent in the immediate post-pandemic period. Thirty percent of bookouts from CBP custody were repatriations, up from 16 percent during the immediate post-pandemic period. Overall, DHS repatriated an average of approximately 1,370 noncitizens encountered at the SWB per day during the first two months of enforcement under the IFR, up from approximately 1,360 in the immediate post-pandemic period. *Id.* This marginal increase understates the actual impact of the IFR, however, given the sharp drop in encounters: repatriations of noncitizens encountered at the SWB as a share of SWB encounters were equivalent to 26 percent in the immediate post-pandemic period compared to 62 percent under the IFR—a rate that is also slightly higher than the pandemic period (58 percent, only 5 percent of which were title 8 repatriations) and the pre-pandemic period (61 percent, at a time of much lower encounters and when Mexicans and Northern Central Americans accounted for over 90 percent of USBP encounters). *Id.* For public reporting suggesting that migrants are aware of the IFR and that it has discouraged attempts to cross

STB_AR1_000023

USBP has placed 59 percent of noncitizen single adults and individuals in family units encountered at the SWB into expedited removal proceedings, compared to 18 percent of such noncitizens during the immediate post-pandemic period following the end of the Title 42 public health Order,[92] and 41 percent in the pre-pandemic period.[93]

While more noncitizens without a legal basis to remain in the United States were removed under the Circumvention of Lawful Pathways rule than in the pre-pandemic period, the Departments recognize that the volume of noncitizens arriving at the SWB remained beyond the Departments' capacity to timely process given the resources provided by Congress.[94] As explained in the IFR's preamble, once the Departments resumed widespread processing under their title 8 authorities, it became clear that, even with the Circumvention of Lawful Pathways rule's expanded measures to impose consequences along the SWB, substantial migration throughout the hemisphere, combined with inadequate resources and tools to keep pace, limited DHS's ability to meaningfully address the historic levels of encounters at the southern border. *See* 89 FR at 48713.

The Departments did not and have not represented that the Circumvention of Lawful Pathways Rule would singlehandedly resolve migratory pressures in the region; the Departments

only represent that it would reduce the number of daily encounters at the SWB that, absent intervention, were predicted to materialize in a post-Title 42 public health Order surge. The pre-IFR status quo of the broken immigration and asylum systems had become a driver for irregular migration throughout the region and an increasingly lucrative source of income for dangerous TCOs. *See* 89 FR at 48714. Without adequate countermeasures, those TCOs will continue to grow in strength, likely resulting in even more smuggling operations and undermining democratic governance in the countries where they operate. *See id.* All of these factors, taken together, pose significant threats to the safety and security of migrants exploited into making the dangerous journey to the SWB and the U.S. communities through which many such migrants transit. *See id.* at 48715.

Moreover, the Departments do not expect the Circumvention of Lawful Pathways rule or this rule to solve every migration problem in the region. Its provisions cannot account for every factor impacting the unprecedented level of migration occurring in the Western Hemisphere, which is why the Departments have instituted complementary measures such as creating lawful, safe, and orderly pathways. Thus far, as discussed in Section II.A of this preamble, this rule has demonstrated that it helps meet its goal of allowing the Departments to deliver timely decisions and consequences during emergency border circumstances.

*Comment:* Several commenters argued that the rule's characterization of the situation at the border as an "emergency" is arbitrary. Commenters took issue with the rule's use of the daily encounter thresholds to identify the existence of emergency border circumstances. One commenter argued that the circumstances that give rise to "emergency border circumstances" and so trigger the provisions of the rule have been met for quite some time and are not a uniquely emergent circumstance but a reflection of an increase in migration globally. Another claimed that rather than starting with an assessment of need, looking at the number of asylum seekers and the capacities of other countries in the region, the Departments began with the current level and allocation of resources in the United States and "work[ed] backwards from there."

Commenters also argued that the rule is arbitrary because it invokes emergency authority while simultaneously asserting that border crossings are down. One commenter

argued that the existence of this emergency is undercut by an almost 50 percent drop in unauthorized border crossings since December 2023, a period during which the Departments' threshold has nonetheless been met. Citing to a statement in Section III.B.2 of the IFR's preamble, a commenter stated the Departments "concede" that the rule was based on a fear of a future emergency rather than a current one.

Finally, one commenter wrote that if a unilateral declaration of an emergency is all that is required for a Federal agency to violate statutes and court decisions, then the Executive Branch could call everything an "emergency." The commenter claimed that the IFR's limitation on asylum eligibility violates section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1), and is indistinguishable from prior regulations that imposed limitations on asylum eligibility that some courts have held unlawful. The commenter also claimed that the rule violates section 235 of the INA, 8 U.S.C. 1225, because it conditions a noncitizen's access to a credible fear interview on the ability to obtain a CBP One appointment. The commenter argued that labeling the situation at the southern border an emergency does not allow the Departments to disregard these statutes and court decisions.

*Response:* The Departments disagree that the numerical encounter thresholds are arbitrary and do not reflect the existence of "emergency" circumstances at the southern border. As explained in the IFR, emergency border circumstances exist when "encounters at the southern border exceed DHS's capacity to deliver timely consequences to most individuals who cross irregularly into the United States and cannot establish a legal basis to remain in the United States." 89 FR at 48711. Thus, an emergency border circumstance is a function of high levels of encounters combined with resource constraints that substantially limit DHS's ability to place eligible noncitizens into expedited removal, the primary consequence-delivery mechanism Congress has made available to the Departments for managing border encounters under title 8. *Id.* at 48714. When southern border encounters exceed DHS's ability to process noncitizens for expedited removal, DHS generally must release those noncitizens pending section 240 removal proceedings, a process that can take several years to conclude. *Id.* The comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against the irregular migration of noncitizens without strong claims for asylum, and

---

into the United States irregularly, see Mariana Martínez Barbra & Caterina Morbiato, *US Border Policy Spurred Migrant Camps Hundreds of Miles Away in Mexico's Capital,* Associated Press, Sept. 1, 2024, *https://apnews.com/article/mexico-migrants-asylum-cbp-app-camps-22b49fabf6e4d7d 25d2873d0637544fe.*

[92] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab).

[93] *Id.*

[94] OHSS analysis of July 2024 OHSS Persist Dataset (Immediate Post-Pandemic Details tab). Although sustained high encounter rates outstripped the Departments' abilities—based on available resources—to process noncitizens through expedited removal in significant numbers in the immediate post-pandemic period, between May 12, 2023, and June 4, 2024, CBP placed into expedited removal an average of about 920 individuals encountered between POEs each day on average, and USCIS conducted more than 206,000 credible fear interviews, a record number. *Id.* Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 796,000 noncitizens who did not have a legal basis to remain in the United States, the vast majority of whom crossed the SWB. *Id.* USBP encounters at the SWB decreased by 16 percent compared to the previous 12 months, to an average of 5,100 per day for the period from May 12, 2023, to June 4, 2024, *id.,* and border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule and complementary measures. April 2023 OHSS Encounter Projection.

**STB_AR1_000024**

this disincentive is diminished when noncitizens are placed into section 240 removal proceedings, which may take several years to conclude.

Given the resources made available by Congress, the Departments determined that the daily encounter thresholds described in the June 3 Proclamation and this rule are a reasonable proxy for when such emergency border circumstances exist. *See* 89 FR at 48749–54. Specifically, when daily encounters average less than 1,500 for a sustained period, DHS anticipates that it "would be able to swiftly deliver a consequence to enough individuals to meaningfully impact migratory decisions and deter unlawful entries." *Id.* at 48752. In contrast, when daily encounters exceed 2,500, "DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level." *Id.* For example, as noted in the IFR, during the FY 2013 to FY 2019 pre-pandemic period, USBP encounters only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, an average of 210 individuals were released each day in months in which daily encounters were between 1,500 and 2,500, while approximately 1,300 individuals were released each day in months in which daily encounters exceeded 2,500, with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.* (footnote omitted). And as discussed below in Section III.D.1 of this preamble, the Departments' demonstrated capacity during the immediate post-pandemic period confirms that these thresholds reflect current operational capacity. If Congress provides significant additional resources, the Departments may then reevaluate whether the current thresholds still serve as a reasonable proxy for when such emergency border circumstances exist.

Relatedly, the Departments disagree with commenters' suggestion that it was arbitrary to rely on the United States' own processing capacity and challenges as a justification for the rule without any consideration of the capacities of other countries in the region to address heightened migration. The Departments acknowledge that since 2021, due to political and economic conditions globally, there have been substantial levels of migration throughout the Western Hemisphere, which have severely strained the capacities of immigration systems in countries throughout the region. *See* 89 FR at 48722. The United States Government

has been working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[95] including by working closely with partner countries across the Western Hemisphere.[96] The Departments do not believe it would be appropriate to defer this rulemaking until foreign partners have developed enough capacity to absorb all irregular migrants, or to measure whether an emergency exists at the southern border by reference to whether such migrants have what commenters would view as sufficient opportunities to resettle elsewhere. Instead, the rule is part of the United States' efforts to act as a regional leader in responding to increased migratory flows. *See* Section III.E.1.a of this preamble. Moreover, the rule is structured to complement those regional efforts, as success in reducing push factors and in promoting alternatives to migration to the United States would contribute to decreasing encounter levels and alleviating emergency border circumstances. The rule permissibly responds to existing challenges at our southern border by providing effective safeguards that improve the Departments' ability to enforce the United States' immigration laws during periods of heightened migration by creating an incentive for noncitizens to use the lawful, safe, and orderly pathways that the Departments have put in place while simultaneously imposing swift consequences on those who do not have a legal basis to remain in the United States. *See* Section II.A.2 of this preamble. And this ability to impose consequences quickly, combined with a historic expansion of lawful pathways, is a critical element of the United States' ongoing diplomatic approach to migration management with partners in the region. *See id.* at 48759–60.

The Departments further note that the United States Government is working with regional partners in a concerted and historic effort via the groundbreaking Los Angeles Declaration on Migration and Protection to address the shared challenge of irregular migration that has strained the resources

of countries throughout the region.[97] The United States has taken steps to address migratory flows throughout the region by encouraging foreign partners to increase their enforcement efforts, integrate migrants residing in their territories, expand lawful pathways and processes, and channel intending migrants into those pathways.[98] The United States is also working to address the root causes of migration, such as a lack of opportunity, poor government and corruption, crime, and violence in countries across the region and the world.[99] However, these measures will take time to have significant impacts and have not been in effect long enough to alleviate the stress that high encounters impose on the United States border security and immigration systems. *See id.* at 48727. In the face of these challenges to the United States' own border and immigration systems, however, the Departments believe that it is appropriate to act at the southern border while pursuing efforts to address the root causes of migration more broadly.

Second, the Departments disagree that, prior to implementation of the IFR, there had not been emergency circumstances at the southern border. During the immediate post-pandemic period, average daily encounters were at levels that significantly exceeded the Departments' capacity to impose consequences on most noncitizens who crossed irregularly at the southern border.[100] As the June 3 Proclamation explains, the border security and immigration systems are badly strained and have been for many years. 89 FR at 48490. DHS processing facilities frequently become overcrowded, forcing DHS to release into the United States noncitizens who could otherwise be

---

[95] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https:// www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (committing to addressing root causes of migration).

[96] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/ statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[97] *See* The White House, *Press Release: Los Angeles Declaration on Migration and Protection* (June 10, 2022), *https://www.whitehouse.gov/ briefing-room/statements-releases/2022/06/10/los-angeles-declaration-on-migration-and-protection/.*

[98] *Id.*

[99] *See* Marcela X. Escobari, *FPC Briefing: Migration Policy and the Biden-Harris Administration's Root Cause Strategy* (June 22, 2023), *https://www.state.gov/briefings-foreign-press-centers/migration-policy-and-the-biden-harris-admins-root-causes-strategy; see also* The White House, *Fact Sheet: Strategy to Address the Root Causes of Migration in Central America* (July 29, 2021), *https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/29/fact-sheet-strategy-to-address-the-root-causes-of-migration-in-central-america/.*

[100] OHSS analysis of July 2024 OHSS Persist Dataset (Summary Statistics tab) (reflecting that average daily encounters were over 5,100 per day during the immediate post-pandemic period). From May 12, 2023 through June 4, 2024, USBP referred a daily average of about 860 individuals encountered at the SWB into the expedited removal process. *See id.* (Imm Post-Pandemic ERCF tab).

STB_AR1_000025

processed for expedited removal, and place them into section 240 removal proceedings, the resolution of which can take years given the pre-existing backlog. By the end of the first half of FY 2024, despite EOIR being on pace to complete a record number of cases during FY 2024 and DHS maximizing expedited removal as much as resources allow, EOIR had received over 1 million initial receipts, some of which could have been processed for expedited removal had there been sufficient resources to do so, increasing the pending caseload before EOIR to over 3.1 million cases.[101] The Departments believe that releasing individuals who may otherwise be referred for expedited removal may inadvertently incentivize increased irregular migration and the exploitation of the asylum system, especially by human smugglers who encourage migrants to claim fear once they are encountered by USBP as it will allow them to remain in the United States for years pending resolution of their case and, where appropriate, removal. 88 FR at 31326. Moreover, maximizing credible fear screening capacity pulls resources away from USCIS processing cases in the affirmative asylum backlog, which had reached over 1.25 million cases as of the third quarter of FY 2024.[102] This vicious cycle is exactly the circumstance to which the rule is responding.[103] The decrease in encounter levels after December 2023 was not an indication that emergency border circumstances had abated or the IFR was not warranted, because encounters remained well above the daily encounter thresholds that, as described above, the Departments determined reflect the existence of emergency

border circumstances.[104] *See* 89 FR at 48752. That DHS had anticipated an increase in migration absent the IFR was not a concession that the rule was unnecessary. Rather, that projection reflected the urgent need to take immediate action, without which encounters would have increased, and the emergency border circumstances that existed at the time that the IFR was issued would have continued to worsen. *See* 89 FR at 48726. Given that daily encounters persistently remain above 1,500—and could rise above 1,500 again, even if they decline for a time— the IFR is currently and will remain an important policy tool.

Finally, the Departments disagree with one commenter's suggestion that the Departments are characterizing the situation at the southern border as an emergency to avoid complying with their legal obligations under the INA and certain court decisions. The commenter is incorrect because the rule is fully compliant with relevant provisions of the INA and applicable judicial decisions. For the reasons discussed in Section III.A.1 of this preamble, the rule is fully consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). Moreover, for the reasons discussed in Section III.C.1.a.i. of this preamble, the Departments also disagree that the rule conditions noncitizens' access to the credible fear process on the ability to obtain CBP One appointments in violation of section 235 of the INA, 8 U.S.C. 1225. Finally, for the reasons discussed in the IFR, *see* 89 FR at 48735–39, and Section III.A of this preamble, the Departments disagree with commenters' comparison between this rule and prior regulatory actions imposing a limitation on asylum eligibility that some courts have ruled unlawful.

*Comment:* Several commenters argued that the Departments justified the rule using mischaracterizations of asylum grant rates resulting from positive credible fear determinations. Commenters took issue with the Departments' reference to a ''small proportion'' of noncitizens in the credible fear process who are likely to

be granted asylum, stating that the Departments artificially deflated the grant rate by including cases where there was no decision on the merits— such as cases where the asylum application was withdrawn or not adjudicated, or the case was administratively closed—in calculating the proportion of cases where asylum was granted. Commenters argued that '''the majority of people who establish a credible fear of persecution are granted asylum' when their asylum claim is adjudicated,'' quoting a statistic claiming that 55 percent of noncitizens whose cases were decided on the basis of their asylum claim after a positive credible fear determination were ultimately granted asylum in FY 2022 and 2023.

Commenters said that the EOIR denial rate in cases originating from a credible fear claim is an unreliable indicator of meritless asylum claims because a denial could result from factors that have nothing to do with the underlying merits of the case, including: noncitizens' lack of timely access to counsel, translation issues, noncitizens' lack of familiarity with the statutory 1-year bar to filling an asylum application after entering the United States, and the significant discretion provided to IJs by law.

One commenter took issue with the Departments' claim that an increase in positive credible fear determinations was evidence that meritorious asylum claims were still making it through the initial screening process, saying that those subject to the Circumvention of Lawful Pathways rule's presumption of ineligibility for asylum are three times more likely to receive negative credible fear determinations than individuals not subject to the presumption. The commenter said it has documented examples of individuals subjected to the Circumvention of Lawful Pathways rule in expedited removal who were wrongfully ordered removed or refouled, outcomes that the commenter stated will only become more frequent under the IFR. The commenter concluded that the available evidence makes clear that many, if not most, people subject to the IFR will have plausible, or even grantable, claims for humanitarian relief.

A commenter alleged that the Departments' focus on the gap between historical credible fear interview screen-in rates and asylum grant rates is ''willfully blind to reality.'' The commenter stated that the Departments ''simply ignore the fact that,'' even before the IFR, such screen-in rates had declined dramatically, and that historical asylum grant rates were for a

---

[101] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.* Initial receipts equal removal, deportation, exclusions, asylum-only, and withholding only cases.

[102] USCIS, *Asylum Division Monthly Statistics Report: Fiscal Year 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx.*

[103] 89 FR at 48489 (''Our broken immigration system is directly contributing to the historic migration we are seeing throughout the Western Hemisphere, exacerbated by poor economic conditions, natural disasters, and general insecurity, and this fact, combined with inadequate resources to keep pace, has once again severely strained our capacity at the border. The result is a vicious cycle in which our United States Border Patrol facilities constantly risk overcrowding, our detention system has regularly been at capacity, and our asylum system remains backlogged and cannot deliver timely decisions, all of which spurs more people to make the dangerous journey north to the United States.'').

[104] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Encounters FY2000–2024 tab). With the exception of the pandemic period (March 2020–May 2023), total SWB encounters for January 2024 and for FY 2024Q2 were the highest for the month of January and for Quarter 2 of the fiscal year since FY 2000, including over 4,000 average daily USBP encounters in January and nearly 5,000 in February (CBP SWB Encounter FY 2000–24 tab and Encounters FY2000–2024 tab). *See also* OHSS analysis of July 2024 OHSS Persist Dataset (USBP Encounters—Holiday Dip tab) (showing that encounters tend to dip immediately after each New Year before increasing again by the end of January).

**STB_AR1_000026**

population of people seeking asylum that, by the IFR's own admission, looked very different—and included many more single Mexican men seeking to work—than the current population of people seeking asylum. The commenter further objected that the Departments' focus on the gap between screen-in rates and merits rates ignores the fact that credible fear interviews are intended to be evaluated at a lower standard; according to the commenter, a screening interview is not, and cannot be, a merits adjudication.

*Response:* The Departments disagree that they have mischaracterized the data related to the percentage of EOIR asylum grants in cases originating from the credible fear process. The data consistently show that only a small percentage of cases referred for section 240 removal proceedings before EOIR after a credible fear determination ultimately result in a grant of asylum.[105]

In the IFR, the Departments noted that from FY 2014 through FY 2019, of the total SWB encounters with positive credible fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief. 89 FR at 48743 n. 219. The Departments included the underlying data in the IFR docket.[106] The Departments acknowledge that the denominator includes cases where there was no decision on the merits of the asylum claim, such as, for example, applications that were withdrawn or not adjudicated, or where the case was administratively closed, terminated, or dismissed.[107] The Departments disagree, however, that this approach is misleading. The cited statistic demonstrates that the number of noncitizens who are placed in section 240 removal proceedings after the expedited removal process greatly exceeds the number of noncitizens who are ultimately granted relief or protection. Even if one excludes cases involving termination, dismissal, or administrative closure as well as in absentia removal orders, DHS and EOIR data show that from 2014 through 2019, of the total SWB encounters referred to EOIR after being processed for expedited removal, only 33 percent of

EOIR case completions ultimately resulted in a grant of relief on the merits.[108] The rate increases slightly to 36 percent if the ''relief rate'' is defined as all EOIR findings of non-removability and grants of asylum, statutory withholding of removal, CAT protection, cancellation of removal, and adjustment of status, divided by the sum of those grants and removal orders not issued in absentia.[109] Whether one uses the 18 percent, 33 percent, or 36 percent figure, the data demonstrate that historically there is a significant disparity between positive credible fear findings and ultimate grants of relief in section 240 removal proceedings.[110]

The Departments disagree with the statistical approach presented by at least one commenter who claimed that the majority of people (55 percent in FY 2023 and 2024) who establish a credible fear are ultimately granted asylum when their asylum claim is adjudicated. The commenter seems to have arrived at this statistic by dividing the number of asylum grants by the total number of grants and denials from a chart provided on EOIR's website.[111] But the EOIR chart also demonstrates that a large percentage of completed cases resulting from a positive credible fear determination involve noncitizens who never filed asylum applications once placed in section 240 removal proceedings or who abandoned or withdrew their applications.[112] The Departments believe that it is inaccurate to exclude these cases in assessing the disparity between positive credible fear findings and ultimate relief because the noncitizens in these cases did not actually pursue an asylum claim during section 240 removal proceedings even though the opportunity to pursue such a claim was the sole reason they were placed in section 240 removal proceedings rather than being removed on an expedited removal order. Instead,

relying on the most recent version of the EOIR chart cited by the commenter, if one includes these cases, which are numerous, in the denominator (and excludes cases where the asylum application was not adjudicated or the case was administratively closed), the ultimate grant rates for cases reflect a much smaller percentage than commenter's representation of the ultimate asylum grant rate. As EOIR's adjudication statistics reflect, the asylum grant rates of cases completed by EOIR in FYs 2022 and 2023 that originated with a credible fear claim were just 23 percent and 18 percent, respectively.[113]

The Departments cited these data to demonstrate the general point that there is a significant disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings, which can take years to resolve. *See* 89 FR at 48743 n.219 (noting that from FY 2014 through FY 2019, of the total SWB encounters with positive fear determinations, only 18 percent of EOIR case completions ultimately resulted in a grant of protection or relief). That reality, as well as the length of time it can take before a removal takes place after a removal order is final, creates a strong incentive for some number of migrants without potentially meritorious claims to make the dangerous journey to the southern border to claim fear in order to take their chances on being allowed to remain in the United States for a lengthy period. And that risk is magnified by Congress's failure to provide the resources necessary to timely and effectively process and interview all those who invoke credible fear procedures through the expedited removal process at the southern border, particularly during periods of high encounters. The rule's limitation on asylum eligibility is intended in part to reduce this incentive and encourage migrants with meritorious asylum claims to use the lawful, safe, and orderly pathways that the United States Government has provided. *See* 89 FR at 48732.

Regarding commenters' concerns that the data cited include noncitizens whose asylum applications may have been denied for reasons unrelated to the meritoriousness of their underlying claim—such as noncitizens' lack of access to counsel, translation issues, noncitizens' lack of knowledge about the one-year bar, and IJ discretion—the Departments disagree that these potential issues would undermine the Departments' reliance on DHS and EOIR

---

[105] *See, e.g.,* EOIR, Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline*; *see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results Tab)

[106] *See* OHSS Data Spreadsheet Data for Securing the Border IFR, tab 219 (June 2024), *https://www.regulations.gov/document/USCIS-2024-0006-0003.*

[107] *See id.; see also* OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[108] Relief on merits rate is defined as EOIR grants of asylum, conditional grants of asylum, or adjustment of status under statutory provisions divided by the sum of those grants of relief plus removal orders not issued in absentia. OHSS analysis of June 2024 Enforcement Lifecycle data (Historic ERCF Results tab).

[109] *See id.*

[110] *See id.*

[111] *See* Human Rights First, Correcting the Record: The Reality of U.S. Asylum Process and Outcomes (Nov. 2023) *https://humanrightsfirst.org/wp-content/uploads/2023/11/US-Asylum-process-and-outcomes-Fact-Sheet_Nov-2023.pdf* (citing EOIR, *Adjudication Statistics: Asylum Decisions and Filing Rates in Cases Originating with a Credible Fear Claim* (Oct. 12, 2023), *https://www.justice.gov/eoir/page/file/1062976/download*).

[112] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline* (last visited Sept. 2, 2024).

[113] *See id.*

STB_AR1_000027

data to demonstrate the disparity between positive credible fear determinations and ultimate relief in section 240 removal proceedings. The factors cited by commenters exist in the absence of the rule and are not impacted by the rule. Furthermore, the Departments' procedures aimed at mitigating these concerns remain unchanged and are expected to continue mitigating those concerns. For example, all AOs are trained to elicit testimony and, even with this rule's changes to the credible fear screening process, the type of information sought to be elicited during a credible fear interview and IJ review is generally well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. *See* Section III.B.2.a.ii of this preamble. USCIS also has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures to address interpretation and rare language issues. *See* 8 CFR 208.30(d)(5). Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[114] Those long existing procedures remain in place under this rule. Nor have any of the procedural requirements for filing an asylum application changed, including the requirement that noncitizens must generally file their application within one year of their arrival in the United States, *see* section 208(a)(2)(B) of the INA, 8 U.S.C. 1158(a)(2)(B), and must show that they should be granted relief in the exercise of discretion. *See Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) (''Asylum is a discretionary form of relief . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum.'').

The Departments agree that credible fear screenings are not meant to mirror ultimate merits adjudications and that, by design, these screenings will result in some noncitizens being screened in who ultimately are not granted asylum or protection. However, the number of noncitizens who are granted asylum or other protection following a screening necessarily reflects the effectiveness of those screenings; the gap between the screen-in rate and the rate of those granted asylum or other protection matters. With a screening standard that is more likely to identify meritorious claims, the Departments expect to see a higher share of screened in noncitizens ultimately granted relief or protection. While a credible fear screening in the expedited removal process takes place shortly after entry into the United States, the ultimate adjudication of an asylum (or other protection) claim may be months or years later. The outcome of the screening compared with the outcome of the asylum application's ultimate adjudication on the merits is an important measure of the credible fear interview's effectiveness at ensuring that meritorious asylum claims proceed in the application process because only cases that could be viable should continue on in the process.

Finally, the Departments acknowledge that, as with all screening mechanisms, there is some risk under the rule that a meritorious case might not proceed to a credible fear screening or a merits adjudication. The Departments believe that during emergency border circumstances, the rule's provisions strike an appropriate balance, and that the rule's benefits outweigh any potential marginal increase in the likelihood that a meritorious case would be missed or would fail under the rule's procedures, as discussed in more detail in Section III.C.3 of this preamble. The Departments reiterate that nothing in this rule prevents a noncitizen from raising a fear claim. All noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview. For the reasons discussed in Section III.C.2 of this preamble, DHS believes that the manifestation standard will continue to provide noncitizens with an adequate opportunity to seek relief and protection in the United States. Moreover, under the rule, those referred for a credible fear screening will continue to have an opportunity to have their claims assessed by an AO in a non-adversarial interview and will be able to seek IJ review of the AO's decision. Although many noncitizens may be subject to the limitation on asylum eligibility under this rule, during the credible fear interview and IJ review (if elected), they will still be screened for potential eligibility for statutory withholding of removal and CAT protection. In sum, as explained in the IFR, the Departments expect that these provisions will continue to produce accurate outcomes, although the Departments believe that the rule continues to be necessary and appropriate to address emergency border circumstances even if this expectation turns out to be misplaced in close cases. 89 FR at 48750 n.250.

Indeed, as discussed in Section II.A.2 of this preamble, the Departments believe that the IFR is working to reduce the gap between high rates of referrals and screen-ins and the historically low percentage of those who are ultimately granted protection or relief, while still providing noncitizens with opportunities to raise and have their claims considered. The Departments believe that the difference between the positive credible fear rate during the pre-pandemic period and the rate under the IFR is attributable to the rule's limitation on asylum eligibility and the higher ''reasonable probability'' screening standard for statutory withholding of removal and CAT claims, which, as the Departments explained in the IFR, is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

*Comment:* At least one commenter argued that the IFR is arbitrary and capricious because the Departments impermissibly use the availability of pathways not related to asylum or humanitarian relief as justification for reducing asylum access. The commenter stated that the availability of lawful pathways is not a factor that Congress intended the agencies to consider as a basis for limiting asylum.

*Response:* The Departments disagree with the assertion that the rule impermissibly relies on the availability of lawful, safe, and orderly pathways to reduce access to asylum. As an initial matter, the Departments note that the primary purpose of the rule's temporary limitation on asylum eligibility is to reduce the daily number of entrants by discouraging irregular migration during periods when the border security and immigration systems are over capacity and unable to effectively process noncitizens through expedited removal. *See* 89 FR at 48731–32. Because section 3(b)(v)(D) of the Proclamation contains an exception for arrivals at the SWB under a process approved by the Secretary, and because this rule's limitation on asylum eligibility excepts those who are described in section 3(b) of the Proclamation, the limitation will also not apply to such arrivals. *See id.* at 48754. In this way, the Proclamation

---

[114] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

**STB_AR1_000028**

and the rule continue to maintain incentives for noncitizens seeking protection to use the safe, lawful, and orderly process that the United States has provided. *See id.* at 48730–31 (stating that ''applying the limitation on asylum eligibility will encourage noncitizens to make an appointment to present at the SWB, take advantage of other lawful migration pathways, or not undertake the dangerous journey north to begin with''); *see also id.* at 48754 (explaining that the rule ''provides important exceptions that continue to incentivize the use of safe, orderly, and lawful pathways''). Indeed, the use of such pathways and tools to access those pathways, like the CBP One app, is critical for promoting efficient border processing especially during emergency border circumstances. *See id.* at 48737 (''During emergency border circumstances [the] use of the CBP One app is especially critical because it allows DHS to maximize the use of its limited resources.'' (citations omitted)); *see also* 88 FR at 31317–18 (explaining the benefits of having noncitizens pre-schedule appointments using the CBP One app). However, contrary to the commenter's claim, the rule does not impose a limitation on asylum eligibility based solely on the availability of such pathways. Rather, the rule's limitation applies to noncitizens who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the Proclamation. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). And even during these situations, the rule provides an exception for noncitizens (including those who do not use the lawful, safe, and orderly pathways) who demonstrate exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2).

In any event, Congress did not preclude the Departments from considering a noncitizen's use of lawful pathways and processes as a factor when establishing conditions and limitations on asylum. As described in Section III.A.1.a of this preamble, in *Matter of Pula,* the BIA explained that a noncitizen's ''circumvention of orderly refugee procedures,'' including their ''manner of entry or attempted entry,'' is a relevant factor for discretionary asylum determinations, 19 I&N Dec. at 472–73, and this rule merely takes such circumvention into account to determine eligibility. And exactly how much weight to put on that factor and whether to do so in weighing asylum eligibility falls well within the broad discretion conferred by section

208 of the INA, 8 U.S.C. 1158, including section 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). For the reasons discussed in Section III.A.1 of this preamble and in the IFR, *see* 89 FR at 48733–38, this rule's limitation on asylum eligibility is consistent with the statute, a proper exercise of the Departments' authority, and distinguishable from the prior regulations that some courts have found invalid.

*Comment:* One commenter disagreed with the Departments' assertion that the IFR will undermine TCOs' ability to incentivize migrants to utilize irregular migration methods. The commenter argued that the IFR will instead have the opposite effect of forcing many migrants to use irregular routes, thus strengthening the organized smuggling operations and TCOs the agencies seek to combat. The commenter also argued that the IFR makes the ''bizarre assertion that *new* measures punishing vulnerable people are necessary because'' smuggling operations have ways to avoid existing asylum restrictions.

*Response:* The Departments disagree that the IFR will incentivize irregular migration and thereby strengthen organized smuggling operations and TCOs. The IFR has enhanced the disincentives to crossing irregularly, reducing the overall number of encounters between POEs. Through August 31, 2024, average daily total encounters between POEs at the SWB under the Proclamation and the IFR have fallen 59 percent from the level of average daily encounters during the ''immediate post-pandemic period,'' *i.e.,* the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before the IFR entered into effect on June 5, 2024.[115] This rule addresses the reality of unprecedented migratory flows, the systemic costs those flows impose, and the ways in which increasingly sophisticated smuggling networks cruelly exploit the system for financial gain. The procedures in place before the publication of the IFR resulted in the release of a high proportion of migrants into the United States to await section 240 removal proceedings, creating a vicious cycle in which exploitative smuggling networks could effectively advertise that border crossers were likely to remain in the United States

---

[115] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024. (Summary Statistics tab). There were, on average, 2,077 encounters per day (including all demographic groups) between POEs at the SWB from June 5 through August 31, 2024, compared to 5,119 per day during the immediate post-pandemic period, defined as May 12, 2023, through June 4, 2024. *Id.*

upon arrival, encouraging higher encounter numbers, which in turn led to more releases. *See* 89 FR at 48714–15. This created a situation in which large numbers of migrants—regardless of their ultimate likelihood of success on an asylum or protection application—were subject to exploitation and risks to their lives by the networks that drove their movements north. *See id.* In contrast, the Departments believe that the reduction in migration resulting from this rule will, over time, weaken the TCOs that prey on migrants for profit by starving such TCOs of funding.

The IFR does not ''punish[ ] vulnerable people,'' as the commenter alleges. The Departments explained that although heightened enforcement efforts by the United States and Mexico helped to mitigate very high levels of irregular migration, ''[s]muggling networks are adaptable, responding to changes put in place. Despite their immediate effectiveness, such changes [in enforcement efforts] are not enough—and will almost certainly have diminished effect over time. The reality is that the scale of irregular migration over the past two years has strained the funding, personnel, and infrastructure of both countries' immigration enforcement systems in ways that have, at times, contributed to high encounters between POEs.'' 89 FR at 48726. The Departments further stated that ''[w]ithout the Proclamation and this rule, the anticipated increase in migration will, in turn, worsen significant strains on resources already experienced by the Departments and communities across the United States.'' *Id.*

The rule is consistent with concern for vulnerable people and the Departments' operational capacity to administer and enforce the immigration laws. As a means of preventing migrants from falling prey to smuggling and other criminal organizations, the Departments have discouraged attempts to enter the United States without inspection while increasing the availability of lawful pathways. The limitation on asylum eligibility contained in the rule undercuts claims made to migrants by TCOs and smugglers that simply arriving at the border will result in them being released into the United States. Additionally, the Departments believe that increasing the availability of lawful pathways for migration helps discourage attempts to enter the United States without inspection by providing individuals with options that do not involve putting their lives in the hands of smugglers. The Departments believe that this balanced approach—expanded lawful pathways to enter the United

STB_AR1_000029

States, coupled with conditions on asylum eligibility for those who fail to exercise those pathways and the swift imposition of immigration consequences when individuals do not establish a legal basis to remain in the United States—will continue to decrease attempts to irregularly enter the United States, and thereby reduce reliance on smugglers and human traffickers.

*Comment:* A commenter argued that the IFR fails to account for the effect of existing and contemporaneously promulgated policies, such as EOIR's "recent arrivals docket."

*Response:* The IFR is one of several tools that the Departments employ to encourage the use of safe, orderly, and lawful processes for accessing the border and to maintain a manageable operational capacity to adequately deliver timely decisions and consequences to noncitizens encountered at the southern border who do not establish a legal basis to remain. The Departments are not aware of any evidence that the recent arrivals docket or any other recent procedural changes in case processing could have, on their own, addressed the record high levels of migration that the Departments have contended with in recent years. Such changes offer important efficiency benefits but by themselves do not adequately address problems such as the large number of non-meritorious claims for asylum and related protection.

For example, as the Departments announced on May 16, 2024, the recent arrivals docket applies to certain noncitizen single adults. [116] For cases on the recent arrivals docket, IJs will generally aim to render a final decision within 180 days, which is substantially longer than the expedited removal process.[117] The recent arrivals docket

provides efficient case processing procedures for removal proceedings, which are, as a general matter, designed to be more comprehensive proceedings for the full adjudication of claims,[118] as compared with expedited removal, which is designed to quickly screen out those who cannot demonstrate a sufficient likelihood of ultimate success on the merits. Thus, the recent arrivals docket is not as efficient as either expedited removal proceedings generally or expedited removal proceedings undertaken pursuant to this rule. Accordingly, the recent arrivals docket is best considered as a complementary measure to this rule for those who are not subject to or cannot be processed under expedited removal despite the resource-saving measures laid out in this rule. Similarly, while the Departments are constantly making efforts to maximize the efficiency of their procedures, all such changes are inadequate, on their own, to accommodate the high volumes of encounters that make this rule necessary.

*Comment:* Citing 89 FR at 48724 nn.99–100 as an example, a commenter objected that the Departments' reliance on an undisclosed data analysis with unknown assumptions as a basis for projecting future trends is arbitrary.

*Response:* The Departments included in the rulemaking docket extensive data supporting the IFR, including an explanation of assumptions underlying certain projections.[119] As DHS explained in the IFR, the complexity of international migration limits DHS's ability to precisely project border encounters under the best of circumstances. *See* 89 FR at 48727 n.127. The period leading up to the IFR

was characterized by greater than usual uncertainty due to ongoing changes in the major migration source countries (*i.e.,* the shift in demographics of those noncitizens encountered by DHS), the growing impact of climate change on migration, political instability in several source countries, the evolving recovery from the COVID–19 pandemic, and uncertainty generated by border-related litigation, among other factors. *Id.* Nonetheless, the Departments included ample basis for their assessment that the IFR was needed and did not rely exclusively on internal projections as a basis for the rule. *See, e.g.,* 89 FR at 48726 (explaining that "between January and April, 2024, [UNCHR] tracked 139,000 irregular entries [through the Darién jungle], up from 128,000 for the same months in 2023 and a seven-fold increase over migration levels during that period in 2022," and that "[p]ast unprecedented migration surges [described in the IFR] bolster . . . the need for this rulemaking"). Further, the Departments note that they are including in the docket extensive data supporting this final rule, including data related to the impact of the IFR, the changes made in this final rule, and the request for comment discussed in Section IV of this preamble, as well as detailed explanations of certain projections.

b. Lack of Resources Does Not Justify the Rule

*Comment:* Some commenters stated that the Departments' justification of the IFR based on the lack of resources and congressional funding needed to effectively and efficiently meet process demands for migrants and those in the U.S. asylum process is not a valid basis for the Departments' purportedly disregarding their legal obligations to migrants when managing asylum claims and upending the asylum system. A commenter similarly stated that resource constraints should have no relationship to the treatment of newly arriving migrants whose right to remain has not yet been assessed.

Another commenter said that the IFR is arbitrary and capricious because, while the agencies argue that the IFR is required because of a lack of funding, they provided no analysis to justify that conclusion. The commenter stated that the primary reason USCIS lacks enough AOs is that USCIS faces challenges with hiring and retention. The commenter stated that the agency underpays officers, forces them to work 60-hour weeks, and routinely requires them to apply new and illegal requirements in credible fear interviews, all while ignoring their primary duty of

---

[116] Press Release, *DHS, DHS and DOJ Announce "Recent Arrivals" Docket Process for More Efficient Immigration Hearings* (May 16, 2024), *https:// www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration* ("Recent Arrivals Docket Announcement").

[117] Credible fear interviews generally take place close in time to when a noncitizen arrives in the United States. *See* INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i) (providing that AOs "shall conduct interviews" of noncitizens who indicate either an intention to apply for asylum or a fear of persecution "at a port of entry or at such other place designated by the Attorney General"). If the noncitizen is not found to have a credible fear, the noncitizen may request review by an IJ, but such review must take place "in no case later than 7 days after the date" of the AO's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). DHS data show a median processing time from credible fear referral to result of 8 days in the pre-pandemic period; 17 days during the pandemic period; 12 days during the immediate post-

pandemic period; and 5 days during the IFR period. *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[118] Parties in section 240 removal proceedings have a wide range of well-established rights, including the following: the rights to representation at no expense to the Government, to a reasonable opportunity to examine and present evidence, and to cross-examine witnesses, INA 240(b)(4)(A)–(B), 8 U.S.C. 1229a(b)(4)(A)–(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)-(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the Board of Immigration Appeals ("BIA"), 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of certain decisions in the appropriate U.S. Court of Appeals, *see generally* INA 242, 8 U.S.C. 1252. For these reasons, the completion goals for cases on the recent arrivals docket remain subject to case-specific circumstances and procedural protections, including allowing time for noncitizens to seek representation where needed. *See* Recent Arrivals Docket Announcement.

[119] *See* OHSS Data Spreadsheet, *Data for Securing the Border IFR* (June 2024), *https:// www.regulations.gov/document/USCIS-2024-0006-0003.*

STB_AR1_000030

**81186**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

conducting asylum adjudications. The commenter stated that CBP has the ability under current resources to greatly expand its capacity at POEs, but that CBP and DHS simply refuse to take that step. Another commenter similarly said that the IFR repeatedly invokes resource constraints as the reason to deny access to asylum, yet CBP is the nation's largest Federal law enforcement agency, and it has ''seriously understated'' its processing capacity in the past. A few commenters said that real solutions to alleviate conditions at the southern border include operational efficiency, better resource allocation, and increasing resources to meet demand and fairly process applications.

One commenter said the rule is motivated by the Departments' concern that too many people are seeking asylum, rather than whether individuals are eligible. Further, this commenter wrote that, without any monitoring of the consequences of removal, it is unclear if the IFR's supposed efficiency is in the best interests of the United States, which include a commitment to upholding human rights and providing humanitarian aid.

*Response:* With respect to the claim that the rule's reliance on resource and funding constraints and efficiency concerns are impermissible bases to disregard legal obligations to migrants seeking asylum and protection, the Departments first reiterate that the rule does not violate any legal obligations to migrants, as explained in Section III.A.1 of this preamble and in the IFR. *See* 89 FR at 48733–39. This rule is consistent with U.S. domestic law and with the United States's treaty obligations. The United States implements its non-refoulement obligations through statutory withholding of removal and CAT protection. Even when the threshold for emergency border circumstances has been reached, these forms of protection remain available. From June 5, 2024, through August 31, 2024, 27 percent of those encountered between ports of entry at the SWB and placed into expedited removal were referred for a credible fear interview, and over half of individuals referred for credible fear interviews under the IFR have ultimately been screened in.[120] Those who have not received such determinations have either been determined to have not manifested a fear of removal or have been determined to have not shown a significant possibility that they could ultimately demonstrate by a preponderance of the

evidence eligibility for asylum in light of the rule's limitation on asylum eligibility or a reasonable probability of persecution or torture.

In addition, the Departments disagree with commenters' assertion that it is impermissible to consider resource constraints and lack of funding as supporting the need for the IFR and this rule. Congress provided the Departments with broad discretionary authority under section 208 of the INA, 8 U.S.C. 1158, including expressly conferring discretion to impose limitations on asylum eligibility. INA 208(b)(1)(A), (b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(1)(A), (b)(2)(C), (d)(5)(B). Nothing in the INA explicitly or implicitly forecloses the Departments from considering the impact of resource constraints when exercising their discretionary authorities. For this reason, as explained in Section II.A.1 of this preamble and in the IFR, *see* 89 FR at 48731–49, the rule's changes to certain expedited removal procedures and the credible fear process are a lawful exercise of the Departments' authorities and are consistent with the INA.

Indeed, resources and funding cannot be separated from the safe, effective, and humane enforcement and administration of our immigration laws. The Departments can only function with the resources provided to them by Congress. While the Departments carefully utilize the resources that they are given, they are inadequate in the face of substantial and unprecedented global migration. As explained in the IFR, these constraints prevent the border and immigration systems from properly functioning to provide timely relief for those who warrant it and timely consequences for those without a legal basis to remain when encounters reach the thresholds identified in the rule. *See* 89 FR at 48730 (discussing the impact of resource limitations); *see also id.* at 48752 (explaining that ''[g]iven current resources[ ] . . . there is a limit on how many people can be put through the process—and that limit directly informs the 1,500 threshold'').

The rule is carefully tailored to address these challenges and is therefore a reasonable exercise of the Departments' discretionary authorities. By shifting to a manifestation standard for fear claims, and heightening the screening standard for withholding and CAT protection, DHS will be able to devote more of its limited resources to more effectively and quickly processing migrants, and the Departments will be able to focus on those claims that are more likely to have merit. *See id.* at 48744–45. The limitation on asylum

eligibility disincentivizes attempts at entry, thereby easing stress on DHS resources, while also providing an efficient way to address claims of fear raised by individuals who do not fall within the exception to the limitation. *See* 89 FR at 48731–33. At the same time, the rule does not foreclose asylum eligibility for noncitizens who are in circumstances that require immediate action: It includes an exception for exceptionally compelling circumstances, including for noncitizens (or members of their families with whom they are traveling) who experience an acute medical emergency, face an imminent and extreme threat to life or safety, or are a ''victim of a severe form of trafficking in persons.'' *See* 89 FR at 48732–33. And those referred to the credible fear process will continue to be screened for potential eligibility for statutory withholding of removal and protection under the CAT. Thus, the rule allows the Departments to use their limited resources more effectively to administer and enforce the nation's immigration laws, while also reducing incentives for migrants to make the dangerous journey to the southern border in the hope that the overwhelmed and under-resourced immigration system will not be able to expeditiously process them for removal. In sum, the rule is needed to support the effective ''operation of the immigration system'' during emergency border circumstances. *Judulang* v. *Holder,* 565 U.S. 42, 55 (2011).

Contrary to commenters' claim, the IFR fully explains the funding shortfall facing the Departments and how it has severely hampered their abilities to effectively and efficiently process noncitizens at the southern border and deliver timely decisions and consequences to those without a legal basis to remain. *See* 89 FR at 48728–30. Under current appropriations, DHS will, at best, be able only to sustain most of its current operations and will not be able to expand capacity along the southern border or increase its ability to deliver consequences through referrals into expedited removal. *See id.* at 48729. Because of the funding shortfall, in the circumstances in which the measures enacted by this rule apply, DHS simply lacks sufficient personnel and facility resources to safely detain a majority of border crossers for the time needed to complete the expedited removal process, which forces DHS to release noncitizens pending prolonged processing pathways outside of expedited removal. *See id.* at 48752. This renders DHS unable to swiftly process migrants and impose

---

[120] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab and IFR ERCF tab).

**STB_AR1_000031**

consequences on those who fail to establish a legal basis to remain in the United States, which in turn leads to higher encounter rates. *See id.*

These resource constraints are not unique to front-line officials. In recent years, EOIR adjudicators have completed a record number of cases.[121] However, the drastic increase in the number of newly initiated cases—composed in large part of cases that could have been processed through expedited removal if DHS resources allowed, *id.* at 48751 ("Due to its resource constraints, the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[.]")—has significantly outpaced even these record numbers of case completions, thus increasing the pending caseload before EOIR.[122]

Similarly, USCIS has experienced a dramatic increase in credible fear referrals. USCIS received an estimated 137,000 credible fear referrals resulting from SWB encounters in FY 2023, up from an average of about 52,000 from 2010 to 2019 and an average of about 5,700 from 2005 to 2009.[123] However, as the Departments explained in the IFR, USCIS does not have enough AOs to keep pace with the number of noncitizens who could be referred for credible fear interviews, much less keep pace with new affirmative asylum receipts or the existing affirmative backlog. 89 FR at 48730. The USCIS affirmative asylum application backlog has reached over 1.25 million cases.[124] Despite its growing affirmative asylum backlog, USCIS must continue to assign AOs to certain caseloads (some of which are included in the affirmative asylum backlog and some of which are not) that must be staffed to meet processing time frames established by statute, regulation, settlement agreement, court order, or litigation need, including: reasonable fear screenings; Operation Allies Welcome affirmative asylum cases; affirmative asylum cases subject to litigation; and Safe Third Country Agreement screenings. With a focus on

credible fear screenings and while having to address the required caseloads mentioned above, AOs are unavailable to fully support efforts to reduce the affirmative asylum backlog. If there is a surge in credible fear referrals, USCIS would be forced to detail and train additional staff from other parts of the agency, further affecting the overall immigration system.

USCIS has filled 850 out of 1,011 available AO positions as of August 15, 2024. USCIS is working diligently to avoid a gap between the number of AOs on board and the number of available positions, but some gap in these numbers persists, in part due to the time it takes to hire and receive security clearances for individuals to come on board as AOs. As of August 15, 2024, USCIS has a total of approximately 702 permanent AOs fully trained and certified to complete its workloads, including credible fear screening, reasonable fear screening, and affirmative asylum adjudication. Given that the ebb and flow of hiring and the number of credible fear referrals prior to the implementation of the IFR required far more officers to maintain pace, USCIS has trained staff members from across the agency to serve temporarily on detail as AOs and conduct credible fear interviews consistent with the statute. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). As of August 15, 2024, USCIS had a total of 807 credible fear trained AOs (702 permanent staff and 105 detailees, who are trained to conduct credible fear screenings only). Given the need to address the Departments' various required workloads mentioned above, 511 AOs are currently assigned to work exclusively on credible fear cases. With this number of available AOs and accounting for some fluctuation, USCIS can generally complete credible fear determinations for an average of 650 individuals daily Monday through Friday and an average of 200 individuals daily on Saturday and Sunday. Workload priorities related to border enforcement, statutory requirements, and litigation obligations, along with insufficient resourcing allocations from Congress, continue to affect USCIS's ability to staff at appropriate levels. Accordingly, these funding shortfalls, combined with high encounter levels at the southern border, necessitate this rule's limitation on asylum eligibility and its changes to the credible fear referral process and screening standard for statutory withholding of removal and CAT protection to ensure the Departments are able to deliver timely decisions and

consequences using the resources provided. *See* 89 FR at 48729–31.

DHS disagrees with the claim that USCIS's resource challenges are due to hiring and staff retention problems caused by working conditions and underpay, rather than Congress's failure to provide the agency with sufficient resources. Resource challenges at USCIS are not a novel issue. Nearly 96 percent of USCIS's funding is from filing fees, not from congressional appropriations. Fees for adjudication and naturalization services are set at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." INA 286(m), 8 U.S.C. 1356(m). On April 1, 2024, DHS implemented a new fee schedule for USCIS-processed immigration benefits, which will generate approximately an additional $1 billion annually; the schedule includes a new asylum program surcharge for employment-based petitioners. 89 FR 6194, 6205, 6391 (Jan. 31, 2024). While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate,[125] keeping pace with USCIS's protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget.[126] As DHS explained in proposing the new fee schedule, the new fee schedule was created based on historical data and the additional funding provided by the new fee schedule may not be sufficient to cover the increased costs of the asylum program, including credible fear processing, if encounters exceed historic rates. 88 FR 402, 432–38 (Jan. 4, 2023). Even with the very limited appropriations provided by Congress to USCIS, the President's budget requests demonstrate the need to supplement USCIS's ability to address credible fear screenings. The President's FY 2024 budget request to Congress sought funds necessary to complete up to 150,000

---

[121] *See* EOIR, *Adjudication Statistics: New Cases and Total Completions* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344796/dl?inline; see also* 89 FR at 48751 (noting that due to its resource constraints, "the majority of individuals USBP encountered since May 11, 2023, were ultimately placed in section 240 removal proceedings[]" (footnote omitted)).

[122] *Id.*

[123] *See* OHSS analysis of Asylum Pre-Screening Officer ("APSO") Global and OHSS Persist Datasets current as of June 30, 2024 (Historic CFIs tab).

[124] USCIS, *Asylum Division Monthly Statistics Report. Fiscal Year 2024. June 2024* (July 23, 2024), *https://www.uscis.gov/sites/default/files/document/reports/asylumfiscalyear2024todatestats_240630.xlsx.*

[125] DHS, *Immigration Examinations Fee Account: Fee Review Supporting Documentation with Addendum* 53 (Nov. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-8176.*

[126] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

STB_AR1_000032

credible fear determinations.[127] A supplemental request in October 2023 sought congressional funding for 1,600 AOs.[128] Congress failed to provide resources to address credible fear screenings with respect to these appropriation requests. Raising fees on other applications and petitions to cover the $755 million that would be required to hire and support the additional 1,600 AOs called for in the President's 2025 FY Budget[129] would impose a burden on other filers. *See* 89 FR at 48729. USCIS takes workforce retention seriously, but any concern about pay, hours, or workload does not obviate the systemic obstacles in running an underfunded program with limited resources.

With regard to the specific comments regarding CBP's ability and capacity to process noncitizens at POEs on the SWB, DHS disagrees that it has the resources to meaningfully expand that capacity under current conditions. CBP has finite resources available at POEs, all of which must be distributed both to processing of noncitizens and to implementing CBP's other priority missions, including facilitating lawful trade and travel and protecting national security interests.[130] That said, CBP has taken steps to increase the number of noncitizens processed at POEs, including through tools such as the CBP One app, which has helped CBP to maximize its limited resources as it permits noncitizens to pre-schedule appointments and mitigates long waiting times at POEs.[131] The

Departments welcome additional resources from Congress, but must respond to emergency border circumstances with the resources currently available.[132]

Finally, the Departments disagree that this rule is motivated by a concern that too many people are seeking asylum. The rule is intended to address the very high levels of irregular migration that the Departments have recently observed, without discouraging those with valid claims from applying for asylum or other protection. By managing flows more effectively, the rule will help ensure the continued effective, humane, and efficient processing of migrants who arrive at the southern border during emergency border circumstances.

Moreover, the Departments disagree with the suggestion that the rule is not in the best interests of the United States. On June 3, 2024, the President signed a Proclamation under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), finding that because the border security and immigration systems of the United States were unduly strained, the entry into the United States of certain categories of noncitizens was detrimental to the interests of the United States, and suspending and limiting the entry of such noncitizens. 89 FR at 48490–91. The Departments determined that the IFR was necessary to respond to the emergency border circumstances discussed in the Proclamation. *Id.* at 48715. Exercising their authorities, including under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Secretary and the Attorney General determined that during emergency border circumstances, it is in the "best interests of the country . . . to limit asylum eligibility for those who enter in violation of the Proclamation, which, in turn, will allow the Departments to allocate their limited resources to prioritize processing of noncitizens who do not enter in violation of it." *Id.* at 48737 (alteration, citation, and internal quotation marks omitted). At this time, the Secretary and

the Attorney General continue to believe that this rule's limitation on asylum eligibility is in the best interests of the United States and that it should continue to apply, while encounter levels remain above the thresholds in the rule (*i.e.,* during emergency border circumstances), to noncitizens who enter across the southern border and who are not described in section 3(b) of the Proclamation, unless such noncitizens demonstrate that exceptionally compelling circumstances exist.

The Departments further disagree with the assertion of commenters that, without monitoring the consequences of removal, it is unclear if the IFR's improvement to systemic efficiency is in the best interests of the United States. The Departments believe that the present rulemaking strikes the appropriate balance between facilitating efficiency during times when emergency border circumstances are present and upholding the commitment of the United States to protecting human rights and honoring its non-refoulement obligations. Indeed, the credible fear screening process itself is designed to make a case-by-case determination related to the consequences of removal and whether those potential consequences warrant allowing a noncitizen to remain in the United States to pursue an asylum or related protection claim. While it is not feasible for the United States to monitor the exact consequences of removal in every individual case, AOs and IJs routinely use country conditions information, including Department of State Country Reports on Human Rights Practices, to inform their evaluation of potential consequences of removal as part of the credible fear determination, as part of their statutory obligation to consider "such other facts as are known" to them in the credible fear of persecution determination (INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)); likewise, they are required by regulation to consider "evidence of gross, flagrant or mass violations of human rights within the country of removal" and "any other relevant information regarding conditions in the country of removal" in any evaluation of protection under the CAT, 8 CFR 208.16(c)(3)(iii)–(iv).[133] The

---

[127] *See* DHS, *FY 2024 Budget-in-Brief* 74 (2024), *https://www.dhs.gov/publication/fy-2024-budget-brief* (last visited Sep. 3, 2024).

[128] *See* The White House, *Fact Sheet: White House Calls on Congress to Advance Critical National Security Priorities* (Oct. 20, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/20/fact-sheet-white-house-calls-on-congress-to-advance-critical-national-security-priorities/.*

[129] *See* The White House, *Fact Sheet: The President's Budget Secures Our Border, Combats Fentanyl Trafficking, and Calls on Congress to Enact Critical Immigration Reform* (Mar. 11, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/03/11/fact-sheet-the-presidents-budget-secures-our-border-combats-fentanyl-trafficking-and-calls-on-congress-to-enact-critical-immigration-reform/.*

[130] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, CBP, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/document/guidance/guidance-management-and-processing-undocumented-non-citizens-southwest-border-land.*

[131] *Id.* During the pre-pandemic period, CBP's Office of Field Operations ("OFO") processed around 330 people per day. From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed approximately four-and-a-half times that number of

people daily. *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[132] *See* Letter for the Hon. Patrick McHenry, Speaker Pro Tempore of the U.S. House of Representatives, from Shalanda D. Young, Dir., Off. of Mgmt. & Budget, *Re: Critical National Security Funding Needs for FY 2024* (Oct. 20, 2023), *https://www.whitehouse.gov/omb/briefing-room/2023/10/20/letter-regarding-critical-national-security-funding-needs-for-fy-2024/*("This request includes resources for an additional 1,300 border patrol agents to work alongside the 20,200 agents already funded in the FY2024 Budget; 375 immigration judge teams to strengthen the immigration court system—the largest incremental request ever; [and] 1,600 asylum officers to speed up processing of asylum claims[.]").

[133] USCIS RAIO Directorate, *Officer Training: Credible Fear of Persecution and Torture Determinations* 19–20 (May 9, 2024) ("Additionally, pursuant to the statutory definition of 'credible fear of persecution,' the asylum officer must take account of 'such other facts as are known to the officer.' Such 'other facts' include relevant country conditions information. Similarly, country conditions information should be considered when evaluating a credible fear of torture. The Convention Against Torture and implementing

STB_AR1_000033

present rulemaking does not change the types of evidence AOs and IJs rely on, such as human rights monitoring reports relating to the potential consequences of removal to a particular country, in making credible fear determinations at the higher ''reasonable probability'' of persecution or torture standard.

c. Rule Does Not Acknowledge Factors Contributing to Migration

*Comment:* Some commenters argued that the Departments failed to analyze to what extent migration patterns are shaped by U.S. immigration enforcement system incentive structures relative to other factors, such as the many reasons people are forced to flee their homes.

These commenters disagreed with what they characterized as the Departments' decision to impose further consequences on individuals seeking protection. Some commenters argued that many factors contribute to the number of border encounters, including dire conditions in migrants' countries of origin and their personal circumstances, and that while the IFR acknowledges that various push factors such as violence, persecution, poverty, human rights abuses, climate change, and others contribute to current migratory patterns, it does not fully engage with them and instead ''assumes, without foundation, that the perceived incentives, responsive to U.S. enforcement measures, single-handedly shape migration patterns,'' despite ample United States Government and academic analyses that demonstrate that U.S. enforcement measures are only one of several factors informing patterns of migration.

Similarly, another commenter stated that, although the IFR asserts that insufficient enforcement leads to high encounter levels, it is more plausible that the world is experiencing high levels of displacement and international migration and that the United States is a desirable destination for migrants. The commenter added that such global pressures would be more productively met with policies that directly address the desire, ability, and opportunities for people to migrate, rather than imposing harsher enforcement.

*Response:* The Departments agree that many factors that are outside the U.S. Government's control influence migration patterns, including push factors. The Departments have never

regulations require consideration of '[e]vidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and [o]ther relevant information regarding conditions in the country of removal.' '' (quoting 8 CFR 208.16(c)(3)(iii)–(iv)).

asserted that U.S. enforcement measures singlehandedly shape migration patterns. Economic and political instability around the world is fueling the highest levels of migration since World War II, including in the Western Hemisphere. 88 FR at 11704. However, the effects of these factors and U.S. immigration enforcement are complementary to each other. They can both simultaneously and separately influence migrants' decisions regarding when, how, and where to migrate. The Departments believe that ensuring the timely enforcement of consequences for noncitizens who enter the United States irregularly without a legal basis to remain in the United States is a powerful tool for addressing the situation at the southern border, particularly when combined with the expanded availability of lawful pathways. This view is supported by the success of the IFR in reducing levels of irregular migration as further discussed in Section II.A.2 of this preamble. Timely enforcement of consequences is but one approach to respond to the specific issue of incentivizing the use of lawful, safe, and orderly pathways and disincentivizing migrants from utilizing dangerous, irregular migration routes along the southern border. This rule was designed to address encounters on our SWB, not to singlehandedly reshape migration patterns throughout the region.

d. Other Comments Related to the Departments' Justification

*Comment:* Commenters suggested that high encounter levels are due to the Biden Administration's border security and immigration regulatory and policy efforts. One commenter disagreed with the Departments' assigning blame for the border crisis to Congress's failure to appropriate additional funding to the Departments, instead stating that it is the Administration's consistent ''abdication of border security and immigration enforcement[]'' that has resulted in the sustained high rate of encounters since 2021. The commenter said DHS must implement additional deterrence policies to discourage ''illegal immigration'' across the SWB.

*Response:* The Departments disagree that the Administration's regulatory and policy efforts have led to the emergency border circumstances. Rather, the Departments believe that the COVID–19 global pandemic upended travel throughout the world, forcing many noncitizens to delay their journeys to the United States. This was further exacerbated by the implementation of the Title 42 public health Order, which quickly expelled noncitizens who were

crossing the border back into Mexico without applying an immigration consequence. *See* 88 FR at 31335 (discussing lack of immigration consequences associated with expulsions under the Title 42 public health Order). These factors contributed greatly to the significant surge in migration immediately following the end of the COVID–19 pandemic period. Since 2021, the United States Government has taken a series of significant steps to strengthen consequences for irregular entry at the southern border in response to record levels of encounters there. The Circumvention of Lawful Pathways rule created disincentives for irregular border crossings and is a critical component of the Government's regional strategy. DHS also put in place complementary measures to streamline expedited removal processing to more quickly apply consequences to those who fail to use lawful, safe, and orderly pathways. These measures include holding noncitizens processed for expedited removal for the pendency of their credible fear interviews in CBP facilities to maximize the use of expedited removal.[134] In the immediate post-pandemic period, DHS maximized the use of expedited removal given its limited resources, placing an average of 900 individuals encountered between POEs at the SWB into the process each day between May 12, 2023, and June 4, 2024, and conducting an average of 490 credible fear interviews daily, both of which are record highs.[135] Between May 12, 2023, and June 4, 2024, DHS removed or returned more than 794,000 noncitizens who did not have a legal basis to remain in the United States, the majority of whom crossed the SWB.[136] Average daily removals and returns during the immediate post-pandemic period exceeded daily rates for every FY since 2010.[137] The majority of all individuals encountered at the SWB from FY 2021 to FY 2023 were removed, returned, or expelled.[138]

Unfortunately, despite maximizing the usage of resources available to the Departments, these efforts have not been as effective as they could have been had Congress provided the tools and resources needed to address substantial

[134] *See* Decl. of Blas Nuñez-Neto ¶ 20, *M.A.* v. *Mayorkas*, No. 23–cv–1843 (D.D.C. Oct. 27, 2023) (Dkt. 53–1).

[135] OHSS analysis of June 2024 Enforcement Lifecycle data (Immediate Post-Pandemic ERCF tab); OHSS analysis of APSO Global and OHSS Persist Datasets (Historic CFIs tab).

[136] *Id.*

[137] OHSS 2022 Yearbook of Immigration Statistics (OHSS YB Table 39 tab) (listing past repatriations).

[138] OHSS analysis of June 2024 Enforcement Lifecycle data (Enforcement Lifecycle 6.2024 tab).

STB_AR1_000034

levels of migration impacting the southern border. Encounter levels increased toward the end of 2023,[139] and December 2023 saw the highest level of encounters between POEs in history,[140] as increasing numbers of people migrated through the Western Hemisphere. 89 FR at 48713. The Departments' inability, given a lack of sufficient resources, to deliver timely decisions and consequences through expedited removal for those without a legal basis to remain creates incentives for further irregular migration and creates further strain on the border security and immigration systems. *See id.* at 48713–14. The IFR was needed to respond to this emergency situation, and it is having its intended effect as discussed in Section II.A.2 of this preamble. However, only Congress can provide the resources and authorities that the Departments need to ensure durable solutions to heightened levels of global migration and the impact it has on the border security and immigration systems.

*B. General Feedback on the IFR*

1. General Support

*Comment:* Some commenters approved of the rule's limitation on asylum eligibility, reasoning that the U.S. asylum system is being ''abused'' and ''exploit[ed].'' A commenter stated that the Federal Government should stop permitting undocumented immigrants to stay in the country while their asylum claims are processed, as many exploit the system to remain for years, and that daily border crossings pose national security risks. That commenter also stated that the United States has housing and job shortages, so allowing immigrants to take housing and jobs is hurting America. Another commenter thanked the Departments for implementing this rule and asked that all enforcement mechanisms be deployed to uphold it.

*Response:* The Departments agree that maintaining border security is critical and that the rule will have benefits for the U.S. border security and immigration systems. Specifically, the United States Government has better ensured timely decisions and consequences for irregular entry at the border, while at the same time overseeing the largest expansion of lawful, safe, and orderly pathways and processes for individuals to come to the United States in decades. *See, e.g.,* 89 FR at 48712–13; *id.* at 48721–26

---

[139] OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP August 6, 2024, for July 2024 (Encounters FY 2000–2024 tab).
[140] *Id.*

(discussing the increase in migration at the SWB, consistent with global trends and regional United States Government efforts); 88 FR at 11716–18 (discussing United States Government measures to offer alternative pathways to address the root causes of migration, improve the asylum system, and address the pernicious role of smugglers). This approach has allowed DHS to process noncitizens arriving at the southern border for removal in record numbers and with record efficiency. 89 FR at 48713, 48727.

This rule has improved DHS's ability to place into expedited removal the majority of single adults and individuals in family units encountered by USBP at the SWB and to swiftly issue decisions and impose consequences that have proven effective to disincentivize noncitizens who do not have a strong claim for asylum or other protection from entering the United States to pursue such claims. *See* Section II.A.2 of this preamble; *see also* 89 FR at 48746. This rule is also designed to identify more effectively those with a fear of return, and, for noncitizens who have manifested or expressed a fear of return, to screen out and swiftly remove those whose claims have a low likelihood of succeeding on the merits. *See* 89 FR at 48743–46. As a result, the Departments believe that this rule will also improve the overall functioning and efficiency of the immigration system by reducing strains on EOIR and USCIS resources and allowing DHS to remove more noncitizens through expedited removal, rather than adding them to the backlogged immigration courts.

2. General Opposition

a. Negative Impacts on Noncitizens and Others

i. Conflicts with Humanitarian Values

*Comment:* Several commenters expressed opposition to the IFR based on general humanitarian and moral concerns, with some commenters urging the Departments to reconsider or rescind the rule. Commenters addressed the general right to seek asylum and the United States' obligations to protect those seeking asylum. For example, commenters emphasized that people have the right to migrate and seek asylum, which commenters described as a human right. Commenters stated the Administration should provide rights to those in the U.S. asylum process. Commenters also stated that people have a right to work and live in a safe environment with their families so that they can enjoy a better life. Several commenters stated that the IFR denies

the right to seek asylum or that it harms those with the right to asylum. Commenters stated that the United States has a responsibility or moral obligation to welcome noncitizens who might make claims of asylum, that the United States should provide protection to those who seek it, and that turning them away is unconscionable. Some commenters suggested that the United States should welcome all people, regardless of their origin or when or how they arrive. Commenters stated that the United States has contributed to the conditions or push factors that promote migration and that it should share the responsibility for the geopolitical and climatic conditions it has created, especially since the response of the United States may shape how other countries react to humanitarian crises.

*Response:* The Departments agree that the United States has certain legal obligations to protect those present in the United States who fear persecution or torture in their home countries or countries of removal and recognize the importance of offering migrants the opportunity to seek protection from removal. *See* 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble, this rule does not run afoul of those obligations or otherwise undermine the commitment of the United States to adhering to international law principles concerning non-refoulement. *See also id.* at 48716–17, 48735–36. The Departments have instead exercised their authority to adopt a limitation on asylum eligibility and an exception to that limitation in certain circumstances. *See id.* at 48718. As discussed more fully in Section III.A.1 of this preamble, this framework comports with section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), which permits limitations and conditions on asylum as long as they are consistent with the INA.

Any noncitizen who is physically present in the United States may apply for asylum, but there is no right for a noncitizen to enter the United States or to be processed in a particular manner. *See United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950) (''At the outset we wish to point out that an alien who seeks admission to this country may not do so under any claim of right. Admission of aliens to the United States is a privilege granted by the sovereign United States Government.''). No individual present in the United States will be denied the opportunity to seek asylum or protection in the United States under this rule.

In particular, this rule does not preclude noncitizens who cross the

STB_AR1_000035

southern border from seeking asylum. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are entitled to a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Also, noncitizens in section 240 removal proceedings have the opportunity to present information asserting fear of or concern about potential removal. *See* INA 240(c)(4), 8 U.S.C. 1229a(c)(4). Although many individuals may be ineligible for asylum under this rule, they may seek to establish that they are subject to the rule's exception for exceptionally compelling circumstances, and they may also still seek statutory withholding of removal and CAT protection in the United States.

The purpose of this rule is to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718. Consistent with that purpose, the rule limits eligibility for asylum during such circumstances and ensures that the process is not overwhelmed by those with nonviable claims in the expedited removal process who will add to an already-large backlog. Those referred to an IJ will become part of the backlog of pending immigration cases before EOIR, which at the end of the third quarter of FY 2024 was over 3.46 million cases.[141] Continuing to process non-viable claims will also exacerbate USCIS's asylum backlog, which, based on case filings through August 31, 2024, was over 1.3 million cases.[142]

*Comment:* Commenters wrote that the IFR contradicts U.S. values and history. Commenters stated that the United States is a nation of immigrants and is built on a history of welcoming migrants. Some commenters described the IFR's limitations on asylum as contrary to U.S. values and democracy and termed it "un-American." Commenters stated that the IFR does not treat noncitizens with dignity and respect. Many commenters emphasized the desire for any process to be "welcoming, transparent, humanitarian,

---

[141] *See* EOIR, *Adjudication Statistics: Pending Cases, New Cases, and Total Completions* (July 19, 2024), *https://www.justice.gov/eoir/media/1344791/dl?inline.* Initial receipts equals removal, deportation, exclusions, asylum-only, and withholding-only cases.

[142] *See* OHSS analysis of USCIS Global data as of September 10, 2024.

and fair;" one commenter specifically expressed concern for "the dignity, safety, and human rights of asylum seekers;" and another expressed concern for those people "seeking safety and the American dream." Another commenter emphasized that immigrants "are human beings and deserve to be treated as such." Many commenters generally desired policies that "welcome immigrants." Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. Commenters emphasized their own status as descendants of immigrants and expressed a desire for fairness in welcoming noncitizens at all borders. Commenters argued that the IFR undermines the historic commitment of the United States to protecting those who seek refuge. At least one commenter described the IFR as "authoritarian."

Commenters also addressed moral concerns related to the IFR or the immigration system overall. One commenter stated that immigrants are not "a problem;" rather it is "our immigration system that is the problem." Some described the IFR, or denying asylum, as "immoral," "inhumane," "cruel," "unjust" or "unfair," or "xenophobi[c]." Commenters asserted that the United States should have an accessible, diverse, safe, welcoming, dignified, fair, and balanced immigration system. Commenters stated that the United States should not make it harder for those fleeing danger to seek protections. Commenters stated that the United States should treat immigrants and refugees with respect, dignity, and compassion while defending human life. Commenters stated that Mexico and Latin America are neighbors of the United States and should be treated with goodwill. One commenter stated that asylum seekers from Mexico should be given the full rights of citizens. One commenter stated that there is no real border security or immigration crisis, but rather the concept has been created to distract Americans from certain political agendas, and that the "real crisis" is climate change.

*Response:* The United States is both a nation of immigrants and a nation of laws. The Departments are charged with administering and enforcing those laws and endeavor to do so humanely. The Departments agree that the historical openness of the United States to immigration has enriched our culture, expanded economic opportunities, and

enhanced our influence around the world. However, the Departments reject the contention that the IFR's limitation on asylum eligibility and other provisions are inconsistent with American values, fairness, and showing respect for immigrants.

The United States has a long tradition of accepting and welcoming refugees. For decades, U.S. law has protected vulnerable populations from return to a country where they would be persecuted or tortured. *See, e.g., Stevic,* 467 U.S. at 409 ("For over 30 years the Attorney General has possessed statutory authority to withhold the deportation of an alien upon a finding that the alien would be subject to persecution in the country to which he would be deported."). Under this rule, the United States will continue to offer such protection. The rule is designed to implement the Proclamation's policies and objectives by enhancing the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718. The rule enhances the Departments' ability to manage high levels of irregular migration to the United States during emergency border circumstances and allows the Departments to quickly deliver decisions and consequences to those who cross the southern border irregularly and are unable to establish a legal basis to remain, while upholding domestic and international protection obligations. *Id.* at 48731.

Without a policy in place to ensure lawful, safe, and orderly processing of migrants entering the United States, the number of migrants would exceed DHS's already limited resources and facilities. Over the past several years, the border security and immigration systems have experienced extreme strain, with a dramatic increase in the number of noncitizens attempting to cross the SWB between POEs. 89 FR at 48722. Despite the meaningful impact of the Circumvention of Lawful Pathways rule and related measures, encounter levels continued to exceed DHS's capacity to, as appropriate, effectively and safely process, detain, and remove noncitizens. *Id.* at 48727. As explained in the IFR, the Departments believed that, without meaningful policy change, encounters between POEs would continue to rise and surpass DHS's capacity and abilities based on available resources. *Id.* at 48726. The Departments disagree with the sentiment that the rule is unnecessary, as it responds to this urgent situation. The Departments reiterate that the goal

**STB_AR1_000036**

of the rule is not to discourage migrants with valid claims from applying for asylum or other protection, but rather to discourage the unprecedented level of irregular migration while at the same time maintaining access to lawful, safe, and orderly pathways to enter the United States. The Departments have determined that the benefits to the overall functioning and efficiency of the immigration system at our southern border justify the rule; applying the rule is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws and to reduce the role of exploitative and dangerous smuggling and human trafficking networks.

The rule does not render noncitizens to whom it applies categorically ineligible for asylum, nor does it alter their ultimate eligibility for withholding or CAT protection. To ensure that particularly vulnerable migrants are not unduly burdened by the rule, the Departments have included an exception to the limitation on asylum eligibility that will allow some migrants to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And even those ineligible for asylum may continue to seek statutory withholding of removal and CAT protection. A noncitizen who seeks to maintain eligibility for asylum can also utilize one of several lawful, safe, and orderly pathways to the United States, including use of the CBP One app, or, for some noncitizens, refugee resettlement, parole processes, family reunification, and labor pathways. Indeed, as noted above, the CBP One app has permitted the United States Government to process nearly five times more individuals at land border POEs each day than it did on an average day in the six years preceding the pandemic—providing an important avenue for individuals who may wish to access protection in the United States to so in a safe and orderly manner.[143] The Safe Mobility Initiative, which includes Safe Mobility Offices in several countries in the Western Hemisphere, processes and educates migrants about the aforementioned pathways.[144] By reducing migration flows to a reasonable rate, the rule will reduce strains on limited Federal Government immigration processing and enforcement resources; preserve the

Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and reduce the role of exploitative TCOs and smugglers. 89 FR at 48767. Finally, as explained in Section III.A.1 of this preamble, the rule is fully consistent with the Departments' authority and obligations under section 208 of the INA, 8 U.S.C. 1158.

ii. Procedural and Due Process Concerns

(1) General Concerns

*Comment:* A commenter stated that the IFR does not violate noncitizens' due process rights because asylum is a discretionary benefit to which noncitizens have no inherent due process interest; instead, they have only the procedural rights guaranteed by statute. Because the IFR preserves all procedural statutory protections, the commenter stated, the IFR complies with due process. The commenter further stated that regulatory bars to asylum do not alter the basic procedural protections, such as the opportunity to be heard, for noncitizens who make credible fear claims.

Other commenters urged the Departments to rescind the IFR entirely. Some commenters expressed general concern that the IFR would violate or undermine due process protections. One commenter said that U.S. immigration law is already confusing, citing research that it said showed that 55.9 percent of noncitizen respondents did not understand the requirements and processes for accessing United States territory. The commenter further stated that noncitizens arriving at the southern border will not be able to understand the procedures for seeking asylum or protection given the IFR's complexity.

Commenters discussed the importance of due process in the asylum system, as required by international human rights law, and said that the United States has a duty to ensure that noncitizens receive a fair trial and fully understand their rights. Similarly, one commenter stated that noncitizens who express the desire to seek asylum have a due process right to information about their rights and obligations, including deadlines and appeals, the interview process, and their right to legal representation. Such safeguards, the commenter wrote, would ensure that noncitizens receive the necessary guidance for pursuing their asylum claims.

Commenters wrote that fair and efficient asylum procedures are even more important for noncitizens with particular vulnerabilities, such as UCs. Commenters stated that the IFR would

hamper consistent application of the law and result in arbitrary application of the law, thus severely restricting access to asylum and humanitarian protections.

*Response:* The Departments disagree that the rule violates the Due Process Clause of the Fifth Amendment or impermissibly restricts access to asylum. Noncitizens who are encountered in close vicinity to and immediately after crossing the border and are placed in expedited removal proceedings, including those in the credible fear screening process, have "only those rights regarding admission that Congress has provided by statute." [145] *Thuraissigiam,* 591 U.S. at 140; *see also Mendoza-Linares* v. *Garland,* 51 F.4th 1146, 1148 (9th Cir. 2022) (concluding that "an arriving immigrant caught at the border . . . 'has no constitutional rights regarding his application' for asylum" (quoting *Thuraissigiam,* 591 U.S. at 139)). As discussed above in Section III.A 1 of this preamble, the changes in this rule are consistent with the INA. They thus comply with the Due Process Clause with respect to noncitizens in expedited removal proceedings.[146]

Contrary to commenters' assertions, the rule ensures that noncitizens receive

---

[143] OHSS analysis of July 2024 OHSS Persist Dataset (OFO Encounters tab).

[144] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas,* https://www.state.gov/safe-mobility-initiative/ (last visited Sept. 24, 2024).

[145] Courts also have held that noncitizens do not have an underlying property or liberty interest in a grant of asylum to which the protections of the Due Process Clause attach. *See, e.g., Jin* v. *Mukasey,* 538 F.3d 143, 157 (2d Cir. 2008) (holding that "an alien who has already filed one asylum application, been adjudicated removable and ordered deported, and who has nevertheless remained in the country illegally for several years, does not have a liberty or property interest in a discretionary grant of asylum"); *Ticoalu* v. *Gonzales,* 472 F.3d 8, 11 (1st Cir. 2006) ("Due process rights do not accrue to discretionary forms of relief, and asylum is a discretionary form of relief." (citation and internal quotation omitted)); *Mudric* v. *Att'y Gen.,* 469 F.3d 94, 99 (3d Cir. 2006) (holding that an 8-year delay in processing the petitioner's asylum application was not a constitutional violation because the petitioner "had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived"); *cf. Munoz* v. *Ashcroft,* 339 F.3d 950, 954 (9th Cir. 2003) ("Since discretionary relief is a privilege created by Congress, denial of such relief cannot violate a substantive interest protected by the Due Process clause."). Notably, UCs are excepted from expedited removal and have other rights under the nation's immigration laws. *See generally* 8 U.S.C. 1232. Procedural concerns related to UCs are addressed later in this section.

[146] Although this rule's limitation on asylum eligibility also applies in section 240 removal proceedings, even if noncitizens in those proceedings had an interest protected by the Due Process Clause, the application of the limitation would not violate the Due Process Clause because, as noted below, noncitizens in such proceedings are entitled to all the procedural protections such proceedings normally entail. *See Pouhova* v. *Holder,* 726 F.3d 1007, 1011 (7th Cir. 2013) (citing section 240(b)(4) of the INA, 8 U.S.C. 1229a(b)(4), and explaining that "[a]ny proceeding that meets the requirements of the statute also satisfies constitutional due process").

**STB_AR1_000037**

a fair process. Indeed, although the rule changes some procedures, as discussed throughout this preamble, it leaves much of the process unaltered. Specific comments concerning the rule's manifestation of fear standard and related changes to the process for determining whether a noncitizen should be referred to an AO for a credible fear interview are addressed in Section III.C.2 of this preamble. The Departments address commenters' concerns about the rule's consistency with international obligations in Section III.A.1 of this preamble.

First, with respect to one commenter's claim that noncitizens do not understand the requirements for accessing United States territory because U.S. immigration law is confusing, the Departments are aware of no statutory requirement that notice regarding any of the INA's provisions be provided to individuals outside the United States, including those who may be subject to expedited removal provisions or this rule's limitation on asylum eligibility upon arrival. In addition, to the extent the commenter's objection is to the complexity of the INA, that concern is a matter for Congress to address.

Second, under the rule, DHS is continuing to provide noncitizens who are subject to expedited removal with notice of their ability to raise a claim of fear of persecution or torture. DHS is using signs and videos that are reasonably designed to ensure that noncitizens in its custody are aware of their right to request asylum or protection. As discussed further in Section III.C.2 of this preamble, these signs and videos are provided in languages that are common to the large majority of noncitizens encountered by CBP at the southern border. ICE likewise provides information in a number of languages to detainees being processed under the rule.[147] And the signs provide a simple instruction to noncitizens that, if they fear persecution or torture if they are removed from the United States, they should tell an immigration officer and an AO will conduct an interview and ask the noncitizens questions about

any fear they may have. Individuals who do not speak one of the languages are provided with language access services consistent with CBP's existing language assistance policies. These procedures are consistent with DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv).

Moreover, to the extent that commenters have expressed due process concerns about the manifestation standard, the Departments reiterate that the expedited removal statute does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if the noncitizen has a fear of persecution or torture. *See* 89 FR at 48740. Instead, the statute provides that only those noncitizens who ''indicate[] either an intention to apply for asylum . . . or a fear of persecution,'' INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As discussed in detail in Section III.C.2 of this preamble, the statute does not place any affirmative obligation on the Government to question noncitizens about intent to seek relief or fear in their home countries, nor does it define what circumstances constitute the requisite indication of intent or fear; to the contrary, the onus under the statute is on the noncitizen to ''indicate[]'' either of the circumstances warranting referral. Because the Departments' procedures comply with the statute, they comport with due process. *See Thuraissigiam,* 591 U.S. at 139–40.

Third, noncitizens who manifest or express a fear and who are referred for a credible fear interview will receive additional information about the credible fear process that has the same types of procedural and substantive information as that provided in the Form M–444, which is used for those not subject to the rule's expedited removal procedures and during times when this rule's provisions do not apply. 89 FR at 48739–40. The new ''Information About Credible Fear Interview Sheet'' informs the noncitizen that the noncitizen may consult with another person, including a legal service provider, and is provided to the noncitizen along with an EOIR-maintained list of pro bono legal service providers. It gives the noncitizen information about the credible fear interview itself, including that an interpreter will be provided, if needed or requested. It explains that the noncitizen may request a male or female interpreter or AO and may speak to the AO separately from the noncitizen's

family. It highlights the importance of telling the AO about the noncitizen's fear of harm and that this may be the only opportunity to do so. The information sheet notifies the noncitizen of the right to have an IJ review a negative fear determination and gives details about the steps following a positive determination.

Individuals in the credible fear process maintain the right to consult with an attorney or other person or persons of their choosing before their interview, and such persons may be present for the interview itself. 8 CFR 235.15(b)(4)(i)(B). Asylum seekers also may present evidence relevant to their claim during their interviews. 89 FR at 48746 & n.239. Additionally, USCIS provides interpreter services at the agency's expense to noncitizens who cannot proceed effectively in English. 8 CFR 208.30(d)(5). And noncitizens may request review of a negative fear determination before an IJ. *Compare* 8 CFR 208.30(g)(1) (providing the standard process for requesting IJ review in credible fear proceedings), *with* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those subject to the rule and unable to show that the exception to the limitation on asylum eligibility applies). The rule requires noncitizens to respond affirmatively when asked whether the noncitizen would like to request such review, rather than providing review if the noncitizen does not respond, but IJ review remains available in all cases with a negative credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1). The rule is thus fully consistent with the Departments' legal authority and obligations.

In addition, the rule provides several procedural protections to ensure that asylum applicants receive a full and fair hearing before an IJ and that the limitation on asylum eligibility applies only to noncitizens properly within the scope of 8 CFR 208.35(a) and 1208.35(a). During the credible fear review, an IJ will evaluate de novo whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen meets the exception. 8 CFR 208.35(b)(2)(v), 1208.35(b). Even where an IJ determines that the noncitizen has not met that burden, if the noncitizen demonstrates a reasonable probability of persecution or torture in the country or countries of removal, the noncitizen will have an opportunity to apply for statutory withholding of removal,

---

[147] *See* Memorandum for Daniel A. Bible, Exec. Assoc. Dir., Enforcement and Removal Operations, ICE, from Patrick J. Lechleitner, Deputy Dir. and Senior Off. Performing the Duties of the Dir., ICE, *Re: Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border, *and Interim Final Rule,* Securing the Border 5 (June 4, 2024) (''These signs must be posted in English and Spanish. [Enforcement and Removal Operations ('ERO')] will have additional translations available in facility law libraries in the following languages . . . .''); ICE, *National Detainee Handbook* 7, 15, 25 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ ndhEnglish.pdf.*

STB_AR1_000038

protection under the CAT regulations, or any other form of relief or protection for which the noncitizen is eligible in section 240 removal proceedings, including asylum. 8 CFR 1208.33(b)(2)(ii), 1208.35(b)(2)(iii). These standards help to ensure the outcome of the process delineated in the rule is not predetermined and that noncitizens potentially subject to the limitation on asylum eligibility receive sufficient opportunity for consideration and review of threshold eligibility determinations to satisfy any putative due process rights they may have. *See Mathews* v. *Eldridge,* 424 U.S. 319, 333 (1976) (''The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'' (internal quotation marks omitted)).

Nor does the rule violate any procedural due process rights noncitizens may have in section 240 removal proceedings. For those placed in section 240 removal proceedings, the rule's limitation on asylum eligibility will be litigated in those proceedings before an IJ with all the procedural rights that apply in such proceedings. *See Pouhova,* 726 F.3d at 1011; *see also Rehman* v. *Gonzales,* 441 F.3d 506, 508 (7th Cir. 2006) (''Any proceeding that meets [the requirements of section 240 of the INA, 8 U.S.C. 1229a, and the INA's implementing regulations,] satisfies the Constitution as well.'').

Additionally, the Departments disagree with comments characterizing the IFR as resulting in unfair procedures that are especially harmful to those with particular vulnerabilities, such as UCs, individuals with mental health issues or intellectual capacity challenges, and victims of violence, torture, or other traumatic experiences. Nothing in the IFR changes the longstanding framework establishing that UCs are not subject to expedited removal. *See* 8 U.S.C. 1232(a)(5)(D). UCs are also specifically excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation and, accordingly, the IFR's limitation on asylum eligibility. 89 FR at 48487; 8 CFR 208.35(a)(1), 1208.35(a)(1). Moreover, the process outlined in the IFR does not prohibit USCIS from exercising its discretion to issue notices to appear (''NTAs'') and place noncitizens, including those who are unable to testify or who speak a rare language, in section 240 removal proceedings, where they can request asylum. *See* 8 CFR 208.30(b); *see also Matter of E–R–M– & L–R–M–,* 25 I&N Dec. 520, 523 (BIA 2011) (finding that the INA provides DHS with ''discretion to put aliens in section 240 removal

proceedings even though they may also be subject to expedited removal''). Additionally, EOIR has established a specialized juvenile docket at each immigration court with an established caseload of children's cases; has issued guidance to its adjudicators regarding special considerations and procedures for cases involving children, including UCs; and has provided training to IJs on cases involving children, including UCs.[148]

Noncitizens in section 240 removal proceedings have a wide range of well-established statutory and regulatory rights, including the following: the right to representation at no expense to the Government, INA 240(b)(4)(A), 8 U.S.C. 1229a(b)(4)(A); a reasonable opportunity to examine evidence, present evidence, and cross-examine witnesses, INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); the right to seek various forms of relief, 8 CFR 1240.1(a)(1)(ii)–(iii); the right to file a motion to continue, 8 CFR 1003.29; and the right to appeal specified decisions to the BIA, 8 CFR 1003.3(a), 1003.38(a), and to later file a petition for review of a final removal order in the appropriate U.S. Court of Appeals, INA 242, 8 U.S.C. 1252. Additionally, EOIR provides interpreters for noncitizens in section 240 removal proceedings.[149] And safeguards are provided to those who are not competent to participate in their proceedings, *see Matter of Matter of M–A–M–,* 25 I&N Dec. 474, 481–82 (BIA 2011), which may include termination of the proceedings where ''[f]undamentally fair proceedings are not possible because the noncitizen is mentally incompetent and adequate safeguards are unavailable,'' 8 CFR 1003.1(m)(1)(i)(B), 1003.18(d)(1)(i)(B).

The Departments also disagree with commenters' assertion that the IFR would lead to disparate or arbitrary application of the law. USCIS AOs and supervisory AOs have received the same training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use Global, a cloud-based case management system,[150] which includes interview guides, forms, and instructions—including specific interview guides, forms, and instructions to implement the IFR—to

ensure consistency in procedures and substantive guidelines. Moreover, the IFR does not change the fact that all credible fear determinations issued by USCIS are reviewed by a supervisory AO prior to being served on a noncitizen, 8 CFR 208.30(e)(8), another important safeguard to ensure quality and consistency within and between offices.

Additionally, IJs are career employees who are selected through a competitive process.[151] The Director of EOIR has authority to order ''comprehensive, continuing training and support'' directed at ''promot[ing] the quality and consistency of adjudications.'' 8 CFR 1003.0(b)(1)(vii). And the Chief IJ has the authority to ''[p]rovide for appropriate training of the immigration judges and other [Office of the Chief Immigration Judge] staff on the conduct of their powers and duties.'' 8 CFR 1003.9(b)(2). Regulations also require IJs to ''resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations.'' 8 CFR 1003.10(b). To that end, all IJs receive ongoing training to facilitate the implementation of new policies and procedures, such as the IFR.[152] EOIR's Legal Education and Research Services Division also offers nationwide legal training for IJs and ''regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.''[153]

(2) Access to Counsel, Unrepresented Applicants, and the Ability or Time To Prepare

*Comment:* Commenters stated that access to counsel is a due process right. Commenters also discussed statutory and regulatory requirements that provide noncitizens eligible for a credible fear interview the right to consult with legal counsel and said that the recent change to a minimum 4-hour consultation period prior to a credible fear interview—which DHS made via guidance—would effectively deny noncitizens that right.

One commenter additionally stated that less than 3 percent of migrants in

---

[148] *See* EOIR, *Director's Memorandum 24–01, Children's Cases in Immigration Court* (Dec. 21, 2023), *https://www.justice.gov/d9/2023-12/dm-24-01_1.pdf.*

[149] *See* EOIR, *Director's Memorandum 23–02, Language Access in Immigration Court* 1–2 (June 6, 2023), *https://www.justice.gov/eoir/book/file/1586686/dl.*

[150] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division,* at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

[151] EOIR, *Make a Difference—Apply for an Immigration Judge Position* (last updated Sept. 17, 2024), *https://www.justice.gov/eoir/Adjudicators* (describing application process and core position requirements for IJ position).

[152] *See, e.g.,* EOIR, *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/eoir/page/file/1513996/dl?inline.*

[153] EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division.*

STB_AR1_000039

expedited removal were able to obtain legal representation. Other commenters said that less than 1 percent were able to find representation in the credible fear process. A commenter stated that in 2023, 35 percent of represented individuals had their negative fear determinations vacated, compared to just 15 percent of unrepresented noncitizens. Commenters emphasized that any immigration solution should include procedures for asylum seekers to access legal representation.

Another commenter said that a 2010 study found that 54 percent of noncitizens with representation were granted asylum, compared to 11 percent of noncitizens without representation. Another commenter said that noncitizens with representation were twice as likely to receive a grant of asylum as their unrepresented counterparts. The commenter said that such data indicate that, as a result of the IFR and reduced access to counsel, applicants with meritorious claims who would have otherwise been referred to full hearings will be denied.

Commenters stated that many noncitizens do not understand the function and purpose of a credible fear interview without speaking with an attorney, particularly those who speak languages not included on orienting signs. Commenters explained that a majority of noncitizens do not have legal representation and thus may struggle to effectively present their cases, particularly if they do not speak English. Commenters also stated that, without legal counsel, many noncitizens will not understand the process nor the legal grounds for their asylum claims. Commenters stated that access to counsel significantly affects asylum outcomes and that less access to counsel is particularly troubling considering that noncitizens must now meet a new, higher standard for protection screenings. One commenter stated that the rule will worsen the issues that already exist in expedited removal proceedings, adding that children and adults are routinely denied access to legal advice if they get referred for fear screenings. Commenters who provide legal services also claimed that they have been excluded from credible fear interviews and subsequent credible fear review hearings before IJs.

Another commenter stated that the availability of legal information and representation at the outset of the asylum process increases efficiency, discourages frivolous claims, reduces the number of appeals and repeat claims, and shortens the time required to determine a claim.

Several commenters stated that noncitizens face significant barriers to obtaining legal representation during the credible fear process. A commenter stated that noncitizens in custody already face insurmountable hurdles to access legal counsel, such as knowing how to contact a lawyer, knowing where they are being detained, having access to a phone, and being given enough information to understand the credible fear process. Another commenter stated that having only 4 hours would make it impossible for providers to meet with clients before credible fear interviews, stating that legal representatives often face barriers to accessing clients within 48 hours, much less 4. The commenter discussed such barriers, stating that legal representatives frequently wait 24 to 48 hours for their interviews with their clients to be scheduled and may be barred from including translators or interpreters in those interviews. Some commenters stated that immigration advocates and attorneys face numerous issues in trying to provide legal consultations, such as being unable to physically access detention facilities or obtain the requisite signatures from their clients. Another commenter added that advocates lack access to private meeting rooms and experience long waits to meet with clients, malfunctioning technology, and unsafe or uncomfortable environments.

Several commenters stated that the rule would effectively eliminate access to legal representation because noncitizens would have only 4 hours to find and consult with a lawyer before an initial hearing. Commenters emphasized that they viewed a 4-hour window as troubling in light of the newly increased standards noncitizens must meet. Commenters stated that it takes more than 4 hours to adequately prepare a noncitizen for the credible fear process. Commenters stated that noncitizens will not have the time or resources to contest arguments and present evidence before the credible fear screenings. Commenters believed that the 4-hour window will lead to greater rates of refoulement. Commenters stated that the 4-hour window may fall on a weekend or after business hours, when legal service providers and aid organizations are closed. Commenters asserted that noncitizens will lose access to legal counsel because the United States does not provide free counsel for noncitizens, and 4 hours is not enough time for individuals to retain counsel. Commenters stated that the rule's restrictions are arbitrary and impermissible, not supported by evidence, and will lead to the denial of

otherwise meritorious asylum claims. Commenters stated that counsel would not be able to access their clients physically or telephonically in a 4-hour window.

Commenters stated that, by reducing noncitizens' ability to secure counsel and connect with communities, the IFR will prevent individuals from becoming aware of other protections from which they could potentially benefit.

*Response:* The rule does not deprive noncitizens of access to counsel in violation of the Fifth Amendment's Due Process Clause. The Supreme Court has held that the rights of individuals seeking asylum at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 591 U.S. at 140. The INA provides that a noncitizen ''may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, according to regulations prescribed by the Attorney General,'' provided that ''[s]uch consultation shall be at no expense to the Government and shall not unreasonably delay the process.'' INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). This statutory right to consult does not attach until a noncitizen becomes eligible for a credible fear interview, and it does not guarantee an absolute right to retain counsel. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). The regulations implementing expedited removal elaborate that ''[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained.'' 8 CFR 235.3(b)(4)(ii).

Moreover, because this rule does not alter procedures governing consultation or representation, commenters' concerns regarding those issues—including that the minimum 4-hour consultation period violates section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), or is unreasonable—are outside the scope of this rulemaking. Procedures regarding consultation and representation are governed by other DHS regulations, guidance, and policies.

Nevertheless, insofar as commenters' concerns relate to the Departments' decision to adopt the changes made by the IFR and this rule, DHS's changes to the consultation period do not undermine the Departments' decision to promulgate this rule. Those changes aim to address the same emergency border circumstances as this rule—specifically, DHS determined that shortening the minimum consultation period would reduce the risk that DHS's processing capacity would become overwhelmed by increasing DHS's ability to impose

**STB_AR1_000040**

**81196**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

consequences swiftly, which in turn lowers incentives for additional irregular migration. DHS's 4-hour minimum consultation period, moreover, continues to allow sufficient time for individuals to make multiple phone calls and have in-depth conversations. DHS is not aware of any data supporting the assertion that this approach has decreased the effective availability of consultation. Finally, even if this approach had some adverse effect on noncitizens' ability to consult, the Departments would still find it necessary and appropriate to adopt this rule's changes, including the two changes to the portions of the removal process that follow consultation—the asylum limitation and the reasonable probability standard.

The Departments start by explaining how the consultation process works. Once a noncitizen is referred to USCIS for a credible fear interview pursuant to 8 CFR 235.15(b)(4), the rule ensures that the noncitizen receives information about that interview and the right to consult with a person or persons of the noncitizen's choosing. Specifically, all those referred for a credible fear interview receive a written "Information About Credible Fear Interview Sheet" describing the purpose of the referral and the credible fear interview process; the right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government; the right to request a review by an IJ of any negative fear determination an AO enters; and the consequences of a failure to establish a credible fear of persecution or torture. 8 CFR 235.15(b)(4)(i)(B). This written disclosure is available in English, Spanish, Haitian Creole, and Portuguese, and the noncitizen is also provided with a list of pro bono legal service providers. If the noncitizen does not speak one of these languages, then language access services are provided to orally communicate the written material in a language understood by the noncitizen.[154] As stated in the "Information About Credible Fear

Interview Sheet," the minimum 4-hour consultation period begins at the time a noncitizen who has been referred to USCIS for a credible fear interview has access to a phone or another opportunity to consult with an individual of the noncitizen's choosing, and the minimum 4-hour period runs only between the hours of 7 a.m. and 7 p.m. This period is calculated in local time. Procedurally, a noncitizen is scheduled for a credible fear interview only after the minimum consultation period has elapsed, regardless of whether the noncitizen used the phone or consulted with anyone during that period.

The "Information About Credible Fear Interview Sheet" further explains that the noncitizen may have a consultant of the noncitizen's choice participate in the interview with USCIS by telephone, and an EOIR-maintained list of pro bono legal service providers who may be able to speak with the noncitizen is also provided. The information sheet instructs noncitizens to ask a DHS officer for assistance if they want to call someone. Individuals who manifest fear in CBP custody and go through the credible fear process in CBP custody are provided access to a phone in order to telephonically consult with any individual of their choosing, including legal counsel, and do not need to ask CBP employees to do so. After manifesting a fear, when a phone becomes available, such noncitizens are brought to the phone and given at least 4 hours in which to use it. If a noncitizen requests use of a phone after the end of the noncitizen's consultation period, but before the noncitizen's interview occurs, the noncitizen is afforded the opportunity to access a phone unless it is not operationally feasible to provide such access (such as because of a lack of available personnel to escort the noncitizen to the consultation area). The phone booths in which such consultations occur are private, closed, confidential booths and include an EOIR-maintained list of pro bono legal service providers.[155]

Those detained noncitizens who go through the credible fear process in ICE custody generally have direct access to phones (without having to interact with facility staff to request access, for instance) and have access to a free call platform that includes telephone numbers of legal service providers who are listed on the EOIR-maintained list of pro bono legal service providers, in accordance with ICE detention

standards.[156] Beyond telephone access, visits between a legal representative and a detained noncitizen are confidential and not subject to auditory supervision.[157] Private consultation rooms may be available for these meetings.[158] To facilitate improved access to legal resources and representation, ICE has also expanded its Virtual Attorney Visitation program, which facilitates confidential attorney-client conversations through virtual technology.[159]

Commenters' arguments concerning the minimum 4-hour consultation period, first, miss that Congress did not provide an unqualified right to consultation or representation during the credible fear process. Rather, noncitizens may consult "according to regulations prescribed by" the Secretary, and "[s]uch consultation . . . shall not unreasonably delay the process." *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). And those regulations specify that "consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained." 8 CFR 235.3(b)(4)(ii). "Read together, the text of these provisions provides noncitizens with a right to consultation while they are detained pending expedited removal, but also plainly establish that the consultation right is subordinate to the expedition that this removal process is designed to facilitate, and that the scope of the right to consult is determined by the facility in which these noncitizens are detained." *Las Americas Immigr. Advoc. Ctr.* v. *Wolf,* 507 F. Supp. 3d 1, 25 (D.D.C. 2020); *cf.* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III) (providing that IJ review of an AO's negative credible fear determination "shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination").

DHS, moreover, moved to the 4-hour minimum consultation period for credible fear referrals for noncitizens

---

[154] *See, e.g.,* ICE, *2019 National Detention Standards for Non-Dedicated Facilities,* Foreword (2019), *https://www.ice.gov/detain/detention-management/2019* ("Generally, all written materials provided to detainees must be translated into Spanish and other frequently encountered languages. Oral interpretation or other language assistance must be provided to any detainee who speaks a language in which written material has not been translated or who is illiterate."); ICE, *2011 Operations Manual ICE Performance-Based National Detention Standards,* Standard 2.13 (2011), *https://www.ice.gov/detain/detention-management/2011* ("Oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.").

[155] *See* USBP, *6.4.24 USBP Field Guidance,* at 4.

[156] ICE, *Attorney Information and Resources: Communicating with Your Client or Prospective Client* (last updated Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources.* Telephone access and use may be limited in the event of emergencies (for instance, escapes, escape attempts, disturbances, fires, power outages) or other events that disrupt orderly facility operations. If such disturbances occur, officers are responsible for ensuring that the minimum 4-hour consultation period is afforded.

[157] *Id.*

[158] *Id.*

[159] ICE, *Virtual Attorney Visitation Program* (last updated Aug. 16, 2024), *https://www.ice.gov/detain/detention-facilities/vav.*

**STB_AR1_000041**

covered by the IFR to address the emergency border circumstances described in the President's June 3 Proclamation based on a determination that operational imperatives necessitated this change in order to avoid unreasonable delays to the process in the context of these emergency border circumstances— exactly the type of determination that Congress authorized DHS to make. Under DHS's guidance that applies outside of the context of emergency border circumstances, noncitizens are not interviewed until at least 24 hours after the noncitizen's acknowledgement of receipt of the Form M–444,[160] unless the noncitizen, at the noncitizen's request, voluntarily waives the consultation period. Even if a noncitizen consults at the start of that 24-hour period, the noncitizen's credible fear interview is not conducted until after that period ends.

The 4-hour approach allows a swifter cadence of scheduling noncitizens for credible fear interviews. This minimum 4-hour consultation period thus enables credible fear screenings to take place in a more efficient manner and reduces the time noncitizens remain in custody; in turn, those improvements mitigate overcapacity issues in DHS facilities, free up detention space to allow for greater expedited-removal processing capacity over time, and help to avoid situations in which DHS must issue NTAs to individuals otherwise eligible for expedited removal and release them pending section 240 removal proceedings—in turn delaying the imposition of consequences for those without a legal basis to remain in the United States and creating incentives for additional arrivals at the border. Conversely, a longer minimum consultation period would delay credible fear screenings, increase the amount of time noncitizens remain in immigration detention, and contribute to a situation where DHS's capacity could quickly become overwhelmed, including potentially requiring the release of individuals into section 240 removal proceedings instead of processing such individuals under expedited removal due to resource constraints—thus delaying the imposition of consequences for those without a legal basis to remain and creating incentives for more irregular migration.

The Departments disagree with the conclusion drawn by certain commenters that a shortened minimum consultation period effectively eliminates access to counsel or that the hours during which the consultation period runs make it practically impossible for noncitizens to reach attorneys or consultants. To the contrary, the minimum 4-hour period that DHS has adopted allows sufficient time for individuals to make multiple phone calls and have in-depth conversations prior to the credible fear interview. *Cf. Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. 3d at 12–14, 30.

The difference between DHS's 24-hour approach and its approach during these emergency border circumstances is also less significant in practice than certain commenters suggested. For example, the consultation period during emergency border circumstances begins to run only when the individual is provided access to a phone and confers access during at least that 4-hour period; the 24-hour period, by contrast, begins when a noncitizen acknowledges receipt of the Form M–444, and the noncitizen does not necessarily have access to a phone immediately at that point. For those who express a fear in CBP custody, under either approach, CBP generally takes a noncitizen to a phone booth once during the noncitizen's time in custody for consultation, and CBP generally will accommodate requests for additional phone access when operationally feasible. In addition, a significant share of the 24-hour period occurs overnight, when fewer people are likely be available to take calls. Under the 4-hour approach, by contrast, the clock runs only during daytime hours.

The 4-hour period is also a minimum, and noncitizens may receive greater time. For example, for noncitizens in CBP custody, if a noncitizen requests access to a phone booth after the consultation, but the interview has not yet occurred, the agent or officer would in the normal course facilitate another call, to the extent operationally feasible. For noncitizens in ICE custody, noncitizens are generally housed in areas with phones that they may use at any time. Hence, noncitizens have phone access even during times when the 4-hour consultation period is tolled, as well as in circumstances in which the noncitizen's credible-fear interview is delayed for a longer time than the 4-hour minimum. The result is that noncitizens in ICE custody will often have more than 4 hours of phone access. Requests to reschedule the credible fear interview may be accommodated for reasons that constitute extraordinary circumstances, such as serious illness of the noncitizen's consultant or serious facility issues that prevented the noncitizen from contacting a consultant.

The Departments acknowledge that the period includes Saturdays, Sundays, holidays, and periods outside of traditional business hours (7 a.m. to 9 a.m. and 5 p.m. to 7 p.m.). And while the Departments recognize that it may be more difficult for detained noncitizens to connect with the person or persons with whom they wish to consult during these times, this concern again does not undermine the Departments' decision to adopt the changes in the IFR and this rule. DHS's 24-hour approach also includes Saturdays, Sundays, and holidays.[161] Although DHS's 4-hour approach uses a shorter window during those periods than its 24-hour approach, the Departments have already explained why that change makes less of a practical difference than some commenters suggest. Moreover, although DHS's approach during emergency border circumstances may sometimes result in some or all of the 4-hour period falling outside of traditional business hours, noncitizens may reach out to individuals in different time zones during these periods. For those who manifest fear in CBP custody, CBP provides noncitizens with a list of legal service providers operating in multiple time zones.[162] For those who manifest fear in ICE custody, ICE provides noncitizens with a list of legal service providers who service the area in which the noncitizen is detained and ICE will, upon request, provide the noncitizen a list of providers in additional States identified by the noncitizen. In addition, DHS's 24-hour approach also does not guarantee that noncitizens would have access to phones during traditional business hours (for example, when the period falls over a weekend or holiday).[163] Excluding weekends, holidays, and periods outside of traditional business hours would thus mark a significant

---

[160] *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023).

[161] *See* DHS, *M–444 Information About Credible Fear Interview* (May 10, 2023) (noting that the interview will occur no earlier than 24 hours after receipt of the form without mention of any tolling or stoppage).

[162] *See, e.g., EOIR, List of Pro Bono Legal Service Providers (Noncitizens in U.S. Customs and Border Protection Custody)* (July 2024), *https:// www.justice.gov/eoir/page/file/1582586/dl.*

[163] The consultation period also was not tolled for weekends, holidays, or periods outside of normal business hours under the 48-hour approach that predated the 24-hour approach. *See* Memorandum for Andrew Davidson, Acting Deputy Dir., USCIS, from John L. Lafferty, Chief, Asylum Div., USCIS, *Re: Scheduling of Credible Fear Interviews* (May 10, 2023) (''Under the current policy, credible fear interviews have generally taken place at least 48 hours after the time of the noncitizen's arrival at the detention facility, unless the noncitizen specifically requests to be interviewed more quickly.'').

**STB_AR1_000042**

change in DHS's practice that could lead to unreasonable delays. And because CBP continues to encounter individuals and to take them into custody 24 hours a day and 7 days a week, that change would be inconsistent with the imperative to facilitate the prompt operation of the expedited removal process, especially during the emergency border circumstances when this rule applies.

In addition, when a noncitizen receives a negative credible fear determination, the noncitizen also has an additional opportunity to consult before review of that determination by an IJ (if requested). INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). Noncitizens can obtain counsel or consult with other individuals of their choosing and seek to introduce new evidence before IJs, allowing for additional consultation beyond the initial 4 hours. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 1003.42(c). That additional consultation opportunity further reinforces the Departments' view that the minimum 4-hour consultation period prior to the credible fear interview does not undermine their decision to adopt the changes made by the IFR and this rule.

In response to comments alleging that legal representatives have been excluded from credible fear interviews, the Departments again note that neither this rule nor the consultation period policy changes the procedures and regulations governing attorney participation during credible fear interviews. Under existing regulations, all noncitizens are afforded the opportunity to have a person or persons of their choosing present, including by phone, during their credible fear interview. 8 CFR 208.30(d)(4). In any case where USCIS has received a properly executed G–28, Notice of Entry of Appearance as Attorney or Accredited Representative, prior to the credible fear interview, asylum office staff notify the attorney or accredited representative of the scheduled interview date and time, and the AO must call the attorney or representative before beginning the interview so the attorney or representative may be present. If the AO is unable to reach the attorney or accredited representative, the AO documents this in the interview notes and asks the noncitizen if the noncitizen would like to proceed without the attorney or accredited representative present. Guidance instructs that, where a properly executed Form G–28 is on file, asylum office staff will attempt to ensure that the attorney or accredited representative is present at the interview if the

noncitizen desires such a person's presence. Further, as long as it does not unreasonably delay the process, the asylum office has discretion to reschedule interviews on a case-by-case basis to ensure that an attorney or accredited representative may attend. At the beginning of the credible fear interview, if it has not already been established through a Form G–28, the AO asks the noncitizen if the noncitizen has an attorney or consultant and verifies whether the noncitizen received a list of free or low-cost legal service providers. If the noncitizen does not have an attorney or consultant present, the AO reminds the noncitizen that the noncitizen may have an attorney or consultant present during the interview and asks the noncitizen if the noncitizen wants to continue with the interview without an attorney or consultant present. In addition, as noted above, if a noncitizen requests to reschedule the interview for reasons that constitute extraordinary circumstances, such as illness of the noncitizen's consultant or technical issues that prevented the noncitizen from contacting a consultant, such requests may be accommodated. If there are individual instances where commenters believe legal representatives have been excluded from a credible fear interview contrary to the wishes of a noncitizen, commenters should lodge those complaints through the proper channels,[164] but the Departments emphasize that the present rule does not change the regulatory provisions that govern who may be present during the credible fear interview or impact how asylum office staff ensure those provisions are enforced.

As for the credible fear interview itself, as discussed more fully below in Section III.C.3 of this preamble, even with the heightened screening standard for those found not to have a significant possibility of demonstrating eligibility for asylum under this rule's limitation on asylum eligibility, the type of information sought to be elicited during a credible fear interview is well within a noncitizen's knowledge, such that having an attorney is not necessary to secure a positive outcome. 89 FR at 48747–48. Indeed, even after implementation of the IFR, the experience of DHS has been that noncitizens who do not have an attorney or consultant present during

the credible fear interview are often able to successfully satisfy the "reasonable probability" screening standard.[165] Additionally, under the IFR and this rule, a noncitizen may request IJ review of an AO's negative credible fear determination, which provides an additional layer of protection, including for those noncitizens who are unable to consult with an attorney.

With respect to commenters' reliance on data that purport to show that few noncitizens are able to secure the assistance of counsel during the credible fear process and that those who do receive better outcomes, the Departments note that such data fail to take into account any screening that may occur by legal service providers to determine the perceived validity of the claim before agreeing to provide representation to a noncitizen. Even assuming some instances of improved results for those with counsel, due process "does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations." *Mackey* v. *Montrym,* 443 U.S. 1, 13 (1979). Moreover, as discussed in Section II.A.2 of this preamble, 51 percent of SWB encounters between POEs referred to the credible fear process under the rule— including many who did not have an attorney or consultant present during the credible fear interview—have received a positive result.[166]

With regard to commenter concerns about lack of privacy during credible fear interviews, DHS notes that these interviews are conducted "separate and apart from the general public." 8 CFR 208.30(d). The Departments are mindful of their duties under 8 CFR 208.6 and 1208.6 to prevent unauthorized disclosure of records pertaining to any credible fear determination, and AOs are required to explain these confidentiality requirements to noncitizens prior to credible fear interviews.[167] For those going through the consultation and credible fear process in CBP custody, noncitizens consulting with an attorney or other individual before a credible fear interview do so in a private phone booth. USCIS contract interpreters

---

[164] See USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint.*

[165] See OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[166] See OHSS analysis of data pulled from CBP UIP on September 3, 2024, and data pulled from Global on September 11, 2024 (Fear by Atty or Cons Present tab).

[167] See USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 19–20 (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing— Working With An Interpreter* 14, 30 (Apr. 24, 2024).

STB_AR1_000043

conducting telephonic interpretation are bound by the confidentiality requirements protecting all credible fear determinations pursuant to 8 CFR 208.6 [168] and must pass all required DHS background checks applicable to contractors. [169] All AOs receive training on working with interpreters, which includes explaining confidentiality, assessing competency, and recognizing other factors that may affect the accuracy of interpretation. [170] AOs are trained to elicit all relevant testimony during credible fear interviews [171] and will not preemptively issue negative credible fear determinations due to phone connectivity issues. And all AOs receive training on interviewing survivors of torture and other severe trauma. [172]

The Departments therefore decline to amend in this rule existing practices with respect to credible fear proceedings based on commenters' concerns about noncitizens' ability to obtain and consult with counsel. Nothing in the rule alters noncitizens' existing ability to consult with persons of their choosing prior to the credible fear interview, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), or prior to IJ review of a negative credible fear determination, *see* 8 CFR 1003.42(c). The Departments believe that any minimal adverse impact on the ability to retain counsel resulting from the rule and changes in DHS's practices are outweighed by the significant benefits to efficiency that the rule and DHS's changed practices promote. In addition, the Departments do not believe that the limitation on asylum eligibility or the heightened "reasonable probability" standard applied to those who do not establish a credible fear of persecution for asylum purposes due to the

limitation require significant development prior to the credible fear interview. At the screening stage, the information pertinent to the limitation— including the existence of exceptionally compelling circumstances—and the reasons for the noncitizen's fear of persecution or torture are reasonably expected to be within the noncitizen's personal knowledge at the time of the credible fear interview. *See* 89 FR at 48747–48. And as explained in the IFR, AOs and IJs are trained on and have extensive experience eliciting such information from noncitizens. *Id.* at 48747–48 & nn.241–44. The Departments do not seek to diminish the importance of being able to consult with a person or persons of the noncitizen's choosing during the screening process as provided by statute, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), but the Departments also do not believe that the information required for the screening process under the IFR and this rule is such that the screening interviews must be significantly delayed to allow for greater consultation time. Doing so in the context of emergency border circumstances would "unreasonably delay the process." INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv).

As to commenters' arguments that ensuring legal representation increases efficiency, discourages frivolous claims, shortens the time required to determine a claim, and reduces the number of appeals and repeat claims, the Departments note that even assuming those claims are true, ensuring legal representation for all noncitizens would impose extraordinary burdens on DHS and would undermine the speed that Congress sought to achieve in the expedited removal system. Moreover, because Congress refrained from creating an unqualified right to legal representation, the approach adopted in this rule accords with the statute and is a reasonable exercise of the Departments' discretion. *See* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv) (providing the noncitizen only an opportunity to "consult" with a person prior to a credible fear interview).

## (3) Noncitizens' Ability To Have Their Claims Heard

*Comment:* Commenters stated that a quota system would deny vulnerable individuals and families the opportunity to have their claims fairly considered, in contravention of U.S. and international law. Similarly, a commenter stated that, by imposing a cap on daily asylum claims and automatically denying asylum to those

who exceed the limit, the IFR "nullifies fundamental rights that the United States is obligated to uphold." The commenter wrote that this "blanket denial" would deviate from due process principles under U.S. and international law that mandate non-refoulement and the individualized assessment of asylum claims. Commenters also stated that the IFR strips away the humane aspects of the asylum system.

*Response:* The Departments do not believe that the rule affords noncitizens an insufficient opportunity to have their asylum or protection claims heard, and the rule's limitation on eligibility includes no automatic "blanket denials" based on quotas or caps. Instead, during the emergency border circumstances described in the Proclamation, in the IFR, and in this rule—which relate to encounter levels as described in Section III.D.1 of this preamble—the rule's provisions (which are consistent with U.S. domestic and international law, as discussed in Section III.A.1 of this preamble) impose a limitation on asylum eligibility (with an appropriate exception) and changes to the expedited removal and credible fear process aimed at providing the Departments a greater ability to deliver timely decisions and consequences to noncitizens encountered along the southern border. The rule does so while ensuring that those in expedited removal proceedings who fear removal continue to have their fear claims heard.

First, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). Such referrals occur irrespective of how many noncitizens have presented at the border or sought protection on a given day.

Second, this rule does not change the longstanding procedural protections that are provided to noncitizens during these credible fear interviews. Credible fear interviews are conducted in a non-adversarial manner, [173] and all AOs are

---

[168] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working With An Interpreter* 14, 30 (Apr. 24, 2024); *see also* USCIS, *Credible Fear Procedures Manual* sec. III.E.3.d (May 10, 2023), *https://www.uscis.gov/sites/default/files/document/guides/CredibleFearProceduresManual.pdf.*

[169] *See* DHS, *Fact Sheet: Contractor Fitness at DHS, https://www.dhs.gov/sites/default/files/publications/personnel_security_contractor_fitness_fact_sheet_new.pdf* (last visited Sept. 20, 2024).

[170] USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* 14, 17–22, 24, 30, 43–44 (Apr. 24, 2024).

[171] USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information."); *id.* at 12 ("It is your duty to fully and fairly develop the record by eliciting information from the interviewee, probing for additional information, and following up on the interviewee's statements.").

[172] USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[173] USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* 13–15 (Apr. 24, 2024). As described in a previous rule, AOs have experience in "country conditions and legal issues, as well as nonadversarial interviewing techniques," and they have "ready access to country conditions experts." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 86 FR 46906, 46918 (Aug. 20, 2021).

STB_AR1_000044

trained in non-adversarial interview techniques to facilitate their duty to elicit relevant and useful information—in effect, to help the noncitizen meet their burden through testimony alone.[174] 8 CFR 208.1(b). AOs are also trained to consult country conditions information, which often provides context to a noncitizen's claim. *Id.* In evaluating whether a noncitizen has shown a credible fear, AOs are instructed by statute to take into account the credibility of the statements made by the noncitizen and such other facts as are known to the AO. INA 235(b)(1)(B)(ii)–(iii), 8 U.S.C. 1158(b)(1)(B)(ii)–(iii). Just as a noncitizen's testimony alone without corroboration may be sufficient to establish the noncitizen meets the definition of a refugee where it is credible, persuasive, and refers to specific facts, INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii), a noncitizen's testimony alone, in the credible fear context, may meet the burden to demonstrate a credible fear of persecution or torture.[175] Accordingly, insofar as it is part of a credible fear determination, credible testimony and evidence available to the AO alone may be sufficient to demonstrate a significant possibility that the noncitizen could show that the noncitizen is eligible for the "exceptionally compelling circumstances" exception to this rule's limitation on asylum eligibility. The procedures outlined above do not depend on how many noncitizens have presented at the border or have sought protection on a given day.

Third, all negative credible fear determinations are reviewed by a supervisory AO prior to becoming final, *see* 8 CFR 208.30(e)(8), and, consistent with the sole statutorily provided mechanism for review of negative credible fear determinations, *see* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), noncitizens may request review of a negative credible fear determination before an IJ, *see* 8 CFR 208.35(b)(2)(iii)–(v) (explaining the process for requesting IJ review for those described in the Proclamation and unable to show that the rule's exception to the limitation on asylum eligibility applies).

Unlike the process that applies to negative credible fear determinations under 8 CFR 208.30(g)(1)(i), during which a noncitizen's refusal or failure to request or decline IJ review is treated as a request for IJ review, noncitizens under the present rule must indicate whether they desire IJ review when asked, *see* 8 CFR 208.35(b)(2)(iv). When serving the negative credible fear determination, USCIS staff read the contents of the Form I–869SBIFR, Record of Negative Credible Fear and Reasonable Probability Finding and Request for Review by Immigration Judge for Noncitizens Subject to the Limitation on Asylum Eligibility Pursuant to 8 CFR 208.35(a), to the noncitizen in a language the noncitizen understands, using an interpreter if needed.[176] The Form I–869SBIFR includes a statement that the noncitizen may request that an IJ review the negative determination and that, if the noncitizen does not request IJ review, the noncitizen will not receive review by an IJ and may be removed from the United States immediately. The noncitizen then must check one of two boxes on the I–869SBIFR indicating either that the noncitizen requests IJ review or does not request IJ review. The noncitizen will be referred to an IJ for review of a negative determination only where the noncitizen requests such review. 8 CFR 208.35(b)(2)(iv)–(v). Under the IFR and this rule, IJ review remains available in all cases with a negative credible fear determination, and such review includes an opportunity for the noncitizen to be heard and questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2), 1208.35(b)(1) and (2). Additionally, while it is not equivalent to another level of review, USCIS retains the sole discretion to reconsider its own negative credible fear determination following IJ concurrence. 8 CFR 208.35(b)(2)(v)(B). Thus, the rule maintains review of any negative credible fear determination by a supervisory AO prior to service and, following service of a negative credible fear determination, the opportunity to have an IJ review the finding de novo. *See* 8 CFR 1208.35(b)(1).

As discussed above in this section of the preamble, the Departments believe these processes are adequate in light of the high levels of training received by adjudicators and the high volume of cases before the Departments.

**(4) Issues With Asylum Officers, Detention Conditions, and Quality of Credible Fear Determinations**

*Comment:* Several commenters expressed concern with the conduct of AOs during credible fear interviews and suggested that AOs are ill-equipped to conduct the analysis the rule requires, including applying the "exceptionally compelling circumstances" exception to the limitation and screening fear claims at a higher evidentiary standard. Some commenters stated that they are aware of instances where AOs have failed to comply with established guidelines during credible fear interviews and that translation issues, such as Indigenous language speakers being interviewed in Spanish, exist in some cases. One commenter recounted examples of noncitizens who, the commenter believes, were wrongly issued negative credible fear determinations; the commenter said that noncitizens' statements were incorrectly translated by interpreters and that noncitizens were not adequately asked about their experiences or were interrupted by AOs during screenings. Other commenters discussed alleged violations of the credible fear interview procedures experienced by noncitizens, such as alleged failures to address language barriers, that prevent noncitizens from adequately telling their stories, resulting in refoulement.

An organizational commenter discussed its experience with clients who it contends were wrongfully deported and returned to violence, stating that the rule will only increase the frequency with which USCIS errs in conducting credible fear screenings and IJs err in reviewing credible fear determinations. Commenters emphasized that hearings take place shortly after noncitizens have endured lengthy and traumatic journeys to reach the United States and asserted that they take place while noncitizens are in detention facilities with deplorable conditions. Commenters stated that the harm caused by the IFR will be exacerbated by expedited removal policies such as conducting credible fear interviews while noncitizens are in CBP custody. A commenter stated that courts have questioned the reliability of credible fear interviews because of the expedited and stressful nature of the process.

*Response:* The Departments take any allegations of misconduct by AOs or other government officials seriously, and there are existing channels available to report any such alleged

---

[174] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11–12 (Apr. 24, 2024).

[175] *See* USCIS, *RAIO Directorate—Officer Training: Credible Fear of Persecution and Torture Determinations* 19 (May 9, 2024); *see also Kiakombua* v. *Wolf,* 498 F. Supp. 3d 1, 46–47 (D.D.C. 2020) (asylum officer ("AO") cannot require an applicant to provide corroborating evidence at the credible fear stage where the applicant's testimony is otherwise found credible).

[176] Following issuance of this rule, the form will be designated I–869SB instead of I–869SBIFR.

STB_AR1_000045

misconduct.[177] To the extent that commenters suggested that examples where they believe AOs failed to follow existing guidance related to credible fear screenings or failed to conduct a fair credible fear interview are representative of AOs generally and are grounds for reasoning that AOs are ill-equipped to perform credible fear screenings under the current rule, the Departments disagree with these assertions and find them unpersuasive. Instances where commenters believe AOs failed to conduct credible fear interviews fairly should be reported through the proper channels and will be addressed on a case-by-case basis, but these anecdotal complaints do not dissuade the Departments from concluding that AOs are capable of performing their duties under this rule. These complaints about AO conduct in specific credible fear interviews do not undermine the statutorily prescribed role of AOs to conduct credible fear interviews and make credible fear determinations, and the Departments are confident, for the reasons explained above, that AOs have the necessary training and expertise to fulfill that role.

As discussed in Section III.A.1.c of this preamble, the rule operates within the expedited removal and credible fear screening process established by section 235 of the INA, 8 U.S.C. 1225, and comports with all statutory requirements. Under the credible fear statutory framework, AOs conduct credible fear screening interviews. INA 235(b)(1)(B)(i), 8 U.S.C. 1225(b)(1)(B)(i). By definition, AOs are individuals who have had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of asylum applications under section 208 of the INA, 8 U.S.C. 1158. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). They are supervised by officers who meet the same training requirements and have had substantial experience adjudicating asylum applications. INA 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E). AOs conducting credible fear interviews do so in a non-adversarial manner, beginning with ensuring the noncitizen understands the purpose of the interview, that the noncitizen has a right to have a legal representative or other person of the noncitizen's choosing present during the interview, and that the noncitizen understands the

interpreter, where applicable. 8 CFR 208.30(d). USCIS has language access policies in place to ensure that noncitizens have an interpreter for a language they understand during credible fear interviews and procedures in place that all AOs must follow to address instances where rare language interpreters may not be available, including issuing a discretionary NTA in certain circumstances. After the noncitizen has received an NTA, the noncitizen's language barrier can be addressed in proceedings before an IJ. At the beginning of a credible fear interview, AOs explain to noncitizens the confidentiality provisions governing credible fear interviews pursuant to 8 CFR 208.6, including that the AO and interpreter will keep the noncitizen's information and testimony confidential. The AO verifies that the noncitizen is comfortable proceeding with the interpreter and the AO of the given gender. AOs also ask noncitizens if there are any issues that could affect their ability to testify, such as a language barrier or health issue, and deal with any such issue according to established procedures. All credible fear determinations, including those in which the IFR limitation on asylum eligibility applies, are reviewed by supervisory AOs before becoming final and being served on the noncitizen, and this will remain true under the final rule. 8 CFR 208.30(e)(8). Supervisory review includes ensuring that AOs follow all applicable procedures and guidelines related to language access and other issues that could impede the noncitizen's ability to effectively communicate during a credible fear interview.

As already explained, AOs are specifically trained on eliciting testimony, working with interpreters, engaging in cross-cultural communication, detecting possible victims of trafficking, and interviewing vulnerable populations, including survivors of torture and other severe trauma. In addition to receiving specialized training on interviewing and eliciting testimony, AOs are trained on and well-versed in applying substantive asylum law in both full asylum adjudications and in screening determinations. As explained in the IFR, AOs and supervisory AOs have the training and experience necessary to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the merits stage. 89 FR at 48748. AOs frequently assess physical and psychological harm

when adjudicating asylum applications and are trained to do so in a sensitive manner.[178] AOs may also evaluate harm resulting from the unavailability of necessary medical care or specific medications when assessing "other serious harm" under 8 CFR 208.13(b)(1)(iii)(B) in full asylum adjudications.[179] When conducting a credible fear interview where the IFR's limitation on asylum eligibility applies, AOs' questioning will necessarily include information related to whether there is a significant possibility that the noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception, regardless of whether the noncitizen affirmatively raises the issue. Since May 11, 2023, when the Circumvention of Lawful Pathways rule went into effect, AOs and supervisory AOs have evaluated the exceptionally compelling circumstances grounds for rebutting the presumption of asylum ineligibility under that rule, including the enumerated examples of an acute medical emergency, imminent and extreme threat to life or safety, and satisfying the definition of a victim of a severe form of trafficking in persons. 8 CFR 208.33(a)(3). The enumerated examples mirror the enumerated examples of exceptionally compelling circumstances that except noncitizens from the limitation on asylum eligibility under the IFR and this rule, *see* 8 CFR 208.35(a)(2), so not only have AOs and supervisory AOs been implementing this approach since the IFR was implemented, but they also already had considerable experience in eliciting testimony related to the "exceptionally compelling circumstances" exception and determining whether that exception applied in the context of the Circumvention of Lawful Pathways rule. Likewise, IJs have extensive experience and training in applying such concepts to individual cases under the Circumvention of Lawful Pathways rule and the IFR.[180] Accordingly, the

---

[177] *See* USCIS, *Report USCIS Employee Misconduct* (last reviewed/updated Mar. 15, 2024), *https://www.uscis.gov/scams-fraud-and-misconduct/report-uscis-employee-misconduct; see also* DHS, *Make a Civil Rights Complaint* (last updated Aug. 20, 2024), *https://www.dhs.gov/file-civil-rights-complaint.*

[178] For example, AOs adjudicate cases involving forms of persecution like female genital mutilation, forced abortion, and forced sterilization. *See Matter of Kasinga,* 21 I&N Dec. 357 (BIA 1996); INA 101(a)(42)(B), 8 U.S.C. 1101(a)(42)(B); *see also* USCIS, *RAIO Directorate—Officer Training: Gender-Related Claims* 23–27 (Apr. 24, 2024).

[179] *See* USCIS, *RAIO Directorate—Officer Training: Definition of Persecution and Eligibility Based on Past Persecution* 56–57 (Apr. 24, 2024).

[180] *See* 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1)–(2) (Chief IJ's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory

Continued

STB_AR1_000046

Departments believe that IJs and AOs will continue to fairly and competently examine the facts and circumstances of each individual's case to determine whether the individual has established a significant possibility that the individual would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the individual satisfies the rule's exception.

The Departments consider the commenters' concerns about the quality of determinations unfounded. USCIS AOs and supervisory AOs have received the same thorough training and materials related to applying the IFR across offices and jurisdictions. Asylum staff nationwide use the Global case management system,[181] which includes updated interview guides, forms, and instructions for processing cases under the IFR to ensure consistency in procedures and substantive guidelines. All credible fear determinations, as noted above, are subject to review by a supervisory AO, 8 CFR 208.30(e)(8), and IJ (if requested), INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III), and determinations made in section 240 removal proceedings are subject to administrative appeal and judicial review.

Regarding concerns about noncitizens going through the credible fear process while in CBP custody, the Departments disagree with the contention that such a process causes or exacerbates harm. Noncitizens who are going through the credible fear process in CBP custody are given at least 4 hours between 7 a.m. and 7 p.m. to telephonically consult with an individual of their choosing, including legal counsel, before their credible fear interview. Additionally, the noncitizens are afforded privacy for these consultations, which occur in a private phone booth. These phones and phone booths are also used to conduct the credible fear interview.

---

authorities'' and ''[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties''); EOIR, *Legal Education and Research Services Division* (last updated Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

[181] USCIS, *Privacy Impact Assessment Update for the USCIS Asylum Division,* at 4 (2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-uscis-asylum-september2018.pdf.*

Additionally, to the extent that commenters have generalized concerns about conditions in CBP custody, such comments are outside the scope of this rule. DHS notes, however, that it is committed to providing safe, sanitary, and humane conditions to all individuals in custody, and that it is committed to transferring individuals out of CBP custody in an expeditious manner. The Departments further note that one anticipated effect of this rule is to reduce the risk of overcrowding in DHS detention facilities. *See* 89 FR at 48742 (noting that ''[h]igh [encounter] numbers, such as those giving rise to the Proclamation and this rule, increase the likelihood that USBP facilities will become quickly overcrowded . . . [which] creates health and safety concerns for noncitizens and Government personnel'').

(5) Fairness or Risks Associated With Process

*Comment:* Commenters stated that the rule would undermine the commitment of the United States to providing refuge for those fleeing persecution and violence and exacerbate the humanitarian crisis at the southern border. Other commenters stated that the rule would increase refoulement and that the Departments did not adequately consider this consequence. Commenters asserted that the rule could cause arbitrary denials of asylum, thus placing noncitizens back into harm's way and resulting in life-threatening outcomes. A commenter asserted that the IFR ignores the realities of initial fear screenings (including that individuals have often experienced a long and difficult journey, undergo screenings within days of arrival, and may face barriers to accessing counsel and language services) and establishes an even higher screening standard that may prevent noncitizens from factually presenting claims before an AO. A commenter stated that a decline in positive credible fear determinations under the Circumvention of Lawful Pathways rule is a result of an orchestrated effort to reduce the screen-in rate by erecting barriers to eligibility and attorney consultation and eroding due process protections, not the result of the appropriate screening out of claims that would in fact be non-meritorious, as suggested by the Departments in the IFR.

Some commenters discussed the existing difficulties that noncitizens in CBP custody have in obtaining what they need, such as a pen and paper to write down essential information, access to counsel, and access to private phone services. Some commenters stated that they have witnessed failures by USCIS and EOIR to notify attorneys of their clients' interviews and immigration court reviews.

*Response:* The present rule complies with all statutory and regulatory requirements related to access to counsel, including the right of a noncitizen to access counsel at no cost to the Government, the right to consult with a person of the noncitizen's choosing prior to the credible fear interview, and the right to have a person of the noncitizen's choosing (including a legal representative) present during the interview, provided it will not cause unreasonable delay. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). Moreover, in addition to protecting the procedural safeguards guaranteed by statute, the rule also ensures the United States honors its non-refoulement obligations under international law by screening for statutory withholding and protection under regulations implementing the CAT, even where a noncitizen is subject to the rule's limitation on asylum eligibility and cannot establish that the rule's exception applies under the significant possibility standard. 8 CFR 208.35(b)(2). Contrary to commenters' assertions that noncitizens may be prevented from presenting factual claims to an AO where they are subject to the IFR's limitation on asylum eligibility, AOs elicit testimony, and noncitizens have the opportunity to present testimony and other evidence relevant to a potential persecution or torture claim, even where the limitation applies and no exception is established during the credible fear interview; this allows the AO to effectively screen the noncitizen for a reasonable probability of persecution or torture. 8 CFR 208.35(b)(2)(i). Indeed, the experience of USCIS with the IFR since its implementation illustrates that noncitizens are still able to meet the higher reasonable probability standard in approximately 48 percent of cases where the IFR's limitation on asylum eligibility applies and no exception is established during the credible fear interview.[182]

Further, while a commenter suggested that the drop in the overall screen-in rate under the Circumvention of Lawful Pathways rule resulted from barriers to eligibility or to counsel and the erosion of due process rights, as opposed to screening out more potentially non-meritorious cases under the higher ''reasonable possibility'' standard in the

---

[182] OHSS analysis of data pulled from CBP UIP on September 3, 2024 (Fear Screening—STB tab).

**STB_AR1_000047**

IFR, *see* 89 FR at 48746, a more granular examination of the various screen-in rates undermines the commenter's assertion. In fact, SWB encounter credible fear screen-in rates for screenings conducted by USCIS under the significant possibility standard remain consistent or increase when comparing (1) interviews that took place in the pre-pandemic period (76 percent positive); (2) interviews that took place under the Circumvention of Lawful Pathways rule where the presumption of asylum ineligibility applied but an exception was established (79 percent positive) or the presumption was rebutted (86 percent positive); and (3) interviews that took place under the IFR where the IFR's limitation on asylum eligibility applied but the IFR's exception was applicable (81 percent positive).[183] If anything, then, the screen-in rate at the significant possibility standard is higher under the Circumvention of Lawful Pathways rule and under the IFR, notwithstanding commenters' claims that factors such as difficulty in accessing counsel necessarily reduce screen-in rates. Rather, USCIS screen-in rates for USBP encounters effectively drop only when AOs apply the higher substantive standards, dropping (1) to approximately 51 percent for cases screened at the reasonable possibility standard where the Circumvention of Lawful Pathways presumption of asylum eligibility applies and no exception or rebuttal is established; and (2) to approximately 48 percent for cases screened at the reasonable probability standard where the IFR's limitation on asylum eligibility applies and no exception is established.[184] Accordingly, the analysis provided by the Departments in the IFR concluding that the drop in screen-in rates under the higher ''reasonable possibility'' standard relates to the merits of the potential claim, *see* 89 FR at 48746, remains supported and is only further bolstered by the experience of the Departments in implementing the IFR.

The IFR acknowledges that the rule's manifestation of fear and reasonable probability standards may increase the risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or may not receive a positive credible fear

determination. 89 FR at 48767. It also explains that there may be costs to noncitizens that result from their removal—indeed, such costs are likely. *Id.* Thus, the Departments did consider these risks, and they have continued to consider these risks in finalizing this rule.

The Departments weighed the fact that, despite the protections preserved by the rule, the available exception, and the training and expertise of DHS personnel, the changes to the credible fear process adopted may result in the denial of asylum when such an asylum claim otherwise may have been granted. *Id.* at 48750 n.250. As with all screening mechanisms, there is some risk that a case that might otherwise lead to a grant of asylum might not proceed to a merits adjudication, *id.,* but as discussed in Sections III.C.2.c and III.B.2.a.ii of this preamble, DHS personnel have significant experience and training in recognizing and interviewing noncitizens with protection claims, which the Departments believe will minimize the frequency of such cases. Regardless, in light of the emergency border circumstances facing the Departments and addressed in the Proclamation and this rule, the Departments believe these measures are appropriate, necessary, and legally permissible. *Id.* And given the emergency border circumstances facing the Departments and the gap between high rates of referrals and screen-ins during the immediate post-pandemic period and historic ultimate grant rates, as described in Section II.A.2 of this preamble, the Departments believe the rule's provisions are appropriate and justified even if certain close cases result in imperfect outcomes. *Id.* As with other conditions and limitations imposed under section 208(b)(2) of the INA, 8 U.S.C. 1158(b)(2), this rule is grounded in important policy objectives, including providing those with valid asylum claims an opportunity to have their claims heard in a timely fashion, preventing an increased flow of migrants arriving at the southern border that would overwhelm DHS's ability to provide safe and orderly processing, and reducing the role of exploitative TCOs and smugglers. The Departments have determined that these important policies outweigh whatever marginal impact on meritorious claims the rule might have.

DHS serves noncitizens with all the necessary documents related to their credible fear determination, 8 CFR 208.30(f)–(g), which for noncitizens in detention may be served through a telephone call by USCIS, during which

information on the noncitizen's determination is relayed in a language that the noncitizen understands, while CBP or ICE personnel physically provide the documents to a noncitizen. While any person may consult with a noncitizen in the credible fear process, DHS provides copies of documents only to legal representatives who have completed a fully executed Form G–28.[185] Although commenters expressed concern about the burden of obtaining consent and a signature from a detained noncitizen, the Departments must balance the sensitive nature of credible fear interviews and the importance of confidentiality pursuant to the nondisclosure provisions in 8 CFR 208.6.

With regard to the comment about noncitizens in CBP custody having difficulties obtaining items such as pen and paper, or having access to counsel or to private phone booths, the Departments disagree with the commenters' characterizations. Noncitizens who are going through the credible fear process in CBP custody are provided with pen and paper, and they are afforded a period of time to consult with an individual of their choosing, which occurs in a private phone booth, as discussed in this section.[186] These phones and phone booths are also used to conduct the credible fear interview.

iii. Impacts on Specific Vulnerable Populations, Discrimination Concerns

*Comment:* Many commenters expressed concern that the rule would disproportionately harm vulnerable groups, including Black individuals, Indigenous individuals, and People of Color (''BIPOC''), those who are HIV positive, and people with disabilities. For example, a commenter remarked that the Departments did not analyze the effect the rule has on particularly vulnerable populations such as Black migrants. A commenter voiced concern about the impact the rule could have on predominantly BIPOC communities, remarking that the rule perpetuates harmful political rhetoric about these communities and the border that can lead to long-term detrimental effects and violence. While sharing specific examples of the way the IFR has impacted members of BIPOC communities, another commenter raised

---

[183] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Summary Statistics tab; Fear Screening—CLP tab; Fear Screening—STB tab).

[184] OHSS analysis of June 2024 Enforcement Lifecycle data, July 2024 Persist Dataset, and data downloaded from UIP on September 3, 2024 (Fear Screening—CLP tab and Fear Screening—STB tab).

[185] DHS, *Instructions for Notice of Entry of Appearance as Attorney or Accredited Representative* 1, 4 (Sep. 17, 2018), *https://www.uscis.gov/sites/default/files/document/forms/g-28instr.pdf.*

[186] To the extent that commenters have concerns regarding compliance with this policy, DHS notes that such complaints about noncompliance can be addressed under the process described in Section III.C.2.c of this preamble.

STB_AR1_000048

concern for the discrimination these populations may face under the rule while seeking asylum and waiting for an appointment. A commenter stated that the rule would prevent fair and equal access to lifesaving protections and lead to the unnecessary deaths of individuals who are denied entry and returned to dangerous and unsafe countries. Therefore, the commenter urged, the rule should be rescinded in its entirety.

*Response:* The Departments are committed to the equal treatment of all persons, and this rule does not distinguish between individuals based on race, nationality, ethnicity, or any other protected characteristic. The Departments also acknowledge that certain populations, including members of BIPOC communities, may have unique vulnerabilities or face unique issues in their country of origin or countries of transit, and agree that the United States has certain legal obligations to protect noncitizens present in the United States who fear harm in their home countries. But as explained more fully in Section III.A.1 of this preamble, the rule ensures that noncitizens may continue to seek asylum or other protection in the United States. The Departments note that the rule and its exception apply equally to noncitizens who enter during the times when emergency border circumstances are present, regardless of nationality, race, ethnicity, or other demographics of concern identified by the commenters. Further, as explained in this section, adjudicators receive training to help them identify members of vulnerable communities and account for the harms such individuals may face. And, to the extent that members of certain communities may face greater risks because of their membership in those communities, the Departments believe that the ''exceptionally compelling circumstances'' exception will afford a means to seek asylum or protection when those risks manifest as specific threats to the individuals in question.

*Comment:* Several commenters expressed concern regarding the separation of families and the treatment of trafficking victims. A commenter generally supported allowing united families to escape persecution and cross the border together. Other commenters raised concern that the IFR and associated policy changes routinely separate families and often complicate or prevent family reunification. Another commenter wrote that the rule is likely to impose negative impacts on family wellbeing and result in family separations, as the commenter reasoned the changes in policy would incentivize an increase in the arrival of UCs because

families are unable to seek or receive protection by crossing the border together. One commenter also expressed concern that the rule puts children at risk to migrate alone. Another commenter elaborated that family unity and reunification is fundamental to our Nation's immigration policies and the foundational principles of a Catholic social teaching. The commenter voiced concern that the effects of this rule would be similar to the effects of the Migrant Protection Protocols (''MPP'') and the Title 42 public health Order, which, the commenter stated, ''led families to 'self-separate' at the border'' because either the adults decided the conditions in Mexico were too dangerous for the children to continue to wait with them or the adults were injured or had disappeared. The commenter urged the Departments to rescind the rule entirely, arguing that the policy changes undermine families' ability to seek humanitarian protection.

Additionally, a commenter stated that the rule's exemption for survivors of trafficking is inadequate. The commenter wrote that survivors could be returned to trafficking situations when the new heightened credible fear standard fails to trigger safeguards codified in the TVPA.

*Response:* The Departments have designed the rule with a goal of keeping families together. As described in Section III.C.1.e of this preamble, the Departments have adopted family unity provisions that apply during both AMIs and section 240 removal proceedings. *See* 8 CFR 208.35(c), 1208.35(c). Additionally, if one member of a family unit traveling together is excepted from the limitation on asylum eligibility based on exceptionally compelling circumstances, then the entire family unit is excepted. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Accordingly, commenters are incorrect that the rule disallows families from obtaining relief or protection together.

Additionally, the Departments believe that the safeguards in place for victims of human trafficking are sufficient. A noncitizen who is a victim of a severe form of trafficking in persons as defined in 8 CFR 214.201 is excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and is also separately excepted from the provisions of this rule. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1) (excepting from the limitation on asylum eligibility noncitizens described in section 3(b) of the Proclamation); 8 CFR 235.15(a) (excepting from the manifestation provision noncitizens described in section 3(b) of the Proclamation). Noncitizens who meet that definition

are also excepted from the limitation on asylum eligibility as having established exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C). In practice, these two provisions provide two significant safeguards and work alongside section 3(b) of the Proclamation and 8 CFR 235.15(a) to ensure that noncitizens are not subject to the suspension and limitation on entry or any of the rule's provisions if they meet the definition of a victim of a severe form of trafficking.

*Comment:* A commenter raised concern for non-Mexicans under the rule being removed and left stranded in Mexico without migration documents or resources. The commenter explained that undocumented individuals removed to Mexico are vulnerable to arrest, detention, and potential deportation by Mexican immigration authorities. The commenter stated that this process has been a dangerous and unsafe practice that results in human rights violations and that government officials in Mexico have confirmed this practice will continue and potentially expand under the rule.

*Response:* This rule does not change the statutory and regulatory process for designating the country to which a noncitizen may be removed. To the extent that a greater number of noncitizens may be removed through the operation of this rule—some of whom may be removed to Mexico rather than their home countries, consistent with country of removal designation authorities—the Departments note that noncitizens may assert claims of fear of harm in Mexico and that the rule explicitly provides that noncitizens are screened for fear of harm in their ''designated country or countries of removal.'' 8 CFR 208.35(b)(2)(ii); *see also* 8 CFR 208.35(b)(2)(iii).

The Departments acknowledge that noncitizens other than Mexicans who are removed to Mexico may be subject to Mexican immigration law. However, the Departments disagree that being returned to Mexico is necessarily unsafe, whether because of actions by the Government of Mexico or otherwise. Over the last several years, the Government of Mexico has made exceptional strides to improve conditions for asylum seekers, migrants, and refugees within its borders. For instance, Mexico's Federal Public Defender's office provides legal counseling and support to asylum seekers and migrants who file claims with Mexico's Commission for Refugee Assistance, and the office has expanded its specialized staff and increased its visits to migration stations. 88 FR at

STB_AR1_000049

31411. Further, not only is Mexico a party to the 1951 Convention [187] relating to the Status of Refugees and its 1967 Refugee Protocol,[188] but also Mexico's Constitution includes a right to seek and receive asylum from political persecution. *See* Mex. Const. art. 11. In fact, the available grounds to qualify for asylum are broader in Mexico than in the United States. *See* 88 FR at 31411 (explaining that Mexico has joined the Cartagena Declaration on Refugees, which expands the definition of "refugee," "thus providing some who may apply for protection, such as asylum, with more grounds on which to make their claim than they would have in the United States"). And applicants who do not qualify for asylum in Mexico are automatically considered for complementary protection if they possess a fear of harm in their country of origin, or if there is reason to believe that they will be subjected to torture or to cruel, inhuman, or degrading treatment, but do not meet the "refugee" definition; those granted complimentary protection are able to regularize their status.[189]

*Comment:* Multiple commenters expressed concerns for the health and safety of women and noncitizens from Lesbian, Gay, Bisexual, Transgender, Queer/Questioning, and Intersex ("LGBTQI+") communities. For example, one commenter voiced concern for the asserted lack of equal opportunity and the Departments' asserted lack of analysis of the effect of the rule on particularly vulnerable populations, such as LGBTQI+ migrants. Another commenter wrote that the rule erroneously separates the imminent threat the noncitizen suffer at the border from their future threat of persecution upon return, especially for those noncitizens fleeing from Mexico who identify as LGBTQI+. The commenter wrote that violence towards members of the LGBTQI+ community can happen randomly and unexpectedly, and hence that noncitizens would be unable to predict or articulate the violent risks

they may face when seeking refuge in the United States. In addition, the commenter voiced concern for the disproportionate impacts of the rule on LGBTQI+ community members from Mexico and the "Northen Triangle" countries of Guatemala, Honduras, and El Salvador because, the commenter asserted, these countries have long and documented histories of severe violence against the LGBTQI+ population. Citing research, the commenter wrote that 4,385 claims of fear were related to LGBTQI+ status and 98.4 percent of the interviews resulted in positive determinations for fear of persecution. In conclusion, the commenter urged that it is imperative for the United States to remain a haven for all people fleeing danger and violence, especially LGBTQI+ migrants and therefore requested that the IFR be immediately rescinded. This commenter further expressed concern that the IFR was contrary to President Biden's February 2021 memorandum on advancing the human rights of LBGTQI+ persons around the world, which included an explicit instruction to the Departments of State and Homeland Security to "enhance their ongoing efforts to ensure that LGBTQI+ refugees and asylum seekers have equal access to protection and assistance, particularly in countries of first asylum."

Citing experts on gender-based violence in Mexico, a commenter stated that violence against asylum seekers who are women or members of LGBTQI+ communities is endemic in many parts of the country. While sharing specific examples involving both LGBTQI+ community members and women, a commenter raised concern about the violence these populations may face under the rule while seeking asylum. For example, the commenter shared that migrant girls, adolescents, and women have either witnessed or been victims of exploitation, sexual violence, kidnapping, and human trafficking both in transit and while waiting in Mexico. The commenter also remarked that the rule adds new barriers that further endanger LGBTQI+ individuals, such as lack of access to safe housing, employment, and medical care.

Another commenter asserted that the rule arbitrarily and unlawfully prevents women, children, families, and LGBTQI+ community members from seeking safety in the form of asylum based on border encounter numbers that are unrelated to the individuals' need for protection. The commenter wrote that the result would be to severely harm the health and safety of those who would otherwise merit protection.

*Response:* The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries and recognize the importance of offering noncitizens the opportunity to seek protection from removal from the United States based on a likelihood of future persecution or torture. 89 FR at 48759. But as explained more fully in Section III.A.1 of this preamble and in the IFR, this rule complies with all such obligations and does not deny anyone the ability to apply for asylum or other protection in the United States. *See id.* at 48716–17, 48735–36.

The rule does not prevent noncitizens with valid claims from seeking asylum or other protection. To the extent that, as commenters asserted, women and members of the LGBTQI+ community do in fact face a greater risk of violence, those individuals would necessarily have a greater ability to establish that exceptionally compelling circumstances exist that would except them from the rule's limitation on asylum eligibility. To be clear, generalized risks of violence would not be sufficient to establish such circumstances, but insofar as such generalized risks manifest as specific threats to women and members of the LGBTQI+ community, the rule affords an avenue for those individuals to remain eligible for asylum. 8 CFR 208.35(a)(2), 1208.35(a)(2). And the rule does not change the ultimate eligibility requirements for statutory withholding of removal or CAT protection. A noncitizen who seeks to apply for asylum can also schedule arrival at a POE under a process approved by the Secretary, including by using the CBP One app, and avoid application of the rule. 8 CFR 208.35(a)(1), 1208.35(a)(1); Proclamation sec. 3(b)(v); 89 FR at 48737.

This rule does not preclude noncitizens who cross the southern border from seeking asylum or protection. Indeed, all noncitizens processed for expedited removal who manifest a fear of return, express an intention to apply for asylum or protection, or express a fear of persecution or torture or a fear of return to their country or the country of removal are referred for a credible fear interview, as appropriate. *See* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii); 8 CFR 235.15(b)(4). AOs receive mandatory, specific training on screening and adjudicating gender-related claims.[190] This training includes information about violence against women (including domestic

---

[187] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Convention Relating to the Status of Refugees, https://treaties. un.org/doc/Publication/MTDSG/Volume%20I/ Chapter%20V/V-2.en.pdf* (last visited Sept. 24, 2024).

[188] *See* United Nations Treaty Collection, *Chapter V: Refugees and Stateless Persons: Protocol Relating to the Status of Refugees, https://treaties.un.org/ doc/Publication/MTDSG/Volume%20I/ Chapter%20V/V-5.en.pdf* (last visited Sept. 24, 2024).

[189] 88 FR at 11721 & n.144 (citing Government of Mexico, *Ley sobre Refugiados, Protección Complementaria y Asilo Político* (Jan. 27, 2011), *https://www.gob.mx/cms/uploads/attachment/file/ 211049/08_Ley_sobre_Refugiados__Protecci_n_ Complementaria_y_Asilo_Pol_tico.pdf*).

[190] USCIS, *RAIO Directorate—Officer Training: Gender-Related Claims* (Apr. 24, 2024).

STB_AR1_000050

violence), and guidance on interview considerations specific to gender-based claims.[191] AOs also receive training on screening and adjudicating claims relating to LGBTQI+ noncitizens.[192] This training includes information about types of harm that may be directed at LGBTQI+ individuals, as well as guidance on interview considerations specific to LGBTQI+ claims.[193] AOs are trained to recognize the sensitive nature of these claims and to pursue appropriate lines of inquiry.[194] AOs also receive training on country of origin information specific to LGBTQI+ issues, while recognizing that LGBTQI+ country-of-origin information may sometimes be difficult to find.[195]

Additionally, the Departments recognize the sensitive nature of credible fear interviews, especially for vulnerable populations, including LGBTQI+ noncitizens. For example, for those going through the credible fear process in CBP custody, CBP has taken steps to protect the privacy of noncitizens during their interviews. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. Additionally, ICE provides similar reasonable access to legal counsel for those who are detained in ICE custody during the credible fear process.[196]

*Comment:* Commenters stated that many immigrants today are Punjabi-speaking Sikhs seeking protection due to the worsening human rights conditions under India's current administration. The commenters stated that these immigrants may face hardships such as language barriers and difficulty accessing employment opportunities and resources upon arrival. Commenters stated that the rule would exacerbate language-barrier issues. Specifically, a commenter stated that the requirement to express a fear of persecution explicitly and proactively in order to be referred for a credible fear screening, and the limited time to seek legal advice from a language-accessible attorney, would prevent many Sikh noncitizens from understanding their legal rights or the need to express their credible fear. The commenters wrote

that it is critical for the Sikh community and many other populations fleeing persecution to have the opportunity to seek asylum and requested clarification on how the Government intends to address the concerns of religious minorities who would be impacted by the rule.

*Response:* The Departments disagree that the rule will exacerbate language-barrier issues. For those who are going through the credible fear process in CBP custody, CBP provides language assistance services for those who do not speak English, consistent with CBP's Language Access Plan.[197] CBP immigration officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. *See* 89 FR at 48741. In addition, CBP facilities have "I Speak" signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages, including Punjabi.[198] With respect to the signs and videos in CBP facilities that provide general information about the ability to express a fear, individuals who are unable to read those signs or communicate effectively in one of the languages in which the sign and video are presented are read the contents of the sign and video in a language they understand. *See* 89 FR at 48741.

The Departments agree that the United States has certain legal obligations to protect those who fear harm in their home countries, including those who are fleeing for religious reasons, and recognize the importance of offering noncitizens the opportunity to seek protection from removal. But as explained more fully in Section III.A.1 of the preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States and meets all such legal obligations. *See also id.* at 48716–17, 48735–36. Further, although commenters asserted generally

that religious minorities would be harmed by the IFR and DHS's policy changes, the commenters provided no specific reason to believe that the IFR and policy changes would disproportionately impact any particular religious groups other than the Punjabi-speaking Sikhs discussed above.

*Comment:* Commenters discussed the rule's impact on noncitizens with fewer financial resources and means. For example, a commenter wrote that the rule would further disadvantage those noncitizens with fewer financial resources because these noncitizens are less likely to pursue alternative routes to safety. A few commenters expressed concern for noncitizens with physical and mental health disabilities. And a commenter remarked that individuals with cognitive issues, disabilities, and language barriers are less likely to effectively articulate fears to border officials.

*Response:* The Departments agree that the United States has certain legal obligations to protect from removal those who fear specific types of harm upon removal and recognize the importance of offering noncitizens the opportunity to seek protection from removal, including noncitizens with fewer financial resources, noncitizens with physical and mental health disabilities, and noncitizens with cognitive issues, disabilities, and language barriers. But as explained more fully in Section III.A.1 of this preamble, this rule does not deny anyone the ability to seek asylum or other protection in the United States. *See also id.* at 48716–17, 48735–36. Further, there is no fee to download or use the CBP One app to schedule an appointment and thereby avoid the IFR's limitation on asylum eligibility,[199] and DHS has designed the CBP One app to be accessible to people with disabilities. Additionally, the Departments note that, depending on individual circumstances, AOs and IJs may find that certain especially vulnerable individuals meet the "exceptionally compelling circumstances" standard, or, as discussed previously, AOs may exercise their discretion to issue an NTA to place such noncitizens into section 240 removal proceedings as appropriate, where additional procedural safeguards are available to noncitizens. For

---

[191] *E.g., id.* at 15–20, 42.

[192] USCIS, *RAIO Directorate—Officer Training: Guidance for Adjudicating Lesbian, Gay, Bisexual, Transgender, and Intersex (LGBTI) Refugee and Asylum Claims* (Apr. 24, 2024).

[193] *E.g., id.* at 18–19, 27–34.

[194] *Id.* at 28–30, 37–38, 49.

[195] *Id.* at 43–44, 50.

[196] ICE, *Access to Due Process: Fiscal Year 2023 Report to Congress* 2–3 (Feb. 20.2024), *https:// www.dhs.gov/sites/default/files/2024-04/2024_ 0220_ice_access_to_due_process.pdf.*

[197] *See* CBP, *Language Access Plan* (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (Feb. 7, 2020), *https://www.dhs.gov/sites/default/files/ publications/cbp-updated-language-access-plan-2020.pdf.*

[198] *See* CBP, *Language Access Plan* 7 (Nov. 18, 2016), *https://www.dhs.gov/sites/default/files/ publications/final-cbp-language-access-plan.pdf;* DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/ publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 24, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https:// www.dhs.gov/sites/default/files/publications/ Habla%20Poster_12-9-16.pdf* (last visited Sept. 24, 2024); *see also* DHS, *DHS Language Access Resources* (last updated July 17, 2023), *https:// www.dhs.gov/publication/dhs-language-access-materials.*

[199] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/ about/mobile-apps-directory/cbpone* (explaining in response to frequently asked questions that "the CBP One™ mobile application is FREE and available to everyone who has access to a mobile device").

STB_AR1_000051

example, during section 240 removal proceedings, IJs may more fully consider whether a noncitizen demonstrates indicia of mental incompetency and, if so, what procedural safeguards are appropriate. *See Matter of M–A–M–,* 25 I&N Dec. at 481–83. Additionally, CBP officers may determine that such noncitizens are excepted from the suspension and limitation on entry (and thus that the provisions of this rule do not apply) under Section 3(b)(vi) or (vii) of the Proclamation.

iv. Impacts on Criminal Enforcement

*Comment:* Commenters stated that they are concerned that noncitizens would face criminal charges if they attempted to return to the United States following removal under the rule. One commenter stated that an increased number of expedited removal orders would inevitably lead more noncitizens to attempt to reenter the United States after their removal, potentially subjecting them to felony charges and two years of imprisonment, and that noncitizens should not be deemed criminals and incarcerated for seeking asylum in the United States. Another commenter stated that charging noncitizens criminally would decrease their access to humanitarian relief and increase the risk that criminal organizations would target those noncitizens.

*Response:* The Departments are committed to the fair, evenhanded enforcement of the law as Congress has enacted it. The Departments agree that, in appropriate cases, noncitizens who have been removed pursuant to an expedited removal order may be subject to criminal charges if they attempt to unlawfully reenter the United States. *See* INA 276(a), 8 U.S.C. 1326(a). Because the rule will allow the Departments to predictably and swiftly impose consequences on noncitizens who enter the United States without a legal basis to remain, the Departments believe noncitizens will be disincentivized from attempting to enter without a legal basis to remain or to reenter after being removed. Nevertheless, for the relatively few who choose nevertheless to reenter unlawfully, congressionally enacted criminal penalties remain an important tool to enforce the law.[200]

v. Negative Impacts on Other Affected Entities

*Comment:* Commenters stated that the rule would impose more burdens on nonprofit organizations, legal-service providers, and communities near the border. One commenter believed that the increase in negative fear determinations would cause legal-service providers to dedicate significant resources to preparing clients for and representing them in hearings before IJs and potential requests for reconsideration to USCIS. The commenter also alleged that the Departments have failed to consider reliance interests such as those of legal-service providers that prepare informational material, employ internal protocols, and deliver client services predicated on access to asylum and on access to clients in custody; the commenter stated that their organization would need to understand the changes effected by the rule, train staff and pro bono volunteers on those changes, and rewrite published legal information in multiple languages. Another commenter stated that its presentations would become longer and more complex to explain the effect of the rule's limitation on asylum eligibility, the exceptionally compelling circumstances needed to overcome it, and the new, heightened ''reasonable probability'' standard in credible fear interviews. The commenter asserted that the rule would also affect its staff's ability to provide services to callers of its hotline and its clients' ability to understand the legal issues involved.

*Response:* The Departments decline to modify the rule in response to the commenters' concerns. The concerns raised are not unique to immigration. Any change to any law or policy regulating the public requires providers who practice in the relevant area to adapt—they must learn the new law and advise clients accordingly. To facilitate the transition to the new provisions, since the Proclamation and IFR came into force, DHS personnel have regularly made themselves available to answer questions about these policies and the Departments' implementation activities, made information about these policies public on the Departments' websites,[201] and proactively engaged a

variety of stakeholder groups to promote understanding of the rule. The Departments believe that any purported costs that nonprofit organizations and legal-service providers assert they will bear in adapting to the changes effected by the rule are outweighed by the interest in reducing the current levels of encounters and allowing the Departments to invest more of their limited resources into predictably and swiftly delivering consequences to noncitizens who cross the border without a lawful basis to remain in the United States. *See* 89 FR at 48714. Although returning to the status quo before the IFR may eliminate some of the asserted burdens to which the commenters object, that status quo would perpetuate the vicious cycle in which the border security and immigration systems cannot deliver timely decisions and consequences to those encountered at the southern border who lack a lawful basis to remain in the United States, ultimately incentivizing more noncitizens to attempt to cross the border. *See id.* Conversely, a decrease in encounters at the southern border could be expected to allow organizations like the commenters to allocate more resources to each of their individual clients, allowing them to serve their clients more effectively.

The Departments also disagree that the rule will burden communities near the border. To the contrary, the rule will free resources to allow DHS to more effectively patrol the border and interdict smugglers and TCOs.[202] Moreover, the rule enables the delivery of predictable, swift consequences to noncitizens who cross the border without a legal basis to remain in the United States. That will disincentivize such noncitizens from attempting to cross the border, depriving smugglers and TCOs of opportunities to perpetuate their illegal operations. *See* 89 FR at 48730. In these ways, this rule is expected to reduce smuggler and TCO activity in border communities, ultimately reducing the harms that those activities bring to those communities. Additionally, the same incentives are expected to ultimately lower the number of noncitizens present in border communities, further reducing the burdens on those communities.

---

[200] Even so, although convictions for certain ''particularly serious crimes'' may render noncitizens ineligible for asylum or withholding of removal, unlawful reentry alone is not necessarily a particularly serious crime. *See* INA 208(b)(2)(A)(ii), 8 U.S.C. 1158(b)(2)(A)(ii); INA 241(b)(3)(B)(ii), 8 U.S.C. 1231(b)(3)(B)(ii); *Matter of N–A–M–,* 24 I&N Dec. 336, 342 (BIA 2007) (''Where,

as in the instant case, a conviction is not for an aggravated felony for which the alien has been sentenced to an aggregate term of imprisonment of at least 5 years, we examine the nature of the conviction, the type of sentence imposed, and the circumstances and underlying facts of the conviction.'').

[201] *See, e.g.,* CBP, *CBP One*™ *Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[202] *See* 89 FR at 48729–30.

STB_AR1_000052

b. Negative or Minimal Impacts on Immigration System and Government Operations

i. Undermines the Administration's Promises and Goals

*Comment:* Some commenters urged the Administration to keep its promises, stating that "[w]e are all immigrant[s]." Specifically, one commenter stated that the Administration "has not upheld its promise to safeguard the legal right to asylum and protect individuals from persecution, violations of due process, and family separation." Other commenters asserted that the Administration issued the Proclamation for political reasons, including using it as a political tool and for reelection purposes, while another commenter stated that the rule will not be effective in achieving the Administration's perceived political messaging or in "sway[ing]" right-wing individuals. And a third commenter argued that the Democratic Party supported discriminatory ideas like those found in the rule despite claiming to disagree with such policies.

Along the same lines, commenters stated that the rule is inconsistent with the Administration's goal of creating a just immigration system and goes against the Administration's promise to not deny asylum for noncitizens fleeing persecution and violence. One commenter claimed that the Administration had "previously pledged to restore the United States' 'moral standing in the world and our historic role as a haven for refugees and asylum seekers, and those fleeing violence and persecution,'" but that the rule "is misaligned with the values promised by this administration, including promises to end Trump-era restrictions on asylum seekers." Other commenters asserted that the Departments sought to curtail the rights of noncitizens arriving at the border by shutting them out of the asylum process based "solely" on how they arrived in the United States, even though the Administration had previously called on agencies to review expedited removal procedures to make them fairer. Another commenter expressed concern regarding what they alleged was a shift in the Administration's "rhetoric" and support for "fear-based restrictions" on asylum, instead of proposing measures to overhaul and ameliorate the asylum process, which they said was "sadly a very different stance" from the Administration's position a few years ago. A few commenters urged the Administration to expand the asylum system and to not close the southern border.

*Response:* The Departments agree that the United States has a long tradition of accepting and welcoming refugees and note that in the past few years, the United States Government has taken steps to significantly expand refugee admissions worldwide,[203] including for refugees from Latin America and the Caribbean. *See* 89 FR at 48712; 88 FR at 31333, 31341. However, without a policy in place to ensure lawful, safe, and orderly processing of noncitizens entering the United States during emergency border circumstances, the number of noncitizens in such circumstances would exceed DHS's already limited resources and facilities. *See* 89 FR at 48711–15. As explained in the IFR and under this rule, noncitizens seeking protection in the United States will still be able to do so, either before USCIS or in removal proceedings before EOIR, subject to the rule's provisions.

The Departments have determined that the changes effected by the IFR and the rule during emergency border circumstances will allow for better management of the limited resources Congress has provided to the Departments. Specifically, noncitizens intending to seek asylum are encouraged to do so using lawful pathways and processes, which facilitate the orderly processing of claims. In addition, the changes in the IFR and this rule permit the Departments to swiftly screen noncitizens not likely to establish eligibility for relief or protection, as well as to efficiently identify and process valid claims. The combined effect of the changes has reduced the percentage of noncitizens placed in section 240 removal proceedings,[204] where cases may take years to resolve.[205] In addition to reducing the impact on EOIR operations, reducing the number of noncitizens in removal proceedings reduces ancillary benefit requests to USCIS, *see* 8 CFR 208.7 (employment authorization for pending asylum applicants), and alleviates the burden on ICE of removing non-detained noncitizens who receive final orders of removal at the conclusion of section 240 removal proceedings but who do not comply with their orders, *see, e.g.,* 8 CFR 241.4(f)(7) (in considering whether to recommend further detention or

[203] U.S. Dep't of State, *Report to Congress on Proposed Refugee Admissions for Fiscal Year 2024,* at 6 (2023), *https://www.state.gov/wp-content/uploads/2023/11/FY-2024-USRAP-Report-to-Congress_FINAL-Accessible-11.02.2023.pdf.*

[204] OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[205] *See* OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab).

release of a noncitizen, an adjudicator must consider "[t]he likelihood that the alien is a significant flight risk or may abscond to avoid removal").

The Departments reiterate that a noncitizen may avoid application of the limitation on asylum eligibility if the noncitizen establishes by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). The Departments recognize that some noncitizens who would otherwise be granted asylum may not be eligible due to this rule. However, because such noncitizens remain able to seek statutory withholding of removal and CAT protection, the Departments believe that this rule strikes the appropriate balance between the need to protect those who wish to seek protection in the United States and the need to use resources effectively during emergency border circumstances.

Moreover, the Departments have determined that responding to emergency border circumstances is necessary to ensure the Departments' continued ability to safely, humanely, and effectively enforce and administer U.S. immigration laws, as well as to reduce the role of exploitative and dangerous smuggling and human trafficking networks. *See* 89 FR at 48714, 48723, 48726, 48767. One cause of recent surges in irregular migration is smugglers' and noncitizens' growing understanding that DHS's capacity to impose consequences at the border is limited by the lack of resources and tools that Congress has made available. Indeed, this rule follows congressional inaction limiting DHS's capacity to impose such consequences despite the Departments' repeated attempts to obtain the legislative framework and resources required to address unprecedented levels of irregular migration. In early February 2024, a bipartisan group of Senators proposed reforms of the country's asylum laws that would have provided new authorities to significantly streamline and speed up immigration enforcement proceedings and immigration adjudications for individuals encountered at the border, including those who are seeking protection, while preserving principles of fairness and humane treatment.[206] 89 FR at 48729.

[206] The White House, *Fact Sheet: Biden-Harris Administration Calls on Congress to Immediately Pass the Bipartisan National Security Agreement* (Feb. 4, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/02/04/fact-sheet-biden-harris-administration-calls-on-congress-to-immediately-pass-the-bipartisan-national-security-agreement/.*

STB_AR1_000053

Critically, the proposal included more than $20 billion in additional resources for DHS, DOJ, and other departments to implement those new authorities.[207] *Id.* However, Congress failed to move forward with this bipartisan legislative proposal.[208] *Id.* It also failed to pass the emergency supplemental funding requests that the Administration submitted. *Id.* Although Congress did ultimately enact an FY 2024 appropriations bill for DHS, the funding falls significantly short of what DHS requires to deliver timely consequences and avoid large-scale releases pending section 240 removal proceedings. *Id.*

In light of congressional inaction, this rule is designed to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances with the resources and tools Congress did make available. As discussed in Section II.A.2 of this preamble, the Departments assess that this rule significantly increases their ability to deliver timely decisions and consequences. Accordingly, the Departments reject commenters' claim that the Departments' basis for promulgating the rule is political. Rather, the Departments believe that the rule will continue to reduce irregular migration by allowing the Departments to better manage their limited resources while delivering consequences more swiftly through expedited removal for those without a legal basis to remain in the United States.

ii. Similarity to Actions of Past Administration

*Comment:* Some commenters stated that the rule was akin to the asylum-related rulemaking and policies of the prior Administration, which, the commenters said, denied noncitizens their ''legal right to request asylum in the United States'' and were ''struck down'' by Federal courts. Specifically, one commenter stated that the prior Administration ''provided [a] similar rationale'' for its policies: ''to alleviate the mass illegal immigration crises along the Southern border by discouraging the submission of fraudulent or otherwise meritless asylum claims.'' And another commenter asserted that the rule was

similar to the prior Administration's interim final rule entitled Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 FR 55934 (Nov. 9, 2018) (''Proclamation Bar IFR''), in that it is ''again barring people crossing between ports from accessing asylum protections for no legitimate reason beyond false optics of border 'control' that unlawfully penalize and seek to deter those who need access to protection.'' A number of commenters criticized the rule as an insufficient break from prior immigration policies that the commenters described as ''inhumane,'' ''cruel[],'' and ''punishing.'' Some commenters claimed that the Administration was ''walking back promises to protect fair asylum processes'' since revoking Title 42. And another commenter stated that the Administration's echoing of ''reactionary measures'' of the prior Administration ''during a looming election season'' was a ''cynical approach'' that would foster ''division and xenophobia,'' fail to address the root causes of immigration issues, and ''alienat[e] an electorate that values fairness and justice for immigrants.''

*Response:* The Departments disagree that the rule is indistinguishable from or too similar to the asylum-related rulemakings and policies commenters cited. The Proclamation Bar IFR, for instance, imposed a categorical eligibility bar for noncitizens crossing the southern border outside a POE. *See* 83 FR at 55935; *cf. East Bay III,* 993 F.3d at 669–70. By contrast, this rule does not operate as a categorical bar on asylum eligibility based on manner of entry. Instead, the rule provides a limitation on asylum eligibility for certain noncitizens who (1) enter the United States across the southern border during emergency border circumstances; (2) are not described in section 3(b) of the Proclamation; and (3) do not establish exceptionally compelling circumstances. *See* 8 CFR 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). Importantly, then, noncitizens may avoid application of the limitation on asylum eligibility if they establish by a preponderance of the evidence that exceptionally compelling circumstances exist. *See* 8 CFR 208.35(a)(2), 1208.35(a)(2). Such circumstances necessarily exist where the noncitizen demonstrates that, at the time of entry, the noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom the noncitizen was traveling faced an acute medical emergency; faced an imminent and extreme threat to their life or safety;

or was a ''victim of a severe form of trafficking in persons'' as defined in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Noncitizens may also be excepted from the limitation if, during section 240 removal proceedings or the asylum merits process, they meet the family unity exception. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, under the family unity provision, the following noncitizens may be treated as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those who (1) are found eligible for statutory withholding of removal or CAT withholding; (2) would be eligible for asylum but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) have a qualifying spouse or child. *See id.* The Departments believe that the distinctions between this rule and the Proclamation Bar IFR are of legal significance, and those distinctions are discussed at length in the IFR. *See* 89 FR at 48735–36.

In addition, the rule is designed to implement policies distinct from those motivating the Proclamation Bar IFR. This rule seeks to enhance the Departments' ability to address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances. 89 FR at 48718, 48726–31. The rule is intended to better manage already strained resources, thereby protecting against overcrowding in border facilities and helping to ensure that the processing of migrants seeking protection in the United States is done in an effective, humane, and efficient manner. *See* 89 FR at 48767. In that vein, the Proclamation Bar IFR differed in important respects from this rule. *See* 89 FR at 48734–36, 48738 (explaining that this rule does not treat the manner of entry as dispositive in determining asylum eligibility, contains an exception that accounts for varied circumstances, and is narrowly tailored to address the emergency border circumstances described in the Proclamation and this rule and thus does not allow for implementation of future proclamations or orders).

Moreover, this rule is a response to emergency border circumstances that did not exist when the Proclamation Bar IFR was promulgated. 89 FR at 48726–28. Current trends and historical data indicate that migration and displacement in the Western Hemisphere will continue to increase as a result of violence, persecution,

---

[207] Deirdre Walsh & Claudia Grisales, *Negotiators Release $118 Billion Border Bill as GOP Leaders Call It Dead in the House,* NPR (Feb. 4, 2024), *https://www.npr.org/2024/02/04/1226427234/senate-border-deal-reached.*

[208] Stephen Groves, Rebecca Santana & Mary Clane Jalonick, *Border Bill Fails Senate Test Vote as Democrats Seek to Underscore Republican Resistance,* AP News (May 23, 2024), *https://apnews.com/article/border-immigration-senate-vote-924f48912eecf1dc544dc648d757c3fe.*

**STB_AR1_000054**

poverty, human rights abuses, the impacts of climate change, and other factors. *Id.* at 48726. The United States Government is working to address these root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[209] including by working closely with partner countries across the Western Hemisphere.[210] *Id.* at 48727. But these efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. *Id.*

iii. Would Be Ineffective or Not Achieve Its Intended Outcomes

*Comment:* Commenters expressed opposition to the rule, claiming that the rule would decrease, not increase, the efficiency of USCIS management of asylum cases and could lead to further backlogs and inefficiencies for AOs and immigration courts, complicating the asylum process. One commenter believed that the rule would ''exacerbate efficiency issues by requiring operational changes to compensate for elimination of the preliminary screening to notify noncitizens of the expedited removal process and the need to affirmatively express their fear of persecution or torture.'' Some commenters asserted that the Departments have created an ''unworkable, convoluted, and unfair'' system at the border, which CBP officers and AOs will not be prepared to adapt to. Commenters claimed that the rule would create additional administrative burdens by requiring officers, applicants, stakeholders, and judges to apply multiple tests in one proceeding. Further, commenters stated that having to track, identify, and apply different standards would be more complex for all those involved.

Other commenters stated that the rule would exacerbate conditions at the southern border and would increase the number of migrants who enter between POEs, further straining resources and escalating the current humanitarian

crisis. A commenter stated that the rule may cause migrants to be turned away if they walked up to a POE, and thus, it would ''inadvertently encourage desperate individuals to resort to dangerous methods to reach safety.'' One commenter voiced concern that the rule would have an adverse effect on the asylum process because the rule would cause a foundational shift in the U.S. asylum system, causing access to asylum to be the exception rather than the norm. Another commenter claimed that decades of deterrence policies have ''proven that punitive policies do not reduce irregular migration—they only increase chaos, confusion, and human suffering.'' (Emphasis omitted.)

Other commenters claimed that the rule would be ineffective at achieving its intended goals for managing the border. One commenter stated that people were coming to the United States because they had no choice, so securing the border would not solve the problem. Similarly, a commenter stated that the rule would be like playing ''whack-a-mole, except with real live people, most of whom would not undertake such a dangerous, difficult journey to the border if they felt they could stay where they were.'' Furthermore, a commenter stated that, without additional resources, the Government will have no way of fully implementing its own policy. Commenters cited an article stating that ''it is hard to say with confidence whether this regulation will work as the administration intends.''[211] One commenter stated that the Proclamation did not address the actual needs of asylum seekers, nor did it address the problem that has led the U.S. immigration system to be ''broken.'' This commenter described a ''broken legal system that takes years to process cases, leading individuals to live in limbo and without important legal rights.'' Along the same lines, another commenter stated that turning away noncitizens is evidence of a faulty immigration system and, thus, there are better solutions than turning away those asking for help.

Other commenters asserted that the rule had not substantiated its aim of incentivizing a sustained drop in the number of encounters at the southern border. While citing a study, one commenter stated that any change in border policy triggers a short-term drop in encounters, regardless of the intent of the policy change. The commenter also

stated that the rule has not provided an adequate explanation for the assumption that it would achieve its objective of reducing the number of encounters at the border. And while referencing another study, another commenter elaborated that policies that limit access to POEs increase irregular crossings by noncitizens who cannot wait in Mexico, which they stated was also confirmed by DHS's Office of Inspector General. Conversely, another commenter remarked that, while there has been a temporary drop in encounters immediately after the issuance of the IFR, the IFR would be ineffective in deterring migrants in the long term because of the rule's exceptions and loopholes. Lastly, another commenter expressed concern that ''[a]s written, the [IFR] simply continues the status quo by encouraging mass illegal immigration and abuse of our asylum system.''

*Response:* The Departments disagree that the rule decreases the efficiency of management of asylum claims. The Departments recognize that the rule may require additional time for AOs and IJs during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and noncitizens' fear claims. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the IFR has resulted in significantly reduced irregular migration and has allowed the Departments to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. *See* Section II.A.2 of this preamble. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be accompanied by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule. And as discussed in Section III.C.3 of this preamble, AOs and IJs are specifically trained to apply multiple tests in the same proceedings; any claim that these trained and skilled professionals would be burdened by multiple tests is unfounded. Moreover, any burdens imposed by the rule on

---

[209] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[210] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declaration-on-migration-and-protection-in-guatemala.*

[211] Am. Immigr. Council, *Analysis of the President's 212(f) Proclamation & Interim Final Rule Restricting Asylum* 2 (2024), *https://www.americanimmigrationcouncil.org/research/american-immigration-council-analysis-presidents-212f-proclamation-and-interim-final-rule.*

**STB_AR1_000055**

CBP officers and agents have been accompanied by a substantial reduction in other resource burdens due to a substantial reduction in encounters at the southern border caused by this rule.

The Departments agree with commenters that the immigration system is badly in need of additional resources and efficiencies. This rule is not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade. However, the Departments disagree that these fundamental challenges mean this rule will be ineffective in achieving its aims. Given the absence of reforms by Congress, the Departments are working within the legal framework and with the resources provided by Congress to ensure the functioning of the border security and immigration systems during emergency border circumstances. After the implementation of the Proclamation and IFR, the Departments saw a significant decrease in encounters along the southern border, which has allowed the Departments to more efficiently process noncitizens through expedited removal, delivering timely decisions and consequences and discouraging irregular migration. In other words, commenters are incorrect that the rule would lead to an increase in encounters between POEs and decreased efficiencies in the process.

Notably, in addition to the decrease in encounters, operations at POEs have remained largely steady over this time. For example, vehicle wait times at POEs on the SWB have not shown changes from typical monthly fluctuations. The numbers of vehicle occupants and pedestrians entering the United States with lawful status have remained aligned with normal entry data. In particular, between August 2023 and May 2024—the last month before implementation of the IFR—the average wait time across all SWB POEs (passenger vehicle, pedestrian, and truck cargo) was 32 minutes for vehicles, 15 minutes for cargo trucks, and 9 minutes for pedestrians. From June 2024 through July 2024, the average wait times were 34 minutes for vehicle traffic, 9 minutes for truck cargo, and 7 minutes for pedestrians.

With respect to the suggestion that the rule would inadvertently encourage desperate individuals to resort to dangerous methods to reach safety (such as crossing between POEs), the Departments note that the rule creates no such incentive; experience shows that the IFR has improved DHS's capacity to swiftly deliver consequences to those who cross between POEs and

do not have a lawful basis to remain, including through the use of expedited removal. *See* Section II.A.2 of this preamble. Notably, the comparatively abbreviated timeline of the expedited removal process serves as a powerful disincentive against irregular migration of noncitizens who cross between POEs without viable claims for asylum. In addition, the rule, by adopting the exceptions contained in section 3(b) of the Proclamation, complements and incentivizes the use of lawful, safe, and orderly pathways and processes for individuals to come to the United States.

With respect to the claim that this rule will yield at most a short-term reduction in encounters as noncitizens decide that they cannot wait in Mexico, the Departments note that thus far, encounters have not increased to the levels that were seen in the years leading up to the IFR. *See* Section II.A.2 of this preamble. Moreover, in the Departments' experience, migrants are sensitive to the incentives created by national policy,[212] and the Departments see an imperative to act in the face of the challenging problem of very high levels of irregular migration. Even if the rule's effects did not last indefinitely, moreover, that would not be a reason to depart from the rule's approach now—when its approach is having its intended effect.

The Departments do assess that ensuring that the reduction in border encounters is sustained will require not just the rule itself but work on the confluence of factors that also contribute to high levels of irregular migration. And in parallel with this rule, the Administration is working to address those factors.[213] For instance, the United States Government is working to address the root causes of migration and to abate adverse effects from unprecedented levels of irregular migration,[214] including through working

closely with partner countries across the Western Hemisphere.[215] 89 FR at 48727; *see* Section II.A.2 of this preamble. Additionally, increased access to lawful, safe, and orderly pathways will continue to complement one of the rule's goals of discouraging irregular migration where appropriate.[216] While these and other parallel measures are necessary complements to the rule, they cannot substitute for the rule: These efforts will take time to have significant impacts and will not alleviate the stress that the border security and immigration systems are currently experiencing, as described in the Proclamation, the IFR, and this rule. 89 FR at 48727.

c. Negative Impacts on the U.S. Economy, Workforce, Citizenry, Public Health, and Safety

*Comment:* Commenters expressed general concern that the IFR would negatively impact the U.S. workforce and economy, stating that the United States needs immigrants to bolster the workforce and address labor shortages, that the United States was built on the labor of immigrants, and that reliance on immigrant labor continues today. They argued that restricting immigration into the United States exacerbates population shortages, and that closing borders to immigrants negatively impacts the food supply chain because a significant portion of agricultural workers and food processing employees are immigrants. One commenter specified that migrants are currently needed because "the reproductive birthrate here has declined" and "replacement" of economic contributors is "essential to avoid complete replacement by 'artificial intelligence.'"

*Response:* The Departments do not dispute the importance and contributions of immigrants to the economy. As noted in Section V.B. of this preamble (in which the Departments describe the estimated

[212] *See, e.g.,* Miriam Jordan, One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay, N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html.*

[213] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and;* U.S. Agency for Int'l Dev., *U.S. Strategy to Address the Roots Causes of Migration in Central America—FY 2022 USAID Results, https://www.usaid.gov/central-america-and-mexico-regional-program/fy-2022-root-causes-strategy-results* (last visited Sept. 15, 2024).

[214] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-*

*strengthen-joint-humanitarian-plan-on-migration/* (describing the commitment of the United States and Mexico to addressing root causes of migration).

[215] *See* The White House, *Fact Sheet: Third Ministerial Meeting on the Los Angeles Declaration on Migration and Protection in Guatemala* (May 7, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/07/fact-sheet-third-ministerial-meeting-on-the-los-angeles-declarationon-migration-and-protection-in-guatemala.*

[216] *See, e.g.,* Ezra Klein, *The Real 'Border Czar' Defends the Biden-Harris Record,* N.Y. Times (Sept. 13, 2024), *https://www.nytimes.com/2024/09/13/opinion/ezra-klein-podcast-alejandro-mayorkas.html* (interview response of Secretary of Homeland Security Alejandro Mayorkas explaining that one "leg[] of the stool" for decreasing encounters is presenting migrants with "alternative means of accessing humanitarian relief in the United States," including "the lawful pathways that we have built").

**STB_AR1_000056**

effects of the rule pursuant to Executive Order 12866), the expected effect of this rule is primarily to reduce incentives for irregular migration and illegal smuggling activity. This rule does not inhibit or prevent regular migration into the United States. In particular, the Departments have been clear that the IFR does not apply to any noncitizen who has a valid visa or other lawful permission to seek entry or admission into the United States or presents at a POE pursuant to a pre-scheduled time and place. 89 FR at 48715; *see also* 8 CFR 208.35(a), 1208.35(a) (excepting from the limitation on asylum eligibility noncitizens who are excepted from the Proclamation's suspension and limitation on entry under section 3(b) of the Proclamation). Additionally, this rule does not change or place any restrictions on those who may be eligible for employment authorization within the United States. The Departments recognize that there may be an impact on some people who attempt to enter the United States irregularly and who are removed after their entry, but the Departments find that the limitation on asylum eligibility is, on balance, an appropriate response to surges in irregular migration during emergency border circumstances. For those whom this rule renders ineligible for asylum but who ultimately receive statutory withholding of removal or CAT protection, another effect would be the increased frequency with which those subject to this rule who are present in the United States are required to renew their employment authorization and a reduced ability for their family to immigrate to the United States.

Additionally, as noted in the IFR, 89 FR at 48712 & nn.10–13, over the past several years the United States Government has implemented a historic expansion of lawful pathways and processes to come to the United States, including:

• The CHNV parole processes, which allow individuals with U.S.-based supporters to seek parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit;

• The Safe Mobility Offices in Colombia, Costa Rica, Ecuador, and Guatemala, which provide, among other things, information and referrals to humanitarian or family reunification parole processes, labor pathways, and expedited refugee processing for eligible individuals;[217]

• The expansion of country-specific family reunification parole processes for individuals in the region who have U.S. citizen relatives in the United States;

• Increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024; and

• Expanding access to labor pathways.

More specifically, recognizing the significant contributions noncitizens make to the U.S. economy, the United States Government significantly expanded access to labor pathways to maintain strong economic growth and meet labor demand in the United States. Our efforts to expand access to labor pathways have yielded results. In FY 2023, the United States issued 442,000 H–2A and H–2B nonimmigrant worker visas globally.[218] Similarly, in FY 2023, the United States issued 265,777 H–1B specialty occupation visas,[219] the highest number of visas issued or otherwise utilized in decades.[220] Furthermore, the United States also issued more than 192,000 employment-based immigrant visas in 2023—far above the pre-pandemic number—and ensured that no employment-based visas went unused for the second year running.[221]

The Departments believe that these new or expanded lawful pathways, and particularly employment-based pathways, are effective ways to address labor shortages and encourage lawful migration. The Departments also believe that, by reducing migrants' incentives to use human smugglers and traffickers to enter the United States, this rule will reduce the likelihood that newly arrived migrants will be subjected to labor

---

The White House, *Fact Sheet: Biden-Harris Administration on World Refugee Day Celebrates a Rebuilt U.S. Refugee Admissions Program* (June 20, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/06/20/fact-sheet-biden-harris-administration-on-world-refugee-day-celebrates-a-rebuilt-u-s-refugee-admissions-program/*.

[218] U.S. Dep't of State, *Worldwide Visa Operations: Update, https://travel.state.gov/content/travel/en/News/visas-news/worldwide-visa-operations-update.html* (last updated Jan. 2, 2024).

[219] U.S. Dep't of State, *Nonimmigrant Visa Statistics, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/nonimmigrant-visa-statistics.html* (last visited Aug. 27, 2024) (see the ''FY2019–2023 Detail Table (PDF)'' under ''Nonimmigrant Visas by Individual Class of Admission (*e.g.* A1, A2, etc.)'').

[220] *Id.* (see the ''FY1997–2023 NIV Detail Table (Excel spreadsheet)'' under ''Nonimmigrant Visa Issuances by Visa Class and by Nationality'' showing issuance totals of H–1B specialty occupation visas).

[221] USCIS, *Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade* (Feb. 9, 2024), *https://www.uscis.gov/EOY2023*.

trafficking. The Departments further reiterate that noncitizens who avail themselves of any of the lawful, safe, and orderly pathways recognized in this rule will not be subject to the limitation on asylum eligibility or the other provisions of the rule.

*Comment:* Other commenters provided additional remarks on the contributions of immigrants to the United States, stating that noncitizens provide value to U.S. communities and that immigrants have enriched the United States. While citing a 2024 article, a commenter stated that the IFR would subject noncitizens who cross the border irregularly to expedited removal and further criminalization through criminal prosecution, costing taxpayers over $7 billion to incarcerate migrants charged or convicted with unauthorized entry or reentry crimes.

*Response:* The Departments emphasize that neither the IFR nor this rule requires DHS to refer noncitizens it encounters at the border for prosecution for unauthorized entry or other immigration-related offenses. It is incorrect to cite expedited removal as the vehicle leading to mass incarceration and criminal prosecution of migrants. To the contrary, expedited removal is a process that allows DHS officials to quickly remove certain noncitizens encountered at the border. While it is true that noncitizens will spend some time in custody pending completion of the expedited removal process (and for a credible fear determination where referred), such custody is not for purposes of criminal prosecution. Although the Departments recognize commenters' concerns regarding the amount of taxpayer funds used to incarcerate migrants who are charged and convicted with unauthorized entry or reentry crimes, that is not at issue here. And in any event, as discussed in Section V.B of this preamble, the Departments expect that the rule will result in significantly reduced irregular migration. Accordingly, the Departments expect AOs and IJs to conduct a smaller number of credible fear cases than AOs and IJs would otherwise be required to handle in the absence of this rule, with the possibility of attendant savings of Government resources.

d. Other General Opposition

*Comment:* Several comments urged the Departments not to close the SWB.

*Response:* The rule does not close the SWB. It adds a limitation on asylum eligibility and alters the process for those individuals described in section 3(a) of the Proclamation who are not described in section 3(b) of the

STB_AR1_000057

---

[217] U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sep. 20, 2024);

Proclamation, but it does not ''close'' the border.

Additionally, the rule does not impose any changes to asylum eligibility or processing of noncitizens who use lawful, safe, and orderly pathways to seek entry to the United States. Noncitizens who use the CBP One app to pre-schedule an appointment at a SWB POE to present themselves at the border in a safe, orderly, and lawful manner are excepted from the suspension and limitation on entry under section 3(b) of the Proclamation and so are excepted from the limitation on asylum eligibility and changes to expedited removal processing. This exception is significant. From June 5, 2024, through August 31, 2024, 123,600 noncitizens with CBP One appointments presented at POEs and were accordingly processed outside of the IFR's provisions and will be excepted from the limitation on asylum eligibility if they choose to apply for asylum.[222] *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D). During the pre-pandemic period, approximately 330 encounters were processed at SWB POEs per day.[223] Since January 2023 through August 2024, approximately 1,500 encounters have been processed at SWB POEs per day.[224] And since the start of FY 2024 through August 2024, that average has increased to approximately 1,700 per day.[225]

*C. Provisions of the Rule*

1. Limitation on Asylum Eligibility

a. Proclamation Exceptions—Section 3(b) of Proclamation

*Comment:* Commenters raised a number of concerns regarding the exceptions to the Proclamation's suspension and limitation on entry, including the exceptions for UCs; those permitted to enter based on the totality of the circumstances; and those permitted to enter based on operational considerations.

As an initial matter, a majority of commenters supported the Proclamation's exclusion of UCs from the suspension and limitation on entry or from provisions of the rule. However, some commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry, without also providing an exception for family units,

would lead families traveling together to choose to ''self-separate'' at the border and send the children across unaccompanied because conditions in Mexico are too dangerous for children to wait with their parents until the family can cross together. Similarly, commenters stated that excepting UCs from the Proclamation's suspension and limitation on entry would encourage the trafficking and exploitation of children. Commenters stated that the rule, without an additional family-unit exception, would therefore result in the separation of families.

Another commenter opposed the Proclamation's exception for UCs. This commenter stated that noncitizens, including those who pose security risks, would attempt to pose as UCs to evade the Proclamation's suspension and limitation on entry.

Additionally, some commenters opposed the exceptions in sections 3(b)(vi) and 3(b)(vii) of the June 3 Proclamation, which provide that the suspension and limitation on entry will not apply to a noncitizen if a CBP immigration officer determines that the noncitizen is permitted to enter either based on the totality of the circumstances or based on operational considerations. Commenters expressed concern that these exceptions are vague and subjective and should not be left to the discretion of CBP immigration officers.

Specifically, commenters asserted that the Proclamation does not provide any standards or make clear how CBP officers will determine when someone is excepted based on the totality of the circumstances or operational considerations. Commenters also stated that CBP immigration officers may not be properly equipped to apply the Proclamation's exceptions, which would result in arbitrary decision-making and removals in violation of non-refoulement principles.

Other commenters stated that the Proclamation's exceptions were overly broad and would authorize CBP immigration officers to use them as a ''loophole'' to permit large populations of noncitizens to enter the country based on the ''totality of the circumstances'' or due to ''operational considerations.'' These commenters stated that, as a result, overbroad use of these exceptions will result in fewer noncitizens being removed and will not change the status quo of large numbers of noncitizens crossing the border.

Lastly, commenters expressed concern that noncitizens excepted under section 3(b)(vi) or 3(b)(vii) of the June 3 Proclamation based on the totality of the circumstances or for

operational considerations and who are subsequently placed into immigration court proceedings will be unable to demonstrate that they are not subject to the rule's provisions in immigration court.

*Response:* Any comments opposing provisions of the Proclamation, as opposed to the parallel provisions of the rule, are outside of the scope of this rule. President Biden issued the Proclamation by the authority vested in the President by the INA. *See* INA 212(f), 8 U.S.C. 1182(f); INA 215(a), 8 U.S.C. 1185(a); 89 FR 48487. Under section 3(d) of the Proclamation, the President directed the Secretary and Attorney General to promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determine are warranted, subject to any exceptions to such asylum eligibility limitations and conditions that they determine are warranted. The Departments lack authority to amend the exceptions to the Proclamation's suspension and limitation on entry, as set forth in section 3(b) of the Proclamation, and any proposal to do so would be outside the scope of this rule. At the same time, the Departments may depart from the Proclamation's section 3(b) exceptions in determining which exceptions to this rule's limitation on asylum eligibility are warranted to the extent they are adopted in this rule, and the Departments have responded to comments suggesting such exceptions below.

To the extent that commenters suggest excepting family units from the rule's limitation on asylum eligibility, the Departments reiterate that excepting all family units could incentivize families to bring their children on the often-perilous journey to the United States. *See* 89 FR at 48757. Such a broad exception would also be at odds with the Proclamation and rule's goals in addressing emergency border circumstances. *See id.* at 48726–31 (''Need for These Measures'').

Further, the Departments do not believe that the rule will meaningfully incentivize the ''self-separation'' of families. Because UCs are already excluded from expedited removal by statute, *see* 8 U.S.C. 1232(a)(5)(D), the Departments do not expect based on their experience implementing border enforcement and asylum that excepting UCs, but not family units, from the limitation on asylum eligibility would lead to increased incentives to ''self-separate.'' Rather, in the time since the

---

[222] OHSS analysis data downloaded from UIP on September 3, 2024 (IFR Details tab).

[223] OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[224] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (OFO Encounters tab).

[225] *Id.*

STB_AR1_000058

IFR took effect, average daily encounters of UCs at the SWB have actually decreased by 37 percent.[226]

Moreover, on balance, the Departments believe that the important interests of protecting the statutorily recognized vulnerabilities of UCs, while maintaining the fundamental goals of the rule in addressing emergency border circumstances, outweigh any consequences of claimed incentives for noncitizens to ''self-separate'' at the border. Notably, the Departments emphasized the importance of maintaining family unity in the IFR and crafted a number of exceptions to the limitation to preserve family unity and avoid family self-separations. *See* 8 CFR 208.35(a)(2), 208.35(c), 1208.35(a)(2), 1208.35(c); *see also* 89 FR at 48733 (explaining that the rule contains exceptions that ''avoid[] the separation of families''). For instance, if any member of a noncitizen's family—as described in 8 CFR 208.30(c)—with whom the noncitizen is traveling demonstrates exceptionally compelling circumstances for entering the United States during emergency border circumstances, then all of the members of that family unit traveling together will be excepted from the rule's limitation on asylum eligibility. 8 CFR 208.35(a)(2), 1208.35(a)(2); *see also* 89 FR at 48754. The rule also contains an explicit family unity provision in the AMI process before USCIS and in removal proceedings before EOIR; this provision allows a principal asylum applicant to be excepted from the rule's limitation on asylum eligibility if the applicant can establish that the applicant meets the statutory requirements for statutory withholding of removal or CAT protection, among other requirements. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 89 FR at 48733 (explaining family unity provision requirements).

The Departments recognize commenters' concerns about the vulnerability of UCs. The Departments encourage all those who seek to travel to the United States, including UCs, to take advantage of available lawful, safe, and orderly pathways and processes

rather than rely on smugglers or criminal organizations to facilitate a potentially dangerous journey. 89 FR at 48723; 88 FR at 31346. However, the Departments note that UCs are particularly vulnerable and entitled to special protections under the law. *See* 88 FR at 31346 (citing INA 208(a)(2), 8 U.S.C. 1158(a)(2) (providing that safe-third-country bar does not apply to UCs); INA 208(b)(3)(C), 8 U.S.C. 1158(b)(3)(C) (stating that an AO has initial jurisdiction over the asylum claims of UCs)); *see generally* 8 U.S.C. 1232. Given that UCs have long had special rules and protections applicable to them in immigration proceedings, the Departments disagree with commenters that this rule's adoption of the exception for UCs at section 3(b)(iii) of the Proclamation would create any meaningful new incentive for noncitizens who may be a security risk to attempt to pose as UCs in order to circumvent the rule's provisions. Further, immigration officers have training, knowledge, skills, and experience in identifying fraudulent behavior. *See* 89 FR at 48744 (explaining that CBP immigration officials ''have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern'').

Furthermore, with respect to commenters' concerns regarding the discretionary nature of the exceptions at sections 3(b)(vi) and 3(b)(vii) of the Proclamation based on the totality of the circumstances and operational considerations, the Departments reiterate that comments on the Proclamation itself are outside the scope of this rulemaking. And insofar as these comments relate to this rule, the Departments disagree that these exceptions will essentially swallow the rule, as commenters suggest, or that CBP immigration officers will be unable to apply these exceptions fairly or consistently. Section 3(b)(vi) of the Proclamation permits entry based on the totality of the circumstances, and then delineates examples such as ''consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests at the time of the entry or encounter that warranted permitting the noncitizen to enter.'' Thus, this ''totality of the circumstances'' exception provides numerous examples that would allow the CBP immigration officer to determine whether such circumstances were present such that a noncitizen would not be subject to the

Proclamation's suspension and limitation on entry. The discretionary nature of the ''operational considerations'' exception provides flexibility for CBP immigration officers to better manage migratory flows during emergency border circumstances, which is a driving purpose of this rule. 89 FR at 48723, 48726–31 (explaining, in detail, the need for the rule). Moreover, CBP officers have experience considering various factors and factual scenarios when exercising their discretion as immigration officers, including determining appropriate processing pathways, and such experience is also relied upon in making these decisions.

Finally, as to commenters' concerns about whether noncitizens who were excepted from the Proclamation's suspension and limitation on entry under subsections 3(b)(vi) and (vii) of the Proclamation will nonetheless be subject to the rule's limitation on asylum eligibility in immigration court, those concerns are misplaced. By their terms, subsections 3(b)(vi) and (vii) apply to ''any noncitizen who is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer,'' based on certain considerations. Whether a noncitizen was excepted from the Proclamation and permitted to enter the United States is a question of historical fact, documented by CBP in the appropriate electronic processing system(s),[227] and does not require a separate assessment by an AO or IJ. *See* 89 FR at 48732 n.169. Thus, any noncitizen who is described in subsections 3(b)(vi) and (vii) of the Proclamation will not be subject to the limitation on asylum eligibility contained in the rule. *Id.*

i. Legal Concerns Related to CBP One and the Lack of Exceptions

*Comment:* Commenters raised a number of concerns regarding the rule's exception to the limitation on asylum eligibility for noncitizens who use the CBP One app to present at a POE pursuant to a pre-scheduled time and place. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); June 3 Proclamation sec. 3(b)(v)(D).

Commenters expressed concern that use of CBP One is unlawful. Some commenters voiced concern that ''barring'' those who enter the United States along the SWB without a pre-

---

[226] *See* OHSS analysis of July 2024 OHSS Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Consistent with the discussion in Section II.C.1 of this preamble, encounters of individuals in family units and single adults have fallen more sharply than encounters of UCs, which has caused UCs' share of total encounters to increase, notwithstanding the overall drop in UC encounters in absolute numbers. The relative stability of UC flows compared to family unit flows is consistent with the fact that most policy changes in recent years (including the current rule) have not had a direct impact on UCs.

[227] Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule,* Securing the Border attach. 5 (June 4, 2024) (Muster).

STB_AR1_000059

scheduled CBP One appointment would violate U.S. and international law and "effectively eliminate[] asylum" for every noncitizen who crosses into the United States at the southern border without an appointment. Commenters further stated that, while the Departments seek to distinguish the IFR from the vacated Proclamation Bar IFR by explaining that it is being implemented during an emergency and some lawful pathways remain available to migrants, most who cannot wait for a CBP One app appointment would be barred from asylum under the IFR. Similarly, commenters stated that the INA requires DHS to provide every noncitizen who arrives in the United States with the opportunity to establish a credible fear of persecution—not just those with the resources to own a smartphone and the ability to schedule an appointment. Other commenters stated that the CBP One app codifies a form of electronic metering and essentially replaces a program that relied on metering to limit the number of noncitizens who could approach POEs, a practice that, the commenters argued, was held unlawful by the Federal courts.

One commenter expressed concern with the use of the CBP One app, stating that the app has been used to release record numbers of undocumented noncitizens into the United States. The commenter warned that the Biden Administration could continue to utilize and expand upon the CBP One app without any limits under the IFR. The commenter also raised concerns that the number of appointments available through the CBP One app can be expanded without limit, such that a large population of noncitizens could be excepted from the Proclamation's suspension and limitation on entry.

Several commenters expressed concern that the IFR, unlike the Circumvention of Lawful Pathways rule, does not provide an exception for those who are unable to access or use the CBP One application. Other commenters asserted that the IFR does not provide a justification for deviating from the Circumvention of Lawful Pathways rule's scheduling issues exception and expressed concern that while the Circumvention of Lawful Pathways rule's exception has not been properly applied, the lack of such an exception in the IFR would expose migrants who are unable to access or use the CBP One app to the risk of refoulement.

*Response:* The Departments believe the exception for noncitizens who present at a POE pursuant to a pre-scheduled time and place, such as through the CBP One app, is consistent with the INA and the purpose of the Proclamation and this rule.

As an initial matter, the Departments note that migrants do not apply for asylum with CBP at a POE. At POEs, CBP is responsible for the inspection and processing of all applicants for admission, including individuals who may intend to seek asylum in the United States. 8 CFR 235.1(a) (concerning all applicants for admission at POEs); *id.* 235.3(b)(4) (concerning individuals processed for expedited removal and claiming fear of persecution or torture). While the CBP One app is one key way that CBP is streamlining and increasing its capacity to process undocumented noncitizens, the app is not a method of seeking asylum in the United States, and CBP officers do not determine the validity of any claims for protection.

The Departments disagree that the use of the CBP One app to manage the flow of migration and intake into POEs and to encourage the use of safe, orderly, and lawful pathways constitutes a form of "digital metering," unlawfully withholds or bars access to the asylum process, or conflicts with the agency's duties under 8 U.S.C. 1225(a)(3). Any noncitizen who is processed for expedited removal upon arrival at a POE and who indicates an intention to apply for asylum or a fear of return, whether or not the noncitizen uses the CBP One app, will be referred for a credible fear interview. Further, as noted in Sections II.B and III.A of this preamble, the United States implements its non-refoulement obligations under the 1967 Refugee Protocol through the provisions governing withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), rather than through section 208 of the INA, 8 U.S.C. 1158, which governs asylum. Noncitizens who are ineligible for asylum under the rule, such as those who enter the United States without pre-scheduling an appointment through the CBP One app, and are unable to establish that exceptionally compelling circumstances exist remain eligible to seek statutory withholding of removal and CAT protection consistent with these obligations.

The Departments also disagree with commenter concerns regarding unlimited expansion of CBP One or the use of CBP One to release individuals. The CBP One app is intended to allow for the orderly processing of noncitizens and, under the Proclamation and this rule, use of the app is especially critical during emergency border circumstances because it allows DHS to maximize the use of its limited resources. 89 FR at 48737; *see also* 88 FR at 31317–18 (explaining that the CBP One app

"enables the POEs to manage the flows in a safe and efficient manner, consistent with [each POE's] footprint and operational capacity, which vary substantially across the SWB"). Thus, because the CBP One app allows each POE to manage the daily number of appointments that the POE has the capacity to handle, commenter concerns that the use of CBP One appointments will be vastly expanded beyond CBP's capacity to process them are unfounded, especially during the emergency border circumstances that the Proclamation and this rule are designed to address. In addition, with regard to concerns regarding the number of noncitizens released following the use of the CBP One app to schedule an appointment, use of the CBP One app does not guarantee a particular processing disposition, and all such determinations are made on a case-by-case basis.[228]

Regarding commenters' concerns that the IFR does not provide an exception for those who present at a POE but are unable to access or use the CBP One app, here, and as noted in the IFR, the Departments choose not to include an exception to the rule's limitation on asylum eligibility for those who present at a POE but have an inability to access the CBP One app due to significant technical failure or other ongoing and serious obstacle. 89 FR at 48732 n.171. The IFR explained that the Departments made this decision in part because of the different purposes of this rule and the Circumvention of Lawful Pathways rule. This rule, unlike the Circumvention of Lawful Pathways rule, applies only during emergency border circumstances as described in the Proclamation and the rule, when encounters strain the border security and immigration systems' capacity. In contrast, the primary aim of the Circumvention of Lawful Pathways rule was to encourage the use of lawful, safe, and orderly pathways. Therefore, the Departments determined that the heightened need to address these emergency border circumstances necessitated limiting the scheduling issues exception in this rule.

Moreover, experience applying the Circumvention of Lawful Pathways rule in credible fear screenings indicates that

---

[228] *See* Memorandum for Exec. Dirs., Headquarters & Dirs., Field Operations, OFO, from Ray Provencio, Acting Exec. Dir., Admissibility and Passenger Programs, OFO, *Re: Implementation of Presidential Proclamation and Interim Final Rule, Securing the Border* attach. 5–6 (June 4, 2024) (Muster); CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone* ("Upon arriving at a POE, CBP officers inspect and evaluate all individuals to determine the appropriate processing disposition.").

STB_AR1_000060

the exception for presenting at a POE and being unable to access or use the CBP One app rarely applied.[229] The Circumvention of Lawful Pathways rule excepted, in addition to UCs, three categories of noncitizens: (1) individuals provided authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process; (2) individuals who presented at a POE with a CBP One appointment or who presented at a POE and demonstrated ''it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle''; and (3) individuals who sought asylum or other protection in a country through which the alien traveled and received a final decision denying that application. 8 CFR 208.33(a)(2)(ii), 1208.33(a)(2)(ii). Leaving aside UCs, as UCs are not subject to expedited removal, 8 U.S.C. 1232(a)(5)(D), noncitizens could establish at least one of these exceptions in only approximately 4.7 percent of total credible fear screenings conducted by USCIS under the Circumvention of Lawful Pathways rule (*i.e.,* including referrals from USBP and OFO).[230] While DHS data do not differentiate among the types of exceptions, available data show that the exception for presenting at a POE and being unable to utilize the CBP One app applied in less than 5 percent of all credible fear determinations made by USCIS when considering whether the presumption of asylum ineligibility applied.[231]

The data showing the limited application of the exception for presenting at a POE and being unable to use CBP One reinforce the Departments' judgment not to adopt a similar exception in the emergency border circumstances in which this rule applies. Consistent with AOs' obligation under 8 CFR 208.30(d) to elicit testimony on all potentially relevant information, USCIS guidance instructs AOs to elicit testimony related to all exceptions to the presumption of asylum ineligibility where they may apply and evaluate their applicability, which for the exception under the Circumvention of Lawful Pathways rule (8 CFR 208.33(a)(2)(ii)(B)) would be any case where the presumption of asylum ineligibility applied and the noncitizen presented at a POE. At a time where emergency border circumstances are present that trigger a suspension and limitation on entry and necessitate the

limitation on asylum eligibility in the current rule, the Departments do not believe it would be appropriate to expend the resources it would take to elicit testimony about possible ways a noncitizen was unable to access the CBP One app and analyze that information in every credible fear interview where the noncitizen presented at a POE without an appointment in order to apply an exception to the limitation on asylum eligibility similar to the one present at 8 CFR 208.33(a)(2)(ii)(B), particularly where recent experience shows that such an exception is rarely applicable in credible fear determinations.

In addition to these exceptions, the Circumvention of Lawful Pathways Rule also contains a ''[r]ebuttal'' ground for ''exceptionally compelling circumstances.'' 8 CFR 208.33(a)(3), 1208.33(a)(3). The Departments determined that this rule should also contain an exception for exceptionally compelling circumstances to ensure that noncitizens with a time-sensitive imperative for entering the United States without authorization may avoid application of this rule's limitation on asylum eligibility. Notably, under the Circumvention of Lawful Pathways rule, across the set of all expedited removal cases that resulted in credible fear interviews (*i.e.,* from encounters at and between POEs), USCIS found that an ''exceptionally compelling circumstances'' rebuttal ground applied in over 10 percent of those cases where the rule's presumption of asylum ineligibility was analyzed as part of the credible fear determination.[232] Under the present rule, the ''exceptionally compelling circumstances'' exception to the rule's limitation on asylum eligibility was found to apply in approximately 11 percent of all encounters with credible fear determinations issued by USCIS where the limitation on asylum eligibility was considered.[233] Under this rule, noncitizens may also be permitted to enter under one of the exceptions in section 3(b) of the Proclamation. For those who are unable to meet such an exception, the Departments believe that, in the emergency border circumstances in which this rule applies, such noncitizens should wait for a CBP One appointment. *See* 89 FR at 48732 n.171.

For those individuals seeking a CBP One appointment, CBP continues to take steps to make the process of seeking appointments more equitable and accessible. For instance, individuals have the chance to request an

appointment within a 12-hour period each day, with appointments allocated to the requesting group the following day.[234] In addition, noncitizens are not required to use the same mobile phone or device to request an appointment each day, as appointment requests are allocated based on the requesting registration. In other words, if a noncitizen has a registration, they can request an appointment each day from any mobile device. Individuals are not required to utilize a single device for each step of the process, and they may use a shared or borrowed device to request and schedule an appointment.

If a noncitizen receives an appointment, they are notified by an email notification, a push notification to the device that made the appointment, an in-app message, and a change to their registration status in the app.[235] The push notification that is sent to the device provides a notification to check the app, alerting a user to log into the app to review and confirm their appointment. This ensures that the notification is provided in multiple ways, such that those without continuous access to the same mobile device can still learn of their appointment status by logging into the app. If selected for an appointment, the individual then has 23 hours to complete the geolocation and liveness check and schedule the appointment.[236] Individuals may also request an automatic 24-hour extension to complete the process, if needed. Again, this can be done via any mobile device.

Individuals who do not have a smartphone or have other phone-related problems can seek assistance from trusted partners, if needed. Individuals are also permitted to seek assistance from others to complete the registration, request, and appointment confirmation process.

ii. Wait Times for CBP One Appointments

*Comment:* Commenters expressed concerns with long wait times for those using the CBP One app to schedule an

---

[229] OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).

[230] *Id.*

[231] *Id.*

---

[232] *See id.*

[233] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—STB tab).

---

[234] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[235] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

[236] *See* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42,* at 4 (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

**STB_AR1_000061**

appointment, with one organizational commenter stating that waiting times routinely reach half a year due to the ''enforced scarcity of appointments.'' Several commenters expressed concern that capping CBP One appointments at 1,450 per day is insufficient to address the number of arrivals at the border. For example, a commenter stated that, while 1,450 CBP One appointments are assigned each day, the ''average number of appointment requests made per month between January 2023 and February 2024 was just under 5 million.'' A commenter stated that appointments are limited to less than 20 percent of the POEs at the SWB, while others noted that CBP One appointments are offered at only eight POEs along the almost 2,000 miles of the SWB.

Commenters further stated that the IFR would likely increase wait times by incentivizing more people to use the CBP One app—including Mexican nationals subject to the IFR—thereby exacerbating the significant backlog for securing an appointment.

Several commenters expressed additional concern that long wait times heighten the risk of danger for migrants in Mexico who intend to seek asylum in the United States. Specifically, multiple commenters warned that long wait times place migrants at severe risk of rape, assault, torture, kidnapping, and death, while leaving Mexican nationals to wait in the same country from which they are fleeing, and that those waiting for a CBP One appointment are vulnerable to being targeted by ''criminal actors and detained or mistreated by Mexican government officials.'' Other commenters expressed concern about the hot weather, insufficient housing, and lack of access to essential resources. Additionally, commenters remarked that violence, coercion, and apprehensions by Mexican authorities prevent migrants waiting in Mexico from attending their pre-scheduled appointments. Commenters further expressed that particularly vulnerable populations who are waiting in Mexico, including Black migrants and women, are particularly susceptible to discrimination, violence, and heightened barriers to report crimes and access support services.

A few commenters further addressed health concerns for noncitizens required to wait in Mexico for their CBP One appointment. A commenter observed that the wait times for an appointment are ''neither predictable nor reliable,'' which compounds stress and difficulties for noncitizens. The commenter further stated that health problems among certain noncitizens make it more

untenable for them to wait in Mexico. The commenter wrote that living conditions in Mexico exacerbate preexisting conditions such as asthma, cancer, and mental health concerns related to trauma, and that migrants have limited access to adequate medical care and life-saving medicine in Mexico. Likewise, another commenter observed that noncitizens living with HIV—both Mexican and non-Mexican—experience barriers to accessing treatment and medication while waiting in Mexico. Another commenter expressed concern over documented outbreaks of chicken pox in informal migrant encampments in Mexico City due to the high number of asylum seekers waiting for an appointment.

A commenter remarked that noncitizens may be granted appointments at a POE far from where they are physically located, despite the app's purported use of geolocational technology, forcing individuals to risk travel within Mexico. The commenter stated that Mexican authorities do not issue and renew temporary humanitarian visas to a majority of migrants, despite the fact that these visas are required to access bus and airline travel. The commenter additionally wrote that Mexican authorities have set up checkpoints targeted at preventing individuals from accessing public transportation required to make it to their scheduled CBP One appointments.

*Response:* Regarding concerns about long wait times to schedule a CBP One appointment, and the uncertainty this may cause, in large part due to high levels of migration in the region, the Departments note that CBP One is a tool that facilitates safe and orderly processing of noncitizens at POEs, and has aided CBP's efforts to increase processing at POEs.[237] CBP currently allocates a certain number of appointments per day to those registrations that have been pending for the longest period of time, based on the date on which a registration was created. CBP also regularly monitors wait times to be able to address any issues. While average wait times have generally increased since June 2023 due to demand for appointments, as of August 25, 2024, CBP has not seen evidence that average wait times have

increased at a greater rate following the implementation of the Proclamation and IFR. Indeed, CBP One represents a significant expansion of CBP's capacity to process noncitizens at SWB POEs: During the pre-pandemic period, CBP's OFO processed around 330 people per day.[238] From January 2023 (when CBP opened CBP One for direct scheduling) through August 31, 2024, OFO has processed four-and-a-half times that number daily.[239] Although demand for appointments currently outpaces supply, there are now more CBP One appointments available daily (1,450) than average daily encounters at and between POEs between FYs 2011 and 2018 (1,300).[240]

With regard to concerns about the number of available CBP One appointments, DHS acknowledges that there are more noncitizens seeking appointments than there are available appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. The total appointment requests over multiple day periods include a significant number of repeat requests because individuals are encouraged to submit an appointment request each day until gaining an appointment, and thus monthly totals do not reflect an accurate count of unique individuals seeking appointments. However, this high level of demand reflects the high levels of migration throughout the region, which CBP has responded to by increasing capacity to process noncitizens at POEs. CBP has increased the number of available appointments since January 2023 but notes that POEs can safely and securely process only a finite number of migrants,[241] and that the current number of appointments reflects that capacity. The Departments disagree that there is ''enforced scarcity'' of appointments or that the number of appointments is set in an arbitrary manner. The number of appointments is determined by a port's capability and capacity to process noncitizens. CBP's ability to process undocumented noncitizens in a timely manner at land border POEs is dependent on CBP

---

[237] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf;* 89 FR at 48737.

[238] *See* OHSS analysis of July 2024 Persist Dataset (OFO Encounters tab).

[239] *See id.*

[240] *See* OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[241] *See, e.g.,* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, OFO, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* 1–2 (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

STB_AR1_000062

**81218**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

resources, including infrastructure and personnel.[242]

With regard to the number of POEs at which appointments are available and the locations of such ports, OFO must evaluate each POE's unique capabilities, both with respect to processing and staffing. There are also important variances between POEs due to geography, infrastructure, and workload. These considerations are evaluated continuously as OFO determines the number of appointments to schedule and at which ports to schedule them. OFO has limited use of CBP One to certain POEs that have the space and infrastructure to process elevated numbers of inadmissible noncitizens and has assigned staff to those POEs to conduct this processing. Adding additional POEs would require reallocation of that staffing, exchanging capacity in one location for another. Additionally, OFO has sought to utilize POEs that are located in or near urban areas with sufficient resources for migrants who may be released from OFO custody.

The Departments acknowledge that there may be humanitarian and health concerns for noncitizens in Mexico, including but not limited to individuals seeking a CBP One appointment, particularly for those with preexisting or underlying health conditions. The Departments also acknowledge that the congregation of groups of individuals can lead to increased transmission of communicable diseases. Similarly, the Departments acknowledge that some noncitizens seeking an appointment— including Mexican nationals—may be required to travel through Mexico to reach their appointment, and to wait in Mexico for their appointment, which may present safety concerns. The Departments also recognize that such concerns may be exacerbated by uncertainty about how long a migrant may have to wait to be processed at a POE, which may make it harder to schedule medical care or travel within Mexico.

Such circumstances, however, have been a reality that existed for migrants seeking to present at POEs prior to the introduction of CBP One. Indeed, before CBP One's introduction, migrants faced greater unpredictability given the high levels of migration in the region, which predate the introduction of CBP One,[243]

and the fact that before CBP One's introduction, migrants did not have the ability to wait anywhere in the expanded geographic boundaries now available to migrants using CBP One. In another respect, too, migrants would face worse conditions without this rule: As explained elsewhere in this preamble, the Departments assess that, when levels of encounters by USBP are elevated, such that DHS does not have the capacity to process most noncitizens through expedited removal and therefore must release a significant number of noncitizens pending section 240 removal proceedings, this dynamic serves to incentivize more migrants to travel through Mexico. This dynamic both exacerbates dangerous conditions along that route and exposes more migrants to dangerous conditions along the way. While CBP has continued to take steps to increase processing at POEs in an effort to provide a safe and orderly mechanism to enter the United States, it continues to be operationally impossible for CBP to immediately process all noncitizens seeking to enter the United States.

With regard to the location of scheduled appointments, the CBP One app does not arbitrarily designate the location for appointments. The location is selected by the user, and the location can be changed by the user every time the user requests an appointment. The Departments continue to believe that the use of CBP One to schedule appointments facilitates the safe and orderly entry of noncitizens at POEs, including migrants who are already waiting in Mexico to enter the United States. In particular, the use of the app enables migrants to schedule their arrival at a pre-determined date and time, providing migrants with certainty about the date of their entry. Migrants may then wait in whatever location they deem best before approaching the border for their appointment. To this end, as of August 23, 2024, the CBP One app allows non-Mexican nationals to request and schedule an appointment from the southern Mexican states of Tabasco and Chiapas in addition to their existing ability to request and schedule appointments from Northern and Central Mexico.[244] Mexican nationals may request and schedule an appointment from anywhere in Mexico.[245] CBP continues to encourage

migrants to make appointments at POEs close to where they may be geographically located in Mexico or seek to enter the United States.

With regard to claims regarding the actions of government authorities in Mexico, the Departments note that they do not control the actions or decisions of the Mexican government or Mexico's implementation of its own laws.

iii. Availability of and Access to CBP One Appointments and Concerns About Discrimination

*Comment:* Several commenters raised concerns about unequal access to POEs and asylum resulting from barriers to using the CBP One app, such as language, disability, resource, and other access issues that disparately impact and discriminate against migrants. A commenter acknowledged that CBP One may allow for certain positive gains in receiving and processing migrants, and also expressed concern that the application is wielded to penalize those with possible protection needs who cannot access it or obtain an appointment. One commenter called the CBP One app ''inherently discriminatory,'' and another commenter articulated that the CBP One app has ''pervasive'' accessibility issues. A commenter cited a 2024 Amnesty International report,[246] where that organization called on the United States to ''stop the mandatory use of the CBP One application'' due to concerns over language access, technological barriers, and privacy and surveillance.

In the same vein, numerous commenters raised concerns related to the accessibility of the app for those lacking the required technology. Specifically, commenters expressed concern that scheduling an appointment via CBP One is not a viable option for those who lack access to reliable internet, electricity, or a smartphone. Some commenters provided examples that migrants have reported that their phones have been stolen by Mexican authorities or cartels, or lost or damaged during their travels. A commenter stated that in encampments with limited access to electricity, migrants are charged high prices for access to an outlet to charge their phones. Another commenter expressed that the IFR places people who do not have access to technology in the prejudicial position of having to meet a higher standard of proof to receive a positive credible fear

---

[242] *See, e.g., id.*

[243] *See, e.g.,* Perla Trevizo, *Dozens of Families, Many from Guatemala, Arrive in Nogales Seeking US Asylum,* Ariz. Daily Star (Aug. 2, 2018), *https://tucson.com/news/local/dozens-of-families-many-from-guatemala-arrive-in-nogales-seeking/article_4dd45e2f-0b19-5b7b-880e-74a82e3515ea.html;* Ariel G. Ruiz Soto, *Record-Breaking Migrant*

*Encounters at the U.S.-Mexico Border Overlook the Bigger Story,* Migration Pol'y Inst. (Oct. 2022), *https://www.migrationpolicy.org/news/2022-record-migrant-encounters-us-mexico-border.*

[244] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[245] *See id.*

[246] Amnesty Int'l, *CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States* (May 9, 2024), *https://www.amnesty.org/en/latest/news/2024/05/cbp-one-mobile-application-violates-the-rights-of-people-seeking-asylum-in-the-united-states/.*

STB_AR1_000063

determination, in violation of U.S. asylum law. A commenter remarked that in perpetuating the "division" between "classes of people seeking asylum"—"those who have a smartphone and access to the internet and are technologically literate" and "those who do not have these required items, skills or abilities"—the IFR fails to apply protections equally under U.S. and international law.

Many commenters also discussed limited language accessibility for the CBP One app, stating that the app is only available in Spanish, English, and Haitian Creole, and expressed that conditioning access to asylum on the use of a smartphone app that is only available in three languages denies equal access to asylum to those in need of protection who are unable to use the app. Commenters expressed concerns about the fact that different stages for securing a CBP One appointment are available in different sets of languages (*e.g., Login.gov*, the initial app registration page, and app form responses), as this results in noncitizens, even those who are literate in Spanish and Haitian Creole, requiring assistance with completing the CBP One app form. The commenter further remarked that the system is particularly difficult for vulnerable populations to navigate as a result of challenges with finding adequate translation services, reasoning, for example, that it can take up to a week to find interpretation for Indigenous languages.

Several commenters additionally raised concerns about access to the app among those who are illiterate, have disabilities, or have limited language and digital literacy. In particular, commenters expressed that the IFR assumes technological literacy in the use of smartphone apps, such as the ability to access an email account, check the account on an ongoing basis, upload a video, and enable Global Positioning System/geolocators with many people requiring assistance to undertake these steps. A commenter provided an account of their experiences with individuals in Ciudad Juarez who struggle to navigate the app despite knowing how to read in Spanish and Haitian Creole, and the inability of legal service providers to provide logistical support to all the individuals with potential asylum claims who lack the digital literacy to navigate the mobile app.

Commenters further remarked on technological issues surrounding the app. Commenters expressed concerns that CBP One remains inaccessible to many due to facial recognition technology errors, which commenters stated are frequent for migrants with darker skin tones. Commenters stated that the app cannot read the faces of Black, Brown, Asian, and Indigenous people seeking asylum, and Haitians and Africans are particularly likely to experience "algorithm bias" while using the CBP One app which would prevent large classes of individuals from using the app to secure an appointment, and, therefore, from seeking asylum, perpetuating racism in the U.S. immigration system.

Commenters also noted additional technology concerns, such as issues with error messages, account access, and deactivated accounts. One commenter listed various reported issues with the CBP One app, such as difficulty uploading files, error messages only provided in English, saturated bandwidth resulting in delays, appointments being rejected if GPS is not activated, and phones unable to take video or photos of sufficient quality to be recognized by the app. Another commenter provided various anecdotal examples of individuals who were unable to access the CBP One app under the Circumvention of Lawful Pathways rule, and who the commenter said would similarly be harmed under the IFR, while another commenter added that complications with the app forced nongovernmental organizations to spend resources helping people use the app rather than assisting noncitizens with credible fear interviews, reviews of negative determinations, and representation in immigration court. A commenter also stated that "[t]here is a thriving black market for appointments available only to the wealthiest refugees."

Separately, while some commenters expressed support for the "expansion of mechanisms for [CBP One] appointments," commenters also stated that these expansions are insufficient to counteract noncitizens' unawareness of the CBP One application and the inability to obtain appointments.

Lastly, a commenter asserted that the use of CBP One results in family separation due to different appointment dates. Furthermore, a commenter expressed additional concern that families with a CBP One appointment are not always guaranteed the ability to cross the border, citing examples of families who were turned away despite arriving on time for a valid appointment.

*Response:* The Departments disagree that the CBP One app is a barrier to asylum. Rather, it is a tool that DHS has established to process the flow of noncitizens seeking to enter the United States in a more orderly and efficient fashion. CBP One is also a free app, and noncitizens are not required to pay to register or schedule an appointment.

The Departments acknowledge that not all migrants may have access to a smartphone or be able to easily use the CBP One app, and that lack of or limited smartphone access or ability to use a smartphone (due to lack of digital literacy, disability, or other reasons) may limit a migrant's ability to use the CBP One app to schedule an appointment. However, individuals who do not have a smartphone or who have other phone-related issues can seek assistance, including sharing phones, or translation or technical assistance, from trusted partners, if needed. In addition, as noted above, individuals may utilize shared or borrowed devices to register for the CBP One app and to schedule an appointment. CBP conducts extensive engagement with non-governmental organizations ("NGOs") and stakeholders, and has received feedback and information about the challenges associated with the use of the CBP One app. Throughout these engagements, access to smartphones has been raised, although not as a significant concern for most individuals. CBP is aware that NGOs have discussed providing assistance with completing individuals' CBP One registrations and offering continued assistance with requesting appointments. CBP also notes that individuals seeking to create a CBP One registration can do so from anywhere. To create a registration, users are not required to enable location services, although they are required to enable location services in order to request and schedule an appointment.

STB_AR1_000064

**81220** **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

With regard to internet access, the Departments acknowledge there can be connectivity gaps, electrical outages, and unreliable wireless internet access in northern Mexico. However, CBP made significant updates to the appointment scheduling process in 2023, including transitioning CBP One scheduling to a daily appointment allocation process to allow noncitizens additional time to complete the process. Under this system, users must ''ask for an appointment'' each day, by selecting the relevant registration and submitting a request for that registration.[247] If a noncitizen receives an appointment that day, they are notified in multiple ways, and have up to 23 hours to confirm that appointment.[248] If a noncitizen does not receive an appointment, they must ''request an appointment'' the following day, again by selecting the relevant registration and requesting that registration. Individuals are not required to use the same mobile phone or device to request an appointment each day, and, as noted above, may use a shared or borrowed device to request and schedule the appointment. In addition, in July 2024, CBP updated the appointment allocator to increase the percentage of appointments allocated to users who had been waiting for longer periods of time, based on the date on which their registration was created.

CBP also continually takes steps to provide access to the app for individuals in different languages. The app was originally available in Spanish and English. Haitian Creole was added in February 2023 in response to feedback from external stakeholders. Additionally, after the user makes a language preference, error messages are available in the selected language (English, Spanish, or Haitian Creole). While the app remains available in Spanish, English, and Haitian Creole, quick reference guides are now available in many languages (including Russian, French, Portuguese, Arabic, Dari, Pashto, Punjabi, and Chinese). According to the UNHCR, of the top 5 nationalities of displaced individuals in Mexico, all are from Spanish-speaking countries and Haiti.[249] Between May 11,

2023 (when the Title 42 public health Order terminated) and September 11, 2024, USBP data show that over 88 percent of noncitizens apprehended between POEs on the SWB were recorded as speaking Spanish or English. The next most common languages were Mandarin, representing just over 2 percent of apprehensions, followed by Portuguese and French, which each represent less than 2 percent of noncitizens apprehended.[250] Finally, a CBP analysis conducted in September 2024 showed that, of all of the CBP One appointment requests during the first week of September 2024, approximately 90 percent were made by individuals from Spanish-speaking countries, with the next highest percentage, 5 percent, made by Haitians, and the remainder by other nationalities. The fact that Haitian nationals represent a relatively large proportion of the displaced persons in Mexico generally, are more likely to be encountered at POEs, and use the CBP One app further supports the prioritization of Haitian Creole and Spanish translations in the app. In addition, based on NGO feedback, CBP will be adding a French translation to the app. CBP has also been made aware of concerns with regard to the accuracy of the app's Haitian Creole translation and is currently taking steps to improve its accuracy.

CBP acknowledges that individuals who do not speak Spanish, English, or Haitian Creole, including those who speak Portuguese or Mandarin, may have more difficulty accessing the app, but has determined that it is appropriate to prioritize translation services in the app to those languages spoken by the vast majority of users of the app and noncitizens in the region. And CBP believes that its efforts to make the app accessible in other ways, such as through the quick reference guides, are working. CBP has seen a significant number of individuals who do not speak Spanish, English, or Haitian Creole requesting appointments, suggesting that the quick reference guides, as well as other information about CBP One

available on CBP's website,[251] are working to provide accessibility to the app even for those who do not speak one of those languages. With regard to concerns about different stages of the CBP One appointment process being in different languages, CBP does not exercise control over Login.gov, which is used to register for an appointment, as it is operated by the General Services Administration.[252] Login.gov is available in several languages, including English, Spanish, and French. And while Login.gov is not available in Haitian Creole, CBP analysis showed that, as noted above, Haitian nationals continue to be the second-highest population of noncitizens requesting CBP One appointments, indicating that Login.gov's languages are not posing a substantial limitation for those users. Moreover, the CBP One quick reference guides include a description of the Login.gov steps in the process. The Departments also appreciate the concerns related to the information required to access or use the CBP One app. The Departments note that users of the app are not required to upload any documents in order to use the app. Users are required to submit a photograph, and may, although are not required to, upload document information, such as scanning their passport information. With regard to concerns raised by commenters relating to facial recognition and access to the app by individuals with darker skin tones, CBP and the third party responsible for liveness detection took steps in 2023 to improve the liveness capability of the application and increase bandwidth. Since that time, CBP has data showing that the app successfully matches liveness in 80–90 percent of attempts, with the difference in performance across ethnicities on the order of tenths of a percent. If an individual initially is not able to successfully match to their live photo, they are not prohibited from trying again, and they may seek an extension to continue to try to complete liveness. Individuals who continue to fail liveness are able to reach out to CBP either directly or, if appropriate, through an NGO or other external entity. CBP notes that it does not collect data on race or skin complexion.

CBP engages frequently with stakeholders to determine further updates and changes in the app that improve the users' experience and

---

[247] See CBP, CBP One™ Mobile Application, Frequently Asked Questions—English (last modified Sept. 19, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[248] See CBP, CBP One™ Application Update Announcement—English (Mar. 1, 2024), *https://www.cbp.gov/document/guidance/cbp-one-application-update-announcement-english.*

[249] See United Nations High Commissioner for Refugees (''UNHCR''), *Country Operations: Mexico, Population by Origin, https://reporting.unhcr.org/operational/operations/mexico#* (last visited Sept. 19, 2024). For purposes of this analysis, the Departments are excluding the nationalities

grouped as ''various,'' given a lack of information on what such category includes.

[250] Due to the way that CBP's OFO records and documents language services, data for languages used by those encountered at POEs are not readily available. Although there is a high volume of displaced Haitian nationals in Mexico, CBP's experience is that, particularly in recent years, Haitian nationals have been much more likely to be encountered at POEs than between POEs. For instance, in FY 2023, more than 75,000 Haitian nationals were encountered at SWB POEs, compared with just over 1,000 between POEs. *See* OHSS analysis of July 2024 Persist Dataset (Haitian Encounters tab).

[251] See CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[252] See U.S. General Servs. Admin., *Login.gov, https://login.gov/* (last visited Aug. 10, 2024).

STB_AR1_000065

enhance access to its features. For example, because of NGO feedback, height and weight were made optional fields and additional response options were added such as "I don't have one" for a foreign address and "Unknown" for parental information. CBP also acknowledges that reading comprehension and disability may present challenges for some users among this user population. CBP has improved the app's text for users with low literacy and will continue to make improvements to the app for this population. The app has also undergone a compliance review pursuant to section 508 of the Rehabilitation Act regarding its accessibility to people with disabilities, with a final certification expected by the end of November 2024.

Regarding concerns raised by NGOs regarding the resources expended to address questions from migrants about the app and its impacts, the Departments are not able to comment on how such entities determine the use of their own resources. With regard to concerns regarding a "black market" for appointments, CBP has advised noncitizens and the general public that appointments that purport to be "for sale" are fraudulent, and migrants should not pay for such appointments.[253]

With regard to the commenters' concerns related to whether noncitizens have sufficient awareness of the availability of the CBP One app and this rule, the Departments believe that they have provided sufficient notice to the public. The Departments note the use of, and benefits of, the CBP One app have been broadly publicized. Indeed, the CBP One app is widely used, as evidenced by the number of requests CBP receives each day for appointments. For example, in July 2024, CBP received an average of 282,824 CBP One appointment requests per day. Demand for CBP One appointments has outpaced supply, which has resulted in average wait times increasing since June 2023. CBP continues to regularly announce updates and improvements made to the app to the public. In particular, CBP regularly announces changes and updates to the app on its public website at *https://www.cbp.gov/about/mobile-apps-directory/cbpone.* This website also contains a number of detailed questions and answers regarding the use of the app. Additionally, DHS has

published a Privacy Impact Analysis (PIA) for CBP One, and subsequent updates to the original CBP One PIA to address privacy risks in the deployment and use of the CBP One app.[254] Moreover, the Departments' publication of the Circumvention of Lawful Pathways rule, the IFR, and this rule have provided (and in the case of this rule, will provide) further notice to the public and to noncitizens of the pathways available to them and the potential consequences of not availing themselves of such pathways. The Departments believe that such efforts provide sufficient information for noncitizens seeking to travel to the United States.

With respect to comments suggesting that families are processed separately or have been turned away, the Departments note that all individuals—including members of families—are processed pursuant to existing CBP policies and practices. Family members who register together on CBP One using a single registration number to schedule an appointment for their whole family are given the same appointment date and time. So long as they arrive as a family for their appointment at that date and time, they will be processed at that appointment time.

b. Regulatory Exception—Exceptionally Compelling Circumstances

*Comment:* Commenters raised concerns regarding the preponderance of the evidence standard for establishing exceptionally compelling circumstances under the IFR. Commenters argued that applying a limitation on asylum eligibility during credible fear interviews, and then requiring noncitizens to demonstrate exceptionally compelling circumstances by a preponderance of the evidence in order to overcome the limitation on asylum eligibility, is inconsistent with

the INA and congressional intent. Rather, commenters stated that Congress enacted a "significant possibility" standard for the credible fear interview in order to safeguard a noncitizen's opportunity to present potentially viable asylum claims in full proceedings and to prevent noncitizens from being returned to persecution or torture.

Relatedly, commenters stated that noncitizens should not have to demonstrate exceptionally compelling circumstances unrelated to their asylum claim by a preponderance of the evidence in order to have their asylum claims adjudicated. Some commenters believed that the preponderance of the evidence standard was too onerous for noncitizens to meet during the credible fear interview, even if the noncitizen had experienced a situation or event prior to entry that should otherwise qualify as an exceptionally compelling circumstance.

Lastly, at least one commenter implied that AOs conducting credible fear interviews did not have adequate training and were not equipped to conduct the analyses required by the IFR, including applying the preponderance of the evidence standard to determine whether a noncitizen is subject to the limitation on asylum eligibility.

*Response:* Many of commenters' concerns are based on an incorrect premise. The Departments recognize that the "significant possibility" standard is established by statute, *see* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and the Departments lack the authority to—and have not sought to—alter this statutory standard through rulemaking. By statute, to determine whether a noncitizen has a "credible fear," an AO must assess whether there is a "significant possibility . . . that the alien could establish eligibility for asylum." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Thus, during credible fear proceedings, the overall standard of proof for establishing exceptionally compelling circumstances to overcome the limitation on asylum eligibility remains the "significant possibility" standard, which must be applied in conjunction with the standard of proof required for the ultimate determination (*i.e.,* preponderance of the evidence that the exception applies). *See* 89 FR at 48739. Accordingly, at the credible fear interview, the AOs assess whether there is a "significant possibility" that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen satisfies the rule's exception.

---

[253] *See* CBP, *CBP One™ Mobile Application, Frequently Asked Questions—English, CBP One™ Mobile Application, "*What if someone asks me to pay for an appointment?*"* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

[254] *See* DHS, DHS/CBP/PIA–068, *Privacy Impact Assessment for CBP One™ Mobile Application* (2021 and subsequent updates), *https://www.dhs.gov/sites/default/files/2023-05/privacy-pia-cbp068-cbpmobileapplication-may2023.pdf;* DHS, DHS/CBP/PIA–068(a), *Privacy Impact Assessment [Update] for CBP One™ Mobile Application* (2024), *https://www.dhs.gov/sites/default/files/2024-07/24_0725_priv_pia-cbp-068%29a%29-cbpone-update.pdf; see also* DHS, DHS/CBP/PIA–076, *Privacy Impact Assessment for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border* (2023), *https://www.dhs.gov/sites/default/files/2023-01/privacy-pia-cbp076-advance-collection-for-undocumented-individuals-jan2023_0.pdf;* DHS, DHS/CBP/PIA–076(a), *Privacy Impact Assessment Update for the Collection of Advance Information from Certain Undocumented Individuals on the Land Border: Post Title 42* (2023), *https://www.dhs.gov/sites/default/files/2023-12/23_1019_priv_pia-cbp-076%28a%29-advance-collection-appendix-update.pdf.*

STB_AR1_000066

Likewise, during credible fear reviews, IJs will apply the ''significant possibility'' standard to determine whether a noncitizen would ultimately be able to demonstrate by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that the noncitizen satisfies the rule's exception.

To the extent commenters voiced general opposition to requiring a noncitizen to demonstrate exceptionally compelling circumstances by a preponderance of the evidence so as not to be subject to the rule's limitation on asylum eligibility, the Departments note that this standard is the general standard noncitizens must meet to determine that a ground of ineligibility does not apply in a merits adjudication. *See* 8 CFR 1240.8(d) (''If the evidence indicates that one or more of the grounds for mandatory denial of the application for relief may apply, the alien shall have the burden of proving by a preponderance of the evidence that such grounds do not apply.''). Additionally, this burden for establishing exceptionally compelling circumstances was codified by the Circumvention of Lawful Pathways rule, which has been in effect since May 11, 2023. 88 FR at 31450–51 (codified at 8 CFR 208.33(a)(3), 1208.33(a)(3)). The Departments believe that maintaining consistency in the preponderance of the evidence standard between these two related rules promotes consistent adjudications when adjudicators must determine whether a noncitizen has demonstrated exceptionally compelling circumstances. In fact, to promote such consistency, the rule provides that if a noncitizen demonstrates an exceptionally compelling circumstance for purposes of this rule, then the noncitizen has necessarily demonstrated an exceptionally compelling circumstance for purposes of the Circumvention of Lawful Pathways rule, and vice versa, further underscoring the importance of maintaining a consistent analytical framework between the two rules. *See* 89 FR at 48754–55 (explaining that the IFR's exception to the limitation on asylum eligibility mirrors the Circumvention of Lawful Pathways rule's rebuttal grounds to simplify administration of each while both rules are in effect).

Further, contrary to commenter concerns, the preponderance of the evidence standard is not onerous or unduly burdensome such that a noncitizen would be unable to demonstrate exceptionally compelling circumstances. To the extent that commenters expressed concern with the preponderance of the evidence standard

during credible fear proceedings, the Departments again clarify that the applicable standard during credible fear proceedings is the ''significant possibility'' standard, INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v), and AOs will assess whether there is a significant possibility that the noncitizen would be able to show at a future merits adjudication by a preponderance of the evidence that the limitation does not apply or that the noncitizen meets the ''exceptionally compelling circumstances'' exception. Similar to the Circumvention of Lawful Pathways rule's rebuttal grounds, *see* 88 FR at 31380, the Departments believe that there should generally be sufficient evidence available at the time of the credible fear interview for an AO to evaluate whether there is a significant possibility that the noncitizen would be able to establish exceptionally compelling circumstances by a preponderance of the evidence. Notably, the credible fear screening process involves eliciting testimony from noncitizens seeking protection, and the rule does not require noncitizens to provide any specific form of evidence, such as written statements or other documentation. *See* 89 FR at 48746 & n.239.

Indeed, DHS data show that the standard is not unduly challenging to meet at the credible fear stage. Since the IFR went into effect through August 31, 2024, USCIS determined that the limitation on asylum eligibility did not apply in over 2,200 cases (approximately 11 percent of credible fear interviews completed under the IFR during that period) because the noncitizen was able to demonstrate exceptionally compelling circumstances under the credible fear screening standard.[255] The Departments believe that these data show that the exception is both meaningful and appropriately tailored to ensure that, during emergency border circumstances, only those with a time-sensitive imperative are able to avoid the rule's limitation on asylum eligibility.

Regarding the preponderance of the evidence standard during a full merits adjudication, the Departments similarly do not believe that it imposes an onerous or unduly burdensome evidentiary standard. The INA explicitly provides that during full merits adjudication of an asylum claim ''testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration'' in

certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Thus, as the Departments have explained, the preponderance of the evidence standard may be met through credible testimony alone. *See* 88 FR at 31395. For example, if a noncitizen or a member of the noncitizen's family as described in 8 CFR 208.30(c) with whom they were traveling faced an acute medical emergency, an imminent and extreme threat to life or safety, or satisfied the definition of a victim of a severe form of trafficking in persons, or faced other exceptionally compelling circumstances, then the noncitizen could present testimony of those facts and circumstances.

Lastly, to the extent commenters expressed skepticism about an AO or IJ's ability to properly apply the screening standard during a credible fear interview, the Departments note that both AOs and IJs receive extensive training in substantive law and procedure, *see* 88 FR at 31395 & nn.211–213, and the Departments are confident that AOs and IJs have the requisite knowledge, skills, and experience to properly apply the framework of this rule, as they have been doing for months.

*Comment:* Some commenters recommended that the Departments rescind the ''exceptionally compelling circumstances'' exception to the limitation on asylum eligibility, stating that the exception codifies ''loopholes'' that are easy for noncitizens to exploit and undermines the Departments' goal of discouraging irregular migration across the SWB.

*Response:* The Departments decline to rescind the ''exceptionally compelling circumstances'' exceptions at 8 CFR 208.35(a)(2)(i) and 1208.35(a)(2)(i). As the Departments explained in the IFR, maintaining an exception to the limitation on asylum eligibility for exceptionally compelling circumstances is intended to mitigate potential adverse impacts of the rule on certain particularly vulnerable individuals and family members as described in 8 CFR 208.30(c) with whom they are traveling, without undermining the Departments' stated policy objectives of disincentivizing irregular migration during emergency border circumstances. 89 FR at 48754. The Departments believe the nature of the exceptionally compelling circumstances—such as facing an acute medical emergency, facing an imminent and extreme threat to life or safety, or meeting the definition of a victim of a severe form of trafficking in persons—appropriately balances the Departments' stated policy

---

[255] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

**STB_AR1_000067**

objectives and does not create a "loophole" as commenters suggest.

The Departments are also confident that AOs and IJs will appropriately assess a noncitizen's testimony and any evidence presented to determine whether a noncitizen has established that the rule's exception to the limitation on asylum eligibility applies. Indeed, DHS and EOIR personnel have the training and experience necessary to determine whether the exception applies, including several months of experience from implementing the IFR and other rules. For example, AOs were provided specific training for the implementation of the Circumvention of Lawful Pathways rule to elicit and analyze testimony related to whether a noncitizen can establish an exception or rebut the presumption of asylum ineligibility. *See* 88 FR at 31330. Additionally, before any AO can interview a noncitizen where the IFR's limitation on asylum eligibility applies, or any supervisory AO can review such a case, they must receive specific training on the IFR, including on applying the IFR's limitation on asylum eligibility and the "exceptionally compelling circumstances" exception.

*Comment:* Commenters stated that the enumerated per se exceptionally compelling circumstances in 8 CFR 208.35(a)(2) and 1208.35(a)(2) are, on the whole, too limited in number and narrow in scope, and are framed in a restrictive manner with a high burden of proof that commenters asserted many noncitizens will be unable to meet. According to commenters, because the exception is so difficult to establish, the vast majority of noncitizens who enter between POEs will be ineligible for asylum. Commenters also alleged that noncitizens may not have access to or be aware of what information or evidence is necessary to sufficiently demonstrate exceptionally compelling circumstances, particularly as they may not be aware of the rule and its evidentiary requirements until they are placed in proceedings. Similarly, commenters expressed concern about the evidentiary burden noncitizens would face in trying to establish that exceptionally compelling circumstances existed at the time of entry when their case may not be adjudicated until years after the date of entry due to existing backlogs, and when evidence and witnesses may be lost over time. Commenters offered, as an example, the difficulty that noncitizens would face in demonstrating that they or a family member with whom they traveled experienced an acute medical emergency, in the absence of concurrently issued medical documents.

Commenters stated that it will be difficult for AOs to evaluate whether a noncitizen satisfies an exception at the credible fear stage because it is a fact-intensive inquiry and will require significant development of the record. Commenters also stated that there is insufficient guidance about how, in practice, AOs are supposed to make a finding regarding exceptionally compelling circumstances. Further, commenters expressed concern that AOs are not required to elicit potentially relevant facts about the rule's exceptions to ensure that noncitizens are not improperly subject to the IFR's limitation on asylum eligibility and recommended that the Departments adopt a screening framework in which AOs have a shared burden to elicit all information relevant to asylum eligibility, preferably in a non-adversarial manner.

*Response:* The Departments believe that the rule's exception to the limitation on asylum eligibility for exceptionally compelling circumstances, including the enumerated per se circumstances, are appropriate in scope and detail, and as such, the Departments decline to modify those provisions. Indeed, during emergency border circumstances, limiting the "exceptionally compelling circumstances" exception to those who are unable to wait for an appointment due to an acute medical emergency or an imminent and extreme threat to life or safety is important to deter irregular migration and provide for efficient border processing during a period of high encounters.[256] *See* 89 FR at 48732 n.171. As discussed above in this section of the preamble, the data reflect that the "exceptionally compelling circumstances" exception is achieving this balance; USCIS determined that the exception had been met in approximately 11 percent of credible fear interviews completed between the IFR's effective date and August 31, 2024.[257]

The Departments stress, however, that exceptionally compelling circumstances are not limited to the enumerated examples. Rather, similar to the rebuttal grounds adopted in the Circumvention

---

[256] Separately, noncitizens facing an urgent humanitarian situation may not be subject to the limitation at all if, under the Proclamation, a noncitizen is permitted to enter by the Secretary of Homeland Security, acting through a CBP immigration officer, based on the totality of the circumstances, including consideration of urgent humanitarian interests at the time of the entry or encounter. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1); Section 3(b) of the Proclamation.

[257] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

---

of Lawful Pathways rule, the examples are a non-exhaustive list intended to preserve AO and IJ flexibility and permit consideration of all facts giving rise to potential exceptionally compelling circumstances. 89 FR at 48733; 88 FR at 31394. Additionally, the Departments continue to prioritize family unity by extending these exceptions to qualifying family members with whom the noncitizen is traveling. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Regarding concerns that establishing exceptionally compelling circumstances is a fact-intensive inquiry that will require significant development of the record, and that noncitizens will not have access to information and evidence of exceptionally compelling circumstances at the time of screening, the Departments note that relevant evidence of such circumstances generally relates to the situation immediately prior to the noncitizen's entry into the United States, and focuses on relevant personal facts and circumstances within the noncitizen's knowledge. Accordingly, the Departments expect that any evidence necessary for a noncitizen to demonstrate that they have a significant possibility of ultimately showing exceptionally compelling circumstances should generally be readily available—whether from the noncitizen in the form of credible testimony or other evidence or from government records relating to the noncitizen's circumstances at the time of entry—at the time of the credible fear screening. With respect to cases where the existence of exceptionally compelling circumstances at the time of entry may be evaluated later in time, the Departments similarly note that the rule does not impose any requirement for the type of evidence necessary to establish exceptionally compelling circumstances, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in a full merits hearing in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). Regarding commenter concerns that noncitizens would have difficulty demonstrating that they faced an acute medical emergency at the time of entry without medical documents, the Departments expect that credible testimony about the medical emergency would generally be sufficient at the credible fear stage, and the rule does not require any specific type of evidence related to the acute medical emergency. *See* 89 FR at 48746 & n.239 (explaining that credible testimony is sufficient in a credible fear screening and that

**STB_AR1_000068**

corroborating evidence is not required); *see also* 88 FR at 31392 (discussing the analogous acute medical emergency rebuttal ground under the Circumvention of Lawful Pathways rule).

Additionally, when conducting credible fear interviews, AOs have an obligation to elicit testimony relevant to a noncitizen's claim, which will necessarily include any information related to exceptionally compelling circumstances.[258] Moreover, during credible fear reviews before IJs, noncitizens have an opportunity to be heard and to be questioned by the IJ. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). During section 240 removal proceedings, IJs also must develop the record, which will, as relevant, necessarily include facts and testimony pertaining to exceptionally compelling circumstances. *See* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("[IJs] shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the [noncitizen] and any witnesses."); 8 CFR 1003.10(b) (same); *see also Quintero* v. *Garland,* 998 F.3d 612, 626 (4th Cir. 2021).

Finally, the Departments disagree with the assertion that there is insufficient guidance regarding making a finding related to exceptionally compelling circumstances. The rule clearly sets forth both the standard for the "exceptionally compelling circumstances" exception and the process for evaluating the limitation on asylum eligibility during credible fear determinations. *See* 8 CFR 208.35(a), (b), 1208.35(a), (b). Additionally, AOs must receive training on application of the limitation on asylum eligibility and the "exceptionally compelling circumstances" exception before any AO can interview a noncitizen where the limitation on asylum eligibility applies, or any supervisory AO can review such a case. Further, the Departments have experience in applying the "exceptionally compelling circumstances" standard in the context of the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733 (explaining that the exception mirrors the rebuttal circumstances adopted in the Circumvention of Lawful Pathways rule and is intended to apply to the same circumstances); *see also* 88 FR at 31380, 31390–93 (explaining the standard for establishing and procedure for evaluating analogous rebuttal

grounds under the Circumvention of Lawful Pathways rule). The Departments also now have several months of experience implementing the IFR, and implementation itself yields valuable information on continued operation of its provisions. *See supra* Section II.A.2.

*Comment:* Commenters raised concerns that the "exceptionally compelling circumstances" exception does not provide adequate protection for vulnerable groups. Specifically, commenters alleged that the exceptions are insufficient to protect vulnerable groups who face a disproportionate risk of harm in Mexico, including LGBTQI+ noncitizens, Black and Indigenous noncitizens, women, and children, among others. Commenters observed that some such noncitizens, and particularly those without access to legal representation, may not understand the intricacies of the IFR or the requirements to establish an exception. Further, commenters stated that the complicated exceptions will contribute to confusion among and disparate treatment of such noncitizens, making them vulnerable to smugglers and undermining the Departments' goal of orderly processing at the SWB.

*Response:* For general discussion regarding concerns related to specific vulnerable populations, please see Section III.B.2.a.iii of this preamble.

With regard to the "exceptionally compelling circumstances" exception and vulnerable populations specifically, the Departments believe that the exception provides sufficient protection for such populations. The exception focuses on relevant personal facts and circumstances within the noncitizen's knowledge relating to potential harm they faced immediately preceding their entry into the United States. *See* 89 FR at 48747–48. To determine whether the exception applies, the AO questions the noncitizen regarding the circumstances of their entry into the United States, which does not require any particular legal knowledge by the noncitizen.

Further, the Departments disagree that the "exceptionally compelling circumstances" provision will make noncitizens more vulnerable to smugglers due to confusion about the rule. As the Departments explained in the IFR, 89 FR at 48733, the exception for exceptionally compelling circumstances was drafted to mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule, which the Departments believe will help reduce any confusion among noncitizens or adjudicators. Moreover, the Departments believe that, overall, this rule is a key measure to combat illegal

smuggling activity by drastically reducing incentives for noncitizens without a lawful basis to remain in the United States to rely on smugglers for entry into the United States. *See* 89 FR at 48714–15 (explaining how the rule is necessary to combat illegal smuggling activity), *id.* at 48766. The "exceptionally compelling circumstances" exception is an important provision of this rule because it appropriately balances the essential need to use resources effectively during emergency border circumstances with consideration of whether a noncitizen or family member with whom they are traveling is specifically vulnerable to immediate harm and has entered the United States during emergency border circumstances due to serious and urgent needs to do so. *See* 89 FR at 48754.

*Comment:* Commenters stated that the exception to the IFR was subjective, highly discretionary, and insufficient to ensure individuals were not refouled. Commenters also expressed concern that the enumerated per se exceptionally compelling circumstances require a subjective assessment of the degree and temporal nature of the needs and threats faced by noncitizens at the time of entry, which commenters allege is inconsistent with the right to seek asylum and the principle of non-refoulement.

*Response:* The Departments disagree that the "exceptionally compelling circumstances" exception is overly subjective or affords too much discretion to AOs and IJs, as the Departments are confident in AOs' and IJs' ability to fairly and accurately apply the exception. AOs and IJs have significant training and experience in eliciting testimony and applying legal standards in immigration proceedings. *See, e.g.,* 89 FR at 48747 (noting that AOs and IJs have the training and experience necessary to elicit information required to determine whether a case meets the necessary requirements); 8 CFR 1003.10(b) (requiring IJs to "seek to resolve the questions before them in a timely and impartial manner consistent with the [INA] and regulations").

Further, to the extent a noncitizen has concerns with an AO's determination, all credible fear determinations undergo supervisory review to ensure consistency. 8 CFR 208.30(e)(8). Noncitizens may also request IJ review of negative credible fear determinations. 8 CFR 208.35(b)(2)(v). Moreover, if the limitation on asylum eligibility is applied to a noncitizen in section 240 removal proceedings, IJ determinations are subject to review by the BIA. 8 CFR 1003.1(b)(3).

---

[258] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* 11 (Apr. 24, 2024) ("In cases requiring an interview, although the burden is on the applicant to establish eligibility, equally important is your obligation to elicit all pertinent information.").

**STB_AR1_000069**

With regard to concerns about potential refoulement, the Departments note that, even in those cases where a noncitizen is unable to establish exceptionally compelling circumstances and is subject to the limitation on asylum eligibility, the noncitizen remains eligible to pursue statutory withholding of removal and CAT protection, which implement the United States' non-refoulement obligations. *See* 8 CFR 208.35(b)(2); 8 CFR 1208.35(b)(2)(iii). For additional discussion regarding the United States' non-refoulement obligations, please see Sections III.A.1.a and III.A.1.d of this preamble.

*Comment:* Commenters noted that the per se exceptionally compelling circumstances mirror the rebuttal grounds established in the Circumvention of Lawful Pathways rule; some commenters incorporated their previous objections to that rule, concerning the per se exceptionally compelling circumstances, into comments submitted in response to this IFR.

*Response:* Commenters correctly assert that the per se exceptionally compelling circumstances mirror the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48733. To the extent that commenters stated that they were incorporating their previous comments submitted in response to the Circumvention of Lawful Pathways NPRM, the Departments responded to those comments as part of the Circumvention of Lawful Pathways rulemaking, and commenters are encouraged to refer to that rule for the Departments' responses. *See, e.g.,* 88 FR at 31390–95 (responding to commenter concerns related to the grounds for rebutting the presumption of asylum ineligibility under the Circumvention of Lawful Pathways rule).

*Comment:* Commenters alleged that the ''imminent and extreme threat to life and safety'' exception is inadequate and illusory, claiming that CBP officers would, in practice, turn away noncitizens who could otherwise establish such threats. For example, commenters provided anecdotal reports of women being turned away from POEs after CBP officers determined that their accounts of being sexually assaulted and raped in Mexico did not fall within an exception.

Commenters also stated that the exception incentivizes noncitizens to wait in Mexico until they are subject to harm or violence before seeking protection. Further, commenters were concerned that the IFR included a per se exception for forward-looking threats,

but not for being a survivor of ''recent and severe forms of violence.'' Commenters stated that such survivors have a significant need for protection to mitigate past harm and to prevent further harm.

Commenters also noted that, in responding to comments about the analogous rebuttal ground in the Circumvention of Lawful Pathways rule, the Departments explicitly stated that generalized threats of violence, membership in a particularly vulnerable group, and dangerous country conditions will not rise to the level of an ''imminent and extreme threat to life and safety,'' which commenters believed was overly limiting.

Commenters further recommended broadening the per se exceptionally compelling circumstances, so that ''acute medical emergencies'' includes non-medical and non-life-threatening medical needs; and ''imminent and extreme threats to life or safety'' includes threats to life or safety that may not necessarily be ''imminent'' or ''extreme.'' Commenters further stated that the grounds for rebutting the presumption of asylum ineligibility contained within the Circumvention of Lawful Pathways rule have been interpreted narrowly, resulting in noncitizens wrongfully being unable to rebut the presumption, not receiving a full adjudication of their claims, and ultimately being ordered removed. Commenters also urged the Departments to ensure that these per se exceptionally compelling circumstances encompass the medical risks and harms reported by asylum seekers while waiting in Mexico.

*Response:* The Departments decline to amend the list of per se exceptionally compelling circumstances established in the rule. The per se circumstances contained in the rule—acute medical emergencies, imminent and extreme threats to life or safety, or being a victim of severe trafficking in persons—are intended to capture noncitizens with a time-sensitive imperative for entering the United States to avoid immediate, serious harm. *See* 89 FR at 48732 n.171. Broadening these per se circumstances further would undermine the goal of this rule: to address the significant strain on the United States' immigration system during emergency border circumstances. *See* 89 FR at 48726–31 (''Need for These Measures'').

Likewise, requiring a situation-specific analysis of potential harm to the noncitizen is necessary to limit the ''exceptionally compelling circumstances'' exception to only those noncitizens who truly require entry to the United States to avoid putting their

life or well-being at extreme risk. Allowing, for example, concern about generalized violence to establish an imminent and extreme threat to life or safety would be purely speculative as to an individual noncitizen, and further undermine the objectives of the rule. However, in requiring specific evidence of potential harm, the Departments note that more generalized evidence, such as membership in a particularly vulnerable group, ''may be a relevant factor in assessing the extremity and immediacy of the threats faced at the time of entry.'' 88 FR at 31393.

Additionally, the Departments disagree that the parallel rebuttal grounds in the Circumvention of Lawful Pathways rule have been interpreted too narrowly, and therefore, that the per se exceptions should be expanded in this rule. Departmental data show that, during the immediate post-pandemic period, over 10 percent of noncitizens subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility were able to rebut the presumption during USCIS credible fear interviews.[259] This indicates that those rebuttal grounds were meaningfully available to noncitizens, and the Departments note that Departmental data show that the parallel exceptions in this rule are being similarly applied. Since the IFR went into effect through August 31, 2024, USCIS determined that there was a significant possibility the noncitizen could demonstrate an ''exceptionally compelling circumstances'' exception to the limitation on asylum eligibility in over 2,200 cases—approximately 11 percent of credible fear interviews completed by USCIS that were subject to the IFR during that period.[260]

With regard to consideration of past harm, the Departments note that, to the extent a noncitizen suffered harm immediately preceding their entry into the United States, such harm can be relevant to whether the noncitizen faces further imminent and extreme harm or threats to their life or safety, and adjudicators could consider such immediate, past harm as relevant to making an ''exceptionally compelling circumstances'' determination.

The Departments also disagree with commenters' assertions that the imminent and extreme threat to life or safety exception incentivizes noncitizens to wait in another country until they are harmed to then seek an

---

[259] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab).

[260] *See* OHHS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab).

STB_AR1_000070

exception under the rule. To the extent that waiting in another country could increase the risk of potential harm, the Departments note that noncitizens need not have actually been harmed or show that the feared harm was certain to occur to demonstrate exceptionally compelling circumstances. Rather, the rule states that those who demonstrate that they or a member of their family as defined in 8 CFR 208.30(c) with whom they are traveling "[f]aced an imminent and extreme threat to life and safety, such as an imminent threat of rape, kidnapping, torture, or murder" shall have demonstrated exceptionally compelling circumstances. 8 CFR 208.35(a)(2)(i)(B), (ii), 1208.35(a)(2)(i)(B), (ii). Therefore, this exception is intended to balance the emergency border circumstances necessitating implementation of the rule's limitation on asylum eligibility with recognition that there may be noncitizens with a specific, time-sensitive safety imperative for entering the United States during times where DHS's resource capacity to process noncitizens at the border is overwhelmed.

Finally, more generally, the Departments also clarify that CBP officers do not apply this rule's "exceptionally compelling circumstances" exception during initial border encounters, although they do implement the Proclamation's suspension and limitation on entry. Rather, the exception—and this rule's limitation on asylum eligibility more broadly—is applied during credible fear screenings before USCIS, once a noncitizen has manifested a fear of return or expressed an intention to apply for asylum or other protection and is placed in the expedited removal process. *See* 8 CFR 208.35(b) ("Application in credible fear determinations.").

*Comment:* Commenters stated that the enumerated "exceptionally compelling circumstances" exception for victims of a severe form of trafficking in persons is inadequate and that this rule imposes an impossible evidentiary hurdle on trafficking survivors. For example, commenters said that not all victims of a severe form of trafficking have proof of such crimes and, during initial fear screenings, AOs do not ask specific questions about trafficking history. Commenters also stated that the trafficking exception should be expanded to encompass both noncitizens who may be at risk of trafficking and noncitizens at risk of or who have experienced trafficking, regardless of the degree of severity of the trafficking.

*Response:* The Departments disagree that the existing "exceptionally compelling circumstances" exception for trafficking victims should be further amended. First, pursuant to section 3(b)(iv) of the Proclamation, noncitizens who are determined to be "a victim of a severe form of trafficking in persons" as defined in 22 U.S.C. 7102(16) are excepted from the Proclamation's suspension and limitation on entry and, therefore, are not subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(a)(1), 1208.35(a)(1) (providing that the limitation on asylum eligibility only applies to a noncitizen described in 8 CFR 1208.13(g) "and who is not described in section 3(b) of the Presidential Proclamation of June 3, 2024"); 89 FR at 48733 n.172.

Nonetheless, as explained by the Departments in the IFR, the Departments have retained the per se "exceptionally compelling circumstances" exception for human trafficking victims to avoid confusion and to ensure that the exceptions in this rule continue to mirror the rebuttal grounds adopted by the Departments in the Circumvention of Lawful Pathways rule. 89 FR at 48733 n.172. Under the rule's exception for victims of human trafficking, both a noncitizen and any family members as defined in 8 CFR 208.30(c) with whom the noncitizen is traveling are excepted from the limitation on asylum eligibility if, at the time of entry, the noncitizen or family member satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 CFR 214.201. 8 CFR 208.35(a)(2)(i)(C), 1208.35(a)(2)(i)(C); 89 FR at 48733.

The Departments disagree that this rule creates an insurmountable evidentiary burden for trafficking survivors. While the Departments recognize that victims of trafficking often do not possess written or documentary evidence of their trafficking, the rule does not impose any requirements about the type of evidence a noncitizen must submit to establish exceptionally compelling circumstances. Indeed, during the credible fear screening process, AOs or IJs elicit testimony from noncitizens, and written statements or other documentation are not required. *See* 89 FR at 48746 n.239.

Regarding concerns that noncitizens will not be asked specific questions about any history involving trafficking, the Departments note that those concerns are unfounded because interview guides specifically designed for credible fear interviews pursuant to the Circumvention of Lawful Pathways rule and the IFR instruct AOs to ask

questions related to trafficking where they are relevant to the credible fear determination, including where either the Circumvention of Lawful Pathways rule's presumption of asylum ineligibility or the IFR's limitation on asylum eligibility applies. In such cases, AOs are instructed to elicit testimony related to potential "exceptionally compelling circumstances" rebuttal grounds (in the case of the Circumvention of Lawful Pathways rule) or the "exceptionally compelling circumstances" exception (in the case of the IFR), including the exceptionally compelling circumstance of the noncitizen or an accompanying family member satisfying the definition of a victim of severe form of trafficking in persons pursuant to 8 CFR 208.33(a)(3)(i)(C) and 208.35(a)(2)(i)(C). *See* 8 CFR 208.30(d). AOs receive extensive training in not only substantive law and procedure but in identifying and interviewing vulnerable noncitizens, including victims of trafficking.[261] Further, for merits adjudications, AOs and IJs receive training [262] and have experience in evaluating credibility and evidence, even in the absence of other documentation, and a noncitizen's testimony alone "may be sufficient to sustain [their] burden without corroboration" in certain circumstances. INA 208(b)(1)(B)(ii), 8 U.S.C. 1158(b)(1)(B)(ii). The Departments are therefore confident in AOs' and IJs' ability to elicit relevant information from victims of trafficking and appropriately evaluate whether the noncitizen established exceptionally compelling circumstances.

Finally, the Departments believe that, as drafted, both section 3(b)(iv) of the June 3 Proclamation and the rule itself, which provides that being a victim of a

---

[261] *See* USCIS, *RAIO Directorate—Officer Training: Detecting Possible Victims of Trafficking* (Apr. 24, 2024)

[262] *See* USCIS, *RAIO Directorate—Officer Training: Decision Making* (Apr. 24, 2024); 8 CFR 1003.0(b)(1)(vii) (EOIR Director's authority to "[p]rovide for comprehensive, continuing training and support" for IJs); 8 CFR 1003.9(b)(1) and (2) (Chief IJ's authority to issue "procedural instructions regarding the implementation of new statutory or regulatory authorities" and "[p]rovide for appropriate training of the [IJs] . . . on the conduct of their powers and duties"); EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* ("[LERS] develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.").

STB_AR1_000071

severe form of trafficking in persons is a per se exceptionally compelling circumstance, provide sufficient protections for victims of trafficking. The Departments decline to expand this exceptionally compelling circumstance to trafficking victims who do not rise to the level of being victims of ''severe forms of trafficking in persons.'' This is a statutorily defined term [263] which includes ''sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age'' and ''the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.'' 22 U.S.C. 7102(11). The Departments find that this statutory definition sufficiently encompasses noncitizens who have experienced exceptionally compelling circumstances that should except them from the limitation on asylum eligibility. This definition has long been employed in the immigration context, *see, e.g.,* INA 101(a)(15)(T)(i)(I), 8 U.S.C. 1101(a)(15)(T)(i)(I) (T nonimmigrant status for victims of severe forms of trafficking in persons); INA 212(a)(2)(H), 8 U.S.C. 1182(a)(2)(H) (ground of inadmissibility for those who engage in severe forms of trafficking), with which AOs and IJs are familiar, and commenters have not offered a persuasive reason for deviating from this well-established definition. Exceptionally compelling circumstances are intended to be narrow and preserved only for those who would generally be subject to the limitation, but present with the most urgent and immediate need to enter without a CBP One appointment or between POEs during times when the border system is overwhelmed. That said, noncitizens who do not satisfy the existing exception for trafficking victims (or other exceptionally compelling circumstances enumerated in the rule) may still seek to establish exceptionally compelling circumstances for another reason, and officers will evaluate every case based on its individual facts and circumstances.

*Comment:* Commenters asserted that the IFR did not provide sufficient clarity about the procedures for noncitizens to seek an exception to the IFR's limitation on asylum eligibility.

First, commenters stated that access to the IFR's exceptions requires physical access to U.S. immigration authorities at POEs but alleged that there are many factors that impede such physical access, including security agents on the Mexican side of the border restricting access to POEs. Commenters asserted that such impediments to physically accessing U.S. immigration authorities undermine the IFR's exceptions and prevent noncitizens who may satisfy an exception from accessing protection. Commenters also stated that it is unclear how the rule and Proclamation together impact access to POEs. Accordingly, commenters requested that the Departments establish clear, transparent procedures to guarantee that noncitizens seeking to establish an exception from the limitation on asylum eligibility can physically access U.S. immigration officials.

*Response:* The Departments believe that the IFR adequately explains the exception to the limitation on asylum eligibility for noncitizens who establish exceptionally compelling circumstances, including the process by which AOs and IJs will evaluate whether a noncitizen has satisfied the exception. *See* 89 FR at 48732–33. Regarding commenters' concerns related to noncitizens' ability to physically access U.S. immigration authorities, the Departments note that nothing in the IFR physically impedes a noncitizen from accessing U.S. immigration authorities and that insofar as these comments concern CBP's implementation of the Proclamation, they are outside the scope of this rulemaking, as are concerns about conduct by individuals outside of the United States who are not U.S. immigration authorities—for example, on the Mexican side of the border. *Cf.* 89 FR at 48732 n.169 (explaining that ''[w]hen it comes to determining the applicability of the Proclamation, CBP immigration officers, who first encounter noncitizens when they enter or attempt to enter, must determine whether a noncitizen is subject to the Proclamation under section 3(a), including whether the noncitizen is excluded from the suspension and limitation on entry under section 3(b)'').

*Comment:* Commenters recommended that the Departments exclude noncitizens who present at a POE from the IFR's limitation on asylum eligibility, and instead limit application of any restrictions to those who cross irregularly, in order to guarantee access to border processing for noncitizens who present at a POE.

*Response:* The Departments decline to adopt an exception to the limitation on asylum eligibility for all noncitizens who present at a POE. As the Departments explained in the IFR, in the absence of congressional action, the changes made by this rule are intended to improve the Departments' ability to deliver timely decisions and consequences to noncitizens who do not have a legal basis to remain in the United States, and the Departments expect that the limitation on asylum eligibility will encourage noncitizens to present at a POE pursuant to an appointment, pursue another lawful pathway, or decline to journey to the United States at all. *See* 89 FR at 48715; *id.* at 48730–31. The Departments have determined that excepting all noncitizens who present at a POE would undermine these objectives and undermine processes designed to manage border inflows at POEs. *See, e.g.,* 88 FR at 31318 (noting that the ''ability to schedule a time and place to arrive at POEs and the availability of other orderly and lawful pathways'' are designed to, among other things, ''protect against an unmanageable flow of migrants arriving at the SWB'').

*Comment:* Commenters questioned why the IFR's exceptions do not fully align with the exceptions available under the Circumvention of Lawful Pathways rule. In particular, commenters stated that the IFR does not provide an exception for technological failure of the CBP One app or for noncitizens who are unable to use the CBP One app due to illiteracy, a language barrier, a disability, or an inability to afford a smartphone or data plan. Noting ongoing technical and accessibility issues with the CBP One app, commenters urged the Departments to adopt an exception to the limitation on asylum eligibility for all noncitizens—whether they present at a POE or cross between POEs—who: (1) are unable to use the CBP One app due to accessibility issues with the app itself; (2) are unable to use the CBP One app due to illiteracy, disabilities, not speaking a language in which the CBP One app is provided, lack of knowledge about the existence of the CBP One app, or a lack of resources or other difficulties; or (3) fail to secure appointments after multiple attempts.

Additionally, commenters noted that the IFR does not contain an exception for being denied asylum in a country through which the noncitizen transited. Commenters stated that the Departments failed to provide a justification or explanation for eliminating such exceptions under the IFR and alleged that it is arbitrary for the Departments

---

[263] The provisions at 8 CFR 208.35(a)(2)(i)(C) and 1208.35(a)(2)(i)(C) reference the definition of ''victim of a severe form of trafficking in persons'' in 8 CFR 214.201, and that regulatory provision references relevant statutory definitions, including definitions found at 22 U.S.C. 7102. *See* 8 CFR 214.201.

STB_AR1_000072

to include such exceptions under the Circumvention of Lawful Pathways rule but not under the IFR.

Commenters also asserted that the inconsistencies between the exceptions available under the IFR and the Circumvention of Lawful Pathways rule will create confusion for all parties, as it is unclear which rule will apply when emergency border circumstances are in effect.

*Response:* The Departments decline to add any additional exceptions to the limitation on asylum eligibility and disagree with commenters' assertions that the Departments did not provide adequate justifications for why the rule does not contain exceptions for an inability to access or use the CBP One app or being denied asylum in a transit country.

The Departments explained in the IFR that they were not adopting these exceptions from the Circumvention of Lawful Pathways rule because, unlike that rule, this rule only applies during emergency border circumstances, when the number of encounters strains the capacity of immigration and border security systems. 89 FR at 48732 n.171. Because of this rule's focus on emergency border circumstances, the Departments have determined that the rule's exceptions should be limited to noncitizens "with a time-sensitive imperative" to enter the United States. *Id.* For example, the rule focuses its exception for exceptionally compelling circumstances on noncitizens who require immediate entry into the United States, due to medical emergencies or imminent and extreme threats to life or safety, among other reasons. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments have explained above why they have not included in the IFR and this rule the exception for difficulty using the CBP One app and refer readers to that discussion.

Similarly, and as explained in the IFR, the Departments did not include and are not adding an exception for noncitizens who received a final decision denying asylum in a country through which they transited because this rule serves a different purpose than the Circumvention of Lawful Pathways rule. 89 FR at 48732 n.171. While the Circumvention of Lawful Pathways rule sought to encourage noncitizens to seek protection in other countries, this rule is focused on deterring irregular migration and speeding up the border process during emergency border circumstances, when the immigration system is experiencing extreme and enduring strains. *Id.* Accordingly, the Departments believe that limiting exceptions to those noncitizens who

have the most immediate and urgent need to present at or cross the U.S. border is imperative. *See id.* Importantly, however, noncitizens who were denied protection in another country remain eligible to apply for asylum if they "enter pursuant to an appointment, meet another exception to the Proclamation, or establish exceptionally compelling circumstances" under this rule. *Id.*

The Departments also disagree that omission of these exceptions will create confusion. The Departments clarify that both this rule and the Circumvention of Lawful Pathways rule are applied during credible fear screenings when emergency border circumstances are in effect. If it is determined that this rule does not apply, AOs and IJs will then consider the noncitizen's claim through the now familiar Circumvention of Lawful Pathways rule, which has been in effect for over a year. Given the Departments' experience in implementing the Circumvention of Lawful Pathways rule, the Departments are confident in adjudicators' ability to implement this rule, which is similar in structure to the Circumvention of Lawful Pathways rule, and to apply this rule's "exceptionally compelling circumstances" exception, which mirrors the rebuttal grounds in the Circumvention of Lawful Pathways rule. *See* 89 FR at 48739. If the noncitizen establishes exceptionally compelling circumstances under this rule pursuant to 8 CFR 208.35(a)(2)(i) or 8 CFR 1208.35(a)(2)(i), they will also have established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). However, adjudication of the additional exceptions in Circumvention of Lawful Pathways are unlikely to be dispositive in cases where both this rule and the Circumvention of Lawful Pathways rule apply, because if the noncitizen does not meet the exception to this rule, this rule's limitation on asylum eligibility will apply.

c. Implementation by CBP Officers

*Comment:* A few commenters expressed concern that, unlike the Circumvention of Lawful Pathways rule, in which AOs and IJs solely adjudicate the application of its presumption of asylum ineligibility and exceptions, the application of the Proclamation and the IFR are first adjudicated by CBP officers at the limit line, resulting in at-risk individuals and survivors of violence being denied entry. Relatedly, commenters stated that although the IFR allows CBP officials at POEs to assess whether a noncitizen qualifies for an

exception, it is unclear what guidance or training has been provided to those officials to ensure fair determinations or whether there is a mechanism for noncitizens to be screened for application of the bar when they approach a POE. A commenter noted that it is difficult to understand from the IFR how CBP will determine whether noncitizens are subject to the rule and how the rule and Proclamation would impact access to POEs and CBP conduct. Another commenter similarly stated that it is unclear whether the Departments would equip CBP officers or noncitizens to navigate the changes under the Proclamation and IFR, including in circumstances where the applicable legal standards could change within short windows of time, depending on whether crossing thresholds are being met.

*Response:* Comments relating to the implementation of the Proclamation itself are outside the scope of this rule, which applies a separate limitation on asylum eligibility. Additionally, to the extent that commenters expressed concern about CBP officials assessing whether a noncitizen qualifies for a regulatory exception to the limitation on asylum eligibility, commenters misunderstand the operation of the IFR. CBP officials may determine whether an exception to the June 3 Proclamation applies to a particular noncitizen, but do not apply the rule's limitation on asylum eligibility and its exception. Rather, it is AOs and IJs, during credible fear screenings and reviews, who must determine "whether there is a significant possibility that the noncitizen would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances." 89 FR at 48739; *see also* 8 CFR 208.35(b), 1208.35(b). AOs and IJs—not CBP officials—will thus be evaluating whether the limitation on asylum eligibility applies and whether a noncitizen has established a regulatory exception. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a), (b).

d. Application of the Limitation on Asylum Eligibility in Proceedings Before EOIR

*Comment:* Commenters stated broad concerns with the credible fear review process in general, including concerns over whether there are adequate opportunities to present supplementary evidence and testimony, questions over whether IJ review is truly de novo, concerns that IJs do not appropriately

**STB_AR1_000073**

weigh evidence in the record, and concerns that the outcome of credible fear reviews is dependent upon the IJ considering the case, rather than the strength of the claim.

Commenters also objected to the IFR's provision that would require noncitizens to affirmatively request IJ review of a negative credible fear determination. Commenters stated that this affirmative request requirement removes an important safeguard intended to minimize the risk of refoulement, with particular harm to the most vulnerable noncitizens. Commenters explained that, given the frequency of IJs reversing negative credible fear findings, IJ review is a necessary procedural protection for the integrity of the asylum screening process, especially since the IFR's changes may lead to erroneous decisions by AOs. Moreover, commenters stated that requiring noncitizens to affirmatively request review is especially problematic when combined with the other changes in the IFR, namely the limited opportunity to access counsel and the heightened standards of proof for pre-screening interviews. Commenters stated that there must be an opportunity for IJ review of negative fear determinations to be considered an effective remedy under international law.

Commenters also stated there are a multitude of reasons why a noncitizen may fail to request IJ review. For example, a noncitizen may fail to request IJ review due to mental health conditions, language barriers, trauma, or because they are not adequately informed of the procedure for requesting review. Similarly, one commenter stated that requiring noncitizens to affirmatively request review mirrors the Global Asylum Final Rule, 85 FR 80274, which the Departments later reversed in a subsequent rulemaking, *see* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 FR 18078 (Mar. 29, 2022) ("Asylum Processing IFR"), citing fairness concerns and noting that treating a failure to elect review as a request for review better accounts for the range of explanations for a noncitizen's failure to seek review.

Commenters supported the IFR's requirement that DHS inform noncitizens of the procedure to request review and recommended that such information be provided both verbally and in writing in a language that the noncitizen understands. However, commenters said that noncitizens may find the concept of an IJ review hearing

confusing, and requiring noncitizens to request review may unfairly punish noncitizens for their confusion.

*Response:* To the extent that commenters raise concerns about the credible fear review process in general, such concerns are outside the scope of this rulemaking, which is focused only on the credible fear review process for noncitizens who are subject to this rule.

As to concerns about credible fear review under this rule, the Departments emphasize that, although the rule requires noncitizens to affirmatively request review of a negative credible fear determination, the statutory right to IJ review remains available. *See* INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.30(g), 1208.30(g)(2). The Departments will continue to seek to ensure noncitizens are aware of the right to IJ review and the consequences of failure to affirmatively request such review. *See, e.g.,* 88 FR at 11747. Specifically, if an AO enters a negative credible fear determination, the AO will provide the noncitizen with a written notice of decision and inquire whether the noncitizen wishes to have an IJ review the negative credible fear determination. 8 CFR 208.35(b)(1)(i), (2)(iii). Thus, contrary to commenters' concerns, this safeguard remains in place and the Departments believe that such notice sufficiently ensures that noncitizens who desire IJ review of negative credible fear determinations can elect it under this rule.

As explained in the analogous provision introduced in the Circumvention of Lawful Pathways rule, to ensure that the noncitizens referenced by commenters—including noncitizens with mental health conditions, those who have suffered trauma, or those who are unable to read or speak English—understand what review is available to them, DHS provides explanations to noncitizens "to make clear to noncitizens that the failure to affirmatively request review will be deemed a waiver of the right to seek such review." 88 FR at 11747. These explanations are provided by trained asylum office staff through an interpreter in a language understood by the noncitizen. As a result, the Departments believe it is reasonable to conclude that noncitizens who do not request IJ review after receiving sufficient notice, see *id.,* and the enhanced explanations described above, can be fairly processed as if they have declined to seek additional IJ review. See 88 FR at 11747.

Moreover, the Departments previously acknowledged in the Circumvention of Lawful Pathways rule that "the

procedure for IJ review of negative credible fear determinations . . . differ[ed] from the credible fear review procedures implemented by the Asylum Processing IFR.'' 88 FR at 31423 (citing 88 FR at 11744). There, the Departments explained that "'the need for expedition under the current and anticipated exigent circumstances' weigh[ed] in favor of requiring noncitizens to affirmatively request IJ review of a negative credible fear determination.'' *Id.*

Following this reasoning, the Departments believe that this requirement that noncitizens affirmatively request IJ review of negative credible fear determinations continues to be necessary during times of emergency border circumstances, despite other measures to address the exceptionally high levels of irregular migration along the southern border, including the Circumvention of Lawful Pathways rule. *See* 89 FR at 48712–13 (listing measures). This rule has been adopted to address emergency border circumstances, times where the Departments' limited resources are under maximum strain to the point where border security and immigration systems are experiencing serious operative impacts and further fueling more lasting effects of a backlogged system. Accordingly, the Departments believe requiring noncitizens to affirmatively request IJ review of credible fear determinations will help ensure that such reviews take place only for those who desire such review. The alternatives suggested by commenters risk extending such review to those not actually interested in IJ review, thereby unnecessarily expending valuable adjudicatory capacity during a time when such resources are not available.

As to requests to provide information about review procedures verbally and in writing in a language that the noncitizen understands, noncitizens receive that information in writing (via a written English document), and noncitizens who do not speak English receive that information verbally through a real-time translation of the written document as well. This approach satisfies the Departments' statutory obligations, *see* INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv), and in DHS's judgment, provides adequate notice of the ability to seek review. It is neither required nor feasible to, in addition, provide that information in written form in all languages that may be spoken.

*Comment:* Commenters stated that the same complexity concerns about the IFR raised by commenters in the credible fear context will apply to removal proceedings before IJs. For example,

**JA487**

STB_AR1_000074

commenters stated that determinations as to the timing and applicability of emergency border circumstances, including determining whether emergency circumstances were in effect on the noncitizen's dates of entry, whether to apply this rule versus the Circumvention of Lawful Pathways rule, and whether exceptionally compelling circumstances apply, would only lead to longer, more complex removal proceedings, and an inefficient focus on inquiries having no bearing on the merits of the protection claim in an already backlogged immigration court system. Commenters said that proceedings could be prolonged due to a potential rise in the numbers of motions to reopen or reconsider and appeals to the BIA or Federal courts challenging application of the rule, among other reasons.

Commenters stated that these determinations will be especially complex for noncitizens who enter without inspection ("EWI"). Commenters explained that it is unclear how the Departments will accurately determine whether this rule applies, especially when few people who EWI remember the exact date they crossed the border and, regardless, will likely not have evidence of the time of such crossing. Therefore, commenters stated that the rule will result in arbitrary IJ decisions, because IJs will not be able to determine whether the rule applies. As a result, commenters suggest creating a specific policy for noncitizens who EWI.

*Response:* The Departments disagree with commenters' concerns about the complexity in applying this rule in EOIR proceedings. To the contrary, given the IJ's role as the fact finder in removal proceedings, IJs are well-equipped to make fact-based determinations, such as dates of entry and whether emergency border circumstances were in effect on a specific date. *See, e.g.,* INA 240(b)(1), 8 U.S.C. 1229a(b)(1) ("Authority of immigration judge"). For example, regarding commenters' concerns about noncitizens who EWI, the Departments note that IJs routinely make similar entry timing determinations, such as determining application of the one-year filing deadline for asylum and continuous physical presence for cancellation of removal for certain nonpermanent residents. INA 208(a)(2)(B), 8 U.S.C. 1158(a)(2)(B) (one-year time limit); INA 240A(b)(1)(A), 8 U.S.C. 1229b(b)(1)(A) (cancellation of removal for certain nonpermanent residents). Moreover, IJs have been applying the Circumvention of Lawful Pathways rule since its effective date, which similarly requires determining a

noncitizen's entry date. *See* 8 CFR 1208.33(a)(1)(i) (requiring determination as to whether a noncitizen entered the United States "[b]etween May 11, 2023, and May 11, 2025").

Additionally, one change made by this rule—requiring the 7-consecutive-calendar-day average to remain below 1,500 encounters between POEs for 28 consecutive calendar days before the 14-day waiting period is triggered—will further reduce complexity concerns by reducing the probability that emergency border circumstances will be discontinued and then continued or reactivated soon thereafter. This requirement not only better ensures that emergency border circumstances have abated, but also mitigates potential confusion in determining whether emergency border circumstances were in effect on a noncitizen's date of entry. Contrary to commenters' concerns, this rule's provisions will not consistently "turn off" one day and "turn on" the next day. Rather, when triggered, this rule will be in effect for a more sustained period of time, making it easier for noncitizens and adjudicators to determine the timing and applicability of emergency border circumstances. Lastly of note, at all times since issuance of the June 3 Proclamation and publication of the IFR, DHS has maintained a publicly available record of the dates that a suspension and limitation on entry is in effect.[264] This DHS-maintained record will be available into the future, and the Departments believe that it will serve as an essential aid for IJs in determining whether the provisions of the rule should be applied based on a noncitizen's date of entry.

e. Family Unity Provisions

*Comment:* Commenters expressed general support for the family unity provisions in the IFR, stating that family unity is a key principle in both international and U.S. immigration law. However, commenters also raised concerns that the provisions were not sufficient, and that family unity would be better preserved by eliminating the rule's limitation on asylum eligibility altogether. For example, commenters stated that the family unity provisions are overly limiting, as they only benefit noncitizens who are able to meet the higher burden of proof for statutory withholding of removal.

Commenters were also concerned that the family unity provisions would create unnecessary procedural hurdles

for families. For example, commenters raised concerns that the family unity provisions only apply to qualifying family members who cannot independently establish other protection from removal. In doing so, commenters also questioned what forms of protection would qualify as "other protection from removal" sufficient to disqualify spouses or children from the family unity provisions.

Commenters stated that this requirement would result in ethical dilemmas where families would need to ensure that qualifying family members do not independently qualify for statutory withholding of removal so that the family members can receive derivative asylum relief under the family unity provisions. Commenters also claimed that this requirement would require family members to obtain separate counsel and sever proceedings, which will cause unnecessary financial hardship to the family and undue burdens to the Government. Rather, commenters recommended removing altogether the requirement that qualifying spouses or children not independently qualify for relief.

Commenters also raised procedural questions about how the family unity provisions function where a noncitizen is belatedly eligible for asylum under the family unity provisions, but after their spouse or child have undergone their own immigration adjudications.

*Response:* The Departments agree with commenters that keeping families unified and avoiding family separation is an important goal. Emergency border circumstances necessitated implementation of the IFR's limitation on asylum eligibility to better manage border operations and substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain in the United States. *See* 89 FR at 48715.

Nevertheless, recognizing the importance of family unity, the Departments included a number of provisions in the IFR to eliminate the risk of family separation. For example, the "exceptionally compelling circumstances" exception applies to all qualifying family members of the noncitizen's traveling party if the noncitizen, or the noncitizen's qualifying family member with whom the noncitizen is traveling, meets the exception. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Similarly, the IFR made no changes to the family unity provision, which establishes an "exceptionally compelling circumstances" exception for noncitizens who can, among other

---

[264] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), *https://www.dhs.gov/immigration laws.*

**STB_AR1_000075**

requirements, establish eligibility for statutory withholding of removal or CAT protection and could have, but for either the IFR's limitation or Circumvention of Lawful Pathways presumption, established eligibility for asylum. *See* 8 CFR 208.35(c), 1208.35(c); *see also* 88 FR at 11723–24 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to treat "the possibility of separating the family" as "an exceptionally compelling circumstance" when the provision's requirements are met). This provision allows qualifying noncitizens to pursue asylum, and its allowance for derivative beneficiaries, instead of statutory withholding of removal and CAT protection, with their comparatively fewer benefits. *See* INA 208(b)(3), 8 U.S.C. 1158(b)(3) (derivative asylum status).

Importantly, these provisions are not intended to serve as wholesale "family" exceptions to the IFR's limitation on asylum eligibility, which would significantly reduce the effectiveness of the limitation on asylum eligibility and incentivize families to engage in dangerous irregular migration to the United States. *See* 89 FR at 48757 (explaining that "[e]xcepting all family units that include minor children could incentivize families who otherwise would not make the dangerous journey and cross unlawfully to do so"). Rather, the exceptionally compelling circumstances family unity exceptions help ensure that noncitizens who qualify for the rule's exception are not separated from their qualifying spouses or children while pursuing relief or protection in the United States, including, for example, through derivate asylee status if granted relief, or through removal of the family unit if denied.

With regard to commenter concerns about qualifying spouses or children obtaining their own independent relief or protection, which would in turn make the IFR's family unity provisions inapplicable, the Departments clarify that the IFR's family unity provisions are intended as limited exceptions solely to prevent potential family separation due to the IFR's limitation on asylum eligibility. If qualifying spouses or children obtain independent relief or protection that allows them to remain in the United States, then they will have necessarily avoided the family separation concerns underlying the IFR's family unity provisions. *See, e.g.,* 88 FR at 11724 (explaining that the parallel Circumvention of Lawful Pathways family unity provision is intended to avoid family separation where "at least one other family member would not qualify for asylum or

other protection from removal on their own"). The Departments further note that asylum "or other protection" under this family unity provision refers to statutory withholding of removal and CAT protection. *See, e.g.,* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims From Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023) (noting that "asylum or other protection" refers to claims "relating to a fear of persecution or torture").

Additionally, to the extent that commenters raised concerns over qualifying spouses or children independently receiving statutory withholding of removal, with comparatively fewer benefits than asylum, the Departments note that statutory withholding of removal protects the qualifying spouse or child from removal to a country where they more likely than not would be persecuted because of their race, religion, nationality, membership in a particular social group, or political opinion. *See* INA 241(b)(3)(A), 8 U.S.C. 1231(b)(3)(A); *INS* v. *Aguirre-Aguirre,* 526 U.S. 415, 419 (1999); *Stevic,* 467 U.S. at 429–30; *see also* 8 CFR 208.16, 1208.16. Moreover, if noncitizen families wish to pursue asylum relief specifically, the IFR and the Circumvention of Lawful Pathways rule are designed to encourage noncitizens to make an appointment to present at the SWB or take advantage of other lawful migration pathways. *See* 89 FR at 48730–31.

Relatedly, the Departments do not share commenters' concerns about potential ethical dilemmas faced by representatives related to pursuing independent relief for family members due to the family unity provisions. Representatives must be truthful to the court in presenting the record facts and will either be able to zealously advocate on behalf of all of their clients where the family members' interests present no conflict, or counsel can withdraw from such representation if they believe they cannot advocate for each client's interests equally. *See* 8 CFR 1003.102 (acknowledging that practitioners who appear before EOIR have a duty to zealously represent their clients "within the bounds of the law"); *see also* 8 CFR 1003.102(c) (setting forth that a practitioner may face disciplinary sanctions for "[k]nowingly or with reckless disregard" making a false statement of material fact or law).

Further, this rule does not impact EOIR's existing procedures for consolidating or severing cases, which

has always involved parties making assessments and strategic decisions on how best to proceed with their cases. *See* Immigration Court Practice Manual ch 4.21 (setting forth procedures for combining and severing cases). Prior to this rule, family units have been able to seek asylum and related forms of protection in consolidated proceedings, and family units are always permitted to sever their proceedings if they so choose, including for strategic reasons based on their own assessment about the strength of their individual claims. *Id.* Thus, the Departments disagree that the rule will meaningfully impact noncitizens choosing to sever their cases from those of their families in the way that commenters claim, especially given the family unity provisions included in the IFR and maintained in this final rule.

Lastly, with regard to procedural timing concerns in applying the family unity provisions, the Departments clarify that the family unity provisions only apply to qualifying family members who are accompanying the principal applicant or who are eligible to follow to join that applicant. *See* 8 CFR 208.35(c), 1208.35(c). Therefore, principal applicants and accompanying family members who are traveling together will generally have their claims adjudicated together in removal proceedings. *See, e.g.,* Immigration Court Practice Manual ch. 4.21(a) (Oct. 25, 2023) (explaining that immigration courts may consolidate cases together that involve immediate family members into a single adjudication). As a result, there are unlikely to be significant timing gaps between determinations on any individual relief or protection claims within a family unit.

*Comment:* Commenters supported the inclusion of a family unity provision in the AMI process, wherein DHS retains jurisdiction over an asylum application for further adjudication after a positive credible fear determination. Commenters stated that it is logical and efficient for AOs to apply the same family unity provision as IJs when adjudicating the merits of an asylum application. However, commenters also expressed concern that the family unity provision in the AMI process is discretionary for AOs, and urged the Departments to make the provision mandatory, similar to the family unity provision for IJs in the IFR. Commenters also recommended amending the Circumvention of Lawful Pathways rule to allow DHS to apply the same family unity exception under that rule to avoid confusion that the disparity would allegedly cause for applicants, counsel,

**STB_AR1_000076**

and AOs, particularly where the two rules are both in effect and overlapping.

*Response:* In the IFR, the Departments included a family unity provision in the AMI process before USCIS, but made it discretionary to provide USCIS with flexibility while implementing the new AMI process. *See* 89 FR at 48733. After further consideration, the Departments are retaining the discretionary nature of the family unity provision in the AMI process before USCIS.

USCIS maintains complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f). In exercising this discretion, USCIS does not foresee that it would be a prudent use of resources to place cases into the AMI process where, at the credible fear stage, the IFR's limitation on asylum eligibility applied and there was not a significant possibility the noncitizen could establish an exception to the limitation. USCIS has a finite number of AOs, and it is more efficient at present to assign work in a manner that maximizes the number of credible fear interviews USCIS can conduct at the southern border. *See* 89 FR at 48756. Accordingly, it is unlikely that USCIS would adjudicate a case where the 8 CFR 208.35(c) family unity provision could apply in the foreseeable future.

With that understanding, were such a case ever to be placed into the AMI process, USCIS has the discretion to apply the 8 CFR 208.35(c) family unity provision, depending on the circumstances of the individual case. Importantly, if USCIS exercises its discretion not to apply the family unity provision, the noncitizen will not be prejudiced because, if USCIS does not grant asylum in such a case, the asylum application will be reviewed de novo by an IJ, 8 CFR 1240.17(i), who is required to apply the family unity provision in removal proceedings pursuant to 8 CFR 1208.35(c).

Additionally, the discretionary nature of the family unity provision before USCIS in 8 CFR 208.35(c) is necessary in order for USCIS to comply with the AMI regulatory timeline laid out in 8 CFR 208.9. This timeline requires USCIS to conduct the AMI interview no later than 45 days of the applicant being served with a positive credible fear determination, absent exigent circumstances, 8 CFR 208.9(a)(1), and prohibits extensions on the submission of additional evidence that would prevent the AMI decision from being issued within 60 days of service of the positive credible fear determination, 8 CFR 208.9(e)(2). While the IFR allows for USCIS to extend both of those timelines up to 15 days in the event

USCIS requires the noncitizen to submit a Form I–589, 8 CFR 208.35(b)(2)(ii), even with a 15-day extension, these are still accelerated time frames that would not accommodate applying the family unity provision in every AMI case where it could potentially apply before USCIS.

In some cases, USCIS may be able to apply the family unity provision without running afoul of the regulatory time frames, such as where the accompanying family members are also dependents on the AMI case, and the principal applicant is found eligible at the AMI for statutory withholding of removal with respect to their country of nationality based on the record before USCIS. In such a case, the AO could likely apply the family unity provision within the regulatory timelines, as there would likely be no need to request additional evidence verifying the qualifying family relationships. Additionally, if the principal applicant was already found eligible for statutory withholding of removal with respect to their country of nationality based on the record before USCIS, it is likely that they also would be found eligible for asylum if the limitation on asylum eligibility is not applied. In such a circumstance, USCIS could likely exercise discretion to apply the 8 CFR 208.35(c) family unity provision in a logical and efficient manner and complete the case within the regulatory time frame without issue.

In other cases, however, applying the family unity provision in an AMI case could prove excessively cumbersome within the regulatory time frame. For example, if the qualifying family relationship relates to a family member outside of the United States for which additional proof is needed to establish the relationship, it may be impossible for an AO to extend the timeline to accommodate the production of such evidence and still meet the processing timeline for an AMI under 8 CFR 208.9(e)(2). In a case where the AO finds the noncitizen is not eligible for asylum due to the IFR's limitation on asylum eligibility, and is not eligible for statutory withholding of removal, but would be eligible for withholding of removal under 8 CFR 208.16(c)(2) (withholding of removal under the CAT) based on the record before USCIS, requiring the AO to apply the 8 CFR 208.35(c) family unity provision would entail the AO conducting a cumbersome analysis, including revisiting the noncitizen's asylum eligibility, absent application of the IFR's limitation on eligibility, only to possibly still find the applicant ineligible for asylum on the merits and refer the case to the IJ, who

would then review the asylum application de novo. *See* 8CFR 1240.17(i).

Indeed, if USCIS were required to apply the 8 CFR 208.35(c) family unity provision in all AMI cases, significant extra resources would likely have to be expended in any case where the provision might apply (including additional interview time, extending the evidentiary submission timeline, and additional time writing up the case) even where it would not result in a grant of asylum. If asylum is not granted by USCIS, asylum eligibility would still be reviewed de novo by an IJ. *See* 8 CFR 1240.17(i). Keeping the provision discretionary, in contrast, allows USCIS to apply the provision where it can do so in a logical and efficient manner without thwarting the regulatory timelines for AMI processing.

While logic and efficiency support keeping the 8 CFR 208.35(c) family unity provision discretionary for AMI cases before USCIS, it is also logical for the 8 CFR 1208.35(c) family unity provision to apply in all removal proceedings (whether they originated as AMI cases or not) before EOIR. Removal proceedings before the IJ are potentially the last opportunity the noncitizen will have to be granted asylum. In contrast, the AMI process before USCIS cannot result in a denial of asylum, only a referral to the IJ for a de novo review of the asylum application. 8 CFR 208.14(c)(1), 1240.17(i). Additionally, while removal proceedings for AMI cases operate on a streamlined time frame, there is still substantially more time allotted for removal proceedings before EOIR than for the initial AMI adjudication before USCIS, 8 CFR 208.9(a)(1), (e)(2), *id.* at 1240.17(f), so there is more flexibility in the time frame for the IJ to apply the family unity provision at the final adjudication stage than there would be for an AO to apply the provision in the AMI process before USCIS.

Separately, the Departments note that any comments regarding family unity amendments to the separate Circumvention of Lawful Pathways rule are outside the scope of this rulemaking.

2. Manifestation of Fear Standard

a. Legality Concerns

*Comment:* Commenters expressed concerns that implementing a manifestation of fear requirement would ultimately lead to noncitizens with valid claims being removed without proper evaluation, which would violate U.S. international non-refoulement obligations and ''circumvent U.S. asylum law.'' One advocacy group

**STB_AR1_000077**

called the manifestation requirement a ''deeply deficient'' means of screening applicants for fear that will cause ''credible fear pass rates to plummet and lead to refoulement.'' Another commenter described the change as ''morally and legally troubling,'' while a third commenter stated that it would create significant hurdles for noncitizens seeking statutory withholding of removal and CAT protection.

Commenters further asserted that the manifestation requirement violates specific international refugee laws or principles. Citing amicus briefs, the UNHCR handbook, and other UNHCR publications, one commenter stated that the United States has an ''affirmative obligation'' under international law ''to elicit information that might reveal potential refugee status'' and ''conduct an individualized assessment to evaluate whether the individual is entitled to protection as a refugee,'' which the manifestation requirement violates. In that same vein, another commenter observed that international refugee organizations have ''long emphasized that to fully carry out . . . obligations under the Refugee Convention'' the parties should implement procedures that ''affirmatively identify'' possible applicants and provide guidance to them on how to apply for relief and protection, and the IFR's ''reliance on manifestation of fear is inadequate to fulfill these basic requirements.''

Commenters stated that the manifestation requirement violated proper implementation of the credible fear process outlined in the INA. One commenter characterized the IFR's manifestation requirement as an attempt to expand the reach of expedited removal by creating additional barriers to credible fear interviews, in violation of Federal law. Another commenter stated the manifestation requirement did not align with ''Congressional intent'' to ''ensure that asylum was available to all those with legitimate claims.'' Other commenters echoed the sentiment that the manifestation requirement was implemented without regard for the risk of refoulement and purely as a means to efficiently remove noncitizens without a hearing.

Commenters also stated that eliminating the requirement that immigration officers affirmatively document and inquire about a noncitizen's fear of persecution during initial encounters at the border is a ''sharp break from prior practice by the Departments'' that would ultimately lead to higher numbers of noncitizens being refoulded. One commenter

described the change to using manifestation as ''a dangerous reversal of a procedural safeguard'' designed to ensure legal compliance, expressing concern that other safeguards are already being removed. Other commenters recommended that the Departments end the manifestation of fear approach and reinstate the previous policy of using preliminary questions to identify whom to refer for credible fear screenings.

Some commenters opposed the manifestation requirement due to concerns that it violated DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), and pointed to what they purport was the Government's acknowledgment (*see* 89 FR at 48741 n.194) that an argument could be made that the IFR conflicts with the INA. Specifically, commenters argued that the INA requires DHS to provide information concerning credible fear interviews to noncitizens who may be eligible and eliminating use of the forms in lieu of a manifestation requirement was a violation of that statutory obligation. Commenters were specifically concerned that the alternatives outlined in the IFR—such as providing signs and videos in facilities—would not be ''sufficient to put noncitizens on notice of how they may assert a claim for protection.''

Commenters pointed to different parts of the IFR where they believe the Government explicitly acknowledged that the manifestation requirement will result in refoulement and stated that these purported acknowledgements are problematic. One commenter stated that the IFR was creating a standard that ''knowingly accepts'' a probability of violating non-refoulement and fails to satisfy the statutory requirement to provide information about credible fear interviews to noncitizens who may be eligible for such interviews. Another commenter highlighted part of the IFR that they said conceded that the manifestation requirement would result in the removal of noncitizens with valid claims. Similarly, commenters discussed the IFR's purported admission that asylum seekers who are asked affirmative questions about whether they have a fear of returning to their home country are seven times more likely to assert a claim.

*Response:* The Departments disagree that the manifestation standard violates any international obligations or that it is inconsistent with Federal law.

As to concerns related to international law, commenters did not specify any binding international law source that creates such obligations and instead

cited publications and amicus briefs, which do not have the force of law and are not international treaties to which the United States is a party. As described in Section II.B of this preamble, the United States' non-refoulement obligations are implemented through domestic law, and neither the 1967 Protocol nor the CAT are self-executing. Regardless, as outlined in the IFR, 89 FR at 48740–41, the applicable international laws do not specifically prescribe the minimum screening requirements that must be implemented to determine whether a noncitizen should be referred for a credible fear interview.[265] Instead, it is up to each participating state ''to establish the procedure that it considers most appropriate, having regard to its particular constitutional and administrative structure.'' [266] Thus, it is within the Departments' discretion to revisit the screening process the United States implements during emergency border circumstances.

Moreover, the United States continues to uphold its non-refoulement obligations during emergency border circumstances.[267] Under applicable international law, the United States has an obligation (1) not to return noncitizens to countries where they would be persecuted; and (2) not to return noncitizens to countries where it is more likely than not that they would be tortured. *See* Refugee Convention, 19 U.S.T. at 6276, 189 U.N.T.S. at 176 (outlining standard under the Refugee Convention); *Pierre* v. *Gonzales,* 502 F.3d 109, 114 (2d Cir. 2007) (outlining standard under the CAT). During the emergency circumstances at the southern border, the manifestation standard temporarily affords immigration officers the ability to refrain from affirmatively asking noncitizens about fear, and instead refer noncitizens to an AO for a credible fear interview if the noncitizen manifests a

---

[265] *See* UNHCR, *Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 189 (Jan. 1992 ed., reissued Feb. 2019), *https://www.unhcr.org/media/handbook-procedures-and-criteria-determining-refugee-status-under-1951-convention-and-1967* (highlighting that the process for identifying refugees is not ''specifically regulated'').

[266] *Id.*

[267] The United States' non-refoulement obligation under Article 33 of the Refugee Convention is implemented by statute through section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), for mandatory withholding of removal. And the United States implements its obligations under Article 3 of the CAT through regulations. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b), 112 Stat. 2681, 2681–822 (8 U.S.C. 1231 note); *see also, e.g.,* 8 CFR 208.16(c), 208.17, 208.18, 1208.16(c), 1208.17, 1208.18.

**STB_AR1_000078**

fear of return, expresses an intention to apply for asylum, expresses a fear of persecution or torture, or expresses a fear of return to the noncitizen's country or country of removal. 89 FR at 48739–40. This rule does not, in any way, prevent noncitizens from manifesting or expressing such fears; rather, the rule ensures that noncitizens who manifest or express such fears are properly screened consistent with United States' non-refoulement obligations. *See* 8 CFR 235.15(b)(4). As explained in the IFR and this rule, the Departments believe that this requirement represents the best way to remain consistent with U.S. international obligations while simultaneously addressing the emergency circumstances at the southern border.

The Departments also do not believe the manifestation standard violates the INA or any other Federal law. As addressed in the IFR, 89 FR at 48739–40, DHS has broad authority to change the procedures that immigration officers apply to determine whether a noncitizen subject to expedited removal will be referred for a credible fear interview by an AO, so long as those procedures are consistent with the INA.[268] In using this authority, the Departments are confident the manifestation standard is fully consistent with the statutory procedures governing expedited removal under section 235(b)(1)(A) of the INA, 8 U.S.C. 1225(b)(1)(A). That statutory section provides that only those noncitizens who "indicate[] either an intention to apply for asylum . . . or a fear of persecution," INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i), must be referred to an AO for a credible fear interview, INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). As such—and contrary to commenters' assertions—the INA does not require immigration officers to affirmatively ask every noncitizen subject to expedited removal if they have a fear of persecution or torture, nor does it define what circumstances constitute the requisite indication of intent or fear. To the contrary, the onus under the statute is on the noncitizen to indicate either of the circumstances warranting referral, which the IFR provides a noncitizen can do at any time during the process. *See* 89 FR at

48740.[269] Thus, as discussed in Section III.B.2 of this preamble, the rule's approach accords with section 235(b)(1)(A)(ii) of the INA, 8 U.S.C. 1225(b)(1)(A)(ii).[270]

Separately, regarding commenters' concerns about departing from the longstanding practice of providing individualized advisals and asking affirmative questions, the Departments disagree that there are insufficient procedural protections for individuals subject to the rule. As the IFR acknowledged, the practice of providing individualized advisals and asking affirmative questions was originally adopted to "ensure that bona fide asylum claimants [were] given every opportunity to assert their claim[s]." 89 FR at 48742 (quoting 62 FR at 10318–19). However, importantly, the legacy INS further explained that enacting these procedures was intended to "not unnecessarily burden[] the inspections process or encourag[e] spurious asylum claims." *Id.* (quoting 62 FR at 10318). While such procedures have remained in place in the expedited removal context since 1997, this fact alone does not indicate that they are required by the INA, and DHS maintains discretion to update the procedures in a manner consistent with the INA. *See FCC* v. *Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (holding that an agency changing an established rule must show that there are good reasons for the new policy but need not necessarily "provide a more detailed justification

than what would suffice for a new policy created on a blank slate"). And indeed, when emergency circumstances are present on the southern border, the procedures adopted in 1997 are unduly suggestive and, thus, unnecessarily burden the inspections process, which necessitates revisiting screening referral processes to more effectively and efficiently identify those noncitizens who may have a fear of return to their native country or country of removal or indicate an intention to seek fear-based relief or protection. Given the extraordinary circumstances facing the Departments during times of emergency border circumstances, DHS has determined it is reasonable to implement the manifestation standard.

The Departments similarly disagree that discontinuing use of the Form I–867A and Form I–867B during emergency border circumstances violates DHS's obligations under section 235(b)(1)(B)(iv) of the INA, 8 U.S.C. 1225(b)(1)(B)(iv), which states that DHS "shall provide information concerning the asylum interview . . . to aliens who may be eligible." DHS continues to provide information concerning credible fear interviews to noncitizens in CBP custody subject to expedited removal who may be eligible to receive such an interview via signs and videos in multiple languages, satisfying DHS's statutory duty under the INA. This is precisely what footnote 194 of the IFR explains. Rather than any purported acknowledgement of conflict with the INA, that footnote was simply included to clarify the points above and illustrate that the IFR does, in fact, satisfy this statutory obligation. Moreover, as the IFR explains, 89 FR at 48741–42, noncitizens who manifest a fear of return (and, thus, who are in fact eligible for a credible fear interview) are given a more detailed written explanation of the credible fear interview process prior to being referred for the interview.[271] Additionally, noncitizens who manifest a fear in CBP custody are shown a video prior to their credible fear interview, which also explains the credible fear process in more detail.

The Departments also recognize commenters' concern regarding the IFR's explicit acknowledgment that the manifestation standard may result in some noncitizens with meritorious claims not being referred to a credible fear interview. *See, e.g.,* 89 FR at 48743–44. The Departments included these statements to demonstrate their

---

[268] *See* INA 103(a)(1), (3), 8 U.S.C. 1103(a)(1), (3) (granting the Secretary the authority to establish regulations and take other actions "necessary for carrying out" the Secretary's authority under the immigration laws); *see also* 6 U.S.C. 202; *Motor Vehicle Mfrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (emphasizing that agencies "must be given ample latitude to adapt their rules and policies to the demands of changing circumstances" (quotation marks omitted)).

[269] *Accord Indicate,* Merriam-Webster's Collegiate Dictionary 592 (10th ed. 1996) ("to point out or point to," "to be a sign, symptom, or index of," "to demonstrate or suggest the necessity or advisability of," or "to state or express briefly"); *Indicate,* New International Webster's Comprehensive Dictionary of the English Language 644 (1996) ("To be or give a sign of; betoken," "To point out; direct attention to," or "To express or make known, especially briefly or indirectly"); *Indicate,* The American Heritage Dictionary of the English Language 918–19 (3d ed. 1996) ("To show the way to or the direction of; point out," "To serve as a sign, symptom, or token of; signify," "To suggest or demonstrate the necessity, expedience, or advisability of," or "To state or express briefly"); *Indicate,* Webster's II New Riverside University Dictionary 622–23 (1994) ("To show or point out," "To serve as a sign, symptom, or token of: signify," "To suggest or demonstrate the need, expedience, or advisability of," or "To express briefly").

[270] *See Vermont Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." (quotation marks omitted)); *Knauff,* 338 U.S. at 543 ("[T]he decision to admit or to exclude an alien may be lawfully placed with the President, who may in turn delegate the carrying out of this function to a responsible executive officer of the sovereign, such as the Attorney General."); *Las Americas Immigr. Advoc. Ctr.,* 507 F. Supp. at 18.

[271] That explanation will be translated into certain common languages or will be read to the noncitizen if required. 89 FR at 48741 n.194.

**STB_AR1_000079**

thorough consideration of all possible issues that might arise from the implementation of a manifestation standard at the southern border during emergency circumstances. In that vein, the Departments emphasize that the manifestation standard is a temporary solution to emergency border circumstances. In light of those circumstances, it is critical to have a system in place that more effectively and efficiently identifies those who may have a fear of return or indicate an intention to seek fear-based relief or protection. Unfortunately, any screening mechanism—even affirmative questioning—could result in some noncitizens with potentially meritorious claims not being referred for a credible fear interview. But given the emergency border circumstances facing the Departments and discussed in the June 3 Proclamation, the IFR, and this rule, the Departments believe the manifestation standard is appropriate and necessary.

b. Concerns About the Efficiency and Complexity of the Manifestation Standard

*Comment:* Several commenters expressed doubts about the Departments' claims that the change to the manifestation approach would increase efficiency, while others observed that the change would make the system more complex and create further inefficiencies. Relatedly, multiple commenters questioned the stated purpose of efficiency for eliminating the credible fear questions by CBP officers, writing that it instead appears to be a desire to reduce referrals of noncitizens for fear interviews and described the assertion by DHS in the preamble that the questions are suggestive and do not result in grants of asylum as unfounded.

One commenter questioned whether the Departments are sacrificing legitimate claims in the name of speed. Commenters wrote that the three questions and explanation previously required by the Form I–867A and Form I–867B take only a few minutes to read and criticized the Departments for alleging efficiency gains of 20 to 30 minutes by eliminating critical questions that could prevent refoulement. The commenters further stated that investing in adequate training and enforcing compliance with the ''standard'' screening process would be more efficient than providing additional guidance and requiring CBP officers to complete additional training. Another commenter described the scenario of CBP officers directing noncitizens to interpreters, who will

refer to the informative signs and videos the IFR's preamble described in CBP waiting rooms, and questioned whether this process would be shorter.

*Response:* Regarding commenters' concerns regarding complexity and efficiencies, the Departments continue to believe that the manifestation standard outlined in the IFR meets the purposes for which it was implemented—to increase processing efficiency and avoid suggestive advisals and questioning, while still ensuring that noncitizens are able to seek protection in the United States.

As outlined in the preamble to the IFR, DHS determined that, in times of emergency border circumstances, it was appropriate to temporarily eliminate the use of affirmative advisals and questions on the Forms I–867A and I–867B, based on DHS's determinations that such advisals and questioning can be suggestive. *See* 89 FR at 48743–45. The Departments disagree with the assertion that this determination was ''unfounded.'' It was based on CBP's experience that, when noncitizens are asked affirmative questions like those on the Form I–867B, noncitizens are more likely to respond in the affirmative. The affirmative questions thus can serve as a prompt for noncitizens in custody to respond in the affirmative, even if they do not actually have a fear of persecution or torture. As outlined in the IFR, the Departments' determination is also consistent with the behavioral science concept of ''acquiescence,'' or the tendency of respondents to ''consistently agree to questionnaire items, irrespective of item directionality.'' *See* 89 FR at 48743 n.220. Regarding concerns that such studies are less probative of noncitizens' experiences in CBP custody, DHS notes that it did not rely, and is not relying, on these studies as the sole basis for its determination that the advisals and affirmative questions are suggestive, nor is it asserting that these studies provide the only justification for the implementation of the manifestation standard in this rule. Rather, the implementation of the standard was, as noted above, based in part on CBP's experience in the years implementing the expedited removal process that providing affirmative advisals and asking affirmative questions was suggestive. As noted in the IFR, these studies provide illustrative support for this learned experience. *See* 89 FR at 48743.

DHS continues to believe that the concept of acquiescence supports its determination, based on its decades of experience in the processing of noncitizens who enter the United States,

that the affirmative advisals on the Form I–867A and the questions on the Form I–867B are suggestive. This determination is informed, in part, by information that agency personnel regularly receive about the activities of TCOs in the region, including information that TCOs guide or coach many noncitizens on what to say in order to remain in the United States. It is DHS's experience that, upon encounter and inspection, the questions on the Form I–867B can prompt noncitizens to follow this guidance, thus leading them to claim a fear even if they would not have done so on their own. While DHS acknowledges that noncitizens could similarly be prompted to manifest a fear under the approach of the IFR and this rule, DHS continues to believe that this approach will at minimum mitigate this problem by removing suggestive questions. Moreover, DHS continues to believe that it is likely that noncitizens with a fear of return or an intent to seek asylum will manifest a fear absent the affirmative advisals and questions on the Form I–867B. This is supported by the fact that DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[272]

DHS's determination that it was appropriate to eliminate the use of affirmative advisals and questions on the Form I–867B was also based in part on its assessment that such action would make the process more efficient. In particular, the Departments anticipated that the implementation of the manifestation standard would save approximately 20–30 minutes of processing time, contributing to increased efficiencies in processing and across the immigration process. *See* 89 FR at 48745. This assessment was based on the experience of CBP officers and agents with extensive experience reading and completing these forms, and DHS thus disagrees with commenters' contention that the completion of these forms only takes a few minutes. This is, in part, due to the fact that, when completing a sworn statement, such as the Form I–867A, officers and agents ask a number of questions of the noncitizen, each of which may need to be translated; the noncitizens' answers may need to be translated; and the officers and agents must record the answers to each question in the processing system. The noncitizen also must sign the sworn statement, which requires additional explanation that may require

---

[272] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

**JA493**

**STB_AR1_000080**

translation. This question-and-answer process is in addition to the potential need to provide translation services to noncitizens, if needed, when reading noncitizens the contents of the Form I–867A. While it is difficult to provide the exact time saved as a result of these changes in processes (because USBP systems do not automatically track processing time, standing alone), it is CBP's experience in the time since the Proclamation and IFR were implemented that the elimination of these questions and processes (including not reading the contents of the Form M–444) has, as anticipated, saved approximately 20–30 minutes per person, and led to more efficient and expedited processing overall.

With regard to concerns questioning the stated purpose behind the changes, the Departments disagree that the true purpose of the changes was to reduce the number of individuals referred for credible fear screenings. As explained in the IFR, the shift to a manifestation standard is intended to address suggestive questions and, in so doing, reduce the gap between high rates of referrals and screen-ins with historic ultimate grant rates as well as increase processing efficiency for DHS. *See* 89 FR at 48742–44 & n.220. As explained above in this section, there are multiple reasons why the referral rate observed under a direct questioning approach is very likely greater than the true rate of noncitizens who fear removal or intend to seek asylum—including coaching by TCOs and the possibility that the advisals and questions lead to an unduly high rate of false positives. *See id.* at 48743 & n.220. Seeking to address this problem is not the same as seeking to decrease the number of referrals for that purpose alone, as commenters suggest. Moreover, noncitizens who manifest or express a fear still have their claims adjudicated as required by the INA.

The Departments appreciate commenters' suggestion that, rather than implementing a manifestation standard, resources should be devoted to providing additional training to CBP officers and agents on the non-IFR process, but decline to eliminate or change the manifestation standard at this time. As noted in the IFR and in this section, the Departments believe that, in the emergency border circumstances outlined in this rule, the manifestation standard is appropriate. In addition, CBP notes that its officers and agents have had experience implementing the statutory and regulatory requirements of expedited removal since they became effective and were implemented by legacy INS in

1997, including experience identifying indicators of fear.[273] Guidance authored at that time explained that inspectors were required to refer a noncitizen to an AO if that noncitizen indicated an intention to apply for asylum or a fear of harm or concern about returning home.[274] The guidance stated that immigration inspectors should consider verbal as well as non-verbal cues given by the noncitizen; and it provided that, when determining whether to refer the noncitizen, "inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations concerning the alien's statements." [275] The guidance also highlighted that "[t]he inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases, including cases which might raise a question about whether the alien faces persecution." [276] CBP also notes that, like legacy INS, under the IFR procedures and consistent with agency policy, agents and officers are instructed to err on the side of caution and refer any questions to supervisory officers.[277]

The Departments also disagree with comments indicating that the manifestation standard creates complexities. They maintain that the manifestation standard, in fact, decreases the complexity of the process, given the more streamlined approach taken in the rule and disuse of the Form I–867A and the Form I–867B. In addition, as outlined in the preamble to the IFR and throughout this rule, the rule also allows DHS to effectively and efficiently remove inadmissible noncitizens who are subject to expedited removal orders while quickly identifying inadmissible noncitizens who require a credible fear screening by USCIS AOs. *See* 89 FR at 48742–43.

---

[273] *See* Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[274] *See id.* at 3.

[275] *Id.*

[276] *Id.*

[277] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance;* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum of Fear Claims or Fear Manifestations* (July 18, 2024); Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. and & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal at 3 (Mar. 31, 1997).

### c. Implementation Guidance and Accuracy of Manifestation to Identify Fear of Return

*Comment:* Several commenters described the manifestation approach presented by the IFR as an unclear method of assessing fear of return and critiqued the rule as confusing or lacking clear guidance on implementation. A commenter expressed concern that the criteria requiring referral for a credible fear interview are overly broad, including a "mere belief" that a noncitizen may have a fear of return. Similarly, another expressed concern that the IFR lacks guidance around what degree of manifestation is required, whether immigration officers will consistently implement the manifestation requirement, and whether noncitizens will be provided information "if and when the Departments begin to figure out what is sufficient under this test," while another commenter added that the existing U.S. asylum infrastructure is inadequate to administer the multiple layered and broad-ranging changes of the IFR, including the change to use manifestation.

Many commenters wrote that it is difficult and inappropriate for immigration officers to use manifestation of fear to assess fear of return. Commenters expressed concern that the IFR creates a confusing, non-transparent, and unfair situation for CBP officers to consider. A commenter described the manifestation standard as "deficient" in refugee protection and far from an equitable standard. The commenter wrote that requiring officers to simultaneously interrogate people at the border while also determining if their behaviors indicate fear is "nonsensical." Similarly, another commenter remarked that Border Patrol agents and CBP officers focus on border security and the identification and prevention of criminal activity at the border, often placing them in an adversarial role with noncitizens that would leave these workers ill-equipped to make careful and considered asylum determinations. The commenter also described the contrasting extensive trauma-informed training given to AOs to learn interviewing techniques designed for vulnerable populations, adding that research shows that many noncitizens who qualify for asylum relief have difficulty expressing their claims without the support of such trained techniques.

A commenter referenced a statement in the IFR noting that although the video explaining the importance of expressing a fear of return will not be

**STB_AR1_000081**

played at small facilities, immigration officers at such facilities have resources to be able to ''devote a great deal of attention to observing individuals'' to see if they manifest fear or need a translator or reading assistance. *See* 89 FR at 48741 n.196. The commenter stated that this suggests that the opposite is true at the larger facilities, *i.e.,* that officers at larger facilities will not have the time or wherewithal to scrutinize noncitizens for nonverbal signs of fear, and, in fact, expect the videos and signs to do a great deal of work for them.

Multiple commenters critiqued the IFR's directive for immigration officers to assess non-verbal shaking, crying, or fleeing behaviors as ''unworkable.'' Commenters further expressed concern that the officers would not be able to discern whether newly arrived noncitizens were cold, hungry, tired, or exhibiting other unconscious behaviors as opposed to a fear of return. Commenters described this directive in the IFR as ''absurd and disingenuous,'' writing that it would be more effective and accurate for CBP officers to directly ask simple questions regarding fear than trying to be ''mind readers.'' Another commenter referenced studies and stated that nonverbal cues of fear would likely go unheard, reasoning that express manifestations of fear are being ignored.

Several commenters recommended requiring CBP officers to ask, in a language understood by the noncitizen, one question regarding whether they have a fear of return.

Many commenters cited research—including a 2022 study by the Center for Gender & Refugee Studies that interviewed 97 families expelled during a previous use of a manifestation approach while the Title 42 public health Order was in effect—that requiring manifestation lowers the rate of noncitizens receiving fear screenings. Commenters stated that human rights monitors have documented that using the manifestation approach has resulted in ''CBP failing to refer people who expressed a fear of return to the required fear screening interviews,'' and that the ''shout'' test under the Title 42 public health Order resulted in the erroneous return of many people, including women and children, to situations of danger. Another commenter observed lower statistics of credible fear interviews granted to Haitian nationals when given the ''shout test'' at sea by the U.S. Coast Guard (''USCG'') compared to the historical rate of credible fear interviews granted to migrants encountered by immigration officials at land borders, when the shout

test was not used. Lastly, commenters stated that the IFR is already leading to failures in properly referring noncitizens for fear interviews.

In addition, several commenters referenced research [278] and expressed strong concern that CBP officers have a pattern of ignoring signs of fear in migrants. They critiqued the Departments' discussion and statistics of the likelihood of migrants responding affirmatively to asylum questions regardless of a valid fear of return, stating that the IFR's preamble does not cite any statistics about noncitizens failing to present legitimate fear claims in their interview or account for greater numbers of people seeking fear interviews if they are told they are available. A commenter stated that the statistics cited by the Departments have been directly contradicted by other research findings.

Similarly, a couple of commenters cited research [279] that some families have been ignored or chastised for requesting asylum, voiced concern that CBP officers were hostile and mistreated noncitizens at the southern border, and further expressed concerns that under ''the Shout Test'' immigration officers have prevented migrants from speaking or verbally abused them.

*Response:* The Departments disagree that the manifestation standard is an unclear, confusing, or inaccurate method of assessing fear of return and are confident that the manifestation process in the IFR—including the use of signage and a video to provide generalized notice of the right to seek asylum and protection and the way to raise such a claim—is sufficient to provide individuals with an opportunity to seek asylum and protection, while also maintaining the efficiency gains discussed above. During the time that the manifestation process has been in place under the IFR, there have been higher rates of manifestation than when the standard was recorded and tracked for family units under the Title 42 public health Order, and DHS is referring on average more than 300 individuals in DHS custody for credible fear interviews each day.[280]

The Departments acknowledge that immigration officers have historically provided advisals regarding the credible fear process and ascertained a

noncitizen's fear through affirmative questioning, through use of the Form I–867A and Form I–867B, and that removing these questions is a significant change. Thus, the Departments acknowledge that the manifestation process is, in the context of expedited removal, a new process both for officers and agents and for noncitizens. However, the Departments disagree that USBP agents and CBP officers are not equipped or trained to properly identify individuals who are vulnerable or who indicate or manifest fear. When implementing this process, agents and officers draw on their longstanding experience and practice observing and interacting with individuals, including observing any indications or behaviors of concern. Immigration officers have implemented the regulatory and statutory standards governing expedited removal since it was implemented in 1997, and, as noted above, they have had guidance regarding the treatment of noncitizens processed under these provisions since that time.

Additionally, CBP provided guidance to its frontline workforce implementing the IFR delineating how fear can be manifested by a noncitizen in many different ways, including verbally, non-verbally, or physically; CBP also provided examples and indicators. Such indicators include statements of fear; statements that the noncitizen was previously harmed in their home country or country of removal; evidence of physical injury consistent with abuse (*e.g.,* bruises, scars); evidence of self-harm; or non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.

Furthermore, the recent guidance on IFR implementation provides that, if officers or agents are in doubt, or if ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then officers and agents should refer the matter to a supervisor.[281] And, as noted above, existing guidance and CBP practice is to err on the side of caution and on the side of referring an individual to USCIS.[282]

---

[278] *See, e.g.,* Ctr. for Gender & Refugee Studies, ''*Manifesting*'' *Fear at the Border: Lessons from Title 42 Expulsions,* Jan. 30, 2024, *https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[279] *See, e.g., id.*

[280] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

---

[281] *See id.; see also* CBP, Off. of Field Operations, *Muster, Documenting Noncitizen Asylum or Fear Claims or Fear Manifestations* (July 18, 2024).

[282] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP,
Continued

STB_AR1_000082

The Departments also disagree with the commenters' concerns that the manifestation of fear standard is difficult and inappropriate, confusing, or unfair for agents and officers to apply, or that agents and officers are ill-equipped to determine the nature of an individual's fear claim. Indeed, USBP agents and CBP officers, as immigration officers, are intimately familiar with the processing of individuals, including vulnerable populations or populations requiring additional care, safety, security, or medical assistance, and with recognizing the needs of such individuals. As a result of their experience and training, CBP immigration officers (both USBP agents and CBP officers) have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow-up steps with regards to any behaviors or indicators of concern. *See* 89 FR at 48744. For instance, upon encountering a group of individuals who purport to be a family, USBP agents will observe the individuals to determine whether they evidence typical familial behavior or whether there are any concerns about the validity of the asserted familial relationship or the safety of any children in the group. *Id.* Additionally, agents and officers frequently encounter individuals who may be vulnerable, including those in physical or medical distress or in need of humanitarian care, as well as those who may be seeking protection in the United States. *Id.* Agents and officers can similarly use such skills and experiences to identify any manifestations of fear. *Id.* DHS believes that this experience, coupled with guidance, helps agents and officers effectively identify noncitizens with potential fear or asylum claims under a manifestation approach. *Id.*

The Departments acknowledge that interactions between agents and officers and noncitizens occur in the context of an immigration inspection and interview and in a custodial environment, but disagree with commenters' suggestion that the interview is "adversarial" in such a manner that noncitizens would be unlikely to manifest fear or officers would have difficulty recognizing manifestations of fear. Such immigration inspections and interviews are conducted for the sole purpose of

determining an individual's admissibility under the immigration laws of the United States and ensuring that they are processed accordingly.[283] In addition, the Departments note that, when in use, the Form I–867A and Form I–867B are also completed in this same context. During such an immigration inspection, officers and agents have face-to-face interactions with the noncitizen and thus have a chance to closely observe the individual who is being inspected, to identify those who may have a fear of return or indicate an intention to seek fear-based relief or protection.[284] The Departments reiterate that agents and officers do not assess the merits of an individual's claim of fear. The Departments acknowledge that fear can be manifested in many different ways, including verbally, non-verbally, or physically, and that when doubt or ambiguity exists, officers and agents should involve supervisors or managers to ensure appropriate decisions are made. The Departments also reiterate that USBP agents and CBP officers do not determine whether a noncitizen is excepted from the rule's limitation on asylum eligibility. Such decisions are made by a USCIS AO or, for those processed with an NTA, by an IJ. *See* 8 CFR 208.35(b)(1); 8 CFR 1208.35(a). Agents and officers are responsible for identifying whether an individual has manifested or expressed a fear and, if so, referring them for further consideration by an AO.

Additionally, the Departments note that, under the manifestation standard, a noncitizen is not required to verbally express or state that they have a fear. Contrary to commenters' concerns, the IFR does not impose a "shout test." As outlined in the IFR, manifestations of fear may be verbal, non-verbal, or physical. 89 FR at 48739–45. Thus, a migrant can manifest a fear through an unconscious behavior. *Id.* at 48744. The Departments acknowledge and appreciate that some noncitizens may have difficulty volunteering a fear of return to agents and officers during processing. However, certain migrants may also have difficulty volunteering their fear in response to the previous questions on the Form I–867B, given that the questions are asked by immigration officers in the context of the immigration process. Additionally, for noncitizens who may be hesitant to answer questions or to affirmatively express a fear, the manifestation

standard and CBP officer and agent training and experience, as well as observations from the inspection itself, take into account physical and non-verbal manifestations, some of which may be unconscious by the noncitizen.

The Departments acknowledge a two-page document cited by commenters regarding the prior use of a manifestation standard under the Title 42 public health Order.[285] The document asserts that from June through October 2022, advocates interviewed at least 97 families expelled to cities along the SWB, of whom over half reported that they had verbally expressed a fear of return and nearly three-quarters reported having non-verbally expressed a fear. According to the document, multiple migrants sought to raise fear claims with "CBP officers" but such officers did not allow them to speak and ultimately expelled them to Mexico. The Departments lack a basis to independently evaluate the advocates' methodology (which is largely undescribed) or the accuracy of migrants' claims as described in the document. At the same time, the Departments note that most of the specific allegations in the document involve behavior—officers not allowing noncitizens to speak—that would be a violation of CBP policy under the Title 42 public health Order, under this rule,[286] and under the Form I–867A/B approach that applies when emergency border circumstances are not in place.[287] For this reason, and due to the distinctions between processing under the IFR and during the implementation of the Title 42 public health Order described below, DHS does not regard this study as providing persuasive evidence that the manifestation approach of the IFR and this rule has not been and will not be effective.

The Departments disagree with commenters' implicit suggestion that the implementation of the IFR is substantially similar to the

*Re:* Processing Expedited Removal Cases & attach. (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, *Re:* Expedited Removal Policy (Aug. 11, 2004); Memorandum for Mgmt. Team, Reg'l Dirs., et al., from Off. of the Dep. Comm'r, Immigr. & Naturalization Serv., DOJ, *Re:* Implementation of Expedited Removal (Mar. 31, 1997).

[283] *See, e.g.,* INA 235(a)(3), 8 U.S.C. 1225(a)(3); 8 CFR 235.1; 8 CFR 235.3(a).

[284] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance.*

[285] *See* Ctr. for Gender & Refugee Studies, "*Manifesting*" *Fear at the Border: Lessons from Title 42 Expulsions* (Jan. 30, 2024), *https://cgrs. uclawsf.edu/our-work/publications/ %E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.*

[286] *See, e.g.,* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance* (requiring officers and agents to refer any noncitizen who manifests a fear for a credible fear interview with USCIS).

[287] *See* Memorandum for Dirs., Field Operations, & Dir., Preclearance Operations, Off. of Field Operations, from Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Processing Expedited Removal Cases & attach. at 1 (Muster); Memorandum for Chief Patrol Agents, Tucson & Laredo Sectors, from David V. Aguilar, Chief, USBP, Re: *Expedited Removal Policy* at 7–8 (Aug. 11, 2004).

**STB_AR1_000083**

implementation of the manifestation standard used during the Title 42 public health Order, such that experience under Title 42, including in the study mentioned above, demonstrates that the manifestation standard is inherently unreliable. As an initial matter, the manifestation under the IFR occurs in the context of immigration processing under title 8, rather than in the context of processing and expulsion under Title 42. Immigration processing is, as a general matter, a more complex process than the processing that occurred under Title 42, with noncitizens generally interacting with immigration officers during processing for a longer period of time than occurred during processing for expulsion. For example, the processing of an individual for expulsion under Title 42 took, on average, less than 30 minutes, as compared to, under the current processes under the IFR, approximately 1.5 hours. Therefore, noncitizens have a longer period of time to interact with the processing agents or officers, and potentially manifest a fear. In addition, noncitizens processed under title 8 procedures under the IFR provisions are generally in CBP custody for longer than under Title 42, and can manifest a fear at any time in DHS custody.

Additionally, based on best practices and lessons learned during the implementation of the Title 42 public health Order, the Departments have implemented several operational advancements and information sharing developments. Under the IFR and this rule, noncitizens have access to signage explaining that they may manifest fear during their time in DHS custody. Noncitizens in large-capacity facilities can also view videos explaining the manifestation standard and the general process they are receiving. 89 FR at 48741–42. As noted above, during implementation of the public health Order under Title 42, the DHS process was more expedited. This resulted in a narrower window of opportunity for a noncitizen to manifest a fear in DHS custody. This difference can be seen through the higher number of noncitizens manifesting fear under the IFR. Since the implementation of the IFR, 27 percent of noncitizens encountered between POEs at the SWB have manifested fear while in DHS custody.[288] Between June 3, 2022, and May 11, 2023, when the use of the manifestation standard for noncitizens encountered and subject to the Title 42 public health Order was tracked, less than 7 percent of individuals in family

units processed under the Title 42 public health Order nationwide were recorded as having manifested a fear in USBP custody and were, in general, excepted from the Title 42 public health Order. As evidenced by the significantly higher manifestation rate under the IFR as compared to what had been recorded during implementation of the Title 42 public health Order, the two circumstances are not comparable. Noncitizens encountered along the SWB under the IFR have manifested a fear and been referred to an AO for a credible fear interview on a much more frequent basis. At the same time, as discussed in Section II.A.2 of this preamble, fear-claim rates remain well below the very high rates following the ending of the Title 42 public health Order and prior to the IFR. During emergency border circumstances, it is critical for the Departments to devote their processing and screening resources to those urgently seeking protection while quickly removing those who are not. DHS believes that the manifestation standard, rather than affirmative questioning, better achieves this balance in emergency border circumstances. *See* 89 FR at 48744.

With regards to commenters' concerns that, particularly at large-capacity facilities, officers and agents may not be able to "scrutinize" noncitizens for nonverbal signs of manifestation of fear, the Departments disagree. As acknowledged in the preamble to the IFR, CBP has placed signs in its facilities along the SWB advising noncitizens of their ability to express or manifest a fear, and has placed videos in its larger facilities. 89 FR at 48741–42. DHS explained that, at smaller facilities, such videos are not played, but officers and agents have had sufficient resources to devote to observing individuals to determine if they manifested a fear. *Id.* at 48741 n.196. This statement was intended to explain why a video was not necessary at such facilities, but is not intended to convey any lack of attention to such claims at large-capacity facilities. Indeed, as noted above, agents and officers interview and observe noncitizens during their immigration inspection and interviews, which occur one-on-one. CBP operations at any CBP facilities with noncitizens in custody are staffed and operate 24 hours a day. Every CBP officer and agent receives annual training on CBP National Standards on Transport, Escort, Detention, and Search (TEDS)—which provide standards for the custodial conditions in CBP facilities—that ensures every noncitizen in CBP

custody is monitored for care and safety, including a provision requiring officers and agents to "physically check" areas where noncitizens are held "on a regular and frequent manner," providing noncitizens with an opportunity to raise any concerns or needs directly with CBP personnel conducting the checks.[289] Noncitizens in custody at CBP facilities are generally under continuous and direct supervision by multiple personnel and may seek assistance or ask questions of any of those individuals supervising their holding areas at any time. *See* 89 FR at 48744. DHS is confident that, during this time, even in large-capacity facilities, agents and officers have sufficient experience and expertise to identify manifestations or expressions of fear. Likewise, noncitizens in custody at ICE facilities may seek assistance or ask questions and are supervised such that officers, who have experience and expertise in these interactions, can identify manifestations or expressions of fear. It is important to note that a noncitizen does not have a finite or limited number of opportunities to manifest fear, but rather may manifest fear at any point while in DHS custody.

Further, regarding comments that express concerns and reference reports concluding that the manifestation standard has resulted in failures to refer noncitizens for a required fear interview, and comments recommending that, given this, officers and agents should ask, at a minimum, a question about fear in the noncitizen's native language, the Departments are aware of these studies and their conclusions. The Departments acknowledge that, under the manifestation approach outlined in this rule, there may be some noncitizens who have a fear of persecution or a fear of return, but who are not referred for a credible fear interview. However, the Departments do not believe that such a possibility is unique to the manifestation standard, and, in any event, DHS has taken steps, including posting signs and videos and providing guidance to its personnel, to help mitigate this possibility. Having considered the reports commenters cite, as well as the mitigating steps DHS has taken and the lessons learned from DHS's experiences during processing under the Title 42 public health Order, the Departments continue to believe that the manifestation standard is

---

[288] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[289] CBP, *National Standards on Transport, Escort, Detention, and Search (TEDS) 4.6*, at 16 (Oct. 2015), *https://www.cbp.gov/document/directives/cbp-national-standards-transport-escort-detention-and-search.*

STB_AR1_000084

appropriate in the circumstances outlined in the IFR and this rule. Moreover, as explained earlier in this response, the Departments' implementation of the IFR has resulted in a fear-claim rate substantially higher than the rate observed under the Title 42 public health Order, further suggesting that the circumstances from other operational contexts, including those studied in earlier research, may be inapposite.[290] DHS acknowledges that asking a single question about fear would be an alternative to the approach adopted in this IFR. However, DHS declines to implement such an option, as it would be subject to the same concerns that DHS outlined in the preamble to the IFR with regards to a short, individualized advisal. As noted in that preamble, DHS has determined that, during times of emergency border circumstances, a short, individualized advisal would be unlikely to convey information more effectively than signs and videos. *See* 89 FR at 48744. In particular, the Departments assessed that if an advisal could be developed that was short enough to avoid unduly lengthening processing times in the current emergency situation, such an advisal would be unlikely to convey information more effectively than the existing signs and videos, and such an advisal would still have the suggestiveness problems of the current system. The Departments assess that asking a single question—particularly in the context of the expedited removal process under the IFR where there are no individualized advisals provided— would likely present the suggestiveness problems of the current system. DHS thus declines to implement this change.[291]

To the extent that there are allegations that an agent or officer ignored expressions or manifestations of fear by a noncitizen, such conduct is contrary to DHS policies and practices, and would be treated as such. The Departments again note that, to the extent it exists, such employee misconduct would not be unique to the implementation of this rule. Nor do such claims provide a persuasive reason to depart from the approach this rule adopts to address emergency border circumstances. As already explained, DHS has provided guidance to CBP and ICE agents and officers on how to identify manifestations of fear; that guidance directs them to refer individuals who manifest fear for a credible fear screening, including instructing them to err on the side of referral. 89 FR at 48744. If agents or officers disregard those instructions— which could occur with or without this rule—DHS has procedures in place for reporting misconduct.[292] DHS relies on

these procedures generally to ensure that personnel are following applicable law and guidance, and DHS assesses that these procedures are generally effective. If allegations of misconduct are found to be substantiated and misconduct is found, such findings may lead to, for instance, disciplinary action against involved personnel and referral for criminal charges if a determination is made that any laws were violated. In addition, regardless of whether any such findings are substantiated, DHS may impose additional training and policy measures consistent with the rule's provisions.

Concerns about misconduct by individual employees are further mitigated by the reality that, as explained above, noncitizens do not have just one chance to manifest fear while in CBP or ICE custody: Noncitizens will typically interact with multiple agents and officials, and they can manifest fear to any of them. Noncitizens will have these opportunities, moreover, after being exposed to signs and videos explaining that they can manifest fear. From June 5, 2024, through August 31, 2024, the median processing time from encounter through repatriation for a case with no fear claims was 6 days.[293]

Moreover, commenters have provided no evidence that there is a widespread problem of CBP officers and agents ignoring fear claims under the IFR. As described above, there are a number of mechanisms within the Department for such complaints and concerns to be raised, and CBP is not aware of any substantiated allegations of misconduct raised through these channels. And the data showing a manifestation rate of 27 percent under the IFR—though not alone proving a negative or showing that no fear claims are being missed— indicate that officers and agents are following their guidance and reporting manifestations of fear in a large number of cases. For all these reasons, DHS does not believe the commenters' arguments provide a reason to depart from the rule's approach.

*Comment:* A few commenters reasoned that because the manifestation of fear approach does not require documentation, unlike affirmative questioning, the IFR removes appropriate accountability. One commenter described the change to using manifestation as ''a dangerous reversal of a procedural safeguard that

---

[290] As noted in the IFR, the manifestation standard is used by the USCG, a DHS component, to determine whether an at-sea protection screening interview is required for migrants interdicted at sea. *See* 89 FR at 48744. Although the Departments believe these other uses support the view that a manifestation standard can be effective, having implemented the IFR's manifestation standard and observed the results of that standard, the Departments now believe that the difference between the operational contexts limits the usefulness of the direct comparison as suggested by some commenters.

[291] As noted in the preamble to the IFR, the Departments acknowledge that there are some studies articulating that the Form I–867A and Form I–867B provide important protections. As explained in the IFR, DHS disagrees with these studies to the extent that they conclude that individualized advisals and affirmative questions are not suggestive, based on DHS's longstanding experience with this process. Indeed, such studies are now nearly two decades old and were done at a time when, as described above, the ER process was very different from what it is now. Additionally, given that the studies do not account for the signs, videos, and other means of providing information under the IFR's approach, DHS does not believe they are

particularly probative as a means of assessing the effectiveness of this approach.

[292] CBP takes allegations of employee misconduct very seriously, and allegations of serious misconduct are investigated by CBP's Office of Professional Responsibility (OPR). CBP, *Office of Professional Responsibility, https://www.cbp.gov/ about/leadership-organization/professional- responsibility* (last modified Mar. 29, 2024). Allegations of misconduct by a CBP employee or contractor can be sent to CBP OPR's Intake Center via email: *JointIntake@cbp.dhs.gov,* or via phone: 1– 877–2INTAKE (246–8253), Option 5. Similarly, ICE's Office of Professional Responsibility (''OPR'') takes employee misconduct very seriously and manages and investigates allegations of employee misconduct and oversees a variety of other integrity programs that protect the public trust and preserve the highest standards of integrity and accountability across the agency. ICE, *Office of Professional* Responsibility, *https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). To promote integrity, mitigate risk, and uphold the agency's professional standards, the OPR-led Integrity Coordination Center receives and assesses information and refers any allegations of employee misconduct to appropriate offices for investigation, if necessary. ICE, *Office of Professional Responsibility, https:// www.ice.gov/about-ice/opr* (last updated May 15, 2024). This process ensures that allegations of criminal or administrative misconduct against ICE personnel are properly assessed and thoroughly investigated. ICE, *Office of Professional Responsibility, https://www.ice.gov/about-ice/opr* (last updated May 15, 2024). Allegations of misconduct by an ICE employee or contractor can be sent to ICE OPR's Integrity Coordination Center via email: *ICEOPRIntake@ice.dhs.gov,* via phone: 1– 833–4ICE–OPR (833–442–3677), or via the ''File a Complaint'' web link. ICE, *Integrity Coordination Center—Intake Form, https://www.ice.gov/ webform/opr-contact-form* (last updated Jan. 9, 2024).

Additionally, the DHS Office of Inspector General and the DHS Office for Civil Rights and Civil Liberties are also available for the public, including previously removed noncitizens, to provide feedback and make complaints involving DHS employees, including officers and agents, or programs; to submit allegations of civil rights and civil liberties violations; and to submit other types of grievances. *See, e.g.,* DHS, Off. of Inspector Gen.,

*Hotline, https://www.oig.dhs.gov/hotline* (last visited Sept. 21, 2024); UDHS, *Office for Rights and Civil Liberties, https://www.dhs.gov/office-civil- rights-and-civil-liberties* (last visited Sept. 21, 2024).

[293] OHSS analysis of data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

STB_AR1_000085

has been implemented to ensure the United States' compliance with its international obligations,'' expressing concern that other safeguards are already being removed. A commenter expressed concern that the Departments have eliminated the Form I–867A and Form I–867B without replacing them with any other documentation, which they wrote could make it impossible to have any record of missed viable claims for asylum or the total extent of any such errors. Another commenter asserted that the previous system of requiring immigration officials to complete and sign two forms incentivized officials to be honest and critiqued the manifestation approach as leaving no paper trail. Another commenter stated that the manifestation standard would worsen already problematic interactions between CBP officers and noncitizens. The commenter referenced a report [294] finding that CBP officers had an ''alarming'' rate of irregularities and non-conforming practices when assessing fear of return, including failing to read the required script for the Form I–867A, failing to record answers correctly, and using questionable interpretation practices. Another commenter discussed reports finding that many interviews conducted by CBP and ICE were marked by inaccuracies, mistranslations, and fabricated information, as well as research showing that in most situations when migrants stated that CBP agents did not ask about their fear of return, the immigration records showed instead that this question had been asked and answered.

*Response:* The Departments disagree that the manifestation of fear standard removes accountability or eliminates official documentation of a fear claim. As an initial matter, while CBP officers and agents are not required to provide noncitizens with an M–444 and do not complete a Form I–867A or Form I–867B when the IFR's provisions are in effect, fear claims are documented in the relevant electronic systems. Guidance issued to both USBP and the OFO requires that, when a noncitizen subject to the Proclamation and the IFR is being processed for expedited removal, and manifests a fear, that noncitizen is to be processed under a particular disposition code in the electronic processing

system.[295] This code is unique to those who are processed for expedited removal and who manifest a fear. Additionally, while noncitizens processed for expedited removal under the IFR procedures are not required to be provided the Form M–444, they continue to be provided information about the credible fear process, through a tear sheet called *Information about Credible Fear Interview* and by video, and they are provided the opportunity to consult with an individual of their choosing.[296] CBP facilities also have signage and, in some cases, videos, providing notice to all noncitizens in custody that, if they have a fear of return, they should inform an agent or officer. 89 FR at 48741. This manifestation may occur at any point during a noncitizen's time in CBP custody, and if such a claim is made, it must be documented in the relevant electronic system at that time.

ICE maintains an electronic system to record case management actions for noncitizens, including referrals to an AO and the disposition of a noncitizen's credible fear determination.[297] If a noncitizen manifests or expresses a fear after their initial encounter with CBP, while in ICE custody, ICE guidance requires officers to refer the case to USCIS for a credible fear interview, including having an opportunity to

consult with an individual of their choosing prior to their credible fear interview.[298]

Per applicable guidance, ICE documents any manifestation or expression of fear on the Form G–166C, which also verifies that the noncitizen has been provided information on the credible fear interview process and the specific language in which it was provided.[299] ICE guidance requires that all documentation, including the claim of credible fear and USCIS fear referral package, are captured in an electronic system of records.[300]

ICE and CBP utilize the same electronic database system for case management of noncitizens and have electronic access to these records.[301] ICE tracks noncitizens transferred from CBP to ICE custody who have manifested fear through the same system.[302] This system ensures that information relating to a noncitizen's case, including fear manifestation, is properly referred to USCIS.[303]

---

[294] *See* U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal,* at 19 (Aug. 2, 2016), https://www.uscirf.gov/publications/barriers-protection-treatment-asylum-seekers-expedited-removal.

[295] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4–5 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[296] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* 4–5 (June 4, 2024); 6.4.24 USBP Field Guidance ER IFR 1; Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 4 (June 4, 2024) (Muster).

[297] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (ICE officers are instructed ''to document the Claim Credible Fear, Fear Referral package submitted, and all subsequent CF related actions in [the electronic system's] Actions and Decisions Tab''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.

[298] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border, *and Interim Final Rule,* Securing the Border, at 4 (June 4, 2024) (''If ERO determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal, the officer will provide the noncitizen with the Information About Credible Fear Interview Sheet and refer the noncitizen to USCIS for a credible fear interview.'').

[299] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024).

[300] *Id.*

[301] DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.

[302] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (''The new processing dispositions [by CBP] can be tracked in the ICE [system's] Dashboard . . . by selecting these new processing dispositions . . . .''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4 (Dec. 3, 2018), https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.

[303] ICE, Broadcast message for Field Office Directors and Deputy Field Office Directors, from Asst. Dir. for Field Operations, *Re:* Procedures for Processing Noncitizens that Fall Under the Presidential Proclamation and Interim Final Rule (June 7, 2024) (for cases transferred to ICE from CBP after a noncitizen has manifested fear, ''[t]he existing automated referral solution using the 'Refer Credible Fear to USCIS button' in [the electronic system] will be available for use . . . [and the automated] functionality will function as designed.''); DHS, *Privacy Impact Assessment for the Enforcement Integrated Database (EID),* at 2, 4

Continued

STB_AR1_000086

With regard to a commenter's concern that the absence of affirmative questioning will result in irregularities and non-conforming practices when assessing fear of return, the Departments disagree. The Departments acknowledge that, under the standard outlined in this rule, official documentation will indicate if a noncitizen expressed or manifested a fear, but will *not* contain an express similar record of a lack of such manifestation. DHS acknowledges that this is a change from non-IFR practices, in which a noncitizen's case file will reflect that the individual was provided with the Form I–867A advisals and will contain the noncitizen's response to the questions in the Form I–867B. DHS disagrees that the lack of such documentation under the manifestation of fear standard removes accountability from CBP officers and agents, incentivizes any falsification of records, or undermines the validity of the manifestation process. During immigration processing, CBP officers and agents ask a noncitizen a number of questions, including about their biographic information, nationality, and purpose of travel to the United States. The processing officer or agent records the noncitizen's answers to these questions in the electronic processing system.[304] In addition, as noted above, any individual who is processed for expedited removal and manifests or expresses a fear is processed using a unique code in the electronic system.[305] Officers and agents have an obligation, as law enforcement officers and Federal employees, to ensure that the record of a particular individual's case file is accurate and complete,[306] which

(Dec. 3, 2018), *https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice-eid-december2018.pdf.*

[304] *See* DHS, *Privacy Impact Assessment for the CBP Portal (E3) to ENFORCE/IDENT, DHS/CBP/PIA–012,* at 1, 3 (July 25, 2012), *https://www.dhs.gov/publication/cbp-portal-e3-enforceident* (discussing the type of information collected from noncitizens and how it is recorded in the electronic system).

[305] *See* Memorandum for All Chief Patrol Agents & All Exec. Directorates, from Jason D. Owens, Chief, USBP, *Re:* Processing Guidelines for Noncitizens Described in Presidential Proclamation, *Securing the Border* and Interim Final Rule, *Securing the Border* at 4 (June 4, 2024); Memorandum for Exec. Dirs., Headquarters, & Dirs., Field Operations, Off. of Field Operations, from Ray Provencio, Acting Exec. Dir., Admissibility & Passenger Programs, Off. of Field Operations, CBP, *Re:* Implementation of Presidential Proclamation and Interim Final Rule, *Securing the Border* attach. at 3–5 (June 4, 2024) (Muster).

[306] *See, e.g.,* 44 U.S.C. 3101 (providing that federal agencies ''make and preserve records containing adequate and proper documentation of the [official activities] of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons affected by the agency's activities'').

includes any manifestations or expressions of fear. Thus, the lack of such a code indicates that the individual did not manifest a fear. However, to the extent that an officer or agent failed to accurately record a manifestation of fear, the lack of the unique code in the noncitizen's file itself would provide a record of that failure—just as an inaccurate ''no'' answer to a question on a Form I–867B would if a noncitizen actually answered ''yes'' to the question. To the extent that commenters are concerned about potential misconduct by officers and agents, CBP and ICE take allegations of misconduct very seriously and have mechanisms in place to investigate and respond to such allegations as discussed above.

*Comment:* Multiple commenters expressed concern that the IFR and ''shout test'' approach avoids the provision of necessary interpretation by immigration officers and thwarts appropriate language access for migrants, often adding that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish. Commenters further stated that the IFR might disproportionately impact speakers of Indigenous languages, who may be able to communicate regarding basic information in Spanish but may be unable to discuss the complicated matter of a fear-based claim in anything other than their native language. Similarly, a commenter observed that noncitizens are held in facilities for only a limited time and that during that time language needs might be overlooked. In the same vein, another commenter expressed concern that the IFR and the preamble are not clear regarding how noncitizens who speak languages other than English or Spanish are expected to manifest fear, when they may be able to communicate only basic identification in English or Spanish and Border Patrol agents are not incentivized to seek an interpreter in the noncitizen's language.

*Response:* The Departments disagree with commenters expressing a belief that immigration officers are not likely to understand expressions of fear in languages other than English or Spanish and that they are not incentivized to seek an interpreter. As noted, noncitizens are not required to verbally express or state a fear. A fear can also be manifested non-verbally or physically. In addition, CBP has legal and policy obligations to provide language access services and translation and has long recognized the importance of effective and accurate communication between CBP personnel and the public. Ensuring effective communication with

all persons, including limited English proficiency (''LEP'') persons, facilitates CBP's mission.

It is the policy of CBP to take reasonable steps to provide LEP persons with meaningful access, free of charge, to its operations, services, and other conducted activities and programs without unduly burdening the Agency's fundamental mission.[307] This policy applies to all methods of communication—*e.g.,* verbal (including telephone); correspondence (including emails); websites; newsletters; community engagement activities; and flyers, posters, pamphlets, and other documents explaining CBP programs.[308] This policy also applies to interactions with the public, including law enforcement encounters (*e.g.,* questioning, processing, etc.).[309] As a result of and related to these policy obligations, CBP agents and officers have extensive experience and training in identifying whether an individual requires a translator or interpreter or is unable to understand a particular language. In addition, CBP facilities have ''I Speak'' signs, which are signs that assist literate individuals to identify a preferred language from one of over 60 possible languages.[310] Upon implementation of the IFR, signs were posted in areas of CBP facilities where individuals are most likely to see those signs, instructing individuals that, in addition to being able to inform the inspecting immigration officers of

[307] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[308] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[309] *See, e.g.,* CBP Directive 2130–031, *Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access* (Dec. 4, 2018); CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[310] *See* CBP, *Language Access Plan* 7 (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* DHS, *I Speak . . . Language Identification Guide, https://www.dhs.gov/sites/default/files/publications/crcl-i-speak-poster-2021.pdf* (last visited Sept. 3, 2024); DHS, *I Speak . . . Indigenous Language Identification Poster, https://www.dhs.gov/sites/default/files/publications/Habla%20Poster_12-9-16.pdf* (last visited Sept. 3, 2024); *see also* DHS, *DHS Language Access Resources* (July 17, 2023), *https://www.dhs.gov/publication/dhs-language-access-materials.*

**STB_AR1_000087**

urgent medical or other concerns, they should inform the inspecting immigration officer if they have a fear of return, and that, if they do, they will be referred for a screening. 89 FR at 48741. Moreover, in CBP's large-capacity facilities—where the vast majority of individuals subject to expedited removal undergo processing—a short video explaining the importance of raising urgent medical concerns, a need for food or water, or fear of return is shown on a loop in the processing areas and will also be available in commonly-spoken languages. To the extent that noncitizens do not speak one of these languages, CBP provides language assistance services consistent with CBP's Language Access Plan.[311] Furthermore, individuals who are unable to read the signs or communicate effectively in one of the languages in which the signs and videos are presented will be read the contents of the signs and videos in a language they understand.

*Comment:* One commenter expressed concern that, as a result of the signs and videos in CBP facilities advising migrants of their ability to manifest or express a fear, noncitizens are ''in essence . . . coached'' by DHS with regard to manifesting fear.

*Response:* With regard to this concern that the existence of signs and videos amount to DHS ''coaching'' migrants with regards to manifesting or expressing a fear, the Departments are cognizant that, for some individuals, such messaging may result in migrants expressing or manifesting a fear when they otherwise would not. However, as explained in the preamble to the IFR, DHS adopted the approach outlined in this rule—a manifestation standard, coupled with a general notice of the right to express or manifest a fear—in an effort to mitigate this potential, compared with the existing practice of asking affirmative questions. *See* 89 FR at 48743–44. DHS believes that the approach taken in this rule appropriately reflects and accounts for DHS operational needs while protecting noncitizens' ability to seek protection in the United States.

d. Trauma Impacting Manifestation and Vulnerable Populations

*Comment:* Many commenters expressed concern that noncitizens have endured significant trauma en route to the United States or are under stress after escaping harm and ''might not be able to explicitly state their fears'' and, thus, would fail the manifestation requirement. One commenter pointed out that trauma does not always present with the physical cues identified in the IFR, such as ''shaking, crying, or signs of physical injury.'' The commenter stated that the relevant USCIS Training Module ''explains that survivors of severe trauma may appear emotionally detached''; the commenter wrote that removing an affirmative individualized explanation of the process makes it even harder for survivors to pursue protection for which they are entitled to apply. Other commenters similarly observed that people who have suffered trauma ''often have great difficulty raising their fears of return in non-confidential group settings'' and might be hesitant to disclose their fear to armed, uniformed officials. One commenter expressed concern that many migrants have fled violence at the hands of government officials and would have difficulty volunteering their fear of return to uniformed CBP agents who are not asking questions about their fear but about other aspects of their situation, while another commenter observed that ''all people [seeking] asylum remain traumatized, and very few are able or prepared to tell their full story even if they understand the consequences of the [credible fear interview] process.'' Commenters also asserted that noncitizens may not understand the importance of their first encounter with a government official or may believe they will have an opportunity to raise their claim later in the process.

*Response:* The Departments acknowledge that many noncitizens arriving in CBP custody may have experienced trauma of some kind and that being taken into immigration custody may exacerbate some of this trauma. The Departments also acknowledge that it may be difficult for some noncitizens to articulate details of their fear claim to CBP officers and agents during processing, and may, in general, have negative reactions to law enforcement officials in uniform. On this point, however, the Departments note that, during CBP processing, the relevant factor determining whether a noncitizen is referred to USCIS is whether the noncitizen manifests a fear. They are not required to, nor expected to, articulate the full scope of their fear or the rationale behind it. Indeed, CBP agents and officers do not determine the validity of any fear claim. Additionally, to the extent that an individual may react negatively to a CBP officer or agent in uniform, such concerns are not limited to the process under the IFR and would ostensibly apply to any screening process implemented by the Departments. CBP has taken steps over the past several years to integrate trauma-informed care for all persons in custody, with a particular focus on UCs.[312] In particular, in CBP holding facilities, the agency has taken steps to ensure that processing procedures are informed by the potential for trauma experienced by individuals in custody, with a particular emphasis on providing a sense of safety and security, providing caregivers for children in custody and increased custodial oversight, increasing medical standards for individuals in CBP custody, providing regular orientation and assistance, and providing activities and recreation for children.[313] In addition, CBP has taken steps specific to the credible fear process, for those going through the process in CBP custody, to protect the privacy of noncitizens during their interviews, where noncitizens may discuss traumatic situations. These interviews occur in confidential and private phone booths intended for use both for consultation and for the credible fear interview. While DHS has taken steps to mitigate the impact of such trauma on the effectiveness of the screening process, including through its signage and videos, it is not possible to develop a screening process that completely eliminates the potential effects of past trauma.

*Comment:* Many commenters expressed specific concerns that certain vulnerable populations of noncitizens would be at a particular disadvantage when seeking protection due to the manifestation requirement. Some commenters highlighted survivors of sexual violence, political dissidents, and LGBTQI+ populations as particularly disadvantaged, in that they may not easily manifest fear in asylum settings due to their specific history of oppression. For example, one commenter wrote that political dissidents may have a fear and mistrust of government officials and be unlikely to reveal their stories to immigration officials. They also discussed the significant harm that they believe the manifestation requirement will have on members of the LGBTQI+ community who are fleeing persecution and thus are

---

[311] *See* CBP, *Language Access Plan* (2016), *https://www.dhs.gov/sites/default/files/publications/final-cbp-language-access-plan.pdf;* CBP, *Supplementary Language Access Plan* (2020), *https://www.dhs.gov/sites/default/files/publications/cbp-updated-language-access-plan-2020.pdf.*

[312] *See* Memorandum for Exec. Assistant Comm'rs, et al., from Chris Magnus, Comm'r, U.S. Customs and Border Protection, *Re:* Directive for U.S. Customs and Border Protection Approach to Trauma-Informed Care for Persons in Custody at 1 (Apr. 29, 2022).

[313] *Id.* at 2–4.

STB_AR1_000088

likely afraid to reveal intimate details of their lives in immigration facility spaces that lack privacy and confidentiality.

*Response:* Regarding concerns that certain populations, including LGBTQI+ individuals, survivors of sexual violence, and political dissidents, may not be comfortable expressing the details of their fear claim to CBP officers and agents, the Departments reiterate that, at the time of CBP processing, agents and officers do not inquire about or ask questions about the nature of an individual's fear claim, nor do they evaluate the validity of that claim. Thus, such migrants are not required to—and are not expected to—provide the details of any fear claim, or even the basis for their claim, during CBP processing. In addition, the Departments note that concerns regarding the ability of these populations to articulate their fear claims are not limited to the process under the IFR, and would seemingly apply to any screening process implemented by the Departments, including the process utilizing the Form I–867A and Form I–867B.

e. A Manifestation of Fear Does Not Sufficiently Align With a Valid Claim for Asylum

*Comment:* Several commenters critiqued the assertion in the IFR that a manifestation of fear aligns with a valid claim for asylum. One commenter articulated that the Departments provided no rationale to think that the new manifestation of fear approach would only affect people with "frivolous claims" to asylum and wrote that this conclusion was contrary to common sense. A commenter wrote that requests for relief or visibly detectable signs of fear are not proxies for a strong claim and that other factors, such as coaching by a smuggler, might determine whether or not a migrant manifests fear.

*Response:* Contrary to the contention contained in the comments, the IFR did not state that the manifestation standard will only impact those with "frivolous" claims. The Departments noted in the preamble to the IFR that they believed that the manifestation standard "is reasonably designed to identify meritorious claims even if a noncitizen does not expressly articulate a fear of return." 89 FR at 48744. This decision was informed by the Department's experience that providing the affirmative advisals on the Form I–867A and asking the affirmative questions on the Form I–867B is, in some cases, suggestive, and by the Departments' belief and experience that those with meritorious claims will make their fear or desire to request asylum known when

given the opportunity to do so. However, the Departments also acknowledge that any screening mechanism may result in some noncitizens with valid claims not being referred for a credible fear interview. *Id.* at 48743–44. Nonetheless, the Departments believe that the manifestation standard will allow DHS to identify claims that may be meritorious in an efficient and effective manner, and that this change remains appropriate and necessary in light of the emergency border circumstances in which this rule is implemented. *Id.* at 48744.

f. Noncitizens May Not Understand Their Legal Right To Seek Asylum

*Comment:* Multiple commenters wrote that some noncitizens may not know that they legally can raise their fears of harm. Other commenters wrote that many immigrants would be unable to meet the requirement to express their fear of return explicitly, due to lack of access to legal counsel or unfamiliarity with the legal requirements. A commenter remarked that noncitizens may not understand that the experiences they suffered based on gender, racism, or homophobia or transphobia in their countries of origin might be grounds for asylum in the United States.

Some commenters described the signs and videos discussed in the IFR as insufficient for communicating the complex concepts of manifestation of fear and credible fear screenings. A commenter criticized the content and design of the signs as insufficient to inform the reader that they forfeit their right to seek asylum if they do not manifest a fear of their return. Another commenter noted that the videos would not necessarily even be played at smaller facilities.

Some commenters stated that signs or videos are an inadequate systematic approach to reaching a broad pool of noncitizens with valid asylum claims, particularly given the limited number of languages used. One commenter criticized the "arbitrary" limitation on the number of languages used for the signs and videos and stated that the IFR at footnote 195 (89 FR at 48741 n.195) suggests the signs and videos in CBP facilities will be posted in English, Spanish, Mandarin, and Hindi, but the ICE Implementation Guidance says only that the signs must be posted in English and Spanish without mentioning additional languages to be used on the signs themselves.[314] The comment

stated that limiting language access to these four languages will clearly leave many without any way to understand the procedure they must follow to have their claims heard. The commenter stated that neither the Implementation Guidance nor the Rule explain how someone who cannot understand one of these four languages would know to seek out translations in the law library, as indicated in the rule, or if all facilities even have a law library.

*Response:* The Departments disagree with the commenters' assertions that the signs and videos are not sufficient to notify noncitizens that they can manifest a fear. CBP has posted signs in areas of its facilities where individuals are most likely to see those signs. In addition, CBP has developed a video that is shown on a loop in the processing areas of its large-capacity facilities. Commenters are correct that these videos are not shown in smaller facilities. However, as outlined in the IFR, in such smaller facilities, the signs are posted, and officers and agents are generally able to devote significant attention to noncitizens in custody and identify either fear manifestations or language needs. *See* 89 FR at 48741 n.196. Contrary to commenters' assertion that the list of languages in which these signs and videos are provided is arbitrary, they are provided in the languages spoken by the most common nationalities encountered by CBP and thus will likely be understood by most of the individuals in CBP custody who are subject to the rule. And if a noncitizen does not speak one of these languages, CBP provides language assistance services in accordance with CBP's Language Access Plan.[315]

These signs and videos have also been provided in short, concise language, rather than explaining the complex details of the credible fear process or the standards for addressing a claim for asylum or other protection. This is based on DHS' experience that short, concise, and simple notifications are most effective for noncitizens in custody at CBP facilities, given the nature of CBP facilities and CBP operations.[316] In

---

[314] ICE, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3,*

*2024, Securing the Border, and Interim Final Rule,* Securing the Border, at 5 (June 4, 2024) ("These signs must be posted in English and Spanish. ERO will have additional translations available in facility law libraries in the following languages. . . .").

[315] *See* CBP, *Supplementary Language Access Plan: Fiscal Years 2020–2021,* at 6 (Feb. 7, 2020), *https://www.cbp.gov/about/language-access.*

[316] *See* CBP, *Directive 2130–031: Roles and Responsibilities of U.S. Customs and Border Protection Offices and Personnel Regarding Provision of Language Access,* at 1, 4–5 (Dec. 4, 2018), *https://www.cbp.gov/document/directives/2013-031-roles-and-responsibilities-us-customs-and-border-protection-offices?language=pt.*

STB_AR1_000089

particular, CBP's role in the credible fear screening process is to identify those who may be seeking protection in the United States, in order to ensure that such individuals are referred to a USCIS AO. This role thus requires officers and agents to identify claims of fear, and, at this initial stage, err on the side of caution.[317] In addition, noncitizens in CBP custody go through a number of steps and may move between various locations in a single facility while completing processing and awaiting transfer out of CBP custody. Therefore, it is CBP's experience that short, simple signs, which can be noticed and read quickly, are more effective for communicating with noncitizens than signs with more complex language. Such claims of fear are, under non-IFR procedures, identified in part through the questions on the Form I–867B. Under this rule, such claims may be manifested or expressed to an officer or agent at the time of processing. However, this rule does not change the role of either the noncitizen or CBP immigration officers in the process—a noncitizen may express or manifest a fear, and, once that fear is expressed, CBP refers the individual to an AO. Additionally, those noncitizens who are referred and who undergo their credible fear interviews in CBP custody are provided additional information about the credible fear process, through the *Information about Credible Fear* tear sheet and the USBP video explaining the credible fear process.

Additionally, for those transferred to ICE custody, commenters are correct that initial ICE guidance called for ICE to provide signage in English and Spanish,[318] but ICE subsequently directed the relevant facilities to post signage in the same four languages as CBP. In addition, as noted by the commenter, ICE has translations available in facility law libraries in the following languages: Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese.[319]

Noncitizens in ICE detention facilities have access to law libraries for at least five hours per week.[320] Furthermore, ICE has access to an ICE-wide 24/7 language services contract for interpretation and translation, and guidance and best practices materials for identifying LEP individuals and their primary language to secure the necessary interpretation and translation services for them.[321] ICE detention standards provide that oral interpretation or assistance shall be provided to any detainee who speaks another language in which written material has not been translated or who is illiterate.[322] Each detained noncitizen in an ICE detention facility is provided an ICE National Detainee Handbook,[323] which is currently available in 16 languages (English, Spanish, Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Pulaar, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese).[324] The Handbook describes the noncitizen's ability to ask for relief from removal, including by seeking asylum, and also provides information regarding the law library and additional resources available to noncitizens.[325] All ICE detainees have the right to use the facility's law library to access approved legal materials.[326]

---

[320] ICE, *Attorney Information and Resources: Other Legal Resources Available to Noncitizens in ICE Custody* (Aug. 9, 2024), *https://www.ice.gov/detain/attorney-information-resources.*

[321] ICE, *Language Access Information and Resources* (May 7, 2024), *https://www.ice.gov/detain/language-access* (describing current language access policies); ICE, *ICE Language Access Plan, Supplemental Update Covering Fiscal Years 2019 and 2020,* at 3–5 (July 21, 2020), *https://www.ice.gov/doclib/about/offices/ero/pdf/iceLanguageAccessPlanSupplemental2020.pdf;* ICE, *Language Access Plan,* at 7, 10, 13 (June 14, 2015), *https://www.ice.gov/sites/default/files/documents/Document/2015/LanguageAccessPlan.pdf.*

[322] *See, e.g.,* ICE, *6.3 Law Libraries and Legal Material,* at 422 (revised Dec. 2016), *https://www.ice.gov/doclib/detention-standards/2011/6-3.pdf.*

[323] ICE, *Detention Management, National Detainee Handbook* (Sept. 4, 2024), *https://www.ice.gov/detain/detention-management/national-detainee-handbook.*

[324] *Id.*

[325] ICE, *National Detainee Handbook,* at 9, 16 (2024), *https://www.ice.gov/doclib/detention/ndHandbook/ndhEnglish.pdf* ("You have the right to ask for relief from removal based on various legal grounds if you believe you qualify. These might include cancellation of removal, adjustment of status, asylum, withholding of removal, or relief under the Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. For example, you have the right to ask for asylum to stay in the U.S. if you were (or are afraid that you will be) persecuted in your native country or a country where you last lived because of your race, religion, nationality, political opinion, or membership in a particular social group.").

[326] *Id.* at 16.

---

[317] *See* CBP, *Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance,* at 1 ("If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then CBP officers and agents should refer the matter to a supervisor.").

[318] Memorandum for Enforcement and Removal Operations Exec. Assoc. Dir. Daniel A. Bible, from ICE Deputy Dir. and Senior Off. Performing the Duties of the Dir. Patrick J. Lechleitner, *Re:* Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border,* and Interim Final Rule, *Securing the Border* at 5 (June 4, 2024).

[319] *Id.*

---

With regard to concerns that migrants may not know that their experience in their home country or on their journey to the United States may be grounds for asylum, the Departments note that this has always been the case, even under non-IFR credible fear processes. In any event, the Departments note that the current signs and videos use general language to advise noncitizens that they should tell an officer if they "[f]ear persecution or torture if removed from the United States." This open-ended language does not require a noncitizen to fully understand the legal nuances or complexities of their claim at the time it is manifested. CBP therefore believes that the existing signs and videos are sufficient.

3. "Reasonable Probability" Screening Standard for Statutory Withholding of Removal and CAT Protection

Commenters largely opposed the heightened "reasonable probability" screening standard for statutory withholding of removal and CAT protection for noncitizens subject to this rule. By contrast, one commenter supported the "reasonable probability" standard for this rulemaking and recommended more broadly applying it to all withholding of removal credible fear screenings.

*Comment:* Commenters stated the "reasonable probability" standard was too high and would lead to refoulement. Some commenters stated that the "reasonable probability" standard is inconsistent with the statutory "significant possibility" standard for asylum in credible fear screenings, and that any attempt to change the "significant possibility" standard was ultra vires. Commenters also explained that the higher standard would cause credible fear passage rates to drop dramatically and result in the removal of noncitizens with valid asylum claims. Commenters stated that Congress intended, as evidenced by the plain language of the statute, for the threshold credible fear screening standards to be low so as not to exclude legitimate asylum seekers, and not to ensure the quick imposition of consequences for irregular entry as described in the IFR.

Similarly, commenters believed the "reasonable probability" standard was set too close to the ultimate burdens of proof for statutory withholding of removal and CAT protection and would require excessively specific evidence, particularly as the credible fear process is designed to move quickly. Rather, commenters suggested that only claims that were "manifestly unfounded" should be screened out at the credible fear stage and that, as much as possible,

STB_AR1_000090

**81246**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

asylum, statutory withholding of removal, and CAT protection claims should be adjudicated in full removal proceedings before an IJ, as such claims are complex and require robust processes with more procedural safeguards. Commenters noted a number of issues that would make it difficult for noncitizens to provide the specific evidence required to establish a reasonable probability under this rule, including the inability to obtain counsel during the credible fear process; being interviewed shortly after arriving in the United States; difficulties sharing information due to trauma, exhaustion, or translation availability; additional stress placed on vulnerable populations; detention status; challenges surrounding placement into the non-detained Family Expedited Removal Management (''FERM'') process, such as challenges involving children attending credible fear interviews and difficulty obtaining Indigenous language interpreters; and difficulties procuring documentary evidence, expert opinions, or witnesses.

*Response:* The Departments disagree with commenters that the rule's reasonable probability screening standard for statutory withholding of removal and CAT claims is too high and decline to make changes to the standard. The Departments believe the reasonable probability screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR. *See* 89 FR at 48745–46.

To start, and as discussed in Section III.A.1 of this preamble, the Departments note that the ''reasonable probability'' standard neither affects nor changes the ''significant possibility'' standard used to screen for asylum eligibility, which is set by statute and remains in effect for asylum claims in the credible fear process. *See* INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v) (a credible fear of persecution ''means that there is a significant possibility'' that a noncitizen could establish eligibility for asylum). Commenter concerns about changes to the statutory ''significant possibility'' standard are therefore misplaced.

While Congress clearly expressed its intent that the ''significant possibility'' standard be used to screen asylum claims, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2242 are silent as to what screening

procedures are to be employed with respect to statutory withholding of removal and CAT protection. The Departments therefore have some discretion to articulate the screening standard for such claims. And in the context of the emergency border circumstances described in the IFR and this rule, the Departments believe the ''reasonable probability'' screening standard better captures the population of noncitizens with potentially valid claims and is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection.

As explained in the IFR and the June 3 Proclamation, resource limitations, outdated laws, and significantly elevated encounter levels at the southern border have made it difficult for the Departments to quickly grant relief or protection to those who require it and to quickly remove those who do not establish a legal basis to remain in the United States. In light of the emergency border circumstances outlined in the June 3 Proclamation, the IFR, and this rule, the goal of this rule is to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross our border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. The Departments believe that imposing a ''reasonable probability'' screening standard for statutory withholding of removal and CAT protection is needed to further this goal and is consistent with all statutory and regulatory requirements and the United States' international law obligations.

Specifically, the elevated ''reasonable probability'' screening standard will better allow the Departments to screen out claims that are unlikely to be meritorious, as the higher screening standard is more proportional to the ultimate burdens of proof for statutory withholding of removal and CAT protection, which are each higher than that for asylum. *See, e.g.,* 89 FR at 48747 (noting that the higher screening standard will help better predict the likelihood of success on the ultimate application for relief or protection); *see also* Regulations Governing the Convention Against Torture, 64 FR at 8485 (applying a higher screening standard for statutory withholding of removal and CAT protection in the reasonable fear context ''[b]ecause the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution)''). Identifying non-meritorious claims early

in the process is an important deterrent to disincentivize noncitizens from making the perilous journey to the United States under the belief that they will be released and able to remain in the United States for a significant period, or indefinitely. Instead, under this rule, those who do not establish eligibility for statutory withholding of removal or CAT protection under the ''reasonable probability'' standard will be swiftly removed rather than being released into the United States to potentially wait years for a hearing. This will also allow the Departments to focus limited resources on processing of those who are most likely to be persecuted or tortured if removed, and to more quickly provide stability and benefits to noncitizens whose asylum claims are granted. *See, e.g.,* INA 209, 8 U.S.C. 1159 (''Adjustment of status of refugees'').

The Departments made a similar determination in the Circumvention of Lawful Pathways rule in implementing the ''reasonable possibility'' standard for statutory withholding of removal and CAT protection for noncitizens subject to that rule. *See* 88 FR at 31336 (noting that the heightened standard would help in ''reducing the strain on the immigration courts by screening out and removing those with non-meritorious claims more quickly''). That determination has been subsequently validated, as the elevated standard for statutory withholding of removal and CAT protection in credible fear screenings under the Circumvention of Lawful Pathways rule resulted in an approximately 30 percent decrease in positive credible fear findings. *See* 89 FR at 48745–46 (providing Circumvention of Lawful Pathways data).

The Departments recognize that, as identified by commenters, noncitizens may face difficulties in their journeys to the United States and in presenting their claims during credible fear screenings. However, the statutory expedited removal process is predicated on the requirement that noncitizens must explain their fear during a credible fear screening. *See* INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B) (implementing credible fear ''[a]sylum interviews,'' to include ''material facts as stated by the applicant''). As part of this threshold screening, the ''reasonable probability'' standard is not intended to be an insurmountable hurdle; rather, it requires noncitizens to provide greater specificity in their testimony related to their claim than that which might be sufficient to meet the ''reasonable possibility'' or ''significant possibility'' screening standards. *See* 89 FR at

STB_AR1_000091

48746–48 (explaining that ''the new standard requires a greater specificity of the claim in the noncitizen's testimony''). This greater specificity is intended to be straightforward for noncitizens to provide, as it entails answering standard credible fear screening questions, such as variations of the following questions: Why do you fear return to the country of removal? Who do you believe would harm you if you were removed from the United States? Have you been previously harmed in the country of removal? If so, why were you harmed? Having the noncitizen answer these types of questions with greater specificity is not intended to require legal expertise and instead seeks to have communicated relevant personal facts and circumstances within the noncitizen's knowledge. Moreover, such evidence is generally provided through testimony at the credible fear screening stage, and credible testimony alone can satisfy the noncitizen's burden. *See, e.g.,* 89 FR at 48746.

Furthermore, to the extent that commenters expressed concerns about the compounding effects of trauma resulting in difficulty expressing fear, less time for consultation, and the need to meet a ''reasonable probability'' standard at the screening stage, the Departments note that AOs have significant training and experience in engaging in non-adversarial interview techniques, working with interpreters, cross-cultural communication, and eliciting information from trauma survivors and other vulnerable populations.[327] As discussed at greater length at section III.B.2.a.ii(2) of this preamble, while the length of the consultation period is outside the scope of this rulemaking, this rule ensures that noncitizens are provided with all of the rights due to them under the statutory expedited removal and credible fear processes, including the right to consult with a legal representative or other individual of their choosing prior to the credible fear interview and to have such an individual present during their credible fear interview, provided it will not unreasonably delay the process. *See* INA 235(b)(1)(B)(iv), 8 U.S.C.

1225(b)(1)(B)(iv); 8 CFR 208.30(d)(4). AOs apply the same training and draw from the same breadth of experience in eliciting testimony and conducting non-adversarial interviews described above regardless of the screening standard that is being applied. Noncitizens are not expected to have legal knowledge or to be familiar with specific standards or elements related to a persecution or torture screening; rather, they are only expected to truthfully testify about their claim and testimony alone can be sufficient to support a positive fear determination.

The Departments take seriously concerns raised by commenters related specifically to difficulties faced by families in the non-detained FERM process, including children attending credible fear interviews and challenges obtaining Indigenous language interpreters. Where issues arise in non-detained credible fear interviews in the FERM process, just as when issues arise in any interview, AOs and supervisory AOs tap into their extensive training and experience and follow existing procedures to address the issue.[328] USCIS has established procedures in place in order to obtain interpreters of rare languages for credible fear interviews and ensure appropriate steps are taken where an interpreter is not available, including issuing a discretionary NTA where warranted. And while there are inherent challenges in conducting non-detained interviews with families, including attending to children during an interview, these issues are not unique to the FERM process. They are issues dealt with during interviews where children may be present in various situations, including affirmative asylum interviews; and AOs, supervisory AOs, and asylum office staff handle these issues as they arise in various circumstances. Whether the credible fear interview is taking place in a detained setting or is taking place in a non-detained setting as part of the FERM process, AOs apply their extensive training related to non-adversarial interviewing, combined with their substantive legal training, to make a determination as to whether a noncitizen meets the given screening standard. Additionally, all credible fear determinations must be reviewed by a supervisory AO before they become final. 8 CFR 208.30(e)(8).

Moreover, as provided by statute and as the IFR makes clear, noncitizens have a right to request review by an IJ of the AO's credible fear determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b)(1); 89 FR at 48748. Where it is requested, the IJ conducts a de novo review of the negative credible fear determination, including the application of the rule's limitation on asylum eligibility and possible exceptions to that limitation. 8 CFR 1208.35(b). Importantly, noncitizens will have additional time to consult with other persons prior to this review. 8 CFR 235.15(b)(4) (requiring written disclosure of a noncitizen's right to consult with other persons prior to an interview or any review thereof). During such review, noncitizens will have the opportunity to make statements in support of their claims, and IJs may also consider other such facts as are known to the IJ. *See* 8 CFR 1003.42(c)–(d); *see also* Immigration Court Practice Manual ch. 7.4(d)(4)(E), *https://www.justice.gov/ eoir/reference-materials/ic/chapter-7/4* (noting that ''[e]ither the noncitizen or DHS may introduce oral or written statements'' during a credible fear review). IJs have significant training and experience in eliciting testimony from individuals who have experienced trauma and developing the record accordingly.[329] As further explained in the IFR, AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards. As such, they are well-suited to be able to identify in a screening whether the information the noncitizen has provided is sufficiently specific to lead them to believe that the noncitizen may be able to establish eligibility at the

---

[327] *See* USCIS, *RAIO Directorate—Officer Training: Interviewing—Introduction to the Non-Adversarial Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Eliciting Testimony* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024); USCIS, *RAIO Directorate—Officer Training: Interviewing Survivors of Torture and Other Severe Trauma* (Apr. 24, 2024).

[328] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Interviewing—Working with an Interpreter* (Apr. 24, 2024); USCIS, *RAIO Directorate—Cross-Cultural Communication and Other Factors That May Impede Communication at an Interview* (Apr. 24, 2024).

[329] *See* 8 CFR 1003.0(b)(1)(vii) (authorizing the provision of comprehensive training and support to IJs); 8 CFR 1003.9(b)(2) (authorizing the Chief IJ to provide ''appropriate training . . . on the conduct of their powers and duties''); *Fact Sheet: Executive Office for Immigration Review Immigration Judge Training* 2 (June 2022), *https://www.justice.gov/ eoir/page/file/1513996/dl?inline;* DOJ EOIR, *Legal Education and Research Services Division* (Jan. 3, 2020), *https://www.justice.gov/eoir/legal-education-and-research-services-division* (''The Legal Education and Research Services Division (LERS) develops and coordinates headquarters and nationwide substantive legal training and professional development for new and experienced judges, attorneys, and others within EOIR who are directly involved in EOIR's adjudicative functions. LERS regularly distributes new information within EOIR that includes relevant legal developments and policy changes from U.S. government entities and international organizations.'').

STB_AR1_000092

**JA505**

81248    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

merits stage. *See* 89 FR at 48747. In sum, the Departments believe the procedural safeguards in place that comport with all statutory requirements and the extensive training and experience of AOs, supervisory AOs, and IJs in conducting screening interviews and making and reviewing fear determinations will ensure that noncitizens in the credible fear process, including those experiencing the effects of trauma and other vulnerable populations, will be screened for potential claims in a sensitive and fair manner at the applicable fear standard.

*Comment:* Commenters stated that the rule's "reasonable probability" definition—which requires "substantially more than a 'reasonable possibility,' but somewhat less than more likely than not"—is vague and amorphous; overly subjective; and lacks interpretive guidance or similar usage in other comparative contexts. Commenters stated that the definition would result in inconsistent application due to a lack of meaningful instruction for AOs and IJs, who would instead rely on their own discretion.

*Response:* The Departments believe that the "reasonable probability" definition set forth in the IFR, which comparatively references the "reasonable possibility" and "more likely than not" legal standards, provides adequate guidance for AOs and IJs and noncitizens to understand the level of evidentiary proof needed to satisfy the threshold credible fear screening process. Both "reasonable possibility" and "more likely than not" are longstanding legal standards familiar to AOs and IJs and representatives, so implementing a new "reasonable probability" standard that falls between those two existing standards provides a stable benchmark for determining whether the new standard has been satisfied. *See, e.g.,* 8 CFR 208.13(b)(1)(iii)(B), 1208.13(b)(1)(iii)(B) ("reasonable possibility" standard); 8 CFR 208.16(b)(2), 1208.16(b)(2) ("more likely than not" standard). AOs and IJs also receive training on the applicable legal screening standards.[330]

Moreover, as explained in the IFR, evaluating evidence under both the "reasonable probability" standard and the "reasonable possibility" standard remains the same, "save for the degree of specificity required." 89 FR at 48747; *see also id.* at 48746 (explaining the difference between the two standards "as being that the new standard requires

a greater specificity of the claim in the noncitizen's testimony"). Indeed, USCIS AOs and supervisory AOs have applied this new standard in a manner that is consistent with expectations, resulting in a somewhat, but not drastically, lower screen-in rate for USBP credible fear cases screened by USCIS under the IFR (51 percent for all fear screening cases subject to the rule, including 48 percent of those screened under the "reasonable probability" standard)[331] than USBP credible fear cases screened by USCIS under the Circumvention of Lawful Pathways rule (54 percent overall, including 51 percent of those screened under the: reasonable possibility" standard).[332] In addition, during credible fear reviews overall, IJs have vacated negative credible fear determinations under the IFR at a much lower rate than under the Circumventing Legal Pathways rule.[333]

*Comment:* Commenters stated that an additional "reasonable probability" screening standard in the credible fear process will lead to confusion amongst adjudicators. Commenters explained that there are now three different legal standards in credible fear screenings— significant possibility, reasonable possibility, and reasonable probability— all of which could be applicable in some cases. Moreover, commenters noted that the governing standards might change depending on whether emergency border circumstances are in effect under this rule. Commenters were concerned that multiple standards would lead to AOs and IJs applying the wrong standard, or conflating the requirements of each standard, which could result in potential refoulement because there will be few mechanisms for accountability if a mistake occurs.

Commenters also stated that adding another screening standard is inefficient, as AOs and IJs will need to

determine which standard applies to each aspect of a case. Commenters also noted that this will require more resources from legal organizations to gather necessary evidence.

*Response:* The Departments disagree with commenters' claims that the "reasonable probability" screening standard for statutory withholding of removal and CAT protection will result in confusion or adjudication errors or would otherwise be inefficient. AOs and IJs regularly work with various standards, and determine which standards apply, in the course of their adjudications, such as the "extraordinary circumstances" standard to determine whether an asylum applicant qualifies for an exception to the one-year filing deadline, *see* INA 208(a)(2)(D), 8 U.S.C. 1158(a)(2)(D), and the discretionary "compelling reasons" standard to determine whether an applicant who has suffered past persecution but lacks a well-founded fear of future persecution should be granted asylum in the exercise of discretion, *see* 8 CFR 208.13(b)(1)(iii)(A), 1208.13(b)(1)(iii)(A). Indeed, deciding which legal standard applies is a critical aspect of the role of AOs and IJs. *See* 8 CFR 1003.10(b).

Further, AOs and IJs have significant training and experience in eliciting testimony and applying evidentiary standards in immigration proceedings. *See, e.g.,* 89 FR at 48747. The Departments are similarly confident that AOs and IJs will efficiently apply the "reasonable probability" standard, which is similar to the "significant possibility" and "reasonable possibility" standards. *See id.* at 48748 (explaining that the reasonable probability standard "is not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis" but is rather "a matter of degree"). Further, credible fear determinations are reviewed by a supervisory AO before they become final to ensure consistency and quality and are subject to de novo review by an IJ if a noncitizen requests such review. *See* 8 CFR 208.30(e)(8), 1208.35(b); 89 FR at 48748. Additionally, to avoid confusion, any changes regarding the applicability of emergency border circumstances are communicated to AOs, IJs, and the public, and have been made publicly available since the June 3 Proclamation and publication of the IFR.[334]

For comparison, under the Circumvention of Lawful Pathways rule,

---

[330] *See, e.g.,* USCIS, *RAIO Directorate—Officer Training: Evidence* 20–26 (Apr. 24, 2024); EOIR, *Fact Sheet: Immigration Judge Training* (June 2022), https://www.justice.gov/eoir/page/file/1513996/dl?inline.

[331] *See* OHSS analysis of data downloaded from UIP on September 3, 2024 (Fear Screening—STB tab). Data are limited to SWB encounters between POEs. The total rate excludes cases referred for fear screening but determined by USCIS not to be subject to the IFR.

[332] *See* OHSS analysis of June 2024 Enforcement Lifecycle data (Fear Screening—CLP tab). The overall rate includes Mexican nationals (even though they are not technically covered by the rule) and excludes cases referred for fear screening but determined by USCIS not to be subject to the Circumvention of Lawful Pathways rule. Data are limited to SWB encounters between POEs.

[333] *See* OHSS analysis of June 2024 Enforcement Lifecycle data and data downloaded from UIP on September 3, 2024 (IFR ERCF tab and Imm Post-Pandemic ERCF tab). During the immediate post-pandemic period, OHSS estimates that IJs vacated 16 percent of negative fear credible fear interviews resulting from USBP ER cases, and 6 percent of all credible fear interviews; under the IFR the corresponding rates for USBP ER cases through July 31, 2024, were 9 percent and 4 percent.

[334] *See* DHS, *Securing the Border: Presidential Proclamation and Rule* (Aug. 6, 2024), https://www.dhs.gov/immigrationlaws.

STB_AR1_000093

AOs and IJs have successfully applied the ''significant possibility'' screening standard to asylum claims and the ''reasonable possibility'' screening standard to statutory withholding of removal and CAT protection claims since its implementation. *See* 8 CFR 208.33(b)(2)(ii), 1208.33(b)(2)(ii). And for several months, AOs and IJs have successfully applied the ''reasonable probability'' standard in screenings under the IFR. Therefore, the Departments believe that AOs and IJs can continue to apply the ''reasonable probability'' standard implemented in this rule.

With regard to concerns from legal service organizations about gathering additional evidence under the ''reasonable probability'' standard, the Departments again reiterate that the relevant evidence largely remains the same, and simply requires more specificity. *See* 89 FR at 48746–47. Much of this specificity is likely to come through the noncitizen's testimony, which will require the noncitizen to describe why they, in particular, are likely to be harmed or threatened with harm. This testimony focuses on relevant personal facts and circumstances within the noncitizen's knowledge, which should not significantly increase the burden of production on the noncitizen or legal service providers.

*Comment:* Commenters raised concerns with the IFR's justifications for implementing the ''reasonable probability'' standard.

Commenters argued that the ultimate asylum grant rate should not be the sole justification for implementing the ''reasonable probability'' standard. Commenters noted that the disparity between positive credible fear determinations and ultimate asylum grant rates itself was not a reason to raise the credible fear screening standard. Commenters explained that the credible fear screening threshold was intended to be low to avoid refoulement and, therefore, the credible fear screening passage rate should necessarily be higher than the ultimate asylum grant rate.

Commenters also believed the IFR relied on misleading statistics in claiming that the screening standard should be raised because the credible fear screening passage rate was significantly higher than the ultimate asylum grant rate in removal proceedings. Commenters explained that the ultimate asylum grant rate statistic in removal proceedings includes all disposition types—not just grants and denials—and also includes factors such as a lack of counsel, poor translation, and variable IJ grant rates, which does not necessarily mean that the asylum claim itself was insufficient. Moreover, commenters pointed to additional EOIR statistics, which they stated showed that the ultimate asylum grant rates were higher than portrayed in the IFR.

Commenters also stated that the Departments did not adequately explain why they imposed a higher screening standard in this rule while, in the previous Asylum Processing IFR (87 FR 18078), the Departments argued that the ''significant possibility'' standard was preferable for screening statutory withholding of removal and CAT protection claims. Separately, commenters argued that the ''reasonable probability'' standard would not meet the IFR's stated goals of deterring irregular migration, asserting that the Circumvention of Lawful Pathways rule's increased screening standard did not ''significantly lower'' the credible fear passage rate. Lastly, commenters stated that the Departments did not consider that deterrence-based policies, such as a heightened standard, only result in temporary reductions in border crossings.

*Response:* The Departments disagree with objections to the IFR's justifications supporting the ''reasonable probability'' standard.

First, the Departments disagree that the disparity between the credible fear screening passage rate and ultimate asylum grant rate is irrelevant or should not be relied upon. This disparity is a clear indication of how many positive credible fear determinations ultimately translate into grants of asylum relief. The Departments understand that the credible fear screening process is only a threshold determination and will, by design, result in asylum claims that meet the initial screening standard but fail during the ultimate merits adjudication. However, for purposes of the IFR, the Departments cited to this disparity to explain that such a wide disparity ultimately indicates a screening process that is excessively overinclusive, resulting in a large number of non-meritorious asylum claims increasing adjudicatory backlogs. *See* 89 FR at 48746 (explaining that, under the Circumvention of Lawful Pathways rule, the ''screen-in rate remains significantly higher than the grant rate for ultimate merits adjudication for SWB expedited removal cases that existed prior to the rule'' and that, under the IFR, the existence of emergency border circumstances necessitates focusing limited resources on ''processing those

who are most likely to be persecuted or tortured if removed'').

The Departments also disagree that any cited statistics in the IFR regarding asylum grant rates in section 240 removal proceedings are misleading. While commenters are correct that section 240 removal proceedings may be completed without an ultimate adjudication on an asylum application (such as through dismissal or termination of proceedings), EOIR data are consistent that, for completed cases, only a small percentage of asylum claims referred from the credible fear process are ultimately granted in section 240 removal proceedings, which was a relevant concern underlying the IFR's justification for the heightened ''reasonable probability'' standard.[335] For example, in 2023, only 18 percent of referred asylum claims ultimately resulted in an asylum grant at the completion of section 240 removal proceedings, even when excluding cases that were administratively closed or did not have the asylum claim adjudicated.[336] Moreover, the Departments note that the data also demonstrate that a large percentage of completed cases without an ultimate asylum adjudication of grant or denial involve noncitizens who never filed an asylum application once placed in section 240 removal proceedings.[337] Additionally, to the extent that section 240 removal proceedings are terminated before an asylum application is adjudicated, the termination does not necessarily have any bearing on the ultimate strength or weakness of the asylum claim.

In response to commenters' concerns regarding the Departments' decision in the 2022 Asylum Processing IFR to maintain the ''significant possibility'' screening standard for statutory withholding of removal and CAT protection, the Departments note that they addressed these concerns in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31336. In response to similar comments on that rule, the Departments explained that ''the current and impending situation on the ground along the SWB warrants departing in some respects from the approach generally applied in credible fear screenings'' and that the ''Asylum Processing IFR was designed for non-exigent circumstances.'' *Id.* Similarly, as explained in the IFR and this rule, prior to implementation of the IFR, migration

---

[335] *See, e.g.,* EOIR, *Adjudication Statistics: Asylum Decisions in Cases Originating with a Credible Fear Claim* (Apr. 19, 2024), *https://www.justice.gov/eoir/media/1344831/dl?inline.*

[336] *See id.*

[337] *See id.*

STB_AR1_000094

patterns and other factors resulting in emergency border circumstances had only intensified, thereby necessitating a further change to the relevant credible fear screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48724 ("While the Circumvention of Lawful Pathways rule and complementary measures have yielded demonstrable results, the resources provided to the Departments still have not kept pace with irregular migration."); *see also supra* Section II.A.1 ("Basis for the IFR").

Lastly, the Departments disagree with commenters regarding the overall efficacy of this rule and of the "reasonable probability" standard in particular. Contrary to commenters' claims, the Departments have seen a significant decrease in the credible fear screen-in rate since the Circumvention of Lawful Pathways rule's implementation of the "reasonable possibility" standard, and a further decrease since the IFR's implementation of the "reasonable probability" standard. *See* 89 FR at 48745–46 (showing a 31 percent decrease in the screen-in rate under the Circumvention of Lawful Pathways rule); *see also* Section II.A.2 of this preamble (providing statistics on the IFR's efficacy to date). The Departments also disagree that deterrence-based policies have only temporary or limited effects, but they do note that deterrence is only one part of an overall border and migration strategy that can help to better manage migratory flows. *See* 89 FR at 48729–30 (explaining that DHS's migration strategy focuses on "enforcement, deterrence, encouragement of the use of lawful pathways, and diplomacy").

Overall, the Departments believe that the screening standard changes made in this rule will help better manage an overwhelmed immigration system, while also noting that, as explained in IFR, this rule is only a piece of broader efforts that will likely require further congressional action. *See* 89 FR at 48715 ("Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action—which remains the only long-term solution to the challenges the Departments have confronted on the border for more than a decade.").

*Comment:* Commenters noted that the "reasonable probability" standard could also apply in the context of the consideration of mandatory asylum bars as proposed in a separate DHS rulemaking, Application of Certain Mandatory Bars in Fear Screenings, 89 FR 41347 (May 13, 2024) ("Mandatory Bars NPRM"). Commenters stated that the Departments should not apply the "reasonable probability" standard to noncitizens found to be barred from asylum due to a mandatory bar, noting the Mandatory Bars NPRM.

*Response:* The Departments agree with commenters that the "reasonable probability" standard may apply in the context of consideration of mandatory bars if DHS finalizes the DHS Mandatory Bars NPRM as proposed, as the Departments noted in the IFR. *See* 89 FR at 48739 n.186 (explaining that, if the DHS Mandatory Bars NPRM is finalized, the "reasonable probability" standard would still apply when a noncitizen is subject to this rule's limitation on asylum eligibility).

The Departments decline to amend the "reasonable probability" standard so that it would not apply to considerations of mandatory bars. First, as stated above in this section, the Departments have determined that a higher "reasonable probability" standard is needed in light of the emergency border circumstances. Accordingly, the Departments decline to make edits to reduce the standard's applicability. If DHS ultimately decides to consider the mandatory bars as part of fear screenings under the steady-state regulations and the Circumvention of Lawful Pathways rule, it would be appropriate for DHS to consider those bars under this rule as well, also under a "reasonable probability" standard. *See* 8 CFR 208.35(b)(2)(i). This would be consistent with the overall purpose of the DHS Mandatory Bars NPRM. *See* 89 FR at 41351 (explaining that the proposed rule "is consistent with the Administration's demonstrated record of providing operators maximum flexibility and tools to apply consequences, including by more expeditiously removing those without a lawful basis to remain in the United States, while providing immigration relief or protection to those who merit it at the earliest point possible" and that the proposed rule would "allow DHS to quickly screen out certain non-meritorious protection claims and to swiftly remove those noncitizens who present a national security or public safety concern").

4. Other Comments on the Regulatory Provisions

a. Application to Mexican Nationals

*Comment:* Commenters raised several concerns regarding the applicability of the IFR's limitation on asylum eligibility to Mexican nationals. Generally, commenters argued that Mexican asylum seekers should be exempt from the rule's limitation on asylum eligibility and should not be forced to wait in Mexico, the country where they fear persecution or torture, during emergency border circumstances. Commenters stated that requiring Mexican asylum seekers to wait in the country where they claim to face persecution is tantamount to refoulement in violation of international law and would further expose them to the threat of future harm. Similarly, commenters stated that Mexican nationals cannot be expected to apply for asylum in Mexico—the country where they are claiming harm—which commenters explained was a "common-sense principle" that the Departments abandoned in the IFR.

Relatedly, commenters stated that the Departments' available pathways to pursue asylum, including the CBP One app, are too limited for Mexican nationals, who would be exposed to an increased risk of persecution if forced to wait in Mexico for the ability to pursue asylum. Commenters expressed further concerns about the rule's lack of exceptions, including that, if the IFR's exceptions are intended to "mirror" the Circumvention of Lawful Pathways rule, it is "unfair and dangerous" for the IFR to apply to Mexican nationals, and that the IFR's requirements would "trap" Mexican nationals in the country of alleged persecution in violation of international law and non-refoulement obligations.

*Response:* The Departments decline to change the rule's applicability to Mexican nationals, as excepting Mexican nationals from the rule would undermine the rule's foundational purpose to alleviate strain on border security and immigration systems while entry is suspended and limited under the Proclamation. *See* 89 FR at 48738–39. The strains that resulted in emergency border circumstances and necessitated implementation of the IFR were driven in part by a recent sharp increase in Mexican nationals processed for expedited removal and referred for credible fear interviews. *Id.* The Departments believe that these emergency border circumstances weigh heavily in favor of applying the rule to Mexican nationals in order to better process increased inflows of Mexican nationals and return border processing to more manageable levels.

Moreover, the rule's applicability to Mexican nationals does not violate non-refoulement obligations because the United States implements its non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol) through the statutory

STB_AR1_000095

withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). All noncitizens, including Mexican nationals, maintain the opportunity to make a threshold showing for statutory withholding of removal and CAT protections during the credible fear screening process, as the rule's limitation on asylum eligibility does not extend to those forms of protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2).

The Departments also disagree that Mexican nationals do not have sufficient paths for seeking relief or protection in the United States. First, Mexican nationals may avail themselves of lawful, safe, and orderly pathways to the United States, such as making an appointment through the CBP One app. *See, e.g.,* 8 CFR 208.33(a)(2)(ii)(B); *see also* 89 FR at 48754 (explaining that CBP One appointments create an efficient and orderly process at POEs). To the extent a Mexican national cannot wait in Mexico for a CBP One appointment due to urgent safety concerns, the rule contains an exception for exceptionally compelling circumstances, including for imminent and extreme threats to life or safety. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). This exception maintains the rule's efficacy by ensuring that Mexican nationals with specific, urgent safety needs to enter the United States can do so, while otherwise allowing the rule to apply to those Mexican nationals who, for example, are able to safely wait in another part of Mexico for their appointment. Furthermore, as of August 23, 2024, the Departments note that Mexican nationals are able to request and schedule a CBP One appointment from anywhere within Mexico.[338] This new adjustment to the CBP One app will enable Mexican nationals facing imminent danger in a specific area of Mexico to internally relocate while waiting for their CBP One appointment.[339]

Second, this rule ensures that noncitizens are able to avoid refoulement through the availability of statutory withholding of removal, in addition to CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b)(2). Third, the rule contains a number of provisions that may apply to Mexican nationals. For example, the limitation on asylum eligibility does not apply to groups that are excepted from the suspension and limitation on entry under section 3(b) of

[338] *See* CBP, *CBP One™ Mobile Application: Recent Updates* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*
[339] *See id.*

the Proclamation, including UCs. *See* 8 CFR 208.35(a)(1), 1208.35(a)(1). The rule also provides an exception for noncitizens who can establish the aforementioned exceptionally compelling circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). Additionally, the rule includes a provision to ensure family unity and avoid potential family separation for certain noncitizens who can establish eligibility for statutory withholding of removal or CAT protection. *See* 8 CFR 208.35(c), 1208.35(c). Taken together, these provisions help ensure that, while some Mexican nationals may not be granted asylum after entering the United States during emergency border circumstances, sufficient options exist for Mexican nationals to pursue available protection and avoid immediate harm.

*Comment:* Commenters stated that the rule's exceptions are inadequate for Mexican nationals. Commenters stated that, for Mexican nationals, the facts underlying their asylum claim would be conflated with the rule's exception for an "imminent and extreme threat to life or safety." According to commenters, in practice, this would result in Mexican nationals having to essentially present their full asylum claim to establish the exception.

*Response:* If a Mexican national is unable to remain in Mexico while awaiting a CBP One appointment due to an imminent and extreme threat of harm, the rule provides an exception for exceptionally compelling circumstances, in order to provide a potential avenue for the Mexican national to avoid application of the rule's limitation on asylum eligibility. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). The Departments disagree that this exception for noncitizens who demonstrate exceptionally compelling circumstances is inadequate for Mexican nationals.

The Departments clarify that the analysis to determine whether any noncitizen—including a Mexican national—has demonstrated exceptionally compelling circumstances based on an "imminent and extreme threat to life or safety" at the time of entry is separate from the ultimate determination regarding the merits of a noncitizen's asylum claim, even if, in certain circumstances, some of the same facts underlying a Mexican national's asylum claim may also be relevant to a determination on the rule's exception. For purposes of the "imminent and extreme threat to life or safety" exception, noncitizens need only provide evidence focused on threats that the noncitizen faced at the time they

crossed the SWB, such that the noncitizen could not wait for an opportunity to present at a POE. *See, e.g.,* 88 FR at 11723 (explaining operation of similar ground for rebutting presumption of ineligibility for asylum under the Circumvention of Lawful Pathways rule). In contrast, for the asylum claim itself, the noncitizen must demonstrate that they otherwise have a credible fear of persecution or torture during credible fear proceedings and, during a full merits adjudication, that they satisfy the eligibility requirements for asylum. *See* 8 CFR 208.35(b)(1)(iii), 1208.35(b)(2)(ii) (directing AOs and IJs to proceed under 8 CFR 208.30 and 1208.30, respectively, in credible fear proceedings where a noncitizen has established the exception to the limitation on asylum eligibility based on exceptionally compelling circumstances); *see generally* 8 CFR 208.13, 1208.13 (describing asylum eligibility requirements).

Relatedly, the Departments also clarify that the "exceptionally compelling circumstances" exception is applied during the credible fear process, and not during any initial border encounter with CBP. *See* 8 CFR 208.35(b) ("Application in credible fear determinations.").

*Comment:* Commenters stated that the rule discriminates against Mexican nationals, both in intent and effect. Commenters stated that, by comparison, the rule is more restrictive than prior Departmental policies, including the Circumvention of Lawful Pathways rule and the now-defunct MPP, which specifically exempted Mexican nationals. Thus, commenters stated, this rule was issued to limit the entry of Mexican nationals and would result in more drastic consequences for Mexican nationals than those other rules and policies. Furthermore, commenters argued that, because the Circumvention of Lawful Pathways rule does not apply to Mexican nationals, there will be significant confusion in applying these rules together during the credible fear process.

*Response:* The Departments disagree with commenters' assertions that this rule discriminates against Mexican nationals. Commenters stated that the discriminatory intent and purpose is evidenced by the Circumvention of Lawful Pathways rule's comparative inapplicability to Mexican nationals. However, the Departments emphasize that this rule and the Circumvention of Lawful Pathways rule serve different objectives. For example, unlike with respect to this rule, traveling through a third country is a key requirement of the Circumvention of Lawful Pathways rule

**STB_AR1_000096**

because requiring that noncitizens apply for protection in a third country is one means for providing protection in the United States where necessary while also sharing the responsibility of providing necessary protections with the United States' regional partners. *See* 8 CFR 208.33(a)(1)(iii); 1208.33(a)(1)(iii); 88 FR at 31316. Thus, the Circumvention of Lawful Pathways rule generally does not apply to Mexican nationals residing in Mexico, who would not need to travel through another country to reach the United States. To the contrary, this rule applies uniformly to all noncitizens who enter the United States at the southern border during emergency border circumstances and are not excepted under the June 3 Proclamation or able to establish exceptionally compelling circumstances, without consideration of the path of transit to the southern border. *See* 8 CFR 208.13(g), 1208.13(g).

Additionally, since the implementation of the Circumvention of Lawful Pathways rule, emergency border circumstances dictate applying the rule broadly in order to reduce irregular entries at the southern border and to quickly issue decisions and impose consequences on those who cross the southern border irregularly and lack a legal basis to remain. *See* 89 FR at 48731. As relevant here, the United States saw a sharp increase in the number of encounters of Mexican nationals at the SWB during the COVID–19 pandemic prior to implementation of the Circumvention of Lawful Pathways rule, which continued into the immediate post-pandemic period.[340] During the same period, the United States saw a corresponding increase in credible fear referrals, which necessitates applying the rule to Mexican nationals. *See id.* at 48738.

Moreover, the Departments do not believe that the rule's broad applicability will cause confusion, as the rule maintains a straightforward application to noncitizens who enter the United States at the southern border during periods of emergency border circumstances and are not excepted under the Proclamation or able to establish exceptionally compelling circumstances.

*Comment:* Commenters stated that the rule's expediency justification for subjecting Mexican nationals to the limitation on asylum eligibility is insufficient. Commenters argued that the statistics provided in the IFR cannot justify extending the limitation on asylum eligibility to Mexican nationals,

noting that statistics evincing recent increases in Mexican nationals making fear claims indicate increasingly dangerous conditions in Mexico and an increased need for protection. Another commenter claimed that applying the rule to Mexican nationals is contrary to the record before the agency because, according to the commenter's characterization of that record, encounters of Mexican nationals have actually declined significantly. Similarly, a commenter objected that the IFR subjects Mexican nationals fleeing persecution to extensive stays in Mexico if they wish to seek asylum in the United States, but fails to consider the impact on Mexican nationals or provide any rationale for that result.

*Response:* The Departments have considered the commenters' concerns and reaffirm the justifications for applying the IFR's limitation on asylum eligibility to Mexican nationals. The foundational basis of the June 3 Proclamation and the IFR is to address substantial migration levels at the southern border, including a ''sharp increase'' in SWB encounters of Mexican nationals. *See, e.g.,* 89 FR at 48726–27; *id.* at 48738. Addressing these migration levels, and their significant impact on border processing and the United States' immigration system more broadly, thereby necessitates applying the rule's limitation on asylum eligibility to all noncitizens, with limited exception, who enter the United States across the southern border during emergency border circumstances, including Mexican nationals.

The Departments believe the cited data fully support the rule's application to Mexican nationals. Departmental data show that excluding Mexican nationals would undermine the rule's deterrent effect, as Mexican nationals comprise the largest portion of recent (post-IFR) SWB encounters between POEs, at approximately 41 percent.[341] And, contrary to one commenter's claim, the data in the IFR did not show a decline in encounters of Mexican nationals. Rather, the Departments explained that, since 2010, the makeup of border crossers has significantly changed, expanding from Mexican single adults to single adults and families from northern Central American countries, and then to single adults and families from throughout the hemisphere (and beyond), many of whom are more likely to seek asylum and other forms of protection. *See* 89 FR at 48721. The Departments further explained that, as the demographics of border encounters

have shifted in recent years to include a higher rate of Mexican nationals claiming fear, in addition to larger encounter numbers of other nationalities with high historical rates of asserting fear claims, the deterrent effect of apprehending noncitizens at the SWB has become more limited. *See id.* at 48731 n.167 (explaining that for noncitizens encountered at and between SWB POEs from FY 2014 through FY 2019 who were placed in expedited removal, nearly 6 percent of Mexican nationals made fear claims that were referred to USCIS for a determination, whereas from May 12, 2023 to March 31, 2024, 29 percent of all Mexican nationals processed for expedited removal at the SWB made fear claims, including 39 percent in February 2024). Given this demonstrated increase in encounters of, and fear claims made by, Mexican nationals, the Departments believe that applying this rule to Mexican nationals will result in faster processing of a significant number of Mexican noncitizens and thereby significantly advance this rule's overarching goal of alleviating the strain on the border security and immigration systems during emergency border circumstances. Without broad application, the practical result would be that those with meritorious claims would wait years for their claims to be granted, while noncitizens who are ultimately denied protection potentially would spend years in the United States before being issued a final order of removal.

*Comment:* Commenters stated that not creating an exception for Mexican nationals is especially concerning for vulnerable Mexican nationals, including people fleeing gang and cartel violence or other severe forms of violence, women, members of the LGBTQI+ community, those escaping sexual and gender-based violence, children, families, Indigenous people, journalists, and activists, among others. Commenters explained that violence against these vulnerable populations is endemic in Mexico and has been recognized by the Departments, including through individual asylum adjudications. Therefore, the commenters stated that it is concerning that the IFR does not except these vulnerable populations despite the clear need to prevent further harm and mitigate past harms suffered.

*Response:* Regarding concerns about specific vulnerable populations of Mexican nationals, the Departments emphasize that agents and officers frequently encounter noncitizens who may be vulnerable and are trained on appropriate action. *See* 89 FR at 48744–

---

[340] *See* OHSS analysis of July 2024 Persist Dataset (USPB Encounters by Citizenship tab).

[341] *See id.*

STB_AR1_000097

45. Moreover, the rule contains an explicit exception for exceptionally compelling circumstances that is intended to limit potential adverse effects of the rule's limitation on asylum eligibility, including on uniquely vulnerable populations. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i). For example, a noncitizen may qualify for the exception if the noncitizen faces an imminent and extreme threat to the noncitizen's life or safety immediately prior to entry into the United States. *See id.*

b. Adequacy of Statutory Withholding of Removal and CAT Protection

*Comment:* Commenters stated that statutory withholding of removal and CAT protection are insufficient alternative forms of protection for noncitizens who would be ineligible for asylum under the rule, asserting that these forms of protection are more difficult to obtain and provide fewer benefits than asylum.

First, commenters explained that statutory withholding of removal and CAT protection require noncitizens to meet a higher burden of proof than asylum and that, ultimately, these higher burdens will result in more noncitizens being denied protection under the rule.

Second, commenters stated that, even if noncitizens were able to meet the higher burden of proof for statutory withholding of removal or CAT protection, the noncitizen would not be accorded the same benefits as asylees. For example, commenters stated that recipients of statutory withholding of removal and CAT protection are subject to the continued risk of removal; cannot petition for derivative beneficiaries; are unable to apply for permanent residency or citizenship; are unable to travel abroad; and must apply annually for work authorization, which commenters claimed is subject to frequent adjudicatory delays. As a result, commenters argued that recipients of statutory withholding of removal and CAT protection are left in an uncertain status incongruent with the United States' obligations to protect refugees; that such status would lead to community instability in the United States, as it prevents noncitizens from investing in their communities and fully recovering from harm; and that such status would fail to ensure family unity—and even promote family separation—due to an inability to petition for derivative beneficiaries.

Further, commenters argued that the Departments cannot meet their non-refoulement obligations with statutory withholding of removal or CAT protections alone, stating that neither statutory withholding of removal nor CAT protections are equivalent to asylum because those protections do not convey rights guaranteed by the Refugee Protocol or meet the goals of the Refugee Convention. Those commenters said that the United States must comply with the Refugee Convention in its entirety, not only with Article 33. For example, commenters said that the United States is obligated to comply with Article 34 of the Refugee Convention and facilitate the integration and naturalization of refugees.

Lastly, commenters claimed that noncitizens who attempt to pursue statutory withholding of removal or CAT protection under the rule would increase confusion in their interactions with DHS, particularly due to the rule's interactions with other rulemakings.

*Response:* As an initial matter, the Departments reiterate that this rule fully complies with the United States' non-refoulement obligations under Article 33 of the Refugee Convention (via the Refugee Protocol), which the United States implements through the statutory withholding of removal provision in section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* Section III.A.1.d of this preamble. This rule's limitation on asylum eligibility does not affect a noncitizen's ultimate eligibility for statutory withholding of removal. *See* 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(i) (requiring an AO to assess a noncitizen's eligibility for statutory withholding of removal and CAT protection when applicable). Similarly, this rule's implementation of the "reasonable probability" screening standard is well within the Departments' broad discretion to determine which screening standard should apply in implementing the United States' non-refoulement obligations. *See* 89 FR at 48740–41.

The rule is similarly compliant with Article 34 of the Refugee Convention, which is precatory and encourages the assimilation and naturalization of refugees. Importantly, although the rule limits asylum eligibility for noncitizens who enter the United States during emergency border circumstances, Article 34 "does not require the implementing authority actually to grant asylum to all those who are eligible." *INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 441 (1987). Indeed, under U.S. law, asylum is a discretionary form of relief. *Id.; see also* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A); 8 CFR 1208.14(a)–(b). Consistent with that authority, the Departments have determined that this rule's limitation on asylum eligibility is necessary to address the emergency border circumstances described in the

IFR. *See* 89 FR at 48726–31. Further, the rule does not preclude the availability of asylum for those to whom the rule does not apply or who demonstrate that exceptionally compelling circumstances exist. For example, noncitizens may utilize the CBP One app to schedule an appointment to present themselves at a POE. *See* June 3 Proclamation Sec. 3(b)(v)(D) (excepting "noncitizens who arrive in the United States at a southwest land border port of entry pursuant to a process the Secretary of Homeland Security determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States"); 89 FR at 48737 ("One of the mechanisms by which a noncitizen may arrive at a POE with a pre-scheduled time to appear is through the CBP One app. Use of the CBP One app creates efficiencies that enable CBP to safely and humanely expand its ability to process noncitizens at POEs, including those who may be seeking asylum."). Additionally, noncitizens may overcome the limitation on asylum eligibility if they, or a family member as described in 8 CFR 208.30(c) with whom they are traveling, are able to demonstrate exceptionally compelling circumstances by a preponderance of the evidence, such as if they face an acute medical emergency or an imminent and extreme threat to life or safety, among other circumstances. *See* 8 CFR 208.35(a)(2)(i), 1208.35(a)(2)(i).

Next, the Departments recognize that the burdens of proof for statutory withholding of removal and CAT protection are higher than that for asylum, as they require a demonstration that it is more likely than not that noncitizens will be persecuted or tortured in another country, while asylum requires that noncitizens demonstrate a lesser burden of proof: a well-founded fear of persecution. *See Cardoza-Fonseca,* 480 U.S. at 423. These higher burdens of proof for those to whom the limitation applies align with the overall purpose of the rule: to disincentivize irregular migration during periods of emergency border circumstances, so as to mitigate the risk that border enforcement operations and the larger immigration system become overwhelmed and unable to issue timely decisions or consequences. *See* 89 FR at 48718 (explaining that the rule is intended to "address historic levels of migration and efficiently process migrants arriving at the southern border during emergency border circumstances"). These differences in burdens of proof also correspond with the distinct, but related, objectives of the Circumvention of Lawful Pathways

STB_AR1_000098

**81254**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

rule: to encourage noncitizens to avail themselves of lawful, safe, and orderly pathways, where possible, as well as to discourage irregular migration, promote orderly processing at POEs, and ensure that protection is still available for those who satisfy the applicable standards for statutory withholding of removal or CAT protection. *See* 88 FR at 31428. Therefore, if a noncitizen is subject to the rule's limitation on asylum eligibility, being required to meet comparatively higher existing standards for statutory withholding of removal or CAT protection is intended to further disincentivize irregular migration when encounters are above a certain benchmark and to ''substantially improve the Departments' ability to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain.'' 89 FR at 48715; *see also id.* at 48754.

Separately, and as explained in response to similar comments on the Circumvention of Lawful Pathways rule, the Departments also recognize the comparatively fewer benefits of statutory withholding of removal and CAT protection as compared to asylum, including: (1) no permanent right to remain in the United States; (2) the inability to adjust status to become a lawful permanent resident and, relatedly, later naturalize as a U.S. citizen; (3) the inability to travel abroad; and (4) the need to affirmatively apply for, and annually renew, employment authorization documents. *See* 88 FR at 31428. However, the Departments again emphasize that the rule's limitation on asylum eligibility, along with the comparatively fewer benefits of statutory withholding of removal and CAT protection, align with the overall purposes of the June 3 Proclamation and this rule: to address historic levels of migration at the southern border and efficiently process migrants arriving at the southern border during emergency border circumstances. *See* 89 FR at 48718; *id.* at 48726–31.

Moreover, with regard to concerns about the inability of statutory withholding of removal or CAT protection recipients to petition for beneficiary derivatives,[342] this rule contains a family unity provision to help prevent family separation for

noncitizens who can establish eligibility for statutory withholding of removal or CAT withholding. *See* 8 CFR 208.35(c), 1208.35(c). As discussed in further detail in Section III.C.1.e of this preamble, the family unity provision treats the following noncitizens as having established exceptionally compelling circumstances sufficient to avoid application of the limitation on asylum eligibility: those (1) who are found eligible for statutory withholding of removal or CAT withholding; (2) who would be eligible for asylum, but for the limitation on asylum eligibility set forth in the rule, the condition set forth in the Circumvention of Lawful Pathways rule, or both; and (3) who have a qualifying spouse or child. *See id.*

Lastly, the Departments do not believe that the ability of a noncitizen to apply for statutory withholding of removal or CAT protection when subject to the rule's limitation on asylum eligibility will cause confusion. Noncitizens have long maintained the ability to pursue such protection, and DHS and EOIR personnel are well-trained in screening for, and adjudicating, such forms of protection. *See* 89 FR at 48748 (explaining that ''AOs, supervisory AOs, and IJs receive training and have experience applying asylum, statutory withholding of removal, and CAT protection screening standards and in applying and reviewing decisions related to the ultimate asylum (for USCIS and EOIR) and statutory withholding of removal and CAT protection (for EOIR) merits standards'').

c. Requests for Reconsideration

*Comment:* Several commenters opposed eliminating noncitizens' ability to request reconsideration of a negative credible fear determination by USCIS. Commenters stated that the opportunity to request reconsideration of a negative credible fear determination after IJ concurrence is an important safeguard against non-refoulement. One commenter noted that in the Asylum Processing IFR, the Departments counted at least 569 negative credible fear determinations that were changed to positive credible fear determinations after a request for reconsideration between FY 2019 and 2021. Commenters stated that USCIS should continue the practice of allowing requests for reconsideration, as it may be the only opportunity for noncitizens to present additional evidence that was not presented during the credible fear interview or to correct procedural defects in the credible fear interview, alleging that the IJ review process generally does not provide meaningful review and routinely affirms erroneous

negative credible fear determinations. A commenter also claimed that even with the regulatory language acknowledging that USCIS maintains the discretion to reconsider its own negative credible fear determinations following IJ concurrence, it is unclear under the rule when or how USCIS would exercise its *sua sponte* authority to reconsider a negative credible fear finding.

*Response:* The Departments disagree with comments urging USCIS to allow noncitizens to request reconsideration of negative credible fear determinations under the present rule. This rule does not eliminate the discretionary authority of USCIS to reconsider negative credible fear determinations concurred upon by an IJ, but instead only prohibits noncitizens from submitting a request to reconsider a negative credible fear determination in cases subject to the rule. 8 CFR 208.35(b)(2)(v)(B). The Departments deem it appropriate to include this prohibition against requests for reconsideration in the rule to further its purpose of effectuating efficient yet fair credible fear case processing where emergency border circumstances are present. As noted in prior rulemakings, allowing requests for reconsideration of negative credible fear determinations diverts limited USCIS resources away from initial screenings, and relatively few such requests ultimately result in a reversal of the determination.[343]

The Departments acknowledge that they previously provided information in the Asylum Processing IFR that USCIS counted at least 569 negative credible fear determinations that were reversed after a request for reconsideration was submitted between FY 2019 through FY 2021. The Departments note, however, that that number was out of a total of at least 5,408 requests for reconsideration that were submitted during those years. *See* 87 FR at 18132. Under the present rule, where emergency border circumstances are present and a credible fear determination is made pursuant to the rule's limitation on asylum eligibility, the Departments assess that, in light of the safeguards in place, efficiency interests outweigh the interest in providing an opportunity to request reconsideration.

To the extent commenters argue that this provision of the rule implicates statutory or due process rights of noncitizens, the Departments note that noncitizens have no statutory right to request reconsideration of a negative credible fear determination. The Supreme Court has held that the due process rights of noncitizens applying

---

[342] The Departments note that, although there is no derivative protection under statutory withholding of removal or CAT protection, certain U.S.-based qualifying parents or legal guardians, including those granted withholding of removal, may petition for qualifying children and eligible family members to be considered for refugee status and possible resettlement in the United States. *See* USCIS, *Central American Minors (CAM) Program, https://www.uscis.gov/CAM* (last updated Mar. 7, 2024).

[343] *See* Asylum Processing IFR, 87 FR at 18132; *see also* 88 FR at 31419.

**STB_AR1_000099**

for admission at the border are limited to ''only those rights regarding admission that Congress has provided by statute.'' *Thuraissigiam,* 591 U.S. at 140. In establishing the streamlined procedures governing credible fear screening, Congress explicitly mandated that review of any negative credible fear determination made by an AO be conducted by an IJ and provided no mechanism for noncitizens to request reconsideration of the IJ's determination. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III).

With respect to commenters' concerns about fairness, the Departments note that all credible fear determinations, including determinations made under the processes set forth in this rule, will continue to be reviewed by a supervisory AO. *See* 8 CFR 208.30(e)(8); *see also* 89 FR at 48748. And the rule does not impact a noncitizen's right to request IJ review of a negative credible fear determination. Where requested, the IJ will evaluate the case de novo, including making a de novo determination as to whether there is a significant possibility the noncitizen could demonstrate they are not subject to the rule's limitation on asylum eligibility or are eligible for the exception. 8 CFR 208.35(b)(2)(iii)–(v), 1208.35(b). Accordingly, this rule ensures IJ review of the entirety of the negative credible fear determination, including application of the rule's limitation on asylum eligibility. To the extent commenters raise general concerns about IJ review of negative credible fear determinations, those concerns are outside the scope of this rulemaking.

In response to the comment noting that it is unclear when USCIS would exercise its discretion to reconsider a negative credible fear determination *sua sponte,* the Departments note that the regulatory framework makes clear that USCIS possesses the inherent discretion to reconsider its own negative credible fear determination that has been concurred upon by an IJ, and that such discretion may be exercised on a case-by-case basis dependent on the facts and circumstances in an individual case. *See, e.g.,* 8 CFR 1208.30(g)(2)(iv)(A) (2018) (noting that ''[t]he Service, however, may reconsider a negative credible fear finding that has been concurred upon by an immigration judge''); 208.35(b)(2)(v)(B). As noted above, the Departments contend that the existing safeguards under the present rule comport with all statutory requirements and believe that these safeguards sufficiently address any concerns related to adequate review of

negative credible fear determinations under the present rule.

*D. Other Issues Relating to the Rule*

1. Scope of the Rule and Implementation

a. Concerns That the Encounter Thresholds Are Too Low or Arbitrary

*Comment:* Some commenters expressed concern with the 2,500-encounter threshold that would trigger the limitation on asylum eligibility for certain individuals who enter during emergency border circumstances. Some commenters characterized the threshold as ''arbitrary.'' Another commenter claimed that encounter rates have historically never fallen below the 2,500-encounter threshold due to the urgent humanitarian need and expressed concern that, contrary to the realities of forced displacement, the IFR limiting entries to 2,500 encounters effectively serves as a policy to close the border and end access to asylum.

Several commenters remarked that the low threshold required for the limitation on asylum eligibility to be discontinued is unrealistic and would virtually guarantee the limitation would always be in place. One commenter expressed concern that 1,500 daily encounters is well below historical averages. Another commenter stated that in the past 6 FYs, monthly average border apprehensions consistently surpassed 1,500 individuals. Similarly, another commenter stated that the ''emergency border circumstances'' would apply during 58 percent of all months this century. Another commenter stated that the 1,500-encounter threshold is unreasonable given the number of encounters at the SWB in 2024, which, according to the commenter, has lately hovered between 170,000 to 190,000 per month, or around 6,000 people per day on average.

While referencing the thresholds, a commenter remarked that the preamble acknowledges that the Departments cannot swiftly change from one means of processing to another. Citing high levels of border crossings since May 2023 (after the implementation of the Circumvention of Lawful Pathways rule), the commenter stated that the Departments' intent is to keep this rule in place indefinitely, punishing migrants in an attempt to deter them from seeking protection in the United States. A commenter warned that ''the mechanism for lifting the restrictions in the IFR is insufficient to meet the humanitarian needs at the U.S. border, jeopardizing the asylum system for many years to come.''

*Response:* The Departments disagree that the numerical thresholds are arbitrary or too low. As explained in the IFR, the emergency border circumstances described in the June 3 Proclamation and this rule necessitate this rule's limitation on asylum eligibility and changes to the referral process and screening standard for statutory withholding of removal and CAT protection. *See* 89 FR at 48726–31. This is because, in such circumstances, DHS lacks the capacity to deliver timely consequences and must resort to large-scale releases of noncitizens pending section 240 removal proceedings. *Id.* at 48749. Such large-scale releases in the absence of this rule would lead to significant harms and incentivize human smuggling organizations to recruit more potential migrants based on the limitations on the Departments' ability to deliver timely decisions and consequences. *Id.* at 48749–50. The 1,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when the border security and immigration systems, as currently resourced, are no longer over capacity and the measures adopted in this rule are not necessary. *Id.* at 48750. And the 2,500-encounter threshold, as adopted in this rule, is a reasonable proxy for when there has been a significant degradation of DHS's ability to impose consequences at the border for individuals who do not establish a legal basis to remain in the United States. *Id.* at 48752. Were the resourcing of border security and immigration systems to change, this change (if sufficiently substantial) could trigger reassessment of these thresholds, in order to ensure that they reflect the Departments' ability to deliver timely decisions and consequences.

In the IFR, the Departments demonstrated the reasonableness of the thresholds in two ways. First, the Departments explained that during the FY 2013 to FY 2019 pre-pandemic period, USBP total encounters (including all UCs) only exceeded 1,500 per day for a sustained period from October 2018 to August 2019. *Id.* at 48753. During that 7-year period, months in which daily encounters were between 1,500 and 2,500 resulted in an average of 210 noncitizens released each day,[344] while months in which daily

---

[344] Although the demographic composition of current encounters (*e.g.,* a higher percentage of noncitizens encountered who assert fear claims) means that such a low release rate is likely unachievable in the near term, releases remain much lower when daily encounters are below the 2,500-encounter threshold. *See* 89 FR at 48731; *see also* OHSS analysis of July 2024 Persist Dataset and
Continued

encounters exceeded 2,500 resulted in approximately 1,300 noncitizens released each day with CBP releasing as many as 46 percent of the individuals it processed pending section 240 removal proceedings. *Id.*

Second, the Departments demonstrated that at the 1,500-encounter level and assuming a similar level of voluntary returns and reinstatements to those seen during implementation of the Circumvention of Lawful Pathways rule, DHS would be able to refer for expedited removal more than 70 percent of the single adults and family unit individuals who are not quickly repatriated (through voluntary return or reinstatement), and would be able to repatriate a total of about 830 noncitizens (*i.e.,* 56 percent of the 1,500 encounters counted towards the threshold). *Id.* at 48752 & nn.274, 276. By contrast, at above 2,500 encounters—the level at which the June 3 Proclamation and the IFR would again apply—DHS's ability to impose such consequences is significantly lower and decreases rapidly as encounters increase beyond that level; for instance, at that level DHS would be able to refer for expedited removal 43 percent of the single adults and family unit individuals who are not quickly repatriated, and would be able to repatriate a total of about 1,010 noncitizens (*i.e.,* 40 percent of the 2,500 encounters counted towards the threshold). *Id.* at 48752 nn.277–278.

In this second analysis as presented in the IFR, consistent with the June 3 Proclamation, DHS excluded encounters of UCs from non-contiguous countries from the threshold counts. But as noted in the IFR, "the demographics and nationalities encountered at the border significantly impact DHS's ability to impose timely consequences and the number of people who are ultimately released by CBP pending section 240 removal proceedings. This is especially true for periods when CBP has encountered more UCs, family units, or individuals from countries to which it is difficult to effectuate removals." *Id.* at 48753. Consistent with this reality, the September 27 Proclamation and this rule include, in both thresholds, consideration of encounters of all UCs, including those from non-contiguous countries. As discussed in Section II.C.1 of this preamble and later in this Section III.D.1, most UCs are from non-contiguous countries, and the processing of all UCs requires the use of significant CBP resources.

Including non-contiguous UCs in the 7-consecutive-calendar-day average calculation recognizes this impact. Depending on the levels of such UCs encountered at any given time, failing to include such UCs in the 1,500 and 2,500 encounter limits may result in an overestimate of resources available to the Departments to efficiently process noncitizens encountered at the SWB while delivering timely decisions and consequences to noncitizens who enter without a lawful basis to remain. This is because the number of UCs from non-contiguous countries encountered by USBP can fluctuate—something that models that assume stable demographics cannot fully account for. And if encounters of such UCs rise but are not included in the rule's thresholds, then those thresholds become much less useful predictors of overall capacity. Although encounters of UCs from non-contiguous countries have generally declined since the IFR took effect,[345] their proportion of USBP encounters has increased,[346] and the population of UCs from non-contiguous countries at the border has surged on several occasions in the past.[347]

As part of this final rule, DHS updated the second analysis discussed above to reflect more recent data and to demonstrate the impact on that analysis of counting all UCs—at current encounter levels—towards the encounter thresholds. The Office of Homeland Security Statistics ("OHSS") updated the IFR's methodology by (1) applying fear claim rates for the entirety of the immediate post-pandemic period (*i.e.,* not ending in April 2024, as the prior analysis did), (2) assuming a demographic makeup (including with respect to UCs) similar to that observed between June 5, 2024, and July 30, 2024 for that entire period, and (3) including all UCs in the 1,500 and 2,500 encounter figures.[348]

Under these parameters, at 1,500 encounters between the POEs (including all UCs) and assuming USBP is able to process 900 cases for expedited removal per day (as was approximately the case during the immediate post-pandemic period between May 12, 2023 and June 4, 2024), DHS would be able to refer for expedited removal 77 percent of the noncitizen single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 880 noncitizens per day (*i.e.,* under 60 percent of the 1,500 encounters counted towards the threshold).[349]

Similarly, at 2,500 encounters between the POEs (including all UCs) and assuming USBP can process 900 people for expedited removal per day, DHS would be able to refer for expedited removal 46 percent of the single adults and individuals in family units who are not quickly repatriated, and would be able to repatriate a total of about 1,040 noncitizens per day (*i.e.,* over 40 percent of the 2,500 encounters counted towards the threshold).[350]

The Departments caution that this type of analysis depends on a range of assumptions regarding capacity, fear claim rates, screen-in rates, and geographic and demographic distribution of encounters, among other variables. A change in these variables—for instance, a spike in UC encounters—could place a strain on custody resources that would further reduce the Departments' overall capacity to deliver timely decisions and consequences, such as by processing noncitizens for expedited removal. The analysis does show, however, that the change to the thresholds to include counting of all UCs is incremental in nature and consistent with the rule's overall purpose.

Finally, with respect to claims that either threshold effectively serves as a policy to "close the border" and end access to asylum, the Departments

---

data downloaded from UIP on September 3, 2024 (Summary Statistics tab, see cells L27 and M27).

[345] *See* OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (USBP Encounters by Fam Status tab).

[346] *See id.*

[347] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables,* https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[348] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). The figures presented in the IFR were based on fear claim rates, demographics, and average expedited removal capacity under the Circumvention of Lawful Pathways rule; these rates were pulled in early April 2024. *See* 89 FR at 48752 nn.274, 276. For instance, based on data pulled in early April 2024, the figures in the IFR assumed that CBP could process approximately 900 USBP encounters for expedited removal per day and that 17 percent of encounters would result in rapid returns via

voluntary return to Mexico, reinstatement of a removal order, or administrative removal. *Id.* Accounting for all of the immediate post-pandemic period (*i.e.,* also, including April, May, and early June 2024), USBP averaged about 860 people processed for expedited removal per day during that time period. OHSS analysis of July 2024 Persist Dataset (Imm Pos Pandemic ERCF tab). CBP processed for expedited removal about 920 people on average during that time. *Id.* From June 5, 2024 through August 31, 2024, CBP processed over 1,100 people for expedited removal per day and about 16 percent of encounters resulted in such rapid returns. OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR Details tab, IFR ERCF tab, and CLP v pre-CLP Projection Tool tab).

[349] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[350] *Id.*

STB_AR1_000101

disagree. The Departments also disagree with commenters' specific claims about historical encounter rates and numbers. Commenters are incorrect that daily encounters rates have never fallen below 2,500.[351] Commenters are also wrong that an average of 1,500 daily encounters is far below historical averages. From FY 2013 through FY 2019, the 7-consecutive-calendar-day average of encounters was below 1,500 nearly 80 percent of the time, and above 2,500 approximately 5 percent of the time.[352] And for over 70 percent of days during that time frame, the 7-consecutive-calendar-day average had been below 1,500 encounters for 28 consecutive days.[353] Over a longer time period, from FY 2009 through FY 2020, there were a total of only four months (all during the spring 2019 family unit surge) that encounters averaged more than 2,500 per day.[354] One commenter argued that in the past six fiscal years, monthly average apprehensions have consistently surpassed 1,500 noncitizens. But this only shows that the past six fiscal years have generally been times of historically high migrations, and the Departments established the 1,500-encounter daily threshold not by selecting an arbitrary figure but by estimating capacity to deliver timely consequences at current resource levels.

Even since the IFR took effect, encounters have dropped to levels indicating that it is possible the 1,500-encounter threshold will be met in the future. If, consistent with the June 3 Proclamation and IFR, one excludes UCs from non-contiguous countries, the 7-consecutive-calendar-day average has been below 2,000 encounters since June 27.[355] And if, consistent with the September 27 Proclamation and this rule, one includes such UCs, the 7-

consecutive-calendar-day average has been below 2,000 encounters since June 29.[356]

b. Concerns Regarding Exceptions From the Encounter Thresholds

*Comment:* A commenter remarked that there are too many exceptions to the types of encounters that are counted daily. The commenter stated that it is "hard to count up to 1,500" when there are so many exceptions. The commenter used the exception for non-contiguous country UCs, who are not counted under the June 3 Proclamation, as an example. The commenter stated that this exception encourages the trafficking of children and prevents reporting these as encounters. The commenter also objected to the exception for noncitizens who are determined to be inadmissible at a SWB POE, which the commenter asserted significantly limits the number of encounters considered.

Another commenter expressed similar concerns regarding the exclusion of UCs from the 2,500-encounter threshold. The commenter stated that the current UC policies, influenced by the Flores Settlement Agreement and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, are susceptible to exploitation. The commenter further noted that during the current Administration, UC encounters have exponentially increased, with more than 480,000 UCs encountered at the southern border between POEs. The commenter cautioned that without counting all UC encounters towards the 1,500-encounter threshold, existing policies may be further abused by criminal elements, leading to increased risks for UCs, such as human trafficking and other forms of exploitation. The commenter remarked that in addition to excluding non-contiguous country UCs, the encounter thresholds in the IFR also exclude 1,650 encounters every day at POEs, plus 30,000 noncitizens processed every month through the CHNV parole processes.

*Response:* Regarding UCs from non-contiguous countries, as discussed in Section II.C.1 of this preamble, the September 27 Proclamation amends the June 3 Proclamation to remove section 2(c), which provided that UCs from non-contiguous countries shall not be included in calculating the number of encounters, and this rule makes a parallel change. As discussed in Section II.C.1 of this preamble, the Departments' experience implementing the IFR has shown that excluding encounters of UCs from non-contiguous countries results in an incomplete assessment of the

Departments' resources and capabilities. UCs, regardless of their country of origin or nationality, require considerable resources to process and safely hold in CBP facilities and the Departments have in the past experienced surges of encounters of such UCs.[357] One of the primary purposes of this rule is to alleviate undue strain on the limited resources of border security and immigration systems, and through their experience with the IFR the Departments have recognized the need to consider the full operational burden that results from all UC encounters at the southern border. The resource burden posed by UCs from non-contiguous countries, along with recent increases in the proportion of such UCs relative to types of encounters, support the Departments' determination that UCs from all countries, not just from contiguous countries, are relevant to the thresholds contained in the rule.

The Departments disagree that the encounter thresholds should include daily encounters at the SWB POEs or CHNV parolees. The IFR applies only when encounters strain the border security and immigration systems' capacity. To date, this strain has been caused primarily by increased encounters between POEs. CBP can more efficiently process those at SWB POEs, particularly those who have used the CBP One app to make an appointment. In the past several years, processing capacity at POEs has been significantly expanded, enabling CBP to manage processing of noncitizens in a safe and efficient manner. However, despite the efforts to increase capacity within the limits of available resources and funding, processing between POEs continues to tax DHS resources and remains very resource intensive.

The CHNV processes do not adversely affect the Departments' resources at the southern border because noncitizens arriving under the CHNV processes travel by air to an interior POE.[358] The Departments do not believe it necessary or appropriate to include noncitizens who use the CHNV processes as part of encounter calculations under this rule for that reason.

---

[351] Average daily encounters averaged 1,310 between FYs 2011 and 2018. In FY 2009, average daily encounters were approximately 1,200. *See* OHSS analysis of July 2024 Persist Dataset (Daily Encounters FY2000–2024 tab).

[352] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the 7-consecutive-calendar-day average was below 1,500 nearly 85 percent of the time and above 2,500 only 4 percent of the time. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[353] Consistent with the September 27 Proclamation, this calculation includes encounters of UCs from non-contiguous countries. If, consistent with the June 3 Proclamation, one excludes such UCs from non-contiguous countries, the resulting figure is just below 80 percent. *See* OHSS analysis of July 2024 Persist Dataset (Trigger Analysis tab).

[354] OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[355] OHSS analysis of data downloaded from UIP on September 3, 2024 (Section 2c Encounters Tab).

[356] *Id.*

[357] *See* OHSS, *Immigration Enforcement and Legal Processes Monthly Tables, https:// www.dhs.gov/ohss/topics/immigration/ enforcement-and-legal-processes-monthly-tables* (last updated Sept. 10, 2024) (SWB encounters by family status from FY 2014 through May 2024).

[358] *See, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR 1255, 1256, 1263 (Jan. 9, 2023); USCIS, *Processes for Cubans, Haitians, Nicaraguans, and Venezuelans* (last updated Aug. 29, 2024), *https://www.uscis.gov/CHNV.*

STB_AR1_000102

c. Other Concerns About the Encounter Thresholds

*Comment:* A commenter wrote that it is reasonable to assume the threshold for suspending the rule will not be met in the foreseeable future, because even if the number of encounters dropped to the level where the 1,500-encounter threshold might be met, the Departments could issue a new IFR to keep the procedure in place. A commenter stated that the IFR provides no end dates and the Departments do not provide an explanation as to why the IFR should be in place indefinitely.

*Response:* The Departments disagree with the suggestion that they would perpetually take actions to lower the threshold for discontinuation solely to keep these emergency measures in place. If the Departments intended to permanently have these measures in place, they could have made the IFR apply indefinitely without using encounter thresholds. The two changes to the threshold made in this rule and the September 27 Proclamation are incremental in nature and consistent with the underlying purpose of the June 3 Proclamation. The Secretary will monitor encounter levels and make relevant determinations consistent with the September 27 Proclamation. Should further policy changes prove necessary—whether in response to comments submitted in response to this final rule's request or in another context—the Departments may take appropriate action to implement such changes. Additionally, the rule does not contain specific end dates because its measures are designed to be responsive to patterns in daily encounters. The IFR does not contain an overall expiration date because, due to the unpredictable nature of migration trends and for so long as Congress fails to increase the Departments' resources and modernize the current U.S. immigration system, such measures will be necessary when the Departments' operational capacity, as measured by daily encounter thresholds, is greatly overwhelmed.

*Comment:* A commenter stated that it would be challenging for noncitizens to know when thresholds have been met. The commenter stated that they had surveyed migrants in Mexico and over half of respondents in the first half of 2024 affirmed that they do not understand the requirements and processes for accessing U.S. territory, and that nearly half of respondents in certain areas confirmed that the main channel through which they receive information on policy changes is word of mouth, while around a third receive this information through social media.

The commenter said noncitizens would not be able to discern the application of the IFR without access to official information, particularly given that, according to the commenter, the United States Government does not currently publish statistics on encounters. The commenter wrote that even when some noncitizens might be aware of the dynamics of irregular movements, this awareness is likely to be limited to the specific region of the SWB where they are located and would very likely not cover the overall number of encounters.

The commenter stated that, given the swiftness with which the limitations established under the IFR can be invoked and applied, they are not likely to influence the ability of noncitizens in different parts of the transit route to adapt their decisions to increase their chances of receiving the protection that they need. The commenter stated that those who are already at or around Mexico's northern border when the rule's provision apply cannot meaningfully consider any potential alternative pathways. The commenter further stated that a significant proportion of people of concern present in Mexico could be ineligible for certain alternatives. For example, 97.9 percent of respondents to the commenter's protection monitoring activities during the first semester of 2024 reported having entered Mexico irregularly, which could render them ineligible for certain parole processes. The commenter stated that as a result, persons of concern are unlikely to become aware of when the additional limitations on asylum eligibility would apply with sufficient lead time to be able to adapt their decisions. This will thus undermine their ability to make decisions that increase their chances of receiving the protection that they need.

The commenter further stated that confusion around changing policies and practices governing access to U.S. territory has fueled the widespread belief that there are certain moments when the U.S. border is "open" and others when it is "closed," and that access to U.S. territory requires individuals to remain close to the border and attentive to any information suggesting that the border is "open." The commenter stated that the IFR has already contributed to this dynamic, with migrants along the U.S.-Mexico border expressing their understanding that the new limitations effectively "close off" access to U.S. territory. According to the commenter, this has led to desperation and fostered the likelihood that the population resorts to imprecise and misleading information

provided by human traffickers or on social media.

*Response:* DHS posts statistics on SWB encounters on CBP's website.[359] The website includes data extracted from CBP systems and data sources regarding encounters with single adults, individuals in family units, and UCs. Information about the status of the suspension and limitation on entry, and the related provisions in this rule, is available in English and Spanish at: *https://www.dhs.gov/immigrationlaws.* In addition, regardless of whether the threshold for discontinuing or continuing or reactivating the suspension and limitation on entry under the Proclamation or the limitation on asylum eligibility under this rule has been met, migrants may, for instance, arrive in the United States at a SWB POE pursuant to a process the Secretary determines is appropriate to allow for the safe and orderly entry of noncitizens into the United States.

For similar reasons, the Departments do not believe that it is necessary to adjust the rule to ensure that the potentially "abrupt" nature of its provisions allows sufficient time for those already in Mexico to adjust their behavior in order to access protection. The IFR was not the first time that the Departments encouraged migrants to use lawful, safe, and orderly pathways to come to the United States. The Circumvention of Lawful Pathways rule also incentivized the use of such pathways, *see generally* 8 CFR 208.33, 1208.33, and since their inception, the CHNV parole processes have included an ineligibility for those who crossed into Mexico irregularly, *see, e.g.,* Implementation of a Parole Process for Nicaraguans, 88 FR at 1263; Implementation of a Parole Process for Venezuelans, 87 FR 63507, 63515 (Oct. 19, 2022). And the CBP One app remains available to noncitizens in Mexico.[360] The rule also provides an exception for those who are able to demonstrate exceptionally compelling circumstances, *see* 8 CFR 208.35(a)(2)(i)

---

[359] CBP, *Southwest Land Border Encounters* (last modified Sept. 16, 2024), *https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.*

[360] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.* On August 23, 2024, CBP expanded the areas from which noncitizens can request appointments through the CBP One app. With this expansion, Mexican nationals will be able to request an appointment from anywhere within Mexico. Additionally, non-Mexican nationals will be able to request and schedule appointments from the Southern Mexico states of Tabasco and Chiapas, in addition to their existing ability to request and schedule an appointment from Northern and Central Mexico—enabling them to make appointments without having to travel all the way north to do so. *See id.*

**STB_AR1_000103**

and (ii), 1208.35(a)(2)(i) and (ii), and the rule's limitation on asylum eligibility does not apply those who are excepted under the Proclamation, *see* 8 CFR 208.35(a)(1), 1208.35(a)(1). And the rule preserves access to statutory withholding of removal, as well as CAT protection. *See* 8 CFR 208.35(b)(2), 1208.35(b). Thus, migrants already in Mexico have the ability under the rule to access available protection.

The Departments acknowledge the potential that some migrants would perceive the possibility of abrupt changes in procedures at the southern border as a reason to remain close to the border and attentive to any information suggesting that the border is or soon will be "open." In the IFR, the Departments explained that "[t]he 14-day waiting period prior to a discontinuation provides time for the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained." 89 FR at 48749 n.248. This rule makes an additional change that addresses this concern: The rule's provisions will not be discontinued unless there has been a 7 consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The Departments expect that this change, coupled with the 14-day waiting period after the Secretary makes a factual determination to discontinue the suspension and limitation on asylum eligibility, will reduce any perceived incentive to remain close to the U.S.-Mexico border in anticipation of a rapid change in policy.

*Comment:* A commenter wrote that while DHS has created a website that states whether the border is currently open or closed, it is unlikely that noncitizens in desperate conditions in Mexico would review the website before deciding to cross the border. Further, the commenter stated that, if the border were to reopen under the rule, it seems inevitable that smugglers would charge higher fees to move noncitizens across the border, and that if noncitizens understand the rule at all, they will flood the border when the suspension and limitation discontinues—leading again to its immediate closure. The commenter stated that the burden of tracking, identifying, and applying different standards over a matter of days is significantly more complex for USCIS personnel as they consider protection claims. The commenter expressed concern that the preamble to the IFR did not consider that this complexity would affect and complicate merits adjudications and lead to longer, more

complex hearings in an already overwhelmed, backlogged system.

*Response:* As noted in Section II.A.2 of this preamble, encounters between POEs have dropped substantially since implementation of the IFR, suggesting that many migrants have not responded as the commenter predicted. But in any event, if a migrant were to disregard the existence of the rule and other restrictions on crossing between POEs, or if a migrant who is unaware of the existence of the rule were to cross between the POEs, the rule would allow the Departments to swiftly deliver decisions and consequences, while allowing noncitizens who are able to demonstrate the existence of exceptionally compelling circumstances to avoid application of the rule's limitation on asylum eligibility and preserving access to statutory withholding of removal and CAT protection, as discussed in the preceding response.

With respect to the commenter's suggestion that noncitizens could respond to the discontinuation of the rule's provisions by "flood[ing] the border" and "leading again to its immediate closure," to the extent there is a prospect of such actions, this highlights the need for this rule, the overall effect of which will be to combat such actions by alleviating stresses on the border security and immigration systems at the southern border; it is not a reason to withdraw the rule. Moreover, the historical encounter data discussed in Section II.C of this preamble suggest that when regional migration decreases, encounter numbers often remain below 2,500 for very long periods. Those data militate against the commenter's view that encounters will inevitably rise quickly above 2,500.

Further, as discussed in Section II.C of this preamble, the September 27 Proclamation and this rule revise the timeline for the 1,500-encounter threshold to reduce the probability that an ephemeral drop in encounters would result in rapid shifts in applicable policy. With respect to the commenter's concern about complexity for Government personnel, the use of a 7-consecutive-calendar-day average, combined with the new requirement for the average to be below 1,500 encounters for each of 28 consecutive calendar days, also reduces the prospect of undue complexity. Although some section 240 removal proceedings and credible fear interviews may become more complex by virtue of this rule's provisions, many such proceedings may be avoided entirely. *See, e.g.,* 89 FR at 48767 ("[T]he Departments expect the additional time spent by AOs and IJs on

implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rule.").

2. Other Comments on Issues Relating to the Rule

*Comment:* Commenters asked how USCIS' implementation of the IFR would be funded, remarking that the funds to execute the IFR as written have not been allocated.

*Response:* USCIS applies the IFR's provisions as part of the credible fear determination or the full asylum adjudication. It is not a discrete or separate adjudication that would require its own funding stream separate from that which is used for credible fear determinations or asylum adjudications.

*Comment:* Commenters expressed concern about their ability to comment on the proposals in DHS's recent Mandatory Bars NPRM, the comment period for which ended four days after the IFR published. For example, a commenter noted that, in the IFR, the Departments expressly asked for comment on the interaction between the two rules, including whether to explicitly apply the heightened "reasonable probability" standard to those who are subject to a mandatory bar but not subject to the Circumvention of Lawful Pathways rule, but the commenter asserted that they could not provide comment on those issues without knowing how and whether DHS plans to finalize the DHS Mandatory Bars NPRM. Commenters also stated that DHS failed to analyze the interaction between the two rulemakings, which they stated will create additional hurdles for noncitizens seeking asylum and will lead to inconsistencies and potential challenges in processing. Commenters expressed the need for a comprehensive examination of how the policies overlap to avoid uncertainty.

*Response:* The Departments disagree that commenters did not have adequate opportunity to comment on the potential interaction between the DHS Mandatory Bars NPRM and the IFR. Indeed, as the commenters note, the Departments requested comment in the IFR on whether to expand 8 CFR 208.35(b)(3) (directing asylum officers to apply a reasonable probability screening standard in protection screenings in the event that 8 CFR 208.35(a) is held to be invalid or unenforceable) to cover "those who are found not to have a significant possibility of eligibility for asylum because they are barred from asylum due to a mandatory bar to

**STB_AR1_000104**

asylum eligibility if the [DHS Mandatory Bars NPRM] is finalized.'' 89 FR at 48756. The DHS Mandatory Bars NPRM provides ample notice of the proposed mandatory bars policy, and the commenters do not explain with any specificity why they must review any final rule associated with the DHS Mandatory Bars NPRM in order to provide relevant comments about its potential impact on the IFR.

Moreover, the Departments have considered the interaction between the two rulemakings and do not believe any corresponding changes to this rule are necessary. While both rules address DHS screening procedures, the DHS Mandatory Bars NPRM relates to a different issue than the issues raised in this rulemaking. The DHS Mandatory Bars NPRM proposes to allow AOs to consider the applicability of certain statutory bars to asylum, statutory withholding of removal, and withholding of removal under the CAT regulations during credible fear screenings, but it does not propose changes to the substantive screening standards by which AOs make their credible fear determinations. *See generally* 89 FR at 41347–61. On the other hand, the IFR established a new ''reasonable probability'' standard for the statutory withholding and CAT screening of noncitizens determined to be subject to the IFR's limitation on asylum eligibility. 8 CFR 208.35(b)(2)(i), 1208.35(b)(2)(iii). Except for this changed screening standard, the AO and IJ would otherwise follow the pre-existing standards at 8 CFR 208.30, 208.33, 1208.30, or 1208.33, as applicable. *Id.* Accordingly, as stated in the IFR, if DHS finalizes the DHS Mandatory Bars NPRM as drafted, the ''reasonable probability'' standard would still apply to determinations involving a noncitizen who is subject to this rule's limitation on asylum eligibility. 89 FR at 48739 n.186.

*Comment:* A commenter added that the Departments failed to explain how the IFR will interact with the Circumvention of Lawful Pathways rule.

*Response:* In the IFR, the Departments explained how the IFR will interact with another recent rule, the Circumvention of Lawful Pathways rule. 89 FR at 48754. The Departments explained that they were adding to 8 CFR 208.13 and 1208.13 a paragraph (g), entitled ''Entry during emergency border circumstances,'' which ''explain[s] when a noncitizen is potentially subject to th[e] IFR's limitation on asylum eligibility and credible fear screening procedures and how this limitation and its associated procedures interact with the Lawful

Pathways condition referenced in paragraph (f) of 8 CFR 208.13 and 1208.13.'' *Id.* These new paragraphs added to 8 CFR 208.13 and 1208.13 provide that, ''[f]or an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, Securing the Border) between the dates described in section 1 of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) of such Proclamation and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.'' 8 CFR 208.13(g), 1208.13(g).

In short, during emergency border circumstances, those who enter across the southern border are subject to this rule, ''[n]otwithstanding'' the Circumvention of Lawful Pathways rule or any other regulatory provision. *See* 8 CFR 208.35, 1208.35. A noncitizen who establishes exceptionally compelling circumstances under this rule has established exceptionally compelling circumstances under the Circumvention of Lawful Pathways rule. *See* 8 CFR 208.35(a)(2)(iii), 1208.35(a)(2)(iii). And the credible fear process under this rule uses the same framework as the Circumvention of Lawful Pathways rule, except for the use of a ''reasonable probability'' screening standard. *See* 8 CFR 208.35(b)(1)(ii), (b)(2)(i), (c), 1208.35(b)(2)(i), (b)(2)(iii), (c). The Departments described the provisions of the regulatory text in detail in the IFR's preamble. 89 FR at 48754–48759; *id.* at 48762–66.

*Comment:* A commenter asserted that recent rulemakings have complicated the asylum system and that the Departments have not provided reliable information about those changes to affected noncitizens.

*Response:* The Departments acknowledge that recent rulemakings have modified the credible fear screening process to better enable the Departments to deliver timely decisions and consequences to noncitizens entering across the southern border who do not have a basis to remain in the United States. Specifically, in the past two and a half years, the Departments have issued the Asylum Processing IFR, the Circumvention of Lawful Pathways rule, and the IFR discussed here. DHS has also issued a proposed rule—the DHS Mandatory Bars NPRM. Each rule has been accompanied by detailed preamble discussion and regulatory text. In addition to the public-facing

materials, although not required to by law, the Departments have executed robust communications plans to notify and inform the public about the consequences of irregular migration while noting the expansion of lawful pathways and the tools that can be used to access those lawful pathways.[361] The public engagement plans have both domestic and international dimensions.[362] Domestically, these plans have included engagement with NGOs, international organizations, legal services organizations, and others.[363] Internationally, the Departments have also executed communications campaigns throughout the Western Hemisphere in coordination with interagency partners and partner governments to educate migrants and would-be migrants about lawful pathways and consequences for not using them.[364] This includes media engagements with in-country reporters, graphics and explainer videos, and press releases highlighting removal flights as a direct consequence of

[361] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

[362] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas;* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (Apr. 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/;* DHS, *Fact Sheet: Department of State and Department of Homeland Security Announce Additional Sweeping Measures to Humanely Manage Border through Deterrence, Enforcement, and Diplomacy* (May 10, 2023), *https://www.dhs.gov/news/2023/05/10/fact-sheet-additional-sweeping-measures-humanely-manage-border.*

[363] *See* U.S. Department of State, *Secretary Antony J. Blinken and Secretary of Homeland Security Alejandro Mayorkas Opening Remarks at the Ministerial Conference on Migration and Protection Reception* (Apr. 19, 2022), *https://www.state.gov/secretary-antony-j-blinken-and-secretary-of-homeland-security-alejandro-mayorkas-opening-remarks-at-the-ministerial-conference-on-migration-and-protection-reception/.*

[364] *See* U.S. Department of State, *U.S. Government Response to Migration in the Americas* (Nov. 17, 2023), *https://www.state.gov/briefings-foreign-press-centers/us-government-response-to-migration-in-the-americas; see also* USCG, Press Release: *Task Force continues to prevent irregular, unlawful maritime migration to United States* (April 12, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3739500/task-force-continues-to-prevent-irregular-unlawful-maritime-migration-to-united/.*

STB_AR1_000105

coming to the United States irregularly.[365]

The Departments understand concerns about changes to southern border processing. However, as discussed throughout the June 3 Proclamation, the IFR, and this rule, the circumstances at the southern border have changed, and U.S. policy has had to change with them to ensure the effective functioning of the immigration and border management systems. The Departments have consistently encouraged noncitizens seeking to enter the United States to pursue lawful, safe, and orderly pathways to do so, and they continue to provide that encouragement now.

*Comment:* One commenter expressed concern that the Departments "failed to analyze how the IFR interacts with the DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings (May 9, 2024).[366]

*Response:* The Departments acknowledge that the IFR did not discuss DHS guidelines governing the use of classified or confidential information, but the IFR does not contain any provisions calling for or governing the use of classified information. Regardless, the rule and DHS's policy on the use of classified information in immigration proceedings are harmonious. The INA permits the use of classified information in certain immigration proceedings, and noncitizens have no right to examine classified national security information that DHS may consider or proffer in opposition to the noncitizen's admission to the United States or application for relief from removal. INA 235(c), 8 U.S.C. 1225(c); INA 240(b)(4)(B), 8 U.S.C. 1229a(b)(4)(B); 8 CFR 235.8(b)(3), 1240.33(c)(4). That was the case before DHS issued its updated policy and guidance on the use of classified information in immigration proceedings on May 9, 2024. The updated guidance does not alter those fundamental principles or the type of information that may be used in the immigration proceedings governed by

the IFR,[367] and so there was no need for the Departments to address the interaction between the IFR and the new classified information policy.

*E. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* Commenters expressed concerns with the Departments' decision to issue an IFR instead of an NPRM, and the Departments' invocation of the "foreign affairs" and "good cause" exceptions. Commenters stated that the Departments have not proved that either exception applies and, therefore, argued the IFR did not comply with the APA.

*Response:* Under the APA, agencies must generally provide "notice of proposed rule making" in the **Federal Register** and, after such notice, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. 553(b) and (c). The APA further provides that the required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except in certain circumstances. *Id.* 553(d). However, consistent with the APA, the Departments did not employ these procedures before issuing the IFR because (1) the IFR involved a foreign affairs function of the United States and thus is excepted from such requirements, *id.* 553(a)(1), and (2) the Departments found good cause to proceed with an immediately effective interim final rule, *id.* 553(b)(B), 553(d)(3). *See also* 89 FR at 48759–66 (explaining use of these APA exceptions). Because the Departments have now issued this final rule after soliciting comments, those concerns are moot—but regardless, the Departments address commenters' concerns below.

a. Foreign Affairs Exception

*Comment:* A commenter suggested that the Departments' invocation of the foreign affairs exception is inappropriate because this exception has been "selective[ly] appli[ed]," pointing to other rules concerning processing of noncitizens at the border (the Circumvention of Lawful Pathways rule and the DHS Mandatory Bars NPRM) for which the Departments did not invoke this exception. Another commenter remarked that the foreign affairs exception cannot apply because the IFR is a "unilateral action" by the United States, seemingly without any formal agreements with Mexico or other affected countries, and the rule's effects might exacerbate undesirable international consequences. A third commenter stated that the foreign affairs exception does not apply to rulemakings concerning the U.S. border, stating that these are matters of domestic policy. Similarly, another commenter noted that Federal courts have previously informed agencies that these exceptions to the APA's notice-and-comment requirement "do not apply to regulations that alter domestic law around asylum eligibility." A fifth commenter expressing opposition to the Departments' invocation of the foreign affairs exception remarked that the exception's interpretation is "overly broad."

*Response:* The IFR is excepted from the APA's notice-and-comment and delayed-effective-date requirements because it involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). Courts have held that this exception applies when the rule in question is "clearly and directly involve[d]" in "a foreign affairs function." *E.B.* v. *U.S. Dep't of State,* 583 F. Supp. 3d 58, 63 (D.D.C. 2022) (cleaned up). In addition, although the text of the APA does not require an agency invoking this exception to show that such procedures may result in "definitely undesirable international consequences," some courts have required such a showing. *See, e.g., Rajah* v. *Mukasey,* 544 F.3d 427, 437 (2d Cir. 2008) (quotation marks omitted). This rule satisfies both standards. Nevertheless, the Departments provided an opportunity for public comment after issuing the IFR and in this final rule are responding to those comments.

With respect to comments asserting this rule represents "unilateral action" by the United States, the United States' border management strategy, as further developed in this rule, is predicated on the belief that migration is a shared responsibility among all countries in the

---

[365] *See* Ecuador Envivo, *La tragedia detrás de la migración irregular, una desgarradora realidad (The tragedy behind irregular migration, a heartbreaking reality)* (July 31, 2024), *https:// ecuadorenvivo.com/blog/2024/07/31/la-tragedia-humana-detras-de-la-migracion-expertos-analizan-crisis-de-migracion-irregular/; see also* ICE, *ICE conducts single adult, family unit removal flights Aug. 9* (Aug. 9, 2024), *https://www.ice.gov/news/ releases/ice-conducts-single-adult-family-unit-removal-flights-aug-9-0.*

[366] DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/ publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.*

[367] The previous policy and guidelines permitted the use of classified national security information in an individual's immigration proceedings only as a matter of last resort. *See* DHS, *DHS Guidelines for the Use of Classified Information in Immigration Proceedings* (Oct. 4, 2004), *https://www.dhs.gov/ publication/dhs-policy-and-guidelines-use-classified-information-immigration-proceedings-october.* The new policy and guidelines now permit the use of classified national security information as the Department deems necessary to protect our national security and public safety interests, subject to procedures outlined in the new guidance. *See* DHS, *DHS Policy and Guidelines for the Use of Classified Information in Immigration Proceedings* (May 9, 2024), *https://www.dhs.gov/publication/ dhs-policy-and-guidelines-use-classified-information-immigration-proceedings.* Neither the new or old policies and guidelines provide the individual who is subject to the immigration proceedings any entitlement to review classified national security information. Such classified information would be reviewed either *ex parte* or *in camera.*

STB_AR1_000106

region—a fact reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.[368] This strategy takes particular inspiration from the Los Angeles Declaration on Migration and Protection ("L.A. Declaration"), which was joined by world leaders during the Summit of the Americas on June 10, 2022, and has been endorsed by 22 countries.[369]

Under the umbrella of this framework, the United States has been working closely with its foreign partners to manage the unprecedented levels of migration that countries throughout the region have recently been experiencing. This work includes efforts to expand access to and increase the number of lawful, safe, and orderly pathways, such as the Safe Mobility Initiative;[370] conduct joint enforcement efforts, such as the Darién Campaign with Colombia and Panama and the mirrored patrols with the Government of Mexico along our shared border; and share information, technical assistance, and best practices. *See* 89 FR at 48759–60 & nn.300–02. These also include the commitment by the United States and Mexico to strengthen their joint humanitarian plan on migration. *See id.* at 48760 & n.310. The United States and endorsing countries continue to progress and expand upon our shared commitments made under this framework.

Given the particular challenges facing the United States and its regional partners at this moment, the Departments appropriately assessed that it was critical that the United States continue to lead the way in responding to ever-changing and increasing migratory flows, and that the IFR and the Proclamation—and the strong consequences they were intended to impose at the border—would send an important message to the region that the United States is prepared to put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.[371] *See* 89 FR at 48761.

In response to the comments that the Departments' invocation of the foreign affairs exception is overly broad and that because the IFR impacts asylum and issues at the southern border of the United States, it implicates only domestic policy and law and thus does not qualify for the foreign affairs exception, the Departments point out that the IFR stems from international cooperation and directly addresses international challenges. As one commenter noted, at least one court has determined that a rule imposing a limitation on asylum eligibility is not subject to the foreign affairs exception when that rule has only an indirect impact on foreign affairs. *See Capital Area Immigrants' Rights Coalition* v. *Trump,* 471 F. Supp. 3d 25, 56 (D.D.C. 2020). But recently Mexico and the United States have worked together on a joint humanitarian plan on migration intended "to address the humanitarian situation caused by unprecedented migration flows at our shared border and in the region."[372] In a joint statement following a meeting between President Biden and President López-Obrador on April 28, 2024, the presidents "ordered their national security teams to work together to immediately implement concrete measures to significantly reduce irregular border crossings while protecting human rights."[373] The IFR and this rule further this international mission by limiting heightened levels of migration. This contrasts with the "indirect international effects," including potential "downstream effects in other countries or on international negotiations," that the court discussed in *Capital Area Immigrants' Rights Coalition. Capital Area Immigrants' Rights Coalition,* 471 F. Supp. 3d at 55. Given the IFR's direct and clear involvement in foreign affairs, the foreign affairs exception applies.

In addition to the IFR's clear and direct involvement in foreign affairs, the Departments believed that conducting a notice-and-comment process and providing a delayed effective date likely would have led to a surge to the southern border before the Departments could finalize the rule, as occurred in anticipation of the end of the Title 42 public health Order.[374] Regional partner countries have repeatedly emphasized the ways in which U.S. policy announcements have a direct and immediate impact on migratory flows through their countries. *See* 88 FR at 31444. For example, one foreign partner opined that the formation of caravans in the spring of 2022 were spurred by rumors of the United States Government terminating the Title 42 public health Order and then the officially announced plans to do so. *Id.* Such effects are precisely the kind of "definitely undesirable international consequences" that the Departments seek to avoid. The Departments appropriately concluded that the emergency measures taken in the IFR would help address this regional challenge, rather than exacerbate it as one commenter suggested, and that any decrease in migration that results would help relieve the strain not just on the U.S.-Mexico border, but also on

---

[368] *See* The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador; see also* Kathia Martínez, *US, Panama, and Colombia aim to stop Darien Gap migration,* AP News (Apr. 11, 2023), *https://apnews.com/article/darien-gap-panama-colombia-us-migrants-cf0cd1e9de2119208c9af186e53e09b7.*

[369] *See* Los Angeles Declaration on Migration and Protection, *Endorsing Countries, https://losangelesdeclaration.com/endorsing-countries* (last visited Aug. 2, 2024).

[370] *See* U.S. Dep't of State, *Safe Mobility Initiative: Helping Those in Need and Reducing Irregular Migration in the Americas, https://www.state.gov/safe-mobility-initiative/* (last visited Sept. 21, 2024).

[371] *See* Muzaffar Chishti et al., *At the Breaking Point: Rethinking the U.S. Immigration Court System,* Migration Pol'y Inst., at 11 (2023), *https://www.migrationpolicy.org/sites/default/files/publications/mpi-courts-report-2023_final.pdf* ("In the case of noncitizens crossing or arriving at the U.S.-Mexico border without authorization to enter, years-long delays create incentives to file frivolous asylum claims that further perpetuate delays for those eligible for protection, undermining the integrity of the asylum system and border enforcement."); Doris Meissner, Faye Hipsman, & T. Alexander Aleinikoff, *The U.S. Asylum System in Crisis: Charting a Way Forward,* Migration Pol'y Inst., at 9 (2018), *https://www.migrationpolicy.org/sites/default/files/publications/MPI-AsylumSystemInCrisis-Final.pdf* ("Incentives to misuse the asylum system may also be reemerging. For example, over the past five years, the number of employment authorization documents (EADs) approved for individuals with pending asylum cases that have passed the 180-day mark increased from 55,000 in FY 2012 to 270,000 in FY 2016, and further to 278,000 in just the first six months of FY 2017. This high and growing level of EAD grants may suggest that, as processing times have grown, so too have incentives to file claims as a means of obtaining work authorization and protection, without a sound underlying claim to humanitarian protection.").

[372] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[373] The White House, *Joint Statement by the President of the United States Joe Biden and the President of Mexico Andrés Manuel López Obrador* (Apr. 29, 2024), *https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/29/joint-statement-by-the-president-of-the-united-states-joe-biden-and-the-president-of-mexico-andres-manuel-lopez-obrador.*

[374] *See* 89 FR at 48761–62. Note that the encounter projections included in the IFR excluded encounters of people who had registered with the CBP One app along with administrative encounters at POEs, but included non-CBP One enforcement encounters at POEs, which at the time averaged about 190 per day since May 2023, based on OHSS analysis of March 2024 OHSS Persist Dataset; *see also* CBP, *CBP One™ Appointments Increased to 1,450 Per Day* (June 30, 2023), *https://www.cbp.gov/newsroom/national-media-release/cbp-one-appointments-increased-1450-day;* Decl. of Blas Nuñez-Neto ¶ 9, *E. Bay Sanctuary Covenant* v. *Biden,* No. 4:18–cv–06810–JST (N.D. Cal. June 16, 2023) (Dkt. 176–2).

STB_AR1_000107

countries throughout the hemisphere.[375] The actions the United States took in the IFR thus affected conditions beyond the southern border and demonstrated a commitment to addressing irregular migration in the region, even as foreign partners have been taking actions themselves that are aligned with a shared interest in reducing migration.[376] Thus, regardless of whether the foreign affairs exception has been invoked for other rulemakings involving border issues, that exception is applicable here. *See* 5 U.S.C. 553(a)(1). The Departments note, however, that the Circumvention of Lawful Pathways rule did invoke the foreign affairs exception to the APA's delayed-effective-date requirement on similar grounds to the IFR. *See* 88 FR at 31444–45.

b. Good Cause Exception

*Comment:* Commenters stated that the good cause exception did not apply to the IFR because the Departments' claim that proceeding via NPRM would yield a surge in border encounters was misguided, not supported by evidence, and an insufficient reason to invoke the good cause exception. Similarly, commenters stated that the IFR acknowledged that border encounters were lower in 2024 than the year prior, belying the claim of a border emergency. Commenters expressed concern that there is no indication of a new emergency sufficient for the Departments to immediately change their rules without allowing the public an opportunity to engage with or be warned about the coming changes. Commenters further claimed that evidence shows that migration rates rise independently of U.S. efforts to enact consequences, that any change in policy leads to a short-term decrease in encounters and, thus, that the IFR should not have been excepted from the APA. Commenters noted that the increase in encounters in December 2023 was not tied to any policy change. Commenters also criticized the Departments' discounting of the lack of a surge after the Circumvention of Lawful Pathways NPRM, stating that although at that time the Title 42 public health Order remained in effect, "it is disingenuous to compare the current IFR with the lifting of Title 42, which,

as the agencies report, led to increased border entries." Commenters expressed opposition to the Departments' invocation of the good cause exception, remarking that the assumption that "not seeking safety in the United States protects the welfare of people who otherwise would undertake that dangerous journey is unsubstantiated and false."

Commenters compared the IFR to the Circumvention of Lawful Pathways NPRM, which according to the commenters did not invoke the good cause exception. Commenters wrote that the good cause exception should not have applied to the IFR because providing notice would have been both "practicable and in the public interest." Commenters stated that the Departments' good cause exception claim of an emergency is based on "long standing structural challenges," such as backlogged immigration case processing and limited resources.

*Response:* The Departments' decision to invoke the good cause exceptions to the APA's notice-and-comment and delayed-effective-date procedures at 5 U.S.C. 553(b)(B) and (d)(3) was reasonable and appropriate. Notwithstanding that the Departments had ample basis to forgo advance notice and comment, the Departments nevertheless provided an opportunity for public comment and in this final rule are responding to those comments.

An agency may forgo notice and comment when it is "impracticable, unnecessary, or contrary to the public interest." *Id.* 553(b)(B). Here, the notice-and-comment procedures were impracticable and contrary to the public interest because the delays associated with such procedures would have unduly postponed implementation of a policy that was urgently needed to avert significant public harm. While courts have "narrowly construed" this exception, it can "excuse[ ] notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." *Am. Pub. Gas Ass'n* v. *U.S. DOE,* 72 F.4th 1324, 1339–40 (D.C. Cir. 2023) (internal citations omitted). An advance announcement of the IFR would have seriously undermined a key goal of the policy in disincentivizing substantial levels of irregular migration, *see, e.g.,* 89 FR at 48754, and instead would have incentivized noncitizens to irregularly enter the United States before the IFR took effect.

First, the "impracticable" prong of the good cause exception "excuses notice

and comment in emergency situations . . . or where delay could result in serious harm." [377] Findings of impracticability are "inevitably fact- or context-dependent," [378] and when reviewing such findings, courts generally consider, among other factors, the harms that might have resulted while the agency completed standard rulemaking procedures [379] and the agency's diligence in addressing the problem it seeks to address.[380]

The critical need to immediately implement more effective border management measures is described at length in the June 3 Proclamation, the IFR, and Section II.A of this preamble. Despite the strengthened consequences in place at the SWB and adjacent coastal borders, including the Circumvention of Lawful Pathways rule and other measures (which led to the highest numbers of returns and removals in more than a decade, 89 FR at 48713), when the IFR was published, the U.S. Government continued to contend with exceptionally high levels of irregular migration along the southern border, including record-high total USBP encounter levels on the SWB as recently as December 2023.[381] While encounter

[375] *See* 88 FR at 11713 (noting that in the 60 days immediately following DHS's resumption of routine repatriation flights to Guatemala and Honduras in 2021, average daily encounters fell by 38 percent for Guatemala and 42 percent for Honduras).

[376] *See, e.g.,* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023), *https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration/.*

[377] *Jifry* v. *FAA,* 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see, e.g., id.* (upholding a claim of good cause to address "a possible imminent hazard to aircraft, persons, and property within the United States" (quotation marks omitted)); *Haw. Helicopter Operators Ass'n* v. *FAA,* 51 F.3d 212, 214 (9th Cir. 1995) (upholding a claim of good cause to address 20 air tour accidents over a four-year period, including recent incidents indicating that voluntary measures were insufficient to address the threat to public safety).

[378] *Mid-Tex Elec. Co-op, Inc.* v. *FERC,* 822 F.2d 1123, 1132 (D.C. Cir. 1987); *see Petry* v. *Block,* 737 F.2d 1193, 1203 (D.C. Cir. 1984) (when evaluating agency "good cause" arguments, "it is clear beyond cavil that we are duty bound to analyze the entire set of circumstances"). Courts have explained that notice-and-comment rulemaking may be impracticable, for instance, where air travel security agencies would be unable to address threats, *Jifry,* 370 F.3d at 1179, if "a safety investigation shows that a new safety rule must be put in place immediately," *Util. Solid Waste Activities Grp.* v. *EPA,* 236 F.3d 749, 754 (D.C. Cir. 2001) (ultimately finding that not to be the case and rejecting the agency's argument), or if a rule was of "life-saving importance" to mine workers in the event of a mine explosion, *Council of S. Mountains, Inc.* v. *Donovan,* 653 F.2d 573, 581 (D.C. Cir. 1981).

[379] *See Util. Solid Waste Activities Grp.,* 236 F.3d at 754–55 (explaining that "a situation is 'impracticable' when an agency finds that due and timely execution of its functions would be impeded by the notice otherwise required in § 553, as when a safety investigation shows that a new safety rule must be put in place immediately" (cleaned up)).

[380] *See, e.g., Tri-Cty. Tel. Ass'n, Inc.* v. *FCC,* 999 F.3d 714, 720 (D.C. Cir. 2021) ("[T]his is not a case of unjustified agency delay. The Commission *did* act earlier, . . . [and t]he agency needed to act again . . . .").

[381] There were approximately 250,000 USBP encounters along the SWB in December 2023, higher than any previous month on record, *see*

Continued

STB_AR1_000108

levels in calendar year 2024 prior to issuance of the IFR had decreased from these record numbers, there was still a substantial and elevated level of migration. Historically high percentages of migrants were claiming fear. 89 FR at 48713.

DHS was forced to place many of these individuals into the backlogged immigration court system, a process that can take several years to result in a decision or consequence.[382] Even then, it can take a substantial period to effectuate the removal of these individuals.[383] This difficulty in predictably delivering timely decisions

and consequences further compounded incentives for migrants to make the dangerous journey to the SWB, regardless of any individual noncitizen's ultimate likelihood of success on an asylum or protection application. 89 FR at 48714. The emergency border circumstances were not, however, due solely to longstanding structural challenges such as case backlogs in immigration court and the lack of government resources, as one commenter suggested; rather, the heightened level of encounters at the southern border occurred despite recent increases in the number of immigration court judges, immigration court cases completed, individuals processed through expedited removal, and expanded opportunities to use lawful, safe, and orderly processes. *Id.* at 48712–13. The Departments reasonably determined that the heightened levels of migration and forced displacement that resulted in the President's determination to apply the suspension and limitation on entry and the Departments' determination to adopt the IFR would further strain resources, risk overcrowding in USBP stations and border POEs in ways that pose significant health and safety concerns, and create a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum or other protection—would be encouraged to put their lives in the hands of dangerous organizations to make the hazardous journey north based on a perceived lack of immediate consequences. *See id.* at 48763. The Departments acted immediately to safeguard their ability to enforce our Nation's immigration laws in a timely way and at the scale necessary with respect to those who seek to enter without complying with our laws. *See id.*

Second, under the "contrary to the public interest" prong of the good cause exception, it has long been recognized that agencies may use the good cause exception, and need not take public comment in advance, when significant public harm would result from the notice-and-comment process.[384] If, for

example, advance notice of a coming price increase would immediately produce market dislocations and lead to serious shortages, advance notice need not be given.[385] A number of cases follow this logic in the context of economic regulation.[386]

With respect to comments stating that migration rates can rise independently of policy changes, commenters are correct that there are increases in migration rates that do not appear to be a result of changes in U.S. policies, such as the increase in encounters in December 2023. But that does not diminish the impact of even short-term surges after announcements of policy changes, which the Departments have experienced time and again, as detailed in the IFR. *See* 89 FR at 48764–66.

The Departments reasonably assessed that announcing this rule in advance would have likely yielded a surge. As explained in the IFR, the Departments were responding to emergency border circumstances, and advance announcement of the response—a significant change in border policy that increased the Departments' ability to swiftly process and remove, as appropriate, more noncitizens who enter the United States irregularly—would have significantly incentivized migrants to engage in actions likely to compound those very challenges.[387]

---

OHSS analysis of July 2024 Persist Dataset (Encounters FY 2000–2024 tab).

[382] EOIR decisions completed in July 2024 were, on average, initiated in February 2022, during the significant operational disruptions caused by the COVID–19 pandemic (with encounters several months earlier than that), but 60 percent of EOIR cases initiated in February 2022 were still pending as of July 2024, so the final mean processing time (once all such cases are complete) will be longer. OHSS analysis of EOIR data as of July 2024 (Mean EOIR Filed Dates tab); EOIR, *EOIR* Strategic Plan 2024, Current Operating Environment, *https://www.justice.gov/eoir/strategic-plan/strategic-context/current-operating-enviroment* (last visited Aug. 2, 2024) ("EOIR [ ] suffered operational setbacks during the COVID–19 pandemic years of FY 2020 through FY 2022, including declining case completions due to health closures and scheduling complications and delays in agency efforts to transition to electronic records and the efficiencies they represent. While the challenges of the pandemic were overcome by adaptive measures taken during those years, the pandemic's impact on the pending caseload is still being felt."). While EOIR does not report statistics on pending median completion times for removal proceedings in general, it does report median completion times for certain types of cases, such as detained cases and cases involving UCs. *See, e.g.,* EOIR, *Median Unaccompanied Noncitizen Child (UAC) Case Completion and Case Pending Time* (July 19, 2024), *https://www.justice.gov/eoir/media/1344951/dl?inline* (median completion time of 1,241 days); EOIR, *Median Completion Times for Detained Cases* (July 19, 2024), *https://www.justice.gov/eoir/media/1344866/dl?inline* (median completion time of 46 days in the third quarter of 2024 for removal, deportation, exclusion, asylum-only, and withholding-only cases); EOIR, *Percentage of DHS-Detained Cases Completed within Six Months* (July 19, 2024), *https://www.justice.gov/eoir/media/1344886/dl?inline* (reporting seven percent of detained cases not completed within six months); *see also* 89 FR at 48749–54 (discussing the limits in the Departments' ability to quickly repatriate noncitizens when encounters are elevated, which results in the release of many of these noncitizens into the United States); Section III.D.1 of this preamble (describing how the rule's thresholds target emergency border circumstances exceeding the Departments' capacity to effectively process, detain, and remove, as appropriate, the noncitizens encountered).

[383] Miriam Jordan, *One Big Reason Migrants Are Coming in Droves: They Believe They Can Stay,* N.Y. Times (Jan. 31, 2024), *https://www.nytimes.com/2024/01/31/us/us-immigration-asylum-border.html* ("Most asylum claims are ultimately rejected. But even when that happens, years down the road, applicants are highly unlikely to be [removed]. . . ."); OHSS analysis of July 2024 Persist Dataset (Removal Orders tab); *see also* 88 FR at 31326, 31381.

[384] *See, e.g., Mack Trucks, Inc.* v. *EPA,* 682 F.3d 87, 95 (D.C. Cir. 2012) (noting that the "contrary to the public interest" prong of the "good cause" exception "is appropriately invoked when the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal—if, for example, announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent . . . [or] in order to prevent the amended rule from being evaded" (cleaned up)); *DeRieux* v. *Five Smiths, Inc.,* 499 F.2d 1321, 1332 (Temp. Emer. Ct. App. 1974) ("[W]e are satisfied that there was in fact 'good cause' to find that advance notice of the freeze was

'impracticable, unnecessary, or contrary to the public interest' within the meaning of § 553(b)(B). . . . Had advance notice issued, it is apparent that there would have ensued a massive rush to raise prices and conduct 'actual transactions'—or avoid them—before the freeze deadline.").

[385] *See, e.g., Nader* v. *Sawhill,* 514 F.2d 1064, 1068 (Temp. Emer. Ct. App. 1975) ("[W]e think good cause was present in this case based upon [the agency's] concern that the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase." (quotation marks omitted)).

[386] *See, e.g., Chamber of Com. of U.S.* v. *S.E.C.,* 443 F.3d 890, 908 (D.C. Cir. 2006) ("The ['good cause'] exception excuses notice and comment in emergency situations, where delay could result in serious harm, or when the very announcement of a proposed rule itself could be expected to precipitate activity by affected parties that would harm the public welfare." (citations omitted)); *Mobil Oil Corp.* v. *Dep't of Energy,* 728 F.2d 1477, 1492 (Temp. Emer. Ct. App. 1983) ("On a number of occasions . . . , this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare.").

[387] *See* Decl. of Robert E. Perez ¶¶ 4–15, *Innovation Law Lab,* No. 19–15716 (9th Cir. Mar. 3, 2020) (Dkt. 95–2) (noting that on February 28, 2020, the Ninth Circuit lifted a stay of a nationwide injunction of the Migrant Protection Protocols, a program implementing the Secretary's contiguous return authority under section 235(b)(2)(C) of the INA, 8 U.S.C. 1225(b)(2)(C), and almost immediately, hundreds of migrants began massing at POEs across the southern border and attempting

STB_AR1_000109

These incentives are exacerbated by smugglers, who routinely emphasize the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy.[388] For the same reasons, "the [need] for immediate implementation" outweighed the "principles" underlying the requirement for a 30-day delay in the effective date, justifying the Departments' finding of good cause to forgo it.[389] The stark drop in encounters following implementation of the Proclamation and IFR, as discussed in Section II.A.2 of this preamble, is strong evidence that announcements of such changes in policy can have significant effects on migration patterns; by making the IFR immediately effective, the Departments avoided triggering a surge in migration that might otherwise have occurred during a notice-and-comment period or pending a delayed effective date.

The increase in SWB encounters preceding the end of the Title 42 public health Order and the increase in border encounters that occurred in December 2023 were far-reaching across multiple sectors of the SWB and significantly greater than what DHS resources and operations are designed to handle. Increasing encounters raised detention capacity concerns anew, and, at that point, DHS faced an urgent situation, including a significant risk of overcrowding in its facilities.[390] Given the nature of its facilities, increased numbers and custody duration increase the likelihood that USBP facilities will become quickly overcrowded.[391] In response to the comment noting skepticism over the Departments' assumption that deterring irregular migration will protect migrants' welfare, the Departments disagree: crowding, particularly given how USBP facilities are necessarily designed, increases the potential risk of health and safety concerns for noncitizens and Government personnel.[392] The Departments thus assessed that there

would be a significant risk of such an urgent situation occurring if they undertook notice-and-comment procedures for the IFR or delayed its effective date.

The Departments' determination in the IFR was also consistent with the United States' past practice. For example, and in response to the comment that the Departments did not invoke the good cause exception in promulgating the Circumvention of Lawful Pathways rule, the Departments provided notice and an opportunity to comment on that rule while the Title 42 public health Order remained in effect[393] but invoked the good cause exception (as well as the foreign affairs exception) to bypass a delayed effective date that would have resulted in a gap between the end of the Title 42 public health Order and the implementation of the rule. *See* 88 FR at 31445–47. Contrary to the comment asserting that it was disingenuous for the Departments to compare the potential surge of migrants between the end of Title 42 and the effective date of the Circumvention of Lawful Pathways rule with the potential surge associated with the delayed implementation of this rule, the Departments merely refer to the Title 42 surge to illustrate that a surge would be likely given the significance of the border policy change made by the IFR, not that the surge would have been of precisely the same degree. *See* 89 FR at 48761–62.

Similarly, when implementing the parole process for Venezuelans, DHS implemented the process without prior public procedures, and witnessed a drastic reduction in irregular migration by Venezuelans.[394] Had the parole process been announced before a lengthy notice-and-comment period, thousands of Venezuelan nationals would have likely attempted to cross the United States and Mexican borders before the ineligibility criteria went into effect and before the United States could return Venezuelan nationals to Mexico. *See* 89 FR at 48766.

DHS similarly concluded in January 2017 that it was imperative to give immediate effect to a rule designating

Cuban nationals arriving by air as eligible for expedited removal because "[p]re-promulgation notice and comment would . . . endanger[ ] human life and hav[e] a potential destabilizing effect in the region."[395] The "publication of the rule as a proposed rule . . . would [have] signal[ed] a significant change in policy while permitting continuation of the exception for Cuban nationals, [and] could [have led] to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule."[396] A surge of this kind "would [have] threaten[ed] national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities" and "could also have [had] a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations," and "could [have] result[ed] in significant loss of human life."[397]

Given the emergency border circumstances facing the Departments, the delays associated with requiring a notice-and-comment process for the IFR would have been contrary to the public interest because an advance announcement of the rule would have incentivized even more irregular migration by those seeking to enter the United States before the IFR took effect.

c. Length and Sufficiency of Comment Period

*Comment:* Commenters remarked that the 30-day post-promulgation comment period was not long enough to allow for "meaningful[ ] comment" on the IFR, including from experts. Multiple commenters recommended that the Departments either rescind the IFR, reissue it with a longer comment period, or both, and suggested the new comment period be at least 60 days or 90 days. A few commenters expressed concern with the IFR's publication four days before the end of the 30-day comment period for the DHS Mandatory Bars NPRM, stating that the Departments did not give the public an adequate opportunity to analyze or comment on them separately or in conjunction.

---

to immediately enter the United States, creating a severe safety hazard that forced CBP to temporarily close POEs in whole or in part).

[388] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/national-security/theres-still-one-way-into-america/2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html.*

[389] *Omnipoint Corp.* v. *FCC,* 78 F.3d 620, 630 (D.C. Cir. 1996) (cleaned up).

[390] *See* Decl. of Matthew J. Hudak ¶¶ 11, 17, *Florida* v. *Mayorkas,* Case No. 3:22–cv–9962 (N.D. Fla. May 12, 2023) (Dkt. 13–1).

[391] *Id.* ¶¶ 6, 14, 17.

[392] *Id.* ¶ 17.

[393] The Departments noted, however, that the Circumvention of Lawful Pathways rule was exempt from notice-and-comment requirements pursuant to the good cause exception at 5 U.S.C. 553(b)(B) for the same reasons that the rule was exempt from delayed effective date requirements under 5 U.S.C. 553(d). *See* 88 FR at 31445 n.377.

[394] *See* 88 FR at 31317 ("A week before the announcement of the Venezuela parole process on October 12, 2022, Venezuela encounters between POEs at the SWB averaged over 1,100 a day from October 5–11. About two weeks after the announcement, Venezuelan encounters averaged under 200 per day between October 18 and 24.").

[395] Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769, 4770 (Jan. 17, 2017).

[396] *Id.*

[397] *Id.*; accord U.S. Dep't of State, Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (finding the good cause exception applicable because of short-run incentive concerns).

**STB_AR1_000110**

*Response:* As explained earlier in this Section III.E of this preamble, the Departments did not provide notice and an opportunity to comment or provide for a delayed effective date because the foreign affairs and good cause exceptions to those procedures applied. *See* 5 U.S.C. 553(a)(1), (b)(B). Thus, the IFR became effective on June 5, 2024, after the Proclamation was issued and the IFR was placed in public inspection. *See* 89 FR at 48710. The Departments invited the public to provide post-promulgation comments on the "rulemaking by submitting written data, views, comments, and arguments on all aspects of this IFR by" July 8, 2024. *Id.* It bears noting that the APA does not impose any requirements governing the process for submitting public comments when an agency voluntarily chooses to receive them following the promulgation of a rule that is exempt from notice-and-comment procedures; much less does it establish any set number of days for which the Departments would have to leave such a comment period open.

This post-promulgation comment period spanned 30 days from the date of publication (from June 7, 2024, through July 8, 2024) and 34 days from the date the IFR was filed for public inspection (the afternoon of June 4, 2024). *See* 89 FR at 48710; *id.* at 48772. The Departments believe this comment period was sufficient to allow for meaningful public input, as evidenced by the 1,067 public comments received, including numerous detailed comments from interested organizations.[398]

Even where notice and comment is required, the APA does not require that the comment period be any particular length. *See* 5 U.S.C. 553(b), (c). And although Executive Orders 12866 and 13563 generally recommend a comment period of at least 60 days, they do not impose any binding requirement that a 60-day period be utilized in every case. In fact, courts have found 30 days to be a reasonable comment period length, finding that such a period is generally "sufficient for interested persons to meaningfully review a proposed rule and provide informed comment," even when "substantial rule changes are proposed." *Nat'l Lifeline Ass'n* v. *FCC,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Petry* v. *Block,* 737 F.2d 1193, 1201 (D.C. Cir. 1984)); *see also Connecticut Light & Power Co.* v. *Nuclear Regul. Comm'n,* 673 F.2d 525, 534 (D.C. Cir. 1982) (noting that a 30-day comment period was not

---

[398] Document Comments, Securing the Border, *https://www.regulations.gov/document/USCIS-2024-0006-0002/comment.*

unreasonable despite complexity of proposed rule). Comment periods shorter than 30 days, often in the face of exigent circumstances, have also been deemed adequate. *See, e.g., Omnipoint Corp.,* 78 F.3d at 629–30 (concluding 15 days for comments was sufficient); *NW Airlines, Inc.* v. *Goldschmidt,* 645 F.2d 1309, 1321 (8th Cir. 1981) (finding 7-day comment period sufficient).

Regarding commenters' concerns about the comment period in light of the DHS Mandatory Bars NPRM, the Departments first emphasize that the two rules regard separate aspects of DHS screening procedures, as discussed above in Section III.D.2 of this preamble. Nevertheless, the Departments explained the relationship between the two rules in the IFR by noting that, "[i]f DHS were to finalize that rule as drafted, [the IFR]'s 'reasonable probability' standard would still apply when the noncitizen is subject to this rule's limitation on asylum eligibility." 89 FR at 48739 n.186; *see id.* at 48756. In addition, because the DHS Mandatory Bars NPRM was published prior to the IFR, commenters were able to use that NPRM to inform their comments on the IFR. Accordingly, the Departments disagree that commenters were provided an inadequate opportunity to comment on the interaction of these two rules.

Here, the 30-day comment period allowed for significant, meaningful public participation. Commenters have provided numerous and detailed comments regarding the IFR, and the Departments appreciate their effort to provide thorough commentary for the Departments' consideration during the preparation of this final rule. The 30-day comment period also allowed the Departments to swiftly finalize a critical border measure needed to address the emergency border circumstances posed by the Departments' lack of resources for delivering timely consequences to the heightened number of migrants attempting to enter the southern border without a viable legal basis for doing so. *See* 89 FR at 48749–54.

2. Impacts, Costs, and Benefits (E.O. 12866 and E.O. 13563)

*Comments:* One commenter reasoned that the effects of removal on noncitizens should not be disregarded because the costs are not low. The commenter stated that the costs resulting from removal would "encourage refoulement for individuals attempting to reach safety." The commenter stated that correctly identifying meritorious claims of fear is an invaluable process that should not be categorized as costs in "additional time

and resources." The commenter further stated that the Departments cannot simply dismiss the task of identifying meritorious claims or characterize their failure to do so as purported cost savings, as the commenter alleges is done in the IFR.

*Response:* The commenter misrepresents the IFR's discussion of costs and impacts, *see* 89 FR at 48766–67, which acknowledged that a noncitizen who would have received asylum in the absence of the rule would incur costs from the denial of that benefit. The IFR also acknowledged that noncitizens may incur further costs upon removal. The Departments have described these potential costs qualitatively not as a means of dismissing the importance of such costs, but in order to assess the costs and benefits of the rule in accordance with certain executive orders addressing the regulatory process. *See id.*

Furthermore, the Departments disagree with the commenter's suggestion that the rule does not result in cost savings. The rule does not cause a reduction in overall resources dedicated to immigration processing and enforcement. Rather, it prevents those resources from being spread so thin. As the IFR's analysis explains, given ongoing strains on limited Federal Government immigration processing and enforcement resources, any reduction in new asylum claims would necessarily increase the availability of those resources and allow for more timely adjudications of existing claims. The benefits of the rule include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the nation's immigration laws; and a reduction in the role of exploitative TCOs and smugglers. *Id.* at 48767. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular migration would impose on the Departments. *Id.*

3. Alternatives

a. Address Root Causes of Migration

*Comment:* A few commenters specifically urged the United States Government to address "root causes" of migration. Many commenters blamed United States foreign policy generally for creating conditions in foreign countries that have caused irregular migration. For example, one commenter stated that the United States must

**STB_AR1_000111**

amend its foreign policies "which contribute to poverty and injustice in the countries migrants are trying to escape." Another commenter called immigration "payback" for the United States's foreign policies. Some commenters specified foreign policies they would like to see changed, such as those regarding weapons sales, fossil fuels, the environment, humanitarian aid, and sanctions on foreign governments. Other commenters criticized the Government and corporations for contributing to destabilization in other countries leading to immigration. Commenters suggested that the Government should disrupt corporate greed causing destabilization in other countries.

*Response:* As a preliminary matter, these comments are outside the scope of this rulemaking. Regardless, the Departments disagree with the suggestion that addressing the root causes of migration obviates the necessity of the rule. Rather, the United States' ongoing efforts, along with those of partner nations, to address the root causes of migration and abate adverse effects from unprecedented levels of global irregular migration will not immediately resolve the urgent border security and immigration systems' situations. Efforts to address the root causes of irregular migration will take significant time to create impact, and in the meantime the more targeted policies set forth in the IFR and this rule are necessary to alleviate the current acute stress on the border security and immigration systems.

The Departments nonetheless agree with commenters that addressing root causes is a necessary element of regional migration management. For example, the *U.S. Strategy for Addressing the Root Causes of Migration in Central America,* directed by the President in Executive Order 14010, 86 FR 8267 (Feb. 5, 2021), focuses on a coordinated, place-based approach to improve the underlying causes that push Central Americans to migrate, and it takes into account, as appropriate, the views of bilateral, multilateral, and private sector partners, as well as civil society.[399] The strategy includes addressing economic, governance, and security challenges through five pillars: (1) addressing economic insecurity and inequality; (2) combating corruption and strengthening democratic governance; (3) promoting human rights and labor rights; (4) countering and preventing violence; and

(5) combating sexual and gender-based violence.[400] In March 2024, the White House announced that the Administration is on track to meet its commitment in the root causes strategy to provide $4 billion to the region over four years.[401]

The United States has also worked closely with its regional partners to prioritize and implement a strategy that advances safe, orderly, legal, and humane migration, including taking measures to address the root causes of migration, expand access to lawful pathways, improve the U.S. asylum system, and address the pernicious role of smugglers. The IFR provided a detailed account of the United States' efforts throughout the region to implement such strategies. *See* 89 FR at 48759–62. For instance, the United States, along with 21 other countries in the Western Hemisphere, has endorsed the L.A. Declaration, which proposes a comprehensive approach to managing migration throughout the Western Hemisphere. *See id.* at 48759. Under the L.A. Declaration's framework, the United States has been working closely with foreign partners to manage the unprecedented levels of migration that countries throughout the region have been experiencing, including efforts to expand access to and increase lawful pathways; conduct joint enforcement efforts; and share information, technical assistance, and best practices. *Id.* at 48759–60.

Additionally, the Government has developed and implemented a number of policy measures, including the Circumvention of Lawful Pathways rule and other measures, which are complemented by a range of actions taken by foreign partners in the region, such as campaigns by Colombia and Panama to counter smuggling networks in the Darién Gap. The Government believes that migration is a shared responsibility among all countries in the region, which is reflected in the intensive and concerted diplomatic outreach on migration issues that DHS and the Department of State have made with partners throughout the Western Hemisphere.

Consistent with these efforts, this rule will further incentivize noncitizens to avoid irregular migration and instead avail themselves of other lawful, safe, and orderly means for seeking

protection in the United States or elsewhere. The Departments agree with commenters that recent surges in irregular migration have been caused by multiple factors, including the growing understanding by smugglers and migrants that DHS's capacity to impose timely consequences at the border is limited by the lack of resources and tools available and by partner nations' operational constraints.

Although this rule does not purport to—and a single rule cannot—address all of the root causes and factors driving migration, the Departments assess that this rule has significantly increased their ability to deliver timely decisions and consequences at the southern border with currently available resources, combating perceptions and messaging to the contrary. Given the challenges facing the United States and its regional partners, this regulatory effort—and the strong consequences it imposes at the southern border—have sent and will continue to send an important message throughout the region that the United States has put in place appropriate measures to prepare for and, if necessary, respond to ongoing migratory challenges.

In short, the Departments acknowledge that international migration trends are the product of exceedingly complex factors and are shaped by, among other things, family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59. The United States Government is working to address these root causes of migration, including by cooperating closely with partner countries, and to abate adverse effects from unprecedented levels of irregular migration.

b. Prioritize Funding and Other Resources

*Comment:* Many commenters urged the United States Government to prioritize funding, other resources, or alternative policies to make border processing and asylum adjudications more effective and efficient. Commenters suggested various priorities for funding, including hiring more personnel and staff, such as immigration officers, IJs, and court personnel; allocating more funding to already existing personnel and staff; allocating more funding and other resources to local governments and organizations that assist immigrants; increasing access to legal representation and mental health services; and devoting more resources to asylum processing and adjudications at POEs and the interior.

---

[399] Nat'l Sec. Council, *U.S. Strategy for Addressing the Root Causes of Migration in Central America* at 4 (July 2021), *https:// www.whitehouse.gov/wp-content/uploads/2021/07/ Root-Causes-Strategy.pdf.*

[400] The White House, *Fact Sheet: Update on the U.S. Strategy for Addressing the Root Causes of Migration in Central America* (Mar. 25, 2024), *https://www.whitehouse.gov/briefing-room/ statements-releases/2024/03/25/fact-sheet-update- on-the-u-s-strategy-for-addressing-the-root-causes- of-migration-in-central-america-3/.*

[401] *Id.*

STB_AR1_000112

Other commenters suggested more generally that the Government devote more resources to recent arrivals and the asylum system. A few commenters specified that the Government should provide additional funding for the Shelter and Services Program and the Case Management Pilot Program. One commenter suggested that the Government create a system to require asylum seekers to have their applications vetted in their home countries as a way to reduce costs and migration. Another commenter suggested sending noncitizen arrivals with family members in the United States to their families. One commenter stated that the Government should expand capacity at the border, while another commenter questioned DHS's ability to increase capacity at POEs.

*Response:* The Departments acknowledge commenters' suggestions for increasing resources, both financial and otherwise, to account for the increased arrivals at the southern border, but those suggestions are outside the scope of this rulemaking, and they would require congressional action. As discussed in the IFR, the circumstances that the Departments faced in June 2024 existed despite the Departments' efforts to address substantial levels of migration and were a direct result of Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. *See* 89 FR at 48712–15. The Administration has repeatedly requested additional resources from Congress, only some of which have been provided. *See id.* at 48728. USCIS also implemented a new fee schedule, effective April 1, 2024, that adjusted the fees to fully recover costs and maintain adequate service.[402] While the new fee rule does provide for increased funding for the Refugee, Asylum, and International Operations Directorate, keeping pace with USCIS' protection screening and affirmative asylum workloads requires additional funding, as reflected in the President's FY 2025 Budget. 89 FR at 48729.

Additional financial support would require additional congressional actions, including significant additional appropriations, which are outside the scope of this rulemaking. The Departments agree with the commenters

that additional resources would provide substantial benefits for managing the border and immigration systems but decline to wait to act pending receipt of additional funding from Congress. DHS notes that despite this lack of additional funding it has taken steps to increase processing at SWB POEs, including through use of the CBP One app.[403]

Additionally, the Departments note that they are leading ongoing Federal Government efforts to support NGOs, local and state governments, and other migrant support organizations as they work to respond to the unprecedented migration impacting communities across the United States. As noted in the Circumvention of Lawful Pathways rule, FEMA spent $260 million in FYs 2021 and 2022 on grants to non-governmental and state and local entities through the EFSP–H to assist migrants arriving at the SWB with shelter and transportation. *See* 88 FR at 31327 (citing 88 FR at 11704–05). In December 2022, $75 million was awarded through the program.[404] In addition, the Bipartisan Year-End Omnibus, which was enacted on December 29, 2022, directed CBP to transfer $800 million in funding to FEMA to support sheltering and related activities for noncitizens encountered by DHS. The Omnibus authorized FEMA to utilize this funding to establish a new Shelter and Services Program and to use a portion of the funding for the existing EFSP–H, until the Shelter and Services Program is established.[405] For FY 2023, there were $363.8 million in available funds to enable non-federal entities to provide humanitarian services to noncitizen migrants following their release from DHS.[406] In FY 2024, that figure increased to nearly $650 million.[407]

The Departments do not agree with commenter's suggestions that alternative policies, including vetting migrants in

their home countries and sending those who arrive the United States who have family members in the United States to those family members, should be pursued in place of this rule. In addition to being far outside the scope of the rule, such policies would lack the demonstrably effective incentive structure of this rule. The Departments nonetheless agree that the United States must consistently engage with partners throughout the Western Hemisphere to address the hardships that cause people to leave their homes and come to our southern border. During the emergency border circumstances underlying the rule, the Departments' limited resources must be focused on processing those who are most likely to be persecuted or tortured if removed and overall border security and immigration systems efficiencies. Swift removal of noncitizens without meritorious claims is critical to deterring noncitizens from seeking entry under the belief that they will be released and able to remain in the United States for a significant period.

*Comment:* Some commenters stated that the Government "should focus on educating the public about the complexities of immigration" and "provide information to the American people" regarding contributions of immigrants to society.

*Response:* The Departments maintain publicly accessible information regarding the border security and immigration systems and routinely publicize law enforcement action and efforts against human trafficking, smuggling, and TCOs that profit from irregular migration.[408] The Departments will continue to make such information publicly available through routine publication. To the extent commenters suggest that the Departments should inform the American public about the contributions migrants have made to the United States, the Departments respectfully note that such action is outside the scope of this rulemaking as it is unrelated to and would have no immediate effect on encounters at the southern border.

**c. Further Expand Refugee Processing or Other Lawful Pathways**

*Comment:* Several commenters suggested increasing access to asylum and humanitarian protections. Commenters expressed concern that the United States' annual rates of refugee admissions have not kept pace with

---

[402] *See U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* 89 FR 6194, 6194 (Jan. 31, 2024); *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Correction,* 89 FR 20101 (Mar. 21, 2024) (making corrections).

[403] *See* Memorandum for William A. Ferrara, Exec. Ass't Comm'r, Off. of Field Operations, from Troy A. Miller, Acting Comm'r, CBP, *Re: Guidance for Management and Processing of Undocumented Noncitizens at Southwest Border Land Ports of Entry* (Nov. 1, 2021), *https://www.cbp.gov/sites/default/files/assets/documents/2021-Nov/CBP-mgmt-processing-non-citizens-swb-lpoes-signed-Memo-11.1.2021-508.pdf.*

[404] *See* FEMA, Release No. HQ–22–232, *Emergency Food and Shelter Program National Board Allocates $75 Million for Humanitarian Assistance* (Dec. 23, 2022), *https://www.fema.gov/press-release/20230103/emergency-food-and-shelter-program-national-board-allocates-75-million.*

[405] Public Law 117–328, Division F, Title II, Security, Enforcement, and Investigations, U.S. Customs and Border Protection, Operations and Support, 131 Stat. 4459, 4730 (2022).

[406] FEMA, Shelter and Services Program (June 14, 2024), *https://www.fema.gov/grants/shelter-services-program.*

[407] *Id.*

[408] *See* DHS, Securing the Border (last updated Aug. 6, 2024), *https://www.dhs.gov/immigrationlaws;* DHS, Border Security (last updated Nov. 7, 2023), *https://www.dhs.gov/topics/border-security.*

STB_AR1_000113

worldwide demand for refugee protections, driving migrants to seek alternative, and oftentimes irregular, migration routes. While many commenters focused on noncitizens arriving at the border, at least one commenter suggested expanding protections for ''those who have long called the United States home.'' Many commenters stated that the Government ''should be creating accessible pathways to citizenship.'' Many commenters emphasized the need for expanded lawful pathways and speeding up processing times. One commenter requested that the Government ''invest in expanding pathways to lawful status.'' Several commenters implored the Government to focus ''on a solutions strategy.''

*Response:* The United States has made and will continue to make extensive efforts to expand refugee processing and lawful pathways generally.[409] As explained in detail in the IFR, in recent years, the Government has overseen the largest expansion of lawful, safe, and orderly pathways and processes for noncitizens to come to the United States in decades. 89 FR at 48760. Such steps include promulgating the Circumvention of Lawful Pathways rule, refocusing a significant portion of DHS's southern border workforce to prioritize migration management above other border security missions, implementing the CHNV parole processes, implementing the Safe Mobility Initiative in several countries, expanding country-specific family reunification parole processes, expanding opportunities to enter the United States for seasonal employment, establishing a mechanism for over 1,400 migrants per day to schedule a time and place to arrive at POEs through the CBP One app, increasing proposed refugee admissions from the Western Hemisphere from 5,000 in FY 2021 to up to 50,000 in FY 2024, completing approximately 89 percent more immigration court cases in FY 2023 compared to FY 2019, and increasing the IJ corps by 66 percent from FY 2019 to FY 2023. 89 FR at 48712–13.

[409] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and* (citing continued efforts to expand lawful pathways and processes, including establishing country-specific parole processes for certain nationals, working with interagency partners and the private sector to increase access to H–2 nonimmigration visa programs, expanding capacity at POEs to increase CBP One app processing capabilities, and implementing new family reunification parole processes among other efforts).

Despite these and other efforts to expand lawful pathways and provide border security, and while DHS is processing noncitizens in record numbers and with record efficiency, the border security and immigration systems have not been able to keep pace with the number of noncitizens arriving at the southern border. Simply put, the Departments do not have adequate resources and tools to deliver timely decisions and consequences to individuals who cross irregularly and cannot establish a legal basis to remain in the United States, or to provide timely protection to those ultimately found eligible for protection, when noncitizens are arriving at such elevated volumes.

Further, existing levels of migration make clear that the efforts described above, on their own, are insufficient to change the incentives of migrants, reduce the risks associated with current levels of irregular migration and the current surges of migrants to the border, and protect migrants from human smugglers that profit from their vulnerability. The Departments note that, while they continue to explore the possibility of providing additional lawful pathways, this rule does not create, expand, or otherwise constitute the basis for any lawful pathway. The Departments further note that requests that the United States create a path to citizenship is outside the scope of this rulemaking.

d. Expand Asylum Merits Process

*Comment:* One commenter stated that instead of finalizing the IFR, the Departments should consider expanding the use of the AMI process outlined in the Asylum Processing IFR. The commenter stated that the rule has the same stated purpose of increasing efficiency and fairness of asylum adjudications for those in expedited removal, but that DHS had reduced its use of the AMI process in the last quarter of 2022 and has not explained why finalizing the IFR is preferable.

*Response:* The Departments do not view the present rulemaking and the Asylum Processing IFR as mutually exclusive. Rather, the Departments view these rulemakings as complementary efforts. The AMI process promulgated in the Asylum Processing IFR is predicated on a noncitizen receiving a positive credible fear determination and seeks to make the process following a positive credible fear determination more efficient and streamlined, while maintaining fairness; meanwhile, the present rulemaking establishes a limitation on asylum eligibility and addresses the credible fear process

itself. While both rulemakings seek to increase efficiency and maintain fairness, they do so by focusing on separate parts of the process—one primarily prior to and during a credible fear determination (the present rulemaking) and one following service of a positive credible fear determination (the Asylum Processing IFR). Additionally, the Asylum Processing IFR was written with the express intent of being implemented in a discretionary manner. As the Departments explained, the discretion of USCIS to place an individual with a positive credible fear determination into the AMI process under the rule or to issue an NTA for removal proceedings under section 240 of the INA was a necessary part of the rule in order for it to function, as the rule would have to be implemented in a reality in which USCIS did not have all of the resources necessary to place every case with a positive credible fear determination into the AMI process. *See* 87 FR at 18185. Accordingly, the Asylum Processing IFR provided USCIS complete discretion to place a case with a positive credible fear determination into the AMI process or to issue an NTA. 8 CFR 208.30(f).

As explained in the preamble to the IFR, there are simply not enough AOs available to conduct fear screenings to keep pace with current sustained high encounter rates. *See* 89 FR at 48714. USCIS has a finite number of AOs to conduct all of its casework, including fear screenings, and does not plan on placing cases into the AMI process in circumstances in which the noncitizen did not establish a significant possibility that they would ultimately be able to establish by a preponderance of the evidence that the limitation on asylum eligibility does not apply or that they qualify for the exception; such an approach would not be a prudent use of resources given current operational realities. *See* 89 FR at 48756. The Departments nonetheless formulated the present rulemaking in a manner that preserves the ability of USCIS to exercise its discretion to place cases with positive credible fear determinations in the AMI process should USCIS have the resources available to do so in the future. *See id.; see also* 8 CFR 208.35(b)(2)(ii). The Departments will continue to implement the Asylum Processing IFR in a manner consistent with the way the rule was envisioned to function, enrolling new cases in the process at the discretion of USCIS, in accordance with available resources.

STB_AR1_000114

**81270**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

e. Other Congressional Action

*Comment:* Many commenters stated that the Administration should work with Congress on comprehensive legislative reforms. Commenters emphasized the need for meaningful legislative reform of the U.S. immigration system. Several commenters demanded that Congress address ''the issue of immigration.'' Commenters pointed to a variety of reforms that they believed Congress should implement. However, one commenter disagreed with any suggestion that the border crisis was the result of any failure of Congress and felt it was the Administration's consistent ''abdication'' of border security and immigration enforcement that has resulted in the sustained, high rate of encounters since 2021.

*Response:* These are suggestions for Congress and are outside the scope of this rulemaking. Nevertheless, the Departments acknowledge the commenters' expressed frustration with Congress's failure to update outdated immigration laws and provide needed funding and resources for the efficient operation of the border security and immigration systems. The Departments observe that this failure, combined with unprecedented levels of irregular migration along the southern border, makes up the causal background of the June 3 Proclamation and this rule, and they therefore disagree with one commenter's suggestion that the current border circumstances can be ascribed to the Administration's alleged ''abdication'' of border security, and in no part to any congressional inaction. As explained in the June 3 Proclamation and the IFR, in the absence of congressional action to provide appropriate resources to DHS and EOIR and to reform the outdated statutory framework, the rule implements new policies to substantially improve the Departments' ability within that framework to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. *See* 89 FR at 48715. Although the Departments are adopting these measures to respond to the emergency situation at the southern border, they are not a substitute for congressional action, which remains the only long-term solution to the challenges the Departments have confronted on the border.

f. Additional Suggested Measures or Revisions

*Comment:* One commenter suggested that the Departments ''engage in meaningful dialogue with legal experts and humanitarian groups to develop compassionate and effective approaches to migration.''

*Response:* The Departments appreciate the commenter's suggestion and welcome the views of legal experts and humanitarian groups. Indeed, the Departments have sought comment on their rules relating to border management—such as the Asylum Processing IFR, Circumvention of Lawful Pathways rule, DHS Mandatory Bars NPRM, and the IFR here—and have either considered and responded to those comments, or, in the case of the DHS Mandatory Bars NPRM, are in the process of doing so. Additionally, such experts and organizations are able to petition the Departments for rulemaking, through which process they may present their proposals for consideration by the Departments. The Departments appreciate the thoughtful comments and feedback they have received from the public, including legal experts and humanitarian groups, and hope that the public's interest in aiding the Departments in their efforts to manage the border continues. Further, since the June 3 Proclamation and the IFR came into force, DHS has continually engaged advocacy, non-governmental, and international organization partners to seek their feedback and perspectives.

*Comment:* One commenter made several suggestions for additional, stricter measures instead of or in addition to this rule. Such suggested measures included strictly limiting parole into the United States, reinstating MPP and requiring noncitizens to wait in Mexico pending removal proceedings, rescinding enforcement priorities and enforcing immigration law in the interior of the United States, expanding expedited removal, terminating policies the commenter viewed as hindering immigration enforcement, requiring AOs to apply all mandatory bars to asylum and statutory withholding of removal in credible fear screenings, raising the standard for withholding of removal and deferral of removal to the ''reasonable probability'' standard for all credible fear proceedings, and terminating USCIS's policy of accepting requests for reconsideration after an IJ has concurred with an AO's negative credible fear determination. The commenter, addressing the instant rule, requested that the Departments eliminate ''overbroad and easy to exploit loopholes,'' specifically stating that the Departments should ''strike'' the exception for those who establish exceptionally compelling circumstances. One commenter stated that the rule should also apply to the northern border.

*Response:* The Departments acknowledge the commenters' varying viewpoints and concerns but believe that even if some of the alternatives proposed by the commenters are suitable to pursue, they would not obviate the need for this rule. Proposals to broadly limit lawful pathways to enter the United States, such as parole processes, are outside the scope of this rulemaking, as are other comments advocating for immigration policy changes or reforms unrelated to the IFR.

The Departments nonetheless note that this rule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations. Even so, in the Departments' experience, the various parole processes work in tandem with other lawful pathways in a complementary manner to address surges in migration. Examples of the success of DHS's discretionary parole processes include the CHNV parole processes and family reunification parole processes resulting in use of lawful pathways for entry into the United States. Importantly, the parole processes themselves are lawful pathways for qualifying individuals seeking to come to the United States, and this rule does not discourage their use. The parole processes are lawful, safe, and orderly pathways that the Departments wish to encourage in light of the urgent circumstances.

The Departments disagree with commenters' suggestion to reinstate MPP for the reasons stated in the IFR and the Circumvention of Lawful Pathways rule. *See* 89 FR at 48752 n.271; 88 FR at 31370.

Regarding commenters' request for expansion of expedited removal, the Departments observe that, among the series of steps the Government has taken to strengthen consequences for irregular entry at the border, DHS has processed record numbers of individuals through expedited removal. For example, in the months between May 12, 2023, and June 4, 2024, CBP processed more than 359,000 noncitizens encountered at and between POEs along the SWB for expedited removal[410]—almost twice as many as any prior full FY.[411] Indeed, under the IFR, from June 5 through August 31, 2024:

---

[410] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[411] OHSS analysis of June 2024 Enforcement Lifecycle and July 2024 OHSS Persist Dataset. Prior to FY 2024, the single-year FY record for Southwest Border cases processed for expedited removal was 202,000 in FY 2013 (Historic CFIs tab).

**STB_AR1_000115**

• DHS removed or returned more than 119,000 individuals encountered at the SWB [412] to more than 140 countries, including by operating more than 400 international repatriation flights; [413]

• DHS has doubled the percentage of noncitizens encountered at the SWB who are removed or returned directly from CBP custody compared to the immediate post-pandemic period (32 percent compared to 16 percent); [414]

• DHS has more than tripled the percentage of noncitizens encountered by USBP at the SWB who are processed through expedited removal (up from 18 percent to 59 percent; expedited removal processing was already at record levels, as noted above); [415] and

• DHS has decreased the percentage of noncitizens encountered at the SWB who are released by USBP pending their section 240 removal proceedings by more than half (from 64 percent to 31 percent).[416]

However, as explained at length in the IFR, DHS's ability to apply expedited removal is subject to resource constraints. *See, e.g.,* 89 FR at 48752. At high levels of encounters, DHS simply lacks sufficient resources, such as AOs to conduct fear screenings and temporary processing facilities, to refer noncitizens for expedited removal processing. The mismatch in resources and encounters has created stress on the border security and immigration systems, forcing DHS to rely on processing pathways outside of expedited removal.

With respect to the suggestion that mandatory bars be considered at the screening stage under a reasonable possibility standard, DHS is considering that issue in a separate rulemaking. *See* Mandatory Bars NPRM.

The Departments decline to apply the "reasonable probability" standard to screen all statutory withholding of removal and CAT protection claims during all credible fear interviews at this time. Although the Departments acknowledge the commenters' concerns, the Departments emphasize that the primary focus of this rule is to substantially improve the Departments' ability, during periods of high encounters, to deliver timely decisions and consequences to noncitizens who lack a lawful basis to remain. Application of a the "reasonable

probability" standard under emergency border circumstances as defined in the rule satisfies these goals.

The suggestion to generally disallow USCIS from accepting requests for reconsideration of negative credible fear determinations exceeds the scope of this rulemaking, which regards the procedures applied during emergency border circumstances. The Departments note that during such circumstances, if it was determined at the credible fear interview that there is not a significant possibility a noncitizen could ultimately demonstrate by a preponderance of the evidence that they are not subject to the IFR's limitation on asylum eligibility or are eligible for the exception to the limitation, the noncitizen would not be permitted to submit requests for reconsideration with USCIS. *See* 8 CFR 208.35(b)(2)(v)(B). In such circumstances, USCIS may, in its sole discretion, reconsider a negative determination. *See id.; see also* 89 FR at 48756.

The Departments disagree with the concern one commenter raised about what it characterized as "loopholes." The exceptions to the limitation on eligibility for asylum are necessary to prevent undue hardship. The Departments have limited the means of avoiding the limitation on asylum eligibility to those identified in the June 3 Proclamation and to exceptionally compelling circumstances in an effort to maximize the rule's applicability.

With respect to a commenter's suggestion that the rule apply to the northern border, the Departments do not currently assess that application of the rule is necessary at the U.S.-Canada land border. Instead, the United States is implementing other measures to address irregular migration at that border, such as the Additional Protocol of 2022 to the Safe Third Country Agreement between the United States and Canada, which expands the Agreement to apply to noncitizens who claim asylum or other protection within 14 days of crossing the U.S.-Canada land border between POEs, including certain mutually designated bodies of water. *See* Implementation of the 2022 Additional Protocol to the 2002 U.S.-Canada Agreement for Cooperation in the Examination of Refugee Status Claims from Nationals of Third Countries, 88 FR 18227 (Mar. 28, 2023). Under the Safe Third Country Agreement, with limited exceptions, noncitizens who cross from Canada to the United States cannot pursue an asylum or other protection claim in the United States and are instead returned to Canada to pursue their claim.

*Comment:* A commenter suggested exempting persons who manifest a credible fear from penalties arising from expedited removal, including restrictions on subsequent admission to the United States, and conditioning the implementation of restrictions on eligibility for protection at the border "on the actual availability of an alternative pathway[ ]."

*Response:* The Departments acknowledge the commenters' suggestions but do not believe the alternatives proposed by the commenters are suitable to address operational concerns or meet the Departments' policy objectives.

With regard to comments recommending that all noncitizens who manifest a fear be exempted from facing "penalties" arising from expedited removal, including restrictions on future admission to the United States, the Departments note that such a change would require a change to the INA, and thus is not within the Department's authority. *See* INA 212(a)(9)(A), 8 U.S.C. 1182(a)(9)(A) (providing that noncitizens removed pursuant to an order of expedited removal are inadmissible for a period of five or ten years following the date of such removal).

With regard to the commenter's suggestion to condition the limitation on asylum eligibility on whether each individual had a lawful, safe, and orderly pathway available to them, the Departments note that the current framework already effectively does so. Any noncitizen without documents sufficient for lawful admission to the United States may pre-schedule a time and place to present at a POE through the CBP One app.[417] Those who cannot wait for such an appointment may present at a POE and seek an exception to the Proclamation's suspension and limitation on entry or establish exceptionally compelling circumstances before an AO or IJ, both of which except them from the limitation on asylum eligibility. *See* 8 CFR 208.35(a), 1208.35(a). To the extent commenters think these mechanisms are insufficient, the Departments have considered those arguments but believe that the rule strikes an appropriate balance between managing emergency border circumstances and protecting noncitizens' access to asylum, as discussed in Section III.C.1.b of this preamble.

---

[412] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR details tab).

[413] OHSS analysis of data downloaded from UIP on September 3, 2024 (Flights and Removals tab).

[414] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[415] *Id.*

[416] *Id.*

[417] *See* CBP, *CBP One™ Mobile Application* (last modified Sept. 23, 2024), *https://www.cbp.gov/about/mobile-apps-directory/cbpone.*

**STB_AR1_000116**

### F. Out of Scope

*Comment:* In addition to the comments discussed above, commenters also discussed a range of topics that are outside the scope of this rule. For example, some commenters shared a general concern relating to overpopulation; a recommendation that the United States accept a certain number of noncitizens each year to compensate for labor shortages; a suggestion that the Government provide legal counsel at no expense to noncitizens or otherwise fund court-appointed counsel; a suggestion to issue ''general rules or guidelines in lieu of case by case assessments that would allow asylum officers to quickly approve certain cases''; a suggested amendment to the DHS Mandatory Bars NPRM to require AOs to apply all mandatory bars to asylum and statutory withholding of removal at the credible fear stage; a recommendation to preclude USCIS from considering requests for reconsideration of negative credible fear or reasonable fear determinations that have been reviewed by an IJ; concern with and strong opposition to the United States' military support for Israel; a request for open borders; a request for the Government to focus its efforts on providing asylum seekers access to mental health services; requests related to custody and detention of noncitizens and asylum seekers, such as investing in ''non-custodial processing centers''; concerns about family separation and reunification policies; a recommendation to provide ''relief for undocumented caregivers by modernizing existing rules''; suggestions relating to work authorization for migrants and asylum seekers; sentiments that the Government should provide funding to support migrant communities with public services and respite; a recommendation that the Government grow ''federal support for case management support''; claims that the President does not have authority under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f) and 1185(a), for the policies and objectives of the Proclamation; a claim that the President's use of his authority under section 212(f) of the INA, 8 U.S.C. 1182(f), to issue the Proclamation is a departure from how other presidents have used the authority in the past, relying on statements from the Ninth Circuit's decision in *Hawaii* v. *Trump,* 878 F.3d 662, 689 (9th Cir. 2017), *rev'd and remanded,* 585 U.S. 667 (2018); challenges to DHS's parole authority and use of parole; and a recommendation to give second chances

to noncitizens involved in unlawful activities and to shut down operations such as the Western Hemisphere Institute for Security Cooperation because they further perpetuate drug-related violence.

*Response:* These comments address matters beyond the scope of the rule and do not require further response. To the extent that commenters' concerns raised in relation to actions taken under sections 212(f) and 215(a) of the INA, 8 U.S.C. 1182(f), 1185(a), apply also to the legality of actions taken by the Departments, and not only to the President's June 3 Proclamation or DHS's implementation of it, those concerns are addressed in Section III.A.1 of this preamble.

## IV. Requests for Comments

### A. Aligning the Geographic Reach of the Circumvention of Lawful Pathways Rule With That of the Proclamation and This Rule

The Departments request comment on whether to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). The Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility applies to a noncitizen who ''enters the United States from Mexico at the southwest land border or adjacent coastal borders.'' *See* 8 CFR 208.33(a)(1), 1208.33(a)(1). In addition, among other requirements, the rebuttable presumption only applies if the noncitizen traveled through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the Refugee Convention or the Refugee Protocol. *See* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii).

The Departments specifically welcome comment on two proposals: first, whether, in 8 CFR 208.33(a)(1) and 1208.33(a)(1), the Departments should remove the words ''from Mexico at the southwest land border or adjacent coastal borders'' and replace them with the words ''across the southern border (as that term is described in section 4(d) of Presidential Proclamation 10773).'' Second, the Departments welcome comment on whether to add to the beginning of 8 CFR 208.33(a)(1)(iii) and 1208.33(a)(1)(iii) a clause that reads, ''After the alien entered the United States by sea, or''—so that paragraph (a)(1)(iii) would state in full, ''After the alien entered the United States by sea, or after the alien traveled through a

country other than the alien's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees.'' In a future final rule, the Departments may adopt the first proposal, the second proposal, or both.

Although this request for comment is similar to the Departments' request for comment in the Circumvention of Lawful Pathways rule, *see* 88 FR at 31440–44, the Departments are now seeking comments on the geographic scope in the broader context of this Securing the Border [418] rulemaking. Given the intervening Securing the Border rulemaking, the comments that will be most useful are those that are informed by the full range of actions taken to address migration since the end of the Title 42 public health Order. Accordingly, although the Departments intend to incorporate any comments received on the 2023 Circumvention of Lawful Pathways rule's request for comment into the docket for this request for comment, those who submitted comments in response to that request for comment are encouraged to update their comments in light of the intervening Securing the Border rulemaking and resubmit their comments here.

Unlike the Circumvention of Lawful Pathways rule, the Proclamation and the Securing the Border rule apply to certain noncitizens entering the United States across the ''southern border,'' which includes ''southern coastal borders.'' 89 FR at 48491; *see also* 8 CFR 208.13(g), 1208.13(g). Section 4(b) of the Proclamation defines ''southern coastal borders'' to mean ''all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida; all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California; and all maritime borders of the United States Virgin Islands and Puerto Rico.'' 89 FR at 48491. The term ''southern border'' adopted by the Proclamation and the Securing the Border rule is categorically broader than the term ''adjacent coastal borders'' adopted in the Circumvention of Lawful Pathways rule, which the Departments defined as ''any coastal border at or near the U.S.-Mexico border.'' 88 FR at 31320. In contrast to this definition, the term ''southern coastal borders'' encompasses certain specified coastlines that are not at or

---

[418] Although the Departments have not referred to the present rule as the ''Securing the Border rule'' throughout this preamble, the Departments do so in this request for comment to distinguish the present rule from the Circumvention of Lawful Pathways rule in an effort to avoid confusion.

STB_AR1_000117

near the U.S.-Mexico border, such as the maritime borders of Puerto Rico and the United States Virgin Islands. 89 FR at 48711 n.4.

The Departments believe it is best to align the geographic reach of the Circumvention of Lawful Pathways rule to that in the Proclamation, which was adopted by the Securing the Border rule, for three reasons: (1) to make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to crossing irregularly no matter where along the southern border they cross; (2) to deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) to ensure consistency in implementation. This modification to the geographic reach of the Circumvention of Lawful Pathways rule would encourage noncitizens to avoid dangerous maritime migration and further persuade them to utilize lawful, safe, and orderly pathways. As discussed in more detail below, maritime migration results in life-threatening risks for both migrants and DHS personnel.

When the Departments initially proposed the Circumvention of Lawful Pathways rule, the rule would have covered migrants who entered the United States from Mexico "at the southwest land border"—that is, "along the entirety of the U.S. land border with Mexico." 88 FR at 11704 n.1; *see also id.* at 11750, 11751. However, the Departments received comment from the public expressing concern that limiting the rebuttable presumption to only those who entered the United States from Mexico by land would incentivize noncitizens without documents sufficient for lawful admission to circumvent the land border by making the hazardous attempt to reach the United States by sea. 88 FR at 31320. Concurring with this concern, the Departments modified the geographic reach of the rebuttable presumption to include "adjacent coastal borders" so that it applied to noncitizens who crossed into the United States from Mexico via adjacent coastal borders. Further, this definition mirrored the geographic reach of the Centers for Disease Control and Prevention's ("CDC") Title 42 public

health Order and, as implemented by CBP, the Amended CDC Order issued in May 2020. *Id.* Because CBP had been interpreting the term in this way for three years before the Circumvention of Lawful Pathways rule's finalization, the Departments believed this consistency with the Title 42 public health Order in geographic application would help prevent smugglers from exploiting what could be perceived as a loophole by persuading migrants to take the perilous journey of trying to reach the United States by sea upon the termination of the Order. *Id.*

The Departments now believe that further expanding the geographic scope of the Circumvention of Lawful Pathways rule beyond "adjacent coastal borders," and, with respect to those who arrive by sea, removing the restriction that the rule only applies to noncitizens who enter the United States from Mexico, could be supported by the same justification for the Securing the Border rule's inclusion of southern coastal borders: these changes would "help avoid any incentive for maritime migration to such locations" that are currently covered by the Securing the Border rule but not by the Circumvention of Lawful Pathways rule. 89 FR at 48711 n.4. For example, expanding the scope of the Circumvention of Lawful Pathways rule in this manner would mean that a noncitizen who enters the United States at a border via the Gulf of Mexico would be subject to the Circumvention of Lawful Pathways rule regardless of whether they transited through Mexico. Further, as an operational matter, this would ensure consistency in processing. Aligning the geographic scope of the Circumvention of Law Pathways rule with that of the Securing the Border rule would eliminate one operational switch that DHS personnel would have to make when the provisions of the Securing the Border rule discontinue in the absence of emergency border circumstances. This would allow DHS personnel to operate consistently with respect to noncitizens encountered utilizing maritime migration to cross the southern coastal borders, all of whom would be presumptively ineligible for asylum.

Maritime migration poses unique hazards to life and safety to both migrants and DHS personnel.[419] Human smugglers and noncitizens migrating to the United States continue to use unseaworthy, overly crowded vessels,

piloted by inexperienced mariners, without any safety equipment— including, but not limited to, personal flotation devices, radios, maritime global positioning systems, or vessel locator beacons.[420] The USCG regularly interdicts noncitizens employing maritime migration in the Gulf of Mexico and Atlantic Ocean in makeshift, overcrowded vessels.[421] In FY 2022, over 12,500 noncitizens were interdicted by the USCG and in FY 2023, that figure was nearly 13,500.[422] This is a dramatic increase from previous years. For example, between FY 2017 and FY 2020, annual maritime interdictions never exceeded 3,600.[423] Between October 1, 2023 and April 30, 2024, the USCG carried out 35 maritime migration interdictions in the Mona Passage and waters near Puerto Rico, with nearly 1,200 noncitizens interdicted at sea from various countries such as the Dominican Republic, Haiti, and Venezuela.[424] Between October 1, 2022 and August 5, 2023, the USCG interdicted over 6,900 migrants from Cuba alone.[425] In August 2024, the

---

[419] The Departments also reiterate the explanation of the dangers of maritime migration in the Circumvention of Lawful Pathways rule. *See* 88 FR at 31441–42.

[420] *See* David C. Adams, James Wagner, *At Least 40 Migrants Die in Boat Fire Off Haitian Coast, U.N. says,* N.Y. Times (July 19, 2024), *https://nytimes.com/2024/07/19/world/americas/boat-fire-haiti-migrants.html;* Samantha Schmidt, Paulina Villegas, Hannah Dormido, *Dreams and Deadly Seas: Bahamas Human Smuggling by Boat,* The Wash. Post (July 27, 2023), *https://www.washingtonpost.com/nation/interactive/2023/bahamas-human-smuggling-by-boat/* ("The United States . . . Coast Guard cutters have been rescuing migrants from foundering or overcrowded boats every few days."); Adriana Gomez Licon, *Situation 'dire' as Coast Guard seeks 38 missing off Florida,* Associated Press (Jan. 26, 2022), *https://apnews.com/article/florida-capsized-boat-live-updates-f251d7d279b6c1fe064304740c3a3019;* Gina Martinez, *Coast Guard rescues more than 180 people from overloaded sailboat in Florida Keys,* CBS News, CW44 Tampa (Nov. 22, 2022), *https://www.cbsnews.com/news/coast-guard-rescues-more-than-180-people-overloaded-sailboat-florida-keys/.*

[421] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate; see also* USCG, *Press Release: Coast Guard repatriates 119 migrants to Dominican Republic following 2 interdictions near Puerto Rico* (Apr. 29, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3758973/coast-guard-repatriates-119-migrants-to-dominican-republic-following-2-interdic/.*

[422] OHSS analysis of July 2024 Persist Dataset (Maritime Interdictions tab).

[423] *Id.*

[424] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate.*

[425] USCG, *Press Release: Coast Guard repatriates 27 people to Cuba* (Aug. 5, 2023), *https://www.news.uscg.mil/Press-Releases/Article/*

Continued

STB_AR1_000118

USCG interdicted a disabled migrant vessel and repatriated 182 migrants back to Haiti.[426] In May 2024, the USCG located and intercepted a 30-foot makeshift vessel with over 60 migrants crammed into it traveling nearly 63 miles north of Punta Cana, Dominican Republic.[427] During a second interdiction occurring on May 20, 2024, CBP's Air and Marine Operations interdicted a ''grossly overloaded makeshift vessel'' carrying 68 migrants located two miles from Puerto Rico's coastline.[428]

In FY 2023, the USCG recorded 112 noncitizen deaths, including those presumed dead, as a result of irregular maritime migration. IOM's Missing Migrants Project found that from 2014 to 2024, in the Americas, the maritime route from the Caribbean to the United States resulted in the second-highest number of dead and missing migrants, after the U.S.-Mexico border crossing.[429] The intention behind the Circumvention of Lawful Pathways rule is to discourage individuals from resorting to irregular migration, including markedly more dangerous maritime migration, and to instead incentivize noncitizens to utilize lawful, safe, and orderly pathways and processes to come to the United States. Expanding the geographic scope of the Circumvention of Lawful Pathways rule's rebuttable presumption would expand that incentive structure to cover the entire southern border, rather than just a portion of it.

The United States has taken significant steps to expand safe and orderly options for migrants, including migrants from the Caribbean region, to

---

[3484466/coast-guard-repatriates-27-people-to-cuba/.](https://...)

[426] USCG, *Press Release: Coast Guard repatriates 182 migrants to Haiti* (Aug. 21, 2024), *https:// www.news.uscg.mil/Press-Releases/Article/ 3878831/coast-guard-repatriates-182-migrants-to-haiti/.*

[427] USCG, *Press Release: Coast Guard repatriates 136 migrants to Dominican Republic, following 3 separate interdictions near Puerto Rico* (May 28, 2024), *https://www.news.uscg.mil/Press-Releases/ Article/3789058/coast-guard-repatriates-136-migrants-to-dominican-republic-following-3-separate/.*

[428] *Id.*

[429] IOM, *Missing Migrants Project: Migration Within the Americas, https://missingmigrants. iom.int/region/americas* (last visited Aug. 15, 2024). IOM cautions that ''[c]ollecting information about migrants who die or disappear on maritime routes while attempting to migrate by boat in the Caribbean is also very challenging. The remote nature of maritime routes, the secrecy in which boats set out, and the lack of information on trajectories means that many shipwrecks carrying migrants are never identified. It is rarely known exactly how many people were on board boats that ran into trouble at sea, making it difficult to verify how many people went missing, or to know any information about their identities.'' *Id.*

---

lawfully enter the United States.[430] The United States has increased and will continue to increase refugee processing in the Western Hemisphere; country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit, including the Cuba and Haiti parole processes; and opportunities to lawfully enter the United States for the purpose of seasonal employment.[431] In addition, the United States has resumed the Cuban Family Reunification Program and resumed and increased participation in the Haitian Family Reunification Program.[432] The availability of these pathways serves as important background for the proposal to expand the geographic reach of the Circumvention of Lawful Pathways rebuttable presumption to include those who enter at southern coastal borders, irrespective of whether they traveled through a third country. Such pathways for migrants from this region provide meaningful opportunities for these individuals to use a lawful, safe, and orderly pathway to enter the United States, even if they did not first travel through a third country where they could request such protection. Accordingly, the Departments are considering and seeking comment on applying the Circumvention of Lawful Pathways rebuttable presumption to those who enter the United States via the southern coastal border, irrespective of whether they traveled through a third country, to discourage noncitizens from using dangerous maritime migration routes.

### B. Extending the Applicability of the Circumvention of Lawful Pathways Rebuttable Presumption

Currently, the Circumvention of Lawful Pathways rule applies to a noncitizen who, *inter alia,* entered the United States from Mexico ''between May 11, 2023 and May 11, 2025'' and ''[s]ubsequent to the end of implementation of the Title 42 public health Order.'' 8 CFR 208.33(a)(1)(i)–(ii),

---

[430] *See* DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), *https://www.dhs.gov/news/ 2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and.*

[431] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/ 04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

[432] *See* DHS, *DHS Modernizes Cuban and Haitian Family Reunification Parole Processes* (Aug. 10, 2023), *https://www.dhs.gov/news/2023/08/10/dhs-modernizes-cuban-and-haitian-family-reunification-parole-processes.*

---

1208.33(a)(1)(i)–(ii). When issuing that rule, the Departments acknowledged that ''aspects of the present situation at the border are likely to continue for some time and are unlikely to be significantly changed in a short period,'' but the Departments opted for a two-year ''entry period'' to, *inter alia,* address the surge in migration that, in the absence of the Circumvention of Lawful Pathways rule, was anticipated to follow the lifting of the Title 42 public health Order and to provide sufficient time to implement and assess the effects of the policy contained in that rule. *See* 88 FR at 11727; 88 FR at 31421. The Departments are now considering, and request comment on, whether to extend the entry period indefinitely so that the rebuttable presumption will apply to noncitizens who entered the United States without documents sufficient for lawful admission any time on or after May 11, 2023, and, if the applicability is extended, other appropriate changes. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); *see also, e.g., id.* 208.33(c), 1208.33(d) (providing the ongoing applicability of the Circumvention of Lawful Pathways rebuttable presumption to any future asylum applications filed by noncitizens who enter during the entry period regardless of when the application was filed, except in the case of certain children who entered as part of a family unit if they later apply for asylum as principal applicants).

In the Circumvention of Lawful Pathways NPRM, the Departments specifically welcomed comment on whether the proposed two-year duration of the rule's applicability ''should be modified, including whether it should be shorter, longer, or of indefinite duration.'' *See* 88 FR at 11708. In response to comments received on the NPRM, the Departments maintained the proposed two-year period in the Circumvention of Lawful Pathways final rule because that rule's focus was to respond to the anticipated surge in migration upon the termination of the Title 42 public health Order. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i); 88 FR at 31421–22. The Departments stated that a 24-month period would provide ''sufficient time to implement and assess the effects of the policy contained in this rule'' and that ''a 24-month period is sufficiently long to impact the decision-making process for noncitizens who might otherwise pursue irregular migration and make the dangerous journey to the United States, while a shorter duration, or one based on specified conditions, would likely not

STB_AR1_000119

have such an effect.'' 88 FR at 31421. The Departments further stated that the United States would continue to build on the multi-pronged, long-term strategy with our foreign partners throughout the region to support conditions that would decrease irregular migration, work to improve refugee processing and other immigration pathways in the region, and implement other measures as appropriate, including continued efforts to increase immigration enforcement capacity and streamline processing of asylum seekers and other migrants. *Id.*

The Departments recognized, however, ''that there is not a specific event or demarcation that would occur at the 24-month mark,'' and stated that they would ''closely monitor conditions during this period in order to review and make a decision, consistent with the requirements of the APA, whether additional rulemaking is appropriate to modify, terminate, or extend the rebuttable presumption and the other provisions of th[e] rule.'' *Id.* The Departments explained that such review and decision would consider all relevant factors, such as resource limitations and the Departments' capacity to safely, humanely, and efficiently administer the immigration system; the availability of lawful pathways to seek protection in the United States and partner nations; and foreign policy considerations. *Id.* The Departments also expected to consider their experience under the Circumvention of Lawful Pathways rule at the 24-month mark, including the effects of the rebuttable presumption on those pursuing asylum claims. *Id.* In addition, the Departments expected to consider changes in policy views and imperatives, including foreign policy objectives, in making any decision regarding the future of the rule. *Id.* The Departments did not identify specific metrics for extending the rule *ex ante,* given the dynamic nature of the circumstances at the SWB and the multifaceted domestic and foreign policy challenges facing the Departments. *Id.*

The Departments have considered these factors and propose and seek comment on an indefinite extension of the applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions. The Departments also seek comment on whether other changes to the Circumvention of Lawful Pathways rule's provisions would be appropriate if its applicability becomes indefinite. First, as detailed in the IFR, although the Circumvention of Lawful Pathways rule did not fully mitigate the very high levels of irregular migration during the

immediate post-pandemic period, it yielded tangible results that ameliorated a situation that otherwise would have been more challenging. *See* 89 FR at 48723–31.[433] Extending the entry period for the Circumvention of Lawful Pathways rule would ensure that DHS can continue to deliver timely consequences, where appropriate, to more noncitizens encountered, even at levels of migration below the threshold at which the suspension and limitation on entry under this rule would be active. As the Departments explained in the IFR, ''at 1,500 daily encounters between POEs . . . DHS would be able to quickly remove the majority of the people it processes at the border on any given day who have no legal basis to remain in the United States.'' *Id.* at 48752. This estimate was expressly based on the Departments' demonstrated performance under the Circumvention of Lawful Pathways rule, *see id.,* and therefore accounted for the effects of that policy as well as the most recent data on capacity limitations, demographics, fear claim rates, and other variables. *See id.* Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption would mean that when encounters between POEs begin to exceed 1,500 encounters and the threshold for continuing or reactivating the measures in this rule is not yet met, the Departments' ability to deliver timely decisions and consequences would likely be impaired.[434]

Second, the Departments continue to be subject to significant resource

limitations, *see* 89 FR at 48728–31, such that—as explained earlier in this section—even at levels of encounters below the 2,500-encounter threshold contained in section 2(b) of the Proclamation, DHS would not be able to quickly remove the majority of those encountered who do not have a basis to remain.[435] In such circumstances, DHS will need policy interventions like the Circumvention of Lawful Pathways rule to continue delivering timely consequences. Although there were months during the FY 2013–FY 2019 period ''in which daily encounters . . . between 1,500 and 2,500 resulted in an average of 210 individuals released each day,'' *see* 89 FR at 48753, such a low release rate would be unrealistic given today's demographic mix of encounters, even at 1,500 daily encounters, particularly in the absence of policy interventions such as the Circumvention of Lawful Pathways rule. For instance, even under the Circumvention of Lawful Pathways rule, assuming that USBP processes 900 noncitizens per day for expedited removal at 1,500 daily encounters between POEs, and assuming a similar level of voluntary returns and reinstatements as observed during the immediate pre-pandemic period, DHS would be able to refer into expedited removal 77 percent of single adults and individuals in family units to expedited removal, and would likely release over 530 single adults and individuals in family units.[436] This is due to current resource limits for expedited removal, current demographics, and fear-claim and screen-in rates under the Circumvention of Lawful Pathways rule.[437] If one adjusts the calculation to use the fear-claim and comprehensive screen-in rates that existed during the pre-pandemic period, over 700 single adults and family members would be released.[438] In short, unless the Departments extend the entry period of the Circumvention of Lawful Pathways rule, DHS's ability to deliver timely consequences would be further degraded because releases pending

---

[433] Between May 12, 2023, and June 4, 2024, CBP placed into expedited removal approximately 920 individuals encountered at and between POEs each day on average. OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab). While encounters at the SWB and in coastal sectors averaged over 5,000 per day for the period from May 12, 2023, to June 4, 2024, border encounters remained below the levels projected to occur in the absence of the Circumvention of Lawful Pathways rule. *Id.;* 89 FR at 48724 & n.99.

[434] Assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs) approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab). At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption. *Id.*

[435] After the conditions for discontinuing the suspension and limitation on entry under section 2(a) of the Proclamation are met, the suspension and limitation on entry in this rule will continue or reactivate when the 2,500-encounter threshold in section 2(b) of the Proclamation is reached. This numerical gap between discontinuation and continuation or reactivation is important for operational reasons, *see* 89 FR at 48753, but also potentially results in periods of relatively high encounter numbers that the Circumvention of Lawful Pathways rule is needed to manage.

[436] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[437] *Id.*

[438] *Id.*

STB_AR1_000120

section 240 removal proceeding would be significantly higher. If the demographics were to shift such that the Circumvention of Lawful Pathways rule was no longer necessary to manage steady-state levels of migration, the Departments could at that time revise policy as appropriate.

Third, even as the United States has continued to coordinate extensively with its regional partners to expand the availability of lawful, safe, and orderly pathways, the Departments have found that these efforts are strengthened by the imposition of appropriate measures to prepare for and respond to ongoing migration challenges as needed. A key component of the Departments' engagement with foreign counterparts has been their ability to demonstrate a willingness to impose, and as appropriate expand, meaningful policy and operational measures in direct response to the pressures caused by migratory flows. *See* 89 FR at 48759. The Departments believe that ''leading by example'' has been an important part of our overall regional engagement and helped encourage regional partners to continue to adopt new and creative policy and operational migration responses. *Id.* By extending the applicability of the Circumvention of Lawful Pathways rule, the Departments believe it would not only demonstrate to our regional partners that we are committed to disincentivizing irregular migration, but it would also encourage our international partners to maintain their mutual efforts to address the unprecedented migration of people in the Western Hemisphere.

Fourth, with respect to the effects of the rule in general and on those who migrate irregularly in particular, experience has proven that the ability to deliver swift consequences for those who do not use lawful, safe, and orderly pathways or processes for entering the United States is critical; the expiration of the Circumvention of Lawful Pathways rule would limit the Departments' abilities to deliver consequences where appropriate, likely changing the perception and decision-making calculus of would-be migrants and thus could be a pull-factor and serve to increase border encounters. Extending the entry period indefinitely would avoid creating the impression among those contemplating crossing irregularly that no timely consequences will apply to them if they wait until the suspension and limitation on asylum eligibility provided for in the Securing the Border rule is lifted and then cross irregularly.

The indefinite applicability of the entry period would also ensure that the Circumvention of Lawful Pathways rule's incentive for migrants to utilize lawful, safe, and orderly pathways will continue should the enhanced measures in the Securing the Border rule not be in effect in the future. Although initially designed as a temporary measure, the Circumvention of Lawful Pathways rule is also a critical component of DHS's broader efforts to incentivize migrants to use the lawful, safe, and orderly pathways and processes that the United States Government has made available to them, thereby reducing irregular migration and allowing more efficient and timely processing at the southern border. *See* 88 FR at 31318. Since 2021, the Departments have steadily expanded such pathways, including by increasing refugee processing in the Western Hemisphere; providing country-specific and other available processes for individuals seeking parole for urgent humanitarian reasons or significant public benefit; and expanding the availability of the CBP One app to allow noncitizens to schedule appointments to present at a POE rather than risking their lives by crossing the border unlawfully.[439] To encourage noncitizens to continue to pursue such pathways, rather than putting their lives in the hands of dangerous smugglers and resorting to irregular migration that strains the border security and immigration system, the Departments are considering extending the Circumvention of Lawful Pathways rule indefinitely.

Fifth, there are a variety of factors outside of DHS's control that an indefinite extension could help mitigate. Political unrest abroad, natural disasters and climate change, perceptions about U.S. elections or changes in domestic policy, implications of elections in the region, large-scale economic fluctuations, and the migration management practices of regional partners (*e.g.,* their enforcement practices or visa policies)—all have the potential to serve as push or pull factors and dramatically impact encounters at the southern border. *See* 88 FR 31327. An indefinite extension would ensure consistency in U.S. border management practices and maintain a basic tool necessary to address potential migration surges.

Sixth, the Departments believe this approach would complement recent policy initiatives, including this Securing the Border rule, by allowing DHS to continue to deliver timely consequences to more noncitizens encountered who do not have a legal basis to remain, even at levels of migration below the threshold at which the suspension and limitation on entry would be continued or reactivated.

Finally, extending the applicability of the rebuttable presumption would guard against a circumstance where an adverse litigation outcome against any aspect of this rule or its limitation on asylum eligibility would leave the Departments without sufficient tools in place to address high volumes of migration. Litigation against the IFR remains ongoing,[440] as does litigation against the Circumvention of Lawful Pathways Rule.[441] Maintaining the rebuttable presumption as a fallback measure is a commonsense way to address the possibility of a judicial decision that temporarily or permanently impairs the Departments' ability to implement this rule.

In considering whether to extend the temporal applicability of the Circumvention of Lawful Pathways rule's rebuttable presumption and credible fear provisions and, if so, how to implement such a change, the Departments expect to consider other changes to the rule's provisions warranted by an extension, and as necessary to achieve the goals of the rule. The Departments request comment regarding any such changes and particularly welcome comments addressing whether and how extending the Circumvention of Lawful Pathways rule's temporal applicability—especially an indefinite extension—would warrant:

• Amendments to the continuing applicability provisions at 8 CFR 208.33(c)(1) and 1208.33(d)(1) regarding future applicability of the rebuttable presumption of asylum ineligibility to those who enter and are subject to the Circumvention of Lawful Pathways rule's provisions;

• Amendments to the exception to continuing applicability at 8 CFR 208.33(c)(2) and 1208.33(d)(2) for certain asylum applications filed after May 11, 2025, by noncitizens who entered as children in a family unit and who later apply for asylum as principal applicants;

---

[439] *See* DHS, *Fact Sheet: DHS Continues to Strengthen Border Security, Reduce Irregular Migration, and Mobilize International Partnerships* (June 4, 2024), *https://www.dhs.gov/news/2024/06/04/fact-sheet-dhs-continues-strengthen-border-security-reduce-irregular-migration-and.*

[440] *See Las Americas Immigrant Advocacy Ctr.* v. *DHS,* No. 1:24–cv–1702–RC (D.D.C. filed June 12, 2024).

[441] *See East Bay Sanctuary Covenant* v. *Biden,* No. 18–cv–06810, 2023 WL 4729278 (N.D. Cal. July 25, 2023), vacatur stayed pending appeal *East Bay Sanctuary Covenant* v. *Biden,* No. 23–16032 (9th Cir. Aug. 3, 2023); *M.A.* v. *Mayorkas,* No. 23–cv–01843 (D.D.C. June 6, 2023); *Texas* v. *Mayorkas,* No. 23–cv–00024 (W.D. Tex. May 23, 2023); and *Indiana* v. *Mayorkas,* 23–cv–00106 (D.N.D. May 31, 2023).

STB_AR1_000121

• Amendments to the grounds for necessarily rebutting the rebuttable presumption;

• Amendments to the exceptions to the rebuttable presumption; and

• The addition or amendment of any other specific regulatory provisions related to the Circumvention of Lawful Pathways rule in light of the proposal to extend the temporal application of the rebuttable presumption and related credible fear provisions.

**V. Regulatory Requirements**

*A. Administrative Procedure Act*

The Departments have forgone the Administrative Procedure Act's (''APA'') delayed-effective-date procedure in implementing this rule because the Departments have found good cause to do so and because this rule relates to a foreign affairs function of the United States. *See* 5 U.S.C. 553(d)(3), (a)(1).[442] This rule generally adopts the provisions of the IFR with a few technical amendments and changes to the calculation of thresholds to ensure those provisions can remain in force until there has been a sustained decrease in daily encounters. None of the amendments, crucially, implicate the justifications for the 30-day waiting period. The purpose of the waiting period is ''to give affected parties time to adjust their behavior before the final rule takes effect.'' *Riverbend Farms, Inc.* v. *Madigan,* 958 F.2d 1479, 1485 (9th Cir. 1992). Here, however, that purpose would not be served by delaying the effective date of the rule: The IFR has been in effect since June 5, and the limited changes adopted in this rule do not require anyone other than the Departments themselves to change their conduct or to take any particular steps in advance of the effective date. *See United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (noting that the ''legislative history of the APA'' indicates that the waiting period ''was not intended to unduly hamper agencies from making a rule effective immediately,'' but intended ''to 'afford persons affected a reasonable time to prepare for the effective date of a rule . . . or to take other action which the issuance may prompt' '' (citing S. Rep.

No. 752, 79th Cong., 1st Sess. 15 (1946); H.R. Rep. No. 1980, 79th Cong., 2d Sess. 25 (1946))). Instead, the changes made by this rule address the encounter thresholds that the Departments will use to determine the applicability of the rule's suspension and limitation on entry and better ensure that the measures devised to deal with emergency border circumstances will remain in place until there has been a sustained easing of those circumstances.

In finding good cause to bypass the 30-day waiting period, the Departments have taken care to ''balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable [amount of] time to prepare for the effective date of [the] rul[e].'' *Gavrilovic,* 551 F.2d at 1105. Here, that balance tips considerably in favor of immediate implementation, where the limited changes introduced by this rule preserve the status quo and do not interfere with the operative provisions of the IFR. At most, the amendments in this rule are designed to buttress the IFR's effectiveness in dealing with the emergency border circumstances by better ensuring that its limitation on asylum eligibility and other measures will stay in place until there has been a sustained improvement in encounter patterns across the southern border. For instance, the September 27 Proclamation and this rule provide that UCs from non-contiguous countries should be included in calculating the number of encounters to determine whether the suspension and limitation on entry remain in effect or are discontinued. They additionally provide that the suspension and limitation on entry are not to be discontinued unless there has been a 7-consecutive-calendar-day average of less than 1,500 encounters that is sustained over a period of 28 days. The changes to the threshold represent an incremental improvement upon the prior thresholds. These changes fine-tune the statistical parameters for tracking daily encounters so as to immunize the emergency measures from transitory blips in the data, but do not disturb or add to requirements imposed by the IFR.

Even in the narrow circumstances where the changes made in this final rule might have an effect on whether the rule's provisions apply, a waiting period would provide little benefit. The amendments do not impose new requirements or obligations on migrants contemplating a border crossing, nor on other entities that might claim an interest in the rulemaking, such as legal service organizations looking to help

noncitizens navigate the immigration system (or, to the extent such interests should be considered, smugglers and TCOs angling to learn about legal developments ahead of time so as to exploit perceived gaps in the border processing regime). All of those parties have long been on notice of the substantive provisions of the June 3 Proclamation and the IFR, none of which this rule purports to invalidate. The Proclamation and the IFR went into effect months ago and have since been the subject of regular public updates from DHS, as well as detailed coverage from the national news press.[443]

To the extent the threshold adjustments might have any effect in the next 30 days—*i.e.,* by preventing the IFR's emergency measures from being discontinued, when they otherwise would have turned off under the old parameters—this would only heighten the impetus for human smugglers and other criminals to inflate or distort the significance of the policy development to manufacture a sense of urgency among migrants and induce them to attempt to enter the country without delay.[444] As the Departments explained in the IFR, individuals contemplating entry into the United States may respond to both real and perceived incentives that stem from changes to border management and immigration

---

[442] There is also good cause to forgo notice and comment on the rule's updates to the cross-reference to the definition of ''victim of a severe form of trafficking in persons'' in 8 CFR 208.33(a)(3)(i)(C) and 1208.33(a)(3)(i)(C) from ''§ 214.11'' to ''§ 214.201.'' Notice and an opportunity to comment on that technical change to the cross-reference is unnecessary as it does not change the substance of the provision and merely updates a cross-reference that has been rendered imprecise by a subsequent rulemaking. *See* 89 FR at 34931–32 (moving the definitions from 8 CFR 214.11 to the newly created 8 CFR 214.201).

[443] *See* DHS, *Fact Sheet: President Biden's Presidential Proclamation and Joint DHS–DOJ Interim Final Rule Cut Encounters at Southwest Border by 55 Percent* (July 24, 2024), *https:// www.dhs.gov/news/2024/07/24/fact-sheet-president-bidens-presidential-proclamation-and-joint-dhs-doj-interim;* CBP, *Statistics Show Lowest Southwest Border Encounters in Nearly Four Years* (Aug. 16, 2024), *https://www.cbp.gov/newsroom/ national-media-release/cbp-releases-july-2024-monthly-update;* Miriam Jordan & J. David Goodman, *Amid Talk of Border Chaos, Crossings Have Sharply Declined,* N.Y. Times (July 20, 2024), *https://www.nytimes.com/2024/07/20/us/border-immigration-current-situation.html;* Rebecca Santana & Elliot Spagat, *Border arrests fall more than 40% after Biden's halt to asylum processing, Homeland Security says,* AP News (June 26, 2024), *https://apnews.com/article/border-arrests-biden-asylum-mexico-immigration-6e302f06f567b96d88 cc1333aa6d10fe.*

[444] *See* Nick Miroff & Carolyn Van Houten, *The Border is Tougher to Cross Than Ever. But There's Still One Way into America,* Wash. Post (Oct. 24, 2018), *https://www.washingtonpost.com/world/ national-security/theres-still-one-way-into-america/ 2018/10/24/d9b68842-aafb-11e8-8f4b-aee063e14538_story.html;* Valerie Gonzalez, *Migrants rush across US border in final hours before Title 42 expires,* AP News (May 11, 2023), *https://apnews.com/article/immigration-border-title-42-mexico-asylum-8c239766c2cb6e257 c0220413b8e9cf9* (''Even as migrants were racing to reach U.S. soil before the rules expire, Mexican President Andrés Manuel López Obrador said smugglers were sending a different message. He noted an uptick in smugglers at his country's southern border offering to take migrants to the United States and telling them the border was open starting Thursday.'').

**STB_AR1_000122**

policies. 89 FR at 48764. In such circumstances, it may be easier for smugglers to ''prey on migrants by spreading rumors, misrepresenting facts, or creating a sense of urgency to induce migrants to make the journey by overemphasizing the significance of recent or upcoming policy developments, among other tactics, and do so particularly when there is a change announced in U.S. policy.'' *Id.*

Immediate implementation is warranted not only in the absence of any benefit that advance notice would provide, but also to avoid the significant costs that would accrue to the Department if they had to toggle between applying and discontinuing the emergency border measures while waiting for this rule to go into effect. That is especially true for the amendment expanding the timeline over which a decline in encounters must be observed before the agencies will lift the suspension and limitation on entry consistent with the June 3 Proclamation. Prior to this rule, a one-day drop in the 7-consecutive-day average to a number below 1,500 encounters would have triggered the process by which the agencies must discontinue the emergency border measures—even if that drop turned out to be a mere one-off event amidst a longer pattern of daily encounters far exceeding 1,500. The amendments contained in this rule guard against such situations where the agencies' ability to consistently apply the rule's important measures might be disrupted by short-lived and intermittent fluctuations in the longitudinal tracking data.[445] That rationale extends to the decision to bypass the 30-day waiting period for this rule. Unless the amendments are implemented immediately, the agencies could face a predicament where they would have to abruptly suspend the emergency measures if the 7-consecutive-calendar-day-average dipped below 1,500 for a single day, only to then reverse course and reimpose the same measures as soon as encounters rose again to an average of 2,500 or more. Such sudden shifts in the

implementation of the June 3 Proclamation and IFR would be operationally burdensome to the agencies and would require the development and issuance of starkly differing instructions and internal guidance based on whether the measures had been discontinued, continued, or reactivated. The possibility of such shifts is arguably an inevitable consequence of the decision to limit the applicability of the rule's provisions to the existence of a temporary circumstance; at the same time, the Departments have sought to temper the frequency and severity of such shifts through two means: (1) in the IFR, providing for a gap between the 1,500-encounter threshold and the 2,500-encounter threshold, *see* 89 FR at 48753; and (2) in this rule, making modest changes to the provisions governing encounter calculations and discontinuation mechanics.

Finally, for similar reasons, immediate implementation is justified in light of the United States' foreign policy priorities. Because this rule involves a foreign affairs function of the United States, it is exempt from the APA's delayed-effective-date requirement. *See* 5 U.S.C. 553(a)(1); *see also* 89 FR at 48759–62. It is conceivable that had a 30-day waiting period been imposed, a very substantial one-day drop in the encounters average would have led to a discontinuation of the emergency provisions of the Proclamation and IFR. That in turn could have had a direct and immediate impact on migratory flows through other countries in the region, as those countries have articulated before. *See* 89 FR at 48761. Past experience has shown that even a *perceived* policy development can touch off a surge in irregular migration throughout the region. One regional partner, for example, concluded that the formation of caravans in the spring of 2022 was attributable to rumors of the termination of the Title 42 public health Order, which were followed by an official announcement. *Id.* Such effects are precisely the kind of ''definitely undesirable international consequences'' that the Departments seek to avoid by forgoing a waiting period. *Rajah,* 544 F.3d at 437 (quotation marks omitted). Immediate implementation also allows the United States to demonstrate its continued and shared commitment to addressing

irregular migration in the region, an objective that directly involves a foreign affairs function of the United States. *See* 89 FR at 48761–62.

In sum, the amendments introduced in this final rule do not fundamentally change the way in which the IFR addresses the emergency circumstances at the border and instead ensure that the system created in response to those circumstances remains in force until a decrease in encounters proves to be sustained. As a result, the purpose of the delayed-effective-date-requirement—providing affected parties time to adjust to changes in the status quo—would not be served by delaying effectiveness here, where the changes preserve the status quo. Moreover, even in the narrow circumstances in which this rule's changes to the thresholds would have an effect (by avoiding a discontinuation of the rule's emergency procedures due to a short-term change in encounter numbers), the Departments are unable to identify sufficient particular hardships to affected persons that would contravene fairness and potentially outweigh the Departments' considered assessment of the need for immediate implementation, including the need to avoid disruptive changes to the continuation of the rule's emergency provisions. There is good cause to forgo the 30-day waiting period for this rule and to instead implement it without delay.

*B. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review), and Executive Order 14094 (Modernizing Regulatory Review)*

Executive Orders 12866 (''Regulatory Planning and Review''), as amended by Executive Order 14094 (''Modernizing Regulatory Review''), and 13563 (''Improving Regulation and Regulatory Review'') direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying costs and benefits, reducing costs, harmonizing rules, and promoting flexibility.

---

[445] For similar reasons, the June 3 Proclamation provides that the suspension and limitation on entry remain in place for 14 days after the agencies have determined there has been an average of less than 1,500 encounters. This allows ''the Departments to complete processing of noncitizens encountered during emergency border circumstances and to confirm that a downward trend in encounters is sustained.'' 89 FR at 48749.

STB_AR1_000123

The Office of Management and Budget has designated this rule a ''significant regulatory action'' as defined under section 3(f)(1) of Executive Order 12866, as amended by Executive Order 14094. Accordingly, the Office of Management and Budget has reviewed this rule.

### 1. Effects Under a Without-IFR Baseline

The primary effect of the final rule, as compared to a without-IFR baseline,[446] is to reduce incentives for irregular migration and illegal smuggling activity. As a result, the primary effects of this rule will be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and described in the Proclamation, the rule will likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable probability of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the limitation on asylum eligibility under this rule if they meet an exception to the rule's limitation or to the Proclamation, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable probability of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of the rule are expected to include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the severe strain that further surges in irregular

---

[446] The benefits and costs of a regulation under Executive Order 12866 are generally measured against a no-action baseline: an analytically reasonable forecast of the way the world would look absent the regulatory action being assessed, including any expected changes to current conditions over time. *See* OMB Circular No. A–4 11 (Nov. 9, 2023), *https://www.whitehouse.gov/wp-content/uploads/2023/11/CircularA-4.pdf*. For purposes of this analysis, the Departments use the without-IFR baseline as the primary baseline, and a with-IFR baseline as a secondary baseline. The primary baseline also serves as the baseline for the significance determination under section 3(f)(1) of Executive Order 12866.

migration would impose on the Departments.

The direct costs of the rule are borne by noncitizens and the Departments. To the extent that any noncitizens are denied or do not seek asylum by virtue of the rule but would have received asylum in the absence of this rule, such an outcome would entail not only the loss of asylum but also its attendant benefits, although such persons may be granted statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would. As discussed in this preamble, the rule's manifestation of fear and reasonable probability standards may also engender a risk that some noncitizens with meritorious claims may not be referred for credible fear interviews or to removal proceedings to seek asylum and protection. In these cases, there would likely be costs to noncitizens that result from their removal.

The rule may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rule and the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rule will require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. On the other hand, in the absence of this rule's provisions, AOs and IJs would have to make other inquiries into potential fear claims under steady-state regulations and into asylum eligibility under the Circumvention of Lawful Pathways rule. In addition, as discussed throughout this preamble, the rule is expected to result in significantly reduced irregular migration and to filter out a greater portion of cases that are unlikely to ultimately be successful on the merits. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rule to be mitigated by a comparatively smaller number of credible fear cases and full adjudications on the merits than AOs and IJs would otherwise have been required to handle in the absence of the rule.

Other entities may also incur some indirect, downstream costs as a result of the rule. The effects should be considered relative to the baseline condition that would exist in the

absence of this rule, which as noted above is the continued application of the Circumvention of Lawful Pathways rule. As compared to the baseline condition, this rule is expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See, e.g.,* 89 FR 67459, 67486–88.

### 2. Effects Under a With-IFR Baseline

The only expected effects of this rule relative to a with-IFR baseline would involve the changes to the thresholds discussed above. As explained in Section II.C.1 of this preamble, the amendments marginally reduce the probability that the suspension and limitation on entry will be discontinued prematurely or remain discontinued during periods in which high levels of migration place significant strain on the Departments' resources and capabilities. The amendments do so by (1) requiring the 7-consecutive-calendar-day average below 1,500 encounters to persist for 28 consecutive calendar days before the 14-day waiting period is triggered, and by (2) including encounters of UCs from non-contiguous countries when calculating encounters for the purpose of the thresholds under sections 2(a) and 2(b) of the Proclamation.

It is challenging to predict with certainty the effects of the Departments' decision to adopt these changes. Although in some circumstances the Departments' decision could reduce the likelihood that the rule's limitation on asylum eligibility and changes to the credible fear process would be discontinued or remain discontinued, the Departments have not assigned a specific probability to such circumstances occurring. Encounter levels are driven by a variety of factors, many of which are external to the United States and difficult to predict, such as family and community networks, labor markets, environmental and security-related push factors, and rapidly evolving criminal smuggling networks. *See* 88 FR at 31327–28 & n.59.

If the changes to the thresholds were to result in this rule's emergency provisions remaining activated for a longer period of time than they would have been under the IFR, those changes would amplify this rule's effects relative to a with-IFR baseline. In such a circumstance, the same analysis presented with respect to the without-IFR baseline above would apply here as well, but the marginal impacts of this final rule (compared to the with-IFR baseline) are expected to be smaller than the marginal impacts of the IFR (compared to the without-IFR baseline). For instance, the primary effects of this

**STB_AR1_000124**

rule would still be felt by noncitizens outside of the United States. And for those who are present in the United States, the rule would still likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are ineligible for asylum and who lack a reasonable probability of persecution or torture would remain in the United States. The changes made in this rule may decrease the administrative burdens associated with discontinuing and continuing or reactivating the measures contained in the rule.

3. Discontinuation Analysis Under a Without-IFR Baseline

For purposes of this assessment, the Departments have also analyzed the potential effects of the 7-consecutive-calendar-day average of encounters falling below 1,500. If that average remains below 1,500 encounters for 28 consecutive calendar days, and the 2,500-encounter threshold is not reached during the 14-day waiting period, the rule's provisions will be discontinued 14 days after the Secretary's determination and remain so until one day after the Secretary determines that the 7-consecutive-calendar-day average of encounters has reached 2,500.

The effects of discontinuation would depend on a wide range of factors that are difficult to predict and may involve factors arising from events occurring outside the United States, or entirely outside the Departments' control. Some such factors would include:

• Whether the Circumvention of Lawful Pathways rule would apply at the time of the discontinuation; [447]

• Whether metrics such as fear-claim rates and screen-in rates during the discontinuation period would resemble rates previously observed under the Circumvention of Lawful Pathways rule; [448]

• Whether, in the absence of a discontinuation, such rates would continue to resemble those observed from June 5, 2024, through August 31, 2024;

• Encounter levels and related demographics during the discontinuation period, which, in turn, are influenced by factors such as family and community networks, economic conditions, environmental and security-related push factors, responses to policy changes such as the discontinuation itself, and rapidly evolving criminal smuggling networks;

• Available processing resources;

• Tactical changes by smugglers and migrants;

• Misinformation, disinformation, or malinformation generated by smugglers and circulating online among migrant communities; and

• Whether and how soon the 2,500-encounter threshold for continuing or reactivating the rule's provisions would be reached.

Assuming the Circumvention of Lawful Pathways rule remains in effect at the time of a discontinuation, in the immediate aftermath of a discontinuation, the Departments would begin the processing of noncitizens under the Circumvention of Lawful Pathways rule's provisions: the Departments would apply the rebuttable presumption of asylum ineligibility during covered credible fear screenings and section 240 removal proceedings and employ a "reasonable possibility of persecution or torture" standard to screen for potential eligibility for statutory withholding of removal and CAT protection for those noncitizens who are unable to establish a significant possibility that the rebuttable presumption does not apply or that they can rebut it. Although it is impossible to reliably address these uncertainties quantitatively, the Departments offer a number of observations about the potential outcomes of a discontinuation while the Circumvention of Lawful Pathways rule applies.

Although the Circumvention of Lawful Pathways rule meaningfully improved the Departments' capacity to deliver timely decisions and consequences and is a critical tool for the Departments to incentivize the use of lawful, safe, and orderly pathways, *see* Section IV of this preamble, it did not yield efficiency benefits comparable to those delivered by the IFR.[449] Under

the Circumvention of Lawful Pathways rule, the average processing time for USBP encounters, from encounter to removal, was 44 days—down from 75 days in the pre-pandemic period; under the IFR, the average processing time decreased more than 25 percent as compared to the time period under the Circumvention of Lawful Pathways rule, to 32 days.[450] A comparison of the number of expedited removals processed per day is also instructive. Under the Circumvention of Lawful Pathways rule, USBP referred, on average, about 860 people for expedited removal per day,[451] while under the IFR, USBP referrals for expedited removal increased approximately 28 percent, to an average of nearly 1,100 persons per day.[452]

In particular, the elimination of lengthy and suggestive advisals and the shift to a manifestation standard under the Securing the Border rule contributes to a substantially lower proportion of noncitizens encountered between POEs at the SWB being referred for credible fear interviews. Fear-claim rates dropped from 57 percent under the Circumvention of Lawful Pathways rule to a 27 percent fear-claim rate under the IFR.[453]

The reduction in fear-claim rates allows USCIS to focus its resources more effectively and efficiently on those noncitizens who may have a fear of return to their native country or their country of removal or indicate an intention to seek fear-based relief or protection and enables DHS to more swiftly process and remove those who do not manifest a fear or express an intent to apply for asylum.[454] Congress has not provided the resources necessary to timely and effectively process and interview all those who

---

[447] In Section IV.B of this preamble, the Departments seek comment on whether to extend the applicability of that rule to certain noncitizens who enter the United States after May 11, 2025.

[448] As noted in Section II.A.2 of this preamble, under this rule, from June 5, 2024, through August 31, 2024, 27 percent of those encounters between POEs at the SWB and processed for expedited removal claimed fear, compared to a 57 percent fear-claim rate under the Circumvention of Lawful Pathways rule and a 37 percent fear-claim rate during the pre-pandemic period. OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab). Similarly, with this rule's "reasonable probability" standard in place, the comprehensive screen-in rate for those USBP encounters manifesting fear has decreased to approximately 57 percent, compared to approximately 62 percent for those screened under the Circumvention of Lawful Pathway rule with its lower "reasonable possibility" standard in place, and 83 percent in the pre-pandemic period.

OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[449] As discussed elsewhere in this preamble and in the Circumvention of Lawful Pathways rule, high

encounter rates at the southern border, combined with inadequate resources and tools to keep pace, have limited DHS's ability to impose timely consequences through expedited removal, the main consequence available at the border under title 8 authorities. *See* 89 FR at 48714. This mismatch between the resources made available by Congress and large numbers of encounters creates significant stress on the border and immigration systems that forces DHS to rely on slower processing pathways—limiting the Departments' ability to more quickly deliver consequences to individuals who do not have a legal basis to remain in the United States.

[450] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[451] OHSS analysis of July 2024 Persist Dataset (Imm Post Pandemic ERCF tab).

[452] OHSS analysis of data downloaded from UIP on September 3, 2024 (IFR ERCF tab).

[453] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (Summary Statistics tab).

[454] *Id.* (showing both reduced rates of fear claims/fear manifestation and reduced time from encounter to negative fear removals).

**STB_AR1_000125**

invoke credible fear procedures through the expedited removal process at the southern border, including under the Circumvention of Lawful Pathways rule. *See* 89 FR at 48732. When the Departments' ability to timely process, detain, and remove, as appropriate, noncitizens who do not establish a legal basis to remain in the United States is limited, it exacerbates the risk of severe overcrowding in USBP facilities and POEs and creates a situation in which large numbers of migrants—only a small proportion of whom are likely to be granted asylum—are not able to be expeditiously removed but are instead referred to backlogged immigration courts. *Id.* This situation is self-reinforcing: the expectation of a lengthy stay in the United States and the lack of timely consequences for irregular migration encourage more migrants to make the dangerous journey to the southern border to invoke credible fear procedures and take their chances on being allowed to remain in the country for a lengthy period. *Id.*

The Securing the Border rule expressly guards against the resource strains posed by very high levels of encounters; the day after the Secretary makes a factual determination that there have been 2,500 daily encounters, the Departments will again implement the Securing the Border rule, thereby reestablishing stronger incentives against irregular migration. But as discussed in Section II.C.1 of this preamble, the Departments may not be able to fully realize the benefits of the Securing the Border rule in the first few days of reactivation, because encounters made prior to reactivation must still be processed under the Circumvention of Lawful Pathways rule. Unnecessary discontinuations and reactivations also impose unnecessary costs on the Departments. And frequent discontinuations—which the changes made in this rule seek to avoid—risk signaling to migrants that emergency border circumstances are so temporal and episodic that the rule's measures can be avoided entirely by simply waiting in Mexico for a short period of time—which could lead to a cycle of surges that significantly disrupt border processing.

Finally, there are of course other differences between the two frameworks as well. For instance, the Circumvention of Lawful Pathways rule affects the asylum eligibility of a smaller number of migrants, because that rule generally does not affect the asylum eligibility of Mexican nationals. For such persons, the application of the Circumvention of Lawful Pathways rule instead of the Securing the Border rule could result in

greater access to asylum and its attendant benefits, and even those determined to be subject to the Circumvention of Lawful Pathways rule's rebuttable presumption of asylum ineligibility will be screened for statutory withholding of removal and CAT protection at the ''reasonable possibility'' standard, rather than the ''reasonable probability'' standard applied during statutory withholding of removal and CAT protection screenings under the Securing the Border rule.

4. Effects of Expansion and Extension of Circumvention of Lawful Pathways Rebuttable Presumption

In Section IV of this preamble, the Departments also propose to extend and expand the applicability of the Circumvention of Lawful Pathways rebuttable presumption. First, in Section IV.A of this preamble, the Departments request comment on whether to expand the rebuttable presumption (which currently applies to noncitizens who ''enter[ ] the United States from Mexico at the southwest land border or adjacent coastal borders'' after traveling through certain third countries) such that the rebuttable presumption would also apply to noncitizens who enter across southern coastal borders by sea and irrespective of whether such noncitizens traveled through a third country before entry across the southern costal borders. This would expand the geographic reach of the rebuttable presumption. Second, in Section IV.B of this preamble, the Departments request comment on whether to indefinitely extend the entry period (currently scheduled to end on May 12, 2025) so that the rebuttable presumption will apply to noncitizens who enter the United States without documents sufficient for lawful admission any time on or after May 11, 2023. *See* 8 CFR 208.33(a)(1)(i), 1208.33(a)(1)(i).

The potential effects of such an expansion and extension are described in Section IV of this preamble. The expansion would (1) make clear to noncitizens intending to migrate to the United States that timely consequences will result if they resort to irregular migration no matter where along the southern border they cross; (2) deter smugglers and noncitizens from using dangerous maritime migration to avoid the rebuttable presumption of asylum ineligibility if the noncitizen did not travel through a country other than the noncitizen's country of citizenship, nationality, or, if stateless, last habitual residence, that is a party to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of

Refugees, *see* 8 CFR 208.33(a)(1)(iii), 1208.33(a)(1)(iii); and (3) ensure consistency in implementation between the Circumvention of Lawful Pathways rule's rebuttable presumption and the provisions in the Securing the Border rule.

The proposed extension of the Circumvention of Lawful Pathways rule's entry period would better preserve the Departments' ability to deliver timely decisions and consequences. Even with the Proclamation and Securing the Border rule in place, the absence of the Circumvention of Lawful Pathways rebuttable presumption after May 11, 2025 would mean that when the following three conditions are satisfied—(1) the threshold for discontinuing the Securing the Border rule's provisions has been met, (2) encounters between POEs begin to exceed 1,500 encounters, and (3) the threshold for continuing or reactivating the measures in this rule is not yet met—without the ability to apply the Circumvention of Lawful Pathways rebuttable presumption, the Departments' ability to deliver timely decisions and consequences would likely be impaired. For example, assuming similar processing capacity as during the immediate post-pandemic period and the same mix of encounter demographics as observed during the first two months of enforcement under the IFR, OHSS estimates that at 1,500 encounters (including all UCs), approximately 58 percent of single adult and family unit encounters would be quickly repatriated (including voluntary returns, reinstatements, and expedited removals) with the rebuttable presumption in effect, versus 46 percent in the absence of the rebuttable presumption.[455] At 2,500 encounters per day, OHSS estimates that 41 percent of single adult and family unit encounters would be quickly repatriated with the rebuttable presumption in effect, versus 34 percent in the absence of the rebuttable presumption.[456] These differences are driven by differences in fear-claim and screen-in rates.[457]

The primary effect of the Departments' proposed expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption would be to reduce incentives for irregular migration and illegal smuggling activity during periods when the threshold for discontinuing

---

[455] OHSS analysis of July 2024 Persist Dataset and data downloaded from UIP on September 3, 2024 (CLP v pre-CLP Proj Outcomes tab).

[456] *Id.*

[457] *Id.*

STB_AR1_000126

**81282**    **Federal Register** / Vol. 89, No. 194 / Monday, October 7, 2024 / Rules and Regulations

the measures in the Securing the Border rule has been met or where that rule is otherwise not in effect due to an adverse litigation outcome against its asylum limitation or any aspect of that rule. The primary effects of such an expansion and extension would be felt by noncitizens outside of the United States. In addition, for those who are present in the United States and subject to the rebuttable presumption, such an action would likely decrease the number of asylum grants and likely reduce the amount of time that noncitizens who are determined to be ineligible for asylum and who are determined to lack a reasonable possibility of establishing eligibility for protection from persecution or torture would remain in the United States. Noncitizens, however, can avoid the rebuttable presumption if they meet certain exceptions, including by presenting at a POE pursuant to a pre-scheduled time and place or by showing exceptionally compelling circumstances. Moreover, noncitizens who in credible fear screenings establish a reasonable possibility of persecution or torture would still be able to seek statutory withholding of removal or CAT protection in proceedings before IJs.

The benefits of such an expansion or extension would include reductions in strains on limited Federal Government immigration processing and enforcement resources; preservation of the Departments' continued ability to safely, humanely, and effectively enforce and administer the immigration laws; and a reduction in the role of exploitative TCOs and smugglers. Some of these benefits accrue to noncitizens whose ability to receive timely decisions on their claims might otherwise be hampered by the strain that further surges in irregular migration would impose on the Departments.

The direct costs of the expansion or extension would be borne by noncitizens and the Departments. To the extent that any noncitizens are made ineligible for asylum by virtue of the rebuttable presumption but would otherwise have received asylum, such an outcome would entail the denial of asylum and its attendant benefits, although such persons may continue to be eligible for statutory withholding of removal and withholding or deferral of removal under the CAT. Unlike asylees, noncitizens granted these more limited forms of protection do not have a path to citizenship and cannot petition for certain family members to join them in the United States—although such noncitizens may in the end be granted asylum despite the rebuttable presumption by operation of the family

unity provision that applies in section 240 removal proceedings. Such noncitizens may also be required to apply for employment authorization more frequently than an asylee would.

The expansion and extension of the rebuttable presumption may also require additional time for AOs and IJs, during credible fear screenings and reviews, respectively, to inquire into the applicability of the rebuttable presumption to the noncitizen's fear claim. Similarly, where its provisions apply to a given case, applying the rebuttable presumption would require additional time during asylum adjudications before USCIS and before IJs during section 240 removal proceedings. However, such an expansion or extension may reduce perceived incentives for irregular migration. Accordingly, the Departments expect the additional time spent by AOs and IJs on implementation of the rebuttable presumption to be mitigated by a comparatively smaller number of credible fear cases than AOs and IJs would otherwise have been required to handle in the absence of the rebuttable presumption.

Other entities may also incur some indirect, downstream costs as a result of an expansion or extension. The nature and scale of such effects will vary by entity and should be considered relative to the baseline condition that would exist in the absence of such an action, which would be the application of steady-state regulations that have not been the primary mode of the processing of noncitizens at the southern border since before the Title 42 public health Order. As compared to the baseline condition, an expansion and extension would be expected to reduce irregular migration. DHS has recently described the impact of noncitizens on the U.S. labor market. *See* 89 FR at 67486–88.

*C. Regulatory Flexibility Act*

Under the Regulatory Flexibility Act (''RFA''), ''[w]henever an agency is required by section 553 of [the APA], or any other law, to publish general notice of proposed rulemaking for any proposed rule, . . . the agency shall prepare and make available for public comment an initial regulatory flexibility analysis.'' 5 U.S.C. 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). Such analysis requires agencies to consider the direct impact of the proposed rule on ''small entities.'' *Id.* 603(a); *see also id.* 604(a) (final regulatory flexibility analysis). This rule does not directly regulate small entities and is not expected to have a direct effect on small entities. It does not

mandate any actions or requirements for small entities. Rather, this rule regulates individuals, and individuals are not defined as ''small entities'' by the RFA. *See* 5 U.S.C. 601(6). Based on the evidence presented in this analysis and throughout this preamble, the Departments certify that this final rule would not have a significant economic impact on a substantial number of small entities. And for the same reason, the Departments certify that the Circumvention of Lawful Pathways rule, if extended or expanded, would not have a significant economic impact on a substantial number of small entities.

*D. Unfunded Mandates Reform Act of 1995*

The Unfunded Mandates Reform Act of 1995 (''UMRA'') is intended, among other things, to curb the practice of imposing unfunded Federal mandates on State, local, and Tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed or final agency rule that may directly result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by State, local, and Tribal governments, in the aggregate, or by the private sector. 2 U.S.C. 1532(a). The inflation-adjusted value of $100 million in 1995 is approximately $200 million in 2023 based on the Consumer Price Index for All Urban Consumers (CPI–U).[458]

The term ''Federal mandate'' means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6). A ''Federal intergovernmental mandate,'' in turn, is a provision that would impose an enforceable duty upon State, local, or Tribal governments (except as a condition of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(5). And the term ''Federal private sector mandate'' refers to a provision that would impose an enforceable duty upon the private sector (except as a condition

---

[458] *See* BLS, Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month, *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202406.pdf* (last visited Sept. 21, 2024). Steps in calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2023); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2023 − Average monthly CPI–U for 1995) ÷ (Average monthly CPI–U for 1995)] × 100 = [(304.702 − 152.383) ÷ 152.383] = (152.319/152.383) = 0.99958001 × 100 = 99.96 percent = 100 percent (rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars × 2.00 = $200 million in 2023 dollars.

**STB_AR1_000127**

of Federal assistance or a duty arising from participation in a voluntary Federal program). *See id.* 658(7).

This rule does not contain a Federal mandate because it does not impose any enforceable duty upon any other level of government or private sector entity. Any downstream effects on such entities would arise solely due to the entity's voluntary choices, and the voluntary choices of others, and would not be a consequence of an enforceable duty imposed by this proposed rule. Similarly, any costs or transfer effects on State and local governments would not result from a Federal mandate as that term is defined under UMRA. The requirements of title II of UMRA, therefore, do not apply, and the Departments have not prepared a statement under UMRA.

### E. Congressional Review Act

The Administrator of the Office of Information and Regulatory Affairs has determined that this rule does not meet the criteria set forth in 5 U.S.C. 804(2). When compared to the with-IFR baseline, the changes made in this final rule [459] have not resulted in, and are not likely to result in, an annual effect on the economy of $100,000,000 or more; a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. The rule will be submitted to Congress and the Government Accountability Office consistent with the Congressional Review Act's requirements no later than its effective date.

### F. Executive Order 13132 (Federalism)

This rule would not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

### G. Executive Order 12988 (Civil Justice Reform)

This rule meets the applicable standards set forth in section 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform.

### H. Family Assessment

The Departments have reviewed this rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999, enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999. The Departments have reviewed the criteria specified in section 654(c)(1), by evaluating whether this regulatory action (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by State or local governments or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines a regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

The Departments have determined that the implementation of this rule will not impose a negative impact on family well-being or the autonomy or integrity of the family as an institution.

### I. Executive Order 13175 (Consultation and Coordination With Indian Tribal Governments)

This rule would not have Tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes.

### J. National Environmental Policy Act

DHS and its components analyze actions to determine whether the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. 4321 *et seq.,* applies to these actions and, if so, what level of NEPA review is required. 42 U.S.C. 4336. DHS's Directive 023–01, Revision 01 and Instruction Manual

023–01–001–01, Revision 01 ("Instruction Manual 023–01–001–01") establish the procedures that DHS uses to comply with NEPA and the Council on Environmental Quality ("CEQ") regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

Federal agencies may establish categorical exclusions for categories of actions they determine normally do not significantly affect the quality of the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 42 U.S.C. 4336e(1); 40 CFR 1501.4, 1507.3(c)(8), 1508.1(e). DHS has established categorical exclusions, which are listed in Appendix A of its Instruction Manual 023–01–001–01. Under DHS's NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the categorical exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.

The rule adopts as final the following three changes to the process for those seeking asylum, statutory withholding of removal, or CAT protection during emergency border circumstances:

• For those who enter the United States across the southern border during emergency border circumstances and are not described in section 3(b) of the June 3 Proclamation, rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, DHS will continue to provide general notice regarding the processes for seeking asylum, statutory withholding of removal, and CAT protection, and will only refer a noncitizen for credible fear screenings if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to their country or the country of removal.

• During emergency border circumstances, those who enter the United States across the southern border and who are not described in paragraph 3(b) of the June 3 Proclamation will continue to be ineligible for asylum unless they demonstrate by a preponderance of the evidence that exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of

---

[459] The Administrator of the Office of Information and Regulatory Affairs has measured the effects of this final rule with a with-IFR baseline. *See* 5 U.S.C. 804(2); *compare* Section V.B of this preamble.

**STB_AR1_000128**

their family as described in 8 CFR 208.30(c) with whom they are traveling: (1) faced an acute medical emergency; (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or (3) satisfied the definition of ''victim of a severe form of trafficking in persons'' provided in 8 CFR 214.201.

• The limitation on asylum eligibility will continue to be applied during credible fear interviews and reviews, and those who enter across the southern border during emergency border circumstances and who are not described in section 3(b) of the June 3 Proclamation and do not establish exceptionally compelling circumstances under the credible fear screening standard will receive a negative credible fear determination with respect to asylum and will thereafter be screened for a reasonable probability of persecution because of a protected ground or torture, a higher standard than that applied to noncitizens in a similar posture under the Circumvention of Lawful Pathways rule.

This rule also makes a small number of changes consistent with the overall purpose and structure of the IFR, as discussed in Section II.C of this preamble, and requests comment on the potential expansion and extension of the applicability of the Circumvention of Lawful Pathways rebuttable presumption.

Given the nature of the final rule with request for comment, DHS has determined that it is categorically excluded under its NEPA implementing procedures, as it satisfies all three relevant conditions. First, the final rule with request for comment clearly fits within categorical exclusions A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, for the promulgation of rules of a ''strictly administrative or procedural nature'' and rules that ''interpret or amend an existing regulation without changing its environmental effect,'' respectively. The IFR changed certain procedures relating to the processing of certain noncitizens during emergency border circumstances, and does not result in a change in environmental effect. This final rule makes only modest changes to the IFR and seeks comment on the expansion and extension of the Circumvention of Lawful Pathways rebuttable presumption. Second, this final rule with request for comment is a standalone rule and is not part of any larger action.[460] Third, in accordance

with its NEPA implementing procedures, DHS has determined no extraordinary circumstances exist that would cause a significant environmental impact. Therefore, this final rule is categorically excluded, and no further NEPA analysis or documentation is required. DOJ is adopting the DHS determination that this final rule is categorically excluded under A3(a) and A3(d) of DHS's Instruction Manual 023–01–001–01, Appendix A, because the final rule's limitation on asylum eligibility and the ''reasonable probability'' standard will be applied by EOIR in substantially the same manner as it will be applied by DHS and DOJ is not aware of any extraordinary circumstances that would require the preparation of an environmental assessment or environmental impact statement. *See* 40 CFR 1506.3(d) (setting forth the ability of an agency to adopt another agency's categorical exclusion determination).

*K. Paperwork Reduction Act*

This rule does not adopt new, or revisions to existing, ''collection[s] of information'' as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 109 Stat. 163, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Department of Homeland Security**

Accordingly, the interim final rule amending 8 CFR parts 208 and 235, which was published at 89 FR 48710 on June 7, 2024, is adopted as final with the following changes:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; 8 CFR part 2; Pub. L. 115–218.

■ 2. Amend § 208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

**§ 208.13    Establishing asylum eligibility.**

\*    \*    \*    \*    \*

(g) *Entry during emergency border circumstances.* For an alien who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and this chapter, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

**§ 208.33    [Amended]**

■ 3. Amend § 208.33 by removing the reference to ''§ 214.11(a)'' in paragraph (a)(3)(i)(C) and adding in its place ''§ 214.201.

■ 4. Amend § 208.35 by:
■ a. Removing the reference to ''§ 214.11'' in paragraph (a)(2)(i)(C) and adding in its place ''§ 214.201'';
■ b. Revising paragraph (b)(2)(i); and
■ c. Removing the words ''Presidential Proclamation of June 3, 2024, Securing the Border,'' and ''Proclamation'' wherever they appear and adding, in their place, the words ''Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),''.

The revision reads as follows:

**§ 208.35    Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.**

\*    \*    \*    \*    \*

(b) \* \* \*
(2) \* \* \*

---

[460] *See* Instruction Manual 023–01–001–01, at V–5.

**STB_AR1_000129**

(i) In cases in which the asylum officer enters a negative credible fear determination under paragraph (b)(1)(i) or (b)(3) of this section, the asylum officer will assess the alien under the procedures set forth in § 208.33(b)(2)(i) except that the asylum officer will apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

\*    \*    \*    \*    \*

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 5. The authority citation for part 235 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, 69 FR 241, 3 CFR, 2003 Comp., p. 278), 1201, 1224, 1225, 1226, 1228, 1365a note, 1365b, 1379, 1731–32; 48 U.S.C. 1806, 1807, and 1808 and 48 U.S.C. 1806 notes (title VII, Pub. L. 110–229, 122 Stat. 754); 8 U.S.C. 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638, and Pub. L. 112–54, 125 Stat. 550).

### § 235.15   [Amended]

■ 6. Amend § 235.15 by removing the words ''Presidential Proclamation of June 3, 2024, Securing the Border,'' wherever they appear and adding, in their place, the words ''Presidential Proclamation of June 3, 2024, as defined in 8 CFR 208.13(h),''.

### Department of Justice

Accordingly, the interim final rule amending 8 CFR part 1208, which was published at 89 FR 48710, on June 7, 2024, is adopted as final with the following changes:

## PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 7. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Pub. L. 110–229; Pub. L. 115–218.

■ 8. Amend § 1208.13 by revising paragraph (g) and adding paragraph (h) to read as follows:

### § 1208.13   Establishing asylum eligibility.

\*    \*    \*    \*    \*

(g) *Entry during emergency border circumstances.* For a noncitizen who entered the United States across the southern border (as that term is described in section 4(d) of the Presidential Proclamation of June 3, 2024, as defined in paragraph (h) of this section) between the dates described in section 1 and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), or between the dates described in section 2(b) and section 2(a) of such Proclamation (or the revocation of such Proclamation, whichever is earlier), refer to the provisions on asylum eligibility described in § 1208.35.

(h) *References to the Presidential Proclamation of June 3, 2024.* For purposes of paragraph (g) of this section and § 1208.35, the Presidential Proclamation of June 3, 2024, refers to Proclamation 10773 of June 3, 2024, as amended by the Presidential Proclamation of September 27, 2024. The Department intends that in the event the Presidential Proclamation of September 27, 2024, or the portions of this chapter referring to it are rendered inoperative by court order, this chapter shall continue to operate as if the references to that Proclamation have been stricken.

### § 1208.33   [Amended]

■ 9. Amend § 1208.33 by removing the reference to ''8 CFR 214.11'' in paragraph (a)(3)(i)(C) and adding in its place ''8 CFR 214.201''.

■ 10. Amend § 1208.35 by:
■ a. Removing the reference to ''§ 214.11(a)'' in paragraph (a)(2)(i)(C) and adding in its place ''§ 214.201'';
■ b. Revising paragraph (b)(2)(iii);
■ c. Removing the words ''An alien'' and adding in their place the words ''A noncitizen'', wherever they appear;

■ d. Removing the words ''the alien'' and adding in their place the words ''the noncitizen'', wherever they appear;
■ e. Removing the words ''the alien's'' and adding in their place the words ''the noncitizen's'', wherever they appear;
■ f. Removing the words ''an alien'' and adding in their place the words ''a noncitizen'', wherever they appear;
■ g. Removing the words ''The alien'' and adding in their place the words ''The noncitizen'', wherever they appear; and
■ h. Removing the words ''Presidential Proclamation of June 3, 2024, Securing the Border,'' and ''Proclamation'' wherever they appear and adding, in their place, the words ''Presidential Proclamation of June 3, 2024, as defined in 8 CFR 1208.13(h).

The revision reads as follows:

### § 1208.35   Limitation on asylum eligibility and credible fear procedures for those who enter the United States during emergency border circumstances.

\*    \*    \*    \*    \*

(b) \*  \*  \*
(2) \*  \*  \*

(iii) Where the immigration judge determines that the noncitizen is subject to the limitation on asylum eligibility under paragraph (a) of this section, the immigration judge shall assess the noncitizen under the procedures set forth in § 1208.33(b)(2)(ii) except that the immigration judge shall apply a reasonable probability standard. For purposes of this section, *reasonable probability* means substantially more than a reasonable possibility, but somewhat less than more likely than not.

\*    \*    \*    \*    \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*

Dated: September 27, 2024.

**Merrick B. Garland,**
*Attorney General, U.S. Department of Justice.*

[FR Doc. 2024–22602 Filed 9–30–24; 1:00 pm]

**BILLING CODE 4410–30–P; 9111–97–P**

STB_AR1_000130



AMENDING PROCLAMATION 10773

- - - - - - -

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

A PROCLAMATION

On June 3, 2024, I signed Proclamation 10773 (Securing the Border).  That proclamation suspended and limited the entry of certain noncitizens into the United States across the southern border during times of high border crossings, and directed the Secretary of Homeland Security and the Attorney General to promptly consider issuing any instructions, orders, or regulations as might be necessary to address the circumstances at the southern border, including any additional limitations and conditions on asylum eligibility that they determined were warranted.  Following that direction, the Secretary of Homeland Security and the Attorney General issued an interim final rule (IFR) that established a limitation on asylum eligibility for certain noncitizens who enter the United States across the southern border during times when Proclamation 10773 and the IFR are designed to be in effect, and revised certain procedures applicable to the expedited removal process to more swiftly apply consequences for irregular migration during those times for noncitizens who do not establish a lawful basis to remain.

Those actions have already produced significant results. Since Proclamation 10773 and the IFR went into effect, and as of the end of the last calendar month, the average number of encounters by the United States Border Patrol at our southwest border between ports of entry has decreased by 59 percent compared to the period after the Circumvention of Lawful Pathways rule began to apply on May 12, 2023, and before Proclamation 10773 and the IFR went into effect.  July and August 2024 were the lowest 2 months of encounters between ports

STB_AR1_000208

JA545

2

of entry since September 2020.  While Proclamation 10773 and the IFR have been in effect, and for individuals encountered between southern border ports of entry as of the end of the last calendar month, the Department of Homeland Security has removed or returned 70 percent of single adults and family members, including more than 119,000 individuals to more than 140 countries; has more than tripled the percentage of noncitizens processed through expedited removal; and has decreased the percentage of noncitizens encountered at the southwest border who are released by United States Border Patrol pending their removal proceedings by 52 percent.

Following the issuance of the IFR, the Department of Homeland Security and the Department of Justice (Departments) received and reviewed more than 1,000 comments.  Based on their review of those comments and their experience in implementing Proclamation 10773 and the IFR, the Departments have identified two issues related to the thresholds for determining when to apply the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR.

First, having closely monitored the 7-consecutive-calendar-day average of encounters following the issuance of Proclamation 10773 and the IFR, the Departments have assessed that the current threshold for discontinuing the suspension and limitation on entry in Proclamation 10773 and the measures described in the IFR could be reached following a short-term decrease in the number of encounters at the southern border that does not reflect a sustained decrease in the number of such encounters or an end to the border circumstances in which Proclamation 10773 and the IFR are designed to apply.  The Departments are currently considering regulatory action to address this issue as it relates to the measures described in

STB_AR1_000209

JA546

3

the IFR.  With respect to Proclamation 10773, to ensure that the threshold to discontinue the suspension and limitation on entry reflects a sustained decrease in encounters, I have now determined that the suspension and limitation on entry in that proclamation should be discontinued only after the Secretary of Homeland Security has made a factual determination that there have been 28 consecutive calendar days in which the 7-consecutive-calendar-day average of encounters is less than 1,500.

Second, while Proclamation 10773 and the IFR excluded encounters of unaccompanied children from non-contiguous countries from the calculation of encounters, the Departments have assessed, based on their experience implementing Proclamation 10773 and the IFR, that this exclusion is unwarranted because processing such noncitizens is particularly resource-intensive for our frontline personnel at the southern border.  This experience indicates that excluding these noncitizens from the calculation yields inaccurate estimates of system capacity.  Again, the Departments are currently considering regulatory action to address this issue as it relates to the measures described in the IFR.  I have now concluded that in order to better achieve Proclamation 10773's goal of enhancing our ability to address historic levels of migration and more efficiently process migrants arriving at the southern border, that proclamation should include unaccompanied children from both non-contiguous and contiguous countries in the calculation of encounters.  Consistent with section 3(b)(iii) of Proclamation 10773, any unaccompanied children will remain excepted from the suspension and limitation on entry pursuant to section 1 of Proclamation 10773.

STB_AR1_000210

JA547

4

NOW, THEREFORE, I, JOSEPH R. BIDEN JR., President of the United States, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (8 U.S.C. 1182(f) and 1185(a)) and section 301 of title 3, United States Code, hereby find that, absent the measures set forth in Proclamation 10773, as amended by this proclamation, the entry into the United States of persons described in section 1 of Proclamation 10773 under circumstances described in section 2 of Proclamation 10773, as amended by this proclamation, would be detrimental to the interests of the United States, and that the entry of such persons should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

Section 1.  Amendment to Section 2(a) of Proclamation 10773.  Section 2(a) of Proclamation 10773 is amended to read as follows:

"The Secretary of Homeland Security shall monitor the number of daily encounters and, subject to subsection (b) of this section, the suspension and limitation on entry pursuant to section 1 of this proclamation shall be discontinued at 12:01 a.m. eastern time on the date that is 14 calendar days after the Secretary makes a factual determination that there have been 28 consecutive calendar days of a 7-consecutive-calendar-day average of less than 1,500 encounters, not including encounters described in subsection 4(a)(iii) of this proclamation."

Sec. 2.  Revocation of Section 2(c) of Proclamation 10773. Section 2(c) of Proclamation 10773 is revoked.

Sec. 3.  Severability.  It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States.

STB_AR1_000211

JA548

5

Accordingly, if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its provisions to any other persons or circumstances shall not be affected thereby.

Sec. 4. Effectiveness. The amendments described in sections 1 and 2 of this proclamation shall be effective if and when there is in effect a final rule promulgated by the Secretary of Homeland Security and the Attorney General that amends the IFR entitled Securing the Border, 89 Fed. Reg. 48,710 (June 7, 2024), consistent with the amendments described in sections 1 and 2 of this proclamation. If, due to court order, the final rule described in the prior sentence cannot be enforced insofar as it makes changes consistent with the amendment described in section 1 of this proclamation, then the amendment described in section 1 of this proclamation will no longer be in effect and section 2(a) of Proclamation 10773 shall continue to apply by its terms. If, due to court order, the final rule described in the first sentence of this section cannot be enforced insofar as it makes changes consistent with the amendment described in section 2 of this proclamation, then the amendment described in section 2 of this proclamation will no longer be in effect and section 2(c) of Proclamation 10773 shall continue to apply by its terms.

Sec. 5. General Provisions. (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

> (i)   the authority granted by law to an executive
>
> department or agency, or the head thereof; or
>
> (ii)  the functions of the Director of the Office of
>
> Management and Budget relating to budgetary,
>
> administrative, or legislative proposals.

STB_AR1_000212

JA549

6

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this twenty-seventh day of September, in the year of our Lord two thousand twenty-four, and of the Independence of the United States of America the two hundred and forty-ninth.

STB_AR1_000213

JA550



**Securing the Border IFR and Presidential Proclamation CBP Manifesting Fear Guidance**

Upon suspension of and limitation on entry during emergency border circumstances under the Presidential Proclamation, *Securing the Border*, pursuant to the Interim Final Rule, *Securing the Border,* 8 C.F.R. § 235.15, a noncitizen who enters across the southern border, who is not described in the exceptions to the Proclamation, and who is placed in expedited removal will be referred for a credible fear interview only if the noncitizen manifests a fear of return or expresses an intention to apply for asylum or related protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal. Such a noncitizen in expedited removal must manifest fear or express a fear or intention to apply for asylum or related protection. This fear is not prompted by CBP questioning regarding whether the noncitizen has a fear of persecution or torture. A noncitizen can manifest fear or an intention to apply for asylum or related protection *at any time in custody.*

A fear can be manifested in many different ways, including verbally, non-verbally, or physically. In determining whether a noncitizen manifests fear, the following verbal, non-verbal, and physical indicators can be indicative of fear of persecution or torture, though this is not an exhaustive list:

- Statements of fear
  - For example, statements of fear may include, but are not limited to, the following;
    - I am afraid to go to [country]
    - I don't want to go to [country] because I [or my family] will be harmed
    - [Individual or group] will hurt me [or my family]
    - I am afraid of [country's government or governing group]
- Statements that the noncitizen was previously harmed in their home country or country of removal
- Statements that, if traveling in a family unit or family group, the noncitizen's family member was previously harmed in home country or proposed country of removal
- Evidence of physical injury consistent with abuse (e.g., bruises, scars, etc.)
- Evidence of self-harm
- Non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence

If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or related protection, then CBP officers and agents should refer the matter to a supervisor.  Note that a noncitizen can only express or manifest fear for themselves or members of their family unit, not on behalf of noncitizens outside their family unit.  For instance, a single adult traveling in a large group of unrelated individuals may only express or manifest fear on their own behalf.  They may not express or manifest a fear for the entire group of individuals.

STB_AR1_000502

JA552

If a member of a family unit manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country of removal, CBP officers and agents will process the rest of the family unit with the family member who expressed or manifested fear or expressed an intention to apply for asylum or related protection.

If CBP determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country of removal, the agent/officer will refer the noncitizen to USCIS for further screening.

STB_AR1_000503

JA553

## IF YOU:

- Are hungry or thirsty,
- Need medical care,
- Fear persecution or torture if removed from the United States,
- Have been a victim of abuse,
- Have been a victim of a sexual assault,
- Have witnessed a crime,

**Tell an Officer. Your claim will be heard.**

**You may be referred to a medical professional, an asylum officer or other law enforcement professional.**

## SI USTED

- Tiene hambre o sed,
- Necesita atención medica,
- Teme persecución o tortura si se lo expulsa de los Estados Unidos,
- Ha sido víctima de abuso,
- Ha sido víctima de asalto sexual,
- Ha sido testigo de un crimen,

**Avisar a un agente de la Patrulla Fronteriza Dígaselo a un oficial. Su reclamo será escuchado. Usted podría ser referida a un profesional médico, o un oficial de asilo u otro funcionario del gobierno.**

## 如果你

- 饿了或渴了 / 餓了或渴了
- 需要医疗护理 / 需要醫療護理
- 担心如果被驱逐出美国会受到迫害或酷刑 / 擔心如果被驅逐出美國會受到迫害或酷刑迫害或者遭受酷刑
- 曾经被是虐待的受害者 / 曾是被虐待的受害者
- 曾经是被性侵犯的受害者 / 曾是被性侵害的受害者
- 曾目睹过犯罪行为 / 曾目睹過犯罪行為

**告诉一位官员。您的申诉将会被听取 / 告訴一名官員。您的申诉將會被聽取 / 您可能会被转介给医疗专业人员、庇护官员或其他执法专业人员。/ 您可能會被轉介給醫療專業人員、庇護官員或其他執法專業人員**

## यदि आप

- क्या आप भूखे या प्यासे हैं
- चिकित्सा देखभाल की आवश्यकता है
- संयुक्त राज्य अमेरिका से हटाए जाने पर उत्पीड़न या यातना का डर
- दुर्व्यवहार के शिकार हो
- यौन उत्पीड़न के शिकार हो
- किसी अपराध के गवाह हो

**किसी अधिकारी को बताइए। आपकी बात सुनी जाएगी।**

**आपको किसी चिकित्सा पेशेवर, शरण अधिकारी या अन्य कानून प्रवर्तन पेशेवर के पास भेजा जा सकता है।**

STB_AR1_001381

JA554



*Office of the Director*

**U.S. Department of Homeland Security**
500 12th Street, SW
Washington, DC 20536

June 4, 2024

MEMORANDUM FOR:     Daniel A. Bible
                    Executive Associate Director
                    Enforcement and Removal Operations

FROM:               Patrick J. Lechleitner    PATRICK J    Digitally signed by
                    Deputy Director and        LECHLEITNER  PATRICK J LECHLEITNER
                                                            Date: 2024.06.04 12:09:06
                    Senior Official Performing the Duties of the Director  -04'00'

SUBJECT:            Implementation Guidance for Noncitizens Described in
                    Presidential Proclamation of June 3, 2024, *Securing the Border*,
                    and Interim Final Rule, *Securing the Border*

The President issued Presidential Proclamation of June 3, 2024, *Securing the Border*. Subsequently, the Secretary issued a memorandum directing relevant components to take all appropriate actions to implement the Proclamation. In addition, the Secretary and the Attorney General issued an Interim Final Rule (IFR), *Securing the Border*, establishing certain limitations on asylum eligibility and revising certain standards and procedures associated with the expedited removal process. These documents go into effect at 12:01 a.m. Eastern Daylight Time on June 5, 2024.

The IFR makes key changes to asylum processing that will be in place whenever encounters are at levels that impede DHS' ability to apply timely decisions and consequences to the majority of noncitizens encountered at the southern border, as described in the Proclamation. These changes include: deeming certain noncitizens who enter across the southern border during circumstances of high encounters at the border to be ineligible for asylum, with limited exceptions; applying a manifestation of fear requirement for those processed for expedited removal to be referred to USCIS for a credible fear interview; and creating a new, higher screening standard when screening for statutory withholding of removal and protection under Article 3 of the Convention Against Torture.

The IFR is intended to significantly increase the consequences in place for noncitizens who cross irregularly—including those who cross unlawfully between ports-of-entry (POEs)— and to maximize our ability to remove noncitizens who do not establish a legal basis to remain in the United States as quickly as possible. The ultimate goal of these measures is to decrease encounter rates at the southern border.

STB_AR1_001418

JA555

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 2 of 5

The Proclamation's suspension and limitation on entry and the IFR both rely on factual findings about average daily encounters, and after June 5, 2024, will turn on or off depending on encounter numbers. The measures in the Proclamation and the rule apply until 14 calendar days after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of less than 1,500 encounters between POEs. The measures continue or reactivate on the calendar day after the Secretary makes a factual determination that there has been a 7-consecutive-calendar-day average of 2,500 encounters or more between POEs.

During a period where the Presidential Proclamation's suspension and limitation on entry applies, the entry of noncitizens across the southern border is suspended and limited, unless an exception applies. For purposes of the Presidential Proclamation, "southern border" refers to:

- The southwest land border, defined as the entirety of the U.S. land border with Mexico; and
- The southern coastal border, defined as all maritime borders in Texas, Louisiana, Mississippi, Alabama, and Florida, and all maritime borders proximate to the southwest land border, the Gulf of Mexico, and the southern Pacific coast in California, as well as the coasts of the U.S. Virgin Islands and Puerto Rico.

The Presidential Proclamation does not apply to U.S. citizens. Moreover, it is not applicable to any of the following:

- U.S. noncitizen nationals;
- Lawful permanent residents (LPRs);
- Unaccompanied children (UCs);
- Noncitizens who are determined to be victims of severe forms of trafficking;
- Noncitizens who have sufficient documents to seek entry or admission into the United States, including visa holders, members of the armed forces, visa waiver program travelers, or those holding advance parole documents;
- Individuals arriving at a POE with a CBP One appointment, which the Secretary has determined is a safe and orderly process to arrive at a POE;
- Noncitizens who a U.S. Customs and Border Protection (CBP) officer permits to enter, based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, urgent humanitarian, and public health interests that warrant permitting the noncitizen to enter; and
- Noncitizens who a CBP officer permits to enter due to operational considerations that warrant permitting the noncitizen to enter.

In general, noncitizens encountered by CBP between POEs on the southern border are subject to the Presidential Proclamation, though it is not applicable to excepted categories of noncitizens such as LPRs, UCs, and other excepted categories of noncitizens.

Additionally, the IFR implements a limitation on asylum eligibility for any noncitizen, with limited exceptions, who enters the United States across the southern border during a period in which the suspension and limitation on entry applies, as described in the Presidential

STB_AR1_001419

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 3 of 5

Proclamation, and makes a number of changes to the credible fear process as applied to such individuals.

Specifically, CBP will not question a noncitizen described in the Presidential Proclamation and processed for expedited removal regarding his or her fear of return, but will refer the impacted noncitizen for a credible fear interview before U.S. Citizenship and Immigration Services (USCIS) only if the noncitizen manifests a fear of return, or expresses an intention to apply for asylum or protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or the country of removal.

Those who enter the United States across the southern border while the suspension and limitation described in the Presidential Proclamation is in effect will be ineligible for asylum unless they demonstrate to USCIS or EOIR that certain exceptionally compelling circumstances exist, including if the noncitizen demonstrates that they or a member of their family with whom they are traveling:

> (1) faced an acute medical emergency;
> (2) faced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or
> (3) satisfied the definition of "victim of a severe form of trafficking in persons" provided in 8 C.F.R. § 214.11.

ERO officers will not determine whether noncitizens are subject to an exception to the limitation on asylum eligibility, however, officers will assist partner agencies, such as USCIS, in their assessment of whether the rule applies or if a noncitizen is subject to an exception, by documenting any information affirmatively stated by the noncitizen that may be relevant to the consideration of the above factors.

ERO officers will continue to follow all other applicable legal obligations and DHS and ICE policies and procedures, including complying with the *Orantes* Injunction,[1] the *Flores* Settlement Agreement,[2] and the *Ms. L. v. ICE* Settlement Agreement.[3]

## Guidance on Noncitizens Manifesting Fear

Upon suspension of and limitation on entry during certain periods of high encounters under the Presidential Proclamation of June 3, 2024, *Securing the Border*, pursuant to the *Securing the Border* IFR, 8 C.F.R. § 235.15, a noncitizen who enters across the southern border, who is not described in the exceptions to the Presidential Proclamation and who is placed in expedited removal will be referred for a credible fear interview only if the noncitizen manifests a fear of return or expresses an intention to apply for asylum or related protection, expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of

---

[1] *Orantes-Hernandez v. Gonzales*, No. 82-01107 (C.D. Cal. Nov. 26, 2007) (Modified, Consolidated Injunction).

[2] *Flores v. Reno*, No. 85-4544 (C.D. Cal. Jan. 17, 1997) (Stipulated Settlement Agreement).

[3] *Ms. L. v. ICE*, No. 18-428 (S.D. Cal. Dec. 11, 2023) (Settlement Agreement).

STB_AR1_001420

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 4 of 5

removal. Such a noncitizen in expedited removal must manifest fear, or express a fear or intention to apply for asylum or related protection. This fear is not prompted by CBP or ICE questioning regarding whether the noncitizen has a fear of persecution or torture. A noncitizen can manifest fear or an intention to apply for asylum or related protection *at any time in custody*.

There may be cases in which a noncitizen manifests a fear of return after the expedited removal order is issued and the noncitizen is transferred to ERO custody. ICE has long recognized that a fear or intention to apply for asylum or related protection can be manifested in many different ways. Indeed, a fear may be manifested verbally, non-verbally, or physically. In determining whether a noncitizen manifests fear, the following verbal, non-verbal, and physical indicators can be indicative of fear of persecution or torture, though this is not an exhaustive list:

- Statements of fear
  - For example, statements may include, but are not limited to, the following;
    - I am afraid to go to [country]
    - I don't want to go to [ country] because I [or my family traveling with me or my family in my home country] will be harmed
    - Individual or group] will hurt me [or my family]
    - I am afraid of [country's government or governing group]
- Statements that the noncitizen was previously harmed in their home country or country of removal
- Statements that, if traveling in a family unit or family group, the noncitizen's family member was previously harmed in home country or proposed country of removal
- Evidence of physical injury consistent with abuse (e.g., bruises, scars)
- Evidence of self-harm
- Non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence.

If doubt or ambiguity exists as to whether a noncitizen's statement, actions, or behavior constitute a manifestation of fear, expression of fear, or expression of an intent to seek asylum or protection, then ERO officers should refer the matter to a supervisor.

If ERO determines that a noncitizen subject to expedited removal manifests a fear of return or expresses an intention to apply for asylum or related protection, or expresses a fear of persecution or torture, or expresses a fear of return to his or her country or designated country of removal, the officer will provide the noncitizen with the Information About Credible Fear Interview Sheet and refer the noncitizen to USCIS for a credible fear interview. Noncitizens who have been referred to USCIS for a credible fear interview shall be afforded a consultation period of a minimum of 4 hours that must occur between 7 a.m. and 7 p.m. local time prior to a credible fear interview. The 4 hour consultation period begins when ICE provides the individual with an opportunity to consult, i.e., when the noncitizen is provided access to a phone. The ERO officer makes no qualitative determination of any claim of fear.

STB_AR1_001421

Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*, and Interim Final Rule, *Securing the Border*
Page 5 of 5

## Signage and Video Guidelines for Noncitizens Described in the Presidential Proclamation

ERO must take the following measures in ICE facilities in which noncitizens subject to the Presidential Proclamation and/or the IFR are housed to ensure that noncitizens who may wish to seek asylum or other protection in the United States are aware of their ability to claim a fear of return or an intention to seek asylum or related protection.

- Post signs in the following areas in detention facilities:
    - Intake/In-processing areas, including hold rooms
    - Medical Units
    - Housing units – including special/restricted housing units
    - Dining Areas
    - Law Libraries

The language on these signs will be provided by ICE headquarters and read:

> If you
> Are hungry or thirsty,
> Need medical care,
> Fear persecution or torture if removed from the United States,
> Have been a victim of abuse,
> Have been a victim of a sexual assault,
> Have witnessed a crime,
> Tell an Officer. Your claim will be heard.
> You may be referred to a medical professional, an asylum officer, or other law enforcement professional.

These signs must be posted in English and Spanish. ERO will have additional translations available in facility law libraries in the following languages: Arabic, Bengali, French, Haitian Creole, Hindi, K'iche' (Quiché)/Kxlantzij, Portuguese, Punjabi, Romanian, Russian, Simplified Chinese, Turkish, and Vietnamese.

Moreover, in any location where it is possible to show to noncitizens a video, the video provided explaining to noncitizens that they should raise these concerns should be played on a loop. It may be played in conjunction with other videos but should be shown no fewer than once every two hours from 7:00 a.m. until 7:00 p.m. on a daily basis.

Specifically, the videos must be played in in-processing areas.

## Disclaimer

This guidance does not, is not intended to, and may not be construed to create or modify any right or benefit, substantive or procedural, enforceable at law by any party against the United States, its agencies, its officers, or any person.



Average Daily **USBP** Encounters and Processing Rates and DHS Repatriations by Time Period and Selected Citizenship

| | Mexico | | | | OTM | | | | Total | | | | % change from pre-pandemic | % change from pandemic | % change from immediate post pandemic |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-Pandemic Period | Pandemic Period | Immediate post-pandemic | IFR Period | Pre-Pandemic Period | Pandemic Period | Immediate post-pandemic | IFR Period | Pre-Pandemic Period | Pandemic Period | Immediate post-pandemic | IFR Period | | | |
| Total Southern Border encounters | 482 | 1,669 | 1,466 | 863 | 793 | 3,071 | 3,661 | 1,224 | 1,275 | 4,741 | 5,127 | 2,088 | 64% | -56% | -59% |
| Coastal Sectors | 2 | 1 | 1 | 2 | 8 | 13 | 7 | 9 | 10 | 13 | 8 | 10 | -1% | -25% | 31% |
| Southwest Border | 479 | 1,669 | 1,465 | 862 | 786 | 3,059 | 3,654 | 1,215 | 1,265 | 4,728 | 5,119 | 2,077 | 64% | -56% | -59% |
| SA | 438 | 1,529 | 834 | 546 | 290 | 1,758 | 1,936 | 712 | 728 | 3,287 | 2,770 | 1,259 | 73% | -62% | -55% |
| FM | 10 | 75 | 551 | 251 | 374 | 1,026 | 1,478 | 365 | 384 | 1,101 | 2,029 | 617 | 61% | -44% | -70% |
| UC | 31 | 65 | 80 | 64 | 122 | 275 | 240 | 138 | 153 | 340 | 320 | 202 | 32% | -41% | -37% |
| T8 Dispositions (FM and SA only; Title 8 only) | | | | | | | | | | | | | | | |
| VR | 6% | 15% | 40% | 4% | 0% | 0% | 1% | 0% | 2% | 1% | 12% | 2% | 0% | 100% | -83% |
| Reinstatement | 43% | 30% | 9% | 24% | 15% | 1% | 3% | 6% | 26% | 3% | 4% | 14% | -46% | 367% | 250% |
| ER | 47% | 24% | 12% | 62% | 38% | 12% | 20% | 56% | 41% | 13% | 18% | 59% | 44% | 354% | 228% |
| NTA | 3% | 18% | 39% | 8% | 47% | 47% | 76% | 37% | 29% | 45% | 66% | 25% | -14% | -44% | -62% |
| Other | 2% | 13% | 0% | 1% | 1% | 40% | 0% | 1% | 1% | 38% | 0% | 1% | 0% | -97% | |
| ER Processing | | | | | | | | | | | | | | | |
| % claiming fear | 1% | 4% | 33% | 8% | 61% | 66% | 63% | 43% | 37% | 59% | 57% | 27% | -27% | -54% | -53% |
| USCIS screen-in rate | 41% | 45% | 42% | 42% | 76% | 61% | 49% | 53% | 76% | 61% | 54% | 51% | -33% | -16% | -6% |
| Comprehensive screen-in rate | 45% | 55% | 51% | 47% | 83% | 73% | 64% | 58% | 83% | 73% | 62% | 57% | -31% | -22% | -8% |
| ERCF Processing timelines (Median days) | | | | | | | | | | | | | | | |
| Encounter to Referral | 14 | 11 | 4 | 2 | 13 | 11 | 6 | 12 | 13 | 11 | 5 | 10 | -23% | -9% | 100% |
| Referral to Result | 8 | 19 | 12 | 3 | 8 | 17 | 12 | 6 | 8 | 17 | 12 | 5 | -38% | -71% | -58% |
| Encounter to Removal: no fear | 1 | 1 | 1 | 2 | 11 | 10 | 7 | 8 | 1 | 1 | 5 | 6 | 500% | 500% | 20% |
| Enounter to Removal: negative fear | 53 | 65 | 25 | 10 | 75 | 74 | 46 | 37 | 75 | 74 | 44 | 32 | -57% | -57% | -27% |
| CBP Bookouts (include T42) | | | | | | | | | | | | | | | |
| Repatriation | 89% | 97% | 53% | 68% | 3% | 36% | 2% | 4% | 37% | 58% | 16% | 32% | -15% | -45% | 94% |
| Release | 1% | 1% | 37% | 12% | 17% | 46% | 75% | 46% | 10% | 30% | 64% | 31% | 200% | 4% | -52% |
| TOT ERO | 9% | 3% | 11% | 13% | 80% | 17% | 23% | 47% | 52% | 12% | 19% | 33% | -36% | 176% | 71% |
| Other | 1% | 0% | 0% | 6% | 0% | 0% | 0% | 3% | 1% | 0% | 0% | 4% | 585% | 2172% | |
| DHS Repatriations (excludes admin returns; includes T42) | 730 | 1,816 | 1,032 | 901 | 438 | 1,251 | 1,009 | 980 | 1,168 | 3,067 | 2,041 | 1,881 | 61% | -39% | -8% |
| Total Title 8 Repatriations | 730 | 262 | 1,032 | 901 | 438 | 226 | 1,009 | 980 | 1,168 | 488 | 2,041 | 1,881 | 61% | 285% | -8% |
| Total Title 42 | 0 | 1,554 | 0 | 0 | 0 | 1,026 | 0 | 0 | 0 | 2,579 | 0 | 0 | | -100% | |
| DHS SWB repatriations | 556 | 1,721 | 924 | 882 | 223 | 1,051 | 431 | 470 | 780 | 2,772 | 1,355 | 1,352 | 73% | -51% | 0% |
| SWB Title 8 Repatriations | 556 | 169 | 924 | 882 | 223 | 66 | 431 | 470 | 780 | 235 | 1,355 | 1,352 | 73% | 475% | 0% |
| SWB Title 42 Repatriations | 0 | 1,552 | 0 | 0 | 0 | 985 | 0 | 0 | 0 | 2,537 | 0 | 0 | | -100% | |
| OTMs to Mexico | 0 | 0 | 0 | 0 | 3 | 554 | 37 | 50 | 3 | 554 | 37 | 50 | 1567% | -91% | 35% |
| OTMs to home countries | 0 | 0 | 0 | 0 | 220 | 63 | 394 | 421 | 220 | 63 | 394 | 421 | 91% | 568% | 7% |
| OTMs T42 delayed expulsion - unknown country | 0 | 0 | 0 | 0 | 0 | 434 | 0 | 0 | 0 | 434 | 0 | 0 | | | |

| | Pre-Pandemic | CLP Period | STB Period |
|---|---|---|---|
| % of encounters placed in ER | 41% | 18% | 59% |
| % claiming/manifesting fear | 37% | 57% | 27% |
| USCIS screen-in rate | 76% | 54% | 51% |
| Comprehensive screen-in rate | 83% | 62% | 57% |

| ERCF Processing timelines | Pre-Pandemic | CLP Period | STB Period |
|---|---|---|---|
| Encounter to Referral | 13 | 5 | 10 |
| Referral to Result | 8 | 12 | 5 |
| Encounter to Removal: no fear | 1 | 5 | 6 |
| Encounter to Removal: negative f | 75 | 44 | 32 |

Notes: Average daily encounters data are for all USBP encounters in SW border and adjacent coastal sectors; dispositions, ER processing, processing timelines, CBP bookouts, and SWB repatriations data are limited to SWB USBP encounters of single adults and family units. DHS repatriations include nationwide repatriations, excluding administrative returns. SWB Repatriations refers to repatriations resulting from SWB encounters. Pandemic period dispositions data are limited to Title 8 encounters but bookouts data and repatriations include Title 42 expulsions within the count of repatriations. Pre-pandemic period refers to FY 2014 - FY 2019; Pandemic period refers to March 20, 2020 to May 11, 2023; immediate post-pandemic period refers to May 12, 2023 - June 4, 2024; IFR Period refers to June 5 - August 31, 2024.

Source: All data for pre-pandemic period, pandemic period, and immediate post-pandemic period are based on OHSS analysis of July 2024 OHSS Persist dataset except for ER Processing data (rows 16-24), which are from OHSS analysis of OHSS Enforcement Lifecycle dataset as of June 30, 2024. All data for IFR period are OHSS analysis of data downloaded from UIP on Sept. 3, 2024.

STB_AR1_001492



# Mexico 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Mexico during the year.

Significant human rights issues included credible reports of:  unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression;  serious government corruption; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, child, early, and forced marriage, femicide, and other forms of such violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities;  and significant or systematic restrictions on workers' freedom of association, including crimes of violence and intimidation against workers.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
JA563

STB_AR1_003183

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
https:www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provided for freedom of internal movement, foreign travel,
emigration, and repatriation, and the government generally respected these
rights.

**In-country Movement:**  There were numerous instances of armed groups
limiting the movements of migrants, including by threats and acts of
kidnapping, extortion, and homicide.  Criminal groups dominated migrant
smuggling operations and often kidnapped, threatened, and extorted
migrants to pay a fee for facilitating northbound travel.  On August 17,
international organizations in Ciudad Juárez reported an increase in
extortion and kidnappings by smugglers.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner
for Refugees (UNHCR) and other humanitarian organizations in providing
protection and assistance to refugees, asylum seekers, and other persons of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
JA564

STB_AR1_003207



10/15/24, 2:14 PM
CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States - Amnesty International

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 812 of 1203

Which language would you like to use this site in?     CLOSE

ENGLISH          ESPAÑOL          FRANÇAIS          العربية



Photo © Gary Coronado / Los Angeles Times via Getty Images

May 9, 2024

# CBP One Mobile Application Violates the Rights of People Seeking Asylum in the United States

The mandatory use of the CBP One mobile application as the sole means of seeking asylum in the United States is a clear violation of international human rights and refugee law, said Amnesty International in a new report published today.

STB_AR1_004406

JA566

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 813 of 1203

The report, _USA: CBP One – A blessing or a trap?_, documents the human rights concerns associated with the mobile app and sheds light on the implications of the Circumvention of Lawful Pathways Final Rule, more commonly known as the Asylum Ban, introduced by the Biden Administration on 11 May 2023.

The Asylum Ban imposes severe restrictions on asylum seekers entering the United States from Mexico at the southern border, denying human rights and violating international law. Amnesty International considers that the Final Rule violates the right to seek asylum, as well as the principles of _non-refoulement_ and non-penalization. Under this rule, individuals are required to use the CBP One application to schedule appointments at ports of entry in order to be considered eligible for asylum, adding layers of complexity and obstacles to an already challenging process.

"The use of the CBP One application conditions entry and access to asylum on appearing at a port of entry with a prior appointment, which is not feasible for some people," said Ana Piquer, Americas director at Amnesty International. "While technological innovations could potentially provide for safe transit and more orderly border processes, programmes like CBP One cannot condition and limit the manner to seek international protection in the United States."

# "

# The use of the CBP One application conditions entry and access to asylum on appearing at a port of entry with a prior appointment, which is not feasible for some people.

### Ana Piquer, Americas Director at Amnesty International

Amnesty International's report documents the significant hurdles faced by asylum seekers in using the CBP One application, including technological barriers, language and literacy limitations, misinformation and the arbitrary nature of appointment allocation. The CBP One application, available only in English,

STB_AR1_004407

JA567

Case 1:24-cv-01702-RC   Document 69   Filed 01/10/25   Page 814 of 1203

Spanish, and Haitian Creole, operates on a system where daily appointments are mainly distributed at random, leading to inconsistent experiences among asylum seekers, leaving them in uncertainty and at risk.

"The CBP One application turns the legal right to asylum into a lottery system based on chance." said Paul O'Brien, Executive Director of Amnesty International USA. "Asylum seekers may never be provided with safety and protection in the United States simply because they may never receive an appointment."  Moreover, the application's mandatory use of facial recognition and GPS tracking raises serious concerns about privacy, surveillance, and potential discrimination, further complicating the asylum-seeking process. An analysis of the CBP One application by Amnesty International's Security Lab found that device information and identifiers are sent to Google's Firebase service, functionality that is not disclosed to users.

## "
# The CBP One application turns the legal right to asylum into a lottery system based on chance.
### Paul O'Brien, Executive Director of Amnesty International USA

The report also outlines the dire situation faced by those seeking asylum waiting in Mexico for CBP One appointments. According to the findings, Mexico has become increasingly dangerous for people seeking asylum who are often extorted, kidnapped and experience discrimination and sexual and gender-based violence by both state and non-state actors.

In one testimony to Amnesty International, a Venezuelan woman seeking asylum in the United States described the harsh conditions of waiting in Mexico until her appointment:

"We were kidnapped for three days and then released. We were blindfolded and they beat us several times. We were taken off the buses several times and were forced to pay. We were sold tickets at double the price. So many things happened.

STB_AR1_004408

JA568

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 815 of 1203

to us that make you want to cry. If we don't get the appointment quickly, we'll throw ourselves into the river."

## "
# We were kidnapped for three days and then released. We were blindfolded and they beat us several times.

### Venezuelan woman seeking asylum in the United States

In another testimony to Amnesty International, a Mexican woman seeking asylum waited months for her appointment to arrive:

"I've been trying to get the appointment for three months. I thought that the appointments were going in order. It's maddening. I'm distraught with the situation. Someone tried to kill me. I don't want to leave my Mexico, but I can't stay."

## "
# It's maddening. I'm distraught with the situation. Someone tried to kill me.

### Mexican woman seeking asylum in the United States

"The situation faced by asylum seekers in Mexico is severe, with many experiencing violence and discrimination on a daily basis," said Edith Olivares Ferreto, Executive Director of Amnesty International Mexico. "Forced to wait in limbo for undetermined amounts of time, people seeking safety are left vulnerable to further harm and violations of their rights."

"
JA569

STB_AR1_004409

# Forced to wait in limbo for undetermined amounts of time, people seeking safety are left vulnerable to further harm and violations of their rights.

### Edith Olivares Ferreto, Executive Director of Amnesty International Mexico.

With increasing wait times and uncertainty about appointment allocation, many asylum seekers are forced to make perilous decisions to cross into the United States without appointments, putting their lives at risk and potentially being ineligible for asylum because of the Asylum Ban.

"The United States has a moral and legal obligation to protect all people who seek safety in our country," said Amy Fischer, Director for Refugee and Migrant Rights at Amnesty International USA. "The Biden administration cannot continue down this path and must live up to our country's promise as a welcoming nation for all."

## "

# The United States has a moral and legal obligation to protect all people who seek safety in our country.

### Amy Fischer, Director for Refugee and Migrant Rights at Amnesty International USA

Amnesty International calls on the United States to immediately cease implementation of its Asylum Ban and stop the mandatory use of the CBP One application, both of which are violations of international human rights law and refugee law. The United States must ensure access to fair and individualized asylum procedures without discrimination based on migration status.

Amnesty International urges the Mexican government to protect the rights of asylum seekers in transit, including ensuring access to US ports of entry and implementing measures to address violence and discrimination against asylum seekers within its borders.

STB_AR1_004410

JA570



Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 819 of 1203



ABOUT US   PROGRAMS   ANALYSIS   THEMES   NEWS   GET INVOLVED   **DONATE**



**4 APR 2024 | PUBLICATION**

Photo: Sergio Borbolla

# Kidnapping of Migrants and Asylum Seekers at the Texas-Tamaulipas Border Reaches Intolerable Levels

by **Ana Lucia Verduzco** and **Stephanie Brewer**

*Content warning: This feature discusses sensitive topics including sexual violence and other forms of abuse.*

"Kidnappings were always known, but they were not as normal as they are now," a religious worker told us about the migrant population they work with. "They're dragging people out of their tents at night, they're taking entire families," added the director of a humanitarian group. "Every woman we work with has been raped,"

SHARE   TWEET

**SIGN UP TO GET THE LATEST ON ANALYSIS & POLICY**



STB_AR1_004413

JA572

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 820 of 1203



ABOUT US     PROGRAMS     ANALYSIS     THEMES     NEWS     GET INVOLVED     DONATE

Asylum seekers can either:

1. Secure an appointment at a port of entry using the CBP One smartphone app, with all the accompanying technological hurdles. This requires being in Mexico City or farther north, where they will wait for up to six months for an appointment at the border.

2. Approach a port of entry to ask for asylum as one of a few daily "walkups", if they are able to get past Mexican immigration authorities

3. Attempt to cross between ports of entry, which in the case of Tamaulipas requires getting across the river and organized crime's paid permission, and turn themselves in to Border Patrol, a method that is a misdemeanor under U.S. law and may limit their ability to seek asylum. Despite the risks, many view this as their only choice, especially when fleeing imminent threats.

Asylum seekers with CBP One appointments in Tamaulipas face obvious dangers of kidnapping and violence if waiting near the border. For this reason, many choose to wait further south in Mexico, in cities such as Mexico City, the southernmost city where the app works, where the risks are fewer, traveling to the border region a day or two before their appointments. We were told this strategy frequently fails, however, because organized crime—often operating with the knowledge or collusion of authorities and transportation drivers—is waiting at bus stations and airports in Tamaulipas for those with appointments.

People often miss their appointments with U.S authorities due to being kidnapped in Mexico; it is unlikely a coincidence that the "no-show" rate in Nuevo Laredo is especially high: a migration researcher informed us that roughly 65% make their appointments. Those who miss appointments are out of luck: barring exceptional intervention by authorities, CBP One forces the asylum seeker to restart the entire, months-long process of requesting an appointment. This ends up being another incentive to cross the river and surrender to Border Patrol instead.

### U.S. OFFICIALS KNOW THIS IS HAPPENING—BUT NOTHING CHANGES

Organized crime is known to adapt its business strategies according to changes in U.S. migration policies: the rule is that border restrictions lead to violence and profitability for criminal groups, since the migrant smuggling and kidnapping industries become more lucrative. This was more than apparent in the high levels of attacks on migrants under the U.S' Title 42 and "Remain in Mexico"

**STB_AR1_004419**

**JA573**



**ABOUT US**    **PROGRAMS**    **ANALYSIS**    **THEMES**    **NEWS**    **GET INVOLVED**    **DONATE**

of extortion without kidnapping using brutal violence and intimidation tactics.

The dangers of travel through Tamaulipas are no secret. Yet the state's ports of entry concentrate 43 percent of the daily appointments that CBP offers border-wide (630 out of 1,450). Since Laredo is the border's busiest port, and McAllen and Brownsville are commercially important, CBP concentrates more personnel and infrastructure in these areas. CBP's reluctance to move assets elsewhere to respond to asylum needs helps perpetuate the crisis.

Tamaulipas is also consistently the highest or second-highest Mexican border state where Mexican migrants from the U.S. interior are sent when deported by Immigration and Customs Enforcement (ICE). In January 2024, the agency deported over 3,600 people into the state—over 100 per day, a concerning practice WOLA has been denouncing for over a decade. ICE often deports Mexican citizens into Tamaulipas because it is the closest segment of the border to the eastern United States, where the agency is constantly arresting migrants.

CBP officers and management know that Tamaulipas is notorious for kidnapping, rape, and brutal assaults of migrants, and that kidnappers are often brazenly waiting within a few hundred yards of the border bridges. Yet service providers have not seen the agency adjust its policies or practices to avoid these harms.

## Conclusion: "No one deserves this"

*Quote from a migration researcher.*

The targeting of migrants in Mexico's northern cities is not a new phenomenon. Human rights organizations including WOLA have been seeking to address it for many years , starting well before policies like "Remain in Mexico" existed. In Tamaulipas, the brutality and frequency of abuse are especially intolerable and growing fast, which demands action from both the U.S. and Mexican governments.

Current U.S.-Mexico border policies that severely limit access to ports of entry, force asylum seekers to wait many months in Mexico, and expel migrants into high-danger border cities like those surveyed here don't just overlook the systematic victimization of migrants by organized crime: they facilitate it. If restricting the right to seek asylum is already intolerable when thousands of families and individuals are fleeing for their lives, it is even more unacceptable in

JA574

STB_AR1_004420

**CGRS** | **Center for Gender & Refugee Studies**

## "Manifesting" Fear At the Border: Lessons from Title 42 Expulsions

*January 30, 2024*

### Title 42 Expulsion Policy and Legal Challenge

In March 2020, under the pretext of the COVID-19 pandemic, the Trump administration began expelling people seeking asylum at the U.S. southern border pursuant to a policy known as Title 42. The U.S. government carried out the expulsions without screening individuals for fear of persecution or torture, in violation of its obligations under international and domestic law. Before the policy ended in May 2023, over two million expulsions were completed, putting many refugees directly in harm's way.

Advocates brought litigation successfully challenging the policy. But the Biden administration was permitted to continue effectuating expulsions with no screening whatsoever while the litigation wound its way through the appellate process. However, in March 2022, the U.S. Court of Appeals for the D.C. Circuit upheld a lower court ruling prohibiting the government from expelling families to places where they risked harm. Although the court concluded the administration had the authority to expel, it had to do so in compliance with the U.S. obligation of *non-refoulement*, which prohibits the return of refugees to countries where they face persecution or torture.

### Implementation of the Manifestation of Fear Guidance

While Title 42 was in place, the U.S. government could have required that border officers ask individuals apprehended near the border whether they had a fear of persecution or torture in Mexico or any other country of expulsion. If so, they would have been required to refer the individuals for a more complete interview with a trained Asylum Officer. This has in fact been the mandatory process at the border since 1996. Instead, the government adopted a "manifestation of fear" process. Also known as the "shout test," it requires an individual to affirmatively raise their fear of return to receive any sort of screening for protection. The "shout test" was first designed by the United States to repel Haitians intercepted at sea in the 1980s and has operated as intended ever since, to keep refugees out and deny them safe haven.

To comply with the March 2022 order in the Title 42 litigation, U.S. Customs and Border Protection (CBP) issued guidance in May 2022 on the processing of individuals "manifesting a fear" of expulsion. Pursuant to that guidance, as with the "shout test" applied to migrants at sea, border officers were to "consider all available information within the scope of their operations." A manifestation of fear could be either "verbal," such as statements of fear or recounting of previous harms, or "non-verbal," such as "panic attacks" or "an unusual level of silence."

**Subjecting Refugees to the "Shout Test" Flouts U.S. Obligations**

Following issuance of the guidance, the Center for Gender & Refugee Studies (CGRS) and other immigrant rights organizations based at the border monitored implementation of the injunction. From June-October 2022, advocates interviewed at least 97 families expelled to cities along the U.S.-Mexico border, including Ciudad Juárez, Reynosa, and Tijuana, Mexico. Of those interviewed, over half (51 families) reported that they had verbally expressed a fear of return, and nearly three-quarters (73 families) reported having non-verbally expressed a fear. Yet CBP did not refer a single family for a fear screening as required under the guidance. Instead, families disclosed that CBP officers verbally abused them, telling them to "shut up," declaring they had "no right" to an interview, or completely ignoring their attempts to communicate.

The cases below illustrate CBP's failure to follow its own guidance and the inadequacy of a "manifestation of fear" requirement to protect against *refoulement*. Each family feared return, but none received a screening to determine the viability of their protection claims.

- A Salvadoran mother with her seven-year-old child feared return because her brother-in-law, a gang member, had attempted to kill her. When she tried to express her fear, CBP did not allow her to speak before expelling her on June 8, 2022.

- A Honduran mother traveling with her 10-year-old child feared return because she had witnessed gang members killing her neighbor and received threats as a result. She was too afraid to speak because of how CBP officers treated her and other asylum seekers. She was expelled on June 11, 2022.

- A Salvadoran mother fled her home with her seven-year-old daughter after her husband threatened to kill her. As he had followed her when she escaped, she feared he would find her in Mexico. CBP did not allow her to speak before expelling her on June 11, 2022.

- A Honduran father fled with his nine-year-old child after his brother was killed, fearing the same fate. CBP officers did not allow him to speak before expelling him on June 11, 2022.

- A Honduran mother and her four-year-old child were kidnapped and held for 22 days in Mexico, before finally escaping and attempting to seek asylum in the United States. CBP did not permit her to speak before expelling her back to Mexico on August 9, 2022.

- An Indigenous Guatemalan woman traveling with her three-year-old child could not explain her fear. She did not speak Spanish well, and CBP did not provide an interpreter or permit her to speak. She was expelled on September 20, 2022.

These harrowing stories represent just the tip of the iceberg. Experience shows that relying on a "shout test" results in refugees being returned to danger. Any legislative proposal to revive this approach will make a mockery of our international commitments and must be rejected.

**JA576**

STB_AR1_004463

Case 1:24-cv-01702-RC     Document 69     Filed 01/10/25     Page 824 of 1203



**MAY 1, 2024**

# US: Digital Metering System Exposes Migrants to Harm

Asylum Turnbacks Violate Rights and Enrich Criminal Groups
Published in

(Mexico City) – The administrations of US President Joe Biden and Mexican President Andrés Manuel López Obrador are forcing thousands of people seeking asylum in the US to wait for months in Mexico, exposing them to danger, Human Rights Watch said in a report released today.

The 68-page report, "We Couldn't Wait: Digital Metering at the US-Mexico Border," details how the Biden and López Obrador administrations have made a difficult-to-use US government mobile application, CBP One, <u>all but mandatory</u> for people seeking asylum in the United States. The result is de facto "metering," a practice <u>formalized early in the Trump administration</u> that limits the number of asylum seekers processed at ports of entry each day, turning others back to Mexico.



A man seeking asylum in the US uses his phone to access the US Customs and Border Protection CBP One application to request an appointment at a land port of entry to the US, outside a shelter in Ciudad Juarez, Mexico, January 12, 2023.

© 2023 REUTERS/Jose Luis Gonzalez

"The Biden and López Obrador administrations are knowingly exposing migrants to persecution at the hands of cartels that systematically target migrants for kidnapping, extortion, and sexual assault," said Ari Sawyer, US border researcher at Human Rights Watch. "The US and Mexican governments should stop forcing migrants to wait in Mexico and should stop collaborating on rights-abusive immigration policies."

The report is based on interviews with 128 asylum seekers who were able to share information on the experiences of a total of 263 people, including family members and friends with whom they were traveling, as well as interviews with 13 shelter workers, eight migrant service providers, Mexican government officials, and human rights workers. Research was conducted in August and September 2023 in Mexico City, Saltillo,

STB_AR1_004594

JA577

and Piedras Negras, Coahuila; Monterrey, Nuevo Leon; Nuevo Laredo, Tamaulipas; and Eagle Pass, Texas. Because US Customs and Border Protection (CBP) does not provide enough appointments through the app to meet the demand from asylum seekers each day, tens of thousands of people seeking asylum have been compelled to wait in Mexico, often for several months, since the Biden administration introduced a new asylum rule in May 2023.

CBP's nearly exclusive use of the CBP One app to process asylum seekers creates additional barriers to access for those seeking asylum, particularly for certain groups. Many asylum seekers do not have cellphones because they cannot afford them or because criminal actors or government agents in Mexico have stolen their phones. When asylum seekers do have phones, their devices often do not have memory space to support the app, they cannot pay for the data they need to use the app, or they do not have access to Wi-Fi.

In addition, nearly all the asylum seekers Human Rights Watch spoke to described having trouble using or accessing CBP One. For some, the app was particularly difficult to use due to identity factors such as their race, digital literacy, ability to read or write, language, age, LGBT status, or disability.

The Biden asylum rule relies on policies nearly identical to two Trump-era policies—the entry and transit bans —held by federal courts to be illegal. It stipulates that asylum seekers must use CBP One in most cases to access the US asylum system. Asylum seekers who show up at the border without an appointment, who cannot prove they applied for and were denied asylum in another country along their route of transit or certain difficult-to-prove extenuating circumstances, face "enhanced expedited removal" to Mexico or their country of origin without adequate due process.

US and Mexican officials and private security guards hired by the Mexican government stand guard at international bridges and screen asylum seekers for CBP One appointments, turning back those who do not have one. Asylum seekers who face danger if they wait in Mexico often cross over more remote and dangerous areas at the border, where their lives are at risk or where they find their passage blocked by river currents, razor wire, or other barriers.

In just one example in September, Human Rights Watch witnessed a Haitian family attempt for three hours to turn themselves in to US immigration officials near Eagle Pass, Texas, but were impeded by Texas Department of Public Safety boats, river currents, razor wire, and other barriers.

Those who are forced to wait in Mexico also face forced relocation to southern Mexico by Mexican officials; a lack of access to basic services like health care, potable water, and shelter; violence at the hands of criminal groups as well as Mexican immigration authorities, National Guard soldiers, and police; and the possibility of summary deportation.

STB_AR1_004595

JA578

Cartels and corrupt government officials <u>profit from policies</u> that strand non-Mexican migrants in Mexico for long periods of time. <u>Thanks to these policies,</u> cartels have expanded their business model to include the extortion of the US-based family or friends of kidnapped migrants, Human Rights Watch found. Cartels routinely search kidnapped migrants' phones for US numbers and demand ransom payments in US dollars. Cartels in Nuevo Laredo extort asylum seekers who have CBP One appointments, threatening to prevent them from getting to their appointments if they don't pay.

"An app-based appointment system suggests the illusion of order and impartiality, but in reality CBP One puts people in danger and means more profit and power for criminal cartels," Sawyer said. "The United States and Mexico can and should do better."

# Related Content

<u>"We Couldn't Wait"</u> <u>Texas Constructing Massive Anti-Migrant Military Base</u>
Region / Country

- <u>United States</u>
- <u>Immigrants' Rights and Border Policy</u>

Topic

- <u>Refugees and Migrants</u>
- <u>Migrants</u>

---

**Source URL:** *https://www.hrw.org/news/2024/05/01/us-digital-metering-system-exposes-migrants-harm*

STB_AR1_004596

JA579



July 2, 2024

**Human Rights First Comment on the Departments of Justice and Homeland Security's Interim Final Rule, *Securing the Border*, DHS Docket No. USCIS-2024-0006**

Human Rights First submits the following comment in response to the Departments of Justice and Homeland Security's ("the Departments") Interim Final Rule, *Securing the Border* ("Interim Final Rule"), incorporating and providing for the implementation of President Biden's proclamation of the same name ("the Proclamation").[1] Human Rights First requests the Departments publish a notice in the Federal Register withdrawing the Interim Final Rule.

The Interim Final Rule represents an aggressive expansion of the Departments' Circumvention of Lawful Pathways ("CLP Rule") manner of entry bar, with fewer exceptions, higher standards, and a laser focus on keeping the Credible Fear screen-in rate lower (and more politically palatable).[2] As reported by asylum seekers to Human Rights First, U.S. officers have said, "There is no asylum" and that "the border is now closed."

It is nearly identical to a Trump administration interim final rule already found to be unlawful by the federal courts, despite the Departments' strenuous exhortations to the contrary. Formally and functionally, the Interim Final Rule is more restrictive than the Trump administration ban because it eliminates the long-required credible fear referral safeguards, invents a higher standard for screening for withholding of removal and protection under the Convention Against Torture ("CAT") eligibility, and effectively limits access to asylum to those who can access and secure a CBP One appointment and survive in Mexico long enough to present themselves at a port of entry at the appointed time. The Interim Final Rule denies equal access to asylum and is inconsistent with federal law and the United States' treaty obligations.

This politically motivated rulemaking from the Departments betrays the United States' commitments to refugees and the commitments made by the Biden-Harris administration. The Departments must withdraw it, and instead, as Human Rights First has detailed in its recommendation reports, strengthen and improve the asylum system.[3]

---

[1] 89 Fed. Reg. 48,710; Exec. Order No. 10773 of June 3, 2024, 89 Fed. Reg. 48,487 (June 7, 2024).
[2] *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 11, 2023).
[3] Human Rights First, "Upholding and Upgrading Asylum," 17-22 (Oct. 2023), https://humanrightsfirst.org/library/upholding-and-upgrading-asylum.

**STB_AR1_006227**

**JA580**

interviews. Research confirms that when questions are not asked, people who express fear are not referred for credible fear screenings.[62]

Most recently, CBP employed only the Shout Test — rather than the referral questions — for members of family units subject to expulsion under Title 42 in connection with a court order preventing their return to persecution or torture.[63] Recent research by the Center for Gender and Refugee Studies showed the use of the Shout Test or "manifestation" approach resulted in CBP failing to refer people who expressed a fear of return to the fear screening interviews they are due under law.[64] Of 97 families interviewed by advocates and expelled during 2022, DHS failed to refer for a screening any of the 73 families that verbally or non-verbally expressed fear.[65] Instead, CBP officers, "verbally abused them, telling them to 'shut up,' declaring they had 'no right' to an interview, or completely ignoring their attempts to communicate."[66]

Eliminating these crucial referral questions will endanger vulnerable and at-risk asylum seekers including rape survivors, people who do not speak English or Spanish, LGBTQI+ asylum seekers, political dissidents, and victims of trauma or torture. For example, if an asylum seeker from China, Russia, Syria, Sudan, or the Democratic Republic of Congo, expresses in their language that they fear return, a CBP officer would likely not understand that expression of fear. Many asylum seekers speak only Indigenous languages, so their expressions of fear will go unrecognized. The expectation that people must somehow start "shaking, crying," or "fleeing" (while in CBP custody) in order to be identified as an asylum seeker who should be referred for a screening interview is absurd and disingenuous.[67] The Interim Final Rule treats CBP officers as though they are mind readers. The Supplementary Information Section asserts that officers will observe for "unconscious behavior" and "will use their expertise and training to determine whether the noncitizen is manifesting a fear" or instead shaking or engaging in other behavior because they are cold, hungry or tired.[68] Certainly asking three simple questions would be more effective, accurate, and efficient than expecting CBP officers to spend time trying to ascertain what only a mind reader could discern: whether various obvious or unconscious behaviors or statements in a language the officer does not understand constitute manifestations of fear of harm, persecution, and torture.

Moreover, people who have suffered torture, rape, and trauma often have great difficulty raising their fears of return in non-confidential group settings. LGBTQI+ refugees who do not speak English, do not know they can raise, or are hesitant to raise fears of harm that relate to their sexual orientation, gender identity or other persecution would not be properly identified and referred for fear screenings. In addition, as CBP regularly tells people in its custody that they are

---

[62] *See* U.S. Comm'n on Int'l Religious Freedom, Barrier to Protection: Report Highlights 1-2 (2016), https://www.uscirf.gov/sites/default/files/Report%20Highlights.%20CBPs%20Record%20Identifying%20Asylum%20Seekers.pdf.

[63] Mem. from Exec. Dir., Office of Field Operations, Customs and Border Protection, *Processing of Noncitizens Manifesting Fear of Expulsion Under Title 42* (May 21, 2022), https://www.aila.org/library/cbp-issues-guidance-on-processing-of-noncitizens.

[64] Ctr. for Refugee and Gender Studies, "Manifesting" Fear At the Border: Lessons from Title 42 Expulsions (Jan. 30, 2024), https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.

[65] *Id.* at 2.

[66] *Id.*

[67] Interim Final Rule at 48,744.

[68] *Id.*

being deported, some do not even know that they can raise their fears of harm.  A sign or video is entirely inadequate to ensure proper identification of asylum seekers and is no substitute for a few simple questions asked in the person's language.

Indeed, failure to refer under the newly imposed Shout Test is already underway.[69] Human Rights First interviewed Mexican families and adults who were summarily removed to Mexico during the first two weeks of the IFR's implementation and were denied an opportunity to express their fear, describing an intimidating and hostile environment in CBP and Border Patrol custody in which they were not allowed to speak. Some individuals reported to Human Rights First that they expressly requested asylum, a hearing with an immigration judge, and relayed the facts of their asylum claims, including the past persecution they had suffered, as well as others who were visibly sobbing and begging to be heard, but were instead ignored, told "there is no asylum" and "the border is closed." Other families recounted to Human Rights First that not only were they not asked whether they had a fear of return or what motivated their arrival, but they were not allowed to speak.

These Mexican families and adults were denied their statutory right to be referred for a credible fear screening or asylum hearing, and were deported back to potential persecution. Among them were three separate female survivors of gender-based violence, including a Mexican woman who was so violently harmed by her husband that she suffered a miscarriage, and a seven-month-pregnant woman escaping harm and death threats by her partner who explicitly requested asylum to a DHS border officer who replied, "I don't speak good Spanish," before summarily deporting her back to danger.

The Interim Final Rule's elimination of the simple fear questions and advisal is cloaked in the language of efficiency, with the Departments noting that it takes "20 to 30 minutes" to fill out Forms I-867A and I-867B that contain not only the three simple questions crucial to help identify asylum seekers but also some initial explanatory language.[70] The three simple questions and the explanation take only a few minutes to read. Indeed, reading the question as to whether a person has a fear of return takes only seconds. Avoiding the provision of necessary interpretation, which thwarts language access, is entirely improper.

The true purpose of the elimination of these essential questions appears to be a desire to reduce referrals of asylum seekers for Credible Fear Interviews — a goal of the Interim Final Rule that is confirmed repeatedly throughout the preamble. The Departments baselessly claim that the questions are "suggestive and account for part of the high rates of referrals and screen-ins that do not ultimately result in a grant of asylum or protection."[71]  This assertion is belied by the fact that these questions have been included in the expedited removal process since its very inception. Over the years, the United States Commission on International Religious Freedom ("USCIRF") and other researchers have confirmed that these questions are critical to ensuring

---

[69] Emily Bregel, *Migrants Report Overnight Deportations, Family Separations,* Arizon Daily Star (June 22, 2024), https://tucson.com/news/local/subscriber/arizona-sonora-us-mexico-border-asylum-deportation-rule-violations-alleged/article_d2ef785c-2e62-11ef-ab2d-e772ff84e1d6.html; Emily Bregel, *Border Agents Ignoring Fear Claims, Migrants Say, In Violation of Biden Border Exception*, Arizona Daily Star (June 16, 2024), https://tucson.com/news/local/border/us-mexico-border-arizona-biden-order-asylum-seekers/article_461bd3a4-29b1-11ef-b884-5f9fc26ba81b.html.

[70] Interim Final Rule at 48,739.

[71] Interim Final Rule at 48,743.

STB_AR1_006239

themselves to the Interim Final Rule's asylum eligibility ban and heightened standard for lesser forms of protection.[97] The following examples documented by Human Rights First of asylum seekers unable to use the CBP One app under the CLP Rule illustrate people in need of protection that the Interim Final Rule will similarly harm:[98]

- A Black Senegalese gay asylum seeker who speaks Wolof and Fulani is at risk under the CLP Rule asylum ban. The man's boyfriend was killed in Senegal, and he fled a stoning, beatings, and death threats because of his sexuality. Once in Mexico, he sought protection after crossing into the United States between ports of entry and was unaware of the asylum ban's consequences for entering without an appointment. He only speaks Wolof and Fulani, languages the CBP One appointment system is not available in and was unable to access the app. He is now in ICE detention and risks return to persecution under the CLP Rule.

- Three Hazara men, a persecuted ethnic and religious minority, fled Afghanistan after the fall of Kabul to the Taliban. Lacking any safe pathways to protection they crossed irregularly into the United States and immediately turned themselves in to seek asylum. They speak Dari and were unfamiliar with the CBP One app, which is not available in their language. Under the CLP Rule asylum ban, they now risk potential return to the Taliban and their certain deaths in Afghanistan. Even if they are subsequently found eligible for withholding of removal, they will be denied a path to permanent residence, citizenship, and stability.

- A Turkish transgender male asylum seeker who does not speak a CBP One language reported to Human Rights First that he was unable to use the app to schedule an appointment at a port of entry due to the language barrier, as he speaks Turkish. He crossed between ports of entry in California and will now risk being barred from asylum under the CLP Rule despite his potential eligibility for asylum.

- A Black Mauritanian human rights advocate who was unaware of, and does not speak CBP One languages, is at risk under the CLP Rule asylum ban. Imprisoned for his anticorruption work in Mauritania, the human rights advocate fears arrest, torture, and death if returned to Mauritania. He was unaware of the CBP One app or of the asylum ban's consequences when seeking protection at the U.S. southwest border. As an Arabic and French speaker, he would not have been able to use the CBP One scheduling system. While in Mexico, he was robbed and beaten by gangs and extorted by Mexican police which motivated his crossing to the U.S. to seek protection. He now risks being barred from asylum and returned to persecution under the ban.

- An Indian Sikh family fleeing persecution on religious grounds crossed between ports of entry into southern California. The family are Hindi speakers and were unaware of the CBP One app.

- A Black Senegalese man who speaks only Wolof is at risk under the CLP Rule. He fled torture and sexual assault in Senegal due to his imputed LGBTQI+ status. The man has limited literacy and only speaks Wolof. While on a bus in Mexico, armed men pulled him and other Black migrants off the bus and robbed them at gunpoint. Shortly after,

---

[97] Trapped, Preyed Upon, and Punished at 14-16.
[98] *Id.* at 15-16.

Mexican immigration officers detained them and held them for four days before releasing them near the U.S. border and informing them they had ten days to leave the country. He entered the United States between ports of entry to seek asylum, was sent into ICE detention, and is at risk of return to persecution under the CLP Rule asylum ban.

While the Interim Final Rule should be rescinded in full for all the reasons we outline in this comment, to the extent the rule continues in force, it must include an exception for all asylum seekers, whether they present at ports of entry or cross irregularly, who do not speak a language in which the CBP One app is provided, are unable to use the application due to illiteracy, disabilities, lack of resources or other difficulties, fail to secure appointments after multiple attempts, or did not know about the application's existence.

C.    The Interim Final Rule's Secretary approved process requirement subjects asylum seekers to kidnapping, torture, and rape in Mexico.

The CLP Rule's CBP One appointment requirement already strands asylum seekers in Mexico while they wait to secure an appointment or wait until the day and time of their appointment — and those wait times will grow longer under the Interim Final Rule. CBP One appointments are only available at eight ports of entry across the entire southwest border, concentrating people seeking asylum at these locations. In Reynosa, Matamoros, and Nuevo Laredo, Mexican border cities where the Department of Homeland Security ("DHS") issues over 40% of its CBP One appointments, kidnappings, torture, and sexual assault by cartels of people seeking asylum, including those waiting for or with CBP One appointments, have risen since the ban took effect.[99]

These areas were already designated by the Department of State as "Do Not Travel" locations due to life-threatening risks — designations that are akin to those issued for war zones. In Nuevo Laredo, the Strauss Center for International Security and Law has reported that conditions are so dangerous that migrant shelters continue to be closed due to "members of organized crime threatening and perpetrating violence against shelter staff and migrants."[100] Reports of sexual violence against migrants in Reynosa and Matamoros increased 70% during the last months of 2023 according to Doctors Without Borders, in addition to the already sharply escalating instances of kidnappings in Reynosa following the implementation of the ban. In January 2024, Doctors Without Borders teams in northern Mexico reported more cases of sexual violence than in any month of the previous year.[101]

Humanitarian aid workers in these areas have informed Human Rights First researchers that the frequency and brutality of the kidnappings has only gotten worse. Aid workers recounted that men and women have suffered from horrific torture and sexual violence, including women gang raped and sexually assaulted in the presence of children. Migrant survivors of kidnapping in Tamaulipas also report extreme physical violence such as acid burns, fractures, beatings with a slab of wood, and even mentioned having witnessed homicides, as told to Doctors Without Borders. After suffering these horrors, children and their families remain terrified and trapped in danger. Aid workers reported to Human Rights First that they have observed that increased

---

[99] *Id.* at 7.

[100] Straus Ctr. for Int'l Sec. and Law, Asylum Processing at the U.S.-Mexico Border: February 2024, at 7 (Feb. 2024), https://www.strausscenter.org/wp-content/uploads/Feb_2024_AsylumProcessing.pdf.

[101] Trapped, Preyed Upon, and Punished  at 7.

STB_AR1_006248

JA584

numbers of asylum seekers have missed their CBP One appointments because of these escalating abuses.[102]

Those who secure CBP One appointments are often specifically targeted by cartels, with Mexican authorities complicit or actively engaged in the abuse against migrants. They will be at even greater risk due to the Interim Final Rule's additional bar on port of entry access for people who do not have CBP One appointments and the even longer wait times the Interim Final Rule will spur. Human Rights First has tracked reports of over 2,500 migrant survivors of kidnapping, rape, torture, extortion, and other violent harm while stranded in Mexico as they wait to seek U.S. asylum in the year since the CLP Rule asylum ban took effect.[103] For Mexican nationals, this danger is compounded by being trapped in their own country of feared persecution under the Interim Final Rule. Given the under-reporting of kidnappings and other crimes in Mexico and substantial increase in kidnappings in parts of the northern Mexico border reported by aid workers and Mexican authorities, this figure certainly represents the tip of the iceberg.

Human Rights First has documented the horrific abuses inflicted on migrants and asylum seekers when they are blocked, turned away, or left to wait in Mexico, including over 13,000 survivors of murder, kidnapping, rape, and other violent attacks against asylum seekers blocked in or expelled to Mexico under the Title 42 policy[104] during the first two years of the Biden administration and similar reports of targeted harm against asylum seekers forced to wait in Mexico under the "Remain in Mexico" Migrant Protection Protocols.[105]

In its prior reports on the CLP Rule asylum ban, Human Rights First documented numerous examples of adults, children, and families who survived these harms while stranded in Mexico as they attempted to secure a CBP One appointment. These included: a Venezuelan young adult kidnapped and tortured by having his finger cut off; a Honduran mother kidnapped with her family and raped; a Venezuelan man kidnapped and shot in the head leading to the loss of his eye; Honduran teenage boys kidnapped and raped; a Latin American mother and her minor children sexually assaulted; a Colombian LGBTQI+ woman sexually assaulted by a Mexican official; and a Latin American man kidnapped and tortured by Mexican officials in Reynosa.[106]

Asylum seekers must not only contend with cartels, but also Mexican authorities. Human Rights First's research over the last year has confirmed, for example, that Mexican immigration authorities are apprehending migrants and people seeking asylum, including those waiting for or with CBP One appointments, separating families, committing abuses, and forcibly relocating them to southern Mexico where they are stranded, at risk, outside the CBP One app's geo-fence and unable to request an appointment. Humanitarian aid providers reported to Human Rights First that some people seeking asylum have missed their CBP One appointments because they were detained by Mexican authorities. For instance:[107]

---

[102] *Id.*

[103] *Id.*

[104] Human Rights First, "Human Rights Stain, Public Health Farce: Evasion of Asylum Law and Title 42 Abuse Must End — and Never Be Revived" (Dec. 15, 2022), https://humanrightsfirst.org/library/human-rights-stain-public-health-farce/.

[105] Fatally Flawed: "Remain in Mexico" Policy Should Never Be Revived (Sept. 13, 2022), https://humanrightsfirst.org/library/fatally-flawed-remain-in-mexico-policy-should-never-be-revived/.

[106] Trapped, Preyed Upon, and Punished at 8.

[107] *Id.* at 21-22.

STB_AR1_006249

Comment of Human Rights First
DHS Dkt. No. USCIS-2024-0006
Page 24

- An Afghan family with a CBP One appointment was extorted by Mexican immigration officers in the Mexico City and Tijuana airports in January 2024. The officers demanded the family open the CBP One app, took their phone, and threatened to eliminate their appointment if they did not pay them a bribe.

- A Venezuelan family with a CBP One appointment flew from Mexico City to Ciudad Juárez where they were questioned by Mexican immigration officers upon arrival who tore up the family's CBP One appointment print out, wrongly accusing them of fraud, and threatened to bus them to southern Mexico or deport them. Another officer eventually arrived and acknowledged their appointment and allowed them to leave in April 2024.

- An Ecuadorian mother and teenage son separated by Mexican immigration officers from her husband and eighteen-year-old son. After the freight train the family was traveling on was stopped as it approached Juárez in March 2024, they were caught by Mexican officers. The mother pleaded with the officers, indicating that they were a family and had documentation to prove it. The officers separated the family. She was left in Chihuahua with her minor son while her husband and 18-year-old son were forcibly transported to Tapachula. When Human Rights First interviewed the mother, the family had already been separated, and unable and to reunite, for a month.

- A Venezuelan family with minor children prevented from seeking U.S. asylum and instead detained by Mexican officers and transported to Tapachula in January 2024. The family was removed from a bus at the last checkpoint as they approached Reynosa. Mexican officers took their cell phones and transported them to a detention center. When the family asked immigration officers why they were being held and what was going to happen, the officers deceived them and said they would be taken to Mexico City to regularize their legal status. Instead, they were taken to the Reynosa airport and forcibly flown to Tapachula, bordering Guatemala, and forced to start their journey to seek U.S. asylum again.

VII.   The Interim Final Rule illegally traps Mexican asylum seekers in their own country of feared persecution, effectuating refoulement.

Glaringly, unlike the CLP Rule, which excepted Mexican nationals from its manner of entry bar, the Interim Final Rule does not adopt a similar exception.[108] People fleeing persecution in Mexico, a country that directly borders the United States, cannot wait. The Proclamation and Interim Final Rule's suspension on entry restricts access to asylum for Mexican asylum seekers, forcing them to remain at risk of persecution in their own country, equivalent to refoulement.

For Mexican individuals and families, the threat of persecution by those they are fleeing – such as violent cartels and other organized crime groups that exercise control over territory and often work in collusion with Mexican authorities – is still palpable as they are forced to continue to wait in northern Mexico in the hopes of finally having access to safety. Conditioning access to asylum on securing a limited, lottery-based CBP One appointment requires Mexican nationals to wait many months in danger in their country of feared harm, violating the Refugee Convention and Protocol.

---

[108] Interim Final Rule at 48,738.

STB_AR1_006250

he began to sexually harass them, leading Zenaida and Yaneth to fear the worst for themselves and their children. They managed to escape and fled directly to the Nogales Port of Entry where they had been sleeping the past five nights outside on the concrete. The grandmother expressed: "Why does no one hear us? We are so scared. We're afraid when people look at us and ask us where we're from. We cannot wait here."[114]

VIII.   The Interim Final Rule will disproportionately harm Black, Indigenous, and LGBTQI+ asylum seekers.

Black, Indigenous, LGBTQI+, HIV+, women, children, and other vulnerable groups, including people with disabilities or urgent medical conditions will continue to face particular and egregious barriers, dangers, and disparities in seeking asylum because of the Interim Final Rule, as they do under the CLP Rule. The Interim Final Rule and related restrictions deny equal access to asylum at ports of entry to most African, Indigenous, and other asylum seekers who are unable to use the CBP One app or wait for an appointment.

A.      Black asylum seekers

Due to the CLP Rule, the new Interim Final Rule, and other restrictions, Black asylum seekers are forced to wait at risk in Mexico where they are targets of anti-Black violence, discrimination, and harm by Mexican authorities. They are also at risk from violent cartels that control vast territory, often with the complicity of some Mexican authorities. In Reynosa, Haitian asylum seekers are also being targeted for kidnapping for ransom. Earlier this year, four Haitian asylum seekers were kidnapped and held by a cartel for six weeks, while Haitian pregnant women have been kidnapped and raped.[115]

As Human Rights First explained in a May 2024 report, Haitian Bridge Alliance ("HBA") reported that Mexican immigration officers and municipal police target Haitians and migrants and asylum seekers of African-descent for extortion, detention, and other harm as they transit through Mexico, including at airports and on buses. Over the last several months, Mexican immigration officers have targeted African migrants in Tijuana at specific hotels and have threatened to arrest, detain, and transfer the migrants and asylum seekers to southern Mexico if they refused to pay bribes to the officers.

Earlier this year, Mexican immigration officers unlawfully arrested and detained 45 Haitian asylum seekers with CBP One appointments in Tijuana for two hours outside the city. HBA's advocacy helped secure the release of nearly all of the victims, but Mexican authorities forcibly moved one family with three children to Tabasco in the south of Mexico who were waiting for their CBP One appointment. HBA also reports that between November 2023 and April 2024, Mexican authorities detained approximately 500 Haitian men, women, and children who were waiting for CBP One appointments in Tijuana and forcibly transferred them to Tabasco and Tapachula in the south of Mexico.

Discriminatory barriers to medical care facing Black asylum seekers and migrants in Mexico forced to wait under the CLP Rule have also resulted in the preventable deaths of Haitian asylum seekers. Some Haitians have been forced to wait with untreated chronic medical issues

---

[114] *Id.* at 9-10.
[115] Trapped, Preyed Upon, and Punished at 8-9.

STB_AR1_006253

in inhumane conditions for many months while waiting for CBP One appointments. For example:

- A 67-year old Haitian man died in Tijuana in November 2023 while waiting for a CBP One appointment. He had suffered paralysis due to three strokes but was unable to access medical care, as confirmed by the Haitian Bridge Alliance.

- A 36-year-old Ghanaian intending to seek U.S. asylum died in December 2023 outside the San Luis Potosí immigration jail shortly after having been released by Mexican immigration officers late at night. Mexican authorities reported that the Ghanaian man entered their facility at 9:00 p.m. and at around 11 p.m., paramedics arrived and he was already deceased. According to the state Attorney General's office, he died as a result of a heart condition, while other reporting indicates suspected hypothermia.

- A humanitarian aid worker confirmed that a Haitian woman who had been waiting in Reynosa to seek U.S. asylum died of health complications in December 2023 due to barriers in accessing urgent medical care.

- A humanitarian aid worker confirmed that a Haitian man who had been waiting with his wife and children in Reynosa for a CBP One appointment died of suspected diabetes-related complications in July 2023.

- A humanitarian aid worker confirmed that a Haitian woman waiting to seek asylum in the U.S. died in front of her two-year-old outside a migrant shelter in Reynosa in September 2023.

- The Haitian Bridge Alliance reported that in late August 2023, a Haitian mother who had been waiting with her husband and three children in Matamoros for a CBP One appointment died of a stroke after being hospitalized. The family had a CBP One appointment, but as the mother was critically ill it came too late.

- The Haitian Bridge Alliance confirmed that a Haitian man who had been waiting for a CBP One appointment in Tijuana died after suffering two strokes in June 2023. The Haitian Bridge Alliance organized a funeral for him.

- A humanitarian aid worker reported that in August 2023 a pregnant Haitian woman was forced by CBP to wait for two days at the Reynosa port of entry while experiencing pregnancy complications. She later lost her baby.

- A pregnant Haitian woman in her third trimester who was unhoused and living outside the entrance to a migrant shelter in Reynosa while waiting to seek U.S. asylum fell ill in July 2023. Seeking emergency medical care, a taxi took her to a private hospital; she was denied treatment. By the time a humanitarian aid worker brought her to a public hospital, she suffered a stillbirth.

B.     LGBTQI+ asylum seekers

The Interim Final Rule exacerbates and adds new barriers that further endanger LGBTQI+ and other people seeking asylum. The Interim Final Rule endangers LGBTQI+ people seeking

STB_AR1_006254

JA588

asylum by requiring them to wait months in Mexico to obtain a CBP One appointment where they face acute risks of anti-LGBTQI+ persecution and suffer kidnappings, sexual assault, and other harms due to their sexual orientation, gender identity, race, language, and nationality. It punishes and will contribute to the potential refoulement to persecution of LGBTQI+ people seeking asylum. In expedited removal, those found ineligible for asylum because of the Interim Final Rule's limitation on asylum eligibility will face an improperly high fear screening standard. As a result, LGBTQI+ asylum seekers from Venezuela and Colombia have been ordered deported while others risk refoulement to persecution. This is even if they are referred for a fear screening, as the Interim Final Rule's manifestation of fear standard disproportionately impacts LGBTQI+ refugees who may be hesitant to raise in Border Patrol encounters fears of harm that relate to their sexual orientation, gender identity or other persecution.[116]

Human Rights First documented cases of LGBTQI+ asylum seekers targeted for harm while stranded in Mexico under the CLP rule, some unable to access the CBP One app due to language barriers, and facing lack of access to safe housing, employment, medical care, and other basic services due to discrimination because of their gender identity, sexual orientation, as well as race, nationality, migratory status, and language barriers:[117]

- A Cuban HIV+ transgender woman and her husband waited nearly seven months for a CBP One appointment that never arrived. They were discriminated against by a migrant shelter on account of the woman's gender identity and sexual orientation. After their first night in the shelter, they were kicked out in the rain after dark and told the shelter did not have the right conditions to house them. The transgender woman is HIV+ and spent six months in Mexico unable to obtain medication, having been denied treatment by a clinic in Mexico City.

- A Venezuelan gay couple escaped a kidnapping, witnessed a violent assault, and lived in fear while waiting five months for a CBP One appointment. In September 2023, a Venezuelan gay man and his partner had been waiting in Matamoros for nearly five months trying to secure a CBP One appointment, living in fear that they would be kidnapped and harmed on account of their sexual orientation and status as migrants, as recounted to Human Rights First. They spent two months living in a tent in the Matamoros river encampment where they witnessed a violent assault on a family by the cartel and other situations of danger, motivating them to seek shelter elsewhere. They also escaped an attempted kidnapping in the city.

- A transgender migrant woman waiting in Ciudad Juárez to seek asylum was extorted by the cartel under threat of sexual exploitation: A young transgender woman waiting to seek asylum in the U.S. was targeted and forced by the cartel to pay them 1,500.00 Mexican pesos a week under threats of sexual exploitation. She was afraid she would be killed if she missed a payment and had not yet been able to safely seek asylum in the U.S. despite these serious protection issues in Mexico, as told to Las Americas Immigrant Advocacy Group in late August 2023.

- A French-speaking Senegalese lesbian woman traveling alone to seek U.S. asylum was unaware of and ultimately unable to use the CBP One app because it is not offered in

---

[116] U.S. Asylum Bans Strand LGBTQI+ Refugees.
[117] *Id.*

STB_AR1_006255

**JA589**

French. She survived an attempted sexual assault in the Mexican border city of Nogales, but remained trapped as the wait time to enter at the Nogales port of entry for those without appointments was six to seven months at the time.

- A Honduran trans woman who survived a sexual and physical assault in Honduras on account of her gender identity and who fears being killed if returned described the increasing desperation she felt waiting for a CBP One appointment: "I feel desperate. There are people who obtain appointments in 12 or 15 days, and I've been waiting for four months. You feel depressed. At the shelter, others are stressed. Another person cries and it's contagious — I do, too. All you think about is 'the appointment, the appointment.' I request it every day and check every day and still nothing. Tomorrow will be four months of waiting."

- A Turkish transgender male asylum seeker who does not speak a CBP One language reported to Human Rights First that he was unable to use the app to schedule an appointment at a port of entry due to the language barrier. He entered the United States between ports of entry in California and will now risk being barred from asylum despite his potential eligibility for asylum.

- A gay man from Senegal who was stoned and beaten while his boyfriend was murdered and only spoke Wolof and Fulani could not use the CBP One application. Because of the language barrier, he was not aware of the CBP One application or the asylum ban. He is now in Immigration and Customs Enforcement (ICE) detention, at risk of return to his persecutors because of the asylum ban.

- An LGBTQI+ and HIV+ Venezuelan young adult traveling alone to seek U.S. asylum was stranded in Matamoros without resources where he was living in a tent in an open-air encampment. As his phone had been stolen, and he had no financial resources to replace it, he was unable to access the CBP One app to request an appointment to enter at a port of entry. Blocked from accessing the port of entry without an appointment, he expressed despair at being trapped in danger.

C.    Indigenous asylum seekers

The Interim Final Rule, like the CLP Rule, punishes people who do not have CBP One appointments, yet the government has made it available only in English, Spanish, and Haitian Creole. This lack of equitable language access discriminates against and denies equal access to asylum to Indigenous and other asylum seekers who speak other languages by subjecting them to the Interim Final Rule's penalties.

The International Mayan League warned that conditioning asylum access on the CBP One app would further marginalize Indigenous individuals and especially endanger Indigenous girls, women, and LGBTQ+ people who are at heightened risk for sex and human trafficking. In June 2023, over 140 non-Indigenous allies, including many human rights and immigration organizations, wrote to DHS to underscore the disproportionate harms the manner of entry bar in the CLP Rule, mirrored in the Interim Final Rule, inflicts on Indigenous people and the insurmountable barriers Indigenous people face in using and accessing CBP One, and in

STB_AR1_006256

JA590

accessing ports of entry for those without appointments, as documented by Human Rights First's.[118] For example:

- A Mayan woman from Guatemala who is illiterate and speaks Akatek entered the United States between ports of entry without an appointment with her infant son. After the mother survived sexual assault in Guatemala, and family members were murdered, they received death threats from MS-13. While transiting Mexico by bus, they were stopped by armed, uniformed Mexican officials who beat the mother and threatened to kill her and her infant if she did not pay a bribe. She arrived near the U.S.-Mexico border terrified of further abuse by Mexican authorities and of being located by MS-13. She had no knowledge of CBP One, had never owned a smartphone, only speaks Akatek, and is illiterate. The family crossed into Arizona between ports of entry and would now risk potential return to persecution under the CLP Rule.[119]

- A Maya Ixil woman and her infant were blocked from accessing a port of entry multiple times despite written permission from DHS to present themselves there. A Maya Indigenous woman, the granddaughter of a survivor of the Ixil genocide in Guatemala, who only speaks Ixil, had not heard of the CBP One app and attempted to seek U.S. protection by crossing the Rio Grande to Eagle Pass, Texas. Once on U.S. soil, U.S. authorities blocked them from seeking protection and stranded them on the U.S. side of the riverbank overnight. Without being able to exercise their right to seek asylum, U.S. authorities forced them to cross back to Mexico where they were treated for hypothermia. After surviving this ordeal, the mother learned of the CBP One appointment system and attempted to secure an appointment for nearly two months but struggled due to limited internet access, technological and language barriers as the app is not available in any Indigenous language. The family attempted to seek protection at two ports of entry in Piedras Negras, Coahuila but were repeatedly blocked by Grupo Enlace, Mexican municipal employees, from accessing the port of entry despite permission from DHS to present. One Mexican agent even implied that she would have to pay a bribe, or they would deport her to Guatemala. During a later attempt, the family was again denied entry despite having a letter from DHS confirming their permission to present. The family was finally allowed to present at the port of entry and were processed into the country following significant intercession by U.S. non-profit groups. These aggressive tactics not only violated their right to seek asylum, but worsened the mental, emotional and spiritual state of an already traumatized mother and child.[120]

D.    Women and children seeking asylum

Barriers to asylum access imposed by the Interim Final Rule will harm women and children seeking asylum, who will be forced to wait in Mexico for a CBP One appointment or cross without authorization, subjecting themselves to the Interim Final Rule's bar to asylum. Women migrants in Mexico face gender-based violence, kidnappings, rape, human trafficking, extortion, harassment, difficulty reporting and accessing justice, and institutional and community violence according to the Instituto Nacional para las Mujeres en Migración. The United Nations Committee on Enforced Disappearances in its September 2023 report noted the increase in

---

[118] Refugee Protection Travesty at 38.
[119] Trapped, Preyed Upon, and Punished at 15.
[120] *Id.* at 11-12.

disappearances of girls, adolescents, and women in Mexico predominantly in the states of Mexico, Tamaulipas, Jalisco, and Guerrero.[121]

Seven of every 10 migrant girls, adolescents, and women have witnessed situations of exploitation, sexual violence, and human trafficking both in transit and while waiting in Mexico and are the target of human trafficking, according to a survey by Plan International Mexico in August 2023. Similarly, sexual crimes against girls and women as well as human trafficking of girls and women are the most recurrent crimes at the northern Mexico border, according to the International Organization for Migration's Mexico anti-trafficking specialist.
Sexual assault has become so commonplace that some women cynically refer to contraceptives as the "vaccine against Mexico" revealing their awareness that at some point during their journey, they are likely to survive sexual assault, as recounted by Las Americas Immigrant Advocacy Group in Ciudad Juárez in September 2023.[122]

Reports of sexual violence against migrants in Reynosa and Matamoros increased 70% during the last months of 2023 according to Doctors Without Borders, in addition to the already sharply escalating instances of kidnappings in Reynosa following the implementation of the ban. In January 2024, Doctors Without Borders teams in northern Mexico reported more cases of sexual violence than in any month of the previous year.[123]

For example, a Haitian unaccompanied teenage girl and three Haitian women seeking asylum survived an enforced disappearance by Mexican authorities who turned them over to cartel members who abused them physically and sexually. The teenage girl and three women were transiting to Reynosa by bus when armed men dressed as Mexican police officers stopped the bus in late December 2024. The Mexican police officers robbed them of their phones and placed them together in a car with black bags over their heads. They were turned over to members of the cartel and held captive for ransom. Cartel members attempted to rape the teenage girl and severely beat her with a stick for resisting. The three Haitian women were raped and beaten. They also witnessed other captive Haitian women who were pregnant and were beaten and raped.[124]

IX.    The Interim Final Rule's exceptions do not protect refugees.

Aside from presenting at a port of entry through a Secretary approved process, the Interim Final Rule provides exceptions for acute medical emergencies, imminent threats to life and safety, and victims of a severe form of trafficking. The Interim Final Rule does not provide any exception, unlike the CLP Rule, for failure of or inability to use the CBP One application.

These limited exceptions are insufficient to protect refugees, including vulnerable populations such as LGBTQI+ individuals, Black and Indigenous asylum seekers, women, and children, who face disproportionate harm in Mexico while blocked from seeking protection in the United States. People seeking protection face unremitting violence at the hands of Mexican authorities and cartels who often target them because they are migrants or asylum seekers. Human Rights First has documented the horrific abuses inflicted on migrants and asylum seekers when they are blocked, turned away, or left to wait in Mexico, including over 2,500 victims of murders,

---

[121] Inhumane and Counterproductive at 32-33.
[122] *Id.*
[123] Trapped, Preyed Upon, and Punished at 7.
[124] *Id.* at 9.



# TRAPPED, PREYED UPON, AND PUNISHED

One Year of the Biden Administration Asylum Ban



May 2024

JA593

STB_AR1_006278

Sharp escalations in targeted violence

*"They torture you and beat you like an animal."*[1]

The asylum ban and related restrictions at U.S. ports of entry strand children and adults seeking U.S. asylum in Mexico where they are targeted for horrific and widespread abuses by cartels and Mexican authorities often acting in complicity with those cartels. Human Rights First has tracked reports of over 2,500 survivors of kidnapping, torture, rape, enforced disappearance, extortion, and other violent attacks against asylum seekers and migrants stranded in Mexico since the asylum ban took effect. As detailed below, and in our October 2023 report, this violence has risen sharply since the asylum ban was initiated.

CBP One appointments are only available at eight ports of entry across the entire southwest border, concentrating people seeking asylum at these locations. In Reynosa, Matamoros, and Nuevo Laredo, Mexican border cities where the Department of Homeland Security (DHS) issues over 40% of its CBP One appointments, kidnappings, torture, and sexual assault by cartels of people seeking asylum, including those waiting for or with CBP One appointments, have risen since the ban took effect. These areas were already designated by the U.S. State Department as "Do Not Travel" locations due to life-threatening risks—designations that are akin to those issued for war zones. In Nuevo Laredo, the Strauss Center for International Security and Law has reported that conditions are so dangerous that migrant shelters continue to be closed due to "members of organized crime threatening and perpetrating violence against shelter staff and migrants." Reports of sexual violence against migrants in Reynosa and Matamoros increased 70% during the last months of 2023 according to Doctors Without Borders, in addition to the already sharply escalating instances of kidnappings in Reynosa following the implementation of the ban. In January 2024, Doctors Without Borders teams in northern Mexico reported more cases of sexual violence than in any month of the previous year.

In recent weeks, humanitarian aid workers in these areas have informed Human Rights First that the frequency and brutality of the kidnappings has only gotten worse. Aid workers recounted that men and women have suffered from horrific torture and sexual violence, including women gang raped and sexually assaulted in the presence of children. Migrant survivors of kidnapping in Tamaulipas also report extreme physical violence such as acid burns, fractures, beatings with a slab of wood, and even mentioned having witnessed homicides, as told to Doctors Without Borders. After suffering these horrors, children and their families remain terrified and trapped in danger. Aid workers reported to Human Rights First that they have observed that increased numbers of asylum seekers have missed their CBP One appointments because of these escalating abuses. Aid workers in Tamaulipas

[1] Quote from a Venezuelan asylum seeker kidnapped and tortured in Reynosa while waiting for a CBP One appointment.

continue to report concerns that they themselves are also at increased risk of violent attacks and threats due to their work with people seeking asylum and other migrants.

In Piedras Negras, Coahuila, another border city where people with CBP One appointments can access a U.S. port of entry, Doctors Without Borders reported cases of sexual violence, kidnappings, beatings, threats, and forced disappearance of family members in transit or at the border in 2023. A humanitarian aid worker informed Human Rights First that many people who arrive in Piedras Negras with CBP One appointments are kidnapped and as a result miss their appointments. West of Coahuila, the Mexican northern border state of Chihuahua recorded last year the highest number of kidnappings in three years. Kidnappings nearly tripled from 67 victims in 2022, during implementation of the Title 42 expulsion policy, to 181 victims in 2023, following implementation of the asylum ban and related restrictions on access to ports of entry. And yet, kidnappings are notoriously under-reported. The Mexican national anti-kidnapping commissioner stated last year that the *cifra negra* of kidnappings in Mexico remains high as only one in ten kidnappings are reported, as quoted by SN Digital Tlaxcala. A Ciudad Juárez prosecutor reported that all kidnappings in the city in 2023 were specifically perpetrated against migrants arriving in Ciudad Juárez, as organized criminal groups have focused on the kidnapping and smuggling of migrants.

Human Rights First has tracked reports of **over 2,500 survivors** of kidnapping, torture, rape, extortion, and other violent harm against people seeking asylum and migrants while stranded in Mexico as they wait to seek U.S. asylum in the year since the ban took effect. Of these, 1,300 survivors of violent harm were identified during the ban's first six months. Given the under-reporting of kidnappings and other crimes in Mexico and substantial increase in kidnappings in parts of the northern Mexico border reported by aid workers and Mexican authorities, this figure certainly represents the tip of the iceberg. In its prior reports on the asylum ban, Human Rights First documented numerous examples of adults, children and families who survived these harms while stranded in Mexico as they attempted to secure a CBP One appointment.

These included: a Venezuelan young adult kidnapped and tortured by having his finger cut off; a Honduran mother kidnapped with her family and raped; a Venezuelan man kidnapped and shot in the head leading to the loss of his eye; Honduran teenage boys kidnapped and raped; a Latin American mother and her minor children sexually assaulted; a Colombian LGBTQI+ woman sexually assaulted by a Mexican official; and a Latin American man kidnapped and tortured by Mexican officials in Reynosa.

Some recent examples of the targeting of people waiting to access U.S ports of entry in order to seek asylum over the last few months, include:

- **Members of a cartel kidnapped and tortured three Haitian men in Reynosa who were seeking asylum. The men were tortured during their abduction, including the forcible removal of teeth.** Two of the men were waiting for CBP One appointments and one missed his appointment on account of the kidnapping in April 2024.

STB_AR1_006285

JA595

- **Latin American[2] woman and her children were pulled off a bus while traveling from Monterrey to Reynosa by members of a cartel and kidnapped. The cartel members gang raped the mother** while holding the family captive in April 2024.

- **Venezuelan man was kidnapped in Reynosa while waiting for a CBP One appointment and physically brutalized for 10 days by members of a cartel.** In fear of being kidnapped again, he fled to the neighboring city of Matamoros after his release and crossed the Rio Grande to seek U.S. asylum protection. Although he had fled political persecution by the Venezuelan police, his claim of fear of return to Venezuela was ignored and he was expeditiously removed to Mexico without receiving a credible fear interview, as Jewish Family Services of San Diego reported.

- **Haitian unaccompanied teenage girl and three Haitian women seeking asylum survived an enforced disappearance by Mexican authorities who turned them over to cartel members who abused them physically and sexually.** The teenage girl and three women were transiting to Reynosa by bus when armed men dressed as Mexican police officers stopped the bus in late December 2024. The Mexican police officers robbed them of their phones and placed them together in a car with black bags over their heads. They were turned over to members of the cartel and held captive for ransom. Cartel members attempted to rape the teenage girl and severely beat her with a stick for resisting. The three Haitian women were raped and beaten. They also witnessed other captive Haitian women who were pregnant and were beaten and raped.

- **Latin American[3] pregnant woman was raped by members of a cartel in Reynosa after they kidnapped her and her husband in March 2024.** The kidnappers continued to rape her as she went into labor and her water broke. She was left on the street with her husband who was badly beaten, and soon after delivered her baby.

---

Indefinite wait in danger with access to U.S. ports of entry restricted

*"I am afraid for my life here. Afraid that I will be killed, kidnapped, or that they'll do something to me."[4]*

In order to seek asylum at a port of entry, people must wait up to six to seven months and try *daily* to obtain an appointment on a glitchy, inequitable smartphone app, CBP One, that operates in essence like a daily lottery. Those facing acute risks who cannot safely wait in Mexico, or in some cases even use the CBP One app, have little to no meaningful access to

---

[2] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.
[3] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.
[4] Quote from a Honduran asylum seeker raped in Matamoros while waiting for a CBP One appointment and who was twice blocked from accessing the U.S. port of entry by Mexican officers.

STB_AR1_006286

JA596

present. One Mexican agent even implied that she would have to pay a bribe or they would deport her to Guatemala. During a later attempt, the family was again denied entry despite having a letter from DHS confirming their permission to present. The family was finally allowed to present at the port of entry and were processed into the country following significant intercession by U.S. non-profit groups. These aggressive tactics not only violated their right to seek asylum, but worsened the mental, emotional and spiritual state of an already traumatized mother and child.

## Equal access to asylum denied

**Black, Indigenous, LGBTQI+, HIV+, women, children, and other vulnerable groups, including people with disabilities or urgent medical conditions continue to face particular and egregious barriers, dangers, and disparities in seeking asylum due to the asylum ban. The asylum ban and related restrictions deny equal access to asylum at U.S. ports of entry to most African, Indigenous, and other asylum seekers who are unable to use the CBP One app or wait for an appointment.**

Black asylum seekers forced to wait at risk in Mexico continue to be targets of anti-Black violence, discrimination and harm by Mexican authorities. They are also at risk from violent cartels that control vast territory, often with the complicity of some Mexican authorities. In Reynosa, Haitian asylum seekers are now also being targeted for kidnapping for ransom. Earlier this year **four Haitian asylum seekers were kidnapped and held by a cartel for six weeks.**

Haitian Bridge Alliance (HBA) reported to Human Rights First that Mexican immigration officers and municipal police continue to target Haitians, and migrants and asylum seekers of African-descent. They are targeted as they transit through Mexico, including  at airports and on buses. Over the last several months, Mexican immigration officers have targeted African migrants in Tijuana at specific hotels. The officers threatened to arrest, detain, and transfer the migrants and asylum seekers to southern Mexico if they refuse to pay bribes to the officers. Earlier this year, **Mexican immigration officers unlawfully arrested and detained 45 Haitian asylum seekers with CBP One appointments in Tijuana for two hours outside the city.** HBA's advocacy helped secure the release of nearly all of the victims, but Mexican authorities forcibly moved one family with three children to Tabasco in the south of Mexico who were waiting for their CBP One appointment. HBA also reports that between November 2023 and April 2024, Mexican authorities **detained approximately 500 Haitian men, women, and children who were waiting for CBP One appointments in Tijuana and forcibly transferred them to Tabasco and Tapachula in the south of Mexico.**

Discriminatory barriers to medical care facing Black asylum seekers and migrants in Mexico have also resulted in the preventable deaths of Haitian asylum seekers. Some Haitians have been forced to wait with untreated chronic medical issues in inhumane conditions for many months while waiting for CBP One appointments.

STB_AR1_006289

JA597

- A 67-year old Haitian man died in Tijuana in November 2023 while waiting for a CBP One appointment. He had suffered paralysis due to three strokes but was unable to access medical care, as confirmed by the Haitian Bridge Alliance.

- A 36-year-old Ghanaian intending to seek U.S. asylum died in December 2023 outside the San Luis Potosí immigration jail shortly after having been released by Mexican immigration officers late at night. Mexican authorities reported that the Ghanaian man entered their facility at 9:00 p.m. and at around 11 p.m., paramedics arrived and he was already deceased. According to the state Attorney General's office, he died as a result of a heart condition, while other reporting indicates suspected hypothermia.

- A humanitarian aid worker confirmed that a Haitian woman who had been waiting in Reynosa to seek U.S. asylum died of health complications in December 2023 due to barriers in accessing urgent medical care.

- A humanitarian aid worker confirmed that a Haitian man who had been waiting with his wife and children in Reynosa for a CBP One appointment died of suspected diabetes-related complications in July 2023.

- A humanitarian aid worker confirmed that a Haitian woman waiting to seek asylum in the U.S. died in front of her two-year-old outside a migrant shelter in Reynosa in September 2023.

- The Haitian Bridge Alliance reported that in late August 2023, a Haitian mother who had been waiting with her husband and three children in Matamoros for a CBP One appointment died of a stroke after being hospitalized. The family had a CBP One appointment, but as the mother was critically ill it came too late.

- The Haitian Bridge Alliance confirmed that a Haitian man who had been waiting for a CBP One appointment in Tijuana died after suffering two strokes in June 2023. The Haitian Bridge Alliance organized a funeral for him.

- A humanitarian aid worker reported that in August 2023 a pregnant Haitian woman was forced by CBP to wait for two days at the Reynosa port of entry while experiencing pregnancy complications. She later lost her baby.

- A pregnant Haitian woman in her third trimester who was unhoused and living outside the entrance to a migrant shelter in Reynosa while waiting to seek U.S. asylum fell ill in July 2023. Seeking emergency medical care, a taxi took her to a private hospital; she was denied treatment. By the time a humanitarian aid worker brought her to a public hospital, she suffered a stillbirth.

**LGBTQI+ people seeking U.S. asylum are stranded in Mexico for months where they are targeted for harm due to anti-LGBTQI+ violence and their migratory status**. Despite these dangers, they are left at risk of being barred from asylum and returned to persecution if they

STB_AR1_006290

JA598

seek protection by crossing at or between ports of entry without a CBP One appointment. In its research over the last year, Human Rights First has encountered examples of vulnerable people in this population who waited months trying to secure a CBP One appointment while facing acute risks and violence in Mexico, including:

- Five LGBTQI+ asylum seekers from **Cuba, Honduras, and Mexico waited in Tijuana about five months** for a CBP One appointment but finally grew desperate for safety in January 2024 and decided to cross between U.S. ports of entry to seek asylum.

- **Cuban HIV+ transgender woman and her husband had been waiting nearly seven months** as of March 2024 but were unsuccessful at securing a CBP One appointment. While waiting in Matamoros they experienced an attempted kidnapping, which spurred them to enter the United States between ports of entry.

- **Honduran transgender woman had been waiting in Tijuana four months for a CBP One appointment** in February 2024, after already waiting eight months in southern Mexico for a one-year Mexican humanitarian visa which she hoped would protect her from return to persecution while transiting through Mexico.

- **Mexican transgender woman had been waiting in Tijuana seven months** for a CBP One appointment as of February 2024. Though Mexican asylum seekers are not subject to the asylum ban's penalties for entering without a CBP One appointment, access at ports of entry for those without appointments is restricted.

**Significant barriers** to the use of CBP One, including limited language access, disproportionately impact **Indigenous, many Black, and other asylum seekers** who do not speak English, Spanish, or Haitian Creole, the only three languages of the CBP One app. People seeking asylum who are illiterate, have limited language and digital literacy, or have disabilities that impede their ability to use the app, are also often denied equal access to ports of entry and asylum. So too are people with limited financial means to access daily internet or purchase a smartphone—a very real challenge for the many migrants who have told Human Rights First that their phones have been stolen by Mexican authorities and cartels or lost or damaged during their travels.

Unable to use the CBP One app, and unable to access ports of entry without appointments, many people cross between ports of entry to seek asylum, unaware of the consequences imposed by the ban. The asylum ban includes an exception for individuals unable to access or use the CBP One app due to a language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle. However, the rule specifically provides that this exception applies only to people who enter at ports of entry (yet, ironically, ports are generally inaccessible for those without CBP One appointments, making this exception largely illusory). Yet Indigenous, Black, and other asylum seekers who are unable to use CBP One for these reasons and cross between ports of entry risk the asylum ban's punishments. This report documents in the expedited removal section further below, individuals who were unable to use the CBP One app due to language barriers and illiteracy, were found to not

STB_AR1_006291

**JA599**

meet an exception, and were subjected to the asylum ban's heightened fear screening, including a Senegalese man who only speaks Wolof, a Nicaraguan illiterate man, and an Egyptian Arabic speaker. DHS's failure to apply the serious and ongoing obstacles exception to asylum seekers facing language barriers would endanger asylum seekers in the following situations:

- **Mayan woman from Guatemala who is illiterate and speaks Akatek crossed without an appointment with her infant son.** After the mother survived sexual assault in Guatemala, and family members were murdered, they received death threats from MS-13. While transiting Mexico by bus, they were stopped by armed, uniformed Mexican officials who beat the mother and threatened to kill her and her infant if she did not pay a bribe. She arrived near the U.S.-Mexico border terrified of further abuse by Mexican authorities and of being located by MS-13. She had no knowledge of CBP One, had never owned a smartphone, only speaks Akatek, and is illiterate. The family crossed into Arizona between ports of entry and now risks potential return to persecution under the ban.

- **Black Senegalese gay asylum seeker who speaks Wolof and Fulani at risk under the asylum ban.**  The man's boyfriend was killed in Senegal, and he fled a stoning, beatings, and death threats because of his sexuality. Once in Mexico, he sought protection after crossing into the United States between ports of entry and was unaware of the asylum ban's consequences for entering without an appointment. He only speaks Wolof and Fulani, languages the CBP One appointment system is not available in and was unable to access the app. He is now in ICE detention and risks return to persecution under the ban.

- **Three Hazara Afghan men who speak Dari, and were unaware of the app, at risk under the asylum ban.** Three Hazara men, a persecuted ethnic and religious minority, fled Afghanistan after the fall of Kabul to the Taliban. Lacking any safe pathways to protection they crossed irregularly into the United States and immediately turned themselves in to seek asylum. They speak Dari and were unfamiliar with the CBP One app, which is not available in their language. Under the asylum ban, they now risk potential return to the Taliban and their certain deaths in Afghanistan. Even if they are subsequently found eligible for withholding of removal, they will be denied a path to permanent residence, citizenship and stability.

- **Turkish transgender male asylum seeker who does not speak a CBP One language** reported to Human Rights First that he was unable to use the app to schedule an appointment at a port of entry due to the language barrier, as he speaks Turkish. He crossed between ports of entry in California and will now risk being barred from asylum despite his potential eligibility for asylum.

- **Black Mauritanian human rights advocate who was unaware of, and does not speak CBP One languages, at risk under the ban.** Imprisoned for his anti-corruption work in Mauritania, the human rights advocate fears arrest, torture, and death if returned to Mauritania. He was unaware of the CBP One app or of the

STB_AR1_006292

**JA600**

asylum ban's consequences when seeking protection at the U.S. southwest border. As an Arabic and French speaker, he would not have been able to use the CBP One scheduling system. While in Mexico, he was robbed and beaten by gangs and extorted by Mexican police which motivated his crossing to the U.S. to seek protection. He now risks being barred from asylum and returned to persecution under the ban.

- **Indian Sikh family** fleeing persecution on religious grounds crossed between ports of entry into southern California. The family are Hindi speakers and were unaware of the CBP One app.

- **Black Senegalese man who speaks only Wolof at risk under the ban.**  He fled torture and sexual assault in Senegal due to his imputed LGBTQI+ status. The man has limited literacy and only speaks Wolof. While on a bus in Mexico, armed men pulled him and other Black migrants off the bus and robbed them at gunpoint. Shortly after, Mexican immigration officers detained them and held them for four days before releasing them near the U.S. border and informing them they had ten days to leave the country. He entered the United States between ports of entry to seek asylum, was sent into ICE detention, and is at risk of return to persecution under the ban.

---

## Counterproductive to effective migration policy and refugee protection

The asylum ban is counterproductive to effective migration policy and refugee protection, setting a terrible example for other countries. Far from deterring people from irregularly crossing the southwest border, the ban and accompanying restrictions spur irregular crossings and cruelly punish people who cross, subjecting them to improper penalties that violate the Refugee Convention. The asylum ban diverts the time of asylum adjudicators from the merits of people's refugee claims, undermines the capacity to adjudicate asylum cases efficiently, and hampers U.S. integration by depriving people who qualify as refugees under U.S. law of a path to stability and citizenship.

As Human Rights First has documented in multiple reports, restrictionist policies that meter and limit access to U.S. ports of entry spur irregular crossings by at-risk people who cannot safely wait in Mexico. Over the last year, Human Rights First has interviewed many asylum seekers who have recounted that they crossed the border, or were contemplating doing so, due to their inability to seek asylum at a port of entry and the risks they face while waiting. Their accounts are detailed both in this report and in the prior four asylum ban reports issued by Human Rights First.

Such policies are also a boon to cartels and smugglers, who target migrants and asylum seekers left stranded in highly dangerous areas for kidnapping, violence and extortion. Indeed, the Chihuahua Attorney General stated in April 2024 that the increase in kidnappings and murders in Chihuahua is linked to the fact that organized crime groups have now taken up migrant smuggling

STB_AR1_006293

**JA601**



# INHUMANE AND COUNTERPRODUCTIVE

## Asylum Ban Inflicts Mounting Harm

October 2023

STB_AR1_006321

JA602

the factors that are motivating crossings. Cartels also exploit U.S. policies that ban, block or limit access to ports of entry and/or cause people to wait in Mexico and use and exploit misinformation to mislead and exploit individuals to cross into the United States outside of ports of entry.

## Asylum seekers report not applying for asylum in transit countries

People seeking asylum reported to Human Rights First and to humanitarian aid workers that they had not applied for asylum in other countries, and as a result did not wait to be denied asylum there as the asylum ban contemplates in blatant disregard of the risks and realities refugees experience in these countries. UNHCR's August 2023 protection monitoring in Honduras found that 100% of 175 migrants it interviewed had not previously sought asylum, and its protection monitoring in Guatemala earlier this year found that only 3% of people surveyed who had international protection needs had applied for asylum in Guatemala or in another transit country.

In an October 2023 amicus brief submitted in litigation in the 9th Circuit Court of Appeals challenging the ban, the union representing over 14,000 USCIS employees including asylum officers who conduct CFIs explained that:

> Most of the countries through which asylum seekers transit en route to the U.S. southern border produce far more refugees than they accept, have inadequate asylum systems and are unable or unwilling to provide migrants with meaningful protection. Forcing asylum seekers to remain in these countries to apply for protection and wait for a denial before continuing on to the United States puts them at risk of experiencing violence as well as refoulement to persecution or torture. The notion that it would be safe and practicable to stay in a transit country long enough to apply for asylum and wait for a decision is inconceivable to the vast majority of asylum seekers.

People seeking asylum explained to Human Rights First researchers the reasons they reasonably believed they would not be safe in transit countries, due to fear of persecution, violence, mistreatment, and other abuse.

## Asylum ban endangers Black, Indigenous, LGBTQ+, women and children

The asylum ban continues to harm the most vulnerable refugees by conditioning access to asylum protection on financial resources, literacy, and proficiency in select languages in requiring use of the CBP One app to seek asylum. The ban denies equitable access to asylum and forces people to wait months within the app's geofencing in central and northern Mexico in inhumane conditions without their basic needs met where they are targeted for exploitation and life-threatening harm by both Mexican authorities and cartels. The asylum ban also punishes Black, Indigenous, LGBTQ+, survivors of gender-based violence and other vulnerable groups for not seeking asylum in countries where they will not be safe.

STB_AR1_006349

JA603

### Asylum ban risks lives of Indigenous and other asylum seekers

The asylum ban punishes people who do not have CBP One appointments, yet U.S. officials have made it available only in English, Spanish, and Haitian Creole. This lack of equitable language access discriminates against Indigenous and other asylum seekers who speak other languages by subjecting them to the ban's penalties.

Before the Biden administration issued the ban, the International Mayan League warned that the ban would further marginalize Indigenous persons and especially endanger Indigenous girls, women, and LGBTQ+ people who are at heightened risk for sex and human trafficking. In June 2023, over 140 non-Indigenous allies, including many human rights and immigration organizations, wrote to DHS to underscore the disproportionate harms the ban inflicts on Indigenous people and the insurmountable barriers Indigenous people face in using and accessing CBP One, as documented in Human Rights First's July report.

Amid the escalating increase of individuals crossing between ports of entry in August and September are nationals of countries who don't speak one of the few languages the CBP One app is available in. Restricted and blocked access at ports of entry renders the exception to use of CBP One due to a serious and ongoing obstacle, only applicable if someone enters through a port of entry, meaningless. As detailed later in this report, Indigenous families from Ecuador and Guatemala have been subjected to the asylum ban in expedited removal proceedings after crossing outside of ports of entry and have been denied interpretation in their primary language during credible fear interviews (CFIs), resulting in the deportation and imminent deportation of Indigenous people fleeing persecution.

For example:

- **An Indigenous woman from Guatemala and her one-year-old daughter are facing imminent deportation after undergoing a CFI in the FERM program in August 2023,** where they were interviewed in Spanish despite clear indications that there were communication issues.

- An Indigenous asylum seeker from Ecuador who was separated from his partner at the border received a negative CFI determination in ICE detention and **was ordered deported in July 2023 after being interviewed in Spanish—even though it is not his best language—while his partner, who was interviewed in Quiche, their native language, received a positive determination.**

- **An Indian Hindi-speaking man** entered the U.S. between ports of entry in Arizona in September 2023 not speaking any of the languages CBP One is available in.

- **A Guinean French-speaking woman** who entered the U.S. between ports of entry in Arizona in September 2023 relayed to Human Rights First that she heard mention of the

STB_AR1_006350

**JA604**

CBP One app and believed it was for Latin American asylum seekers as the app is not available in French.

## Asylum ban risks lives of Black families and individuals

Black asylum seekers forced to wait at risk in Mexico under the asylum ban continue to be targets of anti-Black violence and discrimination. Past Human Rights First reports have documented these harms against Black asylum seekers while stranded in Mexico under other policies that limited or denied them access to asylum.

Many Black individuals and families have untreated chronic medical conditions that are exacerbated during their migration journey and while forced to wait for prolonged periods in Mexico in inhumane conditions and without access to medical care due to discrimination and barriers to access. The Haitian Bridge Alliance has identified hundreds of Haitian asylum seekers, and particularly Haitian women, arriving to the northern Mexico border with significant medical vulnerabilities which precipitously deteriorate, including reproductive health issues, diabetes, and stroke-related conditions, **at times resulting in preventable deaths**. For example:

- **A Haitian man who had been waiting in Reynosa for a CBP One appointment with his wife and children died of suspected diabetes-related complications** in July 2023, as confirmed by a humanitarian aid worker.

- **A Haitian woman waiting to seek asylum in the U.S. died in front of her two-year-old outside a migrant shelter in Reynosa** in September 2023, as confirmed by a humanitarian aid worker.

- **A Haitian mother who had been waiting with her husband and three children for a CBP One appointment in Matamoros died in late August 2023 of a stroke** after being hospitalized. The family had finally received their CBP One appointment, but it was too late, the mother was critically ill, as confirmed by the Haitian Bridge Alliance.

- **A Haitian man who had been waiting for a CBP One appointment in Tijuana died after suffering two strokes** in June 2023, as confirmed by the Haitian Bridge Alliance which organized a funeral for him.

- **A Haitian pregnant woman was forced to wait by CBP at the Reynosa port of entry for two days in August 2023 while experiencing pregnancy complications and later lost her baby.**

- **A Haitian pregnant woman in her third trimester was denied medical care and lost her baby.** A pregnant woman in her third trimester was living outside a migrant shelter in Reynosa in July 2023 waiting to seek asylum in the U.S. when she fell ill. In an attempt to seek emergency medical attention, a taxi took her to a private hospital where she was denied access to medical care. By the time she received support from an advocate to reach a public hospital, she suffered a stillbirth.

STB_AR1_006351

JA605

Black asylum seekers continued to express fear of being targeted for harm while left to wait in Mexico for CBP One appointments. As included earlier in this report, African migrants have been targets of kidnappings in Sonoyta, Sonora, five kilometers from the border. For example:

- **A Haitian family lives in fear of harm while waiting to try to get CBP One appointment in Mexico City**: A Haitian woman, her husband, and two minor children recounted how they felt unsafe in Mexico City while they waited to obtain a CBP One appointment. On one occasion in June 2023, a group of Haitians outside the building where they were staying were attacked and robbed. The mother feared the perpetrators would enter the building and attack them, too, as recounted to Human Rights First researchers in September 2023.

- **A Haitian woman and her minor children faced discrimination in Mexico during four months of waiting for a CBP One appointment:** The mother described incidents of discrimination they experienced as migrants on account of the color of their skin. People threw trash at them while walking on the street and said racist things to them. Several times they were denied accommodation and were unable to rent a room for the night, as told to Human Rights First researchers in September 2023.

The Haitian Bridge Alliance has found that non-Spanish speaking communities of Black asylum seekers in Tijuana, such as Creole and French-speaking asylum seekers, are fearful of being apprehended and deported while waiting to seek asylum in the U.S. In addition, the asylum ban disparately harms many Black asylum seekers by imposing penalties on those who do not have CBP One appointments when the CBP One app is not even available in the languages spoken by many African and other Black asylum seekers. As a result, African asylum seekers unable to use the CBP One app, blocked by Mexican immigration officers from accessing the San Ysidro port of entry without a CBP One appointment, and at risk of anti-Black violence in Tijuana have begun to cross to the U.S. outside of ports of entry. In early October 2023, dozens of African migrants and asylum seekers from Guinea and Senegal crossed into California near the Tijuana port of entry.

## Asylum ban risks lives of women and girls

**Women migrants in Mexico face gender-based violence, kidnappings, rape, human trafficking, extortion, harassment, difficulty reporting and accessing justice, and institutional and community violence** according to the Instituto Nacional para las Mujeres en Migración. The Mexican national anti-kidnapping commissioner warned in July 2023 that among those kidnapped, there are **growing numbers of young people targeted** as reported by SN Digital Tlaxcala. The UN Committee on Enforced Disappearances in its September 2023 report noted the **increase in disappearances of girls, adolescents and women in Mexico** predominantly in the states of **Mexico, Tamaulipas, Jalisco and Guerrero. Seven of every 10 migrant girls, adolescents and women** have witnessed situations of **exploitation, sexual violence, and human trafficking** both in transit and while waiting in Mexico and **are the target of human trafficking**, according to a survey by Plan International Mexico in August 2023. Similarly, **sexual crimes against girls and women as well as human**

**trafficking of girls and women** are the most recurrent crimes at the northern Mexico border, according to the International Organization for Migration's Mexico anti-trafficking specialist.

**Sexual assault has become so commonplace** that some women cynically **refer to contraceptives as the "vaccine against Mexico"** revealing their awareness that at some point during their journey, they are likely to survive sexual assault, as recounted by Las Americas Immigrant Advocacy Group in Ciudad Juárez in September 2023.

For example:

- **A Honduran mother was kidnapped with her family and survived a sexual assault while waiting to seek asylum in the U.S.:** A Honduran woman, her husband, and young daughter were kidnapped in Reynosa in September 2023 by members of a cartel who also **attempted to sexually assault** the mother. As she fought and screamed, her husband attempted to defend her and was **tied with cables, beaten, and seriously injured**, as reported to a humanitarian aid worker.

- **Honduran teenage boys kidnapped and sexually assaulted by the cartel while waiting to seek asylum in the U.S.:** Two 19-year-old and one 20-year-old Honduran male asylum seekers were kidnapped by the cartel in Reynosa in September 2023 and **sexually assaulted.** Since being released, they are suffering from severe acute stress and trauma on account of the sexual violence they survived, as told to a humanitarian aid provider.

- **A Latin American mother and her minor children were sexually assaulted while waiting to seek U.S. asylum:** In September 2023, a mother and her minor children were waiting to seek asylum in the U.S. and were kidnapped by the cartel in Reynosa. The **mother and children were sexually assaulted** by their kidnappers, which they reported to a humanitarian aid provider upon their release.

## Asylum ban risks lives of LGBTQ+ and HIV+ families and individuals

Leading U.S. organizations that represent and advocate on behalf of LGBTQ+ refugees have repeatedly raised dire concerns about the impact of the asylum ban on LGBTQ+ refugees and urged that the ban be rescinded. For example, the Human Rights Campaign, writing on behalf of its more than three million members and supporters nationwide, warned that the asylum ban would deny protection to many refugees, including LGBTQ+ people and people living with HIV, place LGBTQ+ migrants at active risk of facing the same dangers that they are trying to flee from, and is inconsistent with the Biden administration's demonstrated commitment to LGBTQ+ people around the globe.

The U.S. State Department has confirmed LGBTQ+ persons face widespread violence and mistreatment in Mexico. As documented in our July report on the asylum ban, the ban has placed LGBTQ+ individuals at risk of kidnapping, sexual violence, and death while forced to wait in Mexico for a CBP One appointment and blocked from accessing ports of entry by

CBP and Mexican authorities' actions to turn away, limit, and meter the processing of people without appointments.

For example:

- **A lesbian couple was sexually assaulted in Reynosa in September 2023 while waiting to secure CBP One appointments to approach the U.S. port of entry to seek asylum.** The women feared for their lives as they remained trapped in the city waiting for a CBP One appointment and due to restricted access to the U.S. port of entry on account of CBP's metering and Mexican authorities' gatekeeping for those with appointments, as recounted by a humanitarian aid worker in September 2023.

- **An ill Venezuelan HIV+ man in need of medical treatment was ordered removed by Border Patrol and returned to Mexico** after having entered between ports of entry from Matamoros. The Venezuelan man had struggled for two months to try to obtain a CBP One appointment while in Matamoros. During this time, he was without access to HIV treatment and was ill. He approached Mexican immigration authorities to plead his case for access to asylum protection through the port of entry and was told to cross the river into the U.S. Desperate to receive medical attention and reach safety, he crossed between ports of entry into Brownsville.

- **A trans migrant woman waiting in Ciudad Juárez to seek asylum was extorted by the cartel under threat of sexual exploitation:** A young transgender woman waiting to seek asylum in the U.S. has been targeted by the cartel and forced to pay them $1,500.00 Mexican pesos a week under threats of sexual exploitation. She is afraid she will be killed if she misses a payment. She has not yet been able to safely seek asylum in the U.S. despite these serious protection issues in Mexico, as told to Las Americas Immigrant Advocacy Group in late August 2023.

- **A gay couple escape kidnapping, witness violent assault, and live in fear while waiting five months for a CBP One appointment:** In September 2023, a Venezuelan gay man and his partner had been waiting in Matamoros for nearly five months trying to secure a CBP One appointment, living in fear that they would be kidnapped and harmed on account of their sexual orientation and status as migrants, as recounted to Human Rights First. They spent two months living in a tent in the Matamoros river encampment where they were witness to a violent assault on a family by the cartel and other situations of danger, motivating them to seek shelter elsewhere. They also escaped an attempted kidnapping in the city. While they have been continuing to wait because, they explained, they want to do things "the legal way," they have at times been on the brink of crossing the river to the U.S. to seek asylum and safety due to the dangers they continue to face as they wait in Mexico for a port of entry appointment.

- **A Venezuelan trans woman fleeing persecution was kidnapped in Reynosa:** A Venezuelan trans woman fleeing persecution and violence was kidnapped at the Reynosa bus terminal in August 2023. She recounted to Human Rights First researchers in September 2023 how she was held in a room with about 100 other adults and children of various nationalities and forced to witness the physical beatings of others.

STB_AR1_006354

**JA608**

She experienced sexual harassment and threats by cartel members on account of her gender identity. She witnessed women who were taken outside of the room by members of the organized criminal group while others discussed that the women were being sexually exploited. After being released, she experienced an attempted kidnapping in Reynosa before fleeing to Matamoros.

- **A Venezuelan seven-year-old child was kidnapped for three weeks, drugged, and survived sexual violence while waiting in Reynosa to seek asylum in the U.S.:** A seven-year-old child who identifies as LGBTQ traveling with his mother was kidnapped by the cartel while entering Reynosa by bus and held for three weeks in September 2023. The cartel **drugged the child and sexually assaulted him**. Upon payment of their ransom and release, the mother and child sought protection at a migrant shelter where the child experienced an **attempted sexual assault** by other migrant men when forced to separate from his mother and sleep in the area designated for men, as recounted to a humanitarian aid worker in September 2023.

- **A severely ill Venezuelan HIV+ man was left to wait in Mexico despite life-threatening medical needs.** The man was staying in the Matamoros River encampment while waiting to seek asylum in the U.S. and did not have access to HIV treatment. While in the encampment, his medical condition quickly deteriorated, and he was rushed to the hospital with the support of an aid provider. He later made it to the Brownsville port of entry in August 2023 while still critically ill where CBP forced him to wait despite advocates expressing that he will die on the bridge if denied urgent medical care, as recounted by a humanitarian aid worker in September 2023.

- **A Venezuelan HIV+ man** without access to HIV treatment was forced by CBP to wait three days and sleep outside on the Gateway International Bridge at the Brownsville port of entry in the heat and without access to shelter, food or water in August 2023.

---

Asylum Ban and CBP One requirement turn away and meter asylum seekers at ports of entry

People seeking asylum should be allowed to do so in accordance with U.S. law, and swiftly processed in at ports of entry. Both before and after the asylum ban went into effect, humanitarian aid providers consulted in northern Mexico and Human Rights First researchers have spoken with countless asylum seekers who expressed – and continue to express – that they want to enter the U.S. through a port of entry to seek asylum. However, as documented in prior reports on the asylum ban, including Human Rights First's July 2023 report, CBP is limiting and restricting the number of CBP One appointments made available and the number of people without appointments allowed in at U.S. ports of entry. It is doing so by turning away, limiting, metering and/or leaving asylum seekers without appointments to "wait" in Mexico, often in real or virtual lines that barely move. In the wake of the asylum ban's implementation, Mexican authorities prevent people without CBP One appointments from freely approaching most U.S. ports of entry that accept CBP One appointments, as confirmed in the Strauss Center's August 2023 report on asylum processing at the U.S.-Mexico border. Mexican authorities have blocked access even to urgent medical cases and

STB_AR1_006355

**JA609**

Mexican asylum seekers trapped in their own country of feared persecution

Mexican families and individuals fleeing persecution and violence have been trapped in northern Mexico in cities across the border unable to seek asylum despite not being subject to the asylum ban. As discussed earlier, CBP's metering and limited asylum processing at ports of entry of individuals without CBP One appointments, including Mexican nationals not required to have one under the rule to be eligible for asylum, and Mexican authorities' actions to block access to ports of entry have resulted in Mexican asylum seekers being forced to wait months in their own countries of feared persecution, akin to refoulment by denying access to territory to seek asylum. For example, the majority of people waiting to seek asylum on the Nogales municipal waiting list which has an estimated wait of four to five months are Mexican nationals who are not subject to the asylum. Many are fleeing after suffering harm and threats at the hands of brutal cartels that have national reach and exercise control over large parts of Mexico with the complicity of Mexican authorities.

As a consequence of this restricted and blocked access at ports of entry, Human Rights First has spoken with Mexican families and individuals who have struggled for months to secure a CBP One appointment and faced life-threatening risks and were targeted for harm. For example:

- **A Mexican LGBTQ+ asylum seeker was found dead** the first week of September in the apartment he was renting in Nogales. Since mid-July he had been on the waitlist of asylum seekers waiting to be processed by CBP at the Nogales port of entry administered by the Nogales municipality. His partner was already in the U.S. initiating an asylum request. The Nogales municipality informed the Kino Border Initiative of his death.

- **A Mexican five-year-old girl was sexually assaulted, and her uncles killed while waiting for CBP One appointments:** A family consisting of a mother, father, two teenage children, and a five-year old daughter, along with the father's two adult brothers, were kidnapped by people who identified themselves as members of a cartel in Reynosa in September 2023 while waiting to secure a CBP One appointment. The cartel **tortured and killed the two adult brothers** and **forced the family to witness the sexual assault of their five-year-old daughter**, as they subsequently recounted to a humanitarian aid worker. The family was released after relatives paid the ransom, but they remain in danger in Mexico and in need of critical trauma-related psychiatric care.

- **A Mexican man fleeing violence was kidnapped and tortured by the cartel in Reynosa while waiting to seek asylum in the U.S.:** While waiting to seek asylum in the U.S., a Mexican man was kidnapped in Reynosa in August 2023 and held by the cartel for one month. He was tortured and his finger was cut off with images sent to his relatives demanding immediate payment of a ransom, as confirmed by a humanitarian aid worker.

- **A Mexican family fleeing imminent harm and death threats by the cartel in Sonora, including a U.S. citizen child and his pregnant mother, are blocked from accessing protection at the Nogales port of entry:** A family from Sonora, Mexico, consisting of a U.S. citizen child, Lawful Permanent Resident father and pregnant mother without U.S. legal status fled imminent harm and death threats by the cartel when they approached the Nogales port of entry in August 2023. They were informed they would need to wait more than two months to be processed by CBP as they did not have CBP One appointments, despite not requiring one to seek asylum as a Mexican national. If they waited by the port, they would not only risk their lives but the lives of others waiting. As a result, they were denied access to asylum processing and were forced to transit Mexico to another port of entry and continue to risk their lives, as recounted by the Kino Border Initiative.

---

## Asylum ban and other punitive policies rig expedited removal and lead to deportation

The Biden administration is using the asylum ban in combination with expedited removal and other punitive policies to summarily deport people without an opportunity to apply for asylum and present their case, regardless of whether they could establish eligibility for refugee protection. These wrongful deportations violate U.S. and international law and return people to danger without access to the U.S. asylum system.

Under the asylum ban, nearly all asylum seekers who traveled through another country on their way to the United States are deemed ineligible for asylum unless they managed to secure a CBP One appointment, with highly limited exceptions. The ban applies in expedited removal credible fear screenings as well as full asylum adjudications before the immigration court or the U.S. Citizenship and Immigration Services (USCIS) asylum office. Those denied asylum in full adjudications may apply for lesser forms of protection such as withholding of removal and protection under the Convention against Torture, but these protections are far more difficult to secure and do not afford permanent status or a pathway to citizenship. Many who are not granted these other protections will be ordered deported even though they qualify for asylum under U.S. law.

Despite requests to provide information on the application of the asylum ban in expedited removal, immigration court hearings, and USCIS adjudications, the government has not provided this data. As asylum seekers held in ICE jails – where legal representation is scarce – are those most likely to be most quickly subjected to the asylum ban in full asylum adjudications, there is currently a dearth of information about the impact of the ban in full asylum adjudications. However, the use of the asylum ban in expedited removal has already led to disastrous consequences, including denial of an opportunity to apply for asylum for people who are entitled to a full adjudication of their claim under U.S. law and increased risk of refoulement in violation of U.S. and international law.



https://tucson.com/news/local/border/us-mexico-border-arizona-biden-order-asylum-seekers/article_461bd3a4-29b1-11ef-b884-5f9fc26ba81b.html

ALERT   TOP STORY   TOPICAL

# Border agents ignoring fear claims, migrants say, in violation of Biden order exception

**Emily Bregel**

Jun 15, 2024

NOGALES, Sonora — The exhausted couple sat on the ground outside the Mexican immigration office in the DeConcini port of entry on Friday morning, methodically re-lacing their shoes that officials had inspected, as their two daughters, ages 5 and 10, sat quietly beside them.

Gathering their belongings into small plastic bags provided by the immigration agency, the foursome walked out onto a bustling side street to join dozens of other recently returned migrants, mostly Mexican families with children.

Unrelated families consulted with one another, trying to figure out next steps after being returned to Mexico under President Joe Biden's June 5 executive order, which dramatically restricts access to asylum for migrants who enter the U.S. outside an official port of entry during busy times at the border.

Some of the newly deported migrants said they told Border Patrol agents they feared return to their home country — which is supposed to prompt a credible-fear interview, even under the new rule — but they were ignored and deported anyway.

## People are also reading...

1   **Don't sleep on the carne asada from The Quesadillas, which might be one of Tucson's best-kept secrets**

2   **Where to watch fireworks in Tucson this Fourth of July**

3   **Monsoon is here! 9 Tucson restaurants and bars to watch the weather**

STB_AR1_006704

JA613

**4    Arizona, Tucson actions on homeless may follow Supreme Court ruling**

"Are we in Nogales?" one woman from southern Mexico asked in Spanish. A mother from Chiapas with three children, ages 2, 7 and 12, asked how to find a safe taxi to the nearest airport. Her eyes brimming with tears, she described the dangers they'd fled and that they now must return to in San Cristóbal: the homes in her neighborhood burnt down by criminals with impunity, the bullet that whizzed by her eldest daughter's ear a few weeks ago.

Like the others, the family with two daughters, who asked to remain anonymous, were deported to Sonora through an expedited-removal process on Friday morning. They'd crossed into Arizona two days earlier, through the desert near Lukeville.

Fleeing violence in Mexico City, they said they intended to request asylum once they found a Border Patrol agent. But before they could ask, the agent told them that wasn't an option anymore, under the new asylum policy.

"They just told me we were going to be deported," the father said in Spanish. "They said the government changed the rules. They never let me talk so I could ask for asylum."

None of the five families who spoke with the Arizona Daily Star on Friday were aware of the new asylum restrictions until they crossed the border and surrendered to border agents. They now face a five-year ban on re-entry and possible criminal charges if they try again.

# Agents violating protections, advocates say

The Border Patrol has estimated it's returning 500 Mexican nationals daily to Nogales, Sonora, though it's difficult to track: Only about 200 per day appear to be going through official repatriation processing at Mexico's repatriation office in the DeConcini port, said Pedro De Velasco, director of education and advocacy for binational migrant-aid nonprofit Kino Border Initiative, which has a shelter in Nogales, Sonora. Some are being deported at night, when the office is closed, he said.

STB_AR1_006705

JA614

# *Far from Safety: Dangers and Limits to Protection for Asylum Seekers Transiting through Latin America*

**CGRS Report
April 2023**



# Center for Gender & Refugee Studies

STB_AR1_006757

JA615



## Mexico

### Dangers for Asylum Seekers

Mexico is an unsafe country for many asylum seekers, who are targeted by both government authorities and criminal gangs. The Department of State recognizes that "[t]he press, international organizations, and NGOs [have] reported targeting and victimization of migrants and asylum seekers by criminal groups." There have been numerous instances of these groups extorting, threatening, or kidnapping asylum seekers and other migrants. "In many parts of the country, human smuggling organizations wield significant power, and media allege frequent collusion



among local authorities."[7] As reported by CGRS and other human rights organizations, there are several instances of documented violence against asylum seekers transiting or returned to Mexico, particularly women, children, LGBTQ+ individuals, and others who are particularly vulnerable.[8] Mexican immigration or law enforcement authorities are responsible for a large share of this violence and other crimes committed against asylum seekers.[9]

The combination of stringent immigration enforcement measures in Mexico and U.S. policies that restrict asylum seekers' access to the border have tragically resulted in many deaths. A recent example is the devastating fire that broke out at an immigration processing facility in Ciudad Juarez, Mexico, which claimed the lives of 39 individuals and injured many others. Shockingly, video footage of the incident shows uniformed officials passing by the flames without attempting to open the door or provide assistance to the trapped asylum seekers.[10]

### Deficiencies in the Asylum System

The U.S. government asserts that Mexico has become one of the top countries receiving asylum applications due to the government's efforts to strengthen its international protection system.[11] It is true that asylum applications have increased exponentially in Mexico over the last few years.[12] However, this dramatic increase in asylum applications does not indicate that more asylum seekers feel safe in Mexico and are choosing it as a destination. Rather, it coincides with the U.S. government's implementation of policies that severely restricted access to the U.S. territory and asylum system,[13] forcing thousands of individuals – particularly Black Haitian and African asylum seekers – to remain in a country through which they intended only to transit.[14]

In practice, Mexico's asylum system is overwhelmed despite efforts to increase its capacity. COMAR ("Comisión Mexicana de Ayuda a Refugiados"), Mexico's refugee agency, has modestly increased its staffing and field presence. Yet despite these efforts, the agency cannot meet the demand resulting from an increasing number of applications. COMAR's budget has increased over the years, but only modestly and not commensurate with the increase in asylum applications.[15] For 2023, COMAR was assigned a budget of around 2.5 million U.S. dollars. This represents only a 5.8 percent increase over the budget for 2022, and an 8.8 percent increase as compared with 2021.[16] In practice, the unprecedented number of asylum seekers in Mexico has overstretched COMAR's capacity to process

4

STB_AR1_006762

JA617

asylum requests.[17] This lack of capacity has become one of many obstacles to accessing international protection in Mexico.[18]

An illustration of COMAR's lack of capacity is the limited number of requests it adjudicates, in comparison with the total number of applications received. Between 2020 and 2022, COMAR resolved on average 32,189 cases per year, while it received 183,555 asylum applications during the same period.[19] Further, while COMAR granted asylum or complementary protection in around 74 percent of cases adjudicated, it is important to note that the agency treats asylum seekers differently depending on their nationality. For example, COMAR may grant protection to many Hondurans, Venezuelans, and Salvadorans, "while rejecting most applicants from Haiti, saying they do not qualify as refugees."[20] The approval rate among applicants for Haiti was only 12 percent in 2022.[21]

Additional barriers to accessing protection in Mexico include a limited period of 30 days to file asylum applications after entering the country,[22] as well as a series of practices and policies that prevent asylum seekers from filing their claims or obtaining proper support during the process. For instance, human rights organizations have documented cases where immigration agents have dissuaded asylum seekers from applying for refugee status and instead pressured them to agree to voluntary returns, "even when they said they would be at risk of violence and persecution in their home countries."[23] At airports, Mexican immigration authorities have turned around individuals intending to seek protection in Mexico.[24] Mexican authorities have also illegally expelled asylum seekers from the interior of the country and from its southern border.[25]

Further, Mexican law forces asylum seekers to remain in the jurisdiction in which they applied for protection during the duration of their proceedings.[26] This has caused a bottleneck of cases at Mexico's southern border. In 2021 and 2022, on average over 66 percent of those who applied for asylum in Mexico did so in Tapachula, Chiapas, where conditions are dire. Shelters in Chiapas have been stretched beyond their capacity, jobs are nearly impossible to find, and individuals waiting for appointments or decisions are provided little to no assistance, forcing many to live in the streets.[27] Asylum seekers in Tapachula are also prevented from accessing healthcare services, as providers often require them to provide documentation they do not have.[28] Further, not only have asylum seekers experienced violence in Tapachula, but many have also reported feeling unsafe due to its proximity to the Guatemalan border, where some of the gangs they have fled operate.[29]

**Detention**

Mexico's immigration detention system presents another serious barrier to accessing or receiving protection. While the national Migration Law sets a maximum of 60 days for immigration detention, the implementing regulation provides that asylum seekers can be detained for the entire duration of their proceedings.[30]

Asylum seekers in detention face overcrowding, unsanitary conditions, lack of services, and inadequate food and healthcare, forcing many to drop their claims in order to be released.[31] Most of them never receive information about their right to apply for asylum or complementary protection while in detention.[32] During 2021, foreign nationals arriving at airports to seek protection were detained by Mexican migration authorities and held in detention for weeks, without any opportunity

5

STB_AR1_006763

JA618

to apply for asylum.[33] There have also been incidents of torture reported in immigration detention centers.[34]

### Discrimination and Access to Basic Services

The asylum-seeking population in Mexico has also shifted over the last few years, with an increasing number of both Black and non-Spanish speaking applicants.[35] These asylum seekers face racism and increased xenophobia.[36] For example, as documented by CGRS and other organizations, discrimination and racial profiling prevents Haitian asylum seekers from accessing employment, housing, or even public transportation in Mexico.[37] Non-Spanish speakers face language barriers further prevent access to both the asylum system and services such as education and healthcare.[38]

In short, Mexico does not meet the requirements of a safe third country under U.S. law and international standards.

## Belize

### Deficiencies in the Asylum System



Although Belize is a country with lower levels of violence, and greater respect for human rights than many of its nearby neighbors, its asylum system is barely functional. By December 2022, Belize had granted asylum to fewer than 100 individuals, resulting in a backlog of over 4,000 cases.[39]

Asylum seekers in Belize face an inaccessible and inefficient asylum system. First, the actual process is cumbersome as it involves a single Eligibility Officer who oversees gathering and reviewing claims before passing them on to the Refugee Eligibility Committee, a 9-member group that reviews only a limited number of cases at monthly meetings.[40] According to the Department of State, out of 640 positive recommendations, the Ministry of Immigration has granted asylum in only 15 percent of them.[41] Second, more than 50% of asylum seekers report not applying for asylum in Belize due to not knowing it was an option or not having information on how to do so, a clear barrier to accessing the system.[42]

Worse, there are also reports that Belizean authorities prevent asylum seekers from seeking protection or discriminate against them. For example, the Human Rights Commission of Belize reported that 26 individuals filed complaints for not being allowed to apply for refugee status in 2022, while the true number is believed to be much higher.[43] And while the Belizean Refugee Law recognizes the right to seek asylum regardless of the matter of entry into the country, there have been cases reported of asylum seekers being denied this opportunity because they entered irregularly.[44] During 2022, "the government repatriated Cuban nationals who claimed their lives or freedom would be threatened due to their opposition to the government. Belize and Cuba have an agreement that requires Belize to return to Cuba all irregular migrants with Cuban citizenship."[45] Additionally, one government study reported that 15 percent of asylum seekers claimed to have entered Belize irregularly after being rejected at ports of entry due to their nationality.[46]

6

STB_AR1_006764

JA619



# REFUGEE PROTECTION TRAVESTY

## Biden Asylum Ban Endangers and Punishes At-Risk Asylum Seekers

July 2023

JA620

STB_AR1_006842

humanitarian efforts in Mexico, and create funding programs beyond those already in existence, to ensure critical support for sustainable and longer-term faith-based, humanitarian, and other refugee reception in the United States — both along the U.S.-Mexico border and in destination communities across the country.

## The Asylum Ban Endangers Lives

People seeking asylum at the U.S. southwest border in the wake of the Biden administration's asylum ban face grave risks of violence as they struggle to secure CBP One appointments or risk the penalties the asylum ban inflicts if they attempt to approach a port of entry without an appointment or cross the border between U.S. ports of entry. Many are stranded and, instead of being swiftly processed at ports of entry as they should be under U.S. law, are left to wait for months for CBP One appointments in Mexico.  Many are, as a result, stranded in cities that the U.S. State Department has assessed as too dangerous for Americans to even visit. In these and other areas in Mexico, migrants and people seeking asylum — marked by their languages, accents, race, and lack of legal protection — are particular targets of kidnapping, torture, and other human rights abuses.

People seeking asylum — including women, children, and other vulnerable groups — face these grave risks as they wait to seek asylum under the Biden asylum ban. Local humanitarian workers in Reynosa, Tamaulipas, where kidnappings have been prevalent, stressed their concern over alarming incidences of rape and increased kidnappings in the last two months. Human Rights First researchers interviewed many people who suffered horrific harm and threats of violence as they waited in Mexico in the weeks following the implementation of the asylum ban on May 12.  For example:

- **A Honduran woman was raped while waiting for a CBP One appointment and turned away from a port of entry by Mexican officers despite the risk to her life.** Fleeing persecution, she was living alone in a makeshift tent in the Matamoros encampment for three months trying to obtain a CBP One appointment to seek asylum and was **violently raped in her tent at night** in late May 2023 by a man who cursed at her for being a migrant and **threatened to kill her** if she told anyone. She screamed for help, but no one came. Her rapist returned another night in early June 2023 and attempted to rape her again, but she defended herself and escaped the camp. Terrified, she filed a police report and attempted to access the U.S. port of entry in Matamoros after both attacks but was blocked from accessing the U.S. port of entry **both times by Mexican immigration officers** despite her evidence and testimony that she feared for her life. Instead, Mexican immigration officers questioned her as to whether she was in fact raped. She has **received death threats** related to her sexual assault by phone. She

STB_AR1_006851

JA621

was unaware of the asylum ban prior to being informed of it by a Human Rights First researcher, who also explained that she may be subjected to its penalties if she tries to seek asylum without an appointment.

"I am afraid for my life here. Afraid that I will be killed, kidnapped, or that they'll do something to me.

In my country, I'm a professional. I had a career. I'm not coming to work. I came because my life was in danger. And something that had never happened to me – a rape – happened to me here."

- A Latin American[1] man seeking asylum suffered an enforced disappearance when he was kidnapped and tortured by Mexican officials in Reynosa while trying to secure a CBP One appointment. He arrived at the U.S.-Mexico border in December 2022 and has been attempting to secure a CBP One appointment for four months. He was recently beaten unconscious and subjected to an enforced disappearance when he was kidnapped by men dressed as Mexican officials in Reynosa, according to information received by an attorney with Lawyers for Good Government in Reynosa. He managed to escape after one night, but due to the extreme physical violence, he continues to suffer from severe headaches, gastrointestinal issues, and other symptoms. He said: "I constantly hear a loud ringing noise in my ears and it feels like the back of my head is inflating like a balloon. Because of these symptoms, I often want to be alone and feel like my pain and desperation are getting the best of me." His kidnappers robbed him of his phone so he had to obtain a new smartphone in order to begin requesting a CBP One appointment once again. The man has been requesting a CBP One appointment every day since. After his escape, he went into hiding. However, he saw two men following him, so he relocated. He does not go outside because he fears he will be found and tortured again. He will be forced to leave his current housing arrangement soon and has nowhere else to go.

- A Latin American[2] woman was kidnapped, trafficked, and raped and has been forced to wait at risk of harm in Mexico while trying to obtain a CBP One appointment, unable to seek U.S. asylum protection. As she waited to seek U.S. asylum in Mexico, she was kidnapped, held captive, and abused for about a month and a half, according to information received by an attorney with Lawyers for Good Government in Reynosa.  She was able to escape her captors, only to be taken and held captive a second time.

---

[1] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality.
[2] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality. STB_AR1_006852

**JA622**

12

She said: **"I was held captive at this house for about two months and I thought the only way I would leave the house was if I were dead."**

During her captivity, **her captors trafficked her to drug dealers who raped her on several different occasions.** She has been **in hiding** since her escape and has been requesting a CBP One appointment daily without success. She has been **unable to present at the port of entry** to seek U.S. asylum protection due to **Mexican immigration officers unlawfully blocking access** to individuals without CBP One appointments.

- **A Venezuelan women and child were kidnapped, and the mother was raped while waiting for a CBP One appointment. They were then denied access to the port of entry by Mexican officers. They risk the punishment of the asylum ban if they attempt to enter between ports of entry or present without a CBP One appointment.** The mother, her minor son, and adult sister attempted to obtain a CBP One appointment to seek asylum in mid-May 2023 when they were kidnapped and held for 12 days in Reynosa in June 2023. Their abductors **threatened to take their organs if their families didn't pay a ransom.**

  The women described being placed in a room with 50 people from China, Cuba, Ecuador, Honduras, Mexico, and Russia, including kids as young as two years old, all on top of each other. Their kidnappers threatened and beat people, including the children.

  "We **witnessed** them [the cartel] **taser men with electricity who screamed in pain right in front of us** and **severely beat** men if the transfer payment hadn't come through. **My son cried a lot, begging to leave.** They'd also give drugs to the teenage children."

  That first night, a cartel member raped the Venezuelan mother. "He **threatened to kill my son and sister** and threatened me to stay quiet. **We were terrified each time the door opened and our abusers entered. We prayed and prayed.**

  **We feel completely unsafe here in Mexico. We're terrified to go outside; afraid we'll be taken again.**"

- **Venezuelan siblings waiting for a CBP One appointment were denied access to seek asylum at U.S. port of entry by Mexican officers, traveled to a different port of entry where they were kidnapped and tortured, and were again blocked from seeking protection by Mexican officers despite the risk to their lives**. Two Venezuelan young adults, one minor sibling, and their girlfriend arrived in Matamoros after the asylum ban went into effect. They had been trying to obtain a CBP One appointment to seek U.S. asylum since April. Access to the U.S. port of entry in Matamoros was blocked by Mexican immigration officers so they traveled to Reynosa in June, where they heard they may be able to access the port of entry. In Reynosa, they were intercepted by a car while

STB_AR1_006853

JA623

walking. The driver asked where they were from and then kidnapped and held them hostage for three days. During that time, they were all physically assaulted and the **women** were **tortured for ransom.**

The kidnappers threatened **"[i]f you don't pay, we'll cut off your fingers."**

The family's relatives paid the ransom and they were released. They live in constant fear, as their kidnappers took their photos. Following the kidnapping, they escaped Reynosa and returned to Matamoros. They attempted to present at the Matamoros port of entry to request asylum, explaining their fear and what had happened, but were **prevented from approaching the U.S. port of entry by Mexican immigration officers** who wrongly turned them away because they did not have a CBP One appointment.

- **A terrified Venezuelan family that suffered brutal kidnapping while waiting for a CBP One appointment is living in fear of further harm while forced to wait in danger.** The mother, father, and their adolescent and preschool-aged children who had been trying to obtain a CBP One appointment to seek U.S. asylum were **kidnapped** by a cartel in early June in Reynosa and held for 10 days. During their kidnapping, the mother was **sexually abused by a cartel member on two occasions.** The family also described witnessing intense beatings of migrant men and hearing their screams for pain, including one severely assaulted man who pled to his family by phone to send the money or he would be killed. "It was horrible. **You don't know if you'll get out alive. My kids cried and cried. They wanted to leave, wanted to cross [to the U.S.]; they didn't want to be here.**"

  After their release, the family had to register for CBP One again as the phone they had previously used to register was stolen by the cartel. **"We've been waiting for an appointment that doesn't arrive. It [the app] doesn't care about the risk [we face] or our human rights."**

  They managed to keep their other phone when they were released but **have been receiving threatening calls** demanding payment of more money. **"There is no authority here. There was no security. Even hotels aren't safe, they collaborate."**

  **"There is no sense of peace. I ask God to help us get out of here. My family is in danger here. At night you hear gunfire. We're terrified to go out on the street. We aren't safe here in Mexico. At least, thank God, we are alive."**

- **A Latin American[3] family was kidnapped and the mother raped while waiting for a CBP One appointment, but they are forced to continue to wait in danger.** The family,

[3] To protect the safety of the family, Human Rights First is not identifying them by their specific nationality. STB_AR1_006854

JA624

including two elementary-school aged children, were kidnapped in Reynosa in late May and held for 13 days after trying for weeks **to obtain a CBP One appointment to seek U.S. asylum**. The family's relatives with young children were also kidnapped with them. While kidnapped, the mother **was sexually assaulted by cartel members**. She prayed they wouldn't sexually abuse her daughter. **"It was a difficult experience for the children. They didn't eat. They cried. They wanted to escape, but we couldn't."** After 13 days the family was released but the cartel kept their phones and money, so they had no resources to buy a smartphone to use the CBP One app. Nor could they approach the port of entry in Reynosa because it was blocked by Mexican authorities to those who don't have a CBP One appointment. They have been trapped in Reynosa. In late June 2023, they were able to borrow a phone and register on the CBP One app again and were still waiting for an appointment. **A few days after the family's relatives and their young children were released, they were kidnapped again.** At the time the family spoke with Human Rights First, their fates were still unknown.

- **A Venezuelan family was threatened, robbed, and their son nearly kidnapped while waiting for CBP One appointment, and were denied access to the port by Mexican officers.** The family, including a teenage son and young daughter, have been waiting one month in Matamoros to obtain a CBP One appointment to seek asylum. They rented a room where other migrant families were staying, where they thought they would be safe. One day at dawn, **masked men identifying themselves as members of the cartel in charge in Matamoros,** entered and ransacked the house, stealing the family's money, and **attempted to grab the teenage son**. The adult male in the family defended the son and the masked men threatened him, saying that **if they find him in Matamoros, they will kill him**. The family heard others in the house yelling as if being injured. The family fled and approached the port of entry explaining they were afraid for their lives.

  Mexican immigration officers told them, "[i]t's not our problem."

- **A Venezuelan woman is in hiding after experiencing attempted kidnappings while waiting for a CBP One appointment, yet was denied access to U.S. port by Mexican officers.**  The woman, who is traveling alone, has been trying **to obtain a CBP One appointment since April 2023**. During the last days of Title 42, she attempted to seek U.S. asylum protection and was **laterally expelled by CBP** from Matamoros — where she entered — to **immediate harm in Reynosa.** Upon arrival to Reynosa alone, she experienced an **attempted kidnapping** by a taxi driver. She escaped and joined a group of other women who had also been expelled to walk together to the bus terminal, but **a black truck circled them and tried to abduct two women.** She traveled to Matamoros and **continued to request a CBP One appointment each day** in the wake of the asylum ban. She slept on the street outside a shelter and was informed that **a man who had her photo was looking for her**. She sought safety elsewhere and was told that two men who said they were her cousins **had come the night before to look for her.** She

STB_AR1_006855

JA625

fled to the Matamoros port of entry to try again to seek U.S. asylum, but **Mexican immigration officers blocked and informed her she needed a CBP One appointment**. She is **in hiding** and **afraid for her life**.

Many people waiting in Mexico to seek asylum are living in makeshift encampments with none of the necessary safeguards or systems in place to protect women, children, LGBTQ+, and other vulnerable people from being targets of abuse and violence. Local aid workers report instances of the cartel terrorizing the Matamoros camp in June 2023 as well as individuals and families facing heightened risk of kidnapping, rape, and other violent harm in the encampments and outside shelters in Reynosa.



Makeshift tents in the Matamoros encampment, June 2023.

- In early June 2023, two Haitian couples traveling with an 11-month-old infant told a Human Rights First researcher about extortion and dangers they had experienced in Mexico, including difficulties finding safe shelter and an **attempted kidnapping** they had experienced the day prior in Nogales as they approached the DeConcini Port of Entry. The father of the baby shared:

  **"We were walking toward here. A truck with three men stopped and they got out and started coming toward us. 'RUN!' I shouted to my wife and baby. We managed to escape."**

STB_AR1_006856

JA626

- A Colombian **elderly woman travelling alone was physically attacked and verbally assaulted** in the Matamoros camp by **a member of the cartel** who identified himself as the person in charge and whom others said was the leader. She immediately hid in another family's tent, pleading to be allowed to sleep there that night before escaping the camp the next day.

  **"The terror I felt that night was the worst in my life. They [the cartel] don't respect if you're an older woman, a child, a pregnant woman. People are taken from the camp and disappeared, and no one can say anything."**

- A **Mexican Indigenous mother** living alone in the Matamoros encampment with her **infant and three children** explained in May 2023 that her partner obtained a CBP One appointment two months prior but was unable to get one for all of them. As a result of CBP's policy to only process individuals with appointments, she stayed behind in the camp with their children as she tried to request a CBP One appointment daily. She explained that others in the camp knew she was now alone with her children and told of **an attempted sexual assault she experienced when a man entered her tent at night**. She also told of another man who **kept asking for her two elementary school-aged daughters** and the risk of kidnapping and trafficking they faced, forcing them to flee the camp.

- A **Haitian mother with two young daughters** who were living in an encampment in Reynosa while trying to obtain a CBP One appointment to request U.S. asylum shared that **she did not feel safe in Mexico** and that she **used a cable wire to tie her two daughters to her at night to prevent someone from taking them.**

STB_AR1_006857



Young Haitian child living in a tent in a
camp in Matamoros, Mexico, June 2023.

- **Lack of safety, fears that daughters will be kidnapped, and inability to secure CBP One appointment after two months leave family wondering how to cross to safety.** An Ecuadorean family with two teenage children and a six-year-old daughter fleeing threats of harm in Ecuador have been living in the Matamoros camp for two months, unable to obtain a CBP One appointment to seek asylum.

  "We don't sleep. You have to keep one eye open. We use a cable wire to tie ourselves together at night and tie shut our tent. I'm afraid they'll take my girls."

  Her 17-year-old daughter's mental health has deteriorated: "She cuts herself. She feels very unsafe here. There's no privacy. She asks why we can't leave. How can we cross?" she told a Human Rights First researcher as her daughter showed her cut marks.

- **Venezuelan women and children fear kidnapping living on the street as they struggle for over two months to get CBP One appointments and are turned away by U.S. CBP officers and Mexican immigration officers at the port of entry.** The women, who are cousins and one of whom is a mother to one and four-year-old daughters, have been waiting for two and three months, respectively, trying to seek a CBP One

STB_AR1_006858

JA628

18

appointment. "We've been **sleeping on the street**. I worry for my one and four-year-old girls. They **cry from hunger most days. They're not sleeping**. A woman **photographed us yesterday and a black truck approached in the middle of the night** as we walked looking for where to sleep. We've been trying for [two and] three months to get a CBP One appointment.

**We're afraid. We can't continue like this.** We're trying to present ourselves to be processed and to put forward our case. We made it to the bridge and waited hours feet from the American officials, but **Mexican immigration removed us."**

The next day, the women and children made it onto the bridge again and walked straight to speak with the CBP officers to share their fears and request protection. **CBP Officers informed them they couldn't help them.** One of the women indicated that an officer left and made a phone call. They were left waiting about 15 minutes before **Mexican immigration officers approached them on the bridge and removed them**.

- A Haitian man living in a tent in an open-air camp in Matamoros in June 2023 who has been trying to obtain a CBP One appointment for over one month shared his fears after observing a car stop at 3 a.m. and ask Haitians in the camp whether they wanted to work as they had jobs for them. The Haitians answered no. **He feared it was a ploy to kidnap them.** Some nights he observes a car drive past the encampment and park across the street.

    **"Sometimes we don't sleep because we're obliged to not lose consciousness."**

STB_AR1_006859

JA629



Haitian camp in Matamoros, Mexico, June 2023.

Non-Mexicans presenting at ports of entry without a CBP One appointment who are subject to the asylum ban can later try to overcome the ban and be considered for asylum if they can prove that they (or a member of their  family who they are traveling with) faced an "exceptionally compelling" circumstance, such as at the time of entry into the United States, faced an acute medical emergency; an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder; or was a "victim of a severe form of trafficking in persons," as defined by U.S. regulations.

The narrow **exceptions to the ban will not protect many refugees** and will often be impossible to prove. For instance, many asylum seekers in Mexico suffer horrific violence at the hands of Mexican government agents and cartels, with many targeted precisely because they are migrants or seeking asylum in the United States. Human Rights First has tracked over 13,000 reports of murders, kidnappings, rapes, and other violent attacks against migrants blocked in or expelled to Mexico due to Title 42 since President Biden took office. Amid this unremitting violence, asylum seekers in Mexican border regions so often face a serious risk to their safety that it is absurd to require an asylum seeker to establish an "imminent and extreme" threat to life or safety, and it is unclear how they could even prove to an adjudicator that they would have been kidnapped, raped, murdered, or otherwise harmed had they remained in danger for longer.

As is, people facing an urgent protection situation, including threats to their life or safety such as risk of sexual assault, kidnapping, torture or murder, as detailed above, have been left by U.S. officials to wait indefinitely in the wake of the Biden asylum ban as have people with urgent medical emergencies. For example:

- A Venezuelan woman who suffers from heart problems including myocardial ischemia and necrosis had been trying to obtain a CBP One appointment for three months when she **suffered a heart attack at the Matamoros port of entry** while trying to present to seek asylum. A doctor at the port of entry helped her. She told **Mexican immigration officers** that she had suffered a heart attack and had medical documents and tests confirming this diagnosis but **was told to move aside for people with CBP One appointments**.

- A Guatemalan mother in Tijuana fleeing threats to her and her children's life is ill and requires **dialysis treatment due to kidney failure** but has been unable to access asylum protection and has been left waiting to secure a CBP One appointment since May 2023.

- A local humanitarian worker who provides support to critical medical cases requiring access to the Reynosa port of entry was **harassed and threatened by CBP officers,** when attempting to support a **Haitian asylum-seeking man experiencing a medical emergency** who was hospitalized at a local hospital that was unable to provide the emergency treatment he needed. The worker requested access to the Reynosa port of entry for the Haitian man as had been customary for medical emergencies that required transport by ambulance just months prior under Title 42. The humanitarian worker was told by CBP officers at the limit line, "**This isn't our problem. If you want, you can bring him to wait in line.**" At this time, other vulnerable individuals waiting at the limit line to access the port without an appointment were being **forced to wait by CBP for over 72 hours in extreme heat** as they deprioritized persons waiting without CBP One appointments.

STB_AR1_006861

JA631

"**If I bring him to wait in this line without medical care, he will die**," she said.

After advocacy by another local humanitarian worker, the ambulance transporting the critical case was approved to cross. Yet upon arrival at the port with the ambulance, the humanitarian worker and the Haitian man were harassed by CBP: **"It's you again?"** the CBP officer greeted the humanitarian worker who tried to explain the situation **but was silenced**. A CBP nurse said, "**You call this an emergency?**" and **removed the Haitian man's oxygen tubes and ordered him to stand up, lowering him from the bed and off the ambulance**. A CBP supervisor **refused to provide the Haitian man with a wheelchair and instead forced him to walk and to carry his luggage,** prohibiting the humanitarian worker from carrying it for him. The CBP supervisor accepted the man for processing and ordered the local humanitarian worker to leave, threatening her and saying she was prohibited from return:

"**You're already in trouble, so if you don't want to have more problems, leave. You are no longer allowed in this area**."

## Asylum Ban Denies Asylum to Refugees Who Have No Knowledge of It

While some Biden administration officials have attempted to paint the asylum ban as the pivotal factor leading to decreased border crossings after the end of the Title 42 policy, multiple human rights and humanitarian monitors have learned, through speaking with many people waiting in Mexico to seek asylum, that during this period of time, waiting asylum seekers have actually been largely unaware of the asylum ban rule and its consequences. Since the Biden administration initiated its asylum ban in early May 2023, Human Rights First researchers and attorneys have spoken with over 300 people waiting to seek asylum across the southwest border with Mexico, including asylum seekers waiting in Matamoros and Reynosa, Tamaulipas; Ciudad Juárez, Chihuahua; Nogales, Sonora; and Tijuana, Baja California. **Overwhelmingly, the people seeking asylum who our researchers spoke with in the days and weeks after the asylum ban's implementation did not know what the asylum ban was and none understood the penalties it inflicts based on an individual's manner of entry to the United States.**

Multiple humanitarian monitors from various organizations have reported on asylum seekers' lack of information and knowledge about the asylum ban and its consequences. A June 2023 monitoring report issued by the International Rescue Committee (IRC) and six other organizations concluded that "[a]t observed ports of entry where monitors spoke with awaiting asylum seekers without CBP One appointments, many expressed confusion about the difference between Title 42 and the current process or were unaware of the new restrictions that make individuals requesting protection at a port of entry without a CBP One appointment, including themselves, presumptively ineligible for asylum and therefore subject to a range

STB_AR1_006862

JA632



July 3, 2024

Via Federal e-Rulemaking Portal
https://www.regulations.gov

Daniel Delgado
Acting Deputy Assistant Secretary for Immigration Policy
Office of Strategy, Policy, and Plans
Department of Homeland Security

Lauren Alder Reid
Assistant Director
Office of Policy
Executive Office for Immigration Review
Department of Justice

Re:     *Securing the Border,* 89 FR 48710 (June 7, 2024), USCIS Docket No. USCIS-2024-0006
        and *Presidential Proclamation,* 89 FR 48487 (June 3, 2024)

Dear Mr. Delgado and Ms. Reid:

The Center for Gender & Refugee Studies (CGRS) submits this comment in response to USCIS Docket No. USCIS-2024-0006 *Securing the Border* (June 7, 2024) (hereinafter "Interim Final Rule" or "Rule"). We include the following outline to guide your review.

Yet, the Departments fail to explain how providing advance notice to asylum seekers would have been effectuated in the first place. In the wake of implementation of the Lawful Pathways rule, researchers found that people seeking asylum at our southern border "overwhelmingly" did not know what the rule was or the penalties it imposed based on an individual's manner of entry into the United States.[20] CGRS staff have encountered similar lack of knowledge among current asylum seekers about the instant Rule since it took effect. The Departments also do not explain why advance notice would even have mattered when smugglers are spreading lies about how to get to the United States. Given the extremely compelling reasons that continue to force people to flee in search of safety, and the malign influence of smugglers regardless of what border policies may be in place, it is speculative at best to assert that giving advance notice would have resulted in a surge of people to the border.

### B. The Good Cause Exception Does Not Apply Since Providing Notice Would Have Been Both Practicable and in the Public Interest

The Departments next assert that the Rule falls within the good cause exception to the APA's notice-and-comment and delayed-effective-date requirements because compliance would be both impracticable and contrary to the public interest. Rule 48762.

### 1. Providing notice was practicable

As noted in the Rule, findings of impracticability depend on the facts and the context. Rule 48762. Yet the Departments focus solely on reducing numbers at the border at all costs,[21] and avoiding a potential increase of asylum applicants, which, as pointed out above, is speculative in the first place. The Departments also fail entirely to consider that border management policies must comply with existing U.S. and international law designed to protect refugees. Instead, the Rule is forthright in presenting adherence to the law as a problem that the Departments feel they must overcome. For example, the Rule laments that:

> [Department of Homeland Security (DHS)]'s ability to manage this increase in encounters has been significantly challenged by the substantial number of noncitizens processed for expedited removal and expressing a fear of return or an intent to seek asylum; rather than being swiftly removed, these noncitizens are referred to an AO for a credible fear interview and can seek IJ review of an AO's

---

[20] Human Rights First, Refugee Protection Travesty (July 2023), at 21 (hereinafter HRF, Travesty), *attached.*

[21] As the Rule stresses, "The **critical** need to **immediately** implement more effective border management measures is described **at length** in the Presidential Proclamation of June 3, 2024, Securing the Border, and in Section III.B of this preamble." Rule 48762 (emphasis added).

STB_AR1_007485

negative credible fear determination, which requires additional time and resources. Rule 48762.

It is striking that this depiction of the problem is a description of the legally-required process, a decades-long feature of U.S. law that the Departments now treat as a bug.

As another example of its failure to situate the impracticability analysis in its proper context, the Rule frequently refers to U.S. policy as providing "real and perceived incentives" to migrate, Rule 48764, with little corresponding recognition of factors that force people to flee, regardless of how draconian U.S. border procedures may be.

### 2. Providing notice was in the public interest

Turning to the second prong of the good cause exception, the Departments assert that providing notice and delaying implementation would have been contrary to the public interest, again citing the possible increase in people coming to the border in anticipation of a policy change. Rule 48764. As noted above, the potential increase due to providing advance notice is speculative at best.

As further justification, the Departments point to smugglers who create a sense of urgency among migrants by overemphasizing the significance of recent or upcoming policy developments. Rule 48764. However, as noted above, the Departments also state that smugglers spread rumors and misrepresent facts, Rule 48764, which suggests that actual changes in policy are not needed for smugglers to drum up business. In invoking the negative role of smugglers, the Departments again fail to acknowledge the larger context that the more difficult it is to apply for asylum, the more likely it is that people will turn to smugglers in desperation to guide them through the labyrinth of obstacles before them.

The Departments' argument that asylum seekers from Mexico may have had "an additional perceived incentive" to "rush to the border" during a notice-and-comment period, Rule 48765, is particularly reprehensible. They thus acknowledge that, contrary even to the Lawful Pathways rule, direct *refoulement* of Mexican asylum seekers to their country of origin is a specific aim of the instant Rule.

The Departments' chief error here is a narrowly circumscribed view of the public interest, defined solely as reducing the number of people seeking asylum at the border. The Departments fail to acknowledge the public interest in complying with existing law and honoring our treaty commitments, particularly insofar as these international obligations

STB_AR1_007486



National Immigrant Justice Center
111 W. Jackson Blvd.
Suite 800
Chicago, IL 60604

P 312.660.1370
F 312.660.1505
immigrantjustice.org

July 8, 2024

*Submitted via https://regulations.gov*

**Re: Comment on the Proposed IFR by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on "Securing the Border," Docket No. USCIS 2024-0006**

Dear Ms. Reid and Mr. Delgado:

The National Immigrant Justice Center (NIJC or "we") submits the following opposing the Interim Final IFR (IFR) titled "Securing the Border" issued by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) (together, "the agencies") on June 7, 2024. NIJC calls on DHS and EOIR to rescind the IFR in its entirety.

**NIJC's strong interest in the agencies' proposed changes**

NIJC is dedicated to ensuring human rights protections and access to justice for immigrants, refugees, and asylum seekers. NIJC provides direct legal services to and advocates for these populations through policy reform, impact litigation, and public education. Since its founding more than three decades ago, NIJC uniquely blends individual client representation with advocacy for broad-based systemic change.

Headquartered in Chicago, NIJC provides legal services through our staff and pro bono network to more than 10,000 individuals each year, including more than 800 asylum seekers, many of whom have entered the United States by crossing the U.S.-Mexico border. These individuals have survived persecution and torture in their home countries and many dangers throughout their journey to seek safety in the United States.

NIJC's clients include indigent, Black, Brown, Indigenous, and LGBTQ+ people seeking asylum who frequently have no avenue to seek safety but to approach the United States at the U.S.-Mexico border. We have served people forced to wait in Mexico to seek asylum in the United States under anti-asylum policies instituted by both the Trump administration and the Biden administration. In addition to our own direct representation, NIJC provides pro se support to asylum seekers. Our experience working directly with clients and advising pro se applicants makes it clear that the vast majority of asylum seekers lack the linguistic and legal skills to navigate the U.S. asylum system alone. They often lack the financial resources to hire private counsel for purposes of pursuing asylum.

The IFR's proposed changes are certain to severely and adversely impact the people NIJC serves. Many people seeking asylum are not familiar with U.S. asylum law and will not know that they must manifest a fear to claim asylum. Many others will be too scared to do so, given that they are fleeing persecution by government agents and will be facing uniformed, armed agents of the U.S. government at the relevant time. And as is clear from our experience under the Remain in Mexico policy and partner organizations' experiences with the U.S. Coast Guard, still

**JA637**

STB_AR1_007802

seekers to their bar and stripping them of asylum benefits, including the pathway to family reunification.

Third, the IFR leaves many outstanding questions in terms of what independent relief would disqualify families from availing themselves of this provision. If a spouse can independently win withholding like the principal, the agencies may find comfort in the fact that they have preserved family unity without needing to take any further action, though both spouses would live with the burdens inherent to withholding of removal—lack of access to basic social benefits, unstable employment authorization, inability to travel, and the risk of removal to a third country—for the rest of their lives. Here, as in other scenarios, the agencies would be better poised to preserve family unity by implementing the plain text of the INA.

Finally, the agencies disregard the ways in which the IFR will harm families and children long before final adjudications of relief. Expedited processes already have a deleterious impact on families, as derivative spouse and children are continuously haunted by the prospect of family separation were one member of the family not to win relief.[30] The IFR will compound those harms by adding more bars to an already punishing process. Even worse, they do so while families live with the new, yet familiar fear that DHS will begin jailing them again, in the name of deterrence. To tout this provision as a cure-all in this atmosphere—where the agencies are severely aggravating a process that already hurts families, while resurrecting the fear that they will undergo this process from detention—makes a mockery of family unity.

### 7) The agencies have failed to consider obvious alternatives.

The IFR fails to consider the obvious alternate option of expanding capacity to follow the INA's inspection requirement and its dictate that anyone arriving in the United States be allowed to apply for asylum. Because people presented with a safe pathway to seek asylum will choose that pathway, doing so would achieve the agencies' goal of curbing crossings between ports of entry. It would also discourage people from using smugglers, who are often exploitative and violent.

As a result, expanding capacity at ports of entry would, in the medium and long term, sharply reduce the resources that DHS feels the need to expend at the border.[31] This would be especially true if the agencies coordinate with state and local governments as well as non-governmental organizations and move away from the routine imprisonment of people fleeing persecution and torture.[32] Further, because increasing capacity at ports of entry would allow USCIS asylum

---

[30] First Focus on Children and the Young Center for Immigrant Children, *Fast Not Fair: Children Seeking Asylum are Fast-Tracked for Deportation* (Feb. 2023), https://www.theyoungcenter.org/fastnotfair.

[31] CBP has a history of failing to process asylum seekers even within its existing capacity. See Elliot Spagat, *Holding-cell stats raise questions about Trump asylum policy*, AP News (Feb. 13, 2020), https://apnews.com/article/texas-immigration-us-news-ap-top-news-laredo-6d32dd1fcda84a98bbf7c6455a2d6ae5 ("On March 14, according to one daily snapshot, 672 people were in custody at all 24 crossings, a 57% occupancy rate. San Diego's San Ysidro port of entry was 89% full, Hidalgo was overcrowded, and El Paso was nearly full. But Laredo was only 40% full, Brownsville was at 35%, and seven crossings, mostly in California, were empty."); WOLA, *The Futility of "Shutting Down Asylum" by Executive Action at the U.S.-Mexico Border* (June 4, 2024), https://www.wola.org/analysis/futility-of-shutting-down-asylum-by-executive-action-us-mexico-border/.

[32] *See* NIJC, *Solutions for a Humane Border Policy* (Jan. 17, 2023), https://immigrantjustice.org/staff/blog/solutions-humane-border-policy.

STB_AR1_007815

STB_AR1_007818

**JA639**

onto "hostile terrain," making crossing the US southern border so dangerous that it discourages people however, are dying. The policies intentionally funnel migrants into the harsh, inhospitable Sonoran Desert, where temperatures fluctuate between searing heat and icy cold, or through the fast-moving currents of the Rio Grande, where their lives could be at risk. Deterrence also includes punitive immigration policies and dangerous infrastructure, such as border walls, razor wire, armed soldiers, river buoys equipped with saw blades, and surveillance technology. Mexican criminal groups and corrupt state officials systematically target migrants for violence, while missing person reports are rarely resolved, and the human remains of migrants – even in known mass graves – remain unidentified.

Below are nine personal accounts provided by family members whose loved ones disappeared or died while attempting to join them in the United States. The accounts span the three decades of US border deterrence and are the result of a collaboration between Human Rights Watch and the Colibrí Center for Human Rights, which uses DNA testing to help identify the remains of missing migrants and supports families searching for missing loved ones. Some accounts use pseudonyms or first names to protect the families from retaliation.

While every story is unique, they share important commonalities. Each person who tried crossing the border without US authorization felt it was the only way to reunite with loved ones, achieve financial stability, or flee violence and seek safety. It took purpose, hope, and courage to make the journey. When people disappeared, the US Border Patrol provided families with little to no support. Indeed, there is no coordinated US government response to locate missing people in the borderlands. Additionally, after people disappeared, families were often targeted by extortionists, falsely claiming they captured or had information about missing family members, demanding ransom money.

Over the 30 years, groups estimate that between 10,000 and 80,000 people died at the border – the wide-ranging figure highlights the lack of information – with thousands more disappeared, mostly Brown, Indigenous, and Black migrants from Latin America. Deaths and disappearances have hit record highs under President Joe Biden's administration.

While the deterrence strategy has failed to reduce migration numbers, it has enriched criminal groups, including smugglers and kidnappers, and wasted billions of taxpayer dollars. For some border agents, tasked with carrying out these policies, the work has led to moral injury and even suicide.

STB_AR1_007820

JA640



eft 8 (  ft  ( f(ʮ  ft(z x Gʳ ft  ff (9   fift (fft ffft(  (  ft(            ( f(yftf8 ftF(f 8 8(g8  fu    8(  8 ftF(ʳ  ft  ff F(   (jft9  8  (  F
          H(  (      (k   ft    (e  8  l e j u(  8(k ft   (m 8  ft

## u       .1

"I've had dreams where he returns," Angélica Pérez said. "In these dreams, I see him, and I get so excited that I wake up and ask for it to be true."

The last time Angélica spoke to her younger brother, Danny Pérez, was on November 25, 2015, one day before Thanksgiving. Danny was getting ready to cross the border from Mexico into the United States, to come home. He would never arrive.

Danny was born in Mexico, and he and his family migrated to Northern California in 2000 when he was 5 years old to reunite with their father and to seek a better quality of life. Angélica remembers dark,

STB_AR1_007821

JA641

Case 1:24-cv-01702-RC    Document 69-8    Filed 01/10/25    Page 900 of 1203

Still in high school, Danny skateboarded, played soccer with a local team, and wrote and performed rap music with his friends. He was close to Angélica's oldest son, Alexander. At school, Alexander would proudly say he had a big brother who was also his uncle.

When he turned 18, Danny decided to go to Mexico. In 2012, he rejoined his parents in Guanajuato, Mexico. When he arrived, he was full of ideas and energy. But after a failed attempt to launch an ice cream business with his father, and after struggling to get by in Mexico on low wages as a middle school English teacher, he decided to return to the United States.

He hired smugglers who said they would guide him through the desert mountains between the cities of Tecate and Tijuana.

"In his desperation, Danny thought that that was his only way in," Angélica said, "He called … and I asked, 'Are you sure it's safe? I'm scared.'"

Angélica remembers his answer: "Don't worry, I will go prepared," he said. "I will take food and energy bars with me. I'll even take medicine and ointment. I'm strong enough to do this."

She began to panic when, the following day, she had heard nothing from her little brother. He had promised to let her know when he started crossing. She called him, but he didn't pick up. The family began searching for Danny, calling US Immigration and Customs Enforcement (ICE), sharing Danny's last known GPS coordinates with Mexican authorities, and reporting Danny as a missing person. Angélica repeatedly typed in her brother's identifying information on government websites and searched through databases of the missing.

"It was ugly, having to see all of the unidentified bodies while at the same time asking God that we don't find him there," she said. "We did everything we possibly could to find him." They submitted DNA samples in both the United States and Mexico.

Like so many other loved ones who go missing in the borderlands, it may be impossible to know what happened to Danny.

"How do I say goodbye when we don't know anything about what happened?" Angélica asked.

STB_AR1_007822

**JA642**



l     (u8   ff   (yft ft 8ff8(   (     H(   (u    8 ft

## .1        .

Hugo Patricio Tenezaca, 19, called his mother, Romelia Yuqui, in New York City to ask for her blessing. He was going to cross the Sonoran Desert into the US. He went missing on June 17, 2012.

Hugo had first crossed the desert in October 2009, the first time he left Ecuador to be with her in New York.

Romelia, who is a US lawful permanent resident, had left Ecuador when Hugo was a child in search of a better life after her then-husband—a police officer—abused her.

For two years, Hugo worked at a bookstore in Manhattan, helping to pay off the debt of his previous crossing. He spent his free time playing with his much younger brother and sister, painting, drawing,

STB_AR1_007823

JA643

me. I got down on the floor and cried. I told him, 'Hugo, don't go,' but he left."

Nothing but Bones | Human Rights Watch

In Quito, things didn't go as planned. Now that he'd lived in another country, his friends saw him as having money, began to take advantage of him, and ultimately beat him and stole from him. Meanwhile, Mayra was able to get a visa and went to the United States.

Hugo went to the US consulate and was at first approved for a visa to travel safely back to his mother. But then, Romelia recalled, his Ecuadorian passport was taken and US visa revoked for reasons the family do not understand. Without a legal way to migrate, Hugo became desperate. He and his mother contacted the same Guatemalan smuggler who had guided them across the first time and paid him US$14,000.

The journey was difficult, and he called Romelia often.

"Mom, we've arrived in Mexico, [and] it's not like when I crossed the first time," Hugo said. "The road is complete terrorism. The drug traffickers assaulted the group we were traveling with, and I got under the car and didn't allow anything to be stolen." It took Hugo nearly a month to reach the border.

Hugo called her from near Altar, Sonora, to let her know he was going to cross and to ask her to say a blessing for him. He would be walking for about five days, he said, and would arrive in about eight days. He said he loved her very much.

That was the last time she spoke to him.

Eight days passed, and Romelia started making phone calls to locate her son. No one gave her a straight answer. She was told he had disappeared, that he'd gotten lost looking for water, that he took off running, that he fell asleep and didn't wake up. She spoke to an Ecuadorian woman Hugo had met and befriended on the journey, who said she preferred to tell Romelia what had happened in person. She never did.

Romelia posted about Hugo on Facebook and lobbied the Ecuadorian consulates in New York and Arizona to help investigate. They were of no help.

STB_AR1_007824

**JA644**

man called to say he couldn't come because the area was "too hot" with police activity. But there were no police.

Romelia said, "If they had told me, 'Your life in exchange for your son's, I would have given my life."



In 1998, 17-year-old Bairon Fabrizzio Banegas Flores fled Honduras after his life had been threatened by a criminal group, leaving behind a note for his mother, Myrna: "Mommy, I'm going to the United States. Don't worry about me, I'm going to get there. When I do, I'll let you know."

because [as a pastor] I heal wounded hearts," he said.

Bairon gained trust in the immigrant community and, over time, became not only a faith leader but a counselor for those facing deportation or other immigration issues. When the church sent him to Louisville, Kentucky, he continued to advise members in his congregation on immigration issues.

When one member of the congregation was detained by Immigration and Customs Enforcement (ICE) in 2013, Bairon, who was also unauthorized, went to the office to advocate for the fellow immigrant. While he'd never had a problem with ICE in Bowling Green, the ICE officials in Louisville had a completely different attitude. ICE officials asked him to show proof of his legal status. When he couldn't produce any, they detained him and quickly deported him.

Myrna said. "I went to pick him up from the airport [in San Pedro Sula, Honduras,] and they arrived as if they were prisoners, as if they were criminals, chained up and all that...It was a terrible way [to treat them]."

He stayed in Honduras for six months, founding another church and working with local youth. But when one of his young daughters back in Kentucky became depressed, refusing to eat or come out of her room, he decided to go back to his family.

"I put my life in the hands of God, and I know he will help me and that I will make it to my daughter," Myrna remembers he said when she asked him if he was sure about making the journey.

The last time Myrna spoke to her son, he told her he had already made it across the border into Arizona and that the following day the smugglers would pick him up at an agreed upon meeting place. She counted the days. She waited 8 days, then 10 days.

His family looked for him everywhere, but no one has heard from Bairon since. "At first it was very painful because he was always there—there wasn't a day in his life that he didn't call me or send a little text," Myrna said.

Bairon's absence has impacted his whole family, but especially his daughters. The oldest stopped going to church.

STB_AR1_007826

JA646

JA647



STB_AR1_007827

JA647

JA648

STB_AR1_007828

Nothing but Bones | Human Rights Watch

Case 1:24-cv-01702-RC Document 19 Filed 01/11/25 Page 907 of 1203

Maya L. shared an apartment in Mexico City with her family – her husband, mother, sisters, and their children. Although they didn't have a lot of money, they had one another.

"Everything was OK until the pandemic came," Maya's sister, Bianca, said.

Like more than 100 million people around the world, Maya's husband, Marcus, lost his job when the city entered lockdown. The streets in one of the world's largest cities were suddenly empty. Marcus struggled to find work, even chasing down a "promising" opportunity in a nearby state only to be scammed. The family had less money than ever.

Marcus sold his car and used the money to cross the Sonoran Desert. He arrived in the United States without incident, quickly found work in Arizona, and began sending money home. But he and Maya missed one another, and they soon decided Maya would also go to the United States.

"Mom, I'm leaving," Maya said. "I'm going to build you a little house and we're not going to suffer anymore. I promise you I'll be back soon." She said she would come back in a couple of years.

Her mother was worried and wanted Maya to stay, but Maya had made up her mind. The day she left, her sister Bianca hugged Maya, squeezing her tight.

They knew from the news that crossing the border was dangerous, although they didn't know of anyone who had disappeared.

 Once Maya arrived in Sonora, close to the border, she had to stay inside a safehouse and wait. Maya said the coyote seemed like a good person. That he was with his wife surprised her – migrating women experience a disproportionate level of sexual abuse, and having a woman around helped Maya feel safer.

Marcus had paid the smuggler US$2,000 and was to pay another $3,000 once Maya made it across into the United States. After seven days in the safehouse, Maya told her family that she would be crossing and that they would talk when she arrived.

STB_AR1_007829

JA649

"What happened is migration grabbed us and she ran with one of the guides and a cousin. The three of them took off."

The last time they called, the coyote said that Maya had died. Then he stopped picking up the phone.

Her family called the Mexican consulate, US immigration authorities, medical examiners' offices, and hospitals. No one could tell them what had happened to Maya. "It has been nine months without hearing from my sister, and it is like being dead, lifeless, because thinking about whether she is dead, whether they are prostituting her, whether someone has her . . . It is very exhausting to live with this daily," Bianca said.

Marcus, suffering due to her disappearance, was eventually hospitalized in a behavioral healthcare facility.

Extortionists targeted the family. One of the guides from the group hired to take Maya across the border contacted the family, promising to send a few coyotes out in search of her remains in exchange for almost $5,000. The smugglers promised to carry any remains to the highway so that Border Patrol agents could be called to collect them.

"We gave in," Bianca said. "The money was paid, [but] at the end of the day there was no response."

In a separate incident, not long after posting a notice about Maya on Facebook, some people contacted her family to tell them they'd kidnapped her and demanded a ransom of $1,170. They sent a doctored photo, splicing Maya's face from Facebook onto someone else's body. The family never sent any money.

"They started telling us that if [we didn't pay], they were going to kill her," Bianca said.

But Maya's family already suspects she is dead.

STB_AR1_007830

JA650



r 8 ft (x 8 8 8 A(f8    ( ( ft (    ft( (s ft (rft ft F(h ftffft 9 ft (    H( (    (u   8 ft

Mateo Dolores Salazar Hernández had experience crossing the US-Mexico border. With family on both sides, Mateo, who lived in New Jersey and was known for his work ethic and optimism, had gone back and forth several times.

According to Mateo's wife, Gloria Benítez, Mateo came to the United States to build a better life for the family. He wanted to be able to save up enough money so that they would not have to rely on their children in old age.

Mateo set out for Mexico again in May 2018 to meet his new great-granddaughter and to see his granddaughter, Diana Salazar, who calls Mateo "Dad."  He also went to attend the wedding of his daughter, Virginia.

"When he was coming, I told myself, 'Finally, my little girl is going to meet my dad,'" Diana, who lived in Mexico at the time, said through tears.

STB_AR1_007831

JA651

Playas, but we could never find him," Gloria said.

The family drove down from New Jersey to search swathes of the desert, which spans hundreds of miles, situated between mountain peaks on either side. They met up with Ángeles del Desierto. "Where are you?" Diana asked the desert of Mateo.

After three days of searching, they called it off. A few months later, the Salazar family searched again for three days, still finding nothing. They submitted their DNA to Colibrí in case it could be matched with someone's unidentified remains.

"My life changed, radically changed, when my husband went missing," Gloria said. "We had 42 years of marriage, and I remember that my children used to tell us, 'When you reach 50 years of marriage, we are going to throw you a party.' Now time goes on, those 50 years are going to arrive. Let's see if between now and our wedding anniversary we learn anything about what happened to him."

Gloria thinks about what would have happened if she'd gone with Mateo to Mexico as he'd suggested, that maybe he wouldn't have attempted to come back to the United States. But she has needed to be strong for her children, who have also struggled with what-ifs and accepting the loss of their father.

"I have another baby, now I have two," said Diana, who remembers waking up early on summer mornings to the sound of Mateo cutting the grass and singing. "My son is named Mateo, and the truth is, I don't lose hope that they will find him."

Virginia, who was grateful to have seen her father at her wedding, recalled a song her father used to sing when he would come over – "Después de Tanto," by José María Napoleón – often enlisting her now-husband to play the guitar in an impromptu karaoke session.

*Today after so many years of not seeing you, I found you/Today when I saw you among the people without you realizing it, I knew that you live in me/I don't know, I don't know if I can go on, far from you.*

[*Hoy después de tantos años de no verte, te encontré/Hoy al verte entre la gente sin que tú te dieras cuenta supe que vives en mí/No sé, no sé si pueda continuar lejos de ti* ]

STB_AR1_007832

JA652



i ft 8(   fi   (8( ff  ft( f(u ft ( 8 ft(     ft (t fft 8F(     ft( ft 8   ( ft ft( fift    ftfi(9 (g  9 ( (     H( (     (u  8 ft

0     .''     .

Ofelia Muñoz Valenzuela was from a small town, Ignacio de la Llave, in the coastal Mexican state of Veracruz. She disappeared at the US-Mexico border in 1997, when her daughter, Elena Gonzales, who today lives in New York, was just 14 years old.

Ofelia was locally famous as the "Güera Musiquera," a nickname that came from her love of music. "She did not play any instrument, nor did she dance, but she had music in her veins," Elena said about her mother. Not being able to dance or carry a tune did not stop Ofelia from trying. She would organize frequent dance parties in the town and stiffly move about on the dance floor.

"My dad was an alcoholic, he drank too much, and he always came home drunk and hit us," Elena said. "First he started with me and ended with my mom…. I think that was one of the reasons that caused her to decide to leave and emigrate."

When Elena was just two weeks old, her father ordered Ofelia to send their new baby away because of the sound of Elena's cries. From then on, Elena split her time between her grandmother's house in Veracruz City and her parents' home.

STB_AR1_007833

JA653

Case 1:24-cv-01702-RC    Document 69    Filed 01/10/25    Page 912 of 1203

work and save money for Elena's quince. "'No matter what I have to do, I'm going to make sure your [quinceañera] happens," Elena remembers her mother said before Ofelia set out for the US.

When Elena's 15th birthday came on October 22, she remembers sitting on a piece of furniture outside her grandmother's house and waiting for hours for her mother. She thought maybe her mom hadn't been in touch because she wanted to surprise her. But Ofelia never came.

Later, Elena met with a man named Misael, who was among the migrants from her town who returned after failing to reach the US. Misael gave her Ofelia's identification documents. Misael told Elena that when her mother was first detained in the US, her hair was long and curly, like Elena's. But the detention center guards shaved her head because Ofelia wouldn't stop pulling out her own hair because of the stress. Presumably her mother was deported back to Mexico.

Years passed, and Elena eventually migrated to the US. She searched for her mother by word of mouth and on social media to no avail. Eventually someone told her to contact the Colibrí Center for Human Rights. In 2017, staff with Colibrí's Missing Migrants Program went to New York, where Elena lives, and collected a sample of her DNA to compare with DNA found from people who died crossing the US-Mexico border.

Twenty-one years after her mother disappeared, Elena learned her DNA was a match with that of a human skull found in Webb County, Texas.

Today, Elena is a musician. Like her mother, she has gravitated towards singing.

"I felt that singing was not my thing, but suddenly I took refuge in that, [in] singing," she said. When she sings, Elena remembers how her mother looked at her with pride and with joy. "That image is the one that I always sing to now. It's the one that I always see in front of me when I'm singing."



STB_AR1_007834

JA654



uft    ft( ft    8    (f8 (8 fi(fi ft(  (8 ft( ft        (      ftfi(fu   (8
  ft(  G( (  Gfu  ( ftft( ft 8 (9   8 fi (ff        ff ftfi(  fift
fu   ft (z x (u ft  fift  (h   8 fi(y      (8 (  ft(z x G ft  ff (9   fift F
  ft(  ft( ftff    ( f(98  ft ( ff   ftfi( ft ft(ft8  ( f(x 8  89ftF

STB_AR1_007835

**JA655**

JA656

.w        .w        .u

STB_AR1_007836

Left for Dead: Migrant Bones in the Desert | Human Rights Watch

The brothers grew up in Chiapas, a southern Mexican state bordering Guatemala. Wagner studied at a university in Chiapas for a couple of semesters but stopped his studies because he lacked economic support and couldn't find work. He wanted decent-paying work and a better standard of living, something he said he saw in Hollywood movies, and decided to journey to the US.

When Wagner left Chiapas, Rony was still a small child, so he stayed behind.

Wagner's trip to Tucson, Arizona, was a harsh and dangerous one, he said, even though he was in good physical shape from working long hours in the mountains of Chiapas. He walked for eight days and nights in the desert with a group of other migrants. He knew he was one wrong move, a bad fall or twisted ankle, away from death. During the last two days, they went without water and food except for one can of tuna and one flour tortilla shared among the group.

A decade later, when Rony was 20 years old, he began making plans to also head north. In September, some boys he knew from town called him to ask if he wanted to cross with them. They were already in Sonora, a Mexican state bordering the US. And just like that, Rony left, traveling through Mexico alone, a nearly 2,000-mile journey that poses serious risks.

Rony made it safely to Sonora and prepared to cross the US-Mexico border near where his brother had crossed.

"You have to be healthy, mentally," Wagner told Rony over the phone. "You must make a good go of it, decisively, without worrying or something, because that also takes its toll on you. It's not easy to come – for example, if you have problems, your mind is elsewhere, then something bad will for sure happen to you." Wagner explained the risks. "This is not a game," Wagner told him.

"Yes, it's OK, brother," Rony responded. "We'll see each other over there."

They never spoke again.

As the days passed, Wagner and Rony's other family members started to worry. Rony's traveling companions provided differing accounts of what happened when Rony was left behind. They said that

STB_AR1_007837

JA657

Wagner said he prays, asking God where Rony is. "I can't believe a person is lost just like that and disappears into nowhere. That can't be possible."

Wagner and his family still hold out hope that Rony is alive. From both sides of the US-Mexico border, they say they dream about seeing him smiling and musing, grateful to have seen him somehow. Then they feel the pain of loss all over again as they realize the dreams are not reality.

"I asked God to give me those dreams," Wagner said. "I wish that this dream would last forever and continue. Like a lifetime."



w    8(8 (   ( ft8  (  fiF(       H( (       (u   8 ft

ñT

STB_AR1_007838

JA658

chronic illnesses. Rosita wanted to join her aunts, Rosa and Lili, in the United States to work to cover her parents' medical expenses. Her aunts are both legal permanent residents.

In April 2021, Rosita decided to make the journey with a neighbor and a cousin. They agreed to pay a smuggler US$7,500 to guide them.

In June, Rosita crossed the border into South Texas with a group of people, including her cousin. When the group arrived in Odessa, Texas, three days later, Rosita was not with them. "It's just that she couldn't stand walking anymore and so she stayed [behind]," Rosita's cousin said. "She said that she was going to turn herself in to immigration."

The aunts started calling Border Patrol, providing the approximate location for where their niece was last seen and asking if they would go find her. When Border Patrol answered, they said they would look later or that they had already looked. Dozens of calls and visits to the Mexican consulate also proved fruitless. It would take a local sheriff, who picked up the phone when Rosita's aunts called, going above and beyond to track down Rosita's remains.

"Here in Texas, no one is going to help, ma'am," Rosa remembers the sheriff saying. "That Border Patrol told you they were going to look for her, that is a lie. They don't do it. . .The body was found because a rancher alerted us that the body was there. When did [Border Patrol] go to pick it up? Not until they got around to feeling like it."

Lili and Rosa believe that if the Border Patrol had searched, agents may have found their niece alive.

Before her remains were found, the aunts traveled twice to Odessa, Texas, based on false sightings of their niece. They called or visited the Mexican consulate daily. They posted on Facebook and other social media. And they called organizations performing search and rescue at the border.

People tried to take advantage of their situation. On eight occasions, they received calls from people claiming they had kidnapped Rosita and demanding ransom. The scammers sent doctored photographs using Rosita's face from the missing person posts on Facebook.

STB_AR1_007839

JA659

Lili and Rosa went to San Marcos, Texas, to see Rosita's remains. The coroner welcomed them and explained that they had tried to respect and care for the remains of their niece. She also gave the aunts Rosita's belongings.

"The only thing I can tell you is that my niece is fine," Lili said. "Wherever God has her, she is good. Because even though she has experienced something very difficult, when I entered [the room] I felt that peace, that tranquility."

Now, all the family have are memories, photos, and an altar in the house where Rosita grew up. Her little brother pours her a cup of Coca-Cola at mealtime and leaves it at the altar, along with her favorite pastry.



f ft   8 ( 9      ( 8     (8(  ff   ft( f(u ft (f8  ft (k  8 9ft    (f ft   8 F(p   (e   ft ft F(g8 fu   8F(      H( (     (p  (t    8

STB_AR1_007840

JA660

One of his three daughters, María, used to help him in the kitchen. "He never wrote down any recipe or anything like that," she said. "In fact, he had it all in his head."

Those recipes are lost now.

For more than 15 years, Gualberto's children have wondered if their father is alive or dead. "It's like we're never going to have answers," María said.

Gualberto decided to cross the desert to accompany his youngest daughter, Tania, on the journey after the person who was supposed to accompany her backed out. He planned to join his three older children who were already living in Los Angeles.

The siblings were apprehensive about their father's arrival. They hadn't seen him in a long time, and he hadn't always been the easiest person to get along with—his daughters María, Yesenia, and Tania remember him being a rigid disciplinarian and not allowing the girls out of the house much or permitting them to see their boyfriends without their parents and siblings chaperoning.

On June 2, 2007, after walking three days and three nights through the Sonoran Desert, Gualberto and Tania crossed the US-Mexico border and were in Arizona, just a 5-minute walk from the highway near Nogales and Tucson, along with a large group of migrants.  It was Gualberto's birthday.

The smugglers split the group into two, Tania in one and Gualberto in another. Tania's group walked about 10 feet ahead.

"I turned around because he wasn't that far behind me, and [saw] he was coming," Tania said. "My dad was in perfect condition."  Five minutes later, Tania turned to look again, and he was gone.

"I tried helplessly to go back to look for him, but they wouldn't let me," she said.  A friend of her father's traveling in the second group said Gualberto ran off after someone hit him. "From then on, I never saw my dad again," Tania said.

STB_AR1_007841

JA661

call the family were scammers who claimed to hold Gualberto captive. They asked for US$3,000. But when they refused to let one of Gualberto's daughters, Yesenia, speak to him, she refused to pay.

"It's a fraud," Yesenia said. "It's sad for the families, because you don't know if they really [have your loved one]."

STB_AR1_007842

**JA662**

Nothing But Bones | Human Rights Watch

STB_AR1_007843

**JA663**

**JA664**

wft fift    ( (i 8   ft(u8   F(yft 8 F(    fi(8(    (   (x ft   ft  9ft ( F(       F( (ff      ft     8 ft( ft( ft   ft(     ( 8 ft(fi ftfi(       ( (ff    ( ft
9   fift (    ft(            (8ff    ( ft(w  (k 8  fiftH( (       (e  (x 8    ft I l    8 (w     ( 8 ff



This feature was written and researched by Ari Sawyer. Interviews with families were conducted by Perla Torres from the Colibrí Center. The website was designed by Maggie Svoboda. We thank the families for sharing their grief and their love with us.

u     ftff     (w        F(x 8      (p   ft

R

u0"r  w"0

STB_AR1_007844

# Mexico 2023 Human Rights Report

## Executive Summary

There were no significant changes in the human rights situation in Mexico during the year.

Significant human rights issues included credible reports of: unlawful or arbitrary killings, including extrajudicial killings; enforced disappearance; torture or cruel, inhuman, or degrading treatment or punishment by security forces; harsh and life-threatening prison conditions; arbitrary arrest or detention; serious problems with the independence of the judiciary; serious restrictions on freedom of expression and media freedom, including violence against journalists and enforcement of or threat to enforce criminal libel laws to limit expression; serious government corruption; extensive gender-based violence, including domestic or intimate partner violence, sexual violence, workplace violence, child, early, and forced marriage, femicide, and other forms of such violence; crimes involving violence or threats of violence targeting lesbian, gay, bisexual, transgender, queer, or intersex persons; crimes involving violence or threats of violence targeting persons with disabilities; and significant or systematic restrictions on workers' freedom of association, including crimes of violence and intimidation against workers.

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

STB_AR1_007906

JA665

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at

https:www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement and the Right to Leave the Country

Federal law provided for freedom of internal movement, foreign travel, emigration, and repatriation, and the government generally respected these rights.

**In-country Movement:**  There were numerous instances of armed groups limiting the movements of migrants, including by threats and acts of kidnapping, extortion, and homicide.  Criminal groups dominated migrant smuggling operations and often kidnapped, threatened, and extorted migrants to pay a fee for facilitating northbound travel.  On August 17, international organizations in Ciudad Juárez reported an increase in extortion and kidnappings by smugglers.

## e. Protection of Refugees

The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, asylum seekers, and other persons of

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor
JA666

STB_AR1_007930

concern.

**Access to Asylum:**  Federal law provided for granting asylum, refugee status, or complementary protection to those fleeing persecution or facing possible threats to their life, security, or liberty in their country of origin.  The government had an established procedure for determining refugee status and providing protections.  The government worked with UNHCR to improve access to refugee status determinations, improve shelter and reception conditions for vulnerable migrants and asylum applicants, and support local integration programs (including access to school, work, and other social services) for those approved for refugee and complementary protection status.

**Abuse of Refugees and Asylum Seekers:**  The press, international organizations, and NGOs reported targeting and victimization of migrants and asylum seekers by criminal groups and in some cases by police, immigration officers, and customs officials.  There were numerous instances of criminal groups extorting, threatening, or kidnapping asylum seekers and other migrants.  In many parts of the country, human smuggling organizations wielded significant power, and media alleged frequent collusion among local authorities.  There were credible reports of gender-based violence against migrants.  There were also credible reports of officially recognized asylum seekers being denied movement across the country and detained by migration authorities.  Civil society groups reported

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

STB_AR1_007931

JA667

migration authorities did not provide information regarding access to request asylum and migratory regularization and, in some cases, dissuaded migrants from pursuing such alternatives.

The government did not detain migrant children and generally exempted accompanying adults from detention to preserve family unity. Child protection authorities lacked sufficient capacity to shelter and process migrant children and families, but the government made progress to improve shelter space for children and strengthen child protection authorities. During the year, the National System for Integral Family Development transferred 1.1 billion pesos ($67 million) to 26 states to strengthen their capacity to respond to child migration. In May, the government declared it had completed the construction of 58 of the 90 shelters planned.

The government increased efforts to target human smuggling organizations, with limited results. In November 2022, the Attorney General's Office arrested the Los Panchos human smuggling leader and main collaborators. The Attorney General's Office carried out arrests in Ciudad Juarez, Chihuahua; Silao, Guanajuato; and the state of Mexico. In May, the Attorney General's Office arrested three alleged smugglers in the state of Nuevo León. Authorities found 17 migrants with the smugglers and identified 11 others at a safe house.

Obstacles to accessing international protection related most closely to

Country Reports on Human Rights Practices for 2023
United States Department of State • Bureau of Democracy, Human Rights, and Labor

JA668

STB_AR1_007932

# Congress of the United States

## Washington, DC 20515

March 21, 2024

The Honorable Alejandro Mayorkas
Department of Homeland Security
300 7th St. SW
Washington, D.C. 20024

Dear Secretary Mayorkas,

We write to follow up on our previous correspondence expressing serious concerns that the Biden administration's expanded use of the Customs and Border Protection mobile application (CBP One) is contravening the rights of asylum seekers and contributing to dysfunction within our immigration system. We call on the Department of Homeland Security (DHS) to take immediate steps to both improve CBP One and resolve accessibility issues to protect the safety of asylum seekers and support border communities and other cities that receive new arrivals.

A year has passed since the implementation of CBP One as the primary mechanism for managing asylum interview requests. While CBP has implemented minor changes to address serious glitches within the app, there are still several critical issues that require immediate attention and resolution. As asylum seekers remain in danger, CBP must address these access issues to ensure safe and humane asylum processing and relief for those at risk.

## CBP One Application Limits Access to Asylum

First and foremost, CBP's decision to require asylum seekers to use the still-faulty CBP One app fundamentally undermines the accessibility of the asylum process. Because individuals seeking asylum at our southern border are required to pre-schedule an appointment through the app, the current process obstructs the right to seek asylum by forcing individuals to remain in Mexico while waiting for their asylum cases to be heard. CBP One itself is technologically complex and has significant language limitations, creating inherent barriers for applicants who are not familiar with mobile devices or who speak a language other than the three currently offered in the app. We strongly believe the requirement to use CBP One to apply for asylum contradicts President Biden's Executive Order 14012 directive to "ensure full participation by immigrants and eliminate barriers to accessing government services."

## Emboldening Criminal Actors and Endangering Asylum Seekers

To date, many vulnerable individuals have been forced to wait in unsafe and impoverished Mexican border regions for an appointment through CBP One.[1] The appointment system operates like a lottery system, with far fewer appointments than needed. Individuals are only permitted to present their cases at ports of entry that can be hundreds of miles apart. For example, the DeConcini Port of Entry in Nogales, Arizona is the only port that accepts CBP One appointments in the 700 miles between Calexico, California, and El Paso, Texas, and it only

---

[1] *Inhumane and Counterproductive: The Expansion of Expedited Removal to the Interior and its Impact*, Human Rights First (October 2023), https://humanrightsfirst.org/wp-content/uploads/2023/10/Inhumane-and-Counterproductive-final-report.pdf

STB_AR1_008074

**JA669**

accepts 100 appointments a day.[2] This limitation has resulted in prolonged waiting periods, sometimes extending up to six months, forcing families to wait in Mexico in areas rife with criminal activities, including kidnapping, extortion, robbery, and assaults. Requiring asylum seekers to wait for a rare CBP One appointment, available only in a limited number of ports of entry, inadvertently fuels gang violence as criminal groups exploit these vulnerable individuals for financial gain.

The difficulties with CBP One increase the likelihood that asylum seekers will rely on cartel-backed smugglers to enter the United States instead of applying through legal pathways. If these challenges continue, our country could see more tragedies like the June 2022 mass death incident in San Antonio, Texas, where 53 people died after being trapped in the back of a sweltering tractor-trailer. There is also strong evidence that smugglers themselves have been actively spreading misinformation to capitalize on CBP One's faulty implementation. Multiple organizations have reported that smugglers falsely claim that the app will soon be discontinued and suggest that crossing between ports of entry is quicker and more straightforward than waiting for an appointment. There have also been reports of unscrupulous shadow businesses that charge asylum seekers to register for appointments outside of eligible geographic areas in northern or central Mexico. Such deceptive practices, combined with insufficient CBP One appointment availability, confuse asylum seekers about their place in line. At minimum, CBP needs to improve agency communications and outreach to help asylum seekers avoid misinformation and exploitation and reliably navigate the CBP One app.

**Language Barriers**

Another significant issue with CBP One is the language and technological barriers asylum seekers face. As you are well aware, the demographics of asylum seekers have diversified, including rises in extra-continental asylum seekers arriving at our southern border from Ukraine and Nepal among other countries. Notably, since its launch, CBP One has only been offered in English, Spanish, and Haitian Creole. Many asylum seekers who do not speak these languages find themselves at a significant disadvantage, struggling to access critical information and navigate our complex asylum process. One recent report identified that many African asylum seekers are completely unaware of the CBP One application, and those who are aware are unable to use it due to language barriers.[3]

Even for individuals who do speak one of the three main operating languages, the app can be difficult to understand. For example, accessing the Haitian Creole version of the app requires navigating initial questions in English or Spanish, and there are poor translations for critical and contextual words like "Customs." Moreover, the Spanish version of the app is not fully or accurately translated. While there have been additions to Russian and Portuguese language factsheets, these languages are not integrated into the app's core sections.[4] These limitations are extremely problematic because the app is the only way for arriving asylum seekers to schedule an appointment and get screened for asylum. Individuals who cannot use CBP One due to language barriers, technical failures, or other obstacles and present at a port of entry must demonstrate to often-skeptical CBP officials that it was not possible to apply through the app.[5]

---

[2] *A Line that Barely Budges: Nogales, Arizona,* Human Rights First (June 2023), https://humanrightsfirst.org/wp-content/uploads/2023/06/A-Line-That-Barely-Budges_Nogales-Arizona-1.pdf
[3] *Asylum Policies Harm Black Asylum Seekers,* Human Rights First (February 2024), https://humanrightsfirst.org/wp-content/uploads/2024/02/Asylum-Policies-Harm-Black-Asylum-Seekers-FACTSHEET-formatted.pdf
[4] *CBP One – Ficha Técnica (Português),* U.S. Customs and Border Protection, https://www.cbp.gov/document/fact-sheets/cbp-one-ficha-tecnica-portugues

STB_AR1_008075



**Appendix A**

**U.S. Department of Justice**

Immigration and Naturalization Service

**Record of Sworn Statement in Proceedings
under Section 235(b)(1) of the Act**

Statement by: _____

In the case of: _____

Date of Birth:_____    Gender (circle one):   Male   Female

At: _____    Date: _____

Before: _____
(Name and Title)

In the _____ language.  Interpreter _____ Employed by_____

I am an officer of the United States Immigration and Naturalization Service.  I am authorized to administer the immigration laws and to take sworn statements.  I want to take your sworn statement regarding your application for admission to the United States.  Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States.  This may result in your being denied admission and immediately returned to your home country without a hearing.   If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to  me and the Immigration and Naturalization Service to make a decision.  It is very important that you tell me the truth.  If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country.  If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance.   You will have the opportunity to speak privately and confidentially to another officer about your fear or concern.  That officer will determine if you should remain  in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Immigration and Naturalization Service.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Q:   Do you understand what I've said to you?

A.

Q.    Do you have any questions?

A.

Q.    Are you willing to answer my questions at this time?

A.

Q.   Do you swear or affirm that all the statements you are about to make are true and complete?

A.

Page 1 of _____

252

**JA672**

**U.S. Department of Justice**

**Immigration and Naturalization Service**

**Jurat for Record of Sworn Statement in**
**Proceedings under Section 235(b)(1) of the Act**

Q:  Why did you leave your home country or country of last residence?

A.

Q.  Do you have any fear or concern about being returned to your home country or being removed from the United States?

A.

Q.  Would you be harmed if you are returned to your home country or country of last residence?

A.

Q.  Do you have any questions or is there anything else you would like to add?

A.

I have read (or have had read to me) this statement, consisting of _____ pages (including this page).  I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above-named officer of the Immigration and Naturalization Service.  I have initialed each page of this statement (and the corrections noted on page(s) _____).

Signature: _____

Sworn and subscribed to before me at _____
on _____.

_____
Officer, United States Immigration and Naturalization Service

Witnessed by: _____

Page _____ of _____

I-867B (4-1-97)

253

**JA673**

STB_AR1_010152



completed forms lacked important information communicated by the applicant. Finally, several studies have documented instances of inspectors refusing to provide interpretive assistance.

### 1.  *Inspectors Fail to Communicate Required Information*

CBP training materials state that secondary inspectors must use the I-867A & B forms "in every case in which an alien is determined to be subject to Expedited Removal."[38] The following paragraphs of the I-867A must be read to persons subject to expedited removal:

> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, barred from reentry for a period of 5 years or longer.
>
> This may be your only opportunity to present information to me and the Immigration and Naturalization Service [sic] to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.
>
> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.[39]

Nothing is more crucial in preventing the deportation of genuine asylum seekers via expedited removal than ensuring that the I-867A information is communicated; hence, the controlling regulation requires that the information be read out-loud by the secondary inspector or a translator.[40] The need to do this is particularly acute in the case of the paragraph that informs individuals that "U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their

---

38.  USCIRF REPORT, vol. 2, *supra* note 11, at 13.

39.  *See id.* at 252 (copy of I-867A); *see also id.* at 13 (noting obligatory paragraphs).

40.  8 C.F.R. § 235.3(b)(i) (2005) (stating "[t]he examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A"); *see* USCIRF REPORT, vol. 2, *supra* note 11, at 15 (noting that CBP's manual also expressly requires that the I-867A be read aloud).

STB_AR1_010380



JA676



**Re: Comment on the Proposed Rule by the Department of Homeland Security (DHS) and the Executive Office for Immigration Review (EOIR) on "Securing the Border," Docket No. USCIS 2024-0006**

Dear Mr. Delgado and Ms. Reid:

Las Americas Immigrant Advocacy Center (Las Americas, or we) submits this comment in response to the interim final rule (IFR) published by the Department of Homeland Security (DHS) and Department of Justice (DOJ) in the Federal Register on June 7, 2024. That rule, misleadingly titled "Securing the Border," would ban refugees from seeking asylum in the United States and result in the *refoulement* of countless refugees to countries where they will be persecuted or tortured.

The IFR constitutes a brazenly political stunt that panders to hate groups at the expense of the lives and welfare of tens of thousands of people and that discards any pretense of this administration's previously stated commitments to abide by refugee law, restore full access to asylum at ports of entry, and ensure fair and humane asylum adjudications. The IFR operates similarly to the entry ban promulgated by the Trump administration in 2018 that was repeatedly struck down as unlawful by the federal courts. The IFR openly defies those decisions, usurps the role of Congress, and takes the United States farther out of compliance with international law. It must be rescinded immediately.

Policies enacted by DHS and DOJ under three successive administrations have created chaos, uncertainty, and deadly violence at the U.S.-Mexico border. The use of (unlawful) metering, the (unlawful) entry and transit bans, the (unlawful) Title 42 policy, the (unlawful) 2023 asylum ban, the creation of parole programs restricted to certain nationalities, the (unlawful) policies of removing and returning people from third countries to Mexico, and attempts to make (unlawful) substantive changes to asylum law are all examples of how the United States continues to exacerbate, rather than resolve, the challenges that exist at the border. Each time a punitive "deterrence" policy worsens the situation at the border, DHS and DOJ respond by ramping up the punishment they inflict on refugees. Each time, the result is, predictably, a situation that becomes still worse.

To offer just one example of the types of failures of DHS and DOJ policy and of the dangers that will be exacerbated under the proposed rule, Las Americas worked with one young woman who was deported under an expedited removal order and later gang raped by the very attackers she told DHS about in her credible fear interview. She later returned to the United States and was granted withholding of removal. Had her claim been correctly reviewed and

STB_AR1_012881

**JA677**

account and an individual account. Others will register just one member of the family and then be denied entry when they show up with their family members—Las Americas encountered at least one single mother traveling with her 12-year-old son who was denied entry by CBP after she showed up to her appointment with the child, stating it was because she did not register her son with CBP One. This occurred despite the fact that all ports of entry are equipped and well-trained in running in-person processing of families and have done so regularly without the use of CBP One up until January 2023.

The result is that large groups of people must wait in Mexico for extended periods of time, left in precarious positions and unable to plan ahead as to how long their wait will be and what resources they need. This wait forces them to rely on limited and often over-encumbered migrant spaces. Every person forced to wait in Mexico is faced with a risk of kidnapping, assault, rape, and murder; of exploitation by criminal groups and government officials; and of other issues caused by living in temporary conditions without security or regular access to food, clean water, and medical facilities. And each day that a person waits puts them at further risk for serious violence. Criminal elements in Mexico will kidnap people and hold them for ransom, draining a family's already limited resources and putting lives in danger. Many of the conditions that led people to flee their homes are replicated at the border. Las Americas has observed domestic abuse victims being abused again while waiting to be allowed to enter the United States. Some of Las Americas' clients were robbed in broad daylight by Mexican police officers while they were in Ciudad Juárez. Forcing people to wait before entering the United States only increases their vulnerability and the likelihood that they will face the same persecution from which they are fleeing. On July 2, 2024, after the announcement of the IFR and asylum suspension, Las Americas conducted a legal information session for 13 kidnapping victims held against their will by a criminal organization targeting migrants in Ciudad Juárez.

We also commonly see asylum seekers with health problems that make it even more untenable for them to wait in Mexico, particularly when they are forced to live in shelters, in camps, or on the street. All of these situations serve to exacerbate pre-existing conditions such as asthma, cerebral palsy, leukemia, other cancers, and other serious illnesses, including mental health concerns related to trauma experienced on the journey north. Access to medical care on the Mexican side of the border is limited for migrants. While community organizations help migrants access initial consultations with doctors, in most cases, these are general check-ups. When a referral to a specialist is necessary, access to that specialist is either cost-prohibitive, unavailable in the area, or not available to non-residents. In most situations, migrants are not afforded access to the medicine they need. The wait times at the border make it more likely that people living with illnesses will run out of life-saving medications and be unable to access refills.

Furthermore, the CBP One app often requires cell phone capabilities that people seeking asylum do not have. Some brands of cell phones, such as Huawei, fail to load the app effectively, and for those who are able to load it, frequent and mandatory updates are often required, limiting the user's capability of confirming daily their need for an appointment. Many people do not have the required operating system or memory for the CBP One app to function properly on their

STB_AR1_012884

**JA678**

phone. So when they try to register for an appointment through the app, the system kicks them out before they are able to complete the process. And by the time people have traveled all the way to the border, their cell phones are already very damaged (if not already stolen from them), and their touch screen capability does not match what is necessary to answer the questionnaire in the app. As a result, it can be difficult to take, save, then upload the photograph of the traveler. Once a technical issue arises, individuals are forced to start the registration process all over again from the beginning. Additionally, not everyone seeking asylum has the economic resources to pay for roaming data on their cell phone. It often falls to people assisting migrants to share data from their personal cell phones so that people can access the CBP One app.

In addition, the CBP One app continues to discriminate against people of color, especially Black, Brown, and Indigenous people. Because the app is only available in English, Spanish, and Haitian Creole, it inhibits speakers of Indigenous languages, asylum seekers who only speak a little Spanish, or those who speak less common languages or dialects by requiring these individuals to spend many more hours with the app and in search of translation assistance. Even applicants who speak Creole must first create an account through login.gov, which is only available in French, Spanish, and English. Once a login.gov account is created, the initial registration page for CBP One is only available in English, meaning that an applicant must agree to a long page of terms and conditions about the privacy of their information *in English* before they can get to the portions of the app that are translated. Most importantly, when entering information into the app, all answers must be in English. So, even Spanish and Haitian Creole speakers need assistance filling in their answers to the app's forms.

The system is even more obscure and difficult to access for particularly vulnerable migrants. Because it can take up to a week to find interpretation for the Indigenous languages, it is difficult to access translation of the questions and even more difficult to translate responses to the questions. These questions and answers must be entered before applicants are able to request an appointment at a port of entry. Our staff has put many resources toward helping people try to get appointments. Attorneys, caseworkers, and other aid workers conduct interviews with the people who speak indigenous or rare languages, using hard to find interpreters to gather the information the app requires. Because an appointment must be requested anew each day, people who are not English speakers, especially those who speak languages other than Spanish and Haitian Creole, find it very difficult to obtain an appointment using CBP One. The challenge of adequate translation services for these individuals is mirrored in EOIR proceedings, where hearings are routinely delayed as a result.

Once families obtain appointments, they are not always guaranteed the ability to cross the border. We have heard from families who have been turned back from the border, even though they are on time for a valid appointment. In other circumstances, we have also come across people who are granted appointments at a different port of entry far from where they are physically located, despite the app's purported use of geolocational technology. As a result, these individuals are forced to risk travel within Mexico, leaving them exposed to dangerous highway routes where migrants face a significant risk of violence and extortion by gangs and cartels

STB_AR1_012885

JA679

within Mexico. Mexican authorities do not issue and renew temporary humanitarian visas (known in Mexico as "FMMs") to the majority of migrants, despite the fact that these visas are required to access bus and airline travel, and they have set up checkpoints targeted at preventing refugees on the move from accessing public means of travel required to make it to their scheduled CBP One appointments.

When encountering particularly vulnerable families harmed by CBP One, Las Americas has attempted to work with the El Paso port of entry authorities to find a solution, but these efforts have not proved successful. Officers at the port of entry in El Paso often refuse to exercise their discretion to grant port parole in a reasonable manner. We have attempted to flag at least two separate cases to CBP Port of Entry officials via email in which we explained that there were exceptional circumstances interrupting our clients' access to CBP One. In one case, we raised that our client had been kidnapped in Juárez. In another case, our client had an infant living with a serious disability, and as a result, the app was unable to recognize the child's face. In both cases, CBP refused entry on the basis that DHS policy requires all access to ports be done via the app. Such unreviewable and erroneous exercises of discretion are the norm.

The IFR impermissibly fails to even consider these major, irremediable problems with the app, or the effect of the mandatory use of the app on people seeking asylum. Instead, it notes only that the app "creates efficiencies" for CBP.[3] But the convenience of DHS cannot possibly justify human harm and suffering on the scale caused by the IFR and its predecessor bans.

### III.    Withholding of Removal Is No Replacement for the Statutory Right to Asylum Eligibility

Limiting refugees to relief in the form of withholding of removal will continue to cause significant harm to refugees and the organizations that serve them. First, withholding of removal comes with a removal order and allows the government to remove a person to a third country. Additionally, there is no pathway to citizenship, and recipients must apply annually for work authorization, an application that is subject to frequent delays in adjudication. These factors mean that even people who are able to win withholding cases will face long-term limbo that is incompatible with the United States' obligations to allow refugees a path to permanence and resettlement in this country.

Second, withholding of removal causes family separation. In the ordinary course, a person who receives withholding of removal cannot petition for their family members to be considered as derivatives on their applications. And they likewise cannot travel abroad, even to a third country, to visit or reunite with family members. One Las Americas client who received withholding of removal, a young Indigenous woman from Guatemala, is worried she will not ever see her parents again. Were she to travel to see them—even to a country other than Guatemala—she would be barred from returning to the United States for ten years and subject to summary removal if she returned. This family separation is a significant hardship for her and her

---

[3] 89 Fed. Reg. at 48,737.

STB_AR1_012886

**JA680**



July 8, 2024

Submitted via: https://www.regulations.gov.

Daniel Delgado, Director for Immigration Policy
Border and Immigration Policy
Office of Strategy, Policy, and Plans
U.S. Department of Homeland Security
Washington, D.C. 20528

Lauren Alder Reid
Assistant Director
EOIR, Department of Justice
5107 Leesburg Pike
Falls Church, VA 22041

**Re: Comment in Opposition to the Interim Final Rule entitled Securing the Border; USCIS Docket No. USCIS–2024–0006; RIN 1615–AC92; A.G. Order No. 5943–2024; RIN 1125–AB32**

Dear Acting Director Daniel Delgado and Assistant Director Lauren Alder Reid:

The undersigned are non-profit organizations that advocate for and/or directly represent non-citizens who are LGBTQ[1] or are living with HIV. We write in strong opposition to the Department of Homeland Security ("DHS") and the Executive Office for Immigration Review's ("EOIR," collectively with DHS, the "Departments") Interim Final Rule ("IFR" or "Rule") referenced above and urge the Departments to rescind the IFR in its entirety.[2]

## I.    Introduction

The IFR guts the U.S. asylum system by establishing another discriminatory process that applies a heightened asylum standard to refugees at the southern border. Although similar to the Departments' Circumvention of Lawful Pathways ("CLP Rule") asylum ban, the IFR has fewer exceptions, an even higher screening standard, and applies to Mexican refugees who will now be trapped in their country of origin with their persecutors unable to flee without the risk of penalty. Under the IFR, bona fide asylum seekers who are unable to obtain and wait for an appointment through the CBP One mobile application – unless the meet one of the very limited exceptions – will be presumed ineligible for asylum regardless of the merits of their claim.

The IFR will subject LGBTQ/H refugees to grave harm, either because it will result in the wrongful denial of meritorious queer and trans asylum claims, or because LGBTQ/H refugees will put their lives in danger trying to comply with the IFR's illegal requirements. LGBTQ/H asylum seekers

---

[1] We use "LGBTQ" and "queer and trans" as umbrella terms for people with diverse sexual orientations or gender identities, including people who identify as gay, lesbian, bisexual, transgender, queer, intersex, asexual, non-binary, and gender non-conforming. We refer collectively to LGBTQ people and people living with HIV as "LGBTQ/H."

[2] Where this comment includes linked material in footnotes, we request that the Departments review the linked material in its entirety and consider it part of the record.

STB_AR1_013028

identity] basis. LGBT forced migrants experience considerable shame and fear when disclosing their sexual orientation and gender identity, especially in recounting the instances of traumatic violence directed at their sexuality. For many LGBT forced migrants, the notion that they would receive help from governmental authorities on the grounds that they have suffered persecution based on SOGI is difficult to grasp until they have been outside their country of origin for an extended period. Complex PTSD makes it difficult for forced migrants to recount a history of traumatic events and it may take many years for the shame and fear to diminish sufficiently to allow a forced migrant to be able to seek help."[92]

It is not reasonable then to expect LGBTQ/H asylum seekers to be able to "shout out" a fear of returning to their countries of origin, even if explaining the reason behind the fear is not expected or required. As Drs. Shidlo and Ahola explain, many LGBTQ/H asylum seekers are psychologically prevented from seeking help because of trauma experienced due to their LGBTQ/H identities and this includes being able to make a spontaneous statement of fear to an immigration officer. When you add in the extra layers of timing or when the "shout" is expected to happen (at the end of an oftentimes harrowing journey to reach the U.S. border during which more abuse and trauma has most likely occurred) and a lack of confidentiality (due to detention conditions and the Rule's removal of any individualized screening or asylum advisal) it becomes clear that very few LGBTQ/H asylum seekers will be able to access a credible fear interview and subsequent protection in the United States if this shout test is allowed to go into effect. Instead LGBTQ/H asylum seekers will be sent back to conditions of significant harm, danger, and violence without a single question being asked of them.

For all of these reasons, the shout test is woefully insufficient to protect against the return of bona fide asylum seekers to persecution or torture, especially for vulnerable groups such as LGBTQ/H asylum seekers. By putting the onus on asylum seekers to "manifest" a fear to law enforcement officers within hours of being detained and while still in a detention setting, this Rule profoundly misunderstands the nature of trauma, the effects of persecution, and the realities of asylum seekers and what they are escaping from. The probability and risk that bona fide asylum seekers, especially bona fide LGBTQ/H asylum seekers, will be returned to danger is unacceptably high under the shout test. The elimination of a required affirmative fear screening and individualized asylum advisals for asylum seekers under the pretense of efficiency goes against this Administration's stated commitment to protect LGBTQ/H asylum seekers and refugees.

## VII.    The IFR Illegally Creates a New, Higher Protection Screening Standard that Will Result in LGBTQ/H People with Bona Fide Asylum Claims Being Refouled

Asylum seekers subject to expedited removal who express a fear of return must be referred for a preliminary fear screening conducted by an Asylum Officer. Given the circumstances of flight for refugees escaping violence, as well as the conditions under which screening interviews take place, Congress set the standard for asylum screening interviews or Credible Fear Interviews ("CFIs")

---

[92] Shidlo, Ariel; Ahola, Joanne, Forced Migration Review, Issue 42 (2013), 9-11, at 10, available at: https://ora.ox.ac.uk/objects/uuid:04c63cce-3c12-4310-b6f5-48ada2506114/files/m7f5877d072c0170987aaf13b907d78d0

STB_AR1_013050

deliberately low. The INA defines the CFI standard as "a significant possibility . . . that the alien **could** establish eligibility for asylum…"[93] In a recent ruling, the United States District Court for the District of Columbia emphasized that Congress used the word "could" in the credible fear definition to convey that, "a possibility, rather than certainty [of persecution] suffices at the credible fear stage of the asylum-eligibility process."[94] As the Judiciary Committee report to the House version of the bill explained, this was intentional to ensure that "there should be no danger that an alien with a genuine asylum claim will be returned to persecution."[95] Senator Hatch further stated that "the conference report struck a compromise by rejecting the higher standard of credibility included in the House bill. The standard adopted in the conference report is intended to be a low screening standard for admission into the usual full asylum process."[96] The report also noted that the initial screening should "focus on two questions: is the alien telling the truth; and *does the alien have some characteristic that would qualify the alien as a refugee*"[97]

By law, anyone determined to have a credible fear of persecution cannot be deported without a full hearing on their asylum claim.  However, under the CLP Rule enacted in May 2023, and now under the IFR, refugees subject to these rules that cannot establish an exemption or exception, will now have to pass higher screening standards in order to have an opportunity to apply for protection. And even if they pass this higher standard, they will only be eligible for withholding of removal and Convention Against Torture (CAT) relief, even if they would otherwise qualify for asylum.

More specifically, under the IFR, asylum seekers must first demonstrate a "significant possibility that [they] would be able to establish by a preponderance of the evidence that they were not subject to the rule's limitation on asylum eligibility or that they will be able to establish by a preponderance of the evidence exceptionally compelling circumstances."  Notably, this inquiry is completely unrelated to the underlying merits of the applicant's asylum claim. In other words, LGBTQ/H asylum seekers who qualify for asylum will be denied an opportunity to apply for protection simply because of the way they entered the country. Only if they overcome this barrier — which will be impossible for many LGBTQ/H asylum seekers given the challenges outlined throughout this comment — can they then be screened under the "significant possibility" standard. Otherwise, they will be subjected to a brand new, more stringent "reasonable *probability*" screening standard which is defined as "substantially more than a reasonable possibility," (the heightened standard currently applied in the CLP Rule context), but "somewhat less than more likely than not," i.e., 51% chance of harm.

Raising the standard, especially given the conditions under which screening interviews generally take place, is unlawful and will result in bona fide LGBTQ/H refugees being returned to harm. Asylum screening interviews are usually performed in immigration detention in Customs and Border Protection ("CBP") custody where LGBTQ/H asylum seekers face high levels of mistreatment.[98] The vast majority of refugees have no access to an attorney in order to understand the

---

[93] 8 U.S.C. § 1225(b)(1)(B)(v) (emphasis added).

[94] *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 41 (D.D.C. 2020).

[95] 142 Cong. Rec. 25347 (1996).

[96] H.R. Rep. No. 104-469, at 158 (1996).

[97] 142 Cong. Rec. 25347 (1996).

[98] Immigration Equality, National Immigrant Justice Center, and Human Rights First, *"No Human Being Should Be Held There" The Mistreatment of LGBTQ and HIV-Positive People in U.S. Federal Immigration Jails*, June 2024, available at: https://immigrationequality.org/wp-content/uploads/2024/06/No-Human-Being-Should-Be-Held-There-THE-MISTREATMENT-OF-LGBTQ-AND-HIV-POSITIVE-PEOPLE-IN-U.S.-FEDERAL-IMMIGRATION-JAILS.pdf ("LGBTQ Detention Report")

STB_AR1_013051

process before their CFI takes place, which is usually held with an immigration officer over the phone through an interpreter, sometimes just days after the asylum seeker arrives in the U.S.[99]

Many LGBTQ/H asylum seekers – two-thirds of whom face sexual violence and other severe mistreatment on the journey to the U.S. according to one study[100] -- have serious health issues resulting from the journey that are untreated. Prescription medications are routinely confiscated by CBP, and refugees, including people with well controlled HIV are then forced to go without treatment for days or weeks, and sometimes even months.[101] Many queer asylum seekers are still reeling from the psychological impact of persecution in their home country which often includes, beatings, sexual assault, forced conversion therapy, "corrective" rape, the murder and suicide of other LGBTQ/H friends and partners, and a lifetime of homophobic abuse and rejection from family and communities. These traumas are compounded by inhumane detention conditions.[102]

There are other factors that can also impact an LGBTQ/H refugee's ability to tell their story during a screening interview that author organizations regularly encounter -- like the fear of disclosing LGBTQ/H status to government officials when an applicant suffered homophobic abuse at the hands of the authorities in their home country, insufficient privacy in detention facilities leading to homophobic and transphobic abuse by staff and other detained people, and lack of LGBTQ/H competency or other errors among immigration officers.[103] At the asylum screening stage, asylum seekers do not have the opportunity to present documentary evidence, expert opinions, or witnesses. That is why, recognizing these circumstances, Congress intentionally established the credible fear standard as a low bar.

Even under the more generous CFI standards, LGBTQ/H refugees with strong claims sometimes fail screening interviews. Author organizations have successfully gotten negative CFIs reversed in this context, with LGBTQ/H clients going on to win their asylum cases. Similarly, under previous regulations that unlawfully heightened the fear screening standards, LGBTQ/H refugees with bona fide claims for asylum have failed the higher screening standard, even though they would have passed the legally mandated CFI standard. For example, Ines is an Immigration Equality client who is a lesbian woman from Cuba. A Cuban police officer detained and physically assaulted Ines on the basis

---

[99] *See, e.g.,* Obstructed Legal Access: NIJC's Findings From 3 Weeks of Telephonic Legal Consultations in CBP Custody | National Immigrant Justice Center

[100] Amnesty International, *Mexico/Central America: Authorities turning their backs on LGBTI refugees*, 27 November 2017, available at: https://www.amnesty.org/en/latest/news/2017/11/mexico-central-america-authorities-turning-their-backs-on-lgbti-refugees/

[101] *See, e.g.,* LGBTQ Detention Report at 22-23; Immigration Equality to Assistant Director for ICE Health Services Corps Dr. Stewart D. Smith et a., Re: HIV-Positive Asylum Seekers Who Receive Grossly Negligent Medical Care in Immigration Detention and Are Particularly Vulnerable to COVID-19 Must Be Released Immediately. March 23, 2020. https://immigrationequality.org/wp-content/uploads/2020/09/Complaint-to-Office-of-Civil-Rights-and-Civil-Liberties-Re-HIV-Care-in-Detention-Facilities.pdf

[102] *See, e.g.,* LGBTQ Detention Report.

[103] *See e.g.,* CRCL Complaint, Systemic Deficiencies at the Houston Asylum Office in Assessment of Credible and Reasonable Fear Cause Harm and Irreversible Damage to Asylum Seekers, (Apr. 27, 2022), (CRCL Complaint, CFI and RFI Deficiencies) https://immigrationequality.org/wp-content/uploads/2022/04/2022_27April-CFI-complaint-1.pdf ; Human Rights First, Pretense of Protection, Biden Administration and Congress Should Avoid Exacerbating Expedited Removal Deficiencies, (Aug. 3, 2022) at 16-19, https://humanrightsfirst.org/library/pretense-of-protection-biden-administration-and-congress-should-avoid-exacerbating-expedited-removal-deficiencies/ ; Alex Mensing, Asylum Seekers Denied Basic Due Process and Access to Asylum at Torrance County Detention Facility, INNOVATION L. LAB., Feb. 1, 2023, https://innovationlawlab.org/press-releases/asylum-seekers-denied-basic-due-process-and-access-to-asylum-at-torrance-county-detention-facility/

STB_AR1_013052

**JA685**

of her sexual orientation and political opinion. On a different occasion, another Cuban police officer physically assaulted Ines because she is a lesbian and threatened her with arrest. When Ines sought asylum in the United States, the unlawful 8 C.F.R. § 208.13(c)(4) ("transit bar") was in effect. As a result, Ines was deemed not eligible for a CFI. She was given a reasonable fear interview ("RFI") instead under the heightened "reasonable possibility" screening standard. An asylum officer found that Ines did not have reasonable fear of persecution under the RFI's heightened standard. However, given that the travel ban was lifted and Ines was wrongfully given an RFI instead of a CFI, Immigration Equality worked for almost a year to get the negative determination overturned. The efforts were successful and Ines was placed in removal proceedings. Without substantial amounts attorney's assistance, Ines would never have gotten the chance to present her asylum case.

Identifying and advocating for clients who have been wrongfully denied at the fear interview stage has gotten progressively more difficult because asylum seekers in detention have such limited access to counsel and many are rushed through expedited removal processing. Although people are entitled to request an Immigration Judge review of their negative credible fear decision, these reviews are often cursory, with some asylum seekers prohibited from speaking, submitting evidence, or having their attorney speak on their behalf. Additionally, the ability of asylum seekers to request reconsideration of negative fear determinations with USCIS has been severely curtailed under recent regulation and this restriction is also included in the IFR.[104]

Further, forcing asylum officers and immigration judges to apply three distinct legal standards based on manner of entry and the application of conflicting asylum bans is likely to lead to legal errors and places further strains on an already overburdened system and asylum officers where the asylum backlog is in the millions. Already, asylum officers are diverted to conducting increasingly complicated fear screenings rather than adjudicating the merits of pending asylum cases. The changes also overburden attorneys trying to prepare clients for fear interviews during brief consultations, who will likely find it impossible to explain these complex rules and legal standards.

In short, this is an unlawful attempt to circumvent the CFI standard and the number of erroneous denials will skyrocket under the new higher standard. LGBTQ/H refugees who would normally qualify for asylum will instead be returned to countries of persecution.

## VIII.    Under the IFP, LGBTQ/H Refugees Will be Left in Perpetual Limbo and Queer Families Will Be Separated.

LGBTQ/H refugees who would otherwise qualify for asylum, but are only eligible for withholding of removal and CAT relief under the IFR, with be left in perpetual limbo. This jeopardizes the long-term stability and integration of this already marginalized group. More specifically, LGBTQ/H refugees who are awarded withholding of removal or CAT relief will be denied the path to legal residence, stability, and citizenship that they would be entitled to through a grant of asylum. They will be unable to access certain benefits and will face barriers in obtaining and renewing their employment authorization. Moreover, they will be deprived to the ability to reunite with their families because, unlike asylum, withholding of removal and CAT do not enable refugees to bring their families to safety.

Author organizations have witnessed the devastating impact this can have on LGBTQ/H refugees firsthand. For example, Immigration Equality client Alexander was kidnapped, beaten, and

---

[104] Interim Final Rule at 48,770.

**JA686**

STB_AR1_013053



July 8, 2024

Via Federal e-rulemaking portal, https:// www.regulations.gov

Re: Securing the Border, 89 FR 48719 (June 7 2024), DHS Docket No. USCIS-2024-0006

This is a comment on behalf of Refugees International regarding the Securing the Border Interim Final Rule, hereafter referred to as the IFR. Refugees International is an independent policy and advocacy organization focused on upholding the rights and needs of forcibly displaced people. The IFR disconnects asylum from the merits of persecution claims by denying access to asylum based on the number of border arrivals. Refugees International has observed first-hand how this undermines the right to seek asylum and the obligation against non-refoulement and recommends that the Departments withdraw the rule.

The fact that "the Departments do not have adequate resources to deliver timely consequences to individuals who cross unlawfully and cannot establish a legal basis to remain in the United States" should have no relationship to the treatment of newly arriving asylum seekers whose right to remain has not yet been assessed (89 FR 48713). Why should a person fleeing persecution in Mexico be ineligible for asylum because of an inability of the United States, for diplomatic reasons, to remove Eastern Hemisphere migrants?  (89 FR 48722)  The IFR describes a "vicious cycle in which the border security and immigration systems cannot deliver timely…consequences to all the people who are encountered at the SWB and lack a lawful basis to remain in the United States…which then incentivizes more people to make the dangerous journey north…an increasingly lucrative source of income for dangerous TCOs" (89 FR 48714). But there is another vicious cycle at play as a result of this IFR: accesss to asylum is less and less about merits of claim and more arbitrary and discriminatory. The Interim Final Rule is motivated by the Departments' concern that too many people are seeking asylum, rather than whether individuals are eligible. Far from ensuring access to those with the strongest claims and speeding their adjudication on the merits, the new system allows only those with the means to wait for months for a CBP appointment access to the asylum system and shifts resources to increasingly complex credible fear screenings.[1]

There are two ways in which the IFR reduces access to asylum hearings on the merits: it raises the preliminary screening standard and it requires that asylum seekers "manifest fear" to be referred for preliminary screenings. The IFR justifies raising the preliminary screening standard with the claim that "most" people who pass credible fear screenings are denied asylum in immigration courts (89 FR 48728), a claim recently refuted by a report from TRAC showing that "two thirds of court asylum applicants" between 2014 and 2024 have been found legally entitled to remain in the United States (https://trac.syr.edu/reports/742/). The Departments acknowledge that the manifestation of fear requirement "could result in some noncitizens with meritorious claims not being referred to a credible fear interview" and instead removed, an impermissible

---

[1] The flawed metric the IFR uses for measure efficiency (see, for example, 89 FR 48739)  is the time period between encounter and referral to CFI and between negative CFI and removal, rather than any assessment of the length of the CFI interview itself. Thus improved efficiency has nothing to do with actual asylum adjudication. It simply reflects more limited time accorded to asylum seekers to access counsel while in custody.

STB_AR1_013148

JA688

violation of U.S. obligations under the Refugee Convention (89 FR 48744).[2]   Indeed, the Biden administration has evinced less concern than the Carter administration did forty-five years ago, before the passage of the Refugee Acy of 1980, when it conducted a study (albeit inadequate) to assess whether deported Haitians faced persecution upon return[3], or even than during the Eisenhower administration sixty years ago—before the U.S. acceded to the Refugee Convention—when deportations to Yugoslavia  (for example) were carefully monitored by the State Department. The Biden administration is returning Venezuelans and other third country nationals to Mexico with little concern about what happens to them there, often without their identify documents, separated from their families, and without copies of their removal orders.[4] Without any monitoring of the consequences of removal, it is unclear if the IFR's supposed "systemic efficiency" is "in the best interest" of the United States—an interest that includes a commitment to upholding human rights and providing humanitarian aid (89 FT 48736-7).

The IFR notes an increase in fear claims by Mexicans but, as it does throughout the IFR, refuses to consider whether the increase may be attributable to a documented rise in insecurity in Mexico.[5]  Mexicans asylum seekers that Refugees International interviewed after they had been removed to Nogales, Sonora under the IFR described fleeing specific, targeted violence. A woman who fled Guerrero with her seven year old daughter described crying while in CBP custody and saying that she feared return. Rather than referring her to a credible fear interview, a CBP officer told her to seek asylum in Mexico, that she was barred from the United States for five years (though not given a copy of her removal order), and warned not to try to re-enter the country unauthorized lest she be separated from her daughter. Another Mexican woman – who fled death threats-- told Refugees International that when she told a CBP officer that she wanted to seek asylum, he responded "that's what everyone says" and the new regulation made that impossible. She told Refugees International she was considering sending her daughter to the port of entry on her own and then trying to cross in a remote area of the desert – with the help of a smuggler—to evade detection. This is the perverse result of the IFR.

A better way to combat the TCOs the IFR condemns is to expand asylum seeker access at ports of entry and expand CBP One appointments. A better way to provide "timely relief or protection for those who warrant it" would be to establish "general rules or guidelines in lieu of case by case assessments" (89 FR 48738) that would allow officers can quickly *approve* certain cases –

---

[2] The IFR justifies eliminating questions about fear by citing the behavioral science concept of "acquiescence" (89 FR 48743) ignoring a significant amount of research showing how CBP officers intimidate traumatized people into obedience and submission to the process of removal, regardless of their well-founded fear of return. See for example, https://cmsny.org/wp-content/uploads/2019/06/Why-Border-Patrol-Agents-and-CBP-Officers-Should-Not-Serve-as-Asylum-Officers.pdf.
In general, the IFR shockingly approaches the absolute restriction on returning any human being to persecution as if it were a cost-benefit matter fulfillable through probabilistic accounting. "The benefits of this rule, which is consistent with all statutory and regulatory requirements and the United States' international law obligations, outweigh any potential marginal increase in the likelihood that a meritorious case would fail under the raised screening standard"  (89 FR 48746).
[3] For a description of the State Department's 1979 study in Haiti, see Haitian Refugee Center v. Civiletti, https://casetext.com/case/haitian-refugee-ctr-v-civiletti
[4] IMUMI, Factsheet: Removal and Return of Non Mexican Nationals from the United States to Mexico. https://imumi.org/attachments/2024/Removal_an_Return_of_Non_Mexican_Nationals_from_the_US_to_Mx.pdf
[5] https://www.wola.org/wp-content/uploads/2023/09/Militarized-Transformation_-.pdf

STB_AR1_013149

JA689

something suggested by USCIS's own ombudsman.[6] These were not alternatives considered alongside restrictions on access to asylum based on a numerical quota and inconsistent with the explicit language of the Refugee Act of 1980 (allowing for access to asylum regardless of status) and Congressional intent in establishing the credible fear process in 1996 (with a low-threshold screening standard). For these reasons, the IFR should be withdrawn.


Yael Schacher, Ph.D.
Director for the Americas and Europe
www.refugeesinternational.org
Refugees International

**Refugees International**

---

[6] https://www.dhs.gov/sites/default/files/2023-07/2023%20Annual%20Report%20to%20Congress_0.pdf, page 22.

STB_AR1_013150

July 8, 2024

*Submitted via:* https://www.regulations.gov.

| | |
|---|---|
| Ur M. Jaddou | David L. Neal |
| Director | Director |
| U.S. Citizenship and Immigration Services | Executive Office for Immigration Review |
| U.S. Department of Homeland Security | U.S. Department of Justice |

**Re:**    **Comment Re: Securing the Border,**
**USCIS Docket No. USCIS-2024-0006, RIN 1615-AC92,**
**EOIR A.G. Order No. 5943-2024, RIN 1125-AB32**

Dear Director Jaddou and Director Neal,

The Florence Immigrant & Refugee Rights Project (Florence Project) respectfully submits this comment to strongly oppose the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), and Department of Justice (DOJ), and Executive Office for Immigration Review's (EOIR) Interim Final Rule (hereinafter "Rule").

The Rule is one of many of the government's ongoing and pervasive efforts to unlawfully restrict asylum at the border. Instead of engaging in meaningful reforms that modernize and streamline initial identity screenings and intake processes while also meaningfully respecting the statutory right to seek asylum and basic human rights of asylum seekers, most of these efforts have been copycat facsimiles of those of the previous administration designed to limit asylum access and deter people seeking safety from even coming to the United States. Notably, in this Rule the Biden administration stretches the bounds of credulity to use authority known as 212(f) to illegally restrict asylum access. 212(f) was invoked twice by the Trump administration—first in the 2017 Travel Bans and then in Title 42 Expulsions—and twice found unlawful.[1]

Specifically, President Biden relies on a false premise of "emergency border circumstances" and an even more disingenuous claim that allowing people to seek asylum between ports—a right they have regardless of the manner of entering the U.S.—will be detrimental to the interests of the United States. The new Rule:

- creates an Asylum Ban for people crossing between ports by speciously tying asylum access to arbitrary numbers of encounters by U.S. Customs and Border Protection (CBP);

---

[1] *See, e.g.* Exec. Order 13769, 82 FR 8977 (Feb. 1, 2017); Exec. Order 13780, 82 FR 13209 (Mar. 9, 2017); Centers for Disease Control Order re: 42 U.S.C. §§ 265, 268 (Mar. 20, 2020).

STB_AR1_013247

**JA691**

**PHOENIX OFFICE**
P.O. Box 32670
Phoenix, AZ 85064
Tel: 602-307-1008
Fax: 602-340-0596

**TUCSON OFFICE**
P.O. Box 86299
Tucson, AZ 85754
Tel: 520-777-5600
Fax: 520-829-4154

www.firrp.org

"regular instances of erroneous, fabricated, and downright bogus information recorded" on key forms that provide the factual basis for the asylum claim.[21] Many of the forms contained internal discrepancies of the most basic information, "botching or switching names, as well as mangling dates, mistaking gender, and flubbing countries of origin."[22] The USCIRF found that in nearly 90% of the cases where asylum seekers stated that CBP agents did not ask whether the subject was afraid to return to his or her country of origin, "the record inaccurately indicated that it had been asked, and answered."[23]

This is consistent with our experience at the Florence Project, where we have also found that CBP unlawfully removed numerous people with claims of fear *even before* this Rule took effect. For example, Carlos[24] fled his home in southern Mexico after years of threats, extortion, and beatings by local gangs. He arrived at the U.S.-Mexico border near San Luis, Arizona and was taken into CBP custody. He explained to agents that he had a fear of return to Mexico. Instead of correctly allowing Carlos to proceed with a Credible Fear Interview (CFI) before USCIS, agents did not record his fear of Mexico of any of his paperwork and instead indicated that he came to the U.S. to "look for work." Carlos was then illegally expelled to Mexico, where he was threatened by cartel members. Likewise, our client Ivan endured harassment, threats, and beatings in a small border town because of his position as a former police officer. Cartel members physically attacked him near the port of entry, and he fled with his attackers in pursuit directly to CBP agents, who then detained him. Ivan, who had broken his arm and injured his jaw during the chase and detention, went to the hospital with CBP agents. He explained in detail how terrified he was of going back to Mexico. Instead of allowing him to proceed with his asylum application, CBP agents falsified his file to indicate that he did not have a fear of return and *directly returned him to the hands of the cartel members from whom he fled.* Ivan was then kidnapped and held for over a week in an abandoned house, where he was sexually assaulted, beaten, and starved. He then escaped and returned to CBP to ask for help, this time in fear that they would again ignore his pleas for help and return him to the people who tortured him.

We have already seen that shout tests fail and result in widespread refoulment and violations of people's rights. When Title 42 was in effect, families seeking protection in the U.S. also had to pass a shout test similar the one proposed in the Rule. The Center for Gender and Refugee Studies found that more than half of the families who were expelled under Title 42 had clearly expressed their fear to return but were summarily deported and not allowed to pursue asylum. "Instead, families disclosed that CBP officers verbally abused them, telling them to "shut up," declaring they had "no right" to an interview, or completely ignoring their attempts to communicate."[25]

We have witnessed the same pattern of CBP officers engaging in abusive language and ignoring people's claims since the Rule went into effect on June 5: most migrants deported to Nogales,

---

[21] Washington, John. 2019. "*Bad information. Border patrol arrest reports are full of lies that can sabotage asylum claims.*" (Aug. 11 2019) https://theintercept. com/2019/08/11/border-patrol-asylum-claim/.
[22] *Id.*
[23] Cassidy, Elizabeth, and Tiffany Lynch. *Barriers to protection. The treatment of asylum seekers in expedited removal.* US Commission on International Religious Freedom (2016) https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.
[24] All names have been changed to protect privacy.
[25] Center for Gender and Refugee Studies, *"Manifesting" Fear At the Border: Lessons from Title 42 Expulsions,* (Jan. 2024) available at https://cgrs.uclawsf.edu/our-work/publications/%E2%80%9Cmanifesting%E2%80%9D-fear-border-lessons-title-42-expulsions.

STB_AR1_013254

**JA692**

Sonora have told us that they voiced a fear of return to CBP agents but were ignored. One woman reported to our partner organization, the Kino Border Initiative, that she pleaded with agents not to deport her and showed agents the bruises she incurred at the hands of an angry persecutor who threatened her and her family. She was deported to Mexico without any paperwork and is again at risk of harm. Another client reported that, after expressing a fear of return, a CBP agent told them, "It's not my problem if your country or your president treats you badly, I'm going to send you back to your country." A third client tried to explain her fear of return to a CBP agent. She explained that she had a fear of return because her 16-year-old son had been beaten by an organized crime group. The agent did not believe her, did not record her statement of fear, and told her it wasn't his problem.[26]

Given CBP's well-documented past failures and its history of illegal return of those seeking asylum, *see* Attachs. A, B, and C, we are deeply concerned that this "shout test" will be nothing more than further cover for the agency to continue to illegally remove migrants who clearly state a fear of return. Since the Rule's implementation, the agency has already shown that it will continue to do just that, and indeed escalate the practice to increase the number of people wrongfully returned.

V.    **Raising the Standard For Initial Fear Screenings Directly Violates the Standard Set By Congress**

As detailed above, the administration's "Shout Test" will make it so hundreds or thousands of asylum seekers with strong claims will not be allowed to proceed to the initial credible fear or reasonable fear screening interview, and instead will be quickly removed. And for those who do succeed in voicing a fear of return, the administration continues to push through an unlawful heightened standard for initial fear screenings. Like it did in May 2023, the Rule raised the standard to pass that initial screening from "significant possibility" (fraction of a 10 percent chance of persecution), a standard set by Congress and used for decades, to a heightened standard of "reasonable probability" (somewhat less than 51 percent chance of persecution)[27]. This change is illegal and harmful, as we noted in 2023. *See* Attach. A. Congress understood that the standard's threshold must be low because this is merely the initial screening of an asylum seeker's claim to determine whether their full claim will be heard by the administrative agency, e.g. U.S. Citizenship and Immigration Services or an Immigration Judge. At this stage, asylum seekers, particularly those who will be affected by this Rule, will have recently arrived after arduous and often horrifying journeys—tired, hungry, injured— and subjected to these screenings while in detention with limited or no access to an attorney, family, or friends, and often held without blankets in extremely cold holding areas, commonly

---

[26] Email from Kino Border Initiative Education and Advocacy Director Pedro de Velasco dated June 13, 2024, on file with authors.

[27] *Grace v. Whitaker*, 344 F. Supp. 3d 96, 127 (D.D.C. 2018), *aff'd in part, rev'd in part and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020) (describing the "significant possibility" standard at "one in ten chance of persecution, i.e., a fraction of ten percent."); *See also* NATIONAL IMMIGRANT JUSTICE CENTER, *New Biden Executive Action, Further Eviscerates The Rights To Seeks Asylum: Frequently Asked Questions About The Latest Anti-Immigrant Policy: Why is it Harmful to Heighten Fear Screening Standards*, June 5, 2024, https://immigrantjustice.org/staff/blog/new-biden-executive-action-further-eviscerates-right-seek-asylum-frequently-asked.

STB_AR1_013255

JA693



**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LAS AMERICAS IMMIGRANT       :
ADVOCACY CENTER, *et al.*,       :
      :
     Plaintiffs,       :       Civil Action No.:    24-1702 (RC)
      :
     v.       :       Re Document Nos.:    23, 45
      :
U.S. DEPARTMENT OF HOMELAND       :
SECURITY, *et al.*,       :
      :
     Defendants.       :

## ORDER

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT;**

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY**

**JUDGMENT**

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Plaintiffs' motion for summary judgment (ECF No. 23) is **GRANTED IN PART AND DENIED IN PART**; and Defendants' cross-motion for summary judgment (ECF No. 45) is **GRANTED IN PART AND DENIED IN PART**.  It is hereby:

**ORDERED** that the Final Rule's limitation on asylum eligibility be vacated and set aside; and it is

**FURTHER ORDERED** that the Final Rule's manifestation of fear requirement be vacated and set aside; and it is

**FURTHER ORDERED** that the Guidance's four-hour consultation window be vacated and set aside; and it is

**JA695**

**FURTHER ORDERED** that, given the Court's holding on severability, the provisions of the Final Rule not mentioned in this Order remain in effect; and that it is

**FURTHER ORDERED** that the individual Plaintiffs' removal orders and negative credible fear determinations be vacated.

**SO ORDERED**.

Dated:  May 9, 2025

RUDOLPH CONTRERAS
United States District Judge

2

**JA696**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| LAS AMERICAS IMMIGRANT ADVOCATE CENTER, *et al.*, | : | | |
| | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 24-1702 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 23, 45 |
| | : | | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | : | | |
| | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT;**

**GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY**

**JUDGMENT**

**I.  INTRODUCTION**

The Immigration and Nationality Act provides that any noncitizen who is physically present in the United States, regardless of whether he or she arrives at a designated port of entry, may apply for asylum.  In 2024, the Department of Homeland Security and the Department of Justice jointly issued a Rule that, among other things, generally limits asylum to noncitizens who arrive at a port of entry.  Two immigrant advocacy groups and twenty-eight individual asylum seekers challenge the Rule and its implementing Guidance as contrary to law and arbitrary and capricious.  For the reasons discussed below, Plaintiffs' motion for summary judgment is granted in part and denied in part, and Defendants' motion for summary judgment is granted in part and denied in part.

**JA697**

## II.  BACKGROUND

### A.  Statutory and Regulatory Background

Asylum is a form of protection that the Secretary of Homeland Security "may grant" to noncitizens physically present in the United States or at the border who cannot return home "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[1]  8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(A); *see also id.* § 1158(a)(2), (b)(1)(A), (b)(2) (laying out additional eligibility criteria).  Asylum allows a noncitizen to live and work in the United States, creates a path to lawful permanent residency and citizenship, and enables some of the noncitizen's family members to seek derivative asylum.  *Id.* §§ 1158–59.  Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum" within one year of arrival.[2]  *Id.* § 1158(a)(1), (a)(2)(B).

---

[1] By its terms, the Immigration and Nationality Act gives the Attorney General the discretion to grant asylum.  But "[e]ffective March 1, 2003, the Immigration and Naturalization Service (INS), under the direction of the Attorney General, ceased to exist, and its functions were transferred to the Department of Homeland Security (DHS)."  *Vasquez v. Holder*, 602 F.3d 1003, 1006 n.3 (9th Cir. 2010) (citing the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002)); *Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005); *see also Cruz-Miguel v. Holder*, 650 F.3d 189, 195 n.10 (2d Cir. 2011).  Throughout this opinion the Court refers to the authority of the Secretary of Homeland Security.

[2] In general, noncitizens can apply for asylum in one of three ways.  If the noncitizen is not in any kind of removal proceeding, she may file an affirmative application for asylum.  8 U.S.C. § 1158(a)(1); 8 C.F.R. § 208.1(a)(1).  If she is subject to full removal proceedings under 8 U.S.C. § 1229a, she may file an application for asylum as a defense to removal.  *See* 8 U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b).  Finally, noncitizens subject to expedited removal may file an application for asylum as a defense to expedited removal.  *See* 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f).  The third category is at issue in this case.

Noncitizens who arrive at the border without authorization or inspection are typically subject to expedited removal. *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020); 8 U.S.C. § 1225(b)(1). But if a noncitizen expresses a fear of persecution or an intent to seek asylum, she is referred to a credible fear interview with a United States Citizenship and Immigration Services ("USCIS") asylum officer ("AO"). 8 U.S.C. § 1225(b)(1)(A)(ii), (b)(1)(B); *see also* 8 C.F.R. § 235.3(b)(4). That interview functions as an initial screener for asylum and two other forms of protection from removal: statutory withholding of removal and protection under the Convention Against Torture ("CAT"). 8 U.S.C. § 1231(b)(3) (withholding of removal); *id.* § 1231 note (CAT protection); 8 C.F.R. §§ 208.16–.18, 1208.16–.18; *see also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 724–25 (D.C. Cir. 2022) (describing these forms of protection). Both statutory withholding of removal and CAT protection require an applicant to show that she will "more likely than not" be persecuted or tortured if removed. *Nasrallah v. Barr*, 590 U.S. 573, 575 (2020); *INS v. Cardoza-Fonesca*, 480 U.S. 421, 423 (1987); 8 C.F.R. § 208.16(c)(2). Unlike asylum, these protections do not entitle a noncitizen to any legal status in the United States, and both are mandatory, not discretionary, for those who qualify. *Huisha-Huisha*, 27 F.4th at 725.

If a noncitizen demonstrates eligibility for asylum, statutory withholding of removal, or CAT protection during her credible fear interview, she is placed in full removal proceedings, which encompass the right to counsel, the right to present and examine evidence, and the right to appeal. 8 U.S.C. §§ 1225(b)(1)(B)(v), 1229, 1229a, 1231(b)(3), 1252(a)–(b); 8 C.F.R. §§ 1003.12–.47, 208.16–.18, 1208.16–.18. If her claims for protection are rejected by the AO, she can request review by an immigration judge ("IJ"). 8 C.F.R. § 208.30(g); *see also id.* §§ 1003.42, 1208.30(g). If the IJ affirms the AO's negative finding, or if the noncitizen does not

request IJ review, she is subject to removal without further procedure.  8 U.S.C.

§ 1225(b)(1)(B)(iii); *see also* 8 C.F.R. § 235.3(b).

Over the past several years, the United States has experienced a surge of "unlawful

migration" at the southern land border.  *Securing the Border*, 89 Fed. Reg. 48710, 48712 n.5,

48722 (June 7, 2024); *see also* J.A. 1, 8, ECF No. 53.  In response, President Biden issued a

Proclamation "Securing the Border" on June 3, 2024, invoking his authority under sections

212(f) and 215(a) of the INA.  89 Fed. Reg. 48487; J.A. 1–14; *see also* 8 U.S.C. §§ 1182(f),

1185(a).  The proclamation generally suspended the entry of noncitizens at the southern border

during "emergency border circumstances," or until the seven-day average of noncitizen

"encounters" falls below 1,500 per day.  89 Fed. Reg. at 48491; J.A. 9–10.  The proclamation

defines "encounters" to mean "a noncitizen" who:

> (i)      is physically apprehended by [Customs and Border Patrol] immigration officers within 100 miles of the United States southwest land border during the 14-day period immediately after entry between ports of entry;
> (ii)      is physically apprehended by [Department of Homeland Security] personnel at the southern coastal borders during the 14-day period after entry between ports of entry; or
> (iii)      is determined to be inadmissible at a southwest land border port of entry.

J.A. 13.  Essentially the proclamation functions as a toggle: if there are over 1,500 border

crossings over a certain period of time, virtually every noncitizen who arrives at the southern

border cannot apply for asylum.  At the time the proclamation was issued, the 1,500-encounter

daily threshold had been continuously exceeded for almost four years.  Pls.' Mot. Summ. J. at 14,

44, ECF No. 23.

During the emergency border circumstances described in the proclamation, the only

noncitizens permitted to enter the United States at the southern border are U.S. nationals; lawful

permanent residents; unaccompanied children; "any noncitizen who is determined to be a victim

of a severe form of trafficking in persons" as defined in 22 U.S.C. § 7102(16); those who have a valid visa or other lawful permission to seek entry or admission, or who present at a port of entry pursuant to a pre-scheduled time or place; and those permitted to enter by a Customs and Border Patrol ("CBP") immigration officer based on "significant law enforcement, officer and public safety, urgent humanitarian, and public health interests" or "operational considerations." J.A. 11–12. On June 4, 2024, the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") jointly published in the Federal Register an Interim Final Rule incorporating the proclamation. 89 Fed. Reg. 48710. DHS also issued implementing guidance. DHS, *Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,* Securing the Border*, and Interim Final Rule,* Securing the Border (2024), available at https://bit.ly/3WDYeZ8 ("Guidance").

On September 27, 2024, President Biden issued an amended proclamation that altered the June proclamation in two ways. Suppl. J.A. 208–13, ECF No. 69. First, it increased the length of time that the encounter-based asylum ban would remain in place. *Id.* at 210–11; *see also Securing the Border*, 89 Fed. Reg. 81156, 81164–66 (Oct. 7, 2024). Second, it announced that unaccompanied children from non-contiguous countries would be included in the total count of daily encounters. Suppl. J.A. 210–11; *see also* 89 Fed. Reg. at 81166–67. DHS and DOJ jointly published a Final Rule incorporating the changes, which went into effect on October 1, 2024. 89 Fed. Reg. at 81156. As relevant here, the Rule effects several changes to the way the government processes noncitizens' claims for protection at the southern border.[3]

---

[3] Because the differences between the Interim Final Rule and Final Rule are immaterial to this litigation, the Court refers to them collectively as the Rule. *See* Suppl. Mem. in Supp. of Pls.' Mot. Summ. J. at 1, ECF No. 59 ("As relevant to Plaintiffs' claims, the [Final] Rule is identical to the IFR."); *see also* 89 Fed. Reg. at 81164–68 (describing changes between the Final Rule and Interim Final Rule); *Am. Maritime Ass'n v. United States*, 766 F.2d 545, 555 n.17 (D.C.

*First*, the Rule requires noncitizens seeking asylum to schedule a "time to appear" for processing at a specific port of entry. 89 Fed. Reg. at 81253. The only way to schedule an appointment is through a smartphone application, CBP One. *Id.* Without a scheduled appointment, most noncitizens are categorically ineligible for asylum unless they can demonstrate certain "exceptionally compelling circumstances." *Id.* at 81168. These exceptions include "an acute medical emergency," "an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder," and human trafficking. *Id.*

*Second*, under the Rule noncitizens must affirmatively manifest a fear of removal or repatriation to qualify for a credible fear interview. *Id.* at 81168, 81232–45; *see also* 8 U.S.C. § 1225(b)(1)(B)(v). Before, CBP officers proactively asked noncitizens in expedited removal proceedings whether they had any fear or concern of being removed. *Inspection and Expedited Removal of Aliens*, 62 Fed. Reg. 10312, 10318–19 (Mar. 6, 1997); 8 C.F.R. § 235.3(b)(2)(i). Pursuant to the Rule, officials no longer "provid[e] individualized advisals" on asylum. 89 Fed. Reg. at 81234. Nor do they ask noncitizens questions related to whether they have a fear of return. *Id.* The Rule defines "manifesting" fear as "express[ing] an intention to apply for asylum, express[ing] a fear of persecution or torture, or express[ing] a fear of return to the noncitizen's country or country of removal." *Id.* at 81233–34.

*Third*, the Rule raises the threshold for a noncitizen to demonstrate her eligibility for statutory withholding of removal or CAT protection. Under the Rule, a noncitizen must show a "reasonable probability" that she is entitled to either protection during her credible fear interview to be placed in full removal proceedings. *Id.* at 81245–50. This means, according to the Rule,

---

Cir. 1985) (acknowledging that the relevant provisions of an interim final rule and challenged final rule were identical).

"substantially more than a 'reasonable possibility' but somewhat less than more likely than not." *Id.* at 81168. The Rule also requires "greater specificity of the claim" than before, when noncitizens had to show only a "reasonable" or "significant possibility" of their eligibility for statutory withholding of removal or CAT protection. *Id.* at 81246–47.

*Fourth*, the Guidance establishes a four-hour minimum window for asylum seekers in DHS custody to consult with an attorney or other person before their credible fear interviews. Guidance at 4. Regulations from 1997 provided for a 48-hour consultation window; in 2023, DHS reduced the consultation period to 24 hours. 62 Fed. Reg. at 10320; DHS, *Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration* (Apr. 27, 2023).

* * *

On January 20, 2025, President Trump issued an executive order shutting down the CBP One mobile application. *Securing Our Borders* § 7(a) (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders/ [https://perma.cc/L9D3-URKZ]. DHS immediately canceled all existing CBP One appointments. Pls.' Mot. TRO and Mem. Law in Supp. ("Mot. TRO") at 2, ECF No. 71. Since then, most noncitizens have been categorically unable to seek asylum at the southern border. *Id.* According to data posted on CBP's website, by February 2025 southern border "apprehensions" had decreased to under 300 per day. CBP, *CBP Releases February Monthly Update* (Mar. 12, 2025), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-february-2025-monthly-update [https://perma.cc/8F3G-8UHY]. The Rule and Guidance, however, remain in effect.

7

**JA703**

**B. Procedural Background**

This case was initiated on June 12, 2024, when two immigrant advocacy groups, Las Americas Immigrant Advocacy Center ("Las Americas") and Refugee and Immigrant Center for Education and Legal Services ("RAICES"), filed a complaint challenging the Interim Final Rule. Compl., ECF No. 1. One month later, they filed an amended complaint, adding as plaintiffs eleven noncitizens whose claims for protection were rejected under the Interim Final Rule and Guidance. First Am. Compl., ECF No. 14. The amended complaint alleges that the Interim Final Rule and Guidance violate the Immigration and Nationality Act and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. Id.* Named as defendants are DHS; DOJ; USCIS; CBP; U.S. Immigration and Customs Enforcement ("ICE"); the Executive Office for Immigration Review ("EOIR"); Kristi Noem, Secretary of Homeland Security; Kika Scott, Senior Official Performing the Duties of the Director of USCIS; Pete R. Flores, Acting Commissioner for CBP; Caleb Vitello, Acting Director of ICE; Pamela Bondi, Attorney General; and Sirce E. Owen, Acting Director of the EOIR (collectively, "Defendants").[4] First Am. Compl. ¶¶ 26–37.

The operative complaint encompasses five claims. Count I alleges that the Rule's limitation of asylum eligibility is contrary to the INA and the APA. Second Am. Compl. ¶¶ 106–09, ECF No. 56. Count II alleges that the heightened standard for establishing a credible fear of persecution violates the INA and the APA. *Id.* ¶¶ 110–14. Count III characterizes "[a]ll key aspects" of the Rule as arbitrary and capricious, in violation of the APA. *Id.* ¶¶ 115–18. Count IV alleges that Defendants failed to provide notice and an opportunity to comment on the

---

[4] Initially Plaintiffs named Biden administration officials as defendants, but pursuant to Federal Rule of Civil Procedure 25(d) those officials have been substituted by their successors.

Interim Final Rule and that they failed to publish the Interim Final Rule and Guidance 30 days before their effective dates, as required by the APA. *Id.* ¶¶ 119–122. Count V alleges that the Guidance is arbitrary and capricious because it "makes meaningful access to a consultation and time to prepare for [a] credible fear interview effectively unavailable," and because Defendants failed to consider important aspects of the problem. *Id.* ¶¶ 123–29. For relief, Plaintiffs request vacatur of the Final Rule, Interim Final Rule, and Guidance; a declaratory judgment finding the Interim Final Rule and Guidance procedurally invalid and the Rule and Guidance contrary to law and arbitrary and capricious; an order vacating the removal orders issued to each of the individual Plaintiffs; for any individual Plaintiffs who have been removed, "an order paroling those Individual Plaintiffs into the United States for the duration of their removal proceedings so that they may apply for asylum, statutory withholding of removal, and/or CAT protection"; costs and attorneys' fees; and any other relief "the Court deems equitable, just, and proper." *Id.* at 38.

Plaintiffs moved for summary judgment, Pls.' Mot. Summ. J, and several advocacy groups filed briefs as amici curiae in support, *see* Br. Off. United Nations High Comm'r for Refugees as Amicus Curiae in Supp. of Pls.' Mot. Summ. J. ("Amicus Br. of UNHCR"), ECF No. 25-1; Br. Amicus Curiae Pub. Couns. in Supp. of Pls. ("Amicus Br. of Public Counsel"), ECF No. 26-1, Br. Amicus Curiae Human Rights First, Hope Border Inst., Immigrant Defenders L. Ctr., Kino Border Initiative, and Refugees Int'l in Supp. of Pls. ("Amicus Br. of Human Rights First"), ECF No. 27-1, Br. Amicus Curiae Nat'l Citizenship and Immigr. Servs. Council 119 in Supp. of Pls.' Mot. Summ. J. ("Amicus Br. of Council 119"), ECF No. 28-1. The State of Texas moved to intervene as a defendant, which the parties opposed. Texas' Opposed Mot. Intervene as Def., ECF No. 19; *see* Defs.' Opp'n to Mot. Intervene, ECF No. 34; Pls.' Opp'n to Texas's Mot. Intervene, ECF No. 35. The Court denied Texas's motion to intervene but

permitted Texas to file an amicus brief in support of Defendants.  Texas's Mot. Summ. J. or in the Alternative, Amicus Br. in Supp. of Defs., ECF No. 47; Order Den. State of Texas's Mot. Intervene; Den. in Part and Grant. in Part Texas's Mot. Summ. J. or in the Alternative, Amicus Br. in Supp. of Defs., ECF No. 84; Texas's Mot. Summ. J. or in the Alternative, Amicus Br. in Supp. of Defs., ECF No. 86.

Defendants filed a cross-motion for summary judgment and an opposition to Plaintiffs' motion for summary judgment.  Defs.' Cross-Mot. Summ. J., ECF No. 45.  Plaintiffs filed an opposition to Defendants' cross-motion, and Defendants filed a reply.  Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. ("Pls.' Opp'n"), ECF No. 48; Defs.' Reply in Supp. of Cross-Mot. Summ. J. ("Defs.' Reply"), ECF No. 52.  The parties also filed a joint appendix.  J.A. Part 1, ECF No. 53; J.A. Part 2, ECF No. 53-1; J.A. Part 3, ECF No. 53-2; J.A. Part 4, ECF No. 53-3.

After that round of summary judgment briefing concluded, President Biden issued the amended proclamation and DHS and DOJ promulgated the Final Rule.  The Court granted Plaintiffs leave to amend the complaint to address the Final Rule, *see* Second Am. Compl., and both parties submitted supplemental briefing, Pls.' Suppl. Br. in Supp. of Pls.' Mot. Summ. J., ECF No. 59; Defs.' Suppl. Br. in Supp. of Defs.' Mot. Summ. J. ("Defs.' Suppl. Br."), ECF No. 62; Pls.' Suppl. Opp'n to Defs.' Cross-Mot. Summ. J., ECF No. 65; Defs.' Suppl. Reply Br. in Supp. of Defs.' Mot. Summ. J. ("Defs.' Suppl. Reply"), ECF No. 67.  The parties also submitted a supplemental joint appendix, *see* Suppl. J.A., ECF No. 69.

On January 23, 2025, Plaintiffs filed a motion for a temporary restraining order asking the Court to order the government to parole individual Plaintiff S.O. and her children, individual Plaintiffs W.O. and G.F., "into the United States at the Paso Del Norte port of entry . . . so that

they can pursue their claims for asylum."[5]  Mot. TRO at 1.  The Court denied the motion on the

grounds that, under the circumstances, it lacked the authority to order the government to parole

noncitizens into the United States.  Order Den. Mot. TRO, ECF No. 80; Mem. Op. Den. Mot.

TRO ("TRO Mem. Op."), ECF No. 81.

       After President Trump issued the executive order shutting down the CBP One app, the

parties submitted additional supplemental briefing.  Pls.' Suppl. Br. on the Impact of the

Termination of the CBP One Appointment System, ECF No. 74; Defs.' Second Supp. Br. in

Supp. of Defs.' Mot. Summ. J. ("Defs.' Second Suppl. Br."), ECF No. 77; Pls.' Reply Br. on the

Impact of the Termination of the CBP One Appointment System, ECF No. 78.  The parties'

cross-motions for summary judgment are now ripe for review.

### III.  LEGAL STANDARD

       Under Federal Rule of Civil Procedure 56, summary judgment is appropriate when the

pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In cases

involving review of final agency action under the Administrative Procedure Act, however, the

standard articulated in Rule 56 does not apply.  *See Sierra Club v. Mainella*, 459 F. Supp. 2d 76,

89–90 (D.D.C. 2006).  In the APA context, agencies resolve factual issues and "the function of

the district court is to determine whether or not as a matter of law the evidence in the

administrative record permitted the agency to make the decision it did."  *See Occidental Eng'g

Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985).  Summary judgment thus serves as the

---

[5] Because of the sensitive nature of their claims for asylum, the individual Plaintiffs are
proceeding under pseudonyms and their supporting declarations have been filed under seal.  *See*
Order Grant. Pls.' Unopposed Mots. for Leave to Proceed Under Pseudonym and to File
Supporting Exs. Under Seal, ECF No. 61.

mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and is otherwise consistent with the APA. *See Richard v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, the Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a "rational connection between the facts found and the choice made.""" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 43). An agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416. The Court's inquiry is generally confined to the administrative record. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam).

## IV. ANALYSIS

### A. Threshold Issues

Before reaching the merits, the Court must address three threshold issues. First, whether Plaintiffs have standing to bring each of their claims. Second, whether their notice-and-comment challenge to the Interim Final Rule is moot. And finally, whether the challenged provisions of the Rule are severable. The Court takes each issue in turn.

### 1.  Standing

At the outset, at least one Plaintiff must have standing for each form of relief requested in the complaint.  *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012); *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).  Standing is an "irreducible constitutional minimum" that requires a plaintiff to establish that he has suffered a concrete and particularized injury that is fairly traceable to the defendant's conduct and that is likely to be redressed by a favorable court decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  In the procedural-rights context, the redressability requirement is relaxed.  *See Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017).  The party invoking the Court's jurisdiction has the burden of establishing standing.  *Lujan*, 504 U.S. at 561.  Because the challenged components of the Rule are severable, *see infra* pp. 27–29, at least one Plaintiff must demonstrate standing separately for the challenges to the limitation on asylum eligibility, the manifestation of fear requirement, and the heightened probability screening standard.  Same with the Guidance.

The parties dispute whether Plaintiffs must show injury resulting from the Final Rule, or whether injury from the Interim Final Rule is sufficient.  *See* Defs.' Suppl. Br. at 2–3.  As a general matter, "it is clearly preferable . . . to review a set of claims in the context of an extant rather than a defunct rule."  *Ass'n of Am. Physicians and Surgeons v. Sebelius*, 746 F.3d 468, 473 (D.C. Cir. 2014).  Because at least one Plaintiff has standing to challenge each relevant component of the Final Rule, the Court assumes without deciding that Plaintiffs must show injury from the Final Rule.  As discussed *infra* pp. 24–27, Plaintiffs' notice-and-comment challenge to the Interim Final Rule is moot, so the Court does not consider whether any Plaintiff has standing for that claim.

### a. *Limitation on Asylum Eligibility and Manifestation of Fear Requirement*

At a high level, the Rule clearly applies to all of the individual Plaintiffs, each of whom has submitted an uncontroverted declaration establishing a colorable claim for asylum. *See* Exs. 1–10 to Pls.' Unopposed Mot. to Proceed Under Pseudonyms and File Supporting Exs. Under Seal, ECF Nos. 15-1–10 (declarations of D.G., E.R., P.S., D.C., A.E., E.D., T.R., S.G., J.C., and J.R., who were denied protection under the Interim Final Rule); Exs. 1–11 to Pls.' Unopposed Mot. to Proceed Under Pseudonyms and File Supporting Exs. Under Seal, ECF Nos. 57-1–11 (declarations of L.B., J.G., E.M., R.R., L.Q., S.O., J.N., E.C., J.E., R.C., and M.F., who were denied protection under the Final Rule); Second Am. Compl. ¶ 90. Several of the individual Plaintiffs' claims for protection were rejected after the Final Rule went into effect. *See generally* Pls.' Unopposed Mot. to Proceed Under Pseudonyms and to File Supporting Exs. Under Seal, ECF No. 57.

As another court in this District has put it, "[t]here is no doubt that asylum is a valuable form of relief from removal and that affords the asylee benefits above and beyond avoiding removal, including, most notably, a path to lawful permanent resident status and citizenship." *O.A. v. Trump*, 404 F. Supp. 3d 109, 145 (D.D.C. 2019). Denial of a noncitizen's plausible asylum claim is therefore a concrete and particularized injury. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 20 (D.D.C. 2020); *see also Hotel & Rest. Emps. Union, Local 25 v. Smith*, 846 F.2d 1499, 1502 (D.C. Cir. 1988) (equally divided en banc court) (stating that noncitizens suffer an injury in fact if their "asylum claims have been processed in [an] illegal manner").

Defendants "acknowledge that the new individual Plaintiffs" added in the second amended complaint "have had aspects of the final Rule applied to them," Defs.' Suppl. Br. at 2–4, but argue that each individual Plaintiff's claim "should be dismissed as to portions of the Rule

and guidance to which they were not subjected," Defs.' Cross-Mot. Summ. J. at 22–24; *see also* Pls.' Suppl. Opp'n at 2 (noting that "Defendants do not dispute that at least one plaintiff has standing for each claim alleged in the complaint"). Not so. "Because only one plaintiff must have standing," as long as at least one Plaintiff can show a qualifying injury resulting from each challenged aspect of the Rule and at least one Plaintiff can show a qualifying injury resulting from the Guidance, in addition to causation and redressability, the Court can proceed without dismissing the other Plaintiffs. *See In re Navy Chaplaincy*, 697 F.3d at 1178 ("Because only one plaintiff must have standing, we have no need to consider the [defendant's] motion to dismiss certain [plaintiffs] from the appeal for lack of standing . . . .").

The Court concludes that at least Plaintiff S.O. has standing to challenge the Rule's limitation on asylum eligibility and manifestation of fear requirement. S.O. and her children, Plaintiffs W.O., and G.F., are Venezuelan nationals who fled political violence last April. *See generally* S.O. Decl., ECF No. 57-6. While fleeing through Mexico, S.O. was extorted, robbed, and threatened with forced prostitution. *Id.* ¶¶ 14–15. After unsuccessfully waiting five months for a CBP One appointment, S.O. and her children crossed into the United States without one on October 18, 2024. *Id.* ¶ 16. S.O. was not given a credible fear interview before being removed to Mexico, where she and her family continue to live in fear.[6] *Id.* ¶¶ 17–20; *see also* Mot. TRO at 4. S.O. and her family were impacted by at least two aspects of the Rule: the requirement that noncitizens must enter at a port of entry with a CBP One appointment to be eligible for asylum, and the manifestation of fear requirement.

---

[6] S.O. had an asylum appointment scheduled for January 25, 2025, but that appointment was canceled pursuant to President Trump's executive order shutting down CBP One. *See generally* Mot. TRO.

Because S.O., W.O., and G.F. sought and were denied asylum through allegedly unlawful procedures, they have identified a particularized and concrete interest. *See L.M.-M.*, 442 F. Supp. 3d at 20. And those procedures are connected to the substantive harm they faced—the rejection of their asylum claims and removal from the United States. *See Ctr. for Biological Diversity*, 861 F.3d at 184; *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) ("All that is necessary [for causation] is to show that the procedural step was connected to the substantive result."). So S.O., W.O., and G.F. have established causation. Their proffered injury is also redressable under the relaxed redressability standard: if the Rule were invalidated and their removal orders vacated, immigration officials could reach a different conclusion about their ultimate eligibility for protection. *See L.M.-M.*, 442 F. Supp. 3d at 21 ("It is possible that, if given another chance, the individual Plaintiffs [seeking asylum] will fare no better than they did the first time. The Court, however, need decide only whether an asylum officer 'could reach a different conclusion' . . . and that undemanding test is satisfied on the present record."). The Court therefore concludes that Plaintiffs S.O., W.O., and G.F. have standing to challenge the Rule's limitation on asylum eligibility and manifestation requirement. *See O.A.*, 404 F. Supp. 3d at 145 (holding that plaintiffs' declarations, which each "set[] forth facts sufficient to state a plausible claim to asylum" were "enough to establish an injury in fact that is fairly traceable to the challenged Rule and that would be redressed by invalidation of the Rule").

### b. Reasonable Probability Screening Standard

The Court is also satisfied that at least one individual Plaintiff has standing to challenge the reasonable probability screening standard. The Plaintiffs who were exposed to the reasonable probability screening standard are those who were referred for credible fear

interviews: L.B., J.G., E.M., R.R., A.L., J.L., and L.Q.  *See* Defs.' Suppl. Br. at 3.  Each of those

plaintiffs failed his or her credible fear interview and, at the time they submitted their

declarations, all but L.Q. had been removed.  *See* Second Am. Compl. ¶¶ 22–26; Pls.' Decls.,

ECF Nos. 57-1–11.

Although the Complaint states that "[t]he Individual Plaintiffs are noncitizens who came

to the United States to seek asylum, withholding of removal, and protection under the

Convention Against Torture," Second Am. Compl. ¶ 10, none of the Plaintiffs' declarations

contains a statement of intent to seek statutory withholding of removal or CAT protection

specifically.[7]  *See generally* Pls.' Decls., ECF Nos. 57-1–11.  Plaintiffs do, however, assert that

the individual Plaintiffs who received credible fear interviews under the Final Rule "failed

because of the heightened standards and the lack of opportunity to consult given the compressed

consultation period."  Pls.' Opp'n at 2.

It is not the Court's role to adjudicate the individual Plaintiffs' claims for statutory

withholding of removal or CAT protection.  *See O.A.*, 404 F. Supp. 3d at 145.  That said, the

Court is satisfied that at least one of L.B., J.G., E.M., R.R., and L.Q. has articulated a colorable

claim for those forms of protection.  Consider L.B., a Colombian national who has been

repeatedly raped and beaten by members of a paramilitary group because of her political

activism.  *See generally* L.B. Decl., ECF No. 57-1.  She fears that if she is removed to Colombia

and the paramilitary group finds her, she will be killed.  *Id.* ¶¶ 13, 18.  It is possible that L.B.

could establish that it is more likely than not that, were she removed to Colombia, she would

face persecution or torture.  Put another way, she could potentially establish her eligibility for

---

[7] The same is true of the Plaintiffs who had credible fear interviews but were removed pursuant to the Interim Final Rule.  *See* Pls.' Decls, ECF Nos. 15-1–10.

statutory withholding of removal or CAT protection.  As with denials of asylum, the denial of a

noncitizen's plausible claim for those protections is a concrete and particularized injury.  *See*

*L.M.-M.*, 442 F. Supp. 3d at 20.  That L.B.'s claim for protection was denied is fairly traceable to

the Rule's heightened screening standard.  In procedural injury cases, that is enough to establish

causation.  *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005)

("[T]his Court assumes the causal relationship between the procedural defect and the final

agency action.").  And, as discussed above, a Court order vacating the heightened screening

standard and the removal orders issued to L.B. and the other individual Plaintiffs pursuant to that

standard may lead to those Plaintiffs ultimately obtaining statutory withholding of removal or

CAT protection.  Accordingly, at least one Plaintiff has standing to challenge the Rule's

reasonable probability screening standard.

### c.  The Guidance

The Court also finds that the organizational Plaintiffs and at least one individual Plaintiff

have standing to challenge the Guidance.  The Court begins its discussion with RAICES and Las

Americas, then turns to the individual Plaintiffs.

When an organization "claims standing only on its own behalf," as the organizational

Plaintiffs do here, "it must make the same showing required of individuals: an actual or

threatened injury that is fairly traceable to the defendant's allegedly unlawful conduct and likely

to be redressed by a favorable court decision."  *Am. Soc'y for the Prevention of Cruelty to*

*Animals v. Feld Ent., Inc.*, 659 F.3d 13, 24 (D.C. Cir. 2011).  The organization must establish

that it suffers "a concrete and demonstrable injury to its activities, distinct from a mere setback to

the organization's abstract social interests . . . [and] the presence of a direct conflict between the

defendant's conduct and the organization's mission."  *Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d

1249, 1255 (D.C. Cir. 2018) (cleaned up).  RAICES and Las Americas both provide

consultations and legal representation to noncitizens in expedited removal proceedings.  Hidalgo

Decl. ¶¶ 3–7, 19–36, ECF No. 23-1; Babaie Decl. ¶¶ 3–4, 9–12, ECF No. 23-2.  The Court

concludes that both organizations have shown that the Guidance's four-hour consultation

window materially impairs their ability to provide legal services to asylum seekers in DHS

custody.

RAICES is the largest immigration legal services provider in Texas.  Hidalgo Decl. ¶ 5.

It provides free and low-cost legal services to underserved immigrant children, families, and

individuals.  *Id.* ¶ 3.  According to RAICES, the Guidance's four-hour consultation window

constitutes "a virtually impossible time frame" for them to provide pre-interview consultations

because noncitizens "simply do not have enough time" to reach RAICES before their interviews

take place.  *Id.* ¶¶ 22, 26, 31.  As a result, RAICES has a "routine inability to provide [credible

fear interview] consultations," "a critical part of [RAICES'] service mission for individuals

subject to expedited removal."  *Id.* ¶¶ 28, 33.  The "compression at the front end of the expedited

removal process" caused by the Guidance also "forces [RAICES] to engage in much more work

at the end of that process"—after noncitizens' claims for protection have been rejected—"where

[RAICES'] ability to provide meaningful assistance and consultation to noncitizens is

diminished."  *Id.* ¶ 35.

Las Americas provides free legal services to low-income immigrants in Texas, New

Mexico, and Mexico.  Babaie Decl. ¶ 3.  The "heart" of one of Las Americas' "central" programs

is "helping individuals in expedited removal proceedings through the credible fear process."  *Id.*

¶¶ 15, 46.  Las Americas has found "communicating with people in CBP custody . . . virtually

impossible" because of the Guidance.  *Id.* ¶ 46.  "[B]ecause of the speed with which [credible

fear interviews] occur," Las Americas has stopped providing credible fear interview counseling to asylum seekers in CBP custody. *Id.* ¶¶ 47–49.

Both RAICES and Las Americas have articulated injuries to their missions that are analogous to the paradigmatic organizational standing injury described by the Supreme Court in *Havens Realty Corporation v. Coleman*, 455 U.S. 363, 379 (1982). The Guidance's four-hour consultation period "directly affect[s]" the organizations' "core business activities" of providing counseling and legal services to noncitizens in expedited removal proceedings. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024). In other words, there is a "direct conflict" between the organizations' mission to provide legal counseling to noncitizens seeking asylum and the shortened consultation window. *See Elec. Priv. Info. Ctr.*, 892 F.3d at 1255. The organizations have thus identified "substantial, tangible costs" that are cognizable injuries for the purposes of organizational standing. *O.A.*, 404 F. Supp. 3d at 142; *see also Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 40–41 (D.D.C. 2020) (collecting cases finding cognizable injuries where organizations showed that "their activities have been impeded" in some way (quoting *Abigail All. for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006))).

The other two elements of Article III standing are also satisfied: the Guidance directly causes RAICES and Las Americas to provide legal services to fewer asylum seekers because it limits the time noncitizens have to access the organizations' services. And the organizations' injuries are redressable because were the Guidance to be vacated, noncitizens would once again

20
**JA716**

have 24 hours to seek their assistance.  The organizational Plaintiffs therefore have Article III standing to challenge the Guidance.[8]

The organizational Plaintiffs also satisfy the zone of interests test for statutory standing. A plaintiff's interests must "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Ctrl. Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  The test is a "tool for determining who may invoke the cause of action" in a statute.  *Id.* at 130.  Whether a plaintiff's interests fall within that zone is "not meant to be especially demanding": a suit is foreclosed "only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statue that it cannot reasonably be assumed that Congress intended to permit the suit."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchack*, 567 U.S. 209, 225 (2012) (cleaned up).  Courts apply this test "in keeping with Congress's evident intent" in the APA "to make agency action presumptively reviewable."  *Id.* (quotation marks omitted).

Here, "Congress's concern for the availability of pro bono and low-cost legal services in removal proceedings is evident on the face of the INA."  *Cath. Legal Immigr. Network, Inc. v. Exec. Off. Immigr. Rev.*, 513 F. Supp. 3d 154, 173 (D.D.C. 2021); *see also, e.g.*, 8 U.S.C. § 1225(b)(1)(B)(iv) (providing noncitizens with the right to consult with a person of their

---

[8] The Court agrees with the Plaintiff organizations that *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) does not bar their standing.  *See* Pls.' Opp'n at 6–7.  There the D.C. Circuit held that organizations cannot invoke third-party standing to bring suits under the INA.  *Am. Immigration*, 199 F.3d at 1359, 1364; *see also Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 625 (D.C. Cir. 2020) ("*American Immigration* rejected third-party organizational standing . . . .").  The organizational Plaintiffs here assert their own injuries-in-fact, so *American Immigration*'s holding on third-party standing is inapposite.  *See Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, No. 22-cv-3118, 2023 WL 1438376, at *7 & n.6 (D.D.C. Feb. 1, 2023) (concluding the same); *Grace v. Whitaker*, No. 18-cv-1853, 2019 WL 329572, at *4 (D.D.C. Jan. 25, 2019) (same).

choosing prior to a credible fear interview); *id.* § 1229(b)(2) (requiring noncitizens in removal proceedings to be provided a list of pro bono attorneys); *id.* § 1158(d)(4)(A)-(B) (requiring a list of immigration service providers to be distributed to asylum seekers along with a document advising of their right to counsel). The various provisions of the INA that provide for access to low-cost and pro bono legal services "make clear that Congress was concerned not merely about the right to counsel in removal proceedings, but with actual *access* to counsel." *Cath. Legal Immigr. Network, Inc.*, 513 F. Supp. 3d at 173 (emphasis in original). The consultation period itself indicates that Congress intended for asylum seekers to have the opportunity to seek assistance from organizations like RAICES and Las Americas before their credible fear interviews. *See Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 52 (D.D.C. 2020) ("On its own terms, then, the INA contemplates an important role for organizations like [such] Plaintiffs."). It "cannot reasonably be assumed that Congress intended to" prevent legal challenges from those same organizations. *Patchak*, 567 U.S. at 225 (quotation marks omitted).

Defendants argue that the Court lacks jurisdiction over the organizational Plaintiffs' claims under 8 U.S.C. § 1252, which generally limits district court review of expedited removal proceedings. *See* Defs.' Cross-Mot. Summ. J. at 18–20. They are wrong. The INA's systemic review provision, 8 U.S.C. § 1252(e)(3), expressly provides that courts in this District may review "whether . . . a written policy directive, written policy guideline, or written procedure" implementing expedited removal proceedings "is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." *Id.* § 1252(e)(3)(A). That describes the organizational Plaintiffs' claims. The Court is therefore satisfied that the organizational Plaintiffs may challenge the Guidance.

Additionally, at least one individual Plaintiff has demonstrated standing to challenge the Guidance.  Pursuant to 8 U.S.C. § 1252(e)(3)(B), systemic challenges to expedited removal policies must be brought within 60 days.  The Guidance went into effect on June 4, 2024, so the Court considers standing for the original individual Plaintiffs, whose claims were filed on July 12, 2024.  *See* First Am. Compl.  Of that group, several Plaintiffs who were given credible fear interviews were unable to reach counsel during the pre-interview consultation period.  *See, e.g.*, A.E. Decl. ¶ 9, ECF No. 15-5 ("Before that [credible fear] interview, I never had an opportunity to speak to an attorney."); T.R. Decl. ¶ 11, ECF No. 15-7 ("I never got to speak to an attorney before this [credible fear] interview."); S.G. Decl. ¶ 11, ECF No. 15-8 (describing how he was able to call his mother while in CBP custody, but "did not get to speak to a lawyer before my interview").

Take Plaintiff J.R.  She and her partner fled violence in Colombia, entering the United States without a CBP One appointment on Saturday, July 6, 2024.  J.R. Decl. ¶¶ 1–8, ECF No. 15-10.  J.R. received paperwork about her "possible deportation" at 9:30am that day.  *Id.* ¶ 9.  Around 3:00pm, she was given information about seeking asylum.  *Id.*  Her credible fear interview was at 9:00am the next morning, Sunday, July 7.  *Id.* ¶ 10.  J.R. never had the opportunity to make any calls before her credible fear interview, which she failed.  *Id.* ¶ 9.  The entire period between when J.R. entered the United States and her credible fear interview took place over the weekend and outside working hours.

As discussed, denial of a colorable asylum claim is a concrete and particularized injury.[9]  J.R. has articulated such a claim.  *See generally* J.R. Decl.; *id.* ¶ 11 ("I know that my

---

[9] When she signed her declaration in this lawsuit on July 11, 2024, J.R. had not yet been deported.  *See* J.R. Decl. ¶ 13.  Presumably she has since been removed from the United States.

husband and I will be killed if we return to Colombia."). J.R.'s failing her credible fear interview and being denied asylum is fairly traceable to the limited consultation period established by the Guidance. And the Court could grant relief that would redress J.R.'s alleged injury: were the Court to vacate J.R.'s negative determination, and were J.R. to reapply for asylum with additional time to consult with an attorney or other person before her credible fear interview, she may be granted protection from removal.

In concluding that J.R. has standing to challenge the Guidance, the Court is not suggesting that, but for the Guidance, she would have been granted asylum. *See Ctr. for Biological Diversity*, 861 F.3d at 185 (holding that, in procedural-rights cases, a plaintiff "need not show that 'court-ordered compliance . . . would alter the final [agency decision]'" (second alteration in original) (quoting *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005))). Redressability in this context requires only that a plaintiff show "'that a revisitation of' the credible-fear inquiry '*could* reach a different conclusion.'" *L.M.-M.*, 442 F. Supp. 3d at 21 (quoting *Ctr. for Biological Diversity*, 861 F.3d at 185). J.R. has met that burden. The Court therefore concludes that at least one individual Plaintiff also has standing to challenge the Guidance.

### 2. Mootness

Next the Court considers whether it can adjudicate Plaintiffs' notice-and-comment arguments specific to the Interim Final Rule, which they acknowledge has been superseded. *See* Pls.' Suppl. Br. in Supp. of Pls.' Mot. Summ. J. at 1; Second Amended Compl. ¶¶ 89, 119–22. Defendants argue that the issuance of the Final Rule, which was promulgated after notice and

---

But because denial of J.R.'s asylum claim is a sufficient injury to satisfy Article III, her removal status is immaterial to the Court's analysis.

comment, moots this claim. Defs.' Suppl. Br. at 22–23; *see also* 89 Fed. Reg. at 81168–272

("Public Comments and Responses"). Plaintiffs respond that the Court can consider their notice-

and-comment challenge because certain individual Plaintiffs whose asylum claims were denied

pursuant to the Interim Final Rule were, and continue to be, harmed by the Interim Final Rule.

Pls.' Suppl. Opp'n to Defs.' Cross-Mot. Summ. J. at 12. The Court generally agrees with

Defendants.

The APA's procedural requirements apply to interim final rules, which constitute final

agency action while in effect. *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 95 (D.C. Cir.

2012) (rejecting the premise that an interim final rule's procedural errors are necessarily

harmless). But the D.C. Circuit has instructed that "the interim resolution is the final word from

the agency on what will happen up to the time of any different permanent decision." *Nat. Res.*

*Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). In other words, an interim rule

"marks the consummation of the agency's decisionmaking . . . unless and until it is superseded."

*Id.* at 80. In *Association of American Physicians and Surgeons v. Sebelius*, the D.C. Circuit

considered procedural and substantive challenges to an interim final rule that had been

"superseded by a rule promulgated after notice and comment" while the appeal was pending.

746 F.3d at 472–73. The court held that the challenges to the interim final rule were moot. *Id.* at

472. The same principle applies here. *See also Little Sisters of the Poor v. Pennsylvania*, 591

U.S. 657, 686 & n.14 (2020).

The Court also takes as instructive the procedural history of *Capital Area Immigrants'*

*Rights Coalition v. Trump* ("*CAIR*"), 471 F. Supp. 3d 25 (D.D.C. 2020). In that case a group of

individual asylum applicants and immigrant-services organizations challenged an interim final

rule that, like the Rule here, limited asylum eligibility. *Id.* at 31. The court held that the

**JA721**

government had violated the APA in issuing the interim final rule without notice and comment, and vacated the interim final rule on that basis. *Id.* at 44–57. The government appealed. *See E.B. v. Dep't of State*, 583 F. Supp. 3d 58, 63 n.5 (D.D.C. 2022). While the appeal was pending, the government issued a final rule with notice and comment that superseded the interim final rule. *Id.* The D.C. Circuit dismissed the government's appeal as moot. *I.A. v. Garland*, No. 20-5271, 2022 WL 696459 at *1 (D.C. Cir. Feb. 24, 2022) (per curiam) (holding that "the appellees' issuance of a joint final rule that supersedes the joint interim rule giving rise to the complaints in this case has rendered these appeals moot"); *see also* Opp'n to Defs.-Appellants' Mot. Dismiss and Vacate the District Court's Decisions at 7–8, *I.A. v. Garland*, No. 20-5271 (D.C. Cir. Sept. 20, 2021) ("Because the district court vacated the interim final rule solely for failure to follow notice-and-comment procedures, and the final rule superseded the interim final rule, there is no longer a live dispute before this Court."). The Court sees no reason to reach a different conclusion than the D.C. Circuit did under practically identical circumstances. *See also Am. Forest Res. Council v. Williams*, No. 21-601, 2022 WL 2290536, at *3 (D.D.C. June 24, 2022) ("Indeed it is not at all out of the ordinary for an agency to promulgate new rules to supersede or cure defects in the previous rules, thereby mooting challenges to the prior rules.") (citing cases), *aff'd*, 96 F.4th 417 (D.C. Cir. 2024).

Two last points. Where superseding agency actions repeat the same alleged procedural error, they "preserve, rather than moot, the original controversy." *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1111 (D.C. Cir. 1974). Here, though, Defendants did engage in notice and comment before issuing the Final Rule. Defs.' Suppl. Br. at 22. There is therefore no continuing violation. *See Organic Trade Ass'n v. U.S. Dep't of Agric.*, 370 F. Supp. 3d 98, 111 (D.D.C. 2019) (stating that "[a]gencies can moot claims against them by promulgating new rules that cure

previous procedural defects"). Finally, the D.C. Circuit has held that "[f]ailure to provide the required notice and to invite public comment . . . is a fundamental flaw that 'normally' requires vacatur of the rule.'" *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97–98 (D.C. Cir. 2002)). The Court cannot grant that "normal" relief here because it cannot vacate and set aside a rule that is not in effect. There is, in other words, nothing to vacate.[10] Nor does the Court find that any of the exceptions to mootness may apply. Accordingly, the Court will deny as moot Plaintiffs' notice-and-comment challenge to the Interim Final Rule.

### 3. Severability

Before proceeding to the merits, the Court must address one remaining threshold issue: whether the challenged provisions in the Rule are severable. Under the APA, courts can sever and set aside "only the offending parts of the rule." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). Whether a portion of a regulation is severable depends on two factors: the agency's intent, and if the rest of the regulation can function sensibly without that provision. *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22–23 (D.C. Cir. 2001); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). Defendants argue that each of the

---

[10] As discussed at *supra* pp. 5–7, each of the challenged provisions in the Final Rule originated in the Interim Final Rule. "[A]lthough announced in a rule that has now expired," the limitation on asylum eligibility, manifestation of fear requirement, and reasonable probability screening standard have "carried through to a regulation that remains operative today." *Bauer v. DeVos*, 325 F. Supp. 3d 74, 92–93 (D.D.C. 2018). "It is well-established that if a plaintiff challenges both a specific agency action and the *policy* that underlies that action . . . the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1287 (D.C. Cir. 2016) (emphasis in original) (quoting *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994)). The challenged provisions present "question[s] with continuing consequences" for the individual Plaintiffs whose claims for protection were rejected pursuant to those provisions in the Interim Final Rule. *See Bauer*, 325 F. Supp. 3d at 92. The Court can, therefore, grant individual relief to those Plaintiffs.

challenged provisions in the Rule is intended to, and can, operate independently of the others.

Defs.' Cross-Mot. Summ. J. at 64–65; Defs.' Suppl. Br. at 25; Defs.' Second Suppl. Br. at 8–9.

Plaintiffs do not argue otherwise.  The Court agrees.

The issuing agencies' intent is clear from the face of the Rule, which contains a comprehensive severability provision:

> As stated in [the Code of Federal Regulations,] the Departments intend for the provisions of the rule to be severable from each other and to be given effect to the maximum extent possible, such that if a court holds that any provision is invalid or unenforceable as to a particular person or circumstance, the other provisions will remain in effect as to any other person or circumstance.

89 Fed. Reg. at 81168; *see also Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C.

Cir. 2021).  The Rule continues, "the Departments intend for the 'reasonable probability'

screening standard to be used—even in the absence of a limitation of asylum eligibility . . . —to

screen for statutory withholding of removal and CAT protection claims."  89 Fed. Reg. at 81168.

Same with the "manifestation of fear procedures under 8 CFR 235.15."  *Id.*  And the Rule

expressly states that "the Departments intend for the limitation on asylum eligibility to be

severable from the manifestation of fear procedures, the reasonable probability standard, and the

Proclamation because the limitation on asylum eligibility operates independently of those

provisions and the Proclamation."  *Id.*

The Court also agrees with Defendants that the provisions at issue in this lawsuit can

operate independently from one another.  *See* Defs.' Cross-Mot. Summ. J. at 65.  The Rule's

limitation on asylum eligibility is totally distinct from the procedures to which noncitizens are

subjected once they arrive in the United States.  The manifestation of fear requirement, which

triggers whether a noncitizen is eligible for a credible fear interview, functions independently

from the screening standard that applies within that interview, and vice versa.  Accordingly, the

**JA724**

Court will separately consider Plaintiffs' challenges to the Rule's limitation on asylum eligibility, manifestation of fear requirement, and reasonable probability screening standard.

## B. Merits

The Court now turns to the merits. Defendants argue that the INA's structural review provision "does not authorize arbitrary-and-capricious or procedural APA challenges, only contrary-to-law challenges." Defs.' Cross-Mot. Summ. J. at 44–45. That provision provides that a court in this District can review "a regulation [dealing with expedited removal] . . . is not consistent with applicable provisions of this subchapter or is otherwise in violation of law." 8 U.S.C. § 1252(e)(3)(ii). In the Court's view, that encompasses arbitrary and capricious review. For one thing, the APA is clearly a law that a regulation may violate. For another, the D.C. Circuit "'adopt[s] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review.'" *Grace v. Barr*, 965 F.3d 883, 896 (D.C. Cir. 2020) (quoting *Make the Rd.*, 962 F.3d at 624)). The Court will therefore consider Plaintiffs' arbitrary and capricious arguments against the Final Rule.

For the reasons discussed below, the Court agrees with Plaintiffs that the Rule's limitation on asylum eligibility violates the INA, that the manifestation of fear requirement is arbitrary and capricious, and that the Guidance's four-hour consultation window is arbitrary and capricious. The Court rejects Plaintiffs' argument that the reasonable probability screening standard is arbitrary and capricious.

### 1. The Rule

#### a. Limitation on Asylum Eligibility

Plaintiffs challenge the Rule's limitation on asylum eligibility as "flatly inconsistent with Section 1158(a)(1)" of the INA. Pls.' Mot. Summ. J. at 11 (emphasis deleted). That provision

provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .*), irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added). The Rule bars asylum for noncitizens who arrive in the United States outside ports of entry during "emergency border circumstances" unless they can demonstrate a limited set of "exceptionally compelling circumstances." 89 Fed. Reg. at 48718, 81156, 81164. That facially conflicts with the INA. Other courts to consider similar place-of-entry-based bans on asylum have reached the same conclusion. *See, e.g., O.A.*, 404 F. Supp. 3d at 147–48. As one of those courts said, "[i]t would be hard to imagine a more direct conflict." *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1112 (N.D. Cal. 2018).

Courts "must enforce plain and unambiguous statutory language according to its terms." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (internal citations omitted). As originally enacted, the INA required the Attorney General to establish "a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum." The Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (codified at 8 U.S.C. § 1158(a) (1980)). In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (1996). Among other things, IIRIRA amended section 1158 of the INA, adding text clarifying that asylum is available "whether or not" a noncitizen arrives "at a designated port of entry." 8 U.S.C. § 1158(a). In full, the operative provision now reads:

> Any alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

*Id.* § 1158(a)(1) (emphasis added). Congress could not have been more clear that asylum is available to noncitizens who enter the United States outside ports of entry. Every court to consider the issue agrees. *E.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669–70 (9th Cir. 2021); *O.A.*, 404 F. Supp. 3d at 147–52; *E. Bay Sanctuary Covenant v. Biden*, 683 F. Supp. 3d 1025, 1041 (N.D. Cal. 2023).

Defendants emphasize that the INA provides that DHS and DOJ may establish "limitations and conditions" on asylum beyond those laid out by Congress.[11] Defs.' Cross-Mot. Summ. J. at 24–25 (citing 8 U.S.C. § 1158(b)(2)(C) and (d)(5)(B)); *see also* 89 Fed. Reg. at 81162 (invoking the agencies' authority to establish additional conditions for asylum pursuant to 8 U.S.C. § 1158(b)(2)(C) and (d)(5)(B)). True. But the INA requires that those additional limits and conditions be "consistent with" the rest of section 1158: "The [Secretary of Homeland Security] may by regulation establish additional limitations and conditions, consistent with *this section*, under which an alien shall be ineligible for asylum under paragraph (1)." 8 U.S.C. § 1158(b)(2)(C) (emphasis added); *see also id.* § 1158(d)(5)(B) ("The [Secretary of Homeland Security] may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with *this chapter*.") (emphasis added). To Defendants, this means only that any additional conditions cannot reflect any "noteworthy opposing, conflicting, inharmonious, or contradictory qualities." Defs.' Cross-Mot. Summ. J. at 25 (citing Webster's Third New International Dictionary 484 (1993)). The Court doubts that Congress intended for the Secretary's authority to be so capacious. But even if it did, the Rule is

---

[11] Another provision in the INA gives the President the authority to, by proclamation, suspend the entry of "any aliens or any class of aliens into the United States" when he finds that their entry "would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). The issuing agencies did not invoke that provision in issuing the Rule or Guidance, *see generally* 89 Fed. Reg. at 81162–64, so its scope is irrelevant here. *See also* 89 Fed. Reg. at 81164 n.55.

nonetheless unlawful.  By conditioning asylum on a nonimmigrant's place of arrival, the Rule

conflicts with the INA in a "noteworthy" and "inharmonious" way.  *Cf. E. Bay*, 993 F.3d at 670

("Explicitly authorizing a refugee to file an asylum application because he arrived between ports

of entry and then summarily denying the application for the same reason borders on absurdity.").

Defendants argue that the Rule does not treat place of entry as dispositive in determining

eligibility because it carves out certain noncitizens from the limitation on asylum eligibility,

including those who can show "exceptionally compelling circumstances," and those who fall into

certain listed categories.  Defs.' Cross-Mot. Summ. J. at 29–30.  Adding more conditions to

asylum eligibility does not address the problem that place of arrival is, for most noncitizens,

determinative.  And, again, that conflicts with section 1158(a).  That a noncitizen's "failure to

present at a port of entry may be excused upon a showing of exceptionally compelling

circumstances[] does not address the reason why restricting asylum eligibility based on place of

entry conflicts with the law" because the "failure to present at a port of entry" is still dispositive

in many cases.  *E. Bay*, 683 F. Supp. 3d at 1041–42; *see also District of Columbia v. USDA*, 444

F. Supp. 3d 1, 25 (D.D.C. 2020); *Gall v. United States*, 552 U.S. 38, 45–47 (2007) (holding that

when the government cannot make an action mandatory, it also cannot require a showing of

"extraordinary circumstances" to justify departing from that action).  Same with the fact that the

Rule is inapplicable to some types of noncitizens, like lawful permanent residents.  Again: the

INA makes asylum available for "[a]ny" qualifying noncitizen regardless of where he enters the

United States.  8 U.S.C. § 1158(a)(1).  Nor is the Rule saved by the condition that a noncitizen

must schedule a time to appear for asylum processing through the CBP One application.[12]  *See*

---

[12] Because the Court finds that the CBP One appointment system does not affect the Rule's unlawfulness, the termination of the CBP One application has no effect on its holding.

Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. at 12 ("[U]nlawfully rationing asylum for noncitizens who present at ports by forcing them to make appointments through [CBP One] . . . does not somehow cure the illegal condition on those who enter between ports."). *Contra* Defs.' Cross-Mot. Summ. J. at 30.

"When the words of a statute are unambiguous, . . . judicial inquiry is complete." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (quotation omitted). The Court therefore does not consider Defendants' arguments about the INA's structure and history or their arguments about the government's discretion in ultimately granting asylum to any individual noncitizen.[13] *Cf.* Defs.' Cross-Mot. Summ. J. at 25–29. Maybe "in times of heightened border encounters" "practical and operational realities" should enable Defendants to condition the availability of asylum on where a noncitizen enters the United States. *Id.* at 25, 31. But unless and until Congress amends the INA, they cannot. *See* Pls.' Opp'n to Defs.' Cross-Mot. Summ. J. at 10. Because the limitation on asylum eligibility exceeds the authority that Congress conferred on the Secretary of Homeland Security to "establish additional limitations and conditions" on asylum that are "consistent with" section 1158 of the INA, the Rule is "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A); 8 U.S.C. § 1158(b)(2)(C).

### b. Manifestation of Fear Requirement

The Rule also establishes that "rather than asking specific questions of every noncitizen encountered and processed for expedited removal to elicit whether the noncitizen may have a fear of persecution or an intent to apply for asylum, . . . [officials] will refer a noncitizen for a

---

[13]*Matter of Pula*, a Board of Immigrations Appeals decision upon which Defendants rely, *see* Defs.' Cross-Mot. Summ. J. at 28, predated IRRIRA's amendments to the INA and is therefore inapplicable to the issues raised in this litigation. *See E. Bay*, 354 F. Supp. 3d at 1112 ("The BIA's policy prior to *Matter of Pula* is immaterial to this question.") (discussing 119 I. & N. Dec. 47 (BIA 1987)).

credible fear interview only if the noncitizen manifests a fear of return, expresses an intention to apply for asylum or protection, or expresses a fear of persecution or torture or a fear of return to their country or the country of removal." 89 Fed. Reg. at 81168; *see* 8 C.F.R. § 235.15. That fear can "be manifested . . . verbally, non-verbally, or physically." 89 Fed. Reg. at 81237. Plaintiffs challenge the manifestation of fear requirement as a violation of international and federal law, and as arbitrary and capricious. *See, e.g.*, Pls.' Mot. Summ. J. at 22–32. Because the requirement risks different results for identically situated noncitizens, the Court agrees with Plaintiffs that it is arbitrary and capricious.

In conducting arbitrary and capricious review, all a court must determine is whether "the agency has acted within a zone of reasonableness," *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021), so the scope of review is narrow. *State Farm*, 463 U.S. at 43. But if "[a]n alien appearing before one official may suffer deportation[] [and] an identically situated alien appearing before another may gain the right to stay in this country," then any rule or policy driving those outcomes is arbitrary and capricious. *Judulang v. Holder*, 565 U.S. 42, 58–59 (2011); *see also Grace*, 965 F.3d at 900.

The 1997 regulations displaced by the Rule required officials to provide individual advisals to each noncitizen, affirmatively ask questions designed to determine if the noncitizen qualifies for a credible fear interview, "clearly advise[]" the noncitizen that he may have no other opportunity to "present information concerning any fears or concerns about being removed," and convey that any information shared "will be heard confidentially." 62 Fed. Reg. at 10319; *see also* 89 Fed. Reg. at 81234. In issuing the manifestation requirement, DHS and DOJ labeled the 1997 procedure as "unduly suggestive." 89 Fed. Reg. at 81234, 81235; 8 C.F.R. § 235.3(b)(4).

That may be true.  Even so, DHS and DOJ were obligated to replace that procedure with one that complies with the APA.

The Rule asserts that CBP officers have "experience and training" and "skills and expertise" that allow them to determine, sua sponte, which noncitizens have meritorious fear claims.  89 Fed. Reg. at 81238, 81239; *see also* 89 Fed. Reg. at 48744 ("As a result of [CBP immigration officers'] experience and training, they have skills and expertise in interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concern.").  The Rule further states that "DHS has provided guidance to CBP and ICE agents and officers on how to identify manifestations of fear."  89 Fed. Reg. at 81240, 81242.  But the record contains no evidence of that guidance.  Nor does it contain evidence showing that DHS officials can in fact filter meritorious and non-meritorious fear claims under the manifestation standard—let alone that they can do so consistently.  *See* Pls.' Mot. Summ. J. at 27.  Conclusory statements that officials are capable of accurately and consistently evaluating manifestations of fear are not enough.  *Id.* at 28–29.

Plaintiffs point to the experience of individual Plaintiff D.G. as illustrative of how arbitrary the manifestation standard is in practice.  *Id.* at 27–28.  D.G., a Colombian national, fled gang violence with her husband and son.  Decl. of D.G. ¶¶ 1, 6–7, ECF No. 15-1.  They crossed the U.S. border without a CBP One appointment and, upon being captured by authorities, were separated on the basis of sex.  *Id.* ¶¶ 7, 8.  While in custody, D.G. mentioned her fear of returning to Colombia multiple times, but she was "ignored . . . every time" and was ultimately removed to Colombia without a credible fear interview.  *Id.* ¶¶ 9–11.  But D.G.'s husband, whose claim for asylum was *identical* to hers, was given a credible fear interview and remains in

the United States "awaiting an opportunity to seek protection." *Id.* ¶ 10. The same is true of her son. *Id.*

This outcome is unsurprising, given that the manifestation of fear requirement has virtually no guardrails to ensure consistency. For example, the Rule defines manifestation of fear at a high level of generality. *See* 89 Fed. Reg. at 81237 ("Such indicators [of fear] include statements of fear; statements that the noncitizen was previously harmed in their home country or country of removal; evidence of physical injury consistent with abuse (e.g., bruises, scars); evidence of self-harm; or non-verbal actions that may indicate fear such as hysteria, trembling, shaking, unusual behavior, changes in tone of voice, incoherent speech patterns, panic attacks, or an unusual level of silence."). And unlike the asylum officers who conduct credible fear interviews, CBP officials are law enforcement officers who are often "in an adversarial role against noncitizens." Amicus Br. of Council 119 at 14–17. Typically, CBP officers are armed, do not "share a common language with the noncitizens they encounter," and interact with noncitizens in "confined physical spaces," like vans and small rooms, which may discourage noncitizens from manifesting fear. *See id.* at 16. In contrast, asylum officers receive "substantial training in interviewing techniques designed to reliably elicit the information necessary to make legally sufficient determinations" including "a specialized training dedicated to torture" and training materials that "emphasize . . . the role a noncitizen's country of origin plays" in shaping his or her responses in an interview setting. *Id.* at 10–12.

Nothing in the administrative record shows that comparable training is provided to the CBP officers now responsible for determining, without the aid of questioning, whether a noncitizen has manifested a qualifying fear. *See id.* at 15; Pls.' Mot. Summ. J. at 27; Pls.' Opp'n at 22 ("[Defendants] never cite any evidence that officers can successfully identify fear of return,

particularly given that newly arrived asylum seekers are often 'tired, cold, hungry, and disoriented, which may present similarly to manifestation of fear.'") (quoting 89 Fed. Reg. at 48744). A purely subjective standard risks arbitrariness. To the point, Plaintiffs and amici report that since the Interim Final Rule issued, noncitizens' manifestations of fear have been routinely ignored and rejected. Pls.' Mot. Summ. J. at 28–30; Amicus Br. of Council 119 at 15; Amicus Br. of Human Rights First at 12–24.

That said, some features of the Rule tend to support the government's position that CBP officials may accurately filter fear claims. Officers who are unsure whether a noncitizen has manifested a qualifying fear are instructed "to err on the side of referral," *see* 89 Fed. Reg. at 81240 (internal citation omitted), and noncitizens in DHS custody are supposed to be exposed to signage and, in some facilities, videos explaining that they may manifest fear at any time (although amici report that many noncitizens do not see or understand those signs and videos). 89 Fed. Reg. at 81239; Amicus Br. of Human Rights First at 13; *see also* E.C. Decl. ¶ 15, ECF No. 57-8. But the Court agrees with Plaintiffs that that is not enough to overcome the problem that "[b]y relying on subjective officer perceptions rather than objective procedures—such as standardized advisals and questioning—the manifestation requirement inevitably will result in systematic arbitrariness in whether a noncitizen is referred for a credible fear interview." Pls.' Mot. Summ. J. at 27.

The APA does not demand perfection, but it does require reasonableness. The Court is convinced that the manifestation requirement will lead to outcomes where "[a]n alien appearing before one official may suffer deportation[;] [and] an identically situated alien appearing before another may gain the right to" a credible fear interview. *See Judulang*, 565 U.S. at 58. "This,

the Supreme Court has warned, is precisely 'what the APA's "arbitrary and capricious" standard is designed to thwart.'"[14] *Grace*, 965 F.3d at 900 (quoting *Judulang*, 565 U.S. at 59).

### c. Reasonable Probability Screening Standard

Under the Rule, noncitizens in credible fear interviews are screened for statutory withholding of removal and CAT protection based on whether they show "a reasonable probability of persecution . . . or torture." 89 Fed. Reg. at 81168. "[R]easonable probability" is defined to mean "substantially more than a 'reasonable possibility' but somewhat less than more likely than not." *Id.*; 8 C.F.R. 208.35(b), 1208.35(b). For many years, applicants for these protections were generally subject to the same screening standard as asylum applicants: if they could show a "significant possibility" of ultimate eligibility, they were placed in full removal proceedings. Pls.' Mot. Summ. J. at 5–6 (citing 87 Fed. Reg. at 18078, 18084, 18091 (Mar. 29, 2022)); *see also* 8 U.S.C. § 1225(b)(1)(B)(v). In 2023, the Biden administration issued a rule changing that standard to a "reasonable possibility." *See* 88 Fed. Reg. at 11704, 31336–37, 31381 (Feb. 23, 2023). Plaintiffs argue that the Rule's standard is arbitrary and capricious because "it represents an unexplained change from decades of practice and because Defendants failed to meaningfully consider whether the new standard will result in more individuals being wrongfully removed to persecution and torture." Pls.' Mot. Summ. J. at 31. The Court agrees with Defendants that Plaintiffs' arguments are tantamount to a policy disagreement. *See* Defs.' Suppl. Br. at 21.

Plaintiffs characterize the new standard as untethered from the INA or any past practice or regulation, Pls.' Mot. Summ. J. at 33 n.22 (arguing that the standard "appears to have been

---

[14] Because the Court holds that the manifestation of fear requirement is arbitrary and capricious, it does not consider Plaintiffs' alternative arguments that the requirement also violates international and federal law.

invented out of whole cloth"), but it is undisputed that the INA does not require any particular screening standard for statutory withholding of removal and CAT protection. Defs.' Cross-Mot. Summ. J. at 36; Pls.' Mot. Summ. J. at 32 (acknowledging that the "only standard mentioned by statute for use in credible fear interviews . . . refers to asylum specifically") (emphasis deleted); *see also* 89 Fed. Reg. at 81246 ("While Congress clearly expressed its intent that the 'significant possibility' standard be used to screen asylum claims, section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), and FARRA section 2442 are silent as to what screening procedures are to be employed with respect to statutory withholding of removal and CAT protection."). The reasonable probability standard is "intended to be straightforward." 89 Fed. Reg. at 81247. And Defendants provided a legitimate rationale for the new standard: increasing efficiency by reducing the total number of noncitizens placed in full removal proceedings and by more accurately filtering in meritorious claims. *See* Defs.' Cross-Mot. Summ. J. at 47, 54; 89 Fed. Reg. at 81160–61, 81246 (internal citation omitted) ("The Departments believe the reasonable probability screening standard is more appropriate in light of the ultimate burden of proof for statutory withholding of removal and CAT protection, better captures the population of noncitizens with potentially valid claims for such protection, and will assist the Departments in addressing the emergency border circumstances described in the IFR."). The Rule also acknowledges that the issuing agencies were deliberately departing from their prior policy. 89 Fed. Reg. at 81160–61, 81245–46, 81248 (acknowledging and explaining the change specifically as it relates to the previous two screening standards); *see also id.* at 81248 (internal citation omitted) ("[T]he 'reasonable probability' standard . . . is similar to the 'significant possibility' and 'reasonable possibility' standards."); *Am. Fed'n of Gov't Emps.*, *AFL-CIO v. FLRA*, 25 F.4th 1, 5 (D.C. Cir. 2022).

That Defendants rejected a reasonable possibility standard in 2022 is not enough, on its own, to render this Rule's standard arbitrary and capricious. *See, e.g.*, *State Farm*, 463 U.S. at 42 (holding that agencies can change their policies); *see also* Defs.' Reply at 16 (describing how "[t]he chain of reasoning in this history" of the various screening standards "is clear"). In any case, the operative standard before this was the "reasonable possibility" standard adopted by Defendants in 2023. *See* Defs.' Suppl. Br. at 19; 89 Fed. Reg. at 11745–47 (explaining Defendants' initial decision to depart from the 2022 rule that had rejected a heightened screening standard). In issuing the Rule, Defendants reasonably explained why changed circumstances compelled them to depart from the 2023 standard. *See* 89 Fed. Reg. at 48747.

The Rule also addresses the various considerations that Plaintiffs raise, like noncitizens' "difficult[y] sharing information due to trauma, exhaustion, or translation availability" and "additional stress placed on vulnerable populations." *Id.* at 81246; *see* Defs.' Cross-Mot. Summ. J. at 55. *Contra* Pls.' Mot. Summ. J. at 33 (arguing that Defendants failed to consider that "asylum seekers often are unable or unlikely to discuss those details at that stage due to trauma and related considerations") (emphasis deleted). For one, the asylum officers who conduct credible fear interviews "have significant training and experience in engaging in non-adversarial interview techniques, working with interpreters, cross-cultural communication, and eliciting information from trauma survivors and other vulnerable populations." 89 Fed. Reg. at 81247; *see also supra* pp. 36. As Defendants pointed out in the Interim Final Rule, the reasonable probability standard "'is not a significant departure from the types of analyses AOs, supervisory AOs, and IJs conduct on a daily basis.'" 89 Fed. Reg. at 81248 (citing 89 Fed. Reg. at 48748). Defendants additionally explained that credible fear determinations are reviewed by a supervisory AO before they become final and are subject to de novo review by an IJ (if the

noncitizen seeks such review), which "ensure[s] consistency and quality." *Id.* The Court does not agree with Plaintiffs that AOs are incapable of applying the new screening standard just because it is new. *Contra* Pls.' Opp'n at 25.

In issuing the Rule, Defendants explained that "the statutory expedited removal process is predicated on the requirement that noncitizens must explain their fear during a credible fear screening." 89 Fed. Reg. at 81246 (citing INA 235(b)(1)(B), 8 U.S.C. § 1225(b)(1)(B)). Noncitizens are responsible for establishing a credible fear of persecution; requiring specificity of that fear is not inconsistent with the INA. *See* 8 U.S.C. § 1225(b)(1)(B). And Defendants expressly determined that "the rule's benefits outweigh any potential marginal increase in the likelihood that a meritorious case would be missed or would fail under the rule's procedures." 89 Fed. Reg. at 81183.

Plaintiffs' arguments against the heightened screening standard amount a policy disagreement with the agencies that issued the Rule. Defs.' Suppl. Br. at 21. Competing views about policy do not render an agency's action arbitrary and capricious. *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017). DHS and DOJ sufficiently articulated their reasoning for adopting the reasonable probability screening standard.

### 2. The Guidance

Under the INA, a noncitizen is entitled to "consult with a person or persons of [his or her] choosing prior to the [credible fear] interview . . . according to regulations prescribed by the" Secretary of Homeland Security. 8 U.S.C. § 1225(b)(1)(B)(iv). Implementing regulations provide that "[p]rior to the [credible fear] interview," noncitizens "shall be given time to contact and consult with any person or persons of [their] choosing," 8 C.F.R. § 235.3(b)(4)(ii), that they shall receive written notice of that right, *id.* § 235.3(b)(4)(i)(B), that they may have the person

consulted be "present at the interview," *id.* § 208.30(d)(4), that such consultation "shall be made available in accordance with the policies and procedures of the detention facility where the [noncitizen] is detained, shall be at no expense to the government, and shall not unreasonably delay the process," *id.* § 235.3(b)(4)(ii). *See also* 8 U.S.C. § 1225(b)(1)(B)(iv) (providing that the "consultation shall be at no expense to the Government and shall not unreasonably delay the process"). The Guidance limits the consultation period to a minimum of four hours, beginning when the noncitizen is first given access to a telephone, between 7:00am and 7:00pm local time. *See* Guidance at 4.

Plaintiffs challenge the Guidance on two grounds. First, they argue that the four-hour window effectively eliminates the right to consult, which violates the INA. Pls.' Mot. Summ. J. at 35–37. Second, they claim that the Guidance is arbitrary and capricious because DHS "never considered the important fairness considerations that the consultation period is meant to protect." *Id.* at 37–48. The Court agrees with their second point.

Neither the INA nor its implementing regulations detail a specific period of time for pre-interview consultations. 8 U.S.C. § 1225(b)(1)(B)(iv); 8 C.F.R. § 235.3(b)(4)(ii). The INA provides only that the consultation "shall not unreasonably delay the process" and empowers DHS to proffer implementing regulations. 8 U.S.C. § 1225(b)(1)(B)(iv). Defendants point out that when the original 48-hour consultation window was adopted, the government processed around 3,000 credible fear interviews per year, and at the time the Rule was issued, the government was processing over 3,000 credible fear interviews per week. Defs.' Cross-Mot. Summ. J. at 38 (citing 89 Fed. Reg. at 48742). (Just before the Guidance went into effect, noncitizens had a 24-hour consultation window. Pls. Mot. Summ. J. at 9.)

In issuing the Guidance, DHS stated that "[l]engthy consultation periods, including the 24-hour consultation period, cause credible fear screenings to be delayed, increasing the amount of time noncitizens remain in immigration detention." J.A. Part 4 at 410 (Memorandum from Ted H. Kim, Associate Dir., Refugee, Asylum and Int'l Operations Directorate, U.S. Citizenship and Immigration Servs., to Jennifer Higgins, Deputy Dir., U.S. Citizenship and Immigration Servs., *Scheduling of Credible Fear Interviews While the Measures in the Securing the Border IFR Apply*, (Jun. 4, 2024)). It continued: "Delays in the credible fear screening under such circumstances directly contribute to a situation where DHS's capacity can quickly become overwhelmed," which, combined with the emergency border circumstances described in President Biden's proclamation, "constitute unreasonable delay in the [credible fear] process." *Id.* But DHS does not explain how or why a 4-hour period is sufficient to provide noncitizens with a meaningful—or actual—opportunity for consultation. Nor do they provide any evidence that the 24-hour window caused unreasonable delays.

The Guidance states without support that the shortened consultation period provides an opportunity for noncitizens to have "in-depth" conversations before their credible fear interviews. *Id.*; *see also* Guidance at 2–4. But nothing in the administrative record shows that DHS gave any consideration to the practical availability of consultations within such a small window, especially given that "most asylum-seekers arrive to the United States in a particularly vulnerable situation, and may experience technical, psychological, and linguistic difficulties." Amicus Br. of UNHCR at 23; *see also* Amicus Br. of Public Counsel at 8 ("Without adequate time to try to consult with an attorney, a traumatized individual will not have had the modicum of preparation afforded refugees prior to implementation of the Rule."). The border facilities where most noncitizens are held before their interviews are remote and restrictive. Pls.' Mot.

43
**JA739**

Summ. J. at 35, 38 (describing "the extreme communication challenges posed by CBP holding facilities"). And the four-hour window could fall entirely outside of normal business hours because weekends and holidays are not excluded. Take Plaintiff J.R.: her consultation window fell on a Saturday, and her credible fear interview took place at 9:00am the next day. J.R. Decl. ¶ 9. She never had an opportunity to contact a lawyer or other person. *Id.* Even during non-holiday weeks, a noncitizen's consultation period could fall between 5:00 to 7:00pm one night and 7:00 to 9:00am the next morning. Outgoing calls from CBP facilities do not show a callback number, so prospective attorneys are generally unable to return calls placed outside of business hours. *Id.* at 35–36. And attorneys are not allowed to enter CBP facilities and do not have direct access to people detained there. Babaie Decl. ¶ 46. All of these circumstances compound to make access to consultations within a four-hour window difficult.

In setting the four-hour window, DHS expressly considered the burden that pre-interview consultations place on the immigration system, but did not expressly consider whether noncitizens would actually be able to consult. *See* Guidance A.R. 293 (noting, in document explaining the 48-hour consultation window, that the window gave a noncitizen time to "rest [and] collect his or her thoughts" in addition to contacting an outside person). Nor did DHS provide any evidence showing that the 24-hour window in fact caused unreasonable delays. *See generally* Guidance; *see also* Pls.' Mot. Summ. J. at 37–38. Granted, the 24-hour window necessarily pushes a noncitizen's credible fear interview to at least the day after he or she arrives in CBP custody. But because the four-hour consultation window need not be consecutive, that could happen under the Guidance, too.

Judicial review of agency action is limited to the "grounds that the agency invoked when it took the action," so the Court cannot consider any justifications for the Guidance offered in the

Rule, 89 Fed. Reg. at 81195–99. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cali.*, 591 U.S. 1, 20 (2020). Defendants acknowledge as much. 89 Fed. Reg. at 81195 ("[B]ecause this rule does not alter procedures governing consultation . . . concerns regarding those issues— including that the minimum 4-hour consultation period violates [federal law] . . . or is unreasonable—are outside the scope of this rulemaking."); *see also* Defs.' Suppl. Br. at 21–22 (acknowledging that the Guidance was "issued outside of the rulemaking context" so the "final Rule does not alter the government's arguments concerning the legality of that guidance or its reasonableness"). The Guidance itself lacks a reasoned justification for the four-hour consultation window.

The Court sees one other fundamental problem. On its own terms, the Guidance elicits no limiting principle. If the only value DHS considers is efficiency, what stops the agency from adopting a one-hour consultation window? Thirty minutes? DHS failed to take into account the purpose and people the consultation period serves. *See* Pls.' Mot. Summ. J. at 37–38. That is "an important aspect of the problem" that the agency was obligated to consider. *See State Farm*, 463 U.S. at 43. Because the Guidance lacks reasoned analysis, it is arbitrary and capricious.[15] *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 221 (2016); 5 U.S.C. § 706(2)(A).

### C. Remedy

That brings the Court to the question of remedy. Neither party has argued that the decreased number of encounters at the southern border—which have now fallen below the threshold necessary to trigger "emergency border circumstances"—affects the relief available in this case. And nothing in the Court's holding depends on whether the emergency border

---

[15] The Court does not reach Plaintiffs' alternative argument that the Guidance is also arbitrary and capricious because it was not published in the Federal Register 30 days before its effective date. *See* Second Am. Compl. ¶¶ 119–22.

circumstances are or are not in effect.  The Court first addresses systemic relief and then addresses what relief to afford the individual Plaintiffs.

### 1.  Systemic Relief

Because the limitation on asylum eligibility is contrary to law, the manifestation of fear requirement is arbitrary and capricious, and the Guidance is arbitrary and capricious, the Court concludes that they must be vacated and remanded to the issuing agencies under the APA.  5 U.S.C. § 706(2)(A).  When an agency's action is unlawful, "'vacatur is the normal remedy.'" *Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 890 (D.C. Cir. 2024) (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014)).  Generally, "[t]he decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'"  *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.32d 146, 150–51 (D.C. Cir. 1993) (quoting *Int'l Union, UMV v. FMSHA*, 920 F.2d 960, 966–67 (D.C. Cir. 1990)).

For the limitation on asylum eligibility, the issuing agencies "can't 'cure' the fact that [they] lack[] authority to take a certain action"—*i.e.*, to violate the INA—so "remand-without-vacatur" is unavailable.  *Bridgeport Hosp.*, 108 F.4th at 980.  In arguing for remand without vacatur, Defendants suggest that vacating any part of the Rule "'would significantly increase the incentive, on the parts of migrants and others (such as smugglers), to engage in actions' that would overwhelm agency resources at the border."  Defs.' Cross-Mot. Summ. J. at 64 (quoting 89 Fed. Reg. at 48764–65).  But because President Trump has shut down asylum processing at the southern border, that risk is at this point immaterial.  *See generally Securing Our Borders*. Nor does the Court find that vacating the manifestation of fear requirement would be particularly

disruptive, given that the decrease in noncitizen encounters. The Court will therefore vacate both the limitation on asylum eligibility and the manifestation of fear requirement.

For the Guidance, the Court again finds that the "exceptional remedy" of remand-without-vacatur is inappropriate. *See Bridgeport Hosp.*, 108 F.4th at 980 (internal citation omitted). Though it is possible that DHS will be able to justify the four-hour consultation window on remand, the consequences of vacatur will not be disruptive because, again, President Trump has shut down asylum processing at the southern border. *See generally Securing Our Borders*. While the Guidance is vacated, the preexisting 24-hour consultation window will be in effect. As discussed, Defendants have not presented any evidence that the 24-hour window is unworkable or that it caused unreasonable delays. The Court sees no issue with the normal remedy and will therefore vacate the Guidance. *See Public Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1223 (D.C. Cir. 2004).

Defendants argue that the Court can only vacate the Rule and Guidance as applied to the individual Plaintiffs. Defs.' Cross-Mot. Summ. J. at 57. That is flatly wrong. The D.C. Circuit has "made clear that '[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (alterations in original) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *see also O.A.*, 404 F. Supp. 3d at 153 ("[T]he Court would be at a loss to understand what it would mean to vacate a regulation, but only as applied to the parties before the Court. As a practical matter, for example, how could this Court vacate the Rule with respect to the organizational plaintiffs in this case without vacating the Rule writ large? What would it mean to 'vacate' a rule as to some but not other members of the public? What would

appear in the Code of Federal Regulations?").  The INA expressly provides that courts in this District may review "[c]hallenges on [the] validity of the [expedited removal] system."  *Grace*, 965 F.3d at 895 (alterations in original) (internal quotation omitted); 8 U.S.C. § 1252(e)(3). Corollary to that review authority is the authority to order systemwide relief.  *See Grace*, 965 F.3d at 907–08.

Nor does the Court agree with Defendants that the INA's limitation on injunctions, 8 U.S.C. § 1252(f)(1), applies to vacatur orders.  *See* Defs.' Mot. Summ. J. at 57–59; *Florida v. United States*, 660 F. Supp. 3d 1239, 1284–85 (N.D. Fla. 2023) (holding the same); *Al Otro Lado, Inc. v. Mayorkas*, 619 F. Supp. 3d 1029, 1045 (S.D. Cal. 2022) (same).  That provision states:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, [which includes § 1225,] . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).  Vacatur is not an injunction: it is "less drastic" because it "neither compels nor restrains" agency action; all it does is "re-establish the status quo absent the unlawful agency action."  *Texas v. United States*, 40 F.4th 205, 219–20 (5th Cir. 2022) (per curiam); *see* Pls.' Opp'n at 37–38 (citing *Monsanto Co. v. Geerston Seed Farms*, 561 U.S. 139, 165–66 (2010), *Texas*, 40 F.4th at 220, and *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (Jackson, J.)).  The Court can therefore order vacatur here.

### 2.  Individual Relief

The individual Plaintiffs also ask that the Court vacate their negative credible fear determinations and removal orders and order Defendants to parole them into the United States "so that their claims can be processed in accordance with the law."  Pls.' Mot. Summ. J. at 45;

*see also* Second Am. Compl. at 38. Vacatur of an expedited removal order allows a noncitizen who later enters the United States unlawfully to not be (1) processed for reinstatement of removal, (2) criminally prosecuted for illegal reentry, or (3) found inadmissible for being previously removed based on the vacated order. 8 U.S.C. §§ 1231(a)(5), 1326, 1182(a)(9)(A). Parole, which is awarded at the discretion of the Secretary of Homeland Security, allows a noncitizen to temporarily remain in the United States while his application for admission is pending. *Id.* § 1182(d)(5)(A). Although a parolee "has 'liberty to roam the country,' the law considers him legally detained at the border within the government's custody until his immigration status is determined." *Samirah v. O'Connell*, 335 F.3d 545, 547 (7th Cir. 2003).

Defendants argue that because the INA commits both removal and parole determinations to the Secretary of Homeland Security's discretion, this Court is prohibited from awarding either as a form of relief. Defs.' Cross-Mot. Summ. J. at 59–60; *see* 8 U.S.C. § 1182(d)(5)(A). The Court agrees that it cannot order that the individual Plaintiffs—almost all of whom have been deported—be paroled into the United States. *See generally* TRO Mem. Op; Pls.' Decls.; *but see* J.R. Decl. at 3, ECF No. 15-10 (stating that Plaintiff J.R. remained in immigration custody in San Diego, California as of July 11, 2024); L.Q. Decl. ¶ 18, ECF No. 57-5 (stating that Plaintiff L.Q. remained in immigration custody in Laredo, Texas, as of October 31, 2024). But the Court concludes that it does have the authority to vacate the individual Plaintiffs' removal orders, which were issued pursuant to unlawful provisions in the Rule and Guidance. *See Kiakombua*, 498 F. Supp. at 57–58.

The Court starts with Plaintiffs' request for parole. Courts are precluded from reviewing most decisions made discretionary by the INA. 8 U.S.C. § 1252(a)(2)(B)(ii). And "[t]he Judiciary only possesses the power Congress gives it." *Kiyemba v. Obama*, 555 F.3d 1022, 1028

49
**JA745**

n.12 (D.C. Cir. 2009) ("*Kiyemba I*"), *vacated*, 559 U.S. 131 (2010), *reinstated after vacatur*, 605 F.3d 1046 (D.C. Cir. 2010). Other courts have agreed that they lack the power to parole individual noncitizens physically located abroad into the United States. *Gimmarco v. Kerlikowske*, 665 F. App'x 24, 25–26 (2d Cir. 2016); *Samirah*, 335 F.3d at 547; *Dugdale v. Customs & Border Patrol*, No. 14-cv-1175, 2015 WL 2124937, at *1 (D.D.C. May 6, 2025)).

Two courts in this district have, however, ordered parole in systemic review cases. *See Grace v. Barr*, 344 F. Supp. 3d. 96, 141–42 (D.D.C. 2018), *rev'd in part and aff'd in part*, *Grace*, 965 F.3d 883; *Kiakombua*, 498 F. Supp. 3d at 57–59. Those courts reasoned that they could order parole because no part of the INA specifically prohibited them from doing so. One stated that "[b]ecause this case was brought under the [INA's] systemic challenge provision, the limit imposed on the relief available to a court under 1252(e)(1)(a)"—which generally prohibits injunctive relief in INA suits challenging the results of expedited removal proceedings—"does not apply." *Grace*, 344 F. Supp. 3d at 143. The other court put it like this: "[N]othing in the INA prevents this Court from enjoining the agency to take certain actions to remedy prior unlawful agency conduct." *Kiakombua*, 498 F. Supp. 3d. at 58.

The problem with that position is that it elicits no limiting principle. If the Court can order that Plaintiffs be *paroled* into the United States, what stops it from ordering the government to grant them *asylum*? Yet in reviewing a systemic challenge to federal immigration policy, the D.C. Circuit held that a district court could enter a nationwide injunction because no part of the INA prohibited the district court from doing so.[16] That suggests that, unless a

---

[16] In that case, the district court had ordered the government to "provide new credible-fear interviews to the twelve asylum seekers who brought this case." *See Grace*, 965 F.3d at 906 (citing Order at 3, No. 18-cv-1853 (D.D.C. June 3, 2019)). By the time the case was decided on appeal, the plaintiffs had already had their new credible fear interviews, so the only remedy at issue was the injunction. *Id.* at 906–07.

particular remedy is expressly prohibited, any equitable relief is fair game in lawsuits brought under the INA's systemic review provision, 8 U.S.C. § 1252(e)(3).

Other cases also lend support to this position. The Supreme Court has "order[ed] [noncitizens] paroled into the country" in at least two cases: *Zadvydas v. Davis*, 533 U.S. 678 (2001), for one, and *Clark v. Martinez*, 543 U.S. 371 (2005), for another. But both *Zadvydas* and *Clark* involved the constitutional rights of noncitizens who were detained in the United States, not the statutory rights of noncitizens abroad. *See Kiyemba I*, 555 F.3d at 1027–28 (drawing this distinction). The Supreme Court has also stated in dicta that noncitizens pursuing immigration claims from abroad "who prevail can be afforded effective relief by facilitation of their return." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And the Ninth Circuit has held that district courts can order the government to grant parole to noncitizens on a case-by-case basis to remedy constitutional violations. *Walters v. Reno*, 145 F.3d 1032, 1050–51 (9th Cir. 1998). This Court, too, has ordered the government to "consider[]" noncitizens' parole requests when those noncitizens brought a facial challenge to parole procedures and "made explicitly clear that they [we]re not seeking review of their individual parole determinations." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d. 110, 136 (D.D.C. 2018).

But in *Kiyemba I*, the D.C. Circuit described "parole under 8 U.S.C. § 1182(d)(5)(A) [as] a remedy that can be granted . . . only in the exclusive discretion of the Secretary of Homeland Security." *Kiyemba I*, 555 F.3d at 1029 n.14. Even if the Court could generally order that noncitizens be paroled into the United States, the Court cannot do so here. President Trump's *Securing Our Borders* executive order shut down the CBP One application and effectively closed the southern border. Plaintiffs—including any who may still be in U.S. custody—will therefore

be unable to apply for asylum unless or until that executive order is also set aside or withdrawn, which falls outside the scope of this litigation.

The Court will, however, order Defendants to vacate the individual Plaintiffs' negative credible fear decisions and removal orders. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."). Those decisions were issued pursuant to provisions of the Rule that, as discussed *supra*, are contrary to law and arbitrary and capricious. *See Grace*, 344 F. Supp. 3d at 145 ("The credible fear interviews of plaintiffs administered pursuant to the [challenged] policies . . . were fundamentally flawed. A Court Order solely enjoining these policies is meaningless for the removed plaintiffs who are unable to attend the subsequent interviews to which they are entitled.") (citations omitted); *see also Kiakombua*, 498 F. Supp. at 57–58 (similar). As discussed at *supra* pp. 27 note 10, the limitation on asylum eligibility and the manifestation of fear requirement were carried over from the Interim Final Rule, so those provisions present "continuing consequences" for the individual Plaintiffs who were subject to removal under the Interim Final Rule. *Bauer*, 325 F. Supp. 3d at 92. The Court's order therefore encompasses all of the individual Plaintiffs named in the second amended complaint.

The Supreme Court has recognized that there "is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken*, 556 U.S. at 436. All of the individual Plaintiffs are entitled to a fair

shot at asylum, CAT protection, and statutory withholding of removal without the collateral consequences that would otherwise flow from their denials and removals in the first instance.[17]

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (ECF No. 23) is granted in part and denied in part, and Defendants' cross-motion for summary judgment (ECF No. 45) is granted in part and denied in part. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.[18]

Dated:  May 9, 2025                                          RUDOLPH CONTRERAS
                                                             United States District Judge

---

[17] Even though the Court is not setting aside the Rule's reasonable probability screening standard, it will nonetheless vacate the removal orders for the individual Plaintiffs who received credible fear interviews because those Plaintiffs were subject to the Guidance's arbitrary and capricious four-hour consultation window.

[18] Defendants request that the Court stay operation of any order granting Plaintiffs' motion for summary judgment for fourteen days to allow for review in the Court of Appeals. Defs.' Mot. Summ. J. at 65; *See E. Bay Sanctuary Covenant v. Biden*, No. 18-cv-6810, 2023 WL 4729278, at *19 (N.D. Ca. July 25, 2023) (staying an order under similar circumstances). Because President Trump has separately shut down asylum applications at the southern border, the effects of the Court's order are unlikely to be disruptive. The Court will not stay operation of its order.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAS AMERICAS IMMIGRATION ADVOCACY CENTER, et al., | ) ) ) |
| *Plaintiffs,* | ) )  No. 1:24-cv-1702-RC |
| v. | ) ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) ) ) |
| *Defendants.* | ) ) ) |

**PLAINTIFFS' MOTION TO ALTER OR AMEND THE JUDGMENT
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(e)**

**JA750**



## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 59(e), Plaintiffs respectfully move the Court to amend its May 9, 2025, Summary Judgment Order, ECF No. 91, to further order Defendants to return the removed Individual Plaintiffs to the United States.

Neither the Court's Order nor its Memorandum Opinion addressed that request for relief, which was set out in Plaintiffs' summary judgment filings. Instead, the Court addressed only Plaintiffs' request that the Court order Defendants to grant parole to the removed Individual Plaintiffs, a distinct remedy. *See* ECF No. 92 at 48-52. Plaintiffs do not seek to relitigate the Court's denial of that parole relief. They ask only that the Court address for the first time their request for an order requiring Defendants to return the removed Plaintiffs to the United States. That is a standard remedy for unlawful removals, which Defendants have established protocols for effectuating—and which they may accomplish with or without also granting parole.

Notably, on April 10, 2025, following the completion of all supplemental summary judgment briefing in this case, the Supreme Court unanimously confirmed district courts' authority to order the government to return unlawfully removed noncitizens to the United States. *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). In that case, moreover, the plaintiff was imprisoned in El Salvador and the Supreme Court still required the government to facilitate his return. Here, many of the Individual Plaintiffs who seek return are currently in danger in the very countries that they sought to flee; and many others are in precarious circumstances in Mexico after being removed there as a third country. But unlike in *Abrego Garcia*, the Plaintiffs here are not imprisoned in a foreign country and thus do not present any of the same obstacles raised by the government in that case. The Court can and should correct a manifest injustice by amending its judgment to order Defendants to return the Individual Plaintiffs who were unlawfully removed.

1

**JA752**



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER, *et al.*, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.:   24-1702 (RC) |
| | : | |
| v. | : | Re Document No.:   93 |
| | : | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | : | |
| | : | |
| | : | |
| Defendants. | : | |

**ORDER**

**DENYING PLAINTIFFS' MOTION TO ALTER OR AMEND THE JUDGMENT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(E)**

For the reasons stated in the Court's Memorandum Opinion separately and

contemporaneously issued, Plaintiffs' motion to alter or amend the judgment (ECF No. 93) is

**DENIED**.

**SO ORDERED**.


Dated:  July 28, 2025                                          RUDOLPH CONTRERAS
                                                              United States District Judge


**JA754**

**In the United States District Court
for the District of Columbia**

| | |
|---|---|
| LAS AMERICAS IMMIGRANT ADVOCACY CENTER et al., | Case No. 1:24-cv-01702-RC |
| *Plaintiffs,* | |
| v. | **NOTICE OF APPEAL** |
| U.S. DEPARTMENT OF HOMELAND SECURITY et al., | |
| *Defendants.* | |

PLEASE TAKE NOTICE that all Defendants appeal to the United States

Court of Appeals for the District of Columbia Circuit from the judgment of this

Court, docketed at ECF No. 91.

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Ernesto H. Molina**
Deputy Director
Office of Immigration Litigation

1
**JA755**