# ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5313

In the United States Court of Appeals
for the District of Columbia Circuit

**LAS AMERICAS IMMIGRANT
ADVOCACY CENTER** et al.,

*Plaintiffs–Appellees,*

v.

**UNITED STATES DEPARTMENT
OF HOMELAND SECURITY** et al.,

*Defendants–Appellants.*

On Appeal from a Judgment
of the United States District Court
for the District of Columbia

## CORRECTED BRIEF
## OF DEFENDANTS–APPELLANTS

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Ernesto H. Molina**
Deputy Director
Office of Immigration Litigation

**Christopher Ian Pryby**
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 598-5526
christopher.i.pryby@usdoj.gov

*Counsel for Defendants–Appellants*

## Certificate as to Parties, Rulings, and Related Cases

### I. Parties and Amici

The following were Plaintiffs in the district court and are Appellees in this Court:

- Las Americas Immigrant Advocacy Center

- Refugee and Immigrant Center for Education and Legal Services

- Plaintiffs proceeding under pseudonyms: A.E. and her minor son, E.D.; A.L.; D.C. and her minor daughter, L.R.; D.G.; E.C.; E.M.; E.R.; G.F.; J.C.; J.E.; J.G.; J.L.; J.N.; J.R.; J.S.; K.C.; L.B.; L.Q.; M.F.; P.S.; R.C.; R.R.; S.G.; S.O.; T.R.; W.O.

The following were Defendants in the district court and are Appellants in this Court:

- U.S. Department of Homeland Security

- U.S. Citizenship and Immigration Services

- U.S. Customs and Border Protection

- U.S. Immigration and Customs Enforcement

- U.S. Department of Justice

- Executive Office for Immigration Review

- Markwayne Mullin, U.S. Secretary of Homeland Security, in his official capacity[1]

- Joseph B. Edlow, Director of U.S. Citizenship and Immigration Services, in his official capacity[2]

- Rodney S. Scott, Commissioner for U.S. Customs and Border Protection, in his official capacity[3]

- David J. Venturella, Acting Director of U.S. Immigration and Customs Enforcement, in his official capacity[4]

- Todd Blanche, Acting Attorney General of the United States, in his official capacity[5]

---

[1] Alejandro N. Mayorkas occupied this office for a portion of the case's pendency in the district court. Kristi Noem occupied this office for a portion of the case's pendency in the district court and in this Court.

[2] Ur Mendoza Jaddou occupied this office for a portion of the case's pendency in the district court.

[3] Troy A. Miller was the senior official of U.S. Customs and Border Protection performing the duties of this office for a portion of the case's pendency in the district court.

[4] Patrick J. Lechleitner occupied this ofice in an acting capacity for a portion of the case's pendency in the district court. Todd M. Lyons occupied this office in an acting capacity for a portion of the case's pendency in the district court and in this Court.

[5] Merrick B. Garland occupied this office for a portion of the case's pendency in the district court. Pamela J. Bondi occupied this office for a portion of the case's pendency in the district court and in this Court.

- Sirce E. Owen, Acting Director of the Executive Office for Immigration Review, in her official capacity[6]

The following were amici in the district court.

- State of Texas

- National Citizenship and Immigration Services Council 119

The following were movants in the district court.

- Office of the United Nations High Commissioner for Refugees

- Public Counsel

- Human Rights First

- Hope Border Initiative

- Immigrant Defenders Law Center

- Kino Border Initiative

- Refugees International

---

[6] David Neal occupied this office for Immigration Review for a portion of the case's pendency in the district court. Mary Cheng occupied this office in an acting capacity for a portion of the case's pendency in the district court. Daren K. Margolin occupied this office for a portion of the case's pendency in this Court.

## II. Rulings Under Review

The ruling under review is the district court's order granting in part and denying in part Plaintiffs' motion for summary judgment and granting in part and denying in part Defendants' cross-motion for summary judgment (D. Ct. Doc. No. 91) and the associated memorandum opinion (D. Ct. Doc. No. 92), both entered May 9, 2025, by Rudolph Contreras, United States District Judge.

The ruling is available at pages JA697–749 in the joint appendix.

The official citation for this ruling is *Las Americas Immigrant Advocacy Center v. U.S. Department of Homeland Security*, 783 F. Supp. 3d 200 (D.D.C. 2025).

## III. Related Cases

Other than the district court case underlying this appeal, this case has not previously been before this court or "any other court," as defined in Circuit Rule 28(a)(1)(C).

Undersigned counsel is not aware of "any other related cases" currently pending in "any other court," as defined in Circuit Rule 28(a)(1)(C).

# Table of Contents

Certificate as to Parties, Rulings, and Related Cases..............................i

Table of Contents ......................................................................v

Table of Authorities...............................................................vii

Glossary ...............................................................................xiii

Jurisdictional Statement.........................................................1

Questions Presented.................................................................1

Statement of the Case ..............................................................3

    I.      Legal background. ...................................................3

    II.    A marked rise in illegal immigration, fueled by a failure to timely deliver consequences to aliens who enter the United States unlawfully, strains the Executive's resources..........................................................6

    III.   The President issues a Proclamation finding emergency border circumstances based on the high level of illegal entries, and the agencies promulgate the Rule and Guidance to implement the Proclamation...........................8

        A.    Trigger for emergency border circumstances. ..............10

        B.    Consequences of emergency border circumstances. .................................................................11

            1.    The asylum-eligibility restriction. ......................11

            2.    The requirement that an alien manifest fear of return. .........................................................12

            3.    The reasonable-probability screening standard. .........................................................13

4. The Guidance reducing consultation time in expedited-removal proceedings...........16

IV. Procedural history..............................................................17

    A. The proceedings below. ....................................17

    B. Judgment and postjudgment proceedings...................19

Summary of the Argument ........................................................20

Standard of Review .................................................................25

Argument.............................................................................27

I. Threshold issues bar the organizational plaintiffs from receiving relief...................................................................27

    A. The organizational plaintiffs lack standing to challenge the Guidance................................................27

    B. The district court lacked jurisdiction over the organizational plaintiffs' claims. ...............................31

    C. The organizational plaintiffs fall outside the statutory zone of interests. ........................................35

II. The asylum-eligibility rule is not contrary to 8 U.S.C. § 1158(a)(1)....................................................................36

III. The manifestation-of-fear standard is not arbitrary and capricious.......................................................................44

IV. The Guidance on minimum consultation time is not arbitrary and capricious.......................................................50

V. Defendants preserve their argument that 8 U.S.C. § 1252(f)(1) prohibits vacatur. ...........................................57

Conclusion ...........................................................................57

# Table of Authorities

**Cases**

*Access to Developmental Drugs v. Eschenbach,*
469 F.3d 129 (D.C. Cir. 2006) ..................................................................30

*Alaska Dep't of Envt'l Conservation v. EPA,*
540 U.S. 461 (2004) ..................................................................................55

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't,*
659 F.3d 13 (D.C. Cir. 2011) ....................................................................30

*American Immigration Lawyers Association v. Reno,*
199 F.3d 1352 (D.C. Cir. 2000) ..................................... 32, 33, 34, 35

*Angelo v. District of Columbia,*
180 F.4th 324 (D.C. Cir. 2026)..................................................................26

*Arizona v. United States,*
567 U.S. 387 (2012) ..................................................................................38

*Bahlul v. United States,*
77 F.4th 918 (D.C. Cir. 2023)....................................................................31

*Bob Jones Univ. v. United States,*
461 U.S. 574 (1983) ..................................................................................40

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
419 U.S. 281 (1974) ..................................................................................55

*Buenrostro-Mendez v. Bondi,*
166 F.4th 494 (5th Cir. 2026) ..................................................................10

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971) ..................................................................................26

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013)..................................................................................30

*Ctr. for Biological Diversity v. Zeldin,*
171 F.4th 356 (D.C. Cir. 2026)..................................................................26

*Defs. of Wildlife v. Zinke,*
849 F.3d 1077 (D.C. Cir. 2017) ................................................................50

*Dep't of Comm. v. New York,*
  139 S. Ct. 2551 (2019) .......................................................56

*Dhakal v. Sessions,*
  895 F.3d 532 (7th Cir. 2018) ............................................4

*Envt'l Def. Fund, Inc. v. EPA,*
  82 F.3d 451 (D.C. Cir. 1996) ...........................................37

*Envt'l Def. Fund, Inc. v. EPA,*
  92 F.3d 1209 (D.C. Cir. 1996) .........................................37

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ........................................... 27, 46, 55

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................... 28, 29, 30

*Fed'n for Am. Immigr. Reform, Inc. v. Reno,*
  93 F.3d 897 (D.C. Cir. 1996) ...........................................36

*Garland v. Aleman Gonzalez,*
  596 U.S. 543 (2022) ...........................................................57

*Gunn v. Minton,*
  568 U.S. 251 (2013) ...........................................................31

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ...........................................................29

*Herrera Avila v. Bondi,*
  170 F.4th 1128 (8th Cir. 2026) .......................................10

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ................................................................39

*Indian River Cnty. v. DOT,*
  945 F.3d 515 (D.C. Cir. 2019) .........................................26

*INS v. Cardoza-Fonseca,*
  480 U.S. 421 (1987) ..................................................3, 14, 38

*INS v. Legalization Assistance Project of L.A. Cnty.,*
  510 U.S. 1301 (1993) .........................................................35

*James Madison Ltd. ex rel. Hecht v. Ludwig,*
  82 F.3d 1085 (D.C. Cir. 1996) .........................................31

*Johnson v. Guzman Chavez,*
  594 U.S. 523 (2021) ......................................................6

*Judulang v. Holder,*
  565 U.S. 42 (2011) ............................................... 46, 47

*Komarenko v. INS,*
  35 F.3d 432 (9th Cir. 1994) ....................................39

*Las Americas Immigrant Advocacy Center v. Wolf,*
  507 F. Supp. 3d 1 (D.D.C. 2020) .........................54

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ...............................................36

*Loper Bright Enters. v. Raimondo,*
  144 S. Ct. 2244 (2024) ...........................................27

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ...............................................27

*Make the Road N.Y. v. McAleenan,*
  405 F. Supp. 3d 1 (D.D.C. 2019) .........................34

*Make the Road N.Y. v. Noem,*
  2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) .......33

*Make the Road N.Y. v. Wolf,*
  962 F.3d 612 (D.C. Cir. 2020) ................... 32, 33, 34

*Moncrieffe v. Holder,*
  568 U.S. 184 (2013) .................................................6

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...........................................26, 55

*Pac. Power & Light Co. v. Fed. Power Comm'n,*
  111 F.2d 1014 (9th Cir. 1940) ...............................37

*PETA v. USDA,*
  797 F.3d 1087 (D.C. Cir. 2015) .............................31

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin,*
  174 F.4th 81 (D.C. Cir. 2026)...............................57

*Reno v. Flores,*
  507 U.S. 292 (1993) ...............................................43

*Trump v. Hawaii,*
  585 U.S. 667 (2018) ..................................................................39

*United States v. Texas,*
  173 F.4th 659 (5th Cir. 2026) .............................................29, 30

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council,*
  435 U.S. 519 (1978) ..................................................................46

*Yang v. INS,*
  79 F.3d 932 (9th Cir. 1996) .................................................39, 43

**Statutes**

28 U.S.C. § 1291 ..........................................................................1

28 U.S.C. § 1331 ..........................................................................1

6 U.S.C. § 552 .............................................................................5

8 U.S.C. § 1101 ...........................................................................3

8 U.S.C. § 1103 .......................................................................5, 16

8 U.S.C. § 1158 .............................2, 3, 4, 5, 35, 36, 37, 38, 39, 40, 41, 43

8 U.S.C. § 1182 .......................................................................8, 39

8 U.S.C. § 1185 ...........................................................................8

8 U.S.C. § 1225 ............................................. 4, 16, 32, 36, 45, 51, 53

8 U.S.C. § 1229 ..........................................................................36

8 U.S.C. § 1229a ..........................................................................4

8 U.S.C. § 1231 ...........................................................................6

8 U.S.C. § 1252 .........................................1, 2, 21, 25, 27, 32, 33, 35, 57

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
  Pub. L. No. 104-208, div. C, 110 Stat. 3009 ........................................40

**Court Rules**

Fed. R. App. P. 4.........................................................................1

Fed. R. Civ. P. 59........................................................................1

## Administrative Adjudications

*Matter of D-A-C-,*
  27 I. & N. Dec. 575 (BIA 2019) ................................................................42

*Matter of Pula,*
  19 I. & N. Dec. 467 (BIA 1987) ...............................................................42

## Regulations

8 C.F.R. § 1208.13 ............................................................................... 11, 12

8 C.F.R. § 1208.16 ......................................................................................6

8 C.F.R. § 1208.17 ......................................................................................6

8 C.F.R. § 1208.18 ......................................................................................6

8 C.F.R. § 1208.2 ........................................................................................4

8 C.F.R. § 1208.35 ............................................................................... 11, 12

8 C.F.R. § 1240.11 ......................................................................................4

8 C.F.R. § 208.13 ....................................................................... 11, 12, 39

8 C.F.R. § 208.16 ......................................................................................6

8 C.F.R. § 208.17 ......................................................................................6

8 C.F.R. § 208.18 ......................................................................................6

8 C.F.R. § 208.2 ........................................................................................4

8 C.F.R. § 208.30 ......................................................................................4

8 C.F.R. § 208.35 ............................................................................... 11, 12

8 C.F.R. § 214.11 ......................................................................................12

8 C.F.R. § 235.15 ......................................................................................13

8 C.F.R. § 235.154 ....................................................................................11

8 C.F.R. § 235.3 ................................................................................. 51, 53

88 Fed. Reg. 11,704 (Feb. 23, 2023) ........................................................5

*Aliens and Nationality; Refugee and Asylum Procedures*, 45 Fed. Reg.
  37,392 (June 2, 1980) ...........................................................................39

*Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018) ..................................................................................6

*Asylum Procedures*, 65 Fed. Reg. 76,121 (Dec. 6, 2000) ...........................5

*Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023) ..............................................................................................................8

*Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67,202 (Oct. 21, 2020) ...........................................................................6

*Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024)......................... 9, 37, 38, 42, 44, 45, 47, 48, 50, 53

*Securing the Border*, 89 Fed. Reg. 81,156 (Oct. 7, 2024) .................. 18, 49

## Other Authorities

*Webster's New World College Dictionary* (1996) .....................................45

*Webster's Third New International Dictionary* (1993)...........................37

# Glossary

CBP ................................................. U.S. Customs and Border Protection

DHS ............................................ U.S. Department of Homeland Security

DOJ ............................................................... U.S. Department of Justice

ICE ...................................... U.S. Immigration and Customs Enforcement

IFR ............................................................................ Interim Final Rule

INA ....................................................... Immigration and Nationality Act

USCIS .................................... U.S. Citizenship and Immigration Services

## Jurisdictional Statement

The district court had jurisdiction over the action below under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court's judgment—and denial of Plaintiffs' motion under Fed. R. Civ. P. 59(e) to alter or amend the judgment—are final and resolve all parties' claims. Moreover, the appeal was timely because it was noticed within 30 days after the district court's decision denying Plaintiffs' Rule 59(e) motion, which was filed within 28 days of the entry of judgment. *See* 8 U.S.C. § 1252(e)(3)(C) (specifying a 30-day time limit to appeal); Fed. R. App. P. 4(a)(1)(B), (B)(iii); JA12 (showing judgment entered May 9, 2025); JA13 (showing Plaintiffs' Rule 59(e) motion filed June 3, 2025); JA13 (showing Rule 59(e) motion denied July 28, 2025); JA13 (showing Defendants' notice of appeal filed Aug. 27, 2025).

## Questions Presented

1.     Whether the organizational plaintiffs have standing to challenge the Guidance.

2.     Whether 8 U.S.C. § 1252(e)(3) permits the organizational plaintiffs to bring claims on their own behalf.

3.     Whether the organizational plaintiffs' claims lay within the INA's zone of interests.

4.     Whether the district court erred in finding that the Rule's "additional limitations and conditions" on asylum eligibility for aliens unlawfully entering along the southern border is inconsistent with 8 U.S.C. § 1158.

5.     Whether the district court erred in finding that the Rule's requirement that an alien manifest fear before being provided a credible-fear interview is arbitrary and capricious.

6.     Whether the district court erred in finding that the Guidance, which reduced to 4 hours the minimum time an alien has for consultation with counsel before a credible-fear interview, is arbitrary and capricious.

7.     Whether the district court's vacatur of portions of the Rule and the Guidance violated 8 U.S.C. § 1252(f)(1) and exceeded the court's authority under traditional equitable principles.

**Statement of the Case**

## I.     Legal background.

Asylum is a form of discretionary relief under the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1158; *INS v. Cardoza-Fonseca*, 480 U.S. 421, 444 (1987). Generally, asylum protects an alien from removal, authorizes an alien to work, enables certain immediate family members to seek asylum derivatively, and can lead to lawful permanent residence and citizenship. *See* 8 U.S.C. §§ 1158–59. To obtain asylum, an alien must demonstrate qualification as a "refugee"— unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of" a protected ground, *id.* §§ 1101(a)(42), 1158(b)(1)(A); must not be precluded from applying for or receiving asylum, *id.* § 1158(a)(2), (b)(2); and must show that a favorable exercise of the Executive's discretion is warranted, *id.* § 1158(b)(1)(A).

An alien may generally request asylum in three circumstances. First, an alien present in the United States and not in removal proceedings may affirmatively apply for asylum with U.S. Citizenship and Immigration Services ("USCIS"). *See Dhakal v. Sessions*, 895 F.3d

3

532, 536 (7th Cir. 2018); 8 C.F.R. § 208.2(a). Second, an alien in removal proceedings under 8 U.S.C. § 1229a may apply in immigration court for asylum as a defense to removal. 8 C.F.R. §§ 208.2(b), 1208.2(b), 1240.11(c). And third, an alien in expedited-removal proceedings under 8 U.S.C. § 1225(b)(1) may indicate an intention to apply for asylum or a fear of persecution or torture. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30(b).

In the third case, an asylum officer interviews the alien to determine if the alien has a "credible fear" of persecution, meaning there is a "significant possibility" that he "could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v). If the asylum officer finds a credible fear, the alien may apply for asylum and other protection from removal. If the asylum officer finds no credible fear, the alien may request an immigration judge review that decision. *Id.* § 1225(b)(1)(B)(iii)(III). If the immigration judge affirms the asylum officer's determination or the alien declines such review, the alien may be removed without further review. *See id.* § 1225(b)(1).

The INA prohibits certain aliens from applying for asylum, 8 U.S.C. § 1158(a)(2), and deems others ineligible for it—for example,

those who have participated in persecution or who were firmly resettled in another country before arriving in the United States are ineligible, *see id.* § 1158(b)(1)(B), (b)(2). And for decades, the Executive has promulgated conditions and limitations on asylum eligibility that render certain aliens ineligible. *See* 88 Fed. Reg. 11,704, 11,734–35 (Feb. 23, 2023). Attorneys General originally adopted such limits under their authority "to establish a procedure" for asylum. *See id.* In 1996, Congress codified several of those limits. *See id.* Simultaneously, Congress reaffirmed that the Executive retains the same broad authority to establish new conditions, specifying that the Attorney General "may by regulation establish additional limitations and conditions, consistent with [§ 1158], under which an alien shall be ineligible for asylum." *Id.* § 1158(b)(2)(C); *see id.* § 1158(d)(5)(B); 6 U.S.C. § 552(d); 8 U.S.C. § 1103(a)(1), (a)(3), (g). Secretaries of Homeland Security and Attorneys General have invoked that authority for decades to establish limitations and conditions on asylum eligibility beyond those expressly provided in the statute. *See, e.g., Asylum Procedures*, 65 Fed. Reg. 76,121, 76,126 (Dec. 6, 2000); *Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures*

*for Protection Claims*, 83 Fed. Reg. 55,934 (Nov. 9, 2018); *Procedures for Asylum and Bars to Asylum Eligibility*, 85 Fed. Reg. 67,202 (Oct. 21, 2020); *see also* JA126–27 (collecting additional examples).

An alien in the United States may also seek protection from removal to a specific country by applying for statutory withholding of removal under 8 U.S.C. § 1231(b)(3) or withholding or deferral of removal under the Convention Against Torture. *See* 8 C.F.R. §§ 208.16–.18, 1208.16–.18. Unlike asylum, which is discretionary, these forms of protection prohibit removal to a country where an alien will likely be persecuted or tortured. *See Moncrieffe v. Holder*, 568 U.S. 184, 187 n.1 (2013). And, also unlike asylum, neither statutory withholding of removal nor withholding or deferral of removal under the Convention prohibits the government from removing a recipient to a country where he would not face a likelihood of persecution or torture. *See, e.g.*, *Johnson v. Guzman Chavez*, 594 U.S. 523, 536–37 (2021).

II.   **A marked rise in illegal immigration, fueled by a failure to timely deliver consequences to aliens who enter the United States unlawfully, strains the Executive's resources.**

In recent years, the United States has faced a surge in immigration that has strained agency resources. From fiscal year 2017

to 2019, alien encounters between ports of entry along the southwest border more than doubled, and they continued to increase in 2021 (over 1.6 million) and 2022 (over 2.2 million). JA113–14. Encounters remained at record numbers in 2023. JA104–05, 116–17. The high number of encounters strained the resources of DHS and other agencies, of local communities, and of nongovernmental organizations. JA116–17 (noting that detention facilities held more detainees than their capacity).

In 2024, it "bec[ame] increasingly clear that DHS's ability to process individuals encountered" at the southwest border and "to deliver timely consequences to a meaningful proportion of those who do not establish a legal basis to remain in the United States" was "significantly limited by the lack of resources and tools that are available to the Departments" to respond to increased immigration. JA117.

The government thus faced an urgent situation: many more aliens would likely cross the border and assert asylum claims, overwhelming the government's ability to safely and quickly process aliens in an orderly fashion. The government had taken earlier measures to address

the growing number of encounters, including promulgating the rule

*Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023).

But high encounter levels continued and were projected to remain high.

JA105, JA154. Additional measures were needed to impose

consequences on illegal immigration and reduce the strain on agency

resources.

**III.  The President issues a Proclamation finding emergency border circumstances based on the high level of illegal entries, and the agencies promulgate the Rule and Guidance to implement the Proclamation.**

On June 3, 2024, the President announced a Proclamation under

8 U.S.C. §§ 1182(f), 1185(a), finding the entry of certain categories of

aliens during high levels of encounters to be detrimental to the interests

of the United States. JA88–101. The Proclamation limited and

suspended the entry of such aliens until border encounters dropped

below a specified threshold, and it reimposed the suspension and

limitation on entry should encounters again increase above a specified

level. JA88–101. The Proclamation "suspended and limited" the "entry

of any [alien] into the United States across the southern border,"

subject to certain exceptions. JA96, JA98–99 (excepting United States

nationals and lawful permanent residents, unaccompanied alien

children, victims of severe forms of human trafficking, aliens with valid visas or other lawful permission to seek entry or admission or who present at a port of entry at a prescheduled time and place, and aliens whose individual circumstances otherwise merited an exception). The Proclamation directed the Secretary of Homeland Security and the Attorney General to "promptly consider issuing any instructions, orders, or regulations as may be necessary to address the circumstances at the southern border," including "any additional limitations and conditions on asylum eligibility that they determine are warranted." JA99.

DHS and DOJ subsequently issued a joint interim final rule (the "IFR"), *Securing the Border*, 89 Fed. Reg. 48,710 (June 7, 2024), that, during "emergency border circumstances"—the periods of high encounters outlined in the Proclamation—"put in place extraordinary procedures to more quickly process individuals encountered at the southern border, reducing the time [aliens] spend in DHS facilities," and "further streamline DHS processes at the border." JA122. Defendants concluded that the IFR would "significantly increase" their ability "to deliver timely decisions and timely consequences at the border" and "combat[] perceptions and messaging to the contrary."

JA106, JA118. Defendants' aim was to break the vicious cycle in which immigration surges led to additional releases from detention[7] and increased the backlog of removal proceedings in immigration courts, allowing aliens to unlawfully live and work at liberty in the United States for extended times, which further incentivized illegal immigration and emboldened smugglers who encouraged the perception that there were no consequences for unlawful entry. JA106, JA118.

## A. Trigger for emergency border circumstances.

Emergency border circumstances came into effect when the average over the previous seven calendar days of the number of alien encounters not at ports of entry on the southern border met or exceeded 2,500 per day. JA97. The IFR provided that the period of emergency border circumstances would remain in place until 14 calendar days after the Secretary of Homeland Security had determined that the 7-consecutive-calendar-day average had fallen below 1,500 encounters per day. JA97. But emergency border circumstances could continue or be

---

[7] Under the previous administration's incorrect interpretation of 8 U.S.C. § 1225(b)(2). *See generally Buenrostro-Mendez v. Bondi,* 166 F.4th 494 (5th Cir. 2026); *Herrera Avila v. Bondi,* 170 F.4th 1128 (8th Cir. 2026).

reinstated if the Secretary determined there had been a 7-consecutive-calendar-day average of 2,500 encounters or more per day. JA97.

## B.  Consequences of emergency border circumstances.

During periods of emergency border circumstances, the IFR imposed three new provisions. First, it added a limitation on asylum eligibility for those who enter across the southern border, other than those who were excepted from the Proclamation or who established exceptionally compelling circumstances. Second, the IFR altered the process for identifying fear claims during expedited removal processing. And third, the IFR changed the screening standard for statutory withholding of removal and withholding or deferral of removal under the Convention Against Torture for those found ineligible for asylum under the IFR. *See generally* 8 C.F.R. §§ 208.13(g)–(h), 208.35, 235.154, 1208.13(g)–(h), 1208.35.

### 1.  The asylum-eligibility restriction.

First, the IFR imposed a substantive limitation on asylum eligibility during emergency border circumstances. Aliens who crossed the southern border and who did not fall under any of the Proclamation's exceptions were generally not eligible for asylum outside

11

of a limited set of circumstances. 8 C.F.R. §§ 208.13(g), 208.35(a), 1208.13(g), 1208.35(a). An alien could avoid the limit on asylum eligibility by establishing "exceptionally compelling circumstances" by a preponderance of the evidence. 8 C.F.R. §§ 208.35(a)(2), 1208.35(a)(2). Such circumstances could include that, at the time of entry, the alien or a family member with whom the alien was traveling "faced an acute medical emergency," "faced an imminent and extreme threat to their life or safety," or satisfied "the definition of 'victim of a severe form of trafficking in persons' provided in 8 CFR 214.11." 8 C.F.R. §§ 208.35(a)(2), 1208.35(a)(2). An alien would also be deemed to have established exceptionally compelling circumstances in certain circumstances where the alien was eligible for withholding of removal, asylum would have been granted but for the limit on eligibility, and the alien had a spouse or child who was ineligible for asylum or other protection from removal or who remained outside the United States. 8 C.F.R. §§ 208.35(c), 1208.35(c).

### 2. The requirement that an alien manifest fear of return.

Second, the IFR implemented a "'manifestation of fear' process at the border" to reduce the processing time during emergency border

circumstances. JA105, JA110, JA131–37; *see* 8 C.F.R. § 235.15. As part of this process, DHS officers did not affirmatively ask aliens processed for expedited removal whether they have a fear of return or an intent to seek asylum. Instead, signs and videos informed aliens about asylum and protection from removal and explained that an alien should inform an inspecting officer if the alien has a fear of return or intent to apply for asylum. JA133–36; *see also* JA554. The information was provided in multiple languages, including those most commonly spoken by aliens in CBP encounters, and in plain and simple language that could be easily understood by aliens with different education levels, cultures, and backgrounds. JA554. Those aliens who manifested a fear of persecution or torture verbally, nonverbally, or physically were referred for credible-fear screening. JA132. The IFR thus ensured that the Departments' limited resources would be focused on the alien most likely to qualify for asylum or protection and thereby reduce overall processing times. *See* 8 C.F.R. § 235.15(b)(4).

**3.    The reasonable-probability screening standard.**

Third, for aliens subject to the asylum limitation, the IFR implemented a heightened screening standard for forms of protection

other than asylum. Under this standard, an asylum officer interviews an alien who manifests fear and is referred for credible-fear screening. The officer determines if the alien is subject to the IFR and, if so, whether there is a significant possibility the alien can establish an exception to it. JA137–141. For an alien ineligible for asylum because of the asylum limitation, the asylum officer instead determines whether the alien has established a "reasonable probability of persecution or torture"—a standard higher than the "significant possibility" standard that would apply without the IFR but still lower than the standard ultimately applied to adjudicate a claim on the merits. 8 C.F.R. §§ 208.35(b)(2)(i), 1208.35(b)(2)(iii). In other words, a "reasonable probability means substantially more than a reasonable possibility, but somewhat less than more likely than not, that the [alien] would be persecuted because of his or her race, religion, nationality, membership in a particular social group, or political opinion, or tortured, with respect to the designated country or countries of removal." JA147; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (discussing "reasonable possibility" standard). This new standard "requires a greater specificity" in the alien's testimony than simply citing general

14

country conditions, and the alien should "provide greater detail in [the alien's] statements and information as to the basis for [the alien's] individual claim." JA138–39. This change was intended to reduce the large number of false positives—aliens who passed screening for potential eligibility for statutory withholding of removal or protection under the Convention Against Torture under the "reasonable possibility" standard, which was then applicable to those ineligible for asylum under the Circumvention of Lawful Pathways Rule, but who ultimately did not qualify for protection under the higher "more likely than not" merits standard. JA138–39.

Reducing this gap between the screening pass rate and the successful-claim rate is essential during emergency border circumstances. As with the IFR's other changes, it allows Defendants to focus their limited resources on aliens most likely to succeed in their claims; it works to reduce the growing backlog of cases in the immigration courts; and it helps impose timely consequences on aliens who enter illegally, disincentivizing those illegal entries. JA138–39. Absent such a change, aliens with meritorious claims continue to wait years for those claims to be granted, while many aliens with meritless

15

claims may spend years in the United States before their removals are effected. JA138–39.

### 4. The Guidance reducing consultation time in expedited-removal proceedings.

Separately, to quickly conduct expedited-removal proceedings for aliens arriving at the border during emergency border circumstances, DHS issued memorandum guidance (the "Guidance") setting a four-hour minimum period for aliens subject to the IFR to consult with persons of their choosing before a credible-fear interview. *See* 8 U.S.C. § 1225(b)(1)(B)(iv); JA320. Congress set no minimum time for consultation in the statute, instead providing only that the "consultation shall be at no expense to the Government and shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); *see* 8 U.S.C. § 1103(a)(3), (a)(5). Under the Guidance, the consultation period begins at the time ICE or CBP provides the alien with the opportunity to consult someone through access to a phone. JA320. The period runs only between 7 a.m. and 7 p.m. local time (so the four hours need not be consecutive). JA320. DHS issued the Guidance providing for a four-hour consultation period to ensure the consultation does not cause unreasonable delay. *See* JA322.

## IV. Procedural history.

### A. The proceedings below.

On June 12, 2024, Las Americas Immigrant Advocacy Center ("Las Americas") and Refugee and Immigrant Center for Education and Legal Services ("RAICES"), organizations providing services to immigrants, filed suit challenging the IFR and the Guidance. JA16–21 ¶¶ 1–7, 10–13. On July 14, 2024, the organizational plaintiffs amended their complaint to add eleven individual plaintiffs. JA27–33 ¶¶ 10–21. The organizational plaintiffs alleged that the IFR and Guidance frustrated their mission by reducing the number of aliens eligible for asylum and making it more difficult to provide counseling and legal services to aliens subject to expedited removal. JA20–21 ¶¶ 11, 13. The individual plaintiffs alleged they had been denied credible-fear interviews or the opportunity to seek protection from removal because of the IFR, resulting in their removal. JA27–33 ¶¶ 10–21. Plaintiffs alleged that the IFR was contrary to law, arbitrary and capricious, and improperly issued without notice and opportunity to comment, JA38–40 ¶¶ 93–109, and that the Guidance was contrary to law and arbitrary

and capricious, *id.* ¶¶ 110–16. The parties filed cross-motions for summary judgment on all claims.

On September 27, 2024, the President issued an amended proclamation that altered the June proclamation in two ways. JA545–50. First, it increased the length of time that the encounter-based asylum ban would remain in place. JA547–48; *see also Securing the Border*, 89 Fed. Reg. 81156, 81164–66 (Oct. 7, 2024). Second, it announced that unaccompanied alien children from noncontiguous countries would be included in the total count of daily encounters. JA547–48; *see also* 89 Fed. Reg. at 81,166–67. The Departments jointly promulgated a final rule incorporating the changes, which went into effect on October 1, 2024. *Securing the Border*, 89 Fed. Reg. 81,156 (Oct. 7, 2024).[8] On November 1, 2024, Plaintiffs filed a second amended complaint challenging the Rule and the associated Guidance. JA329–73.

---

[8] As the district court noted, "the differences between the Interim Final Rule and Final Rule are immaterial to this litigation," JA701 n.3, excepting that the notice-and-comment challenge to the IFR had been rendered moot by the final rule, JA720–23.

Going forward, Defendants refer collectively to the IFR and final rule as the "Rule."

**B. Judgment and postjudgment proceedings.**

On May 9, 2025, the district court issued a memorandum opinion granting in part the cross-motions for summary judgment and entered a separate order setting forth its judgment. JA695–749. As to the threshold issues, the district court agreed with Plaintiffs that, for each challenged aspect of the Rule and Guidance, at least one Plaintiff had standing. JA709–20. In particular, the court found that Las Americas and RAICES had standing to pursue claims on their own behalf because the Guidance "materially impair[ed] their ability to provide legal services to asylum seekers in DHS custody." JA715; *see also* JA717–18 (concluding that the organizational plaintiffs' interests fall within the "zone of interests" protected by the INA and that jurisdiction over their claims was not barred by 8 U.S.C. § 1252(e)(3)). The court agreed with Defendants that the challenged provisions of the Rule were severable. JA723–25.

On the merits, the district court sided with Plaintiffs in finding the asylum limitation contrary to law, JA725–29; in finding the requirement that aliens affirmatively manifest fear to be arbitrary and capricious, JA729–34; and in finding the Guidance arbitrary and

19

capricious, JA737–41. The district court sided with Defendants in finding that DOJ and DHS had "sufficiently articulated their reasoning for adopting" the reasonable-probability screening standard. JA734–37.

Finally, as to remedy, the district court vacated the challenged provisions of the Rule and vacated the Guidance and remanded them to the agencies under the APA. JA742–44. The district court additionally vacated the individual Plaintiffs' negative credible-fear determinations and removal orders, JA745–49 (claiming broad equitable powers to remedy past wrongs against Plaintiffs), but the court found that it lacked authority to order that Plaintiffs be paroled into the United States, JA715–16.

On June 3, 2025, fewer than 28 days after the entry of that order, Plaintiffs moved to alter the judgment, seeking the return to the United States of the individual Plaintiffs who had already been removed. JA752. The district court denied the motion on July 28, 2025. JA754.

Defendants timely appealed. JA755.

## Summary of the Argument

I.A. The organizational plaintiffs lack standing to challenge the Guidance. The Supreme Court has clearly stated that an organization's

claim that an action has impaired its ability to provide services and achieve its organizational missions does not demonstrate standing. Absent a concrete injury, an organization cannot spend its way into standing or establish standing by diverting its resources in response to a defendant's actions. And that is the kind of purported injuries-in-fact the organizational plaintiffs raise to demonstrate their standing in this case. Although this Court has previously applied the older Supreme Court precedent *Havens Realty* to justify organizational standing in a wide range of circumstances, *Alliance for Hippocratic Medicine* limited *Havens Realty* to its facts, clearly dictating a departure from this Court's precedent.

B.     The INA also deprives the district court of jurisdiction over the organizational plaintiffs' claims. As this Court has explained, litigation under 8 U.S.C. § 1252(e)(3) challenging procedures and policies adopted to implement expedited removal must be brought by the affected individuals themselves. And the organizational plaintiffs' alleged injuries are specific to themselves, not to the individual plaintiffs—indeed, this is why the district court found the organizational plaintiffs had standing. There is no meaningful distinction between an

organization's suit to address an injury to its business of providing asylum services to aliens who have been or will be subject to the challenged rules—as the organizational plaintiffs do here—and a third-party suit brought by an organization on those individual aliens' behalf, which is barred by this Court's decision in *AILA*.

C. And the organizational plaintiffs are outside the zone of interests protected by the INA's asylum and expedited-removal provisions. The statutes the district court relied on to find that the organizational plaintiffs were within the zone of interests give aliens procedural protections such as a right to consult others and a right to information about counsel. But those statutes do not protect those who seek to provide advice to aliens about credible-fear interviews—they do not reflect a clear concern about protecting the interests of groups like the organizational plaintiffs.

II. The asylum-eligibility restriction is not contrary to the INA. Asylum has always been a matter of Executive discretion, both as a matter of statute and as a matter of the Executive's constitutional role in foreign affairs. And place, time, and manner of entry have historically been considered in the discretionary decision whether to

grant asylum. Moreover, the Executive has historically promulgated additional limitations and conditions on asylum eligibility, and Congress has not only codified previously promulgated limitations but also the ability of the Executive to make such categorical restrictions on eligibility.

The district court mischaracterized the Rule's asylum-eligibility restriction as being essentially dispositive if an alien enters the United States other than at a designated port of entry. But place of entry is not dispositive under the Rule. Time and manner of entry matter, as do the circumstances justifying the entry. Other categorical bars that would exclude aliens from receiving asylum are not contrary to the INA even though they would render such an application futile. Neither is a categorical bar that considers place of entry as one among several factors.

III.    The manifestation-of-fear requirement is not arbitrary and capricious. There is no statutory requirement to ask aliens directly whether they have a fear of return to their former country. And the district court improperly focuses on a single line from a Supreme Court decision to create a rule that would eviscerate any agency action that

23

relies on subjective factual determinations by individual officers. The district court should have instead deferentially reviewed Defendants' decision to require a manifestation of fear, ensuring only that the decision was based on reason. Defendants provided such reasons, noting that immigration officers have extensive experience interacting with immigrants—it is their job, after all—and were given guidance on what signs to look for, with instructions to err in doubtful cases in the alien's favor. Defendants further ensured that aliens would be given written or video notice of how to manifest a fear of return. The district court's prioritizing objectivity in Defendants' screening process was an impermissible substitution of its own policy judgment for that of Defendants.

IV.   DHS's Guidance reducing the minimum time for an alien to consult with others before a credible-fear interview to four hours is not arbitrary and capricious. The district court incorrectly concluded that the Guidance lacked reasoned analysis. Rather, the Guidance discussed the sufficiency of the four-hours consultation period. Citing a different case approving of a one-hour period for telephonic consultation and a 30-minute follow-up if needed, the Guidance concluded that four hours

is sufficient for aliens to make multiple phone calls, have in-depth conversations, and consult with persons of their choosing during times when legal-service providers are most likely to be available. And the Guidance further considered drawbacks of the new policy, showing that the agency reasonably considered the relevant issues and reasonably explained its decision. Likewise erroneous is the district court's faulting the Guidance for not providing any evidence that a 24-hour window caused unreasonable delays. On the contrary, the Guidance gave a reasoned explanation for why a four-hour consultation period is necessary during periods of high numbers of border encounters. The district court, instead of conducting a deferential review, again erroneously substituted its own policy judgment for the agency's.

V.     Although this Court has held that 8 U.S.C. § 1252(f)(1) does not prohibit vacatur under the APA, Defendants disagree and preserve the issue for future review.

## Standard of Review

This Court reviews *de novo* the threshold questions of constitutional standing, subject-matter jurisdiction, and whether a plaintiff falls within a statutory zone of interests. *See Angelo v. District*

*of Columbia*, 180 F.4th 324, 328–29 (D.C. Cir. 2026); *Indian River Cnty. v. DOT*, 945 F.3d 515, 527 (D.C. Cir. 2019).

This Court reviews *de novo* the district court's determination that an agency action is contrary to law. *See Indian River Cnty.*, 945 F.3d at 527 (questions of law reviewed *de novo* on summary judgment).

This Court also reviews *de novo* the district court's determination that an agency action is arbitrary and capricious. *Ctr. for Biological Diversity v. Zeldin*, 171 F.4th 356, 376 (D.C. Cir. 2026). "[T]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A reviewing court must be satisfied that the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* The agency's decisions are entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," *id.* at 416. At bottom,

arbitrary-and-capricious review asks only whether "the agency has acted within a zone of reasonableness." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *accord Loper Bright*, 144 S. Ct. at 2263 (when a statute delegates discretionary authority to an agency, "the role of the reviewing court under the APA" is to ensure the "agency has engaged in reasoned decisionmaking within" the bounds of the delegated authority) (internal quotation marks and citations omitted).

## Argument

### I. Threshold issues bar the organizational plaintiffs from receiving relief.

The district court erred in holding that the organizational plaintiffs are entitled to relief. They lack standing, 8 U.S.C. § 1252(e)(3) bars their request for judicial relief, and they fall outside the INA's zone of interests.

#### A. The organizational plaintiffs lack standing to challenge the Guidance.

An "essential" aspect of Article III's case-or-controversy requirement "is the doctrine of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "To establish standing, . . . a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the

defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

The district court incorrectly held that the organizational plaintiffs have standing to challenge the Guidance because it "impairs their ability to provide legal services to asylum seekers in DHS custody." JA715. Specifically, the court concluded that the Guidance makes it more difficult—even sometimes "virtually impossible"—for the organizational plaintiffs to provide consulting services *before* a credible fear interview. *See* JA715–16. As a result, the organizations have diverted resources to different parts of the credible-fear interview process, *see* JA715 (RAICES has "to engage in much more work at the end of th[e] process.") (quotations omitted); JA73 (similar for Las Americas), or to take other steps to provide consulting services, *see* JA73 (The Guidance "has forced us to move some of our CFI consultation work to Mexico.").

The Supreme Court, however, has clearly stated that an organization's claim that an action "impaired [its] ability to provide services and achieve [its] organizational missions . . . does not work to

demonstrate standing." *Hippocratic Med.*, 602 U.S. at 394 (quotations omitted). Absent "a concrete injury," an organization "cannot spend its way into standing" or establish standing by diverting "its resources in response to a defendant's actions." *Id.* at 394–95.

*Hippocratic Medicine* thus establishes that organizational plaintiffs lack standing to challenge governmental decisions affecting others that also affect the organization's ability to accomplish their mission. So, as the Fifth Circuit recently and aptly summarized: "A legal-services organization cannot have Article III standing merely because a new law or regulation requires it to understand the legal change, to adjust resources in response, or to increase the degree or scope of legal representation for its current or prospective clients who may be adversely affected." *United States v. Texas*, 173 F.4th 659, 666 (5th Cir. 2026) (en banc). This is the type of "setback to [an] organization's abstract social interest" that does not give rise to a cognizable harm. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

To be sure, the district court found that the injuries here "directly affect[ed] the organizations' core business activities of providing

29

counseling and legal services to [aliens] in expedited removal proceedings," and thus constituted an injury comparable to the "injury described by the Supreme Court in *Havens Realty Corp.*" JA716 (quotations omitted). But *Hippocratic Medicine* explained that "*Havens* was an unusual case" whose holding does not "extend . . . beyond its context"—where a defendant provided the plaintiff false information that "*directly* affected and interfered with [the plaintiff's] core business activities." 602 U.S. at 395–96 (emphasis added). There is no such *direct* interference where, as here, governmental action is directed at third parties and, as a result, a plaintiff chooses to incur costs and expenses. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411 (2013); *Texas*, 173 F.4th at 666; *see also Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't*, 659 F.3d 13, 25 (D.C. Cir. 2011) (explaining that standing does not existing where "the challenged conduct affects an organization's activities, but is neutral with respect to its substantive mission").

To be sure, this Court "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances." *Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006).

But, this expansion was, from the get-go, "in grave tension with Article III precedent and principles," *PETA v. USDA*, 797 F.3d 1087, 1099 (D.C. Cir. 2015) (Millett, J., dubitante), and does not survive *Hippocratic Medicine* and its clarification that *Havens Realty* is confined to its facts, *see* 602 U.S. at 396. Thus, even if precedent would suggest affirmance, *Hippocratic Medicine* "clearly dictate[s] a departure." *Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023) (quotations omitted).

The district court therefore erred in finding that the organizational Plaintiffs have standing and in rejecting the United States' motion for summary judgment.

## B. The district court lacked jurisdiction over the organizational plaintiffs' claims.

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by . . . statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quotations omitted); *see also James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). And here, the INA expressly bars the organizations' suit.

Under the INA, the implementation of orders stemming from expedited removal proceedings, a decision to invoke expedited removal,

and "procedures and policies adopted" to implement expedited removal are not subject to judicial review, except as provided for, as relevant here, in 8 U.S.C. § 1252(e)(3)(A)(ii), *see id.* § 1252(a)(2)(A)(i), (ii), (iv), which applies to challenges claiming a policy implementing expedited removal "is not consistent with" the INA or otherwise violates the law. *See Make the Road N.Y. v. Wolf*, 962 F.3d 612, 625 (D.C. Cir. 2020) (*Make the Road I*). This Court has explained "that litigation" under § 1252(e)(3) must "be brought by affected individuals themselves." *Id.* at 628.

In *American Immigration Lawyers Association v. Reno*, 199 F.3d 1352, 1355 (D.C. Cir. 2000) ("*AILA*"), this Court considered a suit challenging regulations implementing expedited-removal policies brought, like here, by "[o]rganizations who represent and assist aliens seeking to enter the United States." The organizations there claimed that the regulations violated "not their rights or the rights of their members, but the constitutional and statutory rights of unnamed aliens who were or might be subject to the statute and regulations." *Id.* at 1357. But, this Court held, 8 U.S.C. § 1252(e)(3) "contemplate[s] that lawsuits . . . would be brought, if at all, by individual aliens who . . .

32

were aggrieved by the statute's implementation." *Id.* at 1359; *see Make the Road I*, 962 F.3d at 628 (*AILA* "specifically contemplated that litigation could be brought by affected individuals themselves"). Thus, "[w]hether . . . on their own or band[ed] together through a representative association," the subsection (e)(3) exception to 8 U.S.C. § 1252(a)(2)(A)(i)–(ii) & (iv) requires that "the lawsuit [be] seeking to remedy" individual aliens' injuries "arising from" the implementation of expedited removal. *Make the Road I*, 962 F.3d at 628; *see Make the Road N.Y. v. Noem*, 2025 WL 3563313, at *5 (D.C. Cir. Nov. 22, 2025) (*Make the Road II*) ("[*I*]*ndividuals* may bring challenges to the validity of the statute itself or to any regulation, policy, or written directive implementing it.") (emphasis added) (citing 8 U.S.C. § 1252(e)(3)(A)).

The district court disregarded that precedent. *See* JA718. As the court noted—and as the organizational plaintiffs have consistently argued—the organizational plaintiffs' injuries are specific to *them*; that is, they are in no way connected to any particular alien's injuries arising from the challenged policies. *See, e.g.*, JA715–16 (discussing the organizational plaintiffs' standing); JA78 ("Organizational Plaintiffs have established injury-in-fact because the Rule and Guidance directly

33

affect and interfere with their core business activities.") (brackets and quotations omitted); *see also* JA717 n.8; JA362–65 ¶¶ 94–105 (discussing harms to the organizational plaintiffs).

To be sure, these organizational plaintiffs—unlike the plaintiffs in *AILA*—are not "assert[ing] *third-party standing* on behalf of" aliens who are or might be subject to these policies. *Make the Road N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 30 (D.D.C. 2019) (making that distinction). But as this Court clarified in reversing that decision, the key point in *Make the Road I* was that the plaintiffs had invoked "associational standing to prosecute a case on behalf of individuals directly regulated and affected by the challenged rule." 962 F.3d at 928. By contrast, there is no meaningful distinction between an organization's suit to address an injury to its business of providing asylum services to "aliens who have been or will be" subject to the challenged rules—as the organization plaintiffs do here—and a third-party suit brought by an organization. *AILA*, 199 F.3d at 1357. Neither "is derivative and reflective of [an alien's] individual standing," *Make the Road I*, 962 F.3d at 628, and both "impose[] no confining influence on the scope of the lawsuit," *AILA*, 199 F.3d at 1359. As a result, both

are outside what "Congress must have contemplated" when it enacted

8 U.S.C. § 1252(e)(3). *Id.*

### C. The organizational plaintiffs fall outside the statutory zone of interests.

The organizational plaintiffs also fall outside the zone of interests

of the statutes they rely on. Nothing in the asylum or expedited-removal

provisions of the INA protects the interests of nonprofit organizations

providing legal services to aliens. Rules and procedures governing

expedited removal and asylum, to the extent they grant rights and

protections,[9] "protect the interests of" aliens in the process itself, "not

the interests of organizations" like the organizational plaintiffs. *INS v.*

*Legalization Assistance Project of L.A. Cnty.*, 510 U.S. 1301, 1305 (1993)

(O'Connor, J., in chambers). "The fact that the INS regulation may

affect the way an organization allocates its resources . . . does not give

standing to an entity which is not within the zone of interests the

statute meant to protect." *Id.*

---

[9] *But cf.* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection [governing asylum procedure] shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person.")

The district court reasoned that, because "Congress intended for asylum seekers to have the opportunity to seek assistance from organizations" like the organizational plaintiffs for their credible-fear interviews, the organizational plaintiffs were within the relevant zone-of-interests. JA718; *see* JA717–18. But the statutes the district court pointed to, *see* JA717–18, provide procedural protections for aliens in the asylum process, such as a right to consult others, 8 U.S.C. § 1225(b)(1)(B)(iv), and a right to information about counsel, *id.* §§ 1158(d)(4)(B), 1229(b)(2). They in no way "protect" those *providing* aliens advice about their credible-fear interviews. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 n.5 (2014) (discussing the common-law roots of the zone-of-interest tests). Because those provisions do not "reflect a clear concern about protecting the [consultation] opportunities of" the organizational plaintiffs, they lie outside the zone of interests. *Fed'n for Am. Immigr. Reform, Inc. v. Reno*, 93 F.3d 897, 903 (D.C. Cir. 1996).

## II.     The asylum-eligibility rule is not contrary to 8 U.S.C. § 1158(a)(1).

The INA's text, structure, and history make clear that the Rule reflects a lawful exercise of the Executive's discretion to promulgate

36

conditions on asylum eligibility. The INA expressly provides that the responsible agency heads may by regulation establish "limitations and conditions" on asylum eligibility, beyond those set out in the statute, that are "consistent with" the asylum statute. 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (authorizing "other conditions or limitations").

The Rule's eligibility limitation fits comfortably within that express statutory authorization, which lets the Executive promulgate additional conditions by regulation so long as they are "consistent"— that is, may "coexist[]" and not reflect any "noteworthy opposing, conflicting, inharmonious, or contradictory qualities," *Webster's Third New International Dictionary* 484 (1993)—with the statute. *See, e.g.*, *Envt'l Def. Fund, Inc. v. EPA*, 82 F.3d 451, 457 (D.C. Cir. 1996) (per curiam) (holding that "consistent with" signals "congruity or compatibility"), *as amended*, 92 F.3d 1209; *see also Pac. Power & Light Co. v. Fed. Power Comm'n*, 111 F.2d 1014, 1016 (9th Cir. 1940) (similar); 89 Fed. Reg. at 48,736 n.180 (collecting cases). In times of heightened border encounters, when the President has found that temporary suspension of entry is required, the Rule restricts the ability

of certain aliens who enter during that period to obtain asylum, absent exceptionally compelling circumstances. 89 Fed. Reg. at 48,731–33. That determination does not conflict with the text or structure of § 1158. It is consistent with—and is an appropriate exercise of the Departments' authority under—that provision.

The statute's context and history reinforce this conclusion. Section 1158 implements the government's asylum authority, which is always a matter of Executive "discretion," never of "entitlement." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 n.6 (1987). Thus, Congress has specified that the Executive "*may* grant asylum" to an alien who satisfies governing regulations but is never obliged to do so. 8 U.S.C. § 1158(b)(1)(A) (emphasis added).

That discretion stems not only from the statute but also from the Executive's constitutional role. Asylum decisions, like other "discretionary decisions" about whether aliens may remain in the United States, necessarily "bear on this Nation's international relations." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Indeed, the Rule is part of an overarching cooperative effort with foreign governments to manage migration. Decisions related to asylum

eligibility implicate "sensitive and weighty interests" of foreign affairs, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010), that are the Executive's particular responsibility. *See Trump v. Hawaii*, 585 U.S. 667, 712 (2018) (emphasizing the Executive's broad discretion, codified in 8 U.S.C. § 1182(f), to suspend or place conditions on entry).

The statute's history further highlights the extensive discretion Congress conferred on the Executive. When § 1158 was first enacted in 1980, although it allowed the Attorney General to grant asylum as a matter of discretion, it did not include specific language authorizing "additional limitations and conditions." *See* 8 U.S.C. § 1158(a) (1982). Nevertheless, the Attorney General, exercising that discretion, issued regulations establishing various restrictions on asylum, such as generally mandating denials for claims based on past persecution alone. *See* 8 C.F.R. § 208.13; *see also Aliens and Nationality; Refugee and Asylum Procedures*, 45 Fed. Reg. 37,392 (June 2, 1980); *Yang v. INS*, 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994) (upholding particularly-serious-crime bar).

In 1996, Congress codified six of the Attorney General's mandatory bars *and* amended the INA to expressly confirm the Attorney General's authority to add further "conditions or limitations." Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 604, 110 Stat. 3009 (codified at 8 U.S.C. § 1158(b)(2)). The decision to leave undisturbed the Attorney General's mandatory bars while affirmatively endorsing the authority to promulgate additional limitations is strong support for the Executive's longstanding construction of its discretionary authorities. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 599 (1983) (congressional awareness of Executive interpretation and failure to modify it when enacting related legislation "make out an unusually strong case of legislative acquiescence" and "ratification by implication").

Moreover, several provisions of § 1158 underscore the permissibility of the Rule's focus on promoting efficiency in the asylum system. Congress conditioned the grant of asylum on an alien's applying "in accordance with the requirements and procedures established by" the Departments. 8 U.S.C. § 1158(b)(1)(A). Consistent with Congress's recognition that a properly functioning immigration system requires

40

aliens to follow orderly procedures, Defendants determined that, during exigent circumstances found by the President, certain aliens who enter across the southern border during a suspension of entry will generally be ineligible for asylum. Congress itself has already established asylum conditions that are aimed at promoting systemic efficiency. For example, Congress generally prohibited applications for asylum filed more than one year after entry, *id.* § 1158(a)(2)(B), and prohibited aliens from pursuing successive asylum applications, *id.* § 1158(a)(2)(C). These provisions make clear that the INA does not prioritize the identification of otherwise-meritorious asylum claims above all else, and that administrative practicality and systemic efficiency are legitimate considerations. Nothing in the statute suggests that Congress intended to foreclose the Departments from similarly taking systemic considerations into account.

Indeed, the Executive has long considered factors like those underlying the Rule in determining whether an asylum applicant warrants a favorable exercise of discretion. As the Board of Immigration Appeals has explained, "[t]he ultimate consideration" for whether an alien is deserving of discretionary relief, including asylum, is whether

granting relief "appears to be in the best interest of the United States," as determined by the Executive officials charged with making asylum determinations. *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (BIA 2019). Consistent with that standard, the Board has held that an alien's "circumvention of orderly refugee procedures" is a relevant consideration in exercising that discretion. *Matter of Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987). The Board has also considered aliens' "manner of entry or attempted entry," "whether [they] passed through any other countries or arrived in the United States directly from [their] country, whether orderly refugee procedures were in fact available to help [them] in any country [they] passed through, and whether [they] made any attempts to seek asylum before coming to the United States." *Id.* at 473–74. And although Congress has amended the asylum statute since *Pula,* it has never foreclosed or limited consideration of these systemic factors in exercising discretion. This nearly-40-year-old precedent establishes that the Executive may consider such factors. And, although the Rule places greater weight on an alien's manner of entry during emergency border circumstances, 89 Fed. Reg. at 48,732, how much weight to place on this factor in weighing asylum eligibility

falls well within the broad discretion conferred by § 1158(b)(2)(C). *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (emphasizing the Executive's ability to promulgate "generic rules" even where the INA requires the exercise of discretion through "some level of individualized determination" (quotation omitted)); *Yang*, 79 F.3d at 936–37 (similar).

The district court did not grapple with the statutory text, context, and history. Instead, it found that the Rule conflicts with 8 U.S.C. § 1158(a)(1), which permits an alien "who arrives in the United States (whether or not at a designated port of arrival . . . )" to apply for asylum. Defendants disagree with that interpretation of § 1158(a)(1). But even if the district court's interpretation were correct, in finding the Rule's "limitations and conditions" inconsistent with § 1158 and therefore contrary to law, the district court nevertheless mischaracterized the Rule as making the place of arrival "dispositive." JA728.

But the Rule does not treat place of entry as dispositive in determining asylum eligibility. First, does not differentiate between aliens based on whether they entered at or between ports of entry. *See, e.g.*, 8 U.S.C. § 1158(a)(1) (permitting an alien who arrives in the United States to apply for asylum "whether or not at a designated port of

arrival"). Because of the exceptions to both the Proclamation and the eligibility bar, aliens can remain eligible for asylum despite entering between ports of entry. Second, the eligibility bar considers the presence of exceptionally compelling circumstances, including for those who face an "acute medical emergency" or an "imminent and extreme threat to life or safety" and those who meet the definition of "victim of a severe form of trafficking in persons" provided by regulation. 89 Fed. Reg. at 48,732–33. Third, the eligibility bar does not apply to classes of aliens excepted from the Proclamation, including, among others, individuals whom immigration officials believe should be excepted based on relevant considerations. *Id.* at 48,715. In these respects, the Rule is like other statutory and regulatory asylum provisions that limit asylum for defined categories of aliens for reasons separate from the merits of their claims.

Because the asylum-eligibility restriction is not contrary to law, the district court's judgment otherwise should be vacated.

## III. The manifestation-of-fear standard is not arbitrary and capricious.

The Rule permissibly requires aliens to manifest a fear of return or express an intention to apply for asylum or a fear of persecution or

torture upon return to their country of removal, without prompting or questioning by the immigration officer, before being referred for a credible-fear interview. The INA directs immigration officers to refer aliens to an asylum officer for a credible-fear interview only where the alien "indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii); *accord id.* § 1225(b)(1)(A)(i). The statute does not define what circumstances constitute the requisite indication of intent or fear, nor does any language in the statute place an affirmative obligation on Defendants to question aliens about fear in their home countries or any intent to seek discretionary relief. To the contrary, the statute's plain language puts the burden on the *alien* to indicate either of the circumstances warranting referral. *See Indicate, Webster's New World College Dictionary* 687 (1996) (to "indicate" means to "show," "point out," "direct attention to," "express briefly or generally" or "give a sign, token, or indication of"). The Rule reasonably provides that an alien can do so at any time in the process, whether through words or actions. 89 Fed. Reg. 48,740. Without any explicit statutory directive otherwise, Defendants are entitled to create a process best suited to the specific exigencies the Rule is intended to address. *See Vt.*

*Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 543 (1978) ("Absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.").

The district court failed to heed the narrow review afforded agency actions under arbitrary-and-capricious review. Although the court acknowledged that Defendants need only have "acted within a zone of reasonableness," JA730 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)), it relied on a snippet of *Judulang v. Holder*, 565 U.S. 42, 58–59 (2011), to create the rule that "any rule or policy" under which two identically situated aliens might end up with differing outcomes is necessarily arbitrary and capricious. JA730, JA733. That sweeping rule cannot be correct. Individual immigration officers may well disagree about whether a particular action or behavior will constitute a manifestation of fear, especially in borderline cases. But certainly judges are not arbitrary and capricious just because they may disagree in borderline cases. The point of *Judulang*, rather, was the lack of a "set scheme in deciding what [removability] charges to bring"

46

and the lack of reason to believe that immigration officers brought those charges with an eye to the effect of those charges on aliens' ability to apply for waivers for certain criminal offenses. 565 U.S. at 58. In other words, what made the Board's policy in *Judulang* arbitrary and capricious was not the mere fact that officials might decide differently in a given alien's case but rather that there was nothing *guiding* officials' actions.

Here, far from selecting a removability charge without guidance, immigration officers will be looking for evidence of fear based on their extensive experience plus guidance on what to look for. As the Rule notes, "DHS immigration officers have expertise observing and inspecting individuals, as they consistently encounter and inspect large numbers of people every day." 89 Fed. Reg. at 48,743; *see id.* (noting "USBP's 20,000 agents encountered more than 2 million people on the SWB in FY 2023"). This expertise extends to "interacting with individuals and observing human behavior and in determining appropriate follow up steps with regards to any behaviors or indicators of concerns." *Id.* at 48,744; *see id.* ("Agents and officers can similarly use" skills in dealing with those suffering from trauma or physical or

medical distress in identifying "any manifestations of fear."). Further, "DHS will [also] provide immigration officers with information on how to apply the standard." *Id.*[10] Accordingly, the Rule adequately explains that DHS's operational "experience, coupled with guidance, will help agents and officers effectively identify aliens with potential fear or asylum claims under a manifestation approach." *Id.* at 48,744–45.

Instead of ensuring there was merely a reasonable basis for Defendants' decision to implement the standard, the district court substituted its own policy judgment for Defendants'. It credited an amicus's assertion that "[t]ypically, CBP officers are armed, do not 'share a common language with the [aliens] they encounter,' and interact with [aliens] in 'confined physical spaces,' like vans and small rooms, which may discourage [aliens] from manifesting fear." JA732 (quotation omitted). But the district court did not go through a months-long notice-and-comment process where that very amicus had the opportunity to submit its concerns. Defendants are entitled to select a policy so long as it is based on reason, and the reason here is simple—

---

[10] The district court faulted Defendants for not putting that guidance in the record. JA731. But it *is* in the record. JA552–53.

reducing the likelihood that aliens without any actual fear or intention to seek asylum would nonetheless respond in the affirmative under the old practice of giving aliens specific advisories. 89 Fed. Reg. at 81,160. Further, immigration officers have experience recognizing when aliens are actually afraid to go back to their home country because they see immigrants day-in and day-out. Couple that with guidance provided to the immigration officers in executing their duties, including to "err on the side of referral" for a credible-fear interview, 89 Fed. Reg. at 81,240, and the signs and videos advising aliens that they may manifest a fear at any time, 89 Fed. Reg. at 81,239, and there is ample rationale supporting Defendants' manifestation policy. The district court instead made a naked policy judgment that those reasons were "not enough to overcome the problem" that the process wasn't "objective" enough for the court. JA733 (quoting Pls.' Mot. Summ. J. 27). Subjectivity is not arbitrariness so long as it is guided by reason, as it is here.

As the district court stated, "[t]he APA does not demand perfection, but it does require reasonableness." JA733.[11] But

---

[11] Indeed, there is no claim that the manifestation standard is perfectly accurate. And in emergency border circumstances, the standard balances the need to consider aliens' claims with the requirements of

"[c]ompeting views about policy do not render an agency's action arbitrary and capricious." JA737 (quoting *Defs. of Wildlife v. Zinke*, 849 F.3d 1077, 1089 (D.C. Cir. 2017). The manifestation standard is reasonable. This Court should vacate the district court's judgment otherwise.

## IV. The Guidance on minimum consultation time is not arbitrary and capricious.

To promptly conduct expedited-removal proceedings for aliens described in the Proclamation and the Rule, DHS issued the Guidance, which set a four-hour minimum consultation period from the time the alien is given access to a phone. *See* JA320–22 (noting that those four hours must be between 7 a.m. and 7 p.m. local time). The four-hour consultation period is consistent with DHS's statutory and regulatory authority. Under the expedited-removal statute, "[a]n alien who is eligible for" a credible fear interview "may consult with a person or persons of the alien's choosing prior to the interview or any review thereof, *according to regulations prescribed by the* [*Secretary*]." 8 U.S.C

---

expeditiously processing high numbers of aliens. 89 Fed. Reg. at 48,744 (noting use "in *other urgent and challenging situations*" or to deal with "*urgent, exigent circumstances*") (emphasis added). The district court failed to acknowledge this policy judgment.

§ 1225(b)(1)(B)(iv) (emphasis added). Congress did not prescribe any specific time frame in which consultation should take place, but it directed that "[s]uch consultation . . . shall not unreasonably delay the process." *Id.* The implementing regulations in turn provide that "[s]uch consultation shall be made available in accordance with the policies and procedures of the detention facility where the alien is detained, shall be at no expense to the government, and shall not unreasonably delay the process." 8 C.F.R. § 235.3(b)(4)(ii). The regulation specifically notes that the consultation right depends on the "policies and procedures" adopted by DHS, *id.*, and neither the statute nor the regulation prescribes a minimum time that must be provided for that consultation or defines the term "unreasonable delay."

In establishing the minimum four-hour consultation period, the guidance reasonably implements the statute and regulations. It explains that, "as part of a whole-of-DHS approach, this change to the minimum consultation period will support DHS with operationalizing across its components the requirements set forth in the Presidential Proclamation of June 3, 2024 and the Securing the Border IFR" because "DHS and USCIS's resources are strained, and reasonable attempts

51

must be made to expeditiously conduct expedited removal proceedings for aliens arriving during circumstances described in the Presidential Proclamation." JA321–22.

To do this, DHS must "maximiz[e] the use of expedited removal, and in turn, the number of credible fear screenings that can be conducted." JA322. "Lengthy consultation periods, including the 24-hour consultation period, cause credible fear screenings to be delayed, increasing the amount of time aliens remain in immigration detention," and "[d]elays in the credible fear screening under such circumstances directly contribute to a situation where DHS's capacity can quickly become overwhelmed." JA322. DHS concluded that "[t]hese factors in circumstances described in the [Rule] constitute unreasonable delays in the [credible-fear] process," noting that neither the statute nor the regulations set a minimum consultation period. JA322. The guidance thus invokes and reasonably interprets the statutory requirement to not "unreasonably delay" proceedings in implementing this change. JA321–22. Congress did not prohibit the Departments from considering systemic needs when determining what amount of information about the asylum process should be provided to aliens. And the Departments

could reasonably consider that, when the existing regulations were adopted in 1997, asylum officers conducted 3,000 credible-fear interviews a year, whereas in 2024 they conducted on average over 3,000 credible-fear interviews *per week*. 89 Fed. Reg. at 48,742. Defendants reasonably concluded that a longer consultation period in the face of these increased numbers and emergency border circumstances would unreasonably delay the expedited removal process.

Rather, DHS must balance competing interests inherent in the statute and regulation: providing an opportunity to consult according to regulations prescribed by the agency while also complying with the clear statutory imperative to ensure consultation "shall not unreasonably delay the process." 8 U.S.C. § 1225(b)(1)(B)(iv); *see* 8 C.F.R. § 235.3(b)(4)(ii).

Although the Guidance shortens the consultation period to prevent unreasonable delay, it also provides a meaningful opportunity to consult. It provides that the four-hour period does not begin until after "CBP or ICE provides the individual with an opportunity to consult—i.e., when the individual has access to a phone." JA321–23. It ensures the alien has been given information about the credible-fear

interview process and the right to consult. JA321–23. And it requires

that the alien receive a list of free legal-services providers posted in

CBP facilities and ICE detention centers. JA321–23. Additionally, the

four-hour consultation period runs only between the hours of 7:00 a.m.

and 7:00 p.m. local time, stopping the clock at times when legal-service

providers are less likely to be available for consultation. JA321.

The district court incorrectly concluded that the Guidance failed to

explain "how or why a 4-hour period is sufficient to provide [aliens] with

a meaningful—or actual—opportunity for consultation." JA739. The

Guidance *did* discuss the sufficiency of the 4-hour consultation period.

It cited *Las Americas Immigrant Advocacy Center v. Wolf*,

507 F. Supp. 3d 1, 30 (D.D.C. 2020), which found that "an initial one-

hour period for telephonic consultation, with [a] 30-minute follow-up as

needed . . . provided a legally sufficient opportunity to consult with

others, including a lawyer, before their credible fear interviews." JA322

n.2 (quotations omitted). And the Guidance also concluded that four

hours is "sufficient . . . for individuals to make multiple phone calls and

have in-depth conversations"—indeed, that it gives aliens "an

opportunity to consult with a person(s) of their choosing during times

54

when legal services providers are most likely to be available." JA322. Although the district court faulted the Guidance for letting the four-hour consulting period run during weekends and holidays, *see* JA740, the court ignored that, in this respect, the Guidance is "like" the prior 24-hour consultation rule. JA322. Indeed, DHS "recognize[d] that it may be more difficult for" aliens to consult with others under the new rule, JA322, establishing that the agency considered this "important aspect of the problem" before it, *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Thus, DHS "reasonably considered the relevant issues and reasonably explained the decision" to issue the Guidance. *Prometheus Radio Project*, 592 U.S. at 423. And even though the Guidance may be terse, even a "skeletal" explanation suffices "'if the agency's path may reasonably be discerned.'" *Alaska Dep't of Envt'l Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

The district court also wrongly faulted the Guidance for failing to "provide any evidence that the [prior] 24-hour window caused unreasonable delays." JA739. But the Guidance discusses DHS's

judgment that during times of high border crossings, a systematic reduction in consultation time for aliens is warranted. It notes that shortening the consultation time to four hours "will enable the screening of a majority of migrants on the same day they are processed," with attendant efficiency benefits. JA322. While that is not an express conclusion that a 24-hour consultation period is unreasonable, it is a reasoned explanation for why a 4-hour consultation period is reasonable during periods of high border encounters.

The district court's judgment again ultimately boils down to a policy judgment that Defendants' evidence and rationale is not good enough. But the district court may not "second-guess[] the [Departments'] weighing of risks and benefits" and "substitute [its own] judgment for that of the agenc[ies]." *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2571 (2019). Defendants considered the relevant evidence and provided a reason for the changes with a rational connection to the facts. Because arbitrary-and-capricious review requires nothing more, this Court should vacate the district court's judgment with respect to the Guidance.

**V.  Defendants preserve their argument that 8 U.S.C. § 1252(f)(1) prohibits vacatur.**

The district court also held that 8 U.S.C. § 1252(f)(1), which "generally prohibits lower courts from entering injunctions that order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out," expedited removal, *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022), does not apply to the remedy of APA vacatur. This Court recently agreed. *See Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119–20 (D.C. Cir. 2026).

Defendants disagree with that holding and expressly preserve this issue for future review.

## Conclusion

The district court's judgment should be vacated with respect to the asylum-eligibility restriction, the manifestation standard, and the Guidance, and the case should be remanded for further proceedings. The district court should further be instructed to dismiss the organizational plaintiffs' claims on remand.

Respectfully submitted,

**Brett A. Shumate**
Assistant Attorney General
Civil Division

**Ernesto H. Molina**
Deputy Director
Office of Immigration Litigation

s/Christopher Ian Pryby
**Christopher Ian Pryby**
California Bar No. 334613
D.C. Bar No. 90030774
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 598-5526
christopher.i.pryby@usdoj.gov

Dated: August 5, 2026

*Counsel for Defendants–Appellants*

**Certificate of Compliance
for Briefs Submitted Under Fed. R. App. P. 32(a)(7)(B)**

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts exempted by Fed. R. App. P. 32(f), it contains 10,805 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft® Word for Microsoft 365 MSO (Version 2606 Build 16.0.20131.20152) 64-bit.

Dated: August 5, 2026                    s/Christopher Ian Pryby
                                         **Christopher Ian Pryby**